M. Anderson Berry (SBN 262879)
*aberry@justice4you.com*
Gregory Haroutunian (SBN 330263)
*gharoutunian@justice4you.com*
Brandon P. Jack (SBN 325584)
*bjack@justice4you.com*
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
12100 Wilshire Boulevard, Suite 800
Los Angeles, CA 90025
Telephone: (747) 777-7748
Fax: (916) 924-1829

William B. Federman* (OK Bar No. 2853)
*wbf@federmanlaw.com*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

*Pro Hac Vice application forthcoming*
*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER MALONEY**,** Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MULLEN AUTOMOTIVE, INC. F/K/A NET ELEMENT, INC., DAVID MICHERY, and JONATHAN NEW,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jennifer Maloney ("Plaintiff"), individually and on behalf of all other persons similarly situated, for Plaintiff's complaint against Defendants (defined below), alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mullen Automotive, Inc. ("Mullen", the "Defendant", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.       This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Mullen securities between February 3, 2023, and March 13, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and the rules promulgated thereunder.

///

///

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

2.      The claims asserted herein arise pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged material misrepresentations and omissions. *See* Exhibit 1.

7.      Defendant Mullen purports to be an electronic vehicle ("EV")

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

manufacturer. On November 5, 2021, Mullen Technologies, Inc. underwent a merger with and into Net Element, Inc., and the Company changed its name to Mullen Automotive, Inc. (the "Merger").

8.    Defendant Mullen is incorporated in Delaware with its principal executive offices at 1405 Pioneer Street, Brea, California 92821. The Company's shares trade on the NASDAQ exchange under the ticker symbol "MULN."

9.    As to Individual Defendants David Michery and Jonathan New (collectively the "Individual Defendants"):

a.    Defendant David Michery ("Michery" has served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of the Company following the Merger. Prior to the Merger, Defendant Michery served as the CEO of Mullen Technologies, Inc. It is believed Michery is a resident in this District.

b.    Defendant Jonathan New ("New") has served as the Chief Financial Officer ("CFO") of Mullen since September 19, 2022. Prior to serving as CFO, New served as a director of the Company from November 2021 until September 2022. He also served as CFO of Motorsport Games, Inc. (NASDAQ: MSGM), from July 2018 to January 2020, during which time the Company

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

was alleged of fraud and federal securities violations.[1] Mr. New was also CFO of Mullen's predecessor Net Element, Inc., from 2008 to July 2018. It is believed New is a resident in this District.

10.    The Individual Defendants:

    a.  Directly participated at the top level of management of the Company;

    b.  were directly involved in the day-to-day operations of the Company at the highest level, and responsible for the omission of material facts and misrepresentations alleged herein;

    c.  were privy to and directly involved in confidential proprietary information concerning the Company and its business and operations;

    d.  were directly or directly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.  were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

---

[1]https://www.sportsgamersonline.com/featured/motorsport-games-future-in-question/ (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

f.  were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

11.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

12.    The scienter of the Individual Defendants is similarly imputed to the Company under respondeat superior and agency principles.

13.    The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Materially False and Misleading Statements**

14.    The Company's share price fell 99% between April 2023 and April 2024. As of April 15, 2024, the Company's stock price had fallen 73% in 2024, from $1,286.00 per share to $377.00 (adjusted for reverse splits) per share. The Company's share price had been artificially inflated due to the constant barrage of Defendants' false and misleading statements and material omissions of facts. When

the truth began to come to light the artificial bubble burst, negatively impacting the Company's share price.[2]

15.    The Company and Individual Defendants repeatedly engaged in a scheme to inflate the Company's stock price through press releases making false or misleading statements or material omissions, often before it executed a reverse stock split. The Company has executed four reverse stock splits:

- May 4, 2023, at 25:1;

- August 11, 2023, at 9:1;

- December 21, 2023, at 100:1;

- September 17, 2024, at 100:1.

The Defendants, their affiliates, and partners' public statements were materially false and misleading and/or omitted material information that resulted in an artificially inflated share price.

**The Company's Statements about its First Reverse Stock Split**

16.    The Company called a special shareholder meeting for December 3, 2022 to vote on four proposals, including: (1) a reverse stock split; (2) a switch of incorporation from Delaware to Maryland; (3) an increase to the number of allowable shares from 1.3 billion to 5 billion (despite just over 570 million of the 1.3

---

[2]  See https://invezz.com/news/2024/04/15/muln-stock-mullens-collapse-from-725-million-to-near-zero/ (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

billion shares having been authorized leaving plenty for the company to sell in the event it needed to raise capital); and (4) permission to issue new debt and class D shares to fulfill a prior securities agreement.[3]

17.     The Company announced on January 25, 2023, it "has no plans at the current time to effect a reverse split." The Company has until March 6, 2023, to meet the Nasdaq minimum bid requirement of $1.00.  If the share price of the Company's stock falls short of the said requirement, the Company intends to seek an extension from NASDAQ to meet the required threshold.  If such extension is granted, compliance of the minimum $1.00 stock share threshold requirement may be extended for a further 180 days until approximately September 6, 2023."[4]

18.     This was on the heels of, and contrary to, the Company's proposals presented at the Special Meeting of Stockholders the month before in December 2022 where Proposal No. 1 – The Reverse Stock Split Proposal passed.

The Reverse Stock Split Proposal "grants the Company … to effect a reverse stock split of our outstanding shares of common stock in an amount not less than 1-for-2 shares and not to exceed 1-for-25 shares,

---

[3]See        https://www.marketbeat.com/originals/the-next-catalyst-for-mullen-auto motive-stock-is-december-23rd/ (last visited January 16, 2025).

[4] Mullen Announces Result of Special Meeting of Shareholders (mullenusa.com); *see also* Form 8-k dated January 19, 2023. https://www.sec.gov/Archives/ edgar/data/1499961/000110465923005913/tm234238d1_8k.htm; Form 8-k dated January 25, 2023 https://www.sec.gov/Archives/edgar/data/1499961/00011046 5923008170/tm234957d1_8k.htm.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

with the exact ratio to be set within that range at the discretion of our

Board of Directors (the "**Reverse Stock Split**"); provided, however,

that the Company will not file such amendment before May 1, 2023 to

effect the Reverse Stock Split unless needed in order to maintain

continued inclusion in the Russell 2000, which requires a minimum

stock price of $1.00... the Board of Directors may effectuate the

Reverse Stock Split at any time, and at such time and date, if at all, as

determined by the Board of Directors in its sole discretion, but no later

than December 1, 2023, when the authority granted in this proposal to

implement the Reverse Stock Split would terminate."[5]

19.    The Company's CEO Michery was in favor of and had every intention of affecting the first reverse stock split at that time. This is evidenced by the Company's issuance of a single Class AA preferred stock with inordinate voting power issued to Michery which was redeemed soon after the proposal for the reverse stock split passed.

"Shortly before the announcement for the special meeting the company

announced Mr. Michery had bought a single share of Class AA

preferred stock. The share cost $25,000 and comes with 1.3 billion

---

[5] Form 8-k dated January 19, 2023, https://www.sec.gov/Archives/edgar/data/1499961/000110465923005913/tm234238d1_8k.htm.

votes which are counted in proportion to other voting class shares. The factor that points to Michery's favoring the reverse split is that his share is immediately redeemable for cash upon the passage of the proposal."[6]

Michery and the Company filed notice of the Cancellation of the Certificate of Designation of Series AA Preferred Stock (Michery's AA preferred stock) after it had been automatically redeemed for cash and served its purpose in voting to pass the proposals related to the first reverse stock split. "As reported in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission ("**SEC**") on November 14, 2022, Mullen Automotive Inc. (the "**Company**") filed, on November 14, 2022, a certificate of designation with the Secretary of State of the State of Delaware that designated the rights, preferences, privileges and restrictions of one share of Series AA Preferred Stock (the "**Series AA Certificate of Designation**"). On January 19, 2023, the Series AA Preferred Stock by its terms was automatically redeemed, as described in the Company's definitive Proxy Statement filed with the SEC on November 25, 2022 and

---

[6] https://www.marketbeat.com/originals/the-next-catalyst-for-mullen-automotive-stock-is-december-23rd/ (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Amendments to the Company's definitive Proxy Statement filed with the SEC on December 16, 2022 and January 13, 2023 (collectively, the "**Proxy Statement**").

Pursuant to the terms of the Series AA Certificate of Designation, upon redemption, the share of Series AA Preferred Stock redeemed was automatically retired and restored to the status of an authorized but unissued share of preferred stock, par value $0.001 per share ("**Preferred Stock**"), of the Company. On January 30, 2023, the Company filed a certificate of cancellation (the "**Certificate of Cancellation**") with the Secretary of State of the State of Delaware, effective as of the time of filing, cancelling the Series AA Certificate of Designation, and thereby eliminating all Series AA Preferred Stock. The foregoing description is qualified in its entirety by the full text of the Certificate of Cancellation, which is filed as Exhibit 3.1 to this Current Report on Form 8-K, and is incorporated herein by reference."[7]

20.    The Company saw an increase in its share price that coincided with this announcement reaching a peak the following week. However, the price soon fell

---

[7] https://www.sec.gov/Archives/edgar/data/1499961/000110465923008170/tm234957d1_8k.htm (last visited January 16, 2025).

steeply, only seeing meaningful uptick in share price coinciding with other fraudulent misrepresentations or omissions, such as when the Company announced a partnership with Lawrence Hardge and his "innovative" battery technology discussed below.

21.     The Company announced on May 3, 2023, that "it will effect a 1-for-25 reverse stock split ("Reverse Stock Split") of its common stock, par value $0.001 per share ("Common Stock"), that will become effective on May 4, 2023, at 12:01 a.m., Eastern Time. Mullen's Common Stock will continue to trade on The Nasdaq Capital Market ("Nasdaq") under the existing symbol "MULN" and will begin trading on a split-adjusted basis when the market opens on May 4, 2023. The new CUSIP number for the Common Stock following the Reverse Stock Split will be 62526P 208."[8]

**The Company's Joint Venture Mullen Advanced Energy Operations and Lawrence Hardge**

22.     Less than one month prior to the Company's first reverse split, on April 18, 2023, the Company announced it was forming a joint venture, Mullen Advanced Energy Operations, LLC, ("MAEO"), with Global EV Technology, Inc., to "advance energy management technologies, starting with electric vehicles and

---

[8]https://www.sec.gov/Archives/edgar/data/1499961/000110465923056549/tm2314656d1_ex99-1.htm#:~:text=(NASDAQ%3A%20MULN)%20(%E2%80%9C,%3A01%20a.m.%2C%20Eastern%20Time (last visited January 16, 2025).

scaling to other energy applications."[9] The Company's press release announcing the joint venture stated:

> Under the newly formed entity, the Company "owns 51% and will consolidate the results of its operations in Mullen Automotive, Inc. Under the agreement between the parties, Global EV Technology will be contributing its technology and existing contracts to MAEO, and Mullen will provide capital, execution and commercialization to grow the business." *Id.*

> "Both companies will be contributing and working together on **known verified technology** for improving existing vehicle performance and extending battery range. As **this technology has immediate and key implications for electric vehicles**, MAEO's initial development is focused on improving Mullen's lineup of commercial and consumer EVs."

> "The founder of Global EV Technology Inc., and chief scientific officer, Lawrence Hardge, is a successful life-long inventor with a

---

[9]https://news.mullenusa.com/mullen-automotive-inc.-forms-mullen-advanced-energy-operations -llc (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

storied career of over 30 yrs. Lawrence's accomplishments include the following:

- Holds over 120 intellectual prototypes as well as numerous patents and trademarks.

- Inventor of Knock Out 360 Fire Extinguisher. One of the only extinguishers in the U.S. market that is UL approved for use in electric vehicle fires.

- Featured in various magazines, including Barron's.

- Received Spirit Award from the Detroit City Council for providing Knock Out 360 Extinguishers to local residents.

- Lifelong resident of his hometown, Vicksburg, Mississippi, with a dedicated focus on helping his community.

- Provided scholarships to high school students who achieved honor roll status, who otherwise could not afford to attend college, as well as provided clothing, computers, housing, and utilities.

- Honored by the town of Vicksburg for black history month."

*Id*.

"In the late 90s, Lawrence was convicted of a state crime, which was ultimately expunged. Despite these challenges, Lawrence focused his

energy and attention on his natural gift for inventions related to electrical equipment and batteries and has dedicated his career to bringing them to market." *Id.*

"My partnership with Mullen is very important to help scale this energy technology and bring it to our existing and future customers," said Hardge. *Id.*

"Lawrence is a talented inventor, and we are excited to begin working with him on improving electric vehicle performance," said David Michery, CEO and chairman of Mullen Automotive. "We are always looking for forward-thinking and ground-breaking technology opportunities and are pleased to partner with Global and EV Technologies." *Id.*

23.    The Company, in conjunction with MAEO, announced it had made a "Major Energy Advancement" based on "test results of its recently acquired joint venture technology, greatly improving current EV performance by increasing EV vehicle range."[10] The Company's press release stated:

---

[10] https://www.globenewswire.com/news-release/2023/04/20/2651090/0/en/Mullen-Advanced-Energy-Operations-Announces-Major-Energy-Advancement.html (last visited January 29, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"Element Materials Technology test results indicate that the Energy Management Module ("EMM") technology substantially increases the driving range and efficiency of any current EV battery." *Id*.

"Specific vehicle testing of a high-volume OEM electric vehicle by Element resulted in a calculated increase in range from 269 to 431 miles, which is a 60% increase in efficiency.

EMM technology was also tested by Mullen Automotive engineers on the Company's Class 1 EV Cargo Van at its Troy, Michigan, facility. Results showed more than a 75% increase in range for the 42-kWh lithium-ion battery pack, which would be a calculated EPA estimated range of 186 miles at a very low added cost and mass." *Id*.

"EMM technology is being integrated into final stages of product development and is planned to be introduced in all Mullen commercial and consumer vehicle programs.

U.S. provisional patent application has been filed covering the technology." *Id*.

Mullen Automotive owns 51% of MAEO, LLC and will consolidate the results of its operations in Mullen Automotive, Inc. *Id*.

"We have tested EMM technology in various vehicle applications and have repeatedly seen significant improvements in range. I am extremely pleased to partner with Mullen for the commercialization and global availability of the EMM technology," said Lawrence Hardge, CEO of Global EVT. *Id*.

"Seeing the previous EMM test results conducted by Element, along with Global EVT testing, and correlating that with testing by our engineers, we believe this technology is a perfect fit for Mullen's EV product lineup as well as the advancement in EV technology for the overall automotive industry," said David Michery, CEO and chairman of Mullen Automotive. "Mullen Advanced Energy Operations plans on licensing this technology to anyone who uses an electric vehicle." *Id*.

24.     Immediately following the Company's first reverse stock split, it announced its "Energy Management Module ("EMM") technology was tested by Hardge and Mullen engineers on the Company's EV Cargo Van at its Troy, Michigan, facility, with testing results showing an increased battery capacity of 44%."[11]

---

[11] https://news.mullenusa.com/mullen-automotive-provides-business-update (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

25.    The Company and MAEO's announcements with Hardge came following allegations and litigation about alleged previously false and misleading statements regarding the Company's battery technology. The Company and Michery were attempting to rebut the damning allegations put forth in the Hindenburg report[12] regarding the Company and its solid-state battery technology which stated the following, in pertinent part regarding Mullen's battery technology and capabilities:

- The company's stock has spiked ~316% in the past couple of months driven by retail investor euphoria over bold claims of ground-breaking technology, near term production of its EV vans, and a major as-yet-unnamed Fortune 500 customer.

- Despite only spending ~$3 million in R&D in 2021, Mullen claims its solid-state battery technology is on track for commercialization in 18 to 24 months, putting it head of every major technology and automaker in the industry who have collectively invested billions on solving the problem.

- Mullen recently press released an update on its battery testing, sending its stock soaring 145% in a day. In reality, the "news"

---

[12] https://hindenburgresearch.com/mullen/ (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

appears to be a rehash of testing the company had already announced in 2020.

- Mullen apparently misrepresented the test results, according to the CEO of the company that performed the tests. Its CEO told us of Mullen's press release: "We never would have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery."

- Then, on February 28th, 2022 the company made a surprising announcement. Despite spending only $3 million in R&D during its entire fiscal 2021, Mullen claimed it had made progress and "significant advancement'" on development of solid-state batteries, a widely regarded "holy grail" of the EV battery industry that has long-eluded tech and automaker giants such as Panasonic and Volkswagen. The stock rallied ~145% on the day.

26.     Mullen shares closed higher on April 18, 2023, by 25% following the submission of a Form 8-k detailing the MAEO Joint Venture, adding that the purpose

is to advance a device previously known as a battery life enhancing technology along with ever-charge technology and/or energy management module.[13]

27.    The Company, on May 15, 2023, announced "an update on the pilot program contract for installation of Energy Management Modules ("EMM") on Washington, D.C., city government's fleet of vehicles. The $680,000 contract was previously awarded by the District of Columbia, Washington, D.C., to EV Technologies, LLC. for the purchase and installation of EMM units on Chevrolet Bolts within the D.C. city government's vehicle fleet." The announcement added that:

> Mullen Advanced Energy Operations ("MAEO") is supporting EV Technologies for the execution of the contract, which started April 24, 2023. MAEO, which is a 51%-owned subsidiary of Mullen Automotive, is a collaboration with Global EV Technology, Inc. ("Global").
>
> MAEO has named Lawrence Hardge to the position of senior vice president of technology. Lawrence will be overseeing all technological aspects of the Energy Management Module ("EMM") applications.

---

[13] https://www.fastcompany.com/90917450/lawrence-hardge-mullen-automotive-ev-battery (last visited January 16, 2025).

"We look forward to completing our installation work here in D.C. and the next steps as vehicles enter the fleet with our EMM and also future opportunities with the local and federal government agencies," said Lawrence Hardge, CEO of EV Technologies, LLC.

"As testing and installations continue in D.C., we will provide further updates," said David Michery, CEO and chairman of Mullen Automotive.

28.     On the heels of the Company's May 15, 2023, announcement, Chief Science Officer Lawrence Hardge announced via Facebook live a $10 billion dollar contract with Saudi Arabia.

Hardge went on a Facebook live in early to mid-April to discuss the JV and stated, *"This is not what somebody said or what you heard, this is reality. $10 billion contract with Saudi Arabia* [(the "Saudi Deals")]. *And more to come … Mullen and Lawrence Hardge are here to assist them, they have countries like Yemen, Israel, all of them have joined in to take this technology, and they're going to produce it in Saudi Arabia and they're also paying for a manufacturing plant to come to Michigan. That's in black and white. **So, the SEC if you're watching, that's already agreed upon.***"[14] The video has since been deleted.

---

[14] https://investorplace.com/2023/04/muln-stock-alert-mullen-surges-on-deal-with-lawrence-

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Hardge subsequently addressed his Facebook live statements in another Facebook live by saying there are "*three deals in the Middle East…This is tentative. We already committed, the deals are committed, so nobody can back out…Several multi-billion-dollar deals coming out of the Middle East, some that's coming out of Asia.*"[15]



hardge/ (last visited January 16, 2025).
[15]    https://franknez.com/lawrence-hardge-provides-new-update-on-mullen-saudi-deal/ (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

29.     Mullen CEO David Michery did not publicly state anything about the Saudi Deals until June 6, 2023, after receiving the benefit of the stock bump.[16] Michery said Hardge has a carve out and Mullen agreed to that carve out exclusion and Hardge's Saudi Deals have "no impact" on Mullen and he reviewed no documents regarding any purported Saudi Deals. This information was not disclosed in the Company's April 18, 2023, announcement. Still Michery, and the Company, projected confidence and trust in Hardge. Michery stated about Hardge, "We can't find which lawyer is representing him... But I do believe in him as a person. I think he's a great inventor."[17]

30.     The Company also announced on May 15, 2023, that its joint venture MAEO would benefit from the $680,000 contract "awarded by the District of Columbia, Washington, D.C., to EV Technologies, LLC for the purchase and installation of EMM units on Chevrolet Bolts within the D.C. city government's vehicle fleet."[18]

> "We look forward to completing our installation work here in D.C., and the next steps as vehicles enter the fleet with our EMM and also future opportunities with the local and federal government agencies," said Lawrence Hardge, CEO of EV Technologies, LLC.

---

[16] MULN Stock Alert: Mullen Surges on Deal With Lawrence Hardge | Investor Place (last visited January 16, 2025).
[17] https://www.youtube.com/watch?v=ukltbyOaNzo (last visited January 16, 2025).
[18] https://news.mullenusa.com/mullen-advanced-energy-operations-provides-may-15-update-on-emm-testing-and-installation-with-d.c.-city-government (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"As testing and installations continue in D.C., we will provide further updates," said David Michery, CEO and chairman of Mullen Automotive.

31.     The Company's July 10, 2023, Form 8-K informed investors that the Company had terminated its relationship with Lawrence Hardge and Global EV Technology, Inc.[19] The Company stated:

"On July 10, 2023, the Company issued a notice terminating the Agreement dated April 17, 2023. The termination notice, which was sent after numerous attempts by the Company to obtain adherence by EVT to the terms of the Agreement, references several breaches by EVT including (1) failing to execute documents evidencing an irrevocable, royalty free, worldwide exclusive license to the Technology and IP, in perpetuity, to MAEO, (2) refusing to conduct any tests of the Technology at a Mullen approved facility after the LOA, (3) repeatedly refusing to honor the terms of the Mutual Non-Disclosure Agreement signed April 14, 2023, and (4) failing to disclose all claims or threatened legal actions by any third parties related to the Technology. MAEO has not had significant transactions since formation."

---

[19] https://www.sec.gov/Archives/edgar/data/1499961/000155837023011783/muln-20230710x8k.htm (last visited January 16, 2025).

**The Truth Emerges About Lawrence Hardge, MAEO, and the Battery Technology**

32.    In July, immediately following Mullen's Form 8-k announcement regarding termination of its relationship with Hardge, a July 17, 2023, report from Nathan Baca (WUSA9) in Washington D.C. was published. It stated:

> "Self-described inventor Lawrence Hardge created a small box to be installed into D.C.'s parking enforcement vehicles. **Electrical engineers say this product is untested and practically impossible**." (emphasis added).

> "There's not technologies that I'm aware of that can really boost that same battery pack to significantly more than 200 mile range," said Paul Albertus, associate director of the Maryland Energy Innovation Institute. "There's a variety of limitations just from basic chemical theory. There's only so much energy you can store for the materials that you put into a battery."

> UMD's experts add that any experimental ways to slightly re-energize a battery involve breaking it open, not wiring a box to it as Hardge claims he can do.

///

WUSA also told General Motors, maker of the Chevy Bolts, what Hardge is working on and asked what they know about his claims.

"We have not been involved in this project and are not aware of this specific technology," General Motors wrote in a statement.

**"Court documents show Hardge was sentenced to 26 years in prison for a felony conviction in 2001. He was found guilty of selling unregistered securities from his home state of Mississippi. Hardge served five years in prison and tried to expunge, or wipe, his criminal record in 2021. A Mississippi judge rescinded Hardge's temporary felony expungement in March 2022, after a judge's order shows allegations surfaced that Hardge used business investor's money to repay the people he defrauded in 2001."** (emphasis added.)

Six weeks after we alerted DC about Hardge and his claims, on July 13, DC government told WUSA9 it "terminated" the contract due to "violations of terms of the agreement." It added DC would not pay Hardge any money.

33.     The following was disclosed in a follow up report by Nathan Baca published August 7, 2023.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lawrence Hardge stated, "What I created was simple. Nobody thought of it. I filed a patent on it, okay. What I created instead of having a combustible, alternator, I created an all-electric battery, and it is an energy management system. Basically what it is, sir, is the all-electric generator. I've taken the old battery energy, design a generator, where you see the box, my system is plugged in the box, which is an all-electric generator. And that's why I beat out everybody in the world."

**"First, Hardge claims that his felony record for illegally selling stocks in 2001 was expunged, or wiped, when entering into a contract with DC government. We obtained a judge's order rescinding that expungement after allegations surfaced that Hardge used business investor's money to repay the people he defrauded in 2001. It's dated March 2022. The DC contract was awarded February 2023. Hardge was a felon convicted of business crimes during the DC contract and remains so." (emphasis added).**

Second, WUSA9 asked Hardge for the certified test results he claims reported his technology works. **Paperwork he gave us show Hardge paid Element labs of Michigan to put his modified car through some mileage tests. But the lab came to no conclusion, writing "to**

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**be determined by Hardge Global Technologies, LLC.**" (emphasis added). Hardge provided no testing reports coming to an independent conclusion that agreed with his claims.

Meanwhile, after we aired our original story, **Hardge's former bankruptcy trustee sent us a letter he wrote to Michigan regulators in 2019 calling Hardge a "fraudster" who "defrauded investors $2,145,000.**" (emphasis added).

34.     Other articles as early as June 8, 2023, began reporting on Lawrence Hardge's past that Michery and the Company failed to disclose to investors in their press releases and public statements. For example, Lawrence Hodge (not to be confused with Lawrence Hardge) published a report on June 8, 2023.[20] This report states in part:

Lawrence Hardge is an inventor who is known for coming up with something called the Knock Out 360 Fire Extinguisher, which Consumer Reports didn't approve of. It's not even listed for sale on Amazon anymore. Aside from that, he's also the founder and CEO of a company called Global EV Technology. Their claim to fame is something called Ever-Charge Technology. It comes with bold claims:

---

[20] https://jalopnik.com/im-not-ev-startup-executive-lawrence-hardge-1850517820 (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

it's a cellphone-sized device that can be attached to any EV and enhance its battery performance. *Id*.

Hardge's claims were that, "According to testing completed by Element, our Ever-Charge Technology increases typical EVB runtimes by up to 300+ percent and extends the mileage and range capacity of almost any EVB by hundreds of miles. Under the right conditions, the ranges of top EVs may increase by close to 500 to 700 miles. The Ever-Charge™ Technology has been tested in several EVs in labs and on roadways. It allows EVs to charge fully at lightning speeds at public charging stations in 15-20 minutes or within 1 hour at home, saving time and energy resources. It also saves money by extending battery life. The Ever-Charge™ Technology reduces the need for frequent charging. The Ever-Charge™ Technology rejuvenates parked & cold batteries unplugged 100% in 24 hours." *Id*.

The results of the testing mysteriously disappeared, but I managed to find them: buried in the pictures on Hardge's Facebook profile are two pages of what's supposed to be a 14-page report. If you look closely you'll see that the main details left out of both the description of the Ever-Charge Technology and its release announcement were that the

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

test was performed using a GEM E6, one of those small golf cart like EVs retirees use down in Florida. *Id*.



[Testing] wasn't performed on a "top EV" as the description mentions. The test was also done without the drive wheels touching the ground. Basic science tells us that low rolling resistance and a lighter load on the battery are going to mean a higher range. But this all just points to the testing being purposely presented as misleading. I reached out to Global EV Technology to see if they could explain their tech a bit more and was met with silence. *Id*.

///

**Still, this was all enough to convince a Southern California-based EV startup called Mullen Automotive that Hardge was the man for the Senior Vice President of Technology job at a newly formed partnership between Mullen and Global EV Technology called Mullen Advanced Energy Operations**. *Id.* (emphasis added).

35.    The Company's statements about Lawrence Hardge's criminal history were false and misleading. This was confirmed by Clint Rainey in an article published July 5, 2023.[21] The article states in part:

In 2021, an inventor named Lawrence Hardge convinced the CEO of a Tennessee medical company to invest a hefty sum of money into his "Black Box Technology," an energy system he said would

---

[21]    https://www.fastcompany.com/90917450/lawrence-hardge-mullen-automotive-ev-battery (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

revolutionize electric car batteries. He vowed it could triple vehicle performance, and better yet, regenerate power without being plugged in. Essentially, he was touting a perpetual-motion machine, and argued he only needed $300,000 to complete it. *Id.*

What the investor, Roger Biles, didn't know was that back in 2001, Hardge had been convicted of eight counts of securities fraud, sentenced to 20 years in prison, and ordered by the state of Mississippi to pay fines and restitution equaling $291,497.31. Two days after Biles' funds cleared, Hardge paid back what he owed using the same account where that capital had been deposited, according to documents Biles later introduced in court. Satisfied that Hardge had repaid his legal debt to society, the state granted his request to expunge his felony criminal record. It might have stayed expunged, too—except Hardge allegedly bragged about his scheme immediately, leading the court to rescind his expungement order one month later. *Id.*

Biles contends, in a lawsuit now being heard in a Tennessee court, that he was defrauded "in a fashion similar to the acts for which Hardge was originally convicted"—which include not just embezzling money, but

also refusing to pay $105,000 for Biles' electric Porsche that was negotiated into the deal. *Id*.

It has also unleashed a wider scandal, one that could implicate an emerging California electric carmaker—Mullen Automotive—whose soaring popularity in the world of meme stocks is owed at least in part to a partnership it forged with Hardge. *Id*.

In April, Mullen and Hardge announced a joint venture to install his supposedly self-regenerating battery technology in its electric vehicles, then scale it to golf carts, drones, wheelchairs, e-bikes, anything electric—a veritable game changer worth billions, if it existed. Mullen's shares enjoyed a 24% bump within one day as investors swooped in, dreaming of their own massive, Tesla-style payday. But just months later, a growing number of investors are now doubting if Hardge's device was real, asking if Mullen ever even believed it was, and wondering if that duo has simply taken them all for a ride. *Id*.

There's little mystery why Mullen has teased Hardge's battery system as an industry-shaking technological advancement: It's widely understood that the first American company to produce a scalable solid-state battery—one that's cheaper, faster-charging, and less reliant on

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Chinese materials—will control the holy grail of power sources. Mullen's hype around a "major energy advancement" builds on bold, specific claims that Hardge has made—among them that his technology gives EVs "at least 500 miles to the charge," which is a lot, and "rejuvenates parked and cold batteries unplugged 100% in 24 hours." Mullen Advanced Energy Operations, its joint partnership where Hardge serves as senior vice president of technology, has touted a separate device dubbed the Energy Management Module. Mullen has said in press releases that when Hardge and Mullen's engineers tested it in January on Mullen cargo vans at Mullen's facility in Troy, Michigan, battery capacity increased by 44%. *Id.*

Two days after the automaker announced the formation of Mullen Advanced Energy Operations, Hardge told online followers that they had already inked a $10 billion megadeal with the Saudi Arabian government, causing the stock to surge. Among his claims in a Facebook Live video were that the Saudis had agreed to build a manufacturing facility in Michigan, and that Yemen and Israel were in on it too, before he tacked on: "The SEC, if you're watching—that's already agreed upon." *Id.*

Last year, shares were moving at the level of tens of thousands per day, according to Nasdaq's numbers. But by late June, that number had climbed significantly. On June 27, MULN trades cracked an astounding 433 million. That volume accounts for nearly one in every 12 Nasdaq shares traded that day—almost double the action that Apple, Disney, Amazon, and Google saw combined. *Id*.

To capitalize on the attention, Mullen touted new deals it swore were forthcoming, going so far as to claim that some, such as Hardge's battery technology, would upend the industry.

In its initial press release announcing the partnership with Hardge, the company included a strangely vague acknowledgment: "In the late '90s, Lawrence was convicted of a state crime, which was ultimately expunged." It's known now that this was patently untrue. The question is, what did Mullen know in April? Did it fail to conduct due diligence on a major business partner? Did it ask Hardge and he lied? Or was Mullen aware that Hardge's felony conviction was "expunged" for a mere 10 months and then reinstated? *Id*.

36.    The first signs from the Company and Lawrence Hardge that they were not able to continue with the joint venture (that had sent the share price soaring) were

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

now causing the stock to plunge.[22] "It also appears that communication between Hardge and Michery had deteriorated, as Hardge alleged that the two executives don't speak anymore.

> *"But I can't speak on David, we don't talk. But I can tell you this here: I didn't sign up for this."*

In an interview that summer, CEO David Michery stated:

> *"So, we sent [Lawrence Hardge] definitive agreements, which are the operating agreements and all of the agreements that would underline operating MAEO that went to his current lawyer, the Calhoun Law Firm, and we obviously submitted those documents for review. They submitted those documents to Lawrence and then contacted us towards the end of May to tell us that they were terminated by Lawrence, which we found to be interesting, to say the least."*

37.     The Company issued a press release on June 21, 2023, announcing an investor financing moratorium and the steep decline in the Company's share price

---

[22]https://investorplace.com/2023/06/muln-stock-is-lawrence-hardge-backing-away-from-mullen-deal/. ("The decline follows a livestream held by **Global EV Technology** Founder and **Mullen Advanced Energy Operations** (MAEO) Senior Vice President of Technology Lawrence Hardge over the weekend. At the two-minute mark, Hardge states:*"I don't have nothing to hide. Every day people walk away from deals. They don't work out, life goes on, they move on."*).

claiming the Company had met or was positioned to meet its objectives.[23] The Company stated in part:

> The Company is instituting, "an investor financing moratorium for the balance of 2023 and that the Company has sufficient capital on hand for at least the next 12 months. Remaining investor option expires on June 30, 2023. Company assets are unencumbered with the exception of $7.3 million outstanding debt." *Id*.

> **Since March 31, 2023, the Company's stock has declined over 95% from $3.25 per share to $0.16 per share on June 20, 2023. The Company's common stock trades at a discount to our cash value per common share of $0.38 as of June 13, 2023**. *Id*. (emphasis added).

> Despite the decline in stock price, management believes the Company has already met or is positioned to meet the previously announced objectives. *Id*.

> The Company has sufficient capital on hand for at least the next 12 months. *Id*.

---

[23]https://news.mullenusa.com/mullen-announces-moratorium-on-new-financings-for-balance-of-2023-company-has-sufficient-capital-for-at-least-the-next-12-months (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**The Company Has Omitted Material Information Related to its Financing**

38.    The Company has completed and/or amended multiple financing agreements with Esousa Holdings. The Company has failed to disclose material information about the individual who controls Esousa Holdings, Michael Wachs.

39.    "Michael Wachs is the managing member of Esousa Holdings, LLC and has sole voting control and investment discretion over securities beneficially owned directly by Esousa Holdings, LLC. We have been advised that none of Mr. Wachs or Esousa Holdings, LLC is a member of the Financial Industry Regulatory Authority, or FINRA, or an independent broker-dealer, or an affiliate or associated person of a FINRA member or independent broker-dealer."[24]

40.    The Company has announced the following relevant financing agreements or amendments during the Class Period:

        a.    A Letter Agreement, dated May 15, 2023, an amendment to the Securities Purchase Agreement dated June 7, 2022, delaying the purchase date until June 12, 2023.[25];

        b.    "On May 21, 2024, the Company entered into a common stock purchase agreement (the "Purchase Agreement") with Esousa

---

[24]https://www.sec.gov/Archives/edgar/data/1499961/000182912624004615/mullen automotive_424b3.htm (last visited January 16, 2025).
[25]https://www.sec.gov/Archives/edgar/data/1499961/000110465923062687/tm231 6130d1_ex10-1.htm (last visited January 16, 2025).

Holdings, LLC (the "Investor" or "Selling Stockholder") pursuant to which the Investor has agreed to purchase from the Company, at the Company's direction from time to time, in its sole discretion, from and after the effective date of the registration statement, of which this prospectus forms a part, and until the earlier of (i) the 36-month anniversary of the Commencement Date (as defined below) or (ii) the termination of the Purchase Agreement in accordance with the terms thereof, shares of the Company's Common Stock, having a total maximum aggregate purchase price of $150,000,000 (the "Purchase Shares"), upon the terms and subject to the conditions and limitations set forth therein." [26];

c.   "On August 27, 2024, pursuant to the common stock purchase agreement dated May 21, 2024 (the "Purchase Agreement") between Esousa Holdings LLC (the "Investor") and Mullen Automotive Inc. (the "Company"), as previously reported in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on May 24,

---

[26]https://www.sec.gov/Archives/edgar/data/1499961/000182912624004615/mullen automotive_424b3.htm (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

2024, the Company issued 13,816,105 shares of common stock to the Investor as "Commitment Shares" [27];

d. "On May 21, 2024, the Company entered into the ELOC Purchase Agreement with Esousa, pursuant to which Esousa has agreed to purchase from the Company, at the Company's direction from time to time, in its sole discretion, from and after July 5, 2024, and until the earlier of (i) the 36-month anniversary of the commencement date of July 16, 2024, or (ii) the termination of the ELOC Purchase Agreement in accordance with the terms thereof, shares of Common Stock, having a total maximum aggregate purchase price of $150,000,000, upon the terms and subject to the conditions and limitations set forth therein. Pursuant to the ELOC Purchase Agreement, the Company issued to Esousa an aggregate of 247,935 shares of Common Stock as commitment shares and on October 23, 2024, the Company issued 502,066 shares of Common Stock." [28];

---

[27]https://www.sec.gov/Archives/edgar/data/1499961/000182912624006032/mullen automotive_8k.htm (last visited January 16, 2025).

[28]https://www.sec.gov/Archives/edgar/data/1499961/000182912625000541/mullen automotive_s1a2.htm (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

e. "In connection with the ELOC Purchase Agreement, the Company also entered into a registration rights agreement with Esousa, pursuant to which the Company agreed to file a registration statement, and any additional registration statements, with the SEC covering the resale of the shares of the Company's Common Stock issued to Esousa pursuant to the ELOC Purchase Agreement." *Id*.;

f. "On January 23, 2025, the Company entered into a securities purchase agreement with Esousa and JADR whereby the investors purchased an aggregate principal amount of approximately $6.3 million of 5% Original Issue Discount Secured Notes convertible into shares of Common Stock and five-year warrants exercisable on cash basis for 32,388,664 shares of Common Stock. The terms and conditions of the notes and warrants are further described in the Company's Current Report on Form 8-K filed with the SEC on January 27, 2025." *Id*.;

///

///

///

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

41.     Esousa Holdings, LLC, holds a significant percentage of the shares of common stock for the Company.

| Name of Selling Stockholder | Number of Shares of Common Stock Owned Prior to Offering | Maximum Number of Shares of Common Stock to be Offered Pursuant to this Prospectus | Number of Shares of Common Stock Owned After Offering (1) | Percentage of Shares of Common Stock Owned After Offering |
|---|---|---|---|---|
| Esousa Holdings, LLC (2) | 43,883,982 | 36,130,000 | 24,540,398 | 9.9% |

42.     The Company failed to disclose material information that Mr. Wachs had pled guilty in 1997 to defrauding Chase Manhattan Bank for $20 million.[29]

43.     The Company has also failed to disclose that Mr. Wachs received a lifetime ban from FINRA, NASD, and the board of governors of the Federal Reserve.[30]

**The Company has Continually Issued False and Misleading Press Releases Regarding its Government and Government Affiliate Contracts**

44.     The Company initially announced on March 6, 2023, it was "teaming up with Rapid Response Defense Systems ("RRDS") to fast-track U.S. Federal

---

[29]https://www.washingtonpost.com/archive/business/1998/07/16/digest/8aaa5902-74de-4f34-91eb-f35374f25521/ (last visited January 16, 2025).

[30]https://www.finra.org/sites/default/files/DisciplinaryAction/p007557.pdf.;    see also https://www.federalreserve.gov/boarddocs/press/enforcement/1998/19980206/Attachment.pdf (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Government opportunities for potential large-scale vehicle fleet orders."[31] The press release also stated in part:

> RRDS, one of the country's leading small business federal contractors, has executed over 2,500 federal government delivery orders since 2014. The company currently holds a prime seat on 12 Indefinite Delivery/Indefinite Quantity (IDIQ) federal contracts with combined funding ceilings of $4 billion. *Id*.

> "RRDS is all about providing solutions to the federal government," said Mullen's Manager of Government Sales Ronald Dixon. "Whether its designing products to meet Department of Defense mission requirements or enhancing supply chain logistics, they have a remarkable success record. In addition, RRDS will be a key vehicle supplier to the General Service Administration in an awarded 5-year multibillion-dollar vehicle contract. We are focused on selling our EV products to the federal government and view this relationship as a strategic step in accomplishing that goal." *Id*.

///

///

---

[31] https://news.mullenusa.com/rapid-response-defense-systems-selects-mullen-automotive-as-the-exclusive-provider-for-class-1-ev-cargo-vans (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"With the federal government's strong interest in electrifying a growing portion of its vehicle fleet, Mullen's commercial portfolio is very well positioned," said RRDS SVP – Federal Fred Bouman. "Mullen's Class 1 EV cargo van launches this year and will be the only class 1 EV van in the market. It is 100% electrified, making it a strong fit for federal government business." *Id*.

"Mullen Automotive is proud to team up with RRDS for U.S. government fleet opportunities for our Class 1 EV cargo vans," said Mullen's CEO and Chairman David Michery. "We look forward to working closely with RRDS in meeting the demand for EVs across the U.S. government's fleet of vehicles." *Id*.

45.     The Company issued an update on the RRDS partnership via a press release on November 27, 2023.[32] The press release stated in relevant part:

"the Company and Rapid Response Defense Systems ("RRDS") have filed responses for final ruling and compliance by the U.S. Customs and Border Protection ("CBP") application for Mullen's Class 1 EV cargo van." *Id*.

_____

[32] https://news.mullenusa.com/mullen-automotive-provides-update-on-us-customs-and-border-protection-application-for-class-1-ev-cargo-vans (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

On behalf of Mullen, RRDS filed the Ruling Request Application, which details the substantial transformation Mullen completed for the Class 1 EV cargo van to meet U.S. Federal Motor Vehicle Safety Standards and Environmental Protection Agency regulations, including the design, testing and validation of new safety systems including airbags, sensors and control modules, rearview camera, front bumper system, wiring harnesses and seating. By successfully completing the substantial transformative process, the Mullen ONE will be defined as a U.S.-made end product. *Id.*

46.     The Company issued an update on the RRDS partnership via a press release on March 13, 2024.[33] The press release stated in part:

On March 5, 2024, U.S. Customs and Border Protection informed Rapid Response Defense Systems ("RRDS") counsel that a final determination on the ruling request needs to be issued by the U.S. General Services Administration ("GSA").

Based on CBP advice, Mullen and RRDS **are now proceeding with** the GSA in order to finalize qualification of Mullen to sell Class 1 EV cargo vans to all branches of the U.S. government.

---

[33] https://news.mullenusa.com/mullen-automotive-provides-timeline-update-on-us-government-ruling-for-class-1-ev-cargo-vans (last visited January 16, 2025).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"Mullen is well positioned to support the U.S. government's goal of transitioning its fleet to electric vehicles," said David Michery, CEO and chairman of Mullen Automotive.

47.     Upon information and belief, Mullen has not successfully submitted necessary information required for the Company to participate or receive a benefit from government contracts with the Company or its partner RRDS. Furthermore, the Company has not at any point been on a "fast-track" to achieve opportunities for large-scale vehicle fleet orders from the U.S. Federal Government. All statements and implications provided above were false and/or misleading. Additionally, the Company omitted from its initial and second press release regarding the RRDS contract that a final ruling and compliance needed to be issued by the GSA, instead of CBP.

48.     The statements referenced in ¶¶ 14-47 above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Mullen had no intent of implementing a reverse stock split when in-fact the CEO and the Company believed one was imminent and necessary; (2) Mullen overstates its deals with business

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

partners, including RRDS and MAEO (3) Mullen overstates its battery technology capabilities and partnerships (i.e., Lawrence Hardge related allegations); (4); Mullen misled the investing public about its reverse splits (5) Mullen and Michery knew or should have known about Lawrence Hardge's previous convictions for financial crimes and moral turpitude and disclosed this information to investors; (6) Mullen failed to disclose material information about its financing agreements (7) and as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

49.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

50.     Throughout the course of the Company's false and/or misleading statements and omissions discussed above, Mullen's stock price fell over $3.25 per share, or 96%, to close at approximately $.015 per share on March 13, 2024, on unusually heavy trading volume, damaging investors.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Mullen during the Class Period (the "Class") and were damaged upon the revelation of the alleged

corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest, the assigned Judge and Magistrate Judge and their staffs.

52.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether Defendants' acts as alleged violated the federal securities laws;

b.  whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.  whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.  whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

///

///

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

e.  whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.  whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

57.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  the omissions and misrepresentations were material;

c.  the Company's securities are traded in efficient markets;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

d. the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ, and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g. Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h. Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

58.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972),

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## Violation of Section 10(b) of The Exchange Act and Rule 10b-5

## Against All Defendants

60.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

61.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

64.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

65.    Individual Defendants, who are the senior officers and a director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for

the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

66.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

67.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

68.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

69.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

70.     Plaintiff repeats and realleges each allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his senior position, he knew the adverse non-public information regarding the Company's business practices.

72.     As a senior officer of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

73.     Because of their position of control and authority as a senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were each a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

74.     The Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management position, the Individual Defendants had the power to direct the actions of, and exercised the same to cause the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury.

DATED:  February 11, 2025          By:  __/s/ M. Anderson Berry__

M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
12100 Wilshire Boulevard, Suite 800
Los Angeles, CA 90025
Telephone: (747) 777-7748
Fax: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

William B. Federman* (OK Bar No. 2853)
*wbf@federmanlaw.com*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

*Pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS