POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and
the Proposed Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MULLEN AUTOMOTIVE, INC. SECURITIES LITIGATION II | Case No. 2:25-cv-01187-DMG-AGR<br><br>FIRST AMENDED COMPLAINT<br><br>Hon. Dolly M. Gee |

Co-Lead Plaintiffs Muhammad Jafri ("Jafri") and Teeluck Persad ("Persad", and collectively with Jafri, the "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for their First Amended Complaint (the "Complaint") against Mullen Automotive, Inc. ("Mullen" or the "Company"), David Michery ("Michery"), and Jonathan New ("New"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, interviews with former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Mullen common stock between November 14, 2022, and June 2, 2025, both dates inclusive (the "Class Period"), and were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act"). The action charges that Defendants named herein violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission.

2.      Mullen ostensibly operates as an electric vehicle ("EV") manufacturer, but in reality, acts as a slush fund for its founder, Chief Executive Officer ("CEO"), President, and Chairman of the Board, David Michery. Michery not only took more than $50 million in total compensation during the Class Period (and Defendant New millions more) while

the Company was struggling financially, but he also secretly funneled additional Company funds for personal use, including annual off-the-book payments to his daughter, maintenance on his fleet of luxury vehicles, and financing Michery's other businesses.

3.    The massive payouts to Michery could not be paid from Mullen's operating cash flow, because it had none. Over the past four years, Mullen only once generated a gross profit—and then only $92,118—and never generated a net profit or positive free cash flow. Below is a chart comparing Michery's compensation to Mullen's revenue (not accounting for operating expenses and total net loss):

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| Revenue | $0 | $0 | $366,000 | $1,094,322 |
| Michery's Total Compensation | $2,382,088 | $11,524,440 | $49,629,463 | $3,250,000 |

Source: 2021-2024 Form 10-Ks.

4.    Instead, Mullen funded its exorbitant payments to Michery and New by selling securities, in particular convertible notes and warrants, which the recipients converted into common shares and dumped upon retail investors. However, the perpetual dumping of these shares (as well as insider sales) only exacerbated the downward pressure on Mullen's stock price that resulted from disappointing financial results, causing the share price to drop below $1 on several occasions.

5.    Keeping Mullen's stock price above $1.00 was central to Defendants' scheme. If Mullen could not sustain a stock price above $1.00 (either naturally or by reverse splitting after the price dipped below $1), it could lose its NASDAQ listing and its ability to sell the convertible notes, warrants and other securities that it relied on to raise funds to pay insiders.

6. One way that Defendants inflated the value of Mullen's shares—thereby enabling the vast payments to Michery (and to a lesser extent, New)—was by making blatantly false statements about business deals for the Company. For example, Defendants touted a partnership that was supposed to bring groundbreaking EV technology to Mullen and a $210 million purchase agreement with a company in the United Arab Emirates. But it omitted key details that would inform investors that the so-called deals were complete shams. The technology that was the subject of the partnership never actually existed, and the "inventor" that Defendants promoted was a convicted felon. Even worse, the Company's $210 million purchase agreement could never be fulfilled because Mullen's vehicles did not meet United Arab Emirates safety standards, and could not legally be sold there. All of these damning facts were hidden from investors.

7. Mullen used the inflated prices that resulted from this fraud to sell warrants and convertible notes to a select group of favored investors, thereby bringing in millions of dollars in funding. Once Defendants made their misleading announcements, those favored investors exercised their warrants and converted the notes, yielding them huge amounts of common stock at a discount that they dumped on retail investors. The Company could be paid twice in this process – once when it sold the convertible notes and warrants to favored investors, and, depending on the agreement, again when those warrants were exercised.

8. But, the resulting flood of common shares issued upon exercise of warrants and conversion of notes came at a very serious cost: the resale of so many shares would severely dilute the holdings of retail investors. After Mullen's favored investors had exercised their warrants and convertible notes, bringing millions of dollars into the Company, the Company revealed that the previously-touted deals that spurred retail investor interest had failed, either because the deals were fake to begin with or because risks, which were never disclosed to investors, materialized and caused the deals to fail. Inevitably, these revelations caused the Company's stock price to fall below the

NASDAQ's $1.00 minimum, threatening Mullen with delisting.

9.    To push the Company's stock price back above $1.00 and avoid delisting, Mullen effected a series of reverse stock splits. Each reverse split consolidated up to 100 pre-split shares into a single post-split share. The reverse splits themselves are not intended to impact the overall value of holdings, but rather to consolidate that value among fewer shares resulting in a higher per-share price. For example, 1,000 shares trading at $0.10/share prior to a 1:100 reverse split would be expected to result in 10 shares trading at $10/share post-split.

10.    These reverse splits significantly hurt Mullen's retail investors, whose common stock was diluted into only a few shares. Thus, Mullen shareholders were deeply concerned about the prospect of reverse stock splits that were central to the capital raises used to fund payouts to Michery. To keep them available, Defendants lied to investors about their plans for reverse stock splits.

11.    Each time that the Company used a reverse split to boost its common stock back above $1.00, Defendants restarted the cycle by putting out more misleading statements to generate new investment from retail investors.

12.    As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Mullen's principal office is

located in this District at 1405 Pioneer Street, Brea, California 92821, and a substantial portion of the fraudulent conduct detailed in this Complaint emanated therefrom. Moreover, pursuant to Mullen's most recently filed quarterly report, as of May 15, 2025, the Company had 44,450,738 shares of common stock outstanding. Mullen's securities actively trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, Plaintiffs are informed and believe that there are thousands of investors in Mullen securities located within the U.S., some of whom reside in this Judicial District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

17.     Co-Lead Plaintiff Muhammad Jafri purchased Mullen common stock at artificially inflated prices during the Class Period as set forth in his previously-filed certification, ECF Nos. 39-3; 39-4, and was damaged as a result of the federal securities laws violations alleged herein.

18.     Co-Lead Plaintiff Teeluck Persad purchased Mullen common stock at artificially inflated prices during the Class Period as set forth in his previously-filed certification, ECF No. 35-2, and was damaged as a result of the federal securities laws violations alleged herein.

19.     Defendant Mullen is a Delaware corporation with principal executive offices located at 1405 Pioneer Street, Brea, California 92821. During the Class Period, Mullen's common stock traded in an efficient market on the NASDAQ under the ticker symbol "MULN".[1]

---

[1] On July 15, 2025, the Company announced that it was changing its name to Bollinger Innovations and updating its NASDAQ ticker symbol to "BINI" pending approval by NASDAQ. On July 28, 2025, the name and NASDAQ ticker symbol change became

20.    Defendant David Michery was at all relevant times Mullen's CEO, President, and Chairman of the Board. As CEO, Michery had responsibility for and ultimate authority over Mullen, and dominated its day-to-day business. Michery had sole authority over Mullen's treasury. Moreover, Michery had access to information about Mullen's business operations and deals with potential business partners and buyers, including Mullen's alleged purchase agreements with Volt Mobility. Michery is designated as Mullen's "Chief Operating Decision Maker" in its SEC filings, and oversaw the Company's enactment of reverse stock splits throughout the Class Period. Michery also attended weekly meetings with other Mullen executives where he was informed about the Company's businesses and potential deals. Further, Michery took responsibility for speaking to Mullen investors in public forums, such as public meetings, press releases, and communications on X (formerly known as Twitter), about the Company's operations, its illusory deals, and the Company's plans to effect reverse stock splits. In all of these instances, Michery held himself out as knowledgeable about these topics.

21.    Defendant Jonathan New has served as Mullen's Chief Financial Officer ("CFO") at all relevant times. As CFO, New had access to, and authority and oversight over Mullen's business. Moreover, New had access to information about Mullen's business operations and deals with potential business partners and buyers, including Mullen's alleged purchase agreements with Volt Mobility. Further, New was directly informed by Mullen employees about important details regarding the Company's deal with Volt Mobility, including Mullen's unpreparedness to meet the homologation standards of the United Arab Emirates. New also attended weekly meetings with other Mullen executives where he was informed about the Company's businesses and potential deals, and therefore had access to information about the Company's operations, its illusory deals, and the Company's plans to effect reverse stock splits.

---

effective and the Company began to trade on the NASDAQ as Bollinger Innovations under the "BINI" ticker symbol.

22.    Defendants Michery and New are referred to herein collectively as the "Individual Defendants."

23.    The Individual Defendants, by virtue of their responsibilities and day-to-day activities at Mullen, possessed the power and authority to control the contents of Mullen's SEC filings, press releases, and other market communications. Because of their positions with Mullen, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.    Mullen and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    David Michery Creates Mullen Automotive Inc.

25.    The Company that eventually became Mullen was originally formed on April 20, 2010 by Michery. He was previously involved with a luxury sunglasses company that had its securities registration revoked for failure to file periodic reports.

26.    In 2012, in an effort to exploit public interest in EVs, Michery acquired Mullen Motor Company, despite not having any prior experience in the automobile industry.

27.    In 2014, Michery combined Mullen Motor Cars with another car company, CODA Automotive, which was purchased out of bankruptcy.

28.    On June 16, 2020, the combined company announced that it would become publicly traded through a reverse-merger with Net Element, Inc., a struggling payment processing company that traded on the NASDAQ under the ticker symbol "NETE". Defendant Jonathan New served as CFO of Net Element, Inc. from 2008 to July 2018.

29.    The reverse-merger closed nearly seventeen months later, and the newly

merged company changed its name to "Mullen Automotive Inc." On November 5, 2021,
Mullen began trading on the NASDAQ under the ticker symbol "MULN".

## II.    Mullen's Current Status

30.    Throughout the Class Period, Mullen was a small startup with no saleable
EVs, no ability to mass produce vehicles, and virtually no revenue. Over the past four
years, Mullen generated a gross profit only once—of $92,118, and never consistently
generated revenue.

31.    Below is a table of Mullen's revenue, expenses, and losses before and
throughout the Class Period:

| | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| **Revenue** | $0 | $0 | $366,000 | $1,094,322 |
| **Cost of Revenues** | N/A | N/A | $273,882 | $16,894,100 |
| **Loss from Operations** | $22,402,968 | $96,989,096 | $377,772,350 | $391,826,449 |
| **Net Loss** | $44,240,580 | $740,324,752 | $1,006,658,828 | $505,826,551 |

32.    Further, throughout the Class Period, the Company's minimal cash was
always dwarfed by its liabilities:

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| Cash and Cash Equivalents | $42,174 | $54,085,685 | $155,267,098 | $10,321,827 |
| Total Current Assets | $6,811,055 | $86,333,844 | $198,130,456 | $63,174,638 |
| Total Liabilities | $78,884,141 | $145,637,771 | $148,897,620 | $195,177,166 |

33.    Mullen burned through cash throughout the Class Period, most of which went to general and administrative expenses (including Michery's exorbitant compensation). By comparison, it spent little on research and development:

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| General and Administrative Expenses | $19,393,941 | $75,338,256 | $215,846,132 | $181,947,541 |
| Research and Development Expenses | $3,009,027 | $21,650,840 | $77,387,336 | $74,889,400 |

34.    Mullen's inability to generate revenue, its cash burn (including payouts to Michery), the materialization of concealed risks, and pressure from its repeated capital

9

raises on many occasions drove Mullen's share price below $1.00, which compromised Mullen's NASDAQ listing.

### III. The Importance of Mullen Retaining its NASDAQ Listing

35.    Initial listing requirements for companies on the NASDAQ include (1) a regular bid price of at least $4.00 at the time of the listing; (2) a minimum of 1 million publicly traded shares outstanding; and (3) a minimum of 450 round lot shareholders, 2,200 total shareholders, or 550 total shareholders with a minimum of a 1.1 million average trading volume over the past 12 months. Additionally, companies listed on the NASDAQ must meet financial standards that include a minimum aggregate cash flow and a minimum amount of assets.

36.    To maintain a NASDAQ listing, NASDAQ rules require a company's equity securities listed on the Nasdaq Global Select, Global, and Capital Markets to maintain a minimum bid price of at least one dollar per share (the "Bid Price Requirement").

37.    The Bid Price Requirement is important because it helps prevent the trading of "penny stocks" on the exchange. Penny stocks are often associated with high volatility, low liquidity, and a higher risk of manipulation, which can harm investors. By enforcing a minimum bid price, NASDAQ aims to ensure that listed companies maintain a baseline level of market credibility and stability.

38.    Upon failure of a company's security to satisfy the Bid Price Requirement, NASDAQ Rule 5810(c)(3)(A) during the Class Period provided for an automatic compliance period of 180 calendar days from the date NASDAQ notifies the company of the deficiency for the company to achieve compliance with the Bid Price Requirement.

39.    A failure to meet the Bid Price Requirement occurs when a company's security has a closing bid price below $1.00 for a period of 30 consecutive business days. *See* NASDAQ Rule 5810(c)(3)(A). Compliance can be achieved by meeting the Bid Price Requirement for a minimum of 10 consecutive business days during the applicable compliance period, unless NASDAQ exercises its discretion to extend this 10-day period

as discussed in NASDAQ Rule 5810(c)(3)(H).

40.     If a company fails to meet the Bid Price Requirement during the compliance period, then NASDAQ ordinarily issues a delisting determination under NASDAQ Rule 5810, which the company can appeal, and suspend the delisting during the appeal process. As a result, a company may be continuously deficient with the Bid Price Requirement and continue trading on the NASDAQ for up to 540 days.

41.     Delisting from the NASDAQ would be catastrophic for Mullen, as it would drastically limit its ability to raise capital from outside investors.

42.     Mullen itself acknowledged that it was crucial to its continued business to remain listed on the NASDAQ, stating in its FY2022 10-K, filed on January 13, 2023:

> Our common stock is listed on the Nasdaq Capital Markets. To maintain that listing, we must satisfy minimum financial and other requirements including, without limitation, a requirement that our closing bid price be at least $1.00 per share. On September 7, 2022, we were notified by NASDAQ Listing Qualifications Staff about bid price deficiency. The Board and Management are reviewing plans to regain compliance with the $1.00 closing bid price requirement. If the Company does not regain compliance with the bid price requirement by March 6, 2023, the Company may be eligible for an additional 180-calendar day compliance period so long as it satisfies the criteria for initial listing on the Nasdaq Capital Market and the continued listing requirement for market value of publicly held shares and the Company provides written notice to Nasdaq of its intention to cure the deficiency during the second compliance period by effecting a reverse stock split, if necessary. **If we fail to continue to meet all applicable continued listing requirements for The Nasdaq Capital Market in the future and Nasdaq determines to delist our common stock, the delisting could adversely affect the market liquidity of our common stock, our ability to obtain financing to repay debt and fund our operations.**

43.     Defendants reiterated and expanded on the threat of NASDAQ delisting in Mullen's FY2023 10-K, filed January 17, 2024, by adding:

> If our common stock cease to be listed for trading on the Nasdaq Capital Market, we would expect that our common stock would be traded on one of

the three tiered marketplaces of the OTC Markets Group. If Nasdaq were to delist our common stock, it would be more difficult for our stockholders to dispose of our common stock or warrants and more difficult to obtain accurate price quotations on our common stock. Our ability to issue additional securities for financing or other purposes, or otherwise to arrange for any financing we may need in the future, may also be materially and adversely affected if our common stock or warrants are not listed on a national securities exchange. The OTC Markets (the "OTC Mkts") are generally regarded as a less efficient trading market than the NASDAQ Capital or Global Markets or the New York Stock Exchange.

44.     Consequently, as Mullen admitted, remaining on the NASDAQ was crucial to its ability to raise capital by selling securities. Lacking any operating cash flow (or even consistent car sales), such capital raises were the Company's only source of funding. To maintain the NASDAQ listing to support additional capital raises, Michery decided the Company would reverse split whenever the stock price dropped meaningfully below $1.00.

## IV.    How Reverse Stock Splits Work

45.     During the Class Period, Defendants were desperate to keep Mullen's stock price above $1.00 to stay on the NASDAQ and keep their scheme going. To do so, Defendants effected a series of reverse stock splits, which propped the nominal price but depleted the share count of existing holders.

46.     A reverse stock split is a corporate action where a company reduces the total number of its outstanding shares while proportionally increasing the price per share. In other words, a reverse split merges multiple existing shares into a single share based on a predetermined ratio, such as 1-for-10, 1-for-100, etc.

47.     While the number of shares decreases, the price per share increases proportionally to maintain the same total value (market capitalization) of the company and investment. For example, if an investor owned 100 shares at $1 each (total value $100) and a 1-for-10 reverse split occurred, they would now own 10 shares, and each share would be worth $10. The total investment value should remain constant at $100.

12

48.     Companies declare reverse stock splits to increase the trading price of its shares, thereby attracting investors or regaining compliance with the minimum bid price requirements of an exchange on which the shares are traded.

49.     Because reverse stock splits can be used to manipulate the system, the SEC recently took action to curb their abuse. Specifically, on January 17, 2025, the SEC issued an order approving changes to NASDAQ's Rules 5810 and 5815 relating to the Bid Price Requirement. NASDAQ's amendment added a restriction that if a company's shares fail to meet the Minimum Bid Price Requirement and the company has effected a reverse stock split during the prior one-year period, then the company would not be eligible for the automatic 180-day compliance period and would be subject to immediate delisting. A company would still be permitted to appeal the delisting determination to the NASDAQ hearings panel, where it could potentially receive up to 180 days to regain compliance. However, this rule did not become effective until after the Class Period, so did not constrain Defendants' reverse stock splits.

50.     The NASDAQ's rule changes addressed concerns that companies failing to meet the Bid Price Requirement or repeatedly using reverse stock splits can negatively impact investors and market integrity. These practices can obscure a company's serious financial or operational distress, potentially leading to investor confusion and making these securities susceptible to manipulation. By shortening the time non-compliant securities can trade and increasing scrutiny on certain reverse splits, the NASDAQ aimed to protect investors and maintain fair markets.

51.     The SEC specifically singled out schemes like the one employed by Defendants as a reason for the rule change:

> [NASDAQ] has continued to observe some companies engaging in a pattern of effecting consecutive reverse stock splits, which are often accompanied by dilutive issuances of securities and which potentially cause investor confusion and operational difficulties for market participants.

52.    Critically, the SEC noted that "such securities may have similar characteristics to penny stocks and yet, because they are listed on the [NASDAQ], are exempt from the Penny Stock Rules, which provide enhanced investor protections, among other things, to prevent fraud and safeguard against potential market manipulation."

## V.    Michery Enriches Himself at the Expense of Investors

53.    Mullen's true purpose, instead of manufacturing and selling EVs, is to serve as Michery's personal slush fund.

54.    Michery is paid enormous amounts as CEO of Mullen, despite the Company failing to generate any revenue for most of its existence, and having incurred substantial losses every year. In fiscal year 2022, Michery was paid a total of $11,524,440 in cash and stocks. That same year, the Company confirmed that it did "not yet commercialize[] any of [Mullen's] proposed EV products or generate[] any revenue from sales of such products[,]" and had a total loss in operations of $96,989,096. In fiscal year 2023, Michery was paid an astounding $49,629,463 in cash and stocks. That year, by Mullen's admission, the Company "generated minimal revenue to date[,]" and sold only $366,000 worth of vehicles, but had a total gross profit of $92,118 and a loss from operations of $377,772,350. In fiscal year 2024, Michery was paid $3,250,000 in cash and stocks. That year, the Company sold $1,094,322 worth of vehicles, but had a gross loss of $15,799,778 and a total loss from operations of $391,826,449. Below is the chart from Section II describing Mullen's financial performance before and throughout the Class Period, together with Michery's compensation:

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| Revenue | $0 | $0 | $366,000 | $1,094,322 |
| Cost of Revenues | N/A | N/A | $273,882 | $16,894,100 |
| Loss from Operations | $22,402,968 | $96,989,096 | $377,772,350 | $391,826,449 |
| Net Loss | $44,240,580 | $740,324,752 | $1,006,658,828 | $505,826,551 |
| Michery's Total Compensation | $2,382,088 | $11,524,440 | $49,629,463 | $3,250,000 |

55.    Notably, Defendants designed Michery's compensation so that he was exempted from the deleterious impact of any reverse stock splits and subsequent dilutions. According to his compensation agreements, "[f]or every $100 million of equity or debt financing he raises, he is awarded 1% of the shares then outstanding." Chris Bryant, *A 69,000% EV Dilution Machine Runs Out of Road: Chris Bryant*, BLOOMBERG, July 14, 2023, https://news.bloomberglaw.com/environment-and-energy/a-69-000-ev-dilution-machine-runs-out-of-road-chris-bryant.

56.    In addition to his salary, Mullen also reimburses Michery $500,000 in expenses each year.

57.    In a Fox News interview on August 31, 2023, Michery was confronted about his compensation, with the interviewer asking Michery:

> David, let me go back now to the company. A lot of concerns about your salary, the losses. I went through the last quarter. One thing that jumped out at me on … General and Administrative spending was $31 million. Just as a business itself, why are you spending 31 million on SG&A costs and things like. People are saying, you've taken a lot of money, you've paid yourself a lot of money, and this kind of spending, it just doesn't make sense for a small

15

company like yours.

58.    In response, Michery prevaricated before his audio conveniently cut out, stating, "Well, in relation to, let's say, compensation, whatever compensation that was awarded me and my employment contract, our compensation pursuant to awards were given…." Then, realizing he had no answer, Michery cut the audio feed. Thus, even when given the opportunity, Michery himself could not justify his compensation.

59.    Michery's exorbitant salary was only the tip of the iceberg. He also used the Company to fund lavish perks for himself and those associated with him.

60.    Mullen employed Confidential Witness 1 ("CW1") from June 2022 to March 2025 as a high-level finance executive. CW1 reported to Defendant New and Chief Accounting Officer Chester Bragado. CW1's job responsibilities included overseeing all Mullen manufacturing and commercial finance. CW1 also had full access to Mullen's entire general ledger, which allowed CW1 to view Mullen's entire operations, understand its expenditures—including those made via ACH, check, and other wire transfers—and gain intimate familiarity with the Company's financial details.

61.    Mullen employed Confidential Witness 2 ("CW2") from January 2022 to May 2024 as a director in Mullen's sales and marketing department. CW2's job responsibilities included sales and marketing, price labels, distribution, engineering, and serving as a technical liaison between Mullen and other companies. CW2 also oversaw dealer sales and service agreements.

62.    CW1, who had intimate knowledge of Mullen's payments, revealed that Michery has been paying his daughter—not a Mullen employee—an off-the-books salary of about $160,000 annually since 2022, along with a $50,000 "bonus" that coincided with his daughter's wedding. Michery bypassed Mullen's finance and accounting department by sending these funds via wire transfers, a process he solely controlled through his treasury responsibilities.

63.    According to CW2, Michery personally signed all checks for Mullen.

16

Consequently, Michery knew about all of the payments made by Mullen to its employees.

64.     According to CW1, Michery also had Mullen appoint Makayla Brown, with whom Michery has a romantic relationship, as the Company's Director of Operations.

65.     Further, according to CW1, Michery owns a fleet of luxury vehicles, for which he has Mullen provide maintenance at no cost to him. Routine maintenance for Michery's luxury vehicles usually costs thousands of dollars, but Michery had Mullen perform the work for free. CW1 knows this because the maintenance costs for Michery's luxury vehicles were recorded in Mullen's general ledger.

66.     According to CW1, in 2024, Michery also had Mullen purchase a suite for the National Hockey League's Anaheim Ducks home games, and season tickets for the Los Angeles Angels. CW1 knows this because the costs for the sports tickets were recorded in Mullen's general ledger.

67.     In addition to perks for himself and his family, Michery utilizes Mullen and its staff to build up his new business ventures, including DRIVEiT. DRIVEiT is a start-up business owned by Michery not Mullen, that plans to operate as an "electric vehicle superstore." According to CW1, Michery ordered Mullen employees to spend their time working on DRIVEiT, which the Company does not have a stake in, rather than working on securing deals for Mullen. Further, Mullen provides its commercial EVs to DRIVEiT as part of its offerings.

68.     Michery was able to get away with pilfering the Company's much-needed money by stocking the Board of Directors with his friends and family, as well as rewarding fellow Mullen executives to go along with his scheme.

69.     Defendant New was paid handsomely as the CFO of Mullen throughout the Class Period. In 2023, New was paid $633,300 in cash and stock, and in 2024, New was paid $2,098,405 in cash and stock, all while the Company itself failed to generate revenue.

70.     Additionally, Mullen Director and Board Secretary Mary Winter – who is reported to be Michery's sister-in-law – is paid $5,000 per month ($60,000 annually) for

1   "consulting" services.

2       71.    Similarly, according to Mullen's FY2024 10-K, filed on January 24, 2025,

3   Mullen Board of Director William Miltner was paid $1,180,733 that year for "legal

4   services" to Mullen, more than Mullen's entire 2024 revenue.

5       72.    Further, many of the Mullen Board of Directors and executives who are

6   supposed to hold Michery accountable are also part of DRIVEiT's Board of Directors, and

7   therefore benefit from Michery misusing Mullen resources to build up another company.

8   Defendant New is the CFO for DRIVEiT, while Mullen Directors Kent Puckett, Ignacio

9   Novoa, and Mark Betor are also members of the DRIVEiT Board of Directors.

10  **VI.   Michery's Scheme to Keep Mullen as a Personal Slush Fund**

11      73.    Michery's use of Mullen as a personal slush bankroll to fund his lavish

12  lifestyle and side projects depended on the Company having a constant stream of money

13  funneled into Mullen's coffers. Conventional means of capital raising were closed to it:

14  Mullen could not generate free cash flow from operations because its EV business was

15  mostly illusory and never generated an operating profit, and it had difficulty tapping the

16  capital markets with conventional common stock sales because its past performance made

17  it unattractive to the large institutional investors that usually participate in public stock

18  offerings. Accordingly, Michery engaged in a scheme to keep the Mullen gravy train

19  rolling:

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    **A.    Step One: generate investor interest through misleading announcements**

19    74.    First, Michery generated interest in the Company through misleading press

20    releases and announcements about forthcoming Mullen projects and deals, many of which

21    never existed or were greatly exaggerated.

22    75.    For example, on August 26, 2024, Mullen and Michery announced that Volt

23    Mobility, based in the United Arab Emirates, agreed to pay $210 million to acquire 3,000

24    Mullen vehicles. This caused investors to flock to Mullen, and its share price shot up 69%,

25    from $0.34 to a high of $0.575. In truth, Mullen vehicles could not even be sold in that

26    region. They were not equipped to function in the heat of the United Arab Emirates and

27    violated United Arab Emirates certification standards. According to CW1, Mullen's

28    vehicles were a year away from being properly certified for the United Arab Emirates

market, and it would have taken the Company $25 million to do so – money the Company did not have. Most notably, the batteries in the Mullen vehicles did not meet standards to operate in the heat in the United Arab Emirates and did not meet homologation standards – something that Defendants knew. Nevertheless, Defendants omitted these critical facts from their press releases and tweets so that Mullen could spur investor interest.

76.    Moreover, Defendants made strategic decisions not based on the Company's operating needs, but rather to conceal known problems from investors. According to CW1, Mullen had not manufactured vehicles at its plant in Tunica, Mississippi since late 2024. Nevertheless, CW1 affirmed that Mullen refused to lay off workers because Defendants did not want to spook the market and appear to be a company in decline. Similarly, according to CW1, after the Company decided not to produce its Mullen Five vehicle in November 2023, it refused to lay off an engineering team of approximately 70 workers located in Irvine, California, until January 2025, so that it would not appear to outsiders that the Company was in trouble.

77.    Defendants also delayed the reporting of revenue to manipulate financial reporting. According to CW1, Mullen delayed reporting a transaction of $3.18 million from October 2024 until March 26, 2025 because Defendants wanted to include the revenue in a later reporting period so that they could tout "record GAAP revenue" in 2025 and garner more interest from retail investors. CW1 knew this occurred because CW1 had created the invoice for the $3.18 million transaction and was responsible for Mullen's revenue recognition. CW1 was kept abreast of all details of this transaction. Furthermore, CW1 spoke with New about the transaction and proper revenue recognition, but was rebuffed by New.

78.    These actions were designed to—and did—mislead retail investors, thereby pushing up Mullen's stock price. The inflation caused by Class Period misrepresentations, in combination with the deceptive scheme alleged herein, helped maintain Mullen's listing on the NASDAQ, which Defendants admitted they believed was critical.

**B.    Step Two: sell warrants and convertible notes to favored investors, raising money but ensuring that common stock would be massively diluted at the expense of retail investors**

79.    The primary method by which Mullen raised the capital it used to pay Michery and others was not through traditional public offerings, but by selling warrants and convertible notes to favored investors.

80.    A warrant is a financial instrument that gives the holder the right to purchase a company's stock at a predetermined price (the "strike price") within a specific timeframe. When a warrant is exercised, it results in the issuance of new shares, increasing the total number of shares outstanding. Further, once a warrant is exercised, the issuing company is then paid for the then-issued shares at the previously agreed-upon strike price. Investors who buy warrants generally want the price of the stock to go above the strike price, so that they can make money by exercising the warrant and selling the newly issued stock for a profit. For example, if a company issues a warrant to an investor with a strike price of $50, and then the company's stock price goes to $60, the investor could then exercise that warrant and subsequently sell the newly issued stock for a profit of $10 per share. Critically, the company selling the warrants can be paid twice in this transaction – first when selling the warrant itself, and, depending on the agreement, again when the warrant is exercised.

81.    A convertible note is a financing tool that allows investors to provide a loan to a company with the option to convert that loan into equity/stock at a later time, often at a discount. For example, if a company sells a convertible note to an investor for $100,000 with a discount on conversion of 20%, and the company's stock is trading at $2.00, then the investor could convert the note into a 20% discount and buy the company's stock at $1.60. The investor could then re-sell those shares for a significant profit, especially if the company's stock price continued to rise.

82.    Throughout the Class Period alone, Mullen sold over $300 million worth of

warrants and convertible notes to favored investors.

83.    While the favored investors varied, the main entities that funded Mullen through the Class Period by buying and exercising warrants and convertible notes were Esousa Holdings, LLC (run by Michael Wachs), Michael Wachs 2022 Dynasty Trust, JADR Capital 2 Pty Ltd, TD Capital No 1 Pty Limited, and Acuitas Capital LLC (the "Favored Investors").

84.    Those Favored Investors were then able to flip their stock to retail investors to their advantage, but it was toxic for retail common stockholders because it flooded the market. As one news article noted:

> Mullen has survived by issuing stupefying volumes of stock (plus warrants to acquire even more shares) to a handful of professional investors such as Acuitas Capital LLC and Esousa Holdings LLC. Those investors are then able to flip most of their holdings to the company's retail investors for a quick and sizeable profit. Needless to say, Mullen shareholders haven't shied away from expressing their anger on social media about what they've described as "toxic" financing.

***

> While regulations prevent Mullen's financiers from owning more than 10% of outstanding stock at any one time, these restrictions do not prevent them from selling shares and then exercising warrants for additional shares soon after. "In this way, the selling stockholders could sell more than 9.99% of the outstanding shares of common stock in a relatively short time frame while never holding more than 9.99% at any one time," the prospectus warns.

Chris Bryant, *A 69,000% EV Dilution Machine Runs Out of Road: Chris Bryant*, BLOOMBERG, July 14, 2023, https://news.bloomberglaw.com/environment-and-energy/a-69-000-ev-dilution-machine-runs-out-of-road-chris-bryant.

85.    During the Class Period, pursuant to warrants and convertible notes being exercised, Mullen registered and authorized approximately 6,944,251,311 of potential additional shares of common stock for resale to retail investors:

| Date of Registration | Number of Common Shares Registered/Authorized for Sale by Selling Stockholders | Amount Mullen Stood to Receive from Full Warrant Exercises | Selling Stockholders |
|---|---|---|---|
| November 21, 2022 | 220,828,539 | Mullen's filing does not list the amount | -Esousa Holdings LLC<br>-Acuitas Capital, LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Digital Power Lending, LLC |
| March 6, 2023 | 522,222,223 | $37 million | -Acuitas Capital LLC |
| April 14, 2023 | 2,115,000,000 | $83.25 million | -Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Ault Lending, LLC f/k/a Digital Power Lending, LLC |
| June 5, 2023 | 242,124,674 | Mullen's filing does not list the amount | -Michael Wachs 2022 Dynasty Trust |

| | | | |
|---|---|---|---|
| | | | -Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited |
| June 12, 2023 | 585,937,467 | $83.2 million | -Esousa Holdings, LLC<br>-Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Ault Lending, LLC f/k/a Digital Power Lending, LLC |
| June 26, 2023 | 2,335,128,757 | $139.4 million | -Esousa Holdings, LLC<br>-Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Ault Lending, LLC f/k/a Digital Power Lending, LLC |

| | | | |
|---|---|---|---|
| October 27, 2023 | 103,009,651 | $61 million | -Esosua Holdings, LLC<br>-Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-TD Capital No 1 Pty Limited f/k/a Davis-Rice Pty Limited |
| May 20, 2024 | 20,000,000 | $29.1 million | -Esosua Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| July 5, 2024 | 75,000,000 | $150 million | -Esosua Holdings, LLC |
| July 26, 2024 | 85,000,000 | $19.8 million | -Esosua Holdings, LLC<br>-Ault Lending, LLC<br>-JADR Capital 2 Pty Ltd<br>--Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| September 6, 2024 | 350,000,000 | $87.1 million | -Esosua Holdings, LLC<br>-JADR Capital 2 Pty Ltd |

| | | | -Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
|---|---|---|---|
| October 4, 2024 | 30,000,000 | $102.9 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| January 29, 2025 | 50,000,000 | $247.6 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| March 4, 2025 | 10,000,000 | $115 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Mario Silva<br>-TD Capital No 1 Pty Limited f/k/a Davis-Rice Pty Limited |

| | | | -Esousa Holdings, LLC -JADR Capital 2 Pty Ltd -TD Capital No 1 Pty Limited f/k/a Davis-Rice Pty Limited -Michael Friedlander -Jess Mogul -Jim Fallon -Philip Bannister -Matthew Krieger -Mario Silva |
|---|---|---|---|
| April 7, 2025 | 200,000,000 | $210 million | |

86.    Critically, the warrants held by Favored Investors were not negatively impacted by Mullen's reverse stock splits. Instead, Favored Investors actually *benefited* from the reverse stock splits, as those splits—as well as Defendants' misleading announcements—would push Mullen's stock price above a warrant's strike price, which would allow those Favored Investors to exercise their warrants and sell the common stock received to retail investors for a massive profit.

87.    Mullen benefited from this scheme both when the Company initially sold the warrants and then also when Favored Investors exercised their warrants, pumping more money into the Company.

88.    The following table shows the amount of capital raised by issuing additional Mullen stock throughout the Class Period:

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 | Six Months Ended March 31, 2025 |
|---|---|---|---|---|---|
| **Cash Provided by Financing Activities** | $17,692,704 | $197,282,630 | $358,416,885 | $56,755,744 | $44,020,360 |

89.    For example, in fiscal year 2023, Mullen raised $196,999,970 by issuing common and preferred shares and warrants, eclipsing the $366,000 in EV sales by a factor of over 538.

90.    For these reasons, Defendants had an incentive to and did manipulate their business practices to ensure capital raises from Favored Investors, including by doing everything necessary to keep Mullen's NASDAQ listing intact so the Favored Investors could dump their shares to retail investors, even if it meant lying about corporate opportunities and reverse splits, and manufacturing authority to drive further reverse splits.

**C.    Step Three: Mullen common stock declines when Mullen's highly-touted deals are proven illusory**

91.    Repeatedly, false "deals" touted by Defendants failed to yield revenue. This was a direct result of the fact that the deals were illusory when announced.

92.    For example, on March 20, 2025, the Company unceremoniously announced that the Company "sent a termination notice to Volt Mobility Holding Ltd. ('VoltMobility') regarding the Purchase Agreement entered into on August 23, 2024[.]" On this news, Mullen's share price dropped 30.7% over the course of two days, from $0.40 to falling to a low of $0.2773, before closing at $0.289 on March 21, 2025. According to CW1, despite the promise of a $210 million purchase order, Mullen had sold zero vehicles under the Volt Mobility deal.

93.    The revealed falsity of Defendants' statements caused investors to sell their Mullen stock, driving Mullen's stock price below the NASDAQ's $1.00 Bid Price Requirement.

**D.    Step Four: effect a reverse stock split to avoid being de-listed on the NASDAQ and restart the cycle**

94.    On the many occasions when Mullen's stock dipped below $1.00, Defendants restarted the cycle by reverse-splitting Mullen's stock, thereby pushing it above the NASDAQ's $1.00 Bid Price Requirement.

95.    Critically, Mullen's reverse stock splits were different from most. Most reverse stock splits reduce ***both*** the number of outstanding shares and the number of authorized shares in the same proportion, thereby preserving an investor's percentage of ownership in a company. For example, in a normal 1-for-100 reverse split, where an investor had 1,000 shares and 100 million shares were authorized, the investor's share count would be reduced to 10 shares and the authorized shares would be reduced to 1 million, leaving the investor with the same ownership as a percentage of authorized shares. However, Mullen's reverse stock splits did not change the "authorized number of shares or the par value of the common stock." Mullen's reverse splits only changed the investor's share count, but kept the authorized shares unchanged. As a result, consolidating shares in the manner Mullen did effectively created more and more room to issue additional shares, diluting existing holders. For example, in Mullen's 1-for-100 reverse split, where an investor had 1,000 shares and 100 million shares were authorized, the investor's share count would be reduced to 10 shares, but Mullen could keep issuing shares up to 100 million authorized shares. Consequently, the investor's 10 shares did not keep their same percentage of ownership, but instead had their value diluted considerably.

96.    Due to the moribund revenue of the Company, before the Class Period, investors had become concerned about Mullen's stock price and its potential delisting from the NASDAQ. To assuage those concerns and maintain an artificially inflated stock price,

29

Defendants misrepresented their need and plans for reverse stock splits. *See* Section VII(B). On May 4, 2023, despite Defendants' commitments otherwise, Defendants effected a 1-for-25 reverse stock split to push Mullen's stock price above the NASDAQ's $1.00 Bid Price Requirement.

97.     Throughout the rest of the Class Period, Defendants secretly planned to and did continue the same cycle of reverse splits they told investors were not contemplated. Specifically, to boost Mullen's stock price after it fell due to the falsity of Defendants' statements being discovered, Defendants effected six more reverse stock splits during the Class Period:

- August 11, 2023 – 1-for-9 reverse stock split
- December 21, 2023 – 1-for-100 reverse stock split
- September 17, 2024 – 1-for-100 reverse stock split
- February 18, 2025 – 1-for-60 reverse stock split
- April 11, 2025 – 1-for-100 reverse stock split
- June 2, 2025 – 1-for-100 reverse stock split

98.     Defendants' systematic abuse of reverse stock splits devastated investors. By way of illustration, if an investor had 1 million shares of common stock prior to the reverse stock split on May 4, 2023, that investor would have ***less than a single share*** (technically, a fractional share of 0.00000074) after the last reverse stock split on June 2, 2025, which opened trading at $5.19.

99.     After effecting reverse stock splits, Defendants would restart the scheme with new misleading press releases and announcements to entice new retail investors into buying Mullen common stock.

**VII.   Defendants' False and Misleading Statements and Their Manipulative Acts**

**A.   Defendants deceptively manipulate Mullen's capital structure to manufacture authority to effect reverse stock splits**

100.   On November 14, 2022, the Class Period begins. Prior to that day, it appeared unlikely that shareholders would vote to authorize additional reverse splits. To thwart a negative vote, Defendants schemed to create a Series AA Preferred Stock, which carried with it 1,300,000,000 votes per share, and allowed the holder of the stock to vote on any proposal at the yet-to-be-announced December Special Meeting of Stockholders, including the forthcoming proposal to authorize the Company to effect a reverse stock split. That same day, the Company sold one share of Series AA Preferred Stock to Michery for $25,000. Defendant New signed the Series AA Preferred Stock purchase agreement on behalf of the Company. By this machination, Defendants created the ability to overrule the will of all other shareholders, should they vote against effecting a reverse stock split.

101.   This gave Michery the power to swing the proposals at the December Special Meeting of Stockholders in any way he wanted, and then get back the money he used to purchase the Series AA Preferred Stock. And, by its terms, Michery could immediately redeem the Series AA Preferred share and get his $25,000 back once a reverse stock split proposal was passed.

102.   On November 15, 2022, the Company announced that it would hold a Special Meeting of Stockholders on December 23, 2022 to vote on a series of proposals, including (a) authorizing the Company to effect a reverse stock split; (b) authorizing the Company to increase the total number of shares of common stock that it can use to five billion shares; (c) changing the Company's state of incorporation from the State of Delaware to the State of Maryland; and (d) providing for the issuance of $150 million in notes and up to $190 million in additional shares of Series D Preferred Stock, each convertible into shares of common stock and warrants exercisable into shares of common stock.

103.   That same day, in an amendment to a prior stock purchase agreement entered

31

into on June 7, 2022, Mullen entered into an agreement to sell a convertible note to Esousa Holdings, LLC, Acuitas Capital, LLC, TDR Capital Pty Limited, BitNile Holdings, Inc., Jess Mogul, Jim Fallon, and Michael Friedlander for $150 million. The convertible note accrued interest at a rate of 15% per annum, and whenever a buyer converted a note to shares of common stock, they were entitled to warrants exercisable for 185% of the common stock.

104.    On November 21, 2022, Mullen announced that it was registering and authorizing up to 220,828,539 shares of common stock for resale for Favored Investors pursuant to the exercise of warrants and convertible notes.

105.    On December 23, 2022, the vote on the shareholder proposals was delayed until a Special Meeting of Stockholders scheduled for January 19, 2023. On January 19, 2023, with Michery voting in favor, the proposal to authorize a reverse split passed.

106.    Shareholders—including Michery—also voted in favor of issuing $150 million in notes and up to $190 million in additional shares of Series D Preferred Stock. In effect, this authorized Mullen's capital stock increase from 2.25 billion shares to 5.5 billion shares, giving Defendants more shares they could sell to investors, bringing more money into the Company that could be used to fund the lavish lives of Michery and his associates. Having accomplished this part of the scheme, Michery redeemed his single share of Series AA Preferred Stock for $25,000, and the Company filed a certificate with the Secretary of State of the State of Delaware cancelling the Series AA Certificate of Designation and eliminating all Series AA Preferred Stock.

107.    News outlets at the time commented about the absurdity of increasing the number of authorized shares, noting that it would allow the Company to immediately cash in on the reverse stock split:

> The really wild thing here is that the reverse split doesn't impact how many shares Mullen can issue. Mullen currently has 1.7 billion outstanding shares. So for example, if the company decided to reverse split at 1-for-10, the total number of shares would drop to 170 million. You might think that this means

the company could only increase the authorized stock to 500 million instead of 5 billion, but that's not the case. Despite this 10-fold reverse split, Mullen could still increase the number of authorized shares to 5 billion (if the vote passes and the courts agree this is all legitimate).

David Shultz, *Mullen Approves Reverse Split, Punts Dilution Vote to Next Week Due to Ongoing Lawsuit*, DOT.LA, Jan. 19, 2023, https://dot.la/mullen-automotive-stock-2659283482.html.

**B.    Defendants make false and misleading statements about their reverse stock split scheme**

108.    To assuage investor concerns that Mullen would use the new reverse split authorization to dilute common shareholders, Defendants lied to suggest that they actually had no plans to implement any reverse splits. On January 25, 2023, Mullen put out a press release falsely stating that the Company had "no plans at the current time to effect a reverse split[,]" even though it was already internally decided to do so:

> ***The company has no plans at the current time to effect a reverse split. The company has until March 6, 2023 to meet the Nasdaq minimum bid requirement of $1.00. If the share price of the company's stock falls short of the said requirement, the company intends to seek an extension from NASDAQ to meet the required threshold. If such extension is granted, compliance of the minimum $1.00 stock share threshold requirement may be extended for a further 180 days until approximately September 6, 2023. If the company still falls short of the minimum bid requirement, it will effect a reverse stock split at that time to maintain its Nasdaq listing compliance.*** Mullen is also a member of the Russell 2000 Index through June of 2023, which requires a minimum stock price of $1.00 for inclusion. The Russell Index will rebalance in June of 2023, at which time, if the share price of the company's stock falls short of the minimum $1.00 threshold required, Mullen will evaluate if it is in the best interest of shareholders to initiate a reverse stock split for continued inclusion in the Russell 2000 index.

109.    The above statements identified in Paragraph 108 were materially false and misleading when made because (a) it was subjectively false in that Defendants knew at the time that further stock splits would be needed and would be implemented as needed to

maintain NASDAQ listing, but instead made these statements to convince the NASDAQ to give the Company a 180-day extension to meet the NASDAQ's $1.00 Bid Price Requirement; (b) Defendants, at the time of this statement, did plan to enact as many reverse stock splits that were needed to maintain a NASDAQ listing; (c) the statement embedded a false statement of fact—that it was not anticipated at the time of the statements that additional reverse stock splits would be needed, when in fact it was anticipated; and (d) the statements failed to disclose that because Mullen lacked any legitimate business prospects for manufacturing and selling EVs, Defendants knew that further dilutive offerings and reverse stock splits would be effected.

110.    On February 14, 2023, Mullen issued its Q1 FY2023 10-Q. The Q1 FY2023 10-Q, signed by Michery and New, doubled down on Michery's January 25, 2023 misrepresentations, stating that they had no plans to effect a reverse stock split before September 6, 2023:

> **At the Special Meeting of Mullen Shareholders held on January 25, 2023, in order to meet NASDAQ listing requirements, a proposal for implementation of a reverse stock split was approved, which the company does not plan to enact in the event the stock eclipses the $1 mark between now and September 6th.** Should the price of the Mullen common stock not reach $1 per share, management plans to implement the reverse split at a magnitude determined at that time.

111.    The above statements identified in Paragraph 110 were materially false and misleading when made because (a) it was subjectively false in that Defendants knew at the time that further stock splits would be needed and would be implemented as needed to maintain NASDAQ listing, but instead made these statements to convince the NASDAQ to give the Company a 180-day extension to meet the NASDAQ's $1.00 Bid Price Requirement; (b) Defendants, at the time of this statement, did plan to enact as many reverse stock splits that were needed to maintain a NASDAQ listing; (c) the statement embedded a false statement of fact—that it was not anticipated at the time of the statements

that additional reverse stock splits would be needed, when in fact it was anticipated; and (d) the statements failed to disclose that because Mullen lacked any legitimate business prospects for manufacturing and selling EVs, Defendants knew that further dilutive offerings and reverse stock splits would be effected.

112.    That same day, Defendants issued a press release for its Q1 FY2023 10-Q, reiterating its false promise that the Company had no plans to effect a reverse stock split until September 6, 2023, stating:

> Concerning the Special Meeting of Mullen Shareholders, after removing certain items initially slated for consideration by Shareholders, all remaining proposals were approved. ***This included the implementation of a reverse stock split, which the company does not plan to enact in the event the stock eclipses the $1 mark between now and September 6th.*** Should the price of the Mullen common stock not reach $1 per share, management plans to implement the reverse split at a magnitude determined at that time.

113.    The above statements identified in Paragraph 112 were materially false and misleading when made because (a) it was subjectively false in that Defendants knew at the time that further stock splits would be needed and would be implemented as needed to maintain NASDAQ listing, but instead made these statements to convince the NASDAQ to give the Company a 180-day extension to meet the NASDAQ's $1.00 Bid Price Requirement; (b) Defendants, at the time of this statement, did plan to enact as many reverse stock splits that were needed to maintain a NASDAQ listing; (c) the statement embedded a false statement of fact—that it was not anticipated at the time of the statements that additional reverse stock splits would be needed, when in fact it was anticipated; and (d) the statements failed to disclose that because Mullen lacked any legitimate business prospects for manufacturing and selling EVs, Defendants knew that further dilutive offerings and reverse stock splits would be effected.

114.    On March 6, 2023, Mullen announced that it was registering and authorizing up to 522,222,223 shares of common stock for resale for Acuitas Capital LLC pursuant to

the exercise of warrants and preferred stock.

115.    On March 8, 2023, Mullen received a 180-day extension, until September 5, 2023, to get its stock price above the NASDAQ's $1.00 Bid Price Requirement. Mullen was previously alerted in September 2022 that it had until March 6, 2023 to get its stock price above the NASDAQ's $1.00 Bid Price Requirement. However, in the wake of Defendants' commitments not to effect a reverse stock split before September 6, 2023, the NASDAQ granted Mullen a 180-day extension. Nevertheless, as both the NASDAQ and retail investors would soon realize, Defendants had always planned to effect a reverse stock split well before the committed September 6, 2023 deadline.

116.    On April 3, 2023, the parties to the June 7, 2022 stock purchase agreement entered into an amendment where the Company committed to exchange additional shares of Series D Preferred Stock and warrants in return for two payments of $45 million on April 17, 2023 and May 15, 2023. The Company also agreed that it would not effect a reverse stock split during the five trading days prior to either of these purchase dates.

117.    On April 14, 2023, Mullen again announced that it was registering and authorizing shares of common stock – this time 2,115,000,000 shares of common stock – for Favored Investors pursuant to the exercise of warrants and convertible notes. The exercise of warrants provided Favored Investors a chance to flip their stock for a profit, and Mullen with an infusion of cash.

### C.    Defendants' misleading announcements about a deal with Global EV Technology, Inc. and Lawrence Hardge

118.    On April 18, 2023, Defendants sought to boost the Company's stock price by issuing a flurry of misleading statements about an allegedly revolutionary battery technology that Mullen had acquired. In reality, the promised technology was nothing but lies, as news outlets would later confirm.

119.    That day, Mullen issued a press release announcing that the Company had partnered with Global EV Technology, Inc and EV Technologies LLC (collectively,

36

"EVT") and their founder, Lawrence Hardge, to create a new entity – Mullen Advanced Energy Operations, LLC ("MAEO"). Critically, Mullen owned 51% of MAEO and MAEO would "consolidate the results of [MAEO's] operations in Mullen[.]" Pursuant to the creation of Mullen's new subsidiary, Lawrence Hardge became Senior Vice President of Technology of MAEO. As a result, Mullen controlled MAEO, and Lawrence Hardge operated as Mullen's agent.

120.    Mullen's April 18, 2023 press release also announced that Mullen and EVT would "be contributing and working together on known verified technology for improving existing vehicle performance and extending battery range. As this technology has immediate and key implications for electric vehicles, MAEO['s] initial development is focused on improving Mullen's lineup of commercial and consumer EVs." Further, the Mullen press release lauded Lawrence Hardge as "a successful life-long inventor[,]" while also, perplexingly, noting that "[i]n the late 90s, Lawrence [Hardge] was convicted of a state crime and ultimately it was expunged."

121.    The above statements identified in Paragraphs 119–120 were materially false and misleading when made because: (a) the battery technology referenced was not "known verified technology for improving existing vehicle performance and extending battery range[,]" but instead a fictional technology purportedly created by Lawrence Hardge that did not actually exist; and (b) Lawrence Hardge was not "convicted of a state crime, and ultimately it was expunged[,]" but instead convicted of a felony for selling unregistered securities, which was never expunged.

122.    On April 20, 2023, Mullen issued a complimentary press release announcing "exciting and groundbreaking test results of its recently acquired joint venture technology, greatly improving current EV performance by increasing EV vehicle range." The Company then detailed the allegedly revolutionary technology that it acquired through its partnership with EVT and Lawrence Hardge, stating:

- Element Materials Technology test results indicate that the Energy Management Module (EMM) technology substantially increases the driving range and efficiency of any current EV battery.
- Specific vehicle testing of a high-volume OEM electric vehicle by Element, resulted in a calculated increase in range from 269 to 431 miles, which is a 60% increase in efficiency.
- EMM technology was tested by Mullen Automotive engineers on the Company's Class 1 EV Cargo Van at its Troy, Michigan facility. Results showed more than a 75% increase in range for the 42-kWh lithium-ion battery pack, which would be a calculated EPA estimated range of 186 miles at a very low added cost and mass.
- EMM technology is being integrated into final stages of product development and is planned to be introduced in all Mullen commercial and Mullen consumer vehicle programs.
- U.S. provisional patent application has been filed covering the technology.
- Mullen Automotive owns 51% of MAEO, LLC and will consolidate the results of its operations in Mullen Automotive, Inc., (Nasdaq: MULN)

123.   The April 20, 2023 press release also quoted Michery, who said, "[s]eeing the previous EMM test results conducted by Element, along with Global EVT testing, *and correlating that with testing our own engineers*, we believe this technology is a perfect fit for Mullen's EV product lineup as well as the advancement in EV technology for the overall automotive industry[.] Mullen Advanced Energy Operations plans on licensing this technology to everyone who uses an electric vehicle."

124.   The above statements identified in Paragraphs 122–123 were materially false and misleading when made because (a) the battery technology referenced did not "substantially increase[] the driving range and efficiency of any current EV battery[,]" but instead was a fictional technology purportedly created by Lawrence Hardge that did not actually exist; (b) there is no technology that can boost a battery pack like the one used by EVT up to 431 miles; (c) Element Materials Technology did not confirm the EMM's technological capabilities, but instead came to "no conclusion" about the EMM's ability to increase the driving range and efficiency of any current EV battery; and (d) Mullen never independently confirmed the testing of Global EVT with testing from Mullen's own

38

engineers.

125.   These announcements were important in drawing investor interest because "[i]t's widely understood that the first American company to produce a scalable solid-state battery—one that's cheaper, faster-charging, and less reliant on Chinese materials—will control the holy grail of power sources." Clint Rainey, *The wild saga of a convicted fraudster, a troubled EV company, and the promise of a perfect battery*, FAST COMPANY, July 5, 2023, https://www.fastcompany.com/90917450/lawrence-hardge-mullen-automotive-ev-battery.

126.   Finally, on April 20, 2023, Lawrence Hardge, acting as the actual or apparent agent of Mullen and Mullen's subsidiary, MAEO, went on Facebook Live to announce that EVT and Mullen had agreed to a $10 billion contract with Saudi Arabia, stating:

> This is not what somebody said or what you heard, this is reality. $10 billion contract with Saudi Arabia. And more to come … Mullen and Lawrence Hardge are here to assist them, they have countries like Yemen, Israel, all of them have joined in to take this technology, and they're going to produce it in Saudi Arabia and they're also paying for a manufacturing plant to come to Michigan. That's in black and white. So, the SEC if you're watching, that's already agreed upon.

127.   The above statements identified in Paragraph 126 were materially false and misleading when made because (a) the referenced technology purportedly sold to Saudi Arabia did not exist, but instead was a fiction created by Lawrence Hardge; (b) as a result, neither MAEO nor Mullen had any possibility of receiving $10 billion in revenue from the Saudi Arabia; and (c) even if the technology did exist, Lawrence Hardge had a carve out in his partnership with Mullen for Saudi Arabia, so that any purported deal between Lawrence Hardge and Saudi Arabia would have no impact on Mullen.

128.   In response to these misleading press releases and announcements, Mullen's share price jumped by 25.6%, from an April 20, 2023 closing price of $0.084 to reaching a high of $0.113, before closing at $0.102 on April 21, 2023.

129.   News outlets also noted that the Company was "making 'wonderful' deals and partnerships" and that Mullen's stock "has seen a dramatic spike in trading volume recently, with an average of over 567 million shares over the last five days, according to FactSet data. The stock's 65-day average trading volume is 270.3 million shares." James Rogers, *After TOP Financial's surge, influential meme-stock trader looks for next big opportunity*, MARKETWATCH, May 2, 2023, https://www.marketwatch.com/story/after-top-financials-surge-influential-meme-stock-trader-looks-for-next-big-opportunity-3d7de675.

**D.   Defendants effect Mullen's first reverse stock split of the Class Period, as they always contemplated and issue false statements about battery technology**

130.   Despite the bevy of false announcements about purported deals and technological breakthroughs, Mullen's stock price again fell substantially below the NASDAQ's $1.00 Bid Price Requirement. Accordingly, on May 3, 2023, less than two months after assuring investors that the Company had no plans to effectuate a reverse stock split, Mullen announced that it was going to effectuate a 1-for-25 reverse stock split the next day, just as it always had planned to do when shares dipped. On that news, Mullen's stock dropped by 30.2%, from an opening price of $0.086 to a low of $0.06, before closing at $0.063 on May 3, 2023.

131.   On May 4, 2023, Defendants effected their first reverse stock split of the Class Period.

132.   On May 15, 2023, in an effort to restart the cycle and boost Mullen's stock in the wake of its first reverse stock split, the Company issued a press release where, among other things, it discussed testing of the Energy Management Module (EMM) technology and stated that it had confirmed that the tests "show[ed] an increased battery capacity of 44%":

> On April 18th, 2023, the Company announced the formation of Mullen Advanced Energy Operations ("MAEO"), a collaboration with Global EV Technology, Inc. ("Global"), with initial development focused on improving energy management technology in electric vehicles for greater range and vehicle performance.
>
> \*\*\*
>
> On January 20th, 2023, Energy Management Module ("EMM") technology was also tested by Hardge and Mullen engineers on the Company's EV Cargo Van at its Troy, Michigan, facility, with testing results showing an increased battery capacity of 44%.

133.    The above statements identified in Paragraph 132 were materially false and misleading when made because: (a) the battery technology that EVT and Mullen were touting did not increase battery capacity by 44%; (b) the testing could not have confirmed that the technology increased battery capacity by 44%, because such technology did not actually exist; and (c) the referenced technology and testing was a fiction created by Lawrence Hardge.

134.    Similarly, on May 15, 2023, Mullen filed its Q2 FY2023 10-Q, signed by Michery and New, where it discussed its deal with EVT, stating in relevant part:

> On April 17, 2023, the Company entered into a binding Letter of Agreement with Lawrence Hardge, Global EV Technology, Inc., and EV Technology, LLC to partner on a device known as a Battery Life Enhancing Technology. The parties will form a new corporation called Mullen Advanced Energy Operations to develop, manufacture, market, sell, lease, distribute, and service all products resulting from the technology. The Company will hold a 51% equity interest in MAEO, and EVT will hold a 49% equity interest. EVT will license the technology and intellectual property rights to MAEO and assign all rights to governmental and other contracts relating to the technology. The Company will pay Mr. Hardge an upfront payment of $50,000 and then $5.0 million upon execution of definitive agreements and completion of IP assignment. The Company will also fund up to $5.0 million for all MAEO business operations, with additional funding based on a budget reasonably approved by the parties.

135.    The above statements identified in Paragraph 134 were materially false and

misleading when made because: (a) MAEO did not possess any technology that "enhanced battery life"; and (b) the statements omitted that the so-called battery technology underlying the EVT and Mullen partnership was a fiction created by Lawrence Hardge.

136.    Also on May 15, 2023, Mullen issued a complimentary press release designed to spike investor interest in the Company, touting the $680,000 deal that Mullen and EVT supposedly had with the city of Washington D.C., while omitting the fact that the $680,000 contract was based on delivering impossible technology which Defendants did not have access to, stating:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, today issues an update on the pilot program contract for installation of Energy Management Modules ("EMM") on Washington, D.C., city government's fleet of vehicles. The $680,000 contract was previously awarded by the District of Columbia, Washington, D.C., to EV Technologies, LLC. for the purchase and installation of EMM units on Chevrolet Bolts within the D.C. city government's vehicle fleet. Mullen Advanced Energy Operations ("MAEO") is supporting EV Technologies for the execution of the contract, which started on April 24, 2023. MAEO, which is a 51%-owned subsidiary of Mullen Automotive, is a collaboration with Global EV Technology, Inc. ("Global"). MAEO has named Lawrence Hardge to the position of Senior Vice President of Technology. Lawrence will be overseeing all technological aspects of the Energy Management Module ("EMM") applications.

> "We look forward to completing our installation work here in D.C., and the next steps as vehicles enter the fleet with our EMM and also future opportunities with the local and federal government agencies," said Lawrence Hardge, CEO of EV Technologies, LLC. "As testing and installations continue in D.C., we will provide further updates," said David Michery, CEO and chairman of Mullen Automotive.

137.    The above statements identified in Paragraph 136 were materially false and misleading when made because the statements failed to disclose the following material adverse information necessary to make the statements made not misleading: (a) the referenced technology purportedly sold to the city of Washington, D.C. did not exist, but

instead was a fiction created by Lawrence Hardge; (b) as a result, neither MAEO nor Mullen had any possibility of receiving $680,000 in revenue from the City of Washington D.C.; and (c) there were no further "opportunities with local and federal government agencies."

138.    These misleading announcements were made to, and did, re-energize investor interest in Mullen after it effected its first Class Period reverse stock split.

139.    Favored Investors took advantage of this renewed interest to exercise their warrants and convertible notes. Specifically, in June 2023, Defendants on three occasions registered common stock for resale pursuant to the exercise of warrants and conversion of convertible notes. On June 5, 2023, Mullen registered and authorized up to 242,124,674 shares of common stock for resale by Favored Investors. On June 12, 2023, Mullen registered and authorized up to 585,937,467 shares of common stock for resale by Favored Investors. Finally, on June 26, 2023, Mullen registered and authorized up to 2,335,128,757 shares of common stock for resale by Favored Investors. Each of these registrations was expressly tied to shares to be issued to the Favored Investors upon the exercise of warrants and conversion of convertible notes.

**E.    Defendants' hyped-up deal with Lawrence Hardge is proved illusory**

140.    Defendants' claims of "groundbreaking" technology were quickly debunked just two months after Defendants' initial announcements, devastating investors who purchased Mullen stock on the promise of the EMM technology, the illusory $10 billion Saudi Arabia deal, and the illusory $680,000 Washington, D.C. deal.

141.    On June 6, 2023, in an interview with the YouTube page, Financial Journey, Michery finally commented on the announced Saudi Arabia deal, stating that Lawrence Hardge has a carve out and Lawrence Hardge's alleged deal with Saudi Arabia has "no impact" on Mullen and Michery never reviewed any documents regarding any purported deals with Saudi Arabia. When explaining this, Michery himself conceded that he was disclosing this information because "misrepresentations [were] being made" and that

Mullen "knew" that Lawrence Hardge's statements were not factual. Michery also admitted that, contrary to Mullen's previous announcements, the Company never independently confirmed the test results underlying the purported "groundbreaking" technology, stating:

> So, keep in mind, between January 4th of this year and January 20th, we had Lawrence at our facilities in Troy, Michigan, testing this EMM module. And Lawrence would provide us data, showing that these units performed at whatever level that we had advertised, were the results provided by Lawrence. We had asked that we wanted to have these units independently tested by a EPA certified test facility in Michigan. [Lawrence Hardge] agreed to do that on April 21st. And those vehicles have been sitting at the EPA test facility in Michigan, waiting for him to provide those units. We're told time in, and over and over again, that he's going to provide the units, provide the units. And those vehicles have been sitting... both class one and class three, have sat at that facility now for well over a month, maybe more. And again, waiting to run these EPA certified tests so we could validate the unit as a condition to closing. So, as of this date, there's been no response to that.

Nevertheless, Michery stated that he "do[es] believe in [Hardge] as a person" and that Lawrence Hardge is a "great inventor[,]" and still gave investors hope that Defendants' claim of "groundbreaking" battery technology was both accurate and forthcoming for Mullen.

142.   On this news, Mullen's stock price dropped 22.7%, from an opening day price of $0.655 to a low of $0.506 over the next two trading days, before closing at $0.517 on June 7, 2023.

143.   Then, on June 8, 2023, the first signs that Defendants' claims of "groundbreaking" technology were false materialized, when an article published by Jalopnick.com outlined how Lawrence Hardge's suspiciously grandiose claims omitted devastating details. Specifically, the article explained (1) that EVT's testing was performed on a "small golf cart like EVs retirees use down in Florida" and not on a "top EV" as Lawrence Hardge had claimed; and (2) that the test EVT performed was "done without the

44

drive wheels touching the ground[,]" and therefore had no relation whatsoever to the range an EV battery would actually have when driving on a road where the tires are subject to friction. Lawrence Hodge, *I'm Not EV Startup Executive Lawrence Hardge*, JALOPNIK, June 8, 2023, https://www.jalopnik.com/im-not-ev-startup-executive-lawrence-hardge-1850517820/.

144.   On this news, Mullen's stock price dropped 60.5%, from an opening day price of $0.509 to a low of $0.201 over the next five trading days, before closing at $0.261 on June 15, 2023. Nevertheless, investors – unaware of the full extent of Defendants' lies – still trusted in the hope of Defendants' (misleading) claims.

145.   On July 10, 2023, the Company announced that it had terminated its relationship with Lawrence Hardge and EVT, admitting that it had never been able to verify either the technical claims Lawrence Hardge, MAEO and Mullen had made, or MAEO's license to the technology:

> On July 10, 2023, Mullen Automotive Inc. (the "Company" or "Mullen"), issued a termination notice to Lawrence Hardge and the following entities Global EV Technology, Inc. and EV Technology, LLC (collectively, "EVT") terminating the Agreement dated April 17, 2023 between the Company and EVT. Pursuant to the Agreement, the parties agreed to jointly form and organize Mullen Advanced Energy Operations ("MAEO") to develop, manufacture, market, sell, lease, distribute and service all products resulting from a device that is designed to extend the effective battery life (the "Technology") and EVT would agree to license to MAEO the Technology and all intellectual property rights relating to the Technology.
>
> The termination notice, which was sent after numerous attempts by the Company to obtain adherence by EVT to the terms of the Agreement, references several breaches by EVT including (1) failing to execute documents evidencing an irrevocable, royalty free, worldwide exclusive license to the Technology and IP, in perpetuity, to MAEO, (2) refusing to conduct any tests of the Technology at a Mullen approved facility after the LOA, (3) repeatedly refusing to honor the terms of the Mutual Non-Disclosure Agreement signed April 14, 2023, and (4) failing to disclose all claims or threatened legal actions by any third parties related to the Technology.

146.    On this news, Mullen's stock price dropped 3.2%, from an opening day price of $0.182 to a low of $0.176. Still, the full scope of Defendants' misleading claims about Lawrence Hardge's "exciting and groundbreaking" technology would not be seen until seven days later, when the full scope of Defendants' misleading claims was laid bare.

147.    On July 17, 2023, in the wake of Mullen's announcement that the Company had terminated its relationship with Lawrence Hardge, Washington, D.C. news outlet WUSA9 reported that Lawrence Hardge's technology – which Defendants touted in their April 20, 2023 announcement and reaffirmed in their May 15, 2023 press release – was "untested and practically impossible[,]" as confirmed by engineers. The WUSA9 news report outlined how the electrical engineering labs at the University of Maryland confirmed that no technology existed that could do what Lawrence Hardge and Defendants had touted. It quoted the associate director of the Maryland Energy Innovation Institute as stating, "[t]here's not technologies that I'm aware of that can really boost that same battery pack to significantly more than 200 mile range[.] . . . There's a variety of limitations just from basic chemical theory. There's only so much energy you can store for the materials that you put into a battery." Nathan Baca, *Convicted felon gets DC contract to install car battery tech called impossible by experts*, WUSA9, July 17, 2023, https://www.wusa9.com/article/news/investigations/lawrence-hardge-dc-battery-rejuvenation-contract/65-93a48463-e2fd-43e4-9a1b-9f727036ce0c.

148.    The WUSA9 news report also outlined Lawrence Hardge's criminal history, exposing it as far more extensive than Mullen's falsification that it involved "a state crime, which was ultimately expunged." In reality, Lawrence Hardge "was sentenced to 26 years in prison for a felony conviction in 2001. He was found guilty of selling unregistered securities from his home state of Mississippi. Hardge served five years in prison and tried to expunge, or wipe, his criminal record in 2021. A Mississippi judge rescinded Hardge's temporary felony expungement in March 2022, after a judge's order shows allegations surfaced that Hardge used a business investor's money to repay the people he defrauded

46

in 2001." *Id*. Consequently, at the time of Mullen's press release on April 18, 2023, Lawrence Hardge was, in fact, a convicted felon.

149.    Far from partnering with a "talented inventor" who would help Mullen "scale [] energy technology[,]" the July 17, 2023 news report revealed that Mullen partnered with a convicted felon and made patently false promises of "groundbreaking" battery technology that did not exist.

150.    On this news, Mullen's stock price fell 11.7% over the following two trading days, from an opening price of $0.162 on July 17, 2023 to a low of $0.143, before closing at $0.147 on July 19, 2023.

151.    On July 22, 2023, Carscoops.com reported that Washington D.C. had cancelled the $680,000 contract that Mullen had touted to investors on May 15, 2023. Stephen Rivers, *Washington D.C. Signed A $680,000 Contract For Device That Claimed It'll Double EV Range*, CARSCOOPS, July 22, 2023, https://www.carscoops.com/2023/07/washington-d-c-signed-a-680000-contract-for-device-that-claimed-itll-double-ev-range/.

152.    On this news, Mullen's stock price fell 18% over the following three trading days, from an opening price of $0.15 on July 21, 2023 to a low of $0.123, before closing at $0.13 on July 26, 2023.

153.    On August 7, 2023, WUSA9 published a follow-up story on Lawrence Hardge and his fictional technology. The August 7, 2023 WUSA9 report reiterated the analysis of engineers who reviewed Lawrence Hardge's technology and concluded that the technology did not, and could not, exist. WUSA9 also spoke with Element Materials Technology, who stated that, contrary to the claims of Mullen and Lawrence Hardge, it came to no conclusion about the Energy Management Module (EMM) technology's ability to increase the driving range and efficiency of any current EV battery. Nathan Baca, *WUSA9 investigates how DC government fell for convicted fraudster's invention claims*, WUSA9, Aug. 7, 2023, https://www.wusa9.com/article/news/investigations/lawrence-

47

hardge-speaks-to-wusa9/65-cd0d1afc-edab-4456-8fed-3ab88b95c791.

**F.    Mullen effects its second and third reverse stock split of the Class Period**

154.    Recognizing that Mullen's share price had fallen precipitously after Defendants' fabricated EVT announcements were proved false, Defendants reverted to additional reverse stock splits to again jack up Mullen's stock price.

155.    On August 10, 2023, Mullen announced that it would effect a 1-for-9 reverse stock split, effective on August 11, 2023. On that news, Mullen's stock dropped by 6.9%, from an opening price of $0.115 to a low of $0.107, before closing at $0.113 on August 10, 2023.

156.    On August 11, 2023, Defendants effected their second reverse stock split of the Class Period.

157.    On August 23, 2023, in the wake of Mullen's August reverse stock split, Michery issued an open letter to investors. In that letter, Michery continued to mislead investors about both his intentions and the Company, stating that he was fully committed to Mullen's success and that the Company's share price did not reflect the Company's actual value. In truth, Michery's only commitment was to continue to use Mullen as his own personal slush fund, and he knew, due to the overhyped and misleading pronouncements about deals Mullen had made, that its stock price was well above what it would actually be trading at if investors knew the truth:

> I am very disappointed by the performance of our stock. As I have previously publicly stated, I do not believe the trading price of our stock even closely resembles the Company's actual value. It is evident that, regardless of meeting significant corporate milestones (i.e., vehicle production completion within projected timelines), stock traders continue to place downward pressure on the stock, causing the price to fall.

> I previously announced that the Company engaged Share Intel and other parties to investigate what I suspect to be unlawful trading practices in our stock. We are assembling all the data received to date and should have something to announce in the coming days.

I am extremely frustrated that the hard work of Mullen's dedicated team and the significant momentum and successes achieved to date are overshadowed by the unrealistic value attributed to our stock. The Company and I have demonstrated our commitment to the success of our initiatives by purchasing its stock through the previously announced Share Buy Back program. I have also personally recently purchased stock, demonstrating my unwavering confidence in our Company.

158.   On October 27, 2023, pursuant to the exercise of warrants and convertible notes, Mullen registered and authorized up to 103,009,651 shares of common stock for resale by Favored Investors.

159.   On December 19, 2023, Michery issued an open letter to investors admitting that "the Company was granted until Jan. 22, 2024, to demonstrate that the stock had traded above one dollar for at least 20 consecutive trading days, failing which the Company would be **permanently delisted** from the Nasdaq capital markets" and that the "**only**" way "to give the Company the best possible chance of regaining minimum bid compliance for the mandated 20 trading days and that **was by doing a significantly large reverse stock split**."  The letter further admitted that Mullen "needs to raise capital" and that "**[m]ost sources of capital are not willing to provide financing to the Company if it is no longer on a major national exchange**. Being demoted to an over-the-counter exchange where market making and trading volumes are significantly lower would put the Company – and hence its shareholders – at great risk."

160.   That same day, Mullen issued a press release announcing a 1-for-100 reverse stock split, effective on December 21, 2023. On that news, Mullen's stock dropped by 32.4% over the following two trading days, from an opening price of $0.114 on December 19, 2023, to a low of $0.077, before closing at $0.08 on December 20, 2023.

161.   On May 14, 2024, Mullen bolstered its cash reserves when it entered into a stock purchase agreement whereby the Company agreed to sell convertible notes and warrants to Esousa Holdings, LLC, JADR Capital 2 Pty Ltd., Jim Fallon, Jess Mogul, Michael Friedlander, Phil Bannister, Matthew Krieger, and Mario Silva in exchange for

49

$52.6 million.

162.    Through the Spring and Summer of 2024, Mullen also registered millions of additional shares for resale by Esousa Holdings, LLC and other Favored Investors to be issued upon the exercise of warrants and conversion of convertible notes. On May 20, 2024, Mullen registered and authorized up to 20,000,000 shares of common stock for resale by Favored Investors. On July 5, 2024, pursuant to the exercise of warrants and convertible notes, Mullen registered and authorized up to 75,000,000 shares of common stock for resale by Favored Investors. And finally, on July 26, 2024, pursuant to the exercise of warrants and convertible notes, Mullen registered and authorized up to 85,000,000 shares of common stock for resale by Favored Investors.

**G.    Defendants promote a second false deal with Volt Mobility**

163.    According to CW1, in mid-July 2024, it was well known throughout the Company that none of Mullen's vehicles met the United Arab Emirates' homologation standards. Homologation is the process of certifying that a vehicle meets regulatory and safety standards for a particular market. In the United Arab Emirates, all EVs must be registered and certified by the Emirates Authority for Standardization & Metrology, which requires specific technical requirements, including with respect to electrical performance, electromagnetic compatibility, and general safety requirements. Most notably, the batteries in the Mullen vehicles were not equipped to deal with the heat in the United Arab Emirates and did not meet homologation standards. CW1 spoke with Mullen's head of homologation, Corry Davis, who told CW1 that Mullen's vehicles were a year and $25 million worth of upgrades away from being able to address the United Arab Emirates' homologation standards.

164.    CW1 also spoke with New and the Company's Chief Accounting Officer Chester Bragado multiple times on the telephone in mid-July 2024 about Mullen's inability to sell vehicles in the Middle East because Mullen's vehicles did not meet homologation standards. According to CW1, Defendant New acknowledged that Mullen's

vehicles did not meet the United Arab Emirates' homologation standards, but said that Michery wanted to move forward with a deal with Volt Mobility, a company based in the United Arab Emirates, so the Company would start shipping over vehicles immediately and figure out how to resolve the homologation problems later.

165.    On August 26, 2024, Mullen announced via a press release that the Company had entered into a purchase agreement with Volt Mobility for approximately $210 million, stating:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an electric vehicle ("EV") manufacturer, announced today that Volt Mobility ("Volt"), based in the United Arab Emirates ("UAE"), has entered into a purchase agreement for approximately $210 million to acquire 3,000 Class 1 and Class 3 EV cargo vans and trucks over a 16- month period. Mullen will receive an initial $3 million deposit within 60 days and additional payments as the vehicles are delivered. The Company will begin shipping the first vehicles immediately. Mullen expects to recognize approximately $210 million in revenue over the next 16 months of the agreement. Volt intends to lease these vehicles to its corporate customers based in the Middle East and Gulf States. Current Volt clients include UPS, DHL and FedEx throughout the Gulf Cooperation Council ("GCC") region, which includes Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates (UAE). Volt's vehicle order will be assembled at Mullen's Tunica, Mississippi-based Commercial Vehicle Facility, which is capable of producing 20,000 Class 1 and 6,000 Class 3 vehicles annually with two production shifts.

166.    The above statements identified in Paragraph 165 were materially false and misleading when made because: (a) Mullen did not then expect "to recognize approximately $210 million in revenue over the next 16 months of the agreement"; (b) the statements omitted that Mullen's EVs were not equipped to meet the United Arab Emirates' homologation standards, including that the batteries of Mullen's EVs were not equipped to deal with the heat in the United Arab Emirates; (c) Mullen knew it would take approximately one year and $25 million to modify their EVs so that they could meet the United Arab Emirates' homologation standards; and (d) as a result, Mullen was not in a

51

1  position to "begin shipping the first vehicles immediately."

2  167.   On the heels of Mullen's press release, Michery issued a misleading tweet

3  claiming that the first round of deliveries under the Volt Mobility deal was to "begin

4  immediately":



18  168.   The above statements identified in Paragraph 167 were materially false and

19  misleading when made because the statements failed to disclose that (a) Mullen's EVs

20  were not equipped to meet the United Arab Emirates' homologation standards, including

21  that the batteries of Mullen's EVs were not equipped to deal with the heat in the United

22  Arab Emirates; (b) Mullen knew it would take approximately one year and $25 million to

23  modify their EVs so that they could meet the United Arab Emirates' homologation

24  standards; and (c) as a result, Mullen was not in a position for the "[f]irst round of

25  deliveries to begin immediately."

26  169.   Michery tweeted again that same day, outlining the Volt Mobility deal and

27  misleadingly claiming that the "initial vehicle shipment [was] to begin immediately":

28

1
2
3
4
5
6
7
8
9
10
11
12



13
14    170.    The above statements identified in Paragraph 169 were materially false and
15  misleading when made because: (a) Mullen did not then expect to recognize
16  approximately $210 million in revenue over the next 16 months of the agreement; (b)
17  the statements omitted that Mullen's EVs were not equipped to meet the United Arab
18  Emirates' homologation standards, including that the batteries of Mullen's EVs were not
19  equipped to deal with the heat in the United Arab Emirates; (c) Mullen knew it would take
20  approximately one year and $25 million to modify their EVs so that they could meet the
21  United Arab Emirates' homologation standards; and (d) as a result, Mullen was not in a
22  position for the "initial vehicle shipment to begin immediately."

23    171.    Michery then made another tweet about the Volt Mobility deal, omitting the
24  fact that Mullen was not equipped to satisfy the terms of the deal, making the deal's failure
25  all but inevitable:

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15      172.    The above statements identified in Paragraph 171 were materially false and
16  misleading when made because the statements failed to disclose that (a) Mullen's EVs
17  were not equipped to meet the United Arab Emirates' homologation standards, including
18  that the batteries of Mullen's EVs were not equipped to deal with the heat in the United
19  Arab Emirates; (b) Mullen knew it would take approximately one year and $25 million to
20  modify their EVs so that they could meet the United Arab Emirates' homologation
21  standards; and (c) as a result, Mullen was not in a position to satisfy its obligations under
22  the Volt Mobility deal.
23
24
25
26
27
28

173.    Finally, Michery re-tweeted Mullen's tweet about the Volt Mobility deal, which omitted the fact that Mullen was not equipped to satisfy the terms of the deal, making the deal's failure all but inevitable:



174.    The above statements identified in Paragraph 173 were materially false and misleading when made because the statements failed to disclose that (a) the statements omitted that Mullen's EVs were not equipped to meet the United Arab Emirates' homologation standards, including that the batteries of Mullen's EVs were not equipped to deal with the heat in the United Arab Emirates; (b) Mullen knew it would take approximately one year and $25 million to modify their EVs so that they could meet the United Arab Emirates' homologation standards; and (c) as a result, Mullen was not in a position to satisfy its obligations under the Volt Mobility deal.

175.    In response to this news, Mullen's share price shot up 69%, from $0.34 to a high of $0.575. According to CW1, Michery, New, and other Mullen executives attended

a weekly telephonic meeting every Tuesday, at which Mullen executives would discuss the Company and its business prospects. On information and belief, the Volt Mobility deal – including Mullen's unpreparedness to meet the United Arab Emirates' homologation standards – was discussed at these meetings because internally discussing such prospects was the standard practice at these meetings, and because New had already acknowledged the Company's knowledge of homologation concerns to CW1. *See* ¶¶163–164.

176.    In the wake of the Volt Mobility announcement, the Company announced another authorization and registration of common stock pursuant to the exercise of warrants and convertible notes. Specifically, on September 6, 2024, Mullen registered for resale up to 350,000,000 shares of common stock issuable upon the exercise of warrants and conversion of convertible notes.

177.    Despite the misleading Volt Mobility announcements, Mullen's share price again fell below the NASDAQ's $1.00 Bid Price Requirement.

178.    On September 13, 2024, Mullen issued a press release announcing a 1-for-100 reverse stock split, effective on September 17, 2024. On that news, Mullen's stock dropped by 35.7% over the following two trading days, from an opening price of $0.168 on September 13, 2024, to a low of $0.108, before closing at $0.118 on September 16, 2024.

179.    Soon thereafter, Defendants attempted to restart the cycle again by making additional false and misleading representations about the Company's deal with Volt Mobility. On September 20, 2024, Mullen issued a press release telling investors about how the Company delivered four EVs to the United Arab Emirates:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an electric vehicle ("EV") manufacturer, announces today an update on Volt Mobility's ("Volt") United Arab Emirates ("UAE") recently placed $210 million commercial Class 1 and Class 3 EV order. Mullen's technical and sales team members arrived on site in Dubai this week to meet with Volt's leadership and to support initial market launch activities, including delivery of the first Mullen ONE EV cargo vans and Mullen THREE cab chassis trucks on Sept. 18, 2024.

Mullen recently announced the Volt order to supply 300 all-electric Mullen commercial vehicles in 2024. The Company plans an additional 3,000 vehicles scheduled for delivery in 2025. Additionally, Mullen will establish a parts and service network to support Volt Mobility's fleet operations.

"UAE is a very important market and opportunity for us, and we made sure to have technical and sales team members in Dubai this week to meet Volt leadership to ensure and kick off a successful launch," said David Michery, CEO and chairman of Mullen Automotive.

\*\*\*

Mullen Automotive, a global EV and technology company, working in conjunction with independent company, VoltiE Group, a U.S.-based EV charging infrastructure company with headquarters in Miami, Florida, are collectively providing EV vehicles and EV charging equipment to Volt Mobility. GCC-based Volt is a vehicle transport and leasing company that offers both commercial electric and gas vehicles and charging throughout the Middle East.

180.    According to CW1, who was based in the Tunica, Mississippi plant where the EVs for the Volt Mobility deal were being constructed, the four EVs were sent for marketing purposes, because they did not meet the United Arab Emirates' homologation standards and could not legally be driven in the United Arab Emirates.

181.    The above statements identified in Paragraph 179 were materially false and misleading when made because the statements failed to disclose the following material adverse information necessary to make the statements made not misleading: (a) that Mullen's EVs, including the four EVs already delivered, were not equipped to meet the United Arab Emirates' homologation standards, including the fact that the batteries of Mullen's EVs were not equipped to deal with the heat in the United Arab Emirates; (b) that Mullen would need to spend approximately one year and $25 million to modify their vehicles so that they could meet the United Arab Emirates' homologation standards; and (c) as a result, Mullen had no reasonable basis to assert it was possible to deliver an additional 300 vehicles in 2024 and an additional 3,000 vehicles in 2025.

182.    On October 4, 2024, Mullen registered for resale up to 30,000,000 shares of

common stock issued to Favored Investors upon exercise of warrants or conversion of convertible notes.

183.    On November 8, 2024, the Company issued a prospectus amending this registration statement. The prospectus contained misleading discussion of the Volt Mobility deal, again omitting the fact that Mullen vehicles were not equipped to meet United Arab Emirates homologation standards, and that the Company could not then satisfy its obligations under the arrangement:

> On August 23, 2024, the Company entered into a Purchase Agreement (the "Agreement") with VoltiE Group and Volt Mobility Holding Ltd. ("Volt Mobility") pursuant to which the Company will provide Volt Mobility with commercial electric vehicles ("EVs"), specifically, Class 1 and Class 3 Mullen vehicles and, upon U.S. certification and launch, Bollinger Class 4 vehicles, and chargers at preferred wholesale pricing for the United Arab Emirates ("UAE") region as its exclusive representative. Volt Mobility, as the Company exclusive representative, will have the ability to set up respective dealers and distributors and service partners throughout the region. Volt Mobility committed to purchase 3,000 Class 3 commercial EVs with an initial deposit of $3.0 million for initial orders of 300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025. As of the date of this prospectus, Volt Mobility has not yet made the deposit nor placed the initial orders. The Company also agreed that it will coordinate with Volt Mobility to set up a fully operational service center in the UAE. In the event of default by any party with respect to any material term and upon 30-day notice, any party may terminate the Agreement in part or in its entirety without any further notice. The Agreement has a term of 16 months and will automatically renew for an additional 12 months unless notice is provided otherwise.

184.    The above statements identified in Paragraph 183 were materially false and misleading when made because the statements failed to disclose the following material adverse information necessary to make the statements made not misleading: (a) that Mullen's EVs were not equipped to meet the United Arab Emirates' homologation standards, including that the batteries of Mullen's EVs were not equipped to deal with the

heat in the United Arab Emirates; (b) that Mullen would need to spend approximately one year and $25 million to modify their EVs so that they could meet the United Arab Emirates' homologation standards; and (c) consequently, Mullen was not then able to satisfy its responsibilities under its deal with Volt Mobility to deliver "300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025."

185.    On January 23, 2025, Mullen entered into a new securities purchase agreement with Esousa Holdings, LLC, JADR Capital 2 Pty Ltd., and TD Capital No. 1 Pty Limited, under which the Company sold $6.3 million in convertible notes and warrants. The convertible notes could be converted into shares of common stock at the lower of (i) $23.60, (ii) 95% of the closing sale price of the common stock on the date that a later registration statement became effective, or (iii) 95% of the lowest daily volume weighted average price in the five trading days prior to such conversion date, but not less than $0.08 per share. Esousa Holdings, LLC, JADR Capital 2 Pty Ltd., and TD Capital No. 1 Pty Limited also had additional rights to purchase another $6.3 million in additional notes and warrants, and in any event, the warrants could be exercised on a cashless basis pursuant to a formula with a floor of $0.01.

186.    On January 24, 2025, the Company issued its FY2024 10-K, which was signed by Michery and stated, in relevant part:

> In August 2024, we signed a three-year purchase agreement with Volt Mobility, which subsequently assigned the contract to one of its wholly owned companies, Lessor Car Rental LLC. The agreement was for the purchase of Mullen commercial EVs at preferred wholesale pricing for distribution in the United Arab Emirates region as an exclusive representative. VoltiE Group, an independent entity, which was previously described as a subsidiary of the Company in error, agreed to provide chargers. Volt Mobility committed to purchase 3,000 Class 3 commercial EVs with an initial deposit of $3.0 million for initial orders of 300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025. As of the date of this report, Mullen has fulfilled its initial commitment by providing vehicles to support homologation. However, Volt Mobility has not made the deposit nor placed the initial orders. At this time, it is not known

if the Company will continue the relationship and is currently investigating alternative distributors for the region.

187.    The above statements identified in Paragraph 186 were materially false and misleading when made because the statements failed to disclose the following material adverse information necessary to make the statements made not misleading: (a) that Mullen's EVs were not equipped to meet the United Arab Emirates' homologation standards, including that the batteries of Mullen's EVs were not equipped to deal with the heat in the United Arab Emirates; (b) that Mullen would need to spend approximately one year and $25 million to modify their EVs so that they could meet the United Arab Emirates' homologation standards; and (c) consequently, the cause of Volt Mobility's failure to make a deposit or place initial orders was that Mullen was not then able to satisfy its responsibilities under its deal with Volt Mobility to deliver "300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025."

188.    Five days later, on January 29, 2025, Mullen registered for resale up to 50,000,000 shares of common stock issued to Favored Investors upon exercise of warrants and conversion of convertible notes.

## H.    Mullen's Volt Mobility deal is proven illusory, and Defendants effect more reverse stock splits

189.    On February 5, 2025, the Company entered into another stock purchase agreement with Esousa Holdings, LLC and JADR Capital 2 Pty Ltd., where Mullen agreed to sell $3.1 million worth of warrants and convertible notes.

190.    On February 13, 2025, Mullen issued a press release announcing a 1-for-60 reverse stock split, effective on February 18, 2025. On that news, Mullen's stock dropped by 40% over the following two trading days, from an opening price of $0.317 on February 13, 2025, to a low of $0.19, before closing at $0.197 on February 14, 2025.

191.    On March 4, 2025, Mullen registered for resale up to 10,000,000 shares of common stock to be issued to Favored Investors upon exercise of warrants or conversion

of convertible notes.

192.    On March 20, 2025, the Company admitted that the Company "sent a termination notice to Volt Mobility Holding Ltd. ('Volt Mobility') regarding the Purchase Agreement entered into on August 23, 2024[.]" This was a direct and foreseeable result, and a tacit admission to investors, of the fact that Mullen could not fulfill its obligations to Volt Mobility and could not deliver legally-drivable vehicles to the United Arab Emirates because it could not meet homologation standards.

193.    On this news, Mullen's share price dropped 30.6% over the course of two days, from $0.40 to falling to a low of $0.2773, before closing at $0.289 on March 21, 2025.

194.    Over the course of the subsequent three months, Defendants sold more warrants and convertible notes, and effected two more reverse stock splits.

195.    On March 6, 2025, the Company entered into a securities purchase agreement with Esousa Holdings, LLC and TD Capital No 1 Pty Limited in which the Company agreed to sell a principal amount of $4 million in convertible notes and an additional amount of warrants in exchange for $3.8 million.

196.    On April 9, 2025, after Mullen's stock had again tanked once the falsity of the Company's promised deals became known, Mullen issued a press release announcing a 1-for-100 reverse stock split, effective on April 11, 2025. On that news, Mullen's stock dropped by 12.1%, from an opening price of $0.041, to a low of $0.036, before closing at $0.04 on April 9, 2025. On April 11, 2025, Defendants effected their sixth reverse stock split of the Class Period.

197.    On May 16, 2025, the Company further bolstered its cash reserves by entering into a securities purchase agreement with Esousa Holdings, LLC, in which the Company agreed to sell a principal amount of $1,578,947.37 in convertible notes and an additional amount of warrants in exchange for $1.5 million.

198.    On May 29, 2025, the Company entered into two more securities purchase

agreements. First, Mullen entered into a securities purchase agreement with Esousa Holdings, LLC and TD Capital No 1 Pty Limited, selling a principal amount of $11,578,947.37 in convertible notes and an additional amount of warrants in exchange for $11 million. The Company also entered into a different securities purchase agreement with TD Capital No 1 Pty Limited, where it sold a principal amount of $2,715,789.47 in convertible notes and an additional amount of warrants in exchange for $2,580,000.

199.    That same day, Mullen issued a press release announcing a 1-for-100 reverse stock split, effective on June 2, 2025. On that news, Mullen's stock dropped by 41.7% over the next two trading days, from an opening price of $0.127, to a low of $0.074, before closing at $0.082 on May 30, 2025. On June 2, 2025, Defendants effected the seventh reverse stock split of the Class Period.

200.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII. Additional Allegations of Scienter

### A.    Defendants' access to and actual knowledge of contradictory facts

201.    Defendants had access to and received information about Mullen's plans to effect reverse stock splits, the EMM technology that Defendants touted and undergirded the Company's $680,000 deal with Washington, D.C., and the fact that Mullen vehicles were not equipped to meet the United Arab Emirates' homologation standards.

202.    As outlined in ¶¶20–21, Defendants Michery and New occupied executive positions at Mullen, which would have provided them full access to information about and the ability to control the Company's plans to effect a reverse stock split. Indeed, Michery not only controlled the vote to authorize a reverse stock split in January 2023 with his 1,300,000,000 voting shares, but, as outlined in ¶¶108–112, 157, 159, affirmatively stated that he and Mullen's Board of Directors decided when to effect a reverse stock split.

203.    Further, their positions would have provided them full access to information

about the Company's partnership with EVT and its purported but fake EMM technology, as well as the Company's inability to meet United Arab Emirates' homologation standards, required for Mullen's $210 million deal with Volt Mobility. Michery and New also attended weekly meetings of Mullen executives where Mullen's business and future plans – including plans for reverse stock splits and purported deals were discussed, including, on information and belief, Mullen's homologation problems, its inability to satisfy the terms of the Volt Mobility deal, its inability to verify the existence or effectiveness of the EVT/EMM technology, and its partnership with a convicted felon.

204.    Further, as outlined in ¶¶163–164, in July 2023, New was directly informed by CW1 multiple times over the telephone of Mullen vehicles' inability to meet the United Arab Emirates' homologation standards, which New acknowledged as the truth.

205.    Consequently, Michery and New not only had access to, but actually received most or all of the information contradicting their public statements.

**B.    Michery held himself out as knowledgeable about the concealed information**

206.    Michery's own statements show that he repeatedly held himself out as knowledgeable about the Company's plans to effect a reverse stock split, the Company's partnership with EVT and Lawrence Hardge, and the Company's $210 deal with Volt Mobility.

207.    For example, Michery routinely discussed the Company's plans to effect a reverse stock split and its decisions to do so. *See* ¶¶110, 159.

208.    Moreover, Michery spoke numerous times about the Company's partnership with EVT and Lawrence Hardge, being quoted in multiple press releases about the partnership and the "groundbreaking" technology that EVT was bringing to Mullen. *See* ¶¶123, 134, 136, 141.

209.    Finally, Michery was not only quoted in a press release about the Volt Mobility deal, but also took to X (formerly known as Twitter) to promote the Volt Mobility

deal to investors. *See* ¶¶167–174, 179, 186.

210.    That Michery held himself out as knowledgeable about the concealed matters allows only two inferences: that Michery actually possessed the knowledge claimed but deliberately chose to withhold material adverse information from investors; or despite holding himself out as knowledgeable, he chose not to inform himself of the truth and was reckless to the risk of misleading investors.

## C.    Defendants had significant motivation to mislead investors and conceal Michery's scheme

211.    At the start of the Class Period, Defendants were motivated to mislead investors and the NASDAQ about their plans to effect a reverse stock split, in order to meet what they considered a more important goal: manipulating the stock price above NASDAQ's $1.00 Bid Price Requirement. On September 7, 2022, the Company received a deficiency notice from the SEC informing Mullen that the bid price of the Company's common stock had closed below $1.00 for 30 consecutive business days, and thus Mullen was not in compliance with the NASDAQ's $1.00 Bid Price Requirement. Mullen had 180 days to regain compliance with the NASDAQ's $1.00 Bid Price Requirement – until March 6, 2023. However, as March 6, 2023 approached, Mullen was unable to get its stock price above the NASDAQ's $1.00 Bid Price Requirement, and therefore requested a 180-day extension to regain compliance – until September 5, 2023. To convince NASDAQ and investors that it would use best practices to reach the NASDAQ's $1.00 Bid Price Requirement, and not financial manipulation like a reverse stock split, Defendants publicly committed to not effect a reverse stock split before September 6, 2023. Yet at all times they were motivated to, contemplated, and understood that it would almost certainly be necessary to effect a reverse stock split before September 6, 2023. Defendants' misstatements worked, as on March 8, 2023, the NASDAQ granted Mullen a 180-day extension to meet the NASDAQ's $1.00 Bid Price Requirement. Accordingly, Defendants were motivated to mislead investors and the market about their intentions to effect a

reverse stock split to obtain a 180-day extension to meet the NASDAQ's $1.00 Bid Price Requirement.

212.    Moreover, throughout the Class Period, Defendants were motivated to engage in their scheme to defraud retail investors because Mullen operated as a personal slush fund for Michery, who subsequently rewarded his underlings like New. The Company paid Michery and New exorbitant salaries not commensurate with Mullen's actual success in manufacturing and selling EVs. Further, Defendants allowed Michery to use Company funds for personal interests, including annual, off-the-book payments to Michery's daughter, maintenance on Michery's fleet of luxury vehicles, and building up Michery's other business.

213.    Were investors to realize that the Company had no actual prospects or plans to succeed in manufacturing and selling EVs, they would sell their Mullen common stock, and the Company's stock price would plummet, ultimately resulting in the Company being de-listed from the NASDAQ. This would threaten the very survival of Mullen, and by extension, Michery's ability to continue using Mullen funds for his own interests.

**D.    That Defendants' misrepresentations involved Mullen's survival bolsters scienter**

214.    Defendants' scienter is also supported by the fact that the alleged statements and omissions concerned Mullen's continued survival. Without the combination of reverse stock splits and misleading announcements to drive investor interest, Mullen faced certain delisting from the NASDAQ, and as Michery explained in Class Period admissions, lenders were not willing to provide financing to the Company if its shares were not traded on a major exchange because market making and trading volumes are significantly lower in such scenarios. Further, the Company had no other business means (i.e., through selling vehicles or licensing battery technology) to cover its operating losses, and therefore had no choice but to maintain the scheme to continue the Company's survival.

215. Therefore, it would be absurd to infer that Mullen's most senior executives, including its CEO-founder and CFO, did not act with either actual intent or severe recklessness in issuing false and misleading statements to investors.

### E. That Individual Defendants certified Mullen's SEC filings to investors bolsters scienter

216. Michery and New's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications in connection with Mullen's filing of its Form 10-Qs and Form 10-Ks with the SEC. These certifications certified, among other things, that the reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

217. If Individual Defendants had, in fact, made these assessments, then they were aware of the facts misrepresented in and concealed by their Class Period misrepresentations, and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

### F. Individual Defendants' insider sales at inflated prices enhance an inference of scienter

218. During the Class Period, Michery and New made unusual common stock sales and transfers that took advantage of Mullen's artificially inflated stock price. This unusual activity is summarized in the chart below:

| Defendant | Transaction Date | Transaction Type | Amount of Stock | Transaction Price[2] | Transaction Proceeds |
|-----------|------------------|------------------|-----------------|----------------------|----------------------|
| Michery | 11/30/2022 | Gift | 5,300,000 | $0.1921 | $1,018,130 |
| Michery | 12/01/2022 | Gift | 50,000 | $0.2172 | $10,860 |
| Michery | 1/17/2023 | Transfer for settlement | 1,456,779 | $0.3004 | $437,616.41 |
| Michery | 2/16/2023 | Gift | 5,000,000 | $0.2916 | $1,458,000.00 |
| Michery | 2/16/2023 | Transfer of shares | 1,000,000 | $0.29 | $290,000.00[3] |
| Michery | 2/16/2023 | Sale | 14,937,660 | $0.3164 | $4,726,275.62 |
| New | 3/6/2023 | Sale | 159,066 | $0.2295 | $36,505.65 |
| Michery | 6/15/2023 | Transfer of shares | 2,090,979 | $0.2616 | $547,000.11[4] |
| Michery | 6/15/2023 | Gift | 541,813 | $0.2616 | $141,738.28 |
| Michery | 8/16/2023 | Purchase | 102,040 | $0.9842 | $100,427.77 |
| Michery | 3/4/2025 | Gift | 20,000 | $2.15 | $43,000.00 |

219.    On January 17, 2023, Michery transferred 1,456,779 shares worth $437,616.41 as part of a settlement agreement.

220.    On February 16, 2023, Michery sold 14,937,660 shares for $4,726,275.62 in proceeds on the same day he received 16,685,364 shares at no cost pursuant to a performance stock award agreement. He also "gifted" 5,000,000 shares and conducted a "transfer" of another 1,000,000 shares that same day after he was awarded 6,000,000 shares pursuant to a performance stock award agreement with the Company. On his Form 4, Michery noted that Mullen's shares closed at $0.29 on the date of the transfer, but that "[n]o cash consideration was received by the Reporting Person [him]." Based on the

---

[2] When the transaction is anything other than a purchase or a sale, the transaction price is withheld in the Form 4, and therefore what is reflected is the closing price per unadjusted share on the transaction date.

[3] Footnote of Form 4 states that "no cash consideration was received by the reporting person."

[4] Footnote of Form 4 states that "no cash consideration was received by the reporting person."

closing price, the gift and "transfer" were worth approximately $1,450,000 and $290,000, respectively.

221.    The next day, February 17, 2023, New entered a 10b5-1 trading plan to sell 159,066 shares, which he ultimately did on March 6, 2023, for total proceeds of approximately $36,505. This came only two months after New received 159,066 shares from the Company, demonstrating that New got rid of his Mullen stock almost as soon as possible. After this sale, New only beneficially held 8,611 shares—nearly a 95% reduction. Notably, this sale was pursuant to a trading plan entered into after the start of the Class Period.

222.    Less than two months later, on May 3, 2023, the Company announced a 1-for-25 reverse stock split, effective on May 4, 2023, at which point the Company's stock price cratered.

223.    On June 15, 2023, about a month after its most recent reverse stock split, Michery "gifted" another 541,813 shares worth $141,738.28 and "transferred" another 2,090,979 shares worth $547,000.11. On his Form 4, Michery noted that Mullen's shares closed at $0.2616 on the date of the transfer, but that "[n]o cash consideration was received by the Reporting Person [him]." Mullen's share price collapsed through the summer, necessitating another reverse stock split on August 11, 2023.

224.    On August 16, 2023, just days after its most recent reverse stock split, Michery engaged in a private transaction where he paid nearly four times the closing unadjusted price for 102,040 Mullen shares. He further noted in his Form 4 documenting the transaction that he had promised to pay any profits associated with the trade—which may have been matchable to the share transfer he made on June 23, 2023—to Mullen.

225.    On March 3, 2025, Michery gifted 20,000 shares worth $43,000.00 based on that day's unadjusted closing price. The Company had effected a 1-for-60 reverse split just two weeks earlier on February 18, 2025. By mid-March, the stock price was again in free fall, necessitating yet another reverse stock split, this time 1-for-100, on April 11, 2025.

The gift, therefore, came at an opportune time to take advantage of the artificial inflation of Mullen's stock price.

226.    During the Class Period, Michery was also authorized 105,251,060 shares as part of his compensation. Similarly, New was authorized 162,066 shares as part of his compensation. Accordingly, most of the shares that Individual Defendants actually acquired during the Class Period were provided by the Company as part of their compensation, and not purchased by Individual Defendants.

## NO SAFE HARBOR

227.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Mullen who knew that the statement was false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

228.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities other than Defendants that purchased or otherwise acquired Mullen common stock between November 14, 2022, and June 2, 2025, both dates inclusive (the "Class"), seeking to

69

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of Mullen, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

229.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mullen securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several thousands of members in the proposed Class. Mullen's most recent Form 10-K indicates that as of January 21, 2025, there were 818 registered stockholders of record of its common stock. Because most stock is held in "street name" by brokers, Plaintiffs are informed and believe the actual number of impacted shareholders to be several times higher. Record owners and other members of the Class may be identified from records maintained by Mullen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

230.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

231.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

232.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among

the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mullen;

- whether the Individual Defendants issued false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether Individual Defendants were control persons of Mullen, its subsidiary MAEO, and its agent, Lawrence Hardge;

- whether the prices of Mullen securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

233.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

234.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Mullen securities are traded in an efficient market;

71

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Mullen securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

235.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

236.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the claims alleged herein sound primarily in omission of material information rather than affirmative misrepresentation.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Promulgated Thereunder Against All Defendants)

237.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

238.    During the Class Period, Michery, New, and Mullen employed devices and artifices to defraud, and carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) caused Plaintiffs and the other members of the Class to purchase Mullen's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Michery, New, and Mullen made the misleading statements alleged in Paragraphs 108 through 113,

Paragraphs 119 through 124, Paragraphs 126 through 127, Paragraphs 132 through 137, Paragraphs 165 through 174, Paragraphs 179 through 181, Paragraphs 183 through 184, and Paragraphs 186 through 187, and engaged in additional unlawful acts as alleged herein.

239.    Michery, New, and Mullen, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to use the Mullen coffers as a personal slush fund, while also bringing in money into those coffers through a process of (a) generating investor interest in the stock through misleading announcements; (b) then selling both common stock to retail investors, and convertible notes and warrants to institutional investors; and (c) once the promised revenue from Defendants' previous misleading announcements failed to materialize and Mullen's stock price fell as a result, effecting reverse stock splits to restart the cycle again and stay above the NASDAQ's $1.00 Bid Price Requirement.

240.    Specifically, Michery, New and Mullen employed the following devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in the following acts, practices and a course of conduct in an effort to mislead investors into buying Mullen stock, so that Michery could continue to use the Company as a personal slush fund:

- Michery, New, and Mullen created a Series AA Preferred Stock, which allowed the holder of the stock 1,300,000,000 votes in a forthcoming proposal to effect a reverse stock split, and sold that Series AA Preferred Stock to Michery for $25,000;

- Michery and Mullen announced a Special Meeting of Stockholders to vote on a series of proposals, including a proposal to authorize the Company to effect a reverse stock split;

- Michery used his 1,300,000,000 votes from his Series AA Preferred Stock to vote in favor of authorizing Mullen to effect a reverse stock split, and then redeemed his Series AA Preferred Stock for $25,000;

- Michery and Mullen told investors that the Company had no plans to effect a reverse stock split, at least before September 6, 2023;

- Michery and Mullen misled investors about a partnership with EVT and Lawrence Hardge to boost investor interest in Mullen's stock;

- Michery and Mullen materially misled investors about a $210 million deal with Volt Mobility by omitting the fact that Mullen's vehicles were not equipped to meet the United Arab Emirates' homologation standards, meaning that the $210 million Volt Mobility deal was likely to fail;

- Michery, New, and Mullen effected a reverse stock split on May 4, 2023 – well in advance of the September 6, 2023 deadline Defendants assured investors about;

- Michery, New, and Mullen effected a reverse stock split six more times throughout the Class Period; and

- In purchase agreements agreed to by Michery in consultation with New, Mullen sold warrants and convertible notes to Preferred Investors, who would then make a profit converting the warrants into common stock and selling it to retail investors at opportune times before Mullen's share price cratered again.

241.    As a result of Michery, New, and Mullen's fraudulent scheme and failure to disclose material facts, as set forth above, the market price for Mullen's securities was artificially inflated during the Class Period.

242.    In ignorance of the fact that market prices of Mullen's publicly traded securities were artificially inflated, and relying upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information concealed from them as detailed herein, Plaintiffs and the other members of the Class acquired Mullen's common stock during the Class Period at artificially high prices and were damaged thereby.

243.    At the time Michery, New, and Mullen orchestrated this fraudulent scheme, Plaintiffs and other members of the Class were ignorant of its nature or existence. Had Plaintiffs and the other members of the Class and the marketplace known the truth about

this unlawful scheme, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Mullen's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

244.    As a direct and proximate result of the wrongful scheme and conduct alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period. By virtue of the foregoing, Michery, New and Mullen violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

## COUNT II

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

245.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

246.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

247.    During the Class Period, Defendants made material misstatements to investors, *inter alia*, (a) that Defendants had no plans to effect a reverse stock split, at least until September 6, 2023, when in truth, Defendants had always planned to effect a reverse stock split as part of their overall scheme; (b) that business partner, Lawrence Hardge, had been convicted of a state crime, which was ultimately expunged, when in fact he was a convicted felon whose record was not expunged; and (c) that Mullen had acquired new battery technology which increases the range in battery by approximately 60%, when in fact no such technology existed. Defendants also omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations, *inter alia*, (a) that

the Company's $680,000 deal with Washington D.C. was contingent upon delivering technology that did not exist and which Mullen did not own; and (b) that Mullen's vehicles did not meet the United Arab Emirates' homologation standards, and it would take approximately one year and $25 million to get Mullen's vehicles to meet those homologation standards, thereby threatening the Company's $210 million deal with Volt Mobility.

248.   These misstatements are identified and more fully described in Paragraphs 108 through 113, Paragraphs 119 through 124, Paragraphs 126 through 127, Paragraphs 132 through 137, Paragraphs 165 through 174, Paragraphs 179 through 181, Paragraphs 183 through 184, and Paragraphs 186 through 187.

249.   Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mullen securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Mullen securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

250.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, that were designed to influence the market for Mullen securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Mullen's business prospects and plans to effect reverse stock splits.

251.   By virtue of their positions, responsibilities and control at Mullen, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for

the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

252.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives and/or directors of Mullen, the Individual Defendants had knowledge of the details of Mullen's internal affairs.

253.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their control and authority over Mullen, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Mullen. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Mullen's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Mullen securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Mullen's business and plans to effect reverse stock splits which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Mullen securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

254.    During the Class Period, Mullen securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or

otherwise acquired shares of Mullen securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Mullen securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Mullen securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

255.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

257.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258.    During the Class Period, the Individual Defendants participated in the operation, management and day-to-day control of Mullen. Each conducted and participated, directly and indirectly, in the conduct of Mullen's business affairs. Because of their senior positions, they knew the adverse non-public information about Mullen's misstatement of income and expenses and false financial statements. Further, Michery held himself out to investors as knowledgeable about the misrepresented topics, including the Volt Mobility deal and Mullen's reverse stock splits.

259.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Mullen's financial condition and results of operations, and to correct promptly any public statements issued by Mullen which had become materially false or misleading.

260.    Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mullen, its subsidiary MAEO, and its agent, Lawrence Hardge, disseminated in the marketplace during the Class Period concerning Mullen's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mullen to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Mullen within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mullen securities.

261.    Each of the Individual Defendants, therefore, acted as a controlling person of Mullen, its subsidiary MAEO, and its agent, Lawrence Hardge. By reason of their senior management positions and/or being directors of Mullen, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Mullen to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Mullen and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

262.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mullen.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class

representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated: July 30, 2025                    Respectfully submitted,

POMERANTZ LLP

*/s/ Christopher P.T. Tourek*

Joshua B. Silverman (admitted *pro hac vice*)
Christopher P.T. Tourek (admitted *pro hac vice*)
Genc Arifi (admitted *pro hac vice*)
10 South LaSalle Street, Suite 350
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com
garifi@pomlaw.com

*Counsel for Lead Plaintiff Muhammad Jafri
and Co-Lead Counsel for the Class*

ROBBINS LLP
Stephen J. Oddo
5060 Shoreham Place, Suite 300
San Diego, CA 92122

Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email: soddo@robbinsllp.com

*Counsel for Lead Plaintiff Teeluck Persad
and Co-Lead Counsel for the Class*

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Muhammad Jafri*

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 30, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                      */s/ Christopher P.T. Tourek*
                                        Christopher P.T. Tourek