# EXHIBIT 2

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2022

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to ___

Commission file number: 001-34887

# MULLEN AUTOMOTIVE INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **86-3289406** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1405 Pioneer Street**
**Brea, California 92821**
(Address of principal executive offices)

Registrant's telephone number, including area code: (714) 613-1900

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.001 | MULN | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐ YES ☒ NO

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ YES ☒ NO

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ YES ☐ NO

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ YES ☐ NO

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☐ | Accelerated filer ☐ |
|---|---|
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ YES ☒ NO

The aggregate market value of the registrant's common equity, other than shares held by persons who may be deemed affiliates of the registrant, as of March 31, 2022 was approximately $656.8 million.

The registrant had 1,696,543,863 shares of common stock outstanding as of January 6, 2023.

Documents Incorporated by Reference: None

Table of Contents

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** |  | 6 |
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 20 |
| Item 1B. | Unresolved Staff Comments | 43 |
| Item 2. | Properties | 43 |
| Item 3. | Legal Proceedings | 44 |
| Item 4. | Mine Safety Disclosures | 46 |
| **PART II** |  | 47 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 47 |
| Item 6. | [Reserved] | 47 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 47 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 53 |
| Item 8. | Financial Statements and Supplementary Data | 53 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 53 |
| Item 9A. | Controls and Procedures | 54 |
| Item 9B. | Other Information | 56 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 57 |
| **PART III** |  | 57 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 57 |
| Item 11. | Executive Compensation | 62 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 67 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 70 |
| Item 14. | Principal Accountant Fees and Services | 71 |
| **PART IV** |  | 72 |
| Item 15. | Exhibits and Financial Statement Schedules | 72 |
| Item 16. | Form 10-K Summary | 77 |
| Signatures |  | 72 |

Table of Contents

**FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K (the "**Annual Report**" or "**Report**") contains forward-looking statements that involve substantial risks and uncertainties. All statements contained in this Annual Report, other than statements of historical facts, including statements regarding our strategy, future operations, future financial position, future revenue, projected costs, prospects, plans, objectives of management and expected market growth, are forward-looking statements. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.

The words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. Important factors that could cause actual results to differ materially from the forward-looking statements we make in this Report include but are not limited to:

- We have incurred significant losses since inception, and we expect that we will continue to incur losses for the foreseeable future;
- We will require substantial additional financing to effectuate our business plan;
- We have not yet manufactured or sold any production vehicles to customers and may never develop or manufacture any vehicles;
- Our limited operating history makes it difficult for us to evaluate our future business prospects;
- Our auditor has expressed substantial doubt about our ability to continue as a going concern;
- Certain of our lenders and the Internal Revenue Service have liens on our assets;
- We have not paid, and do not plan to pay, cash dividends on our Common Stock, so any return on investment may be limited to the value of our Common Stock;
- Our stockholders are subject to significant dilution upon the occurrence of certain events which could result in a decrease in our stock price.
- Our commitments to issue shares of Common Stock or securities that are convertible into shares of Common Stock may cause significant dilution to stock holders;
- Our commitment to issue shares of Common Stock pursuant to the terms of the Notes, our preferred stock and the Warrants could encourage short sales by third parties which could contribute to the future decline of stock price.
- We may not be able to maintain compliance with continued listing requirements of the NASDAQ Capital Market;
- We may not be able to develop, manufacture and obtain regulatory approvals for a car of sufficient quality to appeal to customers on schedule or at all;
- Our currently planned vehicles rely on lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame, potentially subjecting us to litigation, recall, and redesign risks;
- The efficiency of a battery's use will decline over time, which may negatively influence customers' decisions whether to purchase an electric vehicle;
- We rely on our OEMs, suppliers and service providers for parts and components, any of whom could choose not to do business with us;
- We will rely on complex machinery for its operations and production, which involve a significant degree of risk and uncertainty in operational performance and costs;
- Complex software and technology systems need to be developed in coordination with vendors and suppliers, and there can be no assurance that such systems will be successfully developed;
- We may experience significant delays in the design, manufacture, regulatory approval, launch and financing of its vehicles, which could harm our business and prospects;
- The inability of our suppliers, including single or limited source suppliers, to deliver components in a timely manner or at acceptable prices or volumes could have a material adverse effect on our business and prospects;
- Financial distress of our suppliers could necessitate that we provide substantial financial support, which could increase our costs, affect our liquidity or cause production disruptions;

2

Table of Contents

- We have a limited operating history and face significant challenges as a new entrant into the automotive industry;
- We have a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future, casting doubt on our ability to continue as a going concern;
- Our business model is untested, and it may fail to commercialize our strategic plans;
- Our operating and financial results forecast relies on assumptions and analyses we developed and may prove to be incorrect;
- We may be unable to accurately estimate the supply and demand for our vehicles;
- Increased costs or disruptions in supply of raw materials or other components could occur;
- Our vehicles may fail to perform as expected;
- The automotive market is highly competitive;
- The automotive industry is rapidly evolving and demand for our vehicles may be adversely affected;
- We may be subject to risks associated with autonomous driving technology;
- Our distribution model is different from the predominant current distribution model for auto manufacturers;
- Our future growth is dependent on the demand for and consumers' willingness to adopt electric vehicles;
- Government and economic incentives could become unavailable, reduced or eliminated;
- Our failure to manage our future growth effectively;
- We may establish insufficient warranty reserves to cover future warranty claims;
- We may not succeed in establishing, maintaining and strengthening our brand;
- Doing business internationally may expose us to operational and financial and political risks;
- We are highly dependent on the services of David Michery, our Chief Executive Officer;
- Our business may be adversely affected by labor and union activities;
- We face risks related to health epidemics, including the recent COVID-19 pandemic;
- Reservations for our vehicles are cancellable;
- We may face legal challenges relating to direct sales to customers;
- We face information security and privacy concerns;
- We may be forced to defend ourselves against alleged patent or trademark infringement claims and may be unable to prevent others from unauthorized use of our intellectual property;
- Our patent applications may not issue as patents, the patents may expire, our patent applications may not be granted, and our rights may be contested;
- We may be subject to damages resulting from trade secrets;
- Our vehicles are subject to various safety standards and regulations that we may fail to comply with;
- We may be subject to product liability claims;
- We are or will be subject to anti-corruption, bribery, money laundering, and financial and economic laws;
- Risk of failure to improve our operational and financial systems to support expected growth;
- Risk of failure to build our financial infrastructure and improve our accounting systems and controls;
- The concentrated voting control of David Michery, Mullen's founder;
- The priority of the holders of our debt and preferred stock over the holders of our common stock in the event of liquidation, dissolution or winding up;
- The number of shares of common stock underlying our outstanding warrants and preferred stock is significant in relation to our currently outstanding common stock;
- The dearth of analyst coverage;
- Other risks and uncertainties, including those listed under Part I, Item 1A of this Annual Report titled "Risk Factors."

These forward-looking statements are only predictions, and we may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, so you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in one or more of the forward-looking statements we make in this Annual Report. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our business, financial condition and operating results. We have included important factors in the cautionary statements included in this Annual Report, particularly in Part I, Item 1A, titled *"Risk Factors,"* that could cause actual future results or events to differ materially from the forward-looking statements that we make. Our forward-looking statements in this Annual Report

3

Table of Contents

do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments we may make.

You should read this Annual Report and the documents that we have filed as exhibits to this Annual Report with the understanding that our actual future results may be materially different from what we expect. We do not assume any obligation to update any forward-looking statements in this Annual Report, whether as a result of new information, future events or otherwise, except as required by applicable law.

4

Table of Contents

Table of Contents

**WEBSITE AND MEDIA DISCLOSURE**

We use our website (www.mullenusa.com) and various social media channels as a means of disclosing information about the company and its products to our customers, investors, and the public (e.g., Instagram: @mullenusa; Twitter: @mullen_usa; Facebook: @MullenUSA; LinkedIn: @mullen-technologies; and YouTube: @mullenautomotive). The information provided on social media channels is not incorporated by reference in this report or in any other report we fie with the SEC.

The information we post throughout these channels may be deemed material. Accordingly, investors should monitor these channels, in addition to our following press releases, SEC filings and public conference calls and webcasts. In addition, you may automatically receive email alerts and other information about the Company when you enroll your email address and other information by visiting "Investor Resources" section of our website at www.mullenusa.com.

5

Table of Contents

**PART I**

**ITEM 1. BUSINESS.**

*References in this Annual Report to the "Company", "we", "us", "our" or similar references, or "Mullen," mean Mullen Automotive Inc., a Delaware corporation, and its subsidiaries Ottava Automotive, Inc., a California corporation, Mullen Real Estate, LLC., a Delaware corporation, Mullen Investment Properties LLC, a Mississippi corporation, and Bollinger Motors, Incorporated a consolidated subsidiary.*

**Background**

We are a Southern California-based electric vehicle company that operates in various verticals of businesses focused within the automotive industry. The Company was originally formed on April 20 2010, as a developer and manufacturer of electric vehicle technology. During 2021, the Company completed a merger with Net Element, Inc., a Delaware-incorporated company[1]. The Company changed its name from "Net Element, Inc." to "Mullen Automotive Inc." The Nasdaq Stock Market, LLC (Nasdaq Capital Market) ticker symbol for the Company's Common Stock changed from "NETE" to "MULN" at the opening of trading on November 5, 2021. The CUSIP number of the Common Stock is 62526P 109.

As disclosed in our Current Report on Form 8-K filed with the Securities and Exchange Commission on September 7, 2022, Mullen Automotive Inc. (the "Company") consummated the acquisition of 544,347 shares of common stock of Bollinger Motors, Inc., a Delaware corporation ("Bollinger Motors"), representing approximately 60% of the outstanding equity ownership on a fully diluted basis (after giving effect to the conversion or exercise of any outstanding debt and equity securities or equivalents), for an aggregate purchase price of approximately $148.6 million paid in a combination of cash and shares. The Company acquired the shares pursuant to (i) that certain Common Stock Purchase Agreement (the "Primary Purchase Agreement"), dated as of the Closing Date, by and among the Company, Bollinger Motors, and Robert Bollinger, (ii) that certain Common Stock Purchase Agreement (the "Bollinger Purchase Agreement"), dated as of the Closing Date, by and between the Company and Robert Bollinger, (iii) that certain Common Stock Purchase Agreement (the "Masters Purchase Agreement"), dated as of the Closing Date, by and between the Company and John Masters and (iv) that certain Common Stock Purchase Agreement (the "Seaport Purchase Agreement" and together with the Primary Purchase Agreement, the Bollinger Purchase Agreement, and the Masters Purchase Agreement, collectively, the "Purchase Agreements"), dated as of the Closing Date, by and between the Company and Seaport Global Asset management SPV LLC - Series A (together with Robert Bollinger and John Masters, the "Sellers"). The Company acquired 282,825 shares of common stock of Bollinger Motors directly from Bollinger Motors as a new issuance of shares and purchased an additional 261,522 shares of common stock of Bollinger Motors from the Sellers.

**The Company**

Mullen Automotive is a Southern California-based automotive company that will be building the next-generation of premium passenger electric vehicles (EVs), and a portfolio of Commercial vehicles.

The Mullen FIVE, the Company's first electric crossover, is slated to start production in late 2024 and features an award-winning design and its patented PERSONA technology that utilizes facial recognition to personalize the driving experience for every individual. With an end-to-end ecosystem that will support owners from test driving to financing and servicing through a future unique dealership model, customers will be supported through every aspect of EV ownership.

On September 7, 2022, Mullen Automotive announced its first EV acquisition which will propel the company into the medium duty truck classes 4-6, along with the B1 Sport Utility and B2 Pick Up Trucks. The purchase price was $148.6 million in cash and stock for a 60% controlling interest, which gives Mullen the majority ownership of Bollinger Motors, Inc. and positions

---

[1] The Merger was accounted for as a reverse merger transaction, in which Mullen Automotive-California is treated as the acquirer for financial accounting purposes. For more information on the Merger, see "The Merger and Related Transactions."

Table of Contents

Bollinger Motors to have a competitive advantage in the retail electric sport utility and commercial vehicle markets (Please refer to Note 4- Acquisition of Bollinger Motor Inc.).

On October 22, 2022, the U.S. Bankruptcy Court approved the Company acquisition of electric vehicle company ELMS' (Electric Last Mile Solutions) assets in an all-cash purchase. In the Chapter 7 approved transaction, Mullen acquired ELMS' manufacturing plant in Mishawaka Indiana, all inventory, and intellectual property for their Class 1 and Class 3 vehicles (See Note 20 - Subsequent Events).

The ELMS asset acquisition and the recent acquisition of the majority ownership of Bollinger Motors give Mullen the ability to integrate Bollinger's vehicle platforms, B1 and B2, along with Mullen's FIVE and FIVE RS platforms into an already existing former ELMS manufacturing facility. As a result, this will accelerate the launch of the Bollinger B1 and B2 consumer vehicles.

Manufacturing optimization will include moving the Mullen FIVE EV Crossover production to the Mishawaka Factory from the Tunica, MS facility. Mullen FIVE production is planned to begin production in Q4 2024. Tunica will now become the Commercial Manufacturing Center and prepare to produce all Mullen and Bollinger Class 1 to 6 commercial vehicles.

Bollinger Motors

Launched in 2015, Bollinger Motors is an American automobile designer and manufacturer of electric sport utility and medium-duty vehicle lines. The company also successfully developed proprietary vehicle battery packs, drivetrains, and thermal and vehicle control software units. In 2017, Bollinger built and debuted the critically acclaimed B1 class 3 sport utility vehicle, the first of its kind. The company followed its initial success with the development of the second-generation B1 and B2 vehicles before pausing in favor of commercial truck development. With years of history in class 3 truck development, intellectual property, patents, and expertise, pre-acquisition focus was commercial vehicle development for classes 4-6. With Mullen's acquisition and capital injection, both B1 and B2 have resumed development and the plan is to begin production after the start of production for class 4-6 commercial truck programs.

Bollinger Motors brings a significant pipeline of interest from large companies for commercial electric truck classes 4-6 in a wide range of markets such as last-mile delivery, refrigeration, utilities, and their upfitters. On Sept. 1, 2022, Bollinger revealed the B4, a class 4 electric commercial truck. The B4 electric chassis cabs will be the first of the company's commercial lineup to hit the ground in upcoming client test programs. The new Bollinger B4 incorporates years of feedback from dozens of major fleets looking to electrify their vehicles. The result is a cab-forward truck, designed from the ground up to offer maximum cargo volume, accommodate unlimited adaptation and prioritize safety.

**Company Overview**

*Our Strength and Strategy*

- *Experienced and proven team in the Electric Vehicle ("EV") space.* Our executive team has extensive experience in the automotive original equipment manufacturing ("*OEM*") space. They have a detailed understanding of the product development cycle from blank sheet to post launch activities in both the high and low volume segments - knowing the different economies of scale which is vital to creating a high-quality profitable product. The team brings expertise in studio design, engineering, supply chain manufacturing, energy storage systems, market analysis, corporate development, strategic planning, and investment strategies.

- *Design.* Our Mullen platform architecture for the Mullen FIVE, creates the opportunity for vehicles with unique aspect ratios - low roof line, wide track width, svelte body, and a long wheelbase. The vehicle is being engineered to be a top safety plus pick and is planned to have a five-star crash rating. To achieve this target, we will use next generation ultra-high strength steel alloys. The entire structure will use mixed materials.

- *Unique plan.* Our approach is speed-to-market with lower capital investment requirements compared to other startup EV companies. Our plan includes launching the Mullen FIVE Crossover in 36 months from program start

7

Table of Contents

(with start of production in Q4 of 2024), while keeping expenditures low by utilizing strategic partnerships in engineering and manufacturing.

For our initial vehicle launches we will use state-of-the-art Li-Ion battery technology. We believe that our future solid state polymer battery technology will eventually allow us to deliver high voltage batteries under $100 per kWh at over two times the energy density of current commercially available lithium batteries. We anticipate the batteries used in our cars will be able to withstand extreme abuse testing, which we believe should make them safer than other commercially available lithium batteries. We plan to utilize a more environmentally sustainable chemistry that does not have a high content of rare precious materials.

**Our Market Opportunity**

**Sustainable vehicles are the future of transportation**

In the last few years, we have observed a significant transformation in the motor vehicle landscape. Electric vehicles, which were once only a fringe element in a market dominated by major global automakers, are quickly becoming mainstream. Joining them, our company and several other start-ups are developing EV offerings.

- Passenger EV sales are set to continue rising sharply in the years ahead as policy pressure continues to increase, more models hit the market, and consumer interest takes off. Plug-in vehicle sales rise from 6.6 million in 2021 to 20.6 million in 2025. This is higher than the 2021 Outlook, due primarily to higher adoption in China.

- The rising cost of batteries does not derail near-term EV adoption. Some of the factors that are driving high battery raw material costs - war, inflation, trade friction - are also pushing the price of gasoline and diesel to record highs, which is driving more consumer interest in EVs. Internal combustion engine ("ICE") vehicles are also becoming more expensive to produce.

- Most importantly, the market is shifting from being driven primarily by policy to where organic demand is the most important factor. Supply is a larger constraint on adoption than demand in many countries.

- The truck market use cases are highly varied. In urban duty cycles, battery electric trucks of any size become the cheapest option for several use cases in the 2020s. That is due to a combination of factors, including improving battery technologies and modest driving ranges. - *Source: Bloomberg Electric Vehicle Outlook 2022.*

In our view, this trend is driven by several factors. A rising environmental consciousness is encouraging customers to weigh their emission footprint. As a zero-emission alternative to traditional internal combustion engine ("ICE") options, an EV that can match or exceed an ICE in performance is a natural choice. Assisting with that choice, local and national governments are offering various forms of rebates and credits for the purchase of an EV and have otherwise begun to support the rise of e-mobility by accelerating the push for zero emission vehicles due to increased awareness of the impacts of global warming. As EV sales grow, parts volume is expected to grow in tandem, allowing automakers to purchase parts at a lower cost and further accelerating the switch to EVs. Lastly, the continuing improvement in battery technology,

8

Table of Contents

continuing build-out of electric charging infrastructure, and the growing comfort with EV range capabilities could ease "range anxiety" and facilitate adoption.



*Source: Derived from data in Bloomberg Electric Vehicle Outlook 2020*

*The rise of the Sports Utility Vehicle*

When designing our first EV offering in 2021, our team elected to develop a Sport Utility Vehicle ("**SUV**") because of the recognized growth in SUV sales. According to market research, today's customers increasingly prefer SUVs to traditional sedans or crossovers.

*The importance of Commercial and Fleet Strategies*

Fleet and Commercial segments represent over 20% of the total U.S. market and is comprised of Government, Commercial and Rental segments. Mullen's Fleet First strategy with a Class One commercial van offering, followed quickly by Class 3 and Class 4 cab chassis models planned for 2023, takes advantage of segments vacated by competitors, and allows a first mover advantage for the company. Our goal is to build strong customer relationships with fleet operators and companies that rent or lease vehicles to fleet operators and to capture a significant market opportunity as the broad trend of vehicle electrification continues

**Our Vehicles**

In 2022, we increased our existing product lines to include a Commercial EV Class 1 van and a Class 3 Cab chassis. The recent Bollinger Motors acquisition further expanded the product lines to include the B1 SUV and B2 pickup truck as well as Commercial Class 4-6 chassis, all of which are fully electric and built/assembled within the USA.

- **Mullen FIVE and Mullen FIVE RS:** The Mullen FIVE represents Mullen Automotive's entry into the full-electric, mid-size luxury SUV market. The Mullen FIVE is competitively priced starting at $55,000 - for the United States market before federal and state incentives are applied. Offering at least two optional packages, with a price range from a base price of $55,000 to $75,000 (for additional features), will allow customers to purchase a vehicle with options that best fit their budgetary and performance needs. The Mullen FIVE RS is an ultra-high-performance EV that will feature a top speed of 200 mph and acceleration from 0-60 mph in just 1.9 seconds. The vehicle will be equipped with 800-volt architecture, all-wheel drive, a two-speed gearbox, and over 1,000 horsepower.

- **Mullen Class 1 Van:** The Mullen 1 van features specifications offering a good fit for a variety of applications like package delivery and service routes. Riding on a 120-inch wheelbase and measuring in at 186 inches long, 65 inches wide, and 75 inches tall, it has 160 cubic-feet of cargo volume accessible via dual sliding side doors or

9

Table of Contents

a tall rear liftgate. It features a curb weight of 3,329 pounds and can carry a maximum payload of 1,700 pounds up to 110 miles with its 42kWh battery. Turning radius is approximately 20 feet, about the same as the smaller Ford Transit van.

- **Mullen Class 3:** The Mullen 3 is a Class 3 commercial electric vehicle targeting over 5,800 pounds of max payload, 11,000 pounds gross vehicle weight rating (GVWR) and approximately 120 miles of range with its 81 KwH battery. The cab-over-chassis design of the vehicle is configurable and can be outfitted with a dry box, flat bed, stake bed, and other customizable cargo options. The cab-over design not only provides great visibility for the driver, but also results in a tight turning circle of approximately 38 ft, which makes this truck extremely maneuverable on narrow city streets. We believe the introduction of the Mullen 3 will expand our target vocations, including delivery, construction, landscaping, towing, and refrigeration.

- **Bollinger B1 and B2:** By designing the Bollinger B1, all-electric four-wheel-drive SUV from the ground up, the Bollinger Motors team created a new platform of electric trucks capable of exceptional off-road performance, combined with never-before-seen cargo and utility features. The Bollinger all-wheel-drive dual-motor drivetrain creates instantly available torque, 50/50 weight distribution, unbeatable traction and best-in-class ground clearance boasting a 10" to 20" adjustable ride height. The Bollinger B2 electric pickup truck is the big brother of the B1 SUV, same everything inside and out, except for the long pickup truck bed. The B2 is a powerful electric pickup truck with a six-foot bed that can carry 16-feet of cargo length through a patented full-vehicle-length passthrough with gates closed.

- **Bollinger B4 Chassis Cab:** The all-new Bollinger B4 chassis is designed from the ground up with driver safety and fleet efficiency as first priority. These purpose-built electric trucks have been designed to be custom configured by fleets to fit their duty cycle needs, making transitioning to electric as seamless as possible with minimal down time. With a GVWR of 14,001 to 16,000 pounds, the Bollinger B4 can carry over 8,350 lbs. of payload when equipped with dual battery packs. With a 158 in wheelbase, this chassis can be upfitted with a body length up to 18 ft., yet still be capable of an impressive turning circle. These attributes make this truck an excellent choice for city driving. Every aspect of these trucks has been streamlined to be as versatile as possible. The cab forward design provides better visibility and frees up space behind the driver for more cargo area.

- **Bollinger B4 Platform:** The DNA and driving force behind the Bollinger B4 Chassis Cab is the Bollinger B4 Platform. It incorporates years of our obsessive electric truck development and feedback from commercial customers looking to electrify their fleets in the best, most efficient way possible. The result is a highly configurable chassis base, which can be upfitted to accommodate most fleet duty cycles, prioritizing efficiency, handling, comfort for fleet drivers, and the overall safety of humans in and around it.

- **Mullen I-GO**: Perfect for urban European markets, the Mullen I-GO bridges the gap between the growing demand for quick deliveries and space constraints in dense cities throughout Europe. The I-GO commercial EV is EU standard homologated, certified, and ready for sale in initial markets of UK, Germany, Spain, France, and Ireland, with the first sample vehicle to be delivered to our Ireland distributor in January 2023. The I-GO is a small class 1 vehicle with dimensions that include a 96 inch wheelbase and gross vehicle weight of 1,753 lbs.

- **I-GO Platform:**



Table of Contents

Our expanded product line:





**Battery Technology**

11

Table of Contents

The Company plans to use Li-Ion technology for its first vehicles. With future research and testing on solid state polymer technology, the Company plans to utilize environmentally sustainable chemistry that does not have a high content of rare precious materials.

On July 20, 2022, Linghang Guochuang Holding Group Co., Ltd (*aka Linghang Boao Group*) and Mullen Automotive agreed to continue their 2019 agreement after the global pandemic. The original plan remains the same and will continue with the same terms. The plan is to advance our solid-state battery pack development to the vehicle pack level. After successfully completing a series of validations tests at the cell level, testing will proceed to the vehicle pack level. In a combined effort with our partner to bring this technology to market, both parties agree to work on the design, development, and testing of battery packs and battery management systems for electric vehicles. While we continue our testing, our manufacturing team is working on establishing the future assembly processes for volume production.

**Our Growth Strategy**

We intend to leverage the following growth strategies to drive stakeholder value:

- ***Continue to develop the Mullen FIVE.*** We intend to continue to invest in research and development and work on establishing partnerships that would enable us to start initial vehicle production in the fourth quarter of 2024.

- ***Recognize the significant opportunities within the Commercial and Fleet Markets***. In addition to entering the largest passenger vehicle segment where the Mullen Five will compete, Mullen through acquisition will aggressively enter the rapidly expanding Electric Commercial vehicle segment in 2023.

**Our Manufacturing Approach**

We have a 124,700 sq ft facility located in Tunica, Mississippi that was purchased during 2021 and currently there is a planned expansion of approximately 200,000 sq ft giving Mullen over 320,000 sq ft for our commercial production lines. Mullen's commercial EV lineup includes Class 1-3 cargo van and cab chassis offerings and Bollinger Motors Class 4-6 chassis products.

Table of Contents




Through the ELMS asset acquisition, Mullen acquired a 675,000 sq ft manufacturing facility. This was the original manufacturing plant for General Motors Hummer H2 production, and later the Mercedes-Benz R-Class. There have been many upgrades to the plant by the prior owners and most importantly the plant has been converted to manufacture Electric Vehicles. This plant will be the Retail Vehicle Manufacturing plant, currently planned to produce the Mullen FIVE and the Bollinger B1 and B2.





13

Table of Contents

**Marketing Strategy**

**Consumer Marketing of Passenger Vehicles**

We will utilize strategic regional and national tradeshows, sporting and automotive events to showcase our vehicles in person and generate further interest, reservations and vehicle orders. Beginning in October 2022, the Company launched the Strikingly Different EV Crossover Tour of the Mullen FIVE. The Mullen FIVE EV Crossover vehicle on tour is equipped with a completely updated infotainment system featuring PERSONA, Mullen's proprietary Personal Vehicle Assistant (PVA), which utilizes facial recognition technology to provide every driver with a highly personalized experience. Participants had the opportunity to interact with and witness PERSONA in action.  The nine City Tour ran through mid-December 2022 with the final stop at the Charlotte Motor Speedway in North Carolina.

We also intend to increase our online focus in 2023 to include online vehicle ordering, allowing customers full online vehicle purchase, with trade-in quote, financing, and insurance options. Customer delivery is planned to be scheduled for "Mullen At Home" delivery or delivered to closest Mullen Lounge Point location, as described below.

**Mullen Lounge Point**

Lounge Point is expected to be the retail center experience for our retail sales network in North America and is planned to feature full vehicle sales interaction including test drives, reservations, orders, trade-in, finance, insurance, and delivery. Our approach is planned to be focused on superior consumer experience in an easily accessible retail environment with a no pressure sales approach.



Our focus will be on delivering a premium vehicle experience while fitting nicely into everyday consumer life.

It is expected that our initial set of retail Lounge Points will be established in high foot traffic centers where consumers visit daily and not on a distant dealer row. This could be Main Street, outdoor based malls, entertainment complexes, commuter hubs and weekend leisure destinations.

**Mullen Service Point and Mobile Service**

It's envisioned that Mullen Service Points will be established near our planned retail sales Lounge Points, but not directly in the same location. Our sales and service locations are expected to serve different customer opportunities and require drastically different layouts and square footage requirements. Establishing Service Points away from sales points lowers our square footage cost and is expected to allow us to focus on an exceptional customer experience.

It is expected that Mullen Service Points will be outfitted with the latest tools and repair service technology to efficiently service our vehicles. We also envision offering vehicle collision repair and detailing services.

14

Table of Contents

We envision operating a mobile fleet of service vehicles that will be available for offsite vehicle repair and service. It is expected that our mobile service technicians will be able to address and resolve most vehicle repairs while at the customer's home or place of work.

It is expected that over-the-air ("**OTA**") software updates and repairs will be made available to our vehicles via Wi-Fi or cellular connection. We believe we will be able to address specific vehicle alerts, allowing us to diagnosis and possibly fix the vehicle remotely, depending on the problem. It is also expected that general software updates will be conducted OTA as well. In general, OTA repairs and updates require less service visits for customers and better overall customer experience.

**Mullen Commercial Sales, Service and Distribution**

Commercial marketing strategy includes forming partnerships with strong existing top performing commercial dealerships that will cover the National fleet business requirements.

On December 13, 2022, the Company announced Randy Marion  Isuzu LLC as its first dealer group partner for Mullen's commercial EV lineup, which is set to launch in the U.S. in 2023 (See Note 20 - Subsequent Events). Additional large commercial dealers will be added in 2023 to expand the coverage, with initial dealers identified in California based on criteria driven by potential customers, size of fleets and state incentives.

**Government Procurement Programs**

The Company also plans to focus on U.S. Government vehicle procurement programs. The Biden administration issued an executive order in 2021 focused on revitalizing the electric-vehicle (EV) program of the U.S. government, requiring the replacement of the government's entire fleet of about 650,000 vehicles with American-made EVs. Currently today, approximately 1% of the federal fleet consists of EV vehicles. The Company focus is establishing Mullen's EV lineup within the overall federal fleet procurement process.

**Research and Development**

As an emerging automaker, we will rely heavily on research and development to establish and strengthen our market position. We will primarily conduct our research and development activities at our headquarters in Irvine, California, for the Mullen FIVE and at our Troy, Michigan facility for the Commercial Platforms. During the fiscal year ended September 30, 2022, we incurred research and development expense of approximately $21.7 million, which includes the development of 2 Mullen Five show cars that were debuted at the Los Angeles Auto Show in November 2021 and the building of our Mullen Five demonstrator vehicles. Other expenses consist primarily of personnel costs for our teams in engineering and research as well as contract and professional services.

**Intellectual Property**

We place a strong emphasis on our innovative approach and proprietary designs which bring intrinsic value and uniqueness to our product portfolio. As part of our business, we seek to protect the underlying intellectual property rights of these innovations and designs such as with respect to patents, trademarks, trade secrets and other measures, including through employee and third-party nondisclosure agreements and other contractual arrangements. Our success depends in part upon our ability to protect our core technology and intellectual property. We have nondisclosure and invention assignment agreements with our consultants and employees, and we seek to control access to and distribution of our proprietary information through non-disclosure agreements with our vendors and business partners.

*Trademarks and Patents*

We plan to file additional applications for the registration of our trademarks and issuances of patents in the United States and foreign jurisdictions as our business expands under current and planned distribution arrangements. Protection of registered trademarks and issued patents in some jurisdictions may not be as extensive as the protection provided by the

15

Table of Contents

United States. There are no assurances given that pending applications will be granted or that they will, if granted, contain all of the claims currently included in the applications. *Refer to Intellectual Property Table.*

| Company | Patents U.S. | Patents Non U.S. | Trademarks U.S. | Trademarks Non U.S. | Status | Total | Comments |
|---|---|---|---|---|---|---|---|
| **Mullen Automotive** | 5 | 7 | 7 | 42 | Issued/Registered | 61 | Not included are 117 patents pending |
| **Bollinger Motors** | 8 | 8 | 5 | 6 | Issued/Registered | 27 | Not included are 5 trademarks pending/allowed; 8 patents are pending |
| **Total** | | | | | | 88 | |

*Trade Secrets*

We own certain intellectual property, including trade secrets, which we seek to protect, in part, through confidentiality agreements with employees and other parties. Even where these agreements exist, there can be no assurance that these agreements will not be breached, that we would have adequate remedies for any breach, or that our trade secrets will not otherwise become known to or independently developed by competitors.

We intend to protect our legal rights concerning intellectual property by all appropriate legal action. Consequently, we may become involved from time to time in litigation to determine the enforceability, scope, and validity of any of the foregoing proprietary rights. Any patent litigation could result in substantial cost and divert the efforts of management and technical personnel.

**Government Regulation and Credits**

We operate in an industry that is subject to extensive environmental regulation, which has become more stringent over time. The laws and regulations to which we are subject govern, among others, water use; air emissions; use of recycled materials; energy sources; the storage, handling, treatment, transportation and disposal of hazardous materials; the protection of the environment, natural resources and endangered species; and the remediation of environmental contamination. Compliance with such laws and regulations at an international, regional, national, provincial and local level is an important aspect of our ability to continue our operations.

Environmental standards applicable to us are established by the laws and regulations of the countries in which we operate, including standards adopted by regulatory agencies as well as the permits and licenses required by such agencies. Each of these sources is subject to periodic modifications and we anticipate increasingly stringent requirements. Violations of these laws, regulations or permits and licenses may result in substantial civil and criminal fines, penalties, and possibly orders to cease the violating operations or to conduct or pay for corrective works. In some instances, violations may also result in the suspension or revocation of permits and licenses.

*Emissions*

In the Unites States, Europe and China, there are vehicle emissions performance standards that may provide an opportunity for us to sell emissions credits.

*United States*

California has greenhouse gas emissions standards that closely follow the standards of the United States Environmental Protection Agency (the "**EPA**"). The registration and sale of Zero Emission Vehicles ("**ZEVs**") in California will earn us ZEV credits that we can sell to other OEMs. Other states within the United States have adopted similar standards include

16

Table of Contents

Colorado, Connecticut, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island and Vermont. We intend to take advantage of these regimes by registering and selling ZEVs in these other states.

ZEV credits in California are calculated under the ZEV Regulation and are paid in relation to ZEVs sold and registered in California including Battery Electric Vehicles ("**BEVs**") and Fuel Cell Electric Vehicles ("**FCEVs**").

The ZEV program assigns ZEV credits to each vehicle manufacturer. Vehicle manufacturers are required to maintain ZEV credits equal to a set percentage of non-electric vehicles sold and registered in California.

Each vehicle sold and registered in California earns a number of credits based on the drivetrain type and the all-electric range ("**AER**") of the vehicle under the Urban Dynamometer Driving Schedule Test Cycle. Plug-in hybrid vehicles ("**PHEVs**") receive between 0.4 and 1.3 credits per vehicle sold and registered in California. Battery electric and fuel cell vehicles receive between one and four credits per vehicle sold in California, based on range.

The credit requirement was 7% in 2019 which required about 3% of sales to be ZEVs. The credit requirement will rise to 22% in 2025, which will require about 8% of sales to be ZEVs.

If a vehicle manufacturer does not produce enough EVs to meet its quota, it can choose to buy credits from other manufacturers who do, or pay a $5,000 fine for each credit such manufacturer is short. This could provide an opportunity for us to sell credits to other manufacturers that may not have met their quota.

*EPA Emissions and Certificate of Conformity*

The United States Clean Air Act requires that we obtain a Certificate of Conformity issued by the EPA and a California Executive Order issued by the California Air Resources Board ("**CARB**") concerning emissions for our vehicles. A Certificate of Conformity is required for vehicles sold in states covered by the Clean Air Act's standards, and an Executive Order is required for vehicles sold in states that have sought and received a waiver from the EPA to utilize California standards. CARB sets the California standards for emissions control for certain regulated pollutants for new vehicles and engines sold in California. States that have adopted the California standards as approved by EPA also recognize the Executive Order for sales of vehicles. There are currently four states which have adopted the California standard for heavy-duty vehicles.

The Greenhouse Gas Rule was incorporated into the Clean Air Act on August 9, 2011. Even though Mullen's vehicles have zero-emissions, Mullen is still required to seek an EPA Certificate of Conformity for the Greenhouse Gas Rule and a CARB Executive Order for the CARB Greenhouse Gas Rule.

*Vehicle Safety and Testing*

Our vehicles will be subject to, and will be required to comply with, numerous regulatory requirements established by the National Highway Traffic Safety Administration (**"NHTSA"**), including applicable United States federal motor vehicle safety standards (**"FMVSS"**). All Mullen products will fully comply with all applicable FMVSS without the need for any exemptions and expect our future vehicles to either fully comply or comply with limited exemptions related to specific new technologies. Additionally, there are regulatory changes being considered for several FMVSS, and while we anticipate compliance, there is no assurance until final regulation changes are enacted.

As a manufacturer, we must self-certify that our vehicles meet all applicable FMVSSs, before the vehicles can be sold in the U.S. Some examples of FMVSS rules that will apply to our vehicles are crashworthiness, crash avoidance and EV requirements. We will also be required to comply with other federal laws administered by the NHTSA, including Theft Prevention Act requirements, consumer information labeling requirements, Early Warning Reporting requirements regarding warranty claims, field reports, death and injury reports and foreign and owner's manual requirements.

The Automobile Information and Disclosure Act requires manufacturers of motor vehicles to disclose certain information regarding the manufacturer's suggested retail price, optional equipment and pricing. In addition, this law allows inclusion

17

Table of Contents

of city and highway 'fuel economy' ratings, as determined by the EPA, as well as crash test ratings as determined by the NHTSA if such tests are conducted.

Our vehicles that may be sold outside of the United States are subject to similar foreign safety, environmental and other regulations. Many of those regulations are different from those applicable in the United States and may require redesign and/or retesting. The European Union has established new rules regarding additional compliance oversight that were scheduled to commence in 2020, and there is also regulatory uncertainty related to the United Kingdom's withdrawal from the European Union. These changes could impact the rollout of new vehicle features in Europe.

In addition to the various territorial legal requirements Mullen is obligated to meet, we plan to engineer the Mullen FIVE to deliver 5-star performance in the two main voluntary vehicle safety performance assessment programs, United States New Car Assessment Program **("NCAP")** and Euro NCAP. 5-star is the maximum attainable score. These independent organizations have introduced several additional safety related tests aimed at improving the safety of passenger vehicles, both for occupants and pedestrians involved in collisions with vehicles. Some of these tests are derived from the legal tests, such as side impact, but have higher performance requirements. Others are unique to the program. Areas covered by these tests include:

- Mobile Progressive Deformable Barrier, Full width rigid barrier, mobile side impact barrier and others.

We intend that the Mullen FIVE will also be equipped with certain advanced driving assistance features which may allow us to garner further Euro NCAP awards for features which are not yet a formal part of the 5-Star rating. This will help promote the advanced societal benefits of the Mullen FIVE.

**Recent Acquisitions**

*Bollinger Motors 60% Controlling Interest*

On September 7, Mullen Automotive, Inc. (the "Company") entered into a series of Purchase Agreements (Primary Purchase Agreement, Bollinger Purchase Agreement, Masters Purchase Agreement and Seaport Purchase Agreement) to acquire a controlling interest in Bollinger Motors, Inc. ("Bollinger Motors").

In conjunction with this transaction, Robert Bollinger, the CEO of Bollinger Motors, entered into an employment agreement with the Company.

On October 7, 2022, the Company and Bollinger Motors amended the payment terms of one portion of the primary transaction such that the $32 million in payments based on reserve shares would be amended to be paid in cash of $15.5 million on or before November 30, 2022, and a balance payment of $16.5 million will be deposited into cash escrow on or before November 30, 2022, to pay out over three equal payments of $5.5 million paid on Feb 5, 2023, May 5, 2023, and Aug 5, 2023, respectively .

The foregoing description of the Bollinger Motors and related transactions does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Merger Agreement dated September 7, 2022, as amended October 7, 2022, copies of which are filed as Exhibits to the Company's Current Reports on Form 8-K filed with the SEC on September 7, 2022, October 7, 2022, and November 21, 2022, respectively.

*ELMS Asset Acquisition*

On September 16, 2022, the Company entered into an Asset Purchase Agreement (the "Agreement") with the Chapter 7 trustee of the Bankruptcy Estates of Electric Last Mile Solutions, Inc. and Electric Last Mile, Inc.

Pursuant to the Agreement, the Company agreed to purchase certain assets of the Debtors, including a plant in Mishawaka, Indiana and assumption of the related land contract, all inventory and tangible personal property, customer and supplier information, and certain intellectual property rights (such as patent applications), out of the Chapter 7

18

Table of Contents

Bankruptcy for approximately $55.0 million plus the assumption of monetary liabilities related to assumed contracts, including the land contract, which are estimated to be approximately $37 million.
The Company provided a deposit of $5.5 million which was applied towards the purchase price.

On October 13, 2022, the United States Bankruptcy Court for the District of Delaware issued an order approving the sale to Mullen Automotive Inc. pursuant to the terms and conditions of the Asset Purchase Agreement dated September 16, 2022. The agreement, which was previously reported in the Company's Form 8-K filed with the Securities and Exchange Commission on September 19, 2022.

The foregoing description of the ELMS asset acquisition and related transactions does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Asset Purchase Agreement dated September 16, 2022, copies of which were filed as Exhibits to the Company's Current Reports on Form 8-K filed with the SEC on September 16, 2022, and October 13, 2022. The transaction closed on December 1, 2022.

**Human Capital Resources**

19

Table of Contents

*Talent Attraction and Capability Assessment*

In an environment where many employees are no longer bound to physical locations, where and how we source our talent is evolving. From a capability perspective, we are leveraging best practices in assessments and talent management to current capabilities and future pipeline while reinforcing a culture of belonging, empowerment, and innovation.

*Diversity and Inclusion*

We strive to attract a pool of diverse and exceptional candidates and support their career growth once they become employees. In addition, we seek to hire based on talent rather than solely on educational pedigree. We also believe that our ability to retain our workforce is dependent on our ability to foster an environment that is sustainably safe, respectful, fair, and inclusive of everyone and promotes diversity, equity and inclusion inside and outside of our business.

*Our Employees*

As of September 30, 2022, we employed 118 full-time employees. Most of our employees are engaged in automotive, finance, and engineering related functions. To date, we have not experienced any work stoppages and consider our relationship with our employees to be in good standing. None of our employees are represented by a labor union or subject to a collective bargaining agreement.

**Available Information**

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and file or furnish reports, proxy statements, and other information with the SEC. You can read our SEC filings over the Internet at the SEC's website at www.sec.gov. Our filings with the SEC, including our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports, also are available free of charge on the investors section of our website at www.mullenusa.com when such reports are available on the SEC's website. Further corporate governance information, including our certificate of incorporation, bylaws, governance guidelines, board committee charters, and code of business conduct and ethics, is also available on the investors section of our website.

The contents of the websites referred to above are not incorporated into this filing or in any other report or document we file with the SEC, and any references to these websites are intended to be inactive textual references only.

**ITEM 1A. RISK FACTORS.**

*Investing in our securities involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Report, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, as well as the preceding "Business" section of this Report, before engaging in any transaction in our securities. Any of the following risks could materially and adversely affect our business, financial condition, results of operations and/or prospects, and cause the value of our securities to decline, which could cause you to lose all or part of your investment.*

**Summary**

**Risks Related to Mullen's Capital Requirements and Financial Condition**

- We have incurred significant losses since inception and we expect that we will continue to incur losses for the foreseeable future;
- We will require substantial additional financing to effectuate our business plan;
- We have not yet manufactured or sold any production vehicles to customers and may never develop or manufacture any vehicles;
- Our limited operating history makes it difficult for us to evaluate our future business prospects;

Table of Contents

- Our auditor has expressed substantial doubt about our ability to continue as a going concern;
- Certain of our lenders and the Internal Revenue Service have liens on our assets;
- We have not paid, and do not plan to pay, cash dividends on our Common Stock, so any return on investment may be limited to the value of our Common Stock;
- Our stockholders are subject to significant dilution upon the occurrence of certain events which could result in a decrease in our stock price.
- Our commitments to issue shares of Common Stock or securities that are convertible into shares of Common Stock may cause significant dilution to stockholders;
- Our commitment to issue shares of Common Stock pursuant to the terms of the Notes, our preferred stock and the Warrants could encourage short sales by third parties which could contribute to the future decline of stock price;
- We may not be able to maintain compliance with continued listing requirements of the NASDAQ Capital Market;
- We may have insufficient authorized and reserved shares.

**Risks Related to Mullen's Business and Operations**

- Potential acquisitions may disrupt our business and dilute stockholder value;
- We may not be able to develop, manufacture and obtain regulatory approvals for a car of sufficient quality to appeal to customers on schedule or at all;
- Our currently planned vehicles rely on lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame, potentially subjecting us to litigation, recall, and redesign risks;
- The efficiency of a battery's use will decline over time, which may negatively influence customers' decisions whether to purchase an electric vehicle;
- We rely on our original equipment manufacturers, suppliers and service providers for parts and components, any of whom could choose not to do business with us;
- We will rely on complex machinery for our operations and production, which involve a significant degree of risk and uncertainty in operational performance and costs;
- Complex software and technology systems need to be developed in coordination with vendors and suppliers, and there can be no assurance that such systems will be successfully developed;
- We may experience significant delays in the design, manufacture, regulatory approval, launch and financing of our vehicles, which could harm our business and prospects;
- The inability of our suppliers, including single or limited source suppliers, to deliver components in a timely manner or at acceptable prices or volumes could have a material adverse effect on our business and prospects;
- Financial distress of our suppliers could necessitate that we provide substantial financial support, which could increase our costs, affect our liquidity or cause production disruptions;
- We have a limited operating history and face significant challenges as a new entrant into the automotive industry;
- We have a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future, casting doubt on our ability to continue as a going concern;
- Our business model is untested and we may fail to commercialize our strategic plans;
- Our operating and financial results forecast relies on assumptions and analyses developed by us and may prove to be incorrect;
- We may be unable to accurately estimate the supply and demand for our vehicles;
- Increased costs or disruptions in supply of raw materials or other components could occur;
- Our vehicles may fail to perform as expected;
- Our services may not be generally accepted by our users;
- The automotive market is highly competitive;
- The automotive industry is rapidly evolving and demand for our vehicles may be adversely affected;
- We may be subject to risks associated with autonomous driving technology;
- Our distribution model is different from the predominant current distribution model for auto manufacturers;
- Our future growth is dependent on the demand for and consumers' willingness to adopt electric vehicles;
- Government and economic incentives could become unavailable, reduced or eliminated;
- Our failure to manage our future growth effectively;

21

Table of Contents

- Our failure to establish warranty reserves sufficient to cover future warranty claims;
- We may not succeed in establishing, maintaining and strengthening the Mullen brand;
- Doing business internationally creates operational and financial risks;
- We are highly dependent on the services of David Michery, our Chief Executive Officer;
- Our business may be adversely affected by labor and union activities;
- We face risks related to health epidemics, including the recent COVID-19 pandemic;
- Reservations for our vehicles are cancellable;
- We may face legal challenges relating to direct sales to customers;
- We face information security and privacy concerns;
- We may be forced to defend ourselves against patent or trademark infringement claims and may be unable to prevent others from unauthorized use of our intellectual property;
- Our patent applications may not issue as patents, the patents may expire, our patent applications may not be granted, and our rights may be contested;
- We may be subject to damages resulting from unintended disclosure of trade secrets;
- Our vehicles are subject to various safety standards and regulations that we may fail to comply with;
- We may be subject to product liability claims;
- We are, or may be subject to, anti-corruption, bribery, money laundering, and financial and economic laws;
- Risk of failure to improve our operational and financial systems to support expected growth;
- Risk of failure to build our financial infrastructure and improve our accounting systems and controls;
- The concentrated voting control of David Michery, Mullen's founder; potential conflicts of interest;
- The priority of our debt over our Common Stock in the event of liquidation, dissolution or winding up;
- The number of shares of Common Stock underlying our outstanding warrants and Preferred Stock is significant in relation to our currently outstanding Common Stock; and
- The dearth of analyst coverage on Mullen.

**Risk Factors**

**Risks Related to our Capital Requirements and Financial Condition**

***We have incurred significant losses since inception and we expect that we will continue to incur losses for the foreseeable future, which makes it difficult to assess our future viability.***

We have not been profitable since operations commenced, and we may never achieve or sustain profitability. In addition, we have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields such as the electric vehicle ("*EV*") industry. Development and deployment of EV technology and vehicles is a highly speculative undertaking and involves a substantial degree of risk. We have not yet commercialized any of our proposed EV products or generated any revenue from sales of such products. We have devoted significant resources to research and development and other expenses related to our ongoing operations.

We will require significant additional capital to continue operations and to execute current business strategy. Mullen cannot estimate with reasonable certainty the actual amounts necessary to successfully complete the development and commercialization of our proposed products and there is no certainty that we will be able to raise the necessary capital on reasonable terms or at all.

***We will require substantial additional financing to effectuate our business plan, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development efforts or other operations.***

For the years ended September 30, 2022, and 2021, we incurred net losses of $154.7 million and $44.2 million, respectively, and net cash used in operating activities was $63.1 million and $17.5 million, respectively. As of September 30, 2022, we had an accumulated deficit of $305.1 million. We will need significant capital to, among other things, conduct research and development, increase our production capacity, and expand our sales and service network.

Table of Contents

We expect to continue to incur substantial operating losses for the next several years as we advance our product development and commercialization efforts. No substantial revenue from operations will likely be available until, and unless, such efforts are successful.

We expect our capital expenditures to continue to be significant in the foreseeable future as we expand our business, and that once our cars are in production our level of capital expenditures will be significantly affected by user demand for our products and services. The fact that we have a limited operating history means we have limited historical data on the demand for our products and services. As a result, our future capital requirements may be uncertain and actual capital requirements may be different from those we currently anticipate. We will likely need to seek equity or debt financing to finance a portion of our capital expenditures. Such financing might not be available to us in a timely manner, or on terms that are acceptable to us, or at all.

Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors, including general market conditions and investor acceptance of our business plan. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. In particular, recent disruptions in the financial markets and volatile economic conditions could affect our ability to raise capital. If we raise additional capital through marketing and distribution arrangements or other collaborations, strategic alliances or licensing arrangements with third parties, we may have to relinquish certain valuable rights to our product candidates, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable. If we raise additional capital through public or private equity offerings, the ownership interest of our stockholders will be diluted, and the terms of any new equity securities may have preferential rights over our Common Stock and further may restrict our ability to obtain additional financing even if needed to continue operations. Further, the ability to fund our needs through equity issuances, warrants or convertible debt is or may be limited by covenants in certain of our existing and future funding or other agreements. If we raise additional capital through debt financing, we would have increased debt service obligations and may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt or making capital expenditures, or subject to specified financial ratios, any of which could restrict our ability to develop and commercialize our product candidates or operate as a business.

Additional capital may not be available when we need it, on terms that are acceptable to us, or at all. If adequate funds are not available to us on a timely basis, we may be required to delay, limit, reduce or terminate our establishment of sales and marketing, manufacturing or distribution capabilities, development activities or other activities that may be necessary to commercialize our proposed products or other development activities. We might not be able to obtain any funding, and we might not have sufficient resources to conduct our business as projected, both of which could mean that we would be forced to curtail or discontinue our operations.

***We have not yet manufactured or sold any production vehicles to customers and may never develop or manufacture any vehicles.***

We have no experience as an organization in high volume manufacturing of the planned electric vehicles and we cannot assure you that us or our partners will be able to develop efficient, automated, cost-efficient manufacturing capability and processes, and reliable sources of component supplies that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully mass market our EVs. Even if we are able to successfully develop and sell or lease our vehicles, there can be no assurance that we will be commercially successful and achieve or sustain profitability. As a new entrant into our industry, we will face significant risks and challenges to our business and prospects, including, among other things, with respect to our ability to:

- design and produce safe, reliable and quality vehicles on an ongoing basis;

- obtain the necessary regulatory approvals in a timely manner;

- build a well-recognized and respected brand;

- establish and expand our customer base;

23

Table of Contents

- successfully market our vehicles and the other services we intend to provide;

- properly price our services, including our charging solutions, financing and lease options, and successfully anticipate the take-rate and usage of such services by users;

- successfully service our vehicles after sales and maintain a good flow of spare parts and customer goodwill;

- establish and maintain our operational efficiency;

- predict our future revenues and appropriately budget for our expenses;

- attract, retain and motivate talented employees;

- anticipate trends that may emerge and affect our business; and

- anticipate and adapt to changing market conditions, including technological developments and changes in the competitive landscape.

If we fail to adequately address any or all of these risks and challenges, our business may be materially and adversely affected.

***Our limited operating history makes it difficult for us to evaluate our future business prospects.***

As we attempt to transition from research and development activities to commercial production and sales, it is difficult, if not impossible, to forecast our future results, and we have limited insight into trends that may emerge and affect our business. The estimated costs and timelines that we have developed to reach full scale commercial production are subject to inherent risks and uncertainties involved in the transition from a start-up company focused on research and development activities to the large-scale manufacture and sale of vehicles. There can be no assurance that our estimates related to the costs and timing necessary to complete the design and engineering of our EVs and tool our facilities will prove accurate. These are complex processes that may be subject to delays, cost overruns and other unforeseen issues. For example, the tooling required within our facilities may be more expensive to produce than predicted, or have a shorter lifespan, resulting in additional replacement and maintenance costs, which could have a material adverse impact on our results of operations and financial condition. Similarly, we may experience higher raw material waste in the composite process than we expect, resulting in higher operating costs and hampering our ability to be profitable.

In addition, market conditions, many of which are outside of our control and subject to change, including general economic conditions, the availability and terms of financing, the impacts and ongoing uncertainties created by the COVID-19 pandemic, fuel and energy prices, regulatory requirements and incentives, competition and the pace and extent of vehicle electrification generally, will impact demand for our electric vehicles, and ultimately our success.

***There is substantial doubt about our ability to continue as a going concern.***

Our ability to continue as a going concern is dependent upon our ability to raise additional debt or equity financings or enter strategic partnerships. Since our inception, we have financed our operations through convertible debt and preferred stock financings. We intend to continue to finance our operations through debt or equity financing and/or strategic partnerships. The failure to obtain sufficient financing or strategic partnerships could adversely affect our ability to achieve our business objectives and continue as a going concern.

24

Table of Contents

***Our senior lender has a security interest on all our assets and the Internal Revenue Service has liens on our assets, and if these lienholders foreclose, that would be detrimental to our business, our financial condition and our ability to continue as a going concern.***

Our senior lender has a security interest on all of our assets. In addition, we have liabilities of $1.7 million due to the Internal Revenue Service (the "**IRS**"). We are in default on such loan. Should either our senior lender or the IRS foreclose, each could secure judgments against our assets. This would be materially detrimental to our business, our financial condition and our ability to operate as a going concern.

***We have not paid cash dividends on our Common Stock in the past and do not expect to pay dividends on our Common Stock in the future. Any return on investment may be limited to the value of our Common Stock.***

We have never paid cash dividends on our Common Stock and do not anticipate paying cash dividends in the near future. The payment of dividends on our Common Stock will depend on earnings, financial condition and other business and economic factors affecting us at such time as the Board of Directors may consider relevant. If we do not pay dividends, our Common Stock may be less valuable because a return on your investment will only occur if our stock price appreciates.

***We may not be able to maintain compliance with the continued listing requirements of the NASDAQ Capital Markets.***

Our common stock is listed on the Nasdaq Capital Markets. To maintain that listing, we must satisfy minimum financial and other requirements including, without limitation, a requirement that our closing bid price be at least $1.00 per share. On September 7, 2022, we were notified by NASDAQ Listing Qualifications Staff about bid price deficiency. The Board and Management are reviewing plans to regain compliance with the $1.00 closing bid price requirement. If the Company does not regain compliance with the bid price requirement by March 6, 2023, the Company may be eligible for an additional 180-calendar day compliance period so long as it satisfies the criteria for initial listing on the Nasdaq Capital Market and the continued listing requirement for market value of publicly held shares and the Company provides written notice to Nasdaq of its intention to cure the deficiency during the second compliance period by effecting a reverse stock split, if necessary. If we fail to continue to meet all applicable continued listing requirements for The Nasdaq Capital Market in the future and Nasdaq determines to delist our common stock, the delisting could adversely affect the market liquidity of our common stock, our ability to obtain financing to repay debt and fund our operations.

***Our commitments to issue shares of Common Stock or securities that are convertible into shares of Common Stock may cause significant dilution to stockholders.***

Pursuant to Amendment No. 3, the investors paid $150 million and in lieu of receiving shares of Series D Preferred Stock and Warrants, the investors received the Notes, which outstanding principal and accrued but unpaid interest on the Notes convert into shares of Common Stock. The conversion price per share of Common Stock is equal to the lower of (i) $0.303, the closing price of the Common Stock on Nasdaq on November 14, 2022, and (ii) (A) if mandatorily converted on November 21, 2022, the closing price of the Common Stock on Nasdaq on November 18, 2022 or (B) if converted after January 3, 2022, the closing price of the Common Stock on Nasdaq on January 3, 2022, both (A) and (B) being subject to a floor price of $0.10 per share.

For no additional consideration, for every share of Common Stock issued to a holder upon conversion of a Note, the holder shall receive Warrants exercisable for 185% of the Common Stock at an exercise price equal to the conversion price applicable at the time of conversion of such Note, subject to further adjustment as provided in the Warrant.

Amendment No. 3 further provides that the remaining $90 million of the Commitment Amount shall be paid in two tranches, on January 24, 2023, and February 24, 2023. The purchase price per share of Series D Preferred Stock will be the lower of (i) $1.27, the closing price of the Company's stock on the date the Securities Purchase Agreement was executed, or (ii) the closing price of the Common Stock on the trading day immediately preceding the respective Purchase Date, subject to a floor price of $0.10 per share. For no additional consideration, for every share of Series D Preferred Stock purchased, such investor shall receive Warrants exercisable for 185% shares of Series D Preferred Stock purchased by the investors at an exercise price equal to the purchase price for shares of Series D Preferred Stock.

25

Table of Contents

Finally, Amendment No. 3 further provides that from April 1, 2023 until June 30, 2023, the investors shall have the right, but not the obligation, at any time from time to time, in each investors sole and absolute discretion to purchase additional shares of Series D Preferred Stock from the Company in an amount equal to such investor's pro rata portion of $100,000,000 on the same terms and conditions as applicable to the purchase and sale of shares of Series D Preferred Stock as provided under the Securities Purchase Agreement, including that each investor exercising such right shall receive a proportional amount of Warrants exercisable for 110% of shares of Series D Preferred Stock purchased by the investors at an exercise price equal to the purchase price for shares of Series D Preferred Stock.

Implementation of Amendment No. 3 would cause issuance of additional shares Common Stock or issuance of shares Common Stock upon the conversion of shares of Series D Preferred Stock and Warrants, which in turn would dilute the percentage ownership interest of holders of our Common Stock, dilute the book value per share of our Common Stock and increase the number of our publicly traded shares, which could depress the market price of our Common Stock.

***Our commitment to issue shares of Common Stock pursuant to the terms of the Notes, our Preferred Stock and the Warrants could encourage short sales by third parties which could contribute to the future decline of stock price.***

Our commitment to issue shares of Common Stock pursuant to the terms of the Notes, our Preferred Stock and the Warrants has the potential to cause significant downward pressure on the price of our Common Stock. In such an environment, short sellers may exacerbate any decline of our stock price. If there are significant short sales of our Common Stock, the share price of our Common Stock may decline more than it would in an environment without such activity. This may cause other holders of our Common Stock to sell their shares. If there are many more shares of our Common Stock on the market for sale than the market will absorb, the price of our common shares will likely decline.

Our investors may participate in short sales of our Common Stock. They may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of Common Stock in the course of hedging in positions they assume. Our investors may also sell shares of Common Stock short and deliver shares of Common Stock covered by their investments to close out short positions and to return borrowed shares in connection with such short sales. Our investors may also loan or pledge shares of Common Stock to broker-dealers that in turn may sell such shares. Such activity could cause a decline in the market price of the shares of our Common Stock.

***Our stockholders are subject to significant dilution upon the occurrence of certain events which could result in a decrease in our stock price.***

As of January 6, 2023, we had outstanding 1,693,663,180 shares of Common Stock. As of that same date, we also had outstanding 1,925 shares of Series A Preferred Stock convertible into an aggregate of 192,500 shares of Common Stock, 1,211,757 shares of Series C Preferred Stock convertible into an aggregate of 1,211,757 shares of Common Stock and 363,097 shares of Series D Preferred Stock convertible into an aggregate of 363,097 shares of Common Stock. The issuance of shares of Common Stock upon the conversion of such shares of Preferred Stock would dilute the percentage ownership interest of holders of our Common Stock, dilute the book value per share of our Common Stock and increase the number of our publicly traded shares, which could depress the market price of our Common Stock.

In addition, the shares of Series D Preferred Stock contain weighted average anti-dilution provisions which, subject to limited exceptions, would increase the number of shares issuable upon conversion of such preferred stock (by reducing the conversion price of the Series D Preferred Stock) in the event that we in the future issue Common Stock, or securities convertible into or exercisable to purchase Common Stock, at a price per share lower than the conversion price then in effect.

***We may have insufficient authorized and reserved shares.***

If at any time there are warrants, preferred stock and convertible notes that remain outstanding, and the Company does not have a sufficient number of authorized and **unreserved shares of Common Stock** to satisfy its obligation to reserve for issuance the Required Reserve Amount (an " Authorized Share Failure "), then the Company shall promptly take all action reasonably necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for the convertible securities then outstanding. In no event later than

26

Table of Contents

ninety (90) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its reasonable best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its board of directors to recommend to the stockholders that they approve such proposal. Notwithstanding the foregoing, if any such time of an Authorized Share Failure, the Company is able to obtain the written consent of a majority of the shares of its issued and outstanding shares of Common Stock to approve the increase in the number of authorized shares of Common Stock, the Company may satisfy this obligation by obtaining such consent and submitting for filing with the SEC the Information Statement on Schedule 14-C.

**Risks Related to our Business and Operations**

***Potential acquisitions may disrupt our business and dilute stockholder value.***

In 2022, we have been an active acquirer of two entities. We have sought merger or acquisition partners that are culturally similar and have experienced management and possess either significant market presence or have potential for improved profitability through financial management, economies of scale or expanded services. Acquiring related electric businesses involve various risks commonly associated with acquisitions, including, among other things:

- potential exposure to unknown or contingent liabilities of the target entity;

- exposure to potential asset quality issues of the target entity;

- difficulty and expense of integrating the operations and personnel of the target entity;

- potential disruption to our business;

- potential diversion of our management's time and attention;

- the possible loss of key employees and customers of the target entity;

- difficulty in estimating the value of the target entity; and

- potential changes in banking or tax laws or regulations that may affect the target entity.

We regularly evaluate merger and acquisition opportunities and conduct due diligence activities related to possible transactions with other businesses. As a result, merger or acquisition discussions and, in some cases, negotiations may take place and future mergers or acquisitions involving cash, debt or equity securities may occur at any time. Acquisitions typically involve the payment of a premium over book and market values, and, therefore, some dilution of our tangible book value and net income per common share may occur in connection with any future transaction. Furthermore, failure to realize the expected revenue increases, cost savings, increases in geographic or product presence, and/or other projected benefits from an acquisition could have a material adverse effect on our financial condition and results of operations.

***We may be unable to develop, manufacture and obtain required regulatory approvals for a car of sufficient quality to appeal to customers on schedule or at all, or may be unable to do so on a large scale.***

Our business depends in large part on our ability to develop, manufacture, market and sell or lease our EVs. Our ability to effectively compete in the EV market will depend in large part on our entry into the ESUV market through the offering of competitively priced vehicles to a wider variety of potential buyers.

27

Table of Contents

We initially plan to manufacture vehicles in collaboration with one or more automotive component and engineering services suppliers, including large OEMs or tier-one automotive suppliers. We have not yet executed definitive supply or manufacturing agreements with any OEM or tier-one automotive supplier for the supply of parts for production of our initially proposed ESUVs or any of our other future vehicle offerings. If we are unable to negotiate and finalize such supply and manufacturing agreements with an OEM or a tier-one automotive supplier, we will not be able to produce any ESUVs and will not be able to generate significant revenue, or the vehicles may become more expensive to deliver with a higher bill of materials, which would have a material adverse effect on our business, prospects, operating results and financial condition.

The continued development and the ability to start manufacturing our vehicles are and will be subject to risks, including with respect to:

- our ability to secure necessary funding;

- our ability to accurately manufacture vehicles within specified design tolerances;

- obtaining required regulatory approvals and certifications;

- compliance with environmental, safety, and similar regulations;

- securing necessary components, services, or licenses on acceptable terms and in a timely manner;

- delays in delivering final component designs to our suppliers;

- our ability to attract, recruit, hire, retain and train skilled employees;

- quality controls that prove to be ineffective or inefficient;

- delays or disruptions in our supply chain including raw material supplies;

- our ability to maintain arrangements on reasonable terms with our manufacturing partners and suppliers, engineering service providers, delivery partners, and after sales service providers; and

- other delays, backlog in manufacturing and research and development of new models, and cost overruns.

Our ability to develop, manufacture and obtain required regulatory approvals for a vehicle of sufficient quality to appeal to customers on schedule and on a large scale is unproven, and the business plan is still evolving. We may be required to introduce new vehicle models and enhanced versions of existing models. To date, we have limited experience, as a company, designing, testing, manufacturing, marketing and selling or leasing our electric vehicles and therefore cannot assure you that we will be able to meet customer expectations. Any failure to develop such manufacturing processes and capabilities within our projected costs and timelines would have a material adverse effect on our business, prospects, operating results and financial condition.

***Our vehicles will make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame, and, if such results occur, bodily injury or death could result and could subject us to lawsuit, product recalls, or redesign efforts.***

The battery packs within our proposed vehicles will make use of lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the battery pack is designed to contain any single cell's release of energy without spreading to neighboring cells, once our vehicles are commercially available, a field or testing failure of battery packs in our vehicles could occur, which could result in bodily injury or death and could subject us to lawsuit, product recalls, or redesign efforts, all of which would be time consuming and expensive and could harm our brand image. Also, negative

28

Table of Contents

public perceptions regarding the suitability of lithium-ion cells for automotive applications, the social and environmental impacts of cobalt mining, or any future incident involving lithium-ion cells, such as a vehicle or other fire, could seriously harm our business and reputation.

***The efficiency of a battery's use over time when driving electric vehicles will decline over time, which may negatively influence potential customers' decisions whether to purchase an electric vehicle.***

The cells used in EV battery modules degrade over time, influenced primarily by the age of the cells and the total energy throughput over the life of the EV. This cell degradation results in a corresponding reduction in the vehicle's range. Although common to all EVs, cell degradation, and the related decrease in range, may negatively influence potential customer's EV purchase decisions.

***We are substantially reliant on our relationships with OEMs, suppliers and service providers for the parts and components in our vehicles, as well as for the manufacture of our initial vehicles. If any of these OEMs, suppliers or service partners choose to not do business with us, then we would have significant difficulty in procuring and producing our vehicles and our business prospects would be significantly harmed.***

Collaboration with third parties for the manufacturing of vehicles is subject to risks with respect to operations that are outside our control. We could experience delays to the extent our current or future partners do not continue doing business with us or fail to meet agreed upon timelines, experience capacity constraints or otherwise are unable to deliver components or manufacture vehicles as expected. There is a risk of potential disputes with partners, and we could be affected by adverse publicity related to our partners whether or not such publicity is related to their collaboration with us. In addition, although we intend to be involved in material decisions in the supply chain process, given that we also rely on our partners to meet our quality standards, there can be no assurance that we will be able to maintain high quality standards.

We may in the future enter into strategic alliances, including joint ventures or minority equity investments, with various third parties to further our business purpose. These alliances could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the third party, and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business.

***We will rely on complex machinery for our operations and production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

We will rely heavily on complex machinery for our operations and our production will involve a significant degree of uncertainty and risk in terms of operational performance and costs. It is expected that our manufacturing plant will consist of large-scale machinery combining many components. The manufacturing plant components are likely to suffer unexpected malfunctions from time to time and will depend on repairs and spare parts to resume operations, which may not be available when needed. Unexpected malfunctions of the manufacturing plant components may significantly affect the intended operational efficiency. Operational performance and costs can be difficult to predict and are often influenced by factors outside of our control, such as, but not limited to, scarcity of natural resources, environmental hazards and remediation, costs associated with decommissioning of machines, labor disputes and strikes, difficulty or delays in obtaining governmental permits, damages or defects in electronic systems, industrial accidents, fire, and seismic activity and natural disasters. Should operational risks materialize, they may result in the personal injury to or death of workers, the loss of production equipment, damage to manufacturing facilities, monetary losses, delays and unanticipated fluctuations in production, environmental damage, administrative fines, increased insurance costs and potential legal liabilities, all which could have a material adverse effect on our business, results of operations, cash flows, financial condition or prospects.

***There are complex software and technology systems that need to be developed in coordination with vendors and suppliers in order to reach production for our EVs, and there can be no assurance such systems will be successfully developed.***

Our vehicles will use a substantial amount of third-party and in-house software codes and complex hardware to operate. The development of such advanced technologies is inherently complex, and we will need to coordinate with our vendors

Table of Contents

and suppliers in order to reach production for our EVs. Defects and errors may be revealed over time and our control over the performance of third-party services and systems may be limited. Thus, our potential inability to develop the necessary software and technology systems may harm our competitive position.

We are relying on third-party suppliers to develop a number of emerging technologies for use in our products, including solid-state polymer battery technology. These technologies are not today, and may not ever be, commercially viable. There can be no assurances that our suppliers will be able to meet the technological requirements, production timing, and volume requirements to support our business plan. In addition, the technology may not comply with the cost, performance useful life and warranty characteristics we anticipate in our business plan. As a result, our business plan could be significantly impacted, and we may incur significant liabilities under warranty claims which could adversely affect our business, prospects, and results of operations.

***We may experience significant delays in the design, manufacture, regulatory approval, launch and financing of our vehicles, which could harm our business and prospects.***

Any delay in the financing, design, manufacture, regulatory approval or launch of our vehicles, including entering into agreements for platform sharing, supply of component parts, and manufacturing, could materially damage our brand, business, prospects, financial condition and operating results and could cause liquidity constraints. Vehicle manufacturers often experience delays in the design, manufacture and commercial release of new products. To the extent we delay the launch of our vehicles, our growth prospects could be adversely affected as we may fail to establish or increase our market share. We rely on third-party suppliers for the provision and development of the key components and materials used in our vehicles. To the extent our suppliers experience any delays in providing us with or developing necessary components, we could experience delays in delivering on our timelines.

***We will be dependent on our suppliers, a significant number of which are single or limited source suppliers, and the inability of these suppliers to deliver necessary components of our vehicles in a timely manner and at prices and volumes acceptable to us could have a material adverse effect on our business, prospects and operating results.***

While we plan to obtain components from multiple sources whenever possible, many of the components used in our vehicles will be purchased by us from a single source. While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are acceptable to us. In addition, we could experience delays if our suppliers do not meet agreed upon timelines or experience capacity constraints.

Any disruption in the supply of components, whether or not from a single source supplier, could temporarily disrupt production of our vehicles until an alternative supplier is able to supply the required material. Changes in business conditions, unforeseen circumstances, governmental changes, and other factors beyond our control or which we do not presently anticipate, could also affect our suppliers' ability to deliver components to us on a timely basis. Any of the foregoing could materially and adversely affect our results of operations, financial condition and prospects.

***If any of our suppliers become economically distressed or go bankrupt, we may be required to provide substantial financial support or take other measures to ensure supplies of components or materials, which could increase our costs, affect our liquidity or cause production disruptions.***

We expect to purchase various types of equipment, raw materials and manufactured component parts from our suppliers. If these suppliers experience substantial financial difficulties, cease operations, or otherwise face business disruptions, we may be required to provide substantial financial support to ensure supply continuity or would have to take other measures to ensure components and materials remain available. Any disruption could affect our ability to deliver vehicles and could increase our costs and negatively affect our liquidity and financial performance.

Table of Contents

***We have a limited operating history and face significant challenges as a new entrant into the automotive industry, our vehicles are in development, and we do not expect our first vehicle to be produced until the second quarter of 2024, at the earliest, if at all.***

We have a short operating history in the automobile industry, which is continuously evolving. We have no experience as an organization in high volume manufacturing of the planned EVs. We cannot assure you that us or our partners will be able to develop efficient, automated, cost-efficient manufacturing capability and processes, and reliable sources of component supplies that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully mass-market future vehicles. You should consider our business and prospects in light of the risks and significant challenges we face as a new entrant into our industry, including, among other things, with respect to our ability to:

- design and produce safe, reliable and quality vehicles on an ongoing basis;

- obtain the necessary regulatory approvals in a timely manner;

- build a well-recognized and respected brand;

- establish and expand our customer base;

- properly price our services, including our charging solutions, financing and lease options, and successfully anticipate the take-rate and usage of such services by users;

- successfully service our vehicles after sales and maintain a good flow of spare parts and customer goodwill;

- improve and maintain our operational efficiency;

- maintain a reliable, secure, high-performance and scalable technology infrastructure;

- predict our future revenues and appropriately budget for our expenses;

- attract, retain and motivate talented employees;

- anticipate trends that may emerge and affect our business;

- anticipate and adapt to changing market conditions, including technological developments and changes in competitive landscape;

- navigate an evolving and complex regulatory environment.

If we fail to adequately address any or all of these risks and challenges, our business may be materially and adversely affected.

***We are an early-stage company with a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future. There is substantial doubt about our ability to continue as a going concern.***

We have incurred a net loss since our inception. We believe that we will continue to incur operating and net losses each quarter until at least the time we begin significant deliveries of our vehicles. Even if we are able to successfully develop, manufacture, and sell or lease our vehicles, there can be no assurance that they will be commercially successful.

We expect the rate at which we will incur losses to be significantly higher in future periods as we, among other things: design, develop and manufacture our vehicles; build up inventories of parts and components for our vehicles; increase our sales and marketing activities, including opening new Mullen Experience Centers; develop our distribution infrastructure;

31

Table of Contents

and increase our general and administrative functions to support our growing operations. We may find that these efforts are more expensive than we currently anticipate or that these efforts may not result in revenues, which would further increase our losses.

Our independent registered public accounting firm has included an emphasis of matter paragraph regarding our ability to continue as a going concern in its opinion on our September 30, 2022, consolidated financial statements due to our lack of revenues and insufficient capital for us to fund our operations.

*Our business model has yet to be tested and any failure to commercialize our strategic plans would have an adverse effect on our operating results and business, harm our reputation and could result in substantial liabilities that exceed our resources.*

Investors should be aware of the difficulties normally encountered by a new enterprise, many of which are beyond our control, including substantial risks and expenses while establishing or entering new markets, setting up operations and undertaking marketing activities. The likelihood of our success must be considered in light of these risks, expenses, complications, delays, and the competitive environment in which we operate. There is, therefore, nothing at this time upon which to base an assumption that our business model will prove successful, and we may not be able to generate significant revenue, raise additional capital or operate profitably. We will continue to encounter risks and difficulties frequently experienced by early commercial stage companies, including scaling up our infrastructure and headcount, and may encounter unforeseen expenses, difficulties or delays in connection with our growth. In addition, as a result of the capital-intensive nature of our business, we can be expected to continue to sustain substantial operating expenses without generating sufficient revenues to cover expenditure. Any investment in our company is therefore highly speculative and could result in the loss of your entire investment.

*We may not be able to accurately estimate the supply and demand for our vehicles, which could result in a variety of inefficiencies in our business and hinder our ability to generate revenue. If we fail to accurately predict our manufacturing requirements, we could incur additional costs or experience delays.*

It is difficult to predict our future revenues and appropriate budget for our expenses, and we may have limited insight into trends that may emerge and affect our business. We will be required to provide forecasts of our demand to our suppliers several months prior to the scheduled delivery of products to our prospective customers. Currently, there is no historical basis for making judgments on the demand for our vehicles or our ability to develop, manufacture, and deliver vehicles, or our profitability in the future. If we overestimate our requirements, our suppliers may have excess inventory, which indirectly would increase our costs. If we underestimate our requirements, our suppliers may have inadequate inventory, which could interrupt the manufacturing of our products and result in delays in shipments and revenues. In addition, lead times for materials and components that our suppliers order may vary significantly and depend on factors such as the specific supplier, contract terms and demand for each component at a given time. If we fail to order sufficient quantities of product components in a timely manner, the delivery of vehicles to our customers could be delayed, which would harm our business, financial condition and operating results.

*We could experience cost increases or disruptions in the supply of raw materials or other components used in our vehicles. If we are unable to establish an arrangement for the sustainable supply of batteries for our vehicles, our business would be materially and adversely harmed.*

We may be unable to adequately control the costs associated with our operations. We expect to incur significant costs related to procuring raw materials required to manufacture and assemble our vehicles. The prices for these raw materials fluctuate depending on factors beyond our control. Our business also depends on the continued supply of battery cells for our vehicles. We are exposed to multiple risks relating to availability and pricing of quality solid-state polymer battery cells and lithium-ion battery cells.

Furthermore, currency fluctuations, tariffs or shortages in petroleum and other economic or political conditions may result in significant increases in freight charges and raw material costs. Substantial increases in the prices for our raw materials or components would increase our operating costs and could reduce our margins. In addition, a growth in popularity of

32

Table of Contents

electric vehicles without a significant expansion in battery cell production capacity could result in shortages, which would result in increased costs in raw materials to us or impact our prospects.

***If our vehicles fail to perform as expected, our ability to develop, market, and sell or lease our electric vehicles could be harmed.***

Once production commences, our vehicles may contain defects in design and manufacture that may cause them not to perform as expected or that may require repair, recalls, and design changes. Our vehicles will use a substantial amount of software code to operate, and software products are inherently complex and often contain defects and errors when first introduced. We have a limited frame of reference by which to evaluate the long-term performance of our systems and vehicles. There can be no assurance that we will be able to detect and fix any defects in the vehicles prior to their sale to consumers. If any of our vehicles fail to perform as expected, we may need to delay deliveries or initiate product recalls, which could adversely affect our brand in our target markets and could adversely affect our business, prospects, and results of operations.

***Our services may not be generally accepted by our users. If we are unable to provide quality customer service, our business and reputation may be materially and adversely affected.***

Our servicing may primarily be carried out through third parties certified by us. Although such servicing partners may have experience in servicing other vehicles, they will initially have limited experience in servicing our vehicles. There can be no assurance that our service arrangements will adequately address the service requirements of our customers to their satisfaction, or that us or any of our proposed service partners will have sufficient resources to meet these service requirements in a timely manner as the volume of vehicles we deliver increases.

***The automotive market is highly competitive, and we may not be successful in competing in this industry.***

Both the automobile industry generally, and the electric vehicle segment, in particular, are highly competitive, and we will be competing for sales with both internal combustion engine ("**ICE**") vehicles and other EVs. Many of our current and potential competitors have significantly greater financial, technical, manufacturing, marketing and other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products, including their electric vehicles. We expect competition for electric vehicles to intensify due to increased demand and a regulatory push for alternative fuel vehicles, continuing globalization, and consolidation in the worldwide automotive industry. Factors affecting competition include product quality and features, innovation and development time, pricing, reliability, safety, fuel economy, customer service, and financing terms. Increased competition may lead to lower vehicle unit sales and increased inventory, which may result in downward price pressure and adversely affect our business, financial condition, operating results, and prospects.

***The automotive industry and our technology are rapidly evolving and may be subject to unforeseen changes. Developments in alternative technologies, including but not limited to hydrogen, may adversely affect the demand for our electric vehicles.***

We may be unable to keep up with changes in EV technology or alternatives to electricity as a fuel source and, as a result, our competitiveness may suffer. Developments in alternative technologies, such as advanced diesel, ethanol, fuel cells, or compressed natural gas, or improvements in the fuel economy of the ICE, may materially and adversely affect our business and prospects in ways we do not currently anticipate. Any failure by us to successfully react to changes in existing technologies could materially harm our competitive position and growth prospects.

***We may be subject to risks associated with autonomous driving technology.***

It is expected that our proposed vehicles will be designed with connectivity for future installation of an autonomous hardware suite, and we plan to partner with a third-party software provider in the future to implement autonomous capabilities. However, we cannot guarantee that we will be able to identify a third party to provide the necessary hardware and software to enable autonomous capabilities in an acceptable timeframe, on terms satisfactory to us, or at all. Autonomous driving technologies are subject to risks and there have been accidents and fatalities associated with such

Table of Contents

technologies. The safety of such technologies depends in part on driving interactions, and drivers may not be accustomed to using or adapting to such technologies. To the extent accidents associated with our autonomous driving systems occur, we could be subject to liability, negative publicity, government scrutiny, and further regulation. Any of the foregoing could materially and adversely affect our results of operations, financial condition, and growth prospects.

***Our distribution model is different from the predominant current distribution model for automobile manufacturers, which makes evaluating our business, operating results and future prospects difficult.***

Our distribution model is different from the predominant current distribution model for automobile manufacturers, which makes evaluating our business, operating results and future prospects difficult. Our distribution model is not common in the automotive industry today. We plan to conduct vehicle sales directly to users rather than through dealerships. This model of vehicle distribution is relatively new and, with limited exceptions, unproven, and subjects us to substantial risk. For example, we will not be able to utilize long-established sales channels developed through a franchise system to increase sales volume. Moreover, we will be competing with companies with well-established distribution channels. Our success will depend in large part on our ability to effectively develop our own sales channels and marketing strategies. If we are unable to achieve this, it could have a material adverse effect on our business, prospects, financial results and results of operations.

***We have identified material weaknesses in our internal control over financial reporting. Failure to achieve and maintain effective internal control over financial reporting could result in our failure to accurately or timely report our financial condition or results of operations, which could have a material adverse effect on our business and stock price.***

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis. Management is working to remediate our current material weaknesses and prevent potential future material weaknesses by hiring additional qualified accounting and financial reporting personnel, and further reviewing and enhancing our accounting processes. We may not be able to fully remediate any future material weaknesses until these steps have been completed and have been operating effectively for a sufficient period of time. If we are not able to maintain effective internal control over financial reporting, our financial statements and related disclosures may be inaccurate, which could have materially adverse effects on our business and our stock price.

***Our future growth is dependent on the demand for, and upon consumers' willingness to adopt, electric vehicles.***

Our future growth is dependent on the demand for, and upon consumers' willingness to adopt electric vehicles, and even if electric vehicles become more mainstream, consumers choosing us over other EV manufacturers. Demand for electric vehicles may be affected by factors directly impacting automobile prices or the cost of purchasing and operating automobiles such as sales and financing incentives, prices of raw materials and parts and components, cost of fuel and governmental regulations, including tariffs, import regulation and other taxes. Volatility in demand may lead to lower vehicle unit sales, which may result in downward price pressure and adversely affect our business, prospects, financial condition, and operating results.

In addition, the demand for our vehicles and services will highly depend upon the adoption by consumers of new energy vehicles in general and electric vehicles in particular. The market for new energy vehicles is still rapidly evolving, characterized by rapidly changing technologies, competitive pricing and competitive factors, evolving government regulation and industry standards, and changing consumer demands and behaviors.

Other factors that may influence the adoption of alternative fuel vehicles, and specifically electric vehicles, include:

- perceptions about EV quality, safety, design, performance and cost, especially if adverse events or accidents occur that are linked to the quality or safety of electric vehicles, whether or not such vehicles are produced by us or other manufacturers;

- range anxiety;

34

Table of Contents

- the availability of new energy vehicles, including plug-in hybrid EVs;

- the availability of service and charging stations for EVs;

- the environmental consciousness of consumers, and their adoption of EVs;

- perceptions about and the actual cost of alternative fuel; and

- macroeconomic factors.

Any of the factors described above may cause current or potential customers not to purchase EVs in general, and our EVs in particular. If the market for EVs does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition and operating results will be affected.

***The unavailability, reduction or elimination of government and economic incentives could have a material adverse effect on our business, prospects, financial condition and operating results.***

Any reduction, elimination, or discriminatory application of government subsidies and economic incentives because of policy changes, or the reduced need for such subsidies and incentives due to the perceived success of the electric vehicle or for other reasons, may result in the diminished competitiveness of the alternative fuel and electric vehicle industry generally or our electric vehicles in particular. This could materially and adversely affect the growth of the alternative fuel automobile markets and our business, prospects, financial condition and operating results.

While certain tax credits and other incentives for alternative energy production, alternative fuel and electric vehicles have been available in the past, there is no guarantee these programs will be available in the future. If current tax incentives are not available in the future, our financial position could be harmed.

In addition, we may apply for federal and state grants, loans and tax incentives under government programs designed to stimulate the economy and support the production of alternative fuel and electric vehicles and related technologies, and our ability to obtain funds or incentives from government sources is subject to the availability of funds under applicable government programs and approval of our applications to participate in such programs. The application process for these funds and other incentives will likely be highly competitive. We cannot assure you that we will be successful in obtaining any of these additional grants, loans and other incentives. If we are not successful in obtaining any of these additional incentives and we are unable to find alternative sources of funding to meet our planned capital needs, our business and prospects could be materially adversely affected.

***If we fail to manage our future growth effectively, we may not be able to develop, manufacture, market and sell or lease our vehicles successfully.***

We intend to expand our operations significantly, which will require hiring, retaining and training new personnel, controlling expenses, establishing facilities and experience centers, and implementing administrative infrastructure, systems and processes. In addition, because our electric vehicles are based on a different technology platform than traditional ICE vehicles, individuals with sufficient training in electric vehicles may not be available to be hired, and we will need to expend significant time and expense training employees we hire. We also require sufficient talent in additional areas such as software development. Furthermore, as we are a relatively young company, our ability to train and integrate new employees into our operations may not meet the growing demands of our business, which may affect our ability to grow. Any failure to effectively manage our growth could materially and adversely affect our business, prospects, operating results and financial condition.

For example, to manage the expected growth of our operations and increasing complexity, we will need to improve our operational and financial systems, procedures, and controls and continue to increase systems automation to reduce reliance on manual operations. Any inability to do so will affect our billing and reporting. Our current and planned systems, procedures and controls may not be adequate to support our complex arrangements and the rules governing revenue and

35

Table of Contents

expense recognition for our future operations and expected growth. Delays or problems associated with any improvement or expansion of our operational and financial systems and controls could adversely affect our relationships with our customers, cause harm to our reputation and brand and could also result in errors in our financial and other reporting.

***Insufficient warranty reserves to cover future warranty claims could materially adversely affect our business, prospects, financial condition and operating results.***

Once our cars are in production, we will need to maintain warranty reserves to cover warranty-related claims. If our warranty reserves are inadequate to cover future warranty claims on our vehicles, our business, prospects, financial condition and operating results could be materially and adversely affected. We may become subject to significant and unexpected warranty expenses. There can be no assurances that then-existing warranty reserves will be sufficient to cover all claims.

***We may not succeed in establishing, maintaining and strengthening the Mullen brand, which would materially and adversely affect customer acceptance of our vehicles and components and our business, revenues and prospects.***

Once our cars are in production, our business and prospects will heavily depend on our ability to develop, maintain and strengthen the Mullen brand. If we are not able to establish, maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Our ability to develop, maintain and strengthen the Mullen brand will depend heavily on the success of our marketing efforts. The automobile industry is intensely competitive, and we may not be successful in building, maintaining and strengthening our brand. Many of our current and potential competitors, particularly automobile manufacturers headquartered in the United States, Japan, the European Union and China, have greater name recognition, broader customer relationships and substantially greater marketing resources than we do. If we do not develop and maintain a strong brand, our business, prospects, financial condition and operating results will be materially and adversely impacted.

***Doing business internationally creates operational and financial risks for our business.***

Our business plan includes eventual expansion into other international markets. Conducting and launching operations on an international scale requires close coordination of activities across multiple jurisdictions and time zones and consumes significant management resources. If we fail to coordinate and manage these activities effectively, our business, financial condition or results of operations could be adversely affected. International sales entail a variety of risks, including currency exchange fluctuations, challenges in staffing and managing foreign operations, tariffs and other trade barriers, unexpected changes in legislative or regulatory requirements of foreign countries into which we sell our products and services, difficulties in obtaining export licenses or in overcoming other trade barriers, laws and business practices favoring local companies, political and economic instability, difficulties protecting or procuring intellectual property rights, and restrictions resulting in delivery delays and significant taxes or other burdens of complying with a variety of foreign laws.

***We are highly dependent on the services of David Michery, our Chief Executive Officer.***

We are highly dependent on the services of David Michery, our founder and Chief Executive Officer. Mr. Michery is the source of many, if not most, of the ideas and execution driving us. If Mr. Michery were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

***Our business may be adversely affected by labor and union activities.***

Although none of our employees are currently represented by a labor union, it is common throughout the automobile industry generally for many employees at automobile companies to belong to a union, which can result in higher employee costs and increased risk of work stoppages. We may also directly and indirectly depend upon other companies with unionized work forces, such as parts suppliers and trucking and freight companies, and work stoppages or strikes organized by such unions could have a material adverse impact on our business, financial condition or operating results.

36

Table of Contents

***We face risks related to health epidemics, including the recent COVID-19 pandemic, which could have a material adverse effect on our business and results of operations.***

We face various risks related to public health issues, including epidemics, pandemics, and other outbreaks, including the recent pandemic of respiratory illness caused by a novel coronavirus known as COVID-19. The impact of COVID-19, including changes in consumer and business behavior, pandemic fears and market downturns, and restrictions on business and individual activities, has created significant volatility in the global economy and led to reduced economic activity. The spread of COVID-19 has also created a disruption in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers and has led to a global decrease in vehicle sales in markets around the world.

The pandemic has resulted in government authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, stay-at-home or shelter-in-place orders, and business shutdowns. These measures may adversely impact our employees and operations and the operations of our customers, suppliers, vendors and business partners, and may negatively impact our sales and marketing activities. In addition, various aspects of our business cannot be conducted remotely. These measures by government authorities may remain in place for a significant period of time and they are likely to continue to adversely affect our manufacturing plans, sales and marketing activities, business and results of operations.

The spread of COVID-19 has caused us to modify our business practices (including employee travel, recommending that all non-essential personnel work from home and cancellation or reduction of physical participation in sales activities, meetings, events and conferences), and we may take further actions as may be required by government authorities or that we determine are in the best interests of our employees, customers, suppliers, vendors and business partners. The reduction of economic activity also disrupted some contractual obligations due to work stoppage requirements. Some employees chose the option to work from home rather than come to the office. As a result, there were some reductions in employee productivity, employee layoffs and employee salaries.

The extent to which the COVID-19 pandemic impacts our business, prospects and results of operations will depend on future developments, which are highly uncertain and cannot be predicted, including the duration and spread of the pandemic, our severity, the actions to contain the virus or treat our impact, and how quickly and to what extent normal economic and operating activities can resume. Even after the COVID-19 pandemic has subsided, we may continue to experience an adverse impact to our business as a result of our global economic impact, including any recession that has occurred or may occur in the future.

Specifically, difficult macroeconomic conditions, such as decreases in per capita income and level of disposable income, increased and prolonged unemployment, or a decline in consumer confidence as a result of the COVID-19 pandemic could have a material adverse effect on the demand for our vehicles. Under difficult economic conditions, potential customers may seek to reduce spending by forgoing our vehicles for other traditional options or may choose to keep their existing vehicles and cancel reservations.

There are no comparable recent events that may provide guidance as to the effect of the spread of COVID-19 and a pandemic, and, as a result, the ultimate impact of the COVID-19 pandemic or a similar health epidemic is highly uncertain.

***Reservations for our vehicles are cancellable.***

The potentially long wait from the time a reservation is made until the time the vehicle is delivered, and any delays beyond expected wait times, could impact user decisions on whether to ultimately make a purchase. Any cancellations could harm our financial condition, business, prospects, and operating results.

***We may face legal challenges in one or more states attempting to sell directly to customers which could materially adversely affect our costs.***

Our business plan includes the direct sale of vehicles to business customers, and potentially, to individual customers. Most, if not all, states require a license to sell vehicles within the state. Many states prohibit manufacturers from directly selling

37

Table of Contents

vehicles to customers. In other states, manufacturers must operate a physical dealership within the state to deliver vehicles to customers. As a result, we may not be able to sell directly to customers in each state in the United States.

For customers residing in states in which we will not be allowed to sell or deliver vehicles, we may have to arrange alternate methods of delivery of vehicles. This could include delivering vehicles to adjacent or nearby states in which we are allowed to directly sell and ship vehicles and arranging for the customer to transport the vehicles to their home states. These workarounds could add significant complexity, and as a result, costs, to our business.

***Failure of information security and privacy concerns could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.***

We expect to face significant challenges with respect to information security and privacy, including the storage, transmission and sharing of confidential information. We will transmit and store confidential and private information of our customers, such as personal information, including names, accounts, user IDs and passwords, and payment or transaction related information.

We have adopted information security policies and deployed measures to implement the policies, including, among others, encryption technologies, and plans to continue to deploy additional measures as we grow. However, advances in technology, an increased level of sophistication and diversity of our products and services, an increased level of expertise of hackers, new discoveries in the field of cryptography or other factors can still result in a compromise or breach of the measures that we use. If we are unable to protect our systems, and hence the information stored in our systems, from unauthorized access, use, disclosure, disruption, modification or destruction, such problems or security breaches could cause a loss, give rise to our liabilities to the owners of confidential information or even subject us to fines and penalties. In addition, complying with various laws and regulations could cause us to incur substantial costs or require us to change our business practices, including our data practices, in a manner adverse to our business.

In addition, we will need to comply with increasingly complex and rigorous regulatory standards enacted to protect business and personal data in the United States, Europe and elsewhere. For example, the European Union adopted the General Data Protection Regulation ("**GDPR**"), which became effective on May 25, 2018, and the State of California adopted the California Consumer Privacy Act of 2018 ("**CCPA**"). Both the GDPR and the CCPA impose additional obligations on companies regarding the handling of personal data and provide certain individual privacy rights to persons whose data is stored. Compliance with existing, proposed and recently enacted laws (including implementation of the privacy and process enhancements called for under the GDPR) and regulations can be costly; any failure to comply with these regulatory standards could subject us to legal and reputational risks.

Compliance with any additional laws and regulations could be expensive and may place restrictions on the conduct of our business and the manner in which we interact with our customers. Any failure to comply with applicable regulations could also result in regulatory enforcement actions against us, and misuse of or failure to secure personal information could also result in violation of data privacy laws and regulations, proceedings against us by governmental entities or others, and damage to our reputation and credibility, and could have a negative impact on revenues and profits.

Significant capital and other resources may be required to protect against information security breaches or to alleviate problems caused by such breaches or to comply with our privacy policies or privacy-related legal obligations. The resources required may increase over time as the methods used by hackers and others engaged in online criminal activities are increasingly sophisticated and constantly evolving. Any failure or perceived failure by us to prevent information security breaches or to comply with privacy policies or privacy-related legal obligations, or any compromise of security that results in the unauthorized release or transfer of personally identifiable information or other customer data, could cause our customers to lose trust in us and could expose us to legal claims. Any perception by the public that online transactions or the privacy of user information are becoming increasingly unsafe or vulnerable to attacks could inhibit the growth of online retail and other online services generally, which may reduce the number of orders we receive.

38

Table of Contents

***We may need to defend ourselves against patent or trademark infringement claims, and we may not be able to prevent others from unauthorized use of our intellectual property, which may be time-consuming and would cause us to incur substantial costs and harm our business and competitive position.***

Companies, organizations, or individuals, including our competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with our ability to make, use, develop, sell, lease or market our vehicles or components, which could make it more difficult for us to operate our business. From time to time, we may receive communications from holders of patents or trademarks regarding their proprietary rights. Companies holding patents or other intellectual property rights may bring suits alleging infringement of such rights or otherwise assert their rights and urge us to take licenses. Our applications and uses of trademarks relating to our design, software or artificial intelligence technologies could be found to infringe upon existing trademark ownership and rights. In addition, if we are determined to have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:

- cease selling or leasing, incorporating certain components into, or using vehicles or offering goods or services that incorporate or use the challenged intellectual property;

- pay substantial damages;

- seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms, or at all;

- redesign our vehicles or other goods or services; or

- establish and maintain alternative branding for our products and services.

In the event of a successful claim of infringement against us and our failure or inability to obtain a license to the infringed technology or other intellectual property right, our business, prospects, operating results and financial condition could be materially and adversely affected. In addition, any litigation or claims, whether or not valid, could result in substantial costs, negative publicity and diversion of resources and management attention.

Further, we may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position. We rely or will rely on a combination of patents, trade secrets (including know-how), employee and third-party nondisclosure agreements, copyrights, trademarks, intellectual property licenses, and other contractual rights to establish and protect our rights in our technology. Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Monitoring unauthorized use of our intellectual property is difficult and costly, and the steps we have taken or will take may not prevent misappropriation. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

Patent, trademark, and trade secret laws vary significantly throughout the world. A number of foreign countries do not protect intellectual property rights to the same extent as do the laws of the United States. Therefore, our intellectual property rights may not be as strong or as easily enforced outside of the United States. Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of some of our competitive advantage and a decrease in our revenue which, would adversely affect our business, prospects, financial condition and operating results.

39

Table of Contents

***Patent applications that we may file may not issue as patents and any patents that may be granted to us may expire and may not be extended, our rights may be contested, circumvented, invalidated or limited in scope, or our rights may not protect us effectively, all of which may have a material adverse effect on our ability to prevent others from commercially exploiting products similar to theirs.***

We cannot be certain that we are the first inventor of the subject matter to which we may file a particular patent application, or if we are the first party to file such a patent application. If another party has filed a patent application for the same subject matter as we have, we may not be entitled to the protection sought by the patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, we cannot be certain that the patent applications that we file will issue, or that our issued patents will afford protection against competitors with similar technology. In addition, our competitors may design around our issued patents, which may adversely affect our business, prospects, financial condition or operating results.

We cannot assure you that we will be granted patents pursuant to any applications that we may file. Even if we file patent applications and we are issued patents in accordance with them, it is still uncertain whether these patents will be contested, circumvented or invalidated in the future. In addition, the rights granted under any issued patents may not provide us with meaningful protection or competitive advantages. The claims under any patents that are issued from our patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ours. The intellectual property rights of others could also bar us from licensing and exploiting any patents that are issued from our applications. Numerous patents and pending patent applications owned by others exist in the fields in which we have developed and are developing our technology. These patents and patent applications might have priority over our patent applications and could subject our patent applications to invalidation. Finally, in addition to those who may claim priority, any of our patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable.

***We may be subject to damages resulting from claims that we or our employees have wrongfully used or disclosed alleged trade secrets of our employees' former employers.***

Many of our employees were previously employed by other automotive companies or by suppliers to automotive companies. We may be subject to claims that we or these employees have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of their former employers. Litigation may be necessary to defend against these claims. If we fail in defending such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel. A loss of key personnel or their work product could hamper or prevent our ability to commercialize our products, which could severely harm our business. Even if we are successful in defending against these claims, litigation could result in substantial costs and demand on management resources.

***Our vehicles are subject to motor vehicle standards and substantial regulation, and the failure to satisfy such mandated safety standards or regulations, or unfavorable changes to such regulations, would have a material adverse effect on our business and operating results.***

All vehicles sold must comply with international, federal, and state motor vehicle safety standards. In the United States, vehicles that meet or exceed all federally mandated safety standards are certified under the federal regulations. Rigorous testing and the use of approved materials and equipment are among the requirements for achieving federal certification. Failure by us to have our future model electric vehicle satisfy motor vehicle standards would have a material adverse effect on our business and operating results.

Additionally, our electric vehicles, and the sale of motor vehicles in general, are subject to substantial regulation under international, federal, state, and local laws. We expect to incur significant costs in complying with these regulations. Regulations related to the electric vehicle industry and alternative energy are currently evolving and we face risks associated with changes to these regulations.

To the extent the laws change, our vehicles may not comply with applicable international, federal, state or local laws, which would have an adverse effect on our business. Compliance with changing regulations could be burdensome, time consuming, and expensive. To the extent compliance with new regulations is cost prohibitive, our business, prospects, financial condition and operating results would be adversely affected.

Table of Contents

Internationally, there may be laws in jurisdictions we have not yet entered or laws we are unaware of in jurisdictions we have entered that may restrict our sales or other business practices. Even for those jurisdictions we have analyzed, the laws in this area can be complex, difficult to interpret and may change over time. Continued regulatory limitations and other obstacles interfering with our ability to sell or lease vehicles directly to consumers could have a negative and material impact on our business, prospects, financial condition and results of operations.

***We may become subject to product liability claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.***

We may become subject to product liability claims, even those without merit, which could harm our business, prospects, operating results, and financial condition. The automobile industry experiences significant product liability claims and we face inherent risk of exposure to claims in the event our vehicles do not perform as expected or malfunction resulting in personal injury or death. Our risks in this area are particularly pronounced given we have limited field experience for our vehicles. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim could generate substantial negative publicity about our vehicles and business and inhibit or prevent commercialization of other future vehicle candidates, which would have material adverse effect on our brand, business, prospects and operating results. Any insurance coverage might not be sufficient to cover all potential product liability claims. Any lawsuit seeking significant monetary damages either in excess of our coverage, or outside of our coverage, may have a material adverse effect on our reputation, business and financial condition. We may not be able to secure additional product liability insurance coverage on commercially acceptable terms or at reasonable costs when needed, particularly if we do face liability for our products and are forced to make a claim under our policy.

***We are or will be subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws, and non-compliance with such laws can subject us to administrative, civil and criminal fines and penalties, collateral consequences, remedial measures and legal expenses, all of which could adversely affect our business, results of operations, financial condition and reputation.***

We are or will be subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations in various jurisdictions in which we conduct or in the future may conduct activities, including the U.S. Foreign Corrupt Practices Act ("**FCPA**"), the U.K. Bribery Act 2010, and other anti-corruption laws and regulations. The FCPA and the U.K. Bribery Act 2010 prohibit us and our officers, directors, employees and business partners acting on our behalf, including agents, from corruptly offering, promising, authorizing or providing anything of value to a "foreign official" for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. The FCPA also requires companies to make and keep books, records and accounts that accurately reflect transactions and dispositions of assets and to maintain a system of adequate internal accounting controls. The U.K. Bribery Act also prohibit non-governmental "commercial" bribery and soliciting or accepting bribes. A violation of these laws or regulations could adversely affect our business, results of operations, financial condition and reputation. Our policies and procedures designed to ensure compliance with these regulations may not be sufficient and our directors, officers, employees, representatives, consultants, agents, and business partners could engage in improper conduct for which we may be held responsible.

Non-compliance with anti-corruption, anti-bribery, anti-money laundering or financial and economic sanctions laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal sanctions, collateral consequences, remedial measures and legal expenses, all of which could materially and adversely affect our business, results of operations, financial condition and reputation. In addition, changes in economic sanctions laws in the future could adversely impact our business and investments in our shares.

***Failure to improve our operational and financial systems to support our expected growth, increasingly complex business arrangements and rules governing revenue and expense recognition and any inability to do so will adversely affect our billing and reporting.***

To manage the expected growth and increasing complexity of our operations, we will need to improve our operational and financial systems, procedures, and controls and continue to increase systems automation to reduce reliance on manual operations. Any inability to do so will affect our billing and reporting. Our current and planned systems, procedures and

41

Table of Contents

controls may not be adequate to support our complex arrangements and the rules governing revenue and expense recognition for our future operations and expected growth. Delays or problems associated with any improvement or expansion of our operational and financial systems and controls could adversely affect our relationships with our customers, cause harm to our reputation and brand and could also result in errors in our financial and other reporting.

***Failure to build our finance infrastructure and improve our accounting systems and controls could impair our ability to comply with the financial reporting and internal controls requirements for publicly traded companies.***

As a public company, we will operate in an increasingly demanding regulatory environment, which requires us to comply with the Sarbanes-Oxley Act of 2002 (the "**Sarbanes-Oxley Act**"), the regulations of the Nasdaq CM, the rules and regulations of the SEC, expanded disclosure requirements, accelerated reporting requirements and more complex accounting rules. Company responsibilities required by the Sarbanes-Oxley Act include establishing corporate oversight and adequate internal control over financial reporting and disclosure controls and procedures. Effective internal controls are necessary for us to produce reliable financial reports and are important to help prevent financial fraud. The Company must perform system and process evaluation and testing of our internal controls over financial reporting to allow management to report on the effectiveness of our internal controls over financial reporting in our Form 10-K filing. Prior to the Closing, we have never been required to test our internal controls within a specified period and, as a result, we may experience difficulty in meeting these reporting requirements in a timely manner.

We anticipate that the process of building our accounting and financial functions and infrastructure will require significant additional professional fees, internal costs and management efforts. We expect that we will need to implement a new internal system to combine and streamline the management of our financial, accounting, human resources and other functions. However, such a system would likely require us to complete many processes and procedures for the effective use of the system or to run our business using the system, which may result in substantial costs. Any disruptions or difficulties in implementing or using such a system could adversely affect our controls and harm our business. Moreover, such disruption or difficulties could result in unanticipated costs and diversion of management's attention. In addition, we may discover additional weaknesses in our system of internal financial and accounting controls and procedures that could result in a material misstatement of our financial statements. Our internal control over financial reporting will not prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud will be detected.

If we are not able to comply with the requirements of Section 404 of the Sarbanes-Oxley Act in a timely manner, or if we are unable to maintain proper and effective internal controls, we may not be able to produce timely and accurate financial statements. If we cannot provide reliable financial reports or prevent fraud, our business and results of operations could be harmed, investors could lose confidence in our reported financial information and we could be subject to sanctions or investigations by the Nasdaq CM, the SEC or other regulatory authorities.

***All of our debt obligations and our senior equity securities will have priority over our Common Stock with respect to payment in the event of liquidation, dissolution or winding up, and our outstanding senior securities restrict our ability to pay dividends on our Common Stock.***

If we were to liquidate, dissolve or wind up, our Common Stock would rank below all debt claims against us and claims of all of our outstanding shares of preferred stock. As a result, holders of Common Stock of the combined company will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution or winding up of the combined company until after all our obligations to our debt holders have been satisfied and holders of senior equity securities have received any payment or distribution due to them.

In addition, our Certificate of Incorporation currently requires us to pay substantial monthly dividends on our Series C Preferred in cash or in stock. Although we can pay such an amount in shares of our Common Stock, the issuance of additional shares may dilute the Company's equity and adversely affect the trading price of the shares of our Common Stock.

42

Table of Contents

*If securities or industry analysts do not publish research or reports about our business or publish negative reports about our business, our share price and trading volume could decline.*

The trading market for our Common Stock will depend on the research and reports that securities or industry analysts publish about us or our business. Currently, we do not have any analyst coverage and may not obtain analyst coverage in the future. In the event we obtain analyst coverage, we will not have any control over such analysts. If one or more of the analysts who cover us downgrade our shares or change their opinion of our shares, our share price would likely decline.

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

Not applicable.

**ITEM 2. PROPERTIES.**

Our corporate headquarters is in Brea, CA, where we occupy approximately 24,730 rentable square feet under a sublease that expires in March 2026 with lease payments of $33,136 per month. We use this space primarily for our senior management, technology, product design, sales and marketing, finance, legal, human resources, general administrative and information technology teams.

On August 1, 2022, the Company announced the opening of its Automotive Development Center in Irvine, CA. The 16,000 square foot facility houses the Automotive Team, which includes Engineering Design and Development, Styling, Program Management, Marketing and Finance. In August 2022, the lease was modified to include the second floor of the building. The leased space increased to 31,603 square feet, and the lease payments are approximately $75,000 per month which includes rent, insurance, and CAM.

Our Battery Innovation Center ("BIC") located in Monrovia, CA. We lease 71,753 square foot space to house the following areas: Battery, Powertrain, Thermal, and Infotainment teams. Lease payments are $71,447 per month.

We own the manufacturing facility located in Robinsonville, Tunica County, MS, which was purchased in November 2021. The Advanced Manufacturing Engineering Center ("AMEC") is 124,000 square foot engineering facility on 100 acres.

On November 30, 2022, the Company purchased an automobile manufacturing facility in Mishawaka, St. Joseph County, IN as part of the ELMS asset acquisition. The site gross area is 1,392,395 square feet. The Mishawaka assembly plant consists of a body shop, paint shop, general assembly area, and water treatment plant.

The Company leases 31,002 square feet of office space in Troy, MI. The lease payments are $21,750 per month; however, the payments will increase to $22,750 per month, beginning January 2023. The Detroit EV Team is comprised of Engineering and Technology Teams.

Bollinger Motors maintains its offices within a 36,300 square foot building located in Oak Park, MI and has operated at this facility since August 2020. The lease payments for this facility were approximately $25,000 per month during 2022. Bollinger Motors recently entered into a new five-year lease agreement for this Oak Park facility which will become effective January 1, 2023 with initial lease payments of approximately $27,000 per month. Additionally, Bollinger Motors still maintains a lease in Ferndale, MI from where the company previously operated prior to August 2020. The lease payments for this facility were approximately $6,000 per month in 2022. However, the Ferndale facility was subleased for the entirety of 2022 with sublease income of approximately $7,000 per month. The sublease is in place until October 2024 when this lease is set to expire.

43

Table of Contents

**ITEM 3. LEGAL PROCEEDINGS.**

Mullen Technologies, Inc. v. Qiantu Motor (Suzhou) Ltd.

This claim was filed in the United States District Court for the Southern District of California (*Case No. 3:19-cv-01979-W-DEB*) on October 11, 2019. This matter arises out of a contract dispute between Mullen and Qiantu related to the engineering, design, support, and homologation of Qiantu's K50 vehicle by Mullen. On July 1, 2020, the court ordered this matter to arbitration. It was submitted to the American Arbitration Association on February 9, 2021, for arbitration in Denver, Colorado. Mullen filed its Demand for Arbitration on February 16, 2021. Arbitration proceedings were then stayed for 90 days to accommodate settlement discussions. On November 3, 2021, Qiantu filed an Arbitration Answering Statement and Counterclaim or Joinder/Consolidation Request. Mullen filed its response on January 28, 2022. On February 11, 2022, the parties exchanged their Initial Requests for Documents. The August 1, 2022, arbitration hearing in this matter was rescheduled to October 17, 2022, to allow the parties to continue settlement negotiations. The parties agreed to reschedule the October 17, 2022, arbitration hearing to a future date while discovery and settlement negotiations continued. In November 2022, the parties agreed to further extend the Arbitration hearing date to February 13th-17th, 2023. All associated pre-hearing dates were also extended.

In early December, the parties reached an agreement in principle for resolution of the Arbitration proceedings which includes the acquisition of the Qiantu IP and the provision of a license to manufacture and sell the K-50 automobile in various territories. The parties are currently negotiating the terms of the proposed Settlement and License Agreement.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations.

*International Business Machines ("IBM")*

On February 2, 2022, IBM filed a Motion to Amend the Judgment it had obtained to add Mullen Automotive and Ottava as Judgment Debtors. Mullen filed its Appeal on April 8, 2022. Settlement efforts were undertaken, and a settlement was reached in which Mullen paid the full amount of the Judgment with interest, for a total of approximately $5.9 million, but maintained its Appeal rights. IBM then filed a Motion to Dismiss the Appeal based on Mullen's payment of the Judgment. Mullen filed an Opposition to the same on July 18th, 2022, and the hearing of the matter was set for July 25th, 2022. The Court took the same under submission, and a decision has still not been issued. The Appeal is still pending.

*TOA Trading LLC Litigation*

This claim arises out of an alleged breach of contract related to an unpaid finder's fee. On April 11, 2022, Plaintiffs TOA Trading LLC and Munshibari LLC filed a complaint against Mullen Automotive, Inc. and Mullen Technologies, Inc. in the United States District Court for the Southern District of Florida. On May 18, 2022, the Company filed a Motion to Dismiss or in the Alternative, Transfer Venue. Plaintiffs filed their opposition on June 3, 2022. The Company filed its reply on June 8, 2022. The court has taken the motions under submission. The Company expects a ruling in two to three months.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected on the condensed consolidated financial statements.

*Mullen Stockholder Litigation*

Margaret Schaub v. Mullen Automotive, Inc.

On May 5, 2022, Plaintiff Margaret Schaub filed a complaint against Mullen Automotive, Inc. f/k/a Net Element, Inc, David Michery, and Oleg Firer in the United States District Court Central District of California on (Case No. 2:22-cv-03026). The complaint alleges violation of section 10(b) of the Exchange Act and Rule 10b-5 against all defendants and

44

Table of Contents

violation of section 20(a) of the Exchange Act arising out of claims made in the Hindenburg article. On June 16, 2022, the Company's insurance company (AXIS) accepted coverage for this lawsuit. The Company engaged King & Spaulding as defense counsel.

On July 5, 2022, movants Duy Nguyen, Mejgan Mirbaz, and David Reed filed motions to consolidate this matter and the Gru matter (see below) into one case and for appointment of lead plaintiff and lead counsel. Subsequently, Plaintiff Nguyen withdrew his motion and Plaintiff Reed filed notice that he did not oppose Plaintiff Mirbaz' motion. On August 4, 2022, the court granted Plaintiff Mirbaz' unopposed motion to consolidate the case and for appointment as lead plaintiff/counsel. The court further vacated the August 5, 2022, hearing on the motions to consolidate.

On August 4, 2022, the Court issued an order consolidating the Schaub Lawsuit with the later-filed Gru Lawsuit (discussed below), and appointing lead plaintiff and lead counsel.

On September 23, 2022, Lead Plaintiff filed a Consolidated Amended Class Action Complaint ("Amended Complaint") against the Company, Mr. Michery, and the Company's predecessor, Mullen Technologies, Inc., premised on the same purported violations of the Exchange Act and Rule 10b-5, seeking to certify a putative class of shareholders, and seeking an award of monetary damages, as well as reasonable fees and expenses.

David Gru v. Mullen Automotive, Inc.

On May 12, 2022, Plaintiff David Gru filed a complaint against Mullen Automotive, Inc. f/k/a Net Element, Inc, David Michery, and Oleg Firer in the United States District Court Central District of California (Case No. 8:22-cv-976). The complaint alleges violation of section 10(b) of the Exchange Act and Rule 10b-5 against all defendants and violation of section 20(a) of the Exchange Act arising out of claims made in the Hindenburg article. On June 16, 2022, the Company's insurance company (AXIS) accepted coverage for this lawsuit. The Company has not been served with the complaint. The Company engaged King & Spaulding as defense counsel. On August 4, 2022, the court consolidated this action into the Schaub action (see above). As a result, the court ordered this matter to be administratively closed.

Ram Hari Khadka v. Mullen Automotive, Inc.

On June 23, 2022, a putative class action complaint was filed in Delaware Chancery Court by Ram Hari Khadka, a stockholder, against Mullen Automotive Inc. (the "Company") and its current directors, as defendants (the "Action"). The complaint alleged breaches of fiduciary duty against the defendants based on alleged disclosure deficiencies in the definitive proxy statement (the "Proxy Statement") filed by the Company on June 10, 2022, relative to the vote at the Company's 2022 Annual Meeting of Stockholders that was to be held on July 26, 2022 (the "2022 Stockholder Meeting") seeking stockholder approval of issuance of shares under the Performance Stock Award Agreement (the "CEO Performance Award") granted to David Michery, the Company's chief executive officer, president and chairman of the board of directors. The complaint sought various remedies, including a preliminary injunction seeking to enjoin the vote at the 2022 Stockholder Meeting to approve the issuance of shares for the CEO Performance Award.

As previously disclosed, the Company filed a supplement to the Proxy Statement on July 13, 2022 (the "Proxy Supplement") addressing the alleged disclosure claims to moot plaintiff's claims in the Action. On August 5, 2022, the Chancery Court approved a stipulation under which the plaintiff voluntarily dismissed the Action with prejudice as to itself only, but without prejudice as to any other putative class member. The Chancery Court retained jurisdiction solely for the purpose of adjudicating the anticipated application of plaintiff's counsel for an award of attorneys' fees and reimbursement of expenses in connection with the supplemental disclosures included in the Proxy Supplement.

The Company subsequently agreed to pay $995,000 to plaintiff's counsel for attorneys' fees and expenses in full satisfaction of the claim for attorneys' fees and expenses in the Action. The Chancery Court has not been asked to review, and will pass no judgment on, the payment of the attorneys' fees and expenses or their reasonableness. A stipulation to that effect was filed on September 19, 2022.

45

Table of Contents

Jeff Witt v. Mullen Automotive, Inc.

On August 1, 2022, Jeff Witt and Joseph Birbigalia, purported stockholders, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, and Company directors Ignacio Novoa, Mary Winter, Kent Puckett, Mark Betor, William Miltner and Jonathan New (the "Witt Action"). This lawsuit asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Witt Lawsuit seeks monetary damages, as well as an award of reasonable fees and expenses.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected on the condensed consolidated financial statements.

Hany Morsy v. David Michery, et al.

On September 30, 2022, Hany Morsy, a purported stockholder, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, former Company officer and director, Jerry Alban, and Company directors Mr. Novoa, Ms. Winter, Mr. Puckett, Mr. Betor, Mr. Miltner, and Mr. New (the "Morsy Lawsuit"). This lawsuit asserts claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Morsy Lawsuit seeks to direct the Company to improve its corporate governance and internal procedures, and also seeks monetary damages, pre-judgment and post-judgment interest, restitution, and an award of reasonable fees and expenses.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected on the condensed consolidated financial statements.

4Wall Entertainment, Inc. v. Mullen Technologies, Inc.

This claim was filed in the Orange County Superior Court (*Case No. 30-2021-01191251-CU-BC-CJC*) on March 23, 2021. The matter arises out of the alleged breach of an equipment lease. Mullen filed its Answer to the Complaint on May 6, 2021. On September 29, 2022, the parties settled this matter for $25,000 and filed a Notice of Settlement on September 30, 2022.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

46

Table of Contents

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information**

Our Common Stock began trading on the NASDAQ Capital Market under the symbol "NETE" on October 3, 2012. In connection with the reverse merger, the ticker symbol for the Company's Common Stock changed from "NETE" to "MULN" at the opening of trading on November 5, 2021.

**Holders**

As of September 30, 2022, our Common Stock was held by 811 registered shareholders of record. The number of record holders was determined from the records of our transfer agent and does not include beneficial owners of Common Stock whose shares are held in the names of various securities brokers, dealers and registered clearing agencies. Our transfer agent is Continental Stock Transfer & Trust Company.

**Dividends**

We have not historically declared any dividends. We have no present intention of paying any cash dividends on our Common Stock in the foreseeable future, as any earnings will be used to help generate growth. The decision on the payment of dividends in the future rests within the discretion of the Board of Directors and will depend upon, among other things, our earnings, capital requirements and financial condition, as well as other relevant factors. There are no restrictions in our certificate of incorporation or bylaws that restrict us from declaring dividends.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The information included under Item 12 of Part III of this Report is hereby incorporated by reference into Item 5 of Part II of this Report.

**Recent Sales of Unregistered Securities**

*Sale of Unregistered Securities*

**Issuer Purchases of Equity Securities**

For the three months ended September 30, 2022, we did not repurchase any shares of our Common Stock.

**ITEM 6. [RESERVED]**

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*You should read the following discussion and analysis of our financial condition and results of operations together with our audited financial statements and related notes included elsewhere in this Report. This discussion and analysis contain forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of many factors, including but not limited to those under the heading "Risk Factors" in Part I, Item 1A of this Report. Certain amounts in this section may not foot due to rounding.*

*In connection with the Merger Agreement (as defined below), and as disclosed in our Current Report on Form 8-K filed with the SEC on November 12, 2021, our fiscal year end has changed from December 31 to September 30, effective for*

47

Table of Contents

*our fiscal year ended September 30, 2022. As a result, and unless otherwise indicated, references to our fiscal year 2022 and prior years mean the fiscal year ended on September 30 of such year.*

**Basis of Presentation**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiary, Mullen Investment Properties, LLC, and its 60% owned subsidiary, Bollinger Motors. Intercompany accounts and transactions have been eliminated, if any. The financial statements reflect the consolidated financial position and results of operations of Mullen, which have been prepared in accordance with Generally Accepted Accounting Principles in the United States As a result, we expect that the financial results of our reports for the periods after we begin commercial operations will not be comparable to the financial results included in this Annual Report.

**Components of Results of Operations**

We are an early-stage company, and our historical results may not be indicative of our future results for reasons that may be difficult to anticipate. Accordingly, the drivers of our future financial results, as well as the components of such results, may not be comparable to our historical or projected results of operations.

**Revenues**

We do not currently generate any revenue. Once we commence production and commercialization of our vehicles, we expect that most of our revenue will be initially derived from direct sales of cargo vans, Class 4 through 6 delivery vehicles, and Sport Utility Vehicles ("*SUVs*").

**Cost of Goods Sold**

To date, we have not recorded cost of goods sold, as we have not recorded commercial revenue. Once we commence the commercial production and sale of our EVs, we expect cost of goods sold to include mainly vehicle components and parts, including batteries, direct labor costs, amortized tooling costs, and reserves for estimated warranty expenses.

**General and Administrative Expense**

General and administrative ("*G&A*") expenses include all non-production expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, licenses and other expenses. Advertising costs are expensed as incurred and are included in G&A expenses. We expense advertising costs as incurred in accordance with ASC 720-35, "*Other Expenses - Advertising Cost.*"

**Research and Development Expense**

To date, our research and development expenses have consisted primarily of external engineering services in connection with the design of our initial EV and development of the first prototype. As we ramp up for commercial operations, we anticipate that research and development expenses will increase for the foreseeable future as we expand our hiring of engineers and designers and continues to invest in new vehicle model design and development of technology.

**Income Tax Expense / Benefit**

Our income tax provision consists of an estimate for U.S. federal and state income taxes based on enacted rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in the tax law. We maintain a valuation allowance against the full value of our U.S. and state net deferred tax assets because we believe the recoverability of the tax assets is not more likely than not.

Table of Contents

**Results of Operations**

*Comparison of the Year Ended September 30, 2022, to the Year Ended September 30, 2021*

The following table sets forth our historical operating results for the periods indicated:

| | Year Ended September 30, | | | % Change |
|---|---|---|---|---|
| | 2022 | 2021 | $ Change | |
| | (dollar amounts, except percentages) | | | |
| **Operating costs and expenses:** | | | | |
| Research & development | $ 21,650,840 | $ 3,009,027 | $ 18,641,813 | 620 % |
| General and administrative | 75,338,256 | 19,393,141 | 55,945,115 | 288 % |
| Total operating costs and expenses | 96,989,096 | 22,402,168 | 74,586,928 | 333 % |
| Loss from operations | (96,989,096) | (22,402,168) | (74,586,928) | 333 % |
| | | | | |
| **Other income (expense):** | | | | |
| Loss on disposal of fixed assets | (50,574) | - | (50,574) | - % |
| Other financing costs | - | (1,559,961) | 1,559,961 | 100 % |
| Gain on extinguishment of indebtedness, net | 33,413 | 890,581 | (857,168) | (96)% |
| Penalty for insufficient authorized shares | (3,495,000) | - | (3,495,000) | - % |
| Revaluation of warrant liabilities | (122,803,715) | - | (122,803,715) | - % |
| Other financing costs - initial recognition of warrant liabilities | (484,421,258) | - | (484,421,258) | - % |
| Other income (expense), net | (5,647,841) | - | (5,647,841) | - % |
| Interest expense | (26,949,081) | (21,168,232) | (5,780,849) | (27)% |
| Total other income (expense) | (643,334,056) | (21,837,612) | (621,496,444) | 2,846 % |
| **Net loss before income taxes** | $ (740,323,152) | $ (44,239,780) | $ (696,083,372) | 1,573 % |
| | | | | |
| Provision for income tax | $ 1,600 | 800 | 800 | - |
| | | | | |
| Net Loss | $ (740,324,752) | $ (44,240,580) | $ (696,084,172) | 1,573 % |
| | | | | |
| Net loss attributable to non-controlling interest | 791,946 | - | 791,946 | 100 % |
| Net loss attributable to Mullen Automotive Shareholders | $ (739,532,806) | $ (44,240,580) | $ (695,291,426) | 1,572 % |
| | | | | |
| Less; Preferred dividends | (40,516,440) | - | (40,516,440) | - % |
| | | | | |
| Net loss attributable to shareholders less preferred dividends | $ (780,049,246) | $ (44,240,580) | $ (735,808,666) | 1,663 % |

*Research and Development*

Research and development expenses increased by approximately $18.6 million or 620% from approximately $3.0 million through the twelve months ended September 30, 2021, to approximately $21.7 million through the twelve months ended September 30, 2022. During the year, there was minimal activity due to the COVID-19 pandemic. Research and Development costs are expensed as incurred. Research and development expenses primarily consist of the Mullen FIVE EV show car development and are primarily comprised of personnel-related costs for employees and consultants.

*General and Administrative*

General and administrative expenses increased by approximately $55.9 million or 288% from approximately $19.4 million in the twelve months ended September 30, 2021, to approximately $75.3 million in the twelve months ended September 30,

49

Table of Contents

2022, primarily due to increases in professional services, marketing, and payroll related expenses with the growth of personnel and resources.

*Interest Expense*

Interest expense increased by approximately $5.8 million or 27% from approximately $21.2 million through the twelve months ended September 30, 2021, to approximately $26.9 million through the twelve months ended September 30, 2022, primarily due to an increase in convertible debt.

*Gain on extinguishment of debt*

During November 2020, the U.S. Small Business Administration ("SBA") approved the CARES Act loan forgiveness amount of $875,426 in principal and accrued interest on November 20, 2020.

*Net Loss*

Net loss was $740.3 million for the twelve months ended September 30, 2022, an increase of $696.1 million or 1,573% from $44.2 million in the twelve months ended September 30, 2021.

**Liquidity and Capital Resources**

To date, we have yet to generate any revenue from our business operations. We have funded our capital expenditure and working capital requirements through the sale of equity and debt securities, as further discussed below. Our ability to successfully commence commercial operations and expand our business will depend on many factors, including our working capital needs, the availability of equity or debt financing and, over time, our ability to generate cash flows from operations.

As of September 30, 2022, our cash, restricted cash and cash equivalents amounted to approximately $84.4 million and our total debt amounted to approximately $9.0 million.

**Debt**

To date, our current working capital and development needs have been primarily funded through the issuance of convertible indebtedness, convertible preferred stock and Common Stock. Short-term debt comprises a component of our funding needs. Short-term debt is generally defined as debt with principal maturities of one-year or less. Long-term debt is defined as principal maturities of one year or more.

*Short and Long-Term Debt*

The short-term debt classification primarily is based upon loans due within twelve-months from the balance sheet date, in addition to loans that have matured and remain unpaid. Management plans to renegotiate matured loans with creditors for favorable terms, such as reduce interest rate, extend maturities, or both; however, there is no guarantee favorable terms will be reached. Until negotiations with creditors are resolved, these matured loans remain outstanding and will be classified within short-term debt on the balance sheet. Interest and fees on loans are being accounted for within accrued interest. The loans are secured by substantially all the Company's assets. Several principal shareholders have provided loans to and hold convertible debt of the Company and are related parties.

50

Table of Contents

The following is a summary of our debt as of September 30, 2022:

| Type of Debt | Net Carrying Value Unpaid Principal Balance | | Current | Long-Term | Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|---|
| Matured Notes | $ | 3,051,085 | $ 3,051,085 | $ - | 0.00 - 10.00 % | 2019-2021 |
| Promissory Notes | | 1,096,787 | - | 1,096,787 | 28 % | 2024 |
| Real Estate Note | | 5,247,612 | 247,612 | 5,000,000 | 5.0 - 8.99 % | 2023 - 2024 |
| Loan Advances | | 557,800 | 557,800 | - | 0.00 - 10.00 % | 2016 - 2018 |
| Less: Debt Discount | | (932,235) | - | (932,235) | NA | NA |
| Total Debt | $ | 9,021,049 | $ 3,856,497 | $ 5,164,552 | NA | NA |

**Cash Flows**

The following table provides a summary of Mullen's cash flow data for the years ended September 30, 2022 and 2021:

| | Years Ended September 30, | |
|---|---|---|
| Net cash provided by (used in): | 2022 | 2021 |
| Operating activities | $ (65,795,610) | $ (17,522,115) |
| Investing activities | (47,154,109) | (161,783) |
| Financing activities | 197,282,630 | 17,692,704 |

*Cash Flows used in Operating Activities*

Our cash flow used in operating activities to date has been primarily comprised of costs related to research and development, payroll and other general and administrative activities. As we continue to ramp up hiring ahead of starting commercial operations, we expect our cash used in operating activities to increase significantly before we start to generate any material cash flow from our business.

Net cash used in operating activities was $65.8 million in the twelve months ended September 30, 2022, an increase from $17.5 million net cash used in the twelve months ended September 30, 2021. Net losses for the year ended September 30, 2022, were $740.3 million offset by non-cash operating activities of $484.4 million financing loss on warrants and $122.8 on revaluation of warrant liabilities. Stock based compensation for employees, directors and consultants totaled $43.7 million.

*Cash Flows used in Investing Activities*

Our cash flows used in investing activities, to date, have been comprised mainly of purchases of equipment and have not been material. We expect these costs to increase substantially in the near future as we ramp up activity ahead of commencing commercial operations.

Net cash used in investing activities was $47.1 million in the year ended September 30, 2022, a decrease from $0.2 million used in investing activities the year ended September 30, 2021. The primary factor in the increased cash outflows was the Bollinger Motors acquisition.

*Cash Flows provided by Financing Activities*

Through September 30, 2022, we have financed our operations primarily through the issuance of convertible notes and equity securities.

Net cash provided by financing activities was $197.3 million for the year ended September 30, 2022 primarily due to issuance of preferred shares, as compared to $17.7 million net cash provided by financing activities for the year ended September 30, 2021, which included (i) $12.2 million net proceeds from issuance of notes payable; (ii) $42.3 million in net proceeds from issuance of Common Stock; (iii) $142.9million in proceeds to issue Preferred C and D shares.

51

Table of Contents

**Contractual Obligations and Commitments**

The following tables summarizes our contractual obligations and other commitments for cash expenditures as of September 30, 2022, and the years in which these obligations are due:

**Operating Lease Commitments**

| Years Ended September 30, | Scheduled Payments |
|---|---|
| 2023 | $ 2,820,060 |
| 2024 | 2,706,912 |
| 2025 | 2,082,614 |
| 2026 | 243,539 |
| 2027 | 15,173 |
| 2028 and Thereafter | - |
| **Total Future Minimum Lease Payments** | **$ 7,868,298** |

We currently lease our headquarters space in the Los Angeles area under a single lease classified as an operating lease expiring in March 2026. We have not executed any binding agreement for leases beyond 2026.

**Scheduled Debt Maturities**

The following are scheduled debt maturities as of September 30, 2022:

| | Years Ended September 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Thereafter | Total |
| **Total Debt** | $ 3,856,497 | $ 5,164,552 | $ - | $ - | $ - | $ - | $ - | $ 9,021,049 |

**Off-Balance Sheet Arrangements**

We are not a party to any off-balance sheet arrangements, as defined under SEC rules.

**Critical Accounting Policies and Estimates**

Our financial statements have been prepared in accordance with U.S. GAAP. In the preparation of these financial statements, our management is required to use judgment in making estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Management considers an accounting judgment, estimate or assumption to be critical when (1) the estimate or assumption is complex in nature or requires a high degree of judgment and (2) the use of different judgments, estimates and assumptions could have a material impact on the consolidated financial statements.

**Stock-Based Compensation and Common Stock Valuation**

We recognize the cost of share-based awards granted to employees and directors based on the estimated grant-date fair value of the awards. Cost is recognized on a straight-line basis over the service period, which is generally the vesting period of the award. Our management reverses previously recognized costs for unvested options in the period that forfeitures occur. Mullen determines the fair value of stock options using the Black-Scholes option pricing model, which is impacted by the following assumptions:

- *Expected Term*-We use the simplified method when calculating the expected term due to insufficient historical exercise data.

52

Table of Contents

- *Expected Volatility*-As our shares were not actively traded during the periods presented, the volatility is based on a benchmark of comparable companies within the automotive and energy storage industries.

- *Expected Dividend Yield*-The dividend rate used is zero as we have never paid any cash dividends on Common Stock and does not anticipate doing so in the foreseeable future.

- *Risk-Free Interest Rate*-The interest rates used are based on the implied yield available on U.S. Treasury zero-coupon issues with an equivalent remaining term equal to the expected life of the award.

*Common Stock Valuations*

The grant date fair value of our Common Stock (pre-merger with Net Element) was typically determined by our board of directors with the assistance of management and a third-party valuation specialist. Given our pre-revenue stage of development, management believed that an Option Pricing Model ("*OPM*") was the most appropriate method for allocating enterprise value to determine the estimated fair value of our Common Stock. Application of the OPM involved the use of estimates, judgment, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and cash flows, discount rates, market multiples, the selection of comparable companies, and the probability of future events. Once Mullen's stock became publicly traded, the Board of Directors elected to determine the fair value of our post-merger Common Stock based on the closing market price the day before the date of grant.

**Warrant Valuations**

Management determined the fair value of the warrant liability for Series C warrants on recognition date and on subsequent dates as a maximum of (i) Black Scholes value for cash exercise of relevant warrants and (ii) current market value of the number of shares the Company would be required to issue upon cashless warrant exercise on a relevant date in accordance with warrant contract conditions. At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants is marked-to-market value and the resulting gain or loss is recorded. The contracts for the Series D Warrants contain cashless exercise provisions similar to Series C Warrants described above. Therefore, Management applied similar accounting treatment to recognition, measurement and presentation of the warrant liabilities.

**Recent Accounting Pronouncements**

Accounting standard updates issued but not yet added were assessed and determined to be either not applicable or not expected to have a material impact on our consolidated financial statements.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not Applicable.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

The consolidated financial statements and notes thereto and the reports of the independent registered public accounting firm are filed as part of this Report and incorporated herein by reference.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

Table of Contents

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed by us under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b) accumulated and communicated to our management, including our principal executive and principal financial officer, to allow timely decisions regarding required disclosures. In designing and evaluating our DCP, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives.

We conducted an evaluation pursuant to Rule 13a-15 of the Exchange Act of the effectiveness of the design and operation of our DCP as of September 30, 2022, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were not effective as of September 30, 2022, because of material weaknesses (the "Material Weakness") in our internal control over financial reporting.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect our transactions and our dispositions of the assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was not effective as of September 30, 2022.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. In conducting our review of our internal control over financial reporting, we identified the continuing Material Weakness described below.

- Based on management's review of key accounting and information technology policies and procedures as of September 30, 2022, we have determined that although such policies and procedures exist, they are not all formalized in a written procedure format that is up to date. Management has since identified, prioritized and prepared several of the critically important accounting policies and procedures and these are being reviewed and implemented.

- As a result of absence of formalized review of key controls across several business processes and insufficiently formalized documentation evidencing such review, management's ability to evaluate the design and monitor the

Table of Contents

effective operation of these preventative and detective internal controls is limited. Accordingly, management's ability to timely detect, prevent and remediate deficiencies and potential fraud risks has been assessed as inadequate.

- The Company identified certain design deficiencies in its management and analytical review controls associated with the financial close process. These deficiencies, individually or in the aggregate, combined with inadequate compensating controls, created a reasonable possibility that a material misstatement to the consolidated financial statements might not be prevented or detected on a timely basis.

- The Company lacks in-house accounting expertise to identify rights and obligations and reflected in non-standard agreements, requiring specialized accounting for complex transactions.

**Management's Plan for Remediation**

We are engaged in ongoing efforts to remediate the control deficiencies that constituted the Material Weaknesses by implementing changes to our internal control over financial reporting, including, without limitation:

a) ensuring that the Company can attract and retain staff with sufficient experience and knowledge in GAAP financial reporting matters;
b) continuing professional training and academic education on accounting subjects for accounting staff;
c) subscribing to relevant online services, other supplemental internal and external resources relating to SEC reporting;
d) using GAAP Disclosure and SEC Reporting Checklists;
e) engaging third-party accounting consulting firms to assist us in creating process narratives and the review of our application of GAAP on complex business combination, significant asset acquisitions, debt, and equity financing transactions;
f) enhancing the precision relating to management review controls related to our financial statement close and financial reporting involving estimates, judgments, and assumptions;
g) Augmenting the design of the financial statement closing and financial reporting process including inadequate documentation of accounting treatment of significant and unusual transactions.

We believe these most recent measures will aid to remediate the control deficiencies that gave rise to the Material Weaknesses, but the Material Weaknesses will not be considered fully remediated until controls have been designed and implemented for a sufficient period of time for our management to conclude that the control environment is operating effectively.

Additional remediation measures may be required, which may require additional implementation time. There is no assurance that our remediation efforts will be successful or that our internal control over financial reporting or disclosure controls and procedures will be effective.

**Attestation Report**

This Annual Report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. As a non-accelerated filer, we are not subject to the attestation requirement.

**Changes in Internal Control Over Financial Reporting**

Except as described above, there were no other changes in our internal control over financial reporting that occurred during the fiscal year ended September 30, 2022, that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

**ITEM 9B. OTHER INFORMATION**

On January 13, 2023, the Company and holders of Series C Preferred Stock entered into a waiver agreement pursuant to which such holders irrevocably waived their right to receive any and all cumulative 15.0% per annum fixed dividends on such Preferred Stock, including all unpaid accrued and accumulated dividends, pursuant to the terms set forth in the Company's Second Amended and Restated Certificate of Incorporation.

**Settlement Agreement- Warrants Exercise and Share Issuance**

On January 13, 2023, the Company entered into Settlement Agreements and Releases with Acuitas Capital LLC, Jim Fallon and Mank Capital (the "**Holders**") pursuant to which the Holders agreed to remit to the Company an aggregate of approximately $17.8 million (collectively, the "**Settlement Payment**") for the erroneous issuance by the Company of an aggregate of 1,660,988 shares of common stock in connection with the exercise of warrants. In consideration of the settlement, the Holders received the right to purchase (the "**Settlement Additional Purchase Right**") additional shares of Series D Preferred Stock and warrants in an dateamount equal to $20 million on the same terms and conditions as provided under the Securities Purchase Agreement, dated as of June 7, 2022 (as amended, the "**Series D Securities Purchase Agreement**") of units, consisting of one share of Preferred Stock and 185% Warrants for each share of Preferred Stock issued. The Settlement Additional Purchase Right may be exercised by a Holder from time to time, in its sole and absolute discretion in accordance with the same terms that apply to Additional Purchases as described in the Series D Securities Purchase Agreement; provided, however, that if a Holder exercises its Settlement Additional Purchase Right, it shall receive Additional Warrants exercisable for 185% of shares of Common Stock at an exercise price equal to the closing price of the Common Stock as of the date of the trading day immediately prior to the exercise of the Second Additional Purchase Right (as defined below) and the Holder agrees to issue to the Company a promissory note (the "**Settlement Note**"), which note will have a principal amount equal to the Settlement Payment applicable to such Holder and which will be immediately due and payable upon the earlier of (1) confirmation that the shares of common stock issuable upon conversion of the Series D Preferred Stock and warrants issued pursuant to the Settlement Additional Purchase Right have been reserved for issuance and that the resale of such reserved shares of common stock have been registered on a registration statement filed with the SEC and (ii) February 1, 2024. The Settlement Note will bear an annual interest rate of 3.5% and payment default will bear an additional rate of 2% and is immediately due in full upon an event of default, which includes a failure to pay, a breach of any representation and warranty, bankruptcy, insolvency or failure to give notice of an event of default.

**Settlement Agreement- Series D Securities Purchase Agreement**

On January 13, 2023, the Company entered into a Settlement Agreement and Release with the investors that entered into the Series D Securities Purchase Agreement pursuant to which such investors waived the default and all damages that are incurred as a result of the default prior to February 1, 2023 under the Series D Securities Purchase Agreement, and the Notes and the Warrants that were issued pursuant to Amendment No. 3. to the Series D Securities Purchase Agreement. In exchange, the Company agreed to grant the investors the right to purchase from the Company additional shares of Series D Preferred Stock and warrants in an amount equal to such investor's pro rata portion of $10 million on the same terms and conditions as applicable to the purchase and sale of shares of Series D Preferred Stock as provided under the Securities Purchase Agreement (the "**Second Additional Purchase Right**"). The Second Additional Purchase Right may be exercised by each investor from time to time, in its sole and absolute discretion in accordance with the same terms that apply to additional purchases as described in the Securities Purchase Agreement; provided, however, that any investor that exercises its Second Additional Purchase Right will receive additional five-year warrants exercisable for 185% of shares of common stock at an exercise price equal to the closing price of the common stock as of the date of the trading day immediately prior to the exercise of the Second Additional Purchase Right.

**Warrants issued pursuant to Settlement Agreements**

Warrants issued pursuant to the Settlement Additional Purchase Right and the Second Additional Purchase Right will provide for cashless exercise pursuant to which the holder will receive upon exercise a "net number" of shares of Common Stock determined according to the following formula:

$$\text{Net Number} = (A \times B) / C$$

56

Table of Contents

For purposes of the foregoing formula:

A= The total number of shares with respect to which the Warrant is then being exercised.

B= The Black Scholes Value (as described in the warrant).

C= The Closing Bid Price of the Common Stock in the day prior the time of such exercise, but in any event not less than $0.10 per share of Common Stock, which will not be subject to adjustment.

The exercise price and number of shares issuable upon exercise of the warrants will further be adjusted upon the occurrence of certain events and holders will be allowed to participate in certain issuances and distributions (subject to certain limitations and restrictions), including certain stock dividends and splits and distributions of assets. The warrants will provide for certain purchase rights whereby if the Company grants, issues or sells any options, convertible securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock, then the holder will be entitled to acquire such purchase rights which the holder could have acquired if the holder had held the number of shares of Common Stock acquirable upon complete exercise of the warrant. The Company would also agree not to enter into any fundamental, transaction, such as a merger, sale of more than 50% of the outstanding voting shares, sale of substantially all assets, or business combination, unless the successor entity assumes all of the obligations of the Company under the Warrants and the other transaction documents related to the warrants.

The Company must reserve out of authorized and unissued shares a number of shares of Common Stock equal to 250% of the maximum number of shares of Common Stock that are issuable upon exercise of the warrants from time to time. If the Company fails to timely deliver shares upon exercise of the Warrant, the Company will be required to either (A) pay the holder for each trading day on which shares are not delivered 1% of the product of the number of shares not so issued multiplied by the closing sale price of the Common Stock on the trading day immediately preceding the required delivery date, or (B) if the holder purchases shares of Common Stock in anticipation of delivery of shares upon exercise of the Warrant, cash in an amount equal to holder's total purchase price of such shares. The exercisability of the warrants may also be limited if, upon exercise, the holder and its affiliates would in aggregate beneficially own more than 9.99% of the common stock.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

## PART III

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.**

The directors and executive officers of the Company and their respective ages, and positions with the Company and certain business experience as of the date of this Report are set forth below. There are no family relationships among any of the directors or executive officers.

There are no material legal proceedings to which any director or executive officer of the Company, or any associate of any director or executive officer of the Company, is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries.

| Name | Age | Position | Director Class |
|---|---|---|---|
| David Michery | 56 | Chief Executive Officer, President, and Chairman of the Board | Class I |
| Jonathan New | 62 | Chief Financial Officer | |
| Calin Popa | 60 | President-Mullen Automotive | |
| Mary Winter | 31 | Secretary and Director | Class I |
| Ignacio Novoa | 39 | Director | Class I |
| Kent Puckett | 59 | Director | Class II |
| Mark Betor | 67 | Director | Class II |
| William Miltner | 61 | Director | Class III |
| John Anderson | 68 | Director | Class III |

57

Table of Contents

Pursuant to the Second Amended and Restated Certificate of Incorporation, the Company's Board of Directors is classified into three classes with staggered three-year terms designated as follows:

- Class I - David Michery, Mary Winter, and Ignacio Novoa whose terms will expire in 2025 at our annual meeting of stockholders or until their respective successors are elected and qualified;

- Class II - Kent Puckett and Mark Betor, whose terms will expire at our second annual meeting of stockholders in 2023; and

- Class III - William Miltner and John Anderson whose terms will expire at our third annual meeting of stockholders in 2024.

At each annual meeting of stockholders, the successors to directors whose terms expire will be elected to serve from the time of election and qualification until the third annual meeting following their election and until the successors are duly elected and qualified. This classification of the Board may have the effect of delaying or preventing changes in Mullen's control of management. These directors may be removed for cause by the affirmative vote of the holders of at least two-thirds (2/3) of Mullen's voting stock.

*David Michery* has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the Merger in November 2021 and held those same positions at Mullen Technologies since its inception in 2018. His automotive experience began with the acquisition of Mullen Motor Company in 2012. Mr. Michery brings over 25 years within executive management, marketing, distressed assets, and business restructuring. He acquired the assets of Coda Automotive, formerly an independent EV manufacturer, through bankruptcy as an entryway into the EV business. We believe that Mr. Michery is qualified to serve as a director because of his operational and historical expertise gained from serving as our Chief Executive Officer, and his experience within various businesses, including automotive.

*Jonathan New* was appointed by the Board as Chief Financial Officer of the Company, effective September 19, 2022. He served as a director of the Company from November 2021 until September 19, 2022. From January 2020 until September 2022, Mr. New served as the Chief Financial Officer of Motorsport Games, Inc. (NASDAQ: MSGM), a racing game developer, publisher and esports ecosystem provider. Previously, from July 2018 to January 2020, Mr. New was Chief Financial Officer of Blink Charging Co (NASDAQ: BLNK), an owner, operator and provider of electric vehicle charging equipment and networked electric vehicle charging services, and, from 2008 to July 2018, he was Chief Financial Officer of Net Element, Inc., a global technology and value-added solutions group that supports electronic payments acceptance in a multi-channel environment. Mr. New is a Florida Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

*Calin Popa* has served as President of the Automotive Electric Vehicles Division of Mullen Technologies since 2017. He has 34 years of experience within the automotive industry. Previously, Mr. Popa was Vice President of Manufacturing Engineering at Karma Automotive, LLC, f/k/a Fisker Automotive, from 2010 to 2017. Mr. Popa has held senior positions within product development, vehicle launch and manufacturing at well-known companies, including MAN, Ford, and Chrysler.

*Mary Winter* has served as director of the Company since the closing of the Merger and has been a director of Mullen Technologies since 2018. Ms. Winter has been an integral part of Mullen since inception. She currently serves as the Secretary of the Company and Board of Directors. Formerly, she was the Vice President of Operations for Mullen Technologies since 2014. We believe that Ms. Winter is qualified to serve as a director because of her business and operational knowledge of Mullen Technologies.

*Ignacio Novoa* has served as a director of the Company since July 2022.Mr. Novoa has been a realtor at Las Lomas Realty since January 2015. Prior to that, from August 2008 to March 2021, Mr. Nova served as police officer with the Federal Reserve Police and, from September 2008 to March 2013, as program security at Northrup Grumman. We believe that Mr. Novoa is qualified to serve as a director because of his experience in managing real estate.

58

Table of Contents

*Kent Puckett* has served on Mullen Technologies' Board of Directors since 2018, serving as the Audit Committee Chair during that time. Previously, he served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018. Mr. Puckett has many years of experience as a CFO with a proven track record of establishing cross-functional partnerships to deliver stellar results. He has led many companies in their audit and disclosure requirements, creating operations, marketing, and sales division budgets of multi-million dollars, and being accountable for the allocation of resources to exceed profit and sales goals. Mr. Puckett has a B.S. in Business Administration from Pensacola Christian College, and Advanced Studies in Management, Finance, Compliance, Insurance, Financial Consulting, Taxation and Financial Reporting, with an emphasis on Public Companies reporting and audit requirements. We believe that Mr. Puckett is qualified to serve as a director because of his finance and accounting background and experience.

*Mark Betor* has served as a director of the Company since the closing of the Merger and a director of Mullen Technologies since 2018, serving on the Compensation Committee. Mr. Betor is a retired businessman and law enforcement officer. Since retirement, he has been involved with real estate investments and private business. We believe that Mr. Betor is qualified to serve as a director because of his vast experience within investments and private businesses.

*William Miltner* has served as a director of the Company since the closing of the Merger. He has served as a litigation attorney for over 30 years. He is the co-founder of Miltner & Menck, APC, a full-service law firm, in San Diego, CA. Mr. Miltner successfully co-founded and co-managed the law firm of Perkins & Miltner, LLP, a respected San Diego litigation firm for 13 years. In 2006, when co-founder David Perkins left the practice of law, Miltner Law Group, APC, was founded. Mr. Miltner has represented many publicly traded and private companies including residential developers, construction contractors, title insurance companies and banking and lending institutions. His substantial experience includes representing and defending clients in complex real property, general business, construction, title insurance and lender litigation and transactional matters. Mr. Miltner is member of the American and San Diego County Bar Associations and American Business Trial Lawyers Association. He was admitted to The State Bar of California in 1988. We believe that Mr. Miltner is qualified to serve as a director because of his knowledge and experience within law practice areas and litigation matters.

*John Andersen* has served as director of the Company since September 2022. Mr. Andersen owned and operated various businesses since 1972, concentrating on real estate investment and management, primarily of multi-family residential units along with commercial sales and leases, in California, Utah and Wyoming, since 1980. From 1986 to 1996, Mr. Anderson was a partner in a large real estate company with over 300 sales agents and an escrow company, loan company and other real estate services. Since 2013, he has been a director and officer of Eminence Escrow, Inc. and, since 2015, he has owned and operated DNJ Investments, Inc., both of which provide escrow services. We believe that Mr. Anderson is qualified to serve as a director because of his extensive and in-depth experience in operating and growing businesses.

### Code of Ethics

We have adopted a Code of Ethics and Business Conduct that applies to all our directors, officers and employees, including our principal executive officer and our principal financial and accounting officer. A copy of our Code of Ethics and Business Conduct has been posted to the "Investor Relations-Governance" section of our Internet website at http://www.mullensua.com. We will provide a copy of our Code of Ethics and Business Conduct to any person without charge, upon written request to our Secretary at 1405 Pioneer Street, Brea, California 92821, phone (714) 613-1900, e-mail address InvestorRelations@mullenusa.com.

### Committees of the Board of Directors

The Board of Directors currently has an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee.

Table of Contents

*Audit Committee*

The Audit Committee of the Board of Directors consists of Kent Puckett, Chair, Mark Betor, and John Andersen. The primary functions of the Audit Committee include, among other things:

- reviewing and approving the engagement of the independent registered public accounting firm to perform audit services and any permissible non-audit services for the Company;

- evaluating the performance of the Company's independent registered public accounting firm and deciding whether to retain their services;

- monitoring the rotation of partners on the engagement team of the Company's independent registered public accounting firm;

- reviewing the Company's annual and quarterly financial statements and reports and discussing the statements and reports with the Company's independent registered public accounting firm and management, including a review of disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

- considering and approving or disapproving all related party transactions for the Company;

- reviewing, with the Company's independent registered public accounting firm and management, significant issues that may arise regarding accounting principles and financial statement presentation, as well as matters concerning the scope, adequacy and effectiveness of the Company's financial controls;

- conducting an annual assessment of the performance of the Audit Committee and its members, and the adequacy of its charter; and

- establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding financial controls, accounting, or auditing matters.

Each member of the Audit Committee satisfies the independence requirements under Nasdaq Capital Market listing standards and Rule 10A-3(b)(1) of the Exchange Act and is a person who the Board of Directors has determined has the requisite financial expertise required under the applicable requirements of Nasdaq Capital Market. In arriving at this determination, the Board of Directors examined each Audit Committee member's scope of experience and the nature of their employment in the corporate finance sector.

*Compensation Committee*

The Compensation Committee of the Board of Directors consists of Kent Puckett, Chair, John Andersen, and Mark Betor. The functions of the Compensation Committee include, among other things:

- determining the compensation and other terms of employment of the Company's chief executive officer and our other executive officers and reviewing and approving corporate performance goals and objectives relevant to such compensation;

- reviewing and recommending to the full Board of Directors the compensation of the Board of Directors;

- evaluating and administering the equity incentive plans, compensation plans and similar programs advisable for the Company, as well as reviewing and recommending to the Board of Directors the adoption, modification or termination of the Company's plans and programs;

- establishing policies with respect to equity compensation arrangements;

60

Table of Contents

- if required, reviewing with management the Company's disclosures under the caption "Compensation Discussion and Analysis" and recommending to the full Board of Directors its inclusion in the Company's periodic reports to be filed with the SEC; and

- reviewing and evaluating, at least annually, the performance of the Compensation Committee and the adequacy of its charter.

The Board of Directors has determined that each member of the Compensation Committee is independent under Nasdaq Capital Market listing standards, a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act and an "outside director" as that term is defined in Section 162(m) of the Code.

*Nominating and Corporate Governance Committee*

The Nominating and Governance Committee of the Board of Directors currently consists of William Miltner, Chair, Mark Betor, and John Andersen. The functions of the Nominating and Corporate Governance Committee include, among other things, the following:

- reviewing periodically and evaluating director performance on the Board of Directors and its applicable committees, and recommending to the Board of Directors and management areas for improvement;

- interviewing, evaluating, nominating and recommending individuals for membership on the Board of Directors;

- reviewing and recommending to our board of directors any amendments to the Company corporate governance policies; and

- reviewing and assessing, at least annually, the performance of the Nominating and Corporate Governance committee and the adequacy of its charter.

The Board of Directors has determined that each member of the Nominating and Corporate Governance Committee is independent under Nasdaq Capital Market listing standards.

**Compensation Committee Interlocks and Insider**

Composition of the Compensation Committee for the combined company has been determined. Each member appointed to the Compensation Committee is an "outside" director as that term is defined in Section 162(m) of the Internal Revenue Code, a "non-employee" director within the meaning of Rule 16b-3 of the rules promulgated under the Exchange Act and independent within the meaning of the independent director guidelines of the Nasdaq Capital Market. None of the Company's executive officers serve as a member of the board of directors or compensation committee of any entity that has one or more executive officers who is serves on the Company's Board of Directors or Compensation Committee following the merger.

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires our directors, executive officers, and the persons who beneficially own more than ten percent of our Common Stock, to file reports of ownership and changes in ownership with the Securities and Exchange Commission. Copies of all filed reports are required to be furnished to us. Based solely on the reports received by us and on the representations of the reporting persons, we believe each greater than ten percent holder complied with all applicable filing requirements during the fiscal year ended September 30, 2022, except for the following: David Michery did not timely file two Form 4s reporting 5 transactions; Calin Popa did not timely file a Form 3 and three Form 4s reporting five transactions; Kent Puckett did not timely file one Form 4 reporting two transactions; Mark Betor did not timely file two Form 4s reporting two transactions; and Ignacio Novoa did not timely file two Form 4s reporting 11 transactions.

61

Table of Contents

**Item 11. Executive Compensation.**

**Summary Compensation Table**

The following table sets forth certain information about the compensation paid or accrued during the years ended September 30, 2022 and 2021 to our Chief Executive Officer and each of our two most highly compensated executive officers other than our Chief Executive Officer who were serving as executive officers at September 30, 2022, and whose annual compensation exceeded $100,000 during such year or would have exceeded $100,000 during such year if the executive officer were employed by the Company for the entire fiscal year (collectively the "**named executive officers**").

| Name and Principal Position | Year | Salary ($) | | Bonus ($) | | Stock Award ($) Common Shares (1) | | All Other Compensation | Total ($) | |
|---|---|---|---|---|---|---|---|---|---|---|
| David Michery | 2022 | $ | 721,154 | $ | 750,000 | $ | 4,897,106 | $ - | $ | 6,368,260 |
| Chief Executive Officer | 2021 | $ | 409,485 | $ | - | $ | 1,972,603 | $ - | $ | 2,382,088 |
| | | | | | | | | | | |
| Kerri Sadler | 2022 | $ | 348,539 | $ | - | $ | 198,000 | $ - | $ | 546,539 |
| Chief Accounting Officer (2) | | | | | | | | | | |
| | | | | | | | | | | |
| Jerry Alban | 2022 | $ | 202,340 | $ | - | $ | 280,500 | $ 53,846 | $ | 536,686 |
| Former Chief Operating Officer (3) | 2021 | $ | 283,835 | $ | - | $ | 25,000 | $ - | $ | 308,835 |
| | | | | | | | | | | |
| Calin Popa | 2022 | $ | 295,815 | $ | - | $ | 122,055 | $ - | $ | 417,870 |
| President - Mullen Automotive | 2021 | $ | 296,969 | $ | - | $ | 87,500 | $ - | $ | 384,469 |

(1)  Represents share-based compensation based on the grant date fair value estimated value of Common Stock at issuance in accordance with FASB ASC Topic 718. For the year ended September 30, 2022 and 2021, Mr. Michery received 14,821,533 shares and 789,041 shares of Common Stock, respectively, Ms. Sadler received 600,000 share and no shares of Common Stock, respectively, Mr. Alban received an aggregate of 850,000 shares of Common Stock, 250,000 of which was paid in connection with his departure from the Company (as further described below), and 0 shares, respectively, and Mr. Popa received 369,863 shares and 35,000 shares of Common Stock, respectively.

(2)  Ms. Sadler served as Chief Financial Officer until September 19, 2022 and currently serves as Chief Accounting Officer.

(3)  Mr. Alban retired from the Company as Chief Operating Officer and a director effective June 30, 2022. On June 27, 2022, the Company and Mr. Alban entered into a Separation Agreement pursuant to which the Company agreed to pay Mr. Alban a single lump sum of $53,846.15 and issue to Mr. Alban 250,000 shares of common stock.

The primary elements of compensation for the Company's named executive officers are base salary, bonus and equity-based compensation awards. The named executive officers also participate in employee benefit plans and programs that we offer to our other full-time employees on the same basis.

*Base Salary*

The base salary payable to our named executive officers is intended to provide a fixed component of compensation that reflects the executive's skill set, experience, role, and responsibilities.

62

Table of Contents

*Bonus*

Although we do not have a written bonus plan, the Board may, in its discretion, award bonuses to our executive officers on a case-by-case basis. These awards are structured to reward named executive officers for the successful performance of Mullen as a whole and of each participating named executive officer as an individual. The bonus amounts awarded in 2021 were on an entirely discretionary basis. In addition, as described under the heading "Employment and Severance Agreements," each of the named executive officers is eligible under the terms of their respective employment agreements to receive set bonus amounts based on Mullen's achievement of certain financial milestones.

*Share-based Compensation*

We do not have a formal policy with respect to the grant of equity incentive awards to our executive officers or any formal equity ownership guidelines applicable to them. On July 26, 2022, at the 2022 Annual Meeting of Stockholders ("2022 Annual Meeting") of the Company, the Company's stockholders approved the 2022 Equity Incentive Plan (the "2022 Plan"). Additional details about the 2022 Plan are set forth in the Company's Definitive Proxy Statement on Schedule 14A, as filed with the SEC on June 24, 2022 and the Supplement to the Proxy Statement filed with the SEC on July 13, 2022.

The 2022 Plan provides for grants of stock options, stock appreciation rights, stock awards and restricted stock units, all of which are sometimes referred to individually, to employees, consultants, non-employee directors of the Company and its subsidiaries. Stock options may be either incentive stock options, as defined in Section 422 of the Internal Revenue Code, or non-qualified stock options. The 2022 Plan authorizes the grant of awards relating to up to 175,000,000 shares of the Company's common stock.

**Outstanding Equity Awards at Fiscal Year End 2022**

The following table sets forth information with respect to outstanding equity awards at the end of the Company's fiscal year 2022 for the "named executive officers":

| Name | Stock Awards | |
| --- | --- | --- |
| | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) (1) |
| David Michery, Chief Executive Officer | 428,382 | $ 141,366 |
| Kerri Sadler, Former Chief Financial Officer | 600,000 | $ 198,000 |
| Jerry Alban, Former Chief Operating Officer | 550,000 | $ 181,500 |
| Calin Popa, President-Mullen Automotive | 369,863 | $ 122,055 |

(1)  Values were calculated based on the closing price of shares of common stock on September 30, 2022, which was $0.33.

**CEO Performance Award**

On May 5, 2022, the Company entered into to the Performance Stock Award Agreement (the "PSA Agreement") pursuant to which the Company agreed to grant performance equity awards to the Chief Executive Officer ("CEO Performance Award"). On July 26, 2022, at the 2022 Annual Meeting, the Company's stockholders approved, for purposes of complying with Nasdaq Listing Rule 5635(c), of the issuance of shares of common stock to the Company's Chief Executive Officer, David Michery, pursuant to the PSA Agreement.

Pursuant to the PSA Agreement, Mr. Michery is eligible to receive shares of common stock of the Company based on the achievement of milestones as described below, and within each milestone the achievement of certain performance tranches, with each tranche representing a portion of shares of common stock that may be issued to Mr. Michery upon achievement of such tranche. Upon the achievement of each tranche of one of the milestones and subject to Mr. Michery continuing as the Chief Executive Officer as of the date of satisfaction of such tranche and through the date the Compensation Committee

63

Table of Contents

determines, approves and certifies that the requisite conditions for the applicable tranche have been satisfied, the Company will issue shares of its common stock as specified in the tranche. Each milestone must be achieved within the performance period specified for such milestone, and the latest milestone may be achieved is December 31, 2024.

Vehicle Delivery Milestones: For each of the following five vehicle delivery milestone that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of Common Stock equal to 2% of the Company's then-current total issued and outstanding shares of Common Stock: (i) Delivery of the Company's Class One Van to customers for a pilot program under the captured fleet exemption by the end of December 2022; (ii) Procuring full USA certification and homologation (or vehicle approval process) for the sale and delivery of its Class One Van by end of August 2023; (iii) Full USA certification and homologation of the Dragonfly RS sports car by August 2024; (iv) Producing a drivable prototype of its Mullen 5 vehicle for consumers to test by end of October 2023; and (v) Producing a drivable prototype of its Mullen 5 RS High Performance vehicle for consumers to test by end of January 2023.

Capital Benchmark Milestones: For each $100 million raised (a "Capital Tranche"), and subject to an aggregate maximum of raised of $1.0 Billion in equity or debt financing between the date of the award agreement and the end of July 2024, the Company will issue a number of shares of Common Stock equal to 1%, of the Company's then-current total issued and outstanding shares of Common Stock; as of the date a Capital Tranche is achieved.

Additionally, if the Company is included in the Russel Index, the Company will issue to Mr. Michery a number of shares of Common Stock equal to 2% of Mullen's then-current total issued and outstanding shares as of the date the Company is approved to be included on the Russel Index.

On June 27, 2022, the Company joined the Russell 2000 and 3000 Indexes. In addition, on June 7, 2022, the Company entered into a securities purchase agreement, as amended by Amendment No. 1 dated June 23, 2022, Amendment No. 2 dated September 19, 2022 and Amendment No. 3 dated November 15, 2022, whereby, the Company shall secure additional funding of $275 million in the form of a put option pursuant to which, upon the terms and subject to the conditions contained in the purchase agreement and solely upon the request of the Company, the investors party to the agreement will be required to purchase an aggregate of $275 million of the Company's Series D Preferred Stock and five-year warrants exercisable for shares of the Company's common stock. As amended, the investors agreed that upon payment of $150 million and in lieu of receiving shares of Series D Preferred Stock and Warrants, the investors shall receive notes convertible into shares of the Company's Common Stock. To the extent that the Company exercises in full its rights under the purchase agreement, this will result in an achievement of two of the Capital Tranches., Mr. Michery will be entitled to such number of shares of Common Stock equal to 1% of the Company's then-current total issued and outstanding shares of Common Stock upon the achievement of each tranche (i.e., upon each $100 million raised, a new tranche will be achieved and an additional 1% will be issued), subject to the final amount that is raised.

Feature Milestone: If Mullen enters into an agreement with a manufacturer or provider of equipment, accessory, feature or other product (collectively, "Feature") by the end of 2023 that sets the Company or its vehicle apart from its competitors or that provides the Company a first mover or first disclosure advantage over its competitors for the Feature, the Company will issue to Mr. Michery a number of shares of Common Stock equal to 5% of the Company's then-current total issued and outstanding shares of Common Stock as of the date the Feature milestone is achieved.

On September 1, 2022, the Company announced that it a signed partnership with Watergen Inc. to develop and equip Mullen's portfolio of electric vehicles with technology that will produce fresh drinking water from the air for in-vehicle consumer and commercial application.

Distribution Milestone: For each vehicle distribution milestone set forth below that is satisfied by entering into a joint venture or other distribution agreement by December 31, 2024, the Company will issue to Mr. Michery a number of shares of Common Stock equal to 2% of Mullen's then-current total issued and outstanding shares of Common Stock for each distribution milestone achieved: (i) agreement with an established local, US dealer or franchise network; and (ii) agreement with an established Latin American or other non-US based dealer or franchise network.

On November 8, 2022, the Company entered into an agreement into an agreement to appoint Newgate Motor Group as the marketing, sales, distribution and servicing agent for the Mullen I-GO in Ireland and the United Kingdom.

Table of Contents

To date the following shares of common stock have been issued based on the achievement of the milestones and tranches listed in the table below:

**CEO Performance Award Table**

| Date | Tranche | % of O/S Shares | Shares O/S | Shares Issued | Stock Price | Stock Compensation ($) |
|------|---------|-----------------|------------|---------------|-------------|------------------------|
| 09/21/2022 | Russell Index Tranche | 2% | 481,194,481 | 9,623,890 | $0.58 | $ 5,581,856 |
| 10/12/2022 | Features Milestone | 5% | 897,686,883 | 44,884,344 | $0.25 | $11,221,086 |
| 11/08/2022 | Non-USA Distribution | 2% | 1,231,150,138 | 24,623,002 | $0.27 | $ 6,648,211 |
| 11/30/2022 | Capital Benchmark | 2% | 1,438,271,285 | 28,765,426 | $0.21 | $ 6,616,048 |
| Total Shares Awarded | | | | 107,896,662 | | $30,067,201 |

### Employment and Severance Agreements

We have entered into employment agreements with each of our named executive officers described below.

Chairman of the Board, President and Chief Executive Officer

Effective July 1, 2021, the Compensation Committee approved a new employment contract for David Michery. He will receive an annual salary of $750,000 plus incentive compensation and 1,000,000 shares of Common Stock each year. He is entitled to reimbursement compensation for all reasonable expenses up to $500,000 per year.

The agreement contains non-competition and non-solicitation covenants. For one year after voluntary separation from the Company, Mr. Michery cannot engage in competitive business activity within the Company territory; prevents him from participating in any transaction that occurred within 24-month period preceding from incident in questions; and prevents him from contacting employees for any business and employment opportunities.

No other employees have severance agreements with the Company. Employment agreements with other executive officers and key employees are standard terms ("*employment at will*") offered to all employees.

Chief Financial Officer

On September 19, 2022, the Company entered into an employment agreement with Jonathan New. He will receive an annual salary of $425,000 and 300,000 restricted shares of Common Stock. Stock compensation is payable quarterly. A prorated tranche of 84,066 of the share compensation will be vested and due on January 1, 2023, for the period September 19, 2022, through December 31, 2022, and quarterly tranches of 75,000 shares shall be vested and due at the end of December, March, June, and September of each calendar year, beginning January 1, 2023. Mr. New also received $25,000 in relocation allowance from Florida to California.  Additionally, the Company will reimburse up to $2,000 per month for temporary accommodation costs.  The reimbursement will terminate on the first to occur: date of permanent housing or February 1, 2023.

If Mr. New is terminated for any reason other than due to negligence, failure to deliver services or perform at the level hired or for any other just cause, he is entitled to a payment of $200,000, paid in the Company's usual payroll cycle.

President - Mullen Automotive

Effective July 7, 2021, the Compensation Committee approved the employment contract for Calin Popa. He will receive an annual salary of $304,000 plus incentive compensation and 100,000 restricted shares of Common Stock per year. Employment agreement contains standard terms ("employment at will") and vacation. There is no severance agreement.

65

Table of Contents

Consulting Agreement

On October 26, 2021, the Company and Mary Winter entered into a Consulting Agreement whereby the Company agreed to pay Ms. Winter $60,000 for the period from October 1, 2021, to September 30, 2022, for her services as corporate secretary.

Separation Agreement

On June 27, 2022, in connection with the retirement by Jerry Alban from the Company as Chief Operating Officer and a director effective June 30, 2022, the Company and Mr. Alban entered into a Separation Agreement pursuant to which the Company agreed to pay Mr. Alban a single lump sum payment of $53,846 and issue 250,000 shares of common stock. Mr. Alban continues to engage the Company as a consultant on special projects for approximately $60,000 a year.

**Non-Employee Director Compensation**

Our non-employee directors receive compensation for service on our board of directors and committees of our board of directors as follows:

- Each non-employee director is entitled to receive $25,000 annually as a cash retainer for he/she board service, with additional annual cash retainers of (i) $2,000 for each member of our compensation committee or nominating and governance committee; (ii) $5,000 for the chairman of our compensation committee or nominating and governance committee; (iii) $8,000 for each member of our audit committee; and (iv) $45,000 for the chairman of our audit committee. All cash retainers are paid quarterly in arrears.

- Additionally, each non-employee director receives an annual stock option award under the Company's equity plan to purchase such number of shares of our Common Stock that will equal $75,000 divided by the closing trading price of our Common Stock on the date of each such grant, which will vest one year from the date of grant. Upon the occurrence of certain corporate events, including a change of control of the Company, all such stock option awards will immediately vest. The initial annual stock option award will be awarded to each of our non-employee directors in connection with this offering.

Our non-employee directors are entitled to reimbursement of ordinary, necessary and reasonable out-of-pocket travel expenses incurred in connection with attending in-person meetings of our board of directors or committees thereof. In the event our non-employee directors are required to attend greater than four in-person meetings or 12 telephonic meetings during any fiscal year, such non-employee directors will be entitled to additional compensation in the amount of $500 for each additional telephonic meeting beyond the 12 telephonic meeting threshold, and $1,000 for each additional in-person meeting beyond the four in-person meeting threshold.

The following table sets forth information regarding compensation earned by or paid to each person who served as a non-employee member of our board of directors during 2022.

| Name of Director | Fees earned or paid in cash ($) | Stock Awards ($)[1] | Total ($) |
|---|---|---|---|
| John Anderson [2] | - | - | - |
| Mark Betor | $35,870 | $137,002 | $172,872 |
| William Miltner | $24,212 | $137,002 | $161,214 |
| Jonathan New [3] | $62,413 | $75,002 | $137,415 |
| Ignacio Novoa [4] | $6,250 | $62,000 | $68,250 |
| Kent Puckett | $35,870 | $137,002 | $172,872 |

(1) Represents share-based compensation based on the grant date fair value estimated value of Common Stock at issuance in accordance with FASB ASC Topic 718. For the year ended September 30, 2022, stock awards were granted as follows: William Miltner, Jonathan New and Kent Puckett each received

66

Table of Contents

18,611 shares; Mark Betor received an aggregate of 118,611 shares; and Ignacio Novoa received 100,000 shares.

(2) Mr. Andersen was appointed effective September 19, 2022.

(3) Mr. New resigned as a director and was appointed as Chief Financial Officer effective September 19, 2022.

(4) Mr. Novoa was appointed as a director effective September 30, 2022. Pursuant to a one year Consulting Agreement, dated January 12, 2022, Mr. Novoa was issued an aggregate of 255,500 shares of Common Stock.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The table below contains information regarding the beneficial ownership of our Common Stock by (i) each person who is known to us to beneficially own more than 5% of our Common Stock, (ii) each of our directors and director-nominees, (iii) each of our named executive officers and (iv) all of our directors and executive officers as a group. Beneficial ownership is determined in accordance with SEC rules and regulations.

Each stockholder's percentage of ownership in the following table is based upon, as applicable, the following shares outstanding as of January 6, 2023:

| Class | Number of Shares | Votes/Share | Number of Votes |
|---|---|---|---|
| Common Stock | 1,693,663,180 | One/share | 1,693,663,180 |
| Series A Preferred Stock | 1,925 | 1,000/share | 1,925,000 |
| Series B Preferred Stock | 0 | One/share on an as-converted to common basis | 0 |
| Series C Preferred Stock | 1,211,757 | One/share on an as-converted to common basis | 1,211,757 |
| Series D Preferred Stock | 363,097 | One/share | 363,097 |

Each share of Series A Preferred Stock converts into 100 shares of Common Stock. The Series C Preferred are convertible at any time by the holder into shares of Common Stock on a share-for-share basis. The Series D Preferred Stock converts into the number of shares of Common Stock determined by dividing the Series D Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the conversion price, in effect on the date the certificate is surrendered for conversion.

Under the terms of the Preferred Stock, Notes and warrants, a holder may not convert or exercise, as applicable, the Preferred Stock, Notes or Warrants into Common Stock to the extent such exercise would cause such holder, together with its affiliates, to beneficially own a number of shares of Common Stock which would exceed 9.99%, as applicable, of our then outstanding Common Stock following such conversion or exercise, excluding for purposes of such determination Common Stock issuable upon conversion of other convertible securities which have not been converted or exercised. The number of shares in the table does not reflect this limitation.

To our knowledge, except as otherwise noted below and subject to applicable community property laws, each person or entity named in the following table has the sole voting and investment power with respect to all shares that he,

67

Table of Contents

she or it beneficially owns. Unless otherwise indicated, the address of each beneficial owner listed below is c/o Mullen Automotive Inc. 1405 Pioneer Street, Brea, CA 92821.

| Name of Beneficial Owners | Common Stock(1) | | Total Voting Power(2) |
| --- | --- | --- | --- |
| | Shares | % | % |
| **Named Executive Officers and Directors** | | | |
| David Michery(3) | 690,391,537 | 33.8% | 33.9 % |
| Jonathan New | 8,611 | * | * |
| Calin Popa | 309,729 | * | * |
| Mary Winter | 87,453 | * | * |
| Jonathan K. Andersen | 500,000 | * | * |
| Mark Betor | 159,869 | * | * |
| William Miltner | 18,611 | * | * |
| Ignacio Novoa | 283,000 | * | * |
| Kent Puckett (4) | 118,611 | * | * |
| **Directors and Executive Officers as a Group (9 Persons)(3)** | 691,877,421 | 32.9% | 333.0 % |
| **5% Beneficial Owners:** | | | |
| Acuitas Group Holdings, LLC(5) | 80,301,289 | 4.4% | 4.4 % |
| Esousa Holdings LLC(6) | 81,907,312 | 4.5% | 4.5 % |
| Davis-Rice Pty Limited(7) | 40,150,642 | 2.3% | 2.3 % |

\*   Less than 1%.

(1) In computing the number of shares of Common Stock beneficially owned by a person and the percentage of beneficial ownership of that person, shares of Common Stock underlying notes, options, warrants or shares of Preferred Stock held by that person that are convertible or exercisable, as the case may be, within 60 days of the Record Date are included. Those shares, however, are not deemed outstanding for the purpose of computing the percentage ownership of any other person.

(2) Percentage total voting power represents voting power with respect to all outstanding shares of Common Stock, Series A Preferred, Series B Preferred and Series C Preferred. The Common Stock, Series A Preferred, Series B Preferred and Series C Preferred vote together as a single class on all matters submitted to a vote of stockholders, except as may otherwise be required by the terms of the Amended and Restated Certificate of Incorporation of the Company or as may be required by law. Each holder of Series A Preferred is entitled to 1,000 votes per share and each share of the Series B Preferred Stock and the Series C Preferred Stock is entitled to one vote per share.

(3) With regards to David Michery, consists of (i) 56,085,896 shares of Common Stock held directly by Mr. Michery, and (ii) the following shares over which Mr. Michery has voting power pursuant to Voting Agreements (as described below): (a) 224,005,491 shares of Common Stock, (b) 192,500 shares of Common Stock issuable upon conversion of 1,925 shares of Series A Preferred Stock, (c) 1,211,757 shares of Common Stock issuable upon conversion of Series C Preferred Stock, (d) 363,097 shares of Common Stock issuable upon conversion of Series D Preferred Stock, and (e) 408,532,797 shares of Common Stock issuable upon exercise of warrants. Excludes shares of Common Stock issuable upon conversion of notes and exercise of warrants issued on November 15, 2022, the issuance of which is subject to stockholder approval as described in the Company's proxy statement filed with the SEC on November 25, 2022. Effective as of November 4, 2021, Mr. Michery entered into voting agreements with certain holders of the Company's securities (the "**Voting Agreements**") pursuant to which such holders agreed to vote as directed by Mr. Michery, and also granted Mr. Michery an irrevocable proxy, at any annual or special meeting of stockholders or through the solicitation of a written consent of stockholders, and in some cases only with respect to any meeting at which an election of directors of the Company or any proposal to approve a change of control of the Company, which includes a merger, sale or

68

Table of Contents

other disposition of the securities of the Company or all or substantially all of its assets, is presented. The Voting Agreements have a term of three years or longer.

(4)    Includes 18,611 shares held by PCS Mastermind LLC, of which Mr. Puckett is the managing member.

(5)    Terren Peizer serves as the Chief Executive Officer of Acuitas Capital, LLC. The amount beneficially owned excludes (a) 148,557,387 shares of Common Stock underlying warrants, and (b) additional shares of Common Stock issuable upon full conversion of a Note, which as of November 21, 2022 had a remaining principal amount outstanding of approximately $33.0 million. Inclusion of the shares of Common Stock underlying the warrants and Note would cause the stockholder to beneficially own more than 5% of Common Stock; however, the full exercise of the warrants and conversion of the Note, as well as an increase in the Company's authorized shares of Common Stock, is subject to stockholder approval, as described in the Company's proxy statement filed with the SEC on November 25, 2022. Securities held by Acuitas Group Holdings, LLC are subject to a 9.99% beneficial ownership limitation pursuant to the terms of warrants, preferred stock and/or convertible notes held by the stockholder, in that such derivative securities may not be exercisable, exchangeable or convertible, as applicable, to the extent that the holder or any of its affiliates would beneficially own in excess of 9.9% of the number of shares of Common Stock issuable upon exercise or conversion of such securities calculated in accordance with Section 13(d) of the Exchange Act. Mr. Peizer is the chairman of Acuitas Group Holdings, LLC and may be deemed to have sole voting and investment power over such shares. The address for Acuitas Capital, LLC is 2120 Colorado Avenue, #230, Santa Monica, CA 90404.

(6)    Michael Wachs serves as the sole Managing Member of Esousa Holdings, LLC. The amount beneficially owned excludes (a) 151,528,527 shares of Common Stock underlying warrants, (b) 458 shares of Common Stock issuable upon conversion of the same number of shares of Series C Preferred Stock, and (c) additional shares of Common Stock issuable upon full conversion of a Note, which as of November 21, 2022 had a remaining principal amount outstanding of approximately $33.7 million. Inclusion of the shares of Common Stock underlying the warrants, Series C Preferred Stock and Note would cause the stockholder to beneficially own more than 5% of Common Stock; however, the full exercise of the warrants and conversion of the Note, as well as an increase in the Company's authorized shares of Common Stock is subject to stockholder approval, as described in the Company's proxy statement filed with the SEC on November 25, 2022. Securities held by Esousa Holdings LLC are subject to a 9.99% beneficial ownership limitation pursuant to the terms of warrants, preferred stock and/or convertible notes held by the stockholder, in that such derivative securities may not be exercisable, exchangeable or convertible, as applicable, to the extent that the holder or any of its affiliates would beneficially own in excess of 9.9% of the number of shares of Common Stock issuable upon exercise or conversion of such securities calculated in accordance with Section 13(d) of the Exchange Act. The address for Esousa Holdings, LLC and Michael Wachs is 211 E 43rd St, 4th Fl, New York, NY 10017.

(7)    The amount beneficially owned excludes (a) 74,278,687 shares of Common Stock underlying warrants and (b) additional shares of Common Stock issuable upon full conversion of a Note, which as of November 21, 2022 had a remaining principal amount outstanding of approximately $16.5 million. Inclusion of the shares of Common Stock underlying the warrants, and Note would cause the stockholder to beneficially own more than 5% of Common Stock; however, the full exercise of the warrants and conversion of the Note, as well as an increase in the Company's authorized shares of Common Stock, is subject to stockholder approval, as described in the Company's proxy statement filed with the SEC on November 25, 2022. Securities held by Davis-Rice Pty Limited are subject to a 9.99% beneficial ownership limitation pursuant to the terms of warrants, preferred stock and/or convertible notes held by the stockholder, in that such derivative securities may not be exercisable, exchangeable or convertible, as applicable, to the extent that the holder or any of its affiliates would beneficially own in excess of 9.9% of the number of shares of Common Stock issuable upon exercise or conversion of such securities calculated in accordance with Section 13(d) of the Exchange Act. Shares held by Davis-Rice Pty Limited may be deemed to be beneficially owned by Timothy Davis-Rice, who serves as the Director of Davis-Rice Pty Limited. The address for Davis-Rice Pty Limited is 4 Murchison Street, Mittagong, NSW 2575, Australia.

Table of Contents

**Equity Compensation Plan Table**

The following table summarizes our equity compensation plan information as of September 30, 2022. Information is included for equity compensation plans approved by our stockholders and equity compensation plans not approved by our stockholders.

| Plan Category | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price per share of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans (excluding securities) |
|---|---|---|---|
| Equity compensation plans approved by stockholders | 1,769,735 | $ 0.95 | 50,336,780 |
| Equity compensation plans not approved by stockholders | - | $ - | - |
| Total | 1,769,735 | - | 50,336,780 |

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

*Director Independence*

The Board determined that Kent Puckett, Mark Betor and John Andersen, qualify as independent directors, as defined under the listing rules of the Nasdaq, and the Board consists of a majority of "independent directors" as defined under the rules of the SEC and Nasdaq listing requirements. In addition, we are subject to the rules of the SEC and Nasdaq relating to the membership, qualifications, and operations of the audit, as discussed below.

*Certain Relationships and Related Transactions*

The Company and Mr. Novoa entered into a one year Consulting Agreement, dated January 12, 2022, whereby Mr. Novoa provides electric vehicle market research, analysis of market trends in the electric vehicle industry and other research and services. Mr. Novoa was issued an aggregate of 255,500 shares of Common Stock with a value of $400,000 pursuant to the terms of the Consulting Agreement pursuant to the terms of the Consulting Agreement.

Prior to its corporate reorganization on November 5, 2021, the Company operated as a division of Mullen Technologies, Inc. ("MTI"). Subsequent to the corporate reorganization, the Company has provided management and accounting services to MTI at cost pursuant to a transition services agreement dated May 12, 2021. At September 30, 2022, the Company has incurred approximately $1.2 million of costs on behalf of MTI, which is reflected in Other Current Assets on the consolidated balance sheet at September 30, 2022.

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner also is an elected Director for the Company, beginning his term in August 2021. For the fiscal year ending September 30, 2022, Mr. Miltner received $881,248 for services rendered to us. Mr. Miltner has been providing legal services to us since 2020.

For further information, see Note 19 - Related Party Transactions, of the notes to the Company's consolidated financial statements.

Table of Contents

**Item 14. Principal Accountant Fees and Services.**

The following table sets forth the aggregate accounting fees paid by us for the years ended September 30, 2022 and 2021. The below fees were paid to the firm Daszkal Bolton LLP.

| Type of Fees | Year Ended September 30, 2022 | | Year Ended September 30, 2021 | |
|---|---|---|---|---|
| Audit fees | $ | 165,733 | $ | 170,000 |
| Audit related fees | | 198,239 | | 49,620 |
| Tax fees | | - | | - |
| Total | $ | 363,972 | $ | 219,620 |

**Types of Fees Explanation**

*Audit Fees*. The aggregate fees, including expenses, billed by our principal accountant for the audit of our annual financial statements and review of financial statements included in our quarterly reports on Form 10-Q and other services that are normally provided in connection with statutory and regulatory filings or engagements during each of the fiscal years ended September 30, 2022, and 2021 were $165,733 and $170,000, respectively.

*Audit-Related Fees*. The aggregate fees, including expenses, billed by our principal accountant for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements not reported under "Audit Fees" above during the fiscal years ended September 30, 2022, and 2021 were $198,239 and $49,620, respectively.

*Tax Fees*. The aggregate fees, including expenses, billed by our principal accountant for services rendered for tax compliance, tax advice and tax planning during the fiscal years ended September 30, 2022, and 2021 were $0 and $0, respectively.

*All Other Fees.* The aggregate fees, including expenses, billed for all other products and services provided by our principal accountant during the fiscal years ended September 30, 2022, and 2021 were $0 and $0, respectively.

**Audit Committee Pre-Approval Policy**

Our audit committee is responsible for approving in advance the engagement of our principal accountant for all audit services and non-audit services, based on independence, qualifications and, if applicable, performance, and approving the fees and other terms of any such engagement. The audit committee may in the future establish pre-approval policies and procedures pursuant to which our principal accountant may provide certain audit and non-audit services to us without first obtaining the audit committee's approval, provided that such policies and procedures (i) are detailed as to particular services, (ii) do not involve delegation to management of the audit committee's responsibilities described in this paragraph and (iii) provide that, at its next scheduled meeting, the audit committee is informed as to each such service for which the principal accountant is engaged pursuant to such policies and procedures. In addition, the audit committee may in the future delegate to one or more members of the audit committee the authority to grant pre-approvals for such services, provided that the decisions of such member(s) to grant any such pre-approval must be presented to the audit committee at its next scheduled meeting.

All audit and audit-related services performed by our principal accountant during the fiscal years ended September 30, 2022, and 2021 were pre-approved by our Board of Directors, then acting in the capacity of an audit committee.

71

Table of Contents

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules.**

(a)   The following documents are filed as a part of this Annual Report on Form 10-K:

1.   *Financial Statements.*

The consolidated financial statements of Mullen Technologies, Inc. and notes thereto and the reports of the independent registered public accounting firms thereon are set forth beginning on page F-1 and filed as part of this Report.

2.   *Exhibits.*

The exhibits filed or furnished as part of this Annual Report on Form 10-K are those listed in the following Exhibit Index.

**EXHIBIT INDEX**

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 2.1 | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., and Robert Bollinger. | 8-K | 001-34887 | 2.1 | 09/08/2022 | |
| 2.1(a) | First Amendment to the Common Stock Purchase Agreement, dated as of October 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., and Robert Bollinger. | 8-K | 001-34887 | 2.1 | 10/14/2022 | |
| 2.1(b) | First Amendment to the Cash Escrow Agreement, dated as of October 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., Robert Bollinger and Continental Stock Transfer & Trust Company. | 8-K | 001-34887 | 2.2 | 10/14/2022 | |
| 2.1(c) | First Amendment to the Stock Reservation Agreement, dated as of October 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., Robert Bollinger and Continental Stock Transfer & Trust Company. | 8-K | 001-34887 | 2.3 | 10/14/2022 | |
| 2.2 | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc. and Robert Bollinger. | 8-K | 001-34887 | 2.2 | 09/08/2022 | |
| 2.3 | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc. and John Masters. | 8-K | 001-34887 | 2.3 | 09/08/2022 | |

72

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 2.4 | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc. and Seaport Global Asset Management SPV LLC - Series A. | 8-K | 001-34887 | 2.4 | 09/08/2022 | |
| 2.5 | Asset Purchase Agreement dated September 16, 2022 between the Company and David W. Carickhoff, solely as Chapter 7 trustee of the Bankruptcy Estates of Electric Last Mile Solutions, Inc. and Electric Last Mile, Inc. | 8-K | 001-34887 | 10.1 | 09/19/2022 | |
| 3.1(a) | Second Amended and Restated Certificate of Incorporation of Mullen Automotive Inc., dated November 5, 2021 | 8-K | 001-34887 | 3.2 | 11/12/2021 | |
| 3.1(b) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation of Mullen Automotive, Inc., dated March 8, 2022 | 8-K | 001-34887 | 3.1 | 03/10/2022 | |
| 3.1(c) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on July 26, 2022 | 8-K | 001-34887 | 3.1 | 07/27/2022 | |
| 3.1(d) | Certificate of Designations, Preferences and Rights of Series D Convertible Preferred Stock. | S-3ASR | 333-267502 | 4.1(c) | 09/19/2022 | |
| 3.1(e) | Certificate of Mullen Automotive Inc. Increasing Number of Shares of Preferred Stock Designated as Series D Convertible Preferred Stock. | S-3ASR | 333-267913 | 4.1(d) | 10/17/2022 | |
| 3.1(f) | Certificate of Designation of Series AA Preferred Stock, filed November 14, 2022 | 8-K | 001-34887 | 3.1 | 11/14/2022 | |
| 3.2 | Amended and Restated Bylaws | 8-K | 001-34887 | 3.3 | 10/05/2012 | |
| 3.2(a) | Amendment No. 1 to the Bylaws, dated June 15, 2015 | 8-K | 001-34887 | 3.2 | 06/16/2015 | |
| 3.2(c) | Amendment No. 3 to the Amended and Restated Bylaws of Mullen Automotive Inc., as amended | 8-K | 001-34887 | 3.1 | 11/14/2022 | |
| 4.1 | Form of Warrant with an exercise price of $0.6877 per share | 10-K | 001-34887 | 4.1 | 12/29/2021 | |
| 4.2 | Form of Warrant (related to Securities Purchase Agreement dated June 7, 2022) | 8-K | 001-34887 | 10.1 (Exhibit A) | 06/10/2022 | |
| 4.3 | Form of Warrant issued March 28, 2022 | 10-Q | 001-34887 | 10.1 | 05/16/2022 | |
| 4.4 | Description of Company's Securities (incorporated by reference to the Company's registration statement on Form S-3 (File No. 333-268497) filed with the Commission on November 21, 2022). | S-3ASR | 333-268497 | | 11/21/2022 | |
| 10.2# | Mullen Automotive Inc. 2022 Equity Incentive Plan | DEF 14A | 001-34887 | Appx B | 06/24/2022 | |

73

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.2(a)# | Form of Stock Option Agreement under 2022 Equity Incentive Plan | | | | | ✓ |
| 10.2(b)# | Form of Restricted Stock Agreement under 2022 Equity Incentive Plan | | | | | ✓ |
| 10.2(c)# | Form of Restricted Stock Unit Agreement under 2022 Equity Incentive Plan | | | | | ✓ |
| 10.3# | CEO Performance Stock Award Agreement dated May 5, 2022 between Mullen Automotive Inc. and David Michery | 8-K | 001-34887 | 10.2 | 07/27/2022 | |
| 10.4 | Securities Purchase Agreement, dated as of September 1, 2021, between Mullen Technologies, Inc. and Esousa Holdings LLC | S-3/A | 333-262093 | 10.1 | 02/01/2022 | |
| 10.4(a) | Amendment to Convertible Preferred Security and Warrant dated February 10, 2022 between the Company and Esousa Holdings, LLC | 10-Q | 001-34887 | 10.6 | 02/14/2022 | |
| 10.4(b) | Form Registration Rights Agreement | S-4/A | 333-256166 | 10.6 (Exhibit C) | 07/22/2021 | |
| 10.5 | Promissory Note dated October 8, 2021 in the principal amount of $15.0 million payable to CEOcast, Inc | 10-Q | 001-34887 | 10.5 | 02/14/2022 | |
| 10.5(a) | Securities Purchase Agreement dated October 8, 2021 between the Company and CEOcast, Inc. | 10-Q | 001-34887 | 10.5(a) | 02/14/2022 | |
| 10.5(b) | Pre-Funded Common Stock Purchase Warrant dated October 8, 2021 issued to CEOcast, Inc. | 10-Q | 001-34887 | 10.5(b) | 02/14/2022 | |
| 10.6 | Amended and Restated Secured Convertible Note and Security Agreement June 17, 2022 Esousa Holdings LLC | 8-K | 001-34887 | 10.1 | 06/21/2022 | |
| 10.6(a) | Letter Agreement (Sale of Note) dated June 17, 2022 | 8-K | 001-34887 | 10.2 | 06/21/2022 | |
| 10.6(b) | Exchange Agreement, dated as of October 14, 2022, by and among Mullen Automotive Inc. and Esousa Holdings LLC. | 8-K | 001-34887 | 10.1 | 10/21/2022 | |
| 10.6(c) | Secured Convertible Note and Security Agreement dated October 14, 2022 with Esousa Holdings LLC. | 8-K | 001-34887 | 10.2 | 10/21/2022 | |
| 10.7# | Amended and Restated Employment Agreement, dated as of June 1, 2021, by and between David Michery and Mullen Technologies, Inc. | S-4/A | 333-256166 | 10.10 | 07/22/2021 | |
| 10.8 | Transition Services Agreement, dated as of May 12, 2021, by and between Mullen Technologies, Inc. and Mullen Automotive Inc. | S-4/A | 333-256166 | 10.14 | 07/22/2021 | |

74

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
| | | Form | File No. | Exhibit | Filing Date | |
|---|---|---|---|---|---|---|
| 10.9 | Tax Sharing Agreement, dated May 12, 2021, by and among Mullen Technologies, Inc. and Mullen Automotive Inc. | S-4/A | 333-256166 | 10.15 | 07/22/2021 | |
| 10.10# | Employment Agreement dated October 25, 2021 between the Company and Kerri Sadler | 10-K | 001-34887 | 10.21#* | 12/29/2021 | |
| 10.11 | Agreement for Purchase and Sale of Real Property and Joint Escrow Instructions between Mullen Technologies, inc. and Saleen Motors International, LLC, dated as of March 9, 2021, and First Amendment dated as of July 23, 2021 | 10-K | 001-34887 | 10.24* | 12/29/2021 | |
| 10.12 | Consultant Agreement dated October 26, 2021 between the Company and Mary Winter | 10-K | 001-34887 | 10.25* | 12/29/2021 | |
| 10.14 | Loan Commitment with NuBridge Commercial Lending executed February 23, 2022 | 8-K | 001-34887 | 10.2 | 02/28/2022 | |
| 10.14(a) | Guaranty dated March 7, 2022 between NuBridge Commercial Lending, LLC and David Michery | 10-Q | 001-34887 | 10.4(a) | 05/16/2022 | |
| 10.15 | Letter of Intent dated January 14, 2022 between the Company and Mark Betor | 10-Q | 001-34887 | 10.2 | 05/16/2022 | |
| 10.16 | Securities Purchase Agreement dated June 7, 2022 for Series D Preferred Stock and Warrants | 8-K | 001-34887 | 10.1 | 06/10/2022 | |
| 10.16(a) | Amendment No. 1 dated June 23, 2022 to Securities Purchase Agreement dated June 7, 2022 | 8-K | 001-34887 | 10.1 | 06/24/2022 | |
| 10.16(b) | Amendment No. 2 dated August 19, 2022 to Securities Purchase Agreement dated June 7, 2022 | S-3ASR | 333-267502 | 99.3 | 09/19/2022 | |
| 10.16(c) | Amendment No. 3 to the Securities Purchase Agreement, dated November 15, 2022, by and between Mullen Automotive Inc. and the buyers named therein | 8-K | 001-34887 | 10.1 | 11/21/2022 | |
| 10.16(d) | Form of Convertible Note dated November 15, 2022 | 8-K | 001-34887 | 10.2 | 11/21/2022 | |
| 10.17# | Employment Separation Agreement between the Company and Jerry Alban dated June 27, 2022 | 10-Q | 001-34887 | 10.6 | 08/12/2022 | |
| 10.18 | Lease dated June 29, 2022 between the Company and with the Lakeview Business Center, LLC | 10-Q | 001-34887 | 10.7 | 08/12/2022 | |
| 10.19 | Consulting Agreement dated January 12, 2022 between the Company and Ignacio Novoa | 10-Q | 001-34887 | 10.8 | 08/12/2022 | |

75

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.20 | Subscription and Investment Representation Agreement, dated November 14, 2022, by and between Mullen Automotive Inc. and the purchaser signatory thereto | 8-K | 001-34887 | 10.1 | 11/14/2022 | |
| 10.21 | Firm Order Agreement dated December 12, 2022, between Randy Marion Isuzu, LLC and the Company | 8-K | 001-34887 | 10.1 | 12/15/2022 | |
| 10.22 | Offer Letter with Jonathan New dated September 7, 2022 | | | | | ✓ |
| 10.23 | Settlement Agreement dated January 13, 2023 with Acuitas, J. Fallon and Mank Capital | | | | | ✓ |
| 10.23(a) | Form of Promissory Note | | | | | ✓ |
| 10.24 | Waiver Agreement dated January 12, 2023 with Series C Preferred Stockholders | | | | | ✓ |
| 10.25 | Settlement Agreement dated January 13, 2023 with respect to Series D Securities Purcashe Agreement | | | | | ✓ |
| 10.25(a) | Form of Warrant | | | | | ✓ |
| 21.1 | List of Subsidiaries | | | | | ✓ |
| 24.1 | Power of Attorney (included on signature page) | | | | | ✓ |
| 23.1 | Consent of Independent Registered Public Accounting Firm (Daszkal Bolton LLP) | | | | | ✓ |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 | | | | | ✓ |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 | | | | | ✓ |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. § 1350 | | | | | ✓ |
| 101.INS | The following financial information from the Annual Report on Form 10-K for the fiscal year ended September 30, 2022, formatted in Inline XBRL (eXtensible Business Reporting Language), is filed electronically herewith: (i) Consolidated Balance Sheets; (ii) Consolidated Statements of Operations and Comprehensive Loss; (iii) Consolidated Statement of Changes in Stockholders' Equity (Deficit); (iv) Consolidated Statements of Cash Flows; and (v) Notes to Consolidated Financial Statements, tagged as blocks of text and including detailed tags. | | | | | ✓ |

76

Table of Contents

| | | Incorporated by Reference | | | | Filed/ Furnished |
| Exhibit No. | Exhibit Description | Form | File No. | Exhibit | Filing Date | Herewith |
|---|---|---|---|---|---|---|
| 104* | Cover Page Interactive Data File (Embedded within the Inline XBRL document and included in Exhibit 101). | | | | | ✓ |

# Indicates management contract or compensatory plan or arrangement.
* Filed herewith (furnished herewith with respect to Exhibit 32.1).

**Item 16. Form 10-K Summary.**

None.

77

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**
**MULLEN AUTOMOTIVE, INC.**

**FINANCIAL STATEMENTS**

**September 30, 2022 and 2021**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (Auditor ID # 229) | F-2 |
| Consolidated Financial Statements: | |
| Consolidated Balance Sheets at September 30, 2022, and 2021 | F-4 |
| Consolidated Statements of Operations for the Years Ended September 30, 2022, and 2021 | F-5 |
| Consolidated Statements of Deficiency in Stockholders' Equity for the Years Ended September 30, 2022, and 2021 | F-6 |
| Consolidated Statements of Cash Flows for the Years Ended September 30, 2022, and 2021 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

F-1

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
Mullen Automotive Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Mullen Automotive Inc. (the "Company") at September 30, 2022 and 2021, and the related consolidated statements of operations, deficiency in stockholders' equity, and cash flows for each of the years in the two-year period ended September 30, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at September 30, 2022 and 2021, and the results of its operations and its cash flows for each of the years in the two-year period ended September 30, 2022, in conformity with accounting principles generally accepted in the United States of America.

**Going Concern Uncertainty**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As described in Note 2 to the financial statements, the Company has sustained net losses, has indebtedness in default, and has a deficiency in working capital of approximately $36.0 million at September 30, 2022, which raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of a critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as whole, and we are not, by communicating the critical matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which it relates.

*Valuation of Intangible Assets and Goodwill in Acquisitions*

As described in Notes 3 to the consolidated financial statements, the Company completed the 60% acquisition for consideration of $148.2 million (enterprise value $247.0 million) and the transaction was accounted for as business combinations. The Company recorded acquired intangible assets and goodwill at fair value on the date of acquisition using a discounted cash flow methodology. The methods used to estimate the fair

F-2

Table of Contents

value of acquired intangible assets and goodwill involve significant assumptions. The significant assumptions applied by management in estimating the fair value of acquired intangible assets included income projections and discount rates.

The principal considerations for our determination that performing procedures relating to the valuation of intangible assets in acquisitions are a critical audit matter are (1) there was a high degree of auditor judgment and subjectivity in applying procedures relating to the fair value of intangible assets acquired due to the significant judgment by management when developing the estimates and (2) significant audit effort was required in evaluating the significant assumptions relating to the estimates, including the income projections and discount rates. In addition, the audit effort involved the use of professionals with specialized skill and knowledge to assist in performing these procedures and evaluating the audit evidence obtained.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included, among others, reading the purchase agreements, and testing management's process for estimating the fair value of intangible assets. Testing management's process included evaluating the appropriateness of the valuation models, testing the completeness, accuracy, and relevance of underlying data used in the models, and testing the reasonableness of significant assumptions, including the income projections and discount rates. Evaluating the reasonableness of the income projections involved considering the current performance of the acquired business, the consistency with external market and industry data, and whether these assumptions were consistent with other evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in evaluating the reasonableness of significant assumptions, including the discount rates, by comparing them against discount rate ranges that were independently developed using publicly available market data for comparable companies.

*Accounting for Contracts that Qualify as Liabilities*

As described in Note 12 to the consolidated financial statements, during the year, the Company had an insufficient number of authorized shares available for issuance for the conversion of Series C Preferred Stock and exercise of warrants to purchase common stock. These financial instruments were measured at fair value on a recurring basis until the Company had sufficient authorized common stock.

The principal considerations for our determination that performing procedures relating to the valuation of financial instruments is a critical audit matter are the significant judgment by management when developing the fair value of the liabilities. This in turn led to a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to the valuation models used and related variable inputs used within those models.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing management's process for developing the fair value estimate; evaluating the appropriateness of the valuation techniques; testing the completeness and accuracy of underlying data used in the model; and evaluating the significant assumptions used by management. Evaluating management's assumptions related to the volatility amounts and discount rates involved evaluating whether the assumptions used by management were reasonable considering the current and historical performance, the consistency with external market and industry data, and whether these assumptions were consistent with evidence obtained in other areas of the audit.

/s/ Daszkal Bolton LLP

We have served as the Company's auditor since 2020.

Fort Lauderdale, Florida
January 13, 2023

F-3

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
**CONSOLIDATED BALANCE SHEETS**

| | September 30, | | |
|---|---|---|---|
| | | **2022** | **2021** |
| **ASSETS** | | | |
| **CURRENT ASSETS** | | | |
| Cash and cash equivalents | $ | 54,085,685 | $ | 42,174 |
| Restricted cash | | 30,289,400 | - |
| Prepaid expenses and other current assets | | 1,958,759 | 6,768,881 |
| **TOTAL CURRENT ASSETS** | | **86,333,844** | **6,811,055** |
| Property, equipment and leasehold improvements, net | | 14,803,716 | 1,181,477 |
| Intangible assets, net | | 93,947,018 | 2,495,259 |
| Deposit on ELMS assets purchase | | 5,500,000 | - |
| Amounts receivable from related parties | | 1,232,387 | - |
| Right-of-use assets | | 4,597,052 | 2,350,929 |
| Goodwill | | 92,834,832 | - |
| Other assets | | 3,345,631 | 4,333,774 |
| **TOTAL ASSETS** | $ | **302,594,479** | $ | **17,172,494** |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts payable | $ | 6,398,425 | $ | 5,206,310 |
| Accrued expenses and other current liabilities | | 7,185,881 | 19,126,765 |
| Dividends payable | | 7,762,255 | - |
| Warrant liabilities | | 84,799,179 | - |
| Liability to issue shares | | 10,710,000 | 7,027,500 |
| Lease liabilities, current portion | | 1,428,474 | 599,898 |
| Notes payable, current portion | | 3,856,497 | 39,200,970 |
| Other current liabilities | | 90,372 | - |
| **TOTAL CURRENT LIABILITIES** | | **122,231,083** | **71,161,443** |
| Notes payable, net of current portion | | 5,164,552 | 247,612 |
| Lease liabilities, net of current portion | | 3,359,354 | 1,857,894 |
| Deferred tax liability | | 14,882,782 | - |
| Other liabilities | | - | 5,617,192 |
| **TOTAL LIABILITIES** | | **145,637,771** | **78,884,141** |
| Commitments and Contingencies (Note 18) | | | |
| | | | |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| Preferred Stock; $0.001 par value; 500,000,000 preferred shares authorized; | | | |
| Preferred Series A; 200,000 shares authorized; 1,924 and 100,363 shares issued and outstanding at September 30, 2022, and 2021, respectively. | | 2 | 100 |
| Preferred Series B; 12,000,000 shares authorized; zero and 5,567,319 shares issued and outstanding at September 30, 2022, and 2021, respectively. | | - | 5,568 |
| Preferred Series C; 40,000,000 shares authorized; 1,360,321 and zero shares issued and outstanding at September 30, 2022, and 2021, respectively. | | 1,360 | - |
| Preferred Series D; 437,500,001 shares authorized; 4,359,652 and zero shares issued and outstanding at September 30, 2022, and 2021, respectively. | | 4,359 | - |
| Common Stock; $0.001 par value; 1,750,000,000 shares authorized; 833,468,180 and 7,048,387 shares issued and outstanding at September 30, 2022, and 2021, respectively. | | 833,468 | 7,048 |
| Additional Paid-in Capital | | 947,765,155 | 88,650,286 |
| Accumulated Deficit | | (889,907,455) | (150,374,649) |
| Non-controlling interest | | 98,259,819 | - |
| **TOTAL STOCKHOLDERS' EQUITY (DEFICIT)** | | **156,956,709** | **(61,711,647)** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | **302,594,479** | $ | **17,172,494** |

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **OPERATING EXPENSES** | | |
| Research and development | $ 21,650,840 | $ 3,009,027 |
| General and administrative | 75,338,256 | 19,393,141 |
| Total Operating Expense | 96,989,096 | 22,402,168 |
| Loss from Operations | (96,989,096) | (22,402,168) |
| | | |
| Loss on disposal of fixed assets | (50,574) | - |
| Other financing costs | - | (1,559,961) |
| Gain on extinguishment of indebtedness, net | 33,413 | 890,581 |
| Penalty for insufficient authorized shares | (3,495,000) | - |
| Revaluation of warrants liabilities | (122,803,715) | - |
| Other financing costs - initial recognition of warrant liabilities | (484,421,258) | - |
| Other income (expense), net | (5,647,841) | - |
| Interest expense | (26,949,081) | (21,168,232) |
| Net Loss before income taxes | (740,323,152) | (44,239,780) |
| | | |
| Provision for income tax | (1,600) | (800) |
| | | |
| Net Loss | (740,324,752) | (44,240,580) |
| | | |
| Net loss attributable to non-controlling interest | 791,946 | - |
| Net loss attributable to Mullen Automotive shareholders | (739,532,806) | (44,240,580) |
| | | |
| Less: Preferred dividends | (40,516,440) | - |
| | | |
| Net loss attributable to shareholders less preferred dividends | $ (780,049,246) | $ (44,240,580) |
| | | |
| Net Loss per Share | $ (2.80) | $ (8.56) |
| | | |
| Weighted average shares outstanding, basic and diluted | 278,219,500 | 5,171,144 |

F-5

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Series A Shares | Series A Amount | Series B Shares | Series B Amount | Series C Shares | Series C Amount | Series D Shares | Series D Amount | Common Stock Shares | Common Stock Amount | Paid-in Capital | Accumulated Deficit | Non-controlling Interest | Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, October 1, 2020 | 116,789 | $ 116 | 5,567,319 | $ 5,568 | - | $ - | - | $ - | 5,086,225 | $ 5,086 | $ 63,619,280 | $(106,134,069) | $ - | $ (42,504,019) |
| Shares issued for cash | - | - | - | - | - | - | - | - | 126,119 | 126 | 4,799,948 | 4,800,074 | - | - |
| Shares issued for legal settlement | - | - | - | - | - | - | - | - | 39,235 | 39 | 1,259,961 | 1,260,000 | - | - |
| Warrant issuances | - | - | - | - | - | - | - | - | - | - | 14,007,258 | 14,007,258 | - | - |
| Issuance of common stock for conversion of preferred stock | (16,426) | (16) | - | - | - | - | - | - | 1,642,563 | 1,643 | (1,627) | - | - | - |
| Stock-based compensation | - | - | - | - | - | - | - | - | 154,245 | 154 | 4,965,466 | - | - | 4,965,620 |
| Net loss | - | - | - | - | - | - | - | - | - | - | - | (44,240,580) | - | (44,240,580) |
| Balance, September 30, 2021 | 100,363 | 100 | 5,567,319 | 5,568 | - | - | - | - | 7,048,387 | 7,048 | 88,650,286 | (150,374,649) | - | (61,711,647) |
| Beneficial conversion feature of convertible debt | - | - | - | - | - | - | - | - | - | - | 3,336,853 | - | - | 3,335,005 |
| Cashless Warrant exercise | - | - | - | - | - | - | - | - | 530,251,927 | 530,252 | 553,841,286 | - | - | 554,371,538 |
| Common shares issued to settle liability to issue | - | - | - | - | - | - | - | - | 131,477 | 131 | 1,034,681 | - | - | 1,034,812 |
| Dividends deemed and accrued on preferred stock | - | - | - | - | - | - | - | - | - | - | (40,516,440) | - | - | (40,516,440) |
| Issuance of common stock for conversion of debt | - | - | - | - | - | - | - | - | 17,500,000 | 17,500 | 18,120,600 | - | - | 18,138,100 |
| Issuance of common stock for conversion of preferred stock | (98,439) | (98) | (5,567,319) | (5,568) | (13,766,058) | (13,766) | (75,567,273) | (75,568) | 104,743,630 | 104,744 | (11,594) | - | - | - |
| Issuance of common stock for note receivable | - | - | - | - | - | - | - | - | 14,343,550 | 14,344 | (14,344) | - | - | - |
| Issuance of common stock as payment of penalty to shareholder | - | - | - | - | - | - | - | - | 5,587,530 | 5,588 | 3,489,412 | - | - | 3,495,000 |

Table of Contents

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Preferred shares issued for cash | - | - | - | - | 12,212,450 | 12,212 | 79,926,925 | 79,927 | - | - | 141,009,395 | - | - | 141,101,534 |
| Preferred shares issued in exchange for conversion of debt | - | - | - | - | 2,829,029 | 2,829 | - | - | - | - | 24,988,926 | - | - | 24,991,755 |
| Preferred shares issued to settle liability to issue | - | - | - | - | 84,900 | 85 | - | - | - | - | 704,915 | - | - | 705,000 |
| Prefunded warrant issuance | - | - | - | - | - | - | - | - | - | - | 15,000,000 | - | - | 15,000,000 |
| Shares issued for asset | - | - | - | - | - | - | - | - | 109,412 | 109 | 140,891 | - | - | 141,000 |
| Shares issued for business acquisition | - | - | - | - | - | - | - | - | 63,599,876 | 63,600 | 41,514,047 | - | - | 41,577,647 |
| Shares issued for cash | - | - | - | - | - | - | - | - | 65,702,395 | 65,702 | 42,269,378 | - | - | 42,335,080 |
| Stock based compensation | - | - | - | - | - | - | - | - | 24,449,996 | 24,450 | 43,715,242 | - | - | 43,739,692 |
| Warrant issuances | - | - | - | - | - | - | - | - | - | - | 10,491,621 | - | - | 10,491,621 |
| Non-controlling interest from Bollinger acquisition | - | - | - | - | - | - | - | - | - | - | - | - | 99,051,765 | 99,051,765 |
| Non-controlling interest loss since Bollinger acquisition | - | - | - | - | - | - | - | - | - | - | - | - | (791,946) | (791,946) |
| Net loss | - | - | - | - | - | - | - | - | - | - | - | (739,532,806) | - | (739,532,806) |
| Balance, September 30, 2022 | 1,924 | $ 2 | - | $ - | 1,360,321 | $ 1,360 | 4,359,652 | $ 4,359 | 833,468,180 | $ 833,468 | $ 947,765,155 | $(889,907,455) | $ 98,259,819 | $ 156,956,709 |

F-7

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities** | | |
| Net Loss | $ (740,324,752) | $ (44,240,580) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 3,282,285 | 720,805 |
| Financing loss on warrants | 484,421,258 | - |
| Revaluation of warrant liabilities | 122,803,715 | - |
| Impairment charge - materials | - | 74,495 |
| Stock-based compensation to employees, directors and consultants | 43,715,242 | 4,965,621 |
| Issuance of shares for legal settlement | - | 1,260,000 |
| Non-cash interest and other operating activities | 13,883,637 | 12,956,583 |
| Non-cash lease expense | 441,066 | 507,189 |
| Income tax expense | 1,600 | 800 |
| Amortization of debt discount | 19,595,915 | 8,211,648 |
| Loss on asset disposal | 50,574 | - |
| Loss (gain) on extinguishment of debt | 41,096 | (890,581) |
| | | |
| Changes in operating assets and liabilities: | | |
| Material and supplies | - | (87,165) |
| Other current assets | - | (49,265) |
| Prepaids and other current assets | 3,114,540 | (3,571,768) |
| Accounts payable | 1,192,113 | 5,665,461 |
| Accrued expenses and other liabilities | (18,013,899) | (2,554,813) |
| Lease liabilities | - | (490,545) |
| Net cash used in operating activities | (65,795,610) | (17,522,115) |
| | | |
| **Cash Flows from Investing Activities** | | |
| Purchase of equipment | (11,606,944) | (43,893) |
| Acquisition of Bollinger Motors, Inc, net of cash acquired | (29,631,984) | - |
| Deposits on purchase of assets | (5,500,000) | - |
| Purchase of intangible assets | (415,181) | (117,890) |
| Net cash used in investing activities | (47,154,109) | (161,783) |
| | | |
| **Cash Flows from Financing Activities** | | |
| Proceeds from issuance of notes payable | 12,240,353 | 12,768,500 |
| Proceeds from issuance of common stock | 42,269,378 | 4,800,074 |
| Proceeds from issuance of preferred stock | 142,873,667 | - |
| Proceeds from issue of prefunded warrants | 15,000,000 | - |
| Proceeds from liability to issue preferred C shares | - | 705,000 |
| Payment of notes payable | (15,100,768) | (580,870) |
| Net cash provided by financing activities | 197,282,630 | 17,692,704 |
| | | |
| **Increase in cash** | 84,332,911 | 8,806 |
| Cash, beginning of year | 42,174 | 33,368 |
| Cash, end of year, including restricted cash | $ 84,375,085 | $ 42,174 |
| | | |
| **Supplemental disclosure of Cash Flow information:** | | |
| Cash paid for interest | $ 1,407,988 | $ 15,136 |
| Cash paid for taxes | $ - | $ 800 |
| **Supplemental disclosure for non-cash activities:** | | |
| Issuance of common stock for conversion of debt and interests | $ 17,339,000 | $ - |
| Preferred shares issued in exchange for convertible debt | $ 24,988,926 | $ - |
| Liability to issue shares in exchange for prepaid expenses | $ - | $ 6,322,500 |
| Stock based payment for business acquired | $ 41,577,647 | $ - |
| Right-of-use assets obtained in exchange of operating lease liabilities | $ 4,081,716 | $ 1,129,003 |
| Conversion of a note payable to a liability to issue shares | $ 10,413,900 | $ - |
| Indebtedness settled via issuance of stock | $ - | $ 1,300,000 |
| Release of deferred advertising | $ - | $ 15,054,000 |

F-8

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1 -DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

*Description of Business*

Mullen Automotive Inc. ("MAI", "Mullen", "we" or the "Company") is a development-stage electronic vehicle (EV) manufacturer. The Company operated as the EV division of Mullen Technologies, Inc. until November 5, 2021, at which time the Company underwent a capitalization and corporate reorganization by way of a spin-off by the Company to its shareholders, followed by a reverse merger with and into Net Element, Inc. (the "Merger").

*Basis of Presentation and Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries Ottava Automotive, Inc., a California corporation, Mullen Real Estate, LLC., a Delaware corporation, Mullen Investment Properties LLC, a Mississippi corporation, and Bollinger Motors, Inc., a Delaware corporation. Intercompany accounts and transactions have been eliminated, if any.

The financial statements reflect the consolidated financial position and results of operations of Mullen, which have been prepared in accordance with Generally Accepted Accounting Principles in the United States ("U.S. GAAP").

**NOTE 2 - LIQUIDITY, CAPITAL RESOURCES, AND GOING CONCERN**

The Coronavirus Pandemic ("COVID-19") continues to impact countries, communities, supply chains and markets, global financial markets, and various industries. To date, COVID-19 has had a material and disruptive impact on our strategy in EV product development and the ability to obtain external financing to fund its development activities. Company management is unable to predict whether the global pandemic will continue to have a material impact on our future financial condition and results of operations.

*Going Concern*

The Company's financial statements as of September 30, 2022, have been prepared on a going concern basis. The Company has not generated revenue to date and has accumulated losses since inception. The Company's ability to continue operating as a going concern is contingent upon, among other things, its ability to raise sufficient additional capital and/or obtaining the necessary financing to support ongoing and future operations and to successfully manufacture and launch its products for sale. While the Company expects to obtain the additional capital and/or financing that is needed, there is no assurance that the Company will be successful in obtaining the necessary funds to bring its product and service offerings to market and support future operations. These factors raise substantial doubt as to the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.

Our management plans to raise additional capital through a combination of equity and debt financing, strategic alliances and licensing arrangements. Company management has evaluated whether there are any conditions and events considered in aggregate, which raises substantial doubt about its ability to continue as a going concern over the next twelve months from the date of filing this report. Since inception, we have incurred significant accumulated losses of approximately $889.9 million, and have a deficiency in working capital of approximately $36.0 million on September 30, 2022. For more information regarding additional financing after September 30, 2022, see Note 20 - Subsequent Events.

F-9

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Significant accounting policies are defined as those that are reflective of significant judgments and uncertainties, and potentially result in materially different results under different assumptions and conditions.

*Business Combination*

Business acquisitions are accounted for in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805 "Business Combinations". FASB ASC 805 requires the reporting entity to identify the acquirer, determine the acquisition date, recognize and measure the identifiable tangible and intangible assets acquired, the liabilities assumed and any non-controlling interest in the acquired entity, and recognize and measure goodwill or a gain from the purchase. The acquiree's results are included in the Company's consolidated financial statements from the date of acquisition. Assets acquired and liabilities assumed are recorded at their fair values and the excess of the purchase price over the amounts assigned is recorded as goodwill. Adjustments to fair value assessments are recorded to goodwill over the measurement period (not longer than twelve months). The acquisition method also requires that acquisition-related transaction and post-acquisition restructuring costs be charged to expense. The Company completed the acquisition of Bollinger Motors, Inc on September 7, 2022 (see Note 4 - Acquisition of Bollinger Motors, Inc.).

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the dates of the financial statements and the reported amounts of total expenses in the reporting periods. Estimates are used for, but not limited to, the fair value of net assets acquired in business acquisitions and asset purchases, fair value of financial instruments, economic lives of intangible assets and property and equipment, income taxes, contingencies, inputs used to value stock-based compensation, and the valuation of common and preferred stock issued by the Company.

Additionally, the interest rates on several debt agreements have been imputed where there was no stated interest rate within the original agreement. The imputed interest results in adjustments to the debt amounts reported in our financial statements prepared under U.S. GAAP. Loan valuations issues can arise when trying to determine the debt attributes, such as discount rate, credit loss factors, liquidity discounts, and pricing.

Management bases its estimates on historical experience and on various other assumptions believed to be reasonable, the results of which form the basis for adjustments about the carrying values of assets and liabilities and the recording of costs and expenses that are not readily apparent from other sources. The actual results may differ materially from these estimates.

*Risks and Uncertainties*

We operate within an industry that is subject to rapid technological change, intense competition, and in which there is significant government regulations. It is subject to significant risks and uncertainties, including competitive, financial, developmental, operational, technological, required knowledge of industry governmental regulations, and other risks associated with an emerging business. Any one or combination of these or other risks could have a substantial influence on our future operations and prospects for commercial success.

*Cash and Cash Equivalents*

Company management considers all short-term investments with an original maturity of three months or less when purchased to be cash equivalents. Cash and cash equivalents are $54.1 million and $42 thousand as of September 30, 2022, and 2021, respectively.

F-10

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Restricted Cash*

Cash obtained from customer deposits is held by the Company and is restricted from use to fund operations. Refundable deposits are $289 thousand and $0 for the year ended September 30, 2022, and 2021, respectively.

On September 7, 2022, the Company deposited $30 million in an escrow account as part of the Bollinger acquisition (see Note 4 - Acquisition of Bollinger Motors, Inc.).

*Prepaid and Other Current Assets*

Prepaid expenses consist of various advance payments made for goods or services to be received in the future. These prepaid expenses include insurance and other contracted services requiring up-front payments.

*Property, Equipment and Leasehold Improvements, net*

Property, equipment and leasehold improvements are stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated economic useful lives of the assets.

*Estimated Useful Lives*

| Description | Life |
| --- | --- |
| Buildings | 30 Years and shorter of life of asset or lease term |
| Furniture and Equipment | 3 to 7 Years |
| Computer and Software | 1 to 5 Years |
| Machinery, Shop and Testing Equipment | 3 to 7 Years |
| Leasehold Improvements | Shorter of the estimated useful life or the underlying lease term |
| Vehicles | 5 Years |

Expenditures for major improvements are capitalized, while minor replacements, maintenance and repairs, which do not extend the asset lives, are charged to operations as incurred. Upon sale or disposition, the cost and related accumulated depreciation are removed from the accounts and any gain or loss is included in operations. Company management continually monitors events and changes in circumstances that could indicate that the carrying balances of its property, equipment and leasehold improvements may not be recoverable in accordance with the provisions of ASC 360, *"Property, Plant, and Equipment."* When such events or changes in circumstances are present, we assess the recoverability of long-lived assets by determining whether the carrying value of such assets will be recovered through undiscounted expected future cash flows. If the total of the future cash flows is less than the carrying amount of those assets, we recognize an impairment loss based on the excess of the carrying amount over the fair value of the assets.

*Income Taxes*

The Company accounts for income taxes using the asset and liability method, under which deferred tax assets and liabilities are recognized for the expected future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. A valuation allowance is provided when it is more likely than not that some portion or all of a deferred tax asset will not be realized. Since the Company has incurred operating losses to date, the net deferred tax assets have been fully offset by a valuation allowance as of September 30, 2022. Uncertain tax positions taken or expected to be taken in a tax return are accounted for using the "more likely than not" threshold for financial statement recognition and measurement. There are transactions that occur during the ordinary course

F-11

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

of business for which the ultimate tax determination may be uncertain. At September 30, 2022, and 2021, there were no material changes to either the nature or the amounts of the uncertain tax positions.

The Company's income tax provision consists of an estimate for U.S. federal and state income taxes based on enacted rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in the tax law. We maintain a full valuation allowance against the value of our U.S. and state net deferred tax assets because management does not believe the recoverability of the tax assets meets the "more likely than not" likelihood at September 30, 2022, and 2021.

### *Intangible Assets*

**Intangible Assets**

The Company capitalizes legal costs related to the application for patents and trademarks. Amortization of such patent costs will begin when the related patent is granted to the Company and is recorded on a straight-line basis. Management judgment is used to determine the estimated economic life on intangible assets. Intangible assets are amortized over a maximum of 10 years. The Company acquired intangible assets in connection with the Bollinger acquisition which are being amortized over its estimated economic lives.

**Impairment of Long-Lived Assets**

The Company periodically evaluates property, plant and equipment and intangible assets for impairment whenever events or changes in circumstances indicate that a potential impairment may have occurred. If such events or changes in circumstances arise, the Company compares the carrying amount of the long-lived assets to the estimated future undiscounted cash flows expected to be generated by the long-lived assets. If the estimated aggregate undiscounted cash flows are less than the carrying amount of the long-lived assets, an impairment charge, calculated as the amount by which the carrying amount of the assets exceeds the fair value of the assets, is recorded. The fair value of the long-lived assets is determined based on the estimated discounted cash flows expected to be generated from the long-lived assets. The Company has not recorded any such impairment charges during the years ended September 30, 2022, and 2021, respectively.

### *Leases*

In February 2016, the FASB issued Accounting Standards Update (ASU) No. 2016-02, Leases. The core principle of ASU 2016-02 is that lessees should recognize on its balance sheet, assets and liabilities arising from a lease. In accordance with that principle, ASU 2016-02 requires that a lessee recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying leased asset for the lease term. Lessees shall classify all leases as finance or operating leases.

### *General and Administrative Expenses*

General and administrative ("G&A") expenses include all non-production related expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, and licenses. Advertising costs are expensed as incurred and are included in G&A expenses. Other than trade show expenses which are deferred until occurrence of the future event, we expense advertising costs as incurred in accordance with ASC 720-35, *"Other Expenses - Advertising Cost."* Advertising costs for the year ended September 30, 2022 and September 30, 2021, were $4,407,764 and $413,771, respectively.

F-12

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Share-Based Compensation*

We account for share-based awards issued by the Company in accordance with ASC Subtopic 718-10, *"Compensation - Share Compensation",* which requires fair value measurement on the grant date and recognition of compensation expense for all common shares of the Company issued to employees, non-employees and directors. The fair value of non-marketable share-based awards has been estimated based on an independent valuation. The Company's common and preferred share valuations have been appraised by an independent financial valuation advisor, based on assumptions management believes to be reasonable. Key assumptions and approaches to value used in estimating fair value, includes economic and industry data; business valuation; prior transactions; option value method and other cost, income and market value approaches. Share-based compensation is included within general and administrative expenses. See Note 10 - Share-Based Compensation for the share-based compensation expense that is included within General and Administrative expenses for the years ended September 30, 2022, and 2021.

*Related Party Transactions*

We have related party transactions with certain of our directors, officers, and principal shareholders, in addition to entities related to certain officers, these transactions include operational loans, convertible debt, and warrants for financial support associated with the borrowing of funds and are entered into in the ordinary course of business (See Note 19 - Related Party Transactions) for detail on related party transactions.

*Fair Value of Financial Instruments*

We apply fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value on a recurring basis. Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities that are required to be recorded at fair value, Company management considers the principal or most advantageous market in which we would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as risks inherent in valuation techniques, transfer restrictions and credit risk. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

> *Level 1 - Quoted prices in active markets for identical assets or liabilities.*

> *Level 2 - Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.*

> *Level 3 - Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.*

*Concentrations of Business and Credit Risk*

We maintain cash balances in several financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Association up to certain federal limitations, generally $250,000. At times, our cash balance may exceed these federal limitations. However, we have not experienced any losses in such accounts and management believes we are not exposed to any significant credit risk on these accounts. The amounts in excess of insured limits as of September 30, 2022, and 2021 are $53.3 million and $0, respectively.

F-13

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Recently Issued Accounting Standards*

Accounting standard updates issued but not yet added were assessed and determined to be either not applicable or not expected to have a material impact on our consolidated financial statements.

**NOTE 4 - ACQUISITION OF BOLLINGER MOTORS, INC.**

On September 7, 2022, the Company acquired, through a series of purchase agreements, 544,347 shares of common stock of Bollinger Motors, Inc. ("Bollinger Motors"), representing approximately 60% of the outstanding shares. Purchase accounting is open with respect to taxes until all tax basis information can be gathered.

The following table summarizes the preliminary purchase price consideration to acquire Bollinger Motors:

| | | |
|---|---|---|
| Cash consideration | $ | 75,000,000 |
| Cash consideration- deferred | | 32,000,000 |
| Stock consideration (book value of $41.2 million) | | 41,577,647 |
| **Total Consideration** | **$** | **148,577,647** |

Total consideration of $148.6 million was paid or payable to Bollinger Motors and Bollinger shareholders as follows:

- Cash consideration due to Bollinger Motors is approximately $107 million, of which $75 million was paid at closing and $32 million is to be paid in five installments through August 5, 2023. The Company deposited $32 million into an escrow account on November 29, 2022 to fulfill the five installment amount.

- Stock consideration due to Bollinger shareholders is 63,599,876 shares of the Company's Common Stock valued at approximately $41.6 million.

The Company has determined that the acquisition of Bollinger Motors constitutes a business acquisition as defined by ACS 805, *Business Combinations*. Accordingly, the assets acquired, and the liabilities assumed in the transaction were recorded at their acquisition date estimated fair value, while the transaction costs associated with the acquisition were expensed as incurred pursuant to the purchased method of accounting in accordance with ASC 805. The Company's purchase price allocation was based on an evaluation of the appropriate fair values and represents management's best estimate based on available data. Fair values are determined based on the requirements of ASC *820, Fair Measurements and Disclosure.*

The following table summarizes the allocation of fair value of assets acquired and liabilities assumed:

| Purchase Consideration | | |
|---|---|---|
| Cash and debt consideration | $ | 107,000,000 |
| Stock consideration | | 41,577,647 |
| Total consideration received for 60% of Bollinger | | 148,577,647 |
| Noncontrolling interest (40%) | | 99,051,765 |
| **Consideration transferred including noncontrolling interest** | **$** | **247,629,412** |

| Allocation of Purchase Consideration | | |
|---|---|---|
| Cash and restricted cash | $ | 77,238,086 |
| Other current assets | | 867,112 |
| Fixed assets | | 1,009,662 |
| Goodwill | | 92,479,704 |

F-14

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---:|
| Intellectual property | 58,304,612 |
| Patents | 32,391,186 |
| Trademarks | 1,075,048 |
| Non-compete agreements | 745,947 |
| Other non-current assets | 246,896 |
| Accounts payable | (638,752) |
| Refundable deposits | (213,679) |
| Deferred tax liability | (14,882,782) |
| Other current liabilities | (993,628) |
| **Estimated fair value of 100% of net assets acquired** | $ **247,629,412** |

As a result of the acquisition transaction, Mullen acquired controlling interest of Bollinger. Acquired intellectual property, patents and non-compete agreements have finite life. The finite-lived intangible assets will be amortized using the straight-line method of the respective lives of each asset. Below are the acquired intangibles with their relative useful lives and method of amortization:

| Intangible Asset | Useful Life | Amortization Method |
|---|:---:|:---:|
| Intellectual property | 10 years | Straight-line |
| Patents | 10 years | Straight-line |
| Trademarks | 10 years | Straight-line |
| Non-compete agreements | 5 years | Straight-line |

*Valuation Methodology*

The fair value of Intellectual Property was determined using the Relief from Royalty Method. This method was applied to the core intellectual property of Bollinger Motors consisting of the designs, trademarks and processes. Under the MPEEM, the Company determines free cash flows for a group of assets, and then adjusts it for a contributory charge for the use of other identifiable tangible and intangible assets. The present value of the resulting excess cash flows is adjusted for any tax benefits and the resulting amount represents the fair value of the intangible asset.

The fair value of the Company's patents was determined using the Relief from Royalty Method. The method considers what a purchaser could afford, or would be willing to pay, for a license of similar intellectual property rights. The royalty stream is then capitalized reflecting the risk and return relationship of investing in the asset. The Company used 5% as an initial royalty rate, gradually decreasing it to 1% over 10 years in 2031 to reflect technological obsolescence.

The non-compete agreement was valued using a discounted cash flow with and without method. Under this method, estimated enterprise value is calculated with non-complete clauses and compared to the enterprise value in the absence of the clauses. Estimated enterprise value is determined as present value of future cash flows. The after-tax differential of enterprise value is adjusted for the probability, reflecting specific facts and circumstances.

As part of application of the above methods, the annual discount rate used to determine the present value of future cash flows varied between 40% and 42%.

Assumptions used in forecasting cash flows and determining the fair value for each of the identified intangible asset included consideration of the following:

- Historical performance of the assets, sales and profitability
- Estimation of the economic life of the assets
- Risk profile of an individual assets
- Business prospects and industry expectations
- Amortization benefits on intangible assets

F-15

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- Acquisition of new customers.

***Supplemental pro forma information***

The following supplemental pro forma information summarizes the Company's results of operations for the current reporting period, as if the Company completed the acquisition as of the beginning of the annual reporting period. Supplemental pro forma information is as follows:

| | Year ended September 30, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Total Revenues | - | - |
| Net loss | (753,916,185) | (57,647,534) |

**NOTE 5 - GOODWILL AND INTANGIBLE ASSETS**

For the years ended September 30, 2022, and 2021, goodwill was approximately $92.8 and $0, respectively (See Note 4 - Acquisition of Bollinger Motors, Inc.).

The Company website development, trademark and patents costs were $93.9 million and $2.5 million as of September 30, 2022 and 2021, respectively. These costs historically have been capitalized.

The weighted average useful life of intangible assets is 9.73 years. Identifiable intangible assets with definite lives are amortized over the period of estimated benefit using the straight-line method and the estimated useful lives. The straight-line method of amortization represents management's best estimate of the distribution of the economic value of the identifiable intangible assets.

| | September 30, 2022 | | | September 30, 2021 | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Finite-Lived Intangible Assets** | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Carrying Amount** | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Carrying Amount** |
| Website design and development | $ 2,660,391 | $ (1,108,496) | $ 1,551,895 | $2,660,391 | $ (221,699) | $2,438,692 |
| Intellectual property | 58,375,794 | (438,581) | 57,937,213 | 71,182 | (69,205) | 1,977 |
| Patents | 32,391,186 | (204,109) | 32,187,077 | - | - | - |
| Other | 1,820,994 | (16,175) | 1,804,819 | - | - | - |
| Trademark | 466,014 | - | 466,014 | 54,590 | - | 54,590 |
| Total Finite-Lived Intangible Assets | **$95,714,379** | **$ (1,767,361)** | **$93,947,018** | **$2,786,163** | **$ (290,904)** | **$2,495,259** |

F-16

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Total future amortization expense for finite-lived intangible assets are as follows:

| Years Ended September 30, 2022 | Future Amortization |
|---|---|
| 2023 | $ 10,213,071 |
| 2024 | 9,991,372 |
| 2025 | 9,326,274 |
| 2026 | 9,326,274 |
| 2027 | 9,326,274 |
| Thereafter | 45,297,740 |
| **Total Future Amortization** | **$ 93,481,005** |

For the years ended September 30, 2022, and 2021, amortization for the intangible assets was $1,476,457 and $245,427 respectively.

**NOTE 6 - DEBT**

Short-term debt comprises a significant component of the Company's funding needs. Short-term debt is defined as debt with principal maturities of one-year or less. Long-term debt is defined as principal maturities of greater than one year.

*Short and Long-Term Debt*

The following is a summary of our indebtedness at September 30, 2022:

| Type of Debt | Net Carrying Value Unpaid Principal Balance | Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|
| Matured Notes | $ 3,051,085 | $ 3,051,085 | $ - | 0.00 - 10.00 % | 2019-2021 |
| Promissory Notes | 1,096,787 | - | 1,096,787 | 28.00 % | 2024 |
| Real Estate Note | 5,247,612 | 247,612 | 5,000,000 | 5.0 - 8.99 % | 2023 - 2024 |
| Loan Advances | 557,800 | 557,800 | - | 0.00 - 10.00 % | 2016 - 2018 |
| Less: Debt Discount | (932,235) | - | (932,235) | NA | NA |
| **Total Debt** | **$ 9,021,049** | **$ 3,856,497** | **$ 5,164,552** | **NA** | **NA** |

*Scheduled Debt Maturities*

The following scheduled debt maturities at September 30, 2022:

| | Years Ended September 30, | | | | |
|---|---|---|---|---|---|
| | 2023 | 2024 | 2025 | 2026 | Total |
| **Total Debt** | $ 3,856,497 | $ 5,164,552 | $ - | $ - | $ 9,021,049 |

F-17

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Notes and Advances*

We enter into promissory notes with third parties and Company officers to support our operations. Promissory notes typically are for less than three years maturity and carry interest rates from 0% to 28.0%. Promissory notes and loan advances that are in default still accrue interest after their scheduled maturity dates. We record imputed interest on promissory notes and advances which are deemed to be below the market interest rate. For the years ended September 30, 2022, and 2021, we recorded interest expenses of $30,199,081 and $21,168,232, respectively.

In some instances, shares of common stock or warrants were issued along with the issuance of promissory notes, resulting in the recognition of a debt discount which is amortized to interest expense over the term of the promissory note. Debt discount amortization for the fiscal year ended September 30, 2022, and 2021, was $19,032,382 and $8,026,328, respectively.

*Prior SPAs and Related Warrants*

The 15% unsecured convertible notes (the "15% Notes") described within the Exchange Agreement dated May 7, 2021 were issued pursuant to certain Securities Purchase Agreements (the "Prior SPAs") with the various noteholders in 2020 and 2021 generally to finance Mullen Technologies' electric vehicle business. The Prior SPAs provided for the issuance of 15% Notes and a specified number of warrants allowing the noteholders to purchase common stock at an exercise price of $0.6877 per share, at any time prior to an expiration date that is generally 5 years after the date of issuance.

At the effective time of the Merger, each of the warrants to purchase Mullen Technologies common stock were canceled and converted automatically into warrants to purchase shares of common stock of the Company (the "Prior SPA Warrants"). See Note 8 - Deficiency in Stockholders' Equity - Amendments to Warrants and Anti-Dilution Waivers**.**

**Amended and Restated Secured Convertible Note and Security Agreement**
On June 17, 2022, the Company entered into an Amended and Restated Secured Convertible Note and Security Agreement (the "A&R Note") with Esousa Holdings LLC, ("Esousa"). The A&R Note amended and restated a promissory note dated July 23, 2020, entered into between Mullen Technologies, Inc. and DBI Lease Buyback Servicing LLC ("DBI"), for a principal amount of $23,831,554 (the "Original Note"). Esousa purchased rights under the Original Note from DBI immediately prior to entering into the A&R Note.
The A&R Note extended the maturity date of the Original Note, to July 23, 2024. In addition, the A&R Note provides that Esousa may elect to convert all or any portion of the then-outstanding principal balance of the A&R Note into that number of shares of the common stock of the Company, equal to the number obtained by dividing the outstanding principal balance of the A&R Note to be so converted at a 5% discount to the lowest daily volume-weighted average price in the 10 trading days prior to conversion based on the prevailing market value of shares of the common stock of the Company as reported on Nasdaq at close on the date on which a written notice of conversion is delivered to the Company. On June 27, 2022, Esousa exercised their right to convert the principal amount of $27,770,400 into 28,000,000 shares of common stock. The Company issued 17,500,000 shares as partial conversion and recorded a liability at fair value in the amount of $13,755,000 classified as shares to be issued. As of September 30, 2022, the balance of the A&R Note was $1,096,787 in principal plus accrued interest of $300,907. The liability to issue shares was remeasured to fair value until the Company had sufficient outstanding shares and is presented within Liability to issue shares in the balance sheet in amount of $10,710.000 (See also Note 20 - *Subsequent Events).*

F-18

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 7 - FAIR VALUE MEASUREMENTS AND FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company utilizes valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. The Company determines fair value based on assumptions that market participants would use in pricing an asset or liability in the principal or most advantageous market. When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs, which are categorized in one of the following three levels:

> Level 1: Observable inputs such as unadjusted quoted prices in active markets for identical assets or liabilities at the measurement date.

> Level 2: Inputs (other than quoted prices included in Level 1) that are either directly or indirectly observable for the asset or liability. These include quoted prices for similar assets or liabilities in active markets and quoted prices for identical or similar assets or liabilities in markets that are not active.

> Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

**Financial Liabilities Measured at Fair Value**

The fair value of warrant obligations on recognition date and on subsequent dates was estimated as a maximum of (i) Black Scholes value for cash exercise of relevant warrants and (ii) current market value of the number of shares the Company would be required to issue upon cashless warrant exercise on a relevant date in accordance with warrant contract conditions.

The fair value of the warrants and other convertible instruments includes inputs that are not observable in the market and thus represents a Level III financial liability. The assumptions used that represent management's best estimates of the fair value of the Company's warrants and other convertible instruments issued and outstanding were as follows:

|  | September 30, 2022 |
|---|---|
| Expected term (in years) | 4.75 - 9.97 |
| Volatility | 152 % |
| Dividend yield | 0.00 % |
| Risk-free interest rate | 2.98 - 3.01 % |
| Exercise price | $ 8.83 |

Please see Note 8-Warrants section for fair value disclosures

***Financial instruments for which carrying value approximates fair value***

Financial instruments that are not carried at fair value on the consolidated balance sheets are carried at amounts that approximate fair value, due to their short-term nature and credit risk. These instruments include cash and cash equivalents, accounts payable, accrued liabilities, and debt. We believe that the carrying value of term debt approximates fair value due to the variable rates associated with these obligations. Accounts payable are short-term in nature and generally terms are due upon receipt or within 30 to 90 days.

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 8 -DEFICIENCY IN STOCKHOLDERS' EQUITY**

The accompanying financial statements include a retrospective recapitalization to reflect the composition of stockholder's equity, as if they had existed for the periods presented.

**Preferred Stock**

On November 5, 2021, the Company filed an Amended and Restated Certificate of Incorporation, which includes the rights and privileges of Preferred Stock Series A, Series B, and Series C. Under the terms of our Certificate of Incorporation, the Board of Directors may determine the rights, preferences and terms of our authorized but unissued shares of preferred stock.

On September 19, 2022, the Company entered into Amendment No. 2 to the Series D SPA, which amendment provided for the sale of $35 million of the Series D Preferred Stock (the "Initial Purchase") at a purchase price per share equal to the lower of (i) $1.27 or (ii) the closing price of the Common Stock on the trading day immediately after the date on which the registration statement becomes effective. For every share of Series D Preferred Stock purchased in the Initial Purchase, such investor also received Warrants exercisable into Common Stock at a rate of 185% of the shares of Common Stock initially issuable upon conversion of the Series D Preferred Stock purchased by such investor.

The Company issued to the investors 79,926,925 shares of Series D Preferred Stock, par value $0.001 per share, and 147,864,810 warrants exercisable for shares of Common Stock on cash or cashless basis. The shares of common stock issuable upon conversion of the Series D Preferred Stock and issuable upon exercise of the warrants were registered for resale on a FormS-3 Registration Statement filed with the Securities and Exchange Commission (the "SEC") on September 19, 2022. The Company also filed a Certificate of Designation of Preferences, Rights and Limitations of Series D Convertible Preferred Stock (the "Certificate of Designation") with the Secretary of State of the State of Delaware. The Certificate of Designations provides for the issuance of up to 87,500,001 shares of Series D Preferred Stock.

Holders of our Series D Preferred Stock have no voting rights except in a liquidation event, issuance of equity security having a preference over the Series D Preferred Stock, amendment of the Company's Certificate of Incorporation or bylaws that adversely affect the rights of the Series D Preferred Stock, and corporate dissolution or bankruptcy, each as set forth in Section 8 of the Certificate of Designation for Series D Preferred Stock. To the extent the holder of a share of Series D Preferred Stock is entitled to vote on a matter pursuant to Section 8, then the holder of each share of Series D Preferred Stock has the right to one vote for each share.

At September 30, 2022, the Company had 500,000,000 shares of Preferred Stock authorized with $0.001 par value per share. There were 1,924 shares of Series A Preferred Stock, 1,360,321 shares of Series C Preferred Stock, and 4,359,652 shares of Series D Preferred Stock as of September 30, 2022. There were 100,363 shares of Series A Preferred Stock and 5,567,319 shares of Series B Preferred Stock as of September 30, 2021.

**Dividends**

The holders of Series A Preferred Stock and Series B Preferred Stock are entitled to non-cumulative dividends if declared by the Board of Directors. The holders of the Series A Preferred Stock and Series B Preferred Stock shall participate on a pro rata basis (on an "as converted" basis to common stock) in any cash dividend paid on common stock. No dividends have been declared or paid during the twelve months ending September 30, 2022 and 2021.

The Series C Preferred Stock bears a 15.0% per annum fixed dividend accumulated and compounded monthly, payable no later than the 5th day after the end of each month on the Series C Original Issue Price plus unpaid accrued and accumulated

F-20

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

dividends (See Note 20 - Subsequent Events). Dividends on the Series C Preferred Stock are payable prior to any dividends on any other series of Preferred Stock or the Common Stock. The balance was approximately $7.5 million at September 30, 2022.

The Company may elect to pay dividends for any month with a paid-in-kind election ("PIK") if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of NASDAQ and (iii) the average daily trading dollar volume of the Company's Common Stock for 10 trading days in any period of 20 consecutive trading days on the NASDAQ is equal to or greater than $2.0 million.

The Series D Preferred Stock bears a 15.0% per annum fixed dividend accumulated and compounded monthly, payable no later than the 5th day after the end of each month on the Series D Original Issue Price plus unpaid accrued and accumulated dividends. Dividends on the Series D Preferred Stock will be prior to any dividends on any other series of Preferred Stock or the Common Stock. The balance was approximately $0.3 million at September 30, 2022.

The Company may elect to pay dividends for any month with a paid-in-kind election if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of Nasdaq and (iii) the average daily trading dollar volume of the Company's common stock for ten trading days in any period of twenty consecutive trading days on the NASDAQ is equal to or greater than $27.5 million.

**Redemption Rights**

There is no mandatory redemption date, but, subject to the conditions set forth below, all, but not less than all, of the shares are redeemable by the Company at any time, provided that if the Company issues notice to redeem, holders of Series C Preferred Stock and holders of Series D Preferred Stock shall have 15 days to convert such shares to common stock prior to the date of redemption.

In addition to the above, the shares of Series C Preferred Stock are also redeemable by the Company in accordance with the following schedule provided the issuance of shares of common stock underlying the shares has been registered and the registration statement remains effective:

> Year 1: No Redemption
> Year 2: Redemption at 120% of the Series C Redemption Price
> Year 3: Redemption at 115% of the Series C Redemption Price
> Year 4: Redemption at 110% of the Series C Redemption Price
> Year 5: Redemption at 105% of the Series C Redemption Price
> Year 6 and thereafter: Redemption at 100% of the Series C Redemption Price

The Series D Preferred Stock may be redeemed by the Company subject to the following conditions: (i) the shares have been issued and outstanding for at least one year, (ii) the issuance of the shares of common stock underlying the shares has been registered pursuant to the Securities Act and the registration statement is effective, and (iii) the trading price for the common stock is less than the Series D Conversion Price (as such term is defined in the Certificate of Designation) for 20 trading days in any period of 30 consecutive trading days on the Nasdaq CM. In addition to the above, the shares will also be redeemable in accordance with the following schedule provided the issuance of shares of Common Stock underlying the shares has been registered and the registration statement remains effective:

> Year 1: No Redemption
> Year 2: Redemption at 120% of the Series D Redemption Price
> Year 3: Redemption at 115% of the Series D Redemption Price
> Year 4: Redemption at 110% of the Series D Redemption Price
> Year 5: Redemption at 105% of the Series D Redemption Price
> Year 6 and thereafter: Redemption at 100% of the Series C Redemption Price

F-21

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Liquidation**

Subject to applicable law, in the event of any Liquidation Event (as defined in the Certificate of Incorporation), the holders of Series D Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of preferred stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series D Original Price (as defined in the Certificate of Designation), plus declared but unpaid dividends. The holders of the Series B Preferred Stock will then be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series B Original Issue Price plus declared but unpaid dividends. The holders of the Series C Preferred Stock will then be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Series A Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series C Original Issue Price plus declared but unpaid dividends. Upon completion of the distribution to the Series B Preferred Stock and Series C Preferred Stock, the holders of the Series A Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Common Stock by reason of their ownership thereof, $1.29 per share for each share of Series A Preferred Stock (subject to adjustment), plus declared and unpaid dividends, Thereafter, any remaining proceeds will be distributed to holders of the Common Stock ratably in proportion to the number of shares of Common Stock held by them.

**Conversion**

Each share of Series A Preferred Stock is convertible at any time at the option of the holder into one hundred shares of fully paid and non-accessible shares of Common Stock. Each share of Series B Preferred Stock and each share of Series C Preferred Stock are convertible at the option of the holder at any time into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing the Series B Original Issue Price of $8.84 or Series C Original Issue Price of $8.84 (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series B Conversion Price or Series C Conversion Price, as applicable (in each case, subject to adjustment). As of September 30, 2022, each share of Series B Preferred Stock and each share of Series C Preferred Stock are convertible into one share of Common Stock.

The Series D Preferred Stock is convertible at the option of each holder at any time into the number of shares of Common Stock determined by dividing the Series D Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series D Conversion Price, subject to adjustment as set in the Certificate of Designation. The "Series D Original Issue Price" for each share of the Series D Preferred Stock means the lower of (i) $1.27 or (ii) the closing price on the Trading Day immediately preceding the Purchase Notice Date.

Each share of Series C Preferred Stock will automatically be converted into shares of Common Stock at the applicable conversion rate at the time in effect immediately upon (A) the issuance of shares of Common Stock underlying the Series C Preferred Stock being registered pursuant to the Securities Act of 1933 and such registration remaining effective, (B) the trading price for this corporation's Common Stock being more than two times the Series C Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of this corporation's Common Stock during such 20 trading days is equal to or greater than $4.0 million.

Each share of Series B Preferred Stock will automatically be converted into shares of Common Stock at the applicable conversion rate at the time in effect immediately upon the earlier of (i) this corporation's sale of its Common Stock in a firm commitment underwritten public offering pursuant to a registration statement on Form S-1 or Form S-3 under the Securities Act of 1933, as amended, the public offering price of which was not less than $100,000,000 in the aggregate (a "Qualified Public Offering") or (ii) the date specified by written consent or agreement of the holders of the then outstanding shares of Series B Preferred Stock.

F-22

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Each share of Series A Preferred Stock will automatically be converted into shares of Common Stock on a 100-for-1 basis (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Common Stock) upon the earlier of (i) a Qualified Public Offering or (ii) the date specified by written consent or agreement of the holders of the then outstanding shares of Series A Preferred Stock.

Each share of Series D Preferred Stock will automatically be converted into shares of Common Stock at the applicable Conversion Rate at the time in effect immediately upon (A) the issuance of shares of Common Stock underlying the Series D Preferred Stock being registered pursuant to the Securities Act and such registration remaining effective, (B) the trading price for the Company's Common Stock being more than two times the Series D Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's Common Stock during such 20 trading days is equal to or greater than $27,500,000.

**Voting Rights**

The holders of shares of Common Stock and Preferred Stock shall at all times vote together as a single class on all matters (including the election of directors) submitted to a vote of the stockholders; *provided, however*, that, any proposal which adversely affects the rights, preferences and privileges of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock, as applicable, must be approved by a majority in interest of the affected Series of Preferred Stock, as the case may be. Each holder of Common Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock have the right to one vote per share (on a fully converted basis) held of record by such holder and each holder of Series A Preferred have the right to 1,000 votes per share held of record by such holder.

**Common Stock**

At September 30, 2022, the Company had 1,750,000,000 shares of common stock authorized with $0.001 par value per share. There were 833,468,180 shares and 7,048,387 shares of common stock issued and outstanding at September 30, 2022 and 2021, respectively.

**Amendments to Anti-Dilution Provisions of Preferred Stock**

On January 31, 2022, the Company received stockholder approval by the written consent of a majority of our stockholders approving, and on January 31, 2022, filed a preliminary information statement of Schedule 14C with the SEC, seeking to ratify, the filing of a Certificate of Amendment to the Amended and Restated Certificate of Incorporation to increase the conversion price of the Series B Preferred Stock and Series C Preferred Stock from $0.6877 per share to $8.84 per share. The Certificate of Amendment was adopted to honor the terms set forth in the Merger Agreement, pursuant to which the Company agreed to issue shares of Series B Preferred Stock and Series C Preferred Stock to holders of Series B Preferred Stock and Series C Preferred Stock of Mullen Technologies, Inc. at a ratio of 1 for 12.846. Upon issuance of the preferred stock at such ratio a corresponding adjustment should have been made to the conversion price of such Series B Preferred Stock and Series C Preferred Stock and such adjustment should have been reflected in the Amended and Restated Certificate of Incorporation that was filed after the closing of the Merger. A Certificate of Amendment effecting the Amendments was filed on March 8, 2022.

F-23

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Additional Investment Rights**

Certain selling stockholders of the Company have the right to purchase additional shares of Series C Preferred Stock and warrants. Until November 5, 2022, (a) pursuant to the Exchange Agreement certain investors have the right to purchase additional up to 2,336,690 shares of Series C Preferred Stock and up to 7,010,093 warrants and (b) the investor under the $20 Million SPA (as defined below) has the right to purchase up to 2,637,524 shares of Series C Preferred Stock and up to 7,912,574 warrants, at the same price as the original securities purchased and on the same terms and conditions.

**Additional Securities Purchase Agreement and Related Warrants**

One of the noteholders and Mullen Technologies entered into an additional Securities Purchase Agreement (the "$20 Million SPA") dated as of May 7, 2021, providing for the purchase of 29,082,449 shares of Series C Preferred Stock of Mullen Technologies (the "Purchase Shares") at a price per share equal to $0.6877 per share, and five-year warrants to purchase, at no additional cost, 75,990,980 shares of common stock of Mullen Technologies at an exercise price $0.6877 per share. The investor may also purchase until November 5, 2022 an additional $40 million of Series C Preferred Stock with similar warrant coverage. The exercise price of these warrants is subject to adjustment in accordance with their terms.

At the effective time of the Merger, (i) each of the Purchase Shares were canceled and converted automatically into the right to receive 0.078 shares of the Series C Preferred Stock, and (ii) each of the warrants to purchase Mullen Technologies common stock were canceled and converted automatically into a warrant exercisable for shares of common stock of the Company.

**Warrants**

The following table summarizes warrant activity for the years ended September 30, 2022, and 2021:

| | Common Stock Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Warrants outstanding at September 30, 2021 | 4,924,452 | $ | 8.84 |
| Warrants exercised | (46,873,726) | $ | 8.84 |
| Warrants granted | 192,785,950 | $ | 2.39 |
| Warrants expired | - | $ | - |
| Warrants outstanding at September 30, 2022 | 150,836,676 | $ | 0.60 |

| | Common Stock Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Warrants outstanding at September 30, 2020 | 540,905 | $ | 0.69 |
| Warrants exercised | - | $ | - |
| Warrants granted | 4,480,855 | $ | 0.69 |
| Warrants expired | (97,308) | $ | 0.69 |
| Warrants outstanding at September 30, 2021 | 4,924,452 | $ | 0.69 |

*2021 Warrants*

The warrants in the amount of 4,924,447 as of September 30 (and 540,905 warrants outstanding on September 30, 2020) were valued under Black Scholes method and recorded as debt discount and were being amortized over the remaining life of relevant convertible debt. The warrants had five-year exercise period and weighted average exercise price of $0.69. No

F-24

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

warrants were exercised during 12 months ended September 30, 2021. These pre-merger warrants were exchanged for Preferred C warrants upon the completion of the reverse acquisition, see below.

|  | September 30, 2022 |
| --- | --- |
| Expected term (in years) | 4.0 |
| Volatility | - % |
| Dividend yield | 0.00 % |
| Risk-free interest rate | 0.78 % |
| Common stock price | $ 0.69 |

The allocation of the fair value of these warrants was included as a discount of the Series C and D Preferred Stock on the consolidated balance sheet and amortized to discount expense immediately upon issuance since the preferred stock has no stated maturity.

### 2022 Warrants

#### Preferred C warrants

The exercise price of pre-merger Warrants was adjusted as provided in the warrants and further in accordance with the Merger Agreement such that the exercise price became $8.834 per share upon the closing of the reverse acquisition on November 9, 2021. At the effective time of the Merger, each of the warrants to purchase Mullen Technologies common stock were canceled and converted into a warrant exercisable for shares of common stock of the Company. The warrants are exercisable for a five-year period commencing upon conversion.

Along with the cash exercise option (at $8.834) these warrants had a cashless exercise option based on certain formula established by relevant contracts. Under the cashless exercise provision of the warrants, the number of shares to be issued upon exercise is determined based on a calculated derived dollar amount.

Under ASC 480-10, a freestanding financial instrument (such as a warrant) is required to be accounted for a liability if it may be settled with a variable number of shares of monetary value of which is based solely or predominantly on a variable inversely related to the fair value of the issuer's shares.

Therefore, Management determined that the cashless option of the warrants precluded recognition as an equity instrument and all the warrants issued attached to Preferrable Series C Stock have been recognized at fair value with subsequent revaluation through earnings.

Management determined fair value of the warrant liability on recognition date and on subsequent dates as a maximum of (i) Black Scholes value for cash exercise of relevant warrants and (ii) current market value of the number of shares the Company would be required to issue upon cashless warrant exercise on a relevant date in accordance with warrant contract conditions.

The initial financial costs recorded upon the issuance of the Preferred C warrants was $429,883,573. This amount is comprised of $137,090,205 preferred stock discount (amortized immediately as the preferred stocks do not have a stated term of life) and $292,793,368 finance costs (calculated as the difference between fair value of warrant liabilities recognized and the preferred stock discount).

At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants is marked-to-market value and the resulting gain or loss is recorded. A mark-to-market net loss of $121,153,249 was recorded for the year ended September 30, 2022.

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On February 10, 2022, the Company entered into amendments to the Prior SPAs. Pursuant to these amendments, the terms of the Prior SPA Warrants were amended, resulting in a change to the calculated derived dollar amount. The effect of these changes in amount of $ 32,735,345 has been accounted for as deemed dividends on preferred stock and decreased additional paid-in capital of the Company.

During the year ended September 30, 2022 41,949,279 Preferred C warrants were exercised on a cashless basis under which 533,214,489 shares of common stock were issued, with a total fair market value of $554,371,539 at the date of exercise.

At September 30, 2022, 2,973,276 Preferred C warrants remain outstanding which, if on a cashless basis, could be exercised for 89,092,811 shares of common stock with a fair market value of $29,400,627 at September 30, 2022.

|  | September 30, 2022 |
|---|---|
| Expected term (in years) | 5.0 |
| Volatility | 34.14 % |
| Dividend yield | 0.00 % |
| Risk-free interest rate | 4.06 % |
| Common stock price | $ 0.33 |

*Preferred D warrants*

For every share of Series D Preferred Stock purchased, the investors received 185% warrants exercisable for shares of Common Stock at an exercise price equal to the lower of (i) $1.27 or (ii) the closing price of the Common Stock on the trading day immediately after the date on which the registration statement registering the shares of Common Stock issuable upon conversion of the Series D Preferred Stock becomes effective ($0.4379 on transaction date). The warrants are exercisable for a five-year period commencing upon issuance.

The contracts for these Series D Warrants contain cashless exercise provisions similar to Series C Warrants described above. Therefore Management applied similar accounting treatment to recognition, measurement and presentation of the warrant liabilities.

Initial financial costs recorded upon the issuance of the Preferred D warrants were $54,537,685. A mark-to-market net loss of $860,866 was recorded for the year ended September 30, 2022.

During the year ended September 30, 2022 no Preferred D warrants were exercised. At September 30, 2022, 147,864,810 Preferred D warrants remain outstanding which, if on a cashless basis, could be exercised for 167,874,398 shares of common stock with a fair market value of $55,398,551 at September 30, 2022.

|  | September 30, 2022 |
|---|---|
| Expected term (in years) | 5.0 |
| Volatility | 34.14 % |
| Dividend yield | 0.00 % |
| Risk-free interest rate | 4.06 % |
| Common stock price | $ 0.33 |

*Other Warrants*

*CEOcast $15 Million Notes Receivable Warrants*

F-26

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On October 8, 2021, the Company entered into an agreement with CEOcast, Inc., whereby CEOCast, Inc. purchased warrants to acquire shares of Company common stock for $15 million. The warrant price was paid via issuance of a $15 million promissory note. During the third quarter of 2022, the Company received $15 million cash collected on the promissory note and issued 14,343,550 shares of the Company's common stock upon the exercise of these warrants.

*$10.5 Million Warrant Issuance*

During 2021, the company received $10.5 million in cash for issuance of 154,592 warrants, which were converted into 2,193,533 shares of the Company's common stock upon exercise of these warrants.

Company management evaluated the terms of these warrant for classification and accounting under the provisions of ASC 815-40 and determined the warrants met treatment as equity.

**NOTE 9 - LOSS PER SHARE**

Earnings per common share is computed by dividing net income allocated to common shareholders by the weighted-average common shares outstanding, excluding unvested common shares subject to repurchase or cancellation. Diluted EPS is computed by dividing income allocated to common shareholders plus dividends on dilutive convertible preferred stock and preferred stock that can be tendered to exercise warrants, by the weighted-average common shares outstanding plus amounts representing the dilutive effect of outstanding warrants and the dilution resulting from the conversion of convertible preferred stock, if applicable.

For the fiscal year ended September 30, 2022, and 2021, the convertible debt and shares of Preferred Stock were excluded from the diluted share count because the result would have been antidilutive under the "if-converted method." The warrants to purchase common shares of stock also were excluded from the computation because the result would have been antidilutive.

The following table presents the reconciliation of net loss attributable to common stockholders to net loss used in computing basic and diluted net income per share of common stock:

| | Fiscal Year ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Net loss attributable to common stockholders | $ (739,532,806) | $ (44,240,580) |
| Less: Accumulated Series C Preferred Stock Dividends | 7,762,255 | - |
| Less: Preferred Series C Deemed Dividend | 32,754,185 | - |
| Net loss used in computing basic net income per share of common stock | $ (780,049,246) | $ (44,240,580) |
| | | |
| Net Loss per Share | $ (2.80) | $ (8.56) |
| | | |
| Weighted average shares outstanding, basic and diluted | 278,219,500 | 5,171,144 |

F-27

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 10 -SHARE- BASED COMPENSATION**

The Company has a share incentive plan as part of its annual discretionary share-based compensation programs. The plan includes consultants and employees, including directors and officers. Subject to the approval of the Company's Board of Directors or its Compensation Committee, and following the adoption of an equity incentive plan, employees are issued a specified number of shares of the Company's Common Stock, are notified of the Company's share incentive plan during their onboarding process, and the employee's offer letter describes the shares earned by the employee under the plan. Employees are vested in 100% of the shares after 12 months of continuous service. Additional shares may be issued to employees over the next two years on their anniversary date. Any disruption or separation of service results in the forfeiture of common shares. Employee share issuances are accounted for as part of Salaries expenses. The total expense recognized for share awards represents the grant date fair value of such awards, which is generally recognized as a charge to income ratably over the vesting period**.**

Shares granted in consulting agreements, or in exchange for services provided, are specified within the individual contracts, are negotiated and approved by our Chief Executive Officer. Shares are earned over the contract or service period. Shares are accounted for as professional fees within G&A expenses. The expense recognized for share awards represents the grant date fair value of such awards, which is generally recognized as a charge to income ratably over the vesting service period.

| | For the fiscal year ended September 30, | |
|---|---|---|
| **Composition of Stock-Based Compensation Expense** | **2022** | **2021** |
| Directors, Officers and Employees share-based compensation | 19,471,496 | 2,505,091 |
| Shares issued to consultants for services | 24,268,196 | 2,460,529 |
| Total Share-Based compensation expense | $ 43,739,692 | $ 4,965,620 |

**NOTE 11 - ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

| | September 30, 2022 | September 30, 2021 |
|---|---|---|
| **Accrued Expenses and Other Liabilities** | | |
| Accrued expense - other | $ 3,529,383 | $ 2,051,696 |
| IRS Tax Liability | 1,744,707 | - |
| Accrued payroll | 534,782 | 4,586,057 |
| Accrued interest | 1,377,008 | 12,489,012 |
| **Total** | $ 7,185,881 | $ 19,126,765 |

**NOTE 12 - LIABILITY TO ISSUE STOCK**

The liability represents the remaining 10,500,000 common shares owed measured at fair value shares arising from conversion notice received by Esousa for its current note on September 30, 2022. Due to the insufficient number of authorized shares available to settle the conversion into 28,000,000 common shares, only 17,500,000 shares were issued to Esousa.

On September 30, 2021, the liability represents an obligation to issue approximately $7.0 million payable in shares of common stock to Preferred Management Partners.

F-28

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 13 - PROPERTY, EQUIPMENT AND LEASEHOLD IMPROVEMENTS, NET**

Property, equipment, and leasehold improvements, net consists of the following:

| | September 30, 2022 | | September 30, 2021 | |
|---|---|---|---|---|
| Building | $ | 8,306,697 | $ | 804,654 |
| Furniture and Equipment | | 556,948 | | 111,102 |
| Vehicles | | 96,363 | | 45,887 |
| Computer Hardware and Software | | 1,013,308 | | 139,742 |
| Machinery and Equipment | | 7,383,612 | | 2,597,654 |
| Construction-in-progress | | 269,778 | | - |
| Leasehold Improvements | | 76,438 | | 66,379 |
| Subtotal | | 17,703,145 | | 3,765,418 |
| Less: Accumulated Depreciation | | (2,899,428) | | (2,583,941) |
| **Property, Equipment and Leasehold Improvements, Net** | $ | **14,803,716** | $ | **1,181,477** |

Depreciation expense related to property, equipment and leasehold improvements for the years ended September 30, 2022, and 2021 was $379,256 and $354,125, respectively.

**NOTE 14 - OTHER ASSETS**

Other assets consist of the following:

| | September 30, 2022 | | September 30, 2021 | |
|---|---|---|---|---|
| **Other Assets** | | | | |
| Other Assets | $ | 81,588 | $ | 167,139 |
| Show Room Vehicles | | 2,982,986 | | 2,739,995 |
| Security Deposits | | 281,057 | | 1,426,640 |
| **Total Other Assets** | $ | **3,345,631** | $ | **4,333,774** |

F-29

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 15 - OPERATING EXPENSES**

General and Administrative Expenses consists of the following:

|  | Year ended September 30, | |
|---|---|---|
|  | 2022 | 2021 |
| Professional fees | $ 46,224,690 | $ 6,991,246 |
| Salaries | 13,714,669 | 6,091,520 |
| Depreciation | 966,940 | 720,805 |
| Amortization | 888,774 | - |
| Lease | 2,145,648 | 1,776,198 |
| Settlements and penalties | 1,134,707 | 1,532,378 |
| Employee benefits | 2,107,793 | 368,563 |
| Utilities and office expense | 511,899 | 345,766 |
| Advertising and promotions | 4,407,764 | 413,771 |
| Taxes and licenses | (284,854) | 73,527 |
| Repairs and maintenance | 392,679 | 244,868 |
| Executive Expenses and Directors' Fees | 482,455 | - |
| Listing and Regulatory Fees | 1,546,810 | - |
| Outside Labor | 352,201 | - |
| Other | 746,081 | 835,299 |
| **Total** | **$ 75,338,256** | **$ 19,393,941** |

Within professional fees is Common shares for services, which is the issuance of the Company's Common Stock shares for services rendered to consultants and professional service firms. The expense is recorded at the fair value of Common Stock shares issued (see Note 10 - Share Based Compensation).

**Research and Development**

Research and Development as of September 30, 2022, and September 30, 2021, were $21,650,840, and $3,009,027 respectively. Research and development costs are expensed as incurred. Research and development expenses primarily consist of the engineering and design of Mullen Five EV and the design and build of the Mullen FIVE RS.

**NOTE 16 - LEASES**

The Company has entered into various operating lease agreements for certain of its offices, manufacturing and warehouse facilities, and corporate jet. We implemented the provisions of ASC 842, on October 1, 2019. Operating leases are included in the right-of-use assets, and current and noncurrent portion of lease liabilities, as appropriate. These right-of-use assets also include any lease payments made and initial direct costs incurred at lease commencement and exclude lease incentives. The lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Lease expense for lease payments is recognized on a straight-line basis over the lease term. We have lease agreements which require payments for both lease and non-lease components and have elected to account for these as a single lease component. Certain leases provide for annual increases to lease payment based on an index or rate. We calculate the present value of future lease payments based on the index or at the lease commencement date for new leases.

F-30

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The table below presents information regarding our lease assets and liabilities.

|  | September 30, 2022 | | September 30, 2021 | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Operating lease right-of-use assets | $ | 4,597,052 | $ | 2,350,929 |
| **Liabilities:** | | | | |
| Operating lease liabilities, current | | (1,428,474) | | (599,898) |
| Operating lease liabilities, non-current | | (3,359,354) | | (1,857,894) |
| Total lease liabilities | $ | (4,787,828) | $ | (2,457,792) |
| **Weighted average remaining lease terms:** | | | | |
| Operating leases | | 2.63 years | | 3.34 years |
| **Weighted average discount rate:** | | | | |
| Operating leases | | 28 % | | 28 % |
| Cash paid for amounts included in the measurement of lease liabilities for the fiscal year ended September 30, 2022, and 2021 | $ | 1,751,680 | $ | 1,057,438 |

| **Operating lease costs:** | For the fiscal year ended September 30, | | | |
|---|---|---|---|---|
|  | 2022 | | 2021 | |
| Fixed lease cost | $ | 1,718,424 | $ | 1,185,576 |
| Variable lease cost | | 496,914 | | 448,983 |
| Short-term lease cost | | 164,690 | | 401,526 |
| Sublease income | | (293,512) | | (84,473) |
| **Total operating lease costs** | $ | **2,086,517** | $ | **1,951,612** |

*Operating Lease Commitments*

Our leases primarily consist of land, land and building, or equipment leases. Our lease obligations are based upon contractual minimum rates. Most leases provide that we pay taxes, maintenance, insurance and operating expenses applicable to the premises. The initial term for most real property leases is typically 1 to 3 years, with renewal options of 1 to 5 years, and may include rent escalation clauses. For financing obligations, a portion of the periodic lease payments is recognized as interest expense and the remainder reduces the obligations. For operating leases, rent is recognized on a straight-line basis over the lease term, including scheduled rent increases and rent holidays.

On November 11, 2021, the Company cancelled its lease with Saleen Motors International LLC and purchased the property for $12,000,000. On June 29, 2022, the Company entered into a lease agreement with Lakeview Business Center LLC to lease general office space at 100 Technology Drive, Irvine, CA, Suite 100. The lease term is 36 months plus such additional days as may be required to cause this lease to expire on the final day of the calendar month. The monthly basic rent is $29,231.85 for the first 12 months of which there are two 2 full calendar months of abatement. On June 22, 2022, the Company and Alber K Karamanoukian Trust changed their agreements from month to month rent to a lease agreement for property addresses, 922 S. Myrtle Ave, Monrovia, CA 91016 and 133 - 135 E. Maple Ave. Monrovia, CA 91016 to 3 years. Base rent is $71,447 per month.

F-31

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table reflects maturities of operating lease liabilities at September 30, 2022:

| Years ending September 30, | | |
|---|---|---:|
| 2023 | $ | 2,820,060 |
| 2024 | | 2,706,912 |
| 2025 | | 2,082,614 |
| 2026 | | 243,539 |
| 2027 | | 15,173 |
| Thereafter | | - |
| Total lease payments | $ | 7,868,298 |
| Less: Imputed interest | | (3,080,470) |
| **Present value of lease liabilities** | **$** | **4,787,828** |

**NOTE 17 - INCOME TAXES**

On December 2, 2019, we entered into a tax sharing agreement with Mullen Technologies Inc. Our tax provision is calculated primarily as though the Company was a separate taxpayer. However, under certain circumstances, transactions between us and Mullen Technologies are assessed using consolidated tax return rules. Tax sharing agreement governs the payment of tax liabilities and entitlement to refunds thereof, allocate responsibility for, and cooperation in, the filing of tax returns, and provide for certain other matters relating to taxes.

We record deferred income taxes using enacted tax laws and rates for the years in which the taxes are expected to be paid. Deferred income tax assets and liabilities are recorded based on the differences between the financial reporting and income tax bases of assets and liabilities.

The components of loss before income taxes are $740,323,152 and $44,239,780, for the years ended September 30, 2022 and 2021, respectively.

The Company's total provision (benefit) for income taxes consists of the following for the year ended September 30, 2022:

| | September 30, 2022 | | September 30, 2021 | |
|---|---:|---|---:|---|
| **Current** | | | | |
| Federal | $ | - | $ | - |
| State | | 1,600 | | 800 |
| | | | | |
| Total Current | $ | 1,600 | $ | 800 |
| | | | | |
| **Deferred** | | | | |
| Federal | $ | (280,552) | $ | - |
| State | | - | | - |
| | | | | |
| Total Deferred | | (280,552) | | - |
| | | | | |
| **Total provision (benefit) for income taxes** | $ | (278,952) | $ | 800 |

F-32

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

For the year ended September 30, 2022, we had income tax NOL carryforwards of approximately $341.4 million for Federal and $318.9 million for California, which will expire as follows:

|  | September 30, 2022 | September 30, 2021 |
|---|---|---|
| **Federal** | | |
| 2034-2037 | $ 29,838,716 | $ 29,838,716 |
| Indefinite | 311,525,886 | 162,818,819 |
| | | |
| **Total Federal** | $ 341,364,602 | $ 192,657,535 |
| | | |
| **California** | | |
| 2034-2040 | 318,862,714 | 191,722,566 |
| | | |
| **Total California** | $ 318,862,714 | $ 191,722,566 |

The reconciliation of our effective tax rate to the statutory federal rate of 21% for the years ended September 30, 2022 and 2021 is as follows:

|  | September 30, 2022 | September 30, 2022 - % | September 30, 2021 | September 30, 2021 - % |
|---|---|---|---|---|
| Income tax benefit at statutory rate | $ (155,466,389) | 21.00 % | $ (9,247,200) | 21.00 % |
| State income taxes | 1,600 | - % | 800 | - % |
| Permanent Differences | 995,227 | (0.13)% | 158,166 | (0.36)% |
| Valuation Allowance | 154,180,328 | (20.83)% | 9,091,163 | (20.65)% |
| Other | 10,282 | - % | (2,129) | - % |
| **Total (benefit) provision for income taxes** | $ (278,952) | 0.04 % | $ 800 | - % |

We record deferred income taxes using enacted tax laws and rates for the years in which the taxes are expected to be paid. Deferred income tax assets and liabilities are recorded based on the differences between the financial reporting and income tax bases of assets and liabilities.

F-33

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Significant components of the Company's net deferred tax assets as of September 30, 2022, are as follows:

|  | 2022 | 2021 |
|---|---|---|
| **Deferred tax assets:** | | |
| Stock Compensation | 8,442 | - |
| Net Operating loss carryforwards | 78,791,906 | 38,676,405 |
| Charitable Contributions | 1,219 | 894 |
| Accrued Expenses | 86,926 | 315,555 |
| Impairment Other | - | - |
| Other Assets | 426,099 | 364,419 |
| Intangibles | 48,382,778 | - |
| 163(j) Limitation | 14,522,536 | 14,491,332 |
| Mark-to-Market Warrants | 121,545,414 | - |
| | | |
| Total gross deferred tax assets | 263,765,320 | 53,848,604 |
| | | |
| R&D Tax Credits | 578,842 | - |
| | | |
| Less valuation allowance | (258,903,457) | (53,416,875) |
| | | |
| Total net deferred tax assets | 5,440,705 | 431,729 |
| | | |
| **Deferred tax liabilities:** | | |
| | | |
| Intangibles | - | (146,639) |
| Fixed Assets | (969,201) | (284,922) |
| IP | (12,243,969) | - |
| Patents | (6,802,149) | - |
| Trademarks | (225,760) | - |
| Non-competes | (156,649) | - |
| Other | (336) | (168) |
| | | |
| Total deferred tax liabilities | (20,398,064) | (431,729) |
| | | |
| **Net deferred tax assets** | $ (14,957,359) | $ - |

For the year ended September 30, 2022, and 2021,we recorded a full valuation allowance against the deferred tax assets because the Company is in a three year cumulative pre-tax book loss, which is significant negative evidence. We do not believe that the deferred tax assets recorded as of September 30, 2022 are more likely than not realizable.

We follow the guidance for accounting for uncertainty in income taxes in accordance with FASB ASC 740, which clarifies uncertainty in income taxes recognized in an enterprise's financial statements. The standard also prescribes a recognition threshold and measurement standard for the financial statement recognition and measurement of an income tax position taken, or expected to be taken, in an income tax return. Only tax positions that meet the more likely than not recognition threshold may be recognized. In addition, the standard provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure. As of September 30, 2022, the Company has recorded $15.2 million related to unrecognized tax benefits. The Company's tax years for 2014 through 2022 are still subject to examination by the tax authorities.

F-34

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Tax Reform.** The Tax Cuts and Jobs Act of 2017 (the "TCJA") was enacted on December 22, 2017, and among other changes, reduced the federal statutory tax rate from 35.0% to 21.0%. In accordance with U.S. GAAP for income taxes, as well as SEC Staff Accounting Bulletin No. 1187 ("SAB"), the Company made a reasonable estimate of the impacts of the TJCA and recorded this estimate in Company results for the year ended September 30, 2022. SAB 118 allows for a measurement period of up to one year, from the date of enactment, to complete the accounting for the impact of TJCA. As of September 20, 2022, our analysis of under SAB 118 was completed and resulted in no material adjustments to the provisional amounts recorded as of September 30, 2022.

**NOTE 18 - CONTINGENCIES AND CLAIMS**

ASC 450 governs the disclosure and recognition of loss contingencies, including potential losses from litigation, regulatory, tax and other matters. The accounting standard defines a "loss contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450 requires accrual for a loss contingency when it is "probable that one or more future events will occur confirming the fact of loss" and "the amount of the loss can be reasonably estimated."

From time to time, we are subject to asserted and actual claims and lawsuits arising in the ordinary course of business. Company management reviews any such legal proceedings and claims on an ongoing basis and follows appropriate accounting guidance when making accrual and disclosure decisions. We establish accruals for those contingencies where the incurrence of a loss is probable and can be reasonably estimated, and it discloses the amount accrued and the amount of a reasonably possible loss in excess of the amount accrued, if such disclosure is necessary for our consolidated financial statements to not be misleading. To estimate whether a loss contingency should be accrued by a charge to income, management evaluates, among other factors, the degree of probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of the loss. We do not record liabilities when the likelihood is probable, but the amount cannot be reasonably estimated.

*Mullen Technologies, Inc. v. Qiantu Motor (Suzhou) Ltd.*

This claim was filed in the United States District Court for the Southern District of California (*Case No. 3:19-cv-01979-W-DEB*) on October 11, 2019. This matter arises out of a contract dispute between Mullen and Qiantu related to the engineering, design, support, and homologation of Qiantu's K50 vehicle by Mullen. On July 1, 2020, the court ordered this matter to arbitration. It was submitted to the American Arbitration Association on February 9, 2020, for arbitration in Denver, Colorado. Mullen filed its Demand for Arbitration on February 16, 2021. Arbitration proceedings were then stayed for 90 days to accommodate settlement discussions. On November 3, 2021, Qiantu filed an Arbitration Answering Statement and Counterclaim or Joinder/Consolidation Request. Mullen filed its response on January 28, 2022. On February 11, 2022, the parties exchanged their Initial Requests for Documents. The August 1, 2022, arbitration hearing in this matter was rescheduled to October 17, 2022, to allow the parties to continue settlement negotiations. The parties agreed to reschedule the October 17, 2022, arbitration hearing to a future date while discovery and settlement negotiations continued. In November 2022, the parties agreed to further extend the Arbitration hearing date to February 13th -17th, 2023. All associated pre-hearing dates were also extended.

In early December, the parties reached an agreement in principle for resolution of the Arbitration proceedings which includes the acquisition of the Qiantu IP and the provision of a license to manufacture and sell the K-50 automobile in various territories. The parties are currently negotiating the terms of the proposed Settlement and License Agreement.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations.

F-35

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*4Wall Entertainment, Inc. v. Mullen Technologies, Inc.*

This claim was filed in the Orange County Superior Court (*Case No. 30-2021-01191251-CU-BC-CJC*) on March 23, 2021. The matter arises out of the alleged breach of an equipment lease. Mullen filed its Answer to the Complaint on May 6, 2021. On September 29, 2022, the parties settled this matter for $25,000 and filed a Notice of Settlement on September 30, 2022.

*Series E Preferred Stock Purchase Option*

We entered into a letter agreement with DBI wherein we are committed to provide DBI with a right to purchase up to $25 million worth of a to-be-issued Series E Convertible Preferred Stock and warrants. The option and its terms have not been finalized (see Note 21 - Restatement).

*ASC GEM Equity Line Financing*

This claim arises out of an alleged breach of the contract in the Securities Purchase Agreement dated November 13, 2020. On November 9, 2021, the parties appointed an arbitrator. On January 7, 2022, GEM filed a letter brief with the arbitrator requesting leave to file a dispositive motion addressing a threshold legal issue regarding a defined term within a contract executed by the parties. Mullen filed a response to the letter brief on January 12, 2022.

On January 21, 2022, the arbitrator issued a procedural order granting GEM's request to file a dispositive motion. GEM filed its dispositive motion on February 14, 2022. Mullen filed its opposition to the dispositive motion on March 3, 2022. On April 4, 2022, the court denied GEM's dispositive motion. The parties exchanged discovery requests on May 10, 2022. Responses were served on June 14, 2022. The follow up hearing with the arbitrator set for June 22, 2022, was adjourned. The parties recently served amended responses along with supplemental document productions on August 2, 2022, as required by the arbitrator at the July 27, 2022, hearing related to ongoing discovery issues. The parties expect a ruling from the arbitrator regarding the issue shortly. All party depositions have been scheduled.

*Federal and State Tax Liabilities*

We have recorded a liability associated with past due amounts owed to the Internal Revenue Service ("*IRS*") and the Employment Development Department of California ("*EDD*") for failing to remit payroll taxes associated with the Company and the Company's employees. As of June 30, 2022, the Company had a current accrued liability of $0.3 million for accrued payroll taxes related to California EDD liabilities, which was paid in July 2022.

On April 14, 2022, the Company entered into an installment plan with the IRS to pay $45,000 per month related to past due unpaid federal payroll liabilities plus accrued interest and penalties. As of September 30, 2022, and September 30, 2021 the Company's past due accrued liability was $1.7 million and 3.9 million, respectively.

*Raymond James and Associates ("RJA") - Investment Banking Services Agreement*

On May 5, 2020, the Company entered into an agreement with Raymond James & Associates for public offering and placement agent services. The agreement called for payment of a cash retainer of $50,000, which remains unpaid. Upon the closing of any public offering, regardless of whether RJA procured the agreement regarding the offering, we are obligated to pay a financing fee of equal to the greater of a) 6.0% of aggregate gross proceeds and b) $3,000,000.

*International Business Machines ("IBM")*

F-36

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

We previously recorded a $4.5 million liability associated with a lawsuit with IBM, in which IBM contended that we had not fulfilled our obligations pursuant to a contract entered into during 2017. On April 28, 2020, the Supreme Court of the State of New York granted summary judgment in favor of IBM's claim for breach of contract. The Court, however, found that a trial (inquest) was required to determine the damages to which IBM is entitled. We proposed an offer in settlement to resolve the matter, with the parties proceeding under the Joint Development and Technology License Agreement and all rights restored to us under the Trademark License Agreement. On December 1, 2021, the Supreme Court of the State of New York entered a judgment of $5.6 million to IBM. On December 2, 2021, we filed a Notice of Appeal. As a result, we recorded an additional charge, increasing the liability to the adjudicated amount.

On February 2, 2022, IBM filed a Motion to Amend the Judgment it had obtained to add Mullen Automotive and Ottava as Judgment Debtors. Mullen filed its Appeal on April 8, 2022. Settlement efforts were undertaken, and a settlement was reached in which Mullen paid the full amount of the Judgment with interest, for a total of approximately $5.9 million, but maintained its Appeal rights. IBM then filed a Motion to Dismiss the Appeal based on Mullen's payment of the Judgment. Mullen filed an Opposition to the same on July 18th, 2022, and the hearing of the matter was set for July 25th, 2022. The Court took the same under submission, and a decision has still not been issued. The Appeal is still pending.

*TOA Trading LLC Litigation*

This claim arises out of an alleged breach of contract related to an unpaid finder's fee. On April 11, 2022, Plaintiffs TOA Trading LLC and Munshibari LLC filed a complaint against Mullen Automotive, Inc. and Mullen Technologies, Inc. in the United States District Court for the Southern District of Florida. On May 18, 2022, the Company filed a Motion to Dismiss or in the Alternative, Transfer Venue. Plaintiffs filed their opposition on June 3, 2022. The Company filed its reply on June 8, 2022. The court has taken the motions under submission. The Company expects a ruling in the second quarter 2023.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected on the condensed consolidated financial statements.

*Mullen Stockholder Litigation*

Margaret Schaub v. Mullen Automotive, Inc.

On May 5, 2022, Plaintiff Margaret Schaub filed a complaint against Mullen Automotive, Inc. f/k/a Net Element, Inc, David Michery, and Oleg Firer in the United States District Court Central District of California on (Case No. 2:22-cv-03026). The complaint alleges violation of section 10(b) of the Exchange Act and Rule 10b-5 against all defendants and violation of section 20(a) of the Exchange Act arising out of claims made in the Hindenburg article. On June 16, 2022, the Company's insurance company (AXIS) accepted coverage for this lawsuit.

On July 5, 2022, movants Duy Nguyen, Mejgan Mirbaz, and David Reed filed motions to consolidate this matter and the Gru matter (see below) into one case and for appointment of lead plaintiff and lead counsel. Subsequently, Plaintiff Nguyen withdrew his motion and Plaintiff Reed filed notice that he did not oppose Plaintiff Mirbaz' motion. On August 4, 2022, the court granted Plaintiff Mirbaz' unopposed motion to consolidate the case and for appointment as lead plaintiff/counsel. The court further vacated the August 5, 2022, hearing on the motions to consolidate.

On August 4, 2022, the Court issued an order consolidating the Schaub Lawsuit with the later-filed Gru Lawsuit (discussed below), and appointing lead plaintiff and lead counsel.

On September 23, 2022, Lead Plaintiff filed a Consolidated Amended Class Action Complaint against the Company, Mr. Michery, and the Company's predecessor, Mullen Technologies, Inc., premised on the same purported violations of the

F-37

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Exchange Act and Rule 10b-5, seeking to certify a putative class of shareholders, and seeking an award of monetary damages, as well as reasonable fees and expenses.

David Gru v. Mullen Automotive, Inc.

On May 12, 2022, Plaintiff David Gru filed a complaint against Mullen Automotive, Inc. f/k/a Net Element, Inc, David Michery, and Oleg Firer in the United States District Court Central District of California (Case No. 8:22-cv-976). The complaint alleges violation of section 10(b) of the Exchange Act and Rule 10b-5 against all defendants and violation of section 20(a) of the Exchange Act arising out of claims made in the Hindenburg article. On June 16, 2022, the Company's insurance company (AXIS) accepted coverage for this lawsuit. The Company has not been served with the complaint. On August 4, 2022, the court consolidated this action into the Schaub action (see above). As a result, the court ordered this matter to be administratively closed.

Ram Hari Khadka v. Mullen Automotive, Inc.

On June 23, 2022, a putative class action complaint was filed in Delaware Chancery Court by Ram Hari Khadka, a stockholder, against the Company and its current directors, as defendants (the "Action"). The complaint alleged breaches of fiduciary duty against the defendants based on alleged disclosure deficiencies in the definitive proxy statement (the "Proxy Statement") filed by the Company on June 10, 2022, relative to the vote at the Company's 2022 Annual Meeting of Stockholders that was to be held on July 26, 2022 (the "2022 Stockholder Meeting") seeking stockholder approval of issuance of shares under the Performance Stock Award Agreement (the "CEO Performance Award") granted to David Michery, the Company's chief executive officer, president and chairman of the board of directors. The complaint sought various remedies, including a preliminary injunction seeking to enjoin the vote at the 2022 Stockholder Meeting to approve the issuance of shares for the CEO Performance Award.

The Company filed a supplement to the Proxy Statement on July 13, 2022 addressing the alleged disclosure claims to moot plaintiff's claims in the action. On August 5, 2022, the Chancery Court approved a stipulation under which the plaintiff voluntarily dismissed the Action with prejudice as to itself only, but without prejudice as to any other putative class member. The Chancery Court retained jurisdiction solely for the purpose of adjudicating the anticipated application of plaintiff's counsel for an award of attorneys' fees and reimbursement of expenses in connection with the supplemental disclosures included in the Proxy Supplement.

The Company subsequently agreed to pay $995,000 to plaintiff's counsel for attorneys' fees and expenses in full satisfaction of the claim for attorneys' fees and expenses in the Action. The Chancery Court has not been asked to review, and will pass no judgment on, the payment of the attorneys' fees and expenses or their reasonableness. A stipulation to that effect was filed on September 19, 2022.

Jeff Witt v. Mullen Automotive, Inc.

On August 1, 2022, Jeff Witt and Joseph Birbigalia, purported stockholders, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, and Company directors Ignacio Novoa, Mary Winter, Kent Puckett, Mark Betor, William Miltner and Jonathan New (the "Witt Action"). This lawsuit asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Witt Action seeks monetary damages, as well as an award of reasonable fees and expenses.

F-38

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected in the consolidated financial statements.

Hany Morsy v. David Michery, et al.

On September 30, 2022, Hany Morsy, a purported stockholder, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, former Company officer and director, Jerry Alban, and Company directors Mr. Novoa, Ms. Winter, Mr. Puckett, Mr. Betor, Mr. Miltner, and Mr. New (the "Morsy Lawsuit"). This lawsuit asserts claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Morsy Lawsuit seeks to direct the Company to improve its corporate governance and internal procedures, and also seeks monetary damages, pre-judgment and post-judgment interest, restitution, and an award of reasonable fees and expenses.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected on the condensed consolidated financial statements.

*Linghang Boao Group, LTD*

In November 2019, we entered into a three-year Strategic Cooperation Agreement ("SCA") with Linghang Boao Group LTD to co-develop a Solid- State Battery Management system with a 480 to 720 mile Driving Range. The Company's total financial commitment under the SCA was $2,196,000.

The contractual target dates and milestones were severely disrupted due to the occurrence COVID-19. As a result, our management believed the COVID-19 pandemic represented a Force Majeure event (that is, the pandemic has impacted our and Linghang Boao Group LTD's ability to meet their respective contractual obligations due to restriction in movement, stoppage of production, increase in costs due to scarcity of raw materials components, labor shortages, shortage of funds, disruption in the supply chains, U.S. governmental closures of ports/borders and travel restrictions). Based on the foregoing, we believe there was no breach of contract due to our failure of performance. Unfortunately, we sustained a loss of $390,000 at September 30, 2020, due to contract nonperformance and force majeure. There are no accrued liabilities recorded for any remaining milestone payments at September 30, 2022, and 2021.

Our management notified Linghang Boao Group of the decision to invoke the force majeure provision of the Strategic Cooperation Agreement due to the inability of the parties to perform caused by the global Pandemic.

**NOTE 19 - RELATED PARTY TRANSACTIONS**

*Transactions with Affiliates*

Prior to its corporate reorganization on November 5, 2021, the Company operated as a division of Mullen Technologies, Inc. ("MTI"). Subsequent to the corporate reorganization, the MTI has provided management and accounting services to the Company at cost pursuant to a transition services agreement dated May 12, 2021. As of September 30, 2022, the Company incurred approximately $1.2 million of costs on behalf of MTI, which is reflected within non-current assets on the consolidated balance sheet at September 30, 2022.

*Bollinger Motors Board of Directors*

F-39

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

These following individuals comprise the board of directors of Bollinger Motors and are considers affiliates.

| Name of Director | Company | Function |
|---|---|---|
| David Michery | Mullen Automotive | Chairman, CEO, and President |
| Mary Winter | Mullen Automotive | Director and Secretary |
| Robert Bollinger | Bollinger Motors | Founder and CEO |
| John Masters | Bollinger Motors | Director |

*Director Provided Services*

William Miltner

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner also is an elected Director for the Company, beginning his term in August 2021. For the fiscal year ending September 30, 2022, Mr. Miltner received $881,248 for services rendered. Mr. Miltner has been providing legal services to us since 2020.

Ignacio Novoa

On June 9, 2022, the board of directors of the Company appointed Ignacio Novoa as a director effective as of the Effective Date. The Company and Mr. Novoa entered into a 1-year Consulting Agreement, dated January 12, 2022, whereby Mr. Novoa provides electric vehicle market research, analysis of market trends in the electric vehicle industry and other research and services. Mr. Novoa was issued an aggregate of 255,500 shares of Common Stock with a value of $400,000 pursuant to the terms of the Consulting Agreement. Other than as described above, Mr. Novoa does not have a direct or indirect material interest in any "related party" transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K. There are no family relationships between Mr. Novoa and any director or executive officer of the Company.

Mary Winter

On October 26, 2021, the Company entered into a 1-year consulting agreement with Mary Winter, Corporate Secretary and Director, to compensate for Corporate Secretary Services and director responsibilities for the period from October 1, 2021 to September 30, 2022, in the amount of $60,000 annually or $5,000 per month. As of September 30, 2022, Ms. Winter has received $60,000 in consulting payments.

**NOTE 20 - SUBSEQUENT EVENTS**

Company management has evaluated subsequent events through January 13, 2023 which is the date these financial statements were available to be issued. Except as discussed below, management has determined that there were no subsequent events which required recognition, adjustment to or disclosure in the financial statements:

Amendment to Amended and Restated By Laws

On November 14, 2022, the Board approved the third amendment to the Company's Amended and Restated Bylaws that amends the following: (1) change the corporate name of the Bylaws to "Mullen Automotive Inc.", which reflects the Company's change of corporate name from "Net Element, Inc." to "Mullen Automotive Inc." as set forth in a Certificate of Amendment to its Certificate of Incorporation filed with the Secretary of State of the State of Delaware (the "Delaware Secretary of State") on November 3, 2021, and (2) amend Section 2.05 of Article 2 of the Company's Bylaws to change

F-40

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

the quorum requirement for a meeting of stockholders from a majority to 33 1/3% of the outstanding capital stock of the Company entitled to vote.

*Certificate of Designation of Series AA Preferred Stock*

On November 14, 2022, the Company filed a certificate of designation (the "Series AA Certificate of Designation") with the Secretary of State of the State of Delaware, effective as of the time of filing, designating the rights, preferences, privileges and restrictions of the share of Series AA Preferred Stock. The Series AA Certificate of Designation provides that the Series AA Preferred Stock will have 1,300,000,000 votes per share of Series AA Preferred Stock and will vote together with the outstanding shares of the Company's common stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock as a single class exclusively with respect to any proposal to adopt an amendment to the Company's Second Amended and Restated Certificate of Incorporation to effect a reverse stock split of the Company's common stock. The Series AA Preferred Stock will be voted, without action by the holder, on any such proposal in the same proportion as shares of common stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock as a single class are voted. The Preferred Stock otherwise has no voting rights except as otherwise required by the General Corporation Law of the State of Delaware.

The Series AA Preferred Stock is not convertible into, or exchangeable for, shares of any other class or series of stock or other securities of the Company. The Series AA Preferred Stock has no rights with respect to any distribution of assets of the Company, including upon a liquidation, bankruptcy, reorganization, merger, acquisition, sale, dissolution or winding up of the Company, whether voluntarily or involuntarily. The holder of the Series AA Preferred Stock will not be entitled to receive dividends of any kind.

On November 14, 2022, the Company entered into a Subscription and Investment Representation Agreement with David Michery, its Chief Executive Officer, pursuant to which the Company issued and sold one share of the Company's Series AA Preferred Stock for $25,000.00 in cash. The outstanding share of Series AA Preferred Stock will be redeemed in whole, but not in part, at any time: (i) if such redemption is ordered by the Board of Directors in its sole discretion or (ii) automatically upon the approval by the Company's stockholders of an amendment to the Certificate of Incorporation to implement a reverse stock split. Upon such redemption, the holder of the Preferred Stock will receive consideration of $25,000.00 in cash.

*Series D Preferred Stock Certificate of Designation*

On October 17, 2022, the Company filed a Certificate of Mullen Automotive Inc. Increasing Number of Shares of Preferred Stock Designated as Series D Convertible Preferred Stock (the "Certificate") with the Secretary of State of the State of Delaware. The Certificate increased the number of shares of the Company's Series D Convertible Preferred Stock from 87,500,001 shares to 437,500,001 shares.

*ELMS Asset Acquisition*

On October 13, 2022, the United States Bankruptcy Court for the District of Delaware approved the sale of certain assets of Electric Last Mile, Inc. and Electric Last Mile Solutions, Inc. pursuant to the terms and conditions of the Asset Purchase Agreement dated September 16, 2022, for approximately $55.0 million plus the assumption of monetary liabilities related to assumed contracts, which are estimated to be approximately $37.0 million. The asset acquisition closed on November 30, 2022.

The ELMS Assets purchased by Mullen consist of:

- Registered intellectual property specifically listed in the Asset Purchase Agreement.

F-41

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- Inventory including vehicles finished and unfinished, finished goods, part modules component parts, raw materials, tooling, including but not limited to product-specific tooling, all manufacturing data that is required or reasonably helpful for the assembly of the Class 1 Electric commercial delivery vans and Class 3 Commercial Delivery Cab Chassis.

- Real property located in Mishawaka, Indiana, together with all buildings, improvements, and fixtures.

- Tangible personal property, including equipment, machinery, furniture, supplies, computer hardware, data networks, servers (with data and software), communication equipment, software, discs, and all other data storage media.

***Mullen Indiana Real Estate LLC***

On November 9, 2022, the Company formed Mullen Indiana Real Estate LLC, a limited liability company in the State of Delaware to holds the acquired real property located in Mishawaka, IN.

***Debt and Equity Financing***

Exchange Agreement

On October 14, 2022, the Company entered into an Exchange Agreement (the "Exchange Agreement") with Esousa pursuant to which Esousa received a new secured convertible promissory note (the "Exchange Note") in settlement of the outstanding amounts owned on the Amended and Restated Secured Convertible Note and Security Agreement, dated June 17, 2022 ("A&R Note"). The Exchange note had a principal amount of $12,945,914. In November 2022, the Company issued 62,048,666 shares to satisfy the outstanding amount on the Exchange Note.

Settlement Agreement

On September 30, 2022, Esousa informed the Company that its sustained economic damages due to its inability to receive common stock upon conversion notification (due to the insufficiency of authorized shares) and its internal standstill agreement not to sell any shares of the Company's common stock.

On October 25, 2022, the Company's Board of Directors approved the settlement agreement and authorized the issuance of 23,000,000 common stock shares to Esousa to settle any potential claims related to the Exchange Agreement.

Amendment No. 3 to Securities Purchase Agreement - Series D Preferred Stock

On November 14, 2022, the Company entered into Amendment No. 3 to the June 7, 2022 Securities Purchase Agreement ("Amendment No. 3"). The investors paid $150 million and in lieu of receiving shares of Series D Preferred Stock and Warrants, the investors received notes convertible into shares of the Company's Common Stock ("Notes"). The convertible note bear and interest rate of 28%.

Upon conversion of a Note, the holder will receive Warrants exercisable for 185% of the Common Stock at an exercise price ranging from $0.25 to $0.46, subject to further adjustment as provided in the Warrant. The warrant cashless exchange formula is Net number + (A x B)/C = share of common stock,

A= the total number of shares with respect to which the Warrant is then being exercised
B= Black Scholes Value (as defined in Section 16 of the Warrant).

F-42

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

C= the Closing Bid Price of the Common Stock as of two (2) Trading Days prior to the time of such exercise (as such Closing Bid Price is defined in Section 16 of the Warrant).

Amendment No. 3 further provides that the remaining $90 million of the Commitment Amount shall be paid in two tranches, on January 24, 2023, and February 24, 2023, (each, a "Purchase Date"). The purchase price per share of Series D Preferred Stock will be the lower of (i) $1.27, the closing price of the Company's stock on the date the Securities Purchase Agreement was executed, or (ii) the closing price of the Common Stock on the trading day immediately preceding the respective Purchase Date, subject to a floor price of $0.10 per share. For no additional consideration, for every share of Series D Preferred Stock purchased, such investor shall receive Warrants exercisable for 185% shares of Series D Preferred Stock purchased by the investors at an exercise price equal to the purchase price for shares of Series D Preferred Stock. Consummation of the transaction is dependent on certain conditions precedent.

Release of Reserved Shares

On November 9, 2022, the Board approved for the release of 350,000,000 shares of common stock previously reserved under the 2022 Equity Incentive Plan. This did not result in changes to equity incentive commitments to employees and directors.

Registration Statement Form S-3

On October 14, 2022, the Company filed a Registration Statement on Form S-3, which became effective upon filing with the SEC. The Registration Statement registered the resale by certain stockholders of up to 900,000,000 shares of common stock, which consist solely of 23,000,000 shares of common stock, 350,000,000 shares of common stock issuable upon conversion of Series D Preferred Stock and 527,000,000 shares of common stock issuable upon exercise of outstanding warrants to purchase shares of common stock.

On November 21, 2022, the Company filed Registration Statement on Form S-3, which became effective upon filing with the SEC. The Company registered the resale by certain stockholders of 220,828,539 shares of common stock issuable upon conversion of convertible notes issued to the selling stockholders on November 15, 2022, pursuant to Amendment No. 3. The investors paid $150 million and in lieu of receiving shares of Series D Preferred Stock and warrants, the investors received the Notes, which outstanding principal and accrued but unpaid interest on the Notes convert into shares of common stock.

Preferred Series C and D Conversions and Warrants Exercises

During the first quarter of the fiscal year ending September 30, 2023, the Company issued:
- 150,256 shares of Common Stock upon conversion of 150,256 shares of Series C Preferred Stock;
- 208,017,020 shares of Common Stock upon cashless exercise of Warrants to purchase 3,871,848 shares of Common Stock;
- 3,996,554 shares of Common Stock upon conversion of 3,996,554 shares of Series D Preferred Stock; and
- 206,667,644 shares of Common stock upon cashless exercise of Warrants to purchase 147,864,810 shares of Common Stock.

Firm Order Agreement

On December 12, 2022, the Company entered into a Firm Order Agreement (the "Order Agreement") with Randy Marion Isuzu, LLC ("RMI") pursuant to which RMI agreed during the period ending on December 31, 2023 (unless terminated earlier pursuant to the terms of the Order Agreement) to purchase a total of not less than 6,000 units of the initial production

F-43

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

6,800 units of the vehicles manufactured and produced by the Company. Contemporaneous with the execution of the Order Agreement, RMI issued a purchase order for 1,000 vehicles and agreed to issue another purchase order on or before May 1, 2023, for no less than 1,000 vehicles. All additional purchase orders required to fulfill the order requirement are required to be issued no later than August 1, 2023. Products and vehicles with less than 500 miles that are not sold after 12 months can be returned to the Company at original pricing, subject to certain conditions. The Agreement may be terminated, among other reasons, if RMI ceases to be an authorized Mullen dealer or fails to function in the ordinary course of business or maintain its dealership facilities, voluntary or involuntary bankruptcy, RMI's conduct adversely affects the Company, or an impairment of RMI's reputation or financial standing.

*Series C Preferred Stock Dividend Waiver*

On January 13, 2023, the Company and holders of Series C Preferred Stock entered into a waiver agreement pursuant to which such holders irrevocably waived their right to receive any and all cumulative 15.0% per annum fixed dividends on such Preferred Stock, including all unpaid accrued and accumulated dividends, pursuant to the terms set forth in the Company's Second Amended and Restated Certificate of Incorporation.

**Settlement Agreement- Warrants Exercise and Share Issuance**

On January 13, 2023, the Company entered into Settlement Agreements and Releases with Acuitas Capital LLC, Jim Fallon and Mank Capital (the "Holders") pursuant to which the Holders agreed to remit to the Company an aggregate of approximately $17.8 million (collectively, the "Settlement Payment") for the erroneous issuance by the Company of an aggregate exercise of 1,660,988 warrants for approximately 100 million shares of common stock. These warrant exercises which led to over issuances of common stock occurred after September 30, 2022.

In consideration of the settlement, the Holders received the right to purchase (the "Settlement Additional Purchase Right") additional shares of Series D Preferred Stock and warrants equal to $20 million as provided under the Securities Purchase Agreement, dated as of June 7, 2022 (as amended, the "Series D Securities Purchase Agreement") of units, consisting of one share of Preferred Stock and 185% Warrants for each share of Preferred Stock issued. The Settlement Additional Purchase Right may be exercised by a Holder in accordance with the same terms that apply to Additional Purchases as described in the Series D Securities Purchase Agreement; provided, however, that if a Holder exercises its Settlement Additional Purchase Right, it shall receive Additional Warrants for shares of Common Stock in exchange for the issue of a promissory note that will bear an annual interest rate of 3.5%.

**Settlement Agreement- Series D Securities Purchase Agreement**

On January 13, 2023, the Company entered into a Settlement Agreement and Release in which investors waived the default prior to February 1, 2023 under the Series D Securities Purchase Agreement, and the Notes and the Warrants that were issued pursuant to Amendment No. 3. to the Series D Securities Purchase Agreement. In exchange, the Company grants the investors the right to purchase additional shares of Series D Preferred Stock and warrants in an amount equal to such investor's pro rata portion of $10 million.

**Warrants issued pursuant to Settlement Agreements**

Warrants issued pursuant to the Settlement Additional Purchase Right and the Second Additional Purchase Right will provide for cashless exercise pursuant to which the holder will receive upon exercise a "net number" of shares of Common Stock determined according to the following formula:

Net Number = (A x B) / C

For purposes of the foregoing formula:

A= The total number of shares with respect to which the Warrant is then being exercised.

B= The Black Scholes Value (as described in the warrant).

F-44

Table of Contents

**MULLEN AUTOMOTIVE, INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

C= The Closing Bid Price of the Common Stock in the day prior the time of such exercise, but in any event not less than $0.10 per share of Common Stock, which will not be subject to adjustment.

The exercise price and number of shares issuable upon exercise of the warrants will further be adjusted upon the occurrence of certain events and holders will be allowed to participate in certain issuances and distributions (subject to certain limitations and restrictions), including certain stock dividends and splits and distributions of assets. The warrants will provide for certain purchase rights whereby if the Company grants, issues or sells any options, convertible securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock, then the holder will be entitled to acquire such purchase rights which the holder could have acquired if the holder had held the number of shares of Common Stock acquirable upon complete exercise of the warrant. The Company would also agree not to enter into any fundamental, transaction, such as a merger, sale of more than 50% of the outstanding voting shares, sale of substantially all assets, or business combination, unless the successor entity assumes all of the obligations of the Company under the Warrants and the other transaction documents related to the warrants.

The Company must reserve out of authorized and unissued shares a number of shares of Common Stock equal to 250% of the maximum number of shares of Common Stock that are issuable upon exercise of the warrants from time to time. If the Company fails to timely deliver shares upon exercise of the Warrant, the Company will be required to either (A) pay the holder for each trading day on which shares are not delivered 1% of the product of the number of shares not so issued multiplied by the closing sale price of the Common Stock on the trading day immediately preceding the required delivery date, or (B) if the holder purchases shares of Common Stock in anticipation of delivery of shares upon exercise of the Warrant, cash in an amount equal to holder's total purchase price of such shares. The exercisability of the warrants may also be limited if, upon exercise, the holder and its affiliates would in aggregate beneficially own more than 9.99% of the common stock.

F-45

Table of Contents

**NOTE 21 - RESTATEMENT**

Prior to the initial issuance of the Company's financial statements for the year ended September 30, 2022, management determined that the warrants issued with the preferred stock did not meet the conditions for equity classification, requiring liability treatment and measured at fair value. In addition, management also discovered that it did not reflect the impact of amendments that resulted in modifications in privileges for the warrants issued with the Series C Preferred Stock, which should have been accounted for as a deemed dividend at the time of modification. Further, management prematurely recorded the option to issue shares of Series E Preferred Stock.

The following table summarizes the impacts of these error corrections on the Company's financial statements for each of the periods presented below:

i. Balance sheet

| December 31, 2021 (Unaudited) | Impact of correction of error | | |
| --- | --- | --- | --- |
| | As previously reported | Adjustments | As restated |
| Total assets | 45,413,291 | - | 45,413,291 |
| | | | |
| Warrant liabilities | - | 119,597,612 | 119,597,612 |
| Other | 55,904,761 | - | 55,904,761 |
| Total liabilities | 55,904,761 | 119,597,612 | 175,502,373 |
| | | | |
| Accumulated deficit | (186,838,587) | (119,597,612) | (306,436,199) |
| Others | 176,347,117 | - | 176,347,117 |
| Total deficiency in shareholders' equity | (10,491,470) | (119,597,612) | (130,089,082) |

| March 31, 2022 (Unaudited) | Impact of correction of error | | |
| --- | --- | --- | --- |
| | As previously reported | Adjustments | As restated |
| Total assets | 105,206,180 | - | 105,206,180 |
| | | | |
| Warrant liabilities | - | 203,955,631 | 203,955,631 |
| Other | 55,649,512 | - | 55,649,512 |
| Total liabilities | 55,649,512 | 203,955,631 | 259,605,143 |
| | | | |
| Accumulated deficit | (219,411,972) | (411,632,707) | (631,044,679) |
| Additional Paid in Capital | 268,667,769 | 207,677,076 | 476,344,845 |
| Others | 300,871 | - | 300,871 |
| Total deficiency in shareholders' equity | 49,556,668 | (203,955,631) | (154,398,963) |

78

Table of Contents

| June 30, 2022 (Unaudited) | Impact of correction of error | | |
| --- | --- | --- | --- |
| | As previously reported | Adjustments | As restated |
| Total assets | 84,264,830 | - | 84,264,830 |
| | | | |
| Warrant liabilities | - | 6,126,358 | 6,126,358 |
| Series E Options liability | 23,085,886 | (23,085,886) | - |
| Other | 42,023,055 | - | 42,023,055 |
| Total liabilities | 65,108,941 | (16,959,528) | 48,149,413 |
| | | | |
| Accumulated deficit | (278,883,532) | (357,008,298) | (635,891,830) |
| Additional Paid in Capital | 297,540,727 | 373,967,826 | 671,508,553 |
| Others | 498,694 | - | 498,694 |
| Total deficiency in shareholders' equity | 19,155,889 | 16,959,528 | 36,115,417 |

ii. Statement of operations

| Quarter ended December 31, 2021 (Unaudited) | Impact of correction of error - year | | |
| --- | --- | --- | --- |
| | As previously reported | Adjustments | As restated |
| Loss from operations | (14,058,407) | - | (14,058,407) |
| | | | |
| Other financing costs - initial recognition of warrants at fair value | - | (108,979,229) | (6,282,494) |
| Revaluation of warrants | - | (10,618,382) | (10,618,382) |
| Others | (22,405,532) | - | (22,405,532) |
| Other income (expense) | (22,405,532) | (119,597,612) | (142,003,144) |
| Net loss | (36,463,939) | (119,597,612) | (156,061,551) |
| Loss per share | (2.09) | | (8.93) |
| Weighted average common shares outstanding | 17,471,173 | | 17,471,173 |

79

Table of Contents

| Quarter ended March 31, 2022 (Unaudited) | Impact of correction of error - quarter | | | Impact of correction of error - year to date | | |
|---|---|---|---|---|---|---|
| | As previously reported | Adjustments | As restated | As previously reported | Adjustments | As restated |
| Loss from operations | (30,452,870) | - | (30,452,870) | (44,511,277) | - | (44,511,277) |
| Other financing costs - initial recognition of warrants at fair value | | | | | | |
| Loss on financing | - | (160,364,949) | (160,364,949) | - | (269,344,178) | (269,344,178) |
| Revaluation of warrants | - | (131,670,146) | (131,670,146) | - | (142,288,528) | (142,288,528) |
| Others | (2,120,515) | - | (2,120,515) | (24,526,046) | - | (24,526,046) |
| Other income (expense) | (2,120,515) | (292,035,095) | (294,155,610) | (24,526,046) | (411,632,707) | (436,158,753) |
| Net loss | (32,573,385) | (292,035,095) | (324,608,480) | (69,037,323) | (411,632,707) | (480,670,030) |
| Deemed dividend on preferred stock | - | (32,735,345) | (32,735,345) | - | (32,735,345) | (32,735,345) |
| Net loss attributable to common stockholders | (32,573,385) | (324,770,440) | (357,343,825) | (69,037,323) | (444,368,052) | (513,405,375) |
| Loss per share - continuing operations | (0.63) | | (6.95) | (1.99) | | (14.82) |
| Weighted average common shares outstanding | 51,392,988 | | 51,392,988 | 34,639,857 | | 34,639,857 |

| Quarter ended June 30, 2022 (Unaudited) | Impact of correction of error - quarter | | | Impact of correction of error - year to date | | |
|---|---|---|---|---|---|---|
| | As previously reported | Adjustments | As restated | As previously reported | Adjustments | As restated |
| Loss from operations | (18,221,165) | - | (18,221,165) | (62,732,442) | - | (62,732,442) |
| Other financing costs - initial recognition of warrants at fair value | | | | | | |
| Loss on financing | - | - | - | - | (269,344,178) | (269,344,178) |
| Revaluation of warrants | - | 31,538,523 | 31,538,523 | - | (110,750,005) | (110,750,005) |
| Series E Options liability | (23,085,886) | 23,085,886 | - | (23,085,886) | 23,085,886 | - |
| Others | (41,250,395) | - | (41,250,395) | (65,776,422) | - | (65,776,422) |
| Other income (expense) | (64,336,281) | 54,624,409 | (9,711,872) | (88,862,308) | (357,008,298) | (445,870,606) |
| Net loss | (82,557,446) | 54,624,409 | (27,933,037) | (151,594,750) | (357,008,298) | (508,603,048) |
| Deemed dividend on preferred stock | - | - | - | - | (32,735,345) | (32,735,345) |
| Net loss attributable to common stockholders | (82,557,446) | 54,624,409 | (27,933,037) | (151,594,750) | (389,743,643) | (541,338,393) |
| Loss per share - continuing operations | (0.22) | | (0.07) | (0.89) | | (3.19) |
| Weighted average common shares outstanding | 376,786,685 | | 376,786,685 | 169,531,688 | | 169,531,688 |

80

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Mullen Automotive Inc.

January 13, 2023                                      By:  /s/ David Michery

David Michery
Chief Executive Officer, President and Chairman of the Board

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each of Mullen Automotive Inc., a Delaware corporation (the "*Company*"), and the undersigned Directors and Officers of Mullen Automotive Inc. hereby constitute and appoint David Michery and Jonathan New as the Company's or such Director's or Officer's true and lawful attorneys-in-fact and agents, for the Company or such Director or Officer and in the Company's or such Director's or Officer's name, place and stead, in any and all capacities, with full power to act alone, to sign any and all amendments to this report, and to file each such amendment to this report, with all exhibits thereto, and any and all documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in connection therewith, as fully to all intents and purposes as the Company or such Director or Officer might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ David Michery<br>David Michery | Chief Executive Officer, President and Chairman of the Board<br>(Principal Executive Officer) | January 13, 2023 |
| /s/ Jonathan New<br>Jonathan New | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | January 13, 2023 |
| /s/ Kerri Sadler<br>Kerri Sadler | Chief Accounting Officer | January 13, 2023 |
| /s/ Mary Winter<br>Mary Winter | Secretary and Director | January 13, 2023 |
| /s/ John Andersen<br>John Andersen | Director | January 13, 2023 |
| /s/ Ignacio Novoa<br>Ignacio Novoa | Director | January 13, 2023 |
| /s/ Kent Puckett<br>Kent Puckett | Director | January 13, 2023 |

72

Table of Contents

| /s/ Mark Betor | Director | January 13, 2023 |
|---|---|---|
| Mark Betor | | |

| /s/ William Miltner | Director | January 13, 2023 |
|---|---|---|
| William Miltner | | |

73

Table of Contents

**Exhibit 10.2(a)**

**MULLEN AUTOMOTICE INC.**

**2022 EQUITY INCENTIVE PLAN**

**NOTICE OF GRANT AND STOCK OPTION AGREEMENT**

---

**Name:**                                               **Option No:**

**Address:**

Effective _____, 20__, ("Grant Date"), you have been granted [a/an] [incentive/non-qualified] stock option ("Option") to purchase _____( _____) shares of Mullen Automotive Inc. common stock ("Underlying Shares") at an Exercise Price of $[_____] per share pursuant to the Mullen Automotive Inc. 2022 Equity Incentive Plan (the "Plan"). Except as otherwise defined herein, terms with initial capital letters shall have the same meanings set forth in the Plan. A copy of the Plan is attached to this Notice and Agreement. The terms and conditions of the Plan are incorporated herein by this reference. This Option shall be exercisable in whole or in part, but only with respect to the Underlying Shares that are vested. The Underlying Shares shall become vested as follows:

*[Insert Vesting Schedule]*

By accepting this grant and exercising any portion of the Option, you represent that you: (i) agree to the terms and conditions of this Notice and Agreement and the Plan; (ii) have reviewed the Plan and the Notice and Agreement in their entirety, and have had an opportunity to obtain the advice of legal counsel and/or your tax advisor with respect thereto; (iii) fully understand and accept all provisions hereof; (iv) agree to accept as binding, conclusive, and final all of the Administrator's decisions regarding, and all interpretations of, the Plan and the Notice and Agreement; and (v) agree to notify the Company upon any change in your home address indicated above.

Please return a signed copy of this Notice of Grant and Stock Option Agreement to [_____] at [_____], and retain a copy for your records.

_____                Dated: _____

**Exhibit 10.2(b)**

**MULLEN AUTOMOTICE INC.**
**2022 EQUITY INCENTIVE PLAN**

**NOTICE OF GRANT**
**AND**
**RESTRICTED STOCK AGREEMENT**

You have been granted the number of shares of Restricted Common Stock of Mullen Automotive Inc. (the "Company"), as set forth below ("Common Shares"), subject to the terms and conditions of the Mullen Automotive Inc. 2022 Equity Incentive Plan ("Plan"), and this Notice of Grant and Restricted Stock Agreement including the attachments hereto (collectively, "Notice and Agreement"). Unless otherwise defined in the Notice and Agreement, terms with initial capital letters shall have the meanings set forth in the Plan.

| | |
|---|---|
| Participant: | [Insert Name] |
| Home Address: | [Insert Address] |
| Soc. Sec. No: | [Insert Tax ID number] |
| Number of shares of Restricted Common Stock Granted: | [Insert No. of Shares] |
| Grant Date: | [Insert Grant Date] |
| Period of Restriction and Release of Common Shares from Company's Return Right (see Sections 2 and 3 of attached Agreement) | The Period of Restriction on the Common Shares granted hereunder, and the Company's Right of Return with respect to such Common Shares, shall lapse on the date that is **six (6) months** following the Grant Date. |

By signing below, you accept this grant of Common Shares and you hereby represent that you: (i) agree to the terms and conditions of this Notice and Agreement and the Plan; (ii) have reviewed the Plan and the Notice and Agreement in their entirety, and have had an opportunity to obtain the advice of legal counsel and/or your tax advisor with respect thereto; (iii) fully understand and accept all provisions hereof; (iv) agree to accept as binding, conclusive, and final all of the Administrator's decisions regarding, and all interpretations of, the Plan and the Notice and Agreement; and (v) agree to notify the Company upon any change in your home address indicated above.

AGREED AND ACCEPTED:

| |
|---|
| Signature: |
| Print Name:   Name:                        Title: |

-1-

**MULLEN AUTOMOTICE INC.**

**2022 EQUITY INCENTIVE PLAN**

RESTRICTED STOCK AGREEMENT

1.      Grant of Restricted Stock. The Company has granted to you the number of shares of Restricted Common Stock specified in the Notice of Grant on the preceding page ("Notice of Grant"), subject to the following terms and conditions. In consideration of such grant, you agree to be bound by the terms and conditions hereof, and by the terms and conditions of the Plan.

2.      Period of Restriction. During the Period of Restriction specified in the Notice of Grant, the Common Shares shall remain subject to the Company's Return Right (defined in Section 3). The Period of Restriction shall expire and the Company's Return Right shall lapse as to the Common Shares granted in the amount(s) and on the date(s) specified in the Notice of Grant (each, a "Release Date"); *provided*, *however*, that no Common Shares shall be released on any Release Date if the Participant has ceased Continuous Status as an Employee, Consultant or Director on or prior to such date. Any and all Common Shares subject to the Company's Return Right at any time shall be defined in this Notice and Agreement as "Unreleased Common Shares."

3.      Return of Restricted Stock to Company. If Participant ceases Continuous Status as an Employee, Consultant or Director for any reason (a "Return Event"), the Company shall become the legal and beneficial owner of the Unreleased Common Shares and all rights and interests therein or relating thereto, and the Company shall have the right to retain and transfer such Unreleased Common Shares to its own name. The Participant shall continue to own any Common Shares subject to the terms of the Plan and this Notice and Agreement with respect to which the Participant has Continuous Status as an Employee, Consultant or Director through the Release Date(s) specified in the Notice of Grant for such Common Shares.

4.      Restriction on Transfer. Except for the transfer of the Common Shares to the Company or its assignees contemplated by this Notice and Agreement, none of the Common Shares or any beneficial interest therein shall be transferred, encumbered or otherwise disposed of in any way until the date that is one year after the Release Date for such Common Shares set forth in this Notice and Agreement. In addition, as a condition to any transfer of the Common Shares after such period, the Company may, in its discretion, require: (i) that the Common Shares shall have been duly listed upon any national securities exchange or automated quotation system on which the Company's Common Stock may then be listed or quoted; (ii) that either (a) a registration statement under the Securities Act of 1933, as amended ("Securities Act") with respect to the Common Shares shall be effective, or (b) in the opinion of counsel for the Company, the proposed purchase shall be exempt from registration under the Securities Act and the Participant shall have entered into agreements with the Company as reasonably required; and (iii) fulfillment of any other requirements deemed necessary by counsel for the Company to comply with Applicable Law.

5.      Retention of Common Shares. To ensure the availability for delivery of the Participant's Unreleased Common Shares upon their return to the Company pursuant to this Notice and Agreement, the Company shall retain possession of the share certificates representing the Unreleased Common Shares, together with a stock assignment duly endorsed in blank, attached hereto as Exhibit A. The Company shall hold the Unreleased Common Shares and related stock

-2-

assignment until the Release Date for such Common Shares. In addition, the Company may require the spouse of Participant, if any, to execute and deliver to the Company the Consent of Spouse in the form attached hereto as Exhibit B. When a Return Event or Release Date occurs, the Company shall promptly deliver the certificate for the applicable Common Shares to the Company or to the Participant, as the case may be.

6.    Stockholder Rights. Subject to the terms hereof, the Participant shall have all the rights of a stockholder with respect to the Common Shares while they are retained by the Company pursuant to Section 5, including without limitation, the right to vote the Common Shares and to receive any cash dividends declared thereon. If, from time to time prior to the Release Date, there is (i) any stock dividend, stock split or other change in the Common Shares, or (ii) any merger or sale of all or substantially all of the assets or other acquisition of the Company, any and all new, substituted or additional securities to which the Participant shall be entitled by reason of the Participant's ownership of the Common Shares shall be immediately subject to the terms of this Notice and Agreement and included thereafter as "Common Shares" for purposes of this Notice and Agreement.

7.    Legends. The share certificate evidencing the Common Shares, if any, issued hereunder shall be endorsed with the following legend (in addition to any legend required under applicable state securities laws):

THE COMMON SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS UPON TRANSFER AND OBLIGATIONS TO RETURN TO THE COMPANY, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE HOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

8.    U.S. Tax Consequences. The Participant has reviewed with the Participant's own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Notice and Agreement. The Participant is relying solely on such advisors and not on any statements or representations of the Company or any of its employees or agents. The Participant understands that the Participant (and not the Company) shall be responsible for the Participant's own tax liability that may arise as a result of the transactions contemplated by this Notice and Agreement. The Participant understands that for U.S. taxpayers, Section 83 of the Internal Revenue Code of 1986, as amended (the "Code"), taxes as ordinary income the difference between the purchase price for the Common Shares, if any, and the fair market value of the Common Shares as of the date any restrictions on the Common Shares lapse. In this context, "restriction" includes the right of the Company to the return of the Common Shares upon a Return Event. The Participant understands that if he/she is a U.S. taxpayer, the Participant may elect to be taxed at the time the Common Shares are awarded as Restricted Stock rather than when and as the Return Right expires by filing an election under Section 83(b) of the Code with the IRS within 30 days from the date of acquisition. The form for making this election is attached as Exhibit C hereto.

THE PARTICIPANT ACKNOWLEDGES THAT IT IS THE PARTICIPANT'S SOLE RESPONSIBILITY AND NOT THE COMPANY'S TO FILE TIMELY THE ELECTION UNDER SECTION 83(b), IF APPLICABLE, EVEN IF THE PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON THE PARTICIPANT'S BEHALF.

-3-

9.      General.

(a)      This Notice and Agreement shall be governed by and construed under the laws of the State of Delaware. The Notice and Agreement and the Plan, which is incorporated herein by reference, represents the entire agreement between the parties with respect to the shares of Restricted Common Stock granted to the Participant. In the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Notice and Agreement, the terms and conditions of the Plan shall prevail.

(b)      Any notice, demand or request required or permitted to be delivered by either the Company or the Participant pursuant to the terms of this Notice and Agreement shall be in writing and shall be deemed given when delivered personally, deposited with a reputable courier service, or deposited in the U.S. Mail, First Class with postage prepaid, and addressed to the parties at the addresses set forth in the Notice of Grant, or such other address as a party may request by notifying the other in writing.

(c)      The rights of the Company under this Notice and Agreement and the Plan shall be transferable to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights and obligations of the Participant under this Notice and Agreement may only be assigned with the prior written consent of the Company.

(d)      The Participant agrees upon request to execute any further documents or instruments necessary or desirable to carry out the purposes or intent of this Notice and Agreement.

(e)       PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE RELEASE OF COMMON SHARES PURSUANT TO THIS AGREEMENT SHALL BE EARNED ONLY BY CONTINUING SERVICE AS AN EMPLOYEE, CONSULTANT OR DIRECTOR, AND NOT THROUGH THE ACT OF BEING HIRED, APPOINTED OR OBTAINING COMMON SHARES HEREUNDER.

#####

-4-

**EXHIBIT A**

<u>ASSIGNMENT SEPARATE FROM CERTIFICATE</u>

FOR VALUE RECEIVED I, _____, hereby sell, assign and transfer unto
_____(_____) Common Shares of Mullen Automotive Inc.,
standing in my name of the books of said corporation represented by Certificate No. _____ herewith and do
hereby irrevocably constitute and appoint _____ to transfer the said stock on the
books of the within named corporation with full power of substitution in the premises.

This Stock Assignment may be used only in accordance with the Notice of Grant and the Restricted Stock
Agreement between [_____] and the undersigned dated_____, 20__.

Dated: _____, 20____

Signature: _____

Print
Name: _____

*INSTRUCTIONS:*

***Please DO NOT fill in any blanks other than the signature lines.***
*The purpose of this assignment is to enable the Company to receive the return of the Common Shares as set
forth in the Notice and Agreement, without requiring additional signatures on the part of the Participant.*

-5-

**EXHIBIT B**

<u>CONSENT OF SPOUSE</u>

I, _____, spouse of _____, have read and approve the foregoing Notice of Grant and Restricted Stock Agreement (the "Notice and Agreement"). In consideration of the Company's grant to my spouse of the Common Shares of Mullen Automotive Inc. as set forth in the Notice and Agreement, I hereby appoint my spouse as my attorney-in-fact in respect to the exercise of any rights under the Notice and Agreement and agree to be bound by the provisions of the Notice and Agreement insofar as I may have any rights in said Notice and Agreement or any Common Shares issued pursuant thereto under the community property laws or similar laws relating to marital property in effect in the state or country of our residence as of the date of the signing of the foregoing Notice and Agreement.

Dated: _____, 20__

_____
Signature of Spouse

Print
Name:    _____

-6-

**EXHIBIT C**

<u>ELECTION UNDER SECTION 83(b)</u>
<u>OF THE U.S. INTERNAL REVENUE CODE OF 1986</u>

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in taxpayer's gross income for the current taxable year the amount of any compensation taxable to taxpayer in connection with his or her receipt of the property described below:

1.  The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

Name:
Spouse:
Taxpayer I.D. No.:
Address:

Tax Year:

2.  The property with respect to which the election is made is described as follows: [_____]_(_____) shares of the common stock ("Common Shares") of Mullen Automotive Inc. (the "Company").

3.  The date on which the property was transferred is _____, 20__.

4.  The property is subject to the following restrictions:

The Common Shares are required to be returned to the Company in the event that the undersigned ceases to perform services for the Company through certain dates specified in the Notice of Grant and Restricted Stock Agreement between me and the Company dated as of _____, 20__. This right lapses with regard to a portion of the Common Shares based on my Continued Status as an Employee, Consultant or Director over time.

5.  The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6.  The amount (if any) paid for such property is: none.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property. The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.

Dated:_____, 20__

Signature of Taxpayer

The undersigned spouse of taxpayer joins in this election.

Dated:_____, 20__

Spouse of Taxpayer

-7-

**Exhibit 10.2(c)**

## MULLEN AUTOMOTIVE INC

## 2022 EQUITY INCENTIVE PLAN

### RESTRICTED STOCK UNIT AGREEMENT

This Restricted Stock Unit Agreement ("Agreement") is dated as of [_____], 20[__] (the "Grant Date"), between [_____], a Mullen Automotive Inc. (the "Company") and [_____] ("Participant").

**WITNESSETH**:

WHEREAS, the Company has awarded Participant a right to receive shares of the Company's common stock ("Common Stock"), subject to the requirements set forth in this Agreement pursuant to the terms and conditions of the Mullen Automotive Inc. 2022 Equity Incentive Plan (the "Plan").

NOW, THEREFORE, in consideration of the promises and as an inducement and incentive to Participant to perform his or her duties and fulfill his or her responsibilities on behalf of the Company and its Subsidiaries at the highest level of dedication and competence, and other good and valuable consideration, receipt of which is hereby acknowledged, the Company hereby awards to Participant a right to receive [_____] (_____) shares of Common Stock (the "RSUs"), pursuant to the terms and subject to the conditions and restrictions set forth in this Agreement and the Plan, and in connection with such award, the Company and Participant hereby agree as follows:

**AGREEMENT:**

1.    ***Vesting Requirements.*** The RSUs shall become vested in accordance with the vesting requirements set forth Exhibit A (the "Vesting Requirements"). Immediately upon vesting, the commensurate number of RSUs shall be converted to Common Stock on a one-unit for one-share basis and such Common Stock shall be delivered to Participant as soon as reasonably practicable, subject to the applicable tax withholding.

2.    ***Termination of Employment.*** If Participant ceases to be employed by the Company and/or a Subsidiary prior to completion of the Vesting Requirements, Participant agrees that the RSUs awarded will be immediately and unconditionally forfeited without any action required by Participant or the Company, to the extent that the Vesting Requirements have not been met as of such cessation of employment.

3.    ***No Ownership Rights Prior to Issuance of Common Stock.*** Participant shall not have any rights as a stockholder of the Company with respect to the shares of Common Stock underlying the RSUs, including but not limited to the right to vote or receive dividends with respect to such shares of Common Stock, until and after the shares of Common Stock have been actually issued to Participant and transferred on the books and records of the Company.

4.    ***Withholding Taxes.*** Upon vesting pursuant to the Vesting Requirements, Participant shall be entitled to receive the shares of Common Stock, less an amount of shares of Common Stock with a Fair Market Value on the date of vesting equal to the minimum required

withholding obligation taking into account all applicable federal, state, and local taxes, and Participant shall be entitled to receive the net number of shares of Common Stock after withholding of shares for taxes. Notwithstanding the foregoing, prior to the delivery of any shares of Common Stock, Participant may make adequate arrangements with the Company to pay the applicable withholding taxes with cash or other payroll withholding.

5.    ***Delivery of Shares of Common Stock.***  As soon as reasonably practicable following the date of vesting pursuant to the Vesting Requirements, the Company shall cause to be delivered to Participant a stock certificate representing the number of shares of Common Stock (net of tax withholding as provided in Section 4) deliverable to Participant in accordance with the provisions of this Agreement.

6.    ***Nontransferability.***  Prior to their conversion into Common Stock, the RSUs may not be sold, transferred, pledged, assigned, encumbered or otherwise alienated or hypothecated otherwise than by will or by the laws of descent and distribution, prior to such time as the shares of Common Stock have actually been issued and delivered to Participant.

7.    ***Acknowledgements.***  Participant acknowledges receipt of and understands and agrees to the terms of the RSUs and the Plan. In addition to the above terms, Participant understands and agrees to the following:

(a)    Participant hereby acknowledges receipt of a copy of the Plan and agrees to be bound by all of the terms and provisions thereof, including the terms and provisions adopted after the date of this Agreement but prior to the completion of the Vesting Requirements.  If and to the extent that any provision contained in this Agreement is inconsistent with the Plan, the Plan shall govern.

(b)    Participant acknowledges that as of the date of this Agreement, the Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of shares of Common Stock underlying the RSUs in the Company and supersedes all prior oral and written agreements pertaining to the RSUs.

(c)    Participant understands that the Company has reserved the right to amend or terminate the Plan at any time, and that the award of RSUs under the Plan at one time does not in any way obligate the Company or its Subsidiaries to grant additional RSUs in any future year or in any given amount. Participant acknowledges and understands that the RSUs are awarded in connection with Participant's status as an employee of his or her employer and, if Participant's employer is not the Company, can in no event be interpreted or understood to mean that the Company is Participant's employer or that there is an employment relationship between Participant and the Company. Participant further acknowledges and understands that Participant's participation in the Plan is voluntary and that the RSUs and any future RSUs under the Plan are wholly discretionary in nature, the value of which do not form part of any normal or expected compensation for any purposes, including, but not limited to, calculating any termination, severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, other than to the extent required by local law.

(d)    Participant acknowledges and understands that the future value of the shares of Common Stock acquired by Participant under the Plan is unknown and cannot be

2

predicted with certainty and that no claim or entitlement to compensation or damages arises from the forfeiture of the RSUs or termination of the Plan or the diminution in value of any shares of Common Stock acquired under the Plan and Participant irrevocably releases the Company and its Subsidiaries from any such claim that may arise.

8.    *No Right to Continued Employment.* Neither the RSUs nor any terms contained in this Agreement shall confer upon Participant any expressed or implied right to be retained in the service of Company or any Subsidiary for any period at all, nor restrict in any way the right of Company or any such Subsidiary, which right is hereby expressly reserved, to terminate his or her employment at any time with or without cause. Participant acknowledges and agrees that any right to receive delivery of shares of Common Stock is earned only by continuing as an employee of Company or a Subsidiary at the will of Company or such Subsidiary, or satisfaction of any other applicable terms and conditions contained in this Agreement and the Plan, and not through the act of being hired, being granted the RSUs or acquiring shares of Common Stock hereunder.

9.    *Compliance with Laws and Regulations.* The award of the RSUs to Participant and the obligation of the Company to deliver shares of Common Stock hereunder shall be subject to (a) all applicable federal, state, and local and laws, rules and regulations, and (b) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Company shall, in its sole discretion, determine to be necessary or applicable. Moreover, shares of Common Stock shall not be delivered hereunder if such delivery would be contrary to applicable law or the rules of any stock exchange.

10.    *Definitions.* All capitalized terms that are used in this Agreement that are not defined herein have the meanings defined in the Plan. In the event of a conflict between the terms of the Plan and the terms of this Agreement, the terms of the Plan shall prevail.

11.    *Notices.* Any notice or other communication required or permitted hereunder shall, if to the Company, be in accordance with the Plan, and, if to Participant, be in writing and delivered in person or by registered or certified mail or overnight courier, postage prepaid, addressed to Participant at his or her last known address as set forth in the Company's records.

12.    *Severability.* If any of the provisions of this Agreement should be deemed unenforceable, the remaining provisions shall remain in full force and effect.

13.    *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, and any dispute arising out of or in connection with the same shall be submitted to binding arbitration in Miami, Florida before a single arbitrator in accordance with the rules of arbitration of the American Arbitration Association.

14.    *Transferability of Agreement.* This Agreement may not be transferred, assigned, pledged or hypothecated by either party hereto, other than by operation of law. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, including, in the case of Participant, his or her estate, heirs, executors, legatees, administrators, designated beneficiary and personal representatives.

3

15.     *Counterparts.* This Agreement has been executed in two counterparts, each of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, Mullen Automotive Inc. has caused this Agreement to be executed and Participant has executed this Agreement, both as of the day and year first written above.

[_____]

By: _____
                    [Insert Title]

Agreed to this _____ day of _____, 20__.

_____
Participant

4

**EXHIBIT A**

**VESTING REQUIREMENTS**

Provided Participant maintains continuous employment with the Company through each applicable vesting date, the RSUS granted to Participant shall become vested as follows:

| Vesting Date (Grant Date Anniversary) | Percentage of RSUS Vested | Cumulative Percentage Vested |
|---|---|---|
| [1st | 25% | 25% |
| 2nd | 25% | 50% |
| 3rd | 25% | 75% |
| 4th | 25% | 100%] |

5

**Exhibit 10.22**

[Letterhead of Mullen Automotive Inc.]

September 7, 2022

Jonathan New
Miami, Florida

Dear Jon:

Mullen Automotive, Inc. is excited to extend this offer of employment as the Company's Chief Financial Officer. Please review this summary of terms and conditions for your anticipated employment with us. If you accept this offer, your start date will be September 19, 2022, or another mutually agreed upon date, and you would report to David Michery, Chief Executive Officer.

As agreed, you will be resigning from your board of directors' responsibilities, effective on your start date. You will be entitled to pro-rata board compensation, in the amount of $15,848, for the portion of the 2022 third quarter served.

Please find attached the terms and conditions of your employment, should you accept this offer letter the company will memorialize in a legally binding form if this letter is not sufficient. In the meantime, please feel free to contact me if you have any questions.

We are all looking forward to having you on our team.


Best regards,

/s/ David Michery

David Michery

Mullen Automotive, Inc.

Jon, you are sometimes referred to herein as "You", "Employee" or "Applicant".

## I.    Position

**Job Title/Duties**

Your title will be Chief Financial Officer and you will report to **David Michery, CEO**.

Your role, duties and responsibilities will be commensurate with those typically performed, required and, expected from a Chief Financial Officer of a Nasdaq publicly traded Company.

**Employment Relationship**

Employment with the Company is for no specific period. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed a duly authorized officer of the Company (other than you.)

## II.    Cash Compensation

**Salary**

The Company will pay you a wage at the rate of **$425,000/year** payable bi-weekly. Other than equity and promotional opportunities, you are eligible to receive increases based on review by the CEO and approval by the Company's Compensation Committee. This wage will be payable pursuant to the Company's employee compensation policies. Your total compensation will be reviewed by the CEO at the end of each annual anniversary of your employment.

**Tax Withholding**

All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

## Ill.    Employee benefits

As a regular employee of the Company, you will be eligible to participate in Company-sponsored benefits. The Company offers a comprehensive employee benefits program, including:

**a.    Paid Time Off ("PTO), Sick Days and Paid Holidays**

Mullen Automotive, Inc. will provide up to 21 days of accrued PTO per year. Any unused PTO accrued at the end of each one year anniversary of your employment ("Anniversary Period") will be added to your salary in the month following each Anniversary Period.

Additionally, you will be eligible to receive 3 sick days and 8 federal holidays.

**b.      Private health, dental and vision plan**

As all Company employees, you will be eligible for the private health, dental, vision and life insurance plan we provide at **100% coverage on premiums for employees; 30% for dependents**. Anything beyond that will be the employee's responsibility. Specific terms and conditions may change upon vendor's decision. Benefits will start on the first of the month, following 30 days of employment with Mullen Automotive. If the Company terminates your employment, we will reimburse you for up to 6 months for the cost to maintain your medical and dental insurance coverage pursuant to that federal law commonly referred to as COBRA.

**C.      Stock compensation and stock awards**

Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be issued 300,000 shares of the Common Stock of the Company registered on Form S-8 ("the Share Compensation") payable quarterly. A prorated tranche of 84,066 of the Share Compensation will be vested and due on January 1, 2023 and thereafter quarterly tranches of 75,000 shares shall be vested and due at the end of March, June, September and December of each calendar year. All stock compensation and stock awards shall only be due and payable by the Company if you are employed as a full-time employee of the Company on the date that the tranche in question becomes vested and due.

In addition to your stock compensation above, you are eligible for additional stock from awards made at the discretion of the CEO and approved by the Compensation Committee.

**D.      Relocation Allowance**

The Company will contribute up to $25,000 for your relocation from Florida to California and will pay to the extent reasonably possible, pay the said allowance directly to the moving company on your behalf. Additionally, commencing September 19, 2022, the Company will reimburse you up to $3,000- per month for your temporary accommodation costs. This reimbursement entitlement shall terminate on the first to occur of: (i) the date you find more permanent' accommodation; or (ii) February 1, 2023.

**IV.      Privacy and Confidentiality Agreements Privacy Agreement**

You are required to observe and uphold all the Company's privacy policies and procedures as implemented or varied from time to time. Collection, storage, access to and dissemination of employee personal information will be in accordance with privacy legislation.

**Conflict of Interest Policy**

While you are employed at this Company, you will not engage in any other employment, consulting, or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company. By signing this letter of agreement, you confirm that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

**Proprietary Information and Inventions Agreement**

Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement.

**V.    No Other Employment**

You agree to devote your full business time, attention, and best efforts to the business of the Company during the employment relationship. The Company's normal business hour are from 8:00 a.m. to 5:00 p.m., Monday through Friday. As an exempt salaried employee, however, you will be required to work additional hours depending on the nature of your work assignment. You must communicate in writing any prior existing other employments. Furthermore, you prohibited from taking on any engagements, contracting positions, Board of Directors roles in a competing company. Additionally, any existing, prior, or pending patents must be disclosed to Company at day of hire.

**VI.    Governing Law**

This Agreement is made and shall be construed and enforced in accordance with the laws of the State of California. This Agreement and any Exhibits supersede and replace all prior agreements or understandings, oral or written, between the Company and you, except by a writing signed by the CEO.

**VII.    Dispute Resolution Mediation**

All employees of the Company agree to mediate any dispute with the Company with a mediator from the American Arbitration Association (A.A.A,) or similar organization trained and experienced in employment disputes. If mediation is not successful both the Company and Employee agree to submit their dispute to arbitration, The arbitrator will be chosen from a panel presented by the A.A.A.

**Arbitration**

Subject to the Arbitration requirement, herein, you and the Company agree that the federal or state courts located within Orange County, California shall have exclusive jurisdiction and venue over any disputed arising out of or relating to this Offer. Any controversy or claim between you and the Company arising out of or relating to this Offer, or a breach of this Offer, which cannot be resolved by mutual agreement, shall be settled by binding arbitration conducted by a single arbitrator in accordance with the A.A.A. rules, and any judgement upon the award rendered by the arbitrator may be entered in any Court having jurisdiction. Any such arbitration shall be filed and held in Orange County, California.

Both the Company and Employee acknowledge that by agreeing to arbitrate, each gives up their right to litigate their employment dispute in court or to submit it to a jury. The decision of the arbitrator is final and binding. However, either party may seek to have a court of competent jurisdiction enforce an arbitration award.

**VIII.    Termination Conditions**

The Company reserves the right to terminate employment of any employee for just cause at any time without notice and except as stated below, without payment in lieu of notice, (At-Will). The Company will be entitled to terminate your employment for any reason other than for just cause, upon providing to you such minimum notice as required by law.

In the event that Company terminates your employment for any reason other than due to your negligence, failure to deliver services or perform at the level for which you were hired or for any other just cause reason, you will be entitled to a one-time payment of $200,000 which will be paid in the Company's usual payroll cycle.

**IX.    Interpretation, Amendment and Enforcement**

This letter agreement supersedes and replaces any prior agreements, representations or understandings (whether written, oral, implied or otherwise) between you and the Company and constitute the complete agreement between you and the Company regarding the subject matter set forth herein. This letter agreement may not be amended or modified, except by an express written agreement signed by a duly authorized officer of the Company.

You may indicate your agreement with these terms and accept this offer by signing and dating this agreement by **September 7, 2022** Upon your acceptance of this employment offer, Mullen Automotive, Inc. will provide you with the necessary paperwork and instructions.

Best Regards,

David Michery, CEO
Mullen Automative, Inc.                    Applicant: Jonathan New

/s/ David Michery                          /s/ Jonathan New
(Signature)                                (Signature)
Date:                                      Date:

**Exhibit 10.23**

*Execution Version*

**SETTLEMENT AGREEMENT AND RELEASE**

**THIS SETTLEMENT AGREEMENT AND RELEASE** (this "*Agreement*") is entered into as of January 13, 2023 by and between (a) Acuitas Capital LLC, a Delaware limited liability company ("*Acuitas*"), and (b) Mullen Automotive Inc., a Delaware corporation (the "*Company*"). Collectively, Acuitas and the Company shall be referred to as the "*Parties*". Capitalized terms not defined herein shall have the same meaning as set forth in the Securities Purchase Agreement (as defined below).

**RECITALS**

WHEREAS, the Parties agree that upon Acuitas' the exercise of warrants convertible into shares of the Company's common stock, par value $0.001 per share ("*Common Stock*") the Company erroneously issued to Acuitas 1,653,005 shares of Common Stock (the "*Excess Stock*") in excess of the amount contractually agreed upon by the Parties under the terms of such warrants.

WHEREAS, the Parties entered into a Securities Purchase Agreement, dated as of June 7, 2022 (as amended, the "*Securities Purchase Agreement*"), pursuant to which, upon the terms and subject to the conditions contained therein, Acuitas has purchased and shall purchase on the Purchase Date the Commitment Amount of shares of the Company's Series D Preferred Stock, par value $0.001 per share (the "*Series D Preferred Stock*"), and Warrants.

WHEREAS, the Parties agree that in order to settle the error with regard to the over issuance of Common Stock, Acuitas shall remit to the Company an amount equal to $17,721,868 (the "*Settlement Payment*").

WHEREAS, in further consideration of the aforementioned settlement, the Parties agree that Acuitas shall receive the right to purchase additional shares of Series D Preferred Stock and Warrants in an amount equal to $20,000,000 on the same terms and conditions as applicable to the purchase and sale of shares of Series D Preferred Stock as provided under the Securities Purchase Agreement, subject to certain conditions and modifications described herein (the "*Settlement Additional Purchase Right*") of units, consisting of one share of Preferred Stock and 185% Warrants for each share of Preferred Stock issued (collectively, the "*Securities*"), as more particularly provided herein.

**NOW, THEREFORE**, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the Company and Acuitas agree as follows:

**AGREED TERMS**

1.      Settlement by the Company. In consideration for the settlement of the claims described herein, (a) the Company agrees to grant Acuitas the Settlement Additional Purchase Right, which may be exercised by Acuitas from time to time, in its sole and absolute discretion in accordance with the same terms that apply to Additional Purchases as described in Section 4(p) of the Securities Purchase Agreement; provided, however, that (i) if Acuitas exercises its Settlement Additional Purchase Right, it shall receive Additional Warrants exercisable for 185% of shares of Common Stock at an exercise price equal to the closing price of the Common Stock as of the date of the Trading Day immediately prior to the exercise of the Second Additional Purchase Right and (ii) that Additional Warrants issued pursuant

to the Settlement Additional Purchase Right will be in the form attached hereto as <u>Exhibit A</u>; and (b) Acuitas agrees to issue to the Company a promissory note, a form of which is attached hereto as <u>Exhibit B</u>, which note shall have a principal amount equal to the Settlement Payment and which, *inter alia*, shall be immediately due and payable upon confirmation that the shares of Common Stock issuable upon conversion of the Series D Preferred Stock and Warrants issued pursuant to the Settlement Additional Purchase Right have been reserved for issuance and that the resale of such reserved shares of Common Stock have been registered on a registration statement filed with the U.S. Securities and Exchange Commission (the "***Commission***"). Shares of Series D Preferred Stock and Warrants purchased pursuant to the Settlement Additional Purchase Right shall be subject to the same terms and conditions of the Securities Purchase Agreement as if they were Additional Purchase Shares or Additional Warrants, respectively.

Acuitas acknowledges that the securities that it is acquiring pursuant to the Settlement Additional Purchase Right are "securities" as defined in Section 2(a)(1) of the Securities Act of 1933, as amended (the "***Securities Act***"). It represents that it is acquiring such securities solely for its own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of such securities. Acuitas understands that such securities have not been registered under the Securities Act or any state securities laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of it and of the other representations made by it in this Agreement. Acuitas understands that the Company is relying upon the representations and agreements contained in this Agreement (and any supplemental information) for the purpose of determining whether this transaction meets the requirements for such exemptions.

Acuitas understands that such securities are "restricted securities" under applicable federal securities laws and that the Securities Act and the rules of the Commission provide in substance that it may dispose of such securities only pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements of the Securities Act, and it understands that, except with regard to the terms of the Securities Purchase Agreement that apply to such securities, the Company has no obligation or intention to register any of such securities or the offering or sale thereof, or to take action so as to permit offers or sales pursuant to the Securities Act or an exemption from registration thereunder (including pursuant to Rule 144 thereunder). Accordingly, Acuitas understands that under the Commission's rules, it may dispose of such securities only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities," subject to the same limitations that apply to such securities in the hands of it. Consequently, Acuitas understands that it must bear the economic risks of the investment in such securities for an indefinite period of time.

Acuitas agrees: (A) that it will not sell, assign, pledge, give, transfer, or otherwise dispose of such securities or any interest therein, or make any offer or attempt to do any of the foregoing, unless the transaction is registered under the Securities Act and complies with the requirements of all applicable state securities laws, or the transaction is exempt from the registration provisions of the Securities Act and all applicable requirements of state securities laws; (B) that the certificates representing such securities or the books and records of the Company's transfer agent will bear a legend making reference to the foregoing restrictions; and (C) that the Company and its affiliates shall not be required to give effect to any purported transfer of such securities, except upon compliance with the foregoing restrictions.

2

Acuitas acknowledges that the Company did not offer to sell such securities to it by means of any form of general solicitation or advertising, including but not limited to: (A) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or (B) any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

The Parties acknowledge and agree that they are solely responsible for paying any attorneys' fees and costs they incurred and that neither Party nor its attorney(s) will seek any award of attorneys' fees or costs from the other Party, except as provided herein.

2.      [Reserved].

3.      Mutual Release. The Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, hereby release and discharge the other Party, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be discovered, or which may hereafter develop, for any acts or omissions related to or arising from the issuance of the Excess Stock, including all losses, costs, liabilities, obligations, expenses, fines, penalties, interest, expenditures, claims, awards, settlements, judgments, damages, reasonable and documented out-of-pocket attorneys' fees and reasonable out-of-pocket expenses of investigating, defending and prosecuting litigation relating to the issuance of the Excess Stock.

This Agreement resolves any claim for relief that is, or could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, costs, and attorneys' fees related to or arising from the issuance of the Excess Stock.

The Company agrees that each Buyer's full settlement of all claims or losses as described in this paragraph 3 is contingent upon the Company having filed with the Commission (at the Company's sole cost and expense) a registration statement registering the resale of the shares of Common Stock issuable pursuant to the conversion or exercise of securities issued upon exercise of the Settlement Additional Purchase Right (which registration statement shall include 100% and 200% of the shares of Common Stock initially issuable upon conversion of the Series D Preferred Stock and the

3

Warrants, respectively), the Company having brought such registration statement effective on or before April 1, 2023 and the Company using its commercially reasonable efforts to keep such registration continuously effective with respect to such shares, and to keep such registration statement or any subsequent shelf registration statement free of any material misstatements or omissions, until the earlier of the following: (1) each Buyer ceases to hold any of the shares of Common Stock issued pursuant to the conversion of the Additional Securities; (2) the date all such shares may be sold without restriction under Rule 144, including without limitation, any volume and manner of sale restrictions which may be applicable to affiliates under Rule 144 promulgated under the Securities Act and without the requirement for the Company to be in compliance with the current public information required under Rule 144(c)(1) or Rule 144(i)(2), as applicable, and (3) two years from the effective date of the registration statement registering such shares.

On or before April 1, 2023, the Company will qualify as a "well-known seasoned issuer" as that term is defined in Rule 405 under the Securities Act, provided that notwithstanding any provision to the contrary in any other agreements between the Parties hereto the Company may, in order to meet the conditions of such qualification, issue additional shares of its Common Stock to Acuitas or to other persons. To the extent that the Company qualifies as a "well-known seasoned issuer," the Company will file a registration statement on Form S-3 with automatic effectiveness on or before April 1, 2023 to register the resale of the shares of Common Stock issuable pursuant to the conversion or exercise of securities issued upon exercise of the Settlement Additional Purchase Right.

4.    No Outstanding or Known Future Claims/Causes of Action. Each Party affirms that it has not filed with any governmental agency or court any type of action or report against the other Party, and currently knows of no existing act or omission by the other Party that may constitute a claim or liability excluded from the release in paragraph 3 above.

5.    Acknowledgment of Settlement. The Parties, as broadly described in paragraph 3 above, acknowledge that (a) the consideration set forth in this Agreement, which includes, but is not limited to, the Settlement Payment, is in full settlement of all claims or losses of whatsoever kind or character that they have, or may ever have had, against the other Party, as broadly described in paragraph 3 above, including by reason of the issuance of the Excess Stock and (b) by signing this Agreement, and accepting the consideration provided herein and the benefits of it, they are giving up forever any right to seek further monetary or other relief from the other Party, as broadly described in paragraph 3 above, for any acts or omissions up to and including the date of this Agreement, including, without limitation, the issuance of the Excess Stock.

6.    No Admission of Liability. The Parties acknowledge that the Settlement Payment and the granting of the Settlement Additional Purchase Right provided herein was agreed upon as a compromise and final settlement of disputed claims and that neither the payment of the Settlement Payment nor the grant of the Settlement Additional Purchase Right may be construed as an admission of liability by either Party and is not to be construed as an admission that either Party engaged in any wrongful, tortious, or unlawful activity. The Company specifically disclaims and denies (a) any liability to Acuitas and (b) engaging in any wrongful, tortious, or unlawful activity.

7.    Agreement is Legally Binding. The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors,

4

administrators, heirs, and estates. Moreover, the persons and entities referred to in paragraph 3 above, but not a Party, are third-party beneficiaries of this Agreement.

8.　　Entire Agreement. The recitals set forth at the beginning of this Agreement are incorporated by reference and made a part of this Agreement. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the parties hereto.

9.　　New or Different Facts: No Effect. Except as provided herein, this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement or the discovery or existence of any new or additional fact, or any fact different from that which either Party now knows or believes to be true. Notwithstanding the foregoing, nothing in this Agreement shall be construed as, or constitute, a release of any Party's rights to enforce the terms of this Agreement.

10.　　Interpretation. Should any provision of this Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement. The headings within this Agreement are purely for convenience and are not to be used as an aid in interpretation. Moreover, this Agreement shall not be construed against either Party as the author or drafter of the Agreement.

11.　　Choice of Law. This Agreement is governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York.

12.　　Reliance on Own Counsel. In entering into this Agreement, the Parties acknowledge that they have relied upon the legal advice of their respective attorneys, who are the attorneys of their own choosing, that such terms are fully understood and voluntarily accepted by them, and that, other than the consideration set forth herein, no promises or representations of any kind have been made to them by the other Party. The Parties represent and acknowledge that in executing this Agreement they did not rely, and have not relied, upon any representation or statement, whether oral or written, made by the other Party or by that other Party's agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise.

13.　　Counterparts. This Agreement may be executed by the Parties in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.　　Authority to Execute Agreement. By signing below, each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any by-law, covenants, and/or other restrictions placed upon them by their respective entities.

**READ THE FOREGOING DOCUMENT CAREFULLY. IT INCLUDES A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

[SIGNATURE PAGE FOLLOWS]

6

   **IN WITNESS WHEREOF,** and intending to be legally bound, each of the Parties hereto has caused this Agreement to be executed as of the date(s) set forth below.

**Mullen Automotive Inc.**

By:     /s/ David Michery

Name:   David Michery

Title:    Chief Executive Officer

[Signature Page to Settlement Agreement and Release - Warrants]

**Acuitas Capital, LLC**

By:      /s/ Terren Peizer
Name:  Terren Peizer
Title:    Chief Executive Officer

[Signature Page to Settlement Agreement and Release - Warrants]

**Exhibit A**

**Form of Warrant**

(Attached)

**Exhibit B**

**Form of Note**

(Attached)

**Exhibit 10.23 (a)**

# PROMISSORY NOTE

| $17,721,868 | January 13, 2023 |
|---|---|

FOR VALUE RECEIVED, Acuitas Capital LLC, a Delaware limited liability company (the "**Borrower**") hereby unconditionally promises to pay to the order of Mullen Automotive Inc., a Delaware corporation (the "**Noteholder**") the principal amount of $17,721,868 (SEVENTEEN MILLION SEVEN HUNDRED TWENTY-ONE EIGHT HUNDRED SIXTY-EIGHT dollars) (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**"). Capitalized terms not defined herein shall have the same meaning as set forth in the Settlement Agreement and Release, entered into as of January __, 2023, by and between the Borrower and the Noteholder.

    1.    <u>Payment Dates</u>.

    (a)    <u>Payment Date</u>. The aggregate unpaid principal amount of the Loan, all accrued and unpaid interest, and all other amounts payable under this Note shall be due and payable on the earlier of (i) the date on which shares of Common Stock issuable upon conversion of the Series D Preferred Stock and Warrants issued pursuant to the Settlement Additional Purchase Right have been reserved for issuance and that the resale of such reserved shares of Common Stock have been registered on a registration statement filed with the U.S. Securities and Exchange Commission, and (ii) February 1, 2024.

    (b)    <u>Prepayment</u>. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

    2.    <u>Interest</u>.

    (a)    <u>Interest Rate</u>. Except as provided in Section 2(b), the principal amount outstanding under this Note from time to time shall bear interest at a rate per annum (the "**Interest Rate**") equal to three and a half percent (3.5%).

    (b)    <u>Default Interest</u>. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus two percent (2%) (the "**Default Rate**").

    (c)    <u>Computation of Interest</u>. All computations of interest hereunder shall be made on the basis of a year of 360 days, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. For any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

(d)    Interest Rate Limitation. If at any time the Interest Rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such Interest Rate shall be reduced automatically to the maximum rate permitted.

3.    Payment Mechanics.

(a)    Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 12:00 on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b)    Application of Payments. All payments shall be applied, *first*, to accrued interest, and, *second*, to principal outstanding under this Note.

(c)    Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in New York, NY are authorized or required by law to close.

(d)    Evidence of Debt. The Borrower authorizes the Noteholder to record on the grid attached as **Exhibit A** the Loan made to the Borrower and the date and amount of each payment or prepayment of the Loan. The entries made by the Noteholder shall be *prima facie* evidence of the existence and amount of the obligations of the Borrower recorded therein in the absence of manifest error. No failure to make any such record, nor any errors in making any such records, shall affect the validity of the Borrower's obligation to repay the unpaid principal of the Loan with interest in accordance with the terms of this Note.

4.    Representations and Warranties. The Borrower represents and warrants to the Noteholder as follows:

(a)    Existence. The Borrower is a limited liability company duly formed, validly existing, and in good standing under the laws of the state of its organization. The Borrower has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

(b)    Compliance with Law. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower, its property, and business.

(c)    Power and Authority. The Borrower has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

(d)    Authorization; Execution and Delivery. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly

authorized by all necessary limited liability action in accordance with applicable law. The Borrower has duly executed and delivered this Note.

5. <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a) <u>Failure to Pay</u>. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan when due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b) <u>Breach of Representations and Warranties</u>. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made; *provided*, *however*, no Event of Default shall be deemed to have occurred pursuant to this Section 5(b) if, within thirty (30) days of the date on which the Borrower receives notice (from any source) of such untrue or misleading statement, Borrower shall have addressed the adverse effects of such untrue or misleading statement to the reasonable satisfaction of the Noteholder.

(c) <u>Bankruptcy; Insolvency</u>.

(i) The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii) An involuntary case is commenced seeking the liquidation or reorganization of the Borrower under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

(iii) The Borrower makes a general assignment for the benefit of its creditors.

(iv) The Borrower is unable, or admits in writing its inability, to pay its debts as they become due.

(v) A case is commenced against the Borrower or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

(d) <u>Failure to Give Notice.</u> The Borrower fails to give the notice of Event of Default specified in 6.

6. <u>Notice of Event of Default</u>. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.      Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.      Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the enforcement of the Noteholder's rights hereunder.

9.      Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a)      If to the Borrower:

Acuitas Capital, LLC
2120 Colorado Avenue, Suite 230
Santa Monica, California 90404
Attention: Terren Peizer, Managing Member
E-mail: terren@AcuitasGH.com

(b)      If to the Noteholder:

Mullen Automotive Inc.
1405 Pioneer Street
Brea, California 92821
Attention: David Michery, CEO
Email: david@mullenusa.com

With a copy (for informational purposes only) to:
McDermot Will & Emery LLP
One Vanderbilt Avenue
New York, New York 10017
Attn: Robert Cohen
Email: RCohen@mwe.com

10.      Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the

4

transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of New York.

11.  Disputes.

(a)  Submission to Jurisdiction.

(i)  The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of New York sitting in New York County, and in the United States District Court for the Southern District of New York, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii)  Nothing in this Section 11(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii)  Nothing in this Section 11(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b)  Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c)  Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12.  Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13.  Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

14.  Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any

5

waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15.     No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

16.     Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

17.     Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

18.     Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq*.), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), and any other similar state laws based on the Uniform Electronic Transactions Act.

6

IN WITNESS WHEREOF, the Borrower has executed this Note as of January 13, 2023.

**ACUITAS CAPITAL, LLC**

By:  /s/ Terren Peizer
      Name: Terren Peizer
      Title: Managing Member

[Signature Page - Promissory Note]

ACKNOWLEDGED AND ACCEPTED BY

**MULLEN AUTOMOTIVE INC.**

By:   /s/ David Michery
        Name: David Michery
        Title: Chief Executive Officer

[Signature Page - Promissory Note]

**EXHIBIT A**

**PAYMENTS ON THE LOAN**

| Date | Principal Amount Paid | Unpaid Principal Balance | Name of Person Making Notation |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Exhibit 10.24**

## WAIVER AGREEMENT

THIS WAIVER AGREEMENT (this "**Agreement**") is entered into as of January 12, 2023, by and among Mullen Automotive Inc., a Delaware corporation (the "**Company**"), and the persons set forth on the signatures pages attached hereto (each, a "**Holder**" and collectively, the "**Holders**").

WHEREAS, the Holders are, or were previously, registered holders and beneficial owners of all of the issued and outstanding shares of the Company's Series C Preferred Stock, $0.001 par value per share (the "**Series C Preferred**");

WHEREAS, pursuant to Article III(B)1(a) of the Second Amended and Restated Certificate of Incorporation of the Company filed with the Secretary of State of Delaware as of November 5, 2021 (as amended, the "**Certificate of Incorporation**"), the Series C Preferred is currently entitled to receive a cumulative dividend that shall accrue, whether or not declared by the board of directors of the Company and whether or not there are funds legally available for the payment of dividends, on a daily basis in arrears at the rate of 15.0% per annum on the sum of the Series C Original Issue Price (as defined in the Certificate of Incorporation) plus all unpaid accrued and accumulated dividends thereon (the "**Series C Dividends**");

WHEREAS, the original intent of the Company and the Holders is that no dividends would accrue and be due and payable by the Company on the Series C Preferred; and

WHEREAS, as consideration for this Agreement, the Company has agreed to grant the Holders a right to purchase up to an aggregate of $2.0 million of shares of its capital stock.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Holders hereby agree as follows:

1.   Waiver. The Holders hereby irrevocably and unconditionally waive all and any rights they may hold, and, prior to the date hereof, held to receive Series C Dividends, including, without limitation, any unpaid accrued and accumulated Series C Dividends. For clarity, this waiver applies to all Series C Dividends that would accrue or be paid on or after the date hereof, together with any and all Series C Dividends that have accrued but have not been paid as of the date hereof. Except as specifically provided herein, this Waiver Agreement does not, and is not intended to, effect the waiver of any other rights held by the Holders under the Certificate of Incorporation.

2.   Certificates and Transfer. It is the intention of the Holders and the Company that the waiver set forth in Section 1 above shall be binding on the Holders and on any transferees of any shares of Series C Preferred. Therefore, the Holders agree to surrender all certificates representing shares of Series C Preferred to the Company for addition of a legend noting the waiver of certain dividend rights pursuant to this Waiver Agreement. Additionally, the Holders agree that the shares of Series C Preferred Stock that they currently hold may not be transferred, including by operation of law, unless the transferee agrees in writing to be bound by the terms of this Waiver Agreement. Any purported transfer of shares of Series C Preferred Stock in contravention of the foregoing sentence shall be null and void.

3.  Representations of the Parties. Each party hereby represents and warrants to the others that:

(a)     The execution and delivery and performance by such party of this Waiver Agreement: (i) is within such party's power, (ii) has been duly authorized by all necessary action of such party, (iii) is not in contravention of such party's organizational documents (as applicable), (iv) does not violate any law or regulation, or any order or decree of any governmental authority applicable to such party, and (v) does not conflict with, or result in the breach or termination, constitute default under or accelerate any performance required by, any agreement to which such party is bound.

(b)     This Waiver Agreement has been duly executed and delivered by or on behalf of such party and constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms except as the enforceability may be limited by bankruptcy, insolvency, organization, moratorium and other laws affecting creditors' rights and remedies in general.

4.  Purchase Right.    For a period of 10 days from the date hereof, each Holder shall have the right, but not the obligation, at any time from time to time, in its sole and absolute discretion to purchase additional shares of capital stock of the Company in an amount equal to such Holder's pro rata ownership of Series C Preferred upon such terms and conditions agreed upon by the Company and such Holder. Holder may exercise such right by the delivery of written notice to the Company.

5.  Miscellaneous.

(a)     This Waiver Agreement may be executed in any number of counterparts, with all such counterparts constituting one agreement, binding on all of the parties hereto.

(b)     This Waiver Agreement shall be governed by and construed exclusively in accordance with the internal laws of the State of Delaware, without regard to the conflicts of laws principles thereof. The parties hereby irrevocably agree that any suit or proceeding arising directly and/or indirectly pursuant to or under this Waiver Agreement shall be brought solely in a federal or state court located in the State of Delaware. By execution hereof, the parties hereby covenant and irrevocably submit to the jurisdiction of the federal and state courts located in the State of Delaware and agree that any process in any such action may be served upon any of them personally, or by certified mail or registered mail addressed to them or their agent, returned receipt requested, with the same force and effect as personally served upon them in the State of Delaware. The parties hereto expressly and irrevocably waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense or lack of jurisdiction with respect thereto. In the event of any such action or proceeding, the party prevailing therein shall be entitled to payment from the other party to such action of its reasonably attorney's fees and disbursements.

(c)     Each party agrees that it shall do and preform or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificate, instruments, waivers and documents, as the other parties many reasonably request in order to carry out the intent and accomplish the purposes of this Waiver Agreement.

2

(d)     The terms and conditions of this Waiver Agreement shall inure to the benefit of and be binding upon their respective successors and assigns, including any transferees of the Series C Preferred.

(e)     Any notice required or permitted by this Waiver Agreement shall be in writing and shall be deemed sufficient upon delivery, when delivered personally or by overnight courier or sent by facsimile (upon customary confirmation of receipt), addressed to the party to be notified at such party's address as set forth in the books and records of the Company.

(f)     Prior to executing this Waiver Agreement, the Company and each of the Holders have had the benefit of the advice and counsel of their own independent attorneys in understanding and negotiating the terms of this Waiver Agreement.

(g)     This Waiver Agreement and the documents referred to herein, constitute the entire agreement between the parties pertaining to the subject matter hereof.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

3

IN WITNESS WHEREOF, the parties have caused this Waiver Agreement to be duly executed and delivered as of the date in and set forth above.

**Mullen Automotive Inc.**

By: /s/ David Michery
Name: David Michery
Title: Chief Executive Officer

[Signature Page to the Waiver Agreement]

IN WITNESS WHEREOF, the parties have caused this Waiver Agreement to be duly executed and delivered as of the date in and set forth above.

**HOLDER:**

By/Signature: _____

Name:

[Signature Page to the Waiver Agreement]

Execution Version

Exhibit 10.25

## SETTLEMENT AGREEMENT AND RELEASE

**THIS SETTLEMENT AGREEMENT AND RELEASE** (this "*Agreement*") is entered into as of January 13, 2023 by and among (a) Mullen Automotive Inc., a Delaware corporation (the "*Company*"), and (b) the Buyers listed on the signature pages hereto (collectively, the "**Buyers**" and each, a "**Buyer**"). Collectively, the Company and the Buyers shall be referred to as the "**Parties**". Capitalized terms not defined herein shall have the same meaning as set forth in the Securities Purchase Agreement (as defined below).

### RECITALS

WHEREAS, the Parties entered into a Securities Purchase Agreement, dated as of June 7, 2022 (as amended, the "*Securities Purchase Agreement*"), pursuant to which, upon the terms and subject to the conditions contained therein, the Buyers have purchased and shall purchase on the Purchase Date the Commitment Amount of shares of the Company's Series D Preferred Stock, par value $0.001 per share (the "*Series D Preferred Stock*"), and Warrants.

WHEREAS, on November 15, 2022, the Parties entered into Amendment No. 3 ("Amendment No. 3") to the Securities Purchase Agreement, pursuant to which, the Buyers paid $150 million and, in lieu of receiving shares of Series D Preferred Stock and Warrants, received notes convertible into shares of the Company's Common Stock and Warrants ("*Notes*").

WHEREAS, the Company is currently in default under the Securities Purchase Agreement, the Notes and the Warrants (the "*Default*").

WHEREAS, the Buyers agree to waive the Default and all damages that are incurred as a result of the Default prior to February 1, 2023 (the "*Waiver*").

WHEREAS, in consideration for the Waiver, the Company shall grant the Buyers the right to purchase from the Company additional shares of Series D Preferred Stock and Warrants in an amount equal to such Buyer's pro rata portion of $10,000,000 on the same terms and conditions as applicable to the purchase and sale of shares of Series D Preferred Stock as provided under the Securities Purchase Agreement, subject to certain conditions and modifications described herein (the "*Second Additional Purchase Right*").

**NOW, THEREFORE**, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the Company and the Buyers agree as follows:

### AGREED TERMS

1.      Settlement by the Company. In consideration for the settlement of the claims described herein, the Company agrees to grant each Buyer the Second Additional Purchase Right, which may be exercised by each Buyer from time to time, in its sole and absolute discretion in accordance with the same terms that apply to Additional Purchases as described in Section 4(p) of the Securities Purchase Agreement; provided, however, that (i) any Buyer that exercises its Second Additional Purchase Right shall receive Additional Warrants exercisable for 185% of shares of Common Stock at an exercise price equal to the closing price of the Common Stock as of the date of the Trading Day immediately prior to

the exercise of the Second Additional Purchase Right and (ii) that Additional Warrants issued pursuant to the Second Additional Purchase Right will be in the form attached hereto as Exhibit A. Shares of Series D Preferred Stock and Warrants purchased pursuant to the Second Additional Purchase Right shall be subject to the same terms and conditions of the Securities Purchase Agreement as if they were Additional Purchase Shares or Additional Warrants, respectively.

Each Buyer acknowledges that the securities it is acquiring pursuant to the Second Additional Purchase Right are "securities" as defined in Section 2(a)(1) of the Securities Act of 1933, as amended (the "***Securities Act***"). Each Buyer represents that it is acquiring such securities solely for its own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of the securities. Each Buyer understands that such securities have not been registered under the Securities Act or any state securities laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of it and of the other representations made by it in this Agreement. Each Buyer understands that the Company is relying upon the representations and agreements contained in this Agreement (and any supplemental information) for the purpose of determining whether this transaction meets the requirements for such exemptions.

Each Buyer understands that such securities are "restricted securities" under applicable federal securities laws and that the Securities Act and the rules of the U.S. Securities and Exchange Commission (the "***Commission***") provide in substance that it may dispose of such securities only pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements of the Securities Act, and it understands that, except with regard to the terms of the Securities Purchase Agreement that apply to such securities, the Company has no obligation or intention to register any such securities or the offering or sale thereof, or to take action so as to permit offers or sales pursuant to the Securities Act or an exemption from registration thereunder (including pursuant to Rule 144 thereunder). Accordingly, each Buyer understands that under the Commission's rules, it may dispose of such securities only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities," subject to the same limitations that apply to such securities in the hands of it. Consequently, each Buyer understands that it must bear the economic risks of the investment in such securities for an indefinite period of time.]

Each Buyer agrees: (A) that it will not sell, assign, pledge, give, transfer, or otherwise dispose of such securities or any interest therein, or make any offer or attempt to do any of the foregoing, unless the transaction is registered under the Securities Act and complies with the requirements of all applicable state securities laws, or the transaction is exempt from the registration provisions of the Securities Act and all applicable requirements of state securities laws; (B) that the certificates representing such securities or the books and records of the Company's transfer agent will bear a legend making reference to the foregoing restrictions; and (C) that the Company and its affiliates shall not be required to give effect to any purported transfer of such securities, except upon compliance with the foregoing restrictions.

Each Buyer acknowledges that the Company did not offer to sell such securities to it by means of any form of general solicitation or advertising, including but not limited to: (A) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or (B) any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

2

The Parties acknowledge and agree that they are solely responsible for paying any attorneys' fees and costs they incurred and that neither Party nor its attorney(s) will seek any award of attorneys' fees or costs from the other Party, except as provided herein.

2.    <u>Reserved</u>.

3.    <u>Mutual Release</u>. The Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, hereby release and discharge the other Party, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be discovered, or which may hereafter develop, for any acts or omissions related to or arising from the Default, including all losses, costs, liabilities, obligations, expenses, fines, penalties, interest, expenditures, claims, awards, settlements, judgments, damages, reasonable and documented out-of-pocket attorneys' fees and reasonable out-of-pocket expenses of investigating, defending and prosecuting litigation relating to the Default that were incurred prior to February 1, 2023.

This Agreement resolves any claim for relief that is, or could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, costs, and attorneys' fees related to or arising from the Default.

The Company agrees that each Buyer's full settlement of all claims or losses as described in this paragraph 3 is contingent upon the Company having filed with the Commission (at the Company's sole cost and expense) a registration statement registering the resale of the shares of Common Stock issuable pursuant to the conversion or exercise of securities issued upon exercise of the Second Additional Purchase Right (which registration statement shall include 100% and 200% of the shares of Common Stock initially issuable upon conversion of the Series D Preferred Stock and the Warrants, respectively), the Company having brought such registration statement effective on or before April 1, 2023 and the Company using its commercially reasonable efforts to keep such registration continuously effective with respect to such shares, and to keep such registration statement or any subsequent shelf registration statement free of any material misstatements or omissions, until the earlier of the following: (1) each Buyer ceases to hold any of the shares of Common Stock issued pursuant to the conversion of the Additional Securities; (2) the date all such shares may be sold without restriction under Rule 144, including without limitation, any volume and manner of sale restrictions which may be

3

applicable to affiliates under Rule 144 promulgated under the Securities Act and without the requirement for the Company to be in compliance with the current public information required under Rule 144(c)(1) or Rule 144(i)(2), as applicable, and (3) two years from the effective date of the registration statement registering such shares.

On or before April 1, 2023, the Company will qualify as a "well-known seasoned issuer" as that term is defined in Rule 405 under the Securities Act, provided that notwithstanding any provision to the contrary in any other agreements between the Parties hereto the Company may, in order to meet the conditions of such qualification, issue additional shares of its Common Stock to the Buyers or to other persons. To the extent that the Company qualifies as a "well-known seasoned issuer," the Company will file a registration statement on Form S-3 with automatic effectiveness on or before April 1, 2023 to register the resale of the shares of Common Stock issuable pursuant to the conversion or exercise of securities issued upon exercise of the Second Additional Purchase Right.

4.    No Outstanding or Known Future Claims/Causes of Action. Each Party affirms that it has not filed with any governmental agency or court any type of action or report against the other Party, and currently knows of no existing act or omission by the other Party that may constitute a claim or liability excluded from the release in paragraph 3 above.

5.    Acknowledgment of Settlement. The Parties, as broadly described in paragraph 3 above, acknowledge that (a) the consideration set forth in this Agreement, which includes, but is not limited to, the Waiver and the issuance of Company securities, is in full settlement of all claims or losses of whatsoever kind or character that they have, or may ever have had, against the other Party, as broadly described in paragraph 3 above, including by reason of the Default and (b) by signing this Agreement, and accepting the consideration provided herein and the benefits of it, they are giving up forever any right to seek further monetary or other relief from the other Party, as broadly described in paragraph 3 above, for any acts or omissions up to and including the date of this Agreement, including, without limitation, the Default.

6.    No Admission of Liability. The Parties acknowledge that the Waiver and the issuance of such securities were agreed upon as a compromise and final settlement of disputed claims and that neither the Waiver nor the issuance of such securities is, and may be construed as, an admission of liability by any Party and are not to be construed as an admission that any Party engaged in any wrongful, tortious, or unlawful activity. The Company specifically disclaims and denies (a) any liability to the Buyers and (b) engaging in any wrongful, tortious, or unlawful activity.

7.    Agreement is Legally Binding. The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs, and estates. Moreover, the persons and entities referred to in paragraph 3 above, but not a Party, are third-party beneficiaries of this Agreement.

8.    Entire Agreement. The recitals set forth at the beginning of this Agreement are incorporated by reference and made a part of this Agreement. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the parties hereto.

4

9.      New or Different Facts: No Effect. Except as provided herein, this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement or the discovery or existence of any new or additional fact, or any fact different from that which either Party now knows or believes to be true. Notwithstanding the foregoing, nothing in this Agreement shall be construed as, or constitute, a release of any Party's rights to enforce the terms of this Agreement.

10.      Interpretation. Should any provision of this Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement. The headings within this Agreement are purely for convenience and are not to be used as an aid in interpretation. Moreover, this Agreement shall not be construed against either Party as the author or drafter of the Agreement.

11.      Choice of Law. This Agreement is governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York.

12.      Reliance on Own Counsel. In entering into this Agreement, the Parties acknowledge that they have relied upon the legal advice of their respective attorneys, who are the attorneys of their own choosing, that such terms are fully understood and voluntarily accepted by them, and that, other than the consideration set forth herein, no promises or representations of any kind have been made to them by the other Party. The Parties represent and acknowledge that in executing this Agreement they did not rely, and have not relied, upon any representation or statement, whether oral or written, made by the other Party or by that other Party's agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise.

13.      Counterparts. This Agreement may be executed by the Parties in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.      Authority to Execute Agreement. By signing below, each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any by-law, covenants, and/or other restrictions placed upon them by their respective entities.

**READ THE FOREGOING DOCUMENT CAREFULLY. IT INCLUDES A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

[SIGNATURE PAGE FOLLOWS]

5

IN WITNESS WHEREOF, and intending to be legally bound, each of the Parties hereto has caused this Agreement to be executed as of the date(s) set forth below.

**Mullen Automotive Inc.**

By:  /s/ David Michery

Name: David Michery

Title:  Chief Executive Officer

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

**Esousa Holdings, LLC**

By:    /s/ Michael Wachs

Name:  Michael Wachs

Title:  Managing Member

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

**Acuitas Capital, LLC**

By:     /s/ Terren Peizer
Name: Terren Peizer
Title:  Chief Executive Officer

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

**Davis-Rice Pty Limited**

By:    /s/ Timothy Davis-Rice
Name:  Timothy Davis-Rice
Title:   Director

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

**Digital Power Lending, LLC**

By:     /s/ David J. Katzoff
Name:   David J. Katzoff
Title:   Manager

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

/s/ Jess Mogul
**Jess Mogul**

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

/s/ Jim Fallon

**Jim Fallon**

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

/s/ Michael Friedlander

**Michael Friedlander**

[Signature Page to Settlement Agreement and Release - Securities Purchase Agreement]

Exhibit 10.25(a)

**WARRANT**

**MULLEN AUTOMOTIVE INC.**

**WARRANT TO PURCHASE COMMON STOCK**

Date of Issuance: [•] ("**Issuance Date**")

Mullen Automotive Inc., a Delaware corporation (the "**Company**"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **[•]**, the registered holder hereof or its permitted assigns (the "**Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon exercise of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "**Warrant**"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York time, on the Expiration Date (as defined below), **[•]** (subject to adjustment as provided herein) fully paid and non-assessable shares of Common Stock (as defined below) (the "**Warrant Shares**"). Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 16. This Warrant is one of the Warrants to purchase Series D Preferred Stock (the "**SPA Warrants**") issued to Holder pursuant to that certain Securities Purchase Agreement dated June 7, 2022 by and between the Company and the Holder (the "**Securities Purchase Agreement**").

1.    EXERCISE OF WARRANT.

    (a)    Mechanics of Exercise. Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as **Exhibit A** (the "**Exercise Notice**"), of the Holder's election to exercise this Warrant. Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (in respect of such specific exercise, the "**Aggregate Exercise Price**") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)). The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder. Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant certificate and issuance of a new Warrant certificate evidencing the right to purchase the remaining number of Warrant Shares. Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant certificate after delivery of the Warrant Shares in accordance with the terms hereof. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as Exhibit B, to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (the "**Required Delivery Date**"), the Company shall (i) *provided* that the Transfer Agent is participating in The Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program (which the Company shall cause the Transfer Agent to do at Holder's request) and provided the legends would be eligible to be removed from such shares of Common Stock pursuant to Section 5(d) of the Securities Purchase Agreement, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/ Withdrawal at Custodian system, or (ii) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or the legends would not be eligible to be removed from such shares of Common Stock pursuant to Section 5(d) of the Securities Purchase Agreement, issue and deliver to the Holder or, at the Holder's instruction pursuant to the Exercise Notice, the Holder's agent or designee, in each case, sent by reputable overnight courier to the address as specified in the applicable Exercise Notice, a certificate, registered in the Company's share register in the name of the Holder or its designee (as indicated in the applicable Exercise Notice), for the number of shares of Common Stock to which the Holder is entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares (as the case may be). If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant is greater than the number of Warrant Shares being acquired upon an exercise, then, at the request of the Holder and upon surrender hereof by the Holder at the principal office of the Company, the Company shall as soon as practicable and in no event later than three (3) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all taxes and fees which may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant.

    (b)    Exercise Price. For purposes of this Warrant, "**Exercise Price**" means $[•], subject to adjustment as provided herein.

(c)     Company's Failure to Timely Deliver Securities. If the Company fails to issue and deliver (or cause to be delivered) to the Holder by the Required Delivery Date a certificate representing the Warrant Shares that is free from all restrictive and other legends or credit the balance account of Holder or Holder's nominee with DTC for such number of Warrant Shares so delivered to the Company, then, in addition to all other remedies available to Holder, at the sole discretion of Holder, the Company shall:

(i)     pay in cash to Holder on each Trading Day after the Required Delivery Date that the issuance or credit of such Warrant Shares is not timely effected an amount equal to 1 % of the product of (A) the number of shares of Common Stock not so delivered or credited (as the case may be) to Holder or Holder's nominee multiplied by (B) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the Required Delivery Date; or

(ii)     if on or after the Required Delivery Date, Holder (or any other Person in respect, or on behalf, of Holder) purchases (in an open market transaction or otherwise) Common Stock ("**Replacement Shares**") to deliver in satisfaction of a sale by Holder of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock equal to all or any portion of the number of shares of Common Stock, that Holder so anticipated receiving from the Company without any restrictive legend, then, within five (5) Trading Days after Holder's request and in Holder's sole discretion, either (A) pay cash to Holder in an amount equal to Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the Replacement Shares (the "**Buy-In Price**"), at which point the Company's obligation to so deliver such certificate or credit Holder's balance account shall terminate and such shares shall be cancelled, or (B) promptly honor its obligation to so deliver to Holder a certificate or certificates or credit Holder's DTC account representing such number of shares of Common Stock that would have been so delivered if the Company timely complied with its obligations hereunder and pay cash to Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (1) such number of shares of Common Stock that the Company was required to deliver to Holder by the Required Delivery Date multiplied by (2) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date Holder purchased Replacement Shares and ending on the date of such delivery and payment under this clause (ii).

To the extent permitted by law, the Company's obligations to issue and deliver the Common Stock upon exercise of the Warrant in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder or any other person of any obligation to the Company or any violation or alleged violation of law by the Holder or any other person, and irrespective of any other circumstance that might otherwise limit such obligation of the Company to the Holder in connection with the issuance of the Common Stock. Nothing herein shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver the Common Stock issuable upon exercise of this Warrant as required pursuant to the terms hereof.

(d)     Cashless Exercise. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below) at any time the Holder may in its sole discretion (and without limiting the Holder's rights and remedies contained herein or in any of the other Transaction Documents (as defined in the Securities Purchase Agreement)), exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of shares of Common Stock determined according to the following formula (a "**Cashless Exercise**"):

Net Number = (A x B) / C

For purposes of the foregoing formulas:

A=     The total number of shares with respect to which this Warrant is then being exercised.
B=     The Black Scholes Value (as defined in Section 16 herein).
C=     The Closing Bid Price of the Common Stock in the day prior the time of such exercise (as such Closing Bid Price is defined in Section 16 herein), but in any event not less than $0.10 per share of Common Stock (the "**Floor Price**"), which Floor Price, for the avoidance of doubt, shall not be adjusted for stock dividends, subdivisions, or combinations in the manner described in Section 2(a) herein.

(e)     Disputes. In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to the terms hereof (including, without limitation, the Net Number), the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed, *provided* that following such issuance to Holder such dispute shall be resolved in accordance with Section 13.

(f)     Limitations on Exercises and Exchanges. Notwithstanding anything to the contrary contained in this Warrant, this Warrant shall not be exercisable or exchangeable by the Holder hereof to the extent (but only to the extent) that the Holder or any of its affiliates would beneficially own in excess of 9.99% of the number of shares of Common Stock outstanding after giving effect to the issuance of Common Stock issuable upon exercise of the Warrants calculated in accordance with Section 13(d) of the Exchange Act (the "**Maximum Percentage**"). To the extent the above limitation applies, the determination of whether this Warrant shall be exercisable or exchangeable (vis-à-vis other convertible, exercisable or exchangeable securities owned by the Holder or any of its affiliates) and of which such securities shall be exercisable or exchangeable (as among all such securities owned by the Holder) shall, subject to such Maximum Percentage limitation, be determined on the basis of the first submission to the Company for conversion, exercise or exchange (as the case may be). No prior inability to exercise or exchange this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability or exchangeability. For the purposes of this paragraph, beneficial ownership and all determinations and calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Section 13(d) of the 1934 Act (as defined in the Securities Purchase Agreement) and the rules and regulations promulgated thereunder. The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Maximum Percentage beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such Maximum Percentage limitation. The limitations contained in this paragraph shall apply to a successor Holder of this

Warrant. The holders of Common Stock shall be third party beneficiaries of this paragraph and the Company may not waive this paragraph without the consent of holders of a majority of its Common Stock. For any reason at any time, upon the written or oral request of the Holder, the Company shall within two (2) Business Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise or exchange of convertible or exercisable or exchangeable securities into shares of Common Stock, including, without limitation, pursuant to this Warrant or securities issued pursuant to the Securities Purchase Agreement.

(g) Reservation of Shares; Insufficient Authorized Shares. The Company shall initially reserve out of its authorized and unissued shares of Common Stock a number of shares of Common Stock equal to 250% of the maximum number of Warrant Shares issuable to satisfy the Company's obligations to issue shares of Common Stock hereunder, and the Company shall at all times keep reserved for issuance under this Warrant a number of shares of Common Stock equal to 250% of the maximum number of Warrant Shares issuable to satisfy the Company's obligation to issue shares of Common Stock hereunder.

(h) Activity Restrictions. For so long as Holder holds this Warrant or any Warrant Shares, Holder will not: (i) engage or participate in any actions, plans or proposals which relate to or would result in (a) acquiring additional securities of the Company, alone or together with any other Person, which would result in beneficially owning or controlling, or being deemed to beneficially own or control, more than 9.99% of the total outstanding shares of Common Stock or other voting securities of the Company, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving Company, (c) a sale or transfer of a material amount of assets of the Company, (d) any change in the present board of directors or management of the Company, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board, (e) any material change in the present capitalization or dividend policy of the Company, (f) any other material change in the Company's business or corporate structure, including but not limited to, if the Company is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote is required by Section 13 of the Investment Company Act of 1940, (g) changes in the Company's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the Company by any Person, (h) causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, (i) a class of equity securities of the Company becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act, or (j) any action, intention, plan or arrangement similar to any of those enumerated above, or (ii) request the Company or its directors, officers, employees, agents or representatives to amend or waive any provision of this Section 1(h); *provided*, *however*, that notwithstanding anything to the contrary contain in clauses (i) and (ii) above, Holder may vote any shares of Common Stock owned or controlled by it, solicit any proxies, or seek to advise or influence any Person with respect to any voting securities of the Company. Holder may only exercise this Warrant for a cash exercise price if the trading price at the time of exercise is greater than the then applicable Exercise Price.

2. ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

(a) Stock Dividends and Splits. Without limiting any provision of Section 4, if the Company, at any time on or after the date of the Securities Purchase Agreement, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of shareholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b) [Reserved].
(c) [Reserved].
(d) [Reserved].

(e)     Other Events. In the event that the Company shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 2 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the number of Warrant Shares (if applicable) so as to protect the rights of the Holder, *provided* that no such adjustment pursuant to this Section 2(e) will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to this Section 2, *provided further* that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding and whose fees and expenses shall be borne by the Company.

3.     RIGHTS UPON DISTRIBUTION OF ASSETS. In addition to any adjustments pursuant to Section 2 above, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, indebtedness, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction, other than a distribution of Common Stock covered by Section 2(a)) (a "**Distribution**"), at any time after the issuance of this Warrant, then, in each such case, provision shall be made so that upon exercise of this Warrant, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the participation in such Distribution (*provided*, *however*, to the extent that the Holder's right to participate in any such Distributions would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to such extent (or the beneficial ownership of any such Common Stock as a result of such Distribution to such extent) and such Distribution to such extent shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage).

4.     PURCHASE RIGHTS; FUNDAMENTAL TRANSACTIONS.

(a)     Purchase Rights. In addition to any adjustments pursuant to Section 2 above, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (*provided*, *however*, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage).

(b)     Fundamental Transactions. The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Warrant and the other Transaction Documents related to this Warrant in accordance with the provisions of this Section 4(b) pursuant to written agreements in form and substance reasonably satisfactory to the Holder, including agreements confirming the obligations of the Successor Entity as set forth in this paragraph (b) and (c) and elsewhere in this Warrant and an obligation to deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant, including, without limitation, which is exercisable for a corresponding number of shares of capital stock equivalent to the Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such adjustments to the number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction). Notwithstanding the foregoing, at the election of the Holder upon exercise of this Warrant following a Fundamental Transaction, the Successor Entity shall deliver to the Holder, in lieu of the Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 3 and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of this Warrant prior to the applicable Fundamental Transaction, such shares of common stock (or its equivalent) of the Successor Entity (including its Parent Entity), or other securities, cash, assets or other property, which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction; *provided*, *however*, that such amount of reserved shares of Common Stock shall be limited by the Maximum Percentage of Common Stock as set forth in Section 1(f).

(c)     Black Scholes Value - FT. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time commencing on the earliest to occur of (i) the public disclosure of any Fundamental Transaction, (ii) the consummation of any Fundamental Transaction and (iii) the Holder first becoming aware of any Fundamental Transaction through the date that is ninety (90) days after the public disclosure of the consummation of such Fundamental Transaction, the Company or the Successor Entity, at the election of the Holder, shall purchase this Warrant from the Holder on the date of the consummation of such Fundamental Transaction by paying to the Holder cash in an amount equal to the Black Scholes Value - FT.

(d)     Application. The provisions of this Section 4 shall apply similarly and equally to successive Fundamental Transactions and shall be applied as if this Warrant (and any such subsequent warrants issued hereunder) were fully exercisable and without regard to any limitations on the exercise of this Warrant (*provided* that the Holder shall continue to be entitled to the benefit of the Maximum Percentage, applied however with respect to shares of capital stock registered under the 1934 Act and thereafter receivable upon exercise of this Warrant (or any such other warrant)).

5.      NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its certificate of incorporation, bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (i) shall not increase the par value of any Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect,
(ii) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the exercise of this Warrant, and (iii) shall, so long as any of the SPA Warrants are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock, solely for the purpose of effecting the exercise of the SPA Warrants, the maximum number of shares of Common Stock as shall from time to time be necessary to effect the exercise of the SPA Warrants then outstanding; *provided*, *however*, that such amount of reserved Common Stock shall be limited by the Maximum Percentage of Common Stock as set forth in Section 1(f).

6.      WARRANT HOLDER NOT DEEMED A SHAREHOLDER. Except as otherwise specifically provided herein, the Holder, solely in its capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in its capacity as the Holder of this Warrant, any of the rights of a shareholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which it is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a shareholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the shareholders of the Company generally, contemporaneously with the giving thereof to the shareholders.

7.      REISSUANCE OF WARRANTS.

(a)      Transfer of Warrant. If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred. If, at the time of the surrender of this Warrant in connection with any transfer of this Warrant, the transfer of this Warrant shall not be either (i) registered pursuant to an effective registration statement under the Securities Act and under applicable state securities or blue sky laws or (ii) eligible for resale without volume or manner-of-sale restrictions or current public information requirements pursuant to Rule 144, the Company may require, as a condition of allowing such transfer, that the Holder or transferee of this Warrant, as the case may be, provide to the Company an opinion of counsel selected by the Holder and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred securities under the Securities Act.

(b)      Lost, Stolen or Mutilated Warrant. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c)      Exchangeable for Multiple Warrants. This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; *provided*, *however*, no warrants for fractional share of Common Stock shall be given.

(d)      Issuance of New Warrants. Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8.      NOTICES. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 10(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant, including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) as soon as practicable upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s) and (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities, indebtedness, or other property pro rata to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information (to the extent it constitutes, or contains, material, non-public information regarding the Company shall be made known to the public prior to or in conjunction with such notice being provided to the Holder and (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction. It is expressly understood and agreed that the time of execution specified by the Holder in each Exercise Notice shall be definitive and may not be disputed or challenged by the Company.

9.      AMENDMENT AND WAIVER. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f)) may be amended and the

Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder. The Holder shall be entitled, at its option, to the benefit of any amendment of any other similar warrant issued under the Securities Purchase Agreement. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

10.    SEVERABILITY. If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited

nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

11.    GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS WARRANT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

12.    CONSTRUCTION; HEADINGS. This Warrant shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any Person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant. Terms used in this Warrant but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date (as defined in the Securities Purchase Agreement) in such other Transaction Documents unless otherwise consented to in writing by the Holder.

13.    DISPUTE RESOLUTION. In the case of a dispute as to the determination of the Exercise Price, the Closing Sale Price, the Closing Bid Price, the Bid Price or fair market value or the arithmetic calculation of the Warrant Shares (as the case may be), the Company or the Holder (as the case may be) shall submit the disputed determinations or arithmetic calculations (as the case may be) via facsimile (i) within two (2) Business Days after receipt of the applicable notice giving rise to such dispute to the Company or the Holder (as the case may be) or (ii) if no notice gave rise to such dispute, at any time after the Holder or the Company (as the case may be) learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to agree upon such determination or calculation (as the case may be) of the Exercise Price, the Closing Sale Price, the Closing Bid Price, the Bid Price or fair market value or the number of Warrant Shares (as the case may be) within three (3) Business Days of such disputed determination or arithmetic calculation being submitted to the Company or the Holder (as the case may be), then the Company shall, within two (2) Business Days submit via facsimile (a) the disputed arithmetic calculation of the Warrant Shares, the disputed determination of the Exercise Price, the Closing Sale Price, the Closing Bid Price, the Bid Price or fair market value (as the case may be) to an independent, reputable investment bank selected by the Holder, with the consent of the Company (which may not be unreasonably withheld, conditioned or delayed), or (b) if acceptable to the Holder, the disputed arithmetic calculation of the Warrant Shares to the Company's independent, outside accountant. The Company shall cause at its expense the investment bank or the accountant (as the case may be) to perform the determinations or calculations (as the case may be) and notify the Company and the Holder of the results no later than ten (10) Business Days from the time it receives such disputed determinations or calculations (as the case may be). Such investment bank's or accountant's determination or calculation (as the case may be) shall be binding upon all parties absent demonstrable error. The fees and expenses of such investment bank or accountant shall be borne by the parties in the same proportion as the respective amounts by which the investment bank's or accountant's determination differs from such party's calculation.

14.    REMEDIES, CHARACTERIZATION, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Warrant shall be cumulative and in addition to all other remedies available under this Warrant and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual damages for any failure by the Company to comply with the terms of this Warrant. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, exercises and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Warrant shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Warrant (including, without limitation, compliance with Section 2 hereof). The issuance of shares and certificates for shares as contemplated hereby upon the exercise of this Warrant shall be made without charge to the Holder or such shares for any issuance tax or other costs in respect thereof, *provided* that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

15.    TRANSFER. This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company.

16.    CERTAIN DEFINITIONS. For purposes of this Warrant, the following terms shall have the following meanings:

(a)    "**Bid Price**" means, for any security as of the particular time of determination, the bid price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg as of such time of determination, or if the foregoing does not apply, the bid price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg as of such time of determination, or, if no bid price is reported for such security by Bloomberg as of such time of determination, the average of the bid prices of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC) as of such time of determination. If the Bid Price cannot be calculated for a security as of the particular time of determination on any of the foregoing bases, the Bid Price of such security as of such time of determination shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(b)    "**Black Scholes Value**" means the Black Scholes value of an option for one share of Common Stock at the date of the applicable Cashless Exercise, as such Black Scholes value is determined, calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the date of the applicable Cashless Exercise, (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable Cashless Exercise, (iv) an expected volatility equal to 135%, and (v) a remaining term of the Warrant equal to the time between the date of the Cashless Exercise and the Termination Date.

(c)    "**Black Scholes Value - Consideration**" means the value of the applicable Option or Convertible Security (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option or Convertible Security (as the case may be) as of the date of issuance of such Option or Convertible Security (as the case may be) and (iii) an expected volatility equal to the greater of 100% and the 100 day volatility obtained from the HVT function on Bloomberg (determined utilizing a 3 65 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option or Convertible Security (as the case may be).

(d)    "**Black Scholes Value - FT**" means the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing

(i) an underlying price per share equal to the greater of (A) the highest Closing Sale Price of the Common Stock during the period beginning on the Trading Day immediately preceding the earliest to occur of (1) the public disclosure of the applicable Fundamental Transaction, (2) the consummation of the applicable Fundamental Transaction and (3) the date on which the Holder first became aware of the applicable Fundamental Transaction and ending on the Trading Day of the Holder's request pursuant to Section 4(c) and (B) the sum of the price per share being offered in cash in the applicable Fundamental Transaction (if any) plus the value of the non-cash consideration being offered in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (A) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c) and (B) the remaining term of this Warrant as of the date of consummation of the applicable Fundamental Transaction or as of the date of the Holder's request pursuant to Section 4(c) if such request is prior to the date of the consummation of the applicable Fundamental Transaction and (iv) an expected volatility equal to the greater of 135% and the 100 day volatility obtained from the HVT function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the earliest to occur of (A) the public disclosure of the applicable Fundamental Transaction, (B) the consummation of the applicable Fundamental Transaction and (C) the date on which the Holder first became aware of the applicable Fundamental Transaction.

(e)    "**Bloomberg**" means Bloomberg, L.P.

(f)    "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

(g)    "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and the last closing trade price, respectively, for such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the average of the bid prices, or the ask prices, respectively, of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price (as the case may be) of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(h)    "**Common Stock**" means the common stock, par value $0.001 per share, of the Company and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, distribution, recapitalization, merger, consolidation, other corporate reorganization or other similar event with respect to the Common Stock).

(i)    "**Convertible Securities**" means any capital stock or other security of the Company that is at any time and under any circumstances directly or indirectly convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any capital stock or other security of the Company (including, without limitation, Common Stock)..

(j)    "**Eligible Market**" means the New York Stock Exchange, the NYSE Amex, the Nasdaq Global Select Market, the Nasdaq Global Market or the Nasdaq Capital Market.

(k)    "**Expiration Date**" means the date that is [•] or, if such date falls on a day other than a Business Day or on which trading does not take place on the principal securities exchange or trading market where the Common Stock is listed (a "**Holiday**"), the next date that is not a Holiday.

(l)    "**Fundamental Transaction**" means that (i) the Company shall, directly or indirectly, in one or more related transactions, (1) consolidate or merge with or into (whether or not the Company is the surviving entity) any other Person unless the shareholders of the Company immediately prior to such consolidation or merger continue to hold more than 50% of the outstanding shares of Voting Stock after such consolidation or merger, or (2) sell, lease, license, assign, transfer, convey or otherwise dispose of all or substantially all of its properties or assets to any other Person, in connection with which the Company is dissolved, or (3) allow any other Person to make a purchase, tender or exchange offer that is accepted by the holders of more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (4) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with any other Person whereby such other Person acquires more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the

other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination), or (ii) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act and the rules and regulations promulgated thereunder) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate ordinary voting power represented by issued and outstanding Voting Stock of the Company.

(m)    "**Options**" means any rights, warrants or options to subscribe for or purchase Common Stock or Convertible Securities.

(n)    "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(o)    "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(p)    "**Successor Entity**" means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(q)    "**Trading Day**" means, as applicable, (x) with respect to all price determinations relating to the Common Stock, any day on which the Common Stock is traded on the principal securities exchange or securities market on which the Common Stock is then traded, *provided* that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(r)    "**Voting Stock**" of a Person means capital stock of such Person of the class or classes pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

(s)    "**VWAP**" means, for any security as of any date, the dollar volume-weighted average price for such security on the principal securities exchange or securities market on which such security is then traded during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "Volume at Price" function or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the three highest closing bid prices and the three lowest closing ask prices of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

[*signature page follows*]

**IN WITNESS WHEREOF**, the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set out above.

**MULLEN AUTOMOTIVE INC.**

By: _____

Name: David Michery

Title:  CEO

**EXHIBIT A**

**EXERCISE NOTICE**

**TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS
WARRANT TO PURCHASE COMMON STOCK**

**MULLEN AUTOMOTIVE INC.**

The undersigned holder hereby exercises the right to purchase _____ shares of the Common Stock ("**Warrant Shares**") of Mullen Automotive Inc., a Delaware corporation (the "**Company**"), evidenced by Warrant to Purchase Common Stock No. _____(the "**Warrant**"). Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1.    Form of Exercise Price. The Holder intends that payment of the Exercise Price shall be made as:

_____    a "Cash Exercise" with respect to _____
Warrant Shares; and/or
_____    a "Cashless Exercise" with respect to _____
Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares, the Holder represents and warrants that _____Common Stock are to be delivered pursuant to such Cashless Exercise, as further specified in Annex A to this Exercise Notice.

2.    Payment of Exercise Price. In the event that the Holder has elected a Cash Exercise with respect to some or all of the Warrant Shares, the Holder shall pay the Aggregate Exercise Price in the sum of $ _____to the Company in accordance with the terms of the Warrant.

3.    Delivery of Warrant Shares and Net Number of Common Stock. The Company shall deliver to Holder, or its designee or agent as specified below, _____Common Stock in respect of the exercise contemplated hereby. Delivery shall be made to Holder, or for its benefit, to the following address:

_____

_____

_____

_____

Date:  _____ ,

_____
Name of Registered Holder

By: _____

Name:
Title:

Account Number: _____
(if electronic book entry transfer) Transaction Code Number:

Transaction Code Number: _____
(if electronic book entry transfer)

**ANNEX A TO EXERCISE NOTICE**

**CASHLESS EXERCISE EXCHANGE CALCULATION**

**TO BE FILLED IN BY THE REGISTERED HOLDER TO EXCHANGE THE
WARRANT TO PURCHASE COMMON STOCK IN A CASHLESS EXERCISE
PURSUANT TO SECTION 1(d) OF THE WARRANT**

Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

[ ] Net Number = (A x B)/C =    shares of Common Stock

For purposes of the foregoing formula:

A= the total number of shares with respect to which the Warrant is then being exercised = _____ .
B= Black Scholes Value (as defined in Section 16 of the Warrant) = _____ .
C= the Closing Bid Price of the Common Stock as of two (2) Trading Days prior to the time of such exercise (as such Closing Bid Price is defined in Section 16 of the Warrant) = _____ .

Date: _____ ,

Name of Registered Holder

By: _____
    Name:
    Title:

**EXHIBIT B**

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Exercise Notice and hereby directs _____ to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions dated _____, 20 , from the Company and acknowledged and agreed to by
_____ .

**MULLEN AUTOMOTIVE INC.**

By:  Name: _____

Title:

**Exhibit 21.1**

<u>List of Subsidiaries</u>

| Subsidiary | Place or Organization |
|---|---|
| Ottava Automotive Inc. | California |
| Mullen Investment Properties, LLC | Mississippi |
| Mullen Indiana Real Estate LLC | Indiana |
| Bollinger Motors Inc. | Michigan |

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Mullen Automotive Inc.

Brea, California

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 333-266583, No. 333-267502, No. 333-267913, No. 333-268497, No. 333-262093, and No. 333-263880) and Form S-8 (No. 333-236719, No. 333-252767, No. 333-260793, No. 333-262110, No. 333-266787, and No. 333-267417) of Mullen Automotive Inc., of our report dated January 13, 2023, relating to the consolidated financial statements of Mullen Automotive Inc. at and for the years ended September 30, 2022 and 2021, which appear in this Form 10-K. Our report contains an explanatory paragraph regarding the Company's ability to continue as a going concern.

/s/ Daszkal Bolton, LLP

Fort Lauderdale, Florida
January 13, 2023

**Exhibit 31.1**

**CEO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, David Michery, certify that:

1.   I have reviewed this report on Form 10-K of Mullen Automotive Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a
     material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   January 13, 2023                              By:  /s/ David Michery
                                                          David Michery
                                                          Chief Executive Officer

**Exhibit 31.2**

**CFO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jonathan New, certify that:

1. I have reviewed this report on Form 10-K of Mullen Automotive Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   January 13, 2023                    By:  /s/ Jonathan New
                                                 Jonathan New
                                                 Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K for the period ended September 30, 2022 of Mullen Automotive Inc. (the "Company") as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned, in the capacities and on the dates indicated below, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods presented in the Report.


By:  /s/ David Michery

David Michery
Chief Executive Officer
January 13, 2023


By:  /s/ Jonathan New

Jonathan New
Chief Financial Officer
January 13, 2023