# EXHIBIT 11

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the quarterly period ended March 31, 2023**

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to ___**

Commission File Number: 001-34887

# MULLEN AUTOMOTIVE INC.

(Exact name of registrant as specified in its charter)

| Delaware | 86-3289406 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

1405 Pioneer Street
Brea, California 92821
(Address of principal executive offices)

(714) 613-1900
(Registrant's Telephone Number, Including Area Code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MULN | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of May 12, 2023, a total of 172,510,340 shares of the Registrant's common stock, par value $0.001 per share, were issued and outstanding.

Table of Contents

**MULLEN AUTOMOTIVE INC.**

**QUARTERLY REPORT ON FORM 10-Q**
**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** |  |  |
| Item 1. | Financial Statements: | 2 |
|  | Condensed Consolidated Balance Sheets as of March 31, 2023 (unaudited) and September 30, 2022 | 2 |
|  | Condensed Consolidated Statements of Operations and Comprehensive Loss for the three and six months ended March 31, 2023 and 2022 (unaudited) | 3 |
|  | Condensed Consolidated Statements of Stockholders Equity (Deficit) for the three and six months ended March 31, 2023 and 2022 (unaudited) | 4 |
|  | Condensed Consolidated Statements of Cash Flows for the six months ended March 31, 2023 and 2022 (unaudited) | 7 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| Item 4. | Controls and Procedures | 44 |
| **PART II.** | **OTHER INFORMATION** |  |  |
| Item 1. | Legal Proceedings | 46 |
| Item 1A. | Risk Factors | 46 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 46 |
| Item 3. | Defaults Upon Senior Securities | 46 |
| Item 4. | Mine Safety Disclosures | 46 |
| Item 5. | Other Information | 46 |
| Item 6. | Exhibits | 47 |
| **SIGNATURES** |  |  | 48 |

Table of Contents

**PART I. FINANCIAL INFORMATION**
**Item 1. Financial Statements**

**MULLEN AUTOMOTIVE INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(unaudited)**

|  | March 31, 2023 | September 30, 2022 |
|---|---|---|
| **ASSETS** |  |  |
| **CURRENT ASSETS** |  |  |
| Cash and cash equivalents | $ 60,337,591 | $ 54,085,685 |
| Restricted cash | 26,409,672 | 30,289,400 |
| Inventory | 6,958,158 | - |
| Prepaid expenses and other current assets | 5,230,602 | 1,958,759 |
| **TOTAL CURRENT ASSETS** | **98,936,023** | **86,333,844** |
| Property, equipment and leasehold improvements, net | 89,641,984 | 17,786,702 |
| Intangible assets, net | 112,744,496 | 93,947,018 |
| Deposit on ELMS purchase | - | 5,500,000 |
| Note receivable from related party | 1,388,405 |  |
| Right-of-use assets | 6,029,432 | 4,597,052 |
| Goodwill | 92,834,832 | 92,834,832 |
| Other assets | 1,167,056 | 1,595,032 |
| **TOTAL ASSETS** | **$ 402,742,228** | **$ 302,594,479** |
|  |  |  |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
| **CURRENT LIABILITIES** |  |  |
| Accounts payable | $ 14,827,682 | $ 6,398,425 |
| Accrued expenses and other current liabilities | 6,211,840 | 7,185,881 |
| Dividends payable | 361,321 | 7,762,255 |
| Derivative liabilities | 30,855,261 | 84,799,179 |
| Liability to issue shares | 59,267,471 | 10,710,000 |
| Lease liabilities, current portion | 2,235,197 | 1,428,474 |
| Notes payable, current portion | 7,588,513 | 3,856,497 |
| Other current liabilities | 103,372 | 90,372 |
| **TOTAL CURRENT LIABILITIES** | **121,450,657** | **122,231,083** |
| Notes payable, net of current portion | - | 5,164,552 |
| Lease liabilities, net of current portion | 4,163,705 | 3,359,354 |
| Deferred tax liability | 13,980,782 | 14,882,782 |
| **TOTAL LIABILITIES** | **139,595,144** | **145,637,771** |
| Commitments and contingencies (Note 17) |  |  |
|  |  |  |
| **STOCKHOLDERS' EQUITY** |  |  |
| Preferred stock, $0.001 par value, 500,000,000 preferred shares authorized |  |  |
| Preferred Series A; 200,000 shares authorized; 1,425 and 1,924 shares issued and outstanding at March 31, 2023 and September 30, 2022 respectively. | 2 | 2 |
| Preferred Series C; 40,000,000 shares authorized; 1,210,056 and 1,360,321 shares issued and outstanding at March 31, 2023 and September 30, 2022 respectively. | 1,210 | 1,360 |
| Preferred Series D; 437,500,001 shares authorized; 363,098 and 4,359,652 shares issued and outstanding at March 31, 2023 and September 30, 2022 respectively. | 363 | 4,359 |
| Preferred Series AA;1 share authorized; zero and zero shares issued and outstanding at March 31, 2023 and September 30, 2022 respectively. | - | - |
| Common stock; $0.001 par value; 5,000,000,000 and 1,750,000,000 shares authorized at March 31, 2023 and September 30, 2022 respectively; 126,281,274 and 33,338,727 shares issued and outstanding at March 31, 2023 and September 30, 2022 respectively (*) | 126,281 | 33,339 |
| Common stock owed but not issued; $0.001 par value; 5,930,263 and zero shares at March 31, 2023 and September 30, 2022 respectively (*) | 5,930 | - |
| Additional paid-in capital (*) | 1,550,030,214 | 948,565,285 |
| Accumulated deficit | (1,381,096,559) | (889,907,455) |
| Non-controlling interest | 94,079,643 | 98,259,819 |
| **TOTAL STOCKHOLDERS' EQUITY** | **263,147,084** | **156,956,709** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$ 402,742,228** | **$ 302,594,479** |

(*) Adjusted retroactively for reverse stock split, see Note 1

See accompanying notes to unaudited condensed consolidated financial statements.

2

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(unaudited)**

| | Three months ended March 31, | | Six months ended March 31, | |
| --- | --- | --- | --- | --- |
| | **2023** | **2022** | **2023** | **2022** |
| **OPERATING EXPENSES** | | | | |
| General and administrative | $ 47,412,338 | $ 29,269,433 | $ 112,408,349 | $ 42,170,516 |
| Research and development | 20,478,971 | 1,183,437 | 29,100,980 | 2,340,761 |
| **Total Operating Expense** | **67,891,309** | **30,452,870** | **141,509,329** | **44,511,277** |
| **Loss from Operations** | **(67,891,309)** | **(30,452,870)** | **(141,509,329)** | **(44,511,277)** |
| | | | | |
| Other financing costs - initial recognition of derivative liabilities | - | (160,364,949) | (255,960,025) | (269,344,178) |
| Loss on derivative liability revaluation | (48,439,415) | (131,670,146) | (89,221,391) | (142,288,528) |
| Gain / (loss) extinguishment of debt, net | (40,000) | - | (6,452,170) | 74,509 |
| Gain on sale of fixed assets | 385,031 | - | 385,031 | - |
| Interest expense | (1,745,882) | (2,120,515) | (4,573,971) | (24,559,459) |
| Loan discount amortization expense | (142,287) | - | (142,287) | - |
| Loss on debt settlement | - | - | - | (41,096) |
| Other income, net | 482,405 | - | 1,128,286 | - |
| | | | | |
| Net loss before income tax benefit | (117,391,457) | (324,608,480) | (496,345,856) | (480,670,029) |
| | | | | |
| Income tax benefit | 482,922 | - | 976,576 | - |
| **Net loss before accrued preferred dividends and noncontrolling interest** | (116,908,535) | (324,608,480) | (495,369,280) | (480,670,029) |
| | | | | |
| Net loss attributable to noncontrolling interest | (1,995,217) | - | (4,180,176) | - |
| **Net loss attributable to shareholders** | **(114,913,318)** | **(324,608,480)** | **(491,189,104)** | **(480,670,029)** |
| | | | | |
| Accrued preferred dividends | 8,039,612 | (32,735,345) | 7,400,935 | (32,735,345) |
| | | | | |
| **Net Loss attributable to common shareholders after preferred dividends** | **$ (106,873,706)** | **$ (357,343,825)** | **$ (483,788,169)** | **$ (513,405,374)** |
| | | | | |
| Net loss per share | $ (1.30) | $ (173.83) | $ (7.09) | $ (370.53) |
| | | | | |
| Weighted average shares outstanding, basic and diluted | 82,409,028 | 2,055,720 | 68,262,145 | 1,385,594 |

See accompanying notes to unaudited condensed consolidated financial statements.

3

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(unaudited)**

Six Months Ended March 31, 2023

| | Preferred Stock | | | | | | | | Common Stock | | Paid-in Capital | Common Stock Owed but not Issued | | Accumulated Deficit | Non-controlling Interest | Deficiency in Stockholders Equity |
| | Series A | | Series C | | Series D | | Series AA | | | | | | | | | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | Shares | Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, September 30, 2022** | 1,924 | $ - | 1,360,321 | $ 1,360 | 4,359,652 | $ 4,359 | - | $ - | 33,338,727 | $ 33,339 | $ 948,565,285 | - | $ - | $ (889,907,455) | $98,259,819 | $ 156,956,709 |
| Share-based compensation issued to management, directors, employees, and consultants | - | - | - | - | - | - | - | - | 4,555,624 | 4,555 | 30,263,104 | - | - | - | - | 30,267,659 |
| Shares issued to extinguish penalty | - | - | - | - | - | - | - | - | 920,000 | 920 | 5,519,080 | - | - | - | - | 5,520,000 |
| Cashless warrant exercise - C | - | - | - | - | - | - | - | - | 5,138,542 | 5,139 | 39,182,839 | - | - | - | - | 39,187,978 |
| Cashless warrant exercise - D | - | - | - | - | - | - | - | - | 9,163,950 | 9,164 | 71,130,100 | - | - | - | - | 71,139,264 |
| Surplus common stock issued on cashless warrant exercise | - | - | - | - | - | - | - | - | 3,148,722 | 3,149 | 26,732,329 | - | - | - | - | 26,735,478 |
| Issuance of common stock for conversion of preferred stock | - | - | (150,265) | (150) | (3,996,554) | (3,996) | - | - | 165,873 | 166 | 3,981 | - | - | - | - | 1 |
| Dividends accumulated on preferred stock | - | - | - | - | - | - | - | - | - | - | (638,677) | - | - | - | - | (638,677 |
| Other transactions | - | - | - | - | - | - | - | - | - | - | (3,122,227) | - | - | - | - | (3,122,227 |
| Shares issued to settle note payable | - | - | - | - | - | - | - | - | 2,481,947 | 2,482 | 13,733,921 | - | - | - | - | 13,736,403 |
| Shares issued for convertible notes | - | - | - | - | - | - | - | - | 8,833,142 | 8,833 | 59,394,043 | - | - | - | - | 59,402,876 |
| Preferred shares issued to officers | - | - | - | - | - | - | 1 | - | - | - | 25,000 | - | - | - | - | 25,000 |
| Net loss allocable to non-controlling interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (2,184,959) | (2,184,959 |
| Net loss | - | - | - | - | - | - | - | - | - | - | - | - | - | (376,275,786) | - | (376,275,786 |
| **Balance, December 31, 2022** | 1,924 | | 2 1,210,056 | 1,210 | 363,098 | 363 | 1 | - | 67,746,527 | 67,747 | 1,190,788,778 | - | - | (1,266,183,241) | 96,074,860 | 20,749,719 |
| Cashless warrant exercise | - | - | - | - | - | - | - | - | 43,007,583 | 43,008 | 183,865,282 | 5,930,263 | 5,930 | - | - | 183,914,220 |
| Issuance of common stock for conversion of convertible notes | - | - | - | - | - | - | - | - | 12,385,394 | 12,385 | 93,806,975 | - - | - | - | - | 93,819,360 |

4

Table of Contents

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuance of common stock for conversion of preferred stock | (499) | (0) | - | - | - | - | - | - | 1,996 | 2 | (2) | - | - | - | - | - | (0) |
| Reclassification of derivatives to equity upon authorization of sufficient number of shares | - | - | - | - | - | - | - | - | - | - | 47,818,881 | - | - | - | - | - | 47,818,881 |
| Preferred shares series AA refund | - | - | - | - | - | - | (1) | - | - | - | (25,000) | - | - | - | - | - | (25,000) |
| Share-based compensation to consultants | - | - | - | - | - | - | - | - | 866,066 | 866 | 7,407,194 | - | - | - | - | - | 7,408,060 |
| Share-based compensation to employees | - | - | - | - | - | - | - | - | 6,363 | 6 | 79,527 | - | - | - | - | - | 79,533 |
| Share-based compensation to officers | - | - | - | - | - | - | - | - | 2,262,345 | 2,262 | 18,211,472 | - | - | - | - | - | 18,213,734 |
| Share-based compensation to directors | - | - | - | - | - | - | - | - | 5,000 | 5 | 37,495 | - | - | - | - | - | 37,500 |
| Preferred C & D stock dividends | - | - | - | - | - | - | - | - | - | - | 8,039,612 | - | - | - | - | - | 8,039,612 |
| Noncontrolling interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,995,217) | (1,995,217) |
| Net loss | - | - | - | - | - | - | - | - | - | - | - | - | - | (114,913,318) | - | (114,913,318) |
| **Balance, March 31, 2023** | 1,425 | 2 | 1,210,056 | 1,210 | 363,098 | 363 | - | - | 126,281,274 | 126,281 | 1,550,030,214 | 5,930,263 | 5,930 | (1,381,096,559) | 94,079,643 | 263,147,084 |

*Adjusted retroactively for reverse stock split, see Note 1

See accompanying notes to unaudited condensed consolidated financial statements.

[Table of Contents](#)

**MULLEN AUTOMOTIVE INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(unaudited)**

| | Preferred Stock | | | | | | Common Stock | | Paid-in | Accumulated | Deficiency in Stockholders' |
| | Series A | | Series B | | Series C | | | | | | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, September 30, 2021** | 100,363 | $ 100 | 5,567,319 | $ 5,568 | - | $ - | 281,935 | $ 282 | $ 88,657,052 | $ (150,374,649) | $ (61,711,647) |
| Common shares issued for cash | - | - | - | - | - | - | 308,163 | 308 | 10,894,351 | - | 10,894,659 |
| Common shares issued for asset | - | - | - | - | - | - | 4,376 | 4 | 140,996 | - | 141,000 |
| Preferred shares issued for cash | - | - | - | - | 2,263,970 | 2,264 | - | - | 19,997,736 | - | 20,000,000 |
| Preferred shares issued to settle liability to issue | - | - | - | - | 84,900 | 85 | - | - | 704,915 | - | 705,000 |
| Warrant issuances | - | - | - | - | - | - | - | - | 10,491,621 | - | 10,491,621 |
| Preferred shares issued in exchange for conversion of debt | - | - | - | - | 2,829,029 | 2,829 | - | - | 24,988,926 | - | 24,991,755 |
| Stock-based compensation | - | - | - | - | - | - | 17,725 | 18 | 4,425,250 | - | 4,425,268 |
| Common shares issued to settle liability to issue | - | - | - | - | - | - | 5,259 | 5 | 1,034,807 | - | 1,034,812 |
| Prefunded warrant issuance | - | - | - | - | - | - | - | - | 15,000,000 | - | 15,000,000 |
| Issuance of common stock for conversion of preferred stock | (84,996) | (85) | - | - | - | - | 339,987 | 340 | (255) | - | - |
| Net Loss | - | - | - | - | - | - | - | - | - | (36,463,938) | (36,463,938) |
| **Balance, December 31, 2021** | 15,367 | 15 | 5,567,319 | 5,568 | 5,177,899 | 5,178 | 957,446 | 957 | 176,335,399 | (186,838,587) | (10,491,470) |
| Cashless warrant exercise | - | - | - | - | - | - | 7,840,214 | 7,840 | (7,840) | - | (0) |
| Shares issued for cash | - | - | - | - | 4,974,266 | 4,974 | 2,319,933 | 2,320 | 73,592,161 | - | 73,599,455 |
| Issuance of common stock for conversion of preferred stock | (13,433) | (13) | (2,783,660) | (2,784) | (1,848,842) | (1,849) | 239,032 | 239 | 4,407 | - | - |
| Share-based compensation | - | - | - | - | - | - | 234,739 | 235 | 21,541,781 | - | 21,542,016 |
| Dividends accumulated on preferred stock | - | - | - | - | - | - | - | - | (2,519,948) | - | (2,519,948) |
| Net Loss | - | - | - | - | - | - | - | - | - | (32,573,385) | (32,573,385) |
| **Balance, March 31, 2022** | 1,934 | 2 | 2,783,659 | 2,784 | 8,303,323 | 8,303 | 11,591,364 | 11,591 | 268,945,960 | (219,411,972) | 49,556,668 |

*Adjusted retroactively for reverse stock split, see Note 1

See accompanying notes to unaudited condensed consolidated financial statements.

6

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(unaudited)**

| | Six Months Ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash Flows from Operating Activities** | | |
| Net loss before accrued preferred dividends and noncontrolling interest | $ (495,369,280) | $ (480,670,029) |
| Adjustments to reconcile net loss attributable to shareholders to net cash used in operating activities: | | |
| Depreciation and amortization | 8,523,682 | 608,496 |
| Officer and employee stock compensation | 47,697,024 | 3,292,987 |
| Issuance of warrants to suppliers | 6,814,000 | - |
| Issuance of shares for services | 12,606,343 | 24,042,060 |
| Revaluation of derivative liabilities | 89,221,391 | 142,288,528 |
| Initial recognition of derivative liabilities | 255,960,025 | 269,344,178 |
| Non-cash interest and other operating activities | (1,745,882) | 1,713,103 |
| Non-cash lease expense | 916,592 | 284,879 |
| Amortization of debt discount | - | 19,400,483 |
| Loss on asset disposal | - | 1,298 |
| Loss/(gain) on extinguishment of debt | 6,452,170 | (74,509) |
| Loss on debt settlement | - | 41,096 |
| Changes in operating assets and liabilities: | | |
| Other current assets | (8,908,021) | 3,330,474 |
| Other assets | 636,633 | (858,692) |
| Accounts payable | 8,429,257 | (1,032,810) |
| Accrued expenses and other liabilities | 2,672,040 | (6,300,181) |
| Deferred tax liability | (901,999) | - |
| Right of use asset | (1,791,434) | - |
| Lease liabilities | 1,220,074 | (283,141) |
| **Net cash used in operating activities** | **(67,567,385)** | **(24,871,780)** |
| | | |
| **Cash Flows from Investing Activities** | | |
| Purchase of equipment | (4,298,563) | (10,491,547) |
| Purchase of intangible assets | (204,660) | (246,132) |
| ELMS asset purchase | (92,916,874) | - |
| **Net cash used in investing activities** | **(97,420,097)** | **(10,737,679)** |
| | | |
| **Cash Flows from Financing Activities** | | |
| Changes in net parent investment | - | (223,067) |
| Proceeds from issuance of notes payable | 150,000,000 | 12,142,791 |
| Proceeds from issuance of common stock | - | 40,151,308 |
| Proceeds from issuance of preferred stock | - | 63,925,000 |
| Reimbursement for overissuance of shares | 17,819,660 | - |
| Payment of notes payable | (460,000) | (15,146,860) |
| **Net cash provided by financing activities** | **167,359,660** | **100,849,172** |
| | | |
| **Increase in cash** | **2,372,178** | **65,239,713** |
| Cash, cash equivalents and restricted cash, beginning of period | 84,375,085 | 42,174 |
| Cash, cash equivalents and restricted cash, ending of period | $ 86,747,263 | $ 65,281,887 |
| | | |
| **Supplemental disclosure of Cash Flow information:** | | |
| Cash paid for interest | $ 5,028 | $ 1,489,908 |

Table of Contents

| | | | | |
|---|---|---:|---|---:|
| Cash paid for taxes | $ | 800 | $ | - |
| **Supplemental Disclosure for Non-Cash Activities:** | | | | |
| Preferred shares issued in exchange for convertible debt | $ | - | $ | 24,991,755 |
| Convertible notes and interest - conversion to common stock | $ | 153,222,236 | $ | 23,192,500 |
| Exercise of warrants recognized earlier as liabilities | $ | 268,713,397 | $ | - |
| Reclassification of derivatives to equity upon authorization of sufficient number of shares | $ | 47,818,882 | $ | - |
| Waiver of dividends by stockholders | $ | 6,872,075 | $ | - |
| Warrants issued to suppliers | $ | 6,814,000 | $ | - |
| Common stock issued to extinguish liability to issue stock | $ | 10,500,712 | $ | - |
| Extinguishment of financial liabilities by sale of property | $ | 231,958 | $ | - |
| Extinguishment of operational liabilities by sale of property | $ | 767,626 | $ | - |
| Debt conversion to common stock | $ | 1,096,787 | $ | - |

See accompanying notes to unaudited condensed consolidated financial statements.

8

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**NOTE 1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

*Description of Business*

Mullen Automotive Inc., a Delaware corporation ("MAI", "Mullen", "we" or the "Company"), is a Southern California-based development-stage electric vehicle company that operates in various verticals of businesses focused within the automotive industry. Mullen Automotive Inc., a California corporation ("Previous Mullen"), was originally formed on April 20 2010, as a developer and manufacturer of electric vehicle technology and operated as the Electric Vehicle ("EV") division of Mullen Technologies, Inc. ("MTI") until November 5, 2021, at which time Previous Mullen underwent a capitalization and corporate reorganization by way of a spin-off to its shareholders, followed by a reverse merger with and into Net Element, Inc., which was accounted for as a reverse merger transaction, in which Previous Mullen was treated as the acquirer for financial accounting purposes. (the "Merger"). The Company changed its name from "Net Element, Inc." to "Mullen Automotive Inc" and the Nasdaq ticker symbol for the Company's common stock changed from "NETE" to "MULN" on the Nasdaq Capital Market Exchange at the opening of trading on November 5, 2021.

*Reverse Stock Split*

In January 2023, the Company's stockholders approved a proposal to authorize the board of directors of the Company (the "Board") to implement a reverse stock split of the outstanding shares of the Company's common stock at a ratio up to 1-for-25.

Pursuant to such authority granted by the Company's stockholders, the Board approved a reverse stock split of the Company's common Stock at a rate of 1-for-25 shares of Common Stock (the "Reverse Stock Split"), which resulted in a reduction in the number of outstanding shares of common stock and a proportionate increase in the value of each share. The common stock began trading on a reverse split-adjusted basis on the NASDAQ on May 4, 2023.

As the Reverse Stock Split occurred after the balance sheet date but before the financial statements are issued, the Company retroactively adjusted its financial statements to reflect the split. All issued and outstanding common stock and per share amounts contained in the financial statements have been retroactively adjusted to reflect this Reverse Stock Split for all periods presented. In addition, a proportionate adjustment was made to the per share exercise price and the number of shares issuable upon the exercise and/or vesting of all warrants to purchase shares of common stock.

A proportionate adjustment was also made to the number of shares reserved for issuance pursuant to the Company's equity incentive compensation plans to reflect the Reverse Stock Split.

No fractional shares were issued in connection with the Reverse Stock Split. All fractional shares were rounded up to the nearest whole share. The number and par value of Series A Preferred Stock, Series C Preferred Stock and Series D Preferred Stock were not affected by the Reverse Stock Split, but their conversion ratios have been proportionally changed. There were no outstanding shares of Series B Preferred Stock as of the effective date of the Reverse Stock Split. The common stock and additional paid-in-capital line items contained in the financial statements were adjusted to account for the Reverse Stock Split for all periods presented (with $800,129 value of common stock decreased and additional paid-in-capital increased on October 1, 2022).

*Subsequent Acquisition and Asset Purchase*

On September 7, 2022, the Company completed the acquisition of Bollinger Motors, Inc., which provides the Company with a medium duty truck classes 4-6, along with the B1 Sport Utility and B2 Pick Up Trucks. The purchase price was approximately $149 million in cash and stock for 60% majority controlling interest.

On October 13, 2022, the U.S. Bankruptcy Court approved the acquisition of assets from electric vehicle company ELMS (Electric Last Mile Solutions) in an all-cash purchase by the Company. In the Chapter 7 approved transaction, Mullen acquired ELMS' manufacturing plant in Mishawaka Indiana, all inventory, and intellectual property for their Class 1 and Class 3 vehicles

9

Table of Contents

for a total of $105 million, which includes the affirmation of approximately $10 million in vendor payables assumed and paid at closing. On November 9, 2022, the Company formed Mullen Indiana Real Estate LLC, a limited liability company in the State of Delaware, to hold the acquired real property located in Mishawaka, Indiana.

*Segment Information*

Our CEO and Chairman of the Board, as the chief operating decision maker, makes decisions about resources to be acquired, allocated and utilized and assesses the performance of the Company as one operating segment.

The Company's long-lived assets are located in the United States of America.

*Basis of Presentation and Principles of Consolidation*

The accompanying unaudited condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "Commission"). Certain information and note disclosures normally included in the annual financial statements prepared in accordance with U.S. generally accepted accounting principles ("U. S. GAAP") have been condensed or omitted pursuant to those rules and regulations, but we believe the disclosures made are adequate to make the information presented not misleading. In the opinion of management, all adjustments, consisting of normal and recurring adjustments, necessary for a fair presentation have been included in the condensed consolidated financial statements included herein. These statements should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K/A for the year ended September 30, 2022, filed with the Commission on January 30, 2023. The results of operations for the periods presented are not necessarily indicative of results to be expected for the full fiscal year or any other periods.

The consolidated financial statements include the accounts of the Company and its subsidiaries, Mullen Investment Properties LLC, a Mississippi corporation, Ottava Automotive, Inc., a California corporation, Mullen Real Estate, LLC, a Delaware corporation, and Bollinger Motors Inc., a Delaware corporation. Intercompany accounts and transactions have been eliminated, if any. The financial statements reflect the consolidated financial position and results of operations of Mullen, which have been prepared in accordance with U.S. GAAP.

**NOTE 2 - LIQUIDITY, CAPITAL RESOURCES, AND GOING CONCERN CONSIDERATION**

*Going Concern*

The accompanying unaudited condensed consolidated financial statements have been prepared on the basis that the Company will continue as a going concern. Our principal source of liquidity consists of existing cash and restricted cash of approximately $

86.7 million as of March 31, 2023. During the six months ended March 31, 2023, the Company used $67.6 million of cash for operating activities and had net working capital deficit of approximately $22.5 million as of March 31, 2023.

The Company has not generated revenue to date and has accumulated losses since inception. The Company's ability to continue operating as a going concern is contingent upon, among other things, its ability to raise sufficient additional capital and/or obtaining the necessary financing to support ongoing and future operations and to successfully manufacture and launch its products for sale. While the Company expects to obtain the additional capital and/or financing that is needed, there is no assurance that the Company will be successful in obtaining the necessary funds to bring its product and service offerings to market and support future operations. These factors raise substantial doubt as to the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.

Our management plans to raise additional capital through a combination of equity and debt financing, strategic alliances, and licensing arrangements. Under existing Securities Purchase Agreement, dated June 7, 2022 and as further amended, the Company has sold Series D Preferred Stock and common stock as well as detached warrants for $45 million (see

10

Table of Contents

Note 19 - Subsequent Events) and a may obtain additional investment, in the amount of $45 million under similar conditions by June 30, 2023.

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Significant accounting policies are defined as those that are reflective of significant judgments and uncertainties, and potentially result in materially different results under different assumptions and conditions.

*Business Combination*

Business acquisitions are accounted for in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805 "Business Combinations". FASB ASC 805 requires the reporting entity to identify the acquirer, determine the acquisition date, recognize and measure the identifiable tangible and intangible assets acquired, the liabilities assumed and any non-controlling interest in the acquired entity, and recognize and measure goodwill or a gain from the purchase. The acquiree's results are included in the Company's consolidated financial statements from the date of acquisition. Assets acquired and liabilities assumed are recorded at their fair values and the excess of the purchase price over the amounts assigned is recorded as goodwill. Adjustments to fair value assessments are recorded to goodwill over the measurement period (not longer than twelve months). The acquisition method also requires that acquisition-related transaction and post-acquisition restructuring costs be charged to expense. The Company completed the acquisition of Bollinger Motors, Inc on September 7, 2022.

*Use of Estimates*

The preparation of our financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the dates of the carve-out financial statements and the reported amounts of total expenses in the reporting periods. Estimates are used for, but not limited to, fair value of long-lived assets, fair value of financial instruments, depreciable lives of property and equipment, income taxes, contingencies, and inputs used to value stock-based compensation, valuation of common and preferred stock and warrants.

Additionally, the rates of interest on several debt agreements have been imputed where there was no stated interest rate within the original agreement. The imputed interest results in adjustments to the debt amounts reported in our condensed consolidated financial statements prepared under U.S. GAAP. Loan valuations issues can arise when trying to determine the debt attributes, such as discount rate, credit loss factors, liquidity discounts, and pricing.

Management bases its estimates on historical experience and on various other assumptions believed to be reasonable, the results of which form the basis for adjustments about the carrying values of assets and liabilities and the recording of costs and expenses that are not readily apparent from other sources. The actual results may differ materially from these estimates.

*Risks and Uncertainties*

The Company operates within an industry that is subject to rapid technological change, intense competition, and serves an industry that has significant government regulations. It is subject to significant risks and uncertainties, including competitive, financial, developmental, operational, technological, required knowledge of industry governmental regulations, and other risks associated with an emerging business. Any one or combination of these or other risks could have a substantial influence on our future operations and prospects for commercial success.

*Reclassification from Other Noncurrent Assets to Property, Equipment and Leasehold Improvements, net*

Certain prior period amounts related to Show Room Assets in the condensed consolidated financial statements and notes thereto have been reclassified to conform to the current period presentation. These reclassifications had no impact on previously reported net income or shareholders' equity. In the Condensed Consolidated Balance Sheet as of September 30, 2022, $2,982,986, the net Show Room asset ($4,418,724 Show Room and $1,435,738 of accumulated depreciation) previously reported under Other Noncurrent Assets, has been reclassified to Property, Equipment and Leasehold

11

Table of Contents

Improvements, net. This reclassification is reflected in all periods presented and all comparative references in the notes to the consolidated financial statements are to the reclassified amounts (See Note 13 and Note 14).

### Cash and Cash Equivalents

Company management considers all short-term investments with an original maturity of three months or less when purchased to be cash equivalents. There were no cash equivalents at March 31, 2023 or September 30, 2022.

### Restricted Cash

Funds that are not available for immediate use and must be used for a specific purpose. On March 31, 2023, the restricted cash balance was $

26,409,672. These funds include approximately $409,672 for the refundable deposits for individuals and businesses who have made deposits for Mullen and Bollinger vehicles and approximately $26 million for cash restricted for use by Bollinger operations. The $26 million of restricted cash will be released in two tranches, $13 million on May 5, 2023 and $13 million on August 5, 2023. Customer deposits are accounted for within other liabilities. Refundable deposits are $289 thousand for the year ended September 30, 2022. On September 7, 2022, the Company deposited $30 million in an escrow account as part of the Bollinger acquisition.

### Prepaid Expenses and Other Current Assets

Prepaid expenses consist of various advance payments made for goods or services to be received in the future. These prepaid expenses include insurance and other contracted services requiring up-front payments.

### Property, Equipment and Leasehold Improvements, Net

Property, equipment, and leasehold improvements are stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated economic useful lives of the assets. Repairs and maintenance expenditures that do not extend the useful lives of related assets are expensed as incurred.

### Estimated Useful Lives

| Description | Life |
| --- | --- |
| Buildings | 30 Years |
| Furniture and Equipment | 3 to 7 Years |
| Computer and Software | 1 to 5 Years |
| Machinery and Equipment | 3 to 7 Years |
| Leasehold Improvements | Shorter of the estimated useful life or the underlying lease term |
| Vehicles | 5 Years |
| Intangibles | 5 to 10 Years |

Expenditures for major improvements are capitalized, while minor replacements, maintenance and repairs, which do not extend the asset lives, are charged to operations as incurred. Upon sale or disposition, the cost and related accumulated depreciation are removed from the accounts and any gain or loss is included in operations. Company management continually monitors events and changes in circumstances that could indicate that the carrying balances of its property, equipment and leasehold improvements may not be recoverable in accordance with the provisions of ASC 360, *"Property, Plant, and Equipment."* When such events or changes in circumstances are present, we assess the recoverability of long-lived assets by determining whether the carrying value of such assets will be recovered through undiscounted expected future cash flows. If the total of the future cash flows is less than the carrying amount of those assets, we recognize an impairment loss based on the excess of the carrying amount over the fair value of the assets.

Table of Contents

### Income Taxes

Income taxes are recorded in accordance with ASC 740, *Income Taxes*, which provides for deferred taxes using an asset and liability approach. We recognize deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the consolidated financial statements or tax returns. Deferred tax assets and liabilities are determined based on the difference between the consolidated financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Valuation allowances are provided, if based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

There are transactions that occur during the ordinary course of business for which the ultimate tax determination may be uncertain. At March 31, 2023 and September 30, 2022, there were no material changes to either the nature or the amounts of the uncertain tax positions.

The Company's income tax provision consists of an estimate for U.S. federal and state income taxes based on enacted rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in the tax law. We maintain a full valuation allowance against the value of our U.S. and state net deferred tax assets because management does not believe the recoverability of the tax assets meets the "more likely than not" likelihood at March 31, 2023 and September 30, 2022.

### Intangible Assets, net

Intangible assets consist of acquired and developed intellectual property and website development costs. In accordance with ASC 350, *"Intangibles-Goodwill and Others,"* goodwill and other intangible assets with indefinite lives are no longer subject to amortization but are tested for impairment annually or whenever events or changes in circumstances indicate that the asset might be impaired. Intangible assets with determinate lives are evaluated for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Amortizable intangible assets generally are amortized on a straight-line basis over periods up to 120 months. The costs to periodically renew our intangible assets are expensed as incurred.

### Impairment of Long-Lived Assets

The Company periodically evaluates property, plant and equipment and intangible assets for impairment whenever events or changes in circumstances indicate that a potential impairment may have occurred. If such events or changes in circumstances arise, the Company compares the carrying amount of the long-lived assets to the estimated future undiscounted cash flows expected to be generated by the long-lived assets. If the estimated aggregate undiscounted cash flows are less than the carrying amount of the long-lived assets, an impairment charge, calculated as the amount by which the carrying amount of the assets exceeds the fair value of the assets, is recorded. The fair value of the long-lived assets is determined based on the estimated discounted cash flows expected to be generated from the long-lived assets.

### Other Assets

Other assets are comprised primarily of related party loans and security deposits for property leases.

### Extinguishment of Liabilities

The Company derecognizes financial liabilities when the Company's obligations are discharged, cancelled, or expired.

### Leases

The Company follows the provisions of ASC 842, *"Leases"*, which requires a lessee to recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying leased asset for the lease term.

13

Table of Contents

*Accrued Expenses*

Accrued expenses are expenses that have been incurred but not yet paid and are classified within current liabilities on the consolidated balance sheets.

*General and Administrative Expenses*

General and administrative ("G&A") expenses include all non-production related expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, and licenses. Advertising costs are expensed as incurred and are included in G&A expenses. Other than trade show expenses which are deferred until occurrence of the future event, we expense advertising costs as incurred in accordance with ASC 720-35, *"Other Expenses - Advertising Cost."*

*Research and Development Costs*

Research and development costs are expensed as incurred. Research and development expenses consist primarily of costs associated with the development of our electric vehicle product lines.

*Share-Based Compensation*

We account for share-based awards issued by the Company in accordance with ASC Subtopic 718-10, *"Compensation - Share Compensation"*, which requires fair value measurement on the grant date and recognition of compensation expense for all common shares of the Company issued to employees, non-employees and directors. The Company's common and preferred share valuations have been made based on assumptions management believes to be reasonable. Key assumptions and approaches to value used in estimating fair value, includes economic and industry data; business valuation; prior transactions; option value method and other cost, income, and market value approaches. Share-based compensation is included within general and administrative expenses.

*Related Party Transactions*

We have related party transactions with certain of our directors, officers, and principal stockholders. These transactions are entered into in the ordinary course of business and include receiving operational loans, issuing convertible debt and warrants, providing financial support associated with the borrowing of funds.

*Fair Value of Financial Instruments*

We apply fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value on a recurring basis. Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities that are required to be recorded at fair value, Company management considers the principal or most advantageous market in which we would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as risks inherent in valuation techniques, transfer restrictions and credit risk. Fair value is estimated by applying the hierarchy as per requirements of ASC 820, *"Fair value measurements"*.

*Concentrations of Business and Credit Risk*

We maintain cash balances in several financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Association up to certain federal limitations, generally $250,000. At times, our cash balance may exceed these federal limitations and maintains significant cash on hand at certain of its locations. However, we have not experienced any losses in such accounts and management believes we are not exposed to any significant credit risk on these accounts. The amounts in excess of insured limits as of March 31, 2023 and September 30, 2022 are $59.6 million and $53.3 million, respectively.

14

Table of Contents

*Recently Issued Accounting Standards*

Accounting standard updates issued but not yet added were assessed and determined to be either not applicable or not expected to have a material impact on our unaudited condensed consolidated financial statements.

**NOTE 4 - PURCHASE OF ASSETS FROM ELMS**

On October 13, 2022, the United States Bankruptcy Court for the District of Delaware issued an order approving the sale for approximately $

105 million to Mullen Automotive Inc. of certain assets and assumption and assignment of contracts and related liabilities of Electric Last Mile, Inc. and Electric Last Mile Solutions, Inc. (collectively, "ELMS") pursuant to the terms and conditions of the Asset Purchase Agreement dated September 16, 2022.

The ELMS asset acquisition closed on November 30, 2022, and is expected to accelerate the market introduction of our cargo van program and provide us with critical manufacturing capacity at a much lower investment than previously expected to supply the rest of our product portfolio.

ELMS assets include:

- The factory in Mishawaka, Indiana, providing Mullen with the capability to produce up to 50,000 vehicles per year;

- All Intellectual Property, including all manufacturing data that is required for the assembly of the Class 1 van and Class 3 Cab Chassis;

- All inventory including finished and unfinished vehicles, part modules, component parts, raw materials, and tooling; and

- All property including equipment, machinery, supplies, computer hardware, software, communication equipment, data networks and all other data storage.

The following details the allocation of purchase price by asset category for the ELMS asset purchase:

| Asset Category | Fair Value Allocation |
|---|---|
| Land | $ 1,440,000 |
| Buildings and site improvements | 41,287,038 |
| Equipment | 33,577,045 |
| Identified intangible: engineering design | 22,112,791 |
| Inventory | 6,958,158 |
| Total Identified Assets | $ 105,375,032 |

**NOTE 5 - GOODWILL AND INTANGIBLE ASSETS**

As at March 31, 2023 and September 30, 2022, goodwill was $92,834,832 and $92,834,832, respectively. The goodwill was due to the Bollinger acquisition on September 7, 2022.

For the six months ended March 31, 2023, and 2022, the Company recorded intangible asset additions of $22,317,452 and $246,132, respectively. The $22.3 million is primarily due to the ELMS asset acquisition (see NOTE 4 - Purchase of Assets from ELMS).

15

Table of Contents

Intangible assets are stated at cost, net of accumulated amortization. The weighted average useful life of intellectual property is 9.4 years. Acquired intellectual property from the Bollinger acquisition, consisted primarily of patents and non-compete agreements have finite life. Identifiable intangible assets with definite lives are amortized over the period of estimated benefit using the straight-line method and the estimated useful lives of three years. The straight-line method of amortization represents management's best estimate of the distribution of the economic value of the identifiable intangible assets.

| Finite-Lived Intangible Assets | March 31, 2023 | | | September 30, 2022 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Website design and development | $ 2,660,391 | (1,551,895) | $ 1,108,496 | $ 2,660,391 | $ (1,108,496) | $ 1,551,895 |
| Intellectual property | 58,375,794 | (71,182) | 58,304,612 | 58,375,794 | (438,581) | 57,937,213 |
| Patents | 32,391,186 | (2,782,994) | 29,608,192 | 32,391,186 | (204,109) | 32,187,077 |
| Engineer design - ELMS | 22,112,791 | (737,093) | 21,375,698 | - | - | - |
| Other | 1,820,995 | (144,171) | 1,676,824 | 1,820,994 | (16,175) | 1,804,819 |
| Trademark | 670,674 | - | 670,674 | 466,014 | - | 466,014 |
| Total Intangible Assets | $118,031,831 | $ (5,287,335) | $112,744,496 | $95,714,379 | $ (1,767,361) | $93,947,018 |

Total future amortization expense for finite-lived intellectual property is as follows:

| Years Ended March 31, | Future Amortization |
| --- | --- |
| 2023 (six months) | $ 3,250,538 |
| 2024 | 6,270,078 |
| 2025 | 5,604,980 |
| 2026 | 5,604,980 |
| 2027 | 5,595,580 |
| Thereafter | 27,443,054 |
| Total Future Amortization Expense | $ 53,769,210 |

For the three and six months ended March 31, 2023, amortization expense for the intangible assets was $763,269 and $3,519,973 and $221,699 and $445,376, for the three and six months ended March 31, 2022, respectively.

**NOTE 6 - DEBT**

*Short and Long-Term Debt*

Short-term debt is generally defined as debt with principal maturities of one-year or less. Long-term debt is defined as principal maturities of one year or more.

The following is a summary of our indebtedness at March 31, 2023:

| Type of Debt | Net Carrying Value Unpaid Principal Balance | Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
| --- | --- | --- | --- | --- | --- |
| Matured notes | $ 3,051,085 | $ 3,051,085 | $ - | 0 - 00% | 2019 - 2021 |
| Promissory notes | - | - | - | NA | NA |
| Real Estate notes | 5,000,000 | 5,000,000 | - | 0 - 00% | 2023 - 2024 |
| Loans and advances | 111,676 | 111,676 | - | 0.00% | 2016 - 2018 |
| Less: debt discount | (574,248) | (574,248) | - | NA | NA |
| Total Debt | $ 7,588,513 | $ 7,588,513 | $ - | | |

16

Table of Contents

The following is a summary of our indebtedness at September 30, 2022:

| Type of Debt | Net Carrying Value Unpaid Principal Balance | | Current | | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|---|---|
| Matured notes | $ | 3,051,085 | $ | 3,051,085 | $ - | 0.00 - 10.00% | 2019 - 2021 |
| Promissory notes | | 1,096,787 | | - | 1,096,787 | 28.00% | 2024 |
| Real Estate note | | 5,247,612 | | 247,612 | 5,000,000 | 5.0 - 8.99% | 2023 - 2024 |
| Loan advances | | 557,800 | | 557,800 | - | 0.00 - 10.00% | 2016 - 2018 |
| Less: debt discount | | (932,235) | | - | (932,235) | NA | NA |
| **Total Debt** | **$** | **9,021,049** | **$** | **3,856,497** | **$   5,164,552** | | |

*Scheduled Debt Maturities*

The following table represents scheduled debt maturities at March 31, 2023:

| | Years Ended March 31, | | |
|---|---|---|---|
| | 2023 (6 months) | 2024 | Total |
| **Total Debt** | $   3,162,761 | $   4,425,752 | $   7,588,513 |

*Notes and Advances*

Total interest is comprised primarily of stated interest, amortization of debt discount and additional interest recognized for warrants issued with convertible notes for the excess in fair value above the face value of the notes. Stated interest was $1,785,718 and $3,920,235 for the three and six months ended March 31, 2023, and $2,120,515 and $24,559,459 for the three and six months ended March 31, 2022, respectively.

In some instances, we issued convertible instruments with detachable warrants, resulting in the recognition of a debt discount, which is amortized to interest expense over the term of the relevant instrument. Debt discount amortization for the three and six months ended March 31, 2023 and 2022, was $142,287 and $150,293,417, and $188,307 and $19,400,483, respectively. During the six months ended March 31, 2023, warrants having a fair value of $244,510,164 (issuable upon conversion of the convertible notes) were recognized as a derivative liability, which exceeded the face value of the underlying convertible debt, resulting in an interest expense of $94,510,164.

The Company issued shares of common stock to certain creditors for the conversion of convertible notes, satisfaction of debt payments, and in settlement of indebtedness. For the six months ended March 31, 2023, the carrying amount of indebtedness that was settled via issuance of shares of our common stock was $153,222,236 (this relates to convertible notes issued in lieu of preferred stock and relevant interest, see below). The carrying amount of indebtedness that was settled via issuance of common stock for the six months ended March 31, 2022 was $23,192,500.

*NuBridge Commercial Lending LLC Promissory Note*

On March 7, 2022, the Company's wholly owned subsidiary, Mullen Investment Properties, LLC entered into a Promissory Note (the "Promissory Note") with NuBridge Commercial Lending LLC for a principal amount of $5 million. The Promissory Note bears interest at a fixed rate of

8.99% per annum and the principal amount is due March 1, 2024. Collateral for the loan includes the title to the Company's property at 1 Greentech Drive, Tunica, MS. Under the Promissory Note, prepaid interest and issuance costs of $1,157,209 were withheld from the principal and recorded as debt discount, which is being amortized over the term of the note. As of March 31, 2023, the remaining unamortized debt discount was $574,248.

*Drawbridge and Amended A&R Note with Esousa*

On October 14, 2022, the Company entered into an Amended and Restated Secured Convertible Note and Security Agreement (the "A&R Note") with Esousa Holdings LLC ("Esousa"), including principal of $1,032,217 (net of debt discount of $64,570) and accrued interest of $316,127 along with the liability to issue 420,000 shares of common stock

17

Table of Contents

(having a then carrying value of $10,710,000) and an obligation to compensate for the losses from market value decline of shares were exchanged for a new convertible note payable with a face value of $12,945,914 and 920,000 shares of common stock (having a fair value of $5,524,600), resulting in a loss on extinguishment of $6,452,170. The A&R Note is convertible at a 5% discount to the lowest daily volume-weighted average price in the 10 trading days prior to conversion, which resulted in interest expense of $681,364 and debt premium of $681,364. On November 1, 2022, the A&R Note payable to Esousa, having a face value of $12,945,914 (plus debt premium of $681,364) and accrued interest of $171,174, was converted into 2,481,923 shares of common stock. No gain or loss was recognized upon the conversion.

*Convertible Notes*

On November 14, 2022, the Company entered into Amendment No. 3 to the June 7, 2022 Securities Purchase Agreement ("Amendment No. 3"). The investors paid $

150 million and in lieu of receiving shares of Series D Preferred Stock and Warrants, the investors received notes convertible into shares of the Company's common stock ("Notes") and Warrants.

Amendment No. 3 further provided that the remaining $90 million of the commitment amount will be paid in the first half of 2023 in two tranches. The purchase price per share of Series D Preferred Stock will be the lower of (i) $1.27, the closing price of the Company's stock on the date the Securities Purchase Agreement was executed, or (ii) the closing price of the common stock on the trading day immediately preceding the respective purchase date, subject to a floor price of $0.10 per share. For no additional consideration, for every share of Series D Preferred Stock purchased, investors will receive warrants to purchase shares of common stock equal to 185% of the number of shares of Series D Preferred Stock purchased by the investors at an exercise price equal to the purchase price for shares of Series D Preferred Stock. The warrants will also permit cashless exercise (see Note 7). Consummation of the transaction is dependent on certain conditions precedent.

On November 15, 2022, the Company issued the unsecured convertible Notes aggregating $150,000,000 in lieu of Series D Preferred Stock. The Notes bear interest at 15% and are convertible into shares of common stock either: (A) at the option of the noteholder at the lower of: (i) $0.303; or (ii) the closing price of our common stock on January 3, 2023; or (B) mandatorily on November 21, 2022 at the lower of: (i) $0.303; or (ii) the closing price of our common stock on November 18, 2022, provided adequate unissued authorized shares were available. For each share issued upon conversion, the holders are entitled to 1.85 times as many five-year warrants with an exercise price equal to the conversion price for the Notes.

As a result, and since the Company had an insufficient number of authorized shares available to settle potential future warrant exercises, the Company recognized a derivative liability of $244,510,164 for the warrants with a corresponding increase in debt discount of $150,000,000 and interest expense of $94,510,164. The debt discount was amortized over the term of the note through the date the convertible notes were mandatorily convertible. Accordingly, the entire $150,000,000 of debt discount was expensed to interest expense during the six-month period ended March 31, 2023. On November 21, 2022, principal of $59,402,877 was mandatorily converted into 8,833,142 shares of common stock, resulting in a corresponding reduction in derivatives liabilities of $10,491,265.

On December 23, 2022, the Company defaulted on the Notes by not having sufficient authorized shares to allow for both the Notes to be fully converted and the warrants to be exercised. On January 13, 2023, the Company entered into a Settlement Agreement and Release in which investors waived the default prior to February 1, 2023. In exchange, the Company granted the investors the right to purchase additional shares of Series D Preferred Stock and warrants in an amount equal to such investor's pro rata portion of $10 million.

During February 2023, the remaining balance of the Notes (with the principal of $90,362,418) and accrued interests (in amount of $3,456,941) were converted by the holders into 12,385,394 shares of common stock. See Note 7 with regards to warrants issued upon conversion of these Notes.

As of March 31, 2023, and September 30, 2022, accrued interest on outstanding notes payable was $1,193,150 (relates mainly to NuBridge Commercial Lending LLC Promissory Note, see above) and $1,374,925, respectively.

18

Table of Contents

**NOTE 7 - WARRANTS AND OTHER DERIVATIVE LIABILITIES AND FAIR VALUE MEASUREMENTS**

ASC 825-10 defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Company considers the principal or most advantageous market in which it would transact and considers assumptions that market participants would use when pricing the asset or liability, such as inherent risk, transfer restrictions, and risk of non-performance. ASC 825-10 establishes a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. ASC 825-10 establishes three levels of inputs that may be used to measure fair value:

- Level 1 - Quoted prices in active markets for identical assets or liabilities.

- Level 2 - Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which all significant inputs are observable or can be derived principally from or corroborated by observable market data for substantially the full term of the assets or liabilities.

- Level 3 - Unobservable inputs to the valuation methodology that are significant to the measurement of fair value of assets or liabilities.

To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement is disclosed and is determined based on the lowest level input that is significant to the fair value measurement.

**Financial Instruments At Carrying Value That Approximated Fair Value**

Certain financial instruments that are not carried at fair value on the condensed consolidated balance sheets are carried at amounts that approximate fair value, due to their short-term nature and credit risk. These instruments include cash and cash equivalents, accounts payable, accrued liabilities, and debt. Accounts payable are short-term in nature and generally terms are due upon receipt or within 30 to 90 days.

**Non-Financial Assets Measured at Fair Value on a Non-Recurring Basis**

Non-financial assets are only required to be measured at fair value when acquired as a part of business combination or when an impairment loss is recognized. See Note 13 - Property, Equipment and Leasehold Improvements and Note 5 - Intangible assets for further information.

**Financial Liabilities Measured at Fair Value on a Recurring Basis**

During the six months ended March 31, 2023, the Company had two main types of financial liabilities measured at fair value on a recurring basis:

1) Warrant liabilities (that relate to sales of Series C Preferred Stock and Series D Preferred Stock issued pursuant to Securities Purchase Agreements) recognized as liabilities due to requirements of ASC 480 as the variable number of shares to be issued upon cashless exercise is based predominantly on monetary value.

Table of Contents

*Preferred C Warrants*

The warrants, which were exercisable for common stock, issued in connection with the sale of Series C Preferred Stock (the "Preferred C Warrants") in accordance with the November 2021 Merger Agreement and further amendments had an exercise price of $8.834 and a cashless exercise option based on certain formula established by relevant contracts. The initial financial costs recorded upon the issuance of the Preferred C Warrants in the year ended September 30, 2022 was $429,883,573. This amount is comprised of $137,090,205 preferred stock discount (amortized immediately as the preferred stock does not have a stated term of life) and $292,793,368 finance costs (calculated as the difference between fair value of warrant liabilities recognized and the preferred stock discount).

At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants was marked-to-market value and the resulting gain or loss was recorded.

On February 10, 2022, the terms of the Prior SPA Warrants were amended, resulting in a change to the calculated derived dollar amount. The effect of these changes in the amount of $32,735,345 has been accounted for as deemed dividends on preferred stock and decreased additional paid-in capital of the Company.

During the year ended September 30, 2022, 1,677,971 (giving effect to the Reverse Stock Split, see Note 1) Preferred C Warrants were exercised on a cashless basis resulting in the issuance of 21,328,580 shares of common stock, with a total fair market value of $554,371,539 at the date of exercise.

During the quarter ending December 31, 2022, 118,931 Preferred C Warrants that remained outstanding as at September 30, 2022 have been fully exercised.

*Preferred D Warrants*

For every share of Series D Preferred Stock purchased, the investors received 185% warrants (the "Preferred D Warrants") exercisable for shares of common stock at an exercise price equal to the lower of (i) $1.27 or (ii) the closing price of the common stock on the trading day immediately after the date on which the registration statement registering the shares of common stock issuable upon conversion of the Series D Preferred Stock becomes effective on transaction date. The Preferred D Warrants are exercisable during a five-year period commencing upon issuance. The contracts for the Preferred D Warrants contain cashless exercise provisions similar to Preferred C Warrants described above. Therefore, management applied similar accounting treatment to recognition, measurement, and presentation of the warrant liabilities.

During the year ended September 30, 2022, no Preferred D Warrants were exercised. On September 30, 2022, 5,914,592 Preferred D Warrants (giving effect to the Reverse Stock Split, see Note 1) remained outstanding.

During the quarter ended December 31, 2022, all Preferred D Warrants were exercised on a cash-less basis for 9,163,951 shares of common stock.

In November 2022, the Company received $150,000,000 and issued, in lieu of Series D Preferred Stock, notes convertible into shares of common stock and warrants. As a result of the conversion of the convertible debt into shares of common stock in November 2022 and February 2023, 39,254,291 warrants (giving effect to the Reverse Stock Split, see Note 1) were issued. They were exercised into shares of common stock on a cash-less basis, except for 3,003,361 warrants that remained outstanding and could, on a cashless basis, be exercised for 7,731,715 shares of common stock with a fair market value of $25,186,062 at March 31, 2023.

At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants was marked-to-market value and the resulting gain or loss was recorded.

The fair value of warrant obligations on recognition date and on subsequent dates was estimated as a maximum of (i) Black Scholes value for cash exercise of relevant warrants and (ii) current market value of the number of shares the Company would be required to issue upon cashless warrant exercise on a relevant date in accordance with warrant contract

20

Table of Contents

requirements. The latter valuation, based on observable inputs (level 2), has been higher and reflects the pattern of the warrants exercise since the inception of the Securities Purchase Agreement.

All the warrants mentioned in this section provide that if the Company issues or sells, enters into a definitive, binding agreement pursuant to which he Company is required to issue or sell or is deemed, pursuant to the provisions of the Warrants, to have issued or sold, any shares of common stock for a price per share lower than the exercise price then in effect, subject to certain limited exceptions, then the exercise price of the warrants shall be reduced to such lower price per share. In addition, the exercise price and the number of shares of common stock issuable upon exercise of the warrants are subject to adjustment in connection with stock splits, dividends or distributions or other similar transactions.

From April 1, 2023 until June 30, 2023, certain investors under the Securities Purchase Agreement have the right, but not the obligation, at any time from time to time, in their sole and absolute discretion to purchase from the Company additional shares of Preferred Stock in an amount equal to such Buyer's pro rata portion on the same terms and conditions as applicable to the purchase and sale of shares of Series D Preferred Stock as provided under the Securities Purchase Agreement, subject to certain conditions and modifications:
a) All investors under the Securities Purchase Agreement - in amount equal to $100,000,000 (pursuant to Amendment 3 to the Securities Purchase Agreement). Along with the shares of Series D Preferred Stock the buyers shall receive Additional Warrants exercisable for 110% of shares of Common Stock under conditions similar to other warrants issued under the Securities Purchase Agreement.
b) One of the investors under the Securities Purchase Agreement - in amount equal to $20,000,000 (pursuant to Settlement greement and Release entered into on January 13, 2023 to settle over-issuance of shares). Along with the shares of Series D Preferred Stock the buyer shall receive Additional Warrants exercisable for 185% of shares of Common Stock under conditions similar to other warrants issued under the Securities Purchase Agreement.
c) All investors under the Securities Purchase Agreement - in amount equal to $10,000,000 (pursuant to Settlement Agreement and Release entered into on January 13, 2023 to waive possible rights of the investors upon default of the Company to maintain sufficient number of registered shares required by the Securities Purchase Agreement). Along with the shares of Series D Preferred Stock the buyer shall receive Additional Warrants exercisable for 185% of shares of Common Stock under conditions similar to other warrants issued under the Securities Purchase Agreement.

2) Other derivative liabilities recognized and remeasured subsequently at fair value correspond to convertible debentures, warrants, and preferred stock, that failed equity presentation when the Company had insufficient number of authorized shares available to settle all potential future conversion transactions.

Most of these derivative liabilities, except for Qiantu warrants (as described below), were initially recognized on November 15, 2022, when the Company had an insufficient number of authorized shares of common stock available for issuance upon conversion of preferred stock and convertible notes payable and the exercise of outstanding warrants. They have been reclassified to equity upon authorization of increase of common stock available for issuance by stockholder of the Company on January 25, 2023.

*Qiantu Warrants*

On March 14, 2023, the Company entered into an Intellectual Property and Distribution Agreement (the "IP Agreement") with Qiantu Motor (Suzhou) Ltd., and two of Qiantu Suzhou's affiliates (herein "Qiantu"). Pursuant to the IP Agreement, Qiantu granted the Company the exclusive license to use certain of Qiantu's trademarks and the exclusive right to assemble, manufacture, and sell the homologated vehicles based on the Qiantu K-50 model throughout North America and South America for a period of five years (see Note 17 for more details). These rights shall be obtained and the commitment shall only be effective upon the Company's assessment of feasibility and profitability of the project.

21

Table of Contents

As a part of consideration for the Company's entry into the IP Agreement, the Company issued to Qiantu USA warrants to purchase up to 3,000,000 (giving effect to the Reverse Stock Split, see Note 1) shares of the Company's common stock (the "Qiantu Warrants").

The warrants are exercisable at Qiantu USA's discretion commencing at any time from September 30, 2023 up to and including September 30, 2024 at

110% of the market price of the Company's common stock at the close of trading on the earlier of (a) when the Company completes its obligations to its Series D Preferred Stock investors; or (b) June 15, 2023. The Qiantu Warrants have anti-dilution provisions similar to those described above, but they provide for exemption for Series D Preferred Stock transactions rights and obligations that existed on the date the Qiantu Warrants were issued.

As it was expected that the Company may not have a sufficient number of authorized shares of common stock available for issuance during the term of the contract (up to September 2024), the Qiantu Warrants were recognized at fair value on inception ($6,814,000) and on March 31, 2023 ($5,663,000).

Upon issuance of the instruments underlying the derivative liabilities and upon revaluation (immediately prior to conversion of the underlying instrument and on the balance sheet date), the Company estimated the fair value of these derivatives using the Black-Scholes Pricing Model and binomial option valuation techniques based on the following assumptions: (1) dividend yield of 0%, (2) expected annualized volatility of

151% to 198%, (3) risk-free interest rate of 4.10% to 4.45%. These liabilities are classified as having significant unobservable input (level 3) in the table below.

Breakdown of items recorded at fair value on a recurring basis in condensed consolidated balance sheets by levels of observable and unobservable inputs as of March 31, 2023 and on September 30, 2022 is presented below:

| | March 31, 2023 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Derivative liability | $ 30,855,261 | $ - | $ 25,192,261 | $ 5,663,000 |

| | September 30, 2022 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Derivative liability | $ 84,799,179 | $ - | $ 84,799,179 | $ 0 |

A summary of all changes in warrants and other derivative liabilities is presented below:

| | | |
|---|---|---|
| Balance, September 30, 2022 | $ | 84,799,179 |
| Derivative liabilities recognized upon issuance of convertible instruments | | 251,324,164 |
| Derivative liability upon authorized shares shortfall | | 11,978,166 |
| Loss / (gain) on derivative liability revaluation | | 89,221,391 |
| Reclassification of derivative liabilities to equity upon authorization of sufficient common shares | | (47,818,882) |
| Financing loss upon over-issuance of shares from warrants | | 8,934,892 |
| Receivables upon over-issuance of shares from warrants | | 17,721,868 |
| Liability to issue shares upon unfinished warrant exercise on period end | | (55,106,287) |
| Conversions of warrants into common shares | | (319,707,966) |
| Conversions of convertible notes and accrued interest into common shares | | (10,491,265) |
| Balance, March 31, 2023 | $ | 30,855,261 |

22

Table of Contents

| | | |
|---|---|---|
| Balance, September 30, 2021 | $ | - |
| Derivative liabilities recognized upon issuance of convertible instruments | | 269,344,178 |
| Loss / (gain) on derivative liability revaluation | | 142,288,528 |
| Reclassification of derivative liabilities to equity upon authorization of sufficient common shares | | - |
| Conversions of warrants into common shares | | (207,677,075) |
| Conversions of convertible notes and accrued interest into common shares | | - |
| Balance, March 31, 2022 | $ | 203,955,631 |

**NOTE 8 - STOCKHOLDERS' EQUITY**

**Common Stock**

At the reconvened special meeting of stockholder on January 25, 2023, stockholders approved the proposal to increase the Company's authorized common stock capital from 1.75 billion to 5 billion shares.

At March 31, 2023, the Company had

5,000,000,000 shares of common stock authorized with $0.001 par value per share.
Effective May 4, 2023, the Company effectuated a 1-for-25 reverse stock split, which resulted in a reduction in the number of outstanding shares of common stock (see more information in the Note 1 above).

The Company had 126,281,274 and 33,338,727 shares of common stock (post stock split) issued and outstanding at March 31, 2023 and September 30, 2022, respectively.

The holders of common stock are entitled to

one vote for each share of common stock held at all meetings of stockholders. In the event of a liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, the common stockholders are entitled to receive the remaining assets following distribution of liquidation preferences, if any, to the holders of our preferred stock. The holders of common stock are not entitled to receive dividends unless declared by our Board. To date, no dividends were declared or paid to the holders of common stock.
If the Company receives a warrant exercise notice or preferred stock conversion notice close to the balance sheet date, and issues relevant order to a transfer agent which is effectively exercised only after the balance sheet date, relevant shares of common stock are presented in the balance sheet as common stock owed but not issued.

**Preferred Stock**

Under the terms of our Certificate of Incorporation, the Board may determine the rights, preferences, and terms of our authorized but unissued shares of Preferred Stock. On March 31, 2023, the Company had 500,000,000 shares of Preferred Stock authorized with $0.001 par value per share, including 437,500,001 shares of Series D Preferred Stock.

The Reverse Stock Split (see Note 1 above) did not affect the number of shares of Preferred Stock but the conversion ratios were proportionately adjusted to decrease the number of shares of common stock to be issued as a result of the Reverse Stock Split ratio of 1-for-25.

**Redemption Rights**

The shares of Preferred Stock are not subject to Mandatory Redemption.

The Series C and Series D Preferred Stock are voluntarily redeemable by the Company in accordance with the following schedule, provided that the issuance of shares of common stock issuable upon conversion has been registered and the registration statement remains effective:

Year 1: No Redemption

23

Table of Contents

Year 2: Redemption at 120% of the Redemption Price
Year 3: Redemption at 115% of the Redemption Price
Year 4: Redemption at 110% of the Redemption Price
Year 5: Redemption at 105% of the Redemption Price
Year 6 and thereafter: Redemption at 100% of the Redemption Price

The Preferred Stock is also redeemable at any time for a price per share equal to the Issue Price, plus all unpaid accrued and accumulated dividends on such share (whether or not declared), provided: (A) the Preferred Stock has been issued and outstanding for a period of at least

one year, (B) the issuance of the shares of common stock underlying the Preferred Stock has been registered pursuant to the Securities Act and such registration remains effective, and (C) the trading price for the common stock is less than the Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market.

**Dividends**

The holders of Series A and Series B Preferred Stock are entitled to non-cumulative dividends if declared by the Board of Directors. The holders of the Series A Preferred Stock and Series B Preferred Stock participate on a pro rata basis (on an "as converted" basis to common stock) in any cash dividend paid on common stock. No dividends have been declared or paid during the three and six months ended March 31, 2023, and 2022.

The Series C Preferred Stock originally provided for a cumulative 15.0% per annum fixed dividend on the Series C Original Issue Price plus unpaid accrued and accumulated dividends. On January 13, 2023, the Company and holders of Series C Preferred Stock entered into a waiver agreement pursuant to which such holders irrevocably waived their right to receive any and all cumulative 15.0% per annum fixed dividends on such Preferred Stock, including all unpaid accrued and accumulated dividends. Corresponding adjustment to the additional paid-in capital of the Company amounted to $6,872,075.

The Series D Preferred Stock bears a 15.0% per annum fixed dividend accumulated and compounded monthly, payable no later than the 5th day after the end of each month on the Series D Original Issue Price plus unpaid accrued and accumulated dividends. Dividends on the Series D Preferred Stock are payable prior to any dividends on any other series of Preferred Stock or the Common Stock. The Series D Preferred Stock dividend payable balance was approximately $361,321 on March 31, 2023.

The Company may elect to pay dividends for any month with a payment-in-kind ("PIK") election if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of NASDAQ and (iii) the average daily trading dollar volume of the Company's common stock for 10 trading days in any period of 20 consecutive trading days on the NASDAQ is equal to or greater than $27.5 million.

**Liquidation, Dissolution, and Winding Up**

Upon the completion of a distribution pursuant to a Liquidation Event to the Series B Preferred Stock and Series C Preferred Stock, the holders of Series A Preferred Stock are entitled to receive, prior and in preference to any distribution of any proceeds to the holders of the common stock, by reason of their ownership thereof, $1.29 per share of each share of the Series A Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series A Preferred Stock), plus declared but unpaid dividends on such share. "Liquidation Event" is as defined in the Certificate of Incorporation and, subject to certain exceptions, includes a sale or other disposition of all or substantially all of the Company's assets, certain mergers, consolidations and transfers of securities, and any liquidation, dissolution or winding up of the Company.

In the event of any Liquidation Event, the holders of the Series B Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series B Original Issue Price plus declared but unpaid dividends.

24

Table of Contents

Upon the completion of a distribution pursuant to a Liquidation Event prior to the Series B Preferred Stock, the holders of the Series C Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Series A Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series C Original Issue Price plus declared but unpaid dividends.

In the event of any Liquidation Event, the holders of the Series D Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series D Original Issue Price plus declared but unpaid dividends.

**Conversion**

Each share of Series A Preferred Stock is convertible at any time at the option of the holder into 4 (giving effect to the Reverse Stock Split - see Note 1) shares of fully paid and non-assessable shares of common stock (rounding up to the nearest share).

Each share of Series B Preferred Stock and each share of Series C Preferred Stock are convertible at the option of the holder at any time into such number of shares of common stock as is determined by dividing the Issue Price by the relevant Conversion Price (in each case, subject to adjustment). As of March 31, 2023 there were no shares of Series B Preferred Stock issued and outstanding. As of March 31, 2023, each share of Series C Preferred Stock is convertible into 0.04 (giving effect to the Reverse Stock Split - see Note 1) shares of fully paid and nonassessable shares of common stock (rounding up to the nearest share).

Each share of Series C Preferred Stock will automatically be converted into shares of common stock at the applicable conversion rate at the time in effect immediately upon (A) the issuance of shares of common stock underlying the Series C Preferred Stock being registered pursuant to the Securities Act of 1933 and such registration remaining effective, (B) the trading price for the Company's common stock being more than two times the Series C Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's common stock during such 20 trading days is equal to or greater than $4.0 million.

The Series D Preferred Stock is convertible at the option of each holder at any time into the number of shares of common stock determined by dividing the Series D Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series D Conversion Price, subject to adjustment as set in the Certificate of Designation. The "Series D Original Issue Price" for each share of the Series D Preferred Stock means the lower of (i) $1.27 or (ii) the closing price on the Trading Day immediately preceding the Purchase Notice Date. As of March 31, 2023, each share of Series D is convertible into 0.04 (giving effect to the Reverse Stock Split - see note 1) shares of fully paid and nonassessable shares of common stock (rounding up to the nearest share).

Each share of Series D Preferred Stock will automatically be converted into shares of common stock at the applicable Conversion Rate at the time in effect immediately upon (A) the issuance of shares of Common Stock underlying the Series D Preferred Stock being registered pursuant to the Securities Act and such registration remaining effective, (B) the trading price for the Company's common stock being more than two times the Series D Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's common stock during such 20 trading days is equal to or greater than $27,500,000.

**Voting Rights**

The holders of shares of common stock and Series A, Series B and Series C Preferred Stock at all times vote together as a single class on all matters (including the election of directors) submitted to a vote of the stockholders; provided, however, that, any proposal which adversely affects the rights, preferences and privileges of the Series A Preferred Stock, Series B Preferred Stock, or Series C Preferred Stock, as applicable, must be approved by a majority in interest of the affected series of Preferred Stock, as the case may be.

25

Table of Contents

Each holder of common stock, Series B Preferred and Series C Preferred has right to one vote for each share of Common Stock into which such Series B Preferred Stock and/or Series C Preferred Stock, as applicable, could be converted. Each holder of Series A Preferred has the right to 1,000 votes per share held of record by such holder.

The holders of Series D Preferred Stock have no voting rights except for protective voting rights (one vote for each share of common stock into which such Series D Preferred Stock could be converted) in such cases as approval of a liquidation event, authorization of issue of securities having a preference over or parity with the Series D Preferred Stock with respect to dividends, liquidation, redemption or voting, entering a merger or consolidation, etc.

**NOTE 9 - LOSS PER SHARE**

Earnings per common share ("EPS") is computed by dividing net income allocated to common stockholders by the weighted-average common shares outstanding, excluding unvested common shares subject to repurchase or cancellation. Diluted EPS is computed by dividing income allocated to common stockholders plus dividends on dilutive convertible preferred stock and preferred stock that can be tendered to exercise warrants, by the weighted-average common shares outstanding plus amounts representing the dilutive effect of outstanding warrants and the dilution resulting from the conversion of convertible preferred stock, if applicable.

For the three and six months ended March 31, 2023, and 2022, the convertible debt and shares of Preferred Stock were excluded from the diluted share count because the result would have been antidilutive under the "if-converted method." The warrants to purchases shares of common stock also were excluded from the computation because the result would have been antidilutive.

The following table presents the reconciliation of net income attributable to common stockholders to net income used in computing basic and diluted net income per share of common stock:

| | Three months ended March 31, | | Six months ended March 31, | |
| --- | --- | --- | --- | --- |
| | **2023** | **2022** | **2023** | **2022** |
| Net income attributable to common stockholders | $ (114,913,318) | $ (324,608,480) | $ (491,189,104) | $ (480,670,029) |
| Less: accumulated preferred stock dividends | 8,039,612 | (32,735,345) | 7,400,935 | (32,735,345) |
| Net income used in computing basic net income per share of common stock | $ (106,873,706) | $ (357,343,825) | $ (483,788,169) | $ (513,405,374) |
| | | | | |
| Net loss per share | $ (1.30) | $ (173.83) | $ (7.09) | $ (370.53) |
| | | | | |
| Weighted average shares outstanding, basic and diluted | 82,409,028 | 2,055,720 | 68,262,145 | 1,385,594 |

**NOTE 10 - SHARE-BASED COMPENSATION**

The Company has a share incentive plan that is part of its annual discretionary share-based compensation program. The plan includes consultants and employees, including directors and officers. For employees, they are notified of company share incentives during the onboarding process. The employee's offer letter briefly describes the plan. Subject to the approval of our Board of Directors Compensation Committee, employees are issued a specified number of shares of the Company's common stock. The total expense recognized for share awards represents the grant date fair value of such awards, which is generally recognized as a charge to income ratably over the vesting period.

26

Table of Contents

The Company has adopted the CEO Award Incentive Plan, approved by the Board and by stockholder on July 26, 2022 at the 2022 Annual Meeting of Stockholders. Under this plan, the Chief Executive Officer is entitled to share-based awards generally calculated as 1-2% of then outstanding number of shares of common stock, issuable upon achievement of specific financial and operational targets (milestones) that are supposed to significantly increase value of the Company. The compensation is accrued over the service term when it is probable that the milestone will be achieved (as at March 31, 2023 the accrual for future awards is approximately $2.4 million).

Consulting agreements with shares for services have a cost determined by the number of shares granted within the individual contract multiplied by the market value of the shares provided on date of grant. The number of shares specified within the individual agreements are generally negotiated by our Chief Executive Officer and approved by the Board. The consultant typically earns share-based compensation over the service period which is generally recognized as a charge to income ratably over the vesting period. The common stock provided for services are accounted for as professional fees within G&A expense and employee share issuances are part of compensation expense.

| Composition of Share-Based Compensation Expense | For the three months ended March 31, | | For the six months ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Directors, officers and employees share-based compensation | $ 11,320,052 | $ 1,688,694 | $ 47,697,024 | $ 3,292,987 |
| Shares issued to consultants for services | 8,229,905 | 21,546,573 | 12,606,343 | 24,042,060 |
| Total share-based compensation expense | $ 19,549,957 | $ 23,235,267 | $ 60,303,367 | $ 27,335,047 |

27

Table of Contents

**NOTE 11 - ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

| | March 31, 2023 | | September 30, 2022 |
|---|---:|---|---:|
| **Accrued Expenses and Other Liabilities** | | | |
| Accrued expense - other | $ 3,211,783 | $ | 3,529,384 |
| IRS tax liability | 185,873 | | 1,744,707 |
| Accrued payroll | 1,621,034 | | 534,782 |
| Accrued interest | 1,193,150 | | 1,377,008 |
| **Total** | $ **6,211,840** | $ | **7,185,881** |

Accrued payroll represents salaries and benefits that are owed to employees, including payroll tax liabilities. Accrued interest of $1,193,150 relates to finance charges on debt financing, interest on loans, and convertible notes payable. See Note 6 - Debt.

**NOTE 12 - LIABILITY TO ISSUE STOCK**

Liability represents stock payable that is accrued for and issuable at a future date for certain convertible securities and warrants and was $

55,106,287 as of March 31, 2023. As of March 31, 2023 consultants stock compensation was $578,582, and employees and directors stock compensation was $3,582,602. As of September 30, 2022, liability to issue stock to Esousa was $10,710,000.

**NOTE 13 - PROPERTY, EQUIPMENT AND LEASEHOLD IMPROVEMENTS, NET**

Property, equipment, and leasehold improvements, net consists of the following:

| | March 31, 2023 | | September 30, 2022 |
|---|---:|---|---:|
| Building | $ 50,541,364 | $ | 8,306,697 |
| Furniture and equipment | 552,859 | | 556,948 |
| Vehicles | 220,886 | | 96,363 |
| Show room assets | 4,428,544 | | 4,418,724 |
| Computer hardware and software | 1,316,745 | | 1,013,308 |
| Machinery and equipment | 41,109,337 | | 7,383,612 |
| Construction-in-progress | 1,047,583 | | 269,778 |
| Leasehold improvements | 111,570 | | 76,438 |
| Subtotal | 99,328,888 | | 22,121,868 |
| Less: accumulated depreciation | (9,686,904) | | (4,335,166) |
| **Property, Equipment and Leasehold Improvements, net** | $ **89,641,984** | $ | **17,786,702** |

Property, plant and equipment assets are stated at cost, net of accumulated amortization. Depreciation expense related to property, equipment, and leasehold improvements for the three and six months ended March 31, 2023, was $2,947,555 and $5,351,737, and was $447,720 and $721,129 for the three and six months ended March 31, 2022, respectively.

The ELMS asset acquisition closed on November 30, 2022 (See Note 4 - Purchase of assets from ELMS), and include property, plant, and equipment additions of:

- The Mishawaka, Indiana factory, which consisted of land and building of $1.44 million and $41.29 million, respectively; and

- All property including equipment, machinery, supplies, computer hardware, software, communication equipment, data networks and all other data storage, that totaled $33.6 million in machinery additions.

28

Table of Contents

**NOTE 14 - OTHER NONCURRENT ASSETS**

Other assets consist of the following:

| | March 31, 2023 | | September 30, 2022 | |
|---|---|---|---|---|
| **Other Assets** | | | | |
| Other assets | $ | 5,000 | $ | 81,588 |
| Other receivables | | 109,184 | | 1,232,387 |
| Security deposits | | 1,052,872 | | 281,057 |
| **Total Other Assets** | **$** | **1,167,056** | **$** | **1,595,032** |

**NOTE 15 - OPERATING EXPENSES**

General and Administrative Expenses consist of the following:

| | Three months ended March 31, | | Six months ended March 31, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Professional fees | $ 12,386,745 | $ 21,725,222 | $ 46,634,060 | $ 26,864,554 |
| Salaries | 18,466,153 | 4,217,073 | 37,013,975 | 7,378,993 |
| Depreciation | 2,966,086 | 302,859 | 5,370,269 | 610,558 |
| Amortization | 850,370 | - | 3,607,075 | - |
| Lease | 843,963 | 559,583 | 1,675,054 | 1,019,118 |
| Settlements and penalties | 6,244,504 | 589,846 | 6,265,349 | 884,832 |
| Employee benefits | 585,053 | 545,108 | 1,618,690 | 913,160 |
| Utilities and office expense | 905,711 | 111,419 | 1,067,103 | 225,913 |
| Advertising and promotions | 1,158,595 | 472,803 | 3,760,269 | 2,925,593 |
| Taxes and licenses | 150,323 | 210,697 | 251,881 | 279,488 |
| Repairs and maintenance | 201,058 | 60,482 | 382,297 | 79,702 |
| Executive expenses and directors' fees | 81,022 | - | 290,066 | - |
| Listing and regulatory fees | 1,433,502 | - | 2,735,345 | - |
| Other | 1,139,253 | 474,341 | 1,736,916 | 988,605 |
| **Total** | **$47,412,338** | **$29,269,433** | **$112,408,349** | **$42,170,516** |

Within professional fees is stock based compensation for services rendered to consultants. Salaries include stock based compensation to officers and employees. The expense is recorded at fair value of the shares to be issued (see Note 10 for stock based compensation).

**Research and development**

Research and development for the three months ended March 31, 2023 and 2022 was $20,478,971 and $1,183,437, respectively. Research and development for the six months ended March 31, 2023 and 2022 was $29,100,980 and $2,340,761, respectively. Costs are expensed as incurred. Research and development expenses are primarily comprised of external fees for engineering, homologation, prototyping costs and other expenses related to preparation to mass-production of electric vehicles such as Mullen Five EV, Mullen One EV cargo van, etc.

**NOTE 16 - LEASES**

We have entered into various operating lease agreements for certain offices, manufacturing and warehouse facilities, and corporate aircraft. Operating leases are included in right-of-use assets, and current and noncurrent portion of lease liabilities, as appropriate. These right-of-use assets also include any lease payments made and initial direct costs incurred at lease commencement and exclude lease incentives. The lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Lease expense for lease payments is recognized on a straight-line basis over the lease term. We have lease agreements which require payments for both lease and non-lease components

29

Table of Contents

and have elected to account for these as a single lease component. Certain leases provide for annual increases to lease payment based on an index or rate. We calculate the present value of future lease payments based on the index or at the lease commencement date for new leases.

The table below presents information regarding our lease assets and liabilities:

|  | March 31, 2023 | September 30, 2022 |
|---|---|---|
| **Assets:** | | |
| Operating lease right-of-use assets | $ 6,029,432 | $ 4,597,052 |
| **Liabilities:** | | |
| Operating lease liabilities, current | (2,235,197) | (1,428,474) |
| Operating lease liabilities, non-current | (4,163,705) | (3,359,354) |
| Total lease liabilities | $ (6,398,902) | $ (4,787,828) |
| **Weighted average remaining lease terms:** | | |
| Operating leases | 1.75 years | 2.63 years |
| **Weighted average discount rate:** | | |
| Operating leases | 28 % | 28 % |

| Operating lease costs: | For the three months ended March 31, | | For the six months ended March 31, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Fixed lease cost | $ 782,101 | $ 452,789 | $ 1,360,748 | $ 739,271 |
| Variable lease cost | 30,828 | 130,752 | 61,822 | 260,357 |
| Short-term lease cost | - | 29,185 | - | 125,777 |
| Sublease income | (45,885) | (53,144) | (65,629) | (106,287) |
| **Total operating lease costs** | $ **767,044** | $ **559,582** | $ **1,356,941** | $ **1,019,118** |

*Operating Lease Commitments*

Our leases primarily consist of land, land and building, or equipment leases. Our lease obligations are based upon contractual minimum rates. Most leases provide that we pay taxes, maintenance, insurance and operating expenses applicable to the premises. The initial term for most real property leases is typically 1 to 3 years, with renewal options of 1 to 5 years, and may include rent escalation clauses. For financing obligations, a portion of the periodic lease payments is recognized as interest expense and the remainder reduces the obligations. For operating leases, rent is recognized on a straight-line basis over the lease term, including scheduled rent increases and rent holidays.

The following table reflects maturities of operating lease liabilities at March 31, 2023:

| Years ending March 31, | |
|---|---|
| 2023 (6 months) | $ 1,763,109 |
| 2024 | 3,062,953 |
| 2025 | 2,412,336 |
| 2026 | 599,369 |
| 2027 | 405,882 |
| Thereafter | 107,972 |
| Total lease payments | $ 8,351,621 |
| Less: imputed interest | (1,952,719) |
| Present value of lease liabilities | $ **6,398,902** |

**NOTE 17 - COMMITMENTS AND CONTINGENCIES**

ASC 450 governs the disclosure and recognition of loss contingencies, including potential losses from litigation, regulation, tax and other matters. The accounting standard defines a "loss contingency" as "an existing condition, situation,

Table of Contents

or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450 requires accrual for a loss contingency when it is "probable that one or more future events will occur confirming the fact of loss" and "the amount of the loss can be reasonably estimated."

From time to time, we are subject to asserted and actual claims and lawsuits arising in the ordinary course of business. Company management reviews any such legal proceedings and claims on an ongoing basis and follows appropriate accounting guidance when making accrual and disclosure decisions. We establish accruals for those contingencies where the incurrence of a loss is probable and can be reasonably estimated, and it discloses the amount accrued and the amount of a reasonably possible loss in excess of the amount accrued, if such disclosure is necessary for our consolidated financial statements to not be misleading. To estimate whether a loss contingency should be accrued by a charge to income, management evaluates, among other factors, the degree of probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of the loss. We do not record liabilities when the likelihood is probable, but the amount cannot be reasonably estimated.

### *DBI Lease Buyback Servicing LLC, Drawbridge Investments LLC v. Mullen Automotive Inc.*

In June 2022, we entered into a letter agreement with DBI Lease Buyback Servicing LLC ("DBI") wherein we agreed to provide DBI with a right to purchase up to $25 million worth of a to-be-issued Series E Convertible Preferred Stock and warrants. The option and its terms have not been finalized.

On March 2, 2023, DBI and Drawbridge Investments LLC (collectively, "Drawbridge") filed a complaint in the Commercial Division of the Supreme Court of the State of New York, County of New York against Mullen. The complaint asserts three claims against Mullen arising out of an alleged Series E option agreement by which Drawbridge allegedly would be able to purchase to-be-created Series E preferred shares and obtain warrants for Mullen's common stock in exchange for, inter alia, a $3.5 million discount on a promissory note held by Drawbridge. Specifically, Drawbridge asserts claims for: (1) specific performance of the alleged agreement; (2) money damages (in an amount exceeding $100 million) arising out of Mullen's alleged breach of the alleged agreement; and (3) declaratory judgment setting forth plaintiff's rights and Mullen's obligations under the alleged agreement.

Drawbridge also commenced an action by Order to Show Cause whereby plaintiffs, inter alia, sought a temporary restraining order ("TRO") (a) enjoining Mullen from (i) increasing the number of designated shares for any outstanding stock and (ii) issuing new preferred stock; and (b) requiring Mullen to maintain at least 500 million in authorized common stock. On March 14, 2023, the Court vacated the TRO and entered an Order on March 15, 2023 whereby the TRO was vacated and denied. At the April 18, 2023 hearing for the preliminary injunctive relief sought by plaintiffs in the Order to Show Cause and after reviewing Mullen's opposition and hearing oral argument from both sides, the Court reserved decision on plaintiffs' motion.
The Company does not have an estimate of possible loss as of March 31, 2023.

### *Mullen Technologies Inc. v. Qiantu Motor (Suzhou) Ltd.*

This matter arises out of a contract dispute between Mullen and Qiantu Motor (Suzhou) Ltd. *("*Qiantu Suzhou") related to the engineering, design, support, and homologation of Qiantu's K50 vehicle by Mullen.

On March 14, 2023, the parties entered into a Settlement Agreement providing for full settlement of all pending litigation between the Company and Qiantu Suzhou. The parties also released all claims against each other arising from or in connection with the matters and claims that were subject to the legal proceedings. Pursuant to the Settlement Agreement, (1) the parties agreed to enter into an IP Agreement (as defined and described below) and (2) in connection with the settlement of the Legal Proceedings and for the privilege of entering into the IP Agreement, the Company paid $6 million to Qiantu Suzhou.

In connection with the execution of the Settlement Agreement, on March 14, 2023, the Company entered into an Intellectual Property and Distribution Agreement (the "IP Agreement") with Qiantu Suzhou, and two of Qiantu Suzhou's affiliates (herein "Qiantu"). Pursuant to the IP Agreement, Qiantu granted the Company the exclusive license to use certain

31

Table of Contents

of Qiantu's trademarks and the exclusive right to assemble, manufacture, and sell the homologated vehicles based on the Qiantu K-50 model throughout North America (including Canada, Mexico, and the United States of America) and South America for a period of five (5) years, which period does not start until the Company has successfully homologated vehicles based on terms of the IP Agreement (the "Five Year Period"). During the Five Year Period, the Company is also obligated to purchase a certain number of vehicle kits every year from Qiantu. These rights shall be obtained and the commitment shall only be effective upon the Company's assessment of feasibility and profitability of the project within 150 days as provided for by the IP Agreement.

As consideration for the Company's entry into the IP Agreement, (1) the Company issued to Qiantu USA warrants to purchase up to 3,000,000 shares of the Company's common stock (the "Qiantu Warrants") as described below; (2) the Company will pay Qiantu $2,000,000 for deliverable items under the IP Agreement; and (3) the Company will pay Qiantu a royalty fee of $1,200 for each homologated vehicle sold in North America and South America during the term of the IP Agreement. The Qiantu Warrants were issued upon execution of the IP Agreement and are exercisable at Qiantu USA's discretion commencing at any time from September 30, 2023 up to and including September 30, 2024 at 110% of the market price of the Company's common stock at the close of trading on the earlier of (a) when the Company completes its obligations to its Series D Preferred Stock investors; or (b) June 15, 2023 (for more information on the warrants, see note 7).

### International Business Machines ("IBM")

This claim was filed in the Supreme Court of the State of New York on May 7, 2019. This matter arises out of a contract dispute between Mullen and IBM related to a joint development and technology license agreement, patent license agreement, and a logo trademark agreement. On November 9, 2021, the court, pursuant to an inquest order, awarded damages in favor of IBM and on December 1, 2021, the court entered a judgment in favor of IBM in the amount of $

5,617,192, which the Company paid.
On February 2, 2022, IBM filed a Motion to Amend the Judgment it had obtained to add Mullen Automotive and Ottava as Judgment Debtors. Mullen filed an Appeal on April 8, 2022. A settlement was reached in which Mullen paid the full amount of the Judgment with interest, for a total of approximately $5.9 million, but maintained its Appeal rights. IBM then filed a Motion to Dismiss the Appeal based on Mullen's payment of the Judgment. Mullen filed an Opposition to the same on July 18, 2022, and the hearing of the matter was set for July 25, 2022. The Court took the same under submission, and a decision has still not been issued. The Appeal remains pending.

### Federal and State Tax Liabilities

During the third quarter of 2022, the Company entered into an instalment agreement with the IRS to pay $

45,000 per month related to unpaid federal payroll liabilities plus accrued interest and penalties. In addition to the payment plan, the IRS also collected $725,817 when the Company sold property IRS had liened. As of March 31, 2023, we had an accrued liability of $185,873 related to IRS liabilities.

### The GEM Group

On September 21, 2021, the GEM Group filed an arbitration demand and statement of claim against Mullen seeking declaratory relief and damages. This matter arises out of an alleged breach of a securities purchase agreement dated November 13, 2020. On April, 20, 2023, at the direction of the sole arbitrator, closing arguments for the arbitration previously scheduled for April 28, 2023, were rescheduled for May 18, 2023. The Company does not have an estimated of possible loss as of March 31, 2023.

### TOA Trading LLC Litigation

This claim arises out of an alleged breach of contract related to an unpaid finder's fee. On April 11, 2022, TOA Trading LLC and Munshibari LLC, filed a complaint against Mullen Automotive Inc. and Mullen Technologies Inc. in the United States District Court for the Southern District of Florida. On May 18, 2022, the Company filed a Motion to Dismiss or in

32

Table of Contents

the Alternative, Transfer Venue, which has not yet been ruled upon. The Company does not have an estimate of possible loss as of March 31, 2023.

***Mullen Stockholder Litigation***

Margaret Schaub v. Mullen Automotive, Inc. - Securities Class Action

On May 5, 2022, Margaret Schaub, a purported stockholder, filed a putative class action complaint in the United States District Court Central District of California against the Company, as well as its Chief Executive Officer, David Michery, and the Chief Executive Officer of a predecessor entity, Oleg Firer (the "Schaub Lawsuit"). This lawsuit was brought by Schaub both individually and on behalf of a putative class of the Company's shareholders, claiming false or misleading statements regarding the Company's business partnerships, technology, and manufacturing capabilities, and alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. The Schaub Lawsuit seeks to certify a putative class of shareholders, and seeks monetary damages, as well as an award of reasonable fees and expenses. The Company filed a motion to dismiss on November 22, 2022. On April 13, 2023, the court took the April 14, 2023 hearing off calendar after determining that oral argument was not necessary. The Company's motion to dismiss has been taken under submission. The Company does not have an estimate of possible loss as of March 31, 2023.

Jeff Witt v. Mullen Automotive, Inc.; Hany Morsy v. David Michery, et al. - Consolidated Derivative Action

On August 1, 2022, Jeff Witt and Joseph Birbigalia, purported stockholders, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, and current or former Company directors Ignacio Novoa, Mary Winter, Kent Puckett, Mark Betor, William Miltner and Jonathan New (the "Witt Lawsuit"). On September 30, 2022, Hany Morsy, a purported stockholder, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, former Company officer and director, Jerry Alban, and Company directors Mr. Novoa, Ms. Winter, Mr. Puckett, Mr. Betor, Mr. Miltner, and Mr. New (the "Morsy Lawsuit"). On November 8, 2022, the court consolidated the Witt Lawsuit and Morsy Lawsuit into one case. The consolidated lawsuit asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, gross mismanagement, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The consolidated lawsuit seeks to direct the Company to improve its corporate governance and internal procedures, monetary damages, pre-judgment and post-judgment interest, restitution, as well as an award of reasonable fees and expenses.

On November 30, 2022, the court stayed this consolidated derivative action pending (1) dismissal of the consolidated securities class action (the Schaub Lawsuit discussed above), or (2) the filing of an answer in the consolidated securities class action and notice by any party that they no longer consent to the voluntary stay of this consolidated derivative action. The case currently remains stayed.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore,

no liability has been reflected on the condensed consolidated financial statements.

Thomas Robbins v. David Michery, et al.; Patrick V.P. Foley, Jr. and Jeffrey Pudlinski v. David Michery, et al.

On December 7, 2022, Thomas Robbins, a purported stockholder, filed a putative stockholder class action complaint for declaratory and injunctive relief in the Court of Chancery of the State of Delaware against the Company, Mr. Michery, and current or former Company directors Mr. Novoa, Ms. Winter, Mr. Betor, Mr. Anderson, Mr. Miltner, Mr. Puckett, and Mr. New (the "Robbins Lawsuit"). On December 13, 2022, a second putative stockholder class action was filed in the Court of Chancery, styled as *Foley v. Michery, et al.,* (the "Foley Lawsuit" and, together with the Robbins Lawsuit, the "Stockholder Actions"). The Stockholder Actions seek declaratory and injunctive relief related to the vote on a series of proposal at a special meeting of Company stockholders that was held on December 23, 2022, and asserts claims for breach

33

Table of Contents

of fiduciary duty against all Company directors (except Mr. New). The consolidated lawsuit also seeks an award of fees and costs related to this action.

On February 3, 2023, the Court entered a stipulated order pursuant to which plaintiffs voluntarily dismissed the Stockholder Actions with prejudice as to themselves only and retained jurisdiction solely for the purpose of deciding any application of plaintiffs' counsel for an award of attorneys' fees and expenses. On March 3, 2023, plaintiffs' counsel filed their motion for an award of attorneys' fee and expenses for benefits they contend were conferred on the Company and its stockholders in connection with the Stockholder Actions (the "Fee Application"), seeking an award of attorneys' fee and expenses in the amount of $3.0 million. The Court has scheduled a hearing to consider the Fee Application on May 25, 2023.

On November 30, 2022, the court stayed this consolidated derivative action pending (1) dismissal of the consolidated securities class action (the Schaub Lawsuit discussed above), or (2) the filing of an answer in the consolidated securities class action and notice by any party that they no longer consent to the voluntary stay of this consolidated derivative action. The case currently remains stayed.

Based upon information presently known to management, the Company believes that the potential liability from this claim, if any, will not have a material adverse effect on its financial condition, cash flows or results of operations. Therefore, no liability has been reflected on the condensed consolidated financial statements.

## NOTE 18 - RELATED PARTY TRANSACTIONS

Affiliate Note Receivable

Prior to its corporate reorganization on November 5, 2021, Previous Mullen operated as a division of Mullen Technologies, Inc. ("MTI"). Subsequent to the corporate reorganization, the Company has provided management and accounting services to MTI. On March 31, 2023, the Company entered a note receivable with an affiliated party. The borrower promises to pay the principal amount of $1,388,405 plus all accrued interest to the noteholder on March 31, 2025. The borrower may prepay the loan without any penalty or premium. The loan carries an annual interest rate of 10%, which may increase to 15% if the borrower defaults on any payment. As of March 31, 2023, there was an additional $314,198 in related party receivable from MTI which was included in Prepaids and Other Current Assets. As of September 30, 2022, the Company incurred approximately $

1.2 million of costs on behalf of MTI, within non current assets.

Director Provided Services

William Miltner

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner also is an elected Director for the Company, beginning his term in August 2021. For the three and six months ended March 31, 2023, Mr. Miltner received $

193,043 and $428,877, for services rendered, respectively. Mr. Miltner has been providing legal services to us since 2020.

Ignacio Novoa

On June 9, 2022, the Board of Directors of the Company appointed Ignacio Novoa as a director effective as of June 28, 2022. Prior to his appointment, on January 12, 2022, the Company and Mr. Novoa entered into a

1-year Consulting Agreement, whereby Mr. Novoa provided electric vehicle market research, analysis of market trends in the electric vehicle industry and other research and services.

34

Table of Contents

Mary Winter

On October 26, 2021, the Company entered into a 1-year consulting agreement with Mary Winter, Corporate Secretary and Director, to compensate for Corporate Secretary Services and director responsibilities in the amount of $

60,000 annually or $5,000 per month.

**NOTE 19 - SUBSEQUENT EVENTS**

Company management has evaluated subsequent events through May 15, 2023, which is the date these condensed consolidated financial statements were available to be issued.

**Amendment No. 4 to the Securities Purchase Agreement**

On April 3, 2023, the Company entered into Amendment No. 4 ("Amendment No. 4") to the existing Securities Purchase Agreement dated as of June 7, 2022 and amended on June 23, 2022, September 19, 2022 and November 15, 2022 (the "Securities Purchase Agreement"), the terms of which, including the terms of Series D Convertible Preferred Stock, par value $0.001 per share (the "Series D Preferred Stock"), were previously reported in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 10, 2022.

Pursuant to Amendment No. 4, the Company irrevocably committed to effect the issuance of Series D Preferred Stock and warrants upon receipt of the remaining $90 million of the Commitment Amount, which is to be paid in two equal tranches on April 17, 2023, and May 15, 2023 (each, a "Purchase Date"). The Company also agreed that it will not affect a reverse stock split of its common stock during the five trading days prior to either Purchase Date. All other terms and conditions of the Securities Purchase Agreement remain unchanged and in full force and effect.

In connection with this Amendment No. 4, on April 4, 2023, the Company entered into three promissory notes in the aggregate principal amount of $20 million. The principal and interest under the Promissory Notes was due on April 17, 2023, and paid on April 21, 2023 and April 24, 2023. The Promissory Notes had an interest at a rate of 15% per annum, which increases to 20% per annum if payments under the Promissory Notes are not paid when due.

**Agreement effective April 17, 2023, to Securities Purchase Agreement**

On April 17, 2023, related to the Securities Purchase Agreement, the Company committed to issuing Series D Convertible Preferred Stock and warrants upon receipt of $45,000,000. An investor paid $16,363,636.50 for the shares, but the issuance of the Shares is void *ab initio*, and instead, the Company issued 6,545,455 shares of common stock. All other terms of the Securities Purchase Agreement remain unchanged.

**Mullen Advanced Energy Operations LLC**

On April 17, 2023, the Company entered into a binding Letter of Agreement with Lawrence Hardge, Global EV Technology, Inc., and EV Technology, LLC to partner on a device known as a Battery Life Enhancing Technology. The parties will form a new corporation called Mullen Advanced Energy Operations to develop, manufacture, market, sell, lease, distribute, and service all products resulting from the technology. The Company will hold a 51% equity interest in MAEO, and EVT will hold a 49% equity interest. EVT will license the technology and intellectual property rights to MAEO and assign all rights to governmental and other contracts relating to the technology. The Company will pay Mr. Hardge an upfront payment of $50,000 and then $5.0 million upon execution of definitive agreements and completion of IP assignment. The Company will also fund up to $5.0 million for all MAEO business operations, with additional funding based on a budget reasonably approved by the parties.

**NOTE 20 - RESTATEMENT**

Prior to the initial issuance of the Company's financial statements for the year ended September 30, 2022, management determined that the warrants issued with the preferred stock did not meet the conditions for equity classification, requiring liability treatment and measured at fair value. In addition, management also discovered that it did not reflect the impact of

35

Table of Contents

amendments that resulted in modifications in privileges for the warrants issued with the Series C Preferred Stock, which should have been accounted for as a deemed dividend at the time of modification.

The following table summarizes the impacts of these error corrections on the Company's financial statements for each of the periods presented below:

Quarter ended March 31, 2022 (Unaudited)

| | Impact of correction of error - quarter | | | Impact of correction of error - year to date | | |
|---|---|---|---|---|---|---|
| | As previously reported | Adjustments | As restated | As previously reported | Adjustments | As restated |
| Loss from operations | ($ 30,452,870) | - | ($ 30,452,870) | ($ 44,511,277) | - | ($ 44,511,277) |
| | | | | | | |
| Other financing costs - initial recognition of warrants at fair value | - | (160,364,949) | (160,364,949) | - | (269,344,178) | (269,344,178) |
| Revaluation of warrants | - | (131,670,146) | (131,670,146) | - | (142,288,528) | (142,288,528) |
| Others | (2,120,515) | - | (2,120,515) | (24,526,046) | - | (24,526,046) |
| Other income (expense) | (2,120,515) | (292,035,095) | (294,155,610) | (24,526,046) | (411,632,706) | (436,158,752) |
| Net loss | ($ 32,573,385) | ($ 292,035,095) | ($ 324,608,480) | ($ 69,037,323) | ($ 411,632,706) | ($ 480,670,029) |
| Deemed dividend on preferred stock | - | (32,735,345) | (32,735,345) | - | (32,735,345) | (32,735,345) |
| Net loss attributable to common stockholders | ($ 32,573,385) | ($ 324,770,440) | ($ 357,343,825) | ($ 69,037,323) | ($ 444,368,051) | ($ 513,405,374) |
| Loss per share - continuing operations | (15.85) | | (173.83) | (49.83) | | (370.53) |
| Weighted average common shares outstanding | 2,055,720 | | 2,055,720 | 1,385,594 | | 1,385,594 |

36

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion in conjunction with the financial statements and other financial information included elsewhere in this Quarterly Report on Form 10-Q (this "Report") and with our audited financial statements and other information presented in our Annual Report on Form 10-K, as amended, for the year ended September 30, 2022 filed with the SEC on January 30, 2023. This discussion and analysis contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of many factors, including but not limited to those under the heading "Risk Factors" in Part I, Item 1A of our Annual Report on Form 10-K, as amended, for the year ended September 30, 2022.*

**Basis of Presentation**

As a pre-revenue company with no commercial operations, our activities to date have been limited and were conducted primarily in the United States and our historical results are reported under accounting principles generally accepted in the United States ("GAAP" or "U.S. GAAP") and in United States ("U.S.") dollars.

**Components of Results of Operations**

We are an early-stage company, and our historical results may not be indicative of our future results for reasons that may be difficult to anticipate. Accordingly, the drivers of our future financial results, as well as the components of such results, may not be comparable to our historical or projected results of operations.

**Revenues**

We have not begun commercial operations and do not currently generate any revenue. Once we commence production and commercialization of our vehicles, we expect that the majority of our revenue will be initially derived from direct sales of Commercial Delivery Vehicles (Class 1 - 6), Sport Utility Vehicles ("SUVs") and, subsequently, from flexible leases of our electric vehicles ("EVs").

**Cost of Goods Sold**

To date, we have not recorded cost of goods sold, as we have not recorded commercial revenue. Once we commence the commercial production and sale of our EVs, we expect cost of goods sold to include mainly vehicle components and parts, including batteries, direct labor costs, amortized tooling costs, and reserves for estimated warranty expenses.

**General and Administrative Expense**

General and administrative ("G&A") expenses include all non-production expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, licenses, and other expenses. We expense advertising costs as incurred in accordance with ASC 720-35, "*Other Expenses - Advertising Cost*."

**Research and Development Expense**

To date, our research and development expenses have consisted primarily of engineering services in connection with the design of our EVs and development of the prototypes. As we ramp up for commercial operations, we anticipate that research and development expenses will increase for the foreseeable future as we expand our hiring of engineers and designers and continue to invest in new vehicle model design and development of technology.

**Income Tax Expense / Benefit**

Our income tax provision consists of an estimate for U.S. federal and state income taxes based on enacted rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in the

37

Table of Contents

tax law. We maintain a valuation allowance against the full value of our U.S. and state net deferred tax assets because we believe the recoverability of the tax assets is not more likely than not.

**Results of Operations**

*Comparison of the Three Months Ended March 31, 2023 to the Three Months Ended March 31, 2022*

The following table sets forth our historical operating results for the periods indicated:

| | Three Months Ended March 31, | | | | | | %Change |
| | 2023 | | 2022 | | $ Change | | |
|---|---|---|---|---|---|---|---|
| **Operating costs and expenses:** | | | | | | | |
| General and administrative | $ | 47,412,338 | $ | 29,269,433 | $ | 18,142,905 | 62 % |
| Research & development | | 20,478,971 | | 1,183,437 | | 19,295,534 | 1,630 % |
| **Total Operating Expense** | | 67,891,309 | | 30,452,870 | | 37,438,439 | 123 % |
| **Loss from Operations** | $ | (67,891,309) | | (30,452,870) | | (37,438,439) | 123 % |
| | | | | | | | |
| **Other income (expense):** | | | | | | | |
| Other financing costs - initial recognition of derivative liabilities | | - | | (160,364,949) | | 160,364,949 | (100)% |
| Loss on derivative liability revaluation | | (48,439,415) | | (131,670,146) | | 83,230,731 | (63)% |
| Loss extinguishment of debt, net | | (40,000) | | - | | (40,000) | - % |
| Gain on sale of fixed assets | | 385,031 | | - | | 385,031 | - % |
| Interest expense | | (1,745,882) | | (2,120,515) | | 374,633 | (18)% |
| Loan discount amortization expense | | (142,287) | | - | | (142,287) | - % |
| Other income, net | | 482,405 | | - | | 482,405 | - % |
| **Total other expense** | | (49,500,148) | | (294,155,610) | | 244,655,462 | (83)% |
| Income tax benefit | | 482,922 | | - | | 482,922 | - % |
| **Net loss before accrued preferred dividends and noncontrolling interest** | $ | (116,908,535) | $ | (324,608,480) | $ | 207,699,945 | (64)% |

*Net loss before accrued preferred dividends and noncontrolling interest*

Net loss before accrued preferred dividends and noncontrolling interest was $116.9 million and $324.6 million for the three months ended March 31, 2023 and 2022, respectively.

The $207.7 million or 64% decrease in Net loss before accrued preferred dividends and noncontrolling interest was primarily due to a $244.7 million decrease in non-cash financing expenses and revaluation and $37.4 million increase in operating losses to ramp up of development efforts and reflecting the additional expenses from Bollinger and ELMS.

*General and Administrative*

General and administrative expenses increased by $18.1 million or 62% to $47.4 million for the three months ended March 31, 2023, from $29.3 million in the three months ended March 31, 2022, primarily due to increases in professional services, marketing, and stock compensation related expenses associated with the growth of personnel and resources necessary to develop and launch our electric vehicles.

*Research and Development*

Research and development expenses increased by $19.3 million or 1,630% to $20.5 million for the three months ended March 31, 2023, compared to $1.2 million in the three months ended March 31, 2022. Research and development expenses primarily consist of engineering, homologation, and prototyping costs. Research and development expenses for the three

38

Table of Contents

months ended March 31, 2023 also include $6.8 million costs representing fair value of warrants issued for acquisition of right to assemble, manufacture, and sell the homologated vehicles based on the Qiantu K-50, subject to positive assessment of feasibility and profitability of the project by the Company (see Note 7). The research and development costs are expected to rise with continuing development of our electric vehicle programs. There will also be incremental research and development costs associated with the recent acquisition of Bollinger Motors for the B1/B2 and Class 4 delivery chassis.

*Other financing costs - initial recognition of derivative liabilities*

Other financing costs for the initial recognition of derivative liabilities was $0 for the three months ended March 31, 2023 as compared to $160.4 million of derivative initial recognition expense for the three months ended March 31, 2022.

*Revaluation of derivative liabilities*

The revaluation of derivative liabilities losses decreased $83.2 million from $131.7 million for the three months ended March 31, 2022 to $48.4 million for the three months ended March 31, 2023 as more warrants were exercised during the period ended March 31, 2023 and less derivative liabilities are outstanding as of that date.

*Interest expense*

Interest expense decreased by $0.4 million or 18% to $1.7 million for the three months ended March 31, 2023 from $2.1 million for the three months ended March 31, 2022. The decrease in interest expense year over year is primarily due to unpaid principal balance decreasing from $22.1 million on March 31, 2022 to $7.6 million on March 31, 2023.

*Loan amortization expense*

Loan amortization expense increased $0.1 million to $0.1 million for the three months ended March 31, 2023 versus zero for the three months ended March 31, 2022.

*Deferred tax benefit*

Deferred tax benefit was $0.5 million for the three months ended March 31, 2023 as compared to zero for the three months ended March 31, 2022 due to an adjustment in permanent timing differences for amortization expense.

*Other income (expense), net*

Other income, net was $0.5 million for the three months ended March 31, 2023 as compared to zero of other income, net for the three months ended March 31, 2022. Bollinger earned interest on a money market account opened in January 2023.

Table of Contents

*Comparison of the Six Months Ended March 31, 2023 to the Six Months Ended March 31, 2022*

The following table sets forth our historical operating results for the periods indicated:

| | Six Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ Change | % Change |
| | (dollar amounts, except percentages) | | | |
| **Operating costs and expenses:** | | | | |
| General and administrative | $ 112,408,349 | $ 42,170,516 | $ 70,237,833 | 167 % |
| Research & development | 29,100,980 | 2,340,761 | 26,760,219 | 1,143 % |
| **Total Operating Expense** | 141,509,329 | 44,511,277 | 96,998,052 | 218 % |
| **Loss from Operations** | (141,509,329) | (44,511,277) | (96,998,052) | 218 % |
| | | | | |
| **Other income (expense):** | | | | |
| Other financing costs - initial recognition of derivative liabilities | (255,960,025) | (269,344,178) | 13,384,153 | (5)% |
| Loss on derivative liability revaluation | (89,221,391) | (142,288,528) | 53,067,137 | (37)% |
| Gain extinguishment of debt, net | (6,452,170) | 74,509 | (6,526,679) | - % |
| Gain on sale of fixed assets | 385,031 | - | 385,031 | - % |
| Interest expense | (4,573,971) | (24,559,459) | 19,985,488 | (81)% |
| Loan discount amortization expense | (142,287) | - | (142,287) | - % |
| Loss on debt settlement | - | (41,096) | 41,096 | (100)% |
| Other income, net | 1,128,286 | - | 1,128,286 | - % |
| **Total other expense** | (354,836,527) | (436,158,752) | 81,322,225 | (19)% |
| Income tax benefit | 976,576 | | 976,576 | - % |
| **Net loss before accrued preferred dividends and noncontrolling interest** | $ (495,369,280) | $ (480,670,029) | $ (14,699,251) | 3 % |

*Net loss before accrued preferred dividends and noncontrolling interest*

Net loss before accrued preferred dividends and noncontrolling interest was $495.4 million and $480.7 million for the six months ended March 31, 2023 and 2022, respectively.

The $14.7 million or 3% increase in Net loss before accrued preferred dividends and noncontrolling interest was primarily due to a $66.5 million decrease in non-cash financing expenses offset by the $97.0 million increase in operating losses to ramp up of development efforts and reflecting the addition expenses after acquisition of Bollinger Motors and after purchase of ELMS assets.

*General and Administrative*

General and administrative expenses increased by $70.2 million or 167% to $112.4 million for the six months ended March 31, 2023, from $42.2 million in the six months ended March 31, 2022, primarily due to increases in professional services, marketing, and stock compensation related expenses associated with the growth of personnel and resources necessary to develop and launch our electric vehicles.

*Research and Development*

Research and development expenses increased by $26.8 million, or 1,143%, to $29.1 million for the six months ended March 31, 2023, versus $2.3 million in the six months ended March 31, 2022. Research and development expenses primarily consist of engineering, homologation, and prototyping costs. Research and development expenses for the three months ended March 31, 2023 also include $6.8 million costs representing fair value of warrants issued for acquisition of right to assemble, manufacture, and sell the homologated vehicles based on the Qiantu K-50, subject to positive assessment of feasibility and profitability of the project by the Company (see Note 7). Research and development costs are expected

40

Table of Contents

to rise with continuing development of our electric vehicle programs. There may also be incremental research and development costs associated with the recent acquisition of Bollinger Motors for the B1/B2 and Class 4 delivery chassis.

*Other financing costs - initial recognition of derivative liabilities*

Other financing costs for the initial recognition of derivative liabilities decreased from $269.3 million for the six months ended March 31, 2022, to $256.0 million for the six months ended March 31, 2023.

*Gain / (loss) on extinguishment of debt, net*

The loss on debt settlement increased $6.5 million from $0.1 million gain for the six months ended March 31, 2022, to a loss of $6.5 million for the six months ended March 31, 2023. The loss on debt settlement increase is primarily due to a settlement with investors claiming losses caused by the Company and the exchange of old note to Esousa for new replacement note.

*Revaluation of derivative liabilities*

The loss on revaluation of derivative liabilities decreased $53 million from $142.3 million for the six months ended March 31, 2022 to $89.2 million for the six months ended March 31, 2023 as more warrants were exercised during the period ended March 31, 2023 and less derivative liabilities are outstanding as of that date.

*Interest expense*

Interest expense decreased by $20.0 million or 81% to $4.6 million for the six months ended March 31, 2023 from $24.6 million for the six months ended March 31, 2022, primarily due to the decrease in the convertible debt balance as well as from the paydown of debt principal during the quarter ended March 31, 2023.

*Loan amortization expense*

Loan amortization expense was $0.1 million for the six months ended March 31, 2023, from zero for the six months ended March 31, 2022.

*Deferred tax benefit*

Deferred tax benefit increased $1.0 million to $1.0 million for the six months ended March 31, 2023 as compared to zero for the six months ended March 31, 2022 due to an adjustment in permanent timing differences for amortization expense.

*Other income (expense), net*

Other income, net increased $1.1 million to $1.1 million for the six months ended March 31, 2023, as compared to zero of other income, net for the six months ended March 31, 2022. Bollinger earned interest on a money market account opened in January 2023.

**Liquidity and Capital Resources**

As of the date of this Quarterly Report, we have yet to generate any revenue from our business operations. To date, we have funded our capital expenditure and working capital requirements through equity and debt capital, as further discussed below. Our ability to successfully commence commercial operations and expand our business will depend on many factors, including our working capital needs, the availability of equity or debt financing and, over time, our ability to generate cash flows from operations.

As of March 31, 2023, our cash and cash equivalents (excluding restricted cash) amounted to $60.3 million. Included in the $26.4 million restricted cash balance at March 31, 2023, is $26.0 million available for development and operations of Bollinger. The total cash available for operations and development was $86.3 million at March 31, 2023.

41

Table of Contents

We expect our capital expenditures and working capital requirements to increase substantially in the near term, as we seek to produce our initial EVs, develop our customer support and marketing infrastructure and expand our research and development efforts. We may need additional cash resources due to changed business conditions or other developments, including unanticipated delays in negotiations with OEMs and tier-one automotive suppliers or other suppliers, supply chain challenges, disruptions due to COVID-19, competitive pressures, and regulatory developments, among other developments. See Note 2 to the condensed consolidated financial statements.

To maintain compliance with the $1.00 minimum bid price requirement of NASDAQ, the Board of the Company has approved a 1-for-25 reverse stock split, which resulted in a reduction in the number of outstanding shares of common stock and a proportionate increase in the value of each share. The common stock began trading on a reverse split-adjusted basis on the NASDAQ on May 4, 2023 (see further Note 1 to the condensed consolidated financial statements).

*Debt*

To date, our current working capital and development needs have been primarily funded through the issuance of convertible indebtedness and common stock. Short-term debt comprises an insignificant component of our funding.

*Short and Long-Term Debt*

The short-term debt classification primarily is based upon loans due within twelve-months from the balance sheet date, in addition to loans that have matured and remain unpaid. Management plans to renegotiate matured loans with creditors for favorable terms, such as reduce interest rate, extend maturities, or both; however, there is no guarantee favorable terms will be reached. Until negotiations with creditors are resolved, these matured loans remain outstanding and will be classified within short-term debt on the balance sheet. Interest and fees on loans are being accounted for within accrued interest. The loans are secured by the Company's assets.

**Cash Flows**

The following table provides a summary of Mullen's cash flow data for the six months ended March 31, 2023 and 2022:

| | Six Months Ended March 31, | |
| Net cash provided by (used in): | 2023 | 2022 |
| --- | --- | --- |
| Operating activities | $ (67,567,385) | $ (24,871,780) |
| Investing activities | (97,420,097) | (10,737,679) |
| Financing activities | 167,359,660 | 100,849,172 |

*Cash Flows used in Operating Activities*

Our cash flow used in operating activities to date have primarily been comprised of costs related to research and development, salaries, taxes, benefits, and other general and administrative activities. As we continue to ramp up hiring ahead of starting commercial operations, we expect our cash used in operating activities to increase significantly before we start to generate any material cash flow from our business.

Net cash used in operating activities was $67.6 million for the six months ended March 31, 2023, a 172% increase from $24.9 million net cash used in activities in the six months ended March 31, 2022.

*Cash Flows used in Investing Activities*

Our cash flows used in investing activities increased due to the ELMS asset purchase (see Note 4 - Purchase of assets from ELMS).

Net cash used in investing activities was $97.4 million in the six months ended March 31, 2023, an increase from $10.7 million used in investing activities in the six months ended March 31, 2022.

42

Table of Contents

*Cash Flows provided by Financing Activities*

Through March 31, 2023, we have financed our operations primarily through the issuance of convertible notes, equity securities, and warrants. Net cash provided by financing activities was $167.4 million for the six months ended March 31, 2023, an increase of $66.5 million over the six months ended March 31, 2022.

**Contractual Obligations and Commitments**

From April 1, 2023 until June 30, 2023, certain investors under the Securities Purchase Agreement have the right, but not the obligation, at any time from time to time, in their sole and absolute discretion to purchase from the Company additional shares of Preferred Stock in an amount equal to such Buyer's pro rata portion on the same terms and conditions as applicable to the purchase and sale of shares of Series D Preferred Stock as provided under the Securities Purchase Agreement, subject to certain conditions and modifications:

a) All investors under the Securities Purchase Agreement - in amount equal to $100,000,000 (pursuant to Amendment 3 to the Securities Purchase Agreement). Along with the shares of Series D Preferred Stock the buyers shall receive Additional Warrants exercisable for 110% of shares of Common Stock under conditions similar to other warrants issued under the Securities Purchase Agreement.

b) One of the investors under the Securities Purchase Agreement - in amount equal to $20,000,000 (pursuant to Settlement greement and Release entered into on January 13, 2023 to settle over-issuance of shares). Along with the shares of Series D Preferred Stock the buyer shall receive Additional Warrants exercisable for 185% of shares of Common Stock under conditions similar to other warrants issued under the Securities Purchase Agreement.

c) All investors under the Securities Purchase Agreement - in amount equal to $10,000,000 (pursuant to Settlement Agreement and Release entered into on January 13, 2023 to waive possible rights of the investors upon default of the Company to maintain sufficient number of registered shares required by the Securities Purchase Agreement). Along with the shares of Series D Preferred Stock the buyer shall receive Additional Warrants exercisable for 185% of shares of Common Stock under conditions similar to other warrants issued under the Securities Purchase Agreement.

The following tables summarizes our contractual obligations and other commitments for cash expenditures as of March 31, 2023, and the years in which these obligations are due:

**Operating Lease Commitments**

| Years Ended March 31, | Scheduled Payments |
|---|---:|
| 2023 (6 months) | $ 1,763,109 |
| 2024 | 3,062,953 |
| 2025 | 2,412,336 |
| 2026 | 599,369 |
| 2027 | 405,882 |
| Thereafter | 107,972 |
| **Total Future Minimum Lease Payments** | **$ 8,351,621** |

We currently lease our headquarters space in the Los Angeles area under a single lease classified as an operating lease expiring in March 2026. We have not executed any binding agreement for leases beyond 2026.

43

Table of Contents

**Scheduled Debt Maturities**

The following are scheduled debt maturities:

| | Years Ended March 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 (6 months) | 2024 | 2025 | 2026 | 2027 | 2028 | Thereafter | Total |
| **Total Debt** | $ 3,162,761 | $ 4,425,752 | $ - | $ - | $ - | $ - | $ - | $ 7,588,513 |

**Off-Balance Sheet Arrangements**

We are not a party to any off-balance sheet arrangements, as defined under SEC rules.

**Critical Accounting Estimates**

Our financial statements have been prepared in accordance with U.S. GAAP. In the preparation of these financial statements, our management is required to use judgment in making estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. An accounting judgment, estimate or assumption is critical when (1) the estimate or assumption is complex in nature or requires a high degree of judgment and (2) the use of different judgments, estimates and assumptions could have a material impact on the consolidated financial statements. Our significant accounting policies are described in note 3 to the condensed consolidated financial statements included elsewhere in this Quarterly Report. Management believes none of the accounting estimates are considered critical for the preparation of these condensed consolidated financial statements.

**Recent Accounting Pronouncements**

Accounting standard updates issued but not yet added were assessed and determined to be either not applicable or not expected to have a material impact on our consolidated financial statements.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk.**

Not applicable.

**Item 4. Controls and Procedures.**

**Disclosure Controls and Procedures**

We are subject to the periodic reporting requirements of the Exchange Act that requires designing disclosure controls and procedures to provide reasonable assurance that information we disclose in reports we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosures.

As of the end of the period covered by this Quarterly Report on Form 10-Q, the Company's management conducted an evaluation, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act). Based on this evaluation, the Chief Executive Officer and the Chief Financial Officer each concluded, as of the end of the period, our disclosure controls and procedures were not effective as of March 31, 2023, due to material weaknesses in internal control over financial reporting that were disclosed in our Annual Report on Form 10-K, as amended, for the year ended September 30, 2022, and as described below.

Table of Contents

**Material Weaknesses in Internal Control Over Financial Reporting**

As previously disclosed in our Annual report on Form 10-K for the year ended September 30, 2022, we identified material weaknesses in our internal control over financial reporting during the preparation of our financial statements for the year ended September 30, 2022. Under standards established by the PCAOB, a material weakness is a deficiency or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected and corrected on a timely basis.

The material weaknesses in financial reporting as of September 30, 2022, are summarized as follows:

- We determined that we did not have sufficient accounting systems and procedures in place, particularly in the areas of specialized accounting for complex debt and equity transactions.
- We determined that we did not have sufficient policies and procedures to ensure the appropriate review and approval of user access rights to our accounting system; and lack of approval of journal entries and segregation of duties in our financial reporting process.
- We determined that our information technology infrastructure does not provide sufficient safeguards required by the COBIT framework.

**Remediation Efforts to Address Previously Identified Material Weaknesses**

As previously described in Item 9A of our Annual Report on Form 10-K for the year ended September 30, 2022, we began implementing remediation plans to address the material weaknesses. The weaknesses will not be considered remediated until the applicable controls operate for a sufficient period and management has concluded, through testing, that these controls are operating effectively. We expect that most of the remediation of these material weaknesses will be completed by the end of fiscal 2023.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the three and six months ended March 31, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

45

Table of Contents

**PART II. OTHER INFORMATION**

**Item 1. Legal Proceedings**

Information with respect to this item may be found in Note 17 - Commitments and Contingencies of the "Notes to Unaudited Consolidated Financial Statements" included in Part I, Item 1 of this Quarterly Report on Form 10-Q, which is incorporated herein by reference.

**Item 1A. Risk Factors**

In addition to the information set forth in this Report, you should read and consider the risk factors discussed in Part I, Item 1A. "Risk Factors" in our Annual Report on Form 10-K, as amended, for the year ended September 30, 2022 which could materially affect our business, financial condition, or future results of operation. The risks described in such report are not the only risks facing us. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may eventually prove to have a material adverse effect on our business, financial condition and/or future operating results.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not Applicable.

**Item 5. Other Information**

None.

46

Table of Contents

**Item 6. Exhibits**

| Exhibit No. | Description |
|---|---|
| 3.1 | Certificate of Cancellation of Series AA Preferred Stock filed on January 30, 2023 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, filed with the SEC on January 31, 2023) |
| 3.2 | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on January 30, 2023 (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K, filed with the SEC on January 31, 2023) |
| 4.1 | Form of Warrant Agreement and Warrant Certificate (incorporated by reference to Exhibit 4.4 to the Company's Form S-3, filed with the SEC on February 14, 2023) |
| 4.2* | Warrant dated March 14, 2023 issued to Qiantu Motor USA, Inc. |
| 10.1 | Settlement Agreement dated January 13, 2023 with Acuitas, J. Fallon and Mank Capital (incorporated by reference to Exhibit 10.23 to the Company's Annual Report on Form 10-K, filed with the SEC on January 13, 2023) |
| 10.1(a) | Form of Promissory Note (incorporated by reference to Exhibit 10.23(a) to the Company's Annual Report on Form 10-K, filed with the SEC on January 13, 2023) |
| 10.2 | Waiver Agreement dated January 12, 2023 with Series C Preferred Stockholders (incorporated by reference to Exhibit 10.24 to the Company's Annual Report on Form 10-K, filed with the SEC on January 13, 2023) |
| 10.3 | Settlement Agreement dated January 13, 2023 with respect to Series D Securities Purchase Agreement (incorporated by reference to Exhibit 10.25 to the Company's Annual Report on Form 10-K, filed with the SEC on January 13, 2023) |
| 10.3(a) | Form of Warrant (incorporated by reference to Exhibit 10.25(a) to the Company's Annual Report on Form 10-K, filed with the SEC on January 13, 2023) |
| 10.4 | Amendment to the Settlement Agreement, dated March 2, 2023, by and between Mullen Automotive Inc. and Acuitas Capital LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed with the SEC on March 6, 2023) |
| 10.5* | Settlement Agreement, dated as of March 14, 2023, by and among Mullen Automotive Inc., Qiantu Motor (Suzhou) Ltd., and Qiantu Motor USA, Inc. |
| 10.5(a)+* | Intellectual Property and Distribution Agreement, dated as of March 14, 2023, by and among Mullen Automotive Inc., Qiantu Motor (Suzhou) Ltd., and two affiliates of Qiantu Motor (Suzhou) Ltd. |
| 10.6#* | Employment Agreement between the Company and Chester Bragado dated March 21, 2023 |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. § 1350 |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL Document and include in Exhibit 101) |

\*    Filed herewith (furnished herewith with respect to Exhibit 32.1).

\#    Indicates management contract or compensatory plan or arrangement.

+    Mullen Automotive Inc. has omitted certain exhibits pursuant to Item 601(a)(5) of Regulation S-K and shall furnish supplementally to the Securities and Exchange Commission copies of any of the omitted exhibits upon request by the SEC.

47

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Mullen Automotive Inc.

May 15, 2023                                   By: /s/ David Michery
                                                   David Michery
                                                   Chief Executive Officer, President and Chairman of the
                                                   Board
                                                   *(Principal Executive Officer)*

                                                   /s/ Jonathan New
                                                   Jonathan New
                                                   Chief Financial Officer
                                                   *(Principal Financial and Accounting Officer)*

48

**Exhibit 4.2**

SCHEDULE 3.01 FORM OF WARRANT

WARRANT

MULLEN AUTOMOTIVE INC.

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II)THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE CORPORATION REQUESTS, AN OPINION SATISFACTORY TO THE CORPORATION TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

Warrant No.:Qiantu 1

Date of Issuance: March 14, 2023 (the "issuance Date")

FOR VALUE RECEIVED, Mullen Automotive Inc., a Delaware corporation (the "Company"), hereby certifies that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Qiantu Motor USA, Inc, the registered holder hereof or its registered assigns (the "Holder") is entitled, subject to the terms set forth below, to purchase from the Company 75,000,000 duly authorized, validly issued, fully paid, and nonassessable shares of Common Stock at a purchase price per share of $____, which is equal to 110% of the market price of the Company's shares at the close of trading on the earlier of (a) when Mullen has completed its obligations to its Series D investors; or (b) June 15, 2023, (subject to adjustment as provided herein, the "Exercise Price"), all subject to the terms, conditions, and adjustments set forth below in this Warrant. Certain capitalized terms used herein are defined in Section 25 hereof.

This Warrant has been issued pursuant to the terms of the IP Agreement, dated as of March 14, 2023 (the "IP Agreement"), between the Company and the Holder.

1.    Term of Warrant. Subject to the terms and conditions hereof, at any time or from time to time after 5 :00 p.m. Eastern Time on September 30, 2023 and prior to 5:00 p.m. Eastern Time on September 30, 2024 or, if such day is not a Business Day, on the next preceding Business Day (the "Exercise Period"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares purchasable hereunder (subject to adjustment as provided herein).

2.    Exercise of Warrant.

(a)    Exercise Procedure. Subject to the terms and conditions hereof, this Warrant may be exercised from time to time on any Business Day during the Exercise Period for all or any part of the unexercised Warrant Shares purchasable hereunder (subject to adjustment as provided

1

herein), upon: (i) surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft, or destruction), together with an Exercise Notice in the form attached hereto as Exhibit A (each, an "Exercise Notice"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and (ii) payment to the Company of the Aggregate Exercise Price in accordance with Section 2(6).

(b)      Payment of the Aggregate Exercise Price. Payment of the Aggregate Exercise Price shall be made by delivery to the Company by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price.

(c)      Delivery of Stock. Upon receipt by the Company of the Exercise Notice, surrender of this Warrant, and payment of the Aggregate Exercise Price (in accordance with Section 2(a) hereof), as promptly as practicable, and in any event within five (5) Business Days thereafter, the Company shall: (i) provided that the Transfer Agent is participating in The Depository Trust Company ("DTC") Fast Automated Securities Transfer Program (which the Company shall cause the Transfer Agent to do at the Holder's request) and provided the legends would be eligible to be removed from such shares of Common Stock pursuant to Section 9 hereof, upon the request of the Holder, credit such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with OTC through its Deposit/ Withdrawal at Custodian system; or (ii) if the Transfer Agent is not participating in the OTC Fast Automated Securities Transfer Program or the legends would not be eligible to be removed from such shares of Common Stock pursuant to Section 9 hereof, issue and deliver to the Holder or, at the Holder's instruction pursuant to the Exercise Notice, the Holder's agent or designee, in each case, in uncertificated form by means of a book-entry kept by the Company's transfer agent and registrar in the name of the Holder or its designee (as indicated in the applicable Exercise Notice), for the number of shares of Common Stock to which the Holder is entitled pursuant to such exercise.

(d)      Record Holder. This Warrant shall be deemed to have been exercised, and such Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become, a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(e)      Fractional Shares. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share down to the nearest whole share.

(f)      Delivery of New Warrant. Unless the purchase rights represented by this Warrant shall have expired or shall have been fully exercised, the Company shall, at the time of delivery of the Warrant Shares being issued in accordance with Section 2(c) hereof deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unexpired and unexercised Warrant Shares called for by this Warrant. Such new Warrant shall in all other respects be identical to this Warrant.

2

(g) Valid Issuance of Warrant and Warrant Shares; Payment of Taxes. With respect to the exercise of this Warrant, the Company hereby represents, covenants, and agrees:

(i) This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(ii) All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid, and non-assessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens, and charges.

(iii) The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares are issued without violation by the Company of any applicable law or governmental regulation or any requirements of Nasdaq or any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares may be listed at the time of such exercise (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).

(iv) The Company shall use its best efforts to cause the Warrant Shares, immediately upon such exercise, to be listed on Nasdaq or any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares are listed at the time of such exercise.

(v) The Company shall pay all expenses in connection with and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; provided, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

(h) Reservation of Shares. During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant.

3. Adjustment to Exercise Price and Number of Warrant Shares. In order to prevent dilution or the purchase rights granted under this Warrant, the Exercise Price and the number of Warrant Shares issuable upon exercise of this Warrant shall be subject to adjustment from time to

3

time as provided in this Section 3 (in each case, after taking into consideration any prior adjustments pursuant to this Section 3).

(a)    Adjustment Lo Exercise Price and Warrant Shares Upon issuance of Common Stock. Except as provided in this Section 3(a) and except in the case of an event described in either Section 3(c) or Section 3(d), if the Company shall, at any time or from time to time after the Issuance Date, issue or sell, or in accordance with Section 3(b) is deemed to have issued or sold, any shares of Common Stock without consideration or for consideration per share less than the Exercise Price in effect immediately prior to such issuance or sale (or deemed issuance or sale), then immediately upon such issuance or sale (or deemed issuance or sale), the Exercise Price in effect immediately prior to such issuance or sale (or deemed issuance or sale) shall be reduced (and in no event increased) to an Exercise Price equal to the lowest price per share at which any such share of Common Stock has been issued or sold (or is deemed to have been issued or sold); provided, however, that if such issuance or sale (or deemed issuance or sale) was without consideration, then the Company shall be deemed to have received an aggregate of $0.01 of consideration for all such shares so issued or deemed to be issued. Upon any and each adjustment of the Exercise Price as provided in this Section 3(a), the number of Warrant Shares issuable upon the exercise of this Warrant immediately prior to any such adjustment shall be increased to a number of Warrant Shares equal to the quotient obtained by dividing: (i) the product of (A) the Exercise Price in effect immediately prior to any such adjustment multiplied by (B) the number of Warrant Shares issuable upon exercise of this Warrant immediately prior to any such adjustment; by (ii) the Exercise Price resulting from such adjustment. Anything herein to the contrary notwithstanding, there shall be no adjustment to the Exercise Price or the number of Warrant Shares issuable upon exercise of this Warrant with respect to any Excluded Issuance.

(b)    Effect of Certain Events on Adjustment to Exercise Price. For purposes of determining the adjusted Exercise Price under Section 3(a) hereof, the following shall be applicable:

(i)    Issuance of Options. If the Company shall, at any time or from time to time after the Issuance Date, in any manner grant or sell (whether directly or by assumption in a merger or otherwise) any Options, whether or not such Options or the right to convert or exchange any Convertible Securities issuable upon the exercise of such Options are immediately exercisable and the lowest price per share (determined as provided in this paragraph and in Section 3(b)(v)) for which any one share of Common Stock is issuable upon the exercise of any such Option or upon the conversion or exchange of any Convertible Security issuable upon the exercise of any such Option is less than the Exercise Price in effect immediately prior to the time of the granting or sale of such Options, then such share of Common Stock issuable upon the exercise of such Option or upon conversion or exchange of such Convertible Security issuable upon the exercise of such Option shall be deemed to have been issued as of the date of granting or sale of such Options (and thereafter shall be deemed to be outstanding for purposes of adjusting the Exercise Price under Section 3(a)), at a price per share equal to such lowest price per share. For purposes of this Section 3(b)(i), the lowest price per share for which any one share of Common Stock is issuable upon the exercise of any such Option or upon the conversion or exchange of any Convertible Security issuable upon the exercise of any such Option shall be equal to the sum (which sum shall constitute the applicable consideration received for

4

purposes of Section 3(a)) of the lowest amounts of consideration, if any, received or receivable by the Company as consideration with respect to any one share of Common Stock upon each of (A) the granting or sale of the Option, plus (B) the exercise of the Option, plus (C) in the case of an Option which relates to Convertible Securities, the issuance or sale of the Convertible Security and the conversion or exchange of the Convertible Security. Except as otherwise provided in Section 3(b)(iii), no further adjustment of the Exercise Price shall be made upon the actual issuance of Common Stock or of Convertible Securities upon exercise of such Options or upon the actual issuance of Common Stock upon conversion or exchange of Convertible Securities issuable upon the exercise of such Options.

(ii)    Issuance of Convertible Securities. If the Company shall, at any time or from time to time after the Issuance Date, in any manner grant or sell (whether directly or by assumption in a merger or otherwise) any Convertible Securities, whether or not the right to convert or exchange any such Convertible Securities is immediately exercisable, and the lowest price per share (determined as provided in this paragraph and in Section 3(b)(v)) for which one share of Common Stock is issuable upon the conversion or exchange of any such Convertible Securities is less than the Exercise Price in effect immediately prior to the time of the granting or sale of such Convertible Securities, then such share of Common Stock issuable upon conversion or exchange of such Convertible Security shall be deemed to have been issued as of the date of granting or sale of such Convertible Securities (and thereafter shall be deemed to be outstanding for purposes of adjusting the Exercise Price under Section 3(a)), at a price per share equal to such lowest price per share. For purposes of this Section 3(b)(ii), the lowest price per share for which any one share of Common Stock is issuable upon the conversion or exchange of any such Convertible Security shall be equal to the sum (which sum shall constitute the applicable consideration received for purposes of Section 3(a)) of the lowest amounts of consideration, if any, received or receivable by the Company as consideration with respect to any one share of Common Stock upon each of (A) the granting or sale of the Convertible Security, plus (B) the conversion or exchange of the Convertible Security. Except as otherwise provided in Section 3(b)(iii), no further adjustment of the Exercise Price shall be made upon the actual issuance of Common Stock upon conversion or exchange of such Convertible Securities or by reason of the issue or sale of Convertible Securities upon exercise of any Options to purchase any such Convertible Securities for which adjustments of the Exercise Price have been made pursuant to the other provisions of this Section 3(b).

(iii)    Change in Terms of Options or Convertible Securities. Upon any change in any of (A) the lowest amounts of consideration, if any, received or receivable by the Company as consideration with respect to any one share of Common Stock upon the granting or sale of any Options or Convertible Securities referred to in Section 3(b)(i) or Section 3(b)(ii) hereof, (B) the lowest amounts of additional consideration, if any, payable to the Company with respect to any one share of Common Stock upon exercise of any Options or upon the issuance, conversion, or exchange of any Convertible Securities referred to in Section 3(b)(i) or Section 3(b)(ii) hereof, (C) the rate at which Convertible Securities referred to in Section 3(b)(i) or Section 3(b)(ii) hereof are convertible into or exchangeable for Common Stock, or (D) the maximum number of shares of Common Stock issuable in connection with any Options referred to in Section 3(b)(i) hereof or any

5

Convertible Securities referred to in Section 3(b)(ii) hereof (in each case, other than in connection with an Excluded Issuance), then (whether or not the original issuance or sale of such Options or Convertible Securities resulted in an adjustment to the Exercise Price pursuant to this Section 3) the Exercise Price in effect at the time of such change shall be adjusted or readjusted, as applicable, to the Exercise Price which would have been in effect at such time pursuant to the provisions of this Section 3 had such Options or Convertible Securities still outstanding provided for such changed consideration, conversion rate, or maximum number of shares, as the case may be, at the time initially granted, issued, or sold, but only if as a result of such adjustment or readjustment the Exercise Price then in effect is reduced, and the number of Warrant Shares issuable upon the exercise of this Warrant immediately prior to any such adjustment or readjustment shall be correspondingly adjusted or readjusted pursuant to the provisions of Section 3(a).

(iv)     Treatment of Expired or Terminated Options or Convertible Securities. Upon the expiration or termination of any unexercised Option (or portion thereof) or any unconverted or unexchanged Convertible Security (or portion thereof) for which any adjustment (either upon its original issuance or upon a revision of its terms) was made pursuant to this Section 3 (including without limitation upon the redemption or purchase for consideration of all or any portion of such Option or Convertible Security by the Company), the Exercise Price then in effect hereunder shall forthwith be changed pursuant to the provisions of this Section 3 to the Exercise Price which would have been in effect at the time of such expiration or termination had such unexercised Option (or portion thereof) or unconverted or unexchanged Convertible Security (or portion thereof), to the extent outstanding immediately prior to such expiration or termination, never been issued.

(v)     Calculation of Consideration Received. If the Company shall, at any time or from time to time after the Issuance Date, issue or sell, or is deemed to have issued or sold in accordance with this Section 3(6), any shares of Common Stock, Options, or Convertible Securities: (A) for cash, the consideration received therefor shall be deemed to be the net amount received by the Company therefor; (B) for consideration other than cash, the amount of the consideration other than cash received by the Company shall be the fair value of such consideration, except where such consideration consists of marketable securities, in which case the amount of consideration received by the Company shall be the market price (as reflected on any securities exchange, quotation system or association, or similar pricing system covering such security) for such securities as of the end of business on the date of receipt of such securities; (C) for no specifically allocated consideration in connection with an issuance or sale of other securities of the Company, together comprising one integrated transaction, the amount of the consideration therefor shall be deemed to be $0.0 I; or (D) to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving corporation, the amount of consideration therefor shall be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options, or Convertible Securities, as the case may be, issued to such owners. The net amount of any cash consideration and the fair value of any consideration other than cash or marketable securities shall be determined in good faith jointly by the Board and the Holder.

6

(vi)    Record Date. For purposes of any adjustment to the Exercise Price or the number of Warrant Shares in accordance with this Section 3, in case the Company shall take a record of the holders of its Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in Common Stock, Options, or Convertible Securities or (B) to subscribe for or purchase Common Stock, Options, or Convertible Securities, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be; provided, that if before the distribution to its holders of Common Stock the Company legally abandons its plan to pay or deliver such dividend, distribution, subscription, or purchase rights, then thereafter no adjustment shall be required by the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled.

(vii)    Treasury Shares. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company or any of its wholly-owned subsidiaries, and the disposition of any such shares (other than the cancellation or retirement thereof or the transfer of such shares among the Company and its wholly-owned subsidiaries) shall be considered an issue or sale of Common Stock for the purpose of this Section 3.

(c)    Adjustment to Exercise Price and Warrant Shares Upon Dividend, Subdivision or Combination of Common Stock. If the Company shall, at any time or from time to time after the Issuance Date, (i) pay a dividend or make any other distribution upon the Common Stock or any other capital stock of the Company payable in shares of Common Stock or in Options or Convertible Securities, or (ii) subdivide (by any stock split, recapitalization, or otherwise) its outstanding shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to any such dividend, distribution, or subdivision shall be proportionately reduced and the number of Warrant Shares issuable upon exercise of this Warrant shall be proportionately increased. If the Company at any time combines (by combination, reverse stock split, or otherwise) its outstanding shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased and the number of Warrant Shares issuable upon exercise of this Warrant shall be proportionately decreased. Any adjustment under this Section 3(c) shall become effective at the close of business on the date the dividend, subdivision, or combination becomes effective.

(d)    Adjustment to Exercise Price and Warrant Shares Upon Reorganization, Reclassification, Consolidation, or Merger. In the event of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up, or combination of shares), (iii) consolidation or merger of the Company with or into another Person, (iv) sale of all or substantially all of the Company's assets to another Person, or (v) other similar transaction, in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) stock, securities, or assets with respect to or in exchange for Common Stock. each Warrant shall, immediately after such reorganization, reclassification, consolidation, merger, sale, or similar transaction, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then

7

exercisable under this Warrant, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Holder would have been entitled upon such reorganization, reclassification, consolidation, merger, sale, or similar transaction if the Holder had exercised this Warrant in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale, or similar transaction and acquired the applicable number of Warrant Shares then issuable hereunder as a result of such exercise (without taking into account any limitations or restrictions on the exercisability of this Warrant); and, in such case, appropriate adjustment (in form and substance satisfactory to the Holder) shall be made with respect to the Holder's rights under this Warrant to insure that the provisions of this Section 3 hereof shall thereafter be applicable, as nearly as possible, to this Warrant in relation to any shares of stock, securities, or assets thereafter acquirable upon exercise of this Warrant (including, in the case of any consolidation, merger, sale, or similar transaction in which the successor or purchasing Person is other than the Company, an immediate adjustment in the Exercise Price to the value per share for the Common Stock reflected by the terms of such consolidation, merger, sale, or similar transaction, and a corresponding immediate adjustment to the number of Warrant Shares acquirable upon exercise of this Warrant without regard to any limitations or restrictions on exercise, if the value so reflected is less than the Exercise Price in effect immediately prior to such consolidation, merger, sale, or similar transaction). The provisions of this Section 3(d) shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers sales or similar transactions. The Company shall not effect any such reorganization, reclassification, consolidation, merger, sale, or similar transaction unless, prior to the consummation thereof, the successor Person (if other than the Company) resulting from such reorganization, reclassification, consolidation, merger, sale, or similar transaction, shall assume, by written instrument substantially similar in form and substance to this Warrant and satisfactory to the Holder, the obligation to deliver to the Holder such shares of stock, securities, or assets which, in accordance with the foregoing provisions, such Holder shall be entitled to receive upon exercise of this Warrant. Notwithstanding anything to the contrary contained herein, with respect to any corporate event or other transaction contemplated by the provisions of this Section 3(d), the Holder shall have the right to elect prior to the consummation of such event or transaction, to give effect to the exercise rights contained in Section 2 instead of giving effect to the provisions contained in this Section 3(d) with respect to this Warrant.

(e)    Certificate as to Adjustment.

(i)    As promptly as reasonably practicable following any adjustment of the Exercise Price, but in any event not later than ten (10) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii)    As promptly as reasonably practicable following the receipt by the Company of a written request by the Holder, but in any event not later than ten (10) Business Days thereafter, the Company shall furnish Lo the Holder a certificate of an executive officer certifying the Exercise Price then in effect and the number of Warrant Shares or the amount, if any, of other shares of stock, securities, or assets then issuable upon exercise of the Warrant.

8

(f)      Notices. In the event:

(i)      that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon exercise of the Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, to vote at a meeting (or by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(ii)      of any capital reorganization of the Company, any reclassification of the Common Stock of the Company, any consolidation or merger of the Company with or into another Person, or sale of all or substantially all of the Company's assets to another Person; or

(iii)      of the voluntary or involuntary dissolution, liquidation, or winding- up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Holder at least ten (10) calendar days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting or consent, or other right or action, and a description of such dividend, distribution, or other right or action to be taken at such meeting or by written consent or (B) the effective date on which such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation, or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon exercise of the Warrant) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale dissolution, liquidation, or winding-up, and the amount per share and character of such exchange applicable to the Warrant and the Warrant Shares.

4.      Purchase Rights. In addition to any adjustments pursuant to Section 3 above, if at any time the Company grants, issues, or sells any shares of Common Stock, Options, Convertible Securities, or rights to purchase stock, warrants, securities, or other property pro rata to the record holders of Common Stock ("Purchase Rights"), then the Holder shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder would have acquired if the Holder had held the number of Warrant Shares acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance, or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue, or sale of such Purchase Rights.

5.      Transfer of Warrant. Subject to the transfer conditions referred to in the legend endorsed hereon, this Warrant and all rights hereunder are transferable, in whole or in part, by the Holder without charge to the Holder, upon surrender of this Warrant to the Company at its then principal executive offices with a properly completed and duly executed Assignment in the form

9

acceptable to the Company, together with funds sufficient to pay any transfer taxes described in Section 2(g)(v) in connection with the making of such transfer. Upon such compliance. surrender and delivery and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant, if any, not so assigned and this Warrant shall promptly be cancelled.

6.    Holder Not Deemed a Stockholder; Limitations on Liability. Except as otherwise specifically provided herein, prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give, or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance, or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6. the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

7.    Replacement on Loss; Division and Combination.

(a)    Replacement of Warrant on Loss. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be a sufficient indemnity) and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company at its own expense shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for an equivalent number of Warrant Shares as the Warrant so lost, stolen, mutilated, or destroyed; provided, however, that in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b)    Division and Combination of Warrant. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the Holder or its agents or attorneys. Subject to compliance with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in

10

the aggregate for an equivalent number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

8.    No Impairment. The Company shall not, by amendment of its Certificate of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed by the Company hereunder, but shall at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may reasonably be requested by the Holder in order to protect the exercise rights of the Holder against dilution or other impairment, consistent with the tenor and purpose of this Warrant.

9.    Compliance with the Securities Act.

(a)    Agreement to Comply with the Securities Act; Legend. The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this Section 9 and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell, or otherwise dispose of this Warrant or any Warrant Shares to be issued upon exercise hereof except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "Securities Act"). This Warrant and all Warrant Shares issued upon exercise of this Warrant (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> "THIS WARRANT AND THE SECURJTTES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURJTIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUJREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE CORPORATION REQUESTS, AN OPINION SATISFACTORY TO THE CORPORATION TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL."

(b)    Representations of the Holder. In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows:

(i)    The Holder is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards or for resale in connection with, the public sale or distribution

11

of this Warrant or the Warrant Shares except pursuant to sales registered or exempted under the Securities Act.

(ii)    The Holder understands and acknowledges that this Warrant and the Warrant Shares to be issued upon exercise hereof are "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, such securities may be resold without registration under the Securities Act only in certain limited circumstances. In addition, the Holder represents that it is familiar with Rule 144 under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

(iii)    The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Warrant and the Warrant Shares. The Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Warrant and the business, properties, prospects, and financial condition of the Company.

(c)    Piggyback Registration Rights.

(i)    If at any time after September 30, 2023 the Company has registered or has determined to register any of its securities for its own account or for the account of other security holders of the Company on any registration form (other than Form S-4 or Form S-8) which permits the inclusion of the Warrant Shares (a Piggyback Registration"), the Company will give the Holder written notice thereof promptly (but in no event less than twenty (20) Business Days prior to the anticipated filing date) and, subject to Section 9(c)(ii), shall include in such registration all Warrant Shares requested to be included therein pursuant to the written request of the Holder received within ten (10) Business Days after delivery of the Company's notice.

(ii)    If any Piggyback Registration is a primary or secondary underwritten offering, the Company shall have the right to select, in its sole discretion, the managing underwriter or underwriters to administer any such offering.

10.  Warrant Register. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination, or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

11.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail

of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11).

| | |
|---|---|
| If to the Company: | Mullen Automotive Inc.<br>1405 Pioneer Street<br>Brea, CA 92821<br>Attention: David Michery, CEO<br>Email: david@mullenusa.com |
| with a copy to: | McDermott, Will & Emery LLP<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention: Robert Cohen<br>Email: RCohen@mwe.com |
| If to the Holder: | Qiantu Motor USA Inc.<br>36982 Forestwood Drive<br>Newark, CA 94560<br>Email: Luqun@ch-auto.com<br>Attention: Lu, Qun |
| with a copy to: | Dickinson Wright PLLC<br>350 S. Main Street, Suite 300<br>Ann Arbor MI 48104<br>Email: MHeusel@dickinson-wright.com<br>Attention: Mark V. Heusel |

12.     Equitable Relief. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction.

13.     Cumulative Remedies. Except to the extent expressly provided herein to the contrary, the rights and remedies provided in this Warrant are cumulative and are not exclusive of and are in addition to and not in substitution for any other rights or remedies available at law, in equity or otherwise.

14.     Entire Agreement. This Warrant constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior

13

and contemporaneous understandings and agreements, both written and oral, with respect to such subject matt.er.

15.    Successor and Assigns. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the patties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

16.    No Third-Party Beneficiaries. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever. under or by reason of this Warrant.

17.    Headings. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

18.    Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights remedy, power, or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    Severability. If any term or provision of this Warrant is invalid, illegal, or unenforceable in any jurisdiction such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

20.    Governing Law. This Warrant shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York.

21.    Submission to Jurisdiction. Any legal suit, action, or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York, Borough of Manhattan, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by certified or registered mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue

14

of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

22.    Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

23.    Counterparts. This Warrant may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Warrant delivered by e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant.

24.    No Strict Construction. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

25.    Certain Defined Terms. As used in this Warrant, the following terms have the respective meanings set forth below:

"Aggregate Exercise Price" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to Section 2 hereof, multiplied by (b) the Exercise Price in effect as of the Exercise Date in accordance with the terms of this Warrant.

"Board" means the board of directors of the Company.

'Business Day" means any day except a Saturday, Sunday or legal holiday, on which banking institutions in the city of New York, New York are authorized or obligated by law or executive order to close.

"Common Stock" means the common stock, par value $0.001 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

'Company" has the meaning set forth in the preamble.

"Convertible Security'' means any security (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

"DTC" has the meaning set forth in Section 2(c).

"Excluded Issuance" means any issuance or sale (or deemed issuance or sale in accordance with Section 3(a)) by the Company after the Issuance Date of: (a) shares of Common Stock issued upon the exercise of this Warrant; (b) shares of Common Stock (as such number of shares is equitably adjusted for subsequent stock splits, stock

15

combinations, stock dividends, and recapitalizations) issued directly or upon the exercise of Options to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company, or their retention as consultants by the Company, in each case authorized by the Board and issued pursuant to the Company's authorized equity incentive plans (including all such shares of Common Stock and Options outstanding prior to the Issuance Date); or (c) shares of Common Stock issued upon the conversion or exercise of Options (other than Options covered by clause (b) of this paragraph) or Convertible Securities issued prior to the Issuance Date, provided that such securities are not amended after the date hereof to increase the number of shares of Common Stock issuable thereunder or to lower the exercise or conversion price thereof.

"Exercise Date' means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in Section 2 shall have been satisfied on a Business Day, including, without limitation, the receipt by the Company of the Exercise Notice, the Warrant, and the Aggregate Exercise Price.

"Exercise Notice" has the meaning set forth in Section 2(a). "Exercise Period" has the meaning set forth in Section 1. "Exercise Price" has the meaning set forth in the preamble. "Holder" has the meaning set forth in the preamble. "Issuance Date" has the meaning set forth in the preamble.

"Options" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"Nasdaq" means The NASDAQ Stock Market LLC.

"Person" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization, or government or department or agency thereof.

"Piggyback Registration" has the meaning set forth in Section 9(c). "Purchase Rights" has the meaning set forth in Section 4. "Securities Act" has the meaning set forth in Section 9(a).

"IP Agreement" has the meaning set forth in the preamble.

"Warrant" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"Warrant Shares" means the shares of Common Stock or other capital stock of the Company then purchasable upon exercise of this Warrant in accordance with the terms of this Warrant.

[SIGNATURE PAGE FOLLOWS]

16

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Issuance Date.

MULLEN AUTOMOTIVE INC.

By: /s/ David Michery
David Michery
Chief Executive Officer

Accepted and agreed.

Qiantu Motor USA Inc

By: /s/ Lu, Qun
Lu, Qun
President

17

**Exhibit 10.5**

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** ("Agreement") is entered into as of the 14th day of March, 2023 ("Effective Date"), by and between **MULLEN TECHNOLOGIES, INC.** ("Mullen"), a California corporation, and **QIANTU MOTOR (SUZHOU) LTD.,** a limited liability company registered in the Peoples Republic of China, and **QIANTU MOTOR USA, INC.**, a California corporation (individually and together, "Qiantu"). Qiantu and Mullen may be individually referred to as a "Party" and collectively referred to as the "Parties".

### WITNESSETH:

**WHEREAS,** Qiantu owns or controls certain intellectual property rights pertaining to the electric high performance sports car known as the "Qiantu K-50," and Qiantu desires to collaborate with Mullen in order to manufacture and sell the Qiantu K-50; and

**WHEREAS,** Mullen is a licensed electric vehicle manufacturer that is in the business of, among other things, providing engineering support, assembling, and distribution of high performance electric vehicles;

**WHEREAS**, in or about May 2019, the Parties entered into an Exclusive Cooperation and Vehicle Assembly Agreement. Subsequently, in July 2019, the Parties replaced and superseded that agreement with a new agreement ("Final Agreement");

**WHEREAS**, a dispute subsequently arose related to the Final Agreement and, as a result, Mullen filed a complaint in the United States District Court for the Southern District of California, Case No. 19-CV-1979-W-AHG (the "Lawsuit"). Upon motion by Qiantu, the Lawsuit was dismissed without prejudice so that the Parties could pursue their respective claims in arbitration. On February 16, 2021, Mullen filed an arbitration demand against Qiantu with the American Arbitration Association as claim No. 01-21-0001-8991 and Qiantu counterclaimed against Mullen (hereafter, the "Arbitration");

**WHEREAS,** Mullen and Qiantu desire to enter into this Agreement to settle all claims/disputes between them with respect to the Final Agreement, the Lawsuit, and the resulting Arbitration, as well as establish an agreement whereby Mullen will be the exclusive assembler, manufacturer, and retailer of the Qiantu K-50 in accordance with the IP Agreement attached as Exhibit 1;

**NOW, THEREFORE,** in consideration of the premises and the covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.01     As used in this Agreement, the following capitalized terms shall have the following meanings:

1

(a)     "Claims" shall mean any and all actions, causes of action, suits, debts, sums of money, accounts, bills, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, claims and demands, of every kind, nature or description, whether known or unknown, fixed or contingent, in law, or equity, that either Party ever had, now has, or might have, upon or by reason of any matter, cause or thing whatsoever arising from, referring to, or any manner relating to the Lawsuit, the Arbitration, the Final Agreement or the Parties' business relationship prior to the execution of this Agreement.

(b)     "Days" shall mean calendar days.

(c)     "IP Agreement" shall mean the Intellectual Property and License Agreement attached hereto as Exhibit 1.

(d)     "Person" shall mean an individual, corporation, partnership, trust, business trust, association, joint-stock company, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

(e)     "Third Party" shall mean any Person other than the Parties and their respective parents, subsidiaries and affiliates.

(f)     Certain Additional Definitions. As used in this Agreement, "herein," "hereunder" and "hereof" shall refer to this Agreement as a whole, and "including" shall mean "including but not limited to" and "including, without limitation."

All other capitalized terms not defined herein shall have those meanings ascribed to them by the context or the reference of the sentences in which such term appears.

## ARTICLE II
## SETTLEMENT OF LITIGATION

2.01     Mullen shall pay, or cause to be paid, to Qiantu $6,000,000.00 USD for settlement and release of all Claims that the Parties have or may have against each other and for the privilege of entering into the IP Agreement attached hereto. Within 48 hours after complete execution of this Agreement, Mullen shall wire $6,000,000.00 USD to the Dickinson Wright PLLC Client Trust Account according to instructions provided by Counsel for Qiantu. This payment shall be for the benefit of Qiantu and in partial consideration for the settlement of the Lawsuit and resulting Arbitration. Should payment not be received, this Agreement shall be null and void and the Arbitration shall resume and the Release shall be of no effect. Once paid, the $6,000,000 payment shall not, under any circumstances, be voidable, refundable, returnable, or subject to a "claw-back" by Mullen or any party named in the IP Agreement, for any reason. To avoid any doubt, this payment shall not be returned to anyone for any reason, including breach of any future obligations

2

by Qiantu, but the Release shall be forever binding on the Parties. The $6,000,000 payment shall not be construed as a condition subsequent to any future obligations in this Agreement or the IP Agreement, other than execution of the Agreements.

2.02    As further consideration for the settlement of the Lawsuit and the Arbitration comprehended by this Agreement, Qiantu and Mullen shall become parties to the IP Agreement attached as Exhibit 1 hereto. Both agreements shall be executed concurrently and are a prerequisite to the $6,000,000 payment referenced above.

2.03    Following receipt of payments under Articles 2.01 and 2.02, the Parties shall both file a stipulated dismissal of their claims with the American Arbitration Association to dismiss the Arbitration within ten (10) days of said payment.

2.04    Mullen shall file a motion for dismissal with the Southern District of California to dismiss with prejudice the Lawsuit filed against Qiantu within ten (10) days of the payment under Article 2.01.

2.05    Release.  In consideration of the agreements, conditions, and releases contained herein and the settlement of the Arbitration and Lawsuit between the Parties, and for other good and valuable consideration, as of the Effective Date, each Party for itself and each of its respective affiliates, predecessors, successors, and assigns fully, finally, and forever hereby releases and discharges forever the other Party from any and all Claims, causes of action, suits, liabilities, damages, judgments, costs, expenses, losses, or other obligations, whatsoever, known or unknown, asserted or unasserted, in law or equity, from the beginning of the world to the Effective Date, arising out of the Final Agreement, the Parties' business relationship, or any acts, facts, omissions or matters that are or could have been part of the Arbitration and Lawsuit, except with respect to the rights and obligations of the Parties under this Agreement.

It is the intention of the Parties to fully, finally, and forever release one another from the Claims released by this Article II. The Release contained in this Article II, Section 2.05 will be and remain in effect notwithstanding the discovery subsequent to the Effective Date of any presently existing fact, and further, mistakes of fact or law will not constitute grounds for modification, avoidance, or rescission. The foregoing Release will not apply to any claims that arise from any breach of any representation, or future obligation or other term or condition of this Agreement.

2.06    The Parties agree to rescind and terminate and/or rescind any prior agreements, including but not limited to the Final Agreement, and/or any promises or commitments, written or oral, made by or between the Parties at any time, for the purpose of avoiding any confusion as to the Release agreed to herein.

**ARTICLE III**
**CONFIDENTIALITY AND DISCLOSURE**

3.01    Public Announcements. The Parties shall announce the existence of this Agreement in a mutually agreeable press release or otherwise within thirty (30) days of the Effective Date,

3

unless otherwise required by law. However, under no circumstances shall any Announcement be made before the payment under Article 2.01 is made in accordance with this Agreement and the Arbitration and Lawsuit are dismissed as described herein ("Minimum Wait Period"). The mutually agreed to press release shall not disclose the financial terms of the Agreement. Notwithstanding the foregoing, Qiantu acknowledges that Mullen is required under SEC guidelines to report any entry into a Material Definitive Agreement within 72 hours. As such, Qiantu acknowledges and agrees that Mullen will be filing an 8K with the SEC describing all material terms of the Settlement and will be filing the Settlement agreements in their entirety as exhibits to the filing. As such, Mullen will be entitled to disclose all aspects of the settlement. in immediate S.E.C. filings and company earnings calls. After expiration of the Minimum Wait Period, Qiantu also agrees that Mullen shall also be entitled to release a public disclosure that it has been granted a license for the IP for the Qiantu K-50 for the United States, Canada, Mexico and all of South America (the "Territory"). Mullen shall also be entitled to disclose that as part of the license, Mullen may re-brand the identity of the Vehicle(s) in the Territory as the Mullen GT and the Mullen GTRS.

3.02 During the Term and thereafter, except as otherwise provided in Section 3.01 or elsewhere of this Agreement, neither of the Parties hereto shall disclose any terms or conditions of the Agreement or the IP Agreement, or performance thereunder, to any Third Party without the prior consent of the other Party except (i) as required by SEC regulations, (ii) its auditors, attorneys, accountants, insurance carriers and Affiliates, (iii) as required by law, order or regulation of a governmental agency or a court of competent jurisdiction, or (iv) in connection with a change in control or financing; and the Party making any such disclosure in case (i), (ii), (iii) or (iv) shall seek reasonable safeguards to maintain the confidentiality of the disclosure. The foregoing shall not otherwise prevent disclosure of (A) information that is now in the public domain or subsequently enters the public domain as contemplated by this Agreement or by publication or otherwise through no action or fault of the other Party; (B) information that is known to either Party without restriction, prior to receipt from the other Party under this Agreement, from its own independent sources as evidenced by such Party's written records, and which was not acquired, directly or indirectly, from the other Party; (C) information that either Party receives from any Third Party reasonably known by such receiving Party to have a legal right to transmit such information, and not under any obligation to keep such information confidential; and (D) information independently developed by either Party's employees or agents provided that either Party can show that those same employees or agents had no access to the confidential information received hereunder.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

4.01    Mutual Representations. Each Party hereby represents and warrants to the other Party as follows:

(a) Corporate Existence and Power. Such Party (a) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, and (b) has the power and authority and the legal right to own and operate its property and assets, and to carry on its business as it is now being conducted.

4

(b)     <u>Authorization and Enforcement of Obligations</u>. Such Party (a) has the power and authority and the legal right to enter into the Agreement and to perform its obligations hereunder and (b) has taken all necessary action on its part to authorize the execution and delivery of the Agreement and the performance of its obligations hereunder. The Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against such Party in accordance with its terms.

(c)     <u>No Consents</u>. All necessary consents, approvals and authorizations of all governmental authorities and other Persons required to be obtained by such Party in connection with the Agreement and the performance hereof have been obtained.

(d)     <u>No Conflict</u>. The execution and delivery of the Agreement and the performance of such Party's obligations hereunder (a) do not conflict with or violate any requirement of applicable laws, and (b) do not conflict with, or constitute a default under, any of its contractual or other obligations of it.

## ARTICLE V
## TERM AND TERMINATION

5.01     <u>Term</u>. This Agreement shall be effective beginning on the Effective Date and shall remain in effect indefinitely. The term of the IP Agreement shall be as stated therein, the Parties agreeing that the IP Agreement is a stand-alone agreement and that only entry into that IP Agreement by the Parties is contemplated by this Agreement.

5.02     <u>Effect of Expiration or Termination</u>. Expiration or termination of the Agreement shall not relieve the Parties of any obligation accruing prior to such expiration or termination, and all terms of this Agreement which by their nature extend beyond its termination remain in effect until fulfilled and apply to respective successors and assigns.

## ARTICLE VI
## FORCE MAJEURE

6.01     No Party shall be held liable or responsible to the other Party nor be deemed to have defaulted under or breached the Agreement for failure or delay in fulfilling or performing any term of the Agreement to the extent, and for so long as, such failure or delay is caused by or results from causes beyond the reasonable control of the affected Party including but not limited to fires, earthquakes, floods, embargoes, wars, acts of war (whether war is declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omissions or delays in acting by any governmental authority or other Party. This provision shall not apply to payment obligations.

**ARTICLE VII**
**MISCELLANEOUS**

7.01     Notices. Any consent, notice or report required or permitted to be given or made under the Agreement by one Party to the other Party shall be in writing, delivered personally or by electronic mail (and promptly confirmed by personal delivery, first class mail, courier or internationally-recognized delivery service), and addressed to the other Party at the address indicated above, or to such other address as the addressee shall have last furnished in writing to addressor, with copies to their respective attorneys:

| | |
|---|---|
| If to Qiantu: | Dickinson Wright, LLC |
| | 350 S. Main Street, Suite 300 |
| | Ann Arbor, MI 48104 |
| | Attention: Mark V. Heusel |
| | mheusel@dickinson-wright.com |
| | |
| If to Mullen: | Miltner & Menck, APC |
| | 402 W. Broadway, Suite 960 |
| | San Diego, CA 92101 |
| | Attention: William Miltner |
| | bill@miltnerlaw.com |

Except as otherwise provided in the Agreement, such consent, notice or report shall be effective upon receipt by the addressee.

7.02     Non-Disparagement. Each Party agrees that from and after the Effective Date such Party will not directly or indirectly engage in any conduct that involves the making or publishing (including through electronic mail distribution or online social media) of any written or oral statements or remarks (including the repetition or distribution of derogatory rumors, allegations, negative reports or comments) that are disparaging, deleterious or damaging to the integrity, reputation or good will of the other Party or their respective management, officers, employees, independent contractors or consultants. Notwithstanding the foregoing, the provisions of this Section 7.02 shall not restrict any Party from providing truthful testimony or information in response to a subpoena or investigation by a governmental authority or in connection with any legal action by such Party against the other Party under this Agreement that is asserted by such Subject Party in good faith.

7.03     Governing Law. The Agreement shall be governed by and construed in accordance with the laws of California, without regard to the conflicts of law principles thereof, and shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods. Each Party hereby consents to the personal jurisdiction of California, acknowledges that venue is proper in any state or Federal court in California, agrees that any action arising out of or related to this Agreement must be brought exclusively in a state or federal court in California and waives any objection it has or may have in the future with respect to any of the foregoing.

6

7.04    <u>Waivers and Amendments</u>. No change, modification, extension, termination or waiver of the Agreement, or any of the provisions herein contained, shall be valid unless made in writing and signed by duly authorized representatives of the Parties hereto. Failure of any Party to this Agreement to insist in any one or more instances upon the performance of any of the terms, covenants or conditions of this Agreement or to exercise any right hereunder shall not be construed as a waiver of or relinquishment of the future performance of any such term, covenant or condition or the future exercise of such right, or of the performance of any other term, covenant or condition of this Agreement, and the obligation of the respective Parties with respect to such future performance shall continue in full force and effect.

7.05    <u>Enforceability</u>. In the event any one or more of the provisions of this Agreement shall for any reason be held to be void, invalid, illegal or unenforceable in any respect, such voidance, invalidity, illegality or unenforceability shall not affect any other of the several provisions of this Agreement and this Agreement shall be construed as if such void, invalid, illegal or unenforceable provision had never been contained herein. To the extent permissible under the applicable law, such provision, however, shall be substituted by an economically comparable provision.

7.06    <u>Specific Performance</u>. In the event of any breach of this Agreement, the Parties hereto hereby acknowledge and agree that the remedy at law would be inadequate, and, in such event, in addition to any other remedy provided herein or by law or in equity, the non-breaching Party shall be entitled to specific enforcement of the terms hereof, including, without limitation, appropriate injunctive relief in any court of competent jurisdiction, and that no bond or other security shall be required in connection therewith.

7.07    <u>Entire Agreement</u>. This Agreement embodies the entire understanding and agreement between the Parties hereto concerning the subject matter hereof, and supersedes all previous agreements and understandings, oral or written, between the Parties with respect to the subject matter hereof, including but not limited to any letters of intent, and shall be governed and construed under the laws of the State of California.

7.08    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. The Parties agree that (i) the provisions of this Agreement shall be severable in the event that any of the provisions hereof are for any reason whatsoever invalid, void or otherwise unenforceable, (ii) such invalid, void or otherwise unenforceable provisions shall be automatically replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions but are valid and enforceable, and (iii) the remaining provisions shall remain enforceable to the fullest extent permitted by law.

7.09    <u>No Assignment</u>. Neither of the Parties hereto shall be entitled to assign or otherwise transfer any of their rights or obligations hereunder, without the prior written consent of the other Party, which shall not be unreasonably withheld.

7.10     Captions. The captions contained in this Agreement are intended only as a matter of convenience and in no way define, limit, extend or describe the scope or intent of the Agreement or any provisions contained herein.

*[The remainder of this page has been intentionally left blank.]*

8

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

**QIANTU MOTOR (SUZHOU) LTD.**          **MULLEN TECHNOLOGIES, INC.**

By:    /s/ Lu, Qun                                      By:    /s/ David Michery

Name: Lu, Qun                                          Name: David Michery

Title:   Chairman                                        Title:   CEO

QIANTU MOTOR USA, INC.

By:    /s/ Lu, Qun

Name: Lu, Qun

Title:   President

9

**Exhibit 10.5(a)**

## INTELLECTUAL PROPERTY AND
## DISTRIBUTION AGREEMENT

THIS INTELLECTUAL PROPERTY AND DISTRIBUTION AGREEMENT ("IP Agreement") is entered into as of the 14th day of March, 2023 ("Effective Date"), by and between, on the one hand, MULLEN AUTOMOTIVE, INC. ("Mullen"), a Delaware corporation, and, on the other hand QIANTU MOTOR (SUZHOU) LTD., a limited liability company registered in the Peoples Republic of China, CH-AUTO TECHNOLOGY CO. LTD., a limited liability company registered in the Peoples Republic of China, and BEIJING U-WATER INVESTMENT CO., LTD., a limited liability company registered in the Peoples Republic of China (collectively, each of Qiantu, CH-Auto, and Beijing U-Water are sometimes referred to herein as "Qiantu"). Each of the foregoing may be individually referred to as a "Party" and collectively referred to as the "Parties."

WITNESSETH:

WHEREAS, Qiantu owns or controls certain intellectual property rights pertaining to the electric high performance sports car known as the "Qiantu K-50," and Qiantu desires to collaborate with Mullen in order to manufacture and sell the Qiantu K-50 throughout the Territory (defined below); and

WHEREAS, Mullen is a licensed electric vehicle manufacturer that is in the business of, among other things, providing engineering support, assembling, and distribution of high performance electric vehicles;

WHEREAS, Mullen and Qiantu desire to enter into this IP Agreement to facilitate assembly, manufacture, and sale of the Qiantu K-50 throughout the Territory upon the mutually agreed terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing premises and the covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Patties agree as follows:

## ARTICLE I
## DEFINITIONS

1.01    As used in this Agreement, the following capitalized terms shall have the following meanings:

(a)    "Days" shall mean consecutive calendar days.

(b)    "Deliverables" shall mean the products and information needed to complete the homologation process which is specifically listed on Schedule 1.01.

(c)    "Person" shall mean an individual, corporation, partnership, trust, business trust, association, joint-stock company, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

(d)    "Third Party" shall mean any Person other than the Parties and their respective parents, subsidiaries and affiliates.

(e)    "Vehicle Trademarks" shall mean the trademarks listed in Schedule 7.02.

(f)    Certain Additional Definitions. As used in this Agreement, "herein," "hereunder" and "hereof" shall refer to this Agreement as a whole, and "including" shall mean "including but not limited to" and "including, without limitation."

(g)    "Confidential information" means any commercially sensitive and nonpublic information, including, without limitation, information relating to the Parties' respective inventions, technological developments", know-how" business practices and plans, business strategies, marketing strategies, financial information, technical information, systems information, customer information, consumer research, information processing, del very systems, product development, service development, file data, documentation know how, processes, formulas, models, proprietary information and employee files, and trade secrets. Hereafter, the Party in the position of disclosing Confidential Information to the other of them is referred to as the "Disclosing Party," while the recipient of such Confidential Information is referred to as the "Receiving Party." The term "Confidential Information" shall not apply to: (1) information that, at the time of disclosure by the Disclosing Party to the Receiving Party, is published, known publicly or is otherwise in the public domain, unless by a third party who is under any obligation of confidence or secrecy to the Disclosing Party; (2) information that, after disclosure to the Receiving Party by the Disclosing Party, is published or becomes known publicly or otherwise becomes part of the public domain, through no fault of the Receiving Party or a third party who is under any obligation of confidence or secrecy to the Disclosing Party; (3) information that, prior to the time of disclosure to the Receiving Party by the Disclosing Party, is known to the Receiving Party, as evidenced by its written records, other than through a third party who is under any obligation of confidence or secrecy to the Disclosing Party; or (4) information that has been or is disclosed to the Receiving Party in good faith by a third party who was not, or is not, under any obligation of confidence or secrecy to the Disclosing Party at the time the third party discloses to the Receiving Party; (5) information that is independently developed by or on behalf of the Receiving Party, without reliance on the Confidential Information received hereunder.

(h)    "Intellectual Property" means discoveries and inventions (patentable or not), issued patents and patent applications, designs (registered or not), trademarks (registered or not) trade dress (registered or not), copyrights (registered or not), mask works, know-how, trade secrets (including without limitation, specifications, designs, plans, computer programs in source and object code, flowcharts, diagrams, drawings, marketing data, financial data, testing data and other competitively sensitive information), moral rights, author rights, Internet domain names, database rights, utility models, statutory invention registrations, invention disclosures, industrial designs, innovations, ideas, applications or improvements, continuations, continuations-in-part, divisional, rights in trade dress and packaging, goodwill and

2

other intellectual property rights, and all divisions, continuations, reissues, renewals, and extensions thereof, regardless of whether any such rights arise under the laws of the United States or any other state, county or jurisdiction, or whether they arise under applicable international laws, treaties and conventions.

(i)     "Vehicle Intellectual Property" means all Qiantu Intellectual Property comprehending the Vehicles, including Qiantu Intellectual Property embodied in the Deliverables, and without a license to which Vehicle Intellectual Property Mullen would be subject to a claim in the Territory for violation of Qiantu's intellectual property rights.

(j)     "Vehicle Patents" means all Qiantu patents and patent applications in the Territory which comprehend Vehicle Intellectual Property.

(k)     "Territory" shall mean North America (including Canada, Mexico, and the United States of America) and South America. At this time, Qiantu has not entered into an agreement with a third party to sell the K-50 in Europe. If Qiantu is presented with an offer from a third party, for the sale/distribution in Europe, Qiantu is amendable to discussing with Mullen opportunities to collaborate in the sale/distribution of the K-50 in this region. This shall not be considered a contractually binding commitment for such rights, but shall be a statement of Qiantu's good faith to carry on such communication for future business opportunity.

(I)     "Vehicle" or "Vehicles" means and refers exclusively to Qiantu's pure electric high-performance sports car, known as the '•Qiantu K-50" and the appearance of which is exemplified in U.S. Design Patent D904230, to be homologated for distribution in the Territory pursuant to this Agreement under the Vehicle Intellectual Property, including the Vehicle Trademarks and Vehicle Patents.

(m)     "Vehicle Kit" means a semi-knocked down and/or completely knocked down kit for assembling a complete, Homologated Vehicle. '•Vehicle Kits" is the plural form of Vehicle Kit.

(n)     "Homologation Kit" means a semi-knocked down and/or completely knocked-down kit of the Vehicle, as it exists as of the Effective Date, suitable for homologation. "Homologation Kits" is the plural form of Homologation Kit.

(o)     "Homologated Vehicle" means the Vehicle as homologated by Mullen pursuant to this Agreement. "Homologated Vehicles" is the plural form of Homologation Vehicle.

ARTICLE I
OBLIGATIONS OF QIANTU

1.01     Initial Deliverables:

(a)     Upon receipt of the settlement payment as described in Section 2.01 of the Settlement Agreement entered into by and between Mullen Technologies, Inc. and

3

Qiantu Motor (Suzhou) Ltd. and Qiantu Motor USA, Inc., Qiantu shall make available for transfer to Mullen two fully assembled K50 vehicles. Before the vehicles may be transferred to Mullen, Mullen shall pay the amount of $104,100 USD as consideration for the vehicles and such purchase price payment may be included in Mullen's payment of the settlement payment. Mullen shall be responsible for all handling and shipping costs, tariffs, export and import fees, special duties, regulatory fees and insurance costs or costs of any kind associated with delivery of the vehicles to Mullen and transportation from China to the U.S.;

(b)      Within 60 days after the Effective Date of this Agreement, Qiantu shall provide Mullen with the Deliverables stated in Schedule 1.0 I and according to the provisions of Section 3.02.

1.02    Following initial engineering for planned homologation by Mullen, Qiantu shall provide no less than 100 Homologation Kits, upon Mullen's written request therefor, which Homologation Kits Mullen shall use to assemble vehicles to be modified and crash tested per United States homologation requirements. The Homologation Kits comprehended by this Section 1.02 shall be provided to Mullen within 120 days after Mullen makes a down payment of 70% towards the Purchase Price as described in Section 1.03. The remaining 30% of the Purchase Price shall be paid prior to the Homologation Kits depart the China seaport for shipment to Mullen.

1.03    During the Term of this Agreement, Qiantu shall sell to Mullen the Homologation Kits, individual component parts of Homologation Kits ("Homologation Parts"), and Vehicle Kits USD FOB China seaport in accordance with the schedule attached as Schedule 1.03 ("Purchase Price"). For each and every purchase of Vehicle Kits, Homologation Parts, and Homologation Kits under this Agreement, Mullen must, for any single order, order a minimum of 50 Vehicle Kits, Homologation Parts, and/or Homologation Kits; all orders for Vehicle Kits, Homologation Parts, and/or Homologation Kits require a 70% down payment towards the Purchase Price. The remaining 30% of the Purchase Price shall be paid prior to the Homologation Kits, Homologation Parts, and/or Vehicle Kits departing the China seaport for shipment to Mullen. All shipments of the Homologation Kits, Homologation Parts, and Vehicle Kits under this Agreement shall be FOB China port.

ARTICLE II<br>OBLIGATIONS OF MULLEN

2.01    <u>Homologation Requirements Study</u>. Mullen shall have 120 days after execution of this Agreement to perform a homologation requirements study, which includes a business case setting forth timing to implement launch of the Vehicle in the Territory. Additionally, the business case will include Mullen's identification of requirements it may have of Qiantu, such as required engineering support and components of the Vehicle to include in the Vehicle Kits.

2.02    <u>Cancelation of Agreement</u>. In the event that the homologation requirements study does not support that assembling, manufacturing, and/or selling the Vehicles in the Territory is a commercially viable and profitable venture for Mullen, within 30 days thereafter, Mullen shall provide written notice to Qiantu canceling this Agreement and Mullen will have no further

4

obligations to fulfill under this Agreement. For the avoidance of doubt, the determination to cancel this Agreement in view of the homologation requirements study is Mullen's independent decision.

2.03    Initial Homologation and Pre-Production. If Mullen does not cancel this Agreement pursuant to Section 2.02, Mullen shall have up to 1,095 days (approximately 36 months) immediately following the 30 day cancelation period of Section 2.02 to complete the homologation of the Vehicles and be capable of assembling, manufacturing, and selling the Homologated Vehicles in the Territory in compliance with all applicable laws and regulations including without limitation safety and emissions standards (the "Homologation Period"). Within the Homologation Period, Mullen shall take all steps necessary to prepare the Vehicles to meet all regulatory standards, rule and requirements to drive the vehicle on public roads within the Territory and prepare all manufacturing facilities to assemble and produce the Homologated Vehicles for sale in the Territory in its own production facilities. Mullen shall bear sole responsibility to manage the homologation and pay for all costs to homologate the Vehicles, but it may contract with Qiantu separately to provide engineering support, as needed and determined solely by Mullen. If homologation of the Vehicles requires modification to the tooling therefor, Qiantu agrees to make changes to existing tooling or make new tooling, at Mullen's sole expense. Whether to change existing tooling or make new tooling will be a decision undertaken by Qiantu according to its sole and absolute discretion.

2.04    Production Period. Within 120 days after Mullen successfully homologates the Vehicle for the Territory, but not later than the expiry of the Homologation Period, Mullen shall commence assembling and selling the Homologated Vehicles from its United States manufacturing facilities and shall continue such assembly and sales activities thereafter for a term of five (5) years (''the Production Period"). For clarity, the Production Period shall commence on the date that the first Homologated Vehicle assembled by Mullen is transferred to a Third Party for consideration, but not later than the first day after expiry of the Homologation Period (i.e., at the latest, 601 days after the Effective Date). During the Production Period, Mullen shall purchase from Qiantu Vehicle Kits as follows:

(a)    1st Full Year of Production Period: Not less than 300 Vehicle Kits

(b)    2nd Full Year of Production Period: Not less than 500 Vehicle Kits

(c)    3rd Full Year of Production Period: Not less than 1,000 Vehicle Kits

(d)    4th Full Year of Production Period: Not less than 1,000 Vehicle Kits

(e)    5th Full Year of Production Period: Not less than 1,000 Vehicle Kits

All Vehicle Kits Mullen acquires from Qiantu pursuant to this Section 2.04 must be assembled into Homologated Vehicles sold within the Territory and/or used for warranty and replacement parts for Homologated Vehicles sold within the Territory pursuant to this Agreement. For the avoidance of doubt, Mullen may not use the Vehicle Kits, or any components thereof, in the assembly or manufacture, or repair of any product other than the Vehicles.

2.05    Post Production Period. Immediately following the conclusion of the Production Period, and provided that Mullen is not then in breach of this Agreement, the license of Section

5

4.02 shall become effective, such that Mullen shall be permitted from that date forward to manufacture and sell Homologated Vehicles without having to acquire Vehicle Kits from Qiantu. If Mullen is in breach of this Agreement at the time the license of Section 4.02 is scheduled to take effect, then that license shall not take effect until such breach is completely cured at Mullen's expense.

2.06    Manufacture; Quality Control; Warranty and Liability Claims. In the Territory, Mullen shall, except as otherwise expressly provided herein, assume full responsibility for the manufacture of Homologated Vehicles, for the maintenance of reasonable quality control standards, and for all warranty and liability claims by any Third Party with respect to the manufacturing of the Homologated Vehicles.

2.07    For the avoidance of doubt, if for any reason a current Qiantu supplier does not agree to sell any part to Qiantu or Mullen, Mullen reserves the right to go directly to such Qiantu supplier or to another supplier to purchase the part; provided, however, that: (i) prior to the conclusion of the Production Period, Mullen may not purchase parts from any supplier that has not been pre-approved in writing by Qiantu, which pre-approval will not be unreasonably withheld; and (ii) after conclusion of the Production Period, Mullen may not purchase parts from any supplier outside of the Territory that has not been pre-approved in writing by Qiantu, which pre-approval will not be unreasonably withheld.

ARTICLE III
PAYMENT OBLIGATIONS OF MULLEN

3.01    Stock Consideration. Upon execution of this IP Agreement, Mullen shall issue to Qiantu warrants to purchase up to 75,000,000 shares of Mullen Automotive, Inc.'s common stock (NASDAQ:MULN) (the "Warrants"). The Warrants shall be exercisable at Qiantu's discretion commencing at any time from September 30, 2023 up to and including September 30, 2024 (the "Exercise Period"). The strike price of the Warrants (the "Strike Price") shall be equal to 110% of the market price of Mullen's shares at close of trading on the Pricing Date which shall be the earlier of (a) when Mullen has completed its obligations to its Series D investors; or (b) June 15, 2023; provided, however, that if the Nasdaq exchange is not open or operational on the Pricing Date, the Strike Price shall be determined using the closing price of Mullen's shares on the last trading day immediately preceding the Pricing Date. The Warrants shall have the other terms and features as set forth in the Form of Warrant included in this Agreement as Schedule 3.01. Upon exercising the Warrants, Qiantu shall pay in U.S. dollars the Strike Price in advance of receipt of the shares of Mullen's common stock. To the Extent that the Warrants are exercised by Qiantu within the Exercise Period, Mullen shall as soon as reasonably practicable thereafter register for resale the shares of common stock purchased by Qiantu and underlying the Warrants.

3.02    Deliverables Provision and Payment. Within 60 days from the Effective Date Qiantu shall make the Deliverables available to Mullen for viewing via a data room (equipped to view all two dimensional and three dimensional data) hosted by Qiantu's counsel as specified in Section 12.02. Qiantu shall notify Mullen in writing of the availability of the Deliverables in the data room and Mullen shall thereafter have 5 days in which to view the Deliverables and notify Qiantu in writing of any discrepancies between the Deliverables of Schedule 1.01 and the Deliverables in the data room. If Mullen provides no such written notice then the Deliverables

6

shall be deemed accepted by Mullen as of the following day. Mullen shall then have 5 days from the date of acceptance in which to pay Qiantu $2,000,000.00 USD ("Deliverables Payment") in accordance with instructions from Qiantu. Immediately upon receipt of the Deliverables Payment Qiantu shall direct its said counsel to provide Mullen with full access to download the Deliverables from the data room.

3.03    <u>Royalty</u>. In addition to Purchase Price of the Vehicle Kits, Mullen shall pay to Qiantu a royalty fee of $1,200 for each Homologated Vehicle sold in the Territory during the Term ("the Royalty"). All Royalties will be paid on a quarterly basis during the Term, with the first payment due 60 days after the first sale of a Homologated Vehicle in the Territory. Thereafter, the payment shall be made by the 25th of month following the end of the calendar quarter. Mullen shall keep true accounts of the numbers of Homologated Vehicles sold in the Territory, and shall deliver to Qiantu, concurrent with its Royalty payments, a written account of the number of Homologated Vehicles sold in the Territory for the period corresponding to the accompanying Royalty payment ("the Royalty Report"). Each Royalty Report shall set forth the calculation of the Royalties due, including the number of Homologated Vehicles sold during the applicable period. Royalties shall be payable in US Dollars. Qiantu shall have the right upon reasonable notice not more twice per year to have an independent auditor examine the books and records of Mullen to ensure compliance with the payment provisions of this Agreement. Underpaid amounts shall be paid applying a late fee of 1.5% above the prime rate per month (according to the Wall Street Journal on the date that the amount in question became overdue) from original due date until all overdue amounts, including accrued late charges, are paid in full. If Mullen has underpaid the amount due for any period by more than five percent (5%) of the amount due, then Mullen shall pay for that audit and the next two subsequent audits. Mullen shall retain all records relating to or underlying each Royalty Report until a date that is five (5) years after termination of this Agreement.

ARTICLE IV
INTELLECTUAL PROPERTY LICENSE

4.01    Subject to the other terms of this Agreement, Qiantu hereby grants to Mullen, for the Homologation and Production Periods, (i) an exclusive right to use the Deliverables in the Territory only in connection with the homologation and manufacture of the Homologated Vehicles from Vehicle Kits and Homologation Kits, (ii) an exclusive license to use the Vehicle Trademarks in commerce in the Territory in connection with the Homologated Vehicles assembled from Vehicle Kits, and (iii) an exclusive license to the Vehicle Patents in the Territory only in connection with the homologation and manufacture of the Homologated Vehicles from Vehicle Kits and Homologation Kits.

4.02    Effective immediately following the end of the Production Period and subject to the other terms of this Agreement, Qiantu grants to Mullen, for the Term, (i) an exclusive right to use the Deliverables in the Territory only in connection with the manufacture and sale of the Homologated Vehicles, (ii) an exclusive license to use the Vehicle Trademarks in commerce in the Territory in connection with the Homologated Vehicles and (iii) an exclusive license to the Vehicle Patents only in the Territory in connection with the manufacture and sale of the Homologated Vehicles.

7

4.03   To the extent Mullen works directly with a pre-approved supplier to source Vehicle parts pursuant to Section 2.07, Qiantu hereby covenants not to bring any claim against such supplier(s) for infringement of any Qiantu Intellectual Property in respect of such sourced parts.

ARTICLE V
INTELLECTUAL PROPERTY RIGHTS AND OBLIGATIONS

5.01   Mullen will mark with the applicable patent numbers of any Vehicle Patents covering the Homologated Vehicles in accordance with the laws of countries in the Territory where Homologated Vehicles are sold or offered for sale.

5.02   During the Term, Qiantu shall be solely responsible to maintain all Vehicle Patents and all registrations for Vehicle Trademarks.

5.03   Except as specified in Section 5.05 below, the Patties agree that any and all intellectual Property developed, made, conceived and/or reduced to practice solely by Mullen, its officers, employees, and/or third party independent contractors in connection with homologation of the Vehicle (hereafter "the Homologation Intellectual Property") is and shall be the property of Mullen. Mullen shall promptly report to Qiantu the existence of all Homologation Intellectual Property. For the Term of this Agreement, Mullen hereby grants, and agrees to grant, to Qiantu a royalty-free license to any and all Homologation Intellectual Property that is incorporated in Vehicles in the Territory.

5.04   No rights are granted to Mullen to use the Vehicle Intellectual Property, including the Deliverables, to make, sell, offer for sale, or import into the Territory any other vehicles except the Homologated Vehicles.

5.05   The Parties acknowledge that changes to the external appearance of the Vehicle may be necessary to homologate the Vehicle. In the event homologation necessitates any such changes to the Vehicle, Mullen shall promptly bring the same to the attention of Qiantu for review and approval, which approval shall not be unreasonably withheld. Apart from such changes in the external appearance of the Vehicle necessitated by homologation, Mullen shall make no changes to the external appearance of the Vehicle without the prior written approval of Qiantu. Any and all Intellectual Property developed, made, conceived and/or reduced to practice, whether solely or jointly, by Mullen, Qiantu, their officers, employees, and/or third party independent contractors in connection with any changes to the external appearance of the Vehicle contemplated by this Section 5.05, whether during the Homologation Process or at any other time during the Term, is and shall be the property of Qiantu and Mullen, jointly. The Parties shall promptly report to each other the existence of all such Intellectual Property. The Parties shall make such assignments to each other as required to transfer joint ownership rights in such Intellectual Property as comprehended by this Section 5.05, and shall do such other acts as may be required to perfect their joint interests and rights in such Intellectual Property, including without limitation in connection with the pursuit of any patent applications. The Patties shall each secure suitable agreements from all of its officers, employees, and/or independent third party contractors in order to effectuate the purposes of this Section 5.05.

8

ARTICLE VI
CONFIDENTIALITY

6.01    During the Term, the Parties may be privy to each other's Confidential Information. Confidential Information will be kept in confidence by the Receiving Party and the Receiving Party will not, without the prior consent of the Disclosing Party, disclose Confidential Information to any third party, or use, directly or indirectly, Confidential Information for any purpose, including, without limitation, for any independent commercial gain.

6.02    Except as to Confidential Information included in the Vehicle Intellectual Property, Mullen acknowledges and agrees that nothing in this Agreement conveys, or is intended to convey, to Mullen any right, title, interest or license in any Confidential Information or intellectual property rights of Qiantu, all of which rights shall remain the sole property of Qiantu.

6.03    The Parties acknowledge and agree that if they breach their obligations hereunder with respect to Confidential Information, the Disclosing Party will suffer irreparable harm and, accordingly, in addition to any other remedies available for such breach, including the recovery of damages, the Disclosing Party shall be entitled to an injunction restraining the Receiving Party from such breach.

6.04    Upon termination of this Agreement, the Receiving Party shall promptly return to the Disclosing Party any and all materials comprising Confidential Information received from the Disclosing Party.

6.05    Mullen acknowledges that signing of this Agreement will require Mullen to publish mandatory 8k and press releases.

ARTICLE VII
USE OF TRADEMARKS AND NAMES

7.01    To maintain the integrity of the Vehicle Trademarks, Qiantu: (i) shall be permitted to inspect, and must approve, the Homologated Vehicles assembled from Vehicle Kits before the first such Homologated Vehicle is transferred to a customer; and (ii) shall be permitted to inspect, and must approve, the Homologated Vehicles manufactured after the end of the Production Period before the first such Homologated Vehicle is transferred to a customer. following each such approval, Mullen agrees that the quality of the Homologated Vehicles shall not materially deviate. Mullen agrees that it will make such changes as may be required to ensure the maintenance of Vehicle quality pursuant to this Section 7.01.

7.02    With respect to the Vehicle Trademarks, Mullen shall use at least the trademark of U.S. Registration 5413660 (the Dragonfly trademark) on the Homologated Vehicles and in connection with their promotion and sale in the Territory. Mullen may use any of the other Vehicle Trademarks, at its discretion, according to the terms and conditions of this Agreement.

7.03    Mullen's use of the Vehicle Trademarks shall be in conformance with such guidelines, specifications, or other requirements of Qiantu as are provided in writing to Mullen (and as the same may be updated from time to time during the Term) (collectively •'the Guidelines").

9

7.04    Mullen shall permit reasonable inspection of its business(es), during regular business hours, by authorized representatives of Qiantu at Qiantu's expense, to ensure compliance with the obligations of this Article VII.

7.05    The form and content of any advertising, marketing, and promotional materials (including any websites or social media platforms) utilizing any of the Vehicle Trademarks must be approved by Qiantu in writing prior to the first commercial use thereof by Mullen. All materials submitted for review and approval by Qiantu as required under this Agreement shall, except as expressly set forth herein, not be unreasonably delayed or withheld by Qiantu and shall be deemed granted if not denied by Qiantu within ten (10) business days after Qiantu 's receipt of such written submission.

7.06    Mullen agrees that it will promptly make any changes required in writing by Qiantu to bring Mullen's use of the Vehicle Trademarks into conformance with the Guidelines.

7.07    No Use of Party Names. Except as otherwise required by applicable law, regulation or order of a governmental agency or court of competent jurisdiction, or as expressly permitted by this Agreement, neither Party shall use the name of the other Party or the other Party's directors, officers or employees in any advertising, news release or other unrestricted publication, without the prior express written consent of the other Party.

7.08    Mullen shall provide appropriate notice of Qiantu's trademark rights in the Vehicle Trademarks wherever practicable.

7.09    The Parties acknowledge that Mullen intends to use the names MULLEN GT and MULLEN GTRS on and in connection with the Homologated Vehicles manufactured and sold by it under this Agreement. Qiantu agrees to this co-branding of the Homologated Vehicles, subject to the other terms and conditions of this Agreement. However, the Parties acknowledge and agree that under no circumstances shall such co-branding give rise to any trade dress or trademark rights in the Homologated Vehicles per se or any rights in any Qiantu Intellectual Property including the Vehicle Intellectual Property.

ARTICLE VIII
REPRESENTATIONS AND WARRANTIES

8.01    Mutual Representations. Each Party hereby represents and warrants to the other Party as follows:

(a)    Corporate Existence and Power. Such Paity (a) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, and (b) has the power and authority and the legal right to own and operate its property and assets, and to carry on its business as it is now being conducted.

(b)    Authorization and Enforcement of Obligations. Such Party (a) has the power and authority and the legal right to enter into the Agreement and to perform its obligations hereunder and (b) has taken all necessary action on its part to authorize the execution and delivery of the Agreement and the

10

performance of its obligations hereunder. The Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against such Party in accordance with its terms.

(c)    <u>No Consents</u>. All necessary consents, approvals and authorizations of all governmental authorities and other Persons required to be obtained by such Party in connection with the Agreement and the performance hereof have been obtained.

(d)    <u>No Conflict</u>. The execution and delivery of the Agreement and the performance of such Party's obligations hereunder (a) do not conflict with or violate any requirement of applicable laws, and (b) do not conflict with, or constitute a default under, any of its contractual or other obligations of it.

8.02    <u>Qiantu Representations</u>. Qiantu hereby represents and warrants to Mullen as follows:

(a)    Qiantu has sufficient ownership rights and the authority to grant the licenses or other rights conveyed herein, in particular with respect to the Vehicle Intellectual Property, Vehicle Patents, and Vehicle Trademarks.

(b)    Qiantu further represents and warrants that it has not, and will not during the term of this Agreement and any extensions thereof, take or fail to take any action that would have the effect of materially impairing the rights conveyed to Mullen under Vehicle Intellectual Property.

(c)    Qiantu represents and warrants that the Vehicle Kits manufactured or provided by Qiantu under this Agreement will (i) be in accordance with the specifications and samples for such Vehicle Kits; (ii) free from material defects and merchantable and fit for their intended use; and (iii) when sold, will be free and clear of any liens or encumbrances.

(d)    Qiantu represents and warrants that, to its knowledge, the Vehicle Kits do not infringe the Intellectual Property rights of others.

(e)    Qiantu represents and warrants that Qiantu has suitable supplier contracts and/or relationships to provide Mullen with the Homologation Kits in a manner consistent with this Agreement.

8.03    Nothing in this Agreement may be construed as:

(a)    a warranty or representation by either Party as to the validity or scope of any Intellectual Property comprehended by this Agreement, including Vehicle Intellectual Property, Vehicle Patents, and Vehicle Trademarks;

(b)    an obligation to bring or prosecute actions or suits against third Parties for infringement of any patent;

11

(c)     granting by implication, estoppel, or otherwise any licenses or rights that are not expressly granted herein.

8.04    EXCEPT AS SET FORTH IN THIS ARTICLE 8, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY WJTH RESPECT TO THE PATENT RIGHTS, THE TRADEMARKS, OR THE LICENSED PRODUCTS. THE PARTIES SPECIFICALLY DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

ARTICLE IX
TERM AND TERMINATION

9.01    Unless canceled under Section 2.02 or terminated sooner as provided for herein, this Agreement, including the license rights granted hereunder, shall terminate 15 years following the Effective Date (the "Term"); except that the Term for Articles 6 and 10 shall be indefinite. Upon prior written agreement between the Parties no later than 60 days prior to the termination date, this Agreement may be renewed for like Terms. In addition to termination as otherwise provided herein, in the event Mullen ceases manufacturing or selling Homologated Vehicles for a continuous 90-day period after the Post-Production Period this Agreement will terminate effective immediately from the end of said 90-day period.

9.02    Effect of Expiration or Termination. Expiration or termination of this Agreement shall not relieve the Parties of any obligation accruing prior to such expiration or termination, and all terms of this Agreement which by their nature extend beyond its termination remain in effect until fulfilled and apply to respective successors and assigns. Upon termination of this Agreement for any reason, all rights granted to Mullen hereunder, including with respect to any Vehicle Intellectual Property (including any Vehicle Patents and Vehicle Trademarks) shall immediately terminate. Termination of this Agreement shall have no effect on either Party's control or ownership or its respective intellectual property rights. Mullen acknowledges that Qiantu considers the appearance of the Vehicle to be distinctive and therefore protectable as trade dress. Mullen acknowledges and agrees that its use of the Vehicle Trademarks, as well as its use of the appearance of the Vehicle, during the Term inures to the benefit of Qiantu.

9.03    Termination in Event of Challenge. Qiantu may, in its sole discretion, elect to terminate this Agreement in the event Mullen challenges, or threatens to challenge the validity and/or enforceability of the Vehicle Intellectual Property or any portion thereof, including any Vehicle Patents or Vehicle Trademarks.

9.04    In the event of a default or breach by either Party of any material representation, warranty or covenant of this Agreement including, without limitation, the failure to make when due any payment owing hereunder, or the making of any knowingly false report, or any other material breach hereof, the non-defaulting Party shall give the defaulting Party written notice of such default, specifying the event causing such default, and if the defaulting Party has not cured the default to the reasonable satisfaction of the non-defaulting Party within thirty (30) days after its receipt of said notice from the non-defaulting Party, then, and in such event, the non-defaulting

12

Party shall have the right and option, in its sole discretion, to elect to terminate this Agreement and the license rights granted hereunder immediately by notice in writing to such effect delivered by the non-defaulting Party to the defaulting Party hereunder.

ARTICLEX
INDEMNIFICATION; LIMITATION ON LIABILITY

10.01    Indemnification by Mullen. Mullen shall indemnify defend and hold harmless Qiantu and its directors, officers, affiliates, employees and agents (collectively ''Agents") from all losses, liabilities, damages and expenses (including reasonable attorneys' fees and costs) (collectively, "Damages") that they may suffer as a result of any claims demands, actions or other proceedings (collectively, "Actions") made or instituted by any Third Party against any of them and arising out of (i) any claim that any Homologated Vehicles made used or sold by or under authority of Mullen is defective, or has caused damage to any Third Party, and (ii) any inaccurate representation or breach of warranty by Mullen.

10.02    Indemnification by Qiantu. Qiantu shall indemnify, defend and hold harmless Mullen and its Agents from all Damages that they may suffer as a result of any Actions made or instituted by any Third Party against any of them and arising out of any inaccurate representation or breach of warranty by Qiantu.

10.03    Indemnification Procedure. If an indemnified Party intends to claim indemnification under this article, it shall promptly notify the indemnifying Party of any Damages or Actions with respect to which the indemnified Patty intends to claim such indemnification. The indemnifying Party's indemnity obligations under this article shall not apply to amounts paid in any settlement if effected without the consent of the indemnifying Party, which consent shall not be unreasonably withheld or delayed. The indemnifying Patty shall not settle or consent to an adverse judgment in any such Action that adversely affects the rights or interests of the indemnified Party or any if its Agents or imposes additional obligations on the indemnified Party or any of its Agents, without the prior express written consent of the indemnified Party, which consent shall not be unreasonably withheld or delayed. The indemnified Party shall cooperate fully with the indemnifying Party and its legal representatives in the investigation of any action, claim or liability covered by this indemnification.

10.04    IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE TO ANY OTHER PARTY OR ANY THIRD PARTY FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR WITH RESPECT TO ANY CLAIM, DEMAND, ACTION OR OTHER PROCEEDING RELATING TO THIS AGREEMENT HOWEVER CAUSED, AND ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE), WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL A PARTY BE LIABLE TO THE OTHER FOR DAMAGES IN EXCESS OF THE FEES ACTUALLY RECEIVED BY QIANTU HEREUNDER. HOWEVER, THE LIMITATIONS IN THE PRECEDING TWO SENTENCES SHALL NOT APPLY EITHER TO THIRD PARTY CLAIMS FOR WHICH A PARTY HAS AGREED TO INDEMNIFY THE OTHER UNDER THIS AGREEMENT, TO VIOLATIONS OF QIANTU'S INTELLECTUAL PROPERTY RIGHTS, OR TO BREACHES OF A PARTY'S CONFIDENTIALITY OBLIGATIONS.

13

ARTICLE XI
FORCE MAJEURE

11.01   No Party shall be held liable or responsible to the other Party nor be deemed to have defaulted under or breached the Agreement for failure or delay in fulfilling or performing any term of the Agreement to the extent, and for so long as, such failure or delay is caused by or results from causes beyond the reasonable control of the affected Patty including but not limited to fires, earthquakes, floods, embargoes, wars, acts of war (whether war is declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omissions or delays in acting by any governmental authority or other Patty. This provision shall not apply to payment obligations.

ARTICLE XII
MISCELLANEOUS

12.01   Notices. Any consent, notice or report required or permitted to be given or made under the Agreement by one Party to the other Party shall be in writing, delivered personally or by electronic mail (and promptly confirmed by personal delivery, first class mail, courier or internationally-recognized delivery service), and addressed to the other Patty at the address indicated above, or to such other address as the addressee shall have last furnished in writing to addressor, with copies to their respective attorneys:

If to Qiantu:        Dickinson Wright, LLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
Attention: Mark V. Heusel
mheusel@dickinson-wright.com

If to Mullen:        Miltner & Menck, APC
402 W. Broadway, Suite 960
San Diego, CA 92101
Attention: William Miltner
bill@miltnerlaw.com

Except as otherwise provided in the Agreement, such consent, notice or report shall be effective upon receipt by the addressee.

12.02   Non-Disparagement. Each Party agrees that from and after the Effective Date such Party will not directly or indirectly engage in any conduct that involves the making or publishing (including through electronic mail distribution or online social media) of any written or oral statements or remarks (including the repetition or distribution of derogatory rumors, allegations, negative reports or comments) that are disparaging, deleterious or damaging to the integrity, reputation or good will of the other Party or their respective management, officers, employees, independent contractors or consultants. Notwithstanding the foregoing, the provisions of this Section 13.02 shall not restrict any Patty from providing truthful testimony or information in response to a subpoena or investigation by a governmental authority or in connection with any

14

legal action by such Patty against the other Party under this Agreement that is asserted by such Subject Party in good faith. Mullen shall not, during the Term, disparage or challenge the validity of any Intellectual Property owned or licensed by Qiantu (including Vehicle Intellectual Property, Vehicle Patent, and Vehicle Trademarks), nor take any actions that are likely to impair such Intellectual Property.

12.03   Governing Law. The Agreement shall be governed by and construed in accordance with the laws of California, without regard to the conflicts of law principles thereof, and shall not be governed by the United Nations Convention on Contracts for the international Sale of Goods. Each Patty hereby consents to the personal jurisdiction of California, acknowledges that venue is proper in any state or Federal court in California, agrees that any action arising out of or related to this Agreement must be brought exclusively in a state or federal court in California and waives any objection it has or may have in the future with respect to any of the foregoing.

12.04   Export Laws and Regulations. Each Party hereby acknowledges that the rights and obligations of the Agreement are subject to the laws and regulations of the United States relating to the export of products and technical information. Without limitation, each Party shall comply with all such laws and regulations.

12.05   Waivers and Amendments. No change, modification, extension, termination or waiver of the Agreement, or any of the provisions herein contained, shall be valid unless made in writing and signed by duly authorized representatives of the Parties hereto. Failure of any Party to this Agreement to insist in any one or more instances upon the performance of any or the terms covenants or conditions of this Agreement or to exercise any right hereunder shall not be construed as a waiver of or relinquishment of the future performance of any such term, covenant or condition or the future exercise of such right, or of the performance of any other term, covenant or condition of this Agreement, and the obligation of the respective Parties with respect to such future performance shall continue in full force and effect.

12.06   Enforceability. In the event any one or more of the provisions of this Agreement shall for any reason be held to be void, invalid, illegal or unenforceable in any respect such voidance, invalidity, illegality or unenforceability shall not affect any other of the several provisions of this Agreement and this Agreement shall be construed as if such void, invalid, illegal or unenforceable provision had never been contained herein. To the extent permissible under the applicable law, such provision, however, shall be substituted by an economically comparable provision.

12.07   Specific Performance. ln the event of any breach or this Agreement, the Patties hereto hereby acknowledge and agree that the remedy at law would be inadequate, and, in such event, in addition to any other remedy provided herein or by law or in equity, the non-breaching Party shall be entitled to specific enforcement of the terms hereof, including, without limitation, appropriate injunctive relief in any court of competent jurisdiction, and that no bond or other security shall be required in connection therewith.

12.08   Entire Agreement. This Agreement, together with the actions and Ancillary Agreements contemplated by Article XIII, and the Exhibit(s), embodies the entire understanding and agreement between the Parties hereto concerning the subject matter hereof. and supersedes all

15

previous agreements and understandings, oral or written, between the Parties with respect to the subject matter hereof, including but not limited to any letters of intent, and shall be governed and construed under the laws of the State of California.

12.09    Severability. Whenever possible, each provisoon of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. The Parties agree that (i) the provisions of this Agreement shall be severable in the event that any of the provisions hereof are for any reason whatsoever invalid, void or otherwise unenforceable, (ii) such invalid, void or otherwise unenforceable provisions shall be automatically replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions but are valid and enforceable, and (iii) the remaining provisions shall remain enforceable to the fullest extent permitted by law.

12.10    No Assignment. Neither of the Parties hereto shall be entitled to assign or otherwise transfer any of their rights or obligations hereunder, without the prior written consent of the other Party, which shall not be unreasonably withheld.

12.11    Captions. The captions contained in this Agreement are intended only as a matter of convenience and in no way define, limit, extend or describe the scope or intent of the Agreement or any provisions contained herein.

12.12    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document. Facsimile and electronic signatures shall be treated as original signatures.

*[The remainder of this page has been intentionally left blank.]*

16

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

QIANTU MOTOR (SUZHOU) LTD.

By: /s/ Lu, Qun

Name: Lu, Qun

Title: Chairman

MULLEN AUTOMOTIVE, INC.

By: /s/ David Michery

Name: David Michery

Title: CEO

CH-AUTO TECHNOLOGY CO. LTD.

By: /s/ Lu, Qun

Name: Lu, Qun

Title: Chairman

BEIJING U-WATER INVESTMENT CO., LTD.

By: /s/ Lu, Qun

Name: Lu, Qun

Title: Chairman

17

**Exhibit 10.6**



**MULLEN AUTOMOTIVE, INC.**
**EMPLOYMENT AGREEMENT**

This Employment Agreement (Agreement) is made as of this 21st day of March 2023, by and between Chester Bragado (Employee) and Mullen Automotive, Inc., a California corporation the "Company".

**PREAMBLE**

The Company desires to employ Employee as the Chief Accounting Officer of the Company effective March 10, 2023, and to compensate Employee, therefore. Employee desires to be employed by the Company and to commit to serve the Company on the terms herein provided.

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements of the parties, the parties agree as follows:

1.  **Definitions.**

Benefits shall mean all the fringe benefits approved by the Board from time to time and established by the Company for the benefit of Employees generally, including, but not limited to, regular holidays, vacations, absences resulting from illness or accident, health insurance, disability, and medical plans (including dental and prescription drug), group life insurance, and pension, profit-sharing and stock bonus plans or their equivalent.

Board shall mean the Board of Directors of the Company, together with an executive committee thereof (if any), as the same shall be constituted from time to time.

Cause shall mean (i) gross negligence in the performance of the material responsibilities of the Employee's position, (ii) willful misconduct in the performance and discharge of the Employee's material duties or that is otherwise materially injurious to the Company's business, (iii) conviction of or a plea of no contest to a felony or Employee's incapacity due to alcoholism or substance abuse, or (iv) a material and intentional breach by Employee of his principal obligations under this Agreement not remedied within fifteen (15) business days after receipt of written notice from the Company.

Change of Control shall mean the occurrence of one or more of the following events:

*   A Reorganization; or
*   A sale of all or substantially all of the assets of the Company.

Chairman shall mean the individual designated by the Board from time to time as its chairman.

Chief Executive Officer shall mean the individual having responsibility to the Board for direction and management of all operational affairs of the Company and who reports and is accountable only to the Board.

Company shall mean Mullen Automotive, Inc., a California corporation and any of its subsidiaries.

Competitive Business Activity shall mean the development, production, marketing and sale of vehicles.



Director shall mean the individual designated by the Board from time to time as a director of the Company.

Disability shall mean a written determination by an independent physician mutually agreeable to the Company and Employee (or, in the event of Employee's total physical or mental disability, Employee's legal representative) that Employee is physically or mentally unable to perform his duties of Chief Accounting Officer under this Agreement and that such disability can reasonably be expected to continue for a period of six (6) consecutive months or for shorter periods aggregating one hundred and eighty (180) days in any twelve-(12)-month period.

Exchange Act shall mean the Securities Exchange Act of 1934.

Employee shall mean Chester Bragado and, if the context requires, his heirs, personal representatives, and permitted successors and assigns.

Performance Year shall mean each twelve-month period of employment under this Agreement commencing upon the date of this Agreement.

Person shall mean any natural person, incorporated entity, limited or general partnership, limited liability company, business trust, association, agency (governmental or private), division, political sovereign, or subdivision or instrumentality, including those groups identified as persons in §§ 13(d)(3) and 14(d)(2) of the Exchange Act.

Chief Accounting Officer shall mean the individual having responsibility to the Chief Executive Officer and the Board for such accounting affairs of the Company as directed by the Chief Executive Officer and/or the Board.

Reorganization shall mean any transaction, or any series of transactions consummated in a 12-month period, pursuant to which any Person acquires (by merger, acquisition, or otherwise) all or substantially all of the assets of the Company or the then outstanding equity securities of the Company and the Company is not the surviving entity, the Company being deemed surviving if and only if the majority of the Board of Directors of the ultimate parent of the surviving entity were directors of the Company prior to its organization.

Territory shall mean any state of the United States and any equivalent section or area of any country in which the Company has revenue-producing customers or activities.

**1.      Position and Responsibilities.**

**1.01      Position.** Employee shall serve as the Chief Accounting Officer. In this capacity, Employee shall, subject to the bylaws of the Company, and to the direction of the Chief Executive Officer and the Board, serve the Company by performing such duties and carrying out such responsibilities as are normally related to the position in accordance with the standards of the industry in which the Company carries on its business.

**1.02      Reporting.** Employee, in his capacity as Chief Accounting Officer, will report directly to the Chief Executive Officer and the Board.



**1.03     Time and Efforts Covenant.** Employee will, to the best of his ability, devote such time and efforts as are necessary to the performance of her duties for the Company and its subsidiaries.

**1.04     Employee's Commitment.**  During Employee's employment with the Company, Employee will not undertake or engage in any other employment, occupation, or business enterprise inconsistent with his obligations under this Agreement. If Employee serves on Boards of non-competitors, he will obtain prior written approval from the CEO. Subject to the foregoing, Employee agrees not to acquire, assume, or participate in, directly or indirectly, any position, investment, or interest in the Territory adverse or antagonistic to the Company, its business, or prospects, financial or otherwise, or take any action towards any of the foregoing. The provisions of this Section shall not prevent Employee from owning shares of any entity engaging in Competitive Business Activity, so long as such shares (i) do not constitute more than 5% of the outstanding equity of such competitor, and (ii) are regularly traded on a national securities exchange or quoted for trading by the NASDAQ Stock Market.

**1.05     Relocation.** Employee's place of employment will not be located outside the United States.

**1.06     Confidential Information.**   Employee recognizes and acknowledges that the Company's trade secrets and proprietary information and know how, as they may exist from time to time and to the extent, they are unique to and internally developed by the Company (Confidential Information), are valuable assets of the Company's business, access to and knowledge of which are essential to the performance of employee's duties hereunder.

Employee will not, during or after the term of his employment by the Company, in whole or in part, disclose such secrets, information or know-how to any Person for any reason or purpose whatsoever, nor shall Employee misuse of any such property for her own purposes or for the benefit of any Person (except the Company) under any circumstances during or after the term other  *employment, provided, however,*  that after the term of her employment these restrictions shall not apply to such secrets, information and know-how which are then in the public domain (provided that Employee was not responsible, directly or indirectly, for such secrets, information or processes entering the public domain without the Company's consent).

Employee shall have no obligation hereunder to keep confidential any Confidential Information if and to the extent disclosure of any thereof is specifically required by law; *provided, however,* that in the event disclosure is required by applicable law, the Employee shall provide the Company with prompt notice of such requirement, prior to making any disclosure, so that the Company may seek an appropriate protective order.

Employee agrees to hold as the Company's property all memoranda, books, papers, letters, customer and supplier lists, processes, computer software, records, financial information, policy and procedure manuals, training and recruiting procedures and other data, and all copies thereof and therefrom, in any way relating to the Company's business and affairs, whether made by his or otherwise coming into his possession, and on termination of his employment, or on demand of the Company at any time, to deliver the same to the Company.

Employee shall use his best efforts to prevent the removal of any Confidential Information from the premises of the Company, except as required in his normal course of employment by the Company.

Employee shall use his best efforts to cause all persons or entities to whom any Confidential Information shall be disclosed by him hereunder to observe the terms and conditions set forth herein



as though each such person or entity was bound hereby.

**1.07    Records, Files.** All records, files, drawings, documents, equipment and the like relating to the business of the Company which are prepared or used by Employee during the term of his employment under this Agreement shall be and shall remain the sole property of the Company.

**1.08    Equitable Relief.** Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company. Employee further recognizes that material and intentional violations by Employee of any one or more of the provisions of this Section 1 may give rise to losses or damages for which the Company cannot be reasonably or adequately compensated in an action at law and that such material and intentional violations may result in irreparable and continuing harm to the Company.

Employee agrees that, in addition to any other remedy which the Company may have at law and equity, including the right to withhold any payment of compensation under Section 3 of this Agreement, the Company shall be entitled to injunctive relief to restrain any material and intentional violation, actual or threatened, by Employee of the provisions of Section 2 of this Agreement.

**1.09    Work Products.**

(a)    Employee agrees promptly to disclose and deliver to the Company any and all, and hereby assigns, transfers, and sets over to the Company, Employee's entire and exclusive right, title, and interest, including rights in the nature of patent rights, trademark rights, copyrights, trade secrets, or design rights, in and to any and all, improvements, inventions, developments, discoveries, works of authorship, innovations, systems, techniques, ideas, processes, programs, listings, and other things that may be of assistance to the Company, whether patentable or unpatentable, relating to or arising out of any development, service, or product of, or pertaining in any manner to the business of, the Company whether conceived, developed, or learned by Employee, alone or with others, during or after normal business hours, while employed by the Company (collectively, Work Products). These include only items that would be construed as part of the Company's business plan. Any other unrelated activities that do not relate to the business plan of the Company will be the property of any third party and/or the Employee, whichever is applicable. Any developments for any third party shall be made solely on the Employee's personal time and not during business hours. The foregoing assignment includes, without limitation, all such rights in the United States of America and throughout the world, and in and to any letters patent, applications for letters patent, any division, reissue, extension, continuation, or continuation in part thereof, or any copyright or trademark registrations that may be granted and issued for such Work Products. Employee hereby authorizes and requests the Commissioner of Patents and Trademarks or other appropriate government official to issue any such Letters Patent or registrations to the Company, its successors, and assigns.

(b)    The parties intend that the Company have the sole and exclusive right, title, and interest in such Work Products. Employee acknowledges and agrees that all Work Products will be and remain the exclusive property of the Company and that Employee will, upon the request of the Company, and without further compensation, do all lawful things requested by the Company to ensure the Company's ownership of the Work Products, including, without limitation, the execution of all documents requested by the Company to assign and transfer to the Company and its assigns all of Employee's right, title, and interest in the Work Products, if any, and to enable the Company to file and obtain patents, copyrights, and other proprietary rights in the United States and foreign countries relating to the Work Products. Employee hereby appoints the Company as Employee's attorney-in-fact to execute all documents relating to such registrations, applications, and assignments. The provisions of this Section



2.09 will survive the expiration or termination of this Agreement for any reason.

**2.      Compensation.**

**2.01    Annual Compensation.** The Company shall pay to Employee for the services to be rendered hereunder an annual base salary of $350,000.00 and 300,000 restricted shares (as adjusted for any reverse stock split the Company may initiate), of common stock of the Company which will be vested and due at the end of each full year of service with the Company (the Annual Compensation). The Annual Compensation will increase by 6% per year to reflect an annual merit increase to hedge against inflation. Employee's salary shall be payable in periodic installments in accordance with the Company's usual practice for similarly situated Employees of the Company.

**2.02    Incentive Compensation.** In addition to his Annual Compensation, Employee shall be entitled to receive annual incentive compensation in such further amounts, if any, as determined by the Board from time to time (the Incentive Compensation). The Board may designate additional Incentive Compensation as it desires and said additions shall be attached as an addendum to this Agreement. Any Incentive Compensation which is not deductible in the opinion of the Company's counsel under § 162(m) of the Internal Revenue Code of 1986 as amended, shall be deferred and paid, without interest, in the first year or years when and to the extent such payment may be deducted, Employee's right to such payment being absolute so long as Employee remains employed by the Company, subject only to the provisions of Section 2.09.

**2.03    Participating in Benefits.** Employee shall be entitled to all Benefits for as long as such Benefits may remain in effect and/or any substitute or additional Benefits made available in the future to similarly situated Employees of the Company, subject to and on a basis consistent with the terms, conditions and overall administration of such Benefits adopted by the Company. Benefits paid to Employee shall not be deemed to be in lieu of other compensation to Employee hereunder as described in this Section 3.

**3.      Term/Termination.**

**3.01    Constructive Discharge.** If the Company (a) fails to comply with the provisions of Section 3, (b) locates Employee's place of employment outside the United States, or (c) engages in any material and intentional breach of the Company's principal obligations under this Agreement which is not remedied within fifteen (15) business days after receipt of written notice from the Employee (a Constructive Discharge), Employee may at his option terminate his employment.

**3.02    Termination by the Company for Cause.** The Company shall have the right at any time to terminate the employment of Employee for Cause (a Termination by the Company for Cause) and such termination shall be effective as of the date of Termination by the Company for Cause.

**3.03    Termination by the Company for Reasons Other Than Cause.** If the Company terminates the employment of Employee and such termination is not for Cause (a "Termination by the Company for Reasons Other Than Cause"), then, the Company shall pay to Employee an amount equal to 90 days of Employee's Annual Compensation at the time of such termination (the "Salary Termination Payment"). The Salary Termination Payment shall be paid to Employee no later than 90 days after the date of such termination. To the extent that Employee is not fully vested in Benefits from any pension or any other retirement plan or program (whether tax qualified or not) maintained by the Company, the Company shall obtain and pay the premium upon an annuity policy to provide Employee with Benefits as though he had been fully vested on the date that her employment terminated.



**3.04    Termination on Account of Employee's Death.** In the event of Employee's death during his employment at the Company, the Company shall pay to Employee's beneficiary or beneficiaries (or to his estate if he fails to make such a designation) an amount equal to his Annual Compensation earned through the dated of Employee's death. Employee may designate one or more beneficiaries for the purposes of this Section 3.03 by making a written designation and delivering such designation to the Board of Directors. If Employee makes more than one such written designation, the designation last received before Employee's death shall control.

**3.05    Disability.** If Employee shall sustain a Disability, the Company shall continue to pay to Employee while such Disability continues the full amount of his then-current Annual Compensation for the three-month period next succeeding the date upon which such Disability shall have been so certified, as well as a prorated amount of any Incentive Compensation which would have been paid to Employee at the end of the year. Thereafter, if Employee's Disability shall continue, the employment of Employee under this Agreement shall terminate and all obligations of Employee shall cease and Employee shall be entitled to receive the Benefits, if any, as may be provided by any insurance to which he may have become entitled pursuant to Section 3.04 as well as the acceleration of the exercise date of any incentive stock options granted prior to Employee's Disability.

**4.    Stock Options.**  Employee will be eligible to participate in any Company stock option plan and will participate at the level of other similarly situated Employees in such plan or any future stock incentive plans established by the Company.

**5.    Indemnification.** The Company shall indemnify Employee and hold Employee harmless from and against any claim, loss or cause of action arising from or out of Employee's performance as an officer, director, or employee of the Company or in any other capacity, including any fiduciary capacity, in which the Employee serves at the request of the Company to the maximum extent permitted by applicable law. The Company shall advance to Employee the reasonable costs and expenses of investigating and/or defending any such claim, subject to receiving a written undertaking from Employee to repay any such amounts advanced to Employee in the event and to the extent of any subsequent determination by an agency of competent jurisdiction that Employee was not entitled to indemnification hereunder. If Employee is or becomes a party to any action or proceeding in respect of which indemnification may be sought hereunder, Employee shall promptly notify the Company thereof following such notice, the Company shall be entitled to participate therein and, to the extent that it may wish, to assume the defense thereof with counsel satisfactory to Employee in its reasonable judgment. After notice from the Company to Employee of the Company's election to assume the defense of such Employee, the Company will not be liable to Employee hereunder for any legal or other expenses subsequently incurred by Employee in connection with the defense thereof other than reasonable costs of investigation. Employee shall not settle any action or claim against Employee without the prior written consent of the Company except at such Employee's sole cost and expense.

**6.    Miscellaneous.**

**6.01    Assignment.** This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of each of the parties hereto and shall also bind and inure to the benefit of any successor or successors of the Company in a Reorganization, merger or consolidation and any assignee of all or substantially all of the Company's business and properties, but, except as to any such successor of the Company, neither this Agreement nor any rights or benefits hereunder may be assigned by the Company or Employee.



**6.02    Governing Law.** This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of California.

**6.03    Interpretation.** In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**6.04    Amendment and Waiver.** This Agreement may not be amended, supplemented, or waived except by a writing signed by the party against which such amendment or waiver is to be enforced. The waiver by any party of a breach of any provision of this Agreement shall not operate to, or be construed as a waiver of, any other breach of that provision or as a waiver of any breach of another provision.

**6.05    Binding Effect.** Subject to the provisions of Sections 4 & 7 hereof, this Agreement shall be binding on the successors and assigns of the parties hereto. All obligations of Employee with respect to any shares covered by this Agreement shall, as the context requires, bind Employee's spouse and the divorce or death of such spouse shall not vitiate the binding nature of such obligation.

**6.06    Survival of Rights and Obligations.** All rights and obligations of Employee or the Company arising during the term of this Agreement shall continue to have full force and effect after the termination of this Agreement unless otherwise provided herein.

**6.07    Section Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

**6.08    Entire Agreement.** This Agreement contains the entire understanding, and cancels and supersedes all prior agreements, including any agreement in principle or oral statement, letter of intent, statement of understanding or guidelines of the parties hereto with respect to the subject matter hereof.

In witness whereof, on the date first written above, the undersigned do hereby agree to the terms contained herein.

**COMPANY:**

/s/ David Michery
David Michery CEO

**EMPLOYEE:**

/s/ Chester Bragado

Chester Bragado

Exhibit 31.1

**CEO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, David Michery, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Mullen Automotive Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 15, 2023

By:    /s/ David Michery

David Michery
Chief Executive Officer

Exhibit 31.2

**CFO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jonathan New, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Mullen Automotive Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 15, 2023                              By:    /s/ Jonathan New
                                                          Jonathan New
                                                          Chief Financial Officer

Exhibit 32.1

**CERTIFICATION
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the period ended March 31, 2023 of Mullen Automotive Inc. (the "Company") as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned, in the capacities and on the dates indicated below, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods presented in the Report.


By:  /s/ David Michery
     David Michery
     Chief Executive Officer
     May 15, 2023


By:  /s/ Jonathan New
     Jonathan New
     Chief Financial Officer
     May 15, 2023