# EXHIBIT 20

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2024

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to ___

Commission file number: 001-34887

# MULLEN AUTOMOTIVE INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **86-3289406** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1405 Pioneer Street**
**Brea, California 92821**

(Address of principal executive offices)

Registrant's telephone number, including area code: (714) 613-1900

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.001 | MULN | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |
| Rights to Purchase Series A-1 Junior Participating Preferred Stock | None | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ YES ☐ NO

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ YES ☐ NO

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                          Accelerated filer ☐

Non-accelerated filer ☒                          Smaller reporting company ☒

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ YES ☒ NO

As of May 9, 2024, a total of 11,412,596 shares of the Registrant's common stock, par value $0.001 per share, were issued and outstanding.

Table of Contents

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | | |
| | Item 1. | Financial Statements: | 3 |
| | | Consolidated Balance Sheets as of March 31, 2024 (unaudited) and September 30, 2023 | 3 |
| | | Consolidated Statements of Operations and Comprehensive Loss for the three and six months ended March 31, 2024 and 2023 (unaudited) | 4 |
| | | Consolidated Statements of Stockholders Equity for the three and six months ended March 31, 2024 and 2023 (unaudited) | 5 |
| | | Consolidated Statements of Cash Flows for the six months ended March 31, 2024 and 2023 (unaudited) | 7 |
| | | Notes to Unaudited Consolidated Financial Statements | 8 |
| | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| | Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 54 |
| | Item 4. | Controls and Procedures | 54 |
| **PART II.** | **OTHER INFORMATION** | | |
| | Item 1. | Legal Proceedings | 57 |
| | Item 1A. | Risk Factors | 57 |
| | Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 58 |
| | Item 3. | Defaults Upon Senior Securities | 58 |
| | Item 4. | Mine Safety Disclosures | 58 |
| | Item 5. | Other Information | 58 |
| | Item 6. | Exhibits | 63 |
| **SIGNATURES** | | | 64 |

Table of Contents

**PART I. FINANCIAL INFORMATION**
**Item 1. Financial Statements**

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED BALANCE SHEETS**
(unaudited)

| | March 31, 2024 | September 30, 2023 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 22,378,089 | $ 155,267,098 |
| Restricted cash | 7,429,572 | 429,372 |
| Accounts receivable | - | 671,750 |
| Inventory | 32,961,724 | 16,807,013 |
| Prepaid expenses and prepaid inventories | 26,114,664 | 24,955,223 |
| **TOTAL CURRENT ASSETS** | **88,884,049** | **198,130,456** |
| | | |
| Property, plant, and equipment, net | 82,803,852 | 82,032,785 |
| Intangible assets, net | 28,812,583 | 104,235,249 |
| Related party receivable | - | 2,250,489 |
| Right-of-use assets | 11,616,450 | 5,249,417 |
| Goodwill, net | - | 28,846,832 |
| Other noncurrent assets | 2,002,815 | 960,502 |
| **TOTAL ASSETS** | $ 214,119,749 | $ 421,705,730 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 22,698,645 | $ 13,175,504 |
| Accrued expenses and other current liabilities | 43,192,512 | 41,208,929 |
| Dividends payable | 445,205 | 401,859 |
| Derivative liabilities | 5,124,487 | 64,863,309 |
| Liability to issue shares | 7,789,786 | 9,935,950 |
| Lease liabilities, current portion | 1,142,350 | 2,134,494 |
| Notes payable, current portion | 2,717,804 | 7,461,492 |
| Refundable deposits | 429,572 | 429,372 |
| **TOTAL CURRENT LIABILITIES** | **83,540,361** | **139,610,909** |
| Liability to issue shares, net of current portion | 526,684 | 1,827,889 |
| Lease liabilities, net of current portion | 12,638,061 | 3,566,922 |
| Deferred tax liability | - | 3,891,900 |
| **TOTAL LIABILITIES** | $ 96,705,106 | $ 148,897,620 |
| Contingencies and claims (Note 19) | | |
| | | |
| **STOCKHOLDERS' EQUITY** | | |

| | | |
|---|---:|---:|
| Preferred stock; $0.001 par value; 127,474,455 preferred shares authorized; | | |
| Preferred Series D; 84,572,538 shares authorized; 363,097 and 363,097 shares issued and outstanding at March 31, 2024 and September 30, 2023, respectively (preference in liquidation of $159,000 and $159,000 at March 31, 2024 and September 30, 2023, respectively) | 363 | 363 |
| Preferred Series C; 26,085,378 shares authorized; 1,211,757 and 1,211,757 shares issued and outstanding at March 31, 2024 and September 30, 2023, respectively (preference in liquidation of $10,696,895 and $10,696,895 at March 31, 2024 and September 30, 2023, respectively) | 1,212 | 1,212 |
| Preferred Series A; 83,859 shares authorized; 648 and 648 shares issued and outstanding at March 31, 2024 and September 30, 2023, respectively (preference in liquidation of $836 and $836 at March 31, 2024 and September 30, 2023, respectively) | 1 | 1 |
| Common stock; $0.001 par value; 5,000,000,000 and 5,000,000,000 shares authorized at March 31, 2024 and September 30, 2023, respectively; 7,974,442 and 2,871,707 shares issued and outstanding at March 31, 2024 and September 30, 2023 respectively (*) | 7,974 | 2,872 |
| Additional paid-in capital (*) | 2,151,067,184 | 2,071,110,126 |
| Accumulated deficit | (2,055,988,895) | (1,862,162,037) |
| **TOTAL STOCKHOLDERS' EQUITY ATTRIBUTABLE TO THE COMPANY'S STOCKHOLDERS** | **95,087,839** | **208,952,537** |
| Noncontrolling interest | 22,326,804 | 63,855,573 |
| **TOTAL STOCKHOLDERS' EQUITY** | **117,414,643** | **272,808,110** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$ 214,119,749** | **$ 421,705,730** |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*

See accompanying notes to these unaudited consolidated financial statements.

3

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(unaudited)

| | Three months ended March 31, | | Six months ended March 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| **Revenue** | | | | |
| Vehicle sales | $ 33,335 | $ - | $ 33,335 | $ - |
| Cost of revenues | (13,440) | - | (13,440) | - |
| **Gross profit / (loss)** | **19,895** | **-** | **19,895** | **-** |
| | | | | |
| **Operating expenses:** | | | | |
| General and administrative | $ 47,903,692 | $ 47,412,338 | $ 91,137,744 | $ 112,408,349 |
| Research and development | 24,023,526 | 20,478,971 | 40,193,493 | 29,100,980 |
| Impairment of goodwill | 28,846,832 | - | 28,846,832 | - |
| Impairment of right-of-use assets | 3,167,608 | - | 3,167,608 | - |
| Impairment of intangible assets | 73,447,067 | - | 73,447,067 | - |
| **Loss from operations** | **(177,368,830)** | **(67,891,309)** | **(236,772,849)** | **(141,509,329)** |
| | | | | |
| **Other income (expense):** | | | | |
| Other financing costs - initial recognition of derivative liabilities | - | - | - | (255,960,025) |
| Gain/(loss) on derivative liability revaluation | 3,622,758 | (48,439,415) | (3,106,223) | (89,221,391) |
| Gain/(loss) on extinguishment of debt | 34,625 | (40,000) | 34,625 | (6,452,170) |
| Gain/(loss) on disposal of fixed assets | (449,855) | 385,031 | (373,865) | 385,031 |
| Gain on lease termination | - | - | 50,000 | - |
| Interest expense | (259,700) | (1,888,169) | (517,723) | (4,716,258) |
| Other income, net | 893,692 | 482,405 | 1,439,108 | 1,128,286 |
| **Net loss before income tax benefit** | **$(173,527,310)** | **$(117,391,457)** | **$(239,246,927)** | **$(496,345,856)** |
| | | | | |
| Income tax benefit | 2,165,062 | 482,922 | 3,891,300 | 976,576 |
| **Net loss** | **$(171,362,248)** | **$(116,908,535)** | **$(235,355,627)** | **$(495,369,280)** |
| | | | | |
| Net loss attributable to noncontrolling interest | (38,930,288) | (1,995,217) | (41,528,769) | (4,180,176) |
| **Net loss attributable to stockholders** | **$(132,431,960)** | **$(114,913,318)** | **$(193,826,858)** | **$(491,189,104)** |
| | | | | |
| Waived/(accrued) accumulated preferred dividends | (22,043) | 8,039,612 | (43,346) | 7,400,935 |
| | | | | |
| **Net loss attributable to common stockholders after preferred dividends** | **$(132,454,003)** | **$(106,873,706)** | **$(193,870,204)** | **$(483,788,169)** |
| | | | | |
| Net Loss per Share (*) | $ (19.39) | $ (1,167.18) | $ (35.83) | $ (6,378.47) |
| | | | | |
| Weighted average shares outstanding, basic and diluted (*) | 6,829,415 | 91,566 | 5,410,894 | 75,847 |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*

See accompanying notes to these unaudited consolidated financial statements.

4

Case 2:25-cv-01187-DMG-AGR   Document 76-20   Filed 09/30/25   Page 7 of 153   Page
ID #:1757

See accompanying notes to these unaudited consolidated financial statements.

4

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
for the three and six months ended March 31, 2024
(unaudited)

| | Preferred Stock, total (see Note 9 for details) | | Common Stock | | Paid-in | Accumulated | Noncontrolling | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Capital | Deficit | Interest | Equity |
| **Balance, October 1, 2023 (*)** | 1,575,502 | $ 1,576 | 2,871,707 | $ 2,872 | $ 2,071,110,126 | $(1,862,162,037) | $ 63,855,573 | $ 272,808,110 |
| Cashless warrant exercise | - | - | 3,240,767 | 3,240 | 59,161,795 | - | - | 59,165,035 |
| Share-based compensation | - | - | 1,540,927 | 1,541 | 20,838,929 | - | - | 20,840,470 |
| Dividends accumulated on preferred stock | - | - | - | - | (43,345) | - | - | (43,345) |
| Shares issued to avoid fractional shares on reverse stock split | - | - | 321,041 | 321 | (321) | - | - | - |
| Net loss attributable to noncontrolling interest | - | - | - | - | - | - | (41,528,769) | (41,528,769) |
| Net loss attributable to stockholders | - | - | - | - | - | (193,826,858) | - | (193,826,858) |
| **Balance, March 31, 2024** | 1,575,502 | $ 1,576 | 7,974,442 | $ 7,974 | $2,151,067,184 | $(2,055,988,895) | $ 22,326,804 | $ 117,414,643 |
| | | | | | | | | |
| **Balance, January 1, 2024** | 1,575,502 | $ 1,576 | 5,884,691 | $ 5,885 | $2,134,106,479 | $(1,923,556,935) | $ 61,257,092 | $ 271,814,097 |
| Cashless warrant exercise | - | - | 1,220,615 | 1,220 | 8,286,146 | - | - | 8,287,366 |
| Share-based compensation | - | - | 869,129 | 869 | 8,696,601 | - | - | 8,697,470 |
| Dividends accumulated on preferred stock | - | - | - | - | (22,042) | - | - | (22,042) |
| Shares issued to avoid fractional shares on reverse stock split | - | - | 7 | - | - | - | - | - |
| Net loss attributable to noncontrolling interest | - | - | - | - | - | - | (38,930,288) | (38,930,288) |
| Net loss attributable to stockholders | - | - | - | - | - | (132,431,960) | - | (132,431,960) |
| **Balance, March 31, 2024** | 1,575,502 | $ 1,576 | 7,974,442 | $ 7,974 | $2,151,067,184 | $(2,055,988,895) | $ 22,326,804 | $ 117,414,643 |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*

See accompanying notes to these unaudited consolidated financial statements.

5

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
for the three and six months ended March 31, 2023
(unaudited)

| | Preferred Stock, total (see Note 9 for details) | | Common Stock | | Paid-in | Common Stock Owed but not Issued | | Accumulated | Noncontrolling | Stockholders' |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Capital | Shares | Amount | Deficit | Interest | Equity |
| **Balance, September 30, 2022 (*)** | 5,721,897 | $ 5,722 | 37,043 | $ 37 | $ 948,598,586 | - | $ - | $ (889,907,455) | $ 98,259,819 | $ 156,956,709 |
| Cashless warrant exercise | - | - | 63,708 | 64 | 295,068,119 | 6,589 | 7 | - | - | 295,068,190 |
| Surplus common stock issued on cashless warrant exercise | - | - | 3,499 | 3 | 26,735,475 | - | - | - | - | 26,735,478 |
| Issuance of common stock for conversion of convertible notes and interest | - | - | 23,576 | 24 | 153,222,210 | - | - | - | - | 153,222,234 |
| Issuance of common stock for conversion of preferred stock and dividends | (4,145,617) | (4,146) | 187 | - | 4,147 | - | - | - | - | 1 |
| Reclassification of derivatives to equity upon authorization of sufficient number of shares | - | - | - | - | 47,818,882 | - | - | - | - | 47,818,882 |
| Shares issued to settle note payable | - | - | 2,758 | 3 | 13,736,400 | - | - | - | - | 13,736,403 |
| Shares issued to extinguish penalty | - | - | 1,022 | 1 | 5,519,999 | - | - | - | - | 5,520,000 |
| Preferred shares series AA issued to officers | 1 | - | - | - | 25,000 | - | - | - | - | 25,000 |
| Preferred shares series AA refund | (1) | - | - | - | (25,000) | - | - | - | - | (25,000) |
| Share-based compensation | - | - | 8,520 | 8 | 52,057,524 | - | - | - | - | 52,057,532 |
| Preferred stock dividends waiver (accrual) | - | - | - | - | 7,400,935 | - | - | - | - | 7,400,935 |
| Noncontrolling interest | - | - | - | - | - | - | - | - | (4,180,176) | (4,180,176) |
| Net Loss | - | - | - | - | - | - | - | (491,189,104) | - | (491,189,104) |
| **Balance, March 31, 2023 (*)** | 1,576,280 | $ 1,576 | 140,313 | $ 140 | $1,550,162,277 | 6,589 | $ 7 | $(1,381,096,559) | $ 94,079,643 | $ 263,147,084 |
| | | | | | | | | | | |
| **Balance, January 1, 2023 (*)** | 1,576,780 | $ 1,577 | 75,274 | $ 75 | $1,190,856,450 | - | $ - | $(1,266,183,241) | $ 96,074,860 | $ 20,749,721 |
| Cashless warrant exercise | - | - | 47,786 | 48 | 183,914,165 | 6,589 | 7 | - | - | 183,914,220 |
| Issuance of common stock for conversion of convertible notes and interest | - | - | 13,762 | 14 | 93,819,343 | - | - | - | - | 93,819,357 |
| Issuance of common stock for conversion of preferred stock and dividends | (499) | (1) | 2 | - | - | - | - | - | - | (1) |
| Reclassification of derivatives to equity | | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| upon authorization of sufficient number of shares | | | | | | | | | |
| - | - | - | - | 47,818,882 | - | - | - | - | 47,818,882 |
| Preferred shares series AA refund | | | | | | | | | |
| (1) | - | - | - | (25,000) | - | - | - | - | (25,000) |
| Share-based compensation | | | | | | | | | |
| - | - | 3,489 | 3 | 25,738,825 | - | - | - | - | 25,738,828 |
| Dividends accumulated on preferred stock | | | | | | | | | |
| - | - | - | - | 8,039,612 | - | - | - | - | 8,039,612 |
| Net loss attributable to noncontrolling interest | | | | | | | | | |
| - | - | - | - | - | - | - | - | (1,995,217) | (1,995,217) |
| Net loss attributable to stockholders | | | | | | | | | |
| - | - | - | - | - | - | - | (114,913,318) | - | (114,913,318) |
| **Balance, March 31, 2023 (\*)** | | | | | | | | | |
| **1,576,280** | **$ 1,576** | **140,313** | **$ 140** | **$1,550,162,277** | **6,589** | **$ 7** | **$(1,381,096,559)** | **$ 94,079,643** | **$ 263,147,084** |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*

See accompanying notes to these unaudited consolidated financial statements.

6

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(unaudited)

| | Six Months Ended March 31, | |
|---|---|---|
| | **2024** | **2023** |
| **Cash Flows from Operating Activities** | | |
| Net loss | $ (235,355,627) | $ (495,369,280) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Stock-based compensation | 15,609,276 | 60,303,367 |
| Revaluation of derivative liabilities | 3,106,223 | 89,221,391 |
| Depreciation and amortization | 14,310,450 | 8,523,682 |
| Issuance of warrants to suppliers | - | 6,814,000 |
| Deferred income taxes | (3,891,300) | (901,999) |
| Other financing costs - initial recognition of derivative liabilities | - | 255,960,025 |
| Impairment of intangible assets | 73,447,067 | - |
| Impairment of goodwill | 28,846,832 | - |
| Impairment of right-of-use assets | 3,167,608 | - |
| Non-cash interest and other operating activities | 216,021 | (1,745,882) |
| Loss/(gain) on assets disposal | 323,865 | - |
| Loss/(gain) on extinguishment of debt | (34,625) | 6,452,170 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 671,750 | - |
| Inventories | (16,154,711) | - |
| Prepaids and other assets | (726,490) | (8,271,388) |
| Accounts payable | 9,523,141 | 8,429,257 |
| Accrued expenses and other liabilities | (77,010) | 2,672,040 |
| Right-of-use assets and lease liabilities | (1,455,446) | 345,232 |
| **Net cash used in operating activities** | **(108,472,976)** | **(67,567,385)** |
| **Cash Flows from Investing Activities** | | |
| Purchase of equipment | (12,470,001) | (4,298,563) |
| Purchase of intangible assets | - | (204,660) |
| ELMS assets purchase | - | (92,916,874) |
| **Net cash used in investing activities** | **(12,470,001)** | **(97,420,097)** |
| **Cash Flows from Financing Activities** | | |
| Proceeds from issuance of convertible notes payable | - | 150,000,000 |
| Payment of notes payable | (4,945,832) | (460,000) |
| Reimbursement for over issuance of shares | - | 17,819,660 |
| **Net cash provided by financing activities** | **(4,945,832)** | **167,359,660** |

| | | | |
|---|---|---|---|
| **Change in cash** | | | |
| | (125,888,809) | | 2,372,178 |
| Cash and restricted cash (in amount of $429,372), beginning of period | | | |
| | 155,696,470 | | 84,375,085 |
| Cash and restricted cash (in amount of $7,429,572), ending of period | | | |
| | $ 29,807,661 | $ | 86,747,263 |
| | | | |
| **Supplemental disclosure of Cash Flow information:** | | | |
| | | | |
| Cash paid for interest | | | |
| | $ 37,458 | $ | 5,028 |
| Cash paid for income taxes | | | |
| | - | | 800 |
| | | | |
| **Supplemental Disclosure for Non-Cash Activities:** | | | |
| | | | |
| Exercise of warrants recognized earlier as liabilities | | | |
| | $ 59,163,019 | $ | 268,713,397 |
| Right-of-use assets obtained in exchange of operating lease liabilities | | | |
| | 11,185,901 | | 370,668 |
| Convertible notes and interest - conversion to common stock | | | |
| | - | | 153,222,236 |
| Reclassification of derivatives to equity upon authorization of sufficient number of shares | | | |
| | - | | 47,818,882 |
| Common stock issued to extinguish other liabilities | | | |
| | - | | 10,500,712 |
| Waiver of dividends by stockholders | | | |
| | - | | 6,872,075 |
| Warrants issued to suppliers | | | |
| | - | | 6,814,000 |
| Debt conversion to common stock | | | |
| | - | | 1,096,787 |
| Extinguishment of operational liabilities by sale of property | | | |
| | - | | 767,626 |
| Extinguishment of financial liabilities by sale of property | | | |
| | - | | 231,958 |

See accompanying notes to these unaudited consolidated financial statements.

7

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1 - DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

*Description of Business*

Mullen Automotive Inc., a Delaware corporation ("Mullen", "we" or the "Company"), is a Southern California-based development-stage electric vehicle company that operates in various verticals of businesses focused within the automotive industry.

Mullen Automotive Inc., a California corporation ("Previous Mullen"), was originally formed on April 20, 2010, as a developer and manufacturer of electric vehicle technology and operated as the Electric Vehicle ("EV") division of Mullen Technologies, Inc. ("MTI") until November 5, 2021, at which time Previous Mullen underwent a capitalization and corporate reorganization by way of a spin-off to its shareholders, followed by a reverse merger with and into Net Element, Inc., which was accounted for as a reverse merger transaction, in which Previous Mullen was treated as the acquirer for financial accounting purposes. (the "Merger"). The Company changed its name from "Net Element, Inc." to "Mullen Automotive Inc." and the Nasdaq ticker symbol for the Company's common stock changed from "NETE" to "MULN" on the Nasdaq Capital Market at the opening of trading on November 5, 2021.

Mullen is building and delivering the newest generation of commercial trucks through the Bollinger Motors and ELMS acquisitions.

Since acquiring a controlling interest in Bollinger Motors, Inc. in September 2022, Mullen has strategically expanded into the medium-duty truck segments (Classes 4-6) and the electric Sport Utility and Pickup Truck markets. In October 2022, Mullen successfully completed a significant acquisition of assets from Electric Last Mile Solutions (ELMS), which included a manufacturing facility in Mishawaka, Indiana, and all necessary intellectual property for the design and production of Class 1 and Class 3 electric vehicles. The first electric vehicles, produced at our Tunica, Mississippi plant, were successfully delivered to customers in August 2023.

Since starting production, we have invoiced 397 vehicles, totaling $17.3 million. For the six months ended March 31, 2024, we delivered 362 vehicles valued at $16.3 million. The Company will not recognize revenue or accounts receivable until payment is received, and the return policy for the vehicles no longer applies once the dealer sells the vehicles to the final customer.

*Basis of Presentation and Principles of Consolidation*

The unaudited consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, Mullen Investment Properties LLC, a Mississippi corporation, Ottava Automotive, Inc., a California corporation, Mullen Real Estate, LLC, a Delaware corporation, Mullen Advanced Energy Operations, LLC, a California corporation, as well as a 60%-owned (on a fully dilutive basis) subsidiary Bollinger Motors Inc., a Delaware corporation. Intercompany accounts and transactions, if any, have been eliminated. Noncontrolling interest presented in these consolidated financial statements relates to the portion of equity (net assets) in subsidiaries not attributable, directly or indirectly, to Mullen. Net income or loss are allocated to noncontrolling interests by multiplying the relative ownership interest of the noncontrolling interest holders for the period by the net income or loss of the entity to which the noncontrolling interest relates.

These unaudited interim consolidated financial statements and the accompanying notes have been prepared on the same basis as the annual consolidated financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments, necessary for a fair statement of the results of operations for the periods presented. The condensed consolidated financial statements for any interim period are not necessarily indicative of the results to be expected for the full year or for any other future years or interim periods. Comprehensive loss is not separately presented as the amounts are equal to net loss for the three and six months ended March 31, 2024 and 2023. These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended September 30, 2023 filed with the SEC on January 16, 2024.

8

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

***Reverse Stock Splits***

During the calendar year ended December 31, 2023 we have completed 3 reverse stock splits in order to regain compliance with NASDAQ Listing Rule 5550(a)(2). In May 2023, we completed a 1-for-25 reverse split of our outstanding shares of common stock. In August 2023, we completed a 1-for-9 reverse split of our outstanding shares of common stock. In December 2023, the stockholders approved a proposal to authorize a reverse stock split of the Company's common stock at a ratio within the range of 1-for-2 to 1-for-100, as determined by the Board of the Company. The Board approved a 1-for-100 reverse stock split effective on December 21, 2023. As a result of the reverse stock split, every 100 shares of the Company's pre-reverse stock split common stock combined and automatically became 1 share of common stock.

On January 24, 2024, the Company received formal notice from The Nasdaq Stock Market LLC confirming the Company has regained compliance with the minimum bid price requirement set forth in Nasdaq Listing Rule 5550(a)(2). On March 6, 2024, the Company received formal notice from Nasdaq confirming that it has regained compliance with the annual shareholder meeting requirement set forth in Nasdaq Listing Rule 5620(a). The Company is now in full compliance with Nasdaq's continued listing requirements and will continue to be listed and traded on the Nasdaq Capital Market.

As a result of the reverse stock splits, the number of shares of common stock that can be issued upon exercise of warrants, preferred stock, and other convertible securities, as well as any commitments to issue securities, that provide for adjustments in the event of a reverse stock split, was appropriately adjusted pursuant to their applicable terms for the reverse stock splits. If applicable, the conversion price for each outstanding share of preferred stock and the exercise price for each outstanding warrant was increased, pursuant to their terms, in inverse proportion to the split ratio such that upon conversion or exercise, the aggregate conversion price for conversion of preferred stock and the aggregate exercise price payable by the warrant holder to the Company for shares of common stock subject to such warrant will remain approximately the same as the aggregate conversion or exercise price, as applicable, prior to the reverse stock splits.

The reverse stock splits have not changed the authorized number of shares or the par value of the common stock nor modified any voting rights of the common stock.

No proportionate adjustment was made to the number of shares reserved for issuance pursuant to the Company's 2022 Equity Incentive Plan (the "2022 Plan") pursuant to an amendment to the 2022 Plan approved by stockholders in August 2023, increasing the maximum aggregate number of shares of common stock and stock equivalents available for the grant of awards under the 2022 Plan by an additional 52,000,000 shares, which amount is not subject to any decrease or increase in the number shares of common stock resulting from a stock spilt, reverse stock split, recapitalization, combination, reclassification, the payment of a stock dividend on the common stock or any other decrease in the number of such shares of common stock effected without receipt of consideration by the Company.

No fractional shares were issued in connection with the reverse stock splits. All shares of common stock that were held by a stockholder were aggregated subsequent to the reverse stock split and each fractional share resulting from such aggregation held by a stockholder was rounded up to the next whole share. As a result, an additional 321,048 shares were issued for the benefit of stockholders that would otherwise obtain fractional shares upon reverse stock split in December 2023.

The number and par value of Series A Preferred Stock, Series C Preferred Stock and Series D Preferred Stock were not affected by the reverse stock splits, but their conversion ratios have been proportionally adjusted. There were no outstanding shares of Series B Preferred Stock as of the effective date of the reverse stock splits.

The Company retroactively adjusted its historical financial statements to reflect the reverse stock splits (See *Note 10 - Loss per share* for reverse stock splits effect on loss per share). All issued and outstanding common stock and per share amounts contained in the financial statements have been adjusted to reflect the reverse stock splits for all periods presented. The common stock and additional paid-in-capital line items of the financial statements were adjusted to account for the reverse stock splits for all periods presented (with $833,431 value of common stock decreased and additional paid-in-capital increased on September 30, 2022).

9

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2 - LIQUIDITY, CAPITAL RESOURCES, AND GOING CONCERN**

These consolidated financial statements have been prepared on the basis that assumes the Company will continue as a going concern which contemplates the realization of assets and satisfaction of liabilities and commitments in the ordinary course of business.

During the six months ended March 31, 2024, the COVID-19 pandemic did not have a material impact on our operating results. The Company has not observed any impairments of its assets or a significant change in the fair value of its assets due to the COVID-19 pandemic. At this time, it is not possible for the Company to predict the duration or magnitude of the adverse results of the outbreak and its effects on the Company's business or results of operations, financial condition, or liquidity.

The Company evaluated whether there are any conditions and events, considered in the aggregate, that raise substantial doubt about its ability to continue as a going concern over the next twelve months from the date of filing this report. The Company's principal source of liquidity consists of existing cash and restricted cash of approximately $

29.8 million as of March 31, 2024. During the six months ended March 31, 2024, the Company used approximately $108.5 million of cash for operating activities. The net working capital on March 31, 2024 amounted to approximately $5.3 million, or approximately $18.3 million after excluding derivative liabilities and liabilities to issue stock that are supposed to be settled by issuing common stock without using cash. For the six months ended March 31, 2024, the Company has incurred a net loss of $235.4 million and, as of March 31, 2024, our accumulated deficit was $2,056.0 million. The Company believes that substantial doubt about its ability to continue as a going concern does exist as its cash on hand will be insufficient to meet its working capital and capital expenditure requirements for a period of at least twelve months from the date of the filing of this Form 10-Q.

If the Company does not secure adequate funding to fulfill its current liabilities, it anticipates seeking bankruptcy protection in various jurisdictions within 30 days of publishing these financial statements. The Company anticipates that its available funds will be insufficient to cover its obligations for at least the next twelve months from the date this Form 10-Q was filed. Consequently, there is significant uncertainty regarding the Company's ability to continue operating. The Company is actively pursuing additional funds (see *Note 21 Subsequent Events* - $50 Million Note and Warrant Financing, $100 Million Financing Arrangement, and First Tranche of $50 Million Financing Payable on Execution). As part of its cost-cutting measures, the Company plans to further reduce its workforce and streamline operations, including downsizing its physical locations. However, there is no guarantee that the Company will be able to restructure its debts and/or secure the necessary financing on favorable terms.

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Significant accounting policies are defined as those that are reflective of significant judgments and uncertainties, and potentially result in materially different results under different assumptions and conditions.

***Use of Estimates***

The preparation of our financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the dates of the consolidated financial statements and the reported amounts of total expenses in the reporting periods. Estimates are used for, but not limited to, cash flow projections and discount rate for calculation of goodwill impairment, fair value and impairment of long-lived assets, including intangible assets, inventory reserves, accrued expenses, fair value of financial instruments, depreciable lives of property and equipment, income taxes, contingencies, valuation of preferred stock and warrants. Additionally, the rates of interest on several debt agreements have been imputed where there was no stated interest rate within the original agreement. Management bases its estimates on historical experience and on various other assumptions believed to be reasonable, the results of which form the basis for carrying values of assets and liabilities and the recording of costs and expenses that are not readily apparent from other sources. The actual results may differ materially from these estimates.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Risks and Uncertainties*

We operate within an industry that is subject to rapid technological change, intense competition, and significant government regulation. It is subject to significant risks and uncertainties, including competitive, financial, developmental, operational, technological, required knowledge of industry governmental regulations, and other risks associated with an emerging business. The Company is dependent on its suppliers, including single source suppliers, for the production of the Mullen vehicles and depends on ability of these suppliers to deliver necessary components of our products in a timely manner at prices, quality levels and volumes acceptable to us. Any one or combination of these or other risks could have a substantial influence on our future operations and prospects for commercial success.

*Business Combination*

Business acquisitions are accounted for in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805 "*Business Combinations*". FASB ASC 805 requires the reporting entity to identify the acquirer, determine the acquisition date, recognize and measure the identifiable tangible and intangible assets acquired, the liabilities assumed and any noncontrolling interest in the acquired entity, and recognize and measure goodwill or a gain from the purchase. The acquiree's results are included in the Company's consolidated financial statements from the date of acquisition. Assets acquired and liabilities assumed are recorded at their fair values and the excess of the purchase price over the amounts assigned is recorded as goodwill. Adjustments to fair value assessments are recorded to goodwill over the measurement period (not longer than twelve months). The acquisition method also requires that acquisition-related transaction and post-acquisition restructuring costs be charged to expense.

*Cash and Cash Equivalents*

Cash equivalents are short-term, highly liquid investments that are readily convertible to known amounts of cash, and so near their maturity (generally, with original maturities of three months or less) that they present insignificant risk of changes in value because of changes in interest rates.

*Restricted Cash*

The main part of restricted cash in amount of $
7 million relates to an escrow account that will become the property of the party determined in the arbitration with GEM Group (see *Note 19 - Contingencies and Claims*). The amount and interest earned will be released only upon further order of the arbitrator, a court or other tribunal of competent jurisdiction, or by agreement of the parties.

Cash obtained from customer deposits is held by the Company and is restricted from use to fund operations. Refundable deposits were $430 thousand as of March 31, 2024.

*Prepaid Expenses and Other Current Assets*

Prepaid expenses consist of various advance payments made for goods or services to be received in the future.

*Inventory*

Inventories are stated at the lower of cost or net realizable value and consist of raw materials, work in progress and finished goods. Cost of inventories is determined using the standard cost method, which approximates actual cost on a first-in first-out basis. This method includes direct materials, direct labor, and a proportionate share of manufacturing overhead costs based on normal capacity. Regular reviews are performed to identify and account for variances between the standard costs and actual costs. Any variances identified are recognized in the cost of revenues during the period in which they occur.

11

Table of Contents

**MULLEN AUTOMOTIVE INC.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company regularly reviews its inventories for excess and obsolete items by assessing their net realizable value (NRV). The NRV is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. This analysis considers factors such as demand forecasts, product life cycles, product development plans, and current market conditions. Provisions are made to reduce the carrying value of the inventories to their net realizable value. Once inventory is written down, a new, lower-cost basis is established, and the inventory is not subsequently written up if market conditions improve. All such inventory write-downs are included as a component of cost of revenues in the period in which the write-down occurs. Adjustments to these estimates and assumptions could impact our financial position and results of operations.

### *Property, Plant, and Equipment, net*

Property, plant, and equipment is stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated economic useful lives of the assets. Repairs and maintenance expenditures that do not extend the useful lives of related assets are expensed as incurred.

### *Estimated Useful Lives*

| Description | Estimated useful lives |
| --- | --- |
| Buildings | 20 to 30 years |
| Furniture and equipment | 3 to 7 years |
| Computer and software | 1 to 5 years |
| Machinery, shop and testing equipment | 3 to 7 years |
| Leasehold improvements | Shorter of the estimated useful life or the underlying lease term |
| Vehicles | 5 years |
| Intangibles | 5 to 10 years |

Expenditures for major improvements are capitalized, while minor replacements, maintenance and repairs, which do not extend the asset lives, are charged to operations as incurred. Upon sale or disposition, the cost and related accumulated depreciation are removed from the accounts and any gain or loss is included in operations. Company management continually monitors events and changes in circumstances that could indicate that the carrying balances of its property, plant, and equipment may not be recoverable in accordance with the provisions of ASC 360, "*Property, Plant, and Equipment.*" When such events or changes in circumstances are present, we assess the recoverability of long-lived assets by determining whether the carrying value of such assets will be recovered through undiscounted expected future cash flows. If the total of the future cash flows is less than the carrying amount of those assets, we recognize an impairment loss based on the excess of the carrying amount over the fair value of the assets.

### *Income Taxes*

Income taxes are recorded in accordance with ASC 740, *"Income Taxes"*. We recognize deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the consolidated financial statements or tax returns. Deferred tax assets and liabilities are determined based on the difference between the consolidated financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Valuation allowances are provided, if based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Uncertain tax positions taken or expected to be taken in a tax return are accounted for using the "more likely than not" threshold for financial statement recognition and measurement. These are transactions that occur during the ordinary course of business for which the ultimate tax determination may be uncertain. At March 31, 2024 and 2023, there were no material uncertain tax positions.

The Company's income tax provision consists of an estimate for U.S. federal and state income taxes based on enacted rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in the tax law. The Company maintains a valuation allowance against the full value of its U.S. and state net deferred tax assets because the Company believes the recoverability of the tax assets is not more likely than not as of March 31, 2024.

*Intangible Assets, net*

Intangible assets consist of acquired and developed intellectual property. In accordance with ASC 350, "*Intangibles-Goodwill and Others,*" goodwill and other intangible assets with indefinite lives (including in-process research and development assets acquired in a business combination) are not subject to amortization but are tested for impairment annually or whenever events or changes in circumstances indicate that the asset might be impaired.

Intangible assets with determinate lives are evaluated for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Amortizable intangible assets generally are amortized on a straight-line basis over periods up to 120 months. The costs to periodically renew our intangible assets are expensed as incurred.

*Impairment of Long-Lived Assets*

The Company periodically evaluates long-lived assets (both intangible assets and property, plant, and equipment) for impairment whenever events or changes in circumstances indicate that a potential impairment may have occurred. If such events or changes in circumstances arise, the Company compares the carrying amount of the long-lived assets to the estimated future undiscounted cash flows expected to be generated by the long-lived assets. If the estimated aggregate undiscounted cash flows are less than the carrying amount of the long-lived assets, an impairment charge, calculated as the amount by which the carrying amount of the assets exceeds the fair value of the assets, is recorded. The fair value of the long-lived assets is determined based on the estimated discounted cash flows expected to be generated from the long-lived asset unless another method provides a more reliable estimate. If an impairment loss is recognized, the adjusted carrying amount of a long-lived asset is recognized as a new cost basis of the impaired asset. Impairment loss is not reversed even if fair value exceeds carrying amount in subsequent periods.

*Extinguishment of Liabilities*

The Company derecognizes financial liabilities when the Company's obligations are discharged, cancelled, or expired.

*Leases*

The Company follows the provisions of ASC 842, "*Leases*", which requires a lessee to recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying leased asset for the lease term. We categorize leases with contractual terms longer than twelve months as either operating or finance. Finance leases are generally those leases that allow us to substantially utilize or pay for the entire asset over its estimated life. All other leases are categorized as operating leases. Lease liabilities are recognized at the present value of the fixed lease payments, reduced by landlord incentives. Lease assets are recognized based on the initial present value of the fixed lease payments, reduced by landlord incentives, plus any direct costs from executing the leases or lease prepayments reclassified upon lease commencement. When we have the option to extend the lease term, terminate the lease before the contractual expiration date, or purchase the leased asset, and it is reasonably certain that we will exercise the option, we consider the option in determining the classification and measurement of the lease. Our leases may include variable payments which are expensed as incurred. Costs associated with operating lease assets are recognized on a straight-line basis within operating expenses over the term of the lease.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Contingencies and Commitments*

The Company follows ASC 440 and ASC 450 to account for contingencies and commitments. Certain conditions, as a result of past events, may exist as of the balance sheet date, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company evaluates the perceived merits of any legal proceedings or unasserted claims as well as the perceived merits of the amount of relief sought or expected to be sought therein.

If the assessment of a contingency indicates that it is probable that a material loss has been incurred and the amount of the liability can be reasonably estimated, then the estimated liability is accrued in the Company's financial statements. If the assessment indicates that a potentially material loss contingency is not probable but is reasonably possible, or is probable but cannot be reasonably estimated, then the nature of the contingent liability, and an estimate of the range of possible losses, if determinable and material, would be disclosed. Legal costs associated with such loss contingencies are expensed as incurred. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

*Accrued Expenses*

Accrued expenses are expenses that have been incurred but not yet paid and are classified within current liabilities on the consolidated balance sheets.

*Revenue Recognition*

The Company's revenue includes revenue from the sale of electric vehicles and is accounted for in accordance with ASC 606, "*Revenue from Contracts with Customers*". The Company applies a five-step analysis to: (i) identify the contract with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when, or as, the Company satisfies a performance obligation. Payments for electric vehicles sales are generally received at or shortly after delivery. Sales tax is excluded from the measurement of the transaction price. The revenue from the sale of electric vehicles is recognized when control of the vehicle is transferred to the customer. In general, the control is transferred at the point of delivery to the customer, signifying the fulfillment of our primary performance obligation under ASC 606. Certain contracts with our dealers contain a return provision, stating that they may return unsold vehicles after 1 year. Since the Company does not have sufficient relevant statistics of returns yet, we defer revenue recognition until the vehicles have been sold by such dealer or until there is sufficient evidence to justify a reasonable estimate for consideration to which the Company expects to be entitled. For any amounts received (or receivable) for which the Company does not recognize revenue when it transfers products to customers, a refund liability is recognized. Relevant vehicles transferred to the dealer are presented as "Finished goods delivered to dealer for distribution" in the consolidated balance sheets at initial cost, less any expected costs to recover those products (including potential decreases in the value to the entity of returned products). At the end of each reporting period, the Company updates the measurement of these assets and refund liabilities. The Company did not generate any significant revenue from its core business operations during the three and six months ended March 31, 2024.

*Cost of Revenues*

The Company's cost of goods sold includes mainly production costs of vehicles sold in the relevant period as well as a provision for expected warranty expenses.

14

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *General and Administrative Expenses*

General and administrative expenses include expenses not related to production, such as salaries and employee benefits, professional fees, rent, repairs and maintenance, utilities and office expense, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, and licenses. Advertising costs are expensed as incurred and are included in general and administrative expenses. Trade show expenses are deferred until occurrence of the future event in accordance with ASC 720-35, "*Other Expenses - Advertising Cost.*" Advertising costs for the three and six months ended March 31, 2024 were approximately $7.3 million and $13.6 million, respectively.

### *Research and Development Costs*

Per ASC 730, *"Research and Development,"* the Company recognizes all research and developments costs in the statement of operations as they occur. These include expenses related to the design, development, testing, and improvement of our electric vehicles and corresponding technologies. Assets with alternative future uses are capitalized and depreciated over their useful lives, with the depreciation expense reported under research and development costs.

### *Share-Based Compensation*

The share-based awards issued by the Company are accounted for in accordance with ASC Subtopic 718-10, "*Compensation - Share Compensation,*" which requires fair value measurement on the grant date and recognition of compensation expense for all shares of common stock of the Company issued to employees, non-employees and directors. Generally, the fair value of awards is estimated based on the market price of the shares of common stock of the Company the day immediately preceding the grant date. The fair value of non-marketable share-based awards (granted to employees before the Company became public) has been estimated based on an independent valuation. The Company recognizes forfeitures of award in the periods they occur.

The overwhelming part of share-based awards to employees per employment contracts, and a certain part of contracts with non-employees (consultants), are classified as equity with costs and additional paid-in capital recognized ratably over the service period. A significant part of the Company's share-based awards to consultants is liability-classified: mainly if the number of shares a consultant is entitled to depends on a certain monetary value fixed in the contract. An accrued part of liability in this case is revaluated each period based on earned portion of the grant and changes in market price of the shares of common stock of the Company, until sufficient number of shares is issued.

The Company has also adopted incentive plans that entitle the Chief Executive Officer to share-based awards generally calculated as 1-3% of then outstanding number of shares of common stock, issuable upon achievement of specific financial and operational targets (milestones) that are supposed to significantly increase value of the Company. This share-based compensation is accrued over the service term when it is probable that the milestone will be achieved. The liability to issue stock (presented within non-current liabilities if the achievement is expected later than 12 months after the balance sheet date) is revalued on every balance sheet date based on the length of the service period, current market price of the common stock and on the number of shares of common stock outstanding - until the shares have been issued, or until fulfilling the milestone requirements becomes unlikely.

15

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Fair Value of Financial Instruments*

We apply fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value on a recurring basis. Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities that are required to be recorded at fair value, Company management considers the principal or most advantageous market in which we would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as risks inherent in valuation techniques, transfer restrictions and credit risk. Fair value is estimated by applying the hierarchy as per requirements of ASC 820, "*Fair value measurements*", i.e.:

- Level 1 - Quoted prices in active markets for identical assets or liabilities.

- Level 2 - Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which all significant inputs are observable or can be derived principally from or corroborated by observable market data for substantially the full term of the assets or liabilities.

- Level 3 - Unobservable inputs to the valuation methodology that are significant to the measurement of fair value of assets or liabilities.

To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement is disclosed and is determined based on the lowest level input that is significant to the fair value measurement.

*Expected credit losses*

The estimation of expected credit losses that may be incurred as we work through the invoice collection process with our customers and other counterparties requires us to make judgments and estimates regarding probability the amounts due to us are going to be paid. We monitor our customers' payment history and current credit worthiness to determine that collectability is reasonably assured. We also consider the overall business climate in which our customers and other counterparties operate. On March 31, 2024 and September 30, 2023, no material allowance for credit losses needed to be recognized to cover anticipated credit losses under current conditions. However, uncertainties regarding changes in the financial condition of our customers, either adverse or positive, could impact the amount and timing of any additional credit losses that may be recognized.

*Concentrations of Credit Risk*

The Company maintains cash balances in several financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Association up to certain federal limitations, generally $250,000. At times, our cash balance may exceed these federal limitations. However, we have not experienced any losses in such accounts and management believes we are not exposed to any significant credit risk on these accounts due to high credit rating of relevant financial institutions. The amounts in excess of insured limits as of March 31, 2024 and September 30, 2023 are $29.0 million and $154.9 million, respectively.

*Accounting Pronouncements*

The Company has implemented all applicable accounting pronouncements that are in effect. The following pronouncements have been recently adopted by the Company:

ASU 2022-04 - *Supplier Finance Program (SFP)*. This ASU requires that a buyer in a SFP disclose qualitative and quantitative information about its program, including the nature of the SFP and key terms, outstanding amounts as of the end the reporting period, and presentation in its financial statements. This pronouncement has not had an impact on the Company's consolidated financial statements.

16

Table of Contents

**MULLEN AUTOMOTIVE INC.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

ASU 2016-13 - *Measurement of Credit Losses on Financial Instruments (CECL).* This guidance, commonly referred to as Current Expected Credit Loss ("CECL"), changes impairment recognition to a model that is based on expected losses rather than incurred losses. The measurement of expected credit losses under the CECL methodology is applicable to financial assets measured at amortized cost, including trade receivables. The Company evaluated and determined the amendment did not have a material effect on the consolidated financial statements.

The following are accounting pronouncements that have been issued but are not yet effective for the Company's consolidated financial statements:

In August 2020, the FASB issued ASU No. 2020-06, *Debt-Debt with Conversion and Other Options* (Subtopic 470-20), and Derivatives and Hedging-Contracts in an Entity's Own Equity (Subtopic 815-40): *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity.* The amendments in ASU No. 2020-06 simplify the complexity associated with applying GAAP for certain financial instruments with characteristics of liabilities and equity. More specifically, the amendments focus on the guidance for convertible instruments and derivative scope exceptions for contracts in an entity's own equity. For smaller reporting companies ASU 2020-06 is effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years. The Company does not expect its application to have a material impact on the Company's consolidated financial statements.

In November 2023, the FASB issued Accounting Standards Update 2023-07-*Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures.* It requires all annual disclosures currently required by ASC 280 to be included in interim periods and requires disclosure of significant segment expenses regularly provided to the chief operating decision maker ("CODM"), a description of other segment items by reportable segment, and applicable additional measures of segment profit or loss used by the CODM when allocating resources and assessing business performance. All public entities will be required to report segment information in accordance with the new guidance starting in annual periods beginning after December 15, 2023. The Company expects to enhance segment reporting disclosures based on new requirements.

In December 2023, the FASB issued ASU No. 2023-09, "*Income Taxes (Topic 740):* Improvements to Income Tax Disclosures." ASU No. 2023-09, which enhances the transparency, effectiveness and comparability of income tax disclosures by requiring consistent categories and greater disaggregation of information related to income tax rate reconciliations and the jurisdictions in which income taxes are paid. The guidance is effective for public business entities for fiscal years beginning after December 15, 2024, with early adoption permitted. The Company expects to enhance income tax disclosures based on new requirements.

Other accounting pronouncements issued but not yet effective are not believed by management to be relevant or to have a material impact on the Company's present or future consolidated financial statements.

**NOTE 4 - SEGMENT INFORMATION**

Our CEO and Chairman of the Board, as the chief operating decision maker, makes decisions about resources to be acquired, allocated and utilized to each operating segment. The Company is currently comprised of 2 major operating segments:

- Bollinger. The Company acquired the controlling interest of Bollinger Motors Inc. (60% on a fully diluted basis) on September 7, 2022. This acquisition positions Mullen into the medium duty truck classes 4-6, along with the Sport Utility and Pick Up Trucks EV segments.

- Mullen/ELMS. By November 30, 2022, Mullen acquired ELMS' manufacturing plant in Mishawaka Indiana and all the intellectual property needed to engineer and build Class 1 and Class 3 electric vehicles.

All long-lived assets of the Company are in the United States of America.

The table below represents main financial information pertaining to the segments (there were no material differences from the last annual report in the basis of segmentation or in the basis of measurement of segment profit or loss).

17

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Segment reporting for the three and six months ended March 31, 2024**

|  | Bollinger | Mullen/ELMS | Total |
|---|---|---|---|
| Revenue for the three months ended March 31, 2024 | $ - | $ 33,335 | $ 33,335 |
| Revenue for the six months ended March 31, 2024 | - | 33,335 | 33,335 |
| Segment's net loss before impairment and income taxes for the three months ended March 31, 2024 | (8,726,290) | (59,339,513) | (68,065,803) |
| Segment's net loss before impairment and income taxes for the six months ended March 31, 2024 | (19,207,967) | (114,577,453) | (133,785,420) |
| Segment's net loss before income taxes for the three months ended March 31, 2024 | (97,232,147) | (76,295,163) | (173,527,310) |
| Segment's net loss before income taxes for the six months ended March 31, 2024 | (107,713,824) | (131,533,103) | (239,246,927) |
| Total segment assets | 60,455,912 | 153,663,837 | 214,119,749 |

**Segment reporting for the three and six months ended March 31, 2023**

|  | Bollinger | Mullen/ELMS | Total |
|---|---|---|---|
| Revenue for the three and six months ended March 31, 2023 | $ - | $ - | $ - |
| Segment's net loss before income taxes for the three months ended March 31, 2023 | (7,853,110) | (109,538,347) | (117,391,457) |
| Segment's net loss before income taxes for the six months ended March 31, 2023 | (13,809,161) | (482,536,695) | (496,345,856) |
| Total segment assets | 252,814,591 | 149,927,637 | 402,742,228 |

**NOTE 5 - INVENTORY**

The Company's inventories are stated at the lower of cost or net realizable value and consist of the following:

| Inventory | March 31, 2024 | September 30, 2023 |
|---|---|---|
| Work in process | $ 4,848,633 | $ 3,136,590 |
| Raw materials | 18,726,440 | 13,733,385 |
| Finished goods | 226,009 | - |
| Finished goods delivered to dealer for distribution | 9,160,642 | 937,322 |
| Less: write-down to net realizable value | - | (1,000,284) |
| **Total Inventory** | **$ 32,961,724** | **$ 16,807,013** |

During the six months ended March 31, 2024, approximately $
0.9 million of the Company's inventories was consumed for R&D activities, which was recognized as part of research and development expense in the consolidated statement of operations.

**NOTE 6 - GOODWILL AND OTHER INTANGIBLE ASSETS**

*Goodwill*

The goodwill in net carrying amount of $
0 and $28,846,832 as of March 31, 2024 and as of September 30, 2023, respectively, and pertains to the Bollinger Motors Inc. acquisition on September 7, 2022. Goodwill is not amortized and is tested for impairment annually, or more frequently if there are indicators of impairment. The Company's management evaluated the goodwill attributable to Bollinger Motors and determined that it was fully impaired.

18

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Upon the quantitative goodwill impairment test, impairment may arise to the extent carrying amount of a reporting unit that includes goodwill (i.e. Bollinger production unit, see *Note 4 - Segment information*) exceeds its fair value. As a result of impairment test performed on March 31, 2024 by management, impairment in amount of $28,846,832 was recognized in the financial statements for the six months ended March 31, 2024, mainly due to the uncertainty of future fundings required to support the business operations of Bollinger Motors and decrease of Company's market capitalization.

*Other intangible assets*

Intangible assets with indefinite useful lives are not amortized but instead tested for impairment. Due to unfavorable market conditions and decline of the market prices of the Company's common stock, we have tested indefinite-lived in-process research and development assets, acquired in September 2022 as part of the Bollinger segment (see *Note 4 - Segment information*), for recoverability on March 31, 2024 and recognized impairment loss in amount of $58,304,612, mainly due to the uncertainty of future fundings required to support the business and decrease of Company's market capitalization.

Intangible assets with finite useful lives are amortized over the period of estimated benefit using the straight-line method. The weighted average useful life of intangible assets is 8.3 years. The straight-line method of amortization represents management's best estimate of the distribution of the economic value of the intangible assets. An impairment loss in amount of $15,142,455 was recognized in respect of the intangible assets of the ELMS/Legacy Mullen segment (engineering designs) during the six months ended March 31, 2024 - mainly due to performance misses compared to the previous budgets. Their accumulated depreciation in amount of $1,057,877 was derecognized in correspondence with initial cost to present the new cost basis of these assets in accordance with ASC 350-30.

| | March 31, 2024 | | | September 30, 2023 | | |
|---|---|---|---|---|---|---|
| | Cost Basis | Accumulated Amortization | Net Carrying Amount | Cost Basis | Accumulated Amortization | Net Carrying Amount |
| **Finite-Lived Intangible Assets** | | | | | | |
| Patents | $ 32,447,460 | $ (5,072,512) | 27,374,948 | $ 31,708,460 | $ (3,445,694) | $ 28,262,766 |
| Engineering designs | - | - | - | 16,200,332 | (184,274) | 16,016,058 |
| Other | 745,947 | (233,389) | 512,558 | 745,947 | (158,590) | 587,357 |
| Trademarks | 1,095,693 | (170,616) | 925,077 | 1,180,138 | (115,682) | 1,064,456 |
| Total finite-lived intangible assets | 34,289,100 | (5,476,517) | 28,812,583 | 49,834,877 | (3,904,240) | 45,930,637 |
| **Indefinite-Lived Intangible Assets** | | | | | | |
| In-process research and development assets | $ - | $ - | $ - | $ 58,304,612 | $ - | $ 58,304,612 |
| Total indefinite-lived intangible assets | - | - | - | 58,304,612 | - | 58,304,612 |
| **Total Intangible Assets** | $ 34,289,100 | $ (5,476,517) | $ 28,812,583 | $ 108,139,489 | $ (3,904,240) | $ 104,235,249 |

Total future amortization expense for finite-lived intangible assets is as follows:

| Years Ended September 30, | Future Amortization |
|---|---|
| 2024 (6 months) | $ 1,746,953 |
| 2025 | 3,503,505 |
| 2026 | 3,503,505 |
| 2027 | 3,493,695 |
| 2028 | 3,363,505 |
| Thereafter | 13,201,420 |
| **Total Future Amortization** | $ 28,812,583 |

For the three and six months ended March 31, 2024, amortization of the intangible assets was $1,310,278 and $2,630,155, and it was $763,269 and $3,519,973 for the three and six months ended March 31, 2023, respectively.

19

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 7 - DEBT**

*Short and Long-Term Debt*

Short-term debt is defined as debt with principal maturities of one year or less, long-term debt has maturities greater than one year.

The following is a summary of our indebtedness as of March 31, 2024:

| | Net Carrying Value | | | | |
| | Unpaid Principal | | | Contractual | Contractual |
| Type of Debt | Balance | Current | Long-Term | Interest Rate | Maturity |
|---|---|---|---|---|---|
| Matured notes | $ 2,385,004 | $ 2,385,004 | $ - | 0.00 - 10.00% | 2019 - 2021 |
| Loan advances | 332,800 | 332,800 | - | 0.00 - 10.00% | 2016 - 2018 |
| Total Debt | $ 2,717,804 | $ 2,717,804 | $ - | | |

The following is a summary of our indebtedness as of September 30, 2023:

| | Net Carrying Value | | | | |
| | Unpaid Principal | | | Contractual | Contractual |
| Type of Debt | Balance | Current | Long-Term | Interest Rate | Maturity |
|---|---|---|---|---|---|
| Matured notes | $ 2,398,881 | $ 2,398,881 | $ - | 0.00 - 10.00% | 2019 - 2021 |
| Real estate note | 5,000,000 | 5,000,000 | - | 8.99% | 2024 |
| Loan advances | 332,800 | 332,800 | - | 0.00 - 10.00% | 2016 - 2018 |
| Less: debt discount | (270,189) | (270,189) | - | | |
| Total Debt | $ 7,461,492 | $ 7,461,492 | $ - | | |

*Scheduled Debt Maturities*

The following are scheduled debt maturities as of March 31, 2024:

| | Year Ended September 30, | | | | | |
| | 2024 (6 months) | 2025 | 2026 | 2027 | 2028 | Total |
|---|---|---|---|---|---|---|
| Total Debt | $ 2,717,804 | $ - | $ - | $ - | $ - | $ 2,717,804 |

*Accrued interest*

As of March 31, 2024 and September 30, 2023, accrued interest on outstanding notes payable was $ 1,683,720 and $1,548,723, respectively.

*NuBridge Commercial Lending LLC Promissory Note*

On March 7, 2022, the Company's wholly owned subsidiary, Mullen Investment Properties, LLC, entered into a Promissory Note (the "Promissory Note") with NuBridge Commercial Lending LLC for a principal amount of $5 million. The Promissory Note bore interest at a fixed rate of 8.99% per annum and the principal amount was due March 1, 2024. Collateral for the loan included the title to the Company's property at 1 Greentech Drive, Tunica, MS. Under the Promissory Note, prepaid interest and issuance costs of $1,157,209 were withheld from the principal and recorded as debt discount, which was amortized over the term of the Promissory Note. In January 2024, the loan was paid by the Company in full, and the collateral was released.

20

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Drawbridge and Amended A&R Note with Esousa*

On October 14, 2022, the Company entered into an Amended and Restated Secured Convertible Note and Security Agreement (the "A&R Note") with Esousa Holdings LLC ("Esousa"), including principal of $1,032,217 (net of debt discount of $64,570) and accrued interest of $316,127 along with the liability to issue 467 shares of common stock (having a then carrying value of $10,710,000) and an obligation to compensate for the losses from market value decline of shares were exchanged for a new convertible note payable with a face value of $12,945,914 and 1,022 shares of common stock (having a fair value of $5,524,600), resulting in a loss on extinguishment of $6,452,170. On November 1, 2022, the A&R Note payable to Esousa, inclusive of accrued interest, was converted into 2,758 shares of common stock.

*Non-convertible secured promissory note*

On December 18, 2023, Mullen entered into a Debt Agreement to issue a non-convertible secured promissory note (the "Note") with a principal amount of $50 million, purchased for $32 million, reflecting an $18 million original issue discount. The Note, which did not include conversion rights, stock, warrants, or other securities, aimed to raise capital for the Company's manufacturing operations. The issuance of this non-convertible Note was expected on the first trading day when all closing conditions are met. The $18 million original issue discount was considered a settlement cost related to a dispute over financings that occurred during the fiscal year ended September 30, 2023. The $18 million settlement cost has been accrued as of September 30, 2023 and is included as accrued expenses and other liabilities at March 31, 2024 and September 30, 2023. The Note contemplated 10% annual interest, escalating to 18% post-Event of Default. It would mature three months post-issuance. The Note's terms allowed for accelerated repayment upon default, requiring the Company to pay the principal, accrued interest, and other due amounts. The Note was supposed to be secured by the Company's assets and imposes restrictions on the Company, limiting additional debt, asset liens, stock repurchases, outstanding debt repayment, and affiliate transactions, except for specified exceptions. It mandated prepayment of the principal from net proceeds of any subsequent financing. The funds contemplated by the Debt Agreement have not been received and, on May 7, 2024, the Debt Agreement has been terminated.

*Convertible Notes*

On November 14, 2022, the Company entered into Amendment No. 3 ("Amendment No. 3") to the June 7, 2022, Securities Purchase Agreement (as amended, the "Series D SPA"). The investors paid $150 million and, in lieu of receiving shares of Series D Preferred Stock and warrants, the investors received notes convertible into shares of the Company's common stock ("Notes") and warrants.

Amendment No. 3 further provided that the remaining $90 million of the commitment amount will be paid in the first half of 2023 in two tranches. The purchase price per share of Series D Preferred Stock would be the lower of (i) $1.27 ($28,575 after reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*), the closing price of the Company's stock on the date the Securities Purchase Agreement was executed, or (ii) the closing price of the common stock on the trading day immediately preceding the respective purchase date, subject to a floor price of $0.10 per share. For no additional consideration, for every share of Series D Preferred Stock purchased, investors received warrants to purchase shares of common stock equal to 185% of the number of shares of Series D Preferred Stock purchased by the investors at an exercise price equal to the purchase price for shares of Series D Preferred Stock (the warrants also permit cashless exercise). The Company exercised its right and received these investments in April and June 2023, see *Note 8 - Warrants and Other Derivative Liabilities and Fair Value Measurements.*

21

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On November 15, 2022, the Company issued the unsecured convertible Notes aggregating $150,000,000 in lieu of Series D Preferred Stock. The Notes bore interest at 15% and were convertible into shares of common stock either: (A) at the option of the noteholder at the lower of: (i) $0.303 (to be adjusted to stock splits); or (ii) the closing price of our common stock on January 3, 2023; or (B) mandatorily on November 21, 2022 at the lower of: (i) $0.303 ($6,818 after reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*); or (ii) the closing price of our common stock on November 18, 2022, provided adequate unissued authorized shares were available. For each share issued upon conversion, the holders were entitled to 1.85 times as many five-year warrants with an exercise price equal to the conversion price for the Notes.

As a result, and since the Company had an insufficient number of authorized shares available to settle potential future warrant exercises, the Company recognized a derivative liability of $244,510,164 for the warrants with a corresponding increase in debt discount of $150,000,000 and interest expense of $94,510,164 (presented combined in the Statement of Operations as "Other financing costs - initial recognition of derivative liabilities"). The debt discount was amortized over the term of the Note through the date the convertible notes were mandatorily convertible. Accordingly, the entire amount was expensed in the first quarter of the year ended September 30, 2023. On November 21, 2022, principal of $59,402,877 was mandatorily converted into 9,815 shares of common stock.

On December 23, 2022, the Company defaulted on the Notes by not having sufficient authorized shares to allow for both the Notes to be fully converted and the warrants to be exercised. On January 13, 2023, the Company entered into a Settlement Agreement and Release in which investors waived the default prior to February 1, 2023. In exchange, the Company granted the investors the right to purchase additional shares of Series D Preferred Stock and warrants in an amount equal to such investor's pro rata portion of $10 million. This right expired on June 30, 2023.

During February 2023, the remaining balance of the Notes (with the principal of $90,362,418) and accrued interest (in amount of $3,456,941) were converted by the holders into 13,762 shares of common stock. See *Note 8 - Warrants and Other Derivative Liabilities and Fair Value Measurements* with regards to warrants issued upon conversion of these Notes.

**NOTE 8 - WARRANTS AND OTHER DERIVATIVE LIABILITIES AND FAIR VALUE MEASUREMENTS**

ASC 825-10 defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

**Financial Instruments at Carrying Value That Approximated Fair Value**

Certain financial instruments that are not carried at fair value on the consolidated balance sheets are carried at amounts that approximate fair value, due to their short-term nature and credit risk. These instruments include cash and cash equivalents, accounts payable, and debt. Accounts payable are short-term in nature and generally are due upon receipt or within 30 to 90 days.

**Non-Financial Assets Measured at Fair Value on a Non-Recurring Basis**

Non-financial assets are only required to be measured at fair value when acquired as a part of business combination or when an impairment loss is recognized. See *Note 14 - Property, Plant, and Equipment* and *Note 6 -Goodwill and Other Intangible Assets* for further information. All these valuations are based on Level 3 - Unobservable inputs to the valuation methodology that are significant to the measurement of fair value of these assets or liabilities.

22

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Financial Liabilities Measured at Fair Value on a Recurring Basis**

During six months ended March 31, 2024 and 2023, the Company had the following financial liabilities measured at fair value on a recurring basis:

*Preferred C Warrants*

The warrants, which were exercisable for common stock, issued in connection with the sale of Series C Preferred Stock (the "Preferred C Warrants") in accordance with the November 2021 Merger Agreement and further amendments, had an exercise price per share of $8.834 (after the reverse stock splits - $198,765) and a cashless exercise option based on certain formula established by relevant contracts.

These warrant liabilities were recognized as liabilities due to requirements of ASC 480 because the variable number of shares to be issued upon cashless exercise (which was deemed to be the predominant exercise option) was based predominantly on a fixed monetary value. At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants was marked-to-market value and the resulting gain or loss was recorded.

During the quarter ended December 31, 2022, remaining 132 Preferred C Warrants that were outstanding as of September 30, 2022 were fully exercised on a cashless basis.

*Preferred D Warrants*

In accordance with Series D SPA (see *Note 7 - Debt*) for every share of Series D Preferred Stock purchased, the investors received 185% (for the final $100 million voluntary investment right expiring June 30, 2023 - 110%) warrants (the "Preferred D Warrants") exercisable for shares of common stock at an exercise price equal to the lower of (i) $1.27 (after the reverse stock splits - $28,575) or (ii) the market price of common stock on the trading day immediately preceding the purchase notice date. The Preferred D Warrants are exercisable during a five-year period commencing upon issuance. The contracts for the Preferred D Warrants contain cashless exercise provisions similar to Preferred C Warrants described above. Therefore, management applied similar accounting treatment to recognition, measurement, and presentation of the warrant liabilities.

In September 2022, the Company received an initial investment amount of $35 million (exercise price was $ 0.4379, or $9,853 after reverse stock splits) and issued to investors 79,926,925 shares of Series D Preferred Stock, and 263 Preferred D Warrants (hereinafter warrants and shares of common stock are presented giving effect to the reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*).

By September 30, 2022, no Preferred D Warrants were exercised, and all Preferred D Warrants remained outstanding with the fair value on September 30, 2022 in the amount of $55,398,551.

During the quarter ended December 31, 2022, all initial Preferred D Warrants were exercised on a cashless basis for 10,182 shares of common stock.

In November 2022, the Company received $150,000,000 and issued, in lieu of Series D Preferred Stock, notes convertible into shares of common stock and Preferred D Warrants. As a result of the conversion of the convertible debt into shares of common stock in November 2022 and February 2023, 43,616 Preferred D Warrants were issued. By June 30, 2023, all these Preferred D Warrants were exercised on a cashless basis for 93,664 shares of common stock.

23

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

During April 2023, we exercised our investment rights under the Series D SPA and requested an additional $45 million (exercise price was $0.1 or $2,250 after reverse stock splits) issuing to investors: 273,363,635 Series D Preferred Stock, 7,851 shares of common stock (in lieu of Series D Preferred Stock), and 37,000 Preferred D Warrants (post reverse stock split). The warrant liability recognized initially amounted to $73,260,454. By June 30, 2023, all these Preferred D Warrants were exercised on a cashless basis for 147,672 shares of common stock (post reverse stock split).

In June 2023, we exercised the second half of our investment right for $45 million (exercise price was $0.432 or $388.8 after reverse stock splits) and, in lieu of Series D Preferred Stock, investors received: 60,778 shares of common stock and 54,962 prefunded warrants exercisable for one share of common stock each, as well as 214,120 Preferred D Warrants.

In June 2023, one of the investors exercised their investment rights and invested $7 million (exercise price was $0.52 or $468 after reverse stock splits). The Company issued, in lieu of Series D Preferred Stock, 14,957 shares of common stock and 27,671 Preferred D Warrants.

Final voluntary investment rights under the Series D SPA were exercised by the pool of investors in June 2023 and the Company received $100 million (exercise price was $0.1601, or $144.09 after reverse stock splits, for majority of investors, and $0.1696, or $152.64 after reverse stock splits, for one investor), issuing to investors, in lieu of Series D Preferred Stock: 183,731 shares of common stock and 508,159 prefunded warrants exercisable for one share of common stock each, as well as 761,079 Preferred D Warrants.

The warrant liability recognized in June 2023 upon initial accounting of these investments amounted to $254,962,776. By September 30, 2023, a part of these prefunded warrants and Preferred D Warrants was exercised on a cashless basis for 2,194,413 shares of common stock (post reverse stock splits).

As of September 30, 2023, none of prefunded warrants and 382,436 Preferred D Warrants (recognized as liability in the consolidated balance sheets) exercisable into 1,438,009 shares of common stock with fair value of $64,739,175 remained outstanding.

During the three months ended December 31, 2023, a part of remaining Preferred D Warrants were exercised on a cashless basis for 2,020,152 shares of common stock (post reverse stock splits). During the three months ended March 31, 2023, a part of remaining Preferred D Warrants was exercised on a cashless basis for 1,220,615 shares of common stock.

As of March 31, 2023, 18,898 Preferred D Warrants (recognized as liability in the consolidated balance sheets) exercisable into 1,070,499 shares of common stock with fair value of $5,122,610 remained outstanding and their exercise (on a cash or cashless basis) was available to investors for a period of approximately 4.2 years.

After the balance sheet date and by the date these financial statements were available to be issued, all remaining Preferred D Warrants were exercised on a cashless basis and there are no more Preferred D Warrants outstanding.

The fair value of warrant obligations is calculated based on the number and market value of shares that can be issued upon exercise of the warrants. The number of shares to be issued in accordance with relevant agreements is variable and depends on (i) lowest closing market price of shares for 2 days before the exercise, and (ii) multiplicator calculated based on Black Scholes formula where all elements, except for risk-free rate, are fixed on the investment date. Accordingly, the fair value of warrants on recognition date and on subsequent dates was estimated as a maximum of (i) Black Scholes value for cash exercise of relevant warrants and (ii) current market value of the number of shares the Company would be required to issue upon cashless warrant exercise on a relevant date in accordance with warrant contract requirements. The latter valuation, based on observable inputs (level 2), has been higher and reflects the pattern of the warrants exercise since the inception of the Series D SPA.

At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants is marked-to-market value and the resulting gain or loss is recorded in consolidated statement of operations as a "Gain / (loss) on derivative liability revaluation".

24

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

All the warrants mentioned in this section provide that if the Company issues or sells, enters into a definitive, binding agreement pursuant to which the Company is required to issue or sell or is deemed, pursuant to the provisions of the warrants, to have issued or sold, any shares of common stock for a price per share lower than the exercise price then in effect, subject to certain limited exceptions, then the exercise price of the warrants shall be reduced to such lower price per share. In addition, the exercise price and the number of shares of common stock issuable upon exercise of the warrants are subject to adjustment in connection with stock splits, dividends or distributions or other similar transactions.

*Other derivative liabilities*

Other derivative liabilities recognized and remeasured subsequently at fair value include: embedded derivatives issued with convertible notes (primarily, conversion option), and preferred stock that failed equity presentation when the Company had insufficient number of authorized shares available to settle all potential future conversion transactions, automatic increase in interest rate upon an event of default, and optional conversion feature that were not clearly and closely related to the economic characteristics and risks of a debt host. These derivative liabilities were initially recognized on November 15, 2022, when the Company entered into Amendment No. 3 to the Series D SPA (see *Note 7 - Debt*) having an insufficient number of authorized shares of common stock available for issuance upon conversion of preferred stock and convertible notes payable and the exercise of outstanding warrants. They were carried at fair value and have been reclassified to equity respectively upon final conversion of the Notes, and upon authorization of increase of common stock available for issuance by stockholders of the Company during the three months ending March 2023.

*Qiantu Warrants*

On March 14, 2023, the Company entered into an Intellectual Property and Distribution Agreement (the "IP Agreement") with Qiantu Motor (Suzhou) Ltd., and two of Qiantu Suzhou's affiliates (herein "Qiantu"). Pursuant to the IP Agreement, Qiantu granted the Company the exclusive license to use certain of Qiantu's trademarks and the exclusive right to assemble, manufacture, and sell the homologated vehicles based on the Qiantu K-50 model throughout North America and South America for a period of five years (see *Note 19* for more details). These rights will be obtained and the commitment will only be effective upon the Company's assessment of feasibility and profitability of the project.

As a part of consideration for the Company's entry into the IP Agreement, the Company issued to Qiantu USA warrants to purchase up to 3,334 (giving effect to the reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*) shares of the Company's common stock (the "Qiantu Warrants").

The Qiantu warrants, per contract, are exercisable at Qiantu USA's discretion at any time from September 30, 2023 up to and including September 30, 2024 at 110% of the market price of the Company's common stock at the close of trading on the earlier of (a) when the Company completes its obligations to its Series D Preferred Stock investors; or (b) June 15, 2023, so their exercise price is $234 (giving effect to the reverse stock splits). The Qiantu Warrants have anti-dilution provisions similar to those described above, but they provide for exemption for Series D Preferred Stock transactions rights and obligations that existed on the date the Qiantu Warrants were issued.

As it was expected that the Company may not have a sufficient number of authorized shares of common stock available for issuance during the term of the contract (up to September 2024), and the shares to be issued upon possible exercise of warrants have not been registered, the Qiantu Warrants were recognized at fair value on inception ($6,814,000) and on each subsequent period end. Due to decline in market price of shares the fair value of Qiantu Warrants on September 30, 2023 decreased to $124,134, and on March 31, 2024 to $1,876. The difference has been recognized within gains (losses) on derivative liabilities revaluation in the consolidated statements of operations.

Upon issuance and upon revaluation of the instruments, the Company estimated the fair value of these derivatives using the Black-Scholes Pricing Model and binomial option valuation techniques based on the following assumptions: (1) dividend yield of 0%, (2) expected annualized volatility of 198-222%, and (3) risk-free interest rate of 4.3% to 4.7%. These liabilities are classified as having significant unobservable inputs (level 3) in the table below.

25

Table of Contents

**MULLEN AUTOMOTIVE INC.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Breakdown of items recorded at fair value on a recurring basis in consolidated balance sheets by levels of observable and unobservable inputs as of March 31, 2024 and on September 30, 2023 is presented below:

| | March 31, 2024 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Derivative liability | $ 5,124,487 | $ - | $ 5,122,611 | $ 1,876 |

| | September 30, 2023 | Quoted Prices in Active Markets for Identical Assets (Level 1 ) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Derivative liability | $ 64,863,309 | $ - | $ 64,739,175 | $ 124,134 |

A summary of all changes in warrants and other derivative liabilities is presented below:

| | |
|---|---|
| **Balance, September 30, 2023** | $ 64,863,309 |
| Loss / (gain) on derivative liability revaluation | 3,106,223 |
| Reclassification to liability to issue shares upon unfinished warrant exercise on period end | (3,680,006) |
| Conversions of warrants into common shares | (59,165,039) |
| **Balance, March 31, 2024** | $ 5,124,487 |
| | |
| **Balance, September 30, 2022** | $ 84,799,179 |
| Derivative liabilities recognized upon issuance of convertible instruments | 251,324,164 |
| Derivative liability upon authorized shares shortfall | 11,978,166 |
| Loss / (gain) on derivative liability revaluation | 89,221,391 |
| Reclassification of derivative liabilities to equity upon authorization of sufficient common shares | (47,818,882) |
| Financing loss upon over-issuance of shares from warrants | 8,934,892 |
| Receivables upon over-issuance of shares from warrants | 17,721,868 |
| Reclassification to liability to issue shares upon unfinished warrant exercise on period end | (55,106,287) |
| Conversions of warrants into common shares | (330,199,230) |
| **Balance, March 31, 2023** | $ 30,855,261 |

**NOTE 9 - STOCKHOLDERS' EQUITY**

**Common Stock**

At a special meeting on January 25, 2023, stockholders approved the proposal to increase the Company's authorized common stock capital from 1.75 billion to
5 billion shares. At March 31, 2024, the Company had 5 billion shares of common stock authorized with $0.001 par value per share.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As described in detail in the *Note 1 - Description of Business and Basis of Presentation* above, by December 31, 2023, the Company has effectuated a series of reverse stock splits. All stock splits resulted in reduction of shares of common stock issued and outstanding and did not affect authorized common stock or preferred stock. The Company had 7,974,442 and 2,871,707 shares of common stock (post reverse stock splits) issued and outstanding on March 31, 2024 and September 30, 2023, respectively.

The holders of common stock are entitled to one vote for each share of common stock held at all meetings of stockholders. In the event of a liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, the common stockholders are entitled to receive the remaining assets following distribution of liquidation preferences, if any, to the holders of our preferred stock. The holders of common stock are not entitled to receive dividends unless declared by our Board. To date, no dividends have been declared or paid to the holders of common stock.

When the Company receives a warrant exercise notice or preferred stock conversion notice close to the balance sheet date, and issues relevant order to a transfer agent, which is effectively exercised only after the balance sheet date, relevant shares of common stock are presented in the balance sheet as common stock owed but not issued.

**Change in Control Agreements**

On August 11, 2023, the Board of Directors approved, and the Company entered, Change in Control Agreements with each non-employee director and Chief Executive Officer. Pursuant to the Change in Control Agreements with each non-employee director, upon a change in control of the Company, any unvested equity compensation will immediately vest in full and such non-employee director will receive $5 million. Pursuant to the Agreement with CEO, upon a change in control of the Company, any unvested equity compensation will immediately vest in full and CEO will receive an aggregate percentage of the transaction proceeds as follows: 10% of the transaction proceeds that are up to and including $1 billion; plus, an additional 5% of transaction proceeds that are more than $1 billion and up to $1.5 billion; and an additional 5% of transaction proceeds that are more than $1.5 billion. A change in control, as defined in the agreements occurs upon (i) any person becoming the beneficial owner of 50% or more of the total voting power of the Company's then outstanding voting securities, (ii) a change in the composition of the Board, as a result of which fewer than a majority of the directors are Incumbent Directors (as defined in the Change in Control Agreements), or (iii) the consummation of a merger or consolidation of the Company (except when the total voting power of the Company continues to represent at least 50% of the surviving entity), any liquidation, or the sale or disposition by the Company of all or substantially all of its assets.

**Preferred Stock**

Under the terms of our Certificate of Incorporation, the Board may determine the rights, preferences, and terms of our authorized but unissued shares of Preferred Stock. Pursuant to the terms of its Second Amended and Restated Certificate of Incorporation, as amended, upon conversion of shares of Preferred Stock, such shares so converted are cancelled and not issuable. As of July 26, 2022, as a result of an amendment to its Certificate of Incorporation increasing its authorized Preferred Stock, the Company had 500,000,000 shares of Preferred Stock authorized with $0.001 par value per share, and as of March 31, 2024, pursuant to its terms of Preferred Stock conversion, the Company had remaining 127,474,455 shares of Preferred Stock authorized. The reverse stock splits (see *Note 1 - Description of Business and Basis of Presentation* above) did not affect the number of shares of Preferred Stock authorized and outstanding, but the conversion ratios were proportionately adjusted to decrease the number of shares of common stock to be issued as a result.

The Company has designated Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock, and Series AA Preferred Stock, which has been cancelled.

On May 1, 2024, in connection with the adoption of a Rights Agreement, the Company filed a Certificate of Designation setting forth the rights, powers and preferences of Series A-1 Junior Participating Preferred Stock par value $0.001 per share, see *Note 21 - Subsequent Events* for further details.

There were no transactions with Preferred Stock during the six months ended March 31, 2024.

27

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Transactions with Preferred Stock during the three and six months ended March 31, 2023 are presented below:

| | Preferred Stock Total | | Preferred Stock Series A | | Preferred Stock Series C | | Preferred Stock Series D | | Preferred Stock Series AA | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Balance, September 30, 2022** | 5,721,897 | $ 5,722 | 1,924 | $ 2 | 1,360,321 | $ 1,360 | 4,359,652 | $ 4,360 | - | $ - |
| Issuance of common stock for conversion of preferred stock and dividends | (4,145,617) | (4,146) | (499) | (1) | (148,564) | (148) | (3,996,554) | (3,997) | - | - |
| Preferred shares series AA issued to officers | 1 | - | - | - | - | - | - | - | 1 | - |
| Preferred shares series AA refund | (1) | - | - | - | - | - | - | - | (1) | - |
| **Balance, March 31, 2023** | 1,576,280 | $ 1,576 | 1,425 | $ 1 | 1,211,757 | $ 1,212 | 363,098 | $ 363 | - | $ - |
| | | | | | | | | | | |
| **Balance, January 1, 2023** | 1,576,780 | $ 1,577 | 1,924 | $ 2 | 1,211,757 | $ 1,212 | 363,098 | $ 363 | 1 | $ - |
| Issuance of common stock for conversion of preferred stock and dividends | (499) | (1) | (499) | (1) | - | - | - | - | - | - |
| Preferred shares series AA refund | (1) | - | - | - | - | - | - | - | (1) | - |
| **Balance, March 31, 2023** | 1,576,280 | $ 1,576 | 1,425 | $ 1 | 1,211,757 | $ 1,212 | 363,098 | $ 363 | - | $ - |

**Redemption Rights**

The shares of Preferred Stock are not subject to mandatory redemption.

The Series C Preferred Stock and Series D Preferred Stock are voluntarily redeemable by the Company in accordance with the following schedule, provided that the issuance of shares of common stock issuable upon conversion has been registered and the registration statement remains effective:

Year 1: No Redemption
Year 2: Redemption at 120% of the Redemption Price
Year 3: Redemption at 115% of the Redemption Price
Year 4: Redemption at 110% of the Redemption Price
Year 5: Redemption at 105% of the Redemption Price
Year 6 and thereafter: Redemption at 100% of the Redemption Price

The Series C Preferred Stock and Series D Preferred Stock are redeemable by the Company for a Redemption price per share equal to the Issue Price ($8.84 for Series C Preferred Stock and $0.4379 for remaining Series D Preferred Stock), plus all unpaid accrued and accumulated dividends on such share (whether or not declared), provided: (A) the Preferred Stock has been issued and outstanding for a period of at least one year, (B) the issuance of the shares of common stock underlying the Preferred Stock has been registered pursuant to the Securities Act and such registration remains effective, and (C) the trading price for the common stock is less than the Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market.

**Dividends**

The holders of Series A and Series B Preferred Stock are entitled to non-cumulative dividends if declared by the Board of Directors. The holders of the Series A Preferred Stock and Series B Preferred Stock participate on a pro rata basis (on an "as converted" basis to common stock) in any cash dividend paid on common stock. No dividends have been declared or paid during three and six months ended March 31, 2024 and 2023.

28

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Series C Preferred Stock originally provided for a cumulative 15.0% per annum fixed dividend on the Series C Original Issue Price plus unpaid accrued and accumulated dividends. On January 13, 2023, the Company and holders of Series C Preferred Stock entered into a waiver agreement pursuant to which such holders irrevocably waived their right to receive any and all cumulative 15.0% per annum fixed dividends on such Preferred Stock, including all unpaid accrued and accumulated dividends.

The Series D Preferred Stock bears a 15.0% per annum fixed dividend accumulated and compounded monthly, payable no later than the 5th day after the end of each month on the Series D Original Issue Price plus unpaid accrued and accumulated dividends. Dividends on the Series D Preferred Stock are payable prior to any dividends on any other series of Preferred Stock or the common stock. The amount of Series D Preferred Stock dividends accumulated as of March 31, 2024 was approximately $0.4 million.

The Company may elect to pay dividends for any month with a payment-in-kind ("PIK") election if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of NASDAQ and (iii) the average daily trading dollar volume of the Company's common stock for 10 trading days in any period of 20 consecutive trading days on the NASDAQ is equal to or greater than $27.5 million.

**Liquidation, Dissolution, and Winding Up**

In the event of any Liquidation Event, the holders of the Series D Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series D Original Issue Price ($0.4379 per share in respect of the outstanding Series D Preferred Stock) plus declared but unpaid dividends (none declared but unpaid dividends on March 31, 2024 and 2023).

In the event of any Liquidation Event, the holders of the Series B Preferred Stock will be entitled to receive, after full execution of rights of the Series D Preferred Stock holders, and prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series B Original Issue Price plus declared but unpaid dividends (none declared but unpaid dividends on March 31, 2024 and 2023).

Upon the completion of a distribution pursuant to a Liquidation Event to the Series D Preferred Stock and Series B Preferred Stock, the holders of the Series C Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Series A Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series C Original Issue Price ($8.84 per share) plus declared but unpaid dividends (none declared but unpaid dividends on March 31, 2024 and 2023).

Upon the completion of a distribution pursuant to a Liquidation Event to the Series D Preferred Stock, Series B Preferred Stock and Series C Preferred Stock, the holders of Series A Preferred Stock are entitled to receive, prior and in preference to any distribution of any proceeds to the holders of the common stock, by reason of their ownership thereof, $1.29 per share of each share of the Series A Preferred Stock, plus declared but unpaid dividends on such share (none declared but unpaid dividends on March 31, 2024 and 2023). "Liquidation Event" is as defined in the Certificate of Incorporation and, subject to certain exceptions, includes a sale or other disposition of all or substantially all of the Company's assets, certain mergers, consolidations and transfers of securities, and any liquidation, dissolution or winding up of the Company.

**Conversion**

Each share of Series A Preferred Stock is convertible at any time at the option of the holder into 0.0046 (giving effect to the reverse stock splits - see *Note 1 - Description of Business and Basis of Presentation*) shares of fully paid and non-assessable shares of common stock (rounding up to the nearest share).

29

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Each share of Series B Preferred Stock and each share of Series C Preferred Stock are convertible at the option of the holder at any time into such number of shares of common stock as is determined by dividing the Issue Price by the relevant Conversion Price (in each case, subject to adjustment). As of March 31, 2024, there were no shares of Series B Preferred Stock issued and outstanding. As of March 31, 2024, each share of Series C Preferred Stock is convertible into 0.000045 (giving effect to the reverse stock split - see *Note 1 - Description of Business and Basis of Presentation*) shares of fully paid and nonassessable shares of common stock (rounding up to the nearest share).

Each share of Series C Preferred Stock will automatically be converted into shares of common stock at the applicable conversion rate at the time in effect immediately upon (A) the issuance of shares of common stock underlying the Series C Preferred Stock being registered pursuant to the Securities Act of 1933 and such registration remaining effective, (B) the trading price for the Company's common stock being more than two times the Series C Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's common stock during such 20 trading days is equal to or greater than $4.0 million.

The Series D Preferred Stock is convertible at the option of each holder at any time into the number of shares of common stock determined by dividing the Series D Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series D Conversion Price, subject to adjustment as set in the Certificate of Designation. As of March 31, 2024, each share of Series D is convertible into 0.000047 (giving effect to the reverse stock split - see *Note 1 - Description of Business and Basis of Presentation*) shares of fully paid and nonassessable shares of common stock (rounding up to the nearest share).

Each share of Series D Preferred Stock will automatically be converted into shares of common stock at the applicable Conversion Rate at the time in effect immediately upon (A) the issuance of shares of common stock underlying the Series D Preferred Stock being registered pursuant to the Securities Act and such registration remaining effective, (B) the trading price for the Company's common stock being more than two times the Series D Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's common stock during such 20 trading days is equal to or greater than $27.5 million.

**Voting Rights**

The holders of shares of common stock and Series A, Series B and Series C Preferred Stock at all times vote together as a single class on all matters (including the election of directors) submitted to a vote of the stockholders; provided, however, that, any proposal which adversely affects the rights, preferences and privileges of the Series A Preferred Stock, Series B Preferred Stock, or Series C Preferred Stock, as applicable, must be approved by a majority in interest of the affected series of Preferred Stock, as the case may be.

Each holder of common stock, Series B Preferred Stock and Series C Preferred Stock has right to one vote for each share of common stock into which such Series B Preferred Stock and/or Series C Preferred Stock, as applicable, could be converted. Each holder of Series A Preferred has the right to 1,000 votes per share held of record by such holder (this right will terminate on November 5, 2024).

The holders of Series D Preferred Stock have no voting rights except for protective voting rights (one vote for each share) in such cases as approval of a liquidation event, authorization of issue of securities having a preference over or parity with the Series D Preferred Stock with respect to dividends, liquidation, redemption or voting, entering a merger or consolidation, etc.

**Series AA Preferred Stock**

The Series AA Certificate of Designation, filed in November 2022, provided that the Series AA Preferred Stock would have 57,778 votes (giving effect to reverse stock splits, see *Note 1 - Description of Business and Basis of Presentation*) per share of Series AA Preferred Stock and would vote together with the outstanding shares of the Company's common stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock as a single class exclusively with respect to any proposal to adopt an amendment to the Company's Second Amended and Restated Certificate of Incorporation to effect a reverse stock split of the Company's common stock. The Preferred Stock otherwise had no voting rights except as otherwise required by the General Corporation Law of the State of Delaware.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Series AA Preferred Stock was not convertible into, or exchangeable for, shares of any other class or series of stock or other securities of the Company. The Series AA Preferred Stock had no rights with respect to any distribution of assets of the Company, including upon a liquidation, bankruptcy, reorganization, merger, acquisition, sale, dissolution or winding up of the Company, whether voluntarily or involuntarily. The holder of the Series AA Preferred Stock was not entitled to receive dividends of any kind. On November 14, 2022, the Company entered into a Subscription and Investment Representation Agreement with David Michery, its Chief Executive Officer, pursuant to which the Company issued and sold one share of the Company's Series AA Preferred Stock for $25,000 in cash. In January 2023, the outstanding share of Series AA Preferred Stock was redeemed for $25,000, upon the approval by the Company's stockholders of an amendment to the Certificate of Incorporation to implement a reverse stock split (see *Note 1 - Description of Business and Basis of Presentation*) and the Company filed a certificate of cancellation of the Series AA Preferred Stock.

**NOTE 10 - LOSS PER SHARE**

Earnings per common share ("EPS") is computed by dividing net income allocated to common stockholders by the weighted-average shares of common stock outstanding. Diluted EPS is computed by dividing income allocated to common stockholders plus dividends on dilutive convertible preferred stock and preferred stock that can be tendered to exercise warrants, by the weighted-average shares of common stock outstanding plus amounts representing the dilutive effect of outstanding warrants and the dilution resulting from the conversion of convertible preferred stock, if applicable.

For the three and six months ended March 31, 2024 and 2023, outstanding warrants, convertible debt and shares of Preferred Stock were excluded from the diluted share count because the result would have been antidilutive under the "if-converted method."

The following table presents the reconciliation of net loss attributable to common stockholders to net loss used in computing basic and diluted net income per share of common stock (giving effect to the reverse stock splits - see *Note 1 - Description of Business and Basis of Presentation*):

| | Three months ended March 31, | | Six months ended March 31, | |
| --- | --- | --- | --- | --- |
| | **2024** | **2023** | **2024** | **2023** |
| Net loss attributable to common stockholders | $ (132,431,960) | $ (114,913,318) | $ (193,826,858) | $ (491,189,104) |
| Less: preferred stock dividends waived/(accrued) | (22,043) | 8,039,612 | (43,346) | 7,400,935 |
| Net loss used in computing basic net loss per share of common stock | $ (132,454,003) | $ (106,873,706) | $ (193,870,204) | $ (483,788,169) |
| Net loss per share | $ (19.39) | $ (1,167.18) | $ (35.83) | $ (6,378.47) |
| Weighted average shares outstanding, basic and diluted | 6,829,415 | 91,566 | 5,410,894 | 75,847 |

31

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 11 - SHARE-BASED COMPENSATION**

The Company has incentive plans that are a part of annual discretionary share-based compensation program. The plans include consultants and employees, directors and officers. The Company has been issuing new shares of common stock under the share-based compensation programs, and cash has not been used to settle equity instruments granted under share-based payment arrangements.

| Composition of Stock-Based Compensation Expense | For the three months ended March 31, | | For the six months ended March 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| CEO share based performance award liability revaluation | $ (6,240,510) | $ 10,100,477 | $ (6,065,658) | $ 45,050,885 |
| Share-based compensation to employees and directors | 3,487,105 | 1,219,575 | 5,473,641 | 2,646,139 |
| Share-based compensation to consultants (equity-classified) | 206,025 | 3,775,481 | 1,272,573 | 6,417,555 |
| Share-based compensation to consultants (liability-classified) | 4,253,239 | 4,454,424 | 14,928,720 | 6,188,788 |
| Total share-based compensation expense | $ 1,705,859 | $ 19,549,957 | $ 15,609,276 | $ 60,303,367 |

***Employees of the Company***

Employees of the Company, including officers, are entitled to a number of shares of common stock specified in relevant offer letters and employment contracts and subject to the approval of our Board of Directors Compensation Committee. The total expense of share awards to employees represents the grant date fair value of relevant number of shares to be issued and is recognized, in correspondence with additional paid-in capital, ratably over the service period. The majority of awards to employees are equity-classified. The liability that relates to liability classified stock-based compensation contracts with employees amounts to $50,000 on March 31, 2024. The Company has also accrued a liability (presented within "Accrued expenses and other current liabilities" in the consolidated balance sheets) in an amount of $1.4 million (or 270,392 shares of common stock at market price on March 31, 2024) to compensate employees for delay with the issuance of common stock per relevant offer letters and employment contracts.

***Consultants***

From time to time the Company also issues share-based compensation to external consultants providing consulting, marketing, R&D, legal and other services. The number of shares specified within individual agreements, or a monetary value of those shares, if applicable, is negotiated by our Chief Executive Officer and approved by Compensation Committee of the Board of Directors. These costs are generally presented as professional fees within general and administrative, and certain qualifying costs may be presented as part of research and development expenses ($0.4 million over the six months ended March 31, 2024).

A part of these share-based awards is classified as equity and accounted for similar to stock-based compensation to employees. Another part of the Company's share-based awards to consultants is classified as liabilities: mainly if a number of shares a consultant is entitled to is predominantly based on monetary value fixed in the contract. An accrued part of liability in this case is revaluated each period based on the part of the services performed and market price of the shares of common stock of the Company, until sufficient number of shares is issued. The liability to consultants as of March 31, 2024 amounted to $1.3 million. The Company generally practices prepayment for future services of the consultants by unrestricted shares of common stock - in this case a prepaid asset is recognized on the balance sheet and is amortized over the period the consultant is delivering their services to the Company. These prepaid costs amounted to $4.2 million as of March 31, 2024.

32

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*CEO Award Incentive Plans*

The Company entered into a CEO Performance Stock Award Agreement, approved by the Board and by stockholders in 2022 ("2022 PSA Agreement") and a CEO Performance Stock Award Agreement, approved by the Board and by stockholders in 2023 ("2023 PSA Agreement"). Under these plans, the Chief Executive Officer is entitled to share-based awards generally calculated as 1-3% of then outstanding number of shares of common stock, issuable upon achievement of specific financial and operational targets (milestones) that are supposed to significantly increase value of the Company.

The costs (income) recognized within the line item "CEO share based performance award liability revaluation" in the table above represent both actual issuances of common stock under PSA Agreements and revaluation of these provisions for future probable awards. This share-based compensation is accrued over the service term when it is probable that the milestone will be achieved. The liability to issue stock (presented within non-current liabilities if the achievement is expected later than 12 months after the balance sheet date) is revalued on every balance sheet date based on the length of the service period, current market price of the common stock, and on the number of shares of common stock outstanding - until the shares have been issued, or until fulfilling of the milestone requirements is no longer probable.

As of March 31, 2024, the accrual for future awards under 2022 PSA Agreement amounted to approximately $0.3 million. Out of all remaining 2022 PSA Agreement awards, the only awards that are considered probable are capital benchmarks that provide for a 1% of outstanding common stock on every $100 million the Company raises.

As of March 31, 2024, the accrual for future awards under 2023 PSA Agreement amounted to approximately $2.8 million. A part of this provision in the amount of $0.5 million has been recognized within non-current liabilities as the achievement is expected later than 12 months after the balance sheet date. Out of all remaining 2023 PSA Agreement awards, all awards are considered probable by the Company, except for Vehicle Completion Milestone (i) (USA certification and homologation of Class Three Van - expired by end of December 2023), and except for Accelerated Development Milestone which has been achieved (Mullen has acquired a facility with existing equipment that allows the Company to expedite scaling of battery pack production in the USA).

**NOTE 12 - ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

| | March 31, 2024 | | September 30, 2023 | |
|---|---|---|---|---|
| Provision for settlement expenses and legal fees | $ | 34,865,306 | $ | 29,763,627 |
| Tax payables | | 2,744,801 | | 2,849,346 |
| Accrued payroll | | 2,460,994 | | 2,406,650 |
| Accrued interest | | 1,683,720 | | 1,548,724 |
| Refund liability | | 652,200 | | 652,200 |
| Accrued expense - other | | 785,491 | | 3,988,382 |
| **Total** | $ | **43,192,512** | $ | **41,208,929** |

**NOTE 13 - LIABILITY TO ISSUE STOCK**

The liability to issue stock on March 31, 2024 (current liability in amount of $
7.8 million and non-current liability in amount of $0.5 million) represents CEO incentive award provision to be settled in shares of common stock upon achievement of specific targets (current liability in amount of $2.6 million and non-current liability in amount of $0.5 million), and shares to be issued to certain investors upon warrants exercise in process (876,192 shares or $3.7 million), as well as certain liability-classified contracts with consultants (current liability in amount of $1.3 million) and other parties (current liability in amount of $0.2 million). The liability on September 30, 2023 mainly related to CEO incentive award provision, see *Note 11 - Share Based Compensation* for more details.

33

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 14 - PROPERTY, PLANT, AND EQUIPMENT, NET**

Property, plant, and equipment consists of the following:

| | | March 31, 2024 | | September 30, 2023 |
|---|---|---|---|---|
| Buildings | $ | 50,716,654 | $ | 48,081,466 |
| Machinery and equipment | | 34,111,234 | | 27,861,452 |
| Construction-in-progress | | 7,451,156 | | 5,180,642 |
| Land | | 3,065,757 | | 3,040,303 |
| Other fixed assets | | 4,113,228 | | 2,824,165 |
| Total cost of assets excluding accumulated impairment | | 99,458,029 | | 86,988,028 |
| Less: accumulated depreciation | | (16,654,177) | | (4,955,243) |
| Property, Plant, and Equipment, net | $ | 82,803,852 | $ | 82,032,785 |

During the last quarter of fiscal year ended September 1, 2023, due to unfavorable market conditions, decline of the market prices of the Company's common stock, and budgeted performance misses compared to the budgets prepared previously, we have tested long-lived asset for recoverability. The test was performed on September 1, 2023 by management with the assistance of independent third-party valuation professionals, using both discounted cash flow method and guideline public company method. The fair value of the property, plant, and equipment of the ELMS/Legacy Mullen segment (classified in Level 3 of the fair value hierarchy) was determined on a standalone basis utilizing the cost and market approaches to value. The assets of the Bollinger's segment (see *Note 4 - Segment information*) were not impaired, except for impairment of goodwill (see *Note 6 - Goodwill and Other Intangible Assets*). An impairment loss in amount of $13,519,492 has been recognized in respect of the property, plant, and equipment of the ELMS/Legacy Mullen segment: primarily construction-in-progress, and machinery and equipment.

No additional impairment has been recognized in respect of property, plant, and equipment during the six months ended March 31, 2024.

Depreciation expense related to property, plant, and equipment for the three and six months ended March 31, 2024 was $8,656,212 and $11,680,295, respectively ($2,947,555 and $5,351,737 for the three and six months ended March 31, 2023, respectively).

**NOTE 15 - PREPAID EXPENSES AND PREPAID INVENTORY**

| | | March 31, 2024 | | September 30, 2023 |
|---|---|---|---|---|
| **Prepaid expenses and prepaid inventory** | | | | |
| Prepaid expense | $ | 6,384,261 | $ | 8,850,311 |
| Prepaid services | | 9,367,225 | | 6,284,441 |
| Prepaid inventory | | 5,944,599 | | 5,063,965 |
| Customs surety bond paid | | 2,600,000 | | - |
| Prepaid trade shows | | 83,193 | | 2,731,352 |
| Other prepayments | | 1,735,386 | | 2,025,154 |
| **Total prepaid expenses and prepaid inventory** | $ | 26,114,664 | $ | 24,955,223 |

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 16 - OPERATING EXPENSES**

General and administrative expenses consist of the following:

| | Three months ended March 31, | | Six months ended March 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Professional fees | $ 14,463,194 | $ 12,386,745 | $ 30,684,192 | $ 46,634,060 |
| Advertising and promotions | 7,295,407 | 1,158,595 | 13,636,422 | 3,760,269 |
| Settlements and penalties | 6,749,408 | 6,244,504 | 8,661,072 | 6,265,349 |
| Depreciation | 8,058,865 | 2,966,086 | 11,082,948 | 5,370,269 |
| Amortization | 1,310,278 | 850,370 | 2,630,155 | 3,607,075 |
| Compensation to employees | 1,991,972 | 18,466,153 | 9,219,814 | 37,013,975 |
| Utilities and office expense | 1,478,469 | 905,712 | 3,062,925 | 1,067,103 |
| Employee benefits | 502,382 | 585,053 | 2,381,872 | 1,618,690 |
| Listing and regulatory fees | 636,059 | 1,433,502 | 2,127,766 | 2,735,345 |
| Repairs and maintenance | 545,726 | 201,058 | 1,368,960 | 382,297 |
| Lease | 774,141 | 843,963 | 972,626 | 1,675,054 |
| Executive expenses and directors' fees | 327,549 | 81,022 | 611,911 | 290,066 |
| Other | 3,770,242 | 1,289,575 | 4,697,081 | 1,988,797 |
| **Total** | **$ 47,903,692** | **$ 47,412,338** | **$ 91,137,744** | **$112,408,349** |

The main portion of the Professional fees relate to stock-based compensation, see *Note 11 - Share Based Compensation* for additional information.

**Research and Development**

Research and development expenses for the six months ended March 31, 2024 and 2023 were $40,193,493 and $29,100,980, respectively. Research and development expenses for the three months ended March 31, 2024 and March 31, 2023 were $24,023,526 and $20,478,971, respectively. Costs are expensed as incurred. Research and development expenses are primarily comprised of external fees and internal costs for engineering, homologation, prototyping costs, and other expenses related to preparation to mass-production of electric vehicles such as Mullen Five EV, Mullen One EV cargo van, etc.

**NOTE 17 - LEASES**

We have entered into various operating lease agreements for certain offices, manufacturing and warehouse facilities, and land. Operating leases led to recognition of right-of-use assets, and current and noncurrent portion of lease liabilities. These right-of-use assets also include any lease payments made and initial direct costs incurred at lease commencement and exclude lease incentives. The lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Lease expense for lease payments is recognized on a straight-line basis over the lease term. We have lease agreements which require payments for both lease and non-lease components and have elected to account for these as a single lease component. Certain leases provide for annual increases to lease payment based on an index or rate.

On November 1, 2023, the Company entered a 5-year lease agreement for premises of approximately 122,000 sq. ft. in Fullerton, California, designated for light manufacturing and distribution of electric vehicle batteries. Base rent is $2,992 thousand for the first year (and increases approximately 4% every year) and additional operating expenses are approximately $715 thousand in the first year with subsequent annual recalculation. Security deposit payable to the landlord is approximately $1 million.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The table below presents information regarding our lease assets and liabilities.

| | March 31, 2024 | September 30, 2023 |
|---|---|---|
| **Assets:** | | |
| Operating lease right-of-use assets | $ 11,616,450 | $ 5,249,417 |
| **Liabilities:** | | |
| Operating lease liabilities, current | (1,142,350) | (2,134,494) |
| Operating lease liabilities, noncurrent | (12,638,061) | (3,566,922) |
| Total lease liabilities | $ (13,780,411) | $ (5,701,416) |
| **Weighted average remaining lease terms:** | | |
| Operating leases (in years) | 5.29 | 3.98 |
| **Weighted average discount rate:** | | |
| Operating leases | 28% | 28% |

For the three and six months ended March 31, 2024, we recognized impairment of right-of-use assets in amount of $3.2 million, see also *Note 6 - Goodwill and Other Intangible Assets.*

| Operating lease costs: | For the three months ended March 31, | | For the six months ended March 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Fixed lease cost | $ 1,620,919 | $ 782,101 | $ 2,936,964 | $ 1,360,748 |
| Variable and short-term lease cost | 193,627 | 30,828 | 250,323 | 61,822 |
| Sublease income | (144,787) | (45,885) | (311,950) | (65,629) |
| **Total operating lease costs** | **$ 1,669,759** | **$ 767,044** | **$ 2,875,337** | **$ 1,356,941** |

The following table reflects maturities of operating lease liabilities at March 31, 2024:

**Years ending September 30,**

2024 (6 months)

| | |
|---|---|
| 2024 | $ 1,609,937 |
| 2025 | 6,255,302 |
| 2026 | 4,823,283 |
| 2027 | 4,765,083 |
| 2028 | 4,555,178 |
| Thereafter | 7,212,541 |
| Total lease payments | $ 29,221,324 |
| Less: imputed interest | (15,440,913) |
| **Present value of lease liabilities** | **$ 13,780,411** |

**NOTE 18 - INCOME TAXES**

The Company and its less than 100% owned subsidiaries are filing separate tax returns and we calculate the provision for income taxes by using a "separate return" method. Section 174 deduction and R&D credits are calculated using consolidated tax return rules and are allocated among its

members. Tax effects of significant unusual or infrequently occurring items are excluded from the estimated annual effective tax rate calculation and recognized in the interim period in which they occur.

36

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

We maintain a full valuation allowance against the value of our U.S. and state net deferred tax assets because recoverability of the tax assets does not meet the "more likely than not" requirement as of March 31, 2024 and September 30, 2023.

**NOTE 19 - CONTINGENCIES AND CLAIMS**

ASC 450.20 governs the disclosure and recognition of loss contingencies, including potential losses from litigation, regulation, tax and other matters. The accounting standard defines a "loss contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450 requires accrual for a loss contingency when it is probable that one or more future events will occur confirming the fact of loss and the amount of the loss can be reasonably estimated. Under this standard an event is probable when it is likely to occur.

From time to time, we are subject to asserted and actual claims and lawsuits arising in the ordinary course of business. Company management reviews any such legal proceedings and claims on an ongoing basis and follows appropriate accounting guidance when making accrual and disclosure decisions. We recognize accruals for those contingencies where the incurrence of a loss is probable and can be reasonably estimated, and disclose the amount accrued and the amount of a reasonably possible loss in excess of the amount accrued, if such disclosure is necessary for our consolidated financial statements to not be misleading. As required by ASC 450 we do not record liabilities when the likelihood is not probable, or when the likelihood is probable, but the amount cannot be reasonably estimated. To estimate whether a loss contingency should be accrued by a charge to income, management evaluates, among other factors, the degree of probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of the loss.

The outcomes of our legal proceedings and other contingencies are inherently unpredictable, subject to significant uncertainties, and could be material to our operating results and cash flows for a particular period. We evaluate, at least quarterly, developments in our legal proceedings and other contingencies that could affect the amount of liability, including amounts in excess of any previous accruals and reasonably possible losses disclosed, and make adjustments and changes to our accruals and disclosures as appropriate. For the matters we disclose that do not include an estimate of the amount of loss or range of losses, such an estimate is not possible or is immaterial, and we may be unable to estimate the possible loss or range of losses that could potentially result from the application of non-monetary remedies. Until the final resolution of such matters, if any of our estimates and assumptions change or prove to have been incorrect, we may experience losses in excess of the amounts recorded, which could have a material effect on our business, consolidated financial position, results of operations, or cash flows.

Information with respect to our legal proceedings is contained in *Note 19 - Contingencies and Claims* of the Notes to Consolidated Financial Statements of our Annual Report on Form 10-K for the year ended September 30, 2023. Other than as set forth herein, there are no additional updates to the legal proceedings involving the Company and/or its subsidiaries.

*Qiantu Motor (Suzhou) Ltd.*

This matter arises out of a contract dispute between Mullen and Qiantu Motor (Suzhou) Ltd. ("Qiantu") related to the engineering, design, support, and homologation of Qiantu's K50 vehicle by Mullen. On July 1, 2020, the court ordered this matter to arbitration. It was submitted to the American Arbitration Association on February 9, 2021, for arbitration in Denver, Colorado. On March 14, 2023, the parties entered into a Settlement Agreement providing for full settlement of all pending litigation between Mullen and Qiantu. Mullen continues its analysis of the homologation costs and the parties continue to negotiate licensing rights to the European territories.

No loss provision has been accrued in respect of this matter as of March 31, 2024, as the Company can reasonably estimate neither probability of additional losses (other than those paid), nor their magnitude (if any), based on all information presently available to management.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*International Business Machines ("IBM")*

On May 7, 2019, International Business Machines ('IBM") filed a claim against Mullen Technologies, Inc., in the Supreme Court of the State of New York. This matter arises out of a contract dispute between Mullen and IBM related to a joint development and technology license agreement, patent license agreement, and a logo trademark agreement.

The Company has recognized the amounts paid ($5.9 million) as losses on settlement in the year ended September 30, 2022 and does not expect any additional losses to be reasonably possible.

*TOA Trading LLC Litigation*

On April 8, 2022, TOA Trading LLC and Munshibari LLC ("Plaintiffs"), filed a complaint against the Company and Mullen Technologies, Inc. in the United States District Court for the Southern District of Florida. Plaintiffs bring claims for breach of contract, or alternatively, unjust enrichment, related to an unpaid alleged finder's fee in connection with a merger, and seek damages, pre- and post-judgment interest, as well as an award of reasonable fees and expenses.

The Company has accrued expected settlement expense as of March 31, 2024.

*DBI Lease Buyback Servicing LLC, Drawbridge Investments LLC*

On March 2, 2023, DBI and Drawbridge Investments LLC (collectively, "Drawbridge") filed a complaint in the Commercial Division of the Supreme Court of the State of New York, County of New York against Mullen. The complaint arises out of a letter agreement providing DBI with a right to purchase up to $25 million worth of a to be issued Series E Convertible Preferred Stock and warrants and asserts claims for: (1) specific performance of the alleged agreement; (2) money damages (in an amount exceeding $100 million) arising out of Mullen's alleged breach of the alleged agreement; and (3) declaratory judgment setting forth Drawbridge's rights and Mullen's obligations under the alleged agreement.

On December 5, 2023, as part of the settlement, Drawbridge withdrew its appeal to Mullen's Motion to Dismiss, which was granted by the court on August 25, 2023, with prejudice. Based on the contract signed by the parties, the Company paid $1.95 million as of March 31, 2024 in full and complete satisfaction of the claims.

*The GEM Group*

On September 21, 2021, the GEM Group filed an arbitration demand and statement of claim with the American Arbitration Association against Mullen seeking declaratory relief and damages. This matter arises out of an alleged breach of a securities purchase agreement dated November 13, 2020. On November 17, 2023, the arbitrator issued the Partial Final Award on Liability finding that Mullen and Mullen Technologies, Inc. ("MTI") had repudiated and breached the securities purchase agreement and a related agreement (the "GEM Agreements"). On January 29, 2024, the parties completed the briefing on the issues of damages and allocation. To date, no award on damages has been issued.

On August 3, 2023, the Arbitrator ordered Mullen to deposit $7,000,000 into an interest-bearing escrow account with a commercial bank or brokerage firm. On January 24, 2024, the arbitrator ordered Mullen to deposit an additional $24,114,921 into escrow on or before March 9, 2024. The GEM Group has moved in the United States District Court to confirm that second interim order. To date, that motion is not fully briefed.

On or about On December 28, 2023, Mullen and MTI filed a complaint against the GEM Group and Christopher F. Brown in the United States District Court for the Southern District of New York alleging, among other things, that the GEM Group and Mr. Brown engaged in an unlawful securities transaction under the federal securities laws by entering into the GEM Agreements while the GEM Group was operating as an unregistered dealer. The complaint seeks an order declaring, among other things, that the GEM Agreements are void *ab initio*. On April 8, 2024, the District Court stayed that action.

Table of Contents

**MULLEN AUTOMOTIVE INC.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company has accrued $7 million as a probable settlement expense as of March 31, 2024. The Company can reasonably estimate neither probability of additional losses, nor their magnitude (if any), based on all information presently available to management.

***Mullen Stockholder Litigation***

Margaret Schaub v. Mullen Automotive Inc.

On May 5, 2022, Plaintiff Margaret Schaub, a purported stockholder, filed a putative class action complaint in the United States District Court Central District of California against the Company, as well as its Chief Executive Officer, David Michery, and the Chief Executive Officer of a predecessor entity, Oleg Firer (the "Schaub Lawsuit"). This lawsuit was brought by Schaub both individually and on behalf of a putative class of the Company's shareholders, claiming false or misleading statements regarding the Company's business partnerships, technology, and manufacturing capabilities, and alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. An amended complaint was filed on September 23, 2022, asserting claims against the Company, Mullen Technologies, Inc., and Mr. Michery. The Schaub Lawsuit seeks to certify a putative class of shareholders, and seeks monetary damages, as well as an award of reasonable fees and expenses.

The Company has accrued expected settlement expense as of March 31, 2024.

Trinon Coleman v. David Michery et al.

On December 8, 2023, Trinon Coleman, a purported stockholder, filed a shareholder derivative action in the Court of Chancery for the State of Delaware, purportedly in the right and for the benefit of the Company as a nominal defendant, against Mr. Michery, and Company directors Mr. Puckett, Ms. Winter, Mr. Betor, Mr. Miltner, and Mr. New (the "Coleman Lawsuit"). This lawsuit asserts claims for breach of fiduciary duty, insider trading, and unjust enrichment primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Coleman Lawsuit seeks to direct the Company to improve its corporate governance and internal procedures, and seeks monetary damages and an award of reasonable fees and expenses.

No loss provision has been accrued in respect of this matter as of March 31, 2024, as the Company can reasonably estimate neither probability of the loss, nor their magnitude (if any), based on all information presently available to management.

David Gru v. Mullen Automotive Inc.

On May 12, 2022, David Gru, a purported stockholder, filed a putative class action lawsuit in the United States District Court for the Central District of California against the Company, Mr. Michery, and Mr. Firer (the "Gru Lawsuit"). This lawsuit was brought by Gru both individually and on behalf of a putative class of Mullen's shareholders, claiming false or misleading statements regarding Mullen's business partnerships, technology, and manufacturing capabilities, and alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. The Gru Lawsuit sought to declare the action to be a class action, and sought monetary damages, pre-judgment and post-judgment interest, as well as an award of reasonable fees and expenses. On August 4, 2022, the Court consolidated this action into the Schaub Lawsuit, and ordered this action administratively closed.

Jeff Witt v. Mullen Automotive Inc.

On August 1, 2022, Jeff Witt and Joseph Birbigalia, purported stockholders, filed a shareholder derivative action in the United States District Court for the Central District of California, purportedly in the right and for the benefit of the Company as a nominal defendant, and Mr. Michery, Mr. Firer, and current or former Company directors Ignacio Novoa, Mary Winter, Kent Puckett, Mark Betor, William Miltner and Jonathan New (the "Witt Lawsuit"). The Witt Lawsuit asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Witt Lawsuit seeks monetary damages, as well as an award of reasonable fees and expenses.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

No loss provision has been accrued in respect of this matter as of March 31, 2024, as the Company can reasonably estimate neither probability of the loss, nor their magnitude (if any), based on all information presently available to management.

Hany Morsy v. David Michery, et al.

On September 30, 2022, Hany Morsy, a purported stockholder, filed a shareholder derivative action in the United States District Court for the Central District of California, purportedly in the right and for the benefit of the Company as a nominal defendant, against Mr. Michery, Mr. Firer, former Company officer and director, Jerry Alban, and Company directors Mr. Novoa, Ms. Winter, Mr. Puckett, Mr. Betor, Mr. Miltner, and Mr. New (the "Morsy Lawsuit"). This lawsuit asserts claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Morsy Lawsuit seeks to direct the Company to improve its corporate governance and internal procedures, and also seeks monetary damages, pre-judgment and post-judgment interest, restitution, and an award of reasonable fees and expenses. On November 8, 2022, the Court consolidated this matter and the Witt Lawsuit (see above).

Chosten Caris v. David Michery

On April 27, 2023, Chosten Caris, a purported stockholder, filed a complaint against Mr. Michery in the Eighth Judicial Circuit in and for Alachua County, Florida (the "Caris Lawsuit"). This lawsuit purports to seek damages for claims arising under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Caris Lawsuit also seeks punitive damages. On May 17, 2023, Mr. Michery removed the Caris Lawsuit to the United States District Court for the Northern District of Florida.

No loss provision has been accrued in respect of this matter as of March 31, 2024, as the Company can reasonably estimate neither probability of the loss, nor their magnitude (if any), based on all information presently available to management.

Martis v. Michery et al.

On March 14, 2024, Marius Martis, a purported stockholder, filed a shareholder derivative action in the United States District Court for the District of New Jersey, purportedly in the right and for the benefit of the Company as a nominal defendant, against Mr. Michery, Company directors Ms. Winter, Mr. Betor, and Mr. Puckett, as well as third-parties Oleg Firer, Jon Najarian, John Roland, Todd Raarup, Argus Merchant Services, LLC and RBL Capital Group LLC (the "Martis Lawsuit"). This lawsuit purports to seek damages for claims relating to the Net Element, Inc. ("Net Element") merger and Net Element's divestiture of a payment processing business, arising under Sections 10(b), 14(a), 20, 21D and 29(b) of the Exchange Act, as well as claims for breach of fiduciary duty. The Martis Lawsuit seeks rescission, as well as monetary damages and an award of reasonable fees and expenses.

No loss provision has been accrued in respect of this matter as of March 31, 2024, as the Company can reasonably estimate neither probability of the loss, nor their magnitude (if any), based on all information presently available to management.

***Other contingencies***

Accrued debt settlement

As discussed in the *Note 7 - Debt*, on December 18, 2023, Mullen entered into a Debt Agreement to issue a non-convertible secured promissory note with a principal amount of $50 million, purchased for $32 million, reflecting an $18 million original issue discount. The $18 million original issue discount was considered a settlement cost related to a dispute over financings that occurred during the fiscal year ended September 30, 2023. The $18 million settlement cost has been accrued as of September 30, 2023 and is included as accrued expenses and other liabilities at March 31, 2024 and September 30, 2023.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 20 - RELATED PARTY TRANSACTIONS**

*Related Party Receivable*

Prior to its spinoff as a separate entity and the closing of the Merger on November 5, 2021, the Company operated as a division of MTI, an entity in which the Company's CEO had a controlling financial interest and of which he was CEO and Chairman. After the spinoff transaction and Merger on November 5, 2021, the Company processed and disbursed payroll and related compensation benefits for 11 employees that provided services only to MTI and rent costs for facilities utilized by MTI pursuant to a Transition Services Agreement ("TSA"). The terms of the TSA required MTI to repay monthly the amounts advanced by the Company, with penalties calculated at the lower of the prime rate plus 1% or the maximum rate under applicable law charged on the unpaid amounts. The terms of the TSA did not provide for any other payment processing service fee from MTI to the Company except the interest fee on overdue advance balances.

On March 31, 2023, the Company converted approximately $1.4 million of these advances to MTI to a note receivable from MTI. The note bore interest at 10% per year and would mature on March 31, 2025 with a default rate of 15% per annum. By the end of the 2023 fiscal year, the note principal had been increased by additional $0.4 million. The Company incurred approximately $2.5 million and $2.1 million of disbursements on behalf of MTI, and charged penalties and interest in amount of approximately $238 thousand and $179 thousand, by December 31, 2023 and September 30, 2023, respectively. Remaining advances, note and interest receivable as of September 30, 2023 were presented within non-current assets of the consolidated balance sheets.

On January 16, 2024, the Company terminated the Transition Services Agreement between the Company and Mullen Technologies, Inc., and received cash payment in full settlement of all amounts outstanding (including outstanding notes receivable, advances and related interest and penalties) of approximately $2.7 million.

*Director Provided Services*

For the six months ended March 31, 2024, our non-employee directors have earned compensation for service on our Board of Directors and Committees of our Board of Directors in amount of $224,500 in cash and $387,411 in shares of common stock. In addition, the following non-employee directors were engaged in certain other consulting contracts with the Company:

William Miltner

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner also is an elected Director for the Company. For the six months ended March 31, 2024, Mr. Miltner was entitled to $706,051 for services rendered. Mr. Miltner has been providing legal services to us since 2020.

Mary Winter

Mary Winter, Corporate Secretary and Director, is compensated for Corporate Secretary responsibilities, in the amount of $5,000 per month. For the six months ended March 31, 2024, Ms. Winter is entitled to $30,000 in consulting fees.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 21 - SUBSEQUENT EVENTS**

Company management has evaluated subsequent events through May 14, 2024, which is the date these financial statements were available to be issued. Except as discussed below, management has determined that there were no subsequent events which required recognition, adjustment to or disclosure in the financial statements.

*HVIP program approval*

In April 2024, California Air Resources Board has approved the Company's all-electric Class 3 low cab forward, the 2024 Mullen THREE, for the Hybrid and Zero-Emission Truck and Bus Voucher Incentive Project ("HVIP"). The HVIP program plays a crucial role in the deployment of zero-emission technologies and accelerates commercialization by providing point-of-sale vouchers to make advanced vehicles more affordable. Under HVIP, the 2024 Mullen THREE EV truck, with a suggested MSRP of $68,500, now qualifies for up to $45,000 cash voucher. When combined with the available $7,500 federal tax credit, the net effective cost of the Mullen THREE could be less than $17,000.

*Debt Agreement termination*

On December 18, 2023, Mullen entered into a Debt Agreement to issue a non-convertible secured promissory note (the "Note") with a principal amount of $

50 million, purchased for $32 million, reflecting an $18 million original issue discount. The issuance of this non-convertible Note was supposed to happen on the first trading day when all closing conditions are met. The Note contemplated 10% annual interest, escalating to 18% post-Event of Default. It would mature three months post-issuance. The Note's terms allowed for accelerated repayment upon default, requiring the Company to pay the principal, accrued interest, and other due amounts. The Note was supposed to be secured by the Company's assets and imposes restrictions on the Company, limiting additional debt, asset liens, stock repurchases, outstanding debt repayment, and affiliate transactions, except for specified exceptions. It mandated prepayment of the principal from net proceeds of any subsequent financing. The funds contemplated by the Debt Agreement have not been received and, on May 7, 2024, the Debt Agreement has been terminated.

*Liabilities settlement agreement*

The Company entered into a Settlement Agreement with Silverback Capital Corporation ("SCC") on May 9, 2024, to resolve outstanding overdue liabilities with different vendors totaling $4,623,655. Under the terms of the agreement, the Company will issue freely tradable common stock shares to SCC, known as "Settlement Shares." The agreement is contingent on court approval following a fairness hearing under Section 3(a)(10) of the Securities Act of 1933. The number of shares issued will be determined based on the stock's trading price during a specified valuation period, with provisions for adjustment based on corporate actions or market conditions. The agreement, enforceable upon court approval, aims to fully settle the specified liabilities without cash outflow.

*Stock issuances after the balance sheet date and exercise of remaining warrants*

After the balance sheet date and by May 13, 2024, the Company issued 3,438,154 shares of common stock, mainly under the contracts with consultants, and upon exercise of remaining Preferred D Warrants (see *Note 8 - Warrants and Other Derivative Liabilities and Fair Value Measurements*). By the date these financial statements were available to be issued, there were no more Preferred D Warrants outstanding.

*Stockholder Rights Agreement*

On May 1, 2024, the Company entered into a Rights Agreement with Continental Stock Transfer & Trust Company, as rights agent, and the Board of Directors declared a dividend of one preferred share purchase right (a "Right") for each share of Common Stock and each outstanding share of Preferred Stock Company payable to holders of record as of the close of business on May 13, 2024. Each Right entitles the registered holder to purchase one ten-thousandth of a share of Series A-1 Junior Participating Preferred Stock ("A-1 Preferred Stock") of the Company at a price of $30.00 per one ten thousandth of a share of A-1 Preferred Stock, subject to adjustment (the "Exercise Price"). The Rights are not exercisable until the Distribution Date (as defined below). The description and terms of the Rights are set forth in the Rights Agreement.

42

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Rights will not be exercisable until the earlier of ten days after a public announcement by us that a person or group has acquired 10% of more of the shares of Common Stock (an "Acquiring Person") and ten business days (or a later date determined by our board of directors) after a person or group begins a tender or an exchange offer that, if completed, would result in that person or group becoming an Acquiring Person (the earlier of such dates being herein referred to as the "Distribution Date"). At any time after a person becomes an Acquiring Person, the Board of Directors may, at its option, exchange all or any part of the then outstanding and exercisable Rights for shares of Common Stock at an exchange ratio of one share of Common Stock for each Right, subject to adjustment as specified in the Rights Agreement. Notwithstanding the foregoing, the Board of Directors generally will not be empowered to effect such exchange at any time after any person becomes the beneficial owner of 50% or more of the Common Stock of the Company. The Rights will expire on May 1, 2025, unless previously redeemed or exchanged by the Company. The Rights Agreement is designed to enable all Company stockholders to realize the long-term value of their investment and is intended to protect Mullen and its stockholders from efforts by a single stockholder or group to obtain control of the Company without paying a control premium, see below for further details. The Rights have certain anti-takeover effects, including potentially discouraging a takeover that stockholders may consider favorable. Certain exemptions may apply to an Acquiring person. The Rights will cause substantial dilution to a person or group that attempts to acquire us on terms not approved by the Board of Directors.

***Foreign Trade Zone status for Tunica Manufacturing Plant***

The Company has been granted Foreign Trade Zone (FTZ) status for its commercial vehicle manufacturing and assembly facility in Tunica, MS, by the U.S. Department of Commerce. An FTZ is a secure area in the U.S. where foreign and domestic goods are treated as being outside U.S. Customs territory for duty and tariff purposes. This designation allows the Company to defer significant amount of import duty payments over FY2024 and FY2025. For vehicles intended for export, the Company will be fully exempt from duties, offering potential savings of up to 20% across both EV cargo vans and trucks. The FTZ approval is expected to provide benefits such as improved cash flow, enhances global competitiveness, reduces taxes, and provides logistical flexibility.

***$50 Million Note and Warrant Financing***

On May 14, 2024, the Company entered into a Securities Purchase Agreement with certain accredited investors for the sale of Senior Secured Convertible Notes and Warrants. The initial aggregate principal amount payable upon execution of the Securities Purchase Agreement is $13.2 million, or $12.5 million including the 5% original issue discount. Investors are also obligated to purchase an additional principal amount of $39.5 million, or $37.5 million including the 5% original issue discount, of Notes and related Warrants if (i) the Company has sufficient authorized shares of Common Stock available to cover 250% of the shares of Common Stock underlying the conversion of the Notes and exercise of the Warrants, (ii) the Common Stock has average daily trading volume of $3 million in the previous ten (10) trading days, (iii) a registration statement covering the shares of Common Stock underlying the conversion of the Notes and exercise of the Warrants has been declared effective, (iv) the Company has obtained stockholder approval of the issuance of the Notes and Warrants in compliance with Nasdaq Listing Rule 5635(d), and (v) the Company is in compliance with the continued listing standards of The Nasdaq Capital Market. Each investor may terminate its obligation to purchase additional amounts under the Securities Purchase Agreement if the Funding Conditions, as well as other closing conditions, have not occurred for a period of three months or longer.

The Convertible Notes accrue interest at 15%, include a 5% Original Issue Discount, and mature in four months from the date of issuance. Upon any event of default, the interest rate automatically increases to 20% per annum. The Company granted a continuing security interest in all of its right, title and interest in, its assets, whether owned, existing, acquired or arising and wherever located. The outstanding principal and accrued but unpaid interest on the Notes may be converted by the holder into shares of Common Stock at the lower of (i) $5.49, (ii) 95% of the closing sale price of the Common Stock on the date that the Company's registration statement on Form S-1 is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five (5) trading days prior to such conversion date, provided that the conversion price will not be less than $1.16 per share.

43

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In connection with the issuance of the Notes, the holder also received 5-year warrants exercisable for 200% of the shares of Common Stock underlying such Notes at an exercise price equal to 105% of closing sale price of the Common Stock on execution date, subject to further adjustment. The Warrants are also exercisable on a cashless basis, according to a predefined Black Scholes Value and the lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (but in any event not less than $0.10). If the Company meets the funding conditions, and the VWAP for each trading day during the 10 trading day period immediately preceding the date on which the Company elects to exercise this option is 250% above the exercise price, the Company will have the right to require the investors to exercise the Warrants for cash.

The Company has agreed to file a registration statement and will seek, pursuant to Nasdaq rules, shareholder approval of the issuance of the shares of common stock issuable upon conversion of the Convertible Notes and exercise of the Warrants via a proxy statement. In the event that the Company fails to file a registration statement by the filing deadline, a registration statement is not declared effective on or prior to a deadline, and in other cases, precluding investors from selling their shares, the Company has agreed (unless the shares of Common Stock are freely tradable pursuant to Rule 144) to make payments to each investor as liquidated damages in an amount equal to 1.5% of such investor's total committed purchase price and an additional 1.5% on every 30 day anniversary, with a maximum of 12 payments. Such payments will bear interest at the rate of 10% per month (prorated for partial months) until paid in full and may be paid in shares of Common Stock at the option of the Company.

The Company is also be restricted from issuing additional securities to other parties for a certain period of time. The Notes and Warrants are not convertible by a holder to the extent that (i) the holder or any of its affiliates would beneficially own in excess of 9.9% of the Common Stock or (ii) the aggregate number of shares of Common Stock issued in connection with the conversion of all Notes and Warrants, at any time exceeds 19.9% of the total number of shares of Common Stock outstanding or of the voting power of the Common Stock outstanding as of the date of execution of the Securities Purchase Agreement, unless the Company obtains stockholder approval in compliance with Nasdaq Listing Rule 5635(d) (the "Exchange Cap").

Pursuant to the Securities Purchase Agreement, the investors may exercise within one year an additional investment right under identical terms.

### First Tranche of $50 Million Financing Payable on Execution

On May 14, 2024, investors executed the Financing agreement (see above) and agreed to fund the Company $12.5 million upon execution.

### $100 Million Financing Arrangement through Senior Secured Notes and Warrants

The Company also signed a commitment letter agreement with an investor for a total investment of $100 million through the issuance of Senior Secured Convertible Notes and Warrants. The Convertible Notes will be issued in eight tranches of $12.5 million over 13 months. The investors will receive a $4 million non-refundable commitment fee, payable in registered common stock. Other conditions are similar to those described above for the $52.6 million Financing Arrangement. The completion of this transaction remains contingent upon mutual consent and the execution of final documentation by both parties.

44

Table of Contents
**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis is intended to help the reader understand Mullen's results of operations and financial condition. You should read the following discussion and analysis of our financial condition and results of operations together with our audited financial statements and related notes included elsewhere in this Report.*

**Cautionary Note Regarding Forward-Looking Statements**

This Report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements can be identified by the use of forward-looking terminology, including the words "believes," "estimates," "anticipates," "expects," "intends," "plans," "may," "will," "potential," "projects," "predicts," "continue," or "should," or, in each case, their negative or other variations or comparable terminology. There can be no assurance that actual results will not materially differ from expectations. The forward-looking statements contained in this Report are based on our current expectations and beliefs concerning future developments and their potential effects on us. Future developments affecting us may not be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control), and other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the section titled "Risk Factors" in Item 1A. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation (and expressly disclaim any obligation) to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. These risks and others described under the section titled "Risk Factors" in Item 1A above may not be exhaustive. By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. We caution you that forward-looking statements are not guarantees of future performance and that our actual results of operations, financial condition and liquidity, and developments in the industry in which we operate may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results or operations, financial condition and liquidity, and developments in the industry in which we operate are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods.

**Basis of Presentation**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries Mullen Investment Properties LLC, a Mississippi corporation, Ottava Automotive, Inc., a California corporation, Mullen Real Estate, LLC, a Delaware corporation, as well as a majority-owned subsidiary Bollinger Motors Inc., a Delaware corporation. Intercompany accounts and transactions have been eliminated. The financial statements reflect the consolidated financial position and results of operations, which have been prepared in accordance with Generally Accepted Accounting Principles in the United States. The operating results for interim periods are not necessarily indicative of results that may be expected for any other interim period or for the full year.

**Components of Results of Operations**

We are an early-stage company, and our historical results may not be indicative of our future results for reasons that may be difficult to anticipate. Accordingly, the drivers of our future financial results, as well as the components of such results, may not be comparable to our historical or projected results of operations.

45

Table of Contents

***Comparison of the Three Months Ended March 31, 2024 to the Three Months Ended March 31, 2023***

The following table sets forth our historical operating results for the periods indicated:

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2024** | **2023** | **$ Change** | **% Change** |
| | (dollar amounts, except percentages) | | | |
| **Revenue** | | | | |
| Vehicle sales | $ 33,335 | $ - | $ 33,335 | -% |
| Cost of revenues | (13,440) | - | (13,440) | -% |
| Gross profit / (loss) | 19,895 | - | 19,895 | -% |
| **Operating expenses:** | | | | |
| General and administrative | 47,903,692 | 47,412,338 | 491,354 | (1)% |
| Research and development | 24,023,526 | 20,478,971 | 3,544,555 | (17)% |
| Impairment of goodwill | 28,846,832 | - | 28,846,832 | -% |
| Impairment of right-of-use assets | 3,167,608 | - | 3,167,608 | -% |
| Impairment of intangible assets | 73,447,067 | - | 73,447,067 | -% |
| **Loss from operations** | $(177,368,830) | $ (67,891,309) | $(109,477,521) | (161)% |
| **Other income (expense):** | | | | |
| Gain/(loss) on sale of fixed assets | (449,855) | 385,031 | (834,886) | (217)% |
| Gain (loss) on extinguishment of indebtedness | 34,625 | (40,000) | 74,625 | (187)% |
| Gain/(loss) on derivative liability revaluation | 3,622,758 | (48,439,415) | 52,062,173 | (107)% |
| Other income, net | 893,692 | 482,405 | 411,287 | 85% |
| Interest expense | (259,700) | (1,888,169) | 1,628,469 | (86)% |
| Total other income (expense) | 3,841,520 | (49,500,148) | 53,341,668 | (108)% |
| **Net loss before income tax benefit** | $(173,527,310) | $(117,391,457) | $ (56,135,853) | (48)% |
| Income tax benefit | 2,165,062 | 482,922 | 1,682,140 | 348% |
| **Net loss** | $(171,362,248) | $(116,908,535) | $ (54,453,713) | (47)% |
| Net loss attributable to noncontrolling interest | (38,930,288) | (1,995,217) | (36,935,071) | (1,851)% |
| **Net loss attributable to stockholders** | $(132,431,960) | $(114,913,318) | $ (17,518,642) | (15)% |
| Accrued accumulated preferred dividends | (22,043) | 8,039,612 | (8,061,655) | (100)% |
| **Net loss attributable to common stockholders after preferred dividends** | $(132,454,003) | $(106,873,706) | $ (25,580,297) | (24)% |
| Net Loss per Share | (19.39) | (1,167.18) | | |
| Weighted average shares outstanding, basic and diluted | 6,829,415 | 91,566 | | |

***Revenues***

We are a development stage company and have only recently started to generate notable revenues. As we expand production and commercialization of vehicles, we expect the majority of our revenue to be derived from sales of commercial vehicles.

46

Table of Contents

We are planning to ramp up production and reach sufficient revenue levels in subsequent periods - primarily from sales of Commercial Delivery Vehicles (Class 1 - 6). As we continue to develop our product line, we expect additional revenue streams in the future, also from the sales of Sport Utility Vehicles ("SUVs") and the flexible leasing of our electric vehicles ("EVs").

In accordance with accounting standards, we recognize revenue from the sale of electric vehicles upon transfer of control to a customer. In general, the control is transferred at the point of delivery to the customer but certain contracts with our dealers contain a return provision, stating that they may return unsold vehicles after 1 year. Since the Company does not have sufficient relevant statistics of returns yet, we defer revenue recognition until the vehicles have been sold by such dealer or until there is sufficient evidence to justify a reasonable estimate for consideration to which the Company expects to be entitled.

The tables below disclose information on deliveries of vehicles, revenue recognized, and payments received from our customers over the recent periods.

**Invoiced during the 3 months ended March 31, 2024 (in thousand dollars)**

| Type | Units invoiced | Amount invoiced | Cash received | Revenue recognized |
|---|---|---|---|---|
| Urban Delivery (UD1) | 131 | 4,405.9 | 33.3 | 33.3 |
| Total | 131 | $ 4,405.9 | $ 33.3 | $ 33.3 |

### Cost of Revenues

Costs of revenues primarily includes vehicle components and parts, labor costs, amortized tooling costs, provisions for estimated warranty expenses, and other relevant costs associated with the production of our vehicles.

### Research and Development

Research and development expenses increased by approximately $3.5 million or 17% from approximately $20.5 million through the three months ended March 31, 2023, to approximately $24.0 million through the three months ended March 31, 2024. Research and development expenses are primarily comprised of external fees and internal costs for engineering, homologation, prototyping costs and other expenses related to preparation to mass-production of electric vehicles such as Mullen Five EV, Mullen One EV cargo van, etc.

### General and Administrative

General and administrative expenses include all non-production expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, licenses and other expenses. We expense advertising costs as incurred. General and administrative expenses increased by approximately $0.5 million or 1% from approximately $47.4 million in the three months ended March 31, 2023, to approximately $47.9 million in the three months ended March 31, 2024, primarily due to decreases in compensation to employees and listing and regulatory fees, partially offset by increases in professional fees, utilities, depreciation expense, amortization expense, and advertising and promotions expenses.

### Impairment

The net loss for the three months ended March 31, 2024 included impairment charges totaling $105.5 million, mainly due to present uncertainty of availability of future funding required to support the business and decrease of Company's market capitalization. These write-downs include Bollinger's goodwill of $28.8 million, intangible assets of Bollinger ($58.3 million) and ELMS ($15.1 million), and the write-down of right-of-use assets of $3.2 million.

### Other losses

The derivative liability mark-to-market revaluation during the three months ended March 31, 2024 resulted in $3.6 million income versus loss of $48.4 million during the three months ended March 31, 2023. These changes are due to the fact that no additional warrants were issued during the three months ended March 31, 2024 and the monetary value of relevant obligations has significantly decreased in comparison to the three months ended March 31, 2023 (see *Notes 7 - Debt and 8- Warrants and Other Derivative Liabilities and Fair Value Measurements* to the financial statements).

Table of Contents

*Interest Expense*

Interest expense decreased by approximately $1.6 million, or 86%, from approximately $1.9 million through the three months ended March 31, 2023, to approximately $0.3 million through the three months ended March 31, 2024, primarily due to a decrease in convertible debt that has was fully converted by March 31, 2023 and repayment of a $5 million note in January 2024.

*Net Loss*

The net loss attributable to common stockholders (after preferred dividends) was approximately $132.5 million, or $19.39 net loss per share, for the three months ended March 31, 2024, as compared to a net loss attributable to common stockholders after preferred dividends of approximately $106.9 million, or $1,167.18 loss per share, for the three months ended March 31, 2023 (giving effect to reverse stock splits, see below).

**Comparison of the six months ended March 31, 2024 to the six months ended March 31, 2023**

The following table sets forth our historical operating results for the periods indicated:

|  | Six Months Ended March 31, | | | |
|  | 2024 | 2023 | $ Change | % Change |
| --- | ---: | ---: | ---: | ---: |
|  |  | (dollar amounts, except percentages) | | |
| **Revenue** | | | | |
| Vehicle sales | $ 33,335 | $ - | $ 33,335 | -% |
| Cost of revenues | (13,440) | - | (13,440) | -% |
| Gross profit / (loss) | 19,895 | - | 19,895 | -% |
| | | | | |
| **Operating expenses:** | | | | |
| General and administrative | 91,137,744 | 112,408,349 | (21,270,605) | 19% |
| Research and development | 40,193,493 | 29,100,980 | 11,092,513 | (38)% |
| Impairment of goodwill | 28,846,832 | - | 28,846,832 | -% |
| Impairment of right-of-use assets | 3,167,608 | - | 3,167,608 | -% |
| Impairment of intangible assets | 73,447,067 | - | 73,447,067 | -% |
| **Loss from operations** | $(236,772,849) | $(141,509,329) | $ (95,263,520) | (67)% |
| | | | | |
| **Other income (expense):** | | | | |
| Other financing costs - initial recognition of derivative liabilities | - | (255,960,025) | 255,960,025 | -% |
| Loss on derivative liability revaluation | (3,106,223) | (89,221,391) | 86,115,168 | 97% |
| Gain/(loss) on extinguishment of debt | 34,625 | (6,452,170) | 6,486,795 | 101% |
| Gain/(loss) on sale of fixed assets | (373,865) | 385,031 | (758,896) | 197% |
| Gain on lease termination | 50,000 | - | 50,000 | -% |
| Interest expense | (517,723) | (4,716,258) | 4,198,535 | 89% |
| Other income, net | 1,439,108 | 1,128,286 | 310,822 | (28)% |
| **Net loss before income tax benefit** | $(239,246,927) | $(496,345,856) | $257,098,929 | 52% |
| | | | | |
| Income tax benefit | 3,891,300 | 976,576 | 2,914,724 | 298% |
| **Net loss** | $(235,355,627) | $(495,369,280) | $260,013,653 | 52% |
| | | | | |
| Net loss attributable to noncontrolling interest | (41,528,769) | (4,180,176) | (37,348,593) | (893)% |
| **Net loss attributable to stockholders** | $(193,826,858) | $(491,189,104) | $297,362,246 | 61% |

| | | | | |
|---|---|---|---|---|
| Accrued accumulated preferred dividends | (43,346) | 7,400,935 | (7,444,281) | (101)% |
| **Net loss attributable to common stockholders after preferred dividends** | **$(193,870,204)** | **$(483,788,169)** | **$289,917,965** | **60%** |

48

Table of Contents

*Revenues*

**Invoiced during the 6 months ended March 31, 2024 (in thousand dollars)**

| Type | Units invoiced | Amount invoiced | Cash received | Revenue recognized |
|---|---|---|---|---|
| Mullen 3 (UU) | | | | |
| | 131 | 8,543.8 | 652.2 | - |
| Urban Delivery (UD1) | | | | |
| | 231 | 7,769.4 | 33.3 | 33.3 |
| Total | | | | |
| | 362 | $ 16,313.2 | $ 685.5 | $ 33.3 |

*Cost of Revenues*

Costs of revenues primarily includes vehicle components and parts, labor costs, amortized tooling costs, provisions for estimated warranty expenses, and other relevant costs associated with the production of our vehicles.

*Research and Development*

Research and development expenses increased by $11.1 million, or 38% from approximately $29.1 million through the six months ended March 31, 2023, to approximately $40.2 million through the six months ended March 31, 2024. Research and development expenses are primarily comprised of external fees and internal costs for engineering, homologation, prototyping costs and other expenses related to preparation to mass-production of electric vehicles such as Mullen Five EV, Mullen One EV cargo van, etc.

*General and Administrative*

General and administrative expenses include all non-production expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, licenses and other expenses. We expense advertising costs as incurred. General and administrative expenses decreased by approximately $21.3 million, or 19%, from approximately $112.4 million in the six months ended March 31, 2023, to approximately $91.1 million in the six months ended March 31, 2024, primarily due to decreases in professional fees and compensation to employees, partially offset by increases in advertising and promotions expenses, and depreciation expense.

*Impairment*

The net loss for the six months ended March 31, 2024 included impairment charges totaling $105.5 million, mainly due to present uncertainty of availability of future funding required to support the business and decrease of Company's market capitalization. These write-downs include Bollinger's goodwill of $28.8 million, intangible assets of Bollinger ($58.3 million) and ELMS ($15.1 million), and the write-down of right-of-use assets of $3.2 million.

*Other losses*

The line item "Other financing costs - initial recognition of derivative liabilities" in the six months ended March 31, 2024 is zero versus the six months ended March 31, 2023 when it amounted to approximately $256.0 million. Similarly, the derivative liability revaluation loss has decreased by $86.1 million from $89.2 million to $3.1 million. These changes are due to the fact that no additional warrants were issued during the six months ended March 31, 2024 and the monetary value of relevant obligations has significantly decreased in comparison to the six months ended March 31, 2023 (see *Notes 7- Debt and 8 - Warrants and Other Derivative Liabilities and Fair Value Measurements* to the financial statements).

*Interest Expense*

Interest expense decreased by approximately $4.2 million, or 89%, from approximately $4.7 million through the six months ended March 31, 2023, to approximately $0.5 million through the six months ended March 31, 2024, primarily due to a decrease in convertible debt that has was fully converted by March 31, 2023 and repayment of a $5 million note in January 2024.

49

Table of Contents

*Net Loss*

The net loss attributable to common stockholders (after preferred dividends) was approximately $193.9 million, or $35.83 net loss per share, for the six months ended March 31, 2024, as compared to a net loss attributable to common stockholders after preferred dividends of approximately $483.8 million, or $6,378.47 loss per share, for the six months ended March 31, 2023 (giving effect to reverse stock splits, see below).

**Operating segments**

The Company is currently comprised of two major operating segments:

- Bollinger Motors. The Company acquired the controlling interest of Bollinger Motors Inc. (60% on a fully diluted basis) in September 2022. This acquisition positions Mullen into the medium duty truck classes 4-6, along with the Sport Utility and Pick Up Trucks EV segments.

- Mullen/ELMS. By November 30, 2022, Mullen acquired ELMS' manufacturing plant in Mishawaka Indiana and all the intellectual property needed to engineer and build Class 1 and Class 3 electric vehicles.

**Reverse Stock Splits and NASDAQ listing rules compliance**

During the calendar year ended December 31, 2023, we have completed three reverse stock splits in order to regain compliance with NASDAQ Listing Rule 5550(a)(2). In May 2023, we completed a 1-for-25 reverse split of our outstanding shares of common stock. In August 2023, we completed a 1-for-9 reverse split of our outstanding shares of common stock. In December 2023, we completed the last 1-for-100 reverse stock split of our outstanding shares of common stock.

On January 24, 2024, the Company received formal notice from The Nasdaq Stock Market LLC confirming the Company has regained compliance with the minimum bid price requirement set forth in Nasdaq Listing Rule 5550(a)(2). On March 6, 2024, the Company received formal notice from Nasdaq confirming that it has regained compliance with the annual shareholder meeting requirement set forth in Nasdaq Listing Rule 5620(a). The Company is now in compliance with Nasdaq's continued listing requirements and will continue to be listed and traded on the Nasdaq Capital Market.

**Liquidity and Capital Resources**

To date, we have yet to generate any significant revenue from our business operations. We have funded our capital expenditure and working capital requirements through the sale of equity securities, as further discussed below. Our ability to successfully expand our business will depend on many factors, including our working capital needs, the availability of equity or debt financing and, over time, our ability to generate cash flows from operations.

The Company's principal source of liquidity consists of existing cash and restricted cash of approximately $29.8 million as of March 31, 2024. During the six months ended March 31, 2024, the Company used approximately $108.5 million of cash for operating activities. The net working capital on March 31, 2024 amounted to approximately $5.3 million, or approximately $18.3 million after excluding derivative liabilities and liabilities to issue stock that are supposed to be settled by issuing common stock without using cash. For the six months ended March 31, 2024, the Company has incurred a net loss of $235.4 million and, as of March 31, 2024, our accumulated deficit was $2,056.0 million.

If the Company does not secure adequate funding to fulfill its current liabilities, it anticipates seeking bankruptcy protection in various jurisdictions within 30 days of publishing these financial statements. The Company anticipates that its available funds will be insufficient to cover its obligations for at least the next twelve months from the date this Form 10-Q was filed. Consequently, there is significant uncertainty regarding the Company's ability to continue operating. The Company is actively pursuing additional funds (see *Note 21 Subsequent Events* - $50 Million Note and Warrant Financing, $100 Million Financing Arrangement, and First Tranche of $50 Million Financing Payable on Execution). As part of its cost-cutting measures, the Company plans to further reduce its workforce and streamline operations, including downsizing its physical locations. However, there is no guarantee that the Company will be able to restructure its debts and/or secure the necessary financing on favorable terms.

Table of Contents

***Debt***

To date, our current working capital and development needs have been primarily funded through the issuance of convertible indebtedness, convertible preferred stock and common stock. Debt comprises an insignificant component of our funding needs.

The short-term debt classification primarily is based upon loans due within twelve-months from the balance sheet date, in addition to loans that have matured and remain unpaid. Management plans to renegotiate matured loans with creditors for favorable terms, such as reduce interest rate, extend maturities, or both; however, there is no guarantee favorable terms will be reached. Until negotiations with creditors are resolved, these matured loans remain outstanding and will be classified within short-term debt on the balance sheet. Interest and fees on loans are being accounted for within accrued interest.

The following is a summary of our debt as of March 31, 2024:

| Type of Debt | Unpaid Principal Balance | Net Carrying Value Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|
| Matured notes | $ 2,385,004 | $ 2,385,004 | $ - | 0.00 - 10.00% | 2019 - 2021 |
| Loan advances | 332,800 | 332,800 | - | 0.00 - 10.00% | 2016 - 2018 |
| **Total Debt** | **$ 2,717,804** | **$ 2,717,804** | **$ -** | | |

The Promissory Note issued to NuBridge Commercial Lending LLC for a principal amount of $5 million (with carrying amount, net of debt discount, of approximately $4.9 million as of December 31, 2023) was repaid by the Company on January 31, 2024, further reducing the overall debt of the Company to approximately $2.7 million.

**Scheduled Debt Maturities**

The following are scheduled debt maturities as of March 31, 2024:

| | Year Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2024 (6 months) | 2025 | 2026 | 2027 | 2028 | Thereafter | Total |
| **Total Debt** | $ 2,717,804 | $ - | $ - | $ - | $ - | $ - | $ 2,717,804 |

**Cash Flows**

The following table provides a summary of our cash flow data for the six months ended March 31, 2024 and 2023:

| | Six Months Ended March 31, | |
|---|---|---|
| Net cash provided by (used in): | 2024 | 2023 |
| Operating activities | $ (108,472,976) | $ (67,567,385) |
| Investing activities | (12,470,001) | (97,420,097) |
| Financing activities | (4,945,832) | 167,359,660 |

51

Table of Contents

*Cash Flows used in Operating Activities*

Our cash flow used in operating activities to date has been primarily comprised of costs related to research and development, payroll and other general and administrative activities. Net cash used in operating activities was $108.5 million in the six months ended March 31, 2024, a 61% increase from $67.6 million net cash used during the six months ended March 31, 2023.

*Cash Flows used in Investing Activities*

Our cash flows used in investing activities, to date, have been comprised mainly of purchases of equipment.

Net cash used in investing activities was $12.5 million in the six months ended March 31, 2024, an 87% decrease from $97.4 million used in investing activities during the six months ended March 31, 2023. The primary factor of the change was the ELMS assets acquisition during the three months ended December 31, 2022.

*Cash Flows provided by Financing Activities*

Through March 31, 2024, we have financed our operations primarily through the issuance of convertible notes and equity securities.

Net cash used in financing activities was $4.9 million for the six months ended March 31, 2024, as compared to $167.4 million net cash obtained from financing activities for the six months ended March 31, 2023, when we issued convertible notes in lieu of preferred shares.

**Contractual Obligations and Commitments**

The following tables summarizes our contractual obligations and other commitments for cash expenditures as of March 31, 2024, and the years in which these obligations are due:

**Operating Lease Commitments**

| Years Ended September 30, | | Scheduled Payments |
|---|---|---|
| 2024 (6 months) | $ | 1,609,937 |
| 2025 | | 6,255,302 |
| 2026 | | 4,823,283 |
| 2027 | | 4,765,083 |
| 2028 | | 4,555,178 |
| Thereafter | | 7,212,541 |
| **Total Future Minimum Lease Payments** | $ | **29,221,324** |

52

Table of Contents

**Off-Balance Sheet Arrangements**

We are not a party to any off-balance sheet arrangements, as defined under SEC rules.

**Critical Accounting Policies and Estimates**

Our financial statements have been prepared in accordance with U.S. GAAP. In the preparation of these financial statements, our management is required to use judgment in making estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Management considers an accounting judgment, estimate or assumption to be critical when (1) the estimate or assumption is complex in nature or requires a high degree of judgment and (2) the use of different judgments, estimates and assumptions could have a material impact on the consolidated financial statements. Our significant accounting policies are described in *Note 3* to the consolidated financial statements.

In preparation of these financial statements, management applied critical estimates and assumptions while performing impairment test for goodwill and other noncurrent assets. We identified Bollinger and ELMS/Legacy Mullen (refer to *Note 4 - Segment information*) as our reporting units for the purposes of assessing impairments.

We review our noncurrent asset groups for impairment whenever events or changes in circumstances indicate that the carrying amount of such asset groups may not be recoverable. Such conditions could include significant adverse changes in the business climate, current period operating or cash flow losses, significant declines in forecasted operations, or a current expectation that an asset group will be disposed of before the end of its useful life. Recoverability of noncurrent asset groups to be held and used is measured by a comparison of the carrying amount of the asset group to future undiscounted net cash flows expected to be generated by the asset group. If the asset group is considered to be impaired, the impairment recognized is the amount by which the carrying amount of the asset group exceeds the fair value of the asset group. Due to a prolonged decrease in our market capitalization, including a significant decline in stock price and budgeted performance targets not achieved as compared to acquisition date budgets, we assessed noncurrent assets for impairment.

*Critical accounting estimates for impairment of assets of the Bollinger segment*

Our goodwill and indefinite-lived in-process research and development assets, as well as patents, pertain to the Bollinger acquisition on September 7, 2022. As a result of impairment test performed on March 31, 2024 by management, impairment was recognized in the financial statements for the three and six months ended March 31, 2024: including $28,846,832 for goodwill, $58,304,612 for indefinite-lived in-process research and development assets, as well as $1,354,413 for right-of-use assets.

The impairment has been recognized primarily due to present uncertainty of availability of future funding required to support this segment and decrease of Company's market capitalization.

53

Table of Contents

***Critical accounting estimates for impairment of assets of the ELMS/Mullen segment***

As a result of impairment test performed on March 31, 2024 by management, impairment was also recognized in respect of part of right-of-use assets in amount of $1,813,195, as well as engineering design intangible assets with carrying amount of $15,142,455, which belong to the ELMS/Mullen segment.

The primary reasons for the impairment of these assets were sales slower than expected and decrease of Company's market capitalization.

Estimating the fair value of the reporting units and certain assets requires us to make assumptions and estimates regarding our future plans, as well as industry, economic, and regulatory conditions. These assumptions and estimates include estimated future annual net cash flows, income tax considerations, discount rates, long-term growth rates, contributory asset charges, and other market factors. Assumptions used in impairment assessments are made at a point in time and therefore, they are subject to change based on the facts and circumstances present at each annual and interim impairment assessment date. Fair value determinations require significant judgment and are sensitive to changes in underlying assumptions, estimates, and market factors.

**Recent Accounting Pronouncements**

Accounting standard updates issued but not yet effective were assessed and determined to be either not applicable or not expected to have a material impact on our consolidated financial statements.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk.**

Not Applicable.

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed by us under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b) accumulated and communicated to our management, including our principal executive and principal financial officer, to allow timely decisions regarding required disclosures.

We conducted an evaluation pursuant to Rule 13a-15 of the Exchange Act of the effectiveness of the design and operation of our DCP as of March 31, 2024, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were not effective at the reasonable assurance level as of March 31, 2024 because of material weaknesses in the Company's internal control over financial reporting described below.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.

54

Table of Contents

While preparing the Company's unaudited interim consolidated financial statements, our management concluded that the following material weaknesses in internal control over financial reporting disclosed in our Annual Report filed on Form 10-K for the year ended September 30, 2023 are not fully remediated:

- Based on management's review of key accounting and information technology policies and procedures, we have determined that although such policies and procedures exist, they are not all formalized in a written procedure format that is up to date.

- As a result of absence of formalized review of key controls across several business processes and/or insufficiently formalized documentation evidencing such review, management's ability to evaluate the design and monitor the effective operation of these preventative and detective internal controls is limited. Accordingly, management's ability to timely detect, prevent and remediate deficiencies and potential risks has been assessed as inadequate.

- The Company identified certain design deficiencies in its controls associated with the financial close process. These deficiencies, individually or in the aggregate, combined with inadequate compensating controls, created a reasonable possibility that a material misstatement to the consolidated financial statements might not be prevented or detected on a timely basis.

- The Company lacks in-house accounting expertise to identify rights and obligations reflected in non-standard agreements, requiring specialized accounting for complex transactions.

- The Company's internal control system as well as disclosure controls and procedures failed to ensure the Company properly presents certain related party disclosures in the financial statements for the year ended September 30, 2022, as discussed in the *Note 20 - Related Party Transactions* to the financial statements for the year ended September 30, 2023.

During the six months ended March 31, 2024, these control deficiencies did not result in identified material misstatements in our consolidated financial statements; however, the control deficiencies described above created a more than remote possibility that a material misstatement in the consolidated financial statements would not be prevented or detected on a timely basis. Therefore, our management concluded that the deficiencies represent material weaknesses.

Based on the performance of additional procedures by management designed to ensure reliability of financial reporting, the Company's management has concluded that, notwithstanding the material weaknesses described above, the consolidated financial statements, included in this Form 10-Q, fairly present, in all material respects, the Company's financial position, results of operations, and cash flows as of the dates, and for the periods presented, in conformity with U.S. GAAP.

**Remediation Efforts to Address the Material Weaknesses**

While the Company has significantly improved its internal control over financial reporting, the material weaknesses remain un-remediated as of March 31, 2024, and the Company's remediation efforts will continue to take place in 2024.

During the six months ended March 31, 2024, the management continued implementing actions in accordance with the remediation plan, including:

- Improvement of accounting policies and procedures.

- Development of systems and IT tools to enable the effectiveness and consistent execution of controls over timely and accurate accounting for certain transactions.

- Consulting with independent accounting firm on accounting and valuation matters.

55

Table of Contents

**Changes in Internal Control Over Financial Reporting**

During the three months ended March 31, 2024, the Company has been implementing internal control improvements in accordance with remediation plan which currently includes:

- Revising and enhancing effectiveness of the controls put in place during previous periods, including those mentioned above.

- Continuing to implement processes and controls to better manage and monitor our financial reporting risks, including enhancing the usage of technology and tools.

- Continuing professional training and education on accounting subjects for accounting staff.

- Enhancing management review controls related to our financial statement close and financial reporting involving estimates, judgments, and assumptions.

- Augmenting the design of the financial statement closing and financial reporting process including documentation of accounting treatment of significant and unusual transactions.

The actions that we are taking are subject to ongoing management review and audit committee oversight. We believe these measures will aid to remediate the control deficiencies that gave rise to the material weaknesses, but the material weaknesses will not be considered fully remediated until controls have been designed and implemented for a sufficient period of time, and properly tested for our management to conclude that the control environment is operating effectively.

We are committed to continuing to improve our internal control processes, and, as we continue to evaluate and work to improve our internal control over financial reporting, we may take additional measures to address control deficiencies, or we may modify certain of the remediation measures described above.

**Limitations on Effectiveness of Controls and Procedures**

In designing and evaluating our disclosure controls and processes as well as internal control over financial reporting, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of controls and procedures must reflect the fact that there are resource constraints, and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Because of its inherent limitations, any internal control system, no matter how well designed and operated, is based upon certain judgments and assumptions, and cannot provide absolute assurance that its objectives will be met. Similarly, an evaluation of controls cannot provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Table of Contents

**PART II. OTHER INFORMATION**

**Item 1. Legal Proceedings**

Material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the Company or any of its subsidiaries is a party or of which any of their property is the subject, are described in the "*Note 19 - Contingencies and Claims*" of the notes to the consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q and incorporated herein by reference.

**Item 1A. Risk Factors**

As a smaller reporting company, we are not required to provide this information in this Report; however, set forth below are certain material changes to the Risk Factors disclosed in our Annual Report on Form 10-K for the year ended September 30, 2023 (the "2023 Form 10-K"). You should also read and consider the risk factors discussed in Part I, Item 1A. "*Risk Factors*" in our 2023 Form 10-K, which could materially affect our business, financial condition, or future results of operation. The risks described herein and in our 2023 Form 10-K are not the only risks facing us. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may eventually prove to have a material adverse effect on our business, financial condition and/or future operating results.

***We may not be able to raise additional funding nor generate or obtain sufficient cash flows to service all of our existing and future liabilities when they become due, and we may be forced to take other actions to satisfy our obligations, which may not be successful.***

We may be unable to obtain alternative sources of financing in an amount sufficient to fund our existing and future liquidity needs. To date, we have yet to generate any significant revenue from our business operations. Our current working capital and development needs have been primarily funded through the issuance of convertible indebtedness, convertible preferred stock and common stock. We will need significant capital to, among other things, conduct research and development, increase our production capacity, and expand our sales and service network. Our ability to successfully expand our business will depend on many factors, including our working capital needs, the availability of equity or debt financing and, over time, our ability to generate cash flows from operations. During the six months ended March 31, 2024, the Company used approximately $108.3 million of cash for operating activities.

The Company's principal source of liquidity consists of existing cash and restricted cash of approximately $29.8 million as of March 31, 2024. If we are unable to obtain funding or a refinancing or some restructuring of our obligations or other improvement in liquidity, we may not be able to service all our liabilities when they become due. The Company is actively pursuing additional funds and remains in discussions with potential financiers. As part of its cost-cutting measures, the Company plans to further reduce its workforce and streamline operations, including downsizing its physical locations. However, there is no guarantee that the Company will be able to restructure its liabilities and/or secure the necessary financing on favorable terms. If any of our significant obligations are accelerated, we may not be able to repay the obligations that become immediately due and will have severe liquidity restraints.

We are currently evaluating strategic alternatives to address our liquidity issues, but we cannot assure you that any of our strategies will yield sufficient funds to meet our working capital or other liquidity needs, and any such alternative measures may be unsuccessful or may not permit us to meet scheduled obligations, which could cause us to default on our obligations. As a result, we may seek bankruptcy court protection to continue our efforts to restructure our business and capital structure and may have to liquidate our assets and may receive less than the value at which those assets are carried on our consolidated financial statements.

Table of Contents

***Our liquidity issues that can force us to seek protection under the federal bankruptcy laws may impact our business and operations.***

Due to the uncertainty about our ability to obtain sufficient cash to service current and future liabilities, there is risk that, among other things:

- third parties' confidence in our ability to develop and manufacture explore and produce electric vehicles, which could impact our ability to execute on our business strategy;

- it may become more difficult to retain, attract or replace key employees;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- our suppliers, vendors and service providers could renegotiate the terms of our arrangements, terminate their relationship with us or require financial assurances from us.

Seeking bankruptcy court protection could have a material adverse effect on our business, financial condition, results of operations and liquidity. For as long as a bankruptcy proceeding continued, our senior management would be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing on our business operations. Bankruptcy court protection also could make it more difficult to retain management and other key personnel necessary to the success and growth of our business. In addition, during the period of time we are involved in a bankruptcy proceeding, our customers and suppliers might lose confidence in our ability to reorganize our business successfully and could seek to establish alternative commercial relationships. The occurrence of certain of these events has already negatively affected our business and may have a material adverse effect on our business, results of operations and financial condition.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not Applicable.

**Item 5. Other Information**

*Termination of Debt Agreement*

On May 7, 2024, the Debt Agreement dated December 18, 2023 to issue a non-convertible secured promissory note with a principal amount of $50 million and $18 million original issue discount was terminated (refer to *Note 7 - Debt* for further information).

*Repayment of Related Party Receivables*

On January 16, 2024, the Company terminated the Transition Services Agreement between the Company and Mullen Technologies, Inc., and received cash payment in full settlement of all amounts outstanding (including outstanding notes receivable, advances and related interest and penalties) of approximately $2.7 million (refer to *Note 20 - Related Party Transactions* for further information).

*$50 Million Note and Warrant Financing*

We are reporting the following information in lieu of reporting on a Current Report on Form 8-K under Item 1.01 (Entry Into a Material Definitive Agreement), Item 2.03 (Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant), and Item 3.02 (Unregistered Sales of Equity Securities).

Table of Contents

On May 14, 2024, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement"), with certain investors, pursuant to which upon the terms and subject to the conditions contained therein, the investors agreed to purchase an aggregate principal amount of $52.6 million of 5% Original Issue Discount Senior Secured Notes convertible into shares of Common Stock (the "Notes") and five-year warrants exercisable for shares of Common Stock (the "Warrants").

Upon execution of the Securities Purchase Agreement, the investors purchased an initial aggregate principal amount of $13.2 million, or $12.5 million including the 5% original issue discount, of Notes and also received Warrants, and are obligated to purchase an additional principal amount of $39.5 million, or $37.5 million including the 5% original issue discount, of Notes and related Warrants if (i) the Company has sufficient authorized shares of Common Stock available to cover 250% of the shares of Common Stock underlying the conversion of the Notes and exercise of the Warrants, (ii) the Common Stock has average daily trading volume of $3 million in the previous ten (10) trading days, (iii) a registration statement covering the shares of Common Stock underlying the conversion of the Notes and exercise of the Warrants has been declared effective, (iv) the Company has obtained stockholder approval of the issuance of the Notes and Warrants in compliance with Nasdaq Listing Rule 5635(d), and (v) the Company is in compliance with the continued listing standards of The Nasdaq Capital Market (the "Funding Conditions"). Each investor may terminate its obligation to purchase additional amounts under the Securities Purchase Agreement if the Funding Conditions, as well as other closing conditions, have not occurred for a period of three months or longer.

For a period until the later of (i) the date a registration statement registering the shares issuable upon conversion of the Notes and exercise of the Warrants is declared effective or (ii) the date the Company has obtained stockholder approval for the transaction, the investors have the right, but not the obligation, to purchase an additional $52.6 million of 5% Original Issue Discount Senior Secured Convertible Notes and related Warrants on the same terms and conditions as provided in the Securities Purchase Agreement.

During the period commencing on the execution date and ending on the date immediately following the 90th day after the latest of: (i) the execution date (ii) the date on which a registration statement (or registration statements) registering for resale all Registrable Securities has been declared effective by the SEC and (iii) the date on which stockholder approval of the Exchange Cap (as defined below) is obtained, the Company agreed, with certain exceptions, not to directly or indirectly issue, offer, sell, or otherwise dispose of (or make any announcement) any equity security or any equity-linked or related security, any convertible securities, debt (with or related to equity), any preferred stock or any purchase rights. The Company also agreed not to enter into any fundamental, transaction, such as a merger, sale of more than 50% of the outstanding voting shares, sale of substantially all assets, or business combination, unless the successor entity assumes all of the obligations of the Company under the Notes and Warrants and the other transaction documents.

The Notes and Warrants are not convertible by a holder to the extent that (i) the holder or any of its affiliates would beneficially own in excess of 9.9% of the Common Stock or (ii) the aggregate number of shares of Common Stock issued in connection with the conversion of all Notes and Warrants, at any time exceeds 19.9% of the total number of shares of Common Stock outstanding or of the voting power of the Common Stock outstanding as of the date of execution of the Securities Purchase Agreement, unless the Company obtains stockholder approval in compliance with Nasdaq Listing Rule 5635(d) (the "Exchange Cap").

Such Notes and Warrants have been issued, and upon conversion or exercise, as applicable, the shares of Common Stock will be issued, pursuant to an exemption from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act.

*Description of the Notes*

The Notes accrue interest at a rate of 15% per annum, have an original issue discount of 5% and mature four months from the date of issuance. As security for payment of the amounts due and payable under the Notes, the Company granted a continuing security interest in all of its right, title and interest in, its assets, whether owned, existing, acquired or arising and wherever located. The outstanding principal and accrued but unpaid interest on the Notes may be converted by the holder into shares of Common Stock (the "Note Shares") at the lower of (i) $5.49, (ii) 95% of the closing sale price of the Common Stock on the date that the Company's registration statement on Form S-1 is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five (5) trading days prior to such conversion date, provided that the conversion price will not be less than $1.16 per share.

59

Table of Contents

Upon any event of default, the interest rate automatically increases to 20% per annum. An event of default includes failure to obtain stockholder approval within 45 calendar days after the closing date for the initial closing; failure to maintain sufficient reserves of authorized and unissued Common Stock to redeem 250% of the maximum number of shares issuable upon conversion of all the Notes then outstanding; failure to timely deliver, or remove any restrictive legend from, the shares upon conversion of the Note for a period of five business days; failure to pay any amount due under the Note or any other related transaction document; the occurrence of any default under or acceleration prior to maturity of any indebtedness (with certain exclusions) in an aggregate amount in excess of $300,000, subject to any cure or grace period provided, or a payment default under any such indebtedness, if such default remains uncured for a period of 10 consecutive trading days; bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, a judgment, settlement or any other satisfaction of any claim pursuant to any litigation, with respect to the payment of cash, securities and/or other assets with an aggregate fair value in excess of $300,000; the Company breaches any representation or warranty; and failure to file annual or quarterly reports within the required periods.

*Description of the Warrants*

In connection with the issuance of the Notes, the holder also received 5-year warrants exercisable for 200% of the shares of Common Stock underlying such Notes at an exercise price equal to 105% of closing sale price of the Common Stock on execution date, subject to further adjustment (the "Warrant Shares"). The Warrants provide for cashless exercise pursuant to which the holder will receive upon exercise a "net number" of shares of Common Stock determined according to the following formula:

Net Number = (A x B) / C
For purposes of the foregoing formula:
A= The total number of shares with respect to which the Warrant is then being exercised.
B= The Black Scholes Value (as described below).
C= The lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (as such Closing Bid Price is defined therein), but in any event not less than $0.10.

For purposes of the cashless exercise, "Black Scholes Value" means the Black Scholes value of an option for one share of Common Stock at the date of the applicable cashless exercise, as such Black Scholes value is determined, calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Exercise Price, as adjusted, (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable Cashless Exercise, (iv) an expected volatility equal to 135%, and (v) a deemed remaining term of the Warrant of 5 years (regardless of the actual remaining term of the Warrant).

The Company will have the option to require the holders to exercise the Warrants for cash, if, at any time, the following conditions are met: (i) the registration statement covering the securities has been declared effective is effective and available for the resale of the securities and no stop-order has been issued nor has the SEC suspended or withdrawn the effectiveness of the registration statement; (ii) the Company is not in violation of any of the rules, regulations or requirements of, and has no knowledge of any facts or circumstances that could reasonably lead to suspension in the foreseeable future on, the principal market; and (ii) the VWAP for each trading day during the 10 trading day period immediately preceding the date on which the Company elects to exercise this option is 250% above the exercise price.

*Conversion of the Notes; Exercise of the Warrants*

The Company must reserve out of authorized and unissued shares a number of shares of Common Stock equal to 250% of the maximum number of shares of Common Stock that are issuable upon conversion of the Notes and exercise of the Warrants. If the Company fails to timely deliver shares upon conversion of Notes or exercise of Warrants, the Company will be required to either (A) pay the holder in cash for each trading day on which shares are not delivered 5% of the product of the number of shares not so issued multiplied by the closing sale price of the Common Stock on the trading day immediately preceding the required delivery date, or (B) if the holder purchases shares of Common Stock in anticipation of delivery of shares upon conversion of the Note or exercise of the Warrant, as applicable, cash in an amount equal to holder's total purchase price of such shares.

60

Table of Contents

The exercise price and number of shares issuable upon conversion of the Notes or exercise of the Warrants, as applicable, will further be adjusted upon the occurrence of certain events and holders will be allowed to participate in certain issuances and distributions (subject to certain limitations and restrictions), including certain stock dividends and splits, dilutive issuances of additional common stock, and dilutive issuances of, or changes in option price or rate of conversion of, options or convertible securities, as well as the issuance of purchase rights or distributions of assets.

If, during restricted period, the Company effects a subsequent financing, including the issuance of options and convertible securities, any Common Stock, issued or sold or deemed to have been issued or sold for a consideration per share less than a price equal to the current conversion price of the Notes or exercise price of the Warrants (a "Dilutive Issuance"), then immediately after such issuance, the conversion price or exercise price, as applicable, will be reduced (and in no event increased) to the price per share as determined in accordance with the following formula:

$$EP2 = EP1 \times (A + B) / (A + C)$$

For purposes of the foregoing formula:
A= The total number of Note/Warrant Shares with respect to which the Note may be converted or the Warrant may be exercised.
B= The total number of shares of Common Stock that would be issued or issuable under the Dilutive Issuance if issued at a per share equal to EP1.
C= The total number of shares of Common Stock actually issued or issuable under the Dilutive Issuance.
EP1= The Conversion Price or Exercise Price, as applicable, in effect immediately prior to a Dilutive Issuance.
EP2= The Conversion Price or Exercise Price, as applicable, immediately after such Dilutive Issuance; provided, however, that such price shall in no event be less than $0.10 per share of Common Stock.

"Restricted period" means the period commencing on the purchase date and ending on the earlier of (i) the date immediately following the 90th day after a registration statement registering for the securities has been declared effective by the SEC and (ii) the 90th day after the securities purchased are saleable under Rule 144 without the requirement for current public information and without volume or manner of sale limitations.

The Notes and Warrants provide for certain purchase rights whereby if the Company grants, issues or sells any options, convertible securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock, then the holder will be entitled to acquire such purchase rights which the holder could have acquired if the holder had held the number of shares of Common Stock acquirable upon complete exercise of the Warrant.

*Registration Rights Agreement*

In connection with the Securities Purchase Agreement, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement"), dated as of May 14, 2024, with the investors, pursuant to which the Company agreed to prepare and file one or more registration statements with the SEC covering the resale of the Note Shares and the Warrant Shares no later than 5 days following the closing date (the "Filing Deadline"), and to have the initial registration statement declared effective the earlier of 45 days after the closing date (or 15 days for any additional registration statement) and the second business day after the Company is notified by the SEC that such registration statement will not be "reviewed" or will not be subject to further review (the "Effectiveness Deadline"). The Company also agreed to provide certain piggyback registration rights to the investors.

61

Table of Contents

In addition, pursuant to the Registration Rights Agreement, the Company is required to use its reasonable best efforts to keep the Registration Statement continuously effective from the date on which the SEC declares the Registration Statement to be effective until such date that all Registrable Securities (as such term is defined in the Registration Rights Agreement) covered by the Registration Statement have been sold pursuant to a registration statement under the Securities Act, under Rule 144 as promulgated by the SEC under the Securities Act ("Rule 144"), or otherwise shall have ceased to be "Registrable Securities" (as defined therein). The Company may not file another registration statement that does not relate to the Registrable Securities until the 30th day anniversary of the first date on which the resale by the investors is covered by one or more registration statement.

In the event that (i) the Company fails to file a registration statement by the Filing Deadline, (ii) a registration statement is not declared effective on or prior to the Effectiveness Deadline, (iii) sales cannot be made pursuant to the registration statement or the prospectus contained therein is not properly available for any reason for more than five (5) consecutive calendar days or more than an aggregate of ten (10) calendar days during any 12-month period, (iv) a registration statement is not effective for any reason or the prospectus contained therein is not properly available for use for any reason, and the Company fails to file with the SEC any required reports under
the Exchange Act, then the Company has agreed (unless the Registrable Securities are freely tradable pursuant to Rule 144) to make payments to each investor as liquidated damages in an amount equal to 1.5% of such investor's total committed purchase price for the Registrable Securities affected by such failure and an additional 1.5% on every 30 day anniversary, with a maximum of 12 payments (except with respect to clause (iv)). Such payments will bear interest at the rate of 10% per month (prorated for partial months) until paid in full and may be paid in shares of Common Stock at the option of the Company.

The Company has granted the investors customary indemnification rights in connection with the Registration Rights Agreement. The investors have also granted the Company customary indemnification rights in connection with the Registration Rights Agreement.

The foregoing descriptions of the Securities Purchase Agreement, Notes, Warrants and Registration Rights Agreement are qualified in their entirety by reference to the full text of such documents, copies of which are attached hereto as Exhibits 10.3, 10.3(a), 10.3(b), and 10.3(c), respectively, and each of which is incorporated herein in its entirety by reference. The representations, warranties and covenants contained in such agreements were made only for purposes of such agreements and as of specific dates, were solely for the benefit of the parties to such agreements and may be subject to limitations agreed upon by the contracting parties.

### *$100 Million Financing Arrangement through Senior Secured Notes and Warrants*

The Company also signed a commitment letter agreement with an investor for a total investment of $100 million through the issuance of Senior Secured Convertible Notes and Warrants. The Convertible Notes will accrue interest at 15%, include a 5% Original Issue Discount, and have a maturity of four months. They will be issued in eight tranches of $12.5 million over 13 months. The investor will receive a $4 million non-refundable commitment fee, payable in registered common stock. Other conditions are similar to those described above for the $50 million Financing Arrangement. The completion of this transaction remains contingent upon mutual consent and the execution of final documentation by both parties.

### *Director and Officer Trading Arrangements*

None of the Company's directors or executive officers adopted, modified, or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement during the Company's quarter ended March 31, 2024.

Table of Contents

**Item 6. Exhibits**

| Exhibit No. | Description |
|---|---|
| 3.1 | Certificate of Designation of Rights, Preferences and Privileges of Series A-1 Junior Participating Preferred Stock of Mullen Automotive Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, filed with the SEC on May 6, 2024) |
| 4.1 | Rights Agreement dated as of May 1, 2024, by and between the Company and Continental Stock Transfer & Trust Company, as rights agent (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, filed with the SEC on May 6, 2024) |
| 10.1 | Termination Agreement, dated January 15, 2024, by and between Mullen Technologies, Inc. and Mullen Automotive Inc. (incorporated by reference to Exhibit 10.6(a) to the Company's Annual Report on Form 10-K, filed with the SEC on January 17, 2024) |
| 10.2 | Commitment Letter Agreement dated May 14, 2024 |
| 10.3 | Securities Purchase Agreement dated May 14, 2024 by and among Mullen Automotive Inc. and the purchasers named therein |
| 10.3(a) | Form of Convertible Note |
| 10.3(b) | Form of Warrant |
| 10.3(c) | Registration Rights Agreement dated May 14, 2024 by and among Mullen Automotive Inc. and the purchasers named therein |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. § 1350 |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL Document and include in Exhibit 101) |

* Filed herewith (furnished herewith with respect to Exhibit 32.1).

63

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Mullen Automotive Inc.

May 14, 2024                                          By:    /s/ David Michery

_____

David Michery

Chief Executive Officer, President and Chairman of the Board
*(Principal Executive Officer and duly authorized officer)*


/s/ Jonathan New

_____

Jonathan New
Chief Financial Officer
*(Principal Financial Officer)*

64

**Exhibit 10.2**

Esousa Holdings, LLC

This letter agreement, dated and effective as of May 14, 2024 under which Esousa Holdings, LLC., a New York LLC, hereby commits to purchase $100 million of Mullen Automotive Inc.'s equity and equitylinked securities (the "Commitment Amount") over the next thirteen months. This Commitment Amount is subject to the company having a sufficient number of authorized shares available and reserved for such financing, being listed on a national stock exchange and in compliance with all conditions to maintain such listing. In connection with the acceptance of such commitment, Mullen shall irrevocably and unconditionally commit to issue and register shares of its common stock, and/or prepaid penny warrants, if necessary, in its next registration statement, such that when such registration statement is declared effective shall have a value of 4% of the Commitment Amount. Mullen represents that it has received all necessary corporate approvals to enter into this agreement, and that such agreement does not violate any existing financial or other restriction.

This Letter Agreement shall be governed by New York law.


By:

_____

Esousa Holdings, LLC
Managing Member


By:

_____

David Michery
Mullen Automotive, Inc.
Chairman and CEO

**Exhibit 10.3**

## SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "**Agreement**"), dated as of May 14, 2024 (the "**Execution Date**"), between Mullen Automotive Inc., a Delaware corporation (the "**Company**"), and the investors listed on the Buyer Schedules attached hereto (each a "**Buyer**" and, collectively, the "**Buyers**").

### RECITALS

A. The Company and the Buyers are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "**1933 Act**"), and Rule 506 of Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the 1933 Act.

B. The Buyers wish to purchase, and the Company wishes to sell, upon the terms and subject to the conditions stated in this Agreement, (i) 5% Original Issue Discount Secured Convertible Notes in the form attached hereto as **Exhibit A** (each a "**Convertible Note**" and, collectively, the "**Convertible Notes**") convertible into shares of Common Stock in an aggregate amount as set forth on the Buyer Schedules and in this Agreement (the "**Conversion Shares**"), and (ii) warrants, in the form attached hereto as **Exhibit B** (each a "**Warrant**" and, collectively, the "**Warrants**"), to acquire shares of Common Stock pursuant to the terms set forth therein. "**Warrant Shares**" means all or a portion of the total number of shares of Common Stock issuable upon full exercise of the Warrants.

C. At the Closing (as defined below), the parties hereto shall execute and deliver a Registration Rights Agreement, in the form attached hereto as **Exhibit C** (the "**Registration Rights Agreement**"), pursuant to which the Company has agreed to provide certain registration rights with respect to the Registrable Securities under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each Buyer hereby agree as follows:

1. **PURCHASE AND SALE OF CONVERTIBLE NOTES AND WARRANTS.**

(a) Convertible Notes and Warrants. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to each Buyer, and each Buyer shall purchase from the Company on the applicable Closing Date (as defined below), Convertible Notes in an aggregate original principal amount as set forth on each Buyer's respective Buyer Schedule, along with Warrants to initially acquire up to the aggregate number of Warrant Shares as set forth on each Buyer's respective Buyer Schedule.

(b) Closing. The aforementioned issuances, sales and deliveries of Convertible Notes and Warrants shall be scheduled as follows: the initial sale and purchase (the "**Initial Closing**") of a $13,157,894.74 principal amount Convertible Note and such number of Warrants by the Buyers as contemplated by this Agreement shall take place on the date hereof; and the additional sale and purchase (the "**Second Closing**" and, together with the Initial Closing, a "**Closing**" and each such date of a Closing being, a "**Closing Date**") of a $39,473,684.20 principal amount Convertible Note and such number of Warrants by the Buyers as contemplated by this Agreement as soon as practicable, but no later than the third (3rd) Business Day following the satisfaction or waiver of all of the closing conditions set forth in Sections 6 and 7 applicable to the Second Closing (other than those to be satisfied at the Second Closing, but subject to the satisfaction or waiver of such closing conditions).

(c) Payment of Purchase Price; Delivery of Securities. On the Closing Date for the Initial Closing, each Buyer shall pay its pro rata portion of an aggregate $12,500,000 (the "**Initial Purchase Price**") to the Company by wire transfer of immediately available funds in accordance with the Company's written wire instructions and the Company shall issue to each Buyer a Convertible Note with a principal amount equal to such Buyer's its pro rata portion of $13,157,894.74, and Warrants to acquire Warrant Shares in the amount as indicated on the Buyer Schedule, in all cases, duly executed on behalf of the Company and registered in the name of such Buyer or its designee. On the Second Closing Date, each Buyer shall pay its pro rata portion of an aggregate $37,500,000 (the "**Second Purchase Price**", and, with the Initial Purchase Price, in each case, the "**Purchase Price**") to the Company by wire transfer of immediately available funds in accordance with the Company's written wire instructions and the Company shall issue to each Buyer a Convertible Note with a principal amount equal to such Buyer's pro rata portion of $39,473,684.20, and Warrants to acquire Warrant Shares in the amount as indicated on the Buyer Schedule, in all cases, duly executed on behalf of the Company and registered in the name of such Buyer or its designee.

(d) Taxes. The Company shall pay any and all transfer, stamp or similar taxes that may be payable with respect to the issuance and delivery of any Securities to the Buyers made under this Agreement or the other Transaction Documents (as defined below).

(e) Legal Expenses. The Company shall reimburse the Buyers' reasonable and documented legal expenses, which expenses shall be paid out of the proceeds at each Closing.

2.    BUYER'S REPRESENTATIONS AND WARRANTIES.

Each Buyer represents and warrants to the Company, on behalf of itself, that:

(a) Organization; Authority. Such Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with the requisite power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents to which it is a party and otherwise to carry out its obligations hereunder and thereunder.

(b) No Public Sale or Distribution. Such Buyer (i) is acquiring, or will acquire, the Convertible Notes and Warrants, (ii) upon conversion of its Convertible Notes, will acquire the Conversion Shares issuable upon conversion thereof, and (iii) upon exercise of its Warrants will acquire the Warrant Shares issuable upon exercise thereof, in each case, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof in violation of applicable securities laws, except pursuant to sales registered or exempted under the 1933 Act; provided, however, by making the representations herein, such Buyer does not agree, or make any representation or warranty, to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act. Such Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person (as defined below) to distribute any of the Securities in violation of applicable securities laws.

(c) Accredited Investor Status. Such Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D.

(d) Reliance on Exemptions. Such Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and such Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of such Buyer to acquire the Securities.

(e) Information. Such Buyer and its advisors, if any, acknowledge that they have been furnished with or provided access via EDGAR to the Company's most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K as well as Registration Statements on Form S-1 or S-3 (including amendments thereto). Such Buyer and its advisors, if any, have been afforded the opportunity to ask questions of, and receive answers from, the Company concerning the offer and sale of the Securities and to obtain any additional information such Buyer has requested which is necessary to verify the accuracy of the information furnished to such Buyer concerning the Company and such offering. Such Buyer understands that its investment in the Securities involves a high degree of risk. Such Buyer has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Securities. Such Buyer acknowledges that such Buyer is basing its decision to invest in the Securities solely upon the information contained in the Transaction Documents, the Company's most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, and any other SEC Documents, and its own due diligence and, except as specifically set forth in this Agreement, has not based its investment decision upon any representations made by any Person (as defined below).

(f) No Governmental Review. Such Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(g) Transfer or Resale. Such Buyer understands, that except as provided in the Registration Rights Agreement and Section 4(g) hereof: (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, (B) such Buyer shall have delivered to the Company (if requested by the Company) an opinion of counsel, reasonably acceptable to the Company, to such Buyer, in a form reasonably acceptable to the Company, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration, or (C) such Buyer provides the Company with reasonable assurance that such Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A promulgated under the 1933 Act (or a successor rule thereto) ("**Rule 144**"); (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144, and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the Person (as defined below) through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC promulgated thereunder; and (iii) neither the Company nor any other Person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

(h) Validity; Enforcement. The execution and delivery of the Transaction Documents and the consummation by such Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of such Buyer and no further consent or authorization of such Buyer or its members is required. Each Transaction Document has been duly executed by such Buyer and when delivered in accordance with terms hereof and thereof, constitutes the legal, valid and binding obligations of such Buyer enforceable against such Buyer in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(i) No Conflicts. The execution, delivery and performance by such Buyer of this Agreement and the consummation by such Buyer of the transactions contemplated hereby will not (i) result in a violation of the organizational documents of such Buyer, (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Buyer is a party or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to such Buyer, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights or violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the ability of such Buyer to perform its obligations hereunder.

(j) Experience of Buyer. Such Buyer has such knowledge, sophistication and experience in business and financial matter so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Buyer is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(k) Foreign Corrupt Practices. Neither such Buyer nor any of its subsidiaries or affiliates, nor, to the knowledge of such Buyer, any director, officer, agent, employee, member or other Person acting on behalf of such Buyer or any its subsidiaries or affiliates has, in the course of its actions for, or on behalf of, such Buyer or any of its subsidiaries or affiliates (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment of any foreign or domestic government official or employee.

(l) General Solicitation. Such Buyer is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or advertisement.

(m)  Patriot Act Representations.

(i) Such Buyer represents that all evidence of identity provided is genuine and all related information furnished is accurate.

(ii) Such Buyer hereby acknowledges that the Company seeks to comply with all applicable anti-money laundering laws and regulations. In furtherance of such efforts, such Buyer hereby represents and agrees that: (A) no part of the funds used by such Buyer to acquire the Securities have been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (B) no payment to the Company by such Buyer shall cause the Company to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Executive Order 13224 (2001) (the "Patriot Act") issued by the President of the United States and the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC") regulations.

(iii) Such Buyer represents and warrants that the amounts to be paid by such Buyer to the Company will not be directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations. Such Buyer represents and warrants that, to the best of its knowledge, none of: (A) such Buyer; (B) any Person controlling or controlled by such Buyer; or (C) any Person having a beneficial interest in such Buyer is (I) a country, territory, individual or entity named on a list maintained by OFAC, (II) a Person prohibited under the OFAC Programs, (III) a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure as such terms are defined in the footnotes below or (IV) a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. §5311 et seq.), as amended (the "Bank Secrecy Act") and the regulations promulgated thereunder by the U.S. Department of the Treasury.

(iv) Such Buyer further represents and warrants that such Buyer: (A) has conducted thorough due diligence with respect to all of its beneficial owners, (B) has established the identities of all beneficial owners and the source of each of the beneficial owner's funds and (C) will retain evidence of any such identities, any such source of funds and any such due diligence.

(v) Neither such Buyer nor any Person directly or indirectly controlling, controlled by or under common control with such Buyer is a person identified as a terrorist organization on any relevant lists maintained by governmental authorities.

(vi) Such Buyer agrees to provide the Company all information that may be reasonably requested to comply with applicable laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of such Buyer from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information. Such Buyer agrees to notify the Company promptly if there is any change with respect to the representations and warranties provided herein. Such Buyer consents to the disclosure to regulators and law enforcement authorities by the Company and its affiliates and agents of any information about such Buyer or its constituents as the Company reasonably deems necessary or appropriate to comply with applicable anti-money laundering, anti-terrorist and asset control laws, regulations, rules and orders.

**3.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**

The Company represents and warrants to the Buyers the matters set forth in this Section 3. These representations and warranties are current as of the date of this Agreement, except to the extent that a representation or warranty expressly states that such representation or warranty is current only as of an earlier date. If any information is so reflected as of an earlier date, there have been no material changes since such date to the date hereof.

(a) Organization and Qualification. Each of the Company and each of its subsidiaries are entities duly organized and validly existing and in good standing under the laws of the jurisdiction in which they are formed, and have the requisite power and authorization to own their properties and to carry on their business as now being conducted and as presently proposed to be conducted. Each of the Company and each of its subsidiaries is duly qualified as a foreign entity to do business and is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect.

(b) Authorization; Enforcement; Validity. The Company has the requisite power and authority to enter into and perform its obligations under this Agreement and the other Transaction Documents and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of this Agreement and the other Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Convertible Notes and the issuance of the Warrants and the reservation for issuance and issuance of the Conversion Shares upon conversion of the Convertible Notes and the reservation for issuance and issuance of the Warrant Shares issuable upon exercise of the Warrants) have been (i) duly authorized by the Company's board of directors and (ii) no further filing, consent or authorization is required by the Company, its board of directors or its shareholders or other governing body of the Company (other than the filing with the SEC of one or more Registration Statements (as defined in the Registration Rights Agreement) in accordance with the requirements of the Registration Rights Agreement, a Form D with the SEC and any other filings as may be required by any state securities agencies, the filing of required notices and/or applications to the Principal Market for the issuance and sale of the Securities, the filings required by Section 4(h) of this Agreement. This Agreement has been, and the other Transaction Documents will be prior to the Closing, duly executed and delivered by the Company, and each constitutes the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies and except as rights to indemnification and to contribution may be limited by federal or state securities law.

(c) Issuance of Securities. The issuance of the Securities is duly authorized and, upon issuance in accordance with the terms of the Transaction Documents, will be validly issued, fully paid and non-assessable and free from all preemptive or similar rights, taxes, Liens, charges and other encumbrances with respect to the issue thereof. As of each Closing, the Company shall have reserved from its duly authorized capital stock not less than the sum of (i) 250% of the maximum number of Conversion Shares issuable upon conversion of the Convertible Notes (without taking into account any limitations on the conversion of the Convertible Notes set forth therein) and (ii) 250% of the maximum number of Warrant Shares issuable upon exercise of the Warrants (without taking into account any limitations on the exercise of the Warrants set forth therein). The issuance of the Convertible Notes and Warrants is duly authorized, and upon the due execution, issuance and delivery, the Convertible Notes and Warrants will be valid and binding obligations of the Company enforceable against the Company in accordance with their terms. The issuance of the Conversion Shares is duly authorized, and upon issuance in accordance with the Convertible Notes, the Conversion Shares will be validly issued, fully paid and non-assessable and free from all preemptive or similar rights, taxes, Liens, charges and other encumbrances with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock. The issuance of the Warrant Shares is duly authorized, and upon issuance in accordance with the Warrants, the Warrant Shares will be validly issued, fully paid and non-assessable and free from all preemptive or similar rights, taxes, Liens, charges and other encumbrances with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock. Subject to the accuracy of the representations and warranties of the Buyers in this Agreement, the offer and issuance by the Company of the Securities is exempt from registration under the 1933 Act. Upon issuance in accordance with the terms of the Transaction Documents, Buyers will have good and marketable title to the Securities.

(d) No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Convertible Notes, the Conversion Shares, the Warrants and the Warrant Shares and the reservation for issuance of the Conversion Shares and the Warrant Shares), subject to the Required Approvals, will not (i) result in a violation of the Certificate of Incorporation of the Company or other organizational documents of the Company or any of its subsidiaries, any capital stock of the Company or any of its subsidiaries or bylaws or operating agreements of the Company or any of its subsidiaries, (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its subsidiaries is a party or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including, without limitation, foreign, federal and state securities laws and regulations and the rules and regulations of the Principal Market applicable to the Company or by which any property or asset of the Company is bound or affected except, in the case of clause (ii) or (iii) above, to the extent such violations that could not reasonably be expected to have a Material Adverse Effect.

(e) Consents. Neither the Company nor any subsidiary is required to obtain any consent from, authorization or order of, or make any filing or registration with any court, governmental agency or any regulatory or self-regulatory agency or any other Person (other than the filing with the SEC of one or more Registration Statements in accordance with the requirements of the Registration Rights Agreement, a Form D with the SEC and other filings as may be required by any state securities agencies, the filing of required notice and/or application to the Principal Market for the issuance and sale of the Securities, the Stockholder Approval and the filings required by Section 4(h) of this Agreement (collectively, the "Required Approvals")), in order for it to execute, deliver or perform any of its respective obligations under, or contemplated by, the Transaction Documents, in each case, in accordance with the terms hereof or thereof, other than have already been waived in connection herewith. All consents, authorizations, orders, filings and registrations that the Company is required to obtain at or prior to the Closing have been obtained or effected on or prior to the Closing Date, and the Company is not aware of any facts or circumstances that might prevent the Company from obtaining or effecting any of the registration, application or filings contemplated by the Transaction Documents. Except as disclosed in the SEC Documents, the Company is not in violation of the requirements of the Principal Market and has no knowledge of any facts or circumstances that could reasonably lead to suspension of the Common Stock in the foreseeable future. The Company has obtained approval of the Principal Market for listing or trading of Registrable Securities that constitute Common Stock.

(f) Acknowledgment Regarding Buyers' Purchase of Securities. The Company acknowledges and agrees that each Buyer is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby and thereby and that such Buyer is not (i) an officer or director of the Company, (ii) an affiliate (as defined in Rule 405 of the 1933 Act) of the Company (an "Affiliate") or (iii) to its knowledge, a "beneficial owner" (as defined for purposes of Rule 13d-3 of the 1934 Act) of more than 10% of the Common Stock. The Company further acknowledges that each Buyer is not acting as a financial advisor or fiduciary of the Company or any of its subsidiaries (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby, and any advice given by such Buyer or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to such Buyer's purchase of the Securities. The Company further represents to such Buyer that the Company's decision to enter into the Transaction Documents to which it is a party has been based solely on the independent evaluation by the Company and its representatives.

(g) No General Solicitation; Placement Agent's Fees. None of the Company, any of its Affiliates, or any Person acting on behalf of the Company or any of its Affiliates, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities. The Company shall be responsible for the payment of any of its placement agent's fees, financial advisory fees, or brokers' commissions, relating to or arising out of the transactions contemplated hereby.

(h) No Integrated Offering. None of the Company, any of its Affiliates, or, to the knowledge of the Company, any Person acting on behalf of the Company or any of its Affiliates has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of the issuance of any of the Securities under the 1933 Act, whether through integration with prior offerings or otherwise, or cause this offering of the Securities to require approval of shareholders of the Company under any applicable shareholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated for quotation. None of the Company, any of its Affiliates, or, to the knowledge of the Company, any Person acting on behalf of the Company or any of its Affiliates will take any action or steps that would require registration of the issuance of any of the Securities under the 1933 Act or cause the offering of any of the Securities to be integrated with other offerings of securities of the Company.

(i) Dilutive Effect. The Company understands and acknowledges that the number of Conversion Shares and Warrant Shares may increase in certain circumstances. The Company further acknowledges that, except to the extent an issuance would exceed the beneficial ownership limitation contained in the Transaction Documents, its obligation to issue the Conversion Shares upon conversion of the Convertible Notes and the Warrant Shares upon exercise of the Warrants in accordance therewith and with this Agreement is absolute and unconditional, regardless of the dilutive effect that such issuance may have on the ownership interests of other shareholders of the Company.

(j) Application of Takeover Protections; Rights Agreement. The Company and its board of directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, interested shareholder, business combination, poison pill (including, without limitation, any distribution under a rights agreement), shareholder rights plan or other similar anti-takeover provision under the Certificate of Incorporation or other organizational documents of the Company or any of its Affiliates or the laws of the jurisdiction of its incorporation or otherwise which is or could become applicable to each Buyer as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and such Buyer's ownership of the Securities. The Company and its board of directors have taken all necessary action, if any, in order to render inapplicable any shareholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company or any of its Affiliates.

(k) SEC Documents; Financial Statements. During the two (2) years prior to the date hereof (or such shorter period of time as the Company has been subject to reporting under the 1934 Act), the Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the 1934 Act (all of the foregoing, as well as all registration statements under the 1933 Act, filed prior to the date hereof and all exhibits and appendices included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "**SEC Documents**"). As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. As of their dates, the financial statements of the Company included in the SEC Documents complied in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as in effect as of the time of filing. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude the footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments which will not be material, either individually or in the aggregate). No other information provided by or on behalf of the Company to each Buyer which is not included in the SEC Documents contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein not misleading, in the light of the circumstance under which they are or were made.

(l) Absence of Certain Changes. Since the date of the Company's most recent audited financial statements contained in a Form 10-K, except as disclosed in the SEC Documents filed subsequent to such Form 10-K, there has been no material adverse change and no material adverse development in the business, assets, liabilities, properties, operations (including results thereof), or condition (financial or otherwise) of the Company and its subsidiaries. Since the date of the Company's most recent audited financial statements contained in a Form 10-K, neither the Company nor any of its subsidiaries has (i) declared or paid any dividends, (ii) sold any material assets outside of the ordinary course of business or (iii) made any material capital expenditures, individually or in the aggregate, outside of the ordinary course of business. Neither the Company nor any of its subsidiaries has taken any steps to seek protection pursuant to any law or statute relating to bankruptcy, insolvency, reorganization, receivership, liquidation or winding up. Neither the Company nor any of its subsidiaries has any knowledge or reason to believe that any of their respective creditors intend to initiate involuntary bankruptcy proceedings or any actual knowledge of any fact which would reasonably lead a creditor to do so. The Company is not, and after giving effect to the transactions contemplated hereby to occur at the Closing will not be, Insolvent (as defined below). The Company has not engaged in any business or in any transaction, and is not about to engage in any business or in any transaction, for which the Company's remaining assets constitute unreasonably small capital.

(m) No Undisclosed Events, Liabilities, Developments or Circumstances. Except as disclosed in the SEC Documents, no event, liability, development or circumstance has occurred or exists, or is reasonably expected to occur or exist with respect to the Company or any of its subsidiaries or any of their respective businesses, properties, liabilities, prospects, operations (including results thereof) or condition (financial or otherwise) that would have a Material Adverse Effect on the Company.

(n) Conduct of Business; Regulatory Permits. Neither the Company nor any of its subsidiaries is in violation of any term of or in default under its organizational documents including its Certificate of Incorporation, any other organizational charter, any certificate of designation, preferences or rights of any outstanding series of preferred stock of the Company or any of its subsidiaries, respectively. Neither the Company nor any of its subsidiaries is in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to the Company or any of its subsidiaries, and the Company will not conduct its business in violation of any of the foregoing, except in all cases for possible violations which could not, individually or in the aggregate, have a Material Adverse Effect. Without limiting the generality of the foregoing, except as disclosed in the SEC Documents, the Company is not in violation of any of the rules, regulations or requirements of the Principal Market and has no knowledge of any facts or circumstances that could reasonably lead to suspension of the Common Stock by the Principal Market in the foreseeable future. Since January 1, 2023, (i) the Common Stock has been designated for quotation on the Principal Market, (ii) trading in the Common Stock has not been suspended by the SEC or the Principal Market and (iii) except as disclosed in the SEC Documents, the Company has received no communication, written or oral, from the SEC or the Principal Market regarding the suspension of the Common Stock from the Principal Market. The Company and each of its subsidiaries possess all certificates, authorizations and permits issued by the appropriate regulatory authorities necessary to conduct their businesses, except where the failure to possess such certificates, authorizations or permits would not have, individually or in the aggregate, a Material Adverse Effect, and neither the Company nor any such subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(o) Foreign Corrupt Practices. Neither the Company nor any of its subsidiaries nor to the knowledge of the Company, any director, officer, agent, employee or other Person acting on behalf of the Company or any of its subsidiaries (as applicable) has, in the course of its actions for, or on behalf of, the Company or any of its subsidiaries (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

(p) Sarbanes-Oxley Act. Except as set forth in the SEC Documents, the Company and each of its subsidiaries is in material compliance with all applicable requirements of the Sarbanes-Oxley Act of 2002 and all applicable rules and regulations promulgated by the SEC thereunder.

(q) Transactions With Affiliates. Except as disclosed in the SEC Documents, none of the officers, directors, employees or Affiliates of the Company is presently a party to any transaction with the Company (other than for ordinary course services as employees, officers or directors and immaterial transactions), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer, director, employee or Affiliate or, to the knowledge of the Company, any corporation, partnership, trust or other Person in which any such officer, director, employee or Affiliate has a substantial interest or is an employee, officer, director, trustee or partner.

(r) Equity Capitalization. As of the date hereof, the authorized capital stock of the Company consists solely of 5,000,000,000 shares of Common Stock, of which 11,412,596 are issued and outstanding and 22,151,694 are reserved for issuance pursuant to Convertible Securities (as defined below) (other than the Convertible Notes and Warrants) and/or an Approved Share Plan. No shares of Common Stock are held in treasury. All of such outstanding shares are duly authorized and have been, or upon issuance will be, validly issued, fully paid and non-assessable. Except as disclosed in the SEC Documents: (i) to the Company's knowledge, no Person owns 10% or more of the Company's issued and outstanding shares of Common Stock (calculated based on the assumption that all Convertible Securities, whether or not presently exercisable or convertible, have been fully exercised or converted (as the case may be) taking account any limitations on exercise or conversion (including "blockers") contained therein without conceding that such identified Person is a 10% shareholder for purposes of federal securities laws); (ii) the Company's capital stock is not subject to preemptive rights or any other similar rights or any Liens; (iii) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any capital stock of the Company or any of its subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its subsidiaries is or may become bound to issue additional capital stock or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any capital stock of the Company or any of its subsidiaries, respectively (other than as may be issued from time to time under any equity incentive plan maintained); (iv) except for the Convertible Note, there are no outstanding debt securities, convertible notes, credit agreements, credit facilities or other agreements, documents or instruments evidencing Indebtedness of the Company or any of its subsidiaries or by which the Company or any of its subsidiaries is or may become bound; (v) there are no financing statements securing obligations in any amounts filed in connection with the Company or any of its subsidiaries; (vi) there are no agreements or arrangements under which the Company or any of its subsidiaries is obligated to register the sale of any of their securities under the 1933 Act (except as provided in the Registration Rights Agreement); (vii) there are no outstanding securities or instruments of the Company or any of its subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of its subsidiaries is or may become bound to redeem a security of the Company or any of its subsidiaries; (viii) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Securities; (ix) neither the Company nor any of its subsidiaries has stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. The SEC Documents contain true, correct and complete copies of the Company's Certificate of Incorporation, as amended and as in effect on the date, and the terms of all securities convertible into, or exercisable or exchangeable for, shares of Common Stock and the material rights of the holders thereof.

(s) Indebtedness and Other Contracts. Except as disclosed in the SEC Documents, each of the Company and its subsidiaries (i) does not have any material outstanding Indebtedness, Indebtedness secured by any Lien on any assets of the Company or any of its Subsidiaries or other material debt obligations, except for the Convertible Notes, (ii) is not a party to any contract, agreement or instrument, the violation of which, or default under which, by the other party(ies) to such contract, agreement or instrument could reasonably be expected to result in a Material Adverse Effect, (iii) is not in violation of any term of, or in default under, any contract, agreement or instrument relating to any Indebtedness, except where such violations and defaults would not result, individually or in the aggregate, in a Material Adverse Effect, and (iv) is not a party to any contract, agreement or instrument relating to any Indebtedness, the performance of which, in the judgment of the Company's officers, has or is expected to have a Material Adverse Effect. The Company has no current intention or expectation to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction.

(t) Absence of Litigation. Except as disclosed in the SEC Documents, there is no action, suit, proceeding, inquiry or investigation before or by the Principal Market, any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company, threatened against or affecting the Company or any of its subsidiaries, the Common Stock or any of the Company's or its subsidiaries' executive officers or directors which would be reasonably likely to adversely affect the transactions contemplated by this Agreement or would require disclosure in the SEC Documents. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the SEC involving the Company, any of its subsidiaries or any current or former director or officer of the Company or any of its subsidiaries. The SEC has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company under the 1933 Act or the 1934 Act.

(u) Insurance. The Company and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its subsidiaries are engaged. The Company has no reason to believe that it will be unable to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

(v) Employee Relations. Neither the Company nor any of its subsidiaries is a party to any collective bargaining agreement nor does it employ any member of a union. No executive officer (as defined in Rule 501(f) promulgated under the 1933 Act) or other key employee of the Company or any of its subsidiaries has notified the Company or any such subsidiary that such officer intends to leave the Company or any such subsidiary or otherwise terminate such officer's employment with the Company or any such subsidiary. To the knowledge of the Company, no executive officer or other key employee of the Company or any of its subsidiaries is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement, non-competition agreement, or any other contract or agreement or any restrictive covenant, and the continued employment of each such executive officer or other key employee (as the case may be) does not subject the Company or any of its subsidiaries to any liability with respect to any of the foregoing matters. The Company and its subsidiaries are in compliance with all federal, state, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours, except where failure to be in compliance would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(w) Title. The Company and its subsidiaries have good and marketable title to (i) all real property owned by it and (ii) all personal property, owned by them which is material to the business of the Company and its subsidiaries, in each case, free and clear of all Liens, encumbrances and defects except such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and any of its subsidiaries. Any real property and facilities held under lease by the Company and any of its subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company or any of its subsidiaries.

(x) Intellectual Property Rights. The Company and its subsidiaries own or possess adequate rights or licenses to use all material trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, original works, inventions, licenses, approvals, governmental authorizations, trade secrets and other intellectual property rights and all applications and registrations therefor ("**Intellectual Property Rights**") necessary to conduct their respective businesses as now conducted and as presently proposed to be conducted. Except as disclosed in the SEC Documents, none of the Company's or its subsidiaries' Intellectual Property Rights have expired, terminated or been abandoned, or are expected to expire, terminate or be abandoned, within three years from the date of this Agreement, which could reasonably be expected to result in a Material Adverse Effect. The Company has no knowledge of any material infringement by the Company or any of its subsidiaries of Intellectual Property Rights of others, except as disclosed in the SEC Documents. There is no claim, action or proceeding being made or brought, or to the knowledge of the Company or any of its subsidiaries, being threatened, against the Company or any of its subsidiaries regarding their Intellectual Property Rights and which would reasonably be expected to have a Material Adverse Effect, except as disclosed in the SEC Documents. The Company is not aware of any facts or circumstances which might give rise to any of the foregoing infringements or claims, actions or proceedings. The Company and each of its subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their Intellectual Property Rights, except where failure to take such measures would not, either individually or in the aggregate, reasonably be expected to materially affect the value of their respective Intellectual Property Rights.

(y) Environmental Laws. The Company and its subsidiaries (i) are in compliance with all Environmental Laws, (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval where, in each of the foregoing clauses (i), (ii) and (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(z) Subsidiary Rights. The Company or one of its subsidiaries has unrestricted right to vote, and (subject to limitations imposed by applicable law) to receive dividends and distributions on, all capital securities of its subsidiaries as owned by the Company or such subsidiary.

(aa) Tax Status. Each of the Company and its subsidiaries (i) has timely made or filed all material foreign, federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has timely paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and (iii) has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply and except in each case where the failure to file, pay or set aside could not be reasonably expected to have a Material Adverse Effect. There are no unpaid taxes in any material amount claimed in writing to be due by the taxing authority of any jurisdiction to which Company and its subsidiaries are subject. The Company is not operated in such a manner as to qualify as a passive foreign investment company, as defined in Section 1297 of the U.S. Internal Revenue Code of 1986, as amended.

(bb) Internal Accounting and Disclosure Controls. Except as disclosed in the SEC Documents, the Company and each of its subsidiaries maintains internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the 1934 Act) that is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, including that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability, (iii) access to assets or incurrence of liabilities is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets and liabilities is compared with the existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any difference. Except as disclosed in the SEC Documents, the Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) under the 1934 Act) that are effective in ensuring that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC, including, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is accumulated and communicated to the Company's management, including its principal executive officer or officers and its principal financial officer or officers, as appropriate, to allow timely decisions regarding required disclosure. Except as disclosed in the SEC Documents, neither the Company nor any of its subsidiaries has received any notice or correspondence from any accountant or other Person relating to any potential material weakness or significant deficiency in any part of the internal controls over financial reporting of the Company or any of its subsidiaries. There are no material disagreements presently existing, or reasonably anticipated by the Company to arise, between the accountants and lawyers formerly or presently employed by the Company.

(cc) Off Balance Sheet Arrangements. There is no transaction, arrangement, or other relationship between the Company or any of its subsidiaries and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in the SEC Documents and is not so disclosed or that otherwise could be reasonably likely to have a Material Adverse Effect.

(dd) Investment Company Status. The Company is not, and upon consummation of the sale of the Securities will not be, an "investment company," an affiliate of an "investment company," a company controlled by an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

(ee) Manipulation of Price. The Company has not, and, to the knowledge of the Company, no Person acting on its behalf has, directly or indirectly, (i) taken any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company.

(ff) U.S. Real Property Holding Corporation. Neither the Company nor any of its subsidiaries is or has ever been, and so long as any of the Securities are held by any Buyer, shall not become, a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended, and the Company and each subsidiary shall so certify upon any Buyer's request.

(gg) No Disqualification Events. None of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the offering contemplated hereby, any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the 1933 Act) connected with the Company in any capacity at the time of sale (each, an "**Issuer Covered Person**") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the 1933 Act (a "**Disqualification Event**"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Company has exercised reasonable care to determine whether any Issuer Covered Person is subject to a Disqualification Event.

(hh) Transfer Taxes. On the Closing Date, all stock transfer or other similar taxes (other than income or similar taxes) which are required by law to be paid in connection with the issuance, sale and transfer of the Securities to be sold to Buyer hereunder will be, or will have been, fully paid or provided for by the Company, and all laws imposing such taxes directly in relation to such stock transfer will be or will have been complied with.

(ii) [Reserved].

(jj) Fixtures and Equipment. Each of the Company and its subsidiaries (as applicable) has good title to, or a valid leasehold interest in, the tangible personal property, equipment, improvements, fixtures, and other personal property and appurtenances that are used by the Company or its subsidiary in connection with the conduct of its business (the "**Fixtures and Equipment**"). The Fixtures and Equipment are structurally sound, are in good operating condition and repair, are adequate for the uses to which they are being put, are not in need of maintenance or repairs except for ordinary, routine maintenance and repairs and are sufficient for the conduct of the Company's and/or its subsidiaries' businesses (as applicable) in the manner as conducted prior to the Closing. Each of the Company and its Subsidiaries owns all of its Fixtures and Equipment free and clear of all Encumbrances except for (i) Liens for current taxes not yet due and (ii) zoning laws and other land use restrictions that do not impair the present or anticipated use of the property subject thereto.

(kk) Illegal or Unauthorized Payments; Political Contributions. Neither the Company nor any of its subsidiaries nor, to the best of the Company's knowledge (after reasonable inquiry of its executive officers and directors), any of the officers, directors, employees, agents or other representatives of the Company or any of its subsidiaries or any other business entity or enterprise with which the Company or any of its subsidiaries is or has been affiliated or associated, has, directly or indirectly, made or authorized any payment, contribution or gift of money, property, or services, whether or not in contravention of applicable law, (i) as a kickback or bribe to any Person or (ii) to any political organization, or the holder of or any aspirant to any elective or appointive public office except for personal political contributions not involving the direct or indirect use of funds of the Company or any of its subsidiaries.

(ll) Money Laundering. The Company and its subsidiaries are in compliance with, and have not previously violated, the USA Patriot Act of 2001 and all other applicable U.S. and non-U.S. anti-money laundering laws and regulations, including, without limitation, the laws, regulations and Executive Orders and sanctions programs administered by the U.S. Office of Foreign Assets Control, including, without limitation, (i) Executive Order 13224 of September 23, 2001 entitled, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism" (66 Fed. Reg. 49079 (2001)); and (ii) any regulations contained in 31 CFR, Subtitle B, Chapter V.

(mm) Registration Rights. Except as disclosed in the SEC Documents, no holder of securities of the Company (other than Buyers) has rights to the registration of any securities of the Company because of the filing of the Registration Statement or the issuance of the Securities hereunder that could expose the Company to material liability or any Buyer to any liability or that could impair the Company's ability to consummate the issuance and sale of the Securities in the manner, and at the times, contemplated hereby, which rights have not been waived by the holder thereof as of the date hereof.

(nn) Disclosure. The Company confirms that neither it nor any other Person acting on its behalf has provided any Buyer or their agents or counsel with any information that constitutes or could reasonably be expected to constitute material, non-public information concerning the Company or any of its subsidiaries, other than the existence of the transactions contemplated by this Agreement and the other Transaction Documents. The Company understands and confirms that Buyers will rely on the foregoing representations in effecting transactions in securities of the Company. All disclosure provided to any Buyer regarding the Company, its subsidiaries, their respective businesses and the transactions contemplated hereby, including the schedules to this Agreement, furnished by or on behalf of the Company or any of its subsidiaries is true and correct in all material respects and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Each press release issued by the Company during the twelve (12) months preceding the date of this Agreement did not at the time of release contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading. No event or circumstance has occurred or information exists with respect to the Company or any of its subsidiaries or their respective businesses, properties, liabilities, prospects, operations (including results thereof) or conditions (financial or otherwise), which, under applicable law, rule or regulation, requires public disclosure at or before the date hereof or announcement by the Company but which has not been so publicly disclosed. The Company acknowledges and agrees that each Buyer makes no and has not made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 2.

4.   **COVENANTS.**

(a) <u>Form D and Blue Sky</u>. The Company shall file a Form D with respect to the Securities as required under Regulation D and provide a copy thereof to each Buyer promptly after filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to, qualify the Securities for sale to each Buyer at the Closing pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide confirmation of any such action, if applicable, so taken to such Buyer on or prior to such Closing Date. Without limiting any other obligation of the Company under this Agreement, the Company shall timely make all filings and reports relating to the offer and sale of the Securities required under all applicable securities laws (including, without limitation, all applicable federal securities laws and all applicable "Blue Sky" laws), and the Company shall comply with all applicable federal, foreign, state and local laws, statutes, rules, regulations and the like relating to the offering and sale of the Securities to such Buyer.

(b) <u>Reporting Status</u>. Until the date on which the Buyers shall have sold all of the Registrable Securities (the "**Reporting Period**"), the Company shall file all reports required to be filed with the SEC pursuant to the 1934 Act, and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would no longer require or otherwise permit such termination.

(c) <u>Use of Proceeds</u>. The Company shall use the proceeds from the sale of the Securities for general corporate purposes (which for the avoidance of doubt may include acquisitions, in the Company's discretion), including working capital.

(d) <u>Financial Information</u>. The Company agrees to send the following to each Buyer during the Reporting Period unless the following are filed with the SEC through EDGAR and are available to the public through the EDGAR system, (i) within one (1) Business Day after the filing thereof with the SEC, a copy of its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, any interim reports or any consolidated balance sheets, income statements, shareholders' equity statements and/or cash flow statements for any period other than annual, any Current Reports on Form 8-K and any registration statements (other than on Form S-8) or amendments filed pursuant to the 1933 Act, (ii) on the same day as the release thereof, facsimile copies of all press releases issued by the Company and (iii) copies of any notices and other information made available or given to the shareholders of the Company generally, contemporaneously with the making available or giving thereof to the shareholders.

(e) <u>Listing</u>. The Company shall use its commercially reasonable efforts to promptly secure the listing or designation for quotation (as the case may be) of all of the Registrable Securities consisting of Common Stock upon each trading market and national securities exchange and automated quotation system, if any, upon which the Common Stock is then listed or designated for quotation (as the case may be) so that all such Registrable Securities consisting of Common Stock may be traded on the foregoing, subject to official notice of issuance, but in no event later than the Closing Date, and shall maintain such listing or designation for quotation (as the case may be) of all Registrable Securities from time to time issuable under the terms of the Transaction Documents on such national securities exchange or automated quotation system. The Company shall use its commercially reasonable efforts to maintain the Common Stock listing or designation for quotation (as the case may be) on the Principal Market, The New York Stock Exchange, the NYSE Amex, the Nasdaq Global Select Market or the Nasdaq Global Market (each, an "**Eligible Market**"). The Company shall not take any action which could be reasonably expected to result in the delisting or suspension of the Common Stock on an Eligible Market. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(e).

(f) <u>Fees</u>. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, transfer agent fees, DTC fees or broker's commissions, relating to or arising out of the transactions contemplated hereby. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, reasonable attorneys' fees and out-of-pocket expenses) arising in connection with any claim relating to any such payment. Except as otherwise set forth in the Transaction Documents, each party to this Agreement shall bear its own expenses in connection with the sale of the Securities to each Buyer.

(g) <u>Pledge of Securities</u>. Notwithstanding anything to the contrary contained in this Agreement, the Company acknowledges and agrees that the Securities may be pledged by each Buyer in connection with a bona fide margin agreement or other loan or financing arrangement that is secured by the Securities. The pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and each Buyer effecting a pledge of Securities shall not be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document. At each Buyer's expense, the Company hereby agrees to execute and deliver such documentation as a pledgee of the Securities may reasonably request in connection with a pledge of the Securities to such pledgee by each Buyer provided that the Company shall be under no obligation to deliver any legal opinion required in connection therewith unless required by the Company's transfer agent to be issued by the Company's legal counsel.

(h) Disclosure of Transactions and Other Material Information. The Company shall, on or before 8:30 a.m., New York time, on the first (1st) Business Day after the date of this Agreement, file a Current Report on Form 8-K describing all the material terms of the transactions contemplated by the Transaction Documents in the form required by the 1934 Act and attaching all the material Transaction Documents (including, without limitation, this Agreement and the form of each of the Warrants) (including all attachments, the "**Form 8-K Filing**"). From and after the date of the Form 8 K Filing, the Company shall have disclosed all material, non-public information (if any) delivered to each Buyer by the Company, or any of its officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents. The Company shall not, and the Company shall cause each of its officers, directors, employees and agents not to, provide each Buyer with any material, non-public information regarding the Company from and after the date of the Form 8 K Filing without the express prior written consent of such Buyer. Subject to the foregoing, neither the Company nor any Buyer shall issue any press releases or any other public statements with respect to the transactions contemplated hereby; provided, however, the Company shall be entitled, without the prior approval of each Buyer, to make any press release or other public disclosure with respect to such transactions (i) in substantial conformity with the Form 8 K Filing and contemporaneously therewith and (ii) as is required by applicable law and regulations (provided that in the case of clause (i) such Buyer shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release). Without the prior written consent of each Buyer, the Company shall not (and shall cause each of its affiliates to not) disclose the name of such Buyer in any filing (other than the Form 8 K Filing or any filing that incorporates language from the Form 8 K Filing and other than the Registration Statement and other than as required by applicable law or rules and regulations), announcement, release or otherwise. Notwithstanding anything contained in this Agreement to the contrary and without implication that the contrary would otherwise be true, the Company expressly acknowledges and agrees that each Buyer has not had, and such Buyer shall not have (unless expressly agreed to by such Buyer after the date hereof in a written definitive and binding agreement executed by the Company and such Buyer), any duty of confidentiality with respect to, or a duty not to trade on the basis of, any information regarding the Company or any of its subsidiaries (as applicable) that such Buyer receives from the Company, any of its subsidiaries or any of its or its officers, directors, employees, shareholders or agents.

(i) Additional Registration Statements. Until the Applicable Date (as defined below), the Company shall not file a registration statement under the 1933 Act relating to securities that are not the Registrable Securities. "**Applicable Date**" means the 30th day anniversary of the first date on which the resale by the Buyers of all Registrable Securities is covered by one or more effective Registration Statements (as defined in the Registration Rights Agreement) (and each prospectus contained therein is available for use on such date). Notwithstanding the foregoing, this Section 4(i) shall be of no further force or effect in the event that the failure to register the Registrable Securities is primarily due to information related to any Buyer and/or actions or events within the reasonable control of any Buyer.

(j) Additional Issuance of Securities. The Company agrees that during the Restricted Period, the Company shall not directly or indirectly issue, offer, sell, grant any option or right to purchase, or otherwise dispose of (or announce any issuance, offer, sale, grant of any option or right to purchase or other disposition of) any equity security or any equity-linked or related security (including, without limitation, any "equity security" (as that term is defined under Rule 405 promulgated under the 1933 Act), any Convertible Securities, debt (with or related to equity), any preferred stock or any purchase rights) ("**Additional Issuance**"). Notwithstanding the foregoing, this Section 4(j) shall not apply in respect of the following: (i) issuances pursuant to acquisitions, joint ventures, license arrangements, leasing arrangements and similar transaction arrangements; (ii) an issuance of shares of Common Stock issued upon the conversion or exercise of Convertible Securities issued prior to the date hereof, provided that the conversion or exercise (as the case may be) of any such Convertible Security is made solely pursuant to the conversion or exercise (as the case may be) provisions of such Convertible Security that were in effect on the date immediately prior to the date of this Agreement, the conversion or exercise price of any such Convertible Securities is not lowered, none of such Convertible Securities are (nor is any provision of any such Convertible Securities) amended or waived in any manner (whether by the Company or the holder thereof) to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities are otherwise materially changed or waived (whether by the Company or the holder thereof) in any manner that adversely affects any Buyer; (iii) the issuance of options to employees, directors and other third parties under an Approved Share Plan; provided that provisions of such Approved Share Plan that were in effect on the date immediately prior to the date of this Agreement remain in effect without amendment in any manner that adversely affects any Buyer, including any amendment to increase the number of shares issuable thereunder and (iv) the issuance of the Convertible Notes, the Conversion Shares, the Warrants and the Warrant Shares.

(k) Additional Investment.   Beginning of the date hereof and ending on the one (1) year anniversary from the later of (i) the date the Initial Registration Statement is declared effective or (ii) the date the Company has obtained Stockholder Approval, each Buyer shall have the right, but not the obligation, at any time from time to time, in its sole and absolute discretion to purchase from the Company additional Convertible Notes (the "**Additional Notes**") in an amount equal to such Buyer's pro rata portion of up to of an aggregate principal amount of $50,000,000 on the same terms and conditions as applicable to the purchase and sale of the Convertible Notes (each an "**Additional Purchase**" and collectively "**Additional Purchases**"). Each Buyer may exercise such right by the delivery of written notice to the Company, which notice shall include a statement that such Buyer is exercising its right to cause the Additional Purchases, the principal amount of Convertible Notes to be purchased by such Buyer, and the date on which such purchase and sale shall occur ("**Additional Purchase Closing**"), which Additional Purchase Closing shall occur within one (1) Trading Day following receipt of such notice by the Company, or such other date mutually agreed upon by such Buyer and the Company. The terms and conditions of any Additional Purchase shall be identical to the terms and conditions set forth in this Agreement applicable to the sale of the Convertible Notes. Further, upon each Additional Purchase, each Buyer shall receive its proportional amount of warrants identical to the terms and conditions set forth in this Agreement (the "**Additional Warrants**") provided that the Expiration Date (as defined in the Warrants) of the Additional Warrants shall be the fifth (5th) anniversary from the issuance date of such Additional Warrants. If a Buyer or Buyers elect to execute an Additional Purchase pursuant to this Section 4(k), the Company agrees and covenants that the restrictions applicable to Additional Registration Statements provided in Section 4(i) and Additional Issuances provided in Section 4(j) shall apply but only if the aggregate purchase price for such Additional Purchase is $5,000,000 or more. Further, the restrictions on Additional Issuances provided in Section 4(j) shall apply during the 90 days following the date on which the Additional Notes and Additional Warrants are delivered.

(l) Reservation of Shares. As long as any of the Convertible Notes and Warrants remain outstanding, the Company shall take all action necessary to at all times have authorized and reserved for the purpose of issuance, no less than 250% of the shares of Common Stock issuable upon conversion of the Convertible Notes (Convertible Notes are exercisable in full and without regard to any limitations on the exercise of the Convertible Notes set forth therein) or exercise of the Warrants (Warrants are exercisable in full and without regard to any limitations on the exercise of the Warrants set forth therein).

(m) Conduct of Business. The business of the Company shall not be conducted in violation of any law, ordinance or regulation of any governmental entity, except where such violations would not result, either individually or in the aggregate, in a Material Adverse Effect.

(n) Passive Foreign Investment Company. The Company shall conduct its business in such a manner as will ensure that the Company will not be deemed to constitute a passive foreign investment company within the meaning of Section 1297 of the U.S. Internal Revenue Code of 1986, as amended.

(o) Corporate Existence. So long as any Buyer owns any Warrants, the Company shall not be party to any Fundamental Transaction (as defined in the Warrants) unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Warrants.

(p) Due Diligence. Each Buyer shall have the right, from time to time as such Buyer may reasonably deem appropriate, to perform reasonable due diligence on the Company during normal business hours and subject to reasonable prior notice to the Company. The Company and its officers and employees shall provide information ("**Confidential Information**") and reasonably cooperate with such Buyer in connection with such Buyer's due diligence; provided, however, that at no time is the Company required or permitted to disclose material nonpublic information to such Buyer or breach any obligation of confidentiality or non-disclosure to a third party or make any disclosure that could cause a waiver of attorney-client privilege. Except as may be required by law, court order or governmental authority, each party hereto agrees not to disclose any Confidential Information of the other party to any third party and shall not use the Confidential Information of such other party for any purpose other than in connection with, or in furtherance of, the transactions contemplated hereby. In the event a party is required by law, court order or governmental authority to disclose the Confidential Information of the other party, such party shall give the other party written notice of the information to be disclosed as far in advance of its disclosure as practicable and shall reasonably cooperate with the other party's efforts, and use its commercially reasonable efforts to obtain assurances that confidential treatment will be accorded such information. Each party hereto acknowledges that the Confidential Information shall remain the property of the disclosing party and agrees that it shall take all reasonable measures to protect the secrecy of any Confidential Information disclosed by the other party.

(q) The Company shall take all action necessary in accordance with applicable Law, its organizational documents and the rules of the Principal Exchange to establish a record date for, duly call, give notice of, convene and hold a meeting of its stockholders (the "Stockholder Meeting") as promptly as reasonably practicable for the purpose of obtaining the approval of its stockholders for the issuance of Common Stock pursuant to this Agreement in excess of the Exchange Cap in accordance with the applicable rules of the Principal Market ("**Stockholder Approval**"). The Company shall, in consultation with the Buyers, prepare and file with the SEC as promptly as practicable, and in any event within five (5) days after the Execution Date, a preliminary version of the Proxy Statement to be sent to Company's stockholders in connection with the stockholder meeting. If, prior to the expiration of the ten (10) day waiting period provided in Rule 14a-6 under the 1934 Act, the Company does not receive either (i) comments from the SEC on the preliminary Proxy Statement or (ii) notice from the SEC that it will review the preliminary Proxy Statement, then the Company shall file definitive proxy materials (including the definitive Proxy Statement) with the SEC and cause the definitive Proxy Statement to be mailed to the Company's stockholders as soon as reasonably practicable, and in any event not later than two (2) Business Days after the expiration of such waiting period. the Company shall use commercially reasonable efforts to resolve all SEC comments, if any, with respect to the Proxy Statement as promptly as practicable after receipt thereof. Promptly following confirmation by the SEC that the SEC has no further comments, the Company shall cause the definitive Proxy Statement to be filed with the SEC and mailed to the Company's stockholders. The Company shall be responsible for 100% of the fees, costs and expenses associated with the preparation, filing and mailing of the Proxy Statement. The Company shall use its reasonable best efforts to solicit proxies to obtain the Stockholder Approval.

5.    **REGISTER; TRANSFER AGENT INSTRUCTIONS; LEGEND.**

(a) Register. The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate by notice to each holder of Securities), a register for the Convertible Notes and the Warrants in which the Company shall record the name and address of the Person in whose name the Convertible Notes and the Warrants have been issued (including the name and address of each transferee) reflecting the principal amount of the Convertible Notes and the Warrants held by such Person. The Company shall keep the register open and available at all times during business hours for inspection by each Buyer or its legal representatives.

(b) Transfer Agent Instructions. The Company shall issue irrevocable instructions to its transfer agent and any subsequent transfer agent in a form acceptable to each Buyer to issue certificates or credit shares to the applicable balance accounts at The Depository Trust Company ("**DTC**"), registered in the name of such Buyer or its respective nominee(s), for the Conversion Shares and the Warrant Shares in such amounts as specified from time to time by such Buyer to the Company, and confirmed by the Company, upon the conversion of the Convertible Notes or the exercise of the Warrants (as the case may be). The Company represents and warrants that no instruction other than such irrevocable transfer agent instructions referred to in this Section 5(b), and stop transfer instructions to give effect to Section 2(g) hereof, will be given by the Company to its transfer agent with respect to the Securities, and that the Securities shall otherwise be freely transferable on the books and records of the Company, as applicable, to the extent provided in this Agreement and the other Transaction Documents. If any Buyer effects a sale, assignment or transfer of the Securities in accordance with Section 2(g), the Company shall permit the transfer and shall promptly instruct its transfer agent to issue one or more certificates or credit shares to the applicable balance accounts at DTC in such name and in such denominations as specified by such Buyer to effect such sale, transfer or assignment. In the event that such sale, assignment or transfer involves Conversion Shares or Warrant Shares sold, assigned or transferred pursuant to an effective registration statement or in compliance with Rule 144 or another exemption from registration, the transfer agent shall issue such shares to such Buyer, assignee or transferee (as the case may be) without any restrictive legend in accordance with Section 5(d) below. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to each Buyer. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5(b) will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5(b), that each Buyer shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required. The Company shall cause its counsel to issue the legal opinion referred to in the irrevocable transfer agent instructions to the Company's transfer agent on the Effective Date (as defined in the Registration Rights Agreement). Any fees (with respect to the transfer agent, counsel to the Company or otherwise) associated with the issuance of such opinion or the removal of any legends on any of the Securities shall be borne by the Company.

(c) Legends. Each Buyer understands that the Securities have been issued (or will be issued in the case of the Conversion Shares and Warrant Shares) pursuant to an exemption from registration or qualification under the 1933 Act and applicable state securities laws, and except as set forth below, the Securities shall bear any legend as required by the "blue sky" laws of any state and a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such stock certificates):

[NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE]/[EXERCISABLE] HAVE BEEN][THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN] REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL TO THE HOLDER (IF REQUESTED BY THE COMPANY), IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

(d) Removal of Legends. Certificates evidencing Securities shall not be required to contain the legend set forth in Section 5(c) above or any other legend (i) while a registration statement (including a Registration Statement) covering the resale of such Securities is effective under the 1933 Act (provided that each Buyer provides the Company with any certificates from such Buyer or its broker reasonably required by the Company's transfer agent), (ii) following any sale of such Securities pursuant to Rule 144 (assuming the transferor is not an affiliate of the Company) or a registration statement, (iii) if such Securities are eligible to be sold, assigned or transferred under Rule 144 without current public information being available and without volume and manner of sale limitations (provided that each Buyer provides the Company with reasonable assurances that such Securities are eligible for sale, assignment or transfer under Rule 144, which shall not include an opinion of counsel, but which may include any certificates from such Buyer or its broker reasonably required by the Company's transfer agent), (iv) in connection with a sale, assignment or other transfer (other than under Rule 144), provided that each Buyer provides the Company with an opinion of counsel to such Buyer from reputable counsel to the effect that such sale, assignment or transfer of the Securities may be made without registration under the applicable requirements of the 1933 Act or (v) if such legend is not required under applicable requirements of the 1933 Act (including, without limitation, controlling judicial interpretations and pronouncements issued by the SEC). If a legend is not required pursuant to the foregoing, the Company shall no later than one (1) Trading Day following the delivery by any Buyer to the Company or the transfer agent (with notice to the Company) of a legended certificate representing such Securities (endorsed or with stock powers attached, signatures guaranteed, and otherwise in form necessary to affect the reissuance and/or transfer, if applicable), together with any other deliveries from such Buyer as may be required above in this Section 5(d), as directed by such Buyer, credit the aggregate number of shares of Common Stock to which each Buyer shall be entitled to such Buyer's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system (the date by which such credit is so required to be made to the balance account of such Buyer's or Buyer's nominee with DTC is referred to herein as the "**Required Delivery Date**").

(e) Failure to Timely Deliver; Buy-In. If the Company fails to issue and credit the balance account of such Buyer's or Buyer's nominee with DTC for such number of Securities so delivered to the Company by the Required Delivery Date, then, in addition to all other remedies available to such Buyer, at the sole discretion of such Buyer, the Company shall:

(i) pay in cash to such Buyer on each Trading Day after the Required Delivery Date that the issuance or credit of such shares is not timely effected an amount equal to 1% of the product of (A) the number of shares of Common Stock not so delivered or credited (as the case may be) to such Buyer or Buyer's nominee multiplied by (B) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the Required Delivery Date; or

(ii) if on or after the Required Delivery Date, such Buyer (or any other Person in respect, or on behalf, of such Buyer) purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by such Buyer of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock (the "**Replacement Shares**") equal to all or any portion of the number of shares of Common Stock, that such Buyer so anticipated receiving from the Company without any restrictive legend, then, within one (1) Trading Day after such Buyer's request and in such Buyer's sole discretion, either (A) pay cash to such Buyer in an amount equal to such Buyer's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the Replacement Shares so purchased (the "**Buy-In Price**"), at which point the Company's obligation to so credit such Buyer's balance account shall terminate and such shares shall be cancelled, or (B) promptly honor its obligation to so credit such Buyer's DTC account representing such number of shares of Common Stock that would have been so delivered if the Company timely complied with its obligations hereunder and pay cash to such Buyer in an amount equal to the excess (if any) of the Buy-In Price over the product of (1) such number of shares of Common Stock that the Company was required to deliver to such Buyer by the Required Delivery Date multiplied by (2) the lowest Closing Sale Price (as defined in the Warrants) of the Common Stock on any Trading Day during the period commencing on the date of the delivery by such Buyer to the Company of the applicable Replacement Shares (as the case may be) and ending on the date of such delivery and payment under this clause (B).

(f) Manner of Sale. Each Buyer, severally and not jointly with the other Buyers, agrees with the Company that such Buyer will sell any Securities pursuant to either the registration requirements of the 1933 Act, including any applicable prospectus delivery requirements, or an exemption therefrom, and acknowledges that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 5 is predicated upon the Company's reliance upon this understanding.

6.    **CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.**

(a) The obligation of the Company hereunder to issue and sell the Convertible Notes and the related Warrants to each Buyer at the applicable Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing each Buyer with prior written notice thereof:

(i) Each Buyer shall have executed each of the other Transaction Documents to which it is a party and delivered the same to the Company.

(ii) Each Buyer shall have delivered to the Company the Purchase Price for the Convertible Notes and Warrants being purchased by such Buyer at the Closing by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company; less any amount for Buyers' reasonable and documented legal expenses, which shall be paid directly to Buyer's legal counsel pursuant to Section 1(e).

(iii) The representations and warranties of each Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though originally made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such date), and such Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Buyer at or prior to the Closing Date.

7.    **CONDITIONS TO BUYERS' OBLIGATION TO PURCHASE.**

(a) The obligation of each Buyer hereunder to purchase its Convertible Notes and related Warrants at the Closing is subject to the satisfaction, at or before each applicable Closing Date and in respect of each such Closing Date, of each of the following conditions, provided that these conditions are for each Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(i) The Company shall have duly executed and delivered to each Buyer each of the Transaction Documents to which the Company is a party and the Company shall have duly executed and delivered to such Buyer the Convertible Notes and Warrants as is set forth on the applicable Buyer Schedule and the Company shall have complied in all material respects with all obligations under this Agreement and the other Transaction Documents, including, without limitation, the Convertible Notes and the Warrants.

(ii) Each and every representation and warranty of the Company shall be true and correct in all material respects as of the date when made and as of the Closing Date as though originally made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct in all material respects as of such date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required to be performed, satisfied or complied with by the Company at or prior to the Closing Date. Each Buyer shall have received a certificate, executed by the Chief Executive Officer of the Company, dated as of the Closing Date, (i) to the foregoing effect and (ii) verifying the accuracy of Section 7(a)(xii) herein.

(iii) The Common Stock (A) shall be designated for quotation on the Principal Market; (B) shall not have been suspended, as of the Closing Date, by the SEC or the Principal Market from trading on the Principal Market; and (C) except as disclosed in the SEC Documents, the Company is in compliance with all requirements in order to maintain quotation on the Principal Market (including reporting requirements under the 1934 Act).

(iv) All reports, schedules, registrations, forms, statements, information and other documents required to have been filed by the Company with the SEC pursuant to the reporting requirements of the 1934 Act, including all material required to have been filed pursuant to Section 13(a) or 15(d) of the 1934 Act, shall have been filed with the SEC under the 1934 Act.

(v) With regard to the Second Closing, the Registration Statement covering the Registrable Securities shall have been declared effective by the SEC in accordance with the Securities Act, shall be effective and available for the resale of the Registrable Securities and the Company shall have not received any notice that the SEC has issued or intends to issue a stop-order with respect to such Registration Statement or that the SEC has otherwise suspended or withdrawn the effectiveness of such Registration Statement.

(vi) With regard to the Second Closing, the average daily trading volume of the Common Stock on the Principal Market during the ten (10) days prior to the Second Closing shall exceed $3,000,000.

(vii) With regard to the Second Closing, the company shall have obtained the Stockholder Approval.

(viii) The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Securities, including without limitation, those required by the Principal Market.

(ix) No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction that prohibits the consummation of any of the transactions contemplated by the Transaction Documents, and no actions, suits or proceedings shall be pending by any governmental authority that seeks to enjoin, prohibit or otherwise adversely affect any of the transactions contemplated by the Transaction Documents.

(x) Since the date of execution of this Agreement, no event or series of events shall have occurred that reasonably would have or result in a Material Adverse Effect and the Company has not filed for nor is it subject to any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors instituted by or against the Company.

(xi) The Company shall have delivered to each Buyer such other documents, instruments or certificates relating to the transactions contemplated by this Agreement reasonably required to consummate the transactions contemplated hereby.

## 8. TERMINATION.

In the event that (i) the Initial Closing shall not have occurred within ten (10) days after the date hereof or (ii) as a result of any condition in Section 7 having not been met, the Second Closing has not occurred for a period of three (3) months or longer, then each Buyer shall have the right to terminate its obligations under this Agreement at any time on or after the close of business on such date without liability to any other party; provided, however, that the right to terminate this Agreement under this Section 8 shall not be available to such Buyer if the failure of the transactions contemplated by this Agreement to have been consummated by such date is the result of such Buyer's breach of this Agreement. Notwithstanding anything to the contrary above, nothing contained in this Section 8 shall be deemed to release any party hereto from any liability for any breach by such party of the terms and provisions of this Agreement or the other Transaction Documents or to impair the right of any party hereto to compel specific performance by any other party of its obligations under this Agreement or the other Transaction Documents.

9.    CERTAIN DEFINITIONS

(a) 1934 Act. The "**1934 Act**" means the Securities Exchange Act of 1934, as amended.

(b) Approved Share Plan. "**Approved Share Plan**" means any employee benefit plan or other compensatory contract, agreement or other arrangement (including an arrangement with a single officer or director) which has been approved by the board of directors of the Company prior to or subsequent to the date hereof pursuant to which shares of Common Stock and standard options to purchase shares of Common Stock may be issued to any employee, officer, director or consultant for services provided or to be provided to the Company in their capacity as such.

(c) Business Day. "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

(d) Closing Sale Price. "**Closing Sale Price**" shall mean for any security as of any date, the last closing trade price for such security on the principal securities exchange or trading market where such security is listed or traded, as reported by Bloomberg, L.P. ("Bloomberg"), or if the foregoing does not apply, the average of the bid prices of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(e) Common Stock. "**Common Stock**" means the common stock, par value $0.001 per share, of the Company and any other shares issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, distribution, recapitalization, merger, consolidation, other corporate reorganization or other similar event with respect to the Common Stock).

(f) Contingent Obligation. "**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(g) Convertible Securities. "**Convertible Securities**" means any capital stock or other security of the Company that is at any time and under any circumstances directly or indirectly convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any capital stock or other security of the Company (including, without limitation, shares of Common Stock).

(h) Environmental Laws. "**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "**Hazardous Materials**") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(i) Indebtedness. "**Indebtedness**" of any Person means, without duplication (A) all indebtedness for borrowed money, (B) all obligations issued, undertaken or assumed as the purchase price of property or assets, including indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), other than trade payables entered into in the ordinary course of business, (C) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (D) all obligations evidenced by notes, bonds, debentures or similar instruments, (E) all monetary obligations under any leasing or similar arrangement which, in connection with generally accepted accounting principles, consistently applied for the periods covered thereby, is classified as a capital lease, (F) all indebtedness referred to in clauses (A) through (E) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in any material property or assets (including accounts and contract rights) owned by such Person, even though the Person has not assumed or become liable for the payment of such indebtedness, and (G) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (A) through (F) above.

(j) Insolvent. "**Insolvent**" means the present fair saleable value of the Company's assets is less than the amount required to pay the Company's total Indebtedness.

(k) Lien. "**Lien**" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the 1933 Act and state securities laws), encroachment, tax, order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

(l) Material Adverse Effect. "**Material Adverse Effect**" means any material adverse effect on (i) the business, properties, assets, liabilities, operations (including results thereof), condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (ii) the transactions contemplated hereby or in any of the other Transaction Documents or (iii) the authority or ability of the Company or any of its subsidiaries to perform any of its respective obligations under any of the Transaction Documents (as defined below).

(m) Person. "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(n) Principal Market. "**Principal Market**" means the Nasdaq Capital Market; provided however, that in the event the Common Stock is ever listed or traded on the New York Stock Exchange, the NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, then the "Principal Market" shall mean such other market or exchange on which the Common Stock is then listed or traded.

(o) Registrable Securities. "**Registrable Securities**" means (i) the Conversion Shares, (ii) the Warrant Shares and (iii) any capital stock of the Company issued or issuable with respect to such Conversion Shares, the Warrant Shares, the Convertible Notes or the Warrants, including, without limitation, (1) as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise and (2) shares of capital stock of the Company into which the Common Stock is converted or exchanged and shares of capital stock of a Successor Entity (as defined in the Warrants) into which the Common Stock is converted or exchanged, in each case, without regard to any limitations on exercise or exchange of the Warrants. As to any Registrable Securities, such securities shall cease to be Registrable Securities when: (a) a registration statement with respect to the sale of such securities shall have become effective under the 1933 Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such registration statement; (b) such securities shall have been otherwise transferred, new certificates for them not bearing a legend restricting further transfer shall have been delivered by the Company, and subsequent public distribution of them shall not require registration under the 1933 Act; or (c) such securities are freely saleable under Rule 144 under the 1933 Act without the requirement for current public information and without volume or manner of sale limitations.

(p) Restricted Period. "**Restricted Period**" means the period commencing on the Execution Date and ending on the date immediately following the 90th day after the latest of: (i) the Execution Date (ii) the date on which a registration statement (or registration statements) registering for resale all Registrable Securities (disregarding any reduction pursuant to Section 2(f) of the Registration Rights Agreement) has been declared effective by the SEC and (iii) the date on which Stockholder Approval is obtained.

(q) Securities. "**Securities**" means the Convertible Notes, the Conversion Shares, the Warrants and the Warrant Shares.

(r) Trading Day. "**Trading Day**" means, as applicable, (x) with respect to all price determinations relating to the Common Stock, any day on which the Common Stock is traded on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Buyer or (y) with respect to all determinations other than price determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(s) Transaction Documents. "**Transaction Documents**" means, collectively, this Agreement, the Convertible Notes, the Warrants, the Registration Rights Agreement, and each of the other agreements and instruments entered into or delivered by any of the parties hereto in connection with the transactions contemplated hereby and thereby, as may be amended from time to time.

(t) VWAP. "**VWAP**" means the volume weighted average price for the Common Stock traded on the Principal Market during normal trading hours for the applicable time period.

**10.   MISCELLANEOUS.**

(a) Governing Law; Jurisdiction; Jury Trial. All questions concerning the construction, validity, enforcement and interpretation of this Agreement and the other Transaction Documents shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or under any of the other Transaction Documents or in connection herewith or therewith or with any transaction contemplated hereby or thereby or discussed herein or therein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude any Buyer from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to such Buyer or to enforce a judgment or other court ruling in favor of such Buyer. **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(b) Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party hereto and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(c) Headings; Gender. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement. Unless the context clearly indicates otherwise, each pronoun herein shall be deemed to include the masculine, feminine, neuter, singular and plural forms thereof. The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

(d) Severability. If any provision of this Agreement is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties hereto as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties hereto or the practical realization of the benefits that would otherwise be conferred upon the parties hereto. The parties hereto will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(e) Entire Agreement; Amendments. This Agreement, the other Transaction Documents and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein supersede all other prior oral or written agreements between the Buyers, the Company, its affiliates and Persons acting on its behalf solely with respect to the matters contained herein and therein, and this Agreement, the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties hereto solely with respect to the matters covered herein and therein. Except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. For clarification purposes, the Recitals are part of this Agreement. No provision of this Agreement may be amended other than by an instrument in writing signed by the Company and each Buyer. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration also is offered to all of the parties to the Transaction Documents or all holders of the Convertible Notes or Warrants (as the case may be). The Company has not, directly or indirectly, made any agreements with any Buyer relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents. Without limiting the foregoing, the Company confirms that, except as set forth in this Agreement, no Buyer has made any commitment or promise or has any other obligation to provide any financing to the Company or otherwise. As a material inducement for each Buyer to enter into this Agreement, the Company expressly acknowledges and agrees that (i) no due diligence or other investigation or inquiry conducted by any Buyer, any of its advisors or any of its representatives shall affect such Buyer's right to rely on, or shall modify or qualify in any manner or be an exception to any of, the Company's representations and warranties contained in this Agreement or any other Transaction Document and (ii) unless a provision of this Agreement or any other Transaction Document is expressly preceded by the phrase "except as disclosed in the SEC Documents," nothing contained in any of the SEC Documents shall affect any Buyer's right to rely on, or shall modify or qualify in any manner or be an exception to any of, the Company's representations and warranties contained in this Agreement or any other Transaction Document.

(f) Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, if delivered personally; (ii) , one (1) Business Day after it is sent, if sent by e-mail (provided that such sent e-mail is kept on file (whether electronically or otherwise) by the sending party and the sending party does not receive an automatically generated message from the recipient's e-mail server that such e-mail could not be delivered to such recipient) and (iii) if sent by overnight courier service, one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the party to receive the same. The addresses and e-mail addresses for such communications shall be:

If to the Company:

Mullen Automotive Inc.
1405 Pioneer Street
Brea, California 92821
Email Address: david@mullenusa.com
Attention: David Michery

With a copy (for informational purposes only) to:

Manatt, Phelps & Phillips, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
E-mail: KBlair@manatt.com
Attention: Katherine J. Blair

and

695 Town Center Drive 14th Floor
Costa Mesa, California 92626
E-mail: TPoletti@manatt.com
Attention: Thomas J. Poletti

If to the Transfer Agent:

[●]

If to a Buyer:

See Buyer Schedule

with a copy (for informational purposes only) to:

McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (914) 329-6625
E-mail: Rcohen@mwe.com
Attention: Robert Cohen, Esq.

or to such other address or e-mail address and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication or (B) provided by an overnight courier service shall be rebuttable evidence of personal service or receipt from an overnight courier service in accordance with clause (i) or (iii) above, respectively. A copy of the e-mail transmission containing the time, date and recipient e-mail address shall be rebuttable evidence of receipt by e-mail in accordance with clause (ii) above.

(g) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and its successors and assigns, including, as contemplated below, any assignee of any of the Securities. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Buyers, including, without limitation, by way of a Fundamental Transaction (as defined in the Warrants) (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the applicable Warrants).

(h) No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and its permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, other than the Indemnitees referred to in Section 10(k).

(i) Survival. The representations, warranties, agreements and covenants shall survive the Closing until the applicable statute of limitations. Each Buyer shall be responsible only for its representations, warranties, agreements and covenants hereunder.

(j) Further Assurances. Each party hereto shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k) Indemnification.

(i) In consideration of each Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless such Buyer and each holder of any Securities and all of their shareholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "**Indemnitees**") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and reasonable and documented expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "**Indemnified Liabilities**"), incurred by any Indemnitee as a result of, or arising out of, or relating to (A) any misrepresentation or breach of any representation or warranty made by the Company in any of the Transaction Documents, (B) any breach of any covenant, agreement or obligation of the Company contained in any of the Transaction Documents or (C) any cause of action, suit, proceeding or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company, but other than by an affiliate of any Buyer) or which otherwise involves such Indemnitee that arises out of or results from (I) the execution, delivery, performance or enforcement of any of the Transaction Documents, (II) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, (III) any disclosure properly made by any Buyer pursuant to Section 4(h), or (IV) the status of any Buyer or holder of the Securities either as an investor in the Company pursuant to the transactions contemplated by the Transaction Documents or as a party to this Agreement (including, without limitation, as a party in interest or otherwise in any action or proceeding for injunctive or other equitable relief), unless such action is based primarily upon a breach of such Buyer's representations, warranties, or covenants under the Transaction Documents, or any agreements or understandings such Buyer may have with any such third party, or any violations by such Buyer of state or federal securities laws or any conduct by such Buyer which constitutes fraud, gross negligence or willful misconduct. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

(ii) Promptly after receipt by an Indemnitee under this Section 10(k) of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving an Indemnified Liability, such Indemnitee shall, if a claim in respect thereof is to be made against the Company under this Section 10(k), deliver to the Company a written notice of the commencement thereof, and the Company shall have the right to participate in, and, to the extent the Company so desires, to assume control of the defense thereof with counsel mutually satisfactory to the Company and the Indemnitee; provided, however, that an Indemnitee shall have the right to retain its own counsel with the fees and expenses of such counsel to be paid by the Company if: (i) the Company has agreed in writing to pay such fees and expenses; (ii) the Company shall have failed promptly to assume the defense of such Indemnified Liability and to employ counsel reasonably satisfactory to such Indemnitee in any such Indemnified Liability; or (iii) the named parties to any such Indemnified Liability (including any impleaded parties) include both such Indemnitee and the Company, and such Indemnitee shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnitee and the Company (in which case, if such Indemnitee notifies the Company in writing that it elects to employ separate counsel at the expense of the Company, then the Company shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Company), provided further, that in the case of clause (iii) above the Company shall not be responsible for the reasonable fees and expenses of more than one (1) separate legal counsel for such Indemnitee. The Indemnitee shall reasonably cooperate with the Company in connection with any negotiation or defense of any such action or Indemnified Liability by the Company and shall furnish to the Company all information reasonably available to the Indemnitee which relates to such action or Indemnified Liability. The Company shall keep the Indemnitee reasonably apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. The Company shall not be liable for any settlement of any action, claim or proceeding effected without its prior written consent, provided, however, that the Company shall not unreasonably withhold, delay or condition its consent. The Company shall not, without the prior written consent of the Indemnitee, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee of a release from all liability in respect to such Indemnified Liability or litigation, and such settlement shall not include any admission as to fault on the part of the Indemnitee. Following indemnification as provided for hereunder, the Company shall be subrogated to all rights of the Indemnitee with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the Company within a reasonable time of the commencement of any such action shall not relieve the Company of any liability to the Indemnitee under this Section 10(k), except to the extent that the Company is materially and adversely prejudiced in its ability to defend such action.

(iii) The indemnification required by this Section 10(k) shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Liabilities are incurred.

(iv) Notwithstanding any provision in this Agreement or any other Transaction Documents, the aggregate indemnification obligations of the Company pursuant to this Section 10(k) shall not exceed 100% of the aggregate Purchase Price actually paid by the Buyers.

(v) The sole and exclusive remedy for any breach of any representation, warranty, covenant or agreement hereunder shall be the indemnification provided by this Section 10(k), and each Buyer expressly waives any other rights or remedies it may have; provided however, that equitable relief, including remedies of specific performance and injunction, shall be available with respect to any matter where money damages would not be sufficient to compensate any Buyer or to preserve the rights of such Buyer pending resolution of a dispute, and this Section 10(k) shall not relieve the Company from liability for willful misconduct, gross negligence, bad faith, fraud or willful breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

(l) Construction. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rules of strict construction will be applied against any party. No specific representation or warranty shall limit the generality or applicability of a more general representation or warranty. Each and every reference to share prices, Common Stock and any other numbers in this Agreement that relate to the Common Stock shall be automatically adjusted for stock dividends, stock splits, stock combinations and other similar transactions that occur with respect to the Common Stock after the date of this Agreement.

(m) Remedies. Each Buyer and each holder of any Securities shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security, to the extent permitted by law), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to each Buyer. The Company therefore agrees that each Buyer shall be entitled to seek specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security.

(n) Exercise of Right. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) the Transaction Documents, whenever any Buyer exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Buyer may continue to exercise its other rights, elections, demands and options hereunder and under any other Transaction Document from time to time as if such original right, election, demand or option had not been exercised without prejudice to its future actions and rights and remedies.

(o) Payment Set Aside; Currency. To the extent that the Company makes a payment or payments to such Buyer hereunder or pursuant to any other Transaction Document or any Buyer enforces or exercises its rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred. Unless otherwise expressly indicated, all dollar amounts referred to in this Agreement and the other Transaction Documents are in United States Dollars ("**U.S. Dollars**"), and all amounts owing under this Agreement and all other Transaction Documents shall be paid in U.S. Dollars. All amounts denominated in other currencies (if any) shall be converted into the U.S. Dollar equivalent amount in accordance with the Exchange Rate on the date of calculation. "**Exchange Rate**" means, in relation to any amount of currency to be converted into U.S. Dollars pursuant to this Agreement, the U.S. Dollar exchange rate as published in the Wall Street Journal on the relevant date of calculation.

[*signature pages follow*]

**IN WITNESS WHEREOF,** each Buyer and the Company has caused its signature page to this Agreement to be duly executed as of the date first written above.


**COMPANY:**

**MULLEN AUTOMOTIVE INC.**

By:        /s/ David Michery

Name:  David Michery

Title:    Chairman and CEO


**IN WITNESS WHEREOF,** each Buyer and the Company has caused its signature page to this Agreement to be duly executed as of the date first written above.

**BUYER:**

Esousa Group Holdings, LLC

By:    /s/ Michael Wachs

Name:  Michael Wachs

Title:    Title: Managing Member

JADR Capital 2 Pty Ltd.

By:    /s/ Justin Davis-Rice

Name:  Justin Davis-Rice

Title:    Title: Sole Director

Jim Fallon

/s/ Jim Fallon

Jess Mogul

/s/ Jess Mogul

Michael Friedlander

/s/ Michael Friedlander

Phil Bannister

/s/ Phil Bannister

Matthew Krieger

/s/ Matthew Krieger

Mario Silva

/s/ Mario Silva

**BUYER SCHEDULE**

**Name of Buyer:**

**Convertible Notes to be purchased and sold** shall have an aggregate principal amount of $[●], convertible into Common Stock at a price per share (the "**Conversion Price**") equal to a 5% discount to the lower of (a) the Closing Sale Price of the Common Stock on the Trading Day immediately prior to the Execution Date, (b) the Closing Sale Price of the Common Stock on the date on which the Initial Registration Statement (as defined in the Registration Rights Agreement) registering at least the number of shares of Common Stock equal to the Initial Required Registration Amount (as defined in the Registration Rights Agreement) is declared effective by the SEC and (c) the lowest daily VWAP in the five trading days prior to such conversion date designated by the Buyer; but in no event less than $[●].

**Purchase Warrants to be issued to Buyer at Closing**: For no additional consideration, five-year warrants to acquire two shares of Common Stock for every Conversion Share issuable to Buyer under the terms of the Conversion Notes (based upon the number of Conversion Shares that would be issuable on the applicable Closing Date (i.e., based on prong (a) in the preceding paragraph). Each Purchase Warrant shall have an exercise price equal to 105% of the Closing Sale Price of the Common Stock on the Trading Day immediately prior to the Execution Date (the "**Exercise Price**").

The Company shall have the option to require the Buyer to exercise the Warrants for cash if, at any time, each of the following conditions are met:

1.  the Registration Statement covering the Registrable Securities has been declared effective by the SEC in accordance with the Securities Act, is effective and available for the resale of the Registrable Securities and the Company has not received any notice that the SEC has issued or intends to issue a stop-order with respect to such Registration Statement or that the SEC has otherwise suspended or withdrawn the effectiveness of such Registration Statement;

2.  the Company is not in violation of any of the rules, regulations or requirements of the Principal Market and has no knowledge of any facts or circumstances that could reasonably lead to suspension of the Common Stock by the Principal Market in the foreseeable future; and

3.  the VWAP for the ten-day period immediately preceding the date on which the which the Company elects the exercise this option is 250% above the Exercise Price.

**Notice Contact Information**

**Exhibit 10.3(a)**

NEITHER THIS CONVERTIBLE NOTE NOR THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL TO THE HOLDER (IF REQUESTED BY THE COMPANY), FROM REPUTABLE COUNSEL, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 2(C)(VI) AND 8 HEREOF. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 2(C)(VI) OF THIS NOTE.

MULLEN AUTOMOTIVE INC.

SECURED CONVERTIBLE NOTE

Issuance Date: [●], 2024                                                                                                    $[●]

FOR VALUE RECEIVED, Mullen Automotive Inc., a Delaware corporation (the "**Company**"), hereby promises to pay to the order of [●] or its registered assigns ("**Holder**") the principal sum set forth above as the original principal amount (as reduced pursuant to the terms hereof pursuant to redemption or otherwise, the "**Principal Amount**") together with interest on any outstanding Principal Amount (as such interest on any outstanding Principal Amount may be reduced pursuant to the terms hereof pursuant to redemption or otherwise) from the date set out above as the Issuance Date. This Convertible Note (with all notes issued in exchange, transfer or replacement hereof, this "**Note**") is one of an issue of convertible notes of the Company (collectively, the "**Convertible Notes**") issued pursuant to that certain Securities Purchase Agreement, dated as of May 14, 2024, by and between the Company, the Holder and the other investors named therein (the "**Securities Purchase Agreement**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement.

1. <u>Payments of Principal Amount and Interest</u>. Interest and Principal Amount under this Note shall be payable as follows:

(a) Except as otherwise provided in this Note, the outstanding Principal Amount shall accrue interest at an annual rate equal to the Interest Rate from the date of this Note until the entire Principal Amount is paid in full, whether at maturity, upon acceleration, by prepayment, or otherwise, unless Holder elects to convert this Note pursuant to Section 2(a).

(b) Interest shall accrue at the Interest Rate on the outstanding Principal Amount.

(c) Unless earlier converted into shares of Common Stock, the outstanding Principal Amount and accrued but unpaid interest of this Note will be due and payable by the Company on [●], 2024 (the "**Maturity Date**").

(d) From and after the occurrence and during the continuance of any Event of Default, the Interest Rate shall automatically be increased to twenty percent (20.0%) per annum. In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure; provided that the Interest as calculated and unpaid at such increased rate during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of such cure of such Event of Default.

(e) All computations of interest shall be made on the basis of the actual number of days elapsed in a year of 360 days. Interest shall commence to accrue on the Principal Amount on the Execution Date and shall not accrue on the Principal Amount on the day on which it is paid if payment is made to Holder prior to 12:00 p.m. ET. Any payment of principal on this Note after 12:00 p.m. ET on any Business Day shall be credited against this Note on the next Business Day and interest will continue to accrue until so credited.

(f) All payments made under this Note will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to the Principal Amount.

(g) The agreements made by Company with respect to this Note and the other Transaction Documents (as defined in the Securities Purchase Agreement) are expressly limited so that in no event shall the amount of interest received, charged, or contracted for by Holder exceed the highest lawful amount of interest permissible under the laws applicable to the Note. If at any time performance of any provision of this Note or the other Transaction Documents results in the highest lawful rate of interest permissible under applicable laws being exceeded, then the amount of interest received, charged, or contracted for by Holder shall automatically and without further action by any party be deemed to have been reduced to the highest lawful amount of interest then permissible under applicable laws. If Holder shall ever receive, charge, or contract for, as interest, an amount which is unlawful, at Holder's election, the amount of unlawful interest shall be refunded to the Company (if actually paid) or applied to reduce the then unpaid Principal Amount. To the fullest extent permitted by applicable laws, any amounts contracted for, charged, or received under the Transaction Documents included for the purpose of determining whether the Interest Rate would exceed the highest lawful rate shall be calculated by allocating and spreading such interest to and over the full stated term of this Note.

2. Conversion. This Note shall be convertible into validly issued, fully paid and non-assessable shares of Common Stock on the terms and conditions set forth in this Section 2.

(a) Holder's Conversion Right. Subject to the provisions of Section 2(e), at any time or times on or after the Execution Date, the Holder shall be entitled to convert any portion or the entirety of the outstanding Principal Amount and accrued interest under this Note into validly issued, fully paid and non-assessable shares of Common Stock ("**Conversion Shares**") in accordance with Section 2(c).

Any such portion of the outstanding Principal Amount and/or accrued interest to be converted in accordance with this Section 2 is referred to herein as the "**Conversion Amount**."

(b) Conversion Shares. The number of Conversion Shares issuable upon conversion of the Conversion Amount shall be determined according to the following formula:

$$\frac{\text{Conversion Amount}}{\text{Conversion Price}}$$

No fractional shares of Common Stock are to be issued upon the conversion of this Note. If the issuance would result in the issuance of a fraction of a share, the Company shall round such fraction of a share up to the nearest whole share.

(c) Mechanics of Conversion. The conversion shall be conducted in the following manner:

(i) Holder's Conversion. To convert all or a portion of this Note into Conversion Shares on any date (each, a "**Conversion Date**"), a Holder shall deliver to the Company (whether via facsimile or otherwise), for receipt on or prior to 4:00 p.m., New York time, on such date, a copy of an executed notice of conversion in the form attached hereto as **Exhibit A** (the "**Conversion Notice**"). All Conversion Notices received after 4:00 p.m., New York time, on any Trading Day or at any time on a day that is not a Trading Day shall be considered to have been provided as of the next Trading Day.

(ii) Company's Response. Not later than the first (1st) Trading Day following the date of receipt of a Conversion Notice, the Company shall transmit by email an acknowledgment of confirmation, in the form attached hereto as **Exhibit B**, of receipt of such Conversion Notice to such Holder and the Company's transfer agent (the "**Transfer Agent**"), which confirmation shall constitute an instruction to the Transfer Agent to process such Conversion Notice in accordance with the terms herein. On or before the first (1st) Trading Day following the date of receipt by the Company of such Conversion Notice (the "**Required Credit Date**"), the Company shall credit such aggregate number of Conversion Shares to which the Holder is entitled pursuant to such conversion to the Holder's or its designee's balance account with The Depository Trust Company ("**DTC**") through its Deposit/ Withdrawal at Custodian system.

(iii) Record Holder. Upon delivery of a Conversion Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Conversion Shares with respect to which such Conversion Notice was issued, irrespective of the date such Conversion Shares are credited to the Holder's DTC account.

(iv) Company's Failure to Timely Deliver Securities. If the Company fails to issue and credit to the Holder by the Required Credit Date the balance account of Holder or Holder's nominee with DTC for such number of Conversion Shares so delivered to the Company, then, in addition to all other remedies available to Holder, at the sole discretion of Holder, the Company shall:

(A) pay in cash to Holder on each Trading Day after the Required Credit Date that the issuance or credit of such Conversion Shares is not timely effected an amount equal to 1% of the product of (A) the number of shares of Common Stock not so delivered or credited (as the case may be) to Holder or Holder's nominee multiplied by (B) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the Required Credit Date; or

(B) if on or after the Required Credit Date, Holder (or any other Person in respect, or on behalf, of Holder) purchases (in an open market transaction or otherwise) shares of Common Stock ("**Replacement Shares**") to deliver in satisfaction of a sale by Holder of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock equal to all or any portion of the number of shares of Common Stock, that Holder so anticipated receiving from the Company without any restrictive legend, then, within two (2) Trading Days after Holder's request and in Holder's sole discretion, either (x) pay cash to Holder in an amount equal to Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the Replacement Shares (the "**Buy-In Price**"), at which point the Company's obligation to credit Holder's balance account shall terminate and such shares shall be cancelled, or (y) promptly honor its obligation to credit Holder's DTC account representing such number of shares of Common Stock that would have been credited to Holder's balance account if the Company timely complied with its obligations hereunder and pay cash to Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (1) such number of shares of Common Stock that the Company was required to credit to Holder by the Required Credit Date multiplied by (2) the lowest Closing Sale Price of the shares of Common Stock on any Trading Day during the period commencing on the date Holder purchased Replacement Shares and ending on the date of such credit and payment under this clause (B).

To the extent permitted by law, the Company's obligations to issue and credit the Conversion Shares in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder or any other person of any obligation to the Company or any violation or alleged violation of law by the Holder or any other person, and irrespective of any other circumstance that might otherwise limit such obligation of the Company to the Holder in connection with the issuance of the Conversion Shares. Nothing herein shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely issue and credit the Conversion Shares as required pursuant to the terms hereof.

(v) <u>Disputes</u>. In the case of a dispute as to the determination of the Conversion Price or the arithmetic calculation of the number of Conversion Shares to be issued pursuant to the terms hereof, the Company shall promptly issue to the Holder the number of Conversion Shares that are not disputed, provided that following such issuance to Holder such dispute shall be resolved in accordance with Section 23.

(vi) <u>Book-Entry</u>. Notwithstanding anything to the contrary set forth in this Section 2, upon conversion of any portion of this Note in accordance with the terms hereof, no Holder thereof shall be required to physically surrender this Note to the Company. If this Note is surrendered as provided by Section 8, then, provided that there remains outstanding Principal Amount and accrued interest under this Note at the time of surrender, the Company shall, as soon as practicable and in no event later than three (3) Trading Days after receipt of this Note and at its own expense, issue and deliver to such Holder (or its designee) a new Note (in accordance with Section 8(d)) representing the outstanding Principal Amount and accrued interest (if any) under this Note. Each Holder and the Company shall maintain records showing the portion of the Note so converted by such Holder and the dates of such conversions or shall use such other method, reasonably satisfactory to such Holder and the Company, so as not to require physical surrender of the Note upon each such conversion. In the event of any dispute or discrepancy, such records of such Holder establishing the portion of the Note to which the record holder is entitled shall be controlling and determinative in the absence of manifest error. A Holder and any transferee or assignee, by acceptance of a certificate, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of any portion of the Note, the outstanding Principal Amount represented by such Note may be less than stated on the face thereof. Each Note shall bear the following legend:

**ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 2(c)(vi) AND 8(a) HEREOF. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO <u>SECTION 2(c)(vi)</u> OF THIS NOTE.**

(d) <u>Taxes</u>. The Company shall pay any and all documentary, stamp, transfer (but only in respect of the registered holder thereof), issuance and other similar taxes that may be payable with respect to the issuance and delivery of Conversion Shares upon the conversion of the Note.

(e) <u>Limitation on Beneficial Ownership</u>. Notwithstanding anything to the contrary contained in this Note, this Note shall not be convertible or exchangeable by the Holder hereof to the extent (but only to the extent), after giving effect to the issuance of shares of Common Stock issuable upon such conversion, the Holder or any of its affiliates would beneficially own in excess of 9.9% of the number of shares of Common Stock then outstanding, as calculated in accordance with Section 13(d) of the 1934 Act (the "**Maximum Percentage**"). To the extent the above limitation applies, the determination of whether this Note shall be convertible or exchangeable (vis-à-vis other convertible, exercisable or exchangeable securities owned by the Holder or any of its affiliates) and of which such securities shall be convertible, exercisable or exchangeable (as among all such securities owned by the Holder) shall, subject to such Maximum Percentage limitation, be determined on the basis of the first submission to the Company for conversion, exercise or exchange (as the case may be). No prior inability to convert or exchange this Note pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of convertibility or exchangeability. For the purposes of this paragraph, beneficial ownership and all determinations and calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Maximum Percentage beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such Maximum Percentage limitation. The limitations contained in this paragraph shall apply to a successor Holder of this Note. The holders of Common Stock shall be third party beneficiaries of this paragraph and the Company may not waive this paragraph without the consent of holders of a majority of its Common Stock. For any reason at any time, upon the written or oral request of the Holder, the Company shall within two (2) Business Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise or exchange of convertible or exercisable or exchangeable securities into Common Stock, including, without limitation, pursuant to this Note or securities issued pursuant to the Securities Purchase Agreement. In addition, under no circumstances whatsoever may the aggregate number of shares of Common Stock issuable to the Holder in connection with the conversion or exchange by the Holder of this Note, when added to the aggregate number of shares of Common Stock issuable in connection with the conversion or exchange of all other Convertible Notes or pursuant to any of the other Transaction Documents, at any time exceed 19.9% of the total number of shares of Common Stock outstanding or of the voting power of the Common Stock (the "**Exchange Maximum**") as of the Execution Date unless the Company has obtained stockholder approval in compliance with Nasdaq Listing Rule 5635(d) to authorize the issuance of shares of Common Stock in connection with the conversion or exchange of all Convertible Notes (the "**Stockholder Approval**") and thereafter the approval from the Principal Market ("**Exchange Approval**").

(f) <u>Reservation of Shares; Insufficient Authorized Shares</u>. The Company shall initially reserve out of its authorized and unissued shares of Common Stock a number of shares of Common Stock equal to 250% of the maximum number of Conversion Shares issuable to satisfy the Company's obligations to issue shares of Common Stock hereunder, and the Company shall at all times keep reserved for issuance under this Note a number of shares of Common Stock equal to 250% of the maximum number of Conversion Shares issuable to satisfy the Company's obligation to issue shares of Common Stock hereunder.

3. <u>Rights upon Event of Default; Acceleration</u>.

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default**":

(i) the Company's failure to obtain Stockholder Approval within forty-five (45) calendar days after the Closing Date for the Initial Closing;

(ii) the Company's failure to maintain sufficient reserves of its authorized and unissued Common Stock to redeem 250% of the maximum number of Conversion Shares issuable upon conversion of all the Convertible Notes then outstanding;

(iii) the Company's failure to maintain a transfer agent that participates in the DTC Fast Automated Securities Transfer Program;

(iv) the Company's (A) failure to timely deliver the required number of shares of Common Stock upon conversion of this Note, and any such failure remains uncured for a period of five (5) Business Days, or (B) notice, written or oral, to any holder of the Convertible Notes, including, without limitation, by way of public announcement or through any of its agents, at any time, of its intention not to comply, as required, with a request for conversion of any Convertible Notes into Common Stock that is requested in accordance with the provisions of the Convertible Notes, in each case, other than pursuant to Section 2(e);

(v) the Company's or any Subsidiary's failure (A) to pay to the Holder any amount of Principal Amount or Interest when and as due under this Note or (B) to pay to the Holder, within five (5) days after the delivery by the Holder of written notice thereof, any amount or penalties or other amounts due under this Note or any amount due under any other Transaction Document or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated hereby and thereby;

(vi) the Company fails to remove any restrictive legend on any certificate or any Common Stock issued to the Holder upon conversion or exercise (as the case may be) of any Securities acquired by the Holder under the Securities Purchase Agreement (including this Note) as and when required by such Securities or the Securities Purchase Agreement, unless otherwise then prohibited by applicable federal securities laws, and any such failure remains uncured for a period of five (5) Business Days;

(vii) the occurrence of (A) any default under or acceleration prior to maturity of any Indebtedness (as defined in the Securities Purchase Agreement, but excluding clause (E) of such definition and clauses (F) and (G) to the extent they relate to Indebtedness describe in clause (E)) of the Company or any of its Subsidiaries in an aggregate amount in excess of $300,000, subject to any cure or grace period provided in the governing documents of such Indebtedness, or (B) a payment default under any such Indebtedness, if such default remains uncured for a period of ten (10) consecutive Trading Days;

(viii) bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors shall be instituted by or against the Company or any Subsidiary and, if instituted against the Company or any Subsidiary by a third party, which have not been dismissed within thirty (30) days of their initiation;

(ix) the commencement by the Company or any Subsidiary of a voluntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by it to the entry of a decree, order, judgment or other similar document in respect of the Company or any Subsidiary in an involuntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable federal, state or foreign law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or any Subsidiary or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the execution of a composition of debts, or the occurrence of any other similar federal, state or foreign proceeding, or the admission by it in writing of its inability to pay its debts generally as they become due, the taking of corporate action by the Company or any Subsidiary in furtherance of any such action or the taking of any action by any Person to commence a UCC foreclosure sale or any other similar action under federal, state or foreign law;

(x) the entry by a court of (A) a decree, order, judgment or other similar document in respect of the Company or any Subsidiary of a voluntary or involuntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law or (B) a decree, order, judgment or other similar document adjudging the Company or any Subsidiary as bankrupt or insolvent, or approving as properly filed a petition seeking liquidation, reorganization, arrangement, adjustment or composition of or in respect of the Company or any Subsidiary under any applicable federal, state or foreign law or (C) a decree, order, judgment or other similar document appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or any Subsidiary or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree, order, judgment or other similar document or any such other decree, order, judgment or other similar document unstayed and in effect for a period of thirty (30) consecutive days;

(xi) a final judgment, judgments, any arbitration or mediation award or any settlement of any litigation or any other satisfaction of any claim made by any Person pursuant to any litigation, as applicable, (each a "**Judgment**", and collectively, the "**Judgments**") with respect to the payment of cash, securities and/or other assets with an aggregate fair value (as determined in accordance with Section 6(a)(iv) below) in excess of $300,000 are rendered against, agreed to or otherwise accepted by, the Company and/or any of its Subsidiaries and which Judgments are not, within thirty (30) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within thirty (30) days after the expiration of such stay; provided, however, any Judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $300,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such Judgment is covered by insurance or an indemnity and the Company or such Subsidiary (as the case may be) will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such Judgment;

(xii) other than as specifically set forth in another clause of this Section 3(a), the Company or any Subsidiary breaches any representation or warranty when made, or any covenant or other term or condition of this Note or any other Transaction Document, and, only, in the case of a breach of a covenant or other term or condition that is curable, if such breach remains uncured for a period of ten (10) consecutive Trading Days after the delivery by Holder of written notice thereof;

(xiii) [Reserved];

(xiv) any provision of this Note or any other Transaction Document (shall at any time for any reason (other than pursuant to the express terms thereof)) cease to be valid and binding on or enforceable against the parties thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document;

(xv) failure to file annual or quarterly reports within the required periods, including any extension provided by Rule 12b-25 of the 1934 Act;

Upon the occurrence of an Event of Default with respect to this Note the Company shall promptly, but in no case later than two (2) Business Days, deliver written notice thereof via email and overnight courier (with next day delivery specified) (an "**Event of Default Notice**") to the Holder.

(b) Remedies. Upon the occurrence of an Event of Default and at any time thereafter, Holder may at its option: (a) declare the entire Principal Amount, together with all accrued interest thereon, immediately due and payable; and (b) exercise any or all of its rights, powers, or remedies under the Transaction Documents or applicable law or available in equity; provided, however that, if an Event of Default described in Sections 3(a)(viii)-(x) of this Note shall occur, the Principal Amount and accrued interest shall become immediately due and payable automatically and without any notice, declaration, or other act on the part of Holder.

(c) <u>Acceleration by Subsidiary Spin-Off</u>. Upon the occurrence of a Subsidiary Spin-Off and at any time thereafter, Holder may at its option declare the entire Principal Amount, together with all accrued interest thereon, immediately due and payable.

4. <u>Adjustment of Conversion Price and Number of Conversion Shares</u>. Until the Note has been paid in full or converted in full, the Conversion Price and number of Conversion Shares issuable upon conversion of this Note are subject to adjustment from time to time as set forth in this Section 4.

(a) [Reserved].

(b) <u>Stock Dividends and Splits</u>. Without limiting any provision of Section 6, if the Company, at any time on or after the date of the Securities Purchase Agreement, (i) pays a stock dividend on one or more classes of its then outstanding Common Stock or otherwise makes a distribution on any class of capital stock that is payable in Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding Common Stock into a smaller number of shares, then in each such case the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of shareholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that a Conversion Price is calculated hereunder, then the calculation of such Conversion Price shall be adjusted appropriately to reflect such event.

(c) <u>Adjustment Upon Issuance of Common Stock</u>. If, during the Restricted Period (as defined in the Securities Purchase Agreement), the Company effects an Additional Issuance (as defined in the Securities Purchase Agreement), or in accordance with this Section 4 is deemed to have effected an Additional Issuance, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company) issued or sold or deemed to have been issued or sold) for a consideration per share (the "**New Issuance Price**") less than a price equal to the Conversion Price in effect immediately prior to such issue or sale or deemed issuance or sale (such Conversion Price then in effect is referred to as the "**Applicable Price**") (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Conversion Price then in effect shall be reduced (and in no event increased) to the price per share as determined in accordance with the following formula:

$$CP_2 = CP_1 \text{ x } (A + B) / (A + C)$$

For purposes of the foregoing formula:

A= The total number of Conversion Shares with respect to which this Note may be converted.

B= The total number of shares of Common Stock that would be issued or issuable under the Dilutive Issuance if issued at a per share equal to $CP_1$.

C= The total number of shares of Common Stock actually issued or issuable under the Dilutive Issuance.

$CP_1$= The Conversion Price in effect immediately prior to a Dilutive Issuance.

$CP_2$= The Conversion Price immediately after such Dilutive Issuance; provided, however, that such price shall in no event be less than $0.40 per share of Common Stock (as may be adjusted for stock dividends, subdivisions, or combinations in the manner described in Section 4(b) herein, the "**Floor Price**");

provided, that if such issuance or sale (or deemed issuance or sale) was without consideration, then the Company shall be deemed to have received the Floor Price for each such share so issued or deemed to be issued. For all purposes of the foregoing (including, without limitation, determining the adjusted Conversion Price and consideration per share under this Section 4(c)), the following shall be applicable:

(i) <u>Issuance of Options</u>. If, during the Restricted Period, the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 4(c)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option" shall be equal to (A) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option minus (B) the sum of all amounts paid or payable to the holder of such Option (or any other Person) upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Option (or any other Person). Except as contemplated below, no further adjustment of the Conversion Price shall be made upon the actual issuance of such Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such Common Stock upon conversion, exercise or exchange of such Convertible Securities.

(ii) Issuance of Convertible Securities. If, during the Restricted Period, the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon the conversion, exercise or exchange thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 4(c)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion, exercise or exchange thereof" shall be equal to (A) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to one share of Common Stock upon the issuance or sale of the Convertible Security and upon conversion, exercise or exchange of such Convertible Security minus (B) the sum of all amounts paid or payable to the holder of such Convertible Security (or any other Person) upon the issuance or sale of such Convertible Security plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Convertible Security (or any other Person). Except as contemplated below, no further adjustment of the Conversion Price shall be made upon the actual issuance of such Common Stock upon conversion, exercise or exchange of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of this Note has been or is to be made pursuant to other provisions of this Section 4(c), except as contemplated below, no further adjustment of the Conversion Price shall be made by reason of such issue or sale.

(iii) Change in Option Price or Rate of Conversion. If, during the Restricted Period, the purchase or exercise price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exercise or exchange of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exercisable or exchangeable for Common Stock increases or decreases at any time, the Conversion Price in effect at the time of such increase or decrease shall be adjusted to the Conversion Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 4(c)(iii), if the terms of any Option or Convertible Security that was outstanding as of the date of issuance of this Warrant are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 4(c) shall be made if such adjustment would result in an increase of the Conversion Price then in effect.

(iv) Calculation of Consideration Received. If, during the Restricted Period, any Option or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company, together comprising one integrated transaction, (A) such Option or Convertible Security (as applicable) will be deemed to have been issued for consideration equal to the Black Scholes Consideration Value thereof and (B) the other securities issued or sold or deemed to have been issued or sold in such integrated transaction shall be deemed to have been issued for consideration equal to the difference of (1) the aggregate consideration received by the Company, minus (2) the Black Scholes Consideration Value of each such Option or Convertible Security (as applicable). If any Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor will be deemed to be the net amount of consideration received by the Company therefor. If any Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company for such securities will be the arithmetic average of the VWAPs of such security for each of the five (5) Trading Days immediately preceding the date of receipt. If any Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Holder. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Trading Days after the tenth (10th) day following such Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Holder. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v) Record Date. If, during the Restricted Period, the Company takes a record of the holders of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase (as the case may be).

(d) Calculations. All calculations under this Section 4 shall be made by rounding to the nearest $1/10000$th of cent and the nearest $1/100$th of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock.

(e) Other Events. In the event that the Company shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 4 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Conversion Price and the number of Conversion Shares (if applicable) so as to protect the rights of the Holder, provided that no such adjustment pursuant to this Section 4(e) will increase the Conversion Price or decrease the number of Conversion Shares as otherwise determined pursuant to this Section 4, provided further that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding and whose fees and expenses shall be borne by the Company.

5. Rights Upon Distribution of Assets. In addition to any adjustments pursuant to Section 4, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, indebtedness, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction, other than a distribution of Common Stock covered by Section 4(b)) (a "**Distribution**"), at any time after the issuance of this Note, then, in each such case, provision shall be made so that upon conversion of this Note, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of Common Stock acquirable upon complete conversion of this Note (without regard to any limitations on conversion hereof, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the participation in such Distribution (provided, however, to the extent that the Holder's right to participate in any such Distributions would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to such extent (or the beneficial ownership of any such Common Stock as a result of such Distribution to such extent) and such Distribution to such extent shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage).

6. Purchase Rights; Fundamental Transaction.

(a) Purchase Rights. In addition to any adjustments pursuant to Section 5 herein, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of Common Stock acquirable upon complete conversion of this Note (without regard to any limitations on exercise hereof, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (provided, however, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage).

(b) <u>Fundamental Transactions</u>. The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Note and the other Transaction Documents related to this Note in accordance with the provisions of this Section 6(b) pursuant to written agreements in form and substance reasonably satisfactory to the Holder, including agreements confirming the obligations of the Successor Entity as set forth in this Note and an obligation to deliver to the Holder in exchange for this Note a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Note, including, without limitation, which is exercisable for a corresponding number of shares of capital stock equivalent to the Common Stock acquirable and receivable upon conversion of this Note (without regard to any limitations on the conversion of this Note) prior to such Fundamental Transaction, and with a conversion price which applies the Conversion Price hereunder to such shares of capital stock (but taking into account the relative value of the Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such adjustments to the number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Note immediately prior to the consummation of such Fundamental Transaction). Notwithstanding the foregoing, at the election of the Holder upon conversion of this Note following a Fundamental Transaction, the Successor Entity shall deliver to the Holder, in lieu of the Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 5 and 6(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of this Note prior to the applicable Fundamental Transaction, such Common Stock (or its equivalent) of the Successor Entity (including its Parent Entity), or other securities, cash, assets or other property, which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Note been exercised immediately prior to the applicable Fundamental Transaction; provided, however, that such amount of reserved shares of Common Stock shall be limited by the Maximum Percentage of Common Stock.

7. <u>Creation of Security Interest and Filings</u>. As security for payment of the amounts due and payable under this Note, the Company hereby collaterally assigns and grants to Holder a continuing security interest in all of the Company's right, title and interest in, to and under the following property of the Company, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located (collectively, the "**Collateral**"): (a) inventory; (b) equipment (including accessions thereto); (c) fixtures; (d) instruments (including promissory notes); (e) documents; (f) accounts; (g) chattel paper (whether tangible or electronic); (h) deposit accounts; (i) letter-of-credit rights (whether or not the letter of credit is evidenced by a writing); (j) commercial tort claims; (k) securities and all other investment property (whether certificated or uncertificated); (l) general intangibles (including payment intangibles); (m) supporting obligations; (n) rights to personal property or goods not otherwise described above (including rights to returned or repossessed goods and rights of stoppage in transit) which are represented by, arise form, or relate to any of the foregoing; (o) supporting evidence and documents relating to any of the above-described property; (p) to the extent not otherwise included above, all proceeds and products of any and all of the foregoing and all accessions and additions to, and substitutions and replacements of, any and all of the foregoing; (q) the Real Property and (r) intellectual property, and all books and records relating to any of the foregoing. The Company hereby authorizes and appoints Eousa Holdings LLC as the Company's true and lawful attorney and agent-in-fact, to execute and file uniform commercial code financing statements necessary or advisable to perfect the security interest granted to Holder herein, documents and other agreements and instruments and do such other acts and things as may be necessary or advisable to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Holder to secure payment of this Note. Such financing statements may describe the Collateral as Eousa Holdings LLC may determine, in its sole but reasonable discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to Holder herein, including, without limitation, describing such property as "all assets" or "all personal property". The Company agrees to maintain all of its tangible property constituting Collateral in good working order (normal wear and tear excepted). At any time and from time to time, upon the written and reasonable request of Holder, the Company shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Holder may reasonably deem necessary or desirable to obtain the full benefits of the security interest in the Collateral granted herein. All terms used in this Section 7, but not defined herein shall have the meaning ascribed to such term in the UCC. Upon the occurrence and continuance of an Event of Default, Holder shall have the right to exercise all rights and remedies available to a secured party against all or any portion of the Collateral pursuant to the UCC or applicable law in its sole and absolute discretion, subject to applicable law. Notwithstanding anything to the contrary herein, Holder's security interest in the Collateral shall not include any Excluded Property as defined below. Notwithstanding the foregoing, the Holder agrees to remove its security interest in all of the Company's right, title and interest in, to and under the Real Property upon request from the Company on any day on which the Company has met the conditions provided in Sections 7(ii)-(v) and 7(vii) of the Securities Purchase Agreement.

For purposes of this Section 7 the following terms shall have the meanings set forth below:

"**Excluded Accounts**" means (a) deposit accounts used primarily for withholding sales tax, payroll and related payments, and employee benefit payments, (b) governmental receivables accounts, (c) escrow, fiduciary or trust accounts, (d) holdback and collateral accounts in favor of third-parties, (e) zero balance accounts or other accounts that are swept on a daily basis to a controlled account, (f) all other deposit accounts containing the proceeds of borrowings or issuances of Indebtedness, including borrowings of the Indebtedness evidenced by this Note, provided that the funds held in such other deposit accounts shall only be included in the definition of Excluded Accounts up to the aggregate amount of such proceeds of borrowings or issuances of Indebtedness, and (g) all other deposit accounts, provided that $5 million in the aggregate of the funds held in all such other deposit accounts shall not be included in the definition of Excluded Accounts.

"**Excluded Property**" means (a) all assets or property, other than inventory and accounts, of the Company that would otherwise be included as Collateral but for the express terms of (i) any permit, lease, license (including any governmental licenses or state or local franchises, charters and authorizations), contract or other agreement or instrument constituting or applicable to such asset or (ii) applicable law (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity) that, in each case, prohibits or restricts the grant to Holder of a security interest in and to such asset or property (including any requirement to obtain the consent of any governmental authority or third party, unless such consent has been obtained (it being understood that there shall be no obligation to obtain such consent)) (after giving effect to the applicable anti-assignment provisions of the UCC) or under which the grant to Holder of a security interest in and to such asset or property would impair the validity or enforceability of such asset or property; provided, however, that such assets or property shall constitute "Excluded Property" only to the extent and for so long as such permit, lease, license, contract or other agreement or applicable law validly prohibits or restricts the creation of a security interest on such property in favor of Holder and, upon the termination of such prohibition or restriction (by written consent or in any other manner), such property shall cease to constitute "Excluded Property"; (b) all Excluded Accounts and all funds therein; (c) property owned by the Company on the date hereof or hereafter acquired that is subject to a purchase money security interest or a capital lease permitted under this Note if the contractual obligation pursuant to which such security interest is granted (or in the document providing for such purchase money security interest or capital lease) prohibits the creation of any other security interest on such property or requires the consent of any Person other than the Company which has not been obtained as a condition to the creation of any other security interest on such property (it being understood that there shall be no obligation to obtain such consent); (d) any lease, license, permit or agreement or any property subject to such agreement, in each case in existence on the date hereof or upon acquisition of the relevant party thereto, to the extent that a grant to Holder of a security interest therein would violate or invalidate such lease, license, permit or agreement or create a right of termination in favor of any other party thereto or otherwise require consent thereunder which has not already been obtained (unless such consent has been obtained (it being understood that there shall be no obligation to obtain such consent)); (e) any asset (including, without limitation, motor vehicles) for which a certificate of title has been issued under any certificate of title statute, in each case, to the extent a security interest thereon cannot be perfected by the filing of a UCC financing statement (or equivalent); (f) other assets to the extent the Company and Holder determines in their reasonable judgment that the cost, burden, difficulty or consequence of obtaining or perfecting such pledge or security interest outweighs the benefit thereof; (g) any leasehold interest in real property and any fee owned real property for which a mortgage is not required pursuant to the terms of this Note; (h) commercial tort claims not in excess of $1,000,000; (i) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law; (j) stock and assets of captive insurance subsidiaries; and (k) interests in non-wholly owned subsidiaries which cannot be pledged without the consent of third parties (unless such consent has been obtained (it being understood that there shall be no obligation to obtain such consent)); provided, however, that Excluded Property shall not include any proceeds of property described in clauses (a) through (k) above (unless such proceeds are also described in such clauses).

"**Real Property**" means the real property owned and/or ground leased by (a) Mullen Investment Property, LLC located at One Mullen Automotive Drive, Robinsonville, MS 38664 and (b) Mullen Indiana Real Estate, LLC located at 12900 McKinley Hwy, Mishawaka, IN 46545.

8. <u>Reissuance of Note.</u>

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 8(d)), registered as the Holder may request, representing the outstanding Principal Amount being transferred by the Holder and, if less than the entire outstanding Principal Amount is being transferred, a new Note (in accordance with Section 8(d)) to the Holder representing the outstanding Principal Amount not being transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of Section 2(c)(vi) following conversion or redemption of any portion of this Note, the outstanding Principal Amount represented by this Note may be less than the Principal Amount stated on the face of this Note.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 8(d)) representing the outstanding Principal Amount.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 8(d) and in principal amounts of at least $10,000) representing in the aggregate the outstanding Principal Amount of this Note, and each such new Note will represent such portion of such outstanding Principal Amount as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Note</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal Amount remaining outstanding (or in the case of a new Note being issued pursuant to Section 18(a) or Section 18(c), the Principal Amount designated by the Holder which, when added to the Principal Amount represented by the other new Notes issued in connection with such issuance, does not exceed the Principal Amount remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Execution Date of this Note, and (iv) shall have the same rights and conditions as this Note.

9. <u>Voting Rights</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law, including but not limited to applicable corporate law of the State of Delaware, and as expressly provided in this Note.

10. <u>Covenants</u>. Until this Note has been entirely converted, redeemed or otherwise satisfied in accordance with its terms:

(a) <u>Rank</u>. This Note shall be senior in right of payment to all other current and future notes to which the Company is a party.

(b) <u>No Secured Indebtedness</u>. The Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, incur any Indebtedness (other than Indebtedness pursuant to this Note) of the Company or any of the Subsidiaries, or amend or modify any Indebtedness in such a manner that results in it being, secured by any Lien on any assets of the Company or any of its Subsidiaries.

(c) <u>Restricted Payments</u>. The Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (other than Indebtedness pursuant to this Note), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, if at the time such payment is due or is otherwise made or, after giving effect to such payment, (i) an event constituting an Event of Default has occurred and is continuing or (ii) an event that with the passage of time and without being cured would constitute an Event of Default has occurred and is continuing.

(d) <u>Restriction on Redemption and Cash Dividends</u>. The Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, redeem, repurchase or pay any cash dividend or distribution on any of its capital stock (other than dividends by wholly-owned Subsidiaries to the Company) without the prior express written consent of the Holder.

(e) <u>Restriction on Transfer of Assets</u>. The Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, sell, lease, license, assign, transfer, convey or otherwise dispose of any assets or rights of the Company or any Subsidiary owned or hereafter acquired whether in a single transaction or a series of related transactions, other than sales, leases, licenses, assignments, transfers, conveyances and other dispositions of such assets or rights by the Company and its Subsidiaries that, in the aggregate, do not have a fair market value in excess of $1,000,000 in any twelve (12) month period, and other than (i) sales, leases, assignments, transfers, conveyances and other dispositions of such assets or rights by the Company in the ordinary course of business and (ii) sales of inventory in the ordinary course of business.

(f) <u>Change in Nature of Business</u>. The Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by the Company and each of its Subsidiaries on the Issuance Date or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

(g) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(h) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(i) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

11. [Reserved]

12. [Reserved]

13. Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, conversions and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Note shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note (including, without limitation, compliance with Section 4 hereof). The issuance of Common Stock and certificates for Common Stock as contemplated hereby upon the conversion of this Note shall be made without charge to the Holder or such Common Stock for any issuance tax or other costs in respect thereof, provided that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

14. Payment of Collection, Enforcement and Other Costs. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company or any of its Subsidiaries shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, without limitation, attorneys' fees and disbursements.

15. Non-circumvention. The Company hereby covenants and agrees that the Company will not, by amendment of its certificate of incorporation or bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all the provisions of this Note and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (i) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the conversion of this Note, and (ii) shall, so long as any of the Principal Amount under this Note remains outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock, solely for the purpose of effecting the exercise of this Note, the maximum number of Common Stock as shall from time to time be necessary to effect the exercise of this Note.

16. Failure or Indulgence Not Waiver. No failure or delay on the part of a Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

17. Notices. Whenever notice is required to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 10(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) as soon as practicable upon each adjustment of the Conversion Price and the number of Conversion Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s) and (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities, indebtedness, or other property pro rata to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information (to the extent it constitutes, or contains, material, non-public information regarding the Company shall be made known to the public prior to or in conjunction with such notice being provided to the Holder and (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction. It is expressly understood and agreed that the time of execution specified by the Holder in each Conversion Notice shall be definitive and may not be disputed or challenged by the Company.

18. [Reserved].

19. Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, unless otherwise expressly set forth herein, such payment shall be made in lawful money of the United States of America by wire transfer of immediately available funds by providing the Company with prior written notice setting out the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day. Any amounts due under the Transaction Documents which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of fifteen percent (15%) per month from the date such amount was due until the same is paid in full.

20. Transferability of Note. A Holder may transfer some or all of this Note, or any shares issuable upon conversion of this Note, without the consent of the Company, subject only to the limitations of Section 2(f) of the Securities Purchase Agreement.

21. Register. The Company shall maintain a register (the "**Register**") and record the names and addresses of the holders of each Convertible Note and the principal amount of the Convertible Notes held by such holders (the "**Registered Notes**"). The entries in the Register shall be conclusive and binding for all purposes absent manifest error. The Company and the holders of the Notes shall treat each Person whose name is recorded in the Register as the owner of a Note for all purposes, including, without limitation, the right to receive payments of Principal Amount and interest hereunder, notwithstanding notice to the contrary. A Registered Note may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Upon its receipt of a request to assign or sell all or part of any Registered Note by a Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate principal amount as the principal amount of the surrendered Registered Note to the designated assignee or transferee.

22. Amendment. Except as otherwise provided herein, the provisions of this Note may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder. The Holder shall be entitled, at its option, to the benefit of any amendment of any other similar Convertible Note issued by the Company under the Securities Purchase Agreement.

23. Dispute Resolution. In the case of a dispute as to the determination of the Conversion Price or the arithmetic calculation of the Conversion Shares (as the case may be), the Company or the Holder (as the case may be) shall submit the disputed determinations or arithmetic calculations (as the case may be) via facsimile (i) within two (2) Business Days after receipt of the applicable notice giving rise to such dispute to the Company or the Holder (as the case may be) or (ii) if no notice gave rise to such dispute, at any time after the Holder or the Company (as the case may be) learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to agree upon such determination or calculation (as the case may be) within three (3) Business Days of such disputed determination or arithmetic calculation being submitted to the Company or the Holder (as the case may be), then the Company shall, within two (2) Business Days submit via facsimile (a) the disputed arithmetic calculation of the Conversion Shares and the disputed determination of the Conversion Price to an independent, reputable investment bank selected by the Holder, with the consent of the Company (which may not be unreasonably withheld, conditioned or delayed), or (b) if acceptable to the Holder, the disputed arithmetic calculation of the Conversion Shares and the disputed determination of the Conversion Price to the Company's independent, outside accountant. The Company shall cause at its expense the investment bank or the accountant (as the case may be) to perform the determinations or calculations (as the case may be) and notify the Company and the Holder of the results no later than ten (10) Business Days from the time it receives such disputed determinations or calculations (as the case may be). Such investment bank's or accountant's determination or calculation (as the case may be) shall be binding upon all parties absent demonstrable error. The fees and expenses of such investment bank or accountant shall be borne by the parties in the same proportion as the respective amounts by which the investment bank's or accountant's determination differs from such party's calculation.

24. Waiver of Notice. To the extent permitted by law, the Company hereby irrevocably waives demand, notice, presentment, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and any other Transaction Document.

25. Governing Law. This Note shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

26. Certain Defined Terms. For purposes of this Note, the following terms shall have the following meanings:

"**1934 Act**" means the Securities Exchange Act of 1934, as amended.

"**Black Scholes Consideration Value**" means the value of the applicable Option or Convertible Security (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option or Convertible Security (as the case may be) as of the date of issuance of such Option or Convertible Security (as the case may be) and (iii) an expected volatility equal to the greater of 100% and the 100 day volatility, obtained from the HVT function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option or Convertible Security (as the case may be).

"**Bloomberg**" means Bloomberg, L.P.

"**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and the last closing trade price, respectively, for such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the average of the bid prices, or the ask prices, respectively, of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price (as the case may be) of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 23. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

"**Collateral**" shall have the meaning set forth in Section 7.

"**Common Stock**" means the common stock, par value $0.001 per share, of the Company and any other shares issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, distribution, recapitalization, merger, consolidation, other corporate reorganization or other similar event with respect to the Common Stock).

"**Conversion Price**" means the lower of (a) $[●], (b) 95% of the Closing Sale Price of the Common Stock on the date on which the Initial Registration Statement (as defined in the Registration Rights Agreement) is declared effective by the SEC and (c) 95% of the lowest daily VWAP in the five (5) Trading Days prior to such Conversion Date, subject to adjustment as provided herein; provided, that, notwithstanding anything to the contrary contained in this Note, the Conversion Price shall not be less than $1.16 per share. For the avoidance of doubt, the $1.16 floor price shall not be subject to adjustment provided for in this Note that is otherwise applicable to the Conversion Price.

"**DTC**" has the meaning set forth in Section 2(c)(ii).

"**Execution Date**" shall have the meaning set forth in the Securities Purchase Agreement.

"**Fundamental Transaction**" means that (i) the Company shall, directly or indirectly, in one or more related transactions, (1) consolidate or merge with or into (whether or not the Company is the surviving entity) any other Person unless the shareholders of the Company immediately prior to such consolidation or merger continue to hold more than 50% of the outstanding shares of Voting Stock after such consolidation or merger, or (2) sell, lease, license, assign, transfer, convey or otherwise dispose of all or substantially all of its properties or assets to any other Person, in connection with which the Company is dissolved, or (3) allow any other Person to make a purchase, tender or exchange offer that is accepted by the holders of more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (4) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with any other Person whereby such other Person acquires more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination), or (ii) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act and the rules and regulations promulgated thereunder) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate ordinary voting power represented by issued and outstanding Voting Stock of the Company.

"**Interest Rate**" means fifteen percent (15%) per annum, in each case as may be adjusted from time to time in accordance with Section 1(b).

"**Lien**" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the federal and state securities laws), encroachment, tax, order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

"**Options**" means any rights, warrants or options to subscribe for or purchase Common Stock or Convertible Securities.

"**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

"**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

"**SEC**" means the Securities and Exchange Commission or the successor thereto.

"**Subsidiary**" means any Person in which the Company, directly or indirectly, (I) owns any of the outstanding capital stock or holds any equity or similar interest of such Person or (II) controls or operates all or any part of the business, operations or administration of such Person; provided, that after the Execution Date, a Person (other than Subsidiaries as of the Execution Date) shall not become a Subsidiary pursuant to clause (I) unless the Company, directly or indirectly, owns at least 25% of any of the outstanding capital stock or holds at least 25% of any equity or similar interest of such person.

"**Subsidiary Spin-Off**" means any inquiry, proposal or offer from any Person relating to any (a) direct or indirect acquisition (whether in a single transaction or a series of related transactions) of assets of a Subsidiary (excluding sales of assets in the ordinary course of business) equal to 51% or more of the value of the assets of the Subsidiary or to which 51% or more of the revenues or earnings of the Subsidiary are attributable, (b) tender offer for, or direct or indirect acquisition (whether in a single transaction or a series of related transactions) of 51% or more of the outstanding equity securities of any Subsidiary, or (c) merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving substantially all of any Subsidiary or involving the assets of the any Subsidiaries with a value set forth in clause (a) of this definition.

"**Successor Entity**" means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

"**Trading Day**" means, as applicable, (x) with respect to all price determinations relating to the Common Stock, any day on which the Common Stock is traded on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

"**UCC**" means the Uniform Commercial Code of the State of Delaware and, to the extent applicable, the State of New York.

"**Voting Stock**" of a Person means capital stock of such Person of the class or classes pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

"**VWAP**" means, for any security as of any date, the dollar volume-weighted average price for such security on the principal securities exchange or securities market on which such security is then traded during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "Volume at Price" function or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the three highest closing bid prices and the three lowest closing ask prices of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 23. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, Holder and the Company have caused their respective signature page to this Convertible Note to be duly executed as of the date first written above.

**COMPANY**

**MULLEN AUTOMOTIVE INC.**

By: _____

  Name:
  Title:
  **HOLDER**


By:_____

  Name:
  Title:

\* \* \* \* \*

**EXHIBIT I**

**MULLEN AUTOMOTIVE INC.**
**CONVERSION NOTICE**

Reference is made to that certain Convertible Note (the "**Note**") issued by Mullen Automotive Inc., a Delaware corporation (the "**Company**") to the undersigned Holder on [●], 2024. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Note.

The undersigned holder hereby exercises the right to convert the portion of the Note indicated below into shares of Common Stock as of the date specified below.

Date of Conversion: _____

Principal Amount of Note to be Converted: _____

Tax ID Number (If applicable): _____

Applicable Conversion Price:

$_____

Number of shares of Common Stock to be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

_____

Address: _____

Telephone Number: _____

Facsimile Number: _____

Holder: _____

By: _____
Title: _____

Dated: _____

Account Number (if electronic book entry transfer): _____

Transaction Code Number (if electronic book entry transfer): _____

**EXHIBIT II**

**ACKNOWLEDGMENT**

Mullen Automotive Inc., a Delaware corporation (the "**Company**") hereby acknowledges its receipt of the enclosed Conversion Notice and hereby directs [_] to issue the above indicated number of Common Stock in accordance with the Irrevocable Transfer Agent Instructions dated [_ _, 20_] from the Company and acknowledged and agreed to by [_].

**MULLEN AUTOMOTIVE INC.**

By: _____
Name: _____
Title: _____

**Exhibit 10.3(b)**

**WARRANT**
**MULLEN AUTOMOTIVE INC.**
**WARRANT TO PURCHASE COMMON STOCK**

Date of Issuance: [●], 2024 ("**Issuance Date**")

Mullen Automotive Inc., a Delaware corporation (the "**Company**"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [●], the registered holder hereof or its permitted assigns (the "**Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon exercise of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "**Warrant**"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York time, on the Expiration Date (as defined below), [●] (subject to adjustment as provided herein) fully paid and non-assessable shares of Common Stock (as defined below) (the "**Warrant Shares**"). Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 16. This Warrant is one of the Warrants to purchase Common Stock (the "**SPA Warrants**") issued to Holder pursuant to that certain Securities Purchase Agreement dated May [●], 2024 by and among the Company, the Holder and the other investors thereto (the "**Securities Purchase Agreement**").

1.　　　EXERCISE OF WARRANT.

(a)　　　Mechanics of Exercise. Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as **Exhibit A** (the "**Exercise Notice**"), of the Holder's election to exercise this Warrant. Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (in respect of such specific exercise, the "**Aggregate Exercise Price**") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)). The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder. Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant certificate and issuance of a new Warrant certificate evidencing the right to purchase the remaining number of Warrant Shares. Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant certificate after delivery of the Warrant Shares in accordance with the terms hereof. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as Exhibit B, to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the first (1st) Trading Day following the date on which the Company has received such Exercise Notice (the "**Required Delivery Date**"), the Company shall, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with The Depository Trust Company ("**DTC**") through its Deposit/ Withdrawal at Custodian system. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account. If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant is greater than the number of Warrant Shares being acquired upon an exercise, then, at the request of the Holder and upon surrender hereof by the Holder at the principal office of the Company, the Company shall as soon as practicable and in no event later than three (3) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all taxes and fees which may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant.

(b)　　　Exercise Price. For purposes of this Warrant, "**Exercise Price**" means $[●], subject to adjustment as provided herein.

(c)　　　Company's Failure to Timely Deliver Securities. If the Company fails to issue and credit the balance account of Holder or Holder's nominee with DTC for such number of Warrant Shares for which this Warrant is exercised by the Holder, then, in addition to all other remedies available to Holder, at the sole discretion of Holder, the Company shall:

(i)        pay in cash to Holder on each Trading Day after the Required Delivery Date that the issuance and credit of such Warrant Shares is not timely effected an amount equal to 5% of the product of (A) the number of shares of Common Stock not so credited to Holder or Holder's nominee multiplied by (B) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the Required Delivery Date; or

(ii)        if on or after the Required Delivery Date, Holder (or any other Person in respect, or on behalf, of Holder) purchases (in an open market transaction or otherwise) Common Stock ("**Replacement Shares**") to deliver in satisfaction of a sale by Holder of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock equal to all or any portion of the number of shares of Common Stock, that Holder so anticipated receiving from the Company without any restrictive legend, then, within five (5) Trading Days after Holder's request and in Holder's sole discretion, either (A) pay cash to Holder in an amount equal to Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the Replacement Shares (the "**Buy-In Price**"), at which point the Company's obligation to so credit Holder's balance account shall terminate and such shares shall be cancelled, or (B) promptly honor its obligation to so credit Holder's DTC account representing such number of shares of Common Stock that would have been so delivered if the Company timely complied with its obligations hereunder and pay cash to Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (1) such number of shares of Common Stock that the Company was required to deliver to Holder by the Required Delivery Date multiplied by (2) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date Holder purchased Replacement Shares and ending on the date of such delivery and payment under this clause (ii).

To the extent permitted by law, the Company's obligations to issue and deliver the Common Stock upon exercise of the Warrant in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder or any other person of any obligation to the Company or any violation or alleged violation of law by the Holder or any other person, and irrespective of any other circumstance that might otherwise limit such obligation of the Company to the Holder in connection with the issuance of the Common Stock. Nothing herein shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver the Common Stock issuable upon exercise of this Warrant as required pursuant to the terms hereof.

(d)        Cashless Exercise. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below) at any time the Holder may in its sole discretion (and without limiting the Holder's rights and remedies contained herein or in any of the other Transaction Documents (as defined in the Securities Purchase Agreement)), exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of shares of Common Stock determined according to the following formula (a "**Cashless Exercise**"):

Net Number = (A x B) / C For purposes of the foregoing formulas:

A=    The total number of shares with respect to which this Warrant is then being exercised. B=    The Black Scholes Value (as defined in Section 16 herein).
C=    The lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (as such Closing Bid Price is defined in Section 16 herein), but in any event not less than $0.01 (as may be adjusted for stock dividends, subdivisions, or combinations in the manner described in Section 2(a) herein).

(e)        Mandatory Cash Exercise. Notwithstanding anything contained herein to the contrary, the Company shall have the option to require the Holder to exercise the Warrants for cash pursuant to Section 1(a) hereof, if, at any time, each of the following conditions are met:

(i)   the Registration Statement covering the Registrable Securities has been declared effective by the SEC in accordance with the Securities Act, is effective and available for the resale of the Registrable Securities and the Company has not received any notice that the SEC has issued or intends to issue a stop-order with respect to such Registration Statement or that the SEC has otherwise suspended or withdrawn the effectiveness of such Registration Statement;

(ii)  the Company is not in violation of any of the rules, regulations or requirements of the Principal Market and has no knowledge of any facts or circumstances that could reasonably lead to suspension of the Common Stock by the Principal Market in the foreseeable future; and

(iii) the VWAP for each Trading Day during the ten-Trading Day period immediately preceding the date on which the Company elects to exercise this option is 250% above the Exercise Price. To the extent that the Holder's exercise of the Warrants would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to receive the Warrant Shares to such extent (or the beneficial ownership of any such Warrant Shares as a result of such exercise to such extent) and the issuance of such Warrant Shares shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage.

The Company shall deliver (whether via facsimile, electronic mail or otherwise) a written notice of the Company's election to require the Holder to exercise this Warrant for cash, including the number of Warrant Shares to be issued and the aggregate Exercise Price to be paid upon such exercise. On or before the first (1st) Trading Day following the date on which the Holder has received such notice, the Holder shall provide a written acknowledgment of confirmation of receipt of such notice to the Company. On or before the fifth (5th) Trading Day following the date on which the Holder has received such notice, the Holder shall deliver the aggregate Exercise Price in cash in accordance with Section 1(a).

(f)    Disputes. In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to the terms hereof (including, without limitation, the Net Number), the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed, *provided* that following such issuance to Holder such dispute shall be resolved in accordance with Section 13.

(g)    Limitations on Exercises and Exchanges. Notwithstanding anything to the contrary contained in this Warrant, this Warrant shall not be exercisable or exchangeable by the Holder hereof to the extent (but only to the extent) that the Holder or any of its affiliates would beneficially own in excess of 9.99% of the number of shares of Common Stock outstanding after giving effect to the issuance of Common Stock issuable upon exercise of the Warrants calculated in accordance with Section 13(d) of the Exchange Act (the "**Maximum Percentage**"). To the extent the above limitation applies, the determination of whether this Warrant shall be exercisable or exchangeable (vis-à-vis other convertible, exercisable or exchangeable securities owned by the Holder or any of its affiliates) and of which such securities shall be exercisable or exchangeable (as among all such securities owned by the Holder) shall, subject to such Maximum Percentage limitation, be determined on the basis of the first submission to the Company for conversion, exercise or exchange (as the case may be). No prior inability to exercise or exchange this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability or exchangeability. For the purposes of this paragraph, beneficial ownership and all determinations and calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Section 13(d) of the 1934 Act (as defined in the Securities Purchase Agreement) and the rules and regulations promulgated thereunder. The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Maximum Percentage beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such Maximum Percentage limitation. The limitations contained in this paragraph shall apply to a successor Holder of this Warrant. The holders of Common Stock shall be third party beneficiaries of this paragraph and the Company may not waive this paragraph without the consent of holders of a majority of its Common Stock. For any reason at any time, upon the written or oral request of the Holder, the Company shall within two (2) Business Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise or exchange of convertible or exercisable or exchangeable securities into shares of Common Stock, including, without limitation, pursuant to this Warrant or securities issued pursuant to the Securities Purchase Agreement.

(h)    Reservation of Shares; Insufficient Authorized Shares. The Company shall initially reserve out of its authorized and unissued shares of Common Stock a number of shares of Common Stock equal to 250% of the maximum number of Warrant Shares issuable to satisfy the Company's obligations to issue shares of Common Stock hereunder, and the Company shall at all times keep reserved for issuance under this Warrant a number of shares of Common Stock equal to 250% of the maximum number of Warrant Shares issuable to satisfy the Company's obligation to issue shares of Common Stock hereunder.

(i)    Activity Restrictions. For so long as Holder holds this Warrant or any Warrant Shares, Holder will not: (i) engage or participate in any actions, plans or proposals which relate to or would result in (a) acquiring additional securities of the Company, alone or together with any other Person, which would result in beneficially owning or controlling, or being deemed to beneficially own or control, more than 9.99% of the total outstanding shares of Common Stock or other voting securities of the Company, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving Company, (c) a sale or transfer of a material amount of assets of the Company, (d) any change in the present board of directors or management of the Company, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board, (e) any material change in the present capitalization or dividend policy of the Company, (f) any other material change in the Company's business or corporate structure, including but not limited to, if the Company is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote is required by Section 13 of the Investment Company Act of 1940, (g) changes in the Company's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the Company by any Person, (h) causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, (i) a class of equity securities of the Company becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act, or (j) any action, intention, plan or arrangement similar to any of those enumerated above, or (ii) request the Company or its directors, officers, employees, agents or representatives to amend or waive any provision of this Section 1(h); *provided*, *however*, that notwithstanding anything to the contrary contain in clauses (i) and (ii) above, Holder may vote any shares of Common Stock owned or controlled by it, solicit any proxies, or seek to advise or influence any Person with respect to any voting securities of the Company. Holder may only exercise this Warrant for a cash exercise price if the trading price at the time of exercise is greater than the then applicable Exercise Price.

2.        ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

(a)        Stock Dividends and Splits. Without limiting any provision of Section 4, if the Company, at any time on or after the date of the Securities Purchase Agreement, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of shareholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b)        Adjustment Upon Issuance of Common Stock. If, during the Restricted Period (as defined in the Securities Purchase Agreement), the Company effects an Subsequent Financing (as defined in the Securities Purchase Agreement), or in accordance with this Section 2 is deemed to have effected an Subsequent Financing, any Common Stock (including the issuance or sale of Common Stock owned or held by or for the account of the Company) issued or sold or deemed to have been issued or sold) for a consideration per share (the "**New Issuance Price**") less than a price equal to the Exercise Price in effect immediately prior to such issue or sale or deemed issuance or sale (such Exercise Price then in effect is referred to as the "**Applicable Price**") (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced (and in no event increased) to the price per share as determined in accordance with the following formula:

$$EP2 = EP1 \times (A + B) / (A + C)$$

For purposes of the foregoing formula:

A=    The total number of Warrant Shares with respect to which this Warrant may be exercised.

B=    The total number of shares of Common Stock that would be issued or issuable under the Dilutive Issuance if issued at a per share equal to EP1.

C=    The total number of shares of Common Stock actually issued or issuable under the Dilutive Issuance. $EP_1$ = The Exercise Price in effect immediately prior to a Dilutive Issuance.

$EP_2$ = The Exercise Price immediately after such Dilutive Issuance; *provided*, *however*, that such price shall in no event be less than $0.01

per share of Common Stock (as may be adjusted for stock dividends, subdivisions, or combinations in the manner described in Section 2(a) herein, the "**Floor Price**");

*provided*, that if such issuance or sale (or deemed issuance or sale) was without consideration, then the Company shall be deemed to have received the Floor Price for each such share so issued or deemed to be issued. For all purposes of the foregoing (including, without limitation, determining the adjusted Exercise Price and consideration per share under this Section 2(b)), the following shall be applicable:

(i)        Issuance of Options. If, during the Restricted Period, the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 2(b)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option" shall be equal to (A) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option minus (B) the sum of all amounts paid or payable to the holder of such Option (or any other Person) upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Option (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such Common Stock upon conversion, exercise or exchange of such Convertible Securities.

(ii)        Issuance of Convertible Securities. If, during the Restricted Period, the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon the conversion, exercise or exchange thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 2(b)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion, exercise or exchange thereof" shall be equal to (A) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to one share of Common Stock upon the issuance or sale of the Convertible Security and upon conversion, exercise or exchange of such Convertible Security minus (B) the sum of all amounts paid or payable to the holder of such Convertible Security (or any other Person) upon the issuance or sale of such Convertible Security plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Convertible Security (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such Common Stock upon conversion, exercise or exchange of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of this Warrant has been or is to be made pursuant to other provisions of this Section 2(b), except as contemplated below, no further adjustment of the Exercise Price shall be made by reason of such issue or sale.

(iii)        Change in Option Price or Rate of Conversion. If, during the Restricted Period, the purchase or exercise price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exercise or exchange of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exercisable or exchangeable for Common Stock increases or decreases at any time, the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 2(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the date of issuance of this Warrant are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 2(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

(iv)        Calculation of Consideration Received. If, during the Restricted Period, any Option or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company, together comprising one integrated transaction, (A) such Option or Convertible Security (as applicable) will be deemed to have been issued for consideration equal to the Black Scholes Value - Consideration thereof and (B) the other securities issued or sold or deemed to have been issued or sold in such integrated transaction shall be deemed to have been issued for consideration equal to the difference of (1) the aggregate consideration received by the Company, minus (2) the Black Scholes Value - Consideration of each such Option or Convertible Security (as applicable). If any Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor will be deemed to be the net amount of consideration received by the Company therefor. If any Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company for such securities will be the arithmetic average of the VWAPs of such security for each of the five (5) Trading Days immediately preceding the date of receipt. If any Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Holder. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Trading Days after the tenth (10th) day following such Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Holder. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v)        Record Date. If, during the Restricted Period, the Company takes a record of the holders of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase (as the case may be).

(c)       Reserved.

(d)       Reserved.

(e)       Other Events. In the event that the Company shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 2 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the number of Warrant Shares (if applicable) so as to protect the rights of the Holder, *provided* that no such adjustment pursuant to this Section 2(e) will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to this Section 2, *provided further* that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding and whose fees and expenses shall be borne by the Company.

3.       RIGHTS UPON DISTRIBUTION OF ASSETS. In addition to any adjustments pursuant to Section 2 above, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, indebtedness, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction, other than a distribution of Common Stock covered by Section 2(a)) (a "**Distribution**"), at any time after the issuance of this Warrant, then, in each such case, provision shall be made so that upon exercise of this Warrant, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the participation in such Distribution (*provided*, *however*, to the extent that the Holder's right to participate in any such Distributions would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to such extent (or the beneficial ownership of any such Common Stock as a result of such Distribution to such extent) and such Distribution to such extent shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage).

4.       PURCHASE RIGHTS; FUNDAMENTAL TRANSACTIONS.

(a)       Purchase Rights. In addition to any adjustments pursuant to Section 2 above, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (*provided*, *however*, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Maximum Percentage).

(b)       Fundamental Transactions. The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Warrant and the other Transaction Documents related to this Warrant in accordance with the provisions of this Section 4(b) pursuant to written agreements in form and substance reasonably satisfactory to the Holder, including agreements confirming the obligations of the Successor Entity as set forth in this paragraph (b) and (c) and elsewhere in this Warrant and an obligation to deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant, including, without limitation, which is exercisable for a corresponding number of shares of capital stock equivalent to the Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such adjustments to the number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction). Notwithstanding the foregoing, at the election of the Holder upon exercise of this Warrant following a Fundamental Transaction, the Successor Entity shall deliver to the Holder, in lieu of the Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 3 and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of this Warrant prior to the applicable Fundamental Transaction, such shares of common stock (or its equivalent) of the Successor Entity (including its Parent Entity), or other securities, cash, assets or other property, which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction; *provided*, *however*, that such amount of reserved shares of Common Stock shall be limited by the Maximum Percentage of Common Stock as set forth in Section 1(f).

(c)    Black Scholes Value - FT. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time commencing on the earliest to occur of (i) the public disclosure of any Fundamental Transaction, (ii) the consummation of any Fundamental Transaction and (iii) the Holder first becoming aware of any Fundamental Transaction through the date that is ninety (90) days after the public disclosure of the consummation of such Fundamental Transaction, the Company or the Successor Entity, at the election of the Holder, shall purchase this Warrant from the Holder on the date of the consummation of such Fundamental Transaction by paying to the Holder cash in an amount equal to the Black Scholes Value - FT.

(d)    Application. The provisions of this Section 4 shall apply similarly and equally to successive Fundamental Transactions and shall be applied as if this Warrant (and any such subsequent warrants issued hereunder) were fully exercisable and without regard to any limitations on the exercise of this Warrant (*provided* that the Holder shall continue to be entitled to the benefit of the Maximum Percentage, applied however with respect to shares of capital stock registered under the 1934 Act and thereafter receivable upon exercise of this Warrant (or any such other warrant)).

5.    NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its certificate of incorporation, bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (i) shall not increase the par value of any Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect,

(ii) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the exercise of this Warrant, and (iii) shall, so long as any of the SPA Warrants are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock, solely for the purpose of effecting the exercise of the SPA Warrants, the maximum number of shares of Common Stock as shall from time to time be necessary to effect the exercise of the SPA Warrants then outstanding; *provided*, *however*, that such amount of reserved Common Stock shall be limited by the Maximum Percentage of Common Stock as set forth in Section 1(f).

6.    WARRANT HOLDER NOT DEEMED A SHAREHOLDER. Except as otherwise specifically provided herein, the Holder, solely in its capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in its capacity as the Holder of this Warrant, any of the rights of a shareholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which it is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a shareholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the shareholders of the Company generally, contemporaneously with the giving thereof to the shareholders.

7.    REISSUANCE OF WARRANTS.

(a)    Transfer of Warrant. If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred. If, at the time of the surrender of this Warrant in connection with any transfer of this Warrant, the transfer of this Warrant shall not be either (i) registered pursuant to an effective registration statement under the Securities Act and under applicable state securities or blue sky laws or (ii) eligible for resale without volume or manner-of-sale restrictions or current public information requirements pursuant to Rule 144, the Company may require, as a condition of allowing such transfer, that the Holder or transferee of this Warrant, as the case may be, provide to the Company an opinion of counsel selected by the Holder and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred securities under the Securities Act.

(b)      Lost, Stolen or Mutilated Warrant. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c)      Exchangeable for Multiple Warrants. This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; *provided*, *however*, no warrants for fractional share of Common Stock shall be given.

(d)      Issuance of New Warrants. Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8.      NOTICES. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 10(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant, including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) as soon as practicable upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s) and (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities, indebtedness, or other property pro rata to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information (to the extent it constitutes, or contains, material, non-public information regarding the Company shall be made known to the public prior to or in conjunction with such notice being provided to the Holder and (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction. It is expressly understood and agreed that the time of execution specified by the Holder in each Exercise Notice shall be definitive and may not be disputed or challenged by the Company.

9.      AMENDMENT AND WAIVER. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f)) may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder. The Holder shall be entitled, at its option, to the benefit of any amendment of any other similar warrant issued under the Securities Purchase Agreement. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

10.      SEVERABILITY. If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

**11.**    GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS WARRANT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

12.    CONSTRUCTION; HEADINGS. This Warrant shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any Person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant. Terms used in this Warrant but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date (as defined in the Securities Purchase Agreement) in such other Transaction Documents unless otherwise consented to in writing by the Holder.

13.    DISPUTE RESOLUTION. In the case of a dispute as to the determination of the Exercise Price, the Closing Sale Price, the Closing Bid Price, the Bid Price or fair market value or the arithmetic calculation of the Warrant Shares (as the case may be), the Company or the Holder (as the case may be) shall submit the disputed determinations or arithmetic calculations (as the case may be) via facsimile (i) within two (2) Business Days after receipt of the applicable notice giving rise to such dispute to the Company or the Holder (as the case may be) or (ii) if no notice gave rise to such dispute, at any time after the Holder or the Company (as the case may be) learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to agree upon such determination or calculation (as the case may be) of the Exercise Price, the Closing Sale Price, the Closing Bid Price, the Bid Price or fair market value or the number of Warrant Shares (as the case may be) within three (3) Business Days of such disputed determination or arithmetic calculation being submitted to the Company or the Holder (as the case may be), then the Company shall, within two (2) Business Days submit via facsimile (a) the disputed arithmetic calculation of the Warrant Shares, the disputed determination of the Exercise Price, the Closing Sale Price, the Closing Bid Price, the Bid Price or fair market value (as the case may be) to an independent, reputable investment bank selected by the Holder, with the consent of the Company (which may not be unreasonably withheld, conditioned or delayed), or (b) if acceptable to the Holder, the disputed arithmetic calculation of the Warrant Shares to the Company's independent, outside accountant. The Company shall cause at its expense the investment bank or the accountant (as the case may be) to perform the determinations or calculations (as the case may be) and notify the Company and the Holder of the results no later than ten (10) Business Days from the time it receives such disputed determinations or calculations (as the case may be). Such investment bank's or accountant's determination or calculation (as the case may be) shall be binding upon all parties absent demonstrable error. The fees and expenses of such investment bank or accountant shall be borne by the parties in the same proportion as the respective amounts by which the investment bank's or accountant's determination differs from such party's calculation.

14.    REMEDIES, CHARACTERIZATION, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Warrant shall be cumulative and in addition to all other remedies available under this Warrant and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual damages for any failure by the Company to comply with the terms of this Warrant. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, exercises and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Warrant shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Warrant (including, without limitation, compliance with Section 2 hereof). The issuance of shares as contemplated hereby upon the exercise of this Warrant shall be made without charge to the Holder or such shares for any issuance tax or other costs in respect thereof, *provided* that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

15.    TRANSFER. This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company.

16.    <u>CERTAIN DEFINITIONS</u>. For purposes of this Warrant, the following terms shall have the following meanings:

(a)    " **Bid Price**" means, for any security as of the particular time of determination, the bid price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg as of such time of determination, or if the foregoing does not apply, the bid price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg as of such time of determination, or, if no bid price is reported for such security by Bloomberg as of such time of determination, the average of the bid prices of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC) as of such time of determination. If the Bid Price cannot be calculated for a security as of the particular time of determination on any of the foregoing bases, the Bid Price of such security as of such time of determination shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(b)    " **Black Scholes Value**" means the Black Scholes value of an option for one share of Common Stock at the date of the applicable Cashless Exercise, as such Black Scholes value is determined, calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Exercise Price, as adjusted, (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable Cashless Exercise, (iv) an expected volatility equal to 135%, and (v) a deemed remaining term of the Warrant of five (5) years (regardless of the actual remaining term of the Warrant).

(c)    " **Black Scholes Value - Consideration**" means the value of the applicable Option or Convertible Security (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option or Convertible Security (as the case may be) as of the date of issuance of such Option or Convertible Security (as the case may be) and (iii) an expected volatility equal to the greater of 100% and the 100 day volatility obtained from the HVT function on Bloomberg (determined utilizing a 3 65 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option or Convertible Security (as the case may be).

(d)    " **Black Scholes Value** - **FT**" means the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing
(i) an underlying price per share equal to the greater of (A) the highest Closing Sale Price of the Common Stock during the period beginning on the Trading Day immediately preceding the earliest to occur of (1) the public disclosure of the applicable Fundamental Transaction, (2) the consummation of the applicable Fundamental Transaction and (3) the date on which the Holder first became aware of the applicable Fundamental Transaction and ending on the Trading Day of the Holder's request pursuant to Section 4(c) and (B) the sum of the price per share being offered in cash in the applicable Fundamental Transaction (if any) plus the value of the non-cash consideration being offered in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (A) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c) and (B) the remaining term of this Warrant as of the date of consummation of the applicable Fundamental Transaction or as of the date of the Holder's request pursuant to Section 4(c) if such request is prior to the date of the consummation of the applicable Fundamental Transaction and (iv) an expected volatility equal to the greater of 135% and the 100 day volatility obtained from the HVT function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the earliest to occur of (A) the public disclosure of the applicable Fundamental Transaction, (B) the consummation of the applicable Fundamental Transaction and (C) the date on which the Holder first became aware of the applicable Fundamental Transaction.

(e)    **"Bloomberg"** means Bloomberg, L.P.

(f)    " **Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

(g)    " **Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and the last closing trade price, respectively, for such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the average of the bid prices, or the ask prices, respectively, of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price (as the case may be) of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(h)    " **Common Stock**" means the common stock, par value $0.001 per share, of the Company and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, distribution, recapitalization, merger, consolidation, other corporate reorganization or other similar event with respect to the Common Stock).

(i)        " **Convertible Securities**" means any capital stock or other security of the Company that is at any time and under any circumstances directly or indirectly convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any capital stock or other security of the Company (including, without limitation, Common Stock)..

(j)        " **Eligible Market**" means the New York Stock Exchange, the NYSE Amex, the Nasdaq Global Select Market, the Nasdaq Global Market or the Nasdaq Capital Market.

(k)        " **Expiration Date**" means the date that is [●], 2029 or, if such date falls on a day other than a Business Day or on which trading does not take place on the principal securities exchange or trading market where the Common Stock is listed (a "**Holiday**"), the next date that is not a Holiday.

(l)        " **Fundamental Transaction**" means that (i) the Company shall, directly or indirectly, in one or more related transactions, (1) consolidate or merge with or into (whether or not the Company is the surviving entity) any other Person unless the shareholders of the Company immediately prior to such consolidation or merger continue to hold more than 50% of the outstanding shares of Voting Stock after such consolidation or merger, or (2) sell, lease, license, assign, transfer, convey or otherwise dispose of all or substantially all of its properties or assets to any other Person, in connection with which the Company is dissolved, or (3) allow any other Person to make a purchase, tender or exchange offer that is accepted by the holders of more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (4) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with any other Person whereby such other Person acquires more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination), or (ii) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act and the rules and regulations promulgated thereunder) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate ordinary voting power represented by issued and outstanding Voting Stock of the Company.

(m)        "**Options**" means any rights, warrants or options to subscribe for or purchase Common Stock or Convertible Securities.

(n)        " **Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(o)        " **Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(p)        " **Successor Entity**" means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(q)        " **Trading Day**" means, as applicable, (x) with respect to all price determinations relating to the Common Stock, any day on which the Common Stock is traded on the principal securities exchange or securities market on which the Common Stock is then traded, *provided* that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(r)        " **Voting Stock**" of a Person means capital stock of such Person of the class or classes pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

(s)        " **VWAP**" means, for any security as of any date, the dollar volume-weighted average price for such security on the principal securities exchange or securities market on which such security is then traded during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "Volume at Price" function or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the three highest closing bid prices and the three lowest closing ask prices of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

*[signature page follows]*

**IN WITNESS WHEREOF**, the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set out above.

**MULLEN AUTOMOTIVE INC.**

By:

Name:  David Michery Title: CEO

**EXHIBIT A**

**EXERCISE NOTICE**

**TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS WARRANT TO PURCHASE COMMON STOCK**

**MULLEN AUTOMOTIVE INC.**

The undersigned holder hereby exercises the right to purchase_shares of the Common Stock ("**Warrant Shares**") of Mullen Automotive Inc., a Delaware corporation (the "**Company**"), evidenced by Warrant to Purchase Common Stock No._(the "**Warrant**"). Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1.        Form of Exercise Price. The Holder intends that payment of the Exercise Price shall be made as:

_ a "Cash Exercise" with respect to _Warrant Shares; and/or

_ a "Cashless Exercise" with respect to _Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares, the Holder represents and warrants that _Common Stock are to be delivered pursuant to such Cashless Exercise, as further specified in Annex A to this Exercise Notice.

2.        Payment of Exercise Price. In the event that the Holder has elected a Cash Exercise with respect to some or all of the Warrant Shares, the Holder shall pay the Aggregate Exercise Price in the sum of $_to the Company in accordance with the terms of the Warrant.

3.        Delivery of Warrant Shares and Net Number of Common Stock. The Company shall deliver to Holder, or its designee or agent as specified below,
_Common Stock in respect of the exercise contemplated hereby. Delivery shall be made to Holder, or for its benefit, to the following address:

Date:   _, _

Name of Registered Holder

**ANNEX A TO EXERCISE NOTICE**

**CASHLESS EXERCISE EXCHANGE CALCULATION**

**TO BE FILLED IN BY THE REGISTERED HOLDER TO EXCHANGE THE WARRANT TO
PURCHASE COMMON STOCK IN A CASHLESS EXERCISE PURSUANT TO SECTION
1(d) OF THE WARRANT**

Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

[ ] Net Number = (A x B)/C =    shares of Common Stock

For purposes of the foregoing formula:

A= the total number of shares with respect to which the Warrant is then being exercised =_.
B= Black Scholes Value (as defined in Section 16 of the Warrant) =_.
C= The lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (as such Closing Bid Price is defined in Section 16 of the Warrant) =_.

Date:  _

**EXHIBIT B**

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Exercise Notice and hereby directs_to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions dated_, 20_, from the Company and acknowledged and agreed to by _.

**MULLEN AUTOMOTIVE INC.**
By:
Name:
Title:

**Exhibit 10.3(c)**

**REGISTRATION RIGHTS AGREEMENT**

This **REGISTRATION RIGHTS AGREEMENT** (this "**Agreement**"), dated as of May 14, 2024, is by and among Mullen Automotive Inc., a Delaware corporation (the "**Company**"), and the undersigned buyers (the "**Buyers**").

**RECITALS**

A. In connection with the Securities Purchase Agreement by and between the parties hereto, dated as of May 14, 2024 (the "**Securities Purchase Agreement**"), the Company has agreed, upon the terms and subject to the conditions of the Securities Purchase Agreement, to issue and sell to the Buyers (i) the Convertible Notes (as defined in the Securities Purchase Agreement), which will be convertible to purchase the Conversion Shares (as defined in the Securities Purchase Agreement) in accordance with the terms of the Convertible Notes and (ii) the Warrants (as defined in the Securities Purchase Agreement), which will be exercisable or exchangeable to purchase Warrant Shares (as defined in the Securities Purchase Agreement) in accordance with the terms of the Warrants.

B. To induce the Buyers to consummate the transactions contemplated by the Securities Purchase Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar successor statute (collectively, the "**1933 Act**"), and applicable state securities laws.

**AGREEMENT**

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Buyers hereby agree as follows:

1.  Definitions.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement. As used in this Agreement, the following terms shall have the following meanings:

(a) "**Business Day**" means any day other than (i) Saturday, Sunday or any other day on which commercial banks in New York, New York are authorized or required by law to remain closed or (ii) with respect to dates on which filings are required to be made with the SEC, any day on which the SEC is not open and available to accept filings.

(b) "**Closing Date**" shall have the meaning set forth in the Securities Purchase Agreement with respect to the Closing (as defined in the Securities Purchase Agreement).

(c) "**Effective Date**" means the date that the applicable Registration Statement has been declared effective by the SEC.

(d) "**Effectiveness Deadline**" means (i) with respect to the Initial Registration Statement required to be filed pursuant to Section 2(a), the earlier of the (A) 45th calendar day after the Closing Date for the Initial Closing and (B) 2nd Business Day after the date the Company is notified (orally or in writing, whichever is earlier) by the SEC that such Registration Statement will not be reviewed or will not be subject to further review and (ii) with respect to any additional Registration Statements that may be required to be filed by the Company pursuant to this Agreement, the earlier of the (A) 15th calendar day following the date on which the Company was required to file such additional Registration Statement and (B) 2nd Business Day after the date the Company is notified (orally or in writing, whichever is earlier) by the SEC that such Registration Statement will not be reviewed or will not be subject to further review. Notwithstanding the foregoing or anything to the contrary herein, if the Effectiveness Deadline falls on a day that is not a Business Day, the Effectiveness Deadline shall be on the next succeeding Business Day.

(e) "**Filing Deadline**" means (i) with respect to the Initial Registration Statement required to be filed pursuant to Section 2(a), the 5th calendar day after the Closing Date for the Initial Closing, (ii) with respect to the Second Closing, the 5th calendar day after the Closing Date for the Second Closing and (ii) with respect to any additional Registration Statements that may be required to be filed by the Company pursuant to this Agreement, the date, if any, on which the Company was required to file such additional Registration Statement pursuant to the terms of this Agreement. Notwithstanding the foregoing or anything to the contrary herein, if the Filing Deadline falls on a day that is not a Business Day, the Filing Deadline shall be on the next succeeding Business Day.

(f) "**Investor**" means a Buyer or any transferee or assignee of any Registrable Securities, Convertible Notes or Warrants, as applicable, to whom such Buyer assigns its rights under this Agreement and who agrees to become bound by the provisions of this Agreement in accordance with Section 9 and any transferee or assignee thereof to whom a transferee or assignee of any Registrable Securities, Convertible Notes or Warrants, as applicable, assigns its rights under this Agreement and who agrees to become bound by the provisions of this Agreement in accordance with Section 9.

(g)" **Initial Required Registration Amount**" means 20,000,000 shares of Common Stock.

(h)" **Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, or any other entity of any kind or nature whatsoever, a trust, an unincorporated organization or a government or any department or agency or portion thereof.

(i)" **register**," "**registered**," and "**registration**" refer to a registration effected by preparing and filing one or more Registration Statements in compliance with the 1933 Act and pursuant to Rule 415 and the declaration of effectiveness of such Registration Statement(s) by the SEC.

(j)" **Registrable Securities**" means (i) the Conversion Shares, (ii) the Warrant Shares and (iii) any capital stock of the Company issued or issuable with respect to such Conversion Shares, the Warrant Shares, the Convertible Notes or the Warrants, including, without limitation, (1) as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise and (2) shares of capital stock of the Company into which the Common Stock is converted or exchanged and shares of capital stock of a Successor Entity (as defined in the Warrants) into which the Common Stock is converted or exchanged, in each case, without regard to any limitations on exercise or exchange of the Warrants. As to any Registrable Securities, such securities shall cease to be Registrable Securities when: (a) a Registration Statement with respect to the sale of such securities shall have become effective under the 1933 Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (b) such securities shall have been otherwise transferred, new certificates for them not bearing a legend restricting further transfer shall have been delivered by the Company, and subsequent public distribution of them shall not require registration under the 1933 Act; or (c) such securities are freely saleable under Rule 144 under the 1933 Act without the requirement for current public information and without volume or manner of sale limitations.

(k)" **Registration Statement**" means a registration statement or registration statements of the Company filed under the 1933 Act covering Registrable Securities (and the term "**Initial Registration Statement**" shall mean the first Registration Statement filed pursuant to this Agreement).

(l)" **Required Holders**" means the holders of a majority in interest of the Registrable Securities (in the case of the Registrable Securities issuable upon conversion of the then-outstanding Convertible Notes or exercise of the then-outstanding Warrants, based on the number of shares of Common Stock then issuable upon a conversion or a cash exercise thereof).

(m)" **Required Registration Amount**" means the sum of the shares of Common Stock issued pursuant to the Securities Purchase Agreement (including any issued Conversion Shares or Warrant Shares), the maximum number of Conversion Shares issuable upon a conversion pursuant to the Convertible Notes, and the maximum number of Warrant Shares issuable upon a cash exercise pursuant to the Warrants, in each case, as of the Trading Day (as defined in the Warrants) immediately preceding the applicable date of determination (without taking into account any limitations on the exercise or exchange of the Warrants set forth therein).

(n)" **Rule 144**" means Rule 144 promulgated by the SEC under the 1933 Act, as such rule may be amended from time to time, or any other similar or successor rule or regulation of the SEC that may at any time permit the Investors to sell securities of the Company to the public without registration.

(o)" **Rule 415**" means Rule 415 promulgated by the SEC under the 1933 Act, as such rule may be amended from time to time, or any other similar or successor rule or regulation of the SEC providing for offering securities on a continuous or delayed basis.

(p)" **SEC**" means the United States Securities and Exchange Commission or any successor thereto.

2. <u>Registration</u>.

(a) <u>Mandatory Registration</u>. The Company shall prepare and, as soon as practicable, but in no event later than the Filing Deadline, file with the SEC an Initial Registration Statement on Form S-1 covering the resale of Registrable Securities equal to the Initial Required Registration Amount as of the date such Registration Statement is initially filed with the SEC (together with such other number of shares of Common Stock constituting Registrable Securities as may be registered thereunder pursuant to Rule 416 or otherwise). Such Initial Registration Statement, and each other Registration Statement required to be filed pursuant to the terms of this Agreement, shall contain (except if otherwise directed by the Required Holders) the "<u>Selling Shareholder</u>" and "<u>Plan of Distribution</u>" sections in substantially the form attached hereto as **Exhibit B**. The Company shall use its best efforts to have such Initial Registration Statement, and each other Registration Statement required to be filed pursuant to the terms of this Agreement, declared effective by the SEC as soon as practicable, but in no event later than the applicable Effectiveness Deadline for such Registration Statement.

(b) <u>Legal Counsel</u>. Subject to Section 5 hereof, Buyers shall have the right to select one (1) legal counsel to review and oversee, solely on its behalf, any registration pursuant to this Section 2 ("**Legal Counsel**"), which shall be McDermott Will & Emery LLP or such other counsel as thereafter designated by Buyers.

(c) Form S-3. The Company shall undertake to register the resale of the Registrable Securities on Form S-3 as soon as such form is available and the Company is not be subject to the "baby shelf requirements" contained in Instruction I.B.6 applicable to a Form S-3 registration statement (or similar provisions of Form S-3, as applicable), provided that the Company shall maintain the effectiveness of all Registration Statements then in effect and the availability for use of each prospectus contained therein until such time as a Registration Statement on Form S-3 covering the resale of all the Registrable Securities has been declared effective by the SEC and the prospectus contained therein is available for use or, if sooner, the expiration of the Registration Period (as defined below).

(d) Sufficient Number of Shares Registered. In the event the number of shares available under any Registration Statement is insufficient to cover from time to time the Required Registration Amount, the Company shall amend such Registration Statement (if permissible), or file with the SEC a new Registration Statement (on the short form available therefor, if applicable), or both, so as to cover at least the Required Registration Amount as of the Trading Day immediately preceding the date of the filing of such amendment or new Registration Statement, in each case, as soon as practicable, but in any event not later than ten (10) days after the necessity therefor arises (but taking account of the position of the staff of the SEC (the "**Staff**") with respect to the date on which the Staff will permit such amendment to the Registration Statement and/or such new Registration Statement (as the case may be) to be filed with the SEC). The Company shall use its best efforts to cause such amendment to such Registration Statement and/or such new Registration Statement (as the case may be) to become effective as soon as practicable following the filing thereof with the SEC, but in no event later than the applicable Effectiveness Deadline for such Registration Statement. For purposes of the foregoing provision, the number of shares available under a Registration Statement shall be deemed "insufficient to cover all of the Registrable Securities" if at any time the number of shares of Common Stock available for resale under the applicable Registration Statement is less than the Required Registration Amount as of such time.

(e) Effect of Failure to File and Obtain and Maintain Effectiveness of any Registration Statement. If (i) a Registration Statement covering the resale of all of the Registrable Securities required to be covered thereby (disregarding any reduction pursuant to Section 2(f)) and required to be filed by the Company pursuant to this Agreement is (A) not filed with the SEC on or before the Filing Deadline for such Registration Statement (a "**Filing Failure**") (it being understood that if the Company files a Registration Statement without affording each Investor the opportunity to review and comment on the same as required by Section 3(c) hereof, the Company shall be deemed to not have satisfied this clause (i)(A) and such event shall be deemed to be a Filing Failure) or (B) not declared effective by the SEC on or before the Effectiveness Deadline for such Registration Statement (an "**Effectiveness Failure**") (it being understood that if on the Business Day immediately following the Effective Date for such Registration Statement the Company shall not have filed a "final" prospectus for such Registration Statement with the SEC under Rule 424(b) in accordance with Section 3(b) (whether or not such a prospectus is technically required by such rule), the Company shall be deemed to not have satisfied this clause (i)(B) and such event shall be deemed to be an Effectiveness Failure), (ii) on any day after the Effective Date of a Registration Statement sales of all of the Registrable Securities required to be included on such Registration Statement (disregarding any reduction pursuant to Section 2(f)) cannot be made pursuant to such Registration Statement (including, without limitation, because of a failure to keep such Registration Statement effective, a failure to disclose such information as is necessary for sales to be made pursuant to such Registration Statement, a suspension or delisting of (or a failure to timely list) the Common Stock on the Principal Market (as defined in the Securities Purchase Agreement), or a failure to register a sufficient number of shares of Common Stock or by reason of a stop order) or the prospectus contained therein is not properly available for use for any reason (a "**Maintenance Failure**"), for more than five (5) consecutive calendar days or more than an aggregate of ten (10) calendar days (which need not be consecutive calendar days) during any 12-month period, provided that a Maintenance Failure shall not be deemed to occur for the purposes of this section to the extent a post-effective amendment to the Registration Statement is required for the purpose of meeting the requirements of section 10(a)(3) of the 1933 Act and the resulting Maintenance Failure continues for fifteen (15) days or less, or (iii) a Registration Statement is not effective for any reason or the prospectus contained therein is not properly available for use for any reason, and the Company fails to file with the SEC any required reports under Section 13 or 15(d) of the 1934 Act such that it is not in compliance with Rule 144(c)(1) (or Rule 144(i)(2), if applicable) (a "**Current Public Information Failure**") as a result of which any of the Investors are unable to sell Registrable Securities without restriction under Rule 144 (including, without limitation, volume restrictions), then, as partial relief for the damages to any holder by reason of any such delay in, or reduction of, its ability to sell the underlying shares of Common Stock (which remedy shall not be exclusive of any other remedies available at law or in equity), the Company shall pay to each holder of Registrable Securities relating to such Registration Statement an amount in cash equal to one and a half percent (1.5%) of such Investor's total committed purchase price for the Registrable Securities affected by such failure pursuant to the Securities Purchase Agreement (e.g., 1.5% of $3,000,000, or $45,000) (1) within three (3) Business Days after the date of such Filing Failure, Effectiveness Failure, Maintenance Failure or Current Public Information Failure, as applicable, and (2) on every thirty (30) day anniversary of (I) a Filing Failure until such Filing Failure is cured; (II) an Effectiveness Failure until such Effectiveness Failure is cured; (III) a Maintenance Failure until such Maintenance Failure is cured; and (IV) a Current Public Information Failure until the earlier of (i) the date such Current Public Information Failure is cured and (ii) such time that such public information is no longer required pursuant to Rule 144 (in each case, pro rated for periods totaling less than thirty (30) days). The payments to which a holder of Registrable Securities shall be entitled pursuant to this Section 2(e) are referred to herein as "**Registration Delay Payments**." Following the initial Registration Delay Payment for any particular event or failure (which shall be paid on the date of such event or failure, as set forth above), without limiting the foregoing, if an event or failure giving rise to the Registration Delay Payments is cured prior to any thirty (30) day anniversary of such event or failure, then no further Registration Delay Payment(s) shall accrue after such cure. In the event the Company fails to make Registration Delay Payments in a timely manner in accordance with the foregoing, such Registration Delay Payments shall bear interest at the rate of ten percent (10%) per month (prorated for partial months) until paid in full. Notwithstanding the foregoing, no Registration Delay Payments shall be owed to an Investor: (i) with respect to Registrable Securities affected by an Effectiveness Failure, a Maintenance Failure or a Current Public Information Failure, for any period during which such Investor may conduct a resale of such Registrable Securities (assuming for this purpose that any Warrant Shares are issued pursuant to a cashless exercise of the applicable Warrant) in reliance on a valid exemption from registration in accordance with Rule 144 and (ii) with respect to any Registrable Securities excluded from a Registration Statement by election of an Investor. Notwithstanding anything herein to the contrary, except in connection with a Current Public Information Failure, the Company shall not be required to make more than an aggregate of twelve (12) Registration Delay Payments pursuant to this Section 2(e), where any such payment pursuant to clause (2) of this Section 2(e) covering less than a 30-day period shall constitute a fraction of a Registration Delay Payment (i.e., no more than 18% in the aggregate). Notwithstanding anything contained herein, Registration Delay Payments (and any interest accrued thereon) may be paid, at the option of the Company, by the issuance of shares of Common Stock ("**Registration Delay Shares**") in such amount equal to the aggregate amount of Registration Delay Payments (and any interest accrued thereon) to be paid in Registration Delay Shares divided by the Closing Bid Price of the Common Stock on the date the Registration Delay Shares are delivered to the Buyer; provided, however, that such option may only be exercised by the Company at the time that all that Registration Delay Shares have been registered for resale pursuant to a Registration Statement that has been declared effective by the SEC.

(f) Offering. Notwithstanding anything to the contrary contained in this Agreement, but subject to the payment of the Registration Delay Payments pursuant to Section 2(e), in the event the staff of the SEC (the "Staff") or the SEC seeks to characterize any offering pursuant to a Registration Statement filed pursuant to this Agreement as constituting an offering of securities by, or on behalf of, the Company, or in any other manner, such that the Staff or the SEC do not permit such Registration Statement to become effective and used for resales in a manner that does not constitute such an offering and that permits the continuous resale at the market by the Investors participating therein (or as otherwise may be acceptable to each Investor) without being named therein as an "underwriter," then the Company shall, after consulting in good faith with the Investors, reduce the number of shares to be included in such Registration Statement by all Investors until such time as the Staff and the SEC shall so permit such Registration Statement to become effective as aforesaid. In making such reduction, the Company shall reduce the number of shares to be included by all Investors on a pro rata basis (based upon the number of Registrable Securities otherwise required to be included for each Investor) unless the inclusion of shares by a particular Investor or a particular set of Investors are resulting in the Staff or the SEC's "by or on behalf of the Company" offering position, in which event the shares held by such Investor or set of Investors shall be the only shares subject to reduction (and if by a set of Investors on a pro rata basis by such Investors or on such other basis as would result in the exclusion of the least number of shares by all such Investors); provided, that, with respect to such pro rata portion allocated to any Investor, such Investor may elect the allocation of such pro rata portion among the Registrable Securities of such Investor. In addition, in the event that the Staff or the SEC requires any Investor seeking to sell securities under a Registration Statement filed pursuant to this Agreement to be specifically identified as an "underwriter" in order to permit such Registration Statement to become effective, and such Investor does not consent to being so named as an underwriter in such Registration Statement, then, in each such case, the Company shall reduce the total number of Registrable Securities to be registered on behalf of such Investor, until such time as the Staff or the SEC does not require such identification or until such Investor accepts such identification and the manner thereof. Any reduction pursuant to this paragraph will first reduce all Registrable Securities other than those issued pursuant to the Securities Purchase Agreement. In the event of any reduction in Registrable Securities pursuant to this paragraph, an affected Investor shall have the right to require, upon delivery of a written request to the Company signed by such Investor, the Company to file a registration statement within ten (10) days of such request (subject to any restrictions imposed by Rule 415 or required by the Staff or the SEC) for resale by such Investor in a manner acceptable to such Investor, and the Company shall following such request cause to be and keep effective such registration statement in the same manner as otherwise contemplated in this Agreement for registration statements hereunder, in each case until such time as: (i) all Registrable Securities held by such Investor have been registered and sold pursuant to an effective Registration Statement in a manner acceptable to such Investor or (ii) all Registrable Securities may be resold by such Investor without restriction (including, without limitation, volume limitations) pursuant to Rule 144 (taking account of any Staff position with respect to "affiliate" status) or (iii) such Investor agrees to be named as an underwriter in any such Registration Statement in a manner acceptable to such Investor as to all Registrable Securities held by such Investor and that have not theretofore been included in a Registration Statement under this Agreement (it being understood that the special demand right under this sentence may be exercised by an Investor multiple times and with respect to limited amounts of Registrable Securities in order to permit the resale thereof by such Investor as contemplated above).

(g) Piggyback Registrations. Without limiting any obligation of the Company hereunder (including its obligations under Section 2(h)) or under the Securities Purchase Agreement, if there is not an effective Registration Statement covering all of the Registrable Securities or the prospectus contained therein is not available for use and the Company shall determine to prepare and file with the SEC a registration statement relating to an offering for its own account or the account of others under the 1933 Act of any of its equity securities (other than on Form S-4 or Form S-8 (each as promulgated under the 1933 Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with the Company's stock option or other employee benefit plans), then the Company shall deliver to each Investor a written notice of such determination and, if within fifteen (15) days after the date of the delivery of such notice, any such Investor shall so request in writing, the Company shall include in such registration statement all or any part of such Registrable Securities such Investor requests to be registered; provided, however, the Company shall not be required to register any Registrable Securities pursuant to this Section 2(g) that are eligible for resale pursuant to Rule 144 without restriction (including, without limitation, volume restrictions) and without the need for current public information required by Rule 144(c)(1) (or Rule 144(i)(2), if applicable) or that are the subject of a then-effective Registration Statement. Notwithstanding anything else to the contrary in this Section 2(g), if (i) the Commission or any position of the Staff sets forth a limitation on the number of Registrable Securities permitted to be registered on a particular Registration Statement as a secondary offering or (ii) the Registration Statement is in the form of an underwritten offering and the managing underwriter(s) advise the Company that the dollar amount or number of Registrable Securities, taken together with all of the other securities which the Company desires to sell or for which registration has been requested pursuant to written contractual piggy-back registration rights held by other stockholders, exceeds the maximum dollar amount or maximum number of securities that can be sold in such offering without adversely affecting the proposed offering price, timing, distribution method, or probability of success (collectively, such limitation the "**Maximum Number of Securities**"), then the Company shall limit the securities to be included on such Registration Statement to: first, the number of securities which the Company desires to sell for itself without exceeding the Maximum Number of Securities; and second, securities (including Registrable Securities) for which registration has been requested pursuant to written contractual piggy-back registration rights, pro rata in accordance with the number of securities that each such person has requested be included in such registration regardless of the number of securities held by each such person, that can be sold without exceeding the Maximum Number of Securities.

(h) No Inclusion of Other Securities. Until such time as there is an effective Registration Statement covering all of the Registrable Securities, or such securities may be sold without restriction under Rule 144 (including, without limitation, volume restrictions), in no event shall the Company include any securities other than Registrable Securities on any Registration Statement without the prior written consent of the Required Holders. Until the Applicable Date (as defined in the Securities Purchase Agreement), except as set forth in Schedule 4(j) of the Securities Purchase Agreement, the Company shall not enter into any agreement providing any registration rights to any of its security holders and the Company shall not file any other registration statement until such time.

3.   Related Obligations.

The Company shall use its best efforts to effect the registration of the Registrable Securities in accordance with the intended method of disposition thereof, and, pursuant thereto, the Company shall have the following obligations:

(a) The Company shall promptly prepare and file with the SEC a Registration Statement with respect to all the Registrable Securities (but in no event later than the applicable Filing Deadline) and use its best efforts to cause such Registration Statement to become effective as soon as practicable after such filing (but in no event later than the Effectiveness Deadline). The Company shall keep each Registration Statement effective (and the prospectus contained therein available for use) pursuant to Rule 415 for resales by the Investors on a delayed or continuous basis at then-prevailing market prices (and not fixed prices) at all times until the earlier of (i) the date as of which all of the Investors may sell all of the Registrable Securities required to be covered by such Registration Statement (disregarding any reduction pursuant to Section 2(f)) without restriction pursuant to Rule 144 (including, without limitation, volume restrictions) and without the need for current public information required by Rule 144(c)(1) (or Rule 144(i)(2), if applicable) or (ii) the date on which the Investors shall have sold all of the Registrable Securities covered by such Registration Statement (the "**Registration Period**"). Notwithstanding anything to the contrary contained in this Agreement, the Company shall ensure that, when filed and at all times while effective, each Registration Statement (including, without limitation, all amendments and supplements thereto) and the prospectus (including, without limitation, all amendments and supplements thereto) used in connection with such Registration Statement (1) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein (in the case of prospectuses, in the light of the circumstances in which they were made) not misleading and (2) will disclose (whether directly or through incorporation by reference to other SEC filings to the extent permitted) all material information regarding the Company and its securities. The Company shall submit to the SEC, within one (1) Business Day after the later of the date that (i) the Company learns that no review of a particular Registration Statement will be made by the Staff or that the Staff has no further comments on a particular Registration Statement (as the case may be) and (ii) the consent of Legal Counsel is obtained pursuant to Section 3(c) (which consent shall be immediately sought), a request for acceleration of effectiveness of such Registration Statement to a time and date not later than forty-eight (48) hours after the submission of such request.

(b) The Company shall prepare and file with the SEC such amendments (including, without limitation, post-effective amendments) and supplements to each Registration Statement and the prospectus used in connection with each such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the 1933 Act, as may be necessary to keep each such Registration Statement effective at all times during the Registration Period for such Registration Statement, and, during such period, comply with the provisions of the 1933 Act with respect to the disposition of all Registrable Securities of the Company required to be covered by such Registration Statement until such time as all of such Registrable Securities shall have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof as set forth in such Registration Statement; provided, however, by 8:30 a.m. (New York time) on the Business Day immediately following each Effective Date, the Company shall file with the SEC in accordance with Rule 424(b) under the 1933 Act the final prospectus to be used in connection with sales pursuant to the applicable Registration Statement (whether or not such a prospectus is technically required by such rule). In the case of amendments and supplements to any Registration Statement which are required to be filed pursuant to this Agreement (including, without limitation, pursuant to this Section 3(b)) by reason of the Company filing a report on Form 10-K or any similar or successor report under the Securities Exchange Act of 1934, as amended (the "**1934 Act**"), the Company shall have incorporated such report by reference into such Registration Statement, if applicable, or shall file such amendments or supplements with the SEC on the same day on which the 1934 Act report is filed which created the requirement for the Company to amend or supplement such Registration Statement.

(c) The Company shall (A) permit Legal Counsel to review and comment upon (i) each Registration Statement at least two (2) Business Days prior to its filing with the SEC and (ii) all amendments and supplements to each Registration Statement (including, without limitation, the prospectus contained therein) (except for Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any similar or successor reports) within a reasonable number of days prior to their filing with the SEC, and (B) not file any Registration Statement or amendment or supplement thereto in a form to which Legal Counsel reasonably objects. The Company shall not submit a request for acceleration of the effectiveness of a Registration Statement or any amendment or supplement thereto or to any prospectus contained therein without the prior consent of Legal Counsel, which consent shall not be unreasonably withheld. The Company shall promptly furnish to Legal Counsel without charge, (i) copies of any correspondence from the SEC or the Staff to the Company or its representatives relating to each Registration Statement, provided that such correspondence shall not contain any material, non-public information regarding the Company or any of its Subsidiaries (as defined in the Securities Purchase Agreement), (ii) after the same is prepared and filed with the SEC, one (1) copy of each Registration Statement and any amendment(s) and supplement(s) thereto, including, without limitation, financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, and all exhibits and (iii) upon the effectiveness of each Registration Statement, one (1) copy of the prospectus included in such Registration Statement and all amendments and supplements thereto. The Company shall reasonably cooperate with Legal Counsel in performing the Company's obligations pursuant to this Section 3.

(d) The Company shall promptly furnish to each Investor whose Registrable Securities are included in any Registration Statement, without charge, (i) after the same is prepared and filed with the SEC, one (1) copy of each Registration Statement and any amendment(s) and supplement(s) thereto, including, without limitation, financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, all exhibits and each preliminary prospectus, (ii) upon the effectiveness of each Registration Statement, one (1) copy of the prospectus included in such Registration Statement and all amendments and supplements thereto (or such other number of copies as such Investor may reasonably request from time to time) and (iii) such other documents, including, without limitation, copies of any preliminary or final prospectus, as such Investor may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities owned by such Investor, it being agreed that providing links to such documents as filed with the SEC shall be deemed "furnished" for purposes of this Agreement.

(e) The Company shall use its best efforts to (i) register and qualify, unless an exemption from registration and qualification applies, the resale by Investors of the Registrable Securities covered by a Registration Statement under such other securities or "blue sky" laws of all applicable jurisdictions in the United States, (ii) prepare and file in those jurisdictions, such amendments (including, without limitation, post-effective amendments) and supplements to such registrations and qualifications as may be necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify the Registrable Securities for sale in such jurisdictions; provided, however, the Company shall not be required in connection therewith or as a condition thereto to (y) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(e) or (z) subject itself to general taxation in any such jurisdiction. The Company shall promptly notify Legal Counsel and each Investor who holds Registrable Securities of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction in the United States or its receipt of actual notice of the initiation or threatening of any proceeding for such purpose.

(f) The Company shall notify Legal Counsel and each Investor in writing of the happening of any event, as promptly as practicable after becoming aware of such event, as a result of which the prospectus included in a Registration Statement, as then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (provided that in no event shall such notice contain any material, non-public information regarding the Company or any of its Subsidiaries), and promptly prepare a supplement or amendment to such Registration Statement and such prospectus contained therein to correct such untrue statement or omission and deliver ten (10) copies of such supplement or amendment to Legal Counsel and each Investor (or such other number of copies as Legal Counsel, legal counsel for each other Investor or such Investor may reasonably request), it being agreed that providing links to such documents as filed with the SEC shall be deemed "furnished" for purposes of this Agreement. The Company shall also promptly notify Legal Counsel and each Investor in writing (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, when a Registration Statement or any post-effective amendment has become effective (notification of such effectiveness shall be delivered to Legal Counsel and each Investor by facsimile or e-mail on the same day of such effectiveness and by overnight mail), and when the Company receives written notice from the SEC that a Registration Statement or any post-effective amendment will be reviewed by the SEC, (ii) of any request by the SEC for amendments or supplements to a Registration Statement or related prospectus or related information, (iii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate; and (iv) of the receipt of any request by the SEC or any other federal or state governmental authority for any additional information relating to the Registration Statement or any amendment or supplement thereto or any related prospectus. The Company shall respond as promptly as practicable to any comments received from the SEC with respect to each Registration Statement or any amendment thereto (it being understood and agreed that the Company's response to any such comments shall be delivered to the SEC no later than five (5) Business Days after the receipt thereof).

(g) The Company shall (i) use its best efforts to prevent the issuance of any stop order or other suspension of effectiveness of each Registration Statement or the use of any prospectus contained therein, or the suspension of the qualification, or the loss of an exemption from qualification, of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and (ii) notify Legal Counsel and each Investor who holds Registrable Securities of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

(h) The Company shall hold in confidence and not make any disclosure of information concerning an Investor provided to the Company unless (i) disclosure of such information is necessary to comply with federal or state securities laws or delivered to the Company for the purpose of inclusion in a Registration Statement, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement or is otherwise required to be disclosed in such Registration Statement pursuant to the 1933 Act, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other Transaction Document. The Company agrees that it shall, upon learning that disclosure of such information concerning an Investor is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to such Investor and allow such Investor, at such Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

(i) Without limiting any obligation of the Company under the Securities Purchase Agreement, the Company shall use its best efforts either to cause all of the Registrable Securities covered by each Registration Statement to be listed on each securities exchange on which securities of the same class or series issued by the Company are then listed, if any, if the listing of such Registrable Securities is then permitted under the rules of such exchange, or (ii) if, despite the Company's best efforts to satisfy the preceding clause (i) the Company is unsuccessful in satisfying the preceding clause (i), without limiting the generality of the foregoing, to use its best efforts to arrange for at least two market makers to register with the Financial Industry Regulatory Authority ("FINRA") as such with respect to such Registrable Securities.

(j) The Company shall cooperate with the Investors who hold Registrable Securities being offered and, to the extent applicable, facilitate the timely preparation and delivery of certificates (not bearing any restrictive legend) representing the Registrable Securities to be offered pursuant to a Registration Statement and enable such certificates to be in such denominations or amounts (as the case may be) as the Investors may reasonably request from time to time and registered in such names as the Investors may request.

(k) If requested by an Investor, the Company shall as soon as practicable after receipt of notice from such Investor and, (i) incorporate in a prospectus supplement or post-effective amendment such information as an Investor reasonably requests to be included therein relating to the sale and distribution of Registrable Securities, including, without limitation, information with respect to the number of Registrable Securities being offered or sold, the purchase price being paid therefor and any other terms of the offering of the Registrable Securities to be sold in such offering; (ii) make all required filings of such prospectus supplement or post-effective amendment after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and (iii) supplement or make amendments to any Registration Statement or prospectus contained therein if reasonably requested by an Investor holding any Registrable Securities.

(l) The Company shall use its best efforts to cause the Registrable Securities covered by a Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Registrable Securities.

(m) The Company shall otherwise use its best efforts to comply with all applicable rules and regulations of the SEC in connection with any registration hereunder.

(n) Within one (1) Business Day after a Registration Statement which covers Registrable Securities is declared effective by the SEC, the Company shall deliver, and shall cause legal counsel for the Company to deliver, to the transfer agent for such Registrable Securities (with copies to the Investors whose Registrable Securities are included in such Registration Statement) confirmation that such Registration Statement has been declared effective by the SEC in the form attached hereto as **Exhibit A**.

(o) Once eligible and so long as the Company is not be subject to the "baby shelf requirements" contained in Instruction I.B.5 applicable to a Form S-3 registration statement, the Company shall use its best efforts to maintain eligibility for use of Form S-3 (or any successor form thereto) for the registration of the resale of all the Registrable Securities.

(p) The Company shall take all other reasonable actions necessary to expedite and facilitate disposition by each Investor of its Registrable Securities pursuant to each Registration Statement.

4.    Obligations of the Investors.

(a) At least five (5) Business Days prior to the first anticipated filing date of each Registration Statement, the Company shall notify each Investor in writing of the information the Company seeks from each such Investor with respect to such Registration Statement. It shall be a condition precedent to the obligations of the Company to complete the registration pursuant to this Agreement with respect to the Registrable Securities of a particular Investor that such Investor shall furnish to the Company such information regarding itself, the Registrable Securities held by it and the intended method of disposition of the Registrable Securities held by it, as shall be reasonably required, in the good faith judgment of such Investor, to effect and maintain the effectiveness of the registration of such Registrable Securities

(b) Each Investor agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(g) or the first sentence of Section 3(f), such Investor will immediately discontinue disposition of Registrable Securities pursuant to any Registration Statement(s) covering such Registrable Securities until such Investor's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(g) or the first sentence of Section 3(f) or receipt of notice that no supplement or amendment is required. Notwithstanding anything to the contrary in this Section 4(b), the Company shall cause its transfer agent to deliver unlegended shares of Common Stock to a transferee of an Investor in accordance with the terms of the Securities Purchase Agreement in connection with any sale of Registrable Securities with respect to which such Investor has entered into a contract for sale prior to the Investor's receipt of a notice from the Company of the happening of any event of the kind described in Section 3(g) or the first sentence of Section 3(f) and for which such Investor has not yet settled.

(c) Each Investor covenants and agrees that it will comply with the prospectus delivery requirements of the 1933 Act as applicable to it in connection with sales of Registrable Securities pursuant to a Registration Statement.

5.    Expenses of Registration.

All reasonable expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Sections 2 and 3, including, without limitation, all registration, listing and qualifications fees, printers and accounting fees, FINRA filing fees (if any) and fees and disbursements of counsel for the Company shall be paid by the Company.

6.    Indemnification.

(a) To the fullest extent permitted by law, the Company will, and hereby does, indemnify, hold harmless and defend each Investor and each of its directors, officers, managers, shareholders, members, partners, employees, agents, advisors, representatives (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding the lack of such title or any other title) and each Person, if any, who controls such Investor within the meaning of the 1933 Act or the 1934 Act and each of the directors, officers, managers, shareholders, members, partners, employees, agents, advisors, representatives (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding the lack of such title or any other title) of such controlling Persons (each, an "**Indemnified Person**"), against any losses, obligations, claims, damages, liabilities, contingencies, judgments, fines, penalties, charges, costs (including, without limitation, court costs, reasonable attorneys' fees and costs of defense and investigation), amounts paid in settlement or expenses, joint or several, (collectively, "**Claims**") incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnified party is or may be a party thereto ("**Indemnified Damages**"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon: (i) any untrue statement or alleged untrue statement of a material fact in a Registration Statement or any post-effective amendment thereto or in any filing made in connection with the qualification of the offering under the securities or other "blue sky" laws of any jurisdiction in which Registrable Securities are offered ("**Blue Sky Filing**"), or the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in any preliminary prospectus if used prior to the effective date of such Registration Statement, or contained in the final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in light of the circumstances under which the statements therein were made, not misleading or (iii) any violation or alleged violation by the Company of the 1933 Act, the 1934 Act, any other law, including, without limitation, any state securities law, or any rule or regulation thereunder relating to the offer or sale of the Registrable Securities pursuant to a Registration Statement (the matters in the foregoing clauses (i) through (iii) being, collectively, "**Violations**") unless such Violations are based primarily upon a breach of Investor's representations, warranties, or covenants under the Transaction Documents or any violations by Investor of state or federal securities laws or any conduct by Investor which constitutes fraud, gross negligence or willful misconduct. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. Subject to Section 6(c), the Company shall reimburse the Indemnified Persons, promptly as such expenses are incurred and are due and payable, for any legal fees or other reasonable expenses incurred by them in connection with investigating or defending any such Claim. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(a): (i) shall not apply to a Claim by an Indemnified Person arising out of or based upon a Violation which occurs in reliance upon and in conformity with information furnished in writing to the Company by such Indemnified Person for such Indemnified Person expressly for use in connection with the preparation of such Registration Statement or any such amendment thereof or supplement thereto and (ii) shall not be available to a particular Investor to the extent such Claim is based on a failure of such Investor to deliver or to cause to be delivered the prospectus made available by the Company (to the extent applicable), including, without limitation, a corrected prospectus, if such prospectus or corrected prospectus was timely made available by the Company pursuant to Section 3(d) and then only if, and to the extent that, following the receipt of the corrected prospectus no grounds for such Claim would have existed; and (iii) shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnified Person and shall survive the transfer of any of the Registrable Securities by any of the Investors pursuant to Section 9.

(b) In connection with any Registration Statement in which an Investor is participating, such Investor agrees to severally and not jointly indemnify, hold harmless and defend, to the same extent and in the same manner as is set forth in Section 6(a), the Company, each of its directors, each of its officers who signs the Registration Statement and each Person, if any, who controls the Company within the meaning of the 1933 Act or the 1934 Act (each, an "**Indemnified Party**"), against any Claim or Indemnified Damages to which any of them may become subject, under the 1933 Act, the 1934 Act or otherwise, insofar as such Claim or Indemnified Damages arise out of or are based upon any Violation, in each case, to the extent, and only to the extent, that such Violation occurs in reliance upon and in conformity with written information furnished to the Company by such Investor expressly for use in connection with such Registration Statement; and, subject to Section 6(c) and the below provisos in this Section 6(b), such Investor will reimburse an Indemnified Party any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such Claim; provided, however, the indemnity agreement contained in this Section 6(b) and the agreement with respect to contribution contained in Section 7 shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of such Investor, which consent shall not be unreasonably withheld or delayed, provided further that such Investor shall be liable under this Section 6(b) for only that amount of a Claim or Indemnified Damages as does not exceed the net proceeds to such Investor as a result of the applicable sale of Registrable Securities pursuant to such Registration Statement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Indemnified Party and shall survive the transfer of any of the Registrable Securities by any of the Investors pursuant to Section 9.

(c) Promptly after receipt by an Indemnified Person or Indemnified Party (as the case may be) under this Section 6 of notice of the commencement of any action or proceeding (including, without limitation, any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party (as the case may be) shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person or the Indemnified Party (as the case may be); provided, however, an Indemnified Person or Indemnified Party (as the case may be) shall have the right to retain its own counsel with the fees and expenses of such counsel to be paid by the indemnifying party if: (i) the indemnifying party has agreed in writing to pay such fees and expenses; (ii) the indemnifying party shall have failed promptly to assume the defense of such Claim and to employ counsel reasonably satisfactory to such Indemnified Person or Indemnified Party (as the case may be) in any such Claim; or (iii) the named parties to any such Claim (including, without limitation, any impleaded parties) include both such Indemnified Person or Indemnified Party (as the case may be) and the indemnifying party, and such Indemnified Person or such Indemnified Party (as the case may be) shall have been advised by counsel in writing that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Person or such Indemnified Party and the indemnifying party (in which case, if such Indemnified Person or such Indemnified Party (as the case may be) notifies the indemnifying party in writing that it elects to employ separate counsel at the expense of the indemnifying party, then the indemnifying party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the indemnifying party, provided further that in the case of clause (iii) above the indemnifying party shall not be responsible for the reasonable fees and expenses of more than one (1) separate legal counsel for such Indemnified Person or Indemnified Party (as the case may be)). The Indemnified Party or Indemnified Person (as the case may be) shall reasonably cooperate with the indemnifying party in connection with any negotiation or defense of any such action or Claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person (as the case may be) which relates to such action or Claim. The indemnifying party shall keep the Indemnified Party or Indemnified Person (as the case may be) reasonably apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any settlement of any action, claim or proceeding effected without its prior written consent; provided, however, the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the prior written consent of the Indemnified Party or Indemnified Person (as the case may be), which shall not be unreasonably withheld, conditioned or delayed, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person (as the case may be) of a release from all liability in respect to such Claim or litigation, and such settlement shall not include any admission as to fault on the part of the Indemnified Party. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person (as the case may be) with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party (as the case may be) under this Section 6, except to the extent that the indemnifying party is materially and adversely prejudiced in its ability to defend such action.

(d) No Person involved in the sale of Registrable Securities who is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) in connection with such sale shall be entitled to indemnification from any Person involved in such sale of Registrable Securities who is not guilty of fraudulent misrepresentation.

(e) The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

(f) The indemnity and contribution agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

7.   Contribution.

To the extent any indemnification by an indemnifying party is prohibited or limited by law, then indemnifying party, in lieu of indemnifying such Indemnified Party or Indemnified Person, shall contribute to the amount paid or payable by such Indemnified Party or Indemnified Person as a result of such Claim or Indemnified Damages in such proportion as is appropriate to reflect the relative fault of the Indemnified Party or Indemnified Person and the indemnifying party in connection with the actions or omissions which resulted in Claim or Indemnified Damages, as well as any other relevant equitable considerations. The relative fault of any Indemnified Party or Indemnified Person and any indemnifying party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such Indemnified Party or such Indemnifying Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding sentence. Notwithstanding the foregoing: (i) no contribution shall be made under circumstances where the maker would not have been liable for indemnification under the fault standards set forth in Section 6 of this Agreement, (ii) no Person involved in the sale of Registrable Securities which Person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) in connection with such sale shall be entitled to contribution from any Person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (iii) contribution by any seller of Registrable Securities shall be limited in amount to the amount of net proceeds received by such seller from the applicable sale of such Registrable Securities pursuant to such Registration Statement. Notwithstanding the provisions of this Section 7, no Investor shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Investor from the applicable sale of the Registrable Securities subject to the Claim exceeds the amount of any damages that such Investor has otherwise been required to pay, or would otherwise be required to pay under Section 6(b), by reason of such untrue or alleged untrue statement or omission or alleged omission.

8.   Reports Under the 1934 Act.

With a view to making available to the Investors the benefits of Rule 144, the Company agrees to:

(a) make and keep public information available, as those terms are understood and defined in Rule 144;

(b) file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act so long as the Company remains subject to such requirements (it being understood and agreed that nothing herein shall limit any obligations of the Company under the Securities Purchase Agreement) and the filing of such reports and other documents is required for the applicable provisions of Rule 144; and

(c) furnish to each Investor so long as such Investor owns Registrable Securities, promptly upon request, (i) a written statement by the Company, if true, that it has complied with the reporting, submission and posting requirements of Rule 144 and the 1934 Act, (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company with the SEC if such reports are not publicly available via EDGAR, and (iii) such other information as may be reasonably requested to permit the Investors to sell such securities pursuant to Rule 144 without registration.

9.   Assignment of Registration Rights.

All or any portion of the rights under this Agreement shall be automatically assignable by each Investor to any transferee or assignee (as the case may be) of all or any portion of such Investor's Registrable Securities or Warrants if: (i) such Investor agrees in writing with such transferee or assignee (as the case may be) to assign all or any portion of such rights, and a copy of such agreement is furnished to the Company within a reasonable time after such transfer or assignment (as the case may be); (ii) the Company is, within a reasonable time after such transfer or assignment (as the case may be), furnished with written notice of (a) the name and address of such transferee or assignee (as the case may be), and (b) the securities with respect to which such registration rights are being transferred or assigned (as the case may be); (iii) immediately following such transfer or assignment (as the case may be) the further disposition of such securities by such transferee or assignee (as the case may be) is restricted under the 1933 Act or applicable state securities laws if so required; (iv) at or before the time the Company receives the written notice contemplated by clause (ii) of this sentence such transferee or assignee (as the case may be) agrees in writing with the Company to be bound by all of the provisions contained herein; (v) such transfer or assignment (as the case may be) shall have been made in accordance with the applicable requirements of the Securities Purchase Agreement and the Warrants (as the case may be); and (vi) such transfer or assignment (as the case may be) shall have been conducted in accordance with all applicable federal and state securities laws.

10. <u>Amendment of Registration Rights.</u>

       Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Required Holders. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

11. <u>Miscellaneous.</u>

       (a) Solely for purposes of this Agreement, a Person is deemed to be a holder of Registrable Securities whenever such Person owns, or is deemed to own, of record such Registrable Securities. If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same Registrable Securities, the Company shall act upon the basis of instructions, notice or election received from such record owner of such Registrable Securities.

       (b) Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by e-mail (provided confirmation of transmission is electronically generated and kept on file by the sending party); or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service with next day delivery specified, in each case, properly addressed to the party to receive the same. The addresses and e-mail addresses for such communications shall be:

          If to the Company:

             Mullen Automotive Inc.
             1405 Pioneer Street
             Brea, California 92821
             Email Address: [●]
             Attention: [●]

          With a copy (for informational purposes only) to:

             Manatt, Phelps & Phillips, LLP
             2049 Century Park East, Suite 1700
             Los Angeles, CA 90067
             E-mail: KBlair@manatt.com
             Attention: Katherine J. Blair

             and

             695 Town Center Drive 14th Floor
             Costa Mesa, California 92626
             E-mail: TPoletti@manatt.com
             Attention: Thomas J. Poletti

          If to the Transfer Agent:

             [●]

          If to a Buyer:

             See Buyer Schedule on Stock Purchase Agreement

          If to Legal Counsel:

        McDermott Will & Emery LLP

             One Vanderbilt Avenue
             New York, NY 10017-3852
             Telephone: (914) 329-6625
             E-mail: Rcohen@mwe.com
             Attention: Robert Cohen, Esq.

or to such address or e-mail address (as the case may be) set forth on the applicable Buyer Schedule attached to the Securities Purchase Agreement, with copies to such Buyer's representatives as set forth on the applicable Buyer Schedule, or to such other address and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change, provided that Legal Counsel shall only be provided notices sent to each Buyer. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's e-mail transmission containing the time, date and e-mail address or (C) provided by a courier or overnight courier service shall be rebuttable evidence of personal service or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

(c) Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof. The Company and each Investor acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each party hereto shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement by any other party hereto and to enforce specifically the terms and provisions hereof (without the necessity of showing economic loss and without any bond or other security being required), this being in addition to any other remedy to which any party may be entitled by law or equity.

(d) All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(e) This Agreement, the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein constitute the entire agreement among the parties hereto and thereto solely with respect to the subject matter hereof and thereof. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein. This Agreement, the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein supersede all prior agreements and understandings among the parties hereto solely with respect to the subject matter hereof and thereof; provided, however, nothing contained in this Agreement or any other Transaction Document shall (or shall be deemed to) (i) have any effect on any agreements any Investor has entered into with, or any instrument that any Investor received from, the Company prior to the date hereof with respect to any prior investment made by such Investor in the Company, (ii) waive, alter, modify or amend in any respect any obligations of the Company or any rights of or benefits to any Investor or any other Person in any agreement entered into prior to the date hereof between or among the Company and any Investor or any instrument that any Investor received prior to the date hereof from the Company and all such agreements and instruments shall continue in full force and effect or (iii) limit any obligations of the Company under any of the other Transaction Documents.

(f) Subject to compliance with Section 9 (if applicable), this Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of each of the parties hereto. This Agreement is not for the benefit of, nor may any provision hereof be enforced by, any Person, other than the parties hereto, their respective permitted successors and assigns and the Persons referred to in Sections 6 and 7 hereof.

(g) The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof. Unless the context clearly indicates otherwise, each pronoun herein shall be deemed to include the masculine, feminine, neuter, singular and plural forms thereof. The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

(h) This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(i) Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(j) The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party. Notwithstanding anything to the contrary set forth in Section 10, terms used in this Agreement but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date in such other Transaction Documents unless otherwise consented to in writing by each Investor.

(k) All consents and other determinations required to be made by the Investors pursuant to this Agreement shall be made, unless otherwise specified in this Agreement, by the Required Holders.

(l) The obligations of each Investor under this Agreement and the other Transaction Documents are several and not joint with the obligations of any other Investor, and no Investor shall be responsible in any way for the performance of the obligations of any other Investor under this Agreement or any other Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Investor pursuant hereto or thereto, shall be deemed to constitute the Investors as, and the Company acknowledges that the Investors do not so constitute, a partnership, an association, a joint venture or any other kind of group or entity, or create a presumption that the Investors are in any way acting in concert or as a group or entity with respect to such obligations or the transactions contemplated by the Transaction Documents or any matters, and the Company acknowledges that the Investors are not acting in concert or as a group, and the Company shall not assert any such claim, with respect to such obligations or the transactions contemplated by this Agreement or any of the other the Transaction Documents. Each Investor shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Investor to be joined as an additional party in any proceeding for such purpose. The use of a single agreement with respect to the obligations of the Company contained herein was solely in the control of the Company, not the action or decision of any Investor, and was done solely for the convenience of the Company and not because it was required or requested to do so by any Investor. It is expressly understood and agreed that each provision contained in this Agreement and in each other Transaction Document is between the Company and an Investor, solely, and not between the Company and the Investors collectively and not between and among Investors.

[*signature pages follow*]

**IN WITNESS WHEREOF**, each of the Buyers and the Company have caused their respective signature page to this Registration Rights Agreement to be duly executed as of the date first written above.

**COMPANY**

**MULLEN AUTOMOTIVE INC.**

By: /s/ David Michery
Name: David Michery
Title: Chairman and CEO

**IN WITNESS WHEREOF**, each of the Buyers and the Company have caused their respective signature page to this Registration Rights Agreement to be duly executed as of the date first written above.

**BUYER:**
Esousa Group Holdings, LLC
By:    /s/ Michael Wachs
Name:  Michael Wachs
Title:   Managing Member
JADR Capital 2 Pty Ltd.
By:    /s/ Justin Davis-Rice
Name:  Justin Davis-Rice
Title:   Sole Director
Jim Fallon
/s/ Jim Fallon
Jess Mogul
/s/ Jess Mogul
Michael Friedlander
/s/ Michael Friedlander
Phil Bannister
/s/ Phil Bannister
Matt Krieger
/s/ Matt Krieger
Mario Silva
/s/ Mario Silva

**EXHIBIT A**

**FORM OF NOTICE OF EFFECTIVENESS
OF REGISTRATION STATEMENT**

_____

_____

_____

Attention: _____

**Re: MULLEN AUTOMOTIVE INC.**

Ladies and Gentlemen:

[We are][I am] counsel to Mullen Automotive Inc., a Delaware corporation (the "**Company**"), and have represented the Company in connection with that certain Securities Purchase Agreement (the "**Securities Purchase Agreement**") entered into by and among the Company and other parties thereto (each, a "**Holder**") pursuant to which the Company issued to the Holder (i) convertible note (the "**Convertible Notes**") convertible into common stock of the Company, par value $0.001 per share (the "**Common Stock**") and (ii) warrants exercisable or exchangeable for shares of Common Stock (the "**Warrants**"). Pursuant to the Securities Purchase Agreement, the Company also has entered into a Registration Rights Agreement with the Holder (the "**Registration Rights Agreement**") pursuant to which the Company agreed, among other things, to register the Registrable Securities (as defined in the Registration Rights Agreement) under the Securities Act of 1933, as amended (the "**1933 Act**"). In connection with the Company's obligations under the Registration Rights Agreement, on _ _, 20_, the Company filed a Registration Statement on Form S-1 (File No. 333-_) (the "**Registration Statement**") with the Securities and Exchange Commission (the "**SEC**") relating to the Registrable Securities which names each of the Holders as a selling shareholder thereunder.

In connection with the foregoing, [we][I] advise you that a member of the SEC's staff has advised [us][me] by telephone that the SEC has entered an order declaring the Registration Statement effective under the 1933 Act at [ENTER TIME OF EFFECTIVENESS] on [ENTER DATE OF EFFECTIVENESS] and [we][I] have no knowledge, after telephonic inquiry of a member of the SEC's staff, that any stop order suspending its effectiveness has been issued or that any proceedings for that purpose are pending before, or threatened by, the SEC and the Registrable Securities are available for resale under the 1933 Act pursuant to the Registration Statement.

This letter shall serve as our standing opinion to you that the shares of Common Stock underlying the Convertible Notes and the shares of Common Stock underlying the Warrants are freely transferable by the Holders pursuant to the Registration Statement so long as the Purchaser certify they will comply with the plan of distribution description in connection with sales or transfers of the Conversion Shares and the Warrant Shares set forth in the Registration Statement and with the prospectus delivery requirements of the Securities Act, to the extent such delivery requirement are applicable. Unless this letter is subsequently revoked, you need not require further letters from us to effect any future legend-free issuance or reissuance of shares of Common Stock to the Holders or to transferees of the Holders, as the case may be, as contemplated by the Company's Irrevocable Transfer Agent Instructions dated , 2024.

Very truly yours,
[ISSUER'S COUNSEL]
By: _____

CC: [**LIST NAMES OF HOLDERS**]

EXHIBIT B

**SELLING SHAREHOLDER**

[The shares of common stock being offered by the selling shareholder are those issued and issuable to the selling shareholders upon conversion of convertible notes or exercise or exchange of warrants. For additional information regarding the issuance of the convertible notes and the warrants, see "Private Placement of Convertible Notes and Warrants" above. We are registering the shares of common stock in order to permit the selling shareholder to offer the shares of common stock for resale from time to time. Except for the ownership of the convertible notes and the warrants issued pursuant to the Securities Purchase Agreement, or as set forth in the table below, the selling shareholder has not had any material relationship with us within the past three years.

The table below lists the selling shareholder and other information regarding the beneficial ownership (as determined under Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder) of the shares of common stock held by each of the selling shareholder. The second column lists the number of shares of common stock beneficially owned by the selling shareholder, based on its respective ownership of shares of common stock and warrants, as of _, 2024, assuming conversion of the convertible notes and exercise or exchange of the warrants held by such selling shareholder on that date but taking account of any limitations on conversion and exercise or exchange set forth therein.

The third column lists the shares of common stock being offered by this prospectus by the selling shareholder and does not take into account any limitations on exercise or exchange of the warrants set forth therein.

In accordance with the terms of a registration rights agreement with the holders of the convertible notes and the warrants, this prospectus generally covers the resale of the sum of (i) 250% of the initial number of shares of common stock issued and issuable pursuant to conversion of the convertible notes (or the number of shares so issued and issuable as of the filing of the registration statement to which this prospectus relates, if more), (ii) 250% of the initial number of shares of common stock issued and issuable pursuant to exercise of the warrants (or the number of shares so issued and issuable as of the filing of the registration statement to which this prospectus relates, if more). This prospectus also or otherwise covers such other shares of common stock issued or issuable pursuant to the Securities Purchase Agreement, pursuant to the warrants as more fully set forth in this prospectus. Because the exercise price of the warrants may be adjusted, the number of shares that will actually be issued may be more or less than the number of shares being offered by this prospectus.

The fourth column assumes the sale of all of the shares offered by the selling shareholder pursuant to this prospectus.

Under the terms of the convertible notes and warrants, the selling shareholder may not convert the convertible notes nor exercise or exchange the warrants to the extent (but only to the extent) such selling shareholder or any of its affiliates would beneficially own a number of shares of common stock which would exceed 9.9%. The number of shares in the second column reflects these limitations. The selling shareholder may sell all, some or none of its shares in this offering. See "Plan of Distribution."

| Name of Selling Shareholder | Number of Shares of Common Stock Owned Prior to Offering | Maximum Number of Shares of Common Stock to be Sold Pursuant to this Prospectus | Number of Shares of Common Stock Owned After Offering |
|---|---|---|---|
| [Esousa Holdings LLC](1) | | | |

(1) [ADD OWNERSHIP INFORMATION]

**PLAN OF DISTRIBUTION**

We are registering the shares of common stock issued to the selling shareholder and issuable upon exercise or exchange of the warrants to permit the resale of these shares of common stock by the holders of the shares of common stock and warrants from time to time after the date of this prospectus. We will not receive any of the proceeds from the sale by the selling shareholder of the shares of common stock. We will bear all fees and expenses incident to our obligation to register the shares of common stock.

The selling shareholder may sell all or a portion of the shares of common stock held by them and offered hereby from time to time directly or through one or more underwriters, broker-dealers or agents. If the shares of common stock are sold through underwriters or broker-dealers, the selling shareholder will be responsible for underwriting discounts or commissions or agent's commissions. The shares of common stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale or at negotiated prices. These sales may be effected in transactions, which may involve crosses or block transactions, pursuant to one or more of the following methods:

- on any national securities exchange or quotation service on which the securities may be listed or quoted at the time of sale;

- in the over-the-counter market;

- in transactions otherwise than on these exchanges or systems or in the over-the-counter market;

- through the writing or settlement of options, whether such options are listed on an options exchange or otherwise;

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- short sales made after the date the Registration Statement is declared effective by the SEC;

- broker-dealers may agree with a selling securityholder to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The selling shareholder may also sell shares of common stock under Rule 144 promulgated under the Securities Act of 1933, as amended, if available, rather than under this prospectus. In addition, the selling shareholder may transfer the shares of common stock by other means not described in this prospectus. If the selling shareholder effects such transactions by selling shares of common stock to or through underwriters, broker-dealers or agents, such underwriters, broker-dealers or agents may receive commissions in the form of discounts, concessions or commissions from the selling shareholder or commissions from purchasers of the shares of common stock for whom they may act as agent or to whom they may sell as principal (which discounts, concessions or commissions as to particular underwriters, broker-dealers or agents may be in excess of those customary in the types of transactions involved). The selling shareholder may also loan or pledge shares of common stock to broker-dealers that in turn may sell such shares.

The selling shareholder may pledge or grant a security interest in some or all of the warrants or shares of common stock owned by it and, if the selling shareholder defaults in the performance of its secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time pursuant to this prospectus or any amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending, if necessary, the list of selling shareholders to include the pledgee, transferee or other successors in interest as selling shareholders under this prospectus. The selling shareholder also may transfer and donate the shares of common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

To the extent required by the Securities Act and the rules and regulations thereunder, the selling shareholder and any broker-dealer participating in the distribution of the shares of common stock may be deemed to be "underwriters" within the meaning of the Securities Act, and any commission paid, or any discounts or concessions allowed to, any such broker-dealer may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of common stock is made, a prospectus supplement, if required, will be distributed, which will set forth the aggregate amount of shares of common stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling shareholder and any discounts, commissions or concessions allowed or re-allowed or paid to broker-dealers.

Under the securities laws of some states, the shares of common stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of common stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with.

There can be no assurance that the selling shareholder will sell any or all of the shares of common stock registered pursuant to the registration statement, of which this prospectus forms a part.

The selling shareholder and any other person participating in such distribution will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including, without limitation, to the extent applicable, Regulation M of the Exchange Act, which may limit the timing of purchases and sales of any of the shares of common stock by the selling shareholder and any other participating person. To the extent applicable, Regulation M may also restrict the ability of any person engaged in the distribution of the shares of common stock to engage in market-making activities with respect to the shares of common stock. All of the foregoing may affect the marketability of the shares of common stock and the ability of any person or entity to engage in market-making activities with respect to the shares of common stock.

We will pay all expenses of the registration of the shares of common stock pursuant to the registration rights agreement, estimated to be $[•] in total, including, without limitation, Securities and Exchange Commission filing fees and expenses of compliance with state securities or "blue sky" laws; provided, however, a selling shareholder will pay all underwriting discounts and selling commissions, if any. We will indemnify the selling shareholder against liabilities, including some liabilities under the Securities Act in accordance with the registration rights agreements or the selling shareholder will be entitled to contribution. We may be indemnified by the selling shareholder against civil liabilities, including liabilities under the Securities Act that may arise from any written information furnished to us by the selling shareholder specifically for use in this prospectus, in accordance with the related registration rights agreements or we may be entitled to contribution.

Once sold under the registration statement, of which this prospectus forms a part, the shares of common stock will be freely tradable in the hands of persons other than our affiliates.

**Exhibit 31.1**

**CEO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, David Michery, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Mullen Automotive Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 14, 2024        By: /s/ David Michery
                                    David Michery
                                    Chief Executive Officer

**Exhibit 31.2**

**CFO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jonathan New, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Mullen Automotive Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 14, 2024

By: /s/ Jonathan New
Jonathan New
Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the period ended March 31, 2024 of Mullen Automotive Inc. (the "Company") as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned, in the capacities and on the dates indicated below, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods presented in the Report.


By:   /s/ David Michery
     David Michery
     Chief Executive Officer
     May 14, 2024

By:   /s/ Jonathan New
     Jonathan New
     Chief Financial Officer
     May 14, 2024