# EXHIBIT 25

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2024

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to ___

Commission file number: 001-34887

## MULLEN AUTOMOTIVE INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **86-3289406** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1405 Pioneer Street**
**Brea, California 92821**

(Address of principal executive offices)

Registrant's telephone number, including area code: (714) 613-1900

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 | MULN | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |
| Rights to Purchase Series A-1 Junior Participating Preferred Stock | None | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐ Yes ☒ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                            Accelerated filer ☐

Non-accelerated filer ☒                                            Smaller reporting company ☒

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☒

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☒ No

The aggregate market value of the registrant's common equity, other than shares held by persons who may be deemed affiliates of the registrant, as of March 31, 2024 was approximately $40.7 million.

The registrant had 61,595,743 shares of common stock outstanding as of January 21, 2025.

Table of Contents

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| **PART I** | | | 6 |
| Item 1. | Business | | 6 |
| Item 1A. | Risk Factors | | 23 |
| Item 1B. | Unresolved Staff Comments | | 56 |
| Item 1C. | Cybersecurity | | 56 |
| Item 2. | Properties | | 57 |
| Item 3. | Legal Proceedings | | 58 |
| Item 4. | Mine Safety Disclosures | | 58 |
| **PART II** | | | 59 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 59 |
| Item 6. | [Reserved] | | 59 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 60 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 70 |
| Item 8. | Financial Statements and Supplementary Data | | 70 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | | 70 |
| Item 9A. | Controls and Procedures | | 70 |
| Item 9B. | Other Information | | 73 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | | 74 |
| **PART III** | | | 74 |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 74 |
| Item 11. | Executive Compensation | | 79 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 88 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 90 |
| Item 14. | Principal Accountant Fees and Services | | 92 |
| **PART IV** | | | 93 |
| Item 15. | Exhibits and Financial Statement Schedules | | 93 |
| Item 16. | Form 10-K Summary | | 99 |
| Signatures | | | 84 |

Table of Contents

**FORWARD-LOOKING STATEMENTS AND RISK FACTOR SUMMARY**

This Annual Report on Form 10-K (the "**Annual Report**" or "**Report**") contains forward-looking statements that involve substantial risks and uncertainties. All statements contained in this Annual Report, other than statements of historical facts, including statements regarding our strategy, future operations, future financial position, future revenue, projected costs, prospects, plans, objectives of management and expected market growth, are forward-looking statements. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.

The words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. Risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company, as applicable, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking information and statements include the risks summarized below. This summary does not address all of the risks that the Company faces. Additional discussion of the risks summarized in this risk factor summary; and other risks the Company faces, can be found below under the heading "Risk Factors" and should be carefully considered, together with other information in this Form 10-K and other filings with the SEC, before making a decision to invest in the Company. These risks include, among others, the following:

- We have incurred significant losses since inception, and we expect that we will continue to incur losses for the foreseeable future;

- We will require substantial additional financing to effectuate our business plan;

- We have not yet manufactured or sold significant number of vehicles to customers. Many of our products are still on the development stage and we may never be able to mass-produce them;

- There is substantial doubt about our ability to continue as a going concern;

- Our ability to raise the substantial additional financing needed to execute our business plan, and a on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our production operations;

- We incurred non-cash impairment charges during 2024 which adversely affected our year fiscal 2024 operating results and we may be required to incur additional future impairment and other charges, which could adversely affect our operating results;

- Our financial results may vary significantly from period to period due to fluctuations in our operating costs and other factors;

- We have not paid, and do not plan to pay, cash dividends on our common stock, so any return on investment may be limited to the value of our common stock;

- We may not be able to maintain compliance with the continued listing requirements of the NASDAQ Capital Markets;

- A reverse stock split may decrease the liquidity of the shares of our common stock and may have a dilutive effect on the ownership of existing stockholders;

- Following a reverse stock split, the resulting market price of our common stock may not attract new investors, including institutional investors, and may not satisfy the investing requirements of those investors. Consequently, the trading liquidity of our common stock may not improve;

- Our common stock may be subject to the "penny stock" rules in the future, which may be more difficult to resell;

- Our commitments to issue shares of common stock or securities that are convertible into shares of common stock may cause significant dilution to stockholders;

- Our commitment to issue shares of common stock pursuant to the terms of our preferred stock, and the Warrants, and stock-based compensation arrangements could encourage short sales by third parties which could contribute to the future decline of stock price;

- Substantial blocks of our total outstanding shares may be sold into the market, which may cause the price of our common stock to decline;

- Our stock price has been volatile, and the market price of our common stock may drop below the price you pay;

- Stockholder equity interest may be substantially diluted in any additional equity issuances;

Table of Contents

- We may issue additional shares of common stock, including under our equity incentive plan. Any such issuances would dilute the interest of our stockholders and likely present other risks;

- Our Certificate of Incorporation designates specific courts as the exclusive forum for certain stockholder litigation matters, which could limit the ability of our stockholders to obtain a favorable forum for disputes with us or our directors, officers or employees;

- The dearth of analyst coverage or negative and inaccurate reporting;

- Potential acquisitions may disrupt our business and dilute stockholder value;

- Changes in tax laws may materially adversely affect our business, prospects, financial condition and operating results;

- We may be unable to develop, manufacture and obtain required regulatory approvals for a car of sufficient quality to appeal to customers on schedule or at all, or may be unable to do so on a large scale;

- We, our third party partners and our suppliers are subject to substantial regulation and unfavorable changes to, or failure by us, our third party partners or our suppliers to comply with, these regulations could substantially harm our business and operating results;

- Future changes to regulatory requirements may have a negative impact upon our business.

- Our currently planned vehicles rely on lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame, potentially subjecting us to litigation, recall, and redesign risks;

- The efficiency of a battery's use will decline slowly over time, which may negatively influence customers' decisions whether to purchase an electric vehicle;

- We rely on our OEMs, suppliers and service providers for parts and components, any of whom could choose not to do business with us;

- We will rely on complex machinery for its operations and production, which involve a significant degree of risk and uncertainty in operational performance and costs;

- Complex software and technology systems need to be developed in coordination with vendors and suppliers, and there can be no assurance that such systems will be successfully developed;

- We may be unable to meet our projected construction timelines, costs and production ramps at our factories, or we may experience difficulties in generating and maintaining demand for products manufactured there;

- We may be negatively impacted by any early obsolescence of our manufacturing equipment;

- The inability of our suppliers, including single or limited source suppliers, to deliver components in a timely manner or at acceptable prices or volumes could have a material adverse effect on our business and prospects;

- Financial distress of our suppliers could necessitate that we provide substantial financial support, which could increase our costs, affect our liquidity or cause production disruptions;

- We have a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future, casting doubt on our ability to continue as a going concern;

- Our operating and financial results forecast relies on assumptions and analyses we developed and may prove to be incorrect;

- Our business model is in the early stages of production, and it may fail to meet our strategic plans
- We may be unable to accurately estimate the supply and demand for our vehicles;

- Increased costs or disruptions in supply of raw materials or other components could occur;

- Our vehicles may fail to perform as expected;

- Our services may not be generally accepted by our users;

- The automotive market is highly competitive;

- The automotive industry is rapidly evolving and demand for our vehicles may be adversely affected;

- We have identified material weaknesses in our internal control over financial reporting;

- Our future growth is dependent on the demand for and consumers' willingness to adopt electric vehicles;

- Government and economic incentives could become unavailable, reduced or eliminated;

- Our failure to manage our future growth effectively;

- We may establish insufficient warranty reserves to cover future warranty claims;

- We may not succeed in establishing, maintaining and strengthening our brand;

- The dealers' end customer, fleet managers' willingness to adopt our electric vehicles;

- Doing business internationally may expose us to operational and financial and political risks;

3

Table of Contents

- We are highly dependent on the services of David Michery, our Chief Executive Officer;

- We are exposed to risks relating to our relationship with a related party;

- Our business may be adversely affected by labor and union activities;

- Our business could be adversely impacted by global or regional catastrophic events;

- We face information security and privacy concerns;

- We may be forced to defend ourselves against alleged patent or trademark infringement claims and may be unable to prevent others from unauthorized use of our intellectual property;

- Our patent applications may not issue as patents, the patents may expire, our patent applications may not be granted, and our rights may be contested;

- We may be subject to damages resulting from trade secrets;

- Our vehicles are subject to various safety standards and regulations that we may fail to comply with;

- We may be subject to product liability claims;

- We face risks and uncertainties related to litigation, regulatory actions and government investigations and inquiries;

- We are or will be subject to anti-corruption, bribery, money laundering, and financial and economic laws;

- Risk of failure to improve our operational and financial systems to support expected growth;

- Risk of failure to build our financial infrastructure and improve our accounting systems and controls;

- The priority of the holders of our debt and preferred stock over the holders of our common stock in the event of liquidation, dissolution or winding up; and

- Other risks and uncertainties, including those listed under Part I, Item 1A of this Annual Report titled "Risk Factors."

These forward-looking statements are only predictions, and we may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, so you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in one or more of the forward-looking statements we make in this Annual Report. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our business, financial condition and operating results. We have included important factors in the cautionary statements included in this Annual Report, particularly in Part I, Item 1A, titled "*Risk Factors,*" that could cause actual future results or events to differ materially from the forward-looking statements that we make. Our forward-looking statements in this Annual Report do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments we may make.

You should read this Annual Report and the documents that we have filed as exhibits to this Annual Report with the understanding that our actual future results may be materially different from what we expect. We do not assume any obligation to update any forward-looking statements in this Annual Report, whether as a result of new information, future events or otherwise, except as required by applicable law.

4

Table of Contents

**WEBSITE AND MEDIA DISCLOSURE**

We use our website (www.mullenusa.com) and various social media channels as a means of disclosing information about the Company and its products to our customers, investors, and the public (e.g., Instagram: @mullenusa; X (formerly Twitter): @mullen_usa; Facebook: @MullenUSA; LinkedIn: @mullen-technologies; and YouTube: @mullenautomotive). The information provided on social media channels is not incorporated by reference in this report or in any other report we file with the SEC.

The information we post throughout these channels may be deemed material. Accordingly, investors should monitor these channels, in addition to our following press releases, SEC filings and public conference calls and webcasts. In addition, you may automatically receive email alerts and other information about the Company when you enroll your email address and other information by visiting "Investor Resources" section of our website at www.mullenusa.com.

Table of Contents

PART I

**ITEM 1. BUSINESS.**

*References in this Annual Report to the "Company", "we", "us", "our" or similar references, or "Mullen," mean Mullen Automotive Inc., a Delaware corporation, and its subsidiaries Ottava Automotive, Inc., a California corporation, Mullen Indiana Real Estate, LLC., a Delaware corporation, Mullen Investment Properties LLC, a Mississippi corporation, Mullen Advanced Energy Operations LLC, a California corporation, and a majority ownership in Bollinger Motors, Incorporated in Delaware.*

**Background**

We are a Southern California-based technology and electric vehicle company that operates in various verticals of energy technology and automotive industry. The Company was originally formed on April 20, 2010, as a developer and manufacturer of electric vehicle technology. During 2021, the Company completed a merger with Net Element, Inc., a Delaware-incorporated company. The merger was accounted for as a reverse merger transaction, in which Mullen Automotive-California is treated as the acquirer for financial accounting purposes. The Company changed its name from "Net Element, Inc." to "Mullen Automotive Inc." The Nasdaq Stock Market, LLC (Nasdaq Capital Market) ticker symbol for the Company's common stock changed from "NETE" to "MULN" at the opening of trading on November 5, 2021.

**The Company**

Mullen Automotive is a Southern California-based technology and automotive company that is building and delivering the newest generation of Commercial Trucks.

The Company entered the Commercial Truck Business executing two opportunistic acquisitions in the later part of 2022. On September 7, 2022, the first acquisition of Bollinger Motors was announced. The purchase price was $148.6 million in cash and stock for a 60% controlling interest, which provided Mullen with majority ownership of Bollinger Motors, Inc. This provided Mullen short term entry into the medium duty truck classes 4-6, and also the possibility to enter the Sport Utility and Pick Up Truck EV segments. In accordance with the stock purchase agreement signed on July 26, 2024, the Company, as part of activities to launch production in the Bollinger segment, invested an additional $12.7 million in newly issued shares of the subsidiary ($18.7 million by January 23, 2025), increasing controlling interest of the Company to 66% on a fully diluted basis at September 30, 2024 (and to approximately 68% by January 23, 2025).

The second acquisition was in October 2022, when the U.S. Bankruptcy Court approved the Company's acquisition of ELMS' (Electric Last Mile Solutions) assets in an all-cash purchase of $105 million, which includes approximately of $10 million vendor payables assumed at closing. With this transaction, Mullen acquired a manufacturing plant in Mishawaka, Indiana and all the intellectual property needed to engineer and build Class 1 and Class 3 electric vehicles.

These two acquisitions gave Mullen a portfolio in the Commercial EV truck market with vehicles ranging from Class 1 to 6 where the Company believes there is very little current competition and, in some segments, no other announced entries.

The Tunica Mississippi manufacturing plant was equipped during 2023 as the Mullen Commercial Manufacturing Center. Tunica was commissioned with two lines to manufacture the Class 1 and 3 vehicles and began shipping Class 3 trucks in September 2023 and Class 1 vans in November 2023. Bollinger Motors has a contract manufacturing relationship with Roush Enterprises in Livonia, Michigan that began producing Class 4 trucks in September, 2024.

The third key strategic transaction was the purchase of the assets of Romeo Battery. This established the base for in house manufacturing of modules and packs for Mullen vehicles as well the possibility for sales to non-Mullen customers as well.

The Mullen FIVE, the Company's first planned consumer electric crossover, has been put on hold as Mullen focuses its efforts and resources on the commercial EV market segment that we believe has more opportunities.

6

Table of Contents

**Company Overview**

*Our Strength and Strategy*

- **Experienced and proven team in the Electric Vehicle ("EV") space.** Our executive team has extensive experience in the automotive original equipment manufacturing ("OEM") space. They have a detailed understanding of the product development cycle from blank sheet to post launch activities. The team brings expertise in all the critical areas required to be successful - studio design, engineering product development, energy storage systems, supply chain management, manufacturing, and sales & service.

- **Manufacturing plants.** Mullen owns two manufacturing plants: Tunica, MS and Mishawaka, IN. Unlike many other new EV companies that must still invest time and money to acquire manufacturing capacity, Mullen has this capability today, with Tunica in production. In addition, pursuant to a contract manufacturing agreement, Bollinger is currently manufacturing the Bollinger B4 truck at Roush Enterprises, a third-party manufacturer, in Livonia, Michigan. From time to time, we may seek out partnerships with an existing manufacturer rather than constructing a new production facility. This contract manufacturing approach is intended to lower our upfront costs, capital expenditures and start-up costs.

- **Unique plan.** Mullen's approach for Class 1 and 3 Commercial Markets was to prioritize speed-to-market and low capital cost of entry by leveraging other OEMS engineering and tooling and only spend Mullen's capital on the required customer and legal requirements for the vehicles to be sold in the North American market. This resulted in lower capital investment requirements compared to other startup EV companies and an opportunity to launch into the market before other entries arrive. This strategy was executed with both launches (Class 1 and 3) in the fourth calendar quarter of 2023. Bollinger's approach for Class 4 was a new architecture designed in house from ground up as a purpose built Electric Vehicle using many existing proven product systems from well-known suppliers and using contract manufacturing to reduce initial capital outlays and reduce start up risk.

**Our Market Opportunity**

There is a significant transformation occurring in the motor vehicle landscape. All major OEM's have announced billions of dollars of investments to transform their vehicle portfolio from gas powered to various forms of electric propulsion. We believe that Mullen is at the forefront of this transformation leading the way in Commercial Trucks.

- Policy changes at federal, state and local levels put in place aggressive rebates and credits to support early adoption of electric vehicles. These initiatives support the commercial fleet adoption to meet the requirements to transition and purchase a portion of their fleet to electric starting in 2023 and increasing through the decade ahead.

- The truck market-use cases are highly varied. In urban duty cycles, electric powered trucks have become an economic option where the overall Total Cost of Ownership (TCO) has equaled or in some case become lower than the gas alternatives.

- As more entries come to market, the overall volume of available EV's increase and the supply industry is able to produce lower cost EV components improving the affordability of the vehicles. A prime example is the decrease in cost of batteries while at the same time having improved technology and performance.

- Many of the large OEM's started their EV investment with high-volume Retail/Passenger vehicles and left their commercial truck conversions low in their roll-out prioritization for market introduction.

**The Importance of Commercial and Fleet Business Segments**

Fleet and Commercial segments represent a large portion of the total U.S. commercial market and includes Government, Commercial and Lease/Rental segments. Our goal is to build strong customer relationships with fleet operators to capture a significant market opportunity as the broad trend of vehicle electrification continues.

7

Table of Contents

The decisions for a Fleet Customer to purchase an EV versus a gas-powered vehicle is pragmatic, a business decision relying on cost variables and company strategies, much different than the decision processes that a retail customer includes in their purchase decision. Fleets have generally well-known routes and duty cycles that allow a good match between range capabilities of the vehicles and the actual daily required range, supporting the early adoption of EV's in the Commercial space.

**Mullen Commercial Portfolio of Vehicles**

- **Mullen Class 1 Cargo Van:** The Mullen ONE van features specifications offering a good fit for a variety of applications including last mile delivery and vocational service applications. Riding on a 120-inch wheelbase and measuring in at 186 inches long, 65 inches wide, and 75 inches tall, it has 160 cubic-feet of cargo volume accessible via dual sliding side doors or a tall rear liftgate. It features a curb weight of 3,198 pounds and can carry a maximum payload of 1,683 pounds up to 110 miles with its 42kWh battery. The turning radius is approximately 20 feet, about the same as the smaller Ford Transit van. In this segment, all other OEMs have withdrawn their gas entry so the Mullen ONE currently has no competition from the legacy manufacturers, in both gas and electric.

**Mullen Class 1 Cargo Van**



8

Table of Contents

- **Mullen Class 3:** The Mullen THREE is a low cab forward electric vehicle targeting over 5,684 pounds of max payload, 11,000 pounds gross vehicle weight rating (GVWR) and approximately 120 miles of range with its 89 KwH battery. The tilt cab chassis design of the vehicle is configurable and can be outfitted with a dry box, flat bed, stake bed, and other customizable cargo options. The cab-over design not only provides great visibility for the driver but also results in a tight turning circle of approximately 38 ft, which makes this truck extremely maneuverable on narrow city streets.

**Mullen THREE**



9

Table of Contents

- **Bollinger B4 Chassis Cab:** The all-new 2025 Bollinger B4 chassis cab began serial production on September 16, 2024, and is currently fulfilling orders and deliveries to dealers and customers nationwide. The B4's product differentiation centers around its proprietary purpose-built EV chassis. It's 40-inch-wide frame rails (vs. traditional 34-inch-wide frame) allows all batteries and components to be securely and optimally housed between the rails. It also includes its unique Quad-Bend technology which enables the 40-inch-wide chassis to turn like a 34-inch chassis, providing impressive driving dynamics and maneuverability. With a GVWR of 15,500 pounds, the Bollinger B4 can carry over 7,325 lbs. of payload and upfits making it ideal for a variety of applications. It comes equipped with dual Our Next Energy (ONE) LFP battery packs, delivering an average range of 185 miles, and can be charged on both Level 2 and DC fast charge systems. With a 158 in. wheelbase, this chassis can be upfit with a body length up to 18 ft. yet still be capable of an impressive 46-foot turning circle, making this truck an excellent choice for urban and semi-urban driving. Every aspect of these trucks has been streamlined and optimized to be as versatile as possible. The cab forward design provides better visibility and frees up space behind the driver for more cargo area. An additional benefit of the B4's purpose-built engineering is that it is optimized for serviceability by making all components, including the batteries, accessible from below the frame. Finally, the 2025 Bollinger B4 is fully certified by the EPA, NHTSA and CARB. Bollinger is in development to launch a Class 5 (B5) in CY 2025 and Class 6 truck in the coming years.

**BOLLINGER MOTORS**






10

Table of Contents

- **Mullen I-GO**: Perfect for international urban markets, the Mullen I-GO bridges the gap between the growing demand for quick deliveries and space constraints in dense cities. The I-GO commercial EV is certified, and ready for sale in initial markets of UK, Germany, Spain, France, and Ireland. The I-GO is a small L7E class vehicle with dimensions that include a 96-inch wheelbase and gross vehicle weight of 1,753 lbs.




**Battery Technology**

The Company is using Li-Ion technology for its first vehicles supplied from world leader CATL. Lithium Iron Phosphate chemistry has proven to be the best combination for Commercial vehicles when balancing cost, reliability and performance.

As part of Mullen's strategy to increase our vertical integration of critical systems, Mullen has expanded its battery development and manufacturing capabilities by purchasing battery related assets of Romeo Power in September 2023 for $3.5 million. This purchase included battery production lines as well as testing equipment and a significant amount of inventory for pack production and the Intellectual Properties (IP) to produce the Legions and Hermes battery systems. In addition, Mullen leased a 122,000 square foot facility in Fullerton, California for battery operations including the installation of Romeo equipment purchased. The purchase of these assets and the acquisition of the battery facility in Fullerton, CA, provides Mullen with the capability to produce an in-house battery system and reduce supply chain risks in a very critical component of the vehicle by reducing reliance on external suppliers.

Table of Contents

**Production Lines in Fullerton Facility**



**Solid State Development**

Mullen is currently in development of a semi-Solid State battery to be used initially in their Class 3 vehicle. Early vehicle testing was completed in March 2024 on the Class 1 vehicle. The Company plans to introduce this technology into the Class 3 vehicle lines after full vehicle testing and certification has been completed.

12

Table of Contents

**Mullen Vehicle Manufacturing**

We have a 124,700 sq ft facility located in Tunica, Mississippi that was purchased during 2021. Following all plant preparations, the first fully certified Class 3 vehicles launched from the plant in September 2023. Following that, the Class 1 assembly line began production in November.



13

Table of Contents

**Mishawaka Manufacturing**

Mullen owns a 675,000 sq ft manufacturing facility in Mishawaka, Indiana. This was the original manufacturing plant for General Motors Hummer H2, and later the Mercedes-Benz R-Class.



**Bollinger Manufacturing**

Bollinger Motors is producing the B4 class 4 EV truck via a contract manufacturing partnership with Roush Industries. The manufacturing work is being conducted at their Livonia, Michigan facility with 135,000 square feet of dedicated to Bollinger Motors assembly, warehouse and office space. This space will be utilized for both ongoing B4 production, and then the B5 starting in CY 2026.

This takes advantage of Roush's long history in manufacturing low volume vehicles and avoided a major capital outlay by Bollinger for a plant facility. As part of the contract, Bollinger purchased and owns the production line allowing relocation if desired at a later time.

**Mullen Commercial Sales, Service and Distribution**

The commercial sales and distribution plan is to form distribution partnerships with existing top performing commercial dealerships that will cover the National fleet business requirements.

Table of Contents

On December 13, 2022, the Company announced Randy Marion Isuzu LLC as its first dealer group partner for Mullen's commercial EV lineup.

During 2024, Mullen expanded its distribution and added six dealer partnerships providing national coverage with Mullen commercial vehicles offered at approximately 67 dealership locations.

Mullen's Dealer Group now includes:

- Pritchard Group, a national leader in the adoption of electric vehicles with commercial fleets supporting leading fleet customers nationwide.

- The Papé Group, the West's premiere, full-service truck dealer offering an extensive parts inventory and reliable service departments which includes Papé Kenworth, consists of over 44 locations in nine states, with 818 service bays and more than 1,500 technicians.

- Eco Auto, a dedicated EV dealer, covering national fleet opportunities in Pennsylvania, Connecticut, Rhode Island, New Hampshire, Maine and Vermont to meet the growing demand for commercial EVs and support the Company's full line of commercial electric vehicles in these regions.

- Minnesota-based Ziegler Truck Group and Washington-based Range Truck Group, a part of the Ziegler Companies distribution network now represents Mullen with a focus on the Pacific Northwest and upper Midwest regions of the United States.

- California based National Auto Fleet Group known nationally for its placements with state and municipal customers, offers Mullen's full line of all-electric commercial vehicles Sourcewell and in two key market locations in California: Watsonville, CA (Northern California) and Alhambra, CA (Southern California).

In August 2024, we signed a three-year purchase agreement with Volt Mobility, which subsequently assigned the contract to one of its wholly owned companies, Lessor Car Rental LLC. The agreement was for the purchase of Mullen commercial EVs at preferred wholesale pricing for distribution in the United Arab Emirates region as an exclusive representative. VoltiE Group, an independent entity, which was previously described as a subsidiary of the Company in error, agreed to provide chargers. Volt Mobility committed to purchase 3,000 Class 3 commercial EVs with an initial deposit of $3.0 million for initial orders of 300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025. As of the date of this report, Mullen has fulfilled its initial commitment by providing vehicles to support homologation. However, Volt Mobility has not made the deposit nor placed the initial orders. At this time, it is not known if the Company will continue the relationship and is currently investigating alternative distributors for the region.

15

Table of Contents

**Government Procurement Programs**

Mullen Automotive has been actively targeting government contracts. However, entering the government sector presents unique challenges at a state level, each of the fifty states has its own procurement office that releases vehicle bid specifications, which can vary significantly in requirements. On the federal level, the U.S. government, through its diverse agencies and departments, relies heavily on procurement processes managed by the General Services Administration (GSA) Automotive Branch.

The Biden administration issued an executive order in 2021 focused on revitalizing the electric-vehicle (EV) program of the U.S. government, requiring the replacement of the government's entire fleet of about 650,000 vehicles with American-made EVs. The Company focus is establishing Mullen's EV lineup within the overall federal fleet procurement process with a partner organization RRDS that has extensive experience in Government sales. The application for approval for sales was submitted jointly with RRDS on November 24, 2023. The company awaits the decision by the GSA which federal agencies as well as states have the option to procure vehicles through GSA contracts. Other states opt to use purchasing platforms, like Sourcewell. Mullen and Bollinger have access to use the Sourcewell platform to market and sell their product lines.

A key challenge electric vehicles could face in the federal space is the potential for changes to the current GSA EV procurement policy under the new Administration. However, some federal agencies have already invested in EV infrastructure, which strongly suggests that the GSA and federal agencies will continue to purchase electric vehicles through automotive contracts. States like California, Washington, Oregon, New York, New Jersey, part of 17 CARB-states, and even some southern states like North Carolina and Florida have established contracts requiring local governments to transition to electric vehicles by 2025. Mullen expects more states to adopt similar procurement policies, offering a broader selection of vehicles and giving individual agencies the flexibility to choose which vehicles they wish to purchase as electric commercial vehicles have proven to offer a lower total cost of ownership within their duty cycles.

**After Sales Strategy**

We anticipate that customers will have access to all contracted Dealers to use the Service Facilities that are part of their Dealership network. In addition, to ensure all Customers nationwide have access to fast response for required servicing of their vehicles, Mullen and Bollinger have partnered with Amerit Fleet Solutions to use both their facilities and mobile vehicles. Amerit technicians have been trained and are ready to service Customer deliveries.



**NATIONWIDE FOOTPRINT**
**24-Hour Dispatch**

16

Table of Contents

**Bollinger Motors Sales, Service and Distribution Approach**

Bollinger Motors employs a traditional OEM-Dealer Network sales approach. By December 31, 2024, Bollinger Motors has built a network of more than 50 dealership locations, nationwide. These dealers are established, respected commercial truck dealers, including Nacarato Truck Centers, Bergey's Truck Centers, TEC Equipment, Affinity Truck Center, Anderson Motors and Nuss Truck & Equipment. As Bollinger Motors authorized dealers, they will provide sales and service support to both prospective and current Bollinger Motors owners. Bollinger expects to grow their national network to 100-plus dealership locations in 2025.

Government Sales for Bollinger Motors are handled through the existing dealer network and a partnership with RRDS. Additionally, Bollinger Motors has access to a key government procurement portal, Sourcewell, via partnership with National Auto Fleet Group (NAFG) and their Sourcewell-approved contract (#032824-NAF), as well as the BidNet tool.

After-sales service will be primarily handled for Bollinger Motors owners via Bollinger's national dealer network who have the parts, tooling and training on the Bollinger Motors product. For those customers outside of the service area of a network dealers, Bollinger has partnered with Amerit to provide mobile service.

**Vehicle Fleet Connectivity**

To assist fleets to improve their operating costs, safety and productivity, Mullen and Bollinger offer Advanced Telematics Systems which provides Driver and Fleet Manager connectivity to the vehicles with real time alerts for vehicle location, routing, maintenance alerts, and battery state of charge.




17

Table of Contents

**Mullen Vehicle Marketing**

In 2023, we launched a comprehensive marketing strategy to promote Mullen's commercial vehicles. Our multi-channel approach encompassed targeted Email Campaigns, engaging Social Media content, strategic Paid Advertising, Press Releases, Editorial Features, Sponsorships, and participation in 20 key regional and national trade shows. We partnered with top-tier agencies to enhance our advertising, event presence, social media engagement, and videography efforts.

In 2024, we built on this momentum with expanded commercial marketing initiatives, including increased trade show participation, a stronger online presence, event collaborations, and an expanded direct sales outreach to new markets. Beginning in April 2024, we conducted over 120 product demonstrations directly with large regional fleets, municipal customers and small businesses.

With the addition of our dealer partners, we have significantly expanded our market reach. Our efforts now include collaborative marketing and product promotion, targeting their customer bases to drive greater visibility and growth.

The Marketing team has built on the success of our launch efforts, to strengthen our web presence, expand marketing outreach, and increase participation in national trade shows. Our sales team is actively collaborating with dealer partners to attend key regional events and boost the availability of our pilot programs. Additionally, we launched a robust upfitter partnership program to showcase our vehicles at upfitter booths across local, regional, and national trade shows. Our marketing and advertising efforts also extend into industry-specific publications, while our online visibility continues to experience significant growth.

We have leveraged the combination of Mullen's sales team and our dealer partners representation in the fleet sector to build relationships with potential national, regional and small business fleets, upfitters, fleet management companies and federal and municipal customers.

We built an aggressive demo program for fleets to test our vehicles across real world use cases and environment. These demonstrations have been critical piece to our overall go to market strategy and has provided resourceful feedback for product development, interest and sales volume.

The addition of nationally renowned, leading dealerships has significantly enhanced Mullen's brand presence among top national fleets. Mullen has worked hand in hand with our dealer partners to grow market awareness and arm their sales teams with all of the pertinent information about our Commercial Product line enabling them to successfully market and sell our vehicles. In addition, we have worked with each of the dealerships marketing teams to develop joint marketing materials, promotional videos and social media campaigns.

Additionally, we have worked with national upfitters to continually demonstrate the versatility of Mullen's product line across vocational sectors.

18

Table of Contents

**Bollinger Motors Vehicle Marketing**

Bollinger takes a multi-pronged approach to marketing their products, leveraging the strength of their unique brand.

- Digital
  The foundation of Bollinger's marketing activities, this channel is used for brand, product and selling activities, as it is both a permanent hub, and flexible tool.
  o Website (bollingermotors.com): Redesigned in April 2024. This acts as the hub for Bollinger information.
  o Social media: Active and growing accounts on LinkedIn, X, Facebook, and Instagram. This is a key element of staying connected to potential customers, with multiple posts per week.
  o Search Marketing: This is both search optimization (SEO) and paid search (SEM)

- CRM
  This is a key integration point between the sales organization and marketing and is used for communicating and managing existing customers and prospects, as well as conducting outreach to build a robust prospect database for sales opportunities.

- Events
  Events, especially those that include "Ride and Drive" activities are critical to the exposure and adoption of the B4, as actual customer experience driving the B4 creates positive business/sales opportunities.
  o "National": Bollinger engages in several key, large national industry events, including NTEA Work Truck Week, and ACT Expo.
  o "Local": In 2024, Bollinger Motors engaged in over 30 smaller local and regional events, which often allow more flexibility, and access to fleet decision makers "on their turf". Often, these events are combined with broader electrification and environmental efforts and involve partnerships with Bollinger Motors dealers who have a local presence.

- PR
  o Press Releases: Bollinger Motors has an active press release schedule, executing an average of three releases per month.
  o Pitching: Proactive outreach to outlets across all media channels to generate articles and interviews.

- Collateral
  Bollinger develops digital and physical collateral materials to support the sales and events activations.

- Dealer Support
  Bollinger Motors partners and supports its national dealer network by providing them with materials that enable them to market Bollinger Motors at their facilities and online consistently with the Bollinger Motors brand. Elements include: brand standards guides, web page templates, collateral materials, and signage guidelines, along with partnering on press releases, social media, and event activations.

19

Table of Contents

**Research and Development**

As an emerging automaker, we rely heavily on research and development to establish and strengthen our market position. We conduct our research and development activities in Troy, Michigan and Oak Park Michigan facilities for our Commercial Platforms and Fullerton California for the Battery Business.

During the fiscal years ended September 30, 2024 and 2023 we incurred research and development expense of approximately $74.9 million and $77.4 million, respectively. Expenses consisted primarily of personnel costs for our teams in engineering as well as contract and professional services that included the production of several demonstrator vehicles.

**Intellectual Property**

We place a strong emphasis on our innovative approach and proprietary designs which bring intrinsic value and uniqueness to our product portfolio. As part of our business, we seek to protect the underlying intellectual property rights of these innovations and designs such as with respect to patents, trademarks, trade secrets and other measures, including through employee and third-party nondisclosure agreements and other contractual arrangements. Our success depends in part upon our ability to protect our core technology and intellectual property. We have nondisclosure and invention assignment agreements with our consultants and employees, and we seek to control access to and distribution of our proprietary information through non-disclosure agreements with our vendors and business partners.

*Trademarks and Patents*

We plan to file additional applications for the registration of our trademarks and issuances of patents in the United States and foreign jurisdictions as our business expands under current and planned distribution arrangements. Protection of registered trademarks and issued patents in some jurisdictions may not be as extensive as the protection provided by the United States. There are no assurances given that pending applications will be granted or that they will, if granted, contain all of the claims currently included in the applications. *Refer to Intellectual Property Table.*

| | Patents | | Trademarks | | | | |
|---|---|---|---|---|---|---|---|
| Company | U.S. | Non U.S. | U.S. | Non U.S. | Status | Total | Comments |
| Mullen Automotive | 22 | 203 | 7 | 17 | Issued/Registered | 249 | Not included 111 pending patents and 34 pending trademarks |
| Bollinger Motors | 8 | 12 | 8 | 10 | Issued/Registered | 38 | Not included 7 pending patents and 18 pending trademarks |
| **Total** | **30** | **215** | **15** | **27** | | **287** | |

*Trade Secrets*

We own certain intellectual property, including trade secrets, which we seek to protect, in part, through confidentiality agreements with employees and other parties. Even where these agreements exist, there can be no assurance that these agreements will not be breached, that we would have adequate remedies for any breach, or that our trade secrets will not otherwise become known to or independently developed by competitors.

We intend to protect our legal rights concerning intellectual property by all appropriate legal action. Consequently, we may become involved from time to time in litigation to determine the enforceability, scope, and validity of any of the foregoing proprietary rights. Any patent litigation could result in substantial cost and divert the efforts of management and technical personnel.

Table of Contents

**Government Regulation and Credits**

We operate in an industry that is subject to extensive environmental regulation, which has become more stringent over time. The laws and regulations to which we are subject govern, among others, water use; air emissions; use of recycled materials; energy sources; the storage, handling, treatment, transportation and disposal of hazardous materials; the protection of the environment, natural resources and endangered species; and the remediation of environmental contamination. Compliance with such laws and regulations at an international, regional, national, state and local level is an important aspect of our ability to continue our operations.

Environmental standards applicable to us are established by the laws and regulations of the countries in which we operate, including standards adopted by regulatory agencies as well as the permits and licenses required by such agencies. Each of these sources is subject to periodic modifications and we anticipate increasingly stringent requirements. Violations of these laws, regulations or permits and licenses may result in substantial civil and criminal fines, penalties, and possibly orders to cease the violating operations or to conduct or pay for corrective works. In some instances, violations may also result in the suspension or revocation of permits and licenses.

**Emissions**

There are vehicle emissions performance standards that may provide an opportunity for us to sell emissions credits.

The United States Environmental Protection Agency (EPA) issues emissions credits and the fleet-average evaporative emission standards. Current Model Year Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles Regulation and are paid in relation to vehicles sold and registered in the U.S.

California has greenhouse gas emissions standards that closely follow the standards of the EPA. The registration and sale of Zero-Emission Vehicles (ZEVs) in California will earn us ZEV credits that we can sell to other Original Equipment Manufacturers (OEMs). Other states within the United States have adopted similar standards include Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington state and Washington D.C. We intend to take advantage of these regimes by registering and selling ZEVs as our vehicles are sold.

ZEV credits in California are calculated under the California Code of Regulations for 2018 through 2025 Model Year Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles Regulation and are paid in relation to ZEVs sold and registered in California including Battery Electric Vehicles (BEVs) and Fuel Cell Electric Vehicles (FCEVs).

The ZEV program assigns ZEV credits to each vehicle manufacturer. Vehicle manufacturers are required to maintain ZEV credits equal to a set percentage of non-electric vehicles sold and registered in California.

Each vehicle sold and registered in California earns a number of credits based on the drivetrain type and the all-electric range of the vehicle under the Urban Dynamometer Driving Schedule Test Cycle. Battery electric and fuel cell vehicles receive between one and four credits per vehicle sold in California, based on range.

If a vehicle manufacturer does not produce enough EVs to meet its quota, it can choose to buy credits from other manufacturers who do or pay fines for each credit such manufacturer is short. This will provide an opportunity for us to sell credits to other manufacturers that may not have met their quota. Initial negotiations with a certain OEM's have started in this area.

21

Table of Contents

**EPA / CARB Emissions and Certificate of Conformity / Executive Order**

The United States Clean Air Act requires that we obtain a Certificate of Conformity (CoC) issued by the EPA and a California Executive Order (EO) issued by the California Air Resources Board (CARB) concerning emissions for our vehicles. A Certificate of Conformity is required for vehicles sold in states covered by the Clean Air Act's standards, and an Executive Order is required for vehicles sold in states that have sought and received a waiver from the EPA to utilize California standards. CARB sets the California standards for emissions control for certain regulated pollutants for new vehicles and engines sold in California. States that have adopted the California standards as approved by EPA also recognize the Executive Order for sales of vehicles. There are currently eight states (Colorado, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont and Washington state) which have adopted the California standard for heavy-duty vehicles.

The Greenhouse Gas Rule was incorporated into the Clean Air Act on August 9, 2011. Even though Mullen's vehicles have zero-emissions, Mullen is still required to seek an EPA Certificate of Conformity for the Greenhouse Gas Rule and a CARB Executive Order for the CARB Greenhouse Gas Rule.

Mullen has received EPA Certificate of Conformity for both Class 1 and Class 3 vehicles. In addition, the California EO has been issued by the CARB for the Mullen ONE, Mullen THREE and Bollinger B4.

**Vehicle Safety and Testing**

Our vehicles are required to comply with, numerous regulatory requirements established by the National Highway Traffic Safety Administration (NHTSA), including applicable United States Federal Motor Vehicle Safety Standards (FMVSS). All Mullen and Bollinger Motors commercial products fully comply with all applicable FMVSS requirements.

**Human Capital Resources**

*Talent Attraction and Capability Assessment*

Where and how we source our talent evolves as conditions and opportunities change. From a capability perspective, we are leveraging best practices in assessments and talent management to current capabilities and future pipeline while reinforcing a culture of belonging, empowerment, and innovation.

*Diversity and Inclusion*

We strive to attract a pool of diverse and exceptional candidates and support their career growth once they become employees. In addition, we seek to hire based on talent rather than solely on educational pedigree. We also believe that our ability to retain our workforce is dependent on our ability to foster an environment that is sustainably safe, respectful, fair, and inclusive of everyone and promotes diversity, equity and inclusion inside and outside of our business.

*Our Employees*

As of September 30, 2024, Mullen employed 388 full-time employees including 243 Mullen and 145 Bollinger employees. Most of our employees are engaged in automotive engineering, manufacturing, sales and marketing and finance related function. None of our employees are represented by a labor union or subject to a collective bargaining agreement.

Table of Contents

**Available Information**

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and file or furnish reports, proxy statements, and other information with the SEC. You can read our SEC filings over the Internet at the SEC's website at www.sec.gov. Our filings with the SEC, including our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports, also are available free of charge on the investors section of our website at www.mullenusa.com when such reports are available on the SEC's website. Further corporate governance information, including our certificate of incorporation, bylaws, governance guidelines, board committee charters, and code of business conduct and ethics, is also available on the investors section of our website.

The contents of the websites referred to above are not incorporated into this filing or in any other report or document we file with the SEC, and any references to these websites are intended to be inactive textual references only.

**ITEM 1A. RISK FACTORS.**

*Investing in our securities involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Report, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, as well as the preceding "Business" section of this Report, before engaging in any transaction in our securities. Any of the following risks could materially and adversely affect our business, financial condition, results of operations and/or prospects, and cause the value of our securities to decline, which could cause you to lose all or part of your investment.*

**Risk Factor Summary**

For a summary of risk factors, see our "*Forward-Looking Statements and Risk Factor Summary*" on page 2.

**Risks Related to our Securities, Capital Requirements and Financial Condition**

***We have incurred significant losses since inception and we expect that we will continue to incur losses for the foreseeable future, which makes it difficult to assess our future viability.***

We have not been profitable since operations commenced, and we may never achieve or sustain profitability. In addition, we have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields such as the EV industry. Development and deployment of EV technology and vehicles is a highly speculative undertaking and involves a substantial degree of risk. We have only commercialized our EV products and generated revenue from sales of such products on a very limited basis. We have previously devoted, and may continue to devote, significant resources to research and development, manufacturing and other expenses related to our ongoing operations.

We will require significant additional capital to continue operations and to execute current business strategy. Mullen cannot estimate with reasonable certainty the actual amounts necessary to successfully continue the development, manufacturing and commercialization of our products and there is no certainty that we will be able to raise the necessary capital on reasonable terms or at all.

***We are an early-stage company with a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future.***

We have incurred a net loss since our inception and particularly incurred losses in the operation of its business related to research and development activities since our inception. We believe that we will continue to incur operating and net losses each quarter until at least the time we begin significant deliveries of our vehicles. Even if we are able to successfully develop, manufacture, and sell or lease our vehicles, there can be no assurance that they will be commercially successful.

23

Table of Contents

We expect the rate at which we will incur losses to be significantly higher in future periods as we, among other things: design, develop and manufacture our vehicles; build up inventories of parts and components for our vehicles; increase our sales and marketing activities; develop our distribution infrastructure; and increase our general and administrative functions to support our growing operations. We may find that these efforts are more expensive than we currently anticipate or that these efforts may not result in revenues, which would further increase our losses.

***There is substantial doubt about our ability to continue as a going concern.***

Our ability to continue as a going concern is dependent upon our ability to raise additional debt or equity financings or enter strategic partnerships. Since our inception, we have financed our operations through convertible debt and preferred stock financings. We intend to continue to finance our operations through debt or equity financing and/or strategic partnerships. The failure to obtain sufficient financing or strategic partnerships could adversely affect our ability to achieve our business objectives and continue as a going concern.

Our independent registered public accounting firm has included an emphasis of matter paragraph regarding our ability to continue as a going concern in its opinion on our September 30, 2024, consolidated financial statements due to our lack of revenues and insufficient capital for us to fund our operations.

***Our operating and financial results forecast relies in large part upon assumptions and analyses developed by us. If these assumptions or analyses prove to be incorrect, our actual operating results may be materially different from our forecasted results.***

Our operating and financial results forecast largely relies on management's assumptions and analyses, which could be incorrect. Whether actual operating and financial results and business developments will be consistent with our expectations and assumptions as reflected in the forecast depends on a number of factors, many of which are outside our control, including, but not limited to:

- whether we can obtain sufficient and timely capital to sustain and grow its business;

- our ability to manage growth;

- whether we can maintain relationships with key suppliers;

- whether we can

- our ability to obtain necessary regulatory approvals;

- demand for our products and services in its target markets;

- the timing and cost of new and existing marketing and promotional efforts;

- competition, including established and future competitors;

- our ability to retain existing key management, to integrate recent hires and to attract, retain and motivate qualified personnel;

- the overall strength and stability of domestic and international economies;

- regulatory, legislative and political changes, including tariffs

Specifically, our operating results forecast is based on projected purchase prices, unit costs for materials, manufacturing, labor, packaging and logistics, warranty, sales, marketing and service, tariffs, and its projected number of orders for the vehicles with factors such as industry benchmarks taken into consideration. Any of these factors could turn out to be different than those anticipated. Unfavorable changes in any of these or other factors, which may be beyond our control, could materially and adversely affect its business, prospects, financial results and results of operations.

24

Table of Contents

***We will require substantial additional financing to execute our business plan, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our production operations***

For the years ended September 30, 2024 and 2023, we incurred net losses of $505.8 million and $1,006.7 million, respectively, and net cash used in operating activities was $185.6 million and $179.2 million, respectively. As of September 30, 2024, we had an accumulated deficit of $2.3 billion. We will need significant capital to, among other things, continue any research and development, increase our production capacity, and expand our sales and service network. We expect to continue to incur substantial operating losses for the next several years as we advance our product development, manufacturing and commercialization efforts.

We expect ongoing capital expenditures in the foreseeable future as we grow our business volumes, including adding new models of our EV products, and that our level of capital expenditures will be significantly affected by user demand for our products and services. The fact that we have a limited operating history means we have limited historical data on the demand for our products and services. As a result, our future capital requirements may be uncertain and actual capital requirements may be different from those we currently anticipate. We will likely need to seek equity or debt financing to finance a portion of our capital expenditures. Such financing might not be available to us in a timely manner, or on terms that are acceptable to us, or at all.

Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors, including general market conditions and investor acceptance of our business plan. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. In particular, our current ineligibility to file a registration statement on Form S-3 due to our failure to timely file our Annual Report on Form 10-K for the year ended September 30, 2023 and our Annual Report on Form 10-K for the year ended September 30, 2024 and disruptions in the financial markets and volatile economic conditions could affect our ability to raise capital. If we raise additional capital through marketing and distribution arrangements or other collaborations, strategic alliances or licensing arrangements with third parties, we may have to relinquish certain valuable rights to our product candidates, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable. If we raise additional capital through public or private equity offerings, the ownership interest of our stockholders will be diluted, and the terms of any new equity securities may have preferential rights over our common stock and further may restrict our ability to obtain additional financing even if needed to continue operations. Further, the ability to fund our needs through equity issuances, warrants or convertible debt is or may be limited by covenants in certain of our existing and future funding or other agreements. If we raise additional capital through debt financing, we would have increased debt service obligations and may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt or making capital expenditures, or subject to specified financial ratios, any of which could restrict our ability to develop and commercialize our product candidates or operate as a business.

Additional capital may not be available when we need it, on terms that are acceptable to us, or at all. If adequate funds are not available to us on a timely basis, we may be required to delay, limit, reduce or terminate our establishment of sales and marketing, manufacturing or distribution capabilities, development activities or other activities that may be necessary to commercialize our proposed products or other development activities. We might not be able to obtain any funding, and we might not have sufficient resources to conduct our business as projected, both of which could mean that we would be forced to curtail or discontinue our operations.

Table of Contents

***We may not be able to raise additional funding nor generate or obtain sufficient cash flows to service all of our existing and future liabilities when they become due, and we may be forced to take other actions to satisfy our obligations, which may not be successful.***

We may be unable to obtain alternative sources of financing in an amount sufficient to fund our existing and future liquidity needs. To date, we have yet to generate any significant revenue from our business operations. Our current working capital and development needs have been primarily funded through the issuance of convertible indebtedness, convertible preferred stock and common stock. We will need significant capital to, among other things, conduct research and development, increase our production capacity, and expand our sales and service network. Our ability to successfully expand our business will depend on many factors, including our working capital needs, the availability of equity or debt financing and, over time, our ability to generate cash flows from operations. During the twelve months ended September 30, 2024, the Company used approximately $185.6 million of cash for operating activities.

The Company's principal source of liquidity consists of existing cash and restricted cash of approximately $10.7 million as of September 30, 2024. The net working capital was negative and reached $120.0 million. If we are unable to obtain funding or a refinancing or some restructuring of our obligations or other improvement in liquidity, we may not be able to service all our liabilities when they become due. The Company is actively pursuing additional funds and remains in discussions with potential financiers. As part of its cost-cutting measures, the Company plans to further reduce its workforce and streamline operations, including downsizing its physical locations. However, there is no guarantee that the Company will be able to restructure its liabilities and/or secure the necessary financing on favorable terms. If any of our significant obligations are accelerated, we may not be able to repay the obligations that become immediately due and will have severe liquidity restraints.

We are currently evaluating strategic alternatives to address our liquidity issues, but we cannot assure you that any of our strategies will yield sufficient funds to meet our working capital or other liquidity needs, and any such alternative measures may be unsuccessful or may not permit us to meet scheduled obligations, which could cause us to default on our obligations. As a result, we may seek bankruptcy court protection to continue our efforts to restructure our business and capital structure and may have to liquidate our assets and may receive less than the value at which those assets are carried on our consolidated financial statements.

***We have defaulted on the payment of certain Convertible Notes and our failure to comply with the terms of Convertible Notes could result in an event of default that could materially adversely affect our business, financial condition and results of operations.***

If there were an event of default under the Senior Convertible Notes that were issued pursuant to a Securities Purchase Agreement dated May 14, 2024, all amounts outstanding under the Convertible Notes could be due and payable immediately, which would have an adverse impact on our business, financial condition and results of operations. An event of default may occur should our assets or cash flow be insufficient to fully repay borrowings under the Convertible Notes, whether paid in the ordinary course or accelerated, or if we are unable to maintain compliance with relevant obligations thereunder, including financial and other covenants. Various risks and uncertainties may impact our ability to comply with our obligations under the Convertible Notes.

As of September 30, 2024, we had an aggregate amount of approximately $20.3 million of Senior Convertible Notes that were issued pursuant to a Securities Purchase Agreement dated May 14, 2024. As of September 30, 2024, the Convertible Notes were in cross-default as the Company had not paid a part of the notes that matured during September 2024. As a result, the interest rate on the Convertible Notes increased from 15% to 20%. Although the investors could request immediate payment in cash, the investors did not demand payment. In December 2024, a settlement agreement between the Company and holders of the Convertible Notes was approved by a court, and, as of the date of this Report, almost full amount of the Convertible Notes, including accumulated interest, has been converted to shares of common stock under Section 3(a)(10) of the Securities Act of 1933.

26

Table of Contents

Our inability to comply with any of the provisions of the Convertible Notes could result in a default, which would permit the holders declare the principal amount and accrued interest immediately due and payable and exercise any or all of its rights, powers, or remedies under the Convertible Notes or applicable law or available in equity. Plus, as security for payment of the amounts due and payable under the Convertible Notes, the Company granted a continuing security interest in all of its right, title and interest in, its assets, whether owned, existing, acquired or arising and wherever located. If we are unable to repay outstanding borrowings when due, the holders also have the right to proceed against the collateral. The occurrence of any of these events could have a material adverse effect on our business, financial condition, results of operations and liquidity.

***Our liquidity issues that can force us to seek protection under the federal bankruptcy laws may impact our business and operations.***

Due to the uncertainty about our ability to obtain sufficient cash to service current and future liabilities, there is risk that, among other things:

- third parties' confidence in our ability to develop and manufacture explore and produce electric vehicles, which could impact our ability to execute on our business strategy;

- it may become more difficult to retain, attract or replace key employees;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- our suppliers, vendors and service providers could renegotiate the terms of our arrangements, terminate their relationship with us or require financial assurances from us.

Seeking bankruptcy court protection could have a material adverse effect on our business, financial condition, results of operations and liquidity. For as long as a bankruptcy proceeding continued, our senior management would be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing on our business operations. Bankruptcy court protection also could make it more difficult to retain management and other key personnel necessary to the success and growth of our business. In addition, during the period of time we are involved in a bankruptcy proceeding, our customers and suppliers might lose confidence in our ability to reorganize our business successfully and could seek to establish alternative commercial relationships. The occurrence of certain of these events has already negatively affected our business and may have a material adverse effect on our business, results of operations and financial condition.

***We have identified material weaknesses in our internal control over financial reporting. Failure to achieve and maintain effective internal control over financial reporting could result in our failure to accurately or timely report our financial condition or results of operations, which could have a material adverse effect on our business and stock price.***

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis. Our management has concluded that our internal control over financial reporting was not effective as of September 30, 2024 due to material weaknesses, such as certain policies and procedures that are not all formalized in a written procedure format that is up to date, absence of formalized review of key controls processes and/or insufficiently formalized documentation evidencing, certain design deficiencies in management and analytical review of controls associated with the financial close process, lack of in-house accounting expertise, and lack of disclosure controls and procedures to ensure the Company properly presents certain related party disclosures. Management is working to remediate our current material weaknesses and prevent potential future material weaknesses by implementing procedures such as, hiring additional qualified accounting and financial reporting personnel, and further reviewing and enhancing our accounting processes, which are further described under "Item 9A. *Controls and Procedures*" of this Report. We may not be able to fully remediate any future material weaknesses until these steps have been completed and have been operating effectively for a sufficient period of time. If we are not able to maintain effective internal control over financial reporting, our financial statements and related disclosures may be inaccurate, which could have materially adverse effects on our business and our stock price. Any failure to maintain internal control over financial reporting could severely inhibit our ability to accurately report our financial condition or results of operations.

27

Table of Contents

Our ability to comply with the annual internal control report requirements will depend on the effectiveness of our financial reporting and data systems and controls across our company. We expect these systems and controls to involve significant expenditures and to become increasingly complex as our business grows. To effectively manage this complexity, we will need to continue to improve our operational, financial, and management controls, and our reporting systems and procedures. Our inability to successfully remediate our existing or any future material weaknesses or other deficiencies in our internal control over financial reporting or any failure to implement required new or improved controls, or difficulties encountered in the implementation or operation of these controls, could harm our operating results and cause us to fail to meet our financial reporting obligations or result in material misstatements in our financial statements, which could limit our liquidity and access to capital markets, adversely affect our business and investor confidence in us, and reduce our stock price.

***Commercial vehicle sales depend on affordable interest rates and availability of credit for vehicle financing and a substantial increase in interest rates could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.***

As interest rates have risen, market rates for new vehicle financing have also risen, which may make our vehicles less affordable to customers or steer customers to less expensive vehicles. Additionally, if financial service providers tighten lending standards or restrict their lending to certain classes of credit, customers may not desire or be able to obtain financing to purchase our vehicles or may reduce the number of vehicles they otherwise would have purchased. As a result, a continuing relatively high interest rate environment or tightening of lending standards could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

***We incurred non-cash impairment charges during 2024 which adversely affected our year fiscal 2024 operating results and we may be required to incur additional future impairment and other charges, which could adversely affect our operating results.***

In connection with our acquisitions and other business combinations, including our acquisition of Bollinger Motors in 2022, applicable accounting standards require the net tangible and intangible assets of the acquired business to be recorded on our consolidated balance sheet at their fair values as of the date of acquisition and any excess in the purchase price paid by us over the fair value of net tangible and intangible assets of any acquired business to be recorded as goodwill. Goodwill and indefinite-lived intangible assets are not amortized but are tested at least annually for impairment or more frequently as events and circumstances dictate. Goodwill is tested for impairment at the reporting unit level, which is generally an operating segment or underlying business component. Indefinite-lived intangible assets are tested for impairment at the individual indefinite-lived intangible asset or asset group level, as appropriate. Finite-lived intangible assets other than goodwill considered long-lived assets for impairment testing purposes, are tested for impairment as events and circumstances dictate, and are required to be amortized over their estimated useful lives and this amortization expense may be significant to our ongoing financial results.

If we determine that the anticipated future cash flows from our reporting units, indefinite-lived intangible assets or asset groups, or long-lived asset groups may be less than their respective carrying values, our goodwill, indefinite-lived intangible assets, and/or long-lived assets may be deemed to be impaired. If this occurs, applicable accounting rules may require us to write down the value of the goodwill, indefinite-lived intangible assets, and/or long-lived assets on our balance sheet to reflect the extent of any such impairment. Any such write-down of goodwill, indefinite-lived intangible assets, and/or long-lived assets would generally be recognized as a non-cash expense in our financial statements for the accounting period during which any such write-down occurs. Impairment losses recorded during the twelve months ended September 30, 2024 amounted to $119.2 million, while impairment losses recorded during the twelve months ended September 30, 2023 amounted to $84.6 million.

Table of Contents

***Our financial results may vary significantly from period to period due to fluctuations in our operating costs and other factors.***

We expect our period-to-period financial results to vary based on our operating costs, which we anticipate will fluctuate as the pace at which we continue to design, develop and manufacture new products and increase production capacity by expanding our current manufacturing facilities and adding future facilities, may not be consistent or linear between periods. Additionally, our revenues from period to period may fluctuate as we introduce existing products to new markets for the first time and as we develop and introduce new products. As a result of these factors, we believe that quarter-to-quarter comparisons of our financial results, especially in the short term, are not necessarily meaningful and that these comparisons cannot be relied upon as indicators of future performance. Moreover, our financial results may not meet expectations of equity research analysts, ratings agencies or investors, who may be focused only on short-term quarterly financial results. If any of this occurs, the trading price of our stock could fall substantially, either suddenly or over time.

***We have not paid cash dividends on our common stock in the past and do not expect to pay dividends on our common stock in the future. Any return on investment may be limited to the value of our common stock.***

We have never paid cash dividends on our common stock and do not anticipate paying cash dividends in the near future. We currently intend to retain our future earnings, if any, to finance the further development and expansion of our business and do not intend to pay cash dividends in the foreseeable future. The payment of dividends on our common stock will depend on earnings, financial condition, cash requirements, contractual restrictions, business prospects and other business and economic factors affecting us at such time as the Board of Directors may consider relevant. If we do not pay dividends, our common stock may be less valuable because a return on your investment will only occur if our stock price appreciates. Consequently, investors may need to rely on sales of their shares after price appreciation, which may never occur, as the only way to realize any future gains on their investment

***We may not be able to maintain compliance with the continued listing requirements of the NASDAQ Capital Markets.***

Our common stock is listed on the Nasdaq Capital Markets. To maintain continued listing, we must satisfy minimum financial and other requirements including, without limitation, a minimum bid price of at least $1 per share as set forth in in Nasdaq Listing Rule 5550(a)(2) (the "Bid Price Rule"). Although the Company regained compliance, during 2022, 2023 and 2024, we received notices from the Nasdaq Listing Qualifications staff ("Staff") that the Company no longer satisfied the Bid Price Rule.

In September 2022, we received a letter from the Staff that, for the previous 30-consecutive business day period, the Company no longer satisfied the Bid Price Rule. Upon approval by the Company's stockholders, in May 2023, we completed a 1-for-25 reverse split of our outstanding shares of common stock, and in August 2023, we completed a 1-for-9 reverse split of our outstanding shares of common stock. After not regaining compliance during a 180-day compliance period, which was extended for another 180-day period, we requested a hearing before the Nasdaq Listing Qualifications Panel ("Panel") to request a further extension of time and present our plan to regain compliance with the Bid Price Rule. The Panel granted the Company an extension and, after receiving stockholder approval, on December 21, 2023, the Company effectuated a 1-for-100 reverse split of its outstanding shares of common stock. On January 24, 2024, the Company announced that it received formal notice from the Staff that it had regained compliance with the Bid Price Rule.

More recently, on September 16, 2024, we received another formal notice from the Staff of Nasdaq that, based upon the closing bid price for our common stock, for the previous 30-consecutive business day period, the Company no longer satisfied the Bid Price Rule. The Staff further indicated that, based upon the Company's implementation of one or more reverse stock splits within the past two years at a cumulative ratio of 250 shares or more to one in contravention of Nasdaq Listing Rule 5810(c)(3)(A)(iv), the Company's securities were subject to delisting unless the Company timely requested a hearing before the Panel, which the Company did. After receiving stockholder approval, on September 17, 2024, the Company implemented a 1-for-100 reverse split of its outstanding shares of common stock. On October 16, 2024, the Company received formal notice from Nasdaq confirming that it had regained compliance with the Bid Price Rule and the previously scheduled Nasdaq hearing was canceled.

Table of Contents

While Nasdaq rules do not impose a specific limit on the number of times a listed company may effect a reverse stock split to maintain or regain compliance with the Bid Price Rule, Nasdaq has stated that a series of reverse stock splits may undermine investor confidence in securities listed on Nasdaq. Accordingly, Nasdaq may determine that it is not in the public interest to maintain our listing, even if we regain compliance with the Bid Price Rule as a result of the reverse stock split. In addition, Nasdaq Listing Rule 5810(c)(3)(A)(iv) states that any listed company that fails to meet the Bid Price Rule after effecting one or more reverse stock splits over the prior two-year period with a cumulative ratio of 250 shares or more to one, then the company is not eligible for a Minimum Bid Price Rule Compliance Period. As a result, since the Company had effected an 1-for-25 reverse stock split on May 4, 2023, an 1-for-9 reverse stock split on August 11, 2023, an 1-for-100 reverse stock split on December 21, 2023, and another 1-for-100 reverse stock split on September 17, 2024, if we subsequently fail to satisfy the Bid Price Rule, Nasdaq will begin the process of delisting our common stock without providing a Minimum Bid Price Rule Compliance Period. However, the Company is still eligible to request a hearing before the Nasdaq Panel to present its plan for regaining and sustaining compliance with the Bid Price Rule.

If our common stock ceases to be listed for trading on the Nasdaq Capital Market, we would expect that our common stock would be traded on one of the three tiered marketplaces of the OTC Markets Group. If Nasdaq were to delist our common stock, it would be more difficult for our stockholders to dispose of our common stock or warrants and more difficult to obtain accurate price quotations on our common stock. Our ability to issue additional securities for financing or other purposes, or otherwise to arrange for any financing we may need in the future, may also be materially and adversely affected if our common stock or warrants are not listed on a national securities exchange. The OTC Markets (the "OTC Mkts") are generally regarded as a less efficient trading market than the NASDAQ Capital or Global Markets or the New York Stock Exchange.

Although the OTC Mkts do not have any listing requirements, to be eligible for quotation on the OTC Mkts, issuers must remain current in their filings with the SEC or applicable regulatory authority. If we are not able to pay the expenses associated with our reporting obligations, we will not be able to apply for quotation on the OTC Board. Market makers are not permitted to begin quotation of a security whose issuer does not meet this filing requirement. If we are delisted to the OTC Mkts and no market is ever developed for our common stock or warrants, it will be difficult for you to sell any shares you purchase in this offering. In such a case, you may find that you are unable to achieve any benefit from your investment or liquidate your shares without considerable delay, if at all.

***A reverse stock split may decrease the liquidity of the shares of our common stock and may have a dilutive effect on the ownership of existing stockholders.***

The liquidity of the shares of our common stock may be affected adversely by a reverse stock split given the reduced number of shares that will be outstanding following the reverse stock split, especially if the market price of our common stock does not increase as a result of the reverse stock split. In addition, a reverse stock split may increase the number of shareholders who own odd lots (less than 100 shares) of our common stock, creating the potential for such shareholders to experience an increase in the cost of selling their shares and greater difficulty effecting such sales.

While we expect that the reduction in the number of outstanding shares of common stock will proportionally increase the market price of our common stock, we cannot assure you that a reverse stock split will increase the market price of our common stock by a multiple of the reverse stock split ratio, or result in any permanent or sustained increase in the market price of our common stock. The market price of our common stock will continue to be based, in part, on our performance and other factors unrelated to the number of shares outstanding. A reverse stock split will reduce the number of outstanding shares of our common stock without reducing the number of shares of available but unissued common stock, which will also have the effect of increasing the number of shares of common stock available for issuance. The issuance of additional shares of our common stock may have a dilutive effect on the ownership of existing stockholders. The current economic environment in which we operate, the debt we carry, along with otherwise volatile equity market conditions, could limit our ability to raise new equity capital in the future.

In addition, a reverse stock split will reduce the total number of outstanding shares of common stock, which may lead to reduced trading and a smaller number of market makers for our common stock, particularly if the price per share of our common stock does not increase as a result of a reverse stock split.

Table of Contents

***Following a reverse stock split, the resulting market price of our common stock may not attract new investors, including institutional investors, and may not satisfy the investing requirements of those investors. Consequently, the trading liquidity of our common stock may not improve.***

Although we believe that a higher market price of our common stock may help generate greater or broader investor interest, there can be no assurance that a reverse stock split will result in a share price that will attract new investors, including institutional investors. In addition, there can be no assurance that the market price of our common stock will satisfy the investing requirements of those investors. As a result, the trading liquidity of our common stock may not necessarily improve.

***Our common stock may be subject to the "penny stock" rules in the future. It may be more difficult to resell securities classified as "penny stock."***

Our common stock may be subject to "penny stock" rules (generally defined as non-exchange traded stock with a per-share price below $5.00) in the future. While our common stock is currently not considered "penny stock" since they are listed on the NasdaqCM, if we are unable to maintain that listing and our common stock are no longer listed on the NasdaqCM, unless we maintain a per-share price above $5.00 or are able to satisfy any another condition, our common stock will become "penny stock." These rules impose additional sales practice requirements on broker-dealers that recommend the purchase or sale of penny stocks to persons other than those who qualify as "established customers" or "accredited investors." For example, broker-dealers must determine the appropriateness for non-qualifying persons of investments in penny stocks. Broker-dealers must also provide, prior to a transaction in a penny stock not otherwise exempt from the rules, a standardized risk disclosure document that provides information about penny stocks and the risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, disclose the compensation of the broker-dealer and its salesperson in the transaction, furnish monthly account statements showing the market value of each penny stock held in the customer's account, provide a special written determination that the penny stock is a suitable investment for the purchaser, and receive the purchaser's written agreement to the transaction. Legal remedies available to an investor in "penny stocks" may include the following:

- If a "penny stock" is sold to the investor in violation of the requirements listed above, or other federal or states securities laws, the investor may be able to cancel the purchase and receive a refund of the investment.

- If a "penny stock" is sold to the investor in a fraudulent manner, the investor may be able to sue the persons and firms that committed the fraud for damages.

- If a "penny stock" is sold to the investor in violation of the requirements listed above, or other federal or states securities laws, the investor may be able to cancel the purchase and receive a refund of the investment.

- If a "penny stock" is sold to the investor in a fraudulent manner, the investor may be able to sue the persons and firms that committed the fraud for damages.

- If a "penny stock" is sold to the investor in violation of the requirements listed above, or other federal or states securities laws, the investor may be able to cancel the purchase and receive a refund of the investment.

- If a "penny stock" is sold to the investor in a fraudulent manner, the investor may be able to sue the persons and firms that committed the fraud for damages.

- If a "penny stock" is sold to the investor in violation of the requirements listed above, or other federal or states securities laws, the investor may be able to cancel the purchase and receive a refund of the investment.

- If a "penny stock" is sold to the investor in a fraudulent manner, the investor may be able to sue the persons and firms that committed the fraud for damages.

These requirements may have the effect of reducing the level of trading activity, if any, in the secondary market for a security that becomes subject to the penny stock rules. The additional burdens imposed upon broker-dealers by such requirements may discourage broker-dealers from effecting transactions in our securities, which could severely limit the market price and liquidity of our securities. These requirements may restrict the ability of broker-dealers to sell our common stock or our warrants and may affect your ability to resell our common stock.

31

Table of Contents

Many brokerage firms will discourage or refrain from recommending investments in penny stocks. Most institutional investors will not invest in penny stocks. In addition, many individual investors will not invest in penny stocks due, among other reasons, to the increased financial risk generally associated with these investments.

For these reasons, penny stocks may have a limited market and, consequently, limited liquidity. We can give no assurance at what time, if ever, our common stock or our warrants will not be classified as a "penny stock" in the future.

***We may issue additional shares of common stock, including under our equity incentive plan and our commitments to issue shares of common stock or securities that are convertible into shares of common stock may cause significant dilution to stockholders and present other risks.***

We may issue a substantial number of additional shares of common stock.

On May 14, 2024, we entered into a Securities Purchase Agreement with certain investors, pursuant to which we issued an aggregate principal amount of $52.6 million of 5% Original Issue Discount Senior Secured Notes convertible into shares of common stock (the "**Notes**") and five-year warrants exercisable for shares of common stock (the "**Warrants**"). Furthermore, for the period ending on July 9, 2025, the investors have the right, but not the obligation, to purchase an additional $52.6 million of Notes and related Warrants on the same terms and conditions as provided in the Securities Purchase Agreement. The outstanding principal and accrued but unpaid interest on the Notes may be converted by the holder into shares of Common Stock at the lower of (i) $549.00, (ii) 95% of the closing sale price of the common stock on the date that the Initial Registration Statement is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five trading days prior to such conversion date, provided, that the conversion price will not be less than $1.16 per share, not subject to adjustment. The Warrants are exercisable for 200% of the shares of Common Stock underlying the Notes at an exercise price equal to $549.10 and may also be exercised on a cashless basis pursuant to their terms. Finally, on December 12, 2024, the Company and certain investors entered into an Additional Investment Rights Agreement whereby for a one-year period ending on December 12, 2025, such investors have the right, but not the obligation, to purchase from the Company additional Notes in an aggregate principal amount of approximately $4.6 million, and related Warrants, on the same terms and conditions as provided in the Securities Purchase Agreement, including the Registration Rights Agreement dated as of May 14, 2024. For further information, see *Note 7 - Debts and Note 8 - Warrants and other derivative liabilities and fair value measurements* to the Company's consolidated financial statements included elsewhere in this Report.

In addition to the Company's equity incentive plan, the Company has also adopted the 2022 CEO Award Incentive Plan, approved by the Board and by stockholders in 2022, and the 2023 CEO Award Incentive Plan, approved by the Board and by stockholders in 2023. Under these plans, the Chief Executive Officer is entitled to share-based awards generally calculated as 1-3% of then outstanding number of shares of common stock, issuable upon achievement of specific financial and operational targets (milestones) that are supposed to significantly increase value of the Company. Total shares of common stock to be issued under the Plans will depend on probability of the milestone achievement and on the number of shares of common stock outstanding on the day a milestone is achieved. See further details under "*Executive Compensation*" of Part III, Item 11 and *Note 11* in the notes to the Company's consolidated financial statements included elsewhere in this Report.

Table of Contents

The issuance of additional shares of common stock or issuance of shares of common stock upon the conversion of Notes and exercise of the Warrants or upon sales pursuant to the ELOC Purchase Agreement,

●May significantly dilute the percentage ownership and equity interest of holders of our common stock;

●dilute the book value per share of our common stock;

●could cause a change in control if a substantial number of shares of our common stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors; and

●and increase the number of our publicly traded shares, which could adversely affect prevailing market prices for our common stock and depress the market price.

***Stockholder equity interest may be substantially diluted in any additional equity issuances.***

We expect that significant additional capital will be needed in the future to continue our planned operations. To the extent we raise additional capital by issuing equity securities, our stockholders may experience substantial dilution. We may sell common stock, convertible securities or other equity securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

***Our commitment to issue shares of common stock pursuant to the terms of our preferred stock, Notes and Warrants and stock-based compensation arrangements could encourage short sales by third parties which could contribute to the future decline of stock price.***

Our commitment to issue shares of common stock pursuant to the terms of our preferred stock, Notes and Warrants and stock-based compensation arrangements has the potential to cause significant downward pressure on the price of our common stock. In such an environment, short sellers may exacerbate any decline of our stock price. If there are significant short sales of our common stock, the share price of our common stock may decline more than it would in an environment without such activity. This may cause other holders of our common stock to sell their shares. If there are many more shares of our common stock on the market for sale than the market will absorb, the price of our shares of common stock will likely decline.

Our investors may participate in short sales of our common stock. They may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of common stock in the course of hedging in positions they assume. Our investors may also sell shares of common stock short and deliver shares of common stock covered by their investments to close out short positions and to return borrowed shares in connection with such short sales. Our investors may also loan or pledge shares of common stock to broker-dealers that in turn may sell such shares. Such activity could cause a decline in the market price of the shares of our common stock.

Table of Contents

***Sale or issuance of our common stock pursuant to the ELOC Purchase Agreement
may cause dilution and the sale of the shares of common stock, or the perception that such sales may occur, could cause the price of our common stock to fall.***

On May 14, 2024, the Company entered into the ELOC Purchase Agreement pursuant to which the investor agreed to purchase from the Company, at the Company's direction from time to time, in its sole discretion, until the earlier of (i) the 36-month anniversary of the commencement date or (ii) the termination of the ELOC Purchase Agreement in accordance with the terms thereof, shares of common stock, having a total maximum aggregate purchase price of $150 million, upon the terms and subject to the conditions and limitations therein. In connection with the ELOC Purchase Agreement, the Company also entered into a registration rights agreement, pursuant to which the Company agreed to file a registration statement and any additional registration statements, with the SEC covering the resale of the shares of the Company's common stock issued to investor pursuant to the ELOC Purchase Agreement. In August and September 2024, the Company issued 247,934 shares of common stock as commitment shares and, on October 24, 2023, the Company issued 502,066 shares of common stock with proceeds of approximately $1.1 million pursuant to the terms of the ELOC Purchase Agreement. The Company can continue to access the ELOC if it files another registration statement with the SEC.

The purchase price for the shares that we may sell under the ELOC Purchase Agreement will fluctuate based on the price of our common stock. Depending on market liquidity at the time, sales of such shares may cause the trading price of our common stock to fall.

Subject to the terms of the ELOC Purchase Agreement, we generally have the right to control the timing and amount of any future sales of our shares to the Investor. The extent to which we rely on the ELOC as a source of funding will depend on a number of factors, including the prevailing market price of our common stock and the extent to which we are able to secure working capital from other sources and other factors to be determined by us. We may ultimately decide to sell all, some, or none of the shares of our common stock that may be available for us to sell pursuant to the ELOC Purchase Agreement. After the investor has acquired shares, it may resell all or some of those shares at any time or from time to time in its discretion. Therefore, sales by us could result in substantial dilution to the interests of other holders of our common stock. Additionally, the sale of a substantial number of shares of our common stock, or the anticipation of such sales, could make it more difficult for us to sell equity or equity-related securities in the future at a time and at a price that we might otherwise wish to effect sales.

***Substantial blocks of our total outstanding shares may be sold into the market. If there are substantial sales or issuances of shares of our common stock, the price of our common stock could decline.***

The price of our common stock could decline if there are substantial sales or issuances of shares of our common stock, particularly sales by significant stockholders or if there is a large number of shares of our common stock available for sale.

As of January 21, 2025, we had outstanding 61,595,743 shares of common stock. Although common stock held by directors, executive officers and other affiliates are subject to volume limitations under Rule 144 under the Securities Act, and various vesting agreements, the market price of the shares of our common stock could decline as a result of the sale of a substantial number of our shares of common stock in the public market or the perception in the market that our significant stockholders or the holders of a large number of such shares of common stock intend to sell their shares.

Our outstanding preferred stock, Notes and Warrants generally contain weighted average anti-dilution provisions which, subject to limited exceptions, would increase the number of shares issuable upon conversion of such securities (by reducing the conversion or exercise price) in the event that we in the future issue common stock, or securities convertible into or exercisable to purchase common stock, at a price per share lower than the conversion price then in effect.

Table of Contents

The issuance of shares of common stock upon the conversion of such preferred stock and Notes and the exercise of Warrants would dilute the percentage ownership interest of holders of our common stock, dilute the book value per share of our common stock and increase the number of our publicly traded shares, which could depress the market price of our common stock.

Furthermore, issuances of shares of our common stock pursuant to the equity and financing agreements that we may continue to utilize or enter into will continue to dilute the percentage ownership of our stockholders and may dilute the market price, the per share projected earnings (if any) or book value of our common stock.

Sales of a substantial number of shares of our common stock in the public market or other issuances of shares of our common stock, or the perception that these sales or issuances could occur, could cause the market price of our common stock to decline and may make it more difficult for you to sell your shares at a time and price that you deem appropriate.

***Our stock price has been volatile, and the market price of our common stock may drop below the price you pay.***

Securities markets worldwide have experienced, and are likely to continue to experience, significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, has subjected the market price of our shares to wide price fluctuations regardless of our operating performance. The market price of our common stock may fluctuate significantly in response to a number of factors, many of which we cannot control, including those described under "*Risks Related to Our Business and Operations*" and the following:

- changes in financial estimates by any securities analysts who follow our common stock, our failure to meet these estimates or failure of those analysts to initiate or maintain coverage of our common stock;

- downgrades by any securities analysts who follow our common stock or publications of these analysts of inaccurate or unfavorable research about our business;

- future sales of our common stock by our officers, directors and significant stockholders;

- market conditions or trends in our industry or the economy as a whole;

- changes in international trade policy, including the imposition of tariffs;

- changes in federal and state EV technology incentive programs;

- investors' perceptions of our prospects;

- announcements by us of significant contracts, acquisitions, joint ventures or capital commitments; and

- changes in key personnel.

In addition, in the past, when the market price of a stock has been volatile, holders of that stock have sometimes instituted securities class action litigation against the company that issued the stock. If any of our stockholders brought a lawsuit against us, we could incur substantial costs defending the lawsuit. Such a lawsuit could also divert the time and attention of our management from our business, which could significantly harm our profitability and reputation.

***All of our debt obligations and our senior equity securities will have priority over our common stock with respect to payment in the event of liquidation, dissolution or winding up, and our outstanding senior securities restrict our ability to pay dividends on our common stock.***

If we were to liquidate, dissolve or wind up, our common stock would rank below all debt claims against us and claims of all of our outstanding shares of preferred stock. As a result, holders of our common stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution or winding up of the combined company until after all our obligations to our debt holders have been satisfied and holders of senior equity securities have received any payment or distribution due to them.

35

Table of Contents

***Our Certificate of Incorporation designates specific courts as the exclusive forum for certain stockholder litigation matters, which could limit the ability of our stockholders to obtain a favorable forum for disputes with us or our directors, officers or employees.***

Our Certificate of Incorporation requires, to the fullest extent permitted by law, that derivative actions brought in our name, actions against current or former directors, officers or other employees for breach of fiduciary duty, other similar actions, any other action as to which the Delaware General Corporation Law confers jurisdiction to the Court of Chancery of the State of Delaware and any action or proceeding concerning the validity of our Certificate of Incorporation or our Bylaws may be brought only in the Court of Chancery in the State of Delaware (or, if and only if the Court of Chancery of the State of Delaware does not have subject matter jurisdiction thereof, any state court located in the State of Delaware or, if and only if all such state courts lack subject matter jurisdiction, the federal district court for the District of Delaware), unless we consent in writing to the selection of an alternative forum. This provision would not apply to suits brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Our Certificate of Incorporation also provides that, unless we consent in writing to the selection of an alternative forum, the federal district courts of the U.S. shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. This provision may limit our stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us and our directors, officers or other employees and may have the effect of discouraging lawsuits against our directors, officers and other employees. Furthermore, our stockholders may be subject to increased costs to bring these claims, and the exclusive forum provision could have the effect of discouraging claims or limiting investors' ability to bring claims in a judicial forum that they find favorable.

In addition, the enforceability of similar exclusive forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that, in connection with one or more actions or proceedings described above, a court could rule that this provision in our Certificate of Incorporation is inapplicable or unenforceable. In March 2020, the Delaware Supreme Court issued a decision in Salzburg et al. v. Sciabacucchi, which found that an exclusive forum provision providing for claims under the Securities Act to be brought in federal court is facially valid under Delaware law. We intend to enforce this provision, but we do not know whether courts in other jurisdictions will agree with this decision or enforce it. If a court were to find the exclusive forum provision contained in our Certificate of Incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, prospects, financial condition and operating results.

***If securities or industry analysts do not publish research or reports about our business or publish negative reports about our business, our share price and trading volume could decline.***

The trading market for our common stock will depend on the research and reports that securities or industry analysts publish about us or our business. We do not control these analysts. As we are a publicly reporting company in the United States, we may attract research coverage and the analysts who publish information about our common stock will have had relatively little experience with us or our industry, which could affect their ability to accurately forecast our results and could make it more likely that we fail to meet their estimates. In the event we obtain analyst coverage, if any of the analysts who cover us provide inaccurate or unfavorable research or issue an adverse opinion regarding our stock price, our stock price could decline. If one or more of these analysts cease coverage of us or fail to publish reports covering us regularly, we could lose visibility in the market, which in turn could cause our stock price or trading volume to decline and result in the loss of all or a part of your investment in our Company.

36

Table of Contents

**Risks Related to our Business and Operations**

***We have a limited operating history, have not yet manufactured or sold a significant number of vehicles to customers, and have limited experience in high-volume manufacturing of commercial EVs, all of which makes evaluating our business and future prospects difficult for potential investors.***

We were originally formed on April 20, 2010 and went public in November 2021. We have a limited operating history in the automobile industry and have generated a small amount of revenue to date. Vehicle deliveries of certain models started only in December 2023. We have limited experience as an organization in high-volume manufacturing of electric commercial vehicles. In addition, as a result of our limited operating history, as well as the limited financing we have received, our management concluded that there was substantial doubt about our ability to continue as a going concern.

As we transition from research and development activities to commercial production and sales, it is difficult, if not impossible, to forecast our future results, and we have limited insight into trends that may emerge and affect our business. The estimated costs and timelines that we have developed to reach full-scale commercial production are subject to inherent risks and uncertainties involved in the transition from a start-up company focused on research and development activities to the large-scale manufacture and sale of vehicles. These are complex processes that may be subject to delays, cost overruns and other unforeseen issues. For example, the tooling required within our facilities may be more expensive to produce than predicted, or have a shorter lifespan, resulting in additional replacement and maintenance costs, which could have a material adverse impact on our results of operations and financial condition.

We cannot assure you that we or our partners will be able to develop cost-efficient manufacturing capability and processes, and reliable sources of component supplies that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully manufacture its electric commercial vehicles. You should consider our business and prospects in light of the risks and significant challenges we face as a new entrant into the EV industry, including, among other things, with respect to our ability to:

- produce safe, reliable and quality vehicles on an ongoing basis;

- build a well-recognized and respected brand;

- establish and expand our customer base;

- successfully market not just our vehicles but also the other services we intend to or may provide;

- properly price our services, including our planned financing and lease options, and successfully anticipate the take-rate and usage of such services by users;

- successfully service our vehicles after sales and maintain a good flow of spare parts and customer goodwill;

- improve and maintain our operational efficiency;

- execute and maintain a reliable, secure, high-performance and scalable technology infrastructure;

- predict our future revenues and appropriately budget for our expenses;

- attract, retain and motivate talented employees;

- anticipate trends that may emerge and affect our business;

- anticipate and adapt to changing market conditions, including technological developments and changes in competitive landscape; and

- navigate an evolving and complex regulatory environment.

Table of Contents

If we fail to adequately address any or all of these risks and challenges, our business may be materially and adversely affected.

In addition, there can be no assurance that fleet managers will embrace our products in significant numbers. Market conditions, many of which are outside of our control and subject to change, including general economic conditions, the availability and terms of financing, energy prices, regulatory requirements, existence and robustness of government incentives, competition and the pace and extent of vehicle electrification generally, will impact demand for our electric commercial vehicles, and ultimately our success.

***Potential acquisitions may disrupt our business and dilute stockholder value.***

During the third calendar quarter of 2022, we acquired a controlling interest in Bollinger Motors, Inc. We also acquired a significant part of the assets of Electric Last Mile Solutions, Inc. during the third calendar quarter of 2022. In September 2023, we acquired certain assets of Romeo Power, which included battery production lines. We will continue to identify and analyze merger or acquisition partners that are culturally similar and have experienced management and possess either significant market presence or have potential for improved profitability through financial management, economies of scale or expanded services. Acquiring related electric vehicle businesses involve various risks commonly associated with acquisitions, including, among other things:

- potential exposure to unknown or contingent liabilities of the target entity;

- exposure to potential asset quality issues of the target entity;

- difficulty and expense of integrating the operations and personnel of the target entity;

- potential disruption to our business;

- potential diversion of our management's time and attention;

- the possible loss of key employees and customers of the target entity;

- difficulty in estimating the value of the target entity; and

- potential changes in banking or tax laws or regulations that may affect the target entity.

We regularly evaluate merger and acquisition opportunities and conduct due diligence activities related to possible transactions with other businesses. As a result, merger or acquisition discussions and, in some cases, negotiations may take place and future mergers or acquisitions involving cash, debt or equity securities may occur at any time. Acquisitions typically involve the payment of a premium over book and market values, and, therefore, some dilution of our tangible book value and net income per share of common stock may occur in connection with any future transaction. Furthermore, failure to realize the expected revenue increases, cost savings, increases in geographic or product presence, and/or other projected benefits from an acquisition could have a material adverse effect on our financial condition and results of operations.

Table of Contents

***We may be unable to develop and manufacture commercial EVs of sufficient quality to appeal to customers on the schedule they expect or may be unable to do so on a large scale.***

Our business depends in large part on our ability to manufacture, market and sell or lease our EVs. Our ability to effectively compete in the EV market will depend in large part on our entry into the EV market through the offering of competitively priced vehicles to a wider variety of potential buyers.

Our ability to continue to develop and manufacture our vehicles will be subject to risks, including with respect to:

- our ability to secure necessary funding;

- our ability to accurately manufacture vehicles within specified design tolerances;

- compliance with environmental, safety, and similar regulations;

- securing necessary components, services, or licenses on acceptable terms and in a timely manner;

- delays in delivering final component designs to our suppliers;

- our ability to attract, recruit, hire, retain and train skilled employees;

- quality controls that prove to be ineffective or inefficient;

- delays or disruptions in our supply chain including raw material supplies;

- our ability to maintain arrangements on reasonable terms with our manufacturing partners and suppliers, engineering service providers, delivery partners, and after sales service providers; and

- other delays, backlog in manufacturing and research and development of new models, and cost overruns.

Our ability to develop and manufacture commercial EVs of sufficient quality to appeal to customers on schedule and on a large scale is unproven, and the business plan is still evolving. We may be required to introduce new vehicle models and enhanced versions of existing models. To date, we have limited experience, as a company, designing, testing, manufacturing, marketing and selling or leasing our electric vehicles and therefore cannot assure you that we will be able to meet customer expectations. Any failure to develop such manufacturing processes and capabilities within our projected costs and timelines would have a material adverse effect on our business, prospects, operating results and financial condition. We, our third party partners and our suppliers are subject to substantial regulation and unfavorable changes to, or failure by us, our third party partners or our suppliers to comply with, these regulations could substantially harm our business and operating results.

Our EVs, and motor vehicles in general, as well as our third-party partners and our suppliers are or will be subject to substantial regulation under federal, state and local, and foreign laws. We continue to evaluate requirements for licenses, approvals, certificates and governmental authorizations necessary to manufacture, deploy or service our vehicles in the jurisdictions in which it plans to operate and intends to take such actions necessary to comply. We may experience difficulties in obtaining or complying with various licenses, approvals, certifications and other governmental authorizations necessary to manufacture, deploy or service our vehicles in any of these jurisdictions. If we, our third-party partners or our suppliers are unable to obtain or comply with any of the licenses, approvals, certifications or other governmental authorizations necessary to carry out our operations in the jurisdictions in which they currently operate, or those jurisdictions in which they plan to operate in the future, our business, prospects, financial condition and operating results could be materially adversely affected. We expect to incur significant costs in complying with these regulations. Regulations related to the electric and alternative energy vehicle industry are evolving and we face risks associated with changes to these regulations, including but not limited to increased support for other alternative fuel systems, which could have an impact on the acceptance of our vehicles.

To the extent the laws change, our vehicles may not comply with applicable federal, state and local, or foreign laws, which would have an adverse effect on our business. Compliance with changing regulations could be burdensome, time consuming and expensive. To the extent compliance with new regulations is cost prohibitive, our business, prospects, financial condition, and operating results would be adversely affected.

Table of Contents

***We are dependent on certain principal suppliers and vendors in China for a significant portion of our vehicle components, and the inability of these vendors to deliver necessary components of our products according to our schedule and at prices, quality levels and volumes acceptable to us, or our inability to efficiently manage these components, could have a material adverse effect on our financial condition and operating results.***

We source a significant portion of our vehicle components from China and then assemble these parts into our products in the United States. We rely on certain principal vendors who help us source and supply parts used in our vehicles from various suppliers in China. We currently maintain long-term contracts with some of our key suppliers and vendors but not all of our suppliers and vendors. While we believe our contract management processes are strong, we nevertheless could experience difficulties.

If our principal vendors decide to terminate their partnership with us, experience sourcing failures, or otherwise become unable to provide us with the necessary components in sufficient quantities, in a timely manner, and on acceptable terms, we may have to delay the production and sale of our products or find an alternative vendor. Any significant unanticipated demand would require us to procure additional components in a short amount of time. While we believe that we will be able to secure additional or alternate sources of supply for some of our components in a relatively short time frame, there is no assurance that we will be able to do so or develop our own replacements for certain highly customized components of our products.

If we encounter unexpected difficulties with our principal vendors, and if we are unable to fill these needs from other vendors in a timely manner, we could experience production delays and potential loss of access to important technology and parts for producing, servicing and supporting our vehicles. The loss of any vendors or the disruption in the supply of components from these vendors could lead to design changes and delays in product deliveries to our customers, which could hurt our relationships with our customers and result in negative publicity, damage to our brand and a material and adverse effect on our business, prospects, financial condition and operating results.

***Our vehicles will make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame, and, if such results occur, bodily injury or death could result and could subject us to lawsuit, product recalls, or redesign efforts.***

The battery packs within our vehicles make use of lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the battery pack is designed to contain any single cell's release of energy without spreading to neighboring cells, a field or testing failure of battery packs in our vehicles could occur, which could result in bodily injury or death and could subject us to lawsuit, product recalls, or redesign efforts, all of which would be time consuming and expensive and could harm our brand image. Also, negative public perceptions regarding the suitability of lithium-ion cells for automotive applications, the social and environmental impacts of cobalt mining, or any future incident involving lithium-ion cells, such as a vehicle or other fire, could seriously harm our business and reputation.

***The efficiency of a battery's use when driving electric vehicles will decline slowly over time, which may negatively influence potential customers' decisions whether to purchase an electric vehicle***

The cells used in EV battery modules degrade slowly over time, influenced primarily by the age of the cells and the total energy throughput over the life of the EV. This cell degradation results in a corresponding reduction in the vehicle's range. Although common to all EVs, cell degradation, and the related decrease in range, may negatively influence potential customer's EV purchase decisions.

40

Table of Contents

***We are substantially reliant on our relationships with a limited number of OEMs, suppliers and service providers for the parts and components in our vehicles, as well as for the manufacture of our vehicles. If any of these OEMs, suppliers or service partners choose to not do business with us, then we would have significant difficulty in procuring and producing our vehicles and our business prospects would be significantly harmed.***

Collaboration with third parties is subject to risks with respect to operations that are outside our control. We could experience delays to the extent our current or future partners do not continue doing business with us or fail to meet agreed upon timelines, experience capacity constraints or otherwise are unable to deliver components or manufacture vehicles as expected. There is a risk of potential disputes with partners, and we could be affected by adverse publicity related to our partners whether or not such publicity is related to their collaboration with us. If for any reason, an OEM, supplier, or service provider becomes unable to continue their current commitments or does not perform under current agreements, we may seek alternative arrangements and there is a risk that we would not be successful in obtaining the necessary components for our vehicles. In addition, although we intend to be involved in material decisions in the supply chain process, given that we also rely on our partners to meet our quality standards, there can be no assurance that we will be able to maintain high quality standards.

We may in the future enter into strategic alliances, including joint ventures or minority equity investments, with various third parties to further our business purpose. These alliances could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the third party, and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business.

***Because we are currently dependent upon a limited number of dealers/customers, the loss of a significant dealer could adversely affect our operating results.***

We rely on a limited number of contractual commercial dealers that currently account for a substantial portion of our income. For the year ended September 30, 2023 one customer represented 100% of total revenue. For the year ended September 30, 2024 one main customer represented 64% of total revenue. Our operating projections are contingent on our performance under our commercial contracts. We expect a substantial portion of our cash receipts in the near future to be from a limited number of commercial dealers and, as a result, will be subject to any risks specific to those entities and the and markets in which they operate.

***We rely on complex machinery for our operations and production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

We rely heavily on complex machinery for our operations and our production involves a significant degree of uncertainty and risk in terms of operational performance and costs. Our manufacturing plants consist of large-scale machinery combining many components. The manufacturing plant components are likely to suffer unexpected malfunctions from time to time and will depend on repairs and spare parts to resume operations, which may not be available when needed. Unexpected malfunctions of the manufacturing plant components may significantly affect the intended operational efficiency. Operational performance and costs can be difficult to predict and are often influenced by factors outside of our control, such as, but not limited to, scarcity of natural resources, environmental hazards and remediation, costs associated with decommissioning of machines, labor disputes and strikes, damages or defects in electronic systems, industrial accidents, fire, and seismic activity and natural disasters. Should operational risks materialize, they may result in the personal injury to or death of workers, the loss of production equipment, damage to manufacturing facilities, monetary losses, delays and unanticipated fluctuations in production, environmental damage, administrative fines, increased insurance costs and potential legal liabilities, all which could have a material adverse effect on our business, results of operations, cash flows, financial condition or prospects.

Table of Contents

***We rely on the development and functionality of complex software and technology systems, in coordination with vendors and suppliers, in order to produce our EVs. There can be no assurance such systems will be successfully developed or will be reliable.***

Our vehicles use a substantial amount of third-party and in-house software codes and complex hardware to operate. The development of such advanced technologies is inherently complex and requires coordination with our vendors and suppliers in order to produce our EVs. Defects and errors may be revealed over time and our control over the performance of third-party services and systems may be limited. Thus, our usage of a defective software or technology system may harm our competitive position.

We are also relying on third-party suppliers to develop several emerging technologies for use in our products. These technologies are not today, and may not ever be, commercially viable. There can be no assurances that our suppliers will be able to meet the technological requirements, production timing, and volume requirements to support our business plan. In addition, the technology may not comply with the cost, performance useful life and warranty characteristics we anticipate in our business plan. As a result, our business plan could be significantly impacted, and we may incur significant liabilities under warranty claims which could adversely affect our business, prospects, and results of operations.

***We may be negatively impacted by any early obsolescence of our manufacturing equipment.***

We depreciate the cost of our manufacturing equipment over their expected useful lives. However, product cycles or manufacturing technology may change periodically, and we may decide to update our products or manufacturing processes more quickly than expected. Moreover, improvements in engineering and manufacturing expertise and efficiency may result in our ability to manufacture our products using less of our currently installed equipment. Alternatively, as we ramp and mature the production of our products to higher levels, we may discontinue the use of already installed equipment in favor of different or additional equipment. The useful life of any equipment that would be retired early as a result would be shortened, causing the depreciation on such equipment to be accelerated, and our results of operations may be harmed.

***We may be negatively impacted by any early obsolescence of our vehicles.***

As EV technologies change, we plan to upgrade or adapt our vehicles. However, our products may become obsolete or our research and development efforts may not be sufficient to adapt to changes in or to create the necessary technology. Thus, our potential inability to adapt and develop the necessary technology may harm our business and competitive position.

***We are dependent on our suppliers, a significant number of which are single or limited source suppliers, and the inability of these suppliers to deliver necessary components of our vehicles in a timely manner and at prices and volumes acceptable to us could have a material adverse effect on our business, prospects and operating results.***

Many of the components used in our vehicles are purchased by us from a single source. While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are acceptable to us. In addition, we could experience delays if our suppliers do not meet agreed upon timelines or experience capacity constraints.

Any disruption in the supply of components, whether or not from a single source supplier, could temporarily disrupt production of our vehicles until an alternative supplier is able to supply the required material. Changes in business conditions, unforeseen circumstances, governmental changes, and other factors beyond our control or which we do not presently anticipate, could also affect our suppliers' ability to deliver components to us on a timely basis. Any of the foregoing could materially and adversely affect our results of operations, financial condition and prospects.

Table of Contents

***If any of our suppliers become economically distressed or go bankrupt, we may be required to provide substantial financial support or take other measures to ensure supplies of components or materials, which could increase our costs, affect our liquidity or cause production disruptions.***

If our product or service suppliers experience substantial financial difficulties, cease operations, or otherwise face business disruptions, we may be required to provide financial support to ensure supply continuity or would have to take other measures to ensure components and materials remain available. Any disruption could affect our ability to deliver vehicles and could increase our costs and negatively affect our liquidity and financial performance.

***Our business model has yet to be fully tested and any failure to successfully commercialize our strategic plans would have an adverse effect on our operating results and business, harm our reputation and could result in substantial liabilities that exceed our resources.***

Investors should be aware of the difficulties normally encountered by a new enterprise, many of which are beyond our control, including substantial risks and expenses while establishing or entering new markets, setting up operations and undertaking marketing activities. The likelihood of our success must be considered in light of these risks, expenses, complications, delays, and the competitive environment in which we operate. There is, therefore, nothing at this time upon which to base an assumption that our business model will prove successful, and we may not be able to generate significant revenue, raise additional capital or operate profitably. We will continue to encounter risks and difficulties frequently experienced by early commercial stage companies, including scaling up our infrastructure and headcount, and may encounter unforeseen expenses, difficulties or delays in connection with our growth. In addition, as a result of the capital-intensive nature of our business, we can be expected to continue to sustain substantial operating expenses without generating sufficient revenues to cover expenditure. Any investment in our company is therefore highly speculative and could result in the loss of your entire investment.

***We may not be able to accurately estimate the supply and demand for our vehicles, which could result in a variety of inefficiencies in our business and hinder our ability to generate revenue. If we fail to accurately predict our manufacturing requirements, we could incur additional costs or experience delays.***

It is difficult to predict our future revenues and appropriate budget for our expenses, and we may have limited insight into trends that may emerge and affect our business. We will be required to provide forecasts of our demand to our suppliers several months prior to the scheduled delivery of products to our prospective customers. Currently, there is no historical basis for making judgments on the demand for our vehicles or our ability to develop, manufacture, and deliver vehicles, or our profitability in the future. If we overestimate our requirements, our suppliers may have excess inventory, which indirectly would increase our costs. If we underestimate our requirements, our suppliers may have inadequate inventory, which could interrupt the manufacturing of our products and result in delays in shipments and revenues. In addition, lead times for materials and components that our suppliers order may vary significantly and depend on factors such as the specific supplier, contract terms and demand for each component at a given time. If we fail to order sufficient quantities of product components in a timely manner, the delivery of vehicles to our customers could be delayed, which would harm our business, financial condition and operating results.

***We could experience cost increases or disruptions in the supply of raw materials or other components used in our vehicles. If we are unable to establish an arrangement for the sustainable supply of batteries for our vehicles, our business would be materially and adversely harmed.***

We may be unable to adequately control the costs associated with our operations. We expect to incur significant costs related to procuring materials required to manufacture and assemble our vehicles. The prices for these materials fluctuate depending on factors beyond our control. Our business also depends on the continued supply of battery cells for our vehicles. We are exposed to multiple risks relating to availability and global pricing of lithium-ion battery cells.

Table of Contents

Furthermore, currency fluctuations, tariffs or shortages in petroleum and other economic or political conditions may result in significant increases in freight charges and material costs. Substantial increases in the prices for our materials or components would increase our operating costs and could reduce our margins. In addition, a growth in popularity of electric vehicles without a significant expansion in battery cell production capacity could result in shortages, which would result in increased costs in materials to us or impact our prospects.

### If our vehicles fail to perform as expected, our ability to develop, market, and sell or lease our electric vehicles could be harmed.

Our vehicles may contain defects in design and manufacture that may cause them not to perform as expected or that may require repair, recalls, and design changes. Our vehicles use a substantial amount of software code to operate, and software products are inherently complex and often contain defects and errors. We have a limited frame of reference by which to evaluate the long-term performance of our systems and vehicles. There can be no assurance that we will be able to detect and fix any defects in the vehicles prior to their sale to consumers. If any of our vehicles fail to perform as expected, we may need to delay deliveries and/or initiate product recalls, and/or compensate damages to our dealers or customers, possibly exceeding the revenues received upon sales, - which could adversely affect our brand in our target markets and could adversely affect our business, prospects, and results of operations.

### We have minimal experience servicing and repairing our vehicles. The inability to adequately service vehicles may adversely affect our business.

We have minimal experience servicing and repairing our vehicles. Servicing EVs is different than servicing vehicles with internal combustion engines and requires specialized skills, including high voltage training and servicing techniques. There can be no assurance that such service arrangements will adequately address the service requirements of our customers to their satisfaction, or that Mullen and our servicing partners will have sufficient resources, experience, or inventory to meet these service requirements in a timely manner as the volume of EVs we deliver increases.

In addition, a number of states currently impose limitations on the ability of manufacturers to directly service vehicles. The application of these state laws to our operations could hinder or impede our ability to provide services for our vehicles from a location in every state. As a result, if we are unable to roll out and establish a widespread service network that complies with applicable laws, customer satisfaction could be adversely affected, which in turn could materially and adversely affect our reputation and business.

### Our services may not be generally accepted by our users. If we are unable to provide quality customer service, our business and reputation may be materially and adversely affected.

Our servicing will primarily be carried out through third parties certified by us. Although such servicing partners may have experience in servicing other vehicles, they will initially have limited experience in servicing our vehicles. There can be no assurance that our service arrangements will adequately address the service requirements of our customers to their satisfaction, or that us or any of our proposed service partners will have sufficient resources to meet these service requirements in a timely manner as the volume of vehicles we deliver increases.

### The automotive market is highly competitive, and we may not be successful in competing in this industry.

Both the automobile industry generally, and the electric vehicle segment, in particular, are highly competitive, and we are competing for sales with both internal combustion engine ("**ICE**") vehicles and other EVs. Many of our current and potential competitors have significantly greater financial, technical, manufacturing, marketing and other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products, including their electric vehicles. We expect competition for electric vehicles to intensify due to increased demand for alternative fuel vehicles, continuing globalization, and consolidation in the worldwide automotive industry. Factors affecting competition include product quality and features, innovation and development time, pricing, reliability, safety, fuel economy, customer service, and financing terms. Increased competition may lead to lower vehicle unit sales and increased inventory, which may result in downward price pressure and adversely affect our business, financial condition, operating results, and prospects.

Table of Contents

***The automotive industry and our technology are rapidly evolving and may be subject to unforeseen changes. Developments in alternative technologies, including but not limited to hydrogen, may adversely affect the demand for our electric vehicles.***

We may be unable to keep up with changes in EV technology or alternatives to electricity as a fuel source and, as a result, our competitiveness may suffer. Developments in alternative technologies, such as advanced diesel, ethanol, fuel cells, or compressed natural gas, or improvements in the fuel economy of the ICE, may materially and adversely affect our business and prospects in ways we do not currently anticipate. Any failure by us to successfully react to changes in existing technologies could materially harm our competitive position and growth prospects.

***Our future growth depends on the demand for and upon the dealers' end customer, fleet managers' willingness to adopt our electric vehicles.***

Our future growth is dependent on the demand for, and upon fleet managers' willingness to adopt, electric vehicles. Moreover, even if electric vehicles become more mainstream, our growth is dependent on fleet managers choosing us over other EV manufacturers. Demand for electric vehicles may be affected by factors directly impacting the cost of purchasing and operating automobiles such as sales and financing incentives, prices of raw materials and parts and components, cost of fuel and governmental regulations, including tariffs, import regulation and other taxes. Volatility in demand may lead to lower vehicle unit sales, which may result in downward price pressure and adversely affect our business, prospects, financial condition, and operating results.

In addition, the demand for our vehicles and services will highly depend upon the adoption by consumers of new energy vehicles in general and electric vehicles in particular. The market for alternative fuels, hybrid and EVs is relatively new and is characterized by rapidly changing technologies, price competition, numerous competitors, evolving government regulation, and industry standards and uncertain customer demands and behaviors.

Other factors that may influence the adoption of alternative fuel vehicles, and specifically electric vehicles, include:

- perceptions about EV quality, safety, design, performance and cost, especially if adverse events or accidents occur that are linked to the quality or safety of electric vehicles, whether or not such vehicles are produced by us or other manufacturers;

- perceptions about the limited range over which EVs may be driven on a single battery charge;

- concerns over access to charging and charging stations, as well as the time required to charge EVs;

- perceptions about the limited range over which EVs may be driven on a single battery charge;

- fuel prices, including volatility in the cost of fossil fuels;

- competition, including from other types of alternative fuel, including hydrogen or compressed natural gas (CNG) vehicles, plug-in hybrid EVs and high fuel-economy internal combustion engine vehicles;

- the availability of new energy vehicles, including plug-in hybrid EVs;

- concerns over access to charging and charging stations, as well as the time required to charge EVs;

- electric grid capacity and reliability;

- government regulations, ESG restrictions, and economic incentives;

- the environmental consciousness of consumers, and their adoption of EVs;

- perceptions of overall EV vehicle safety, such as those relating to battery combustibility; and

- perceptions about and the actual cost of alternative fuel.

Any of the factors described above may cause current or potential customers not to purchase EVs in general, and our EVs in particular. If the market for EVs does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition and operating results will be affected.

45

Table of Contents

***Changes in tax laws may materially adversely affect our business, prospects, financial condition and operating results.***

New income, sales, use or other tax laws, statutes, rules, regulations or ordinances could be enacted at any time, and failure to appropriately comply with such tax laws, statutes, rules and regulations could result in sanctions by regulatory agencies, civil money penalties and/or reputational damage, which could adversely affect our business, prospects, financial condition and operating results. Future guidance from the Internal Revenue Service (the "IRS") with respect to the Tax Cuts and Jobs Act (the "Tax Act") may affect us, and certain aspects of the Tax Act could be repealed or modified in future legislation. The CARES Act has already modified certain provisions of the Tax Act. In addition, it is uncertain if and to what extent various states will conform to the Tax Act, the CARES Act or any newly enacted federal tax legislation. Changes in corporate tax rates, the realization of net deferred tax assets relating to our operations and the deductibility of expenses under the Tax Act or future reform legislation could have a material impact on the value of our deferred tax assets, could result in significant one-time charges, and could increase our future U.S. tax expense.

***The unavailability, reduction or elimination of government and economic incentives could have a material adverse effect on our business, prospects, financial condition and operating results.***

The U.S. federal government and some state and local governments provide incentives to end users and owners of EVs in the form of rebates, tax credits, low-cost funding and other financial incentives, which could, in the future, be reduced or eliminated, including as a result of legislative or regulatory action. The EV market relies on these governmental rebates, tax credits and other financial incentives to significantly lower the effective price of EVs and to otherwise financially support these industries. However, these incentives may expire on a particular date, end when the allocated funding is exhausted, or may be reduced or terminated as a matter of regulatory or legislative policy. The results of the 2024 Presidential and Congressional elections and resulting legislative or regulatory actions, if pursued, could impact the availability or value of these incentives or reduce access to such low-cost funding.

Any reduction in rebates, tax credits or other financial incentives available to EVs or EV charging stations, could negatively affect the EV market and adversely impact our business operations and expansion potential. In addition, there is no assurance we will have the necessary tax attributes to utilize any such credits that are available and may not be able to monetize such credits on favorable terms.

Any reduction, elimination, or discriminatory application of government subsidies and economic incentives because of policy changes, or the reduced need for such subsidies and incentives due to the perceived success of the electric vehicle or for other reasons, may result in the diminished competitiveness of the alternative fuel and electric vehicle industry generally or our electric vehicles in particular. This could materially and adversely affect the growth of the alternative fuel automobile markets and our business, prospects, financial condition and operating results.

While certain tax credits and other incentives for alternative energy production, alternative fuel and electric vehicles have been available in the past, there is no guarantee these programs will be available in the future. If current tax incentives are not available in the future, our financial position could be harmed.

In addition, we may apply for federal and state grants, loans and tax incentives under government programs designed to stimulate the economy and support the production of alternative fuel and electric vehicles and related technologies, and our ability to obtain funds or incentives from government sources is subject to the availability of funds under applicable government programs and approval of our applications to participate in such programs. The application process for these funds and other incentives will likely be highly competitive. We cannot assure you that we will be successful in obtaining any of these additional grants, loans and other incentives. If we are not successful in obtaining any of these additional incentives and we are unable to find alternative sources of funding to meet our planned capital needs, our business and prospects could be materially adversely affected.

Table of Contents

***If we fail to manage our future growth effectively, we may not be able to develop, manufacture, market and sell or lease our vehicles successfully.***

We intend to expand our operations significantly, which will require hiring, retaining and training new personnel, controlling expenses, establishing facilities, and implementing administrative infrastructure, systems and processes. In addition, because our electric vehicles are based on a different technology platform than traditional ICE vehicles, individuals with sufficient training in electric vehicles may not be available to be hired, and we will need to expend significant time and expense training employees we hire. We also require sufficient talent in additional areas such as software development. Furthermore, as we are a relatively young company, our ability to train and integrate new employees into our operations may not meet the growing demands of our business, which may affect our ability to grow. Any failure to effectively manage our growth could materially and adversely affect our business, prospects, operating results and financial condition.

For example, to manage the expected growth of our operations and increasing complexity, we will need to improve our operational and financial systems, procedures, and controls and continue to increase systems automation to reduce reliance on manual operations. Any inability to do so will affect our billing and reporting. Our current and planned systems, procedures and controls may not be adequate to support our complex arrangements and the rules governing revenue and expense recognition for our future operations and expected growth. Delays or problems associated with any improvement or expansion of our operational and financial systems and controls could adversely affect our relationships with our customers, cause harm to our reputation and brand and could also result in errors in our financial and other reporting.

***Insufficient warranty reserves to cover future warranty claims could materially adversely affect our business, prospects, financial condition and operating results.***

We will need to maintain warranty reserves to cover warranty-related claims. If our warranty reserves are inadequate to cover future warranty claims on our vehicles, our business, prospects, financial condition and operating results could be materially and adversely affected. We may become subject to significant and unexpected warranty expenses. There can be no assurances that then-existing warranty reserves will be sufficient to cover all claims.

***We may not succeed in establishing, maintaining and strengthening the Mullen brand, which would materially and adversely affect customer acceptance of our vehicles and components and our business, revenues and prospects.***

Once our vehicles are in high volume production, our business and prospects will heavily depend on our ability to develop, maintain and strengthen the Mullen brand. If we are not able to establish, maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Our ability to develop, maintain and strengthen the Mullen brand will depend heavily on the success of our marketing efforts. The automobile industry is intensely competitive, and we may not be successful in building, maintaining and strengthening our brand. Many of our current and potential competitors, particularly automobile manufacturers headquartered in the United States, Japan, the European Union and China, have greater name recognition, broader customer relationships and substantially greater marketing resources than we do. If we do not develop and maintain a strong brand, our business, prospects, financial condition and operating results will be materially and adversely impacted.

47

Table of Contents

***Doing business internationally creates operational and financial risks for our business.***

Our business plan includes expansion into other international markets. Conducting and launching operations on an international scale requires close coordination of activities across multiple jurisdictions and time zones and consumes significant management resources. If we fail to coordinate and manage these activities effectively, our business, financial condition or results of operations could be adversely affected. International sales entail a variety of risks, including currency exchange fluctuations, challenges in staffing and managing foreign operations, tariffs and other trade barriers, unexpected changes in legislative or regulatory requirements of foreign countries into which we sell our products and services, difficulties in obtaining export licenses or in overcoming other trade barriers, laws and business practices favoring local companies, political and economic instability, difficulties protecting or procuring intellectual property rights, and restrictions resulting in delivery delays and significant taxes or other burdens of complying with a variety of foreign laws.

***We are highly dependent on the services of David Michery, our Chief Executive Officer.***

We are highly dependent on the services of David Michery, our founder and Chief Executive Officer. Mr. Michery is the source of many, if not most, of the ideas and execution driving us. If Mr. Michery were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

***We are exposed to risks relating to relationships with related parties.***

Prior to its spinoff as a separate entity and the closing of the Merger on November 5, 2021, the Company operated as a division of Mullen Technologies, Inc. ("MTI"), an entity in which the Company's CEO has a controlling financial interest and of which he is also CEO and Chairman. The Company and MTI entered into a Transaction Services Agreement pursuant to which the Company incurred approximately $1.2 million and $0.9 million of disbursements on behalf of MTI during the years ended September 30, 2022 and 2023, respectively. On January 16, 2024, the Company terminated the Transition Services Agreement between the Company and MTI and received a cash payment in full settlement of all outstanding amounts (including outstanding notes receivable, advances, and related interest and penalties) of approximately $2.7 million.

Furthermore, some of the Company's executive officers and directors also hold positions at DRIVEiT, a start-up independent enterprise planning to be in the business of operating electric vehicle superstores. At this time, it is planned for the Company to provide its portfolio of new commercial EVs to DRIVEiT as part of their offerings. David Michery, the Company's Chairman Chief Executive Officer, President and Chairman, is also Chairman of the Board of Directors of DRIVEiT. Jonathan New, Chief Financial Officer, is also Chief Financial Officer of DRIVEiT. Kent Puckett, a director and chair of audit committee of Mullen, is also a director of DRIVEiT, and Ignacio Novoa and Mark Betor serve as directors for both companies. Makayla Brown is the Director of Operations for Mullen and serves as a director of DRIVEiT. Related party transactions that present difficult conflicts of interest, could result in disadvantages to Mullen, and may impair investor confidence, which could materially and adversely affect us. Related party transactions could also cause us to become materially dependent on related parties in the ongoing conduct of our business, and related parties may be motivated by personal interests to pursue courses of action that are not necessarily in the best interests of our company and our stockholders.

In all related party transactions, there is a risk that even if the Company personnel negotiating on behalf of the Company with the related party are striving to ensure that the terms of the transaction are arms-length, the related party's influence may be such that the transaction terms could be viewed as favorable to that related party. Plus, the related party transaction could be perceived as a potential conflict of interest since the transaction may benefit the related party. Such conflicts could cause an individual in our management to seek to advance his or her economic interests or the economic interests of certain related parties above ours. Further, the appearance of conflicts of interest created by related party transactions could impair the confidence of our investors.

Table of Contents

***Our business may be adversely affected by labor and union activities.***

We may directly and indirectly depend upon other companies with unionized work forces, such as parts suppliers and trucking and freight companies, and work stoppages or strikes organized by such unions could have a material adverse impact on our business, financial condition or operating results.

***Our business could be adversely impacted by global or regional catastrophic events.***

Our business could be materially adversely affected by terrorist acts, widespread outbreaks of infectious diseases, government responses emplaced to limit the impact of infectious diseases, or the outbreak or escalation of wars including, but not limited to, the invasion of Ukraine by the Russian Federation and the Israel-Hamas war. Such events in the geographic regions in which we do business, including escalations of political tensions and military conflicts in the U.S., Europe, Asia, and any governmental sanctions enacted in reaction thereto, could result in a global energy crisis, economic inflation, supply-chain disruptions, or the confiscation or destruction of our facilities; all and any of these outcomes could have material, adverse impacts on our results of operations, financial condition, and cash flows.

***Our business could be adversely impacted by the cancellation of our contracts involving the sale of commercial vehicles.***

We are a party to some dealer contracts that allow the purchasers of our vehicles to take actions that could negatively impact our business. One such contract grants the dealer the ability to return unsold inventory that is over a year old and another such contract grants the dealer the right to force Mullen to repurchase any inventory held by the dealer, in the event that the dealer agreement is terminated by either Mullen or the dealer. Both of these provisions may impact our ability to recognize payments received under the contract as revenue. If the contract is terminated by the dealer under any of our other dealer contracts involving the sale of vehicles, we may, at our discretion elect to repurchase our vehicles held as inventory by the dealer but are under no obligation to do so.

***Failure of cybersecurity and privacy concerns could subject us to lawsuits and penalties, damage our reputation and brand, and harm our business and results of operations.***

We face significant challenges with respect to cybersecurity and privacy, including the storage, transmission and sharing of personal information and confidential information. We transmit and store confidential and private information of our customers, such as personal information, including names, accounts, user IDs and passwords, and payment or transaction related information.

We have adopted cybersecurity policies and deployed measures to implement these policies, including, among others, encryption technologies, and plans to continue to deploy additional measures as we grow. However, advances in technology, an increased level of sophistication of attacks and threats, diversity of our products and services, an increased level of expertise of hackers, failures of our policies and procedures, human error, or other factors can still result in a cybersecurity incident, which could lead to interruptions to our business operations or the unauthorized access, use, disclosure, disruption, modification or destruction, of our data or systems. Cybersecurity threat actors also may attempt to exploit vulnerabilities in software and cause disruption to our business or that of our third party business partners who support our business. Like many other companies, we detect attempts by threat actors to gain access to our systems and networks on a frequent basis, and the frequency of such attempts could increase in the future. We have experienced, and from time to time in the future may experience, a failure or interruption that results in the unavailability of certain information systems. Protecting against cybersecurity threats and experiencing any cybersecurity incidents may result in substantial harm to our business strategy, results of operations and financial condition, including major disruptions to business operations, loss of intellectual property, release of confidential information, malicious alteration or corruption of data or systems, costs related to remediation or the payment of ransom, and litigation including individual claims or consumer class actions, commercial litigation, administrative, and civil or criminal investigations or actions, regulatory intervention and sanctions or fines, investigation and remediation costs and possible prolonged negative publicity. In addition, complying with various laws and regulations could cause us to incur substantial costs or require us to change our business practices, including our data practices, in a manner adverse to our business.

49

Table of Contents

In addition, we may need to comply with increasingly complex and rigorous regulatory laws, regulations, and standards to protect business and personal data in the United States, and as we expand our business, Europe and elsewhere, such as the European Union's General Data Protection Regulation (" **GDPR**") and the State of California's California Consumer Privacy Act of 2018 ("
**CCPA**"), as well as other U.S. state comprehensive privacy laws. These privacy laws impose additional obligations on companies regarding the handling of personal data and provide certain individual privacy rights to persons whose data is stored. Compliance with existing, proposed and recently enacted laws and regulations can be costly; any failure to comply with these regulatory standards could subject us to legal and reputational risks.

Compliance with any additional laws and regulations could be expensive and may place restrictions on the conduct of our business and the manner in which we interact with our customers. Any failure to comply with applicable laws and regulations, failure to maintain our technology resources, manage new technologies such as generative AI tools, and misuse of or failure to secure personal information could also result in violation of laws and regulations, individual claims or consumer class actions, commercial litigation, investigations or proceedings against us by governmental entities or others, and damage to our reputation and credibility, and could have a negative impact on revenues and profits.

Significant capital and other resources may be required to protect against and address cybersecurity threats and to comply with our privacy policies or privacy-related legal obligations. The resources required may increase over time. Any failure or perceived failure by us to prevent cybersecurity incidents or to comply with privacy policies or privacy-related legal obligations, or any compromise of security that results in the unauthorized release or transfer of personal information or other customer data, could cause our customers to lose trust in us and could expose us to legal claims. Any perception by the public that online transactions or the privacy of user information are becoming increasingly unsafe or vulnerable to attacks could inhibit the growth of online retail and other online services generally, which may reduce the number of orders we receive.

***We may need to defend ourselves against patent or trademark infringement claims, and we may not be able to prevent others from unauthorized use of our intellectual property, which may be time-consuming and would cause us to incur substantial costs and harm our business and competitive position.***

Companies, organizations, or individuals, including our competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with our ability to make, use, develop, sell, lease or market our vehicles or components, which could make it more difficult for us to operate our business. From time to time, we may receive communications from holders of patents or trademarks regarding their proprietary rights. Companies holding patents or other intellectual property rights may bring suits alleging infringement of such rights or otherwise assert their rights and urge us to take licenses. Our applications and uses of trademarks relating to our design, software or artificial intelligence technologies could be found to infringe upon existing trademark ownership and rights. In addition, if we are determined to have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:

- cease selling or leasing, incorporating certain components into, or using vehicles or offering goods or services that incorporate or use the challenged intellectual property;

- pay substantial damages;

- seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms, or at all;

- redesign our vehicles or other goods or services; or

- establish and maintain alternative branding for our products and services.

In the event of a successful claim of infringement against us and our failure or inability to obtain a license to the infringed technology or other intellectual property right, our business, prospects, operating results and financial condition could be materially and adversely affected. In addition, any litigation or claims, whether or not valid, could result in substantial costs, negative publicity and diversion of resources and management attention.

Table of Contents

Further, we may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position. We rely or will rely on a combination of patents, trade secrets (including know-how), employee and third-party nondisclosure agreements, copyrights, trademarks, intellectual property licenses, and other contractual rights to establish and protect our rights in our technology. Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Monitoring unauthorized use of our intellectual property is difficult and costly, and the steps we have taken or will take may not prevent misappropriation. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

Patent, trademark, and trade secret laws vary significantly throughout the world. A number of foreign countries do not protect intellectual property rights to the same extent as do the laws of the United States. Therefore, our intellectual property rights may not be as strong or as easily enforced outside of the United States. Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of some of our competitive advantage and a decrease in our revenue which, would adversely affect our business, prospects, financial condition and operating results.

***Our future patent applications may not issue as patents, which may have a material adverse effect on our ability to prevent others from commercially exploiting products similar to ours.***

We cannot be certain that we are the first inventor of the subject matter to which we may file a particular patent application, or if we are the first party to file such a patent application. If another party has filed a patent application for the same subject matter as we have, we may not be entitled to the protection sought by the patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, we cannot be certain that the patent applications that we file will issue, or that our issued patents will afford protection against competitors with similar technology. In addition, our competitors may design around our issued patents, which may adversely affect our business, prospects, financial condition or operating results.

We cannot assure you that we will be granted patents pursuant to any applications that we may file. Even if we file patent applications and we are issued patents in accordance with them, it is still uncertain whether these patents will be contested, circumvented or invalidated in the future. In addition, the rights granted under any issued patents may not provide us with meaningful protection or competitive advantages. The claims under any patents that are issued from our patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ours. The intellectual property rights of others could also bar us from licensing and exploiting any patents that are issued from our applications. Numerous patents and pending patent applications owned by others exist in the fields in which we have developed and are developing our technology. These patents and patent applications might have priority over our patent applications and could subject our patent applications to invalidation. Finally, in addition to those who may claim priority, any of our patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable.

***We may be subject to damages resulting from claims that we or our employees have wrongfully used or disclosed alleged trade secrets of our employees' former employers.***

Many of our employees were previously employed by other automotive companies or by suppliers to automotive companies. We may be subject to claims that we or these employees have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of their former employers. Litigation may be necessary to defend against these claims. If we fail in defending such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel. A loss of key personnel or their work product could hamper or prevent our ability to commercialize our products, which could severely harm our business. Even if we are successful in defending against these claims, litigation could result in substantial costs and demand on management resources.

Table of Contents

***Our vehicles are subject to motor vehicle standards and substantial regulation, and the failure to satisfy such mandated safety standards or regulations, or unfavorable changes to such regulations, would have a material adverse effect on our business and operating results.***

All vehicles sold must comply with international, federal, and state motor vehicle safety standards. In the United States, vehicles that meet or exceed all federally mandated safety standards are certified under the federal regulations. Rigorous testing and the use of approved materials and equipment are among the requirements for achieving federal certification. Failure by us to have our future model electric vehicle satisfy motor vehicle standards would have a material adverse effect on our business and operating results.

Additionally, our electric vehicles, and the sale of motor vehicles in general, are subject to substantial regulation under international, federal, state, and local laws. We expect to incur significant costs in complying with these regulations. Regulations related to the electric vehicle industry and alternative energy are currently evolving and we face risks associated with changes to these regulations.

To the extent the laws change, our vehicles may not comply with applicable international, federal, state or local laws, which would have an adverse effect on our business. Compliance with changing regulations could be burdensome, time consuming, and expensive. To the extent compliance with new regulations is cost prohibitive, our business, prospects, financial condition and operating results would be adversely affected. Further, certain federal, state and local laws and industry standards currently regulate electrical and electronics equipment. Our vehicles may become subject to additional international, federal, state, and local regulation in the future. Compliance with these regulations could be burdensome, time consuming, and expensive.

Our vehicles are subject to environmental and safety compliance with various federal and state regulations, including regulations promulgated by the Environmental Protection Agency, the National Highway Traffic and Safety Administration and various state boards, and compliance certification is required for each new model year. The cost of these compliance activities and the delays and risks associated with obtaining approval can be substantial. The risks, delays and expenses incurred in connection with such compliance could be substantial.

Internationally, there may be laws in jurisdictions we have not yet entered or laws we are unaware of in jurisdictions we have entered that may restrict our sales or other business practices. Even for those jurisdictions we have analyzed, the laws in this area can be complex, difficult to interpret and may change over time. Continued regulatory limitations and other obstacles interfering with our ability to sell or lease vehicles directly to consumers could have a negative and material impact on our business, prospects, financial condition and results of operations.

***We may become subject to product liability claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.***

We may become subject to product liability claims, even those without merit, which could harm our business, prospects, operating results, and financial condition. The automobile industry experiences significant product liability claims and we face inherent risk of exposure to claims in the event our vehicles do not perform as expected or malfunction resulting in personal injury or death. Our risks in this area are particularly pronounced given we have limited field experience for our vehicles. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim could generate substantial negative publicity about our vehicles and business and inhibit or prevent commercialization of other future vehicle candidates, which would have material adverse effect on our brand, business, prospects and operating results. Any insurance coverage might not be sufficient to cover all potential product liability claims. Any lawsuit seeking significant monetary damages either in excess of our coverage, or outside of our coverage, may have a material adverse effect on our reputation, business and financial condition. We may not be able to secure additional product liability insurance coverage on commercially acceptable terms or at reasonable costs when needed, particularly if we do face liability for our products and are forced to make a claim under our policy.

52

Table of Contents

***We face risks and uncertainties related to litigation, regulatory actions and government investigations and inquiries.***

We are, and may in the future become, subject to various litigations, other claims, suits, regulatory actions and government investigations and inquiries. See the description of certain current legal proceedings described under "*Note 19, Contingencies and Claims*" of the notes to the Company's consolidated financial statements included elsewhere in this Report.

In addition, from time to time, we may be involved in other legal proceedings arising in the ordinary course of business, including those relating to employment matters, relationships with collaboration partners, intellectual property disputes, and other business matters. Any such claims or investigations may be time-consuming, costly, divert management resources, or otherwise have a material adverse effect on our business or result of operations.

The results of the current legal proceedings and any future legal proceedings cannot be predicted with certainty and adverse judgments or settlements in some or all of these legal proceedings may result in materially adverse monetary damages or injunctive relief against us. Any such payments or settlement arrangements in current or future litigation, could have a material adverse effect on our business, operating results or financial condition. Even if the plaintiffs' claims are not successful, current or future litigation could result in substantial costs and significantly and adversely impact our reputation and divert management's attention and resources, which could have a material adverse effect on our business, operating results and financial condition, and negatively affect the price of our common stock. In addition, such legal proceedings may make it more difficult to finance our operations.

***We are or will be subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws, and non-compliance with such laws can subject us to administrative, civil and criminal fines and penalties, collateral consequences, remedial measures and legal expenses, all of which could adversely affect our business, results of operations, financial condition and reputation.***

We are or will be subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations in various jurisdictions in which we conduct or in the future may conduct activities, including the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act 2010, and other anti-corruption laws and regulations. The FCPA and the U.K. Bribery Act 2010 prohibit us and our officers, directors, employees and business partners acting on our behalf, including agents, from corruptly offering, promising, authorizing or providing anything of value to a "foreign official" for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. The FCPA also requires companies to make and keep books, records and accounts that accurately reflect transactions and dispositions of assets and to maintain a system of adequate internal accounting controls. The U.K. Bribery Act also prohibit non-governmental "commercial" bribery and soliciting or accepting bribes. A violation of these laws or regulations could adversely affect our business, results of operations, financial condition and reputation. Our policies and procedures designed to ensure compliance with these regulations may not be sufficient and our directors, officers, employees, representatives, consultants, agents, and business partners could engage in improper conduct for which we may be held responsible.

Non-compliance with anti-corruption, anti-bribery, anti-money laundering or financial and economic sanctions laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal sanctions, collateral consequences, remedial measures and legal expenses, all of which could materially and adversely affect our business, results of operations, financial condition and reputation. In addition, changes in economic sanctions laws in the future could adversely impact our business and investments in our shares.

53

Table of Contents

***Failure to improve our operational and financial systems to support our expected growth, increasingly complex business arrangements and rules***
***governing revenue and expense recognition and any inability to do so will adversely affect our billing and reporting.***

To manage the expected growth and increasing complexity of our operations, we will need to improve our operational and financial systems, procedures, and controls and continue to increase systems automation to reduce reliance on manual operations. Any inability to do so will affect our billing and reporting. Our current and planned systems, procedures and controls may not be adequate to support our complex arrangements and the rules governing revenue and expense recognition for our future operations and expected growth. Delays or problems associated with any improvement or expansion of our operational and financial systems and controls could adversely affect our relationships with our customers, cause harm to our reputation and brand and could also result in errors in our financial and other reporting.

***Failure to build our finance infrastructure and improve our accounting systems and controls could impair our ability to comply with the***
***financial reporting and internal controls requirements for publicly traded companies.***

As a public company, we will operate in an increasingly demanding regulatory environment, which requires us to comply with the Sarbanes-Oxley Act of 2002 (the "**Sarbanes-Oxley Act**"), the regulations of the Nasdaq CM, the rules and regulations of the SEC, expanded disclosure requirements, accelerated reporting requirements and more complex accounting rules. Company responsibilities required by the Sarbanes-Oxley Act include establishing corporate oversight and adequate internal control over financial reporting and disclosure controls and procedures. Effective internal controls are necessary for us to produce reliable financial reports and are important to help prevent financial fraud. The Company must perform system and process evaluation and testing of our internal controls over financial reporting to allow management to report on the effectiveness of our internal controls over financial reporting in our Form 10-K filing. Prior to the Closing, we have never been required to test our internal controls within a specified period and, as a result, we may experience difficulty in meeting these reporting requirements in a timely manner.

We anticipate that the process of building our accounting and financial functions and infrastructure will require significant additional professional fees, internal costs and management efforts. We expect that we will need to implement a new internal system to combine and streamline the management of our financial, accounting, human resources and other functions. However, such a system would likely require us to complete many processes and procedures for the effective use of the system or to run our business using the system, which may result in substantial costs. Any disruptions or difficulties in implementing or using such a system could adversely affect our controls and harm our business. Moreover, such disruption or difficulties could result in unanticipated costs and diversion of management's attention. In addition, we may discover additional weaknesses in our system of internal financial and accounting controls and procedures that could result in a material misstatement of our financial statements. Our internal control over financial reporting will not prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud will be detected.

If we are not able to comply with the requirements of Section 404 of the Sarbanes-Oxley Act in a timely manner, or if we are unable to maintain proper and effective internal controls, we may not be able to produce timely and accurate financial statements. If we cannot provide reliable financial reports or prevent fraud, our business and results of operations could be harmed, investors could lose confidence in our reported financial information and we could be subject to sanctions or investigations by the Nasdaq CM, the SEC or other regulatory authorities.

Table of Contents

***We are subject to various environmental laws and regulations that could impose substantial costs upon us and cause delays in operating our manufacturing facilities.***

Our operations are subject to international, federal, state and local environmental laws and regulations relating to the use, handling, storage, disposal of and exposure to hazardous materials and batteries. Environmental, health and safety laws and regulations are complex and evolving. For example, regulations regarding battery storage, recycling, disposal and processing are relatively new and the current lack of industry standards may increase our cost of compliance. Moreover, we may be affected by future amendments to such laws or other new environmental, health and safety laws and regulations which may require a change in our operations, potentially resulting in a material adverse effect on our business, prospects, results of operations and financial condition. These laws can give rise to liability for administrative oversight costs, cleanup costs, property damage, bodily injury, fines and penalties. Capital and operating expenses needed to comply with environmental laws and regulations can be significant, and violations could result in substantial fines and penalties, third-party damages, suspension of production or a cessation of our operations.

Contamination at properties we currently or will own and operate, we formerly owned or operated, that are adjacent or near our properties, or to which hazardous substances were sent by us, may result in liability for us under environmental laws and regulations, including, but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, which can impose liability for the full amount of remediation-related costs without regard to fault, for the investigation and cleanup of contaminated soil and ground water, for building contamination and impacts to human health and for damages to natural resources. The costs of complying with environmental laws and regulations and any claims concerning noncompliance, or liability with respect to contamination in the future, could have a material adverse effect on our financial condition or operating results. We may face unexpected delays in obtaining the required permits and approvals in connection with our manufacturing facilities that could require significant time and financial resources and delay our ability to operate these facilities, which would adversely impact our business prospects and operating results.

***Changes in U.S. and international trade policies, including the export and import controls and laws, particularly with regard to China, may adversely impact our business and operating results.***

While our production is located in the United States, a high percentage of Mullen parts used in the production of our vehicles are sourced from China. While we believe this is the best strategic business model, it also is more subject to risks associated with international trade conflicts including between the United States and China, particularly with respect to export and import controls and laws. During his previous administration, President Donald J. Trump advocated for greater restrictions on international trade in general, which significantly increased tariffs on certain goods imported into the United States - particularly from China. President Trump also took steps toward restricting trade in certain goods. In response, China and other countries imposed similar retaliatory tariffs and other measures and such international trade conflicts continued under the Biden administration. President Trump has spoken regularly about his desire to implement additional tariffs on foreign products during his forthcoming administration.

On December 23, 2021, the Uyghur Forced Labor Prevention Act, which effectively prohibits imports of any goods made either wholly or in part in Xinjiang, was signed into law. The law went into effect on June 21, 2022. The law prohibits "the importation of goods made with forced labor" unless U.S. Customs and Border Protection determines, based on "clear and convincing evidence", that the goods in question were not produced "wholly or in part by forced labor", and submits a report to the U.S. Congress setting out its findings. While we do not currently expect that this law will directly affect our supplies, since we do not believe that our suppliers source materials from Xinjiang for the products they sell to us, other renewable energy companies' attempts to shift suppliers in response to this law, withhold release orders, or other policy developments could result in shortages, delays, and/or price increases that could disrupt our own supply chain or cause our suppliers to renegotiate existing arrangements with us or fail to perform on such obligations. Broader policy uncertainty could also reduce Chinese panel production, affecting supplies and/or prices for panels, regardless of supplier. While we have developed supply sources in a variety of countries, we could still be adversely affected by increases in our costs, negative publicity related to the industry, or other adverse consequences to our business.

55

Table of Contents

Rising political tensions could reduce trade volume, investment, technological exchange and other economic activities between major international economies, resulting in a material adverse effect on global economic conditions and the stability of global financial markets. Additionally, increasing tariffs could impact raw material prices, the cost of component parts and transportation. Any of the foregoing could have an adverse effect on our business, prospects, financial condition and results of operations.

***Our ability to utilize our net operating loss and tax credit carryforwards to offset future taxable income may be subject to certain limitations.***

In general, under Section 382 of the Internal Revenue Code of 1986, as amended (the "Code"), a corporation that undergoes an "ownership change" is subject to limitations on its ability to use its pre-change net operating loss carryforwards, or NOLs, to offset future taxable income. The limitations apply if a corporation undergoes an "ownership change," which is generally defined as a greater than 50 percentage point change (by value) in its equity ownership by certain stockholders over a three-year period. If we have experienced an ownership change at any time since our incorporation, we may already be subject to limitations on our ability to utilize our existing NOLs and other tax attributes to offset taxable income or tax liability. In addition, the Business Combination and future changes in our stock ownership, which may be outside of our control, may trigger an ownership change. Similar provisions of state tax law may also apply to limit our use of accumulated state tax attributes. As a result, even if we earn net taxable income in the future, our ability to use our pre-change NOL carryforwards and other tax attributes to offset such taxable income or tax liability may be subject to limitations, which could potentially result in increased future income tax liability to us.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not applicable.

## ITEM 1C. CYBERSECURITY

### Risk Management and Strategy

Cybersecurity risk management is an integral part of Mullen's overall enterprise risk management framework. We have implemented comprehensive measures to safeguard our information systems, protect sensitive data, and identify, assess and manage material risks from cybersecurity threats. Our cybersecurity program encompasses threat prevention, detection, mitigation, and remediation strategies tailored to the dynamic risk landscape in the automotive sector.

Our risk management efforts include threat intelligence gathering, vulnerability assessments, and the integration of advanced cybersecurity technologies. These measures are designed to help protect Mullen's proprietary systems and customer data from both internal and external cybersecurity threats. From time to time, Mullen has engaged third parties, on an as needed basis, to perform various cybersecurity services and risk assessments. Additionally, we maintain third-party tools to monitor for vulnerabilities.

We perform diligence, which includes reviewing SOC II reports, on certain third-party service providers who provide critical data and cloud services in order to oversee and identify risks from cybersecurity threats associated with such critical third-party service providers.

Despite our efforts, we cannot eliminate all risks from cybersecurity threats, or provide assurances that we have not experienced an undetected cybersecurity incident.

Table of Contents

*Governance*

As a function of its oversight role, the Board is responsible for ensuring that material risks are identified and managed appropriately. While the Board of Directors has the ultimate responsibility for risk oversight, the Board of Directors has delegated responsibility for the oversight of data privacy and cybersecurity to the Audit Committee. Senior management of Mullen regularly report to the full Board regarding risks we face, however, there has been no specific reports of risks related to cybersecurity threats that have been discussed with the Board.

Our VP of IT and our Director of IT Operations are responsible for assessing and managing risks from cybersecurity threats. Our VP of IT and Director of IT Operations each have over 20 years of experience in information technology, with cybersecurity comprising a significant role in their experience. The VP of IT and the Director of IT Operations are informed about and monitor the prevention, detection, mitigation, and remediation of cybersecurity incidents as a function of their management of our cybersecurity program.

As of the date of this filing, we do not believe that any risks from cybersecurity threats, including as the result of past cybersecurity incidents, have had, or are reasonably likely to have, a material effect on our business strategy, results of operations, or financial condition. While we strive to employ safeguards, no system can guarantee absolute security and we cannot guarantee that any future risk from cybersecurity, including any future cybersecurity incidents, will not be material to our business strategy, results of operations or financial condition.

## ITEM 2. PROPERTIES.

Our corporate headquarters is in Brea, CA, where we occupy approximately 24,730 rentable square feet under a sublease that expires in March 2026 with lease payments of $35,435 per month. We use this space primarily for our senior management, finance, legal, human resources, general administrative and information technology teams.

The Automotive Development Center in Irvine, CA, of 31,603 square foot facility houses the California Automotive Team, which includes Engineering Design and Development, Styling Purchasing and Program Management. Lease payments are approximately $84,737 per month which includes rent, insurance, and CAM.

Table of Contents

We own the manufacturing facility located in Robinsonville, Tunica County, MS. The Manufacturing Center is 124,000 square foot engineering facility on 100 acres.

On November 30, 2022, the Company purchased an automobile manufacturing facility in Mishawaka, St. Joseph County, IN. The site gross area is 1,392,395 square feet. The 660,000 sq ft Mishawaka assembly plant consists of a body shop, paint shop, general assembly area, and water treatment plant.

The Company leases 59,034 square feet of office space in Troy, MI for the Commercial Leadership and Engineering team. The lease payments are $62,724 per month.

On November 1, 2023, the Company entered a 5-year lease agreement for premises of approximately 122,000 sq. ft. in Fullerton, California, designated for manufacturing and distribution of electric vehicle batteries. Base rent was $2,992,000 for the first year (and increases approximately 4% every year). Security deposit paid to the landlord is approximately $1 million. Rent was prepaid in full for the first year, but is now $260,000 per month beginning November 2024.

Bollinger Motors maintains its offices within a 36,300 square foot building located in Oak Park, MI and has operated at this facility since August 2020. On August 1, 2023, Bollinger Motors executed a 5-year lease agreement for a building at 26650 Harding Ave, Oak Park, MI, adjacent to their Oak Park headquarters for an additional 10,774 square feet for engineering development, supplemental warehousing, vehicle storage and repair, and office space. The lease payments for these facilities are approximately $42,742 per month. Additionally, Bollinger Motors still maintained a lease in Ferndale, MI from where the company previously operated prior to August 2020. The lease payments for this facility were approximately $6,000 per month in 2023. However, the Ferndale facility was subleased for the entirety of 2023 with sublease income of approximately $7,000 per month.

As security for payment of the amounts due and payable under the Senior Secured Convertible Notes, the Company collaterally assigned and granted to the holders a continuing security interest in all of the Company's right, title, and interest in, to, and under the property of the Company. For further information about $50 Million Senior Secured Convertible Notes and Warrants (and Additional Investment Right), see "*Note 7 - Debt*" of the notes to the consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

## ITEM 3. LEGAL PROCEEDINGS.

Material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the Company or any of its subsidiaries is a party or of which any of their property is the subject, are described in the "*Note 19 - Contingencies and Claims*" of the notes to the consolidated financial statements included elsewhere in this Annual Report on Form 10-K and incorporated herein by reference.

## ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

Table of Contents

**PART II**

**ITEM 5. MARKET FOR REGISTRANT`S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information**

Our common stock trades on the NASDAQ Capital Market under the symbol "MULN."

**Holders**

As of January 21, 2025, our common stock was held by 818 registered shareholders of record. The number of record holders was determined from the records of our transfer agent and does not include beneficial owners of common stock whose shares are held in the names of various securities brokers, dealers and registered clearing agencies. Our transfer agent is Continental Stock Transfer & Trust Company.

**Dividends**

We have not historically declared any dividends on common stock. We have no present intention of paying any cash dividends on our common stock in the foreseeable future, as any earnings will be used to help generate growth. The decision on the payment of dividends in the future rests within the discretion of the Board of Directors and will depend upon, among other things, our earnings, capital requirements and financial condition, as well as other relevant factors. There are no restrictions in our certificate of incorporation or bylaws that restrict us from declaring dividends.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The information included under Item 12 of Part III of this Report is hereby incorporated by reference into Item 5 of Part II of this Report.

**Recent Sales of Unregistered Securities**

Not applicable.

**ITEM 6. [RESERVED]**

Table of Contents

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*The following discussion and analysis is intended to help the reader understand Mullen's results of operations and financial condition. You should read the following discussion and analysis of our financial condition and results of operations together with our audited financial statements and related notes included elsewhere in this Report.*

**Cautionary Note Regarding Forward-Looking Statements**

This Report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements can be identified by the use of forward-looking terminology, including the words "believes," "estimates," "anticipates," "expects," "intends," "plans," "may," "will," "potential," "projects," "predicts," "continue," or "should," or, in each case, their negative or other variations or comparable terminology. There can be no assurance that actual results will not materially differ from expectations. The forward-looking statements contained in this Report are based on our current expectations and beliefs concerning future developments and their potential effects on us. Future developments affecting us may not be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control), and other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the section titled "*Risk Factors*" in Item 1A above. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation (and expressly disclaim any obligation) to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. These risks and others described under the section titled "*Risk Factors*" in Item 1A above may not be exhaustive. By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. We caution you that forward-looking statements are not guarantees of future performance and that our actual results of operations, financial condition and liquidity, and developments in the industry in which we operate may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results or operations, financial condition and liquidity, and developments in the industry in which we operate are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods.

**Basis of Presentation**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries Ottava Automotive, Inc., a California corporation, Mullen Indiana Real Estate, LLC., a Delaware corporation, Mullen Investment Properties LLC, a Mississippi corporation, Mullen Advanced Energy Operations LLC, a California corporation and a majority ownership in Bollinger Motors, incorporated in Delaware. Intercompany accounts and transactions have been eliminated, if any. The financial statements reflect the consolidated financial position and results of operations of Mullen, which have been prepared in accordance with Generally Accepted Accounting Principles in the United States.

**Components of Results of Operations**

We are an early-stage company, and our historical results may not be indicative of our future results for reasons that may be difficult to anticipate. Accordingly, the drivers of our future financial results, as well as the components of such results, may not be comparable to our historical or projected results of operations.

Table of Contents

**Results of Operations**

**Comparison of the Year Ended September 30, 2024 to the Year Ended September 30, 2023**

The following table sets forth our historical operating results for the periods indicated:

| | Year Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2024 | 2023 | $ Change | % Change |
| | (dollar amounts, except percentages) | | | |
| Revenue from sale of vehicles | $ 1,094,322 | $ 366,000 | $ 728,322 | 199% |
| Cost of revenues | 16,894,100 | 273,882 | 16,620,218 | 6,068% |
| Gross profit / (loss) | (15,799,778) | 92,118 | (15,891,896) | (17,252)% |
| **Operating expenses:** | | | | |
| General and administrative | 181,947,541 | 215,846,132 | (33,898,591) | 16% |
| Research and development | 74,889,400 | 77,387,336 | (2,497,936) | 3% |
| Impairment of intangible assets | 73,447,067 | 5,873,000 | 67,574,067 | (1,151)% |
| Impairment of goodwill | 30,062,727 | 63,988,000 | (33,925,273) | 53% |
| Impairment of right-of-use assets | 11,505,001 | - | 11,505,001 | -% |
| Impairment of property, plant, and equipment, and other non-current assets | 4,174,935 | 14,770,000 | (10,595,065) | 72% |
| **Loss from operations** | $ (391,826,449) | $ (377,772,350) | $ (14,054,099) | (4)% |
| **Other income (expense):** | | | | |
| Other financing costs - initial recognition of derivative liabilities | (54,653,033) | (506,238,038) | 451,585,005 | 89% |
| Other financing costs - ELOC commitment fee | (6,000,000) | - | (6,000,000) | -% |
| Other financing costs - initial recognition of warrants | (13,652,762) | - | (13,652,762) | -% |
| Gain/(loss) on warrants and derivative liability revaluation | 4,503,099 | (116,256,212) | 120,759,311 | 104% |
| Gain/(loss) on extinguishment of debt | (655,721) | (6,246,089) | 5,590,368 | 90% |
| Loss on financing | - | (8,934,892) | 8,934,892 | 100% |
| Gain/(loss) on disposal of fixed assets | (511,838) | 386,377 | (898,215) | (232)% |
| Interest expense | (49,377,125) | (4,993,140) | (44,383,985) | (889)% |
| Other income, net | 2,458,578 | 2,407,034 | 51,544 | 2% |
| Total other income (expense) | (117,888,802) | (639,874,960) | 521,986,158 | 82% |
| **Net loss before income tax benefit** | $ (509,715,251) | $(1,017,647,310) | $ 507,932,059 | 50% |
| Income tax benefit/ (provision) | 3,888,700 | 10,988,482 | (7,099,782) | (65)% |
| **Net loss** | $ (505,826,551) | $(1,006,658,828) | $ 500,832,277 | 50% |
| Net loss attributable to noncontrolling interest | (48,767,650) | (34,404,246) | (14,363,404) | (42)% |
| **Net loss attributable to stockholders** | $ (457,058,901) | $ (972,254,582) | $ 515,195,681 | 53% |

Waived/(accrued) accumulated preferred dividends and other capital transactions with
Preferred stock owners

| | | | |
|---|---|---|---|
| | (13,902,843) | 7,360,397 | (21,263,240) | (289)% |
| **Net loss attributable to common stockholders after preferred dividends** | $ (470,961,744) | $ (964,894,185) | $ 493,932,441 | 51% |
| | | | |
| Net Loss per Share | $ (1,425.61) | $ (157,405.25) | | |
| | | | |
| Weighted average shares outstanding, basic and diluted | 330,358 | 6,130 | | |

61

Table of Contents

*Revenues*

We are an early-stage company and have recently begun generating notable revenues, with vehicle production and deliveries commencing in fiscal year 2023 (Mullen THREE and, later, Mullen ONE in the last calendar quarter of 2023). In September 2024, our Bollinger segment delivered the first B4 vehicles to customers.

We recognize revenue from the sale of electric vehicles upon the transfer of control to the dealer/customer. Normally, control transfers at the point of delivery when the dealer/customer has possession of the vehicle and bears the risks and rewards of ownership. However, a contract with one of our dealers includes return provision, allowing unsold vehicles to be returned after one year; and contracts with two of our dealers include return provisions, allowing unsold vehicles to be returned upon contract termination. For these arrangements, due to limited historical data on returns, we defer revenue recognition until the dealer sells the vehicles to end customers, or there is sufficient evidence to reasonably estimate the consideration to which we expect to be entitled. This approach aligns with our commitment to conservative revenue recognition practices and ensures compliance with accounting standards.

The tables below disclose information on deliveries of vehicles, revenue recognized, revenue deferred, and payments received from our customers over the recent periods.

**Invoiced during the year ended September 30, 2024 (dollars in thousands)**

| Vehicle type | Units invoiced | Amount invoiced | Revenue recognized |
|---|---|---|---|
| Mullen 3 (UU) | 180 | $ 11,658 | $ 163 |
| Mullen Urban Delivery (UD1) | 258 | 8,568 | 228 |
| Bollinger B4 | 5 | 703 | 703 |
| **Total** | **443** | **$ 20,929** | **$ 1,094** |

**Invoiced during the year ended September 30, 2023 (dollars in thousands)**

| Vehicle type | Units Invoiced | Amount invoiced | Revenue recognized |
|---|---|---|---|
| Mullen Urban Delivery (UD0) | 25 | 366 | 366 |
| Mullen 3 (UU) | 10 | 652 | - |
| **Total** | **35** | **$ 1,018** | **$ 366** |

*Cost of revenues*

The cost of revenues for the year ended September 30, 2024, totaled $16.9 million, comprising:

*a) Cost of Goods Sold (COGS)*
COGS amounted to $1.3 million, including $0.2 million from the Mullen Commercial segment and $1.1 million from the Bollinger segment. These costs encompass vehicle components and parts, labor costs, amortized tooling costs, and other production-related expenses, as well as estimated warranty provisions. The $1.1 million COGS for the Bollinger segment consist of approximately $0.6 million in standard costs and $0.5 million in cost variances.

*b) Inventory Adjustments to Net Realizable Value*
A non-cash write-down of $15.6 million was recognized for the Mullen Commercial segment, primarily due to excess raw materials and slower-moving inventory. The determination of net realizable value (NRV) involves significant judgment, and actual results may materially differ from estimates. For further details, refer to "Critical Accounting Policies and Estimates" below.

Table of Contents

*Research and Development*

Research and development expenses decreased by approximately $2.5 million or 3% from approximately $77.4 million through the twelve months ended September 30, 2023, to approximately $74.9 million through the twelve months ended September 30, 2024. Research and development costs are expensed as incurred. To date, our research and development expenses have consisted primarily of engineering and consulting services in connection with the development and design of our EVs.

*General and Administrative*

General and administrative ("G&A") expenses include all non-production expenses incurred by us in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, licenses and other expenses. We expense advertising costs as incurred. General and administrative expenses decreased by approximately $33.9 million or 16% from approximately $215.8 million in the twelve months ended September 30, 2023, to approximately $181.9 million in the twelve months ended September 30, 2024, primarily due to decrease in settlements and penalties, and in stock-based compensation to CEO under Performance stock awards agreements (including CEO share based performance award liability revaluation - see *Note 11 - Share-based compensation* of the financial statements for more information), although certain expenses increased, like advertising and promotion, professional fees, depreciation, etc.

*Interest Expense*

Interest expense increased by approximately $44.4 million from $5.0 million through the twelve months ended September 30, 2023, to $49.4 million through the twelve months ended September 30, 2024, primarily due to amortization of original issue discount of convertible notes issued and partially converted by the Company in the second half of fiscal year ending September 30, 2024.

*Impairment*

Due to unfavorable market conditions and decline of the market prices of the Company's common stock, we have tested long-lived assets for recoverability. As a result of the impairment tests performed during the year ended September 30, 2024, the Company recognized impairment losses in amount of $119.2 million that related to goodwill, property, plant, and equipment, intangible assets, and right-of-use assets - an increase of $34.6 million from the last year, when impairment of goodwill, property, plant, and equipment, and intangible assets reached $84.6 million. See more details in the section below.

*Other financing costs*

Financing costs other than "Interest expense" included losses on initial recognition of derivative liabilities, ELOC commitment fee, losses on initial recognition of warrants and gain/(loss) on derivative liability revaluation: $69.8 million during the year ended September 30, 2024, and $622.5 million during the fiscal year ended September 30, 2023, a decrease of 89% or $552.7 million. These losses have decreased in comparison to the previous year mainly due to decrease in financing. The main part of these losses is caused when the Company issues warrants recognized at fair value as liabilities in addition to preferred stock or other equity instruments in lieu of preferred stock and notes (see further details in the *Note 8* and *Note 7* of the consolidated financial statements).

*Waived/(accrued) accumulated preferred dividends and other capital transactions with preferred stock owners*

The accumulated preferred dividends and other capital transactions with preferred stock owners amounted to $13.9 million loss in the fiscal year ended September 30, 2023 and were represented primarily by fair value of common stock issued to avoid fractional shares on reverse stock splits - $5.2 million (see *Note 1 - Description of business and basis of presentation*) and $8.6 million of financial result from exchange of Series C P/S for Series E P/S (see *Note 9*, Series E Preferred Stock section). In the previous fiscal year ended September 30, 2023, the amount was positive ($7.4 million) due to the fact that holders of Series C Preferred stock waived accumulated dividends.

*Net Loss*

The net loss attributable to common stockholders (after transactions accounted for as preferred dividends) was $471.0 million, or $1,425.61 net loss per share, for the twelve months ended September 30, 2024, as compared to a net loss attributable to common stockholders (after transactions accounted for as preferred dividends) of $964.9 million, or $157,405.25 loss per share, for the twelve months ended September 30, 2023.

Table of Contents

**Operating segments**

The Company is currently comprised of 2 major operating segments:

- Bollinger Motors. The Company acquired the controlling interest of Bollinger Motors Inc. on September 7, 2022. This acquisition positioned Mullen into the medium duty truck classes 4-6, along with the Sport Utility and Pick Up Trucks EV segments.

- Mullen Commercial. By November 30, 2022, Mullen acquired a manufacturing plant in Mishawaka Indiana and all the intellectual property needed to engineer and build Class 1 and Class 3 electric vehicles.

**Reverse Stock Splits and NASDAQ listing rules compliance**

Our Common Stock is listed on the Nasdaq Capital Market. To maintain that listing, we must satisfy minimum financial and other requirements including, without limitation, a requirement that our closing bid price be at least $1.00 per share.  Effective September 17, 2024, the Company implemented a reverse stock split at a ratio of 1-for-100 shares in order to satisfy this requirement. The reverse stock split did not change the authorized number of shares or the par value of the Common Stock nor modify any voting rights of the Common Stock. No fractional shares were issued in connection with the September 2024 reverse stock split and each fractional share resulting from the reverse stock split were rounded up to the next whole share. On October 16, 2024, the Company received formal notice from Nasdaq confirming that it had regained compliance with the minimum bid price requirement set forth in Nasdaq Listing Rule 5550(a)(2).

In addition to the reverse stock split implemented in September 2024, the Company previously effected a 1-for-25 reverse stock split on May 4, 2023, a 1-for-9 reverse stock split on August 11, 2023, and a 1-for-100 reverse stock split on December 21, 2023. The Company retroactively adjusted its historical financial statements to reflect the reverse stock splits.

**Liquidity and Capital Resources**

To date, we have yet to generate any significant revenue from our business operations. We have funded our capital expenditure and working capital requirements through the sale of equity securities, as further discussed below. Our ability to successfully expand our business will depend on many factors, including our working capital needs, the availability of equity or debt financing and, over time, our ability to generate cash flows from operations.

The Company's principal source of liquidity consists of existing cash and restricted cash of approximately $10.7 million as of September 30, 2024. During the twelve months ended September 30, 2024, the Company used approximately $185.6 million of cash for operating activities. The net working capital on September 30, 2024 was negative and amounted to approximately $120.0 million, or approximately $38.5 million after excluding derivative liabilities and liabilities to issue stock that are supposed to be settled by issuing common stock without using cash. For the year ended September 30, 2024, the Company has incurred a net loss of $505.8 million and, as of September 30, 2024, our accumulated deficit was $2.3 billion.

The Company believes that its available liquidity will not be sufficient to meet its current obligations for a period of at least twelve months from the date of the filing of this Annual Report on Form 10-K. Accordingly, the Company has concluded there is substantial doubt about its ability to continue as a going concern. Without additional funding, the Company may be unable to continue operations and could be required to seek bankruptcy protection within 30 days of the issuance of these financial statements.

Table of Contents

Management is pursuing several strategies to address liquidity concerns, including:

● Raising additional capital through equity or debt financing.

● Executing cost reduction measures and operational restructuring.

● Exploring strategic alternatives, including partnerships or asset sales.

Despite these efforts, there is no assurance that these initiatives will be successful. If the Company cannot secure additional funding in the immediate term, it may be required to curtail operations significantly or seek bankruptcy protection. These consolidated financial statements do not include any adjustments to the carrying amounts of assets or liabilities that may result from the outcome of these uncertainties.

*Debt*

To date, our current working capital and development needs have been primarily funded through the issuance of convertible indebtedness, convertible preferred stock and common stock.

The short-term debt classification primarily is based upon loans due within twelve-months from the balance sheet date, in addition to loans that have matured and remain unpaid.

The following is a summary of our debt as of September 30, 2024:

| Type of Debt | Carrying amount | Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|
| Matured notes (1) | $ 2,385,004 | $ 2,385,004 | $ - | 10% | Due (default) |
| Matured loan advances (1) | 332,800 | 332,800 | - | 10% | Due (default) |
| Senior convertible notes (2) | 20,346,283 | 20,346,283 | - | 20% (default) | Due (cross-default) |
| Less: debt discount to convertible notes | (17,664,310) | (17,664,310) | - | | |
| **Total Debt** | $ **5,399,777** | $ **5,399,777** | $ - | | |

(1) In October 2024, the Company reached an agreement with holders of all matured notes and loan advances (see table above) in amount of $2.7 million, as well as accumulated interest in amount of approximately $1.8 million, that the liabilities would be settled by issuance of shares of common stock of the Company worth of $3 million. The liability has been fully settled by December 2024 by issuing shares of common stock in several installments.

(2) As of September 30, 2024, the Company's senior convertible notes (totaling $20.3 million) and accumulated interest (approximately $0.3 million) were in cross-default due to the non-payment of $0.2 million that matured in September 2024. As a result, the entire principal balance became due immediately, allowing investors to demand full repayment. Additionally, the interest rate increased from 15% to 20%. However, investors have not requested immediate cash payment of the notes or accrued interest. In December 2024, the court has approved a settlement agreement between the Company and holders of the Senior convertible notes, and, by the date these financial statements are available to be issued, almost full amount of the Senior convertible notes and accumulated interest has been converted to shares of common stock under Section 3(a)(10) of the Securities Act of 1933.

Table of Contents

The following is the overview of changes in our indebtedness during the year ended September 30, 2024:

| | Matured loans and advances | NuBridge real estate note | Senior Secured Convertible Notes | Total |
|---|---|---|---|---|
| Principal as of October 1, 2023 | $ 2,731,681 | $ 5,000,000 | $ - | $ 7,731,681 |
| Original interest discount and debt issuance costs as of October 1, 2023 | - | (270,189) | - | (270,189) |
| **Carrying amount as of October 1, 2023** | **2,731,681** | **4,729,811** | **-** | **7,461,492** |
| Notes issued, principal | - | - | 68,326,316 | 68,326,316 |
| Original interest discount and debt issuance costs at inception | - | - | (65,168,421) | (65,168,421) |
| Amortization of original interest discount and debt issuance costs | - | 232,794 | 47,504,111 | 47,736,905 |
| Paid in cash | - | (4,945,832) | - | (4,945,832) |
| Principal converted | - | - | (48,056,575) | (48,056,575) |
| Other adjustments | (13,877) | (16,773) | 76,542 | 45,892 |
| Principal as of September 30, 2024 | 2,717,804 | - | 20,346,283 | 23,064,087 |
| Original interest discount and debt issuance costs as of September 30, 2024 | - | - | (17,664,310) | (17,664,310) |
| **Carrying amount as of September 30, 2024** | **$ 2,717,804** | **$ -** | **$ 2,681,973** | **$ 5,399,777** |

The following is a summary of our debt as of September 30, 2023:

| Type of Debt | Carrying amount | Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|
| Matured notes | $ 2,398,881 | $ 2,398,881 | $ - | 0.00 - 10.00% | 2019 - 2021 |
| Real estate note | 5,000,000 | 5,000,000 | - | 8.99% | 2024 |
| Matured loan advances | 332,800 | 332,800 | - | 0.00 - 10.00% | 2016 - 2018 |
| Less: debt discount | (270,189) | (270,189) | - | | |
| **Total Debt** | **$ 7,461,492** | **$ 7,461,492** | **$ -** | | |

66

Table of Contents

The following is the overview of changes in our indebtedness during the year ended September 30, 2023:

| | Matured notes, loans and advances | NuBridge real estate note | Series D Convertible Notes | Other notes payable | Total |
|---|---|---|---|---|---|
| Principal as of October 1, 2022 | $ 3,608,885 | $ 5,000,000 | $ - | $ 1,344,399 | $ 9,953,284 |
| Original interest discount as of October 1, 2022 | - | (857,257) | - | (74,978) | (932,235) |
| Carrying amount as of October 1, 2022 | 3,608,885 | 4,142,743 | - | 1,269,421 | 9,021,049 |
| Notes issued, principal | - | - | 150,000,000 | 20,000,000 | 170,000,000 |
| Original interest discount and debt issuance costs at inception | | - | (150,000,000) | - | (150,000,000) |
| Paid in cash | (446,741) | - | - | (20,247,612) | (20,694,353) |
| Amortization of original interest discount and debt issuance costs | - | 587,068 | 150,000,000 | 163,558 | 150,750,626 |
| Derecognition of an old note upon exchange | - | - | - | (1,032,217) | (1,032,217) |
| Recognition of a new note upon exchange | - | - | - | 12,945,914 | 12,945,914 |
| Principal converted | - | - | (150,000,000) | (12,945,914) | (162,945,914) |
| Other adjustments | (430,463) | - | - | (153,150) | (583,613) |
| Principal as of September 30, 2023 | 2,731,681 | 5,000,000 | - | - | 7,731,681 |
| Original interest discount as of September 30, 2023 | - | (270,189) | - | - | (270,189) |
| Carrying amount as of September 30, 2023 | $ 2,731,681 | $ 4,729,811 | $ - | $ - | $ 7,461,492 |

**Cash Flows**

The following table provides a summary of our cash flow data for the years ended September 30, 2024 and 2023:

| | Years Ended September 30, | |
|---|---|---|
| **Net cash provided by (used in):** | **2024** | **2023** |
| Operating activities | $ (185,555,481) | $ (179,172,191) |
| Investing activities | (16,148,055) | (107,923,309) |
| Financing activities | 56,755,744 | 358,416,885 |

***Cash Flows used in Operating Activities***

Our cash flow used in operating activities to date has been primarily comprised of costs related to starting production, research and development, payroll and other general and administrative activities. As we continue to ramp up commercial manufacturing and sales, we expect our cash used in operating activities to decrease over time as we continue to reduce operating expenses and start to generate cash flow from our commercial vehicle sales. Net cash used in operating activities was $185.6 million in the twelve months ended September 30, 2024, a 4% increase from $179.2 million net cash used during the twelve months ended September 30, 2023.

Table of Contents

### Cash Flows used in Investing Activities

Our cash flows used in investing activities, to date, have been comprised mainly of purchases of equipment. We expect these costs to decrease in the near future as we have ramped up production activity during 2024. Net cash used in investing activities was $16.1 million in the year ended September 30, 2024, an 85% decrease from $107.9 million used in investing activities the year ended September 30, 2023.

### Cash Flows provided by Financing Activities

Through September 30, 2024, we have financed our operations primarily through the issuance of convertible notes and warrants. Net cash provided by financing activities was $56.8 million for the year ended September 30, 2024, as compared to $358.4 million net cash provided by financing activities for the year ended September 30, 2023.

### Contractual Obligations and Commitments

The following tables summarizes our contractual obligations and other commitments for cash expenditures as of September 30, 2024, and the years in which these obligations are due:

**Operating Lease Commitments**

| Years Ended September 30, | Scheduled Payments |
|---|---|
| 2025 | $ 6,421,692 |
| 2026 | 5,022,623 |
| 2027 | 5,000,409 |
| 2028 | 4,828,305 |
| 2029 | 1,358,041 |
| Thereafter | 5,994,883 |
| **Total Future Minimum Lease Payments** | **$ 28,625,953** |

### Off-Balance Sheet Arrangements

We are not a party to any off-balance sheet arrangements, as defined under SEC rules.

### Critical Accounting Policies and Estimates

Our financial statements have been prepared by U.S. GAAP. In the preparation of these financial statements, our management is required to use judgment in making estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Management considers an accounting judgment, estimate, or assumption to be critical when (1) the estimate or assumption is complex in nature or requires a high degree of judgment and (2) the use of different judgments, estimates, and assumptions could have a material impact on the consolidated financial statements. Our significant accounting policies are described in *Note 3* to the consolidated financial statements.

In preparation of these financial statements, management applied critical estimates and assumptions while performing impairment tests for goodwill and other long-lived assets and while determining net realizable value of inventory.

*Impairment tests for goodwill and other long-lived assets*

We identified Bollinger and Mullen Commercial (refer to *Note 21 - Segment information*) as our reporting units for the purposes of assessing impairments.

68

Table of Contents

We review our noncurrent asset groups for impairment whenever events or changes in circumstances indicate that the carrying amount of such asset groups may not be recoverable. Such conditions could include significant adverse changes in the business climate, current period operating or cash flow losses, significant declines in forecasted operations, or a current expectation that an asset group will be disposed of before the end of its useful life. The recoverability of noncurrent asset groups to be held and used is measured by a comparison of the carrying amount of the asset group to future undiscounted net cash flows expected to be generated by the asset group. Suppose the asset group is considered to be impaired. In that case, the impairment recognized is the amount by which the carrying amount of the asset group exceeds the fair value of the asset group. Due to a prolonged decrease in our market capitalization, including a significant decline in stock price and budgeted performance targets not achieved as compared to acquisition date budgets, we assessed noncurrent assets for impairment.

As a result of impairment tests performed by management during the twelve months ended September 30, 2024 in respect of Mullen Commercial segment, impairment was recognized for part of right-of-use assets in the amount of $10.2 million, as well as for engineering design intangible assets with a carrying amount of $15.1 million, and construction-in-progress for $4.2 million. Also, the Company has recorded impairment of goodwill in amount of $1.2 million pertaining to acquisition of retail business (see *Note 4 - Business acquisitions*). The primary reasons for the impairment of these assets were sales slower than expected, decrease in the Company's market capitalization, and uncertainty of the availability of future funding.

As a result of impairment tests performed by management during the twelve months ended September 30, 2024 in respect of the Bollinger segment, additional impairment was recognized in the financial statements: including $28.8 million for goodwill, $58.3 million for indefinite-lived in-process research and development assets, as well as $1.3 million for right-of-use assets. The impairment has been recognized primarily due to the present uncertainty of the availability of future funding required to support this segment and the decrease in the Company's market capitalization.

Estimating the fair value of the reporting units and certain assets requires us to make assumptions and estimates regarding our future plans, as well as industry, economic, and regulatory conditions. These assumptions and estimates include estimated future annual net cash flows, income tax considerations, discount rates, long-term growth rates, contributory asset charges, and other market factors. Assumptions used in impairment assessments are made at a point in time. Therefore, they are subject to change based on the facts and circumstances present at each annual and interim impairment assessment date. Fair value determinations require significant judgment and are sensitive to changes in underlying assumptions, estimates, and market factors.

*Net realizable value of inventory*

In accordance with applicable accounting standards, we value inventory at the lower of cost or net realizable value. Our assessment of net realizable value is a critical accounting estimate due to the inherent market volatility, evolving technology, and competitive landscape of the EV industry.

The net realizable value of inventory is determined based on the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. In determining net realizable value, we consider several factors, including:

- Market Demand and Pricing Trends - The EV industry is highly competitive, with frequent price adjustments based on consumer demand, regulatory incentives, and competitor pricing strategies.

- Technological Obsolescence - As battery and vehicle technology evolves, older inventory may require discounting or write-downs to remain competitive.

- Production Costs and Cost Absorption - Given supply chain fluctuations and raw material pricing (e.g., lithium, nickel, and other battery components), production costs may exceed expected selling prices.

- Other Factors - Changes in government incentives, infrastructure development, and interest rates may affect consumer adoption and, consequently, inventory valuation.

For the year ended September 30, 2024, we recognized net realizable value adjustments of $15.6 million, primarily related to excess raw material and slower moving inventory of the Mullen Commercial segment. These adjustments were recorded as a component of cost of goods sold.

69

Table of Contents

**Recent Accounting Pronouncements**

Accounting standard updates issued but not yet effective were assessed and determined to be either not applicable or not expected to have a material impact on our consolidated financial statements.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not Applicable.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

The consolidated financial statements and notes thereto and the reports of the independent registered public accounting firm are filed as part of this Report and incorporated herein by reference.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed by us under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b) accumulated and communicated to our management, including our principal executive and principal financial officer, to allow timely decisions regarding required disclosures.

We conducted an evaluation pursuant to Rule 13a-15 of the Exchange Act of the effectiveness of the design and operation of our DCP as of September 30, 2024, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were not effective at the reasonable assurance level as of September 30, 2024 because of material weaknesses in the Company's internal control over financial reporting described below.

70

Table of Contents

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect our transactions and our dispositions of the assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was not effective as of September 30, 2024 due to material weaknesses described below.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. In conducting our review of our internal control over financial reporting, we identified the following material weaknesses described below.

- Based on management's review of key accounting and information technology policies and procedures, we have determined that although such policies and procedures exist, they are not all formalized in a centralized written procedure format that is up to date.

- As a result of the absence of formalized reviews of key controls across several business processes and/or insufficiently formalized documentation evidencing such review, management's ability to evaluate the design and monitor the effective operation of these preventative and detective internal controls is limited. Accordingly, management's ability to timely detect, prevent, and remediate deficiencies and potential risks has been assessed as ineffective.

- The Company identified certain design deficiencies in its management and analytical review controls associated with the inventory accounting and revenue recognition close process. These deficiencies, individually or in the aggregate, combined with inadequate compensating controls, created a reasonable possibility that a material misstatement to the consolidated financial statements might not be prevented or detected on a timely basis.

- The Company lacks in-house accounting expertise to identify rights and obligations reflected in non-standard agreements, requiring specialized accounting for complex transactions that the Company currently outsources.

- The Company had numerous post close adjustments within the areas of inventory and debt which affected the timeliness to file the 10-K.

During the year ended September 30, 2024, these control deficiencies did not result in identified material misstatements in our consolidated financial statements; however, the control deficiencies described above created a more than remote possibility that a material misstatement in the consolidated financial statements would not be prevented or detected on a timely basis. Therefore, our management concluded that the deficiencies represent material weaknesses.

Table of Contents

Based on the performance of additional procedures by management designed to ensure reliability of financial reporting, the Company's management has concluded that, notwithstanding the material weaknesses described above, the consolidated financial statements, included in this Form 10-K, fairly present, in all material respects, the Company's financial position, results of operations, and cash flows as of the dates, and for the periods presented, in conformity with U.S. GAAP.

**Remediation Efforts to Address the Material Weaknesses and Other Changes in Internal Control Over Financial Reporting**

The aforementioned material weaknesses were first identified in 2022. While the Company has significantly improved its internal control over financial reporting, the material weaknesses remain un-remediated as of September 30, 2024, as the Company has moved from development stage to production and sale of vehicles. The Company's remediation efforts will continue throughout 2025.

During the year ended September 30, 2024, the management completed the following actions in accordance with the remediation plan:

- **Formalization of Policies and Procedures**: Accounting and IT policies were updated and formalized to ensure they are current and comprehensive.

- **Enhanced Review Controls**: Review controls for inventory and revenue accounting close processes were redesigned, with compensating controls implemented to ensure accurate reporting and timely disclosures. We have rolled out new revenue policy to marketing and sales organization and continue to closely monitor revenue transactions and documentation.

- **Strengthened Technical Expertise**: Additional leadership roles with expertise in GAAP financial reporting and public company controls have been hired, and external consultants engaged to address gaps in accounting for complex transactions.

In addition to the remedial actions taken to date, the Company is considering the full extent of the procedures to implement in order to remediate the material weaknesses described above. Currently, the remediation plan includes:

- Implementation of the Plex ERP and General ledger systems will automate inventory tracking, adjustments, net realizable value and improve controls over financial transactions;

- Evaluating skill set gaps and hiring additional accounting, financial reporting, and compliance personnel (including both internal and external resources), as needed, with an appropriate level of accounting knowledge, training and experience to appropriately analyze, record and disclose accounting matters timely and accurately, and to achieve complete financial accounting, reporting and disclosures;

- Continuing integration of Mullen and Bollinger accounting groups along with professional training and education on accounting subjects for existing accounting staff including preparation and review of account reconciliations;

- Improving and maintaining effective controls for communicating and sharing information between the operations, accounting, information technology, sales, finance and legal departments to ensure that the accounting department is consistently provided with complete and adequate support, documentation and information, and that matters are resolved in a timely and effective manner.

- Enhancing management review controls related to our financial statement close and financial reporting involving estimates, judgments, and assumptions;

- Designing and implementing controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the accounting for variable interest entities and valuation of convertible debt and the related derivative liability.

72

Table of Contents

The actions that we are taking are subject to ongoing management review and audit committee oversight. We believe these measures will aid to remediate the control deficiencies that gave rise to the material weaknesses, but the material weaknesses will not be considered fully remediated until controls have been designed and implemented for a sufficient period of time, and properly tested for our management to conclude that the control environment is operating effectively.

The Company is committed to remediating the material weaknesses and the actions the Company is taking are subject to ongoing senior management review, as well as oversight from the Company's Board of Directors. When fully implemented and operational, the Company believes the measures described above will remediate the underlying causes of the control deficiencies that gave rise to the material weaknesses and strengthen the Company's internal control over financial reporting. The Company will not be able to fully remediate these material weaknesses until these steps have been completed and operate effectively for a sufficient period of time. The Company may also identify additional measures that may be required to remediate the material weaknesses in the Company's internal control over financial reporting, necessitating further action.

**Limitations on Effectiveness of Controls and Procedures**

In designing and evaluating our disclosure controls and processes as well as internal control over financial reporting, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of controls and procedures must reflect the fact that there are resource constraints, and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Because of its inherent limitations, any internal control system, no matter how well designed and operated, is based upon certain judgments and assumptions, and cannot provide absolute assurance that its objectives will be met. Similarly, an evaluation of controls cannot provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Attestation Report**

This Annual Report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. As a non-accelerated filer, we are not subject to the attestation requirement.

**ITEM 9B. OTHER INFORMATION**

On July 18, 2024, the Company entered into an Asset Purchase Agreement with Mullen Technologies, Inc. ("MTI"), pursuant to which the Company assumed a lease for premises located in Oceanside, California and all equipment and inventory in the premises, as well as staffing and other infrastructure for vehicle sales and repairs for consideration of $1.4 million. The Company's CEO has a controlling financial interest and is Chairman of MTI. For further information, see *Note 4 - Business Acquisitions* in the notes to the Company's consolidated financial statement include in this Report.

Table of Contents

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.**

The directors and executive officers of the Company and their respective ages, and positions with the Company and certain business experience as of the date of this prospectus are set forth below. There are no family relationships among any of the directors or executive officers.

There are no material legal proceedings to which any director or executive officer of the Company, or any associate of any director or executive officer of the Company, is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries.

| Name | Age | Position | Director Class |
|------|-----|----------|----------------|
| David Michery | 58 | Chief Executive Officer, President, and Chairman of the Board | Class I |
| Jonathan New | 64 | Chief Financial Officer | |
| Calin Popa | 62 | President-Mullen Automotive | |
| Chester Bragado | 46 | Chief Accounting Officer | |
| John Taylor | 64 | President & SVP of Global Manufacturing | |
| Mary Winter | 33 | Secretary and Director | Class I |
| Ignacio Novoa | 41 | Director | Class I |
| Kent Puckett | 61 | Director | Class II |
| Mark Betor | 69 | Director | Class II |
| William Miltner | 63 | Director | Class III |
| John Anderson | 70 | Director | Class III |

Pursuant to the Second Amended and Restated Certificate of Incorporation, as amended, the Company's Board of Directors is classified into three classes with staggered three-year terms designated as follows:

● Class I - David Michery, Mary Winter, and Ignacio Novoa whose terms will expire in 2025 at our annual meeting of stockholders or until their respective successors are elected and qualified;

● Class II - Kent Puckett and Mark Betor, whose terms will expire at our annual meeting of stockholders in 2026.

● Class III - William Miltner and John Anderson whose terms will expire at our annual meeting of stockholders in 2027.

At each annual meeting of stockholders, the successors to directors whose terms expire will be elected to serve from the time of election and qualification until the third annual meeting following their election and until the successors are duly elected and qualified. This classification of the Board may have the effect of delaying or preventing changes in Mullen's control of management. These directors may be removed for cause by the affirmative vote of the holders of at least two-thirds (2/3) of Mullen's voting stock.

74

Table of Contents

*David Michery* has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the Merger in November 2021 and held those same positions at Mullen Technologies since its inception in 2018. His automotive experience began with the acquisition of Mullen Motor Company in 2012. Mr. Michery brings over 25 years within executive management, marketing, distressed assets, and business restructuring. He acquired the assets of Coda Automotive, formerly an independent EV manufacturer, through bankruptcy as an entryway into the EV business. We believe that Mr. Michery is qualified to serve as a director because of his operational and historical expertise gained from serving as our Chief Executive Officer, and his experience within various businesses, including automotive.

*Jonathan New* was appointed by the Board as Chief Financial Officer of the Company, effective September 19, 2022. He served as a director of the Company from November 2021 until September 19, 2022. From January 2020 until September 2022, Mr. New served as the Chief Financial Officer of Motorsport Games, Inc. (NASDAQ: MSGM), a racing game developer, publisher and esports ecosystem provider. Previously, from July 2018 to January 2020, Mr. New was Chief Financial Officer of Blink Charging Co (NASDAQ: BLNK), an owner, operator and provider of electric vehicle charging equipment and networked electric vehicle charging services, and, from 2008 to July 2018, he was Chief Financial Officer of Net Element, Inc., a global technology and value-added solutions group that supports electronic payments acceptance in a multi-channel environment. Mr. New is a Florida Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

*Calin Popa* has served as President of the Automotive Electric Vehicles Division of the Company and of its predecessor, Mullen Technologies, since 2017. He has 34 years of experience within the automotive industry. Previously, Mr. Popa was Vice President of Manufacturing Engineering at Karma Automotive, LLC, f/k/a Fisker Automotive, from 2010 to 2017. Mr. Popa has held senior positions within product development, vehicle launch and manufacturing at well-known companies, including MAN, Ford, and Chrysler.

*Chester A. Bragado* has served as Chief Accounting Officer since March 2023. Mr. Bragado brings over 20 years of diverse expertise in accounting, finance, and organizational leadership to his role as Chief Accounting Officer at Mullen Automotive. Before assuming the role of Chief Accounting Officer, Mr. Bragado served as the Executive Vice President of Operations at Mullen Automotive from July 2022 to March 2023. Prior to that, since 2021, Mr. Bragado served as Vice President, Finance and Controller at Sambazon, an international organic food manufacturer, from 2020 to 2021, he was Financial Reporting Director at Loop Media, a digital video company, and from 2017 to 2020, he was Controller at Custom Foods LLC/Marie Callender. Mr. Bragado has consulted and audited Fortune 500 companies throughout his expansive 20 plus year career, which includes roles as an external auditor at PricewaterhouseCoopers and increasing responsibilities in Corporate Accounting, SEC reporting, and internal audit at various other public and private companies. Mr. Bragado graduated from the University of California, Riverside, with a BA in Business Administration and holds a California CPA license and is currently an executive MBA candidate at UCLA Anderson School of Management

*John Taylor* is the President & SVP of Global Manufacturing at Mullen. From 2010 to April 2013, he was employed at Tesla being one of the first 50 employees and, leading the advanced manufacturing engineering group. Mr. Taylor played a critical role in opening the Fremont facility and manufacturing operations for the Tesla Model S and architecture for future projects. Mr. Taylor started his automotive career at General Motors ("**GM**") in 1982. At GM, he was involved in eleven major automotive vehicle launches serving as launch manager, operations manager, and machine and equipment manager, among other roles. Mr Taylor has also held executive roles within several intermodal products companies, serving as the President and Chief Operations Officer of American Intermodal Container Manufacturing from April 2015 to November 2020 and the Chief Executive Officer of Intermodal Products of America from April 2021 to April 2022. Mr. Taylor graduated from the Philpot School of Automotive Design in Detroit in 1987.

*Mary Winter* has served as director of the Company since November 2021 and has been a director of Mullen Technologies since 2018. Ms. Winter has been an integral part of Mullen since inception. She currently serves as the Secretary of the Company and Board of Directors. Formerly, she was the Vice President of Operations for Mullen Technologies since 2014. We believe that Ms. Winter is qualified to serve as a director because of her business and operational knowledge of Mullen.

*Ignacio Novoa* has served as a director of the Company since July 2022. Mr. Novoa has been a realtor at Las Lomas Realty since January 2015. Prior to that, from August 2008 to March 2021, Mr. Nova served as police officer with the Federal Reserve Police and, from September 2008 to March 2013, as program security at Northrup Grumman. Mr. Novoa has also served as a director of DRIVEiT since January 2024. We believe that Mr. Novoa is qualified to serve as a director because of his experience in managing real estate.

75

Table of Contents

**Kent Puckett** has served as a director of the Company since November 2021 and has served on the board of Mullen Technologies since 2018. Previously, Mr. Puckett served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018. Mr. Puckett has also served as a director of DRIVEiT since January 2024. Mr. Puckett has many years of experience as a CFO with a proven track record of establishing cross-functional partnerships to deliver stellar results. He has led many companies in their audit and disclosure requirements, creating operations, marketing, and sales division budgets of multi-million dollars, and being accountable for the allocation of resources to exceed profit and sales goals. Mr. Puckett has a B.S. in Business Administration from Pensacola Christian College, and Advanced Studies in Management, Finance, Compliance, Insurance, Financial Consulting, Taxation and Financial Reporting, with an emphasis on Public Companies reporting and audit requirements. We believe that Mr. Puckett is qualified to serve as a director because of his finance and accounting background and experience.

**Mark Betor** has served as a director of the Company since November 2021 and a director of Mullen Technologies since 2018. Mr. Betor has also served as a director of DRIVEiT since January 2024. Mr. Betor is a retired businessman and law enforcement officer. Since retirement, he has been involved with real estate investments and private business. We believe that Mr. Betor is qualified to serve as a director because of his vast experience within investments and private businesses.

**William Miltner** has served as a director of the Company since the closing of the Merger. He has served as a litigation attorney for over 30 years. He is the co-founder of Miltner & Menck, APC, a full-service law firm, in San Diego, CA. Mr. Miltner successfully co-founded and co-managed the law firm of Perkins & Miltner, LLP, a respected San Diego litigation firm for 13 years. In 2006, when co-founder David Perkins left the practice of law, Miltner Law Group, APC, was founded. Mr. Miltner has represented many publicly traded and private companies including residential developers, construction contractors, title insurance companies and banking and lending institutions. His substantial experience includes representing and defending clients in complex real property, general business, construction, title insurance and lender litigation and transactional matters. Mr. Miltner is member of the American and San Diego County Bar Associations and American Business Trial Lawyers Association. He was admitted to The State Bar of California in 1988. We believe that Mr. Miltner is qualified to serve as a director because of his knowledge and experience within law practice areas and litigation matters.

**John K. Andersen** has served as director of the Company since September 2022. Mr. Andersen owned and operated various businesses since 1972, concentrating on real estate investment and management, primarily of multi-family residential units along with commercial sales and leases, in California, Utah and Wyoming, since 1980. From 1986 to 1996, Mr. Anderson was a partner in a large real estate company with over 300 sales agents and an escrow company, loan company and other real estate services. Since 2013, he has been a director and officer of Eminence Escrow, Inc. and, since 2015, he has owned and operated DNJ Investments, Inc., both of which provide escrow services. We believe that Mr. Anderson is qualified to serve as a director because of his extensive and in-depth experience in operating and growing businesses.

**Corporate Governance**

***Director Independence***

The Board determined that Mary Winter, Kent Puckett, Mark Betor and John K. Andersen, qualify as independent directors, as defined under the listing rules of the Nasdaq, and the Board consists of a majority of "independent directors" as defined under the rules of the SEC and Nasdaq listing requirements. In addition, we are subject to the rules of the SEC and Nasdaq relating to the membership, qualifications, and operations of the audit, as discussed below.

Table of Contents

*Insider Trading Policy*

We have adopted trading policies and procedures governing the purchase, sale, and/or other dispositions of the registrant's securities by directors, officers and employees or the registrant itself that are reasonably designed to promote compliance with insider trading laws, rules and regulations, and any listing standards applicable to the Company. A copy of such policies and procedures is filed hereto as Exhibit 19.1.

*Code of Ethics*

We have adopted a Code of Ethics and Business Conduct that applies to all our directors, officers and employees, including our principal executive officer and our principal financial and accounting officer. A copy of our Code of Ethics and Business Conduct has been posted to the "Investor Relations-Governance" section of our Internet website at http://www.mullensua.com. We will provide a copy of our Code of Ethics and Business Conduct to any person without charge, upon written request to our Secretary at 1405 Pioneer Street, Brea, California 92821, phone (714) 613-1900, e-mail address InvestorRelations@mullenusa.com.

**Committees of the Board of Directors**

The Board of Directors currently has an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee.

*Audit Committee*

The Audit Committee of the Board of Directors consists of Kent Puckett, Chair, Mark Betor, and John K. Andersen. The Board determined that Kent Puckett is an "audit committee financial expert," as defined under the applicable rules of the SEC. The primary functions of the Audit Committee include, among other things:

● reviewing and approving the engagement of the independent registered public accounting firm to perform audit services and any permissible non-audit services for the Company;

● evaluating the performance of the Company's independent registered public accounting firm and deciding whether to retain their services;

● monitoring the rotation of partners on the engagement team of the Company's independent registered public accounting firm;

● reviewing the Company's annual and quarterly financial statements and reports and discussing the statements and reports with the Company's independent registered public accounting firm and management, including a review of disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

● considering and approving or disapproving all related party transactions for the Company;

● reviewing, with the Company's independent registered public accounting firm and management, significant issues that may arise regarding accounting principles and financial statement presentation, as well as matters concerning the scope, adequacy and effectiveness of the Company's financial controls;

● conducting an annual assessment of the performance of the Audit Committee and its members, and the adequacy of its charter; and

● establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding financial controls, accounting, or auditing matters.

77

Table of Contents

Each member of the Audit Committee satisfies the independence requirements under Nasdaq Capital Market listing standards and Rule 10A-3(b)(1) of the Exchange Act and is a person who the Board of Directors has determined has the requisite financial expertise required under the applicable requirements of Nasdaq Capital Market. In arriving at this determination, the Board of Directors examined each Audit Committee member's scope of experience and the nature of their employment in the corporate finance sector.

***Compensation Committee***

The Compensation Committee of the Board of Directors consists of Kent Puckett, Chair, John K. Andersen, and Mark Betor. The functions of the Compensation Committee include, among other things:

●determining the compensation and other terms of employment of the Company's chief executive officer and our other executive officers and reviewing and approving corporate performance goals and objectives relevant to such compensation;

●reviewing and recommending to the full Board of Directors the compensation of the Board of Directors;

●evaluating and administering the equity incentive plans, compensation plans and similar programs advisable for the Company, as well as reviewing and recommending to the Board of Directors the adoption, modification or termination of the Company's plans and programs;

●establishing policies with respect to equity compensation arrangements;

●if required, reviewing with management the Company's disclosures under the caption "Compensation Discussion and Analysis" and recommending to the full Board of Directors its inclusion in the Company's periodic reports to be filed with the SEC; and

●reviewing and evaluating, at least annually, the performance of the Compensation Committee and the adequacy of its charter.

The Board of Directors has determined that each member of the Compensation Committee is independent under Nasdaq Capital Market listing standards and a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act.

***Nominating and Corporate Governance Committee***

The Nominating and Governance Committee of the Board of Directors currently consists of Mark Betor, Chair, Mary Winter and Kent Puckett. The functions of the Nominating and Corporate Governance Committee include, among other things, the following:

●reviewing periodically and evaluating director performance on the Board of Directors and its applicable committees, and recommending to the Board of Directors and management areas for improvement;

●interviewing, evaluating, nominating and recommending individuals for membership on the Board of Directors;

●reviewing and recommending to our board of directors any amendments to the Company corporate governance policies; and

●reviewing and assessing, at least annually, the performance of the Nominating and Corporate Governance committee and the adequacy of its charter.

The Board of Directors has determined that each member of the Nominating and Corporate Governance Committee is independent under Nasdaq Capital Market listing standards.

Table of Contents

**Item 11. Executive Compensation.**

**Summary Compensation Table**

The following table sets forth certain information about the compensation earned during the years ended September 30, 2024 and 2023, as applicable, to our Chief Executive Officer and each of our two most highly compensated executive officers other than our Chief Executive Officer who were serving as executive officers at September 30, 2024, and whose annual compensation exceeded $100,000 during such year or would have exceeded $100,000 during such year if the executive officer were employed by the Company for the entire fiscal year (collectively the "**named executive officers**").

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) (1) | Options Awards ($) | Total ($) |
|---|---|---|---|---|---|---|
| David Michery | 2024 | $ 750,000 | $ - | $ 2,500,000 | $ - | $ 3,250,000 |
| Chief Executive Officer | 2023 | 750,000 | - | 48,879,463 | - | 49,629,463 |
| | | | | | | |
| Jonathan New | 2024 | 499,795 | - | - | 1,598,610(2) | 2,098,405 |
| Chief Financial Officer | 2023 | 425,000 | 10,000 | 198,300 | - | 633,300 |
| | | | | | | |
| Chester Bragado | 2024 | 392,192 | - | 1,533,000 | - | 1,925,192 |
| Chief Accounting Officer | 2023 | - | - | - | - | - |

(1) Represents share-based compensation based on the grant date fair value of common stock computed in accordance with FASB ASC Topic 718, i.e. for common stock earned per labor contract - market price of the shares on the date immediately preceding the employment contract date, for common stock earned by CEO per Award Incentive Plans - market price of the shares on the date immediately preceding the date when the shares have been issued (see the list of performance awards in the CEO Performance Award chapter, and the list of achieved milestones in the CEO Performance Award Table below). The stock-based compensation to Mr. Michery for the year ended September 30, 2024 in the enclosed statements of operations is different due to revaluation of a liability accrued per FASB ASC Topic 718 that have not been earned and paid by September 30, 2024, but will probably be earned and paid later. See the Company's financial statements for discussion of stock-based compensation.

(2) Represents grant date fair value, computed in accordance with FASB ASC Topic 718, of a 5-year option to purchase 3,000 shares of common stock, awarded in May 2024, vested immediately, with an exercise price of $486 (giving effect to reverse stock splits, including 1:100 reverse stock split effectuated in September 2024).

***Narrative Disclosure to Summary Compensation Table***

The primary elements of compensation for the Company's named executive officers are base salary, bonus and equity-based compensation awards. The named executive officers also participate in employee benefit plans and programs that we offer to our other full-time employees on the same basis.

*Base Salary*

The base salary payable to our named executive officers is intended to provide a fixed component of compensation that reflects the executive's skill set, experience, role, and responsibilities.

Table of Contents

*Bonus*

Although we do not have a written bonus plan, the Board may, in its discretion, award bonuses to our executive officers on a case-by-case basis. These awards are structured to reward named executive officers for the successful performance of Mullen as a whole and of each participating named executive officer as an individual. The bonus amounts awarded were on an entirely discretionary basis. In addition, as described under the heading "*Employment and Severance Agreements,*" the chief executive officer is eligible under the terms of their respective employment agreements to receive set bonus amounts based on Mullen's achievement of certain financial milestones.

**Share-based Compensation**

*2022 Equity Incentive Plan*

On July 26, 2022, at the 2022 Annual Meeting, the Company's stockholders approved the 2022 Equity Incentive Plan (the "**2022 Plan**"). Additional details about the 2022 Plan are set forth in the Company's Definitive Proxy Statement on Schedule 14A, as filed with the SEC on July 10, 2023.

The 2022 Plan provides for grants of stock options, stock appreciation rights, stock awards and restricted stock units, all of which are sometimes referred to individually, to employees, consultants, non-employee directors of the Company and its subsidiaries. Stock options may be either incentive stock options, as defined in Section 422 of the Internal Revenue Code, or non-qualified stock options. The 2022 Plan initially reserved for issuance 4 shares of common stock (giving effect to the Company's reverse stock splits), and on August 3, 2023, the stockholders approved an increase of the number of reserved shares by 52,000,000, and on September 13, 2024, the stockholders approved an increase of the number of reserved shares by 11,000,000 (not subject to adjustment for any decrease or increase in the number shares of common stock resulting from a stock spilt, reverse stock split, recapitalization, combination, reclassification, the payment of a stock dividend on the common stock or any other decrease in the number of such shares of common stock effected without receipt of consideration by the Company).

During the years ended September 30, 2024 and 2023, Mr. Michery earned 1 share and 1,135 shares of Common Stock, respectively; Mr. New earned 1 share and received a 5-year option to purchase 3,000 shares of common stock in lieu of shares and 1 share of common stock, respectively; and Mr. Bragado earned 2,738 shares and 1 share of Common Stock, respectively (giving effect to the Company's reverse stock splits, including a 1:100 reverse stock split effectuated in September 2024).

*Policies and Practices Related to the Grant of Certain Equity Awards Close in Time to the Release of Material Nonpublic Information*

We do not have a formal policy with respect to the grant of equity incentive awards to our executive officers or any formal equity ownership guidelines applicable to them.

**Clawback Policy**

In November 2023, the Board of Directors adopted a clawback policy that may be applied in the event of a material financial restatement. The clawback policy covers current and former executive officers and includes all incentive compensation. Specifically, in the event of an accounting restatement, the Company must recover, reasonably promptly, any excess incentive compensation received during the three completed fiscal years immediately preceding the date on which the Company is required to prepare an accounting restatement. Compensation that may be recoverable under the policy includes cash or equity-based compensation for which the grant, payment or vesting is or was based wholly or in part on the attainment of a financial reporting measure. The amount to be recovered will be the excess of the incentive compensation paid based on the erroneous data over the incentive compensation that would have been paid had it been based on the restated results.

Table of Contents

| Name | Number of securities underlying unexercised options (#) exercisable | Number of securities underlying unexercised options (#) unexercisable | Equity incentive plan awards: number of securities underlying unexercised unearned options (#) | Option exercise price ($) | Option expiration date |
|---|---|---|---|---|---|
| David Michery | - | - | - | - | - |
| Jonathan New | 3,000 | - | - | $ 486 | 5/16/2029 |
| Chester Bragado | - | - | - | - | - |

**CEO Performance Awards**

On May 5, 2022, the Company entered into to a Performance Stock Award Agreement (the "**2022 PSA Agreement**") pursuant to which the Company agreed to grant performance equity awards to the Chief Executive Officer ("**2022 CEO Performance Award**") and on July 26, 2022, the Company's stockholders approved, for purposes of complying with Nasdaq Listing Rule 5635(c), of the issuance of shares of common stock to the Company's Chief Executive Officer, David Michery, pursuant to the 2022 PSA Agreement. On June 8, 2023, the Compensation Committee further (1) determined that the grant of performance equity awards to the Chief Executive Officer ("**2023 CEO Performance Award**") pursuant to the 2023 Performance Stock Award Agreement (the "**2023 PSA Agreement**" and together with the 2022 PSA Agreement, the "**PSA Agreements**") was advisable and in the best interests of the Company and its stockholders and (2) approved entering into the 2023 PSA Agreement and the grant of the 2023 CEO Performance Award. On August 3, 2023, at the 2023 Annual Meeting, the Company's stockholders approved, for purposes of complying with Nasdaq Listing Rule 5635(c), of the issuance of shares of common stock to the Company's Chief Executive Officer, David Michery, pursuant to the 2023 PSA Agreement.

On December 27, 2024, the Company entered into amendments to the PSA Agreements, subject to stockholder approval, extending the deadline of the Capital Benchmark Milestone in the 2022 PSA Agreement (the "**2022 PSA Amendment**") and the Vehicle Completion, Revenue Benchmark, Battery Development and JV Acquisition Milestones in the 2023 PSA Agreement (the "**2023 PSA Amendment**" and together with the 2022 PSA Amendment, the "**PSA Amendments**").

Pursuant to each PSA Agreement, Mr. Michery is eligible to receive shares of common stock of the Company based on the achievement of milestones as described below, and within each milestone the achievement of certain performance tranches, with each tranche representing a portion of shares of common stock that may be issued to Mr. Michery upon achievement of such tranche. Upon the achievement of each tranche of one of the milestones and subject to Mr. Michery continuing as the Chief Executive Officer as of the date of satisfaction of such tranche and through the date the Compensation Committee determines, approves and certifies that the requisite conditions for the applicable tranche have been satisfied, the Company will issue shares of its common stock as specified in the tranche. Each milestone must be achieved within the performance period specified for such milestone. The latest milestone that may be achieved is December 31, 2024 under the 2022 PSA Agreement, and December 31, 2025 under the 2023 PSA Agreement. Under the PSA Amendments, subject to stockholder approval, the latest milestone that may be achieved is the end of July 2026 under the 2022 PSA Agreement, and the end of December 2027 under the 2023 PSA Agreement.

81

Table of Contents

***2022 PSA Agreement - Description of Milestones***

- *Vehicle Delivery Milestones*: For each of the following five vehicle delivery milestone that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of the Company's then-current total issued and outstanding shares of common stock: (i) Delivery of the Company's Class One Van to customers for a pilot program under the captured fleet exemption by the end of December 2022 (achieved, see below); (ii) Procuring full USA certification and homologation (or vehicle approval process) for the sale and delivery of its Class One Van by end of August 2023 (expired); (iii) Full USA certification and homologation of the Dragonfly RS sports car by August 2024 (expired); (iv) Producing a drivable prototype of its Mullen 5 vehicle for consumers to test by end of October 2023 (achieved, see below); and (v) Producing a drivable prototype of its Mullen 5 RS High Performance vehicle for consumers to test by end of January 2023 (expired).

  On October 3, 2022, the Company delivered its Class One Van to Hotwire Communications, a South Florida-based telecommunications company and Internet Service Provider for a pilot program under the captured fleet exemption.

  On August 20, 2023, a drivable porotype of the Mullen 5 vehicle was part of the Mullen road tour and available for consumers to test drive. The other milestones mentioned above have expired

- *Capital Benchmark Milestones*: For each $100 million raised (a "Capital Tranche"), and subject to an aggregate maximum of raised of $1.0 billion in equity or debt financing between the date of the award agreement and the end of July 2024 (the PSA Amendments extend this deadline to July 2026), the Company will issue a number of shares of common stock equal to 1%, of the Company's then-current total issued and outstanding shares of common stock; as of the date a Capital Tranche is achieved. Additionally, if the Company is included in the Russell Index, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares as of the date the Company is approved to be included on the Russell Index. On June 7, 2022, the Company entered into a securities purchase agreement which, along with subsequent amendments, allowed the Company to raise more than $400 million to date through the issuance of preferred stock, prefunded warrants and common stock in lieu of preferred stock and other warrants.

  On June 27, 2022, the Company joined the Russell 2000 and 3000 Indexes.

  By September 30, 2023, the Company raised more than $400 million through the issuance of preferred stock, prefunded warrants and common stock in lieu of preferred stock and other warrants. By July 31, 2024, the Company raised additional funds so that accumulated raised capital exceeded $100 million (mainly through the issuance of convertible notes and warrants), and relevant milestone shares are due as of September 30, 2024.

- *Feature Milestone*: If Mullen enters into an agreement with a manufacturer or provider of equipment, accessory, feature or other product (collectively, "Feature") by the end of 2023 that sets the Company or its vehicle apart from its competitors or that provides the Company a first mover or first disclosure advantage over its competitors for the Feature, the Company will issue to Mr. Michery a number of shares of common stock equal to 5% of the Company's then-current total issued and outstanding shares of common stock as of the date the Feature milestone is achieved.

  On September 1, 2022, the Company announced that it a signed partnership with Watergen Inc. to develop and equip Mullen's portfolio of electric vehicles with technology that will produce fresh drinking water from the air for in-vehicle consumer and commercial application. On October 12, 2022, the Company entered into the Distributorship Agreement whereby Watergen will be integrating its unique atmospheric water generating and dehumidifying technology into the Company's vehicles and granting exclusivity to the Company for the integration design developed specifically for its vehicles.

82

Table of Contents

●*Distribution Milestone*: For each vehicle distribution milestone set forth below that is satisfied by entering into a joint venture or other distribution agreement by December 31, 2024, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares of common stock for each distribution milestone achieved: (i) agreement with an established local, US dealer or franchise network; and (ii) agreement with an established Latin American or other non-US based dealer or franchise network.

On November 8, 2022, the Company entered into an agreement into an agreement to appoint Newgate Motor Group as the marketing, sales, distribution and servicing agent for the Mullen I-GO in Ireland and the United Kingdom.

On December 12, 2022, the Company entered into a Dealer Agreement with Randy Marion Isuzu, a large USA dealer, to purchase and distribute the Company's vehicles.

*2023 PSA Agreement - Description of Milestones*

●*Vehicle Completion Milestones*: For each vehicle completion Milestone set forth below that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of common stock equal to 3% of Mullen's then-current total issued and outstanding shares of common stock: (i) Procuring full USA certification and homologation of its Class Three Van by end of December 2023; (ii) Full USA certification and homologation of the Bollinger B1 sports car by end of June 2025; and (iii) Full USA certification and homologation of the Bollinger B2 sports car by end of June 2025. The milestone described in subsection (i) has expired. The PSA Amendments extend the deadlines in subsections (ii) and (iii) to June 2026.

●*Revenue Benchmark Milestones*: For each $25 Million of revenue recognized by the Company (each a "Revenue Tranche"), and subject to an aggregate maximum of recognized revenue of $250 Million between the date of grant and the end of December 2025, the Company will issue to Mr. Michery a number of shares of common stock equal to 1% of Mullen's then-current total issued and outstanding shares of common stock as of the date a Revenue Tranche is achieved. The PSA Amendments extend the deadline to the end of December 2027.

●*Battery Development Milestones*: For each Battery Development Milestone set forth below that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares of common stock: (i) the Company either directly or in collaboration with a joint venture partner develops or produces new and more advanced battery cells by the end of December 2024; (ii) the Company either directly or in collaboration with a joint venture partner scales its battery cells in the USA to the vehicle pack level for the Mullen Class 1 vehicle by the end of December 2024; (iii) the Company either directly or in collaboration with a joint venture partner scales its battery cells in the USA to the vehicle pack level for the Mullen Class 3 vehicle by the end of December 2024. The PSA Amendments extend the deadline in subsection (iii) to the end of December 2025.

On February 26, 2024, the Company began Class One EV cargo van road testing with the integrated solid-state polymer battery pack.

On November 21, 2024, the Company announced to the public that utilizing equipment, inventory, and intellectual property for high-volume battery pack and module production acquired as part of its Romeo assets acquisition (see below), it had integrated these assets into the Company's Monrovia, California facility, enhancing production capabilities and reducing supplier dependency. Battery lines include High-volume standard battery chemistry line, High-precision, low-volume standard chemistry R&D line, High-precision, low-volume solid-state polymer R&D line and in progress, High-volume standard chemistry battery line.

Shares to be issued pursuant to the Company meeting these two milestones are recognized as a liability in the consolidated balance sheets as of September 30, 2024.

●*JV-Acquisition Milestones*: If Mullen enters into a partnership, joint venture, purchase and sale agreement or similar transaction by the end of 2025 where the Company acquires a majority interest in an enterprise that manufacturers or provides vehicles, vehicle equipment, battery cells, accessories or other products beneficial to the Company, the Company will issue to Mr. Michery a number of shares of common stock equal to 3% of Mullen's then-current total issued and outstanding shares of common stock as of date the JV-Acquisition Milestone is achieved. The PSA Amendments extend the deadline to the end of 2026.

83

Table of Contents

● *Accelerated Development Milestone*: If Mullen acquires a facility with existing equipment that allows the Company to expedite scaling of battery pack production in the USA, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares of common stock as of date the Accelerated Development Milestone is achieved.

On September 6, 2023, the Company acquired the battery production assets of Romeo Power including intellectual property, machinery and equipment that allows the Company to expedite scaling of battery pack production in the USA.

To date, the following shares of common stock have been issued pursuant to the PSA Agreements based on the achievement of the milestones and tranches listed in the table below (giving effect to the Company's reverse stock splits):

**CEO Performance Award Table**

| Date approved by BOD | Milestone | % of O/S Shares | Shares O/S (*) | Shares Issued / due (*) | Stock Price (*) | Stock Compensation ($) (**) |
|---|---|---|---|---|---|---|
| 9/21/2022 | PSA2022. Russell Index Tranche | 2% | 214 | 5 | $ 789,160 | $ 3,945,799 |
| **Total shares issued during the fiscal year ended 9/30/2022** | | | | **5** | | **$ 3,945,799** |
| 10/12/2022 | PSA2022. Features Milestone | 5% | 399 | 20 | 561,054 | 11,221,088 |
| 11/9/2022 | PSA2022. Non-USA Distribution | 2% | 548 | 11 | 604,383 | 6,648,217 |
| 11/30/2022 | PSA2022. Capital Benchmark (>$200 mln) | 2% | 640 | 13 | 442,545 | 5,753,090 |
| 12/16/2022 | PSA2022. USA Distribution | 2% | 753 | 16 | 635,124 | 10,161,979 |
| 2/16/2023 | PSA2022. Vehicle Delivery - Pilot | 2% | 371 | 8 | 709,128 | 5,673,024 |
| 6/13/2023 | PSA2022. Capital Benchmark (>$300 mln) | 1% | 2,926 | 30 | 20,185 | 605,542 |
| 7/5/2023 | PSA2022. Capital Benchmark (>$400 mln) | 1% | 7,149 | 72 | 5,262 | 378,877 |
| **Total shares issued during the fiscal year ended 9/30/2023** | | | | **170** | | **$ 40,441,817** |
| 10/10/2023 | PSA2022. Vehicle Delivery - Mullen 5 | 2% | 18,441 | 369 | 2,671 | 985,468 |
| 10/10/2023 | PSA2023. Accelerated development milestone | 2% | 24,848 | 497 | 2,672 | 1,327,840 |
| **Total shares issued during the fiscal year ended 9/30/2024** | | | | **866** | | **$ 2,313,308** |
| 12/23/2024 | PSA2022. Capital Benchmark (>$500 mln) | 1% | 228,648 | 2,286 | 1.20 | 2,744 |
| 12/23/2024 | PSA2023. Battery development #2 (Class 1) | 2% | 70,576 | 1,411 | 1.20 | 1,693 |
| 12/23/2024 | PSA2023. Battery development #1 (Advanced) | 2% | 9,958,323 | 199,166 | 1.20 | 238,999 |
| **Total shares issued or to be issued after 9/30/2024** | | | | **202,863** | | **$ 243,436** |
| **Total shares issued or to be issued** | | | | **203,904** | | **$ 46,944,360** |

(*) The number of outstanding shares, shares issued and the stock price have been retroactively adjusted giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. The number of shares issued for each milestone as presented in the table may not equal the product of the percentage of outstanding shares for such milestone, due to the rounding up of fractional shares as a result of each reverse stock split.

(**) Compensation amounts do not reflect cash amounts actually received by the CEO. Amounts reported only represent fair value of common stock awarded computed in accordance with FASB ASC Topic 718 (i.e., market price of the shares on the date immediately preceding the date when the shares were issued). Based on the closing price of $0.4142 on January 22, 2025, the dollar amount of the 203,904 total shares issued or to be issued is $84,457.

Table of Contents

**Employment and Severance Agreements**

We have entered into employment agreements with each of our named executive officers described below.

*Chairman of the Board, President and Chief Executive Officer*

Effective June 1, 2021, David Michery and the Company entered into an employment agreement pursuant to which Mr. Michery receives an annual salary of $750,000 plus incentive compensation and 1,000,000 shares of common stock each year. Mr. Michery is also entitled to reimbursement compensation for all reasonable expenses up to $500,000 per year.

In the event (a) the Company terminates Mr. Michery's employment without cause, (b) Mr. Michery leaves as a result of constructive discharge by the Company, (c) of Mr Michery's death, or (d) there is a change of control of the Company or the Company's stockholders receive a proxy request or tender offer for a transaction which could result in a change of control and Mr. Michery at his option terminates his employment, then the Company is obligated to pay Mr. Michery (i) his then-current annual compensation multiplied by a number of years equal to 10 minus the number of complete years since the date of the agreement, to be paid within 90 days of termination, and (ii) an amount equal to 10% of the Company's market capitalization at such time, to be paid 180 days after termination. To the extent that Mr. Michery's benefits from any pension or any other retirement plan or program (whether tax qualified or not) are not fully vested at the time of such termination, the Company will obtain and pay the premium upon an annuity policy to provide the benefits as though Mr. Michery had been fully vested on the date of termination. Upon termination for cause, the employment agreement will terminate, except for certain provisions such as post-employment noncompetition and nonsolicitation, and the Company will not be obligated to make any further payments, except for any remaining payments of annual compensation, benefits which are required by applicable law to be continued, and reimbursement of expenses.

Pursuant to the agreement, "cause" means conviction of or a plea of no contest to a felony, or incapacity due to alcoholism or substance abuse. "Constructive discharge" means (a) diminution in title(s), responsibilities, or the then-current annual compensation, (b) failure by the Company to comply with the compensation provisions of the agreement, (c) location of place of employment outside the United States, and (d) engagement in any material and intentional breach by the Company of its principal obligations under the agreement which is not remedied within 15 business days after receipt of written notice. A "change of control" means a sale of all or substantially all of the assets of the Company, or any transaction, or any series of transactions consummated in a 12-month period, pursuant to which any person acquires (by merger, acquisition, or otherwise) all or substantially all of the assets of the Company or the then outstanding equity securities of the Company and the Company is not the surviving entity, the Company being deemed surviving if and only if the majority of the Board of Directors of the ultimate parent of the surviving entity were directors of the Company prior to its organization.

During a disability, the Company will continue to pay to Mr. Michery his full amount of his then-current annual compensation for the one-year period next succeeding the date upon which such disability has been certified, as well as a prorated amount of any incentive compensation which would have been paid at the end of the year. Thereafter, if the disability continues, the agreement will terminate and all of Mr. Michery's obligations will cease and Mr. Michery will be entitled to receive the benefits, if any, as may be provided by any insurance to which he may have become entitled as well as the acceleration of the exercise date of any incentive stock options granted prior to disability. A "disability" means a written determination by an independent physician mutually agreeable to the Company and Mr. Michery that he is physically or mentally unable to perform his duties of CEO under the agreement and that such disability can reasonably be expected to continue for a period of six consecutive months or for shorter periods aggregating 180 days in any 12-month period.

The agreement contains non-competition and non-solicitation covenants. For one year after voluntary separation from the Company, Mr. Michery cannot engage in competitive business activity within the Company territory; prevents him from participating in any transaction that occurred within 24-month period preceding from incident in questions; and prevents him from contacting employees for any business and employment opportunities.

85

Table of Contents

***Chief Financial Officer***

On September 19, 2022, the Company entered into an employment agreement with Jonathan New. After the changes effectuated on 10/2/2023, he receives an annual salary of $500,000 and 1 share of common stock per year (giving effect to the Company's reverse stock splits). If Mr. New is terminated for any reason other than due to negligence, failure to deliver services or perform at the level hired or for any other just cause, he is entitled to a payment of $200,000, paid in the Company's usual payroll cycle.

***Chief Accounting officer***

In March 2023, the Company entered into an employment agreement with Chester Bragado. Starting from November 27, 2023, he receives an annual salary of $400,000 and 1 share of common stock per year (giving effect to the Company's reverse stock splits). If Mr. Bragado is terminated for any reason other than due to negligence, failure to deliver services or perform at the level hired or for any other just cause, he is entitled to a payment of six months salary, paid in the Company's usual payroll cycle.

***Consulting Agreements***

***William Miltner***

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner is also an elected Director for the Company, beginning his term in August 2021. For the fiscal year ending September 30, 2024, Mr. Miltner received $1,180,733 for services rendered. Mr. Miltner has been providing legal services to us since 2020.

***Mary Winter***

On October 26, 2021, the Company entered into a consulting agreement with Mary Winter, Corporate Secretary and Director, to compensate for corporate secretary services and director responsibilities for the period from October 1, 2021, to September 30, 2024, in the amount of $60,000 annually or $5,000 per month. For the fiscal year ending September 30, 2024, Ms. Winter has received $60,000 in consulting payments.

***Change of Control Agreements - CEO and Non-Employee Directors***

On August 11, 2023, the Company entered into Change in Control Agreements with each non-employee director (John Andersen, Mark Betor, William Miltner, Ignacio Novoa, and Kent Puckett) and David Michery, its Chief Executive Officer. Pursuant to the Change in Control Agreements with each non-employee director, upon a change in control of the Company, any unvested equity compensation will immediately vest in full and such non-employee director will receive $5 million. Pursuant to the Change in Control Agreement with Mr. Michery, upon a change in control of the Company, any unvested equity compensation will immediately vest in full and Mr. Michery will receive an aggregate percentage of the transaction proceeds as follows: 10% of the transaction proceeds that are up to and including $1 billion; plus an additional 5% of transaction proceeds that are more than $1 billion and up to $1.5 billion; and an additional 5% of transaction proceeds that are more than $1.5 billion. A change in control, as defined in the agreements occurs upon (i) any person becoming the beneficial owner of 50% or more of the total voting power of the Company's then outstanding voting securities, (ii) a change in the composition of the Board, as a result of which fewer than a majority of the directors are Incumbent Directors (as defined in the Change in Control Agreements), or (iii) the consummation of a merger or consolidation of the Company (except when the total voting power of the Company continues to represent at least 50% of the surviving entity), any liquidation, or the sale or disposition by the Company of all or substantially all of its assets.

Table of Contents

**Non-Employee Director Compensation**

Our non-employee directors receive compensation for service on our board of directors and committees of our board of directors as follows:

- Each non-employee director will receive $50,000 annually as a cash retainer for their Board service, with additional annual cash retainers of (i) $5,000 for each member of the Company's Compensation Committee or Nominating and Corporate Governance Committee; (ii) $7,500 for the Chairman of the Compensation Committee or Nominating and Corporate Governance Committee; (iii) $10,000 for each member of the Audit Committee; (iv) $45,000 for the chair of the Audit Committee; and (v) $25,000 to the Lead Independent Director. All cash retainers are paid quarterly in arrears.

- Additionally, each non-employee director shall receive an annual stock award under the Company's equity plan equal to $100,000 divided by the closing trading price of the Company's common stock on the date of each such grant.

- The non-employee directors are entitled to reimbursement of ordinary, necessary, and reasonable out-of-pocket travel expenses incurred in connection with attending in-person meetings of the Board or committees thereof. In the event non-employee directors are required to attend greater than four in-person meetings or 15 telephonic meetings during any fiscal year, such non-employee directors will be entitled to additional compensation in the amount of $500 for each additional telephonic meeting beyond the 15 telephonic meeting thresholds, and $1,000 for each additional in-person meeting beyond the four in-person meeting threshold.

The following table sets forth information regarding compensation earned by each person who served as a non-employee member of our board of directors during 2024.

| Name of Director | Fees earned and payable in cash ($) | Awards earned and payable in stock ($) | Total ($) |
|---|---|---|---|
| John K. Anderson | $ 67,000 | $ 122,730 | $ 189,730 |
| Mark Betor | 99,500 | 125,080 | 224,580 |
| William Miltner | 52,000 | 101,140 | 153,140 |
| Mary Winter | 57,000 | 108,073 | 165,073 |
| Ignacio Novoa | 52,000 | 126,220 | 178,220 |
| Kent Puckett | 109,500 | 129,904 | 239,404 |
| **Total** | **$ 437,000** | **$ 713,147** | **$ 1,150,147** |

87

Table of Contents

**Item 12. Security Ownership of Certain Beneficial Owners and Management**

The table below contains information regarding the beneficial ownership of our common stock by (i) each person who is known to us to beneficially own more than 5% of our common stock, (ii) each of our directors and director-nominees, (iii) each of our named executive officers and (iv) all of our directors and executive officers as a group. The table below reflects the 1:25 reverse stock split that was effected on May 4, 2023, the 1:9 reverse stock split that was effected on August 11, 2023, the 1:100 reverse stock split that was effected on December 21, 2023, and the 1:100 reverse stock split that was effected on September 17, 2024, where each fractional share resulting from such reverse stock splits held by a stockholder was rounded up to the next whole share. Beneficial ownership is determined in accordance with SEC rules and regulations.

Each stockholder's percentage of ownership in the following table is based upon, as applicable, the following shares outstanding as of January 21, 2025:

| Class | Number of Shares | As converted to common stock | Votes/Share | Number of Votes |
|---|---|---|---|---|
| Common Stock | 61,595,743 | N/A | One/share | 61,595,743 |
| Series A Preferred Stock | 648 | 4 | One/share on an as-converted to common basis | 4 |
| Series B Preferred Stock | 0 | 0 | One/share on an as-converted to common basis | 0 |
| Series C Preferred Stock | 458 | 1 | One/share on an as-converted to common basis | 1 |
| Series D Preferred Stock | 363,097 | 1 | One/share, only protective voting | 363,097 |
| Series E Preferred Stock | 0 | 0 | One/share on an as-converted to common basis | 0 |

Each share of Series A Preferred Stock is entitled to 1 vote per share. Each share of Series C Preferred Stock is entitled to one vote for each share of common stock into which such share of Series C Preferred Stock can then be converted. Each share of Series D Preferred Stock is entitled to one vote for each share. Holders of the Series D Preferred Stock have no voting rights except a majority of the outstanding Series D Preferred Stock, voting separately, is required for approval of the authorization or issuance of an equity security having a preference over the Series D Preferred Stock, amendment of the Company's Certificate of Incorporation or bylaws that adversely affect the rights of the Series D Preferred Stock, merger or consolidation of the Company, or dissolution, liquidation or bankruptcy, as set forth in Section 8 of the Certificate of Designation for Series D Preferred Stock.

Under the terms of the Preferred Stock and warrants, a holder may not convert or exercise, as applicable, the Preferred Stock or warrants into common stock to the extent such exercise would cause such holder, together with its affiliates, to beneficially own a number of shares of common stock which would exceed 9.99%, as applicable, of our then outstanding common stock following such conversion or exercise, excluding for purposes of such determination common stock issuable upon conversion of other convertible securities which have not been converted or exercised. The number of shares in the table does not reflect this limitation.

88

Table of Contents

To our knowledge, except as otherwise noted below and subject to applicable community property laws, each person or entity named in the following table has the sole voting and investment power with respect to all shares that he, she or it beneficially owns. Unless otherwise indicated, the address of each beneficial owner listed below is c/o Mullen Automotive Inc. 1405 Pioneer Street, Brea, CA 92821.

| Name of Beneficial Owners | Common Stock(1) Shares | % | Total Voting Power(2) % |
|---|---|---|---|
| **Named Executive Officers and Directors** | | | |
| David Michery | 1,203,961 | 2.0 | 2.0 |
| Jonathan New (3) | 3,000 | * | * |
| Calin Popa | 1 | * | * |
| Chester Bragado | - | - | - |
| John Taylor | - | - | - |
| Mary Winter | 163,001 | * | * |
| Jonathan K. Andersen | 501 | - | - |
| Mark Betor | 231,000 | * | * |
| William Miltner | 175,134 | * | * |
| Ignacio Novoa | - | - | - |
| Kent Puckett | 175,167 | * | * |
| **Directors and Executive Officers as a Group (11 Persons)** | **1,951,765** | **3.2** | **3.2** |
| **5% Beneficial Owners:** | | | |
| Esousa Holdings, LLC (4) | 21,875,812 | 9.9 | 9.9 |
| JADR Capital 2 Pty Ltd (5) | 14,857,106 | 9.9 | 9.9 |
| Acuitas Capital LLC (6) | 5,745,052 | 9.3 | 9.3 |

* Less than 1%.

(1) In computing the number of shares of common stock beneficially owned by a person and the percentage of beneficial ownership of that person, shares of common stock underlying notes, options, warrants or shares of Preferred Stock held by that person that are convertible or exercisable, as the case may be, within 60 days of the Record Date are included. Those shares, however, are not deemed outstanding for the purpose of computing the percentage ownership of any other person.

(2) Percentage total voting power represents voting power with respect to all outstanding shares of Common Stock, Series A Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock; and excludes the Series D Preferred Stock, which is only entitled to limited voting rights. Percentage total voting power also excludes shares of common stock issuable upon exercise of warrants and conversion of notes.

(3) Consists of options to purchase 3,000 shares of Common Stock.

(4) Consists of (i) 6,093,961 shares of Common Stock, (ii) 11,537,895 shares of Common Stock issuable upon conversion of Notes, (iii) 4,243,955 shares of Common Stock issuable upon cash exercise of Warrants, and (iii) 1 share of Common Stock issuable upon conversion of 458 shares of Series C Preferred Stock held by Esousa Holdings, LLC, which may be deemed to be beneficially owned by Michael Wachs, who serves as the sole managing member for Esousa Holdings, LLC. The address for Esousa Holdings, LLC and Michael Wachs is 211 E 43rd St, 4th Fl, New York, NY 10017.

(5) Consists of (i) 5,178,987 shares of Common Stock, (i) 5,524,215 shares of Common Stock issuable upon conversion of Notes, and (ii) 4,153,904 shares of Common Stock issuable upon cash exercise of Warrants, which may be deemed to be beneficially owned by Justin Davis-Rice, who serves as the Director of JADR Capital 2 Pty Ltd. The address for JADR Capital 2 Pty Ltd is Suite 61.06, 25 Martin Place, Sydney NSW 2000 Australia.

(6) Shares of common stock may be deemed to be beneficially owned by Terren Peizer, who serves as the Chief Executive Officer of Acuitas Capital LLC. The address for Acuitas Capital, LLC is 200 Dorado Beach Drive #3831, Dorado, Puerto Rico 00646.

Table of Contents

**Equity Compensation Plan Information**

The following table summarizes our equity compensation plan information as of September 30, 2024, including shares remaining under 2022 Equity Incentive Plan, as amended (the "**2022 Plan**"), designated for compensation to employees, directors and consultants., as well as shares reserved for compensation under PSA Agreements with the CEO. For information about the PSA Agreements, see section titled "*CEO Performance Awards*" under "Item 11. Executive Compensation" in this Annual Report.

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price per share of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by stockholders | 3,000 | $ 486 | 20,910,183(1) |
| Equity compensation plans not approved by stockholders | - | $ - | - |
| **Total** | **3,000** | **486** | **20,910,183** |

As of September 30, 2024, there was 20,449,704 shares of common stock remaining available for future issuance under the 2022 Plan. Shares reserved under the 2022 Plan are not subject to adjustment for any decrease or increase in the number shares of common stock resulting from a stock spilt, reverse stock split, recapitalization, combination, reclassification, the payment of a stock dividend on the common stock or any other decrease in the number of such shares of common stock effected without receipt of consideration by the Company. Shares remaining available for future issuance under the PSA Agreements is based on remaining shares registered on Registration Statements on Form S-8; additional shares may be registered and issued pursuant to the terms of such agreements.

**Item 13. Certain Relationships and Related Party Transactions**

**Transactions with Directors**

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner is also an elected Director for the Company, beginning his term in August 2021. For the fiscal year ending September 30, 2024, Mr. Miltner received $1,180,733 for services rendered. Mr. Miltner has been providing legal services to us since 2020.

On October 26, 2021, the Company entered into a consulting agreement with Mary Winter, Corporate Secretary and Director, to compensate for corporate secretary services and director responsibilities for the period from October 1, 2021, to September 30, 2024, in the amount of $60,000 annually or $5,000 per month. For the fiscal year ending September 30, 2024, Ms. Winter has received $60,000 in consulting payments.

90

Table of Contents

**Transition Services Agreement with MTI**

Prior to its spinoff as a separate entity and the closing of the Merger on November 5, 2021, the Company operated as a division of Mullen Technology, Inc. (MTI), an entity in which the Company's CEO and Chairman of the Board of directors David Michery has a controlling financial interest and of which he was CEO and Chairman during the fiscal years ended September 30, 2023 and 2022.

Subsequent to the spinoff transaction and Merger on November 5, 2021, the Company, in accordance with Transition Services Agreement dated May 12, 2021 between the Company and MTI (the "TSA"), processed and disbursed payroll and related compensation benefits for 11 employees that provided services only to MTI and rent costs for facilities utilized by MTI pursuant to the TSA. The terms of the TSA require MTI to repay monthly the amounts advanced by the Company, with the lower of the prime rate plus 1% or the maximum rate under applicable law charged on the unpaid amounts. The terms of the TSA do not provide for any other payment processing service fee from MTI to the Company except the interest fee on overdue advance balances.

The Company incurred approximately $1.2 million and $0.9 million of disbursements on behalf of MTI during the years ended September 30, 2022 and 2023, respectively. No amounts have been collected for the funds advanced through September 30, 2023.

On March 31, 2023, the Company converted approximately $1.4 million of these advances to MTI to a note receivable from MTI. The note bears interest at 10% per year and matures on March 31, 2025 with a default rate of 15% per annum. By the end of the 2023 fiscal year, the note principal has been increased by additional $0.4 million. Remaining advances, note and interest receivable as at September 30 2023 and 2022 are presented within non-current assets of the consolidated balance sheets.

On January 16, 2024, the Company terminated the Transition Services Agreement between the Company and Mullen Technologies, Inc., and received payment in full settlement of all amounts outstanding (including outstanding notes receivable, advances and related interest) of approximately $2.7 million.

Similarly, during the fiscal year ended September 30, 2024, the Company paid $55 thousand for certain expenses of other companies under control of the Company's CEO and $25 thousand was reimbursed by September 30, 2024.

**MTI Business Acquisition**

On July 18, 2024, the Company entered into an Asset Purchase Agreement with Mullen Technologies, Inc. ("MTI"), pursuant to which the Company assumed a lease for premises located in Oceanside, California and all equipment and inventory in the premises, as well as staffing and other infrastructure for vehicle sales and repairs for consideration of $1.4 million. The Company's CEO has a controlling financial interest and is Chairman of MTI. For further information, see *Note 4 - Business acquisitions* in the notes to the Company's consolidated financial statement include in this Report.

91

Table of Contents

**DRIVEiT**

Some of the Company's executive officers and directors also hold positions at DRIVEiT, a start-up enterprise in the business of operating electric vehicle superstores. At this time, it is planned for the Company to provide its portfolio of new commercial EVs to DRIVEiT as part of their offerings. David Michery, the Company's Chairman Chief Executive Officer, President and Chairman, is also Chairman of the Board of Directors of DRIVEiT. Jonathan New, Chief Financial Officer, is also Chief Financial Officer of DRIVEiT. Kent Puckett, a director and chair of audit committee of Mullen, is also a director of DRIVEiT, and Ignacio Novoa and Mark Betor serve as directors for both companies. Makayla Brown is the Director of Operations for Mullen and serves as a director DRIVEiT. Related party transactions that present difficult conflicts of interest, could result in disadvantages to Mullen.

**Item 14. Principal Accountant Fees and Services.**

The following tables sets forth the aggregate accounting fees paid by (or due from) by the Company for the years ended September 30, 2024 and 2023 to the independent audit firm RBSM LLP. Review of the financial statements for the first quarter of the year ended September 30, 2023 was performed by another firm (Daszkal Bolton LLP).

| RBSM LLP | Year Ended September 30, 2024 | | Year Ended September 30, 2023 | |
|---|---|---|---|---|
| **Type of Fees** | | | | |
| Audit fees | $ | 987,500 | $ | 376,336 |
| Audit related fees | | - | | - |
| Tax fees | | - | | - |
| Total | $ | 987,500 | $ | 376,336 |

**Types of Fees Explanation**

*Audit Fees*. The aggregate fees, including expenses, billed by (expected to be billed by) our principal accountant for the audit of our annual financial statements and review of financial statements included in our quarterly reports on Form 10-Q and other services that are normally provided in connection with statutory and regulatory filings.

*Audit-Related Fees*. The aggregate fees, including expenses, billed by (expected to be billed by) our principal accountant for other assurance and related services that are reasonably related to the performance of the audit or review of our financial statements not reported under "Audit Fees" above.

*Tax Fees*. The aggregate fees, including expenses, billed by (expected to be billed by) our principal accountant for services rendered for tax compliance, tax advice and tax planning.

**Audit Committee Pre-Approval Policy**

Our audit committee is responsible for approving in advance the engagement of our principal accountant for all audit services and non-audit services, based on independence, qualifications and, if applicable, performance, and approving the fees and other terms of any such engagement. The audit committee may in the future establish pre-approval policies and procedures pursuant to which our principal accountant may provide certain audit and non-audit services to us without first obtaining the audit committee's approval, provided that such policies and procedures (i) are detailed as to particular services, (ii) do not involve delegation to management of the audit committee's responsibilities described in this paragraph and (iii) provide that, at its next scheduled meeting, the audit committee is informed as to each such service for which the principal accountant is engaged pursuant to such policies and procedures. In addition, the audit committee may in the future delegate to one or more members of the audit committee the authority to grant pre-approvals for such services, provided that the decisions of such member(s) to grant any such pre-approval must be presented to the audit committee at its next scheduled meeting.

All audit and audit-related services performed by our principal accountant during the fiscal years ended September 30, 2024, and 2023 were pre-approved by our Audit Committee or by our Board of Directors, then acting in the capacity of an audit committee.

Table of Contents

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules.**

(a)  The following documents are filed as a part of this Annual Report on Form 10-K:

1.  *Financial Statements.*

The consolidated financial statements of Mullen Automotive Inc. and notes thereto and the reports of the independent registered public accounting firms thereon are set forth beginning on page F-1 and filed as part of this Report.

2.  *Exhibits.*

The exhibits filed or furnished as part of this Annual Report on Form 10-K are those listed in the following Exhibit Index.

**EXHIBIT INDEX**

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit | Filing Date | |
| 2.1+ | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., and Robert Bollinger. | 8-K | 001-34887 | 2.1 | 09/08/2022 | |
| 2.1(a) | First Amendment to the Common Stock Purchase Agreement, dated as of October 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., and Robert Bollinger. | 8-K | 001-34887 | 2.1 | 10/14/2022 | |
| 2.1(b) | First Amendment to the Cash Escrow Agreement, dated as of October 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., Robert Bollinger and Continental Stock Transfer & Trust Company. | 8-K | 001-34887 | 2.2 | 10/14/2022 | |
| 2.1(c) | First Amendment to the Stock Reservation Agreement, dated as of October 7, 2022, by and among Mullen Automotive Inc., Bollinger Motors, Inc., Robert Bollinger and Continental Stock Transfer & Trust Company. | 8-K | 001-34887 | 2.3 | 10/14/2022 | |
| 2.2 | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc. and Robert Bollinger. | 8-K | 001-34887 | 2.2 | 09/08/2022 | |
| 2.3 | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc. and John Masters. | 8-K | 001-34887 | 2.3 | 09/08/2022 | |
| 2.4+ | Common Stock Purchase Agreement, dated as of September 7, 2022, by and among Mullen Automotive Inc. and Seaport Global Asset Management SPV LLC - Series A. | 8-K | 001-34887 | 2.4 | 09/08/2022 | |
| 2.5+ | Asset Purchase Agreement dated September 16, 2022 between the Company and David W. Carickhoff, solely as Chapter 7 trustee of the Bankruptcy Estates of Electric Last Mile Solutions, Inc. and Electric Last Mile, Inc. | 8-K | 001-34887 | 10.1 | 09/19/2022 | |
| 3.1(a) | Second Amended and Restated Certificate of Incorporation of Mullen Automotive Inc., dated November 5, 2021 | 8-K | 001-34887 | 3.2 | 11/12/2021 | |

93

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
| | | Form | File No. | Exhibit | Filing Date | |
|---|---|---|---|---|---|---|
| 3.1(b) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation of Mullen Automotive Inc., dated March 8, 2022 | 8-K | 001-34887 | 3.1 | 03/10/2022 | |
| 3.1(c) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on July 26, 2022 | 8-K | 001-34887 | 3.1 | 07/27/2022 | |
| 3.1(d) | Certificate of Designations, Preferences and Rights of Series D Convertible Preferred Stock. | S-3ASR | 333-267502 | 4.1(c) | 09/19/2022 | |
| 3.1(e) | Certificate of Mullen Automotive Inc. Increasing Number of Shares of Preferred Stock Designated as Series D Convertible Preferred Stock. | S-3ASR | 333-267913 | 4.1(d) | 10/17/2022 | |
| 3.1(f) | Certificate of Designation of Series AA Preferred Stock, filed November 14, 2022 | 8-K | 001-34887 | 3.1 | 11/14/2022 | |
| 3.1(g) | Certificate of Cancellation filed on January 30, 2023 | 8-K | 001-34887 | 3.1 | 01/30/2023 | |
| 3.1(h) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on January 30, 2023 | 8-K | 001-34887 | 3.2 | 01/30/2023 | |
| 3.1(i) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on May 3, 2023 | 8-K | 001-34887 | 3.1 | 05/05/2023 | |
| 3.1(j) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on August 10, 2023 | 8-K | 001-34887 | 3.1 | 08/11/2023 | |
| 3.1 (k) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on December 20, 2023 | 8-K/A | 001-34887 | 3.1 | 12/21/2023 | |
| 3.1(l) | Certificate of Designation of Rights, Preferences and Privileges of Series A-1 Junior Participating Preferred Stock filed on May 1, 2024 | 8-K | 001-34887 | 3.1 | 5/6/2024 | |
| 3.1(m) | Certificate of Mullen Automotive Inc. of Preferred Stock Designated as Series E Preferred Stock filed on May 31, 2024. | 8-K | 001-34887 | 3.1 | 6/6/2024 | |
| 3.1(n) | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation filed on September 16, 2024 | 8-K | 001-34887 | 3.1 | 9/20/2024 | |
| 3.2 | Amended and Restated Bylaws, as of November 30, 2023 | 10-K | 001-34887 | 3.2 | 1/17/2024 | |
| 4.1 | Description of Company's Securities | | | | | ✔ |
| 4.2 | Warrant dated March 14, 2023 issued to Qiantu Motor USA, Inc. | 10-Q | 001-34887 | 4.2 | 05/15/2023 | |
| 10.1# | Mullen Automotive Inc. 2022 Equity Incentive Plan | DEF 14A | 001-34887 | Appx B | 06/24/2022 | |
| 10.1(a)# | Amendment to 2022 Equity Incentive Plan dated August 3, 2023 | 8-K | 001-34887 | 10.1 | 08/07/2023 | |
| 10.1(b)# | Amendment to 2022 Equity Incentive Plan dated September 9, 2024 | 8-K | 001-34887 | 10.1 | 9/13/2024 | |
| 10.1(c)# | Form of Stock Option Agreement under 2022 Equity Incentive Plan | 10-K | 001-34887 | 10.2(a) | 1/13/2023 | |
| 10.1(d)# | Form of Restricted Stock Agreement under 2022 Equity Incentive Plan | 10-K | 001-34887 | 10.2(b) | 1/13/2023 | |

94

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.1(e)# | Form of Restricted Stock Unit Agreement under 2022 Equity Incentive Plan | 10-K | 001-34887 | 10.2(c) | 1/13/2023 | |
| 10.2# | CEO Performance Stock Award Agreement dated May 5, 2022 between Mullen Automotive Inc. and David Michery | 8-K | 001-34887 | 10.2 | 07/27/2022 | |
| 10.3# | CEO Performance Stock Award Agreement dated June 8, 2023 between Mullen Automotive Inc. and David Michery | 8-K | 001-34887 | 10.2 | 08/07/2023 | |
| 10.3(a)# | Amendments to 2022 Performance Stock Award Agreement and 2023 Performance Stock Award Agreement dated December 27, 2024 between Mullen Automotive Inc. and David Michery | | | | | ✔ |
| 10.4 | Amended and Restated Secured Convertible Note and Security Agreement dated June 17, 2022 Esousa Holdings LLC | 8-K | 001-34887 | 10.1 | 06/21/2022 | |
| 10.4(a) | Letter Agreement (Sale of Note) dated June 17, 2022 | 8-K | 001-34887 | 10.2 | 06/21/2022 | |
| 10.4(b) | Exchange Agreement, dated as of October 14, 2022, by and among Mullen Automotive Inc. and Esousa Holdings LLC. | 8-K | 001-34887 | 10.1 | 10/21/2022 | |
| 10.4(c) | Secured Convertible Note and Security Agreement dated October 14, 2022 with Esousa Holdings LLC. | 8-K | 001-34887 | 10.2 | 10/21/2022 | |
| 10.5# | Amended and Restated Employment Agreement, dated as of June 1, 2021, by and between David Michery and Mullen Technologies, Inc. | S-4/A | 333-256166 | 10.10 | 07/22/2021 | |
| 10.6 | Transition Services Agreement, dated as of May 12, 2021, by and between Mullen Technologies, Inc. and Mullen Automotive Inc. | S-4/A | 333-256166 | 10.14 | 07/22/2021 | |
| 10.6(a) | Termination Agreement, dated January 15, 2024, by and between Mullen Technologies, Inc. and Mullen Automotive Inc. | 10-K | 001-34887 | 10.6(a) | 1/17/2024 | |
| 10.7 | Tax Sharing Agreement, dated May 12, 2021, by and among Mullen Technologies, Inc. and Mullen Automotive Inc. | S-4/A | 333-256166 | 10.15 | 07/22/2021 | |
| 10.8 | Consultant Agreement dated October 26, 2021 between the Company and Mary Winter | 10-K | 001-34887 | 10.25 | 12/29/2021 | |
| 10.9 | Loan Commitment with NuBridge Commercial Lending executed February 23, 2022 | 8-K | 001-34887 | 10.2 | 02/28/2022 | |
| 10.9(a) | Guaranty dated March 7, 2022 between NuBridge Commercial Lending, LLC and David Michery | 10-Q | 001-34887 | 10.4(a) | 05/16/2022 | |
| 10.10 | Securities Purchase Agreement dated June 7, 2022 for Series D Preferred Stock and Warrants | 8-K | 001-34887 | 10.1 | 06/10/2022 | |
| 10.10(a) | Amendment No. 1 dated June 23, 2022 to Securities Purchase Agreement dated June 7, 2022 | 8-K | 001-34887 | 10.1 | 06/24/2022 | |
| 10.10(b) | Amendment No. 2 dated September 19, 2022 to Securities Purchase Agreement dated June 7, 2022 | S-3ASR | 333-267502 | 99.3 | 09/19/2022 | |
| 10.10(c) | Amendment No. 3 to the Securities Purchase Agreement, dated November 15, 2022, by and between Mullen Automotive Inc. and the buyers named therein | 8-K | 001-34887 | 10.1 | 11/21/2022 | |
| 10.10(d) | Form of Convertible Note dated November 15, 2022 | 8-K | 001-34887 | 10.2 | 11/21/2022 | |

Table of Contents

| Exhibit No. | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | | | | | |
| 10.10(e) | Amendment No. 4 to the Securities Purchase Agreement, dated April 3, 2023, by and between Mullen Automotive Inc. and the buyers named therein | 8-K | 001-34887 | 10.1 | 04/07/2023 | |
| 10.10(f) | Form of Promissory Note | 8-K | 001-34887 | 10.2 | 04/07/2023 | |
| 10.10(g) | Letter Agreement, dated May 15, 2023, by and among Mullen Automotive Inc. and the buyers named therein | 8-K | 001-34887 | 10.1 | 05/19/2023 | |
| 10.10(h) | Letter Agreement, dated June 5, 2023, by and between Mullen Automotive Inc. and Acuitas Capital LLC | 8-K | 001-34887 | 10.1 | 06/05/2023 | |
| 10.10(i) | Letter Agreement, dated June 12, 2023, by and between Mullen Automotive Inc. and the buyers named therein | 8-K | 001-34887 | 10.1 | 06/12/2023 | |
| 10.10(j) | Letter Agreement, dated June 22, 2023, by and between Mullen Automotive Inc. and the buyers named therein. | 8-K | 001-34887 | 10.1 | 06/26/2023 | |
| 10.10(k) | Letter Agreement, dated June 26, 2023, by and between Mullen Automotive Inc. and Ault Lending, LLC | 8-K | 001-34887 | 10.2 | 06/26/2023 | |
| 10.10(l) | Letter Agreement, dated June 20, 2023, by and between Mullen Automotive Inc. and Acuitas Capital LLC. | 8-K | 001-34887 | 10.3 | 06/26/2023 | |
| 10.11 | Lease dated June 29, 2022 between the Company and Lakeview Business Center, LLC | 10-Q | 001-34887 | 10.7 | 08/12/2022 | |
| 10.12 | Consulting Agreement dated January 12, 2022 between the Company and Ignacio Novoa | 10-Q | 001-34887 | 10.8 | 08/12/2022 | |
| 10.13 | Firm Order Agreement dated December 12, 2022, between Randy Marion Isuzu, LLC and the Company | 8-K | 001-34887 | 10.1 | 12/15/2022 | |
| 10.14# | Offer Letter with Jonathan New dated September 7, 2022 | 10-K | 001-34887 | 10.22 | 1/13/2023 | |
| 10.15 | Settlement Agreement dated January 13, 2023 with Acuitas, J. Fallon and Mank Capital | 10-K | 001-34887 | 10.23 | 1/13/2023 | |
| 10.15(a) | Form of Promissory Note | 10-K | 001-34887 | 10.23(a) | 1/13/2023 | |
| 10.16 | Waiver Agreement dated January 12, 2023 with Series C Preferred Stockholders | 10-K | 001-34887 | 10.24 | 1/13/2023 | |
| 10.17 | Settlement Agreement dated January 13, 2023 with respect to Series D Securities Purchase Agreement | 10-K | 001-34887 | 10.25 | 1/13/2023 | |
| 10.17(a) | Form of Warrant | 10-K | 001-34887 | 10.25(a) | 1/13/2023 | |
| 10.17(b) | Amendment to the Settlement Agreement, dated March 2, 2023, by and between Mullen Automotive Inc. and Acuitas Capital LLC | 8-K | 001-34887 | 10.1 | 03/06/2023 | |
| 10.18 | Settlement Agreement, dated as of March 14, 2023, by and among Mullen Automotive Inc., Qiantu Motor (Suzhou) Ltd., and Qiantu Motor USA, Inc. | 10-Q | 001-34887 | 10.5 | 05/15/2023 | |
| 10.18(a)+ | Intellectual Property and Distribution Agreement, dated as of March 14, 2023, by and among Mullen Automotive Inc., Qiantu Motor (Suzhou) Ltd., and two affiliates of Qiantu Motor (Suzhou) Ltd. | 10-Q | 001-34887 | 10.5(a) | 05/15/2023 | |

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/Furnished |
| | | Form | File No. | Exhibit | Filing Date | Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| 10.19# | Employment Agreement between the Company and Chester Bragado dated March 21, 2023 | 10-Q | 001-34887 | 10.6 | 05/15/2023 | |
| 10.20 | Promissory Note dated March 31, 2023 from Mullen Technologies, Inc. to Mullen Automotive Inc., and Addendum dated August 12, 2023 | 10-K | 001-34887 | 10.20 | 1/17/2024 | |
| 10.21 | Change of Control Agreement dated August 14, 2023 between Mullen Automotive Inc. and David Michery | 10-K | 001-34887 | 10.21 | 1/17/2024 | |
| 10.22 | Form of Change of Control Agreement dated August 14, 2023 between Mullen Automotive Inc. and each non-employee director | 10-K | 001-34887 | 10.22 | 1/17/2024 | |
| 10.23 | Securities Purchase Agreement, dated December 18, 2023, by and among Mullen Automotive Inc. and the purchaser named therein | 8-K | 001-34887 | 10.1 | 12/22/2023 | |
| 10.24 | Commitment Letter dated May 14, 2024 | 10-Q | 001-34887 | 10.2 | 5/14/2024 | |
| 10.25 | Securities Purchase Agreement dated May 14, 2024 by and among Mullen Automotive Inc. and the purchasers named therein | 10-Q | 001-34887 | 10.3 | 5/14/2024 | |
| 10.25(a) | Form of Convertible Note | 10-Q | 001-34887 | 10.3(a) | 5/14/2024 | |
| 10.25(b) | Form of Warrant | 10-Q | 001-34887 | 10.3(b) | 5/14/2024 | |
| 10.25(c) | Registration Rights Agreement dated May 14, 2024 by and among Mullen Automotive Inc. and the purchasers named therein | 10-Q | 001-34887 | 10.3(c) | 5/14/2024 | |
| 10.25(d) | Additional Investment Right Agreement dated December 12, 2024 by and among Mullen Automotive Inc. and the purchasers named therein | | | | | ✔ |
| 10.25(e) | Additional Investment Rights Agreement dated December 31, 2024 by and among Mullen Automotive Inc. and the purchaser named therein | | | | | ✔ |
| 10.26 | Common Stock Purchase Agreement, dated as of May 21, 2024, by and between the Company and the Investor | 8-K | 001-34887 | 10.1 | 5/24/2024 | |
| 10.26(a) | Registration Rights Agreement, dated as of May 21, 2024, by and between the Company and the Investor | 8-K | 001-34887 | 10.2 | 5/24/2024 | |
| 10.27 | Settlement Agreement and Release, dated May 31, 2024, by and between Mullen Automotive Inc. and the investor thereto. | 8-K | 001-34887 | 10.1 | 6/6/2024 | |
| 10.28 | Settlement Agreement and Release, dated May 13, 2024, by and between Mullen Automotive Inc. and Silverback Capital Corporation | 10-Q | 001-34887 | 10.1 | 8/12/2024 | |
| 10.29 | Purchase Agreement dated August 23, 2024 between the Mullen Automotive Inc, VoltiE Group and Volt Mobility Holding Ltd. | 8-K | 001-34887 | 10.1 | 8/26/2024 | |
| 10.29(a) | Amendment to Purchase Agreement dated November 4, 2024 | | | | | ✔ |
| 10.30 | Amended and Restated Secured Promissory Note dated October 24, 2024 issued by Bollinger Motors, Inc. | 8-K | 001-34887 | 10.1 | 10/28/2024 | |
| 10.31 | Settlement Agreement and Stipulation dated November 19, 2024 between Mullen Automotive Inc and investors named therein (Form of Pre-Funded Warrant attached as Exhibit A) | | | | | ✔ |
| 10.32 | Asset Purchase Agreement dated July 18, 2024 between Mullen Automotive Inc and Mullen | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Technologies, Inc | | | | | ✔ |
| 10.33#+ | Employment Agreement dated August 5, 2024 between Mullen Automotive Inc. and John Taylor | | | | | ✔ |
| 16.1 | Letter from Daszkal Bolton LLP dated March 3, 2023 | 8-K | 001-34887 | 16.1 | 03/03/2023 | |
| 19.1 | Insider Trading Policy | 10-K | 001-34887 | 19.1 | 1/17/2024 | |
| 21.1 | List of Subsidiaries | | | | | ✔ |

97

Case 2:25-cv-01187-DMG-AGR   Document 76-25   Filed 09/30/25   Page 104 of 284
Page ID #:2393

Technologies, Inc
10.33#+   Employment Agreement dated August 5, 2024 between
Mullen Automotive Inc. and John Taylor
16.1   Letter from Daszkal Bolton LLP dated March 3, 2023
8-K   001-34887
19.1   Insider Trading Policy
10-K   001-34887   19.1   1/17/2024
21.1   List of Subsidiaries

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed/Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 23.1 | Consent of Independent Registered Public Accounting Firm (RBSM LLP) | | | | | ✔ |
| 24.1 | Power of Attorney (included on signature page) | | | | | ✔ |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 | | | | | ✔ |
| 31.2 | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 | | | | | ✔ |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. § 1350 | | | | | ✔ |
| 97.1 | Clawback Policy | 10-K | 001-34887 | 97.1 | 01/17/2024 | |
| 101.INS | The following financial information from the Annual Report on Form 10-K for the fiscal year ended September 30, 2024, formatted in Inline XBRL (eXtensible Business Reporting Language), is filed electronically herewith: (i) Consolidated Balance Sheets; (ii) Consolidated Statements of Operations and Comprehensive Loss; (iii) Consolidated Statement of Changes in Stockholders' Equity (Deficit); (iv) Consolidated Statements of Cash Flows; and (v) Notes to Consolidated Financial Statements, tagged as blocks of text and including detailed tags. | | | | | ✔ |
| 104 | Cover Page Interactive Data File (Embedded within the Inline XBRL document and included in Exhibit 101). | | | | | ✔ |

# Indicates management compensatory plan, contract or arrangement.

+ Mullen Automotive Inc. has omitted certain exhibits pursuant to Item 601(a)(5) of Regulation S-K and shall furnish supplementally to the Securities and Exchange Commission copies of any of the omitted exhibits upon request by the SEC.

98

Table of Contents

**Item 16. Form 10-K Summary.**

None.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**September 30, 2024 and 2023**

| | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm (Auditor ID # 587) | F-2 |
| | |
| Consolidated Financial Statements: | |
| | |
| Consolidated Balance Sheets at September 30, 2024, and 2023 | F-4 |
| | |
| Consolidated Statements of Operations for the Years Ended September 30, 2024, and 2023 | F-5 |
| | |
| Consolidated Statements of Stockholders' Equity (Deficit) for the Years Ended September 30, 2024, and 2023 | F-6 |
| | |
| Consolidated Statements of Cash Flows for the Years Ended September 30, 2024, and 2023 | F-8 |
| | |
| Notes to Consolidated Financial Statements | F-10 |

F-1

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and
Stockholders of Mullen Automotive Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Mullen Automotive Inc., and subsidiaries (the "Company") as of September 30, 2024 and 2023, and the related consolidated statements of operations, changes in stockholders' equity (deficit), and cash flows for each of the two years in the period ended September 30, 2024, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of September 30, 2024 and 2023 and the results of its operations and its cash flows for each of the years in the two-year period ended September 30, 2024, in conformity with accounting principles generally accepted in the United States of America.

**The Company's Ability to Continue as a Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company, among other things, (i) has an accumulated deficit, (ii) has incurred recurring losses, and (iii) does not believe that its available liquidity will be sufficient to meet its current obligations for a period of at least twelve months from the date of the issuance of the financial statements, which raises substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2, and if management's plans are not successful, the Company expects to seek protection under applicable bankruptcy laws. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits.

We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

F-2

Table of Contents

***Critical Audit Matters***

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of a critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Accounting for Inventory*

As described in Notes 3 and 5 to the consolidated financial statements, as of September 30, 2024, the Company's inventory balance was $37.5 million. Inventories are stated at the lower of cost or net realizable value and consist of raw materials, work in progress and finished goods. Inventory value is determined using standard cost, which approximates actual cost on a first-in, first-out basis. Fixed production overhead costs are allocated to inventory based on the estimated normal level of production. For the year ended September 30, 2024, the Company recorded a write down of total inventory to net realizable value totaling $15.6 million. As disclosed by management, inventory is reviewed by management to determine whether its carrying value exceeds its net realizable value (NRV) upon the ultimate sale of the inventory. This requires management to determine the selling price of the vehicles less the estimated cost to convert the inventory on-hand into a finished product.

The principal considerations for our determination that performing procedures relating to accounting for inventory is a critical audit matter are (i) the significant judgment by management in developing estimates for inventory related to accounting for fixed production overhead costs and in determining inventory write-downs for lower of cost or net realizable value and (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating audit evidence related to the existence, accuracy, and valuation of inventory. As described in the "Opinions on the Financial Statements and Internal Control over Financial Reporting" section, a material weakness was identified related to this matter.

*How the Critical Audit Matter Was Addressed in the Audit*

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included, among others, testing the existence, accuracy, and valuation of inventory including the following:

- Testing the existence of inventory involved conducting physical inventory observation procedures, on a sample basis, by performing test counts of inventory quantities and testing movements of inventory between the time of the inventory observations and September 30, 2024.

- Testing the accuracy of the cost of inventory items involved, on a sample basis, obtaining and inspecting third-party invoices and other supporting documents and recalculating the cost of inventory on a first-in, first-out basis.

- Testing the valuation of inventory involved testing management's process for developing estimates for inventory related to accounting for fixed production overhead costs and in determining inventory write-downs for lower of cost or net realizable value.

- Testing management's process included evaluating the appropriateness of the methods used by management to estimate future sales volumes and selling price of the vehicles less the estimated cost to convert the inventory on-hand into a finished product, and testing the completeness and accuracy of the underlying data used by management in the estimates.

/s/ RBSM, LLP

**RBSM LLP**
We have served as the Company's auditor since 2023.
Larkspur, California
January 24, 2025

PCAOB ID Number 587

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED BALANCE SHEETS**

| | September 30, 2024 | September 30, 2023 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 10,321,827 | $ 155,267,098 |
| Restricted cash | 426,851 | 429,372 |
| Inventory | 37,503,112 | 16,807,013 |
| Prepaid expenses and prepaid inventories | 14,798,553 | 24,955,223 |
| Accounts receivable | 124,295 | 671,750 |
| **TOTAL CURRENT ASSETS** | **63,174,638** | **198,130,456** |
| Property, plant, and equipment, net | 82,180,266 | 82,032,785 |
| Intangible assets, net | 27,056,030 | 104,235,249 |
| Right-of-use assets | 3,041,485 | 5,249,417 |
| Related party receivable | - | 2,250,489 |
| Goodwill, net | - | 28,846,832 |
| Other noncurrent assets | 3,178,870 | 960,502 |
| **TOTAL ASSETS** | **$ 178,631,289** | **$ 421,705,730** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 41,335,509 | $ 13,175,504 |
| Accrued expenses and other current liabilities | 51,612,166 | 41,610,788 |
| Derivative liabilities | 79,742,180 | 64,863,309 |
| Liability to issue shares | 1,771,025 | 9,935,950 |
| Lease liabilities, current portion | 2,893,967 | 2,134,494 |
| Notes payable | 5,399,777 | 7,461,492 |
| Refundable deposits | 417,674 | 429,372 |
| **TOTAL CURRENT LIABILITIES** | **183,172,298** | **139,610,909** |
| Liability to issue shares, net of current portion | 356,206 | 1,827,889 |
| Lease liabilities, net of current portion | 11,648,662 | 3,566,922 |
| Deferred tax liability | - | 3,891,900 |
| **TOTAL LIABILITIES** | **$ 195,177,166** | **$ 148,897,620** |
| Contingencies and claims (Note 19) | | |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Preferred stock; $0.001 par value; 126,263,159 and 127,474,458 shares authorized at September 30, 2024 and 2023, respectively; | | |
| Preferred Series D; 84,572,538 shares authorized, 363,097 shares issued and outstanding at September 30, 2024 and 2023, respectively (preference in liquidation of $159,000 at September 30, 2024 and 2023) | 363 | 363 |
| Preferred Series C; 24,874,079 and 26,085,378 shares authorized at September 30, 2024 and 2023, respectively; | | |

| | | |
|---|---:|---:|
| 458 and 1,211,757 shares issued and outstanding at September 30, 2024 and 2023, respectively (preference in liquidation of $4,049 and $10,696,895 at September 30, 2024 and 2023, respectively) | | |
| | - | 1,212 |
| Preferred Series A; 83,859 shares authorized; 648 shares issued and outstanding at September 30, 2024 and 2023 (preference in liquidation of $836 at September 30, 2024 and 2023) | | |
| | 1 | 1 |
| Common stock; $0.001 par value; 5,000,000,000 shares authorized; 4,577,306 and 28,718 shares issued and outstanding at September 30, 2024 and 2023 respectively (*) | | |
| | 4,577 | 29 |
| Additional paid-in capital (*) | | |
| | 2,290,659,971 | 2,071,112,969 |
| Accumulated deficit | | |
| | (2,319,220,938) | (1,862,162,037) |
| **TOTAL STOCKHOLDERS' EQUITY (DEFICIT) ATTRIBUTABLE TO THE COMPANY'S STOCKHOLDERS** | | |
| | **(28,556,026)** | **208,952,537** |
| Noncontrolling interest | | |
| | 12,010,149 | 63,855,573 |
| **TOTAL STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| | **(16,545,877)** | **272,808,110** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| | $ **178,631,289** | $ **421,705,730** |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of business and basis of presentation.*

The accompanying notes are an integral part of these consolidated financial statements.

F-4

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended September 30, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Revenue from sale of vehicles | $ 1,094,322 | $ 366,000 |
| Cost of revenues | 16,894,100 | 273,882 |
| Gross profit / (loss) | (15,799,778) | 92,118 |
| **Operating expenses:** | | |
| General and administrative | 181,947,541 | 215,846,132 |
| Research and development | 74,889,400 | 77,387,336 |
| Impairment of goodwill | 30,062,727 | 63,988,000 |
| Impairment of intangible assets | 73,447,067 | 5,873,000 |
| Impairment of right-of-use assets | 11,505,001 | - |
| Impairment of property, plant, and equipment, and other noncurrent assets | 4,174,935 | 14,770,000 |
| Loss from operations | $ (391,826,449) | $ (377,772,350) |
| **Other income (expense):** | | |
| Other financing costs - initial recognition of derivative liabilities | (54,653,033) | (506,238,038) |
| Other financing costs - initial recognition of warrants | (13,652,762) | - |
| Other financing costs - ELOC commitment fee | (6,000,000) | - |
| Gain/(loss) on warrants and derivative liability revaluation | 4,503,099 | (116,256,212) |
| Gain/(loss) on extinguishment of debt | (655,721) | (6,246,089) |
| Loss on financing | - | (8,934,892) |
| Gain/(loss) on disposal of fixed assets | (511,838) | 386,377 |
| Interest expense | (49,377,125) | (4,993,140) |
| Other income, net | 2,458,578 | 2,407,034 |
| Total other income (expense) | (117,888,802) | (639,874,960) |
| **Net loss before income tax benefit** | $ (509,715,251) | $ (1,017,647,310) |
| Income tax benefit/ (provision) | 3,888,700 | 10,988,482 |
| **Net loss** | $ (505,826,551) | $ (1,006,658,828) |
| Net loss attributable to noncontrolling interest | (48,767,650) | (34,404,246) |
| **Net loss attributable to stockholders** | $ (457,058,901) | $ (972,254,582) |
| Waived/(accrued) accumulated preferred dividends and other capital transactions with Preferred stock owners | (13,902,843) | 7,360,397 |
| **Net loss attributable to common stockholders after preferred dividends and other capital transactions with Preferred stock owners** | $ (470,961,744) | $ (964,894,185) |
| Net Loss per Share (*) | | |

| | | | | |
|---|---|---|---|---|
| | | $ | (1,425.61) $ | (157,405.25) |

| | | |
|---|---|---|
| Weighted average shares outstanding, basic and diluted (*) | | |
| | 330,358 | 6,130 |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of business and basis of presentation.*

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**for the year ended September 30, 2024**

| | Preferred Stock, total (see Note 9 - Stockholder's equity for details) | | Common Stock | | Paid-in | Accumulated | Equity (deficit) attributable to the reporting entity | Noncontrolling | Total Stockholders' |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Capital | Deficit | | Interest | Equity (deficit) |
| **Balance, October 1, 2023 (*)** | 1,575,502 | $ 1,576 | 28,718 | $ 29 | $ 2,071,112,969 | $(1,862,162,037) | $ 208,952,537 | $ 63,855,573 | $ 272,808,110 |
| Cashless Warrant exercise | - | - | 2,097,160 | 2,097 | 113,835,645 | - | 113,837,742 | - | 113,837,742 |
| Issuance of common stock for conversion of convertible notes and interest | - | - | 822,705 | 822 | 49,893,308 | - | 49,894,130 | - | 49,894,130 |
| Common stock issued to settle other derivative liability | - | - | 63,812 | 64 | 6,484,146 | - | 6,484,210 | - | 6,484,210 |
| Common stock issued to settle legal commitment | - | - | 1,106 | 1 | 639,255 | - | 639,256 | - | 639,256 |
| Common stock issued to settle ELOC commitment fee | - | - | 247,935 | 248 | 5,999,752 | - | 6,000,000 | - | 6,000,000 |
| Share-based compensation | - | - | 872,761 | 873 | 48,312,025 | - | 48,312,898 | - | 48,312,898 |
| Preferred stock dividends | - | - | - | - | (90,431) | - | (90,431) | - | (90,431) |
| Extinguishment of Series C P/S by issuance of Series E P/S | (1,211,299) | (1,212) | - | - | - | - | (1,212) | - | (1,212) |
| Financial result from exchange of Series C P/S for Series E P/S | - | - | - | - | (8,604,029) | - | (8,604,029) | - | (8,604,029) |
| Common stock issued to avoid fractional shares on reverse stock split | - | - | 443,109 | 443 | (443) | - | - | - | - |
| Noncontrolling interest - decrease from additional investments into subsidiary | - | - | - | - | 3,077,774 | - | 3,077,774 | (3,077,774) | - |
| Noncontrolling interest - decrease from current losses | - | - | - | - | - | - | - | (48,767,650) | (48,767,650) |
| Net Loss | - | - | - | - | - | (457,058,901) | (457,058,901) | - | (457,058,901) |
| **Balance, September 30, 2024** | 364,203 | $ 364 | 4,577,306 | $ 4,577 | $ 2,290,659,971 | $(2,319,220,938) | $ (28,556,026) | $ 12,010,149 | $ (16,545,877) |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of business and basis of presentation.*

F-6

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**for the year ended September 30, 2023**

| | Preferred Stock, total (see Note 9 - Stockholder's equity - for details) | | Common Stock | | Paid-in | Accumulated | Equity attributable to the reporting | Noncontrolling | Total Stockholders' |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares (*) | Amount (*) | Capital (*) | Deficit | entity | Interest | Equity |
| Balance, October 1, 2022 (*) | 5,721,897 | $ 5,721 | 371 | $ 1 | $ 948,598,623 | $ (889,907,455) | $ 58,696,890 | $ 98,259,819 | $ 156,956,709 |
| Cashless exercise of warrants | - | - | 24,554 | 25 | 627,743,209 | - | 627,743,234 | - | 627,743,234 |
| Issuance of preferred stock, common stock and prefunded warrants in lieu of preferred stock | 273,363,635 | 273,364 | 2,673 | 3 | 196,551,845 | - | 196,825,212 | - | 196,825,212 |
| Issuance of common stock for conversion of convertible notes and interest | - | - | 236 | - | 153,222,237 | - | 153,222,237 | - | 153,222,237 |
| Issuance of common stock for conversion of preferred stock and dividends | (277,510,030) | (277,509) | 121 | - | 277,489 | - | (20) | - | (20) |
| Reclassification of derivatives to equity upon authorization of sufficient number of shares | - | - | - | - | 47,818,884 | - | 47,818,884 | - | 47,818,884 |
| Shares issued to settle note payable | - | - | 28 | - | 13,736,403 | - | 13,736,403 | - | 13,736,403 |
| Shares issued to extinguish penalty | - | - | 10 | - | 5,520,000 | - | 5,520,000 | - | 5,520,000 |
| Preferred shares series AA issued to officers | 1 | - | - | - | 25,000 | - | 25,000 | - | 25,000 |
| Preferred shares series AA refund | (1) | - | - | - | (25,000) | - | (25,000) | - | (25,000) |
| Share-based compensation | - | - | 1,271 | 1 | 75,894,481 | - | 75,894,482 | - | 75,894,482 |
| Preferred stock dividends waiver | - | - | - | - | 7,360,397 | - | 7,360,397 | - | 7,360,397 |
| Common stock purchased and retired | - | - | (570) | (1) | (5,610,599) | - | (5,610,600) | - | (5,610,600) |
| Shares issued to avoid fractional shares on reverse stock split | - | - | 24 | - | - | - | - | - | - |
| Noncontrolling interest | - | - | - | - | - | - | - | (34,404,246) | (34,404,246) |
| Net loss | - | - | - | - | - | (972,254,582) | (972,254,582) | - | (972,254,582) |
| Balance, September 30, 2023 (*) | 1,575,502 | $ 1,576 | 28,718 | $ 29 | $2,071,112,969 | $(1,862,162,037) | $ 208,952,537 | $ 63,855,573 | $ 272,808,110 |

(*) Adjusted retroactively for reverse stock splits, see *Note 1 - Description of business and basis of presentation.*

The accompanying notes are an integral part of these consolidated financial statements.

F-7

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended September 30, | |
|---|---|---|
| | **2024** | **2023** |
| **Cash Flows from Operating Activities** | | |
| Net loss | $ (505,826,551) | $ (1,006,658,828) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Stock-based compensation | 40,432,688 | 85,441,869 |
| Deferred income taxes | (3,891,900) | (10,990,882) |
| Depreciation and amortization | 21,984,312 | 16,388,299 |
| Amortization of debt discount and other non-cash interest expense | 48,790,729 | 862,045 |
| Impairment of intangible assets | 73,447,067 | 5,873,000 |
| Impairment of goodwill | 30,062,727 | 63,988,000 |
| Impairment of right-of-use assets | 11,505,001 | - |
| Impairment of property, plant, and equipment, and other noncurrent assets | 4,174,935 | 14,770,000 |
| Write-down of inventory to net realizable value | 15,578,429 | 1,000,284 |
| Other financing costs - ELOC commitment fee | 6,000,000 | - |
| Other financing costs - initial recognition of derivative liabilities | 54,653,033 | 506,238,038 |
| Other financing costs - initial recognition of warrants | 13,652,762 | 6,814,000 |
| Revaluation of derivative liabilities | (4,503,099) | 116,256,212 |
| Loss/(gain) on extinguishment of debt | 655,721 | 6,246,089 |
| Loss/(gain) on assets disposal | 511,838 | (386,377) |
| Non-cash financing loss on over-exercise of warrants | - | 8,934,892 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 547,455 | - |
| Inventories | (36,274,528) | (17,807,297) |
| Prepaids and other assets | 8,420,150 | (22,687,245) |
| Accounts payable | 25,227,125 | 7,784,136 |
| Accrued expenses and other liabilities | 9,752,481 | 38,500,352 |
| Right-of-use assets and lease liabilities | (455,856) | 261,222 |
| **Net cash used in operating activities** | **(185,555,481)** | **(179,172,191)** |
| **Cash Flows from Investing Activities** | | |
| Purchase of equipment | (14,748,055) | (14,508,004) |
| Acquisition of MTI business | (1,400,000) | - |
| Purchase of intangible assets | - | (498,431) |
| ELMS assets purchase | - | (92,916,874) |
| **Net cash used in investing activities** | **(16,148,055)** | **(107,923,309)** |

| Cash Flows from Financing Activities | | |
|---|---|---|
| Proceeds from issuance of notes payable with attached warrants | 61,701,576 | 170,000,000 |
| Payment of notes payable | (4,945,832) | (20,694,353) |
| Proceeds from issuance of common stock and prefunded warrants | - | 196,999,970 |
| Reimbursement for over issuance of shares | - | 17,721,868 |
| Payments to acquire treasury stock | - | (5,610,600) |
| **Net cash provided by financing activities** | **56,755,744** | **358,416,885** |

F-8

Table of Contents

**MULLEN AUTOMOTIVE INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)**

| | Year Ended September 30, | |
|---|---|---|
| | 2024 | 2023 |
| **Change in cash** | | |
| | (144,947,792) | 71,321,385 |
| Cash and restricted cash (in amount of $429,372), beginning of period | | |
| | 155,696,470 | 84,375,085 |
| Cash and restricted cash (in amount of $426,851), ending of period | | |
| | $ 10,748,678 | $ 155,696,470 |
| **Supplemental disclosure of Cash Flow information:** | | |
| Cash paid for interest | | |
| | $ 37,458 | $ 122,501 |
| **Supplemental Disclosure for Non-Cash Activities:** | | |
| Exercise of warrants recognized earlier as liabilities | | |
| | $ 113,837,742 | $ 627,836,463 |
| Convertible notes and interest - conversion to common stock | | |
| | 49,894,130 | 167,070,343 |
| Right-of-use assets obtained in exchange of operating lease liabilities | | |
| | 11,867,625 | 2,112,773 |
| Issuance of Series E P/S in exchange for Series C P/S | | |
| | 8,605,241 | - |
| Issuance of Notes and Warrants upon exchange of Series E P/S | | |
| | 7,866,592 | - |
| Common stock issued to settle other derivative liability | | |
| | 6,508,995 | - |
| Fair value of common stock issued to avoid fractional shares on reverse stock split | | |
| | 5,208,383 | |
| Extinguishment of accounts payable with recognition of derivatives | | |
| | 4,623,655 | - |
| Decrease of noncontrolling interest upon additional investments into subsidiary | | |
| | 3,077,774 | - |
| Common stock issued to extinguish other liabilities | | |
| | 639,146 | 5,524,838 |
| Reclassification of derivatives to equity upon authorization of common shares | | |
| | - | 47,818,882 |
| Notes issued to extinguish liability to issue stock | | |
| | | 11,597,571 |
| Waiver of dividends by stockholders | | |
| | - | 7,387,808 |
| Extinguishment of operational liabilities by sale of property | | |
| | - | 760,669 |
| Extinguishment of financial liabilities by sale of property | | |
| | - | 238,259 |

The accompanying notes are an integral part of these consolidated financial statements.

F-9

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1 - DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

### Description of Business

Mullen Automotive Inc., a Delaware corporation ("MAI", "Mullen", "we" or the "Company"), is a Southern California-based development-stage electric vehicle company that operates in various verticals of businesses focused within the automotive industry. Mullen controls wholly owned subsidiaries Ottava Automotive, Inc., a California corporation, Mullen Indiana Real Estate, LLC., a Delaware corporation, Mullen Investment Properties LLC, a Mississippi corporation, Mullen Advanced Energy Operations LLC, a California corporation and a majority ownership in Bollinger Motors, incorporated in Delaware.

Mullen Automotive Inc., a California corporation ("Previous Mullen"), was originally formed on April 20 2010, as a developer and manufacturer of electric vehicle technology and operated as the Electric Vehicle ("EV") division of Mullen Technologies, Inc. ("MTI") until November 5, 2021, at which time Previous Mullen underwent a capitalization and corporate reorganization by way of a spin-off to its shareholders, followed by a reverse merger with and into Net Element, Inc., which was accounted for as a reverse merger transaction, in which Previous Mullen was treated as the acquirer for financial accounting purposes. (the "Merger"). The Company changed its name from "Net Element, Inc." to "Mullen Automotive Inc" and the Nasdaq ticker symbol for the Company's common stock changed from "NETE" to "MULN" on the Nasdaq Capital Market at the opening of trading on November 5, 2021.

Mullen is building and delivering the newest generation of Commercial Trucks. We also have a portfolio of high-performance Passenger vehicles in various stages of Product Development for launch in subsequent years subject to available financing.

Acquisition of controlling interest in Bollinger Motors, Inc. in September 2022 positioned Mullen into the medium duty truck classes 4-6, along with the Sport Utility and Pick Up Trucks EV segments. First Bollinger vehicles were sold in September 2024.

The second acquisition was in October 2022, when the U.S. Bankruptcy Court approved the Company acquisition of ELMS (Electric Last Mile Solutions) assets in an all-cash purchase. With this transaction, Mullen acquired a manufacturing plant in Mishawaka Indiana and all the intellectual property needed to engineer and build Class 1 and Class 3 electric vehicles. First vehicles were produced and delivered to customers during the 12 months ended September 30, 2023.

### Basis of Presentation and Principles of Consolidation

These consolidated financial statements have been prepared in accordance with Generally Accepted Accounting Principles in the United States ("U.S. GAAP"). The financial statements reflect the consolidated financial position and results of operations of Mullen, which include the accounts of the Company and its subsidiaries. Intercompany accounts and transactions have been eliminated, if any. Certain prior-period amounts have been reclassified in the accompanying consolidated financial statements and notes thereto in order to conform to the current period presentation.

Noncontrolling interest presented in these consolidated financial statements relates to the portion of equity (net assets) in subsidiaries not attributable, directly or indirectly, to Mullen. Net income or loss are allocated to noncontrolling interests by multiplying the relative ownership interest of the noncontrolling interest holders for the period by the net income or loss of the entity to which the noncontrolling interest relates.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

***Reverse Stock Splits***

Our Common Stock is listed on the Nasdaq Capital Market. To maintain that listing, we must satisfy minimum financial and other requirements including, without limitation, a requirement that our closing bid price be at least $
1.00 per share. On September 16, 2024, we received formal notice from the Listing Qualifications department of The Nasdaq Stock Market LLC that, based upon the closing bid price for our Common Stock, for the previous 30-consecutive business day period, the Company no longer satisfied the minimum bid price requirement for continued listing.

Effective September 17, 2024, the Company implemented a reverse stock split at a ratio of 1-for-100 shares. On October 16, 2024, the Company received formal notice from Nasdaq confirming that it had regained compliance with the minimum bid price requirement set forth in Nasdaq Listing Rule 5550(a)(2).

In addition to the reverse stock split implemented in September 2024, the Company previously effected a 1-for-25 reverse stock split on May 4, 2023, a 1-for-9 reverse stock split on August 11, 2023, and a 1-for-100 reverse stock split on December 21, 2023.

As a result of these reverse stock splits, the number of shares of common stock that can be issued upon exercise of warrants, preferred stock, and other convertible securities, as well as any commitments to issue securities, that provide for adjustments in the event of a reverse stock split, was appropriately adjusted pursuant to their applicable terms for the reverse stock splits. If applicable, the conversion price for each outstanding share of preferred stock and the exercise price for each outstanding warrant was increased, pursuant to their terms, in inverse proportion to the split ratio such that upon conversion or exercise, the aggregate conversion price for conversion of preferred stock and the aggregate exercise price payable by the warrant holder to the Company for shares of common stock subject to such warrant will remain approximately the same as the aggregate conversion or exercise price, as applicable, prior to the reverse stock splits. No fractional shares were issued in connection with the reverse stock splits. All fractional shares were rounded up to the nearest whole share. As a result, additional 3,210 and 439,899 shares were issued for the benefit of stockholders that would otherwise obtain fractional shares upon reverse stock split in December 2023 and September 2024, respectively.

The reverse stock splits have not changed the authorized number of shares or the par value of the common stock nor modified any voting rights of the common stock. The number and par value of Series A Preferred Stock, Series C Preferred Stock and Series D Preferred Stock were not affected by the reverse stock splits, but their conversion ratios have been proportionally adjusted. There were no outstanding shares of Series B Preferred Stock and Series E Preferred Stock as of the effective date of the reverse stock splits.

The Company retroactively adjusted its historical financial statements to reflect the reverse stock splits (See *Note 10 - Loss per share* for reverse stock splits effect on loss per share). All issued and outstanding common stock and per share amounts contained in the financial statements have been adjusted to reflect the reverse stock splits for all periods presented. The common stock and additional paid-in-capital line items of the financial statements were adjusted to account for the reverse stock splits for all periods presented: including adjustment of $2,843 and $37 to common stock (decreased) and additional paid-in-capital (increased) reported by the Company in the previous 10-K as of September 30, 2023, and October 1, 2022, respectively.

F- 11

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The impact of the reverse stock splits on the shares of common stock previously reported for the fiscal year ended September 30, 2023 was as follows:

| | Reported in previous 10-K 2023 | Adjustment to RSS 1:100 (September 2024) | Total after RSS of 2024 |
|---|---|---|---|
| Balance, September 30, 2022, number of shares of common stock | 37,043 | (36,672) | 371 |
| Increase of common stock during fiscal year 2023 | 2,834,664 | (2,806,317) | 28,347 |
| Balance, September 30, 2023, number of shares of common stock | 2,871,707 | (2,842,989) | 28,718 |

## NOTE 2 - LIQUIDITY, CAPITAL RESOURCES, AND GOING CONCERN

These consolidated financial statements have been prepared on the basis that assumes the Company will continue as a going concern which contemplates the realization of assets and satisfaction of liabilities and commitments in the ordinary course of business.

The Company's principal source of liquidity consists of existing cash and restricted cash of approximately $10.7 million as of September 30, 2024. During the twelve months ended September 30, 2024, the Company used approximately $185.6 million of cash for operating activities. The net working capital on September 30, 2024 was negative and amounted to approximately $120.0 million, or approximately $38.5 million after excluding derivative liabilities and liabilities to issue stock that are supposed to be settled by issuing common stock without using cash. For the year ended September 30, 2024, the Company has incurred a net loss of $505.8 million and, as of September 30, 2024, our accumulated deficit was $2.3 billion.

The Company believes that its available liquidity will not be sufficient to meet its current obligations for a period of at least twelve months from the date of the filing of this Annual Report on Form 10-K. Accordingly, the Company has concluded there is substantial doubt about its ability to continue as a going concern. Without additional funding, the Company may be unable to continue operations and could be required to seek bankruptcy protection within 30 days of the issuance of these financial statements.

*Management's Plans and Uncertainty About Future Viability*

Management is pursuing several strategies to address liquidity concerns, including:

- Raising additional capital through equity or debt financing.

- Executing cost reduction measures and operational restructuring.

- Exploring strategic alternatives, including partnerships or asset sales.

Despite these efforts, there is no assurance that these initiatives will be successful. If the Company cannot secure additional funding in the immediate term, it may be required to curtail operations significantly or seek bankruptcy protection.

These consolidated financial statements do not include any adjustments to the carrying amounts of assets or liabilities that may result from the outcome of these uncertainties.

F- 12

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### *Use of Estimates*

The preparation of our financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the dates of the consolidated financial statements and the reported amounts of total expenses in the reporting periods. Estimates are used for, but not limited to, cash flow projections and discount rate for calculation of goodwill impairment, fair value and impairment of long-lived assets, including intangible assets, inventory valuation, and fair value of financial instruments. Management bases its estimates on historical experience and on various other assumptions believed to be reasonable, the results of which form the basis for carrying values of assets and liabilities and the recording of costs and expenses that are not readily apparent from other sources. The actual results may differ materially from these estimates.

### *Risks and Uncertainties*

We operate within an industry that is subject to rapid technological change, intense competition, and significant government regulation. It is subject to significant risks and uncertainties, including competitive, financial, developmental, operational, technological, required knowledge of industry governmental regulations, and other risks associated with an emerging business. The Company is dependent on its suppliers, including single-source suppliers. It depends on the ability of these suppliers to deliver the necessary components of our products in a timely manner at prices, quality levels, and volumes acceptable to us. Any one or combination of these or other risks could have a substantial impact on our future operations and prospects for commercial success.

### *Business Combination*

Business acquisitions are accounted for in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805 "*Business Combinations*". FASB ASC 805 requires the reporting entity to identify the acquirer, determine the acquisition date, recognize and measure the identifiable tangible and intangible assets acquired, the liabilities assumed and any noncontrolling interest in the acquired entity, and recognize and measure goodwill or a gain from the purchase. The acquiree's results are included in the Company's consolidated financial statements from the date of acquisition. Assets acquired and liabilities assumed are recorded at their fair values and the excess of the purchase price over the amounts assigned is recorded as goodwill. Adjustments to fair value assessments are recorded to goodwill over the measurement period (not longer than twelve months). The acquisition method also requires that acquisition-related transaction and post-acquisition restructuring costs be charged to expense.

### *Cash and Cash Equivalents*

Cash and cash equivalents are financial instruments that are potentially subject to concentrations of credit risk. The Company's cash and cash equivalents are deposited in accounts at large financial institutions, and amounts may exceed federally insured limits. The Company believes it is not exposed to significant credit risk due to the financial strength of the depository institutions in which the cash and cash equivalents are held. The Company has no financial instruments with off-balance sheet risk of loss.

### *Restricted Cash*

Cash obtained from customer deposits is held by the Company and is considered to be restricted from use to fund operations. Refundable deposits were $
426.9 thousand and $429.4 thousand for the years ended September 30, 2024 and 2023.

### *Prepaid Expenses and Other Current Assets*

Prepaid expenses consist of various advance payments made for goods or services to be received in the future. These prepaid expenses include insurance and other contracted services requiring up-front payments.

F- 13

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Accounts receivable*

Accounts receivable consist of receivables from our customers for the sale of vehicles. The Company provides an allowance against accounts receivable for any expected credit losses. No allowance was recorded for the Company for the years ended September 30, 2024and 2023.

*Inventory*

Inventories are stated at the lower of cost or net realizable value and consist of raw materials, work in progress, and finished goods. The net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. Cost of inventories is determined using the standard cost method, which approximates actual cost on a first-in first-out basis. Cost includes direct materials, direct labor, and a proportionate share of manufacturing overhead costs based on normal capacity. Regular reviews are performed to identify and account for variances between the standard costs and actual costs. The Company regularly reviews its inventory for excess quantities and obsolescence. This analysis takes into account factors such as demand forecasts, product life cycles, product development plans, and current market conditions. The Company records inventory write-downs for excess or obsolete inventories based upon assumptions about current and future demand forecasts. If inventory on-hand is in excess of future demand forecast, the excess amounts are written-off. Once inventory is written down to a net realizable value, a new, lower-cost basis is established, and the inventory is not subsequently written up if market conditions improve. All such inventory write-downs are included as a component of cost of revenues in the period in which the write-down occurs. The Company records inventory write-downs for excess or obsolete inventories based upon assumptions about current and future demand forecasts. If inventory on-hand is in excess of future demand forecast, the excess amounts are written-off. During the year ended September 30, 2024, the Company recorded a write down of inventory totaling $15.6 million which includes consideration for potential reductions in the selling price of vehicles in inventory.

*Property, Plant, and Equipment, net*

Property, plant, and equipment is stated at cost less accumulated depreciation and impairment. Depreciation is calculated using the straight-line method over the estimated economic useful lives of the assets. Repairs and maintenance expenditures that do not extend the useful lives of related assets are expensed as incurred.

*Estimated Useful Lives*

| Description | Estimated useful lives |
|---|---|
| Buildings | 20 to 30 years |
| Furniture and equipment | 3 to 7 years |
| Computer and software | 1 to 5 years |
| Machinery, shop and testing equipment | 3 to 7 years |
| Leasehold improvements | Shorter of the estimated useful life or the underlying lease term |
| Vehicles | 5 years |
| Intangibles | 5 to 10 years |

Expenditures for major improvements are capitalized, while minor replacements, maintenance and repairs, which do not extend the asset lives, are charged to operations as incurred. Upon sale or disposition, the cost and related accumulated depreciation are removed from the accounts and any gain or loss is included in operations. Company management continually monitors events and changes in circumstances that could indicate that the carrying balances of its property, plant, and equipment may not be recoverable in accordance with the provisions of ASC 360, "*Property, Plant, and Equipment.*" When such events or changes in circumstances are present, we assess the recoverability of long-lived assets by determining whether the carrying value of such assets will be recovered through undiscounted expected future cash flows. If the total of the future cash flows is less than the carrying amount of those assets, we recognize an impairment loss based on the excess of the carrying amount over the fair value of the assets. Management has assessed whether indicators of impairment exist as of September 30, 2024, and concluded there were such triggering events. The Company recorded an impairment charge of $ 4.2 million in 2024. The recoverability of long-lived assets continues to be dependent on the market acceptance of the Company's vehicles.

F- 14

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Income Taxes*

The Company and its less than 100% owned subsidiaries are filing separate tax returns, and we calculate the provision for income taxes by using a "separate" return method. Section 174 capitalization and R&D credits are calculated using consolidated tax return rules and allocated among its members.

The Company's income tax provision consists of an estimate for U.S. federal and state income taxes based on enacted rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in the tax law.

Income taxes are recorded in accordance with ASC 740, *Income Taxes*, which provides for deferred taxes using an asset and liability approach. We record deferred income taxes using enacted tax laws and rates for the years in which the taxes are expected to be paid. We recognize deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the consolidated financial statements or tax returns. Deferred tax assets and liabilities are determined based on the difference between the consolidated financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Valuation allowances are provided, if based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. We maintain a full valuation allowance against the value of our U.S. and state net deferred tax assets because the recoverability of the tax assets does not meet the "more likely than not" requirement as of September 30, 2024 and 2023.

Uncertain tax positions taken or expected to be taken in a tax return are accounted for using the "more likely than not" threshold for financial statement recognition and measurement. There are transactions that occur during the ordinary course of business for which the ultimate tax determination may be uncertain. As of September 30, 2024 and 2023, there were no material changes to either the nature or the amounts of the uncertain tax positions.

*Intangible Assets, net*

Intangible assets consist of acquired and developed intellectual property. In accordance with ASC 350, "*Intangibles-Goodwill and Others,*" goodwill and other intangible assets with indefinite lives (including in-process research and development assets acquired in a business combination) are not subject to amortization but are tested for impairment annually or whenever events or changes in circumstances indicate that the asset might be impaired.

Intangible assets with determinate lives are evaluated for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Amortizable intangible assets generally are amortized on a straight-line basis over periods up to 120 months. The costs to periodically renew our intangible assets are expensed as incurred.

*Impairment of Long-Lived Assets*

The Company periodically evaluates long-lived assets (intangible assets, right-of-use assets, and property, plant, and equipment) for impairment whenever events or changes in circumstances indicate that a potential impairment may have occurred. If such events or changes in circumstances arise, the Company compares the carrying amount of the long-lived assets to the estimated future undiscounted cash flows expected to be generated by the long-lived assets. If the estimated aggregate undiscounted cash flows are less than the carrying amount of the long-lived assets, an impairment charge, calculated as the amount by which the carrying amount of the assets exceeds the fair value of the assets, is recorded. The fair value of the long-lived assets is determined based on the estimated discounted cash flows expected to be generated from the long-lived asset unless another method provides a more reliable estimate. If an impairment loss is recognized, the adjusted carrying amount of a long-lived asset is recognized as a new cost basis of the impaired asset. Impairment loss is not reversed even if fair value exceeds carrying amount in subsequent periods.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Other Assets*

Other noncurrent assets are comprised primarily of security deposits for property leases.

*Extinguishment of Liabilities*

The Company derecognizes financial liabilities when the Company's obligations are discharged, cancelled, or expired.

*Leases*

Leases are recorded on the consolidated balance sheet as both a right-of-use asset and lease liability, calculated by discounting fixed lease payments over the lease term at the rate implicit in the lease or the Company's incremental borrowing rate. Lease liabilities are increased by interest and reduced by payments each period, and the right of use asset is amortized over the lease term. The Company excludes short-term leases having initial terms of 12 months or less from the new guidance as an accounting policy election, and instead recognizes rent expense on a straight-line basis over the lease term. The current portion of the Company's lease liability is based on lease payments due within twelve months of the balance sheet date.

*Contingencies and Commitments*

The Company follows ASC 440 and ASC 450 to account for contingencies and commitments, respectively. Certain conditions, as a result of past events, may exist as of the balance sheet date, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company evaluates the perceived merits of any legal proceedings or unasserted claims as well as the perceived merits of the amount of relief sought or expected to be sought therein.

If the assessment of a contingency indicates that it is probable that a material loss has been incurred and the amount of the liability can be reasonably estimated, then the estimated liability is accrued in the Company's financial statements. If the assessment indicates that a potentially material loss contingency is not probable but is reasonably possible, or is probable but cannot be reasonably estimated, then the nature of the contingent liability, and an estimate of the range of possible losses, if determinable and material, would be disclosed. Legal costs associated with such loss contingencies are expensed as incurred. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

*Accrued Expenses*

Accrued expenses are expenses that have been incurred but not yet billed and paid are classified within current liabilities on the consolidated balance sheets.

F- 16

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Debt Issuance Costs*

Direct and incremental costs, including amounts paid to initial purchasers of the Company's convertible notes, are directly attributed to efforts to obtain debt financing and are debt issuance costs. Upon issuance of debt, the carrying value is the principal amount of debt reduced by any debt issuance costs. Debt issuance costs are attributed to interest expense and accreted over the expected term of the debt using the effective interest rate method when the fair value option has not been elected.

### *Revenue Recognition*

The Company's revenue includes revenue from the sale of electric vehicles and is accounted for in accordance with ASC 606, "*Revenue from Contracts with Customers*". The Company applies a five-step analysis to: (i) identify the contract with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when, or as, the Company satisfies a performance obligation. Payments for electric vehicle sales are generally received at or shortly after delivery. Sales tax, if any, is excluded from the measurement of the transaction price. The revenue from the sale of electric vehicles is recognized when control of the vehicle is transferred to the customer. In general, the control is transferred at the point of delivery to the customer, signifying the fulfillment of our primary performance obligation under ASC 606. A contract with one of our dealers includes return provision, allowing unsold vehicles to be returned after one year; and contracts with two of our dealers include a return provision, allowing unsold vehicles to be returned upon contract termination. Since the Company does not have sufficient relevant statistics of returns yet, we defer revenue recognition until the vehicles have been sold by such dealer (when the dealer has a right of return exists) or until there is sufficient evidence to justify a reasonable estimate for the consideration to which the Company expects to be entitled. Relevant vehicles transferred to the dealer are presented as "Finished goods delivered to dealer for distribution" in the consolidated balance sheets at initial cost, less any expected costs to recover those products (including potential decreases in the value to the entity of returned products). At the end of each reporting period, the Company updates the measurement of these assets and refund liabilities.

### *Customer Deposits and Advances*

Customer deposits are required in order to complete the sales order process, which includes the selection of the vehicle model, trim and options and will be applied to the sales price of the vehicle and recognized as revenue when the vehicle is sold and delivered to the customer.

### *Cost of Revenues*

The costs of goods sold primarily include vehicle components and parts, labor costs, amortized tooling costs, and other relevant costs associated with the production of these vehicles. Other inventory costs and expenses primarily include write downs of inventory to net realizable value, provisions for estimated warranty expenses, and other similar costs.

### *Warranty*

The Company provides a manufacturer's warranty on all vehicles sold that covers the costs to repair or replace faulty parts or components, including those costs incurred under recalls. The Company records a warranty reserve based on industry benchmarks and/or actual claims incurred to date and after consideration of the nature, frequency and costs of future claims. The warranty does not cover any item where failure is due to normal wear and tear. This assurance-type warranty does not create a performance obligation as part of the sale of the vehicle. The amount of warranty claims is included within Accrued expenses and other in the Consolidated Balance Sheets. Carrying amount of the warranty provision as of September 30, 2024 is $89 thousand. The Company reevaluates the adequacy of the warranty reserve on a regular basis and makes revisions when necessary. Warranty estimates are inherently uncertain, especially given the Company's limited history of sales, and more historical experience or updates to benchmarks and projections may cause material changes to the warranty reserve in the future.

### *General and Administrative Expenses*

General and administrative ("G&A") expenses include expenses not related to production, such as salaries and employee benefits, professional fees, rent, repairs and maintenance, utilities and office expenses, depreciation and amortization, advertising, marketing and other selling expenses, settlements and penalties, taxes, and licenses, etc. Advertising costs are expensed as incurred and are included in G&A expenses, other than trade show expenses which are deferred until occurrence of the future event in accordance with ASC 720-35, "*Other Expenses - Advertising Cost.*" Advertising costs for the years ended September 30, 2024 and 2023 were $17.3 million and $8.4 million, respectively.

F- 17

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Research and Development Costs

Research and development expenses are primarily comprised of external fees and internal costs for engineering, homologation, prototyping costs and other expenses related to preparation to mass-production of electric vehicles such as Mullen Three EV, Mullen One EV cargo van, Bollinger B4 Truck, etc. These include expenses related to the design, development, testing, and improvement of our electric vehicles and corresponding technologies. Per ASC 730, *"Research and Development,"* the Company recognizes all research and development costs in the statement of operations as they occur. Assets with alternative future uses are capitalized and depreciated over their useful lives, with the depreciation expense reported under research and development costs.

### Share-Based Compensation

The share-based awards issued by the Company are accounted for in accordance with ASC Subtopic 718-10, "*Compensation - Share Compensation*," which requires fair value measurement on the grant date and recognition of compensation expense for all shares of common stock of the Company issued to employees, non-employees, and directors. The grant date is the date at which a grantor and a grantee reach a mutual understanding of the key terms and conditions of a share-based payment award, and is the date that a grantee begins to benefit from, or be adversely affected by, subsequent changes in the price of the grantor's equity shares (e.g. the date when the Board of Directors has authorized share-based compensation to be issued from reserves approved by shareholders). Generally, the fair value of awards is estimated based on the market price of the shares of common stock of the Company the day immediately preceding the grant date. The fair value of non-marketable share-based awards (granted to employees before the Company became public) was estimated based on an independent valuation. The Company recognizes forfeitures of awards in the periods they occur.

The overwhelming part of share-based awards to employees per employment contracts and a certain part of contracts with non-employees (consultants) are classified as equity with costs and additional paid-in capital recognized ratably over the service period. A significant part of the Company's share-based awards to consultants is liability-classified: mainly if the number of shares the consultant is entitled to depends on a certain monetary value fixed in the contract. An accrued part of liability, in this case, is revalued each period based on an earned portion of the grant and changes in the market price of the shares of common stock of the Company until a sufficient number of shares is issued.

The Company has also adopted incentive plans that entitle the Chief Executive Officer to share-based awards generally calculated as 1-3% of then outstanding number of shares of common stock, issuable upon achievement of specific financial and operational targets (milestones). This share-based compensation is accrued over the service term when it is probable that the milestone will be achieved. The liability to issue stock (presented within non-current liabilities if the achievement is expected later than 12 months after the balance sheet date) is revalued on every balance sheet date based on the length of the service period, the current market price of the common stock and the number of shares of common stock outstanding - until the shares have been issued, or until fulfilling the milestone requirements becomes unlikely.

### Net Loss per Share of Common Stock

Basic net loss per share is calculated by dividing the net loss attributable to common shares by the weighted-average number of shares of common stock outstanding for the period. The diluted net loss per share of common stock is computed by dividing the net loss using the weighted-average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares consist of stock options and warrants to purchase common stock (using the treasury stock method). Due to net loss incurred in 2024 and 2023, securities convertible into common stock were considered anti-dilutive.

### Derivative Financial Instruments

The Company does not use derivative instruments to hedge exposures to interest rate, market, or foreign currency risks. The Company evaluates all of its financial instruments, including notes payable and warrants, to determine if such instruments are derivatives or contain features that qualify as embedded derivatives. The Company applies significant judgment to identify and evaluate complex terms and conditions in its contracts and agreements to determine whether embedded derivatives exist. Embedded derivatives must be separately measured from the host contract if all the requirements for bifurcation are met. The assessment of the conditions surrounding the bifurcation of embedded derivatives depends on the nature of the host contract. Bifurcated embedded derivatives are recognized at fair value, with changes in fair value recognized in the statement of operations each period. Bifurcated embedded derivatives are classified with the related host contract on the Company's balance sheet.

A freestanding instrument that is a derivative is evaluated by the Company to determine if it qualifies for an exception to derivative accounting. The Company determines whether the equity-linked feature is indexed to the Company's common stock and whether the settlement provision in the contract is consistent with a fixed-for-fixed equity instrument. To qualify for classification in stockholder's equity, the Company evaluates whether the contract requires physical settlement, net share settlement, or a combination thereof and, when the Company has a choice of net cash settlement or settlement in the Company's shares, additional criteria are evaluated to determine whether equity classification is appropriate. Refer to Notes 7 and 8 for additional information regarding the accounting for the convertible notes and warrants.

F- 18

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Fair Value of Financial Instruments*

ASC 825-10 defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Company considers the principal or most advantageous market in which it would transact and considers assumptions that market participants would use when pricing the asset or liability, such as inherent risk, transfer restrictions, and risk of non-performance. ASC 825-10 establishes a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. ASC 825-10 establishes three levels of inputs that may be used to measure fair value:

- Level 1 - Quoted prices in active markets for identical assets or liabilities.

- Level 2 - Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which all significant inputs are observable or can be derived principally from or corroborated by observable market data for substantially the full term of the assets or liabilities.

- Level 3 - Unobservable inputs to the valuation methodology that are significant to the measurement of fair value of assets or liabilities.

To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement is disclosed and is determined based on the lowest level input that is significant to the fair value measurement.

*Expected credit losses*

The estimation of expected credit losses that may be incurred as we work through the invoice collection process with our customers and other counterparties requires us to make judgments and estimates regarding the probability the amounts due to us are going to be paid. We monitor our customers' payment history and current creditworthiness to determine that collectability is reasonably assured. We also consider the overall business climate in which our customers and other counterparties operate. Uncertainties regarding changes in the financial condition of our counterparties could impact the amount and timing of any additional credit losses that may be recognized. Due to insignificant value of financial assets, no material allowance for credit losses was recognized to cover anticipated credit losses under current conditions as of September 30, 2024 and 2023.

*Concentrations of Credit Risk*

Cash and cash equivalents are financial instruments that are potentially subject to concentrations of credit risk. The Company maintains cash balances in several financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Association up to certain federal limitations, generally $250,000. At times, our cash balance may exceed these federal limitations. However, we have not experienced any losses in such accounts and management believes we are not exposed to any significant credit risk on these accounts due to the high credit rating of relevant financial institutions. The amounts in excess of insured limits as of September 30, 2024 and 2023 are $10.0 million and $154.9 million, respectively. The Company has no financial instruments with off-balance sheet risk of loss.

F- 19

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

***Concentrations of Supply Risk***

The Company is dependent on its suppliers, the majority of which are single-source suppliers, and the inability of these suppliers to deliver necessary components of its products according to the schedule and at prices, quality levels and volumes acceptable to the Company, or its inability to efficiently manage these components, could have a material adverse effect on the Company's results of operations and financial condition.

As of and for the year ended September 30, 2024, one supplier accounted for 12% of the Company's total accounts payable and two suppliers accounted for 17% and 10% of inventory purchases. As of and for the year ended September 30, 2023, three suppliers accounted for 20%, 19% and 11% of the Company's total accounts payable and one supplier accounted for 10% of inventory purchases.

***Segments***

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's CODM is its Chief Executive Officer. The Company has determined that it operates in two operating segments, as the CODM reviews financial information presented on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance.

***Accounting pronouncements***

The Company has implemented all applicable accounting pronouncements that are in effect. The Company has recently adopted the following pronouncements:

ASU 2022-04 - *Supplier Finance Program (SFP)*. This ASU requires that a buyer in an SFP disclose qualitative and quantitative information about its program, including the nature of the SFP and key terms, outstanding amounts as of the end of the reporting period, and presentation in its financial statements. This pronouncement has not impacted the Company's consolidated financial statements.

ASU 2016-13 - *Measurement of Credit Losses on Financial Instruments (CECL).* This guidance, commonly referred to as Current Expected Credit Loss ("CECL"), changes impairment recognition to a model that is based on expected losses rather than incurred losses. The measurement of expected credit losses under the CECL methodology is applicable to financial assets measured at amortized cost, including trade receivables. The Company evaluated and determined the amendment did not have a material effect on the consolidated financial statements.

The following are accounting pronouncements that have been issued but are not yet effective for the Company's consolidated financial statements:

In August 2020, the FASB issued ASU No. 2020-06, *Debt-Debt with Conversion and Other Options* (Subtopic 470-20), and Derivatives and Hedging-Contracts in an Entity's Own Equity (Subtopic 815-40): *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity.* The amendments in ASU No. 2020-06 simplify the complexity associated with applying GAAP for certain financial instruments with characteristics of liabilities and equity. More specifically, the amendments focus on the guidance for convertible instruments and derivative scope exceptions for contracts in an entity's own equity. For smaller reporting companies, ASU 2020-06 is effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years. The Company is examining the impact this pronouncement may have on the Company's consolidated financial statements.

In November 2023, the FASB issued Accounting Standards Update 2023-07-*Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures.* It requires all annual disclosures currently required by ASC 280 to be included in interim periods. It requires disclosure of significant segment expenses regularly provided to the chief operating decision maker ("CODM"), a description of other segment items by reportable segment, and applicable additional measures of segment profit or loss used by the CODM when allocating resources and assessing business performance. All public entities will be required to report segment information in accordance with the new guidance starting in annual periods beginning after December 15, 2023. The Company expects to enhance segment reporting disclosures based on new requirements.

In December 2023, the FASB issued ASU No. 2023-09, "*Income Taxes (Topic 740): Improvements to Income Tax Disclosures.*" ASU No. 2023-09, which enhances the transparency, effectiveness, and comparability of income tax disclosures by requiring consistent categories and greater disaggregation of information related to income tax rate reconciliations and the jurisdictions in which income taxes are paid. The guidance is effective for public business entities for fiscal years beginning after December 15, 2024, with early adoption permitted. The Company expects to enhance income tax disclosures based on new requirements.

F- 20

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In November 2024, the FASB issued Accounting Standards Update 2024-03 "*Income Statement - Reporting Comprehensive Income - Expense Disaggregation Disclosures (Subtopic 220-40)*" which requires that at each interim and annual reporting period an entity:
1. Disclose the amounts of (a) purchases of inventory, (b) employee compensation, (c) depreciation, (d) intangible asset amortization, and (e) depreciation, depletion, and amortization included in each relevant expense caption. A relevant expense caption is an expense caption presented on the face of the income statement within continuing operations that contains any of the listed expense categories.
2. Include certain amounts that are already required to be disclosed under current generally accepted accounting principles (GAAP) in the same disclosure as the other disaggregation requirements.
3. Disclose a qualitative description of the amounts remaining in relevant expense captions that are not separately disaggregated quantitatively.
4. Disclose the total amount of selling expenses and, in annual reporting periods, an entity's definition of selling expenses.
These amendments are effective for annual reporting periods beginning after December 15, 2026, and interim reporting periods beginning after December 15, 2027: either (1) prospectively to financial statements issued for reporting periods after the effective date of this Update or (2) retrospectively to any or all prior periods presented in the financial statements. The Company expects to enhance disclosures of expenses based on new requirements.

In November 2024, the FASB also issued Accounting Standards Update 2024-04 "*Debt - Debt with Conversion and Other Options (Subtopic 470-20) "Induced Conversions of Convertible Debt Instruments"* to clarify the requirements for determining whether certain settlements of convertible debt instruments should be accounted for as an induced conversion. Under the amendments, to account for a settlement of a convertible debt instrument as an induced conversion, an inducement offer is required to provide the debt holder with, at a minimum, the consideration (in form and amount) issuable under the conversion privileges provided in the terms of the instrument. An entity should assess whether this criterion is satisfied as of the date the inducement offer is accepted by the holder. If, when applying this criterion, the convertible debt instrument had been exchanged or modified (without being deemed substantially different) within the one-year period leading up to the offer acceptance date, an entity should compare the terms provided in the inducement offer with the terms that existed one year before the offer acceptance date. The amendments in this Update also clarify that the induced conversion guidance applies to a convertible debt instrument that is not currently convertible as long as it had a substantive conversion feature as of both its issuance date and the date the inducement offer is accepted. The amendments are effective for all entities for annual reporting periods beginning after December 15, 2025, and interim reporting periods within those annual reporting periods. The Company is examining the impact this pronouncement may have on the Company's consolidated financial statements.

Other accounting pronouncements issued but not yet effective are not believed by management to be relevant or to have a material impact on the Company's present or future consolidated financial statements.

**NOTE 4 - BUSINESS ACQUISITIONS**

*Acquisition of retail and repair business of Mullen Technologies, Inc.*

On July 18, 2024, the Company entered into an Asset Purchase Agreement with Mullen Technologies, Inc. ("MTI"), related party (the Company's CEO has a controlling financial interest and is Chairman of MTI), pursuant to which the Company assumed a lease for premises located in Oceanside, California (approximately 8,000 square feet premises on approximately 16,000 square feet of land) and acquired all equipment and inventory in these premises, as well as staffing (relevant workforce of MTI has been employed by the Company) and other infrastructure for vehicle sales and repairs for consideration of $1.4 million in cash paid at closing. The Company has purchased no shares of common stock of MTI and has assumed no liabilities of MTI other than lease in Oceanside. The acquisition is expected to facilitate retail sales of the Company's products in California.

F- 21

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Financial results of the acquired business since the acquisition date**

| | |
|---|---:|
| Total revenues | $ - |
| Net loss | $ 194,985 |

The Company has determined that the contract constitutes a business acquisition as defined by ACS 805, *Business Combinations,* as the Company has acquired an integrated set of activities and assets that is capable of being conducted and managed for the purpose of providing a return in the form of lower costs and other economic benefits. Accordingly, the assets acquired, and the liabilities assumed in the transaction were recorded at their acquisition date estimated fair value, while the transaction costs associated with the acquisition were expensed as incurred pursuant to the purchased method of accounting in accordance with ASC 805. The Company's purchase price allocation was based on evaluation of the appropriate fair values by independent appraiser. Fair values were determined based on the requirements of ASC *820, Fair Measurements and Disclosure* (level 3). The following table summarizes the allocation of fair value of assets acquired and liabilities assumed.

**Recognized amounts of identifiable assets acquired and liabilities assumed**

| | |
|---|---:|
| Equipment and inventories | $ 184,105 |
| Right-of-use assets | 681,724 |
| Lease liabilities | (681,724) |
| **Total identifiable net assets** | **$ 184,105** |
| | |
| Goodwill | 1,215,895 |
| | |
| **Consideration paid in cash at closing** | **$ 1,400,000** |

As disclosed further in the *Note 6 - Goodwill and other intangible assets*, when preparing financial statements, for the fiscal year ended September 30, 2024, the Company recognized impairment loss in amount of $1.2 million in respect of this goodwill due to the uncertainty with future funding required to support business operations.

*Supplemental pro forma information*

The following supplemental pro forma information summarizes the Company's results of operations for the fiscal year ended September 30, 2024, as if the Company completed the acquisition as of the beginning of the annual reporting period beginning October 1, 2023. The MTI acquisition did not result in additional revenues as the operations and location are to be integrated in the Mullen commercial sales operations.

| | Year Ended September 30, | |
|---|---:|---:|
| **Supplemental pro forma information** | **2024** | **2023** |
| Total revenues | $ 1,094,322 | $ 366,000 |
| Net loss | $ (505,826,551) | $ (1,006,658,828) |

F- 22

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 5 - INVENTORY

The Company's inventories are stated at the lower of cost or net realizable value and consist of the following:

| | September 30, 2024 | September 30, 2023 |
|---|---|---|
| **Inventory** | | |
| Raw materials | $ 12,658,123 | $ 12,733,101 |
| Work in process | 4,360,565 | 3,136,590 |
| Finished goods | 3,857,427 | - |
| Finished goods delivered to dealers for distribution | 16,626,997 | 937,322 |
| **Total Inventory** | $ 37,503,112 | $ 16,807,013 |

The cost of inventories is determined using a standard cost method, which approximates the first-in, first-out (FIFO) method. This includes direct materials, direct labor, and relevant manufacturing overhead costs. Variances between standard and actual costs are recognized in the cost of goods sold during the period in which they occur.

The Company regularly reviews its inventories for excess and obsolete items by assessing their net realizable value. The net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. During the year ended September 30, 2024, we recorded a loss of $
15.6 million to write the inventories down to net realizable value (Mullen commercial segment) - mainly due to excess raw materials and slower-moving inventory.

The net realizable value assessment considered the current expected selling prices of Mullen One, Mullen Three, and Bollinger B4 vehicles, based on recent sales and current market demand. Should actual sales prices or demand decline, additional write-downs may be required in future periods. Additionally, if the Company is unable to secure sufficient funding to continue operations as planned, inventory may need to be sold at further discounted prices, which could negatively impact future financial results.

During the year ended September 30, 2024, approximately $4.5 million of the Company's inventories was consumed in R&D activities (approximately $1 million during the year ended September 30, 2023), which was recognized as part of research and development expense in the consolidated statement of operations.

## NOTE 6 - GOODWILL AND OTHER INTANGIBLE ASSETS

### *Goodwill*

The goodwill pertains to the Bollinger Motors acquisition in September 2022 and retail and repair business of MTI in July 2024 (see *Note 4 - Business Acquisitions*).

Goodwill is not amortized and is tested for impairment annually, or more frequently if there are indicators of impairment. Every reporting period the Company assesses qualitative factors (such as macroeconomic conditions, industry and market considerations, financial performance of the Company, entity-specific events etc.) to determine whether it is necessary to perform the quantitative goodwill impairment test. Upon the quantitative goodwill impairment test, impairment may arise to the extent carrying amount of a reporting unit that includes goodwill (i.e. Bollinger production unit, see *Note 21 - Segment information*) exceeds its fair value.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As a result of the impairment test for goodwill pertaining to the Bollinger segment, performed on September 1, 2023 by management with the assistance of independent third-party valuation professionals, the Company has recognized impairment loss in amount of $64.0 million in the statement of operations for the year ended September 30, 2023. The impairment was caused mainly by unfavorable capital market conditions, i.e., prolonged decrease in the Company's market capitalization, including a significant decline in stock price and a budgeted performance misses compared to the budgets prepared on acquisition date. As a result of the impairment test on March 31, 2024, the Company recognized further impairment in the remaining amount of $28.8 million, mainly due to the uncertainty with future funding required to support Bollinger Motors' business operations and the decrease in the Company's market capitalization. Full amount of the loss has been recognized in the consolidated statement of operations, and the part of the loss that relates to noncontrolling interest in the subsidiary has decreased noncontrolling interest in equity section of the consolidated balance sheets.

We used a combination of market and income approach to determine impairment of goodwill. The quantitative goodwill impairment tests were based on determining the fair value of the Bollinger Motors reporting units based on management judgments and assumptions using the discounted cash flows under the income approach classified in Level 3 of the fair value hierarchy and comparable company market valuation classified in Level 2 of the fair value hierarchy approaches. When the carrying value of a reporting unit exceeded its fair value, the Company measured goodwill impairment loss as the amount by which the carrying amount of a reporting unit exceeds its fair value, not to exceed the total amount of goodwill allocated to that reporting unit. The valuation approaches are subject to key judgments and assumptions that are sensitive to change such as judgments and assumptions about appropriate sales growth rates, operating margins, discount rate, and comparable company market multiples. When developing these key judgments and assumptions, the Company considers economic, operational and market conditions that could impact the fair value of the reporting unit. However, estimates are inherently uncertain and represent only management's reasonable expectations regarding future developments. These estimates and the judgments and assumptions upon which the estimates are based will likely differ in some respects from actual future results.

As a result of the impairment test for goodwill pertaining to MTI retail business, the Company has recognized impairment loss in amount of $1.2 million in the statement of operations for the year ended September 30, 2024. The impairment was recorded mainly due to the uncertainty of future funding required to support business operations (see *Note 2*).

Changes in the carrying amount of goodwill are presented in the following table:

| | Bollinger Motors, Inc. | Retail business of MTI | Total |
|---|---|---|---|
| Goodwill, gross amount as of October 1, 2022 | 92,834,832 | - | 92,834,832 |
| Goodwill, accumulated impairment as of October 1, 2022 | - | - | - |
| **Carrying value as of October 1, 2022** | $ 92,834,832 | $ - | $ 92,834,832 |
| Impairment recognized in fiscal year ending September 30, 2023 | (63,988,000) | - | (63,988,000) |
| Goodwill, gross amount as of September 30, 2023 | 92,834,832 | - | 92,834,832 |
| Goodwill, accumulated impairment as of September 30, 2023 | (63,988,000) | - | (63,988,000) |
| **Carrying value as of as of September 30, 2023** | $ 28,846,832 | $ - | $ 28,846,832 |
| Additional goodwill recognized during the period | - | 1,215,895 | 1,215,895 |
| Impairment recognized in fiscal year ending September 30, 2024 | (28,846,832) | (1,215,895) | (30,062,727) |
| | - | - | - |
| Goodwill, gross amount as of September 30, 2024 | 92,834,832 | 1,215,895 | 94,050,727 |
| Goodwill, accumulated impairment as of September 30, 2024 | (92,834,832) | (1,215,895) | (94,050,727) |
| **Carrying value as of as of September 30, 2024** | $ - | $ - | $ - |

F- 24

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Other intangible assets*

Intangible assets are stated at cost, net of accumulated amortization and impairment. Patents and other identifiable intellectual property purchased as part of the Bollinger Motors acquisition in September 2022 have been initially recognized at fair value.

Intangible assets with indefinite useful lives (in-process research and development assets acquired as part of the Bollinger Motors acquisition) are not amortized but instead tested for impairment. Due to unfavorable market conditions and the decline of market prices of the Company's common stock, we have tested indefinite-lived in-process research and development assets acquired in September 2022 as part of the Bollinger segment (see *Note 21 - Segment information*) for recoverability on March 31, 2024 and recognized impairment loss in full amount of $58.3 million, mainly due to the uncertainty of future fundings required to support the business and decrease of Company's market capitalization.

Intangible assets with finite useful lives (e.g. patents,) are amortized over the period of estimated benefit using the straight-line method. The weighted average useful life of intangible assets is 7.7 years. The straight-line method of amortization represents management's best estimate of the distribution of the economic value of the intangible assets.

During the year ended September 30, 2024, an impairment loss in the amount of $15.1 million was recognized in respect of the intangible assets with finite useful lives of the Mullen Commercial segment (engineering designs) on March 31, 2024 - mainly due to performance misses compared to the previous budgets. Their accumulated amortization in the amount of $1.1 million was derecognized in correspondence with the initial cost to present the new cost basis of these assets in accordance with ASC 350-30. No additional impairment has been recognized based on tests performed subsequently. During the year ended September 30, 2023, an impairment loss in amount of $5.9 million was recognized in respect of the intangible assets of the Mullen Commercial segment (primarily engineering designs and website design and development). Their accumulated amortizaiton in amount of $4.3 million was derecognized in correspondence with initial cost to present the new cost basis. Fair value of the engineering designs (classified in Level 3 of the fair value hierarchy) was estimated based on cost approach, which involves evaluation of the costs required to replace or recreate the subject intangible assets. Significant judgments inherent in this analysis include the accuracy of the historical cost data, obsolescence factor, probability of success related to the commercialization of the reporting segment that utilizes the engineering designs.

The remaining finite lived intangible assets at September 30, 2024 consist of the patents which were acquired as part of the acquisition of Bollinger (Patents). The Company performed an impairment test on these intangible assets and determined that the carrying amount of the Patents were recoverable, therefore no impairment is required at September 30, 2024. It is currently the plan of the Company to operate the Bollinger business unit and the Company believes that operations would recover the Patent. At the same time, the Company also believes that the Bollinger business unit is marketable and the deemed fair value of the business unit exceeds the carrying amount and would result in a recovery of the Patent assets.

| | As of September 30, 2024 | | | As of September 30, 2023 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Cost Basis | Accumulated Amortization | Net Carrying Amount | Cost Basis | Accumulated Amortization | Net Carrying Amount |
| **Finite-Lived Intangible Assets** | | | | | | |
| Patents | $ 32,447,460 | $ (6,699,330) | 25,748,130 | $ 31,708,460 | $ (3,445,694) | $ 28,262,766 |
| Engineering designs | - | - | - | 16,200,332 | (184,274) | 16,016,058 |
| Other | 745,947 | (308,188) | 437,759 | 745,947 | (158,590) | 587,357 |
| Trademarks | 1,095,693 | (225,552) | 870,141 | 1,180,138 | (115,682) | 1,064,456 |
| Total finite-lived intangible assets | 34,289,100 | (7,233,070) | 27,056,030 | 49,834,877 | (3,904,240) | 45,930,637 |
| **Indefinite-Lived Intangible Assets** | | | | | | |
| In-process research and development assets | - | - | - | 58,304,612 | - | 58,304,612 |
| Total indefinite-lived intangible assets | - | - | - | 58,304,612 | - | 58,304,612 |
| **Total Intangible Assets** | $ 34,289,100 | $ (7,233,070) | $ 27,056,030 | $ 108,139,489 | $ (3,904,240) | $ 104,235,249 |

F- 25

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Total future amortization expense for finite-lived intangible assets is as follows:

| Years Ended September 30, | Future Amortization |
|---|---|
| 2025 | $ 3,503,505 |
| 2026 | 3,503,505 |
| 2027 | 3,493,695 |
| 2028 | 3,363,505 |
| 2029 | 3,354,315 |
| Thereafter | 9,837,505 |
| **Total Future Amortization** | $ **27,056,030** |

For the years ended September 30, 2024 and 2023, amortization of the intangible assets was $4.3 million and $6.5 million respectively. For the years ended September 30, 2024 and 2023, impairment of the intangible assets was $

73.4 million and $5.9 million respectively.

**NOTE 7 - DEBT**

The Company has only short-term debt defined as debt with principal maturities of one year or less from the balance sheet date, as well as loans that have matured or in default and remain unpaid.

The following is a summary of our indebtedness as of September 30, 2024:

| Type of Debt | Carrying amount | Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|
| Matured notes (1) | $ 2,385,004 | $ 2,385,004 | $ - | 10% | Due (default) |
| Matured loan advances (1) | 332,800 | 332,800 | - | 10% | Due (default) |
| Senior convertible notes (2) | 20,346,283 | 20,346,283 | - | 20% (default) | Due (cross-default) |
| Less: debt discount to convertible notes | (17,664,310) | (17,664,310) | - | | |
| **Total Debt** | $ **5,399,777** | $ **5,399,777** | $ - | | |

(1) In October 2024, the Company reached an agreement with holders of all matured notes and loan advances (see table above) in amount of $2.7 million, as well as accumulated interest in amount of approximately $1.8 million, that the liabilities would be settled by issuance of shares of common stock of the Company worth of $3 million. The liability has been fully settled by December 2024 by issuing common stock in several installments.

(2) As of September 30, 2024, the Company's senior convertible notes (totaling $20.3 million) and accumulated interest (approximately $0.3 million) were in cross-default due to the non-payment of $0.2 million that matured in September 2024. As a result, the entire principal balance became due immediately, allowing investors to demand full repayment. Additionally, the interest rate increased from 15% to 20%. However, investors have not requested immediate cash payment of the notes or accrued interest. In December 2024, the court has approved a settlement agreement between the Company and holders of the Senior convertible notes, and, by the date these financial statements are available to be issued, almost full amount of the Senior convertible notes and accumulated interest has been converted to shares of common stock under Section 3(a)(10) of the Securities Act of 1933.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following is the overview of changes in our indebtedness during the year ended September 30, 2024 (see further details in narrative disclosures below):

| | Matured loans and advances | NuBridge real estate note | Senior Secured Convertible Notes | Total |
|---|---|---|---|---|
| Principal as of October 1, 2023 | $ 2,731,681 | $ 5,000,000 | $ - | $ 7,731,681 |
| Original interest discount and debt issuance costs as of October 1, 2023 | - | (270,189) | - | (270,189) |
| **Carrying amount as of October 1, 2023** | **2,731,681** | **4,729,811** | **-** | **7,461,492** |
| Notes issued, principal | - | - | 68,326,316 | 68,326,316 |
| Original interest discount and debt issuance costs at inception | - | - | (65,168,421) | (65,168,421) |
| Amortization of original interest discount and debt issuance costs | - | 232,794 | 47,504,111 | 47,736,905 |
| Paid in cash | - | (4,945,832) | - | (4,945,832) |
| Principal converted | - | - | (48,056,575) | (48,056,575) |
| Other adjustments | (13,877) | (16,773) | 76,542 | 45,892 |
| Principal as of September 30, 2024 | 2,717,804 | - | 20,346,283 | 23,064,087 |
| Original interest discount and debt issuance costs as of September 30, 2024 | - | - | (17,664,310) | (17,664,310) |
| **Carrying amount as of September 30, 2024** | $ 2,717,804 | $ - | $ 2,681,973 | $ 5,399,777 |

The following is a summary of our debt as of September 30, 2023:

| Type of Debt | Carrying amount | Current | Long-Term | Contractual Interest Rate | Contractual Maturity |
|---|---|---|---|---|---|
| Matured notes | $ 2,398,881 | $ 2,398,881 | $ - | 0.00 - 10.00% | 2019 - 2021 |
| Real estate note | 5,000,000 | 5,000,000 | - | 8.99% | 2024 |
| Matured loan advances | 332,800 | 332,800 | - | 0.00 - 10.00% | 2016 - 2018 |
| Less: debt discount | (270,189) | (270,189) | - | | |
| **Total Debt** | $ 7,461,492 | $ 7,461,492 | $ - | | |

F- 27

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following is the overview of changes in our indebtedness during the year ended September 30, 2023:

| | Matured notes, loans and advances | NuBridge real estate note | Series D Convertible Notes | Other notes payable | Total |
|---|---|---|---|---|---|
| Principal as of October 1, 2022 | $ 3,608,885 | $ 5,000,000 | $ - | $ 1,344,399 | $ 9,953,284 |
| Original interest discount as of October 1, 2022 | - | (857,257) | - | (74,978) | (932,235) |
| **Carrying amount as of October 1, 2022** | **3,608,885** | **4,142,743** | **-** | **1,269,421** | **9,021,049** |
| Notes issued, principal | - | - | 150,000,000 | 20,000,000 | 170,000,000 |
| Original interest discount and debt issuance costs at inception | - | (150,000,000) | | - | (150,000,000) |
| Paid in cash | (446,741) | | | (20,247,612) | (20,694,353) |
| Amortization of original interest discount and debt issuance costs | | 587,068 | 150,000,000 | 163,558 | 150,750,626 |
| Derecognition of an old note upon exchange | | | | (1,032,217) | (1,032,217) |
| Recognition of a new note upon exchange | | | | 12,945,914 | 12,945,914 |
| Principal converted | | | (150,000,000) | (12,945,914) | (162,945,914) |
| Other adjustments | (430,463) | | | (153,150) | (583,613) |
| Principal as of September 30, 2023 | 2,731,681 | 5,000,000 | - | - | 7,731,681 |
| Original interest discount as of September 30, 2023 | - | (270,189) | - | - | (270,189) |
| **Carrying amount as of September 30, 2023** | $ 2,731,681 | $ 4,729,811 | $ - | $ - | $ 7,461,492 |

*Accrued interest*

As of September 30, 2024 and September 30, 2023, accrued interest on outstanding notes payable was $2.4 million and $1.5 million, respectively. The weighted average interest rate on short term borrowings outstanding as of September 30, 2024 was 18.8% (9.3% - as of September 30, 2023) and approximates effective interest rate as of those dates. Amortization of the debt discounts and issuance costs during the fiscal year ended September 30, 2024 amounted to $47.7 million (during the year ended September 30, 2023 - $0.8 million presented as interest expense; plus $150 million of original issue discount (see subsection *Series D Convertible Notes* below) was presented as part of item "Other financing costs - initial recognition of derivative liabilities" of the statement of operations for the year ended September 30, 2023, as these expenses were closely related to initial recognition of notes and warrants). Contractual interest expense during the fiscal year ended September 30, 2024 amounted to $1.6 million ($4.2 million - during the year ended September 30, 2023).

*NuBridge Commercial Lending LLC Promissory Note (paid)*

On March 7, 2022, the Company's wholly owned subsidiary, Mullen Investment Properties, LLC, entered into a Promissory Note (the "Real estate note") with NuBridge Commercial Lending LLC for a principal amount of $5 million. The Real estate note bore interest at a fixed rate of 8.99% per annum and the principal amount was due March 1, 2024. Collateral for the loan included the title to the Company's property at 1 Greentech Drive, Tunica, MS. Under the Real estate note, prepaid interest and issuance costs of $1,157,209 were withheld from the principal and recorded as debt discount, which was amortized over the term of the Real estate note. In January 2024, the loan was paid by the Company in full, and the collateral was released.

F- 28

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Non-convertible promissory note (terminated)*

On December 18, 2023, Mullen entered into a Debt Agreement to issue a non-convertible secured promissory note (the "Note") with a principal amount of $50 million, purchased for $32 million, reflecting an $18 million original issue discount. The issuance of this non-convertible Note was expected on the first trading day when all closing conditions are met. The Note contemplated 10% annual interest, escalating to 18% post-Event of Default. It would mature three months post-issuance. The Note's terms allowed for accelerated repayment upon default, requiring the Company to pay the principal, accrued interest, and other due amounts. The Note was supposed to be secured by the Company's assets and impose restrictions on the Company, limiting additional debt, asset liens, stock repurchases, outstanding debt repayment, and affiliate transactions, except for specified exceptions. It mandated prepayment of the principal from net proceeds of any subsequent financing. The funds contemplated by the Debt Agreement have not been received, and on May 7, 2024, the Debt Agreement was terminated. The $18 million original issue discount was considered a settlement cost related to a dispute over financings that occurred during the fiscal year ending September 30, 2023. The costs have been accrued as of September 30, 2023. Since the loss is no longer probable, the accrual was reversed.

*Series D Convertible Notes (converted)*

During the previous financial years ended September 30, 2023 and September 30, 2022, the Company financed its activities mainly with proceeds from the June 7, 2022 Securities Purchase Agreement. On November 14, 2022, the Company entered into Amendment No. 3 to the June 7, 2022, Securities Purchase Agreement (as amended, the "Series D SPA"). The investors paid $150 million. Instead of receiving shares of Series D Preferred Stock and warrants, they received notes convertible into shares of the Company's common stock ("Notes") and warrants (see *Note 8 - Warrants and other derivative liabilities and fair value measurements*). During the year ended September 30, 2023, all Notes and accumulated interest have been fully converted to shares of common stock of the Company.

*$50 Million Senior Secured Convertible Notes and Warrants (and Additional Investment Right)*

On May 14, 2024, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with certain accredited investors for the sale of Senior Secured Convertible Notes ("Convertible Notes") and five-year warrants exercisable for shares of common stock (the "Warrants"). Upon execution of the Securities Purchase Agreement, investors purchased an initial aggregate principal amount of $13.2 million, or $12.5 million, including the 5% original issue discount, of Convertible Notes (the "Initial Notes"), and also received 47,934 Warrants, giving effect to reverse stock split (the "Initial Warrants"). Investors were also obligated to purchase an additional principal amount of $39.5 million, or $37.5 million including the 5% original issue discount, of Convertible Notes and related Warrants if (i) the Company has sufficient authorized shares of common stock available to cover 250% of the shares of common stock underlying the conversion of the Convertible Notes and exercise of the Warrants, (ii) the common stock has an average daily trading volume of $3 million in the previous ten (10) trading days, (iii) a registration statement covering the shares of common stock underlying the conversion of the Convertible Notes and exercise of the Warrants has been declared effective, (iv) the Company has obtained stockholder approval of the issuance of the Convertible Notes and Warrants in compliance with Nasdaq Listing Rule 5635(d), and (v) the Company is in compliance with the continued listing standards of the Nasdaq Capital Market. Such additional Convertible Notes and Warrants were issued in July 2024.

The Convertible Notes accrue interest at 15%, including a 5% Original Issue Discount, and mature in four months from the date of issuance. Upon any event of default, the interest rate automatically increases to 20% per annum. The outstanding principal and accrued but unpaid interest on the Convertible Notes may be converted by the holder into shares of common stock at the lower of (i) $5.49 (after reverse stock split - $549), (ii) 95% of the closing sale price of the common stock on the date that the Company's registration statement on Form S-1 is declared effective (i.e. $3.61, after the reverse stock split - $361), or (iii) 95% of the lowest daily volume weighted average price in the five (5) trading days prior to such conversion date, provided that the conversion price will not be less than $1.16 per share (not subject to reverse stock split).

F- 29

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As security for payment of the amounts due and payable under the Convertible Notes, the Company collaterally assigned and granted to the holders a continuing security interest in all of the Company's right, title, and interest in, to, and under the property of the Company, whether then or hereafter owned, existing, acquired or arising and wherever then or hereafter located (subject to certain exceptions). The Convertible Notes are senior in right of payment to all other current and future notes to which the Company is a party. The Convertible Notes also impose restrictions on the Company, limiting additional debt, asset liens, stock repurchases, outstanding debt repayment, dividends distribution, and affiliate transactions, except for specified exceptions.

In connection with the issuance of the Convertible Notes, the holders also received 5-year warrants exercisable for 200% of the shares of common stock underlying such Convertible Notes, see further details in the *Note 8*.

The Convertible Notes and Warrants are not convertible by a holder to the extent that the holder or any of its affiliates would beneficially own in excess of 9.9% of the common stock.

The Company and the investors also executed a registration rights agreement. In the event that (i) sales cannot be made pursuant to the registration statement or the prospectus contained therein is not properly available for any reason for more than five consecutive calendar days or more than an aggregate of 10 calendar days during any 12-month period or (ii) a registration statement is not effective for any reason, or the prospectus contained therein is not properly available for use for any reason, and the Company fails to file with the SEC any required reports under the Exchange Act, then the Company has agreed (unless the Registrable Securities are freely tradable pursuant to Rule 144) to make payments to each investor as liquidated damages in an amount equal to 1.5% of such investor's total committed purchase price for the registrable securities affected by such failure and an additional 1.5% on every 30 day anniversary, with a maximum of 12 payments. Such payments will bear interest at the rate of 10% per month (prorated for partial months) until paid in full and may be paid in registered shares of common stock at the option of the Company. The Company will recognize a liability under the registration payment arrangement if the transfer of consideration becomes probable and can be reasonably estimated.

For a period beginning on May 14, 2024, and ending on the one-year anniversary from the later of (i) the date registration statements registering the shares issuable upon conversion of all of the Convertible Notes and exercise of all the Warrants is declared effective or (ii) the date the Company has obtained stockholder approval for the transaction, the investors have the right, but not the obligation, to purchase an additional $52.6 million of 5% Original Issue Discount Senior Secured Convertible Notes and related Warrants on the same terms and conditions as provided in the Securities Purchase Agreement.

The exercise price and number of shares issuable upon conversion of the Convertible Notes or exercise of the Warrants, as applicable, will further be adjusted upon the occurrence of certain events, and holders will be allowed to participate in certain issuances and distributions (subject to certain limitations and restrictions), including certain stock dividends and splits, dilutive issuances of additional common stock, and dilutive issuances of, or changes in option price or rate of conversion of, options or convertible securities, as well as the issuance of purchase rights or distributions of assets during restricted period. "Restricted period" means the period commencing on the purchase date and ending on the earlier of (i) the date immediately following the 90th day after a registration statement registering for the securities has been declared effective by the SEC and (ii) the 90th day after the securities purchased are saleable under Rule 144 without the requirement for current public information and without volume or manner of sale limitations.

The Convertible Notes and Warrants also provide for certain purchase rights whereby if the Company grants, issues, or sells any options, convertible securities, or rights to purchase stock, warrants, securities, or other property pro rata to the record holders of any class of common stock, then the holder will be entitled to acquire such purchase rights which the holder could have acquired if the holder had held the number of shares of common stock acquirable upon complete exercise of the Warrant.

F- 30

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On May 14, 2024, upon execution of the Securities Purchase Agreement, the investors purchased an initial aggregate principal amount of $13.2 million, or $12.5 million, including the 5% original issue discount, of Notes and also received 47,934 Warrants (giving effect to the reverse stock split, see *Note 1 - Description of business and basis of presentation*).

On July 9, 2024, the investors purchased an additional aggregate principal amount of $10.5 million, or $10 million including the 5% original issue discount, of Notes and also received 38,347 Warrants (giving effect to the reverse stock split).

On July 15, 2024, the investors purchased the final aggregate principal amount of $29 million, or $27.5 million including the 5% original issue discount, of Notes and also received 105,455 Warrants (giving effect to the reverse stock split).

Subsequently, on or around September 27, 2024, the investors exercised a part of their additional investment rights and purchased an aggregate principal amount of $12.5 million, or $11.9 million including the 5% original issue discount, of Notes and also received 45,664 Warrants (giving effect to the reverse stock split).

For details on initial recognition of these transactions in these consolidated financial statements, see further *Note 8* below.

During the remaining period until September 30, 2024, a part of notes and accumulated interest with carrying value of $48.5 million had been converted to 822,705 shares of common stock of the Company (giving effect to the reverse stock split). Any unamortized original issue discount has been immediately recognized as interest expense in the consolidated statement of operations.

The Convertible Notes in amount of $5 million were in technical default on June 28, 2024, because the Company failed to obtain shareholders' approval as was required by the contract. This gave investors the right to demand immediate repayment of the outstanding notes. None of the investors utilized this right to accelerate payment. An increased interest rate of 20% was applied until the Company obtained shareholders' approval for this transaction on July 9, 2024.

The Convertible Notes and relevant accumulated interest were in cross-default as of September 30, 2024, therefore the interest rate increased from 15% to 20% starting from October 1, 2024. As of the date these financial statements are authorized for issuance, investors have not demanded accelerated payment of the notes and interest in cash. In November 2024, the Company and the investors reached a settlement agreement (approved by court in December 2024) which allowed investors to convert all the notes and interest, under the conditions described above, into shares of common stock issued pursuant to Section 3(a)(10) of the Securities Act. The Company has elected to continue to amortize the related debt discounts over the original loan terms because the creditors have not and are not expected to demand repayment.

As of September 30, 2024, the outstanding convertible notes amounted to $20.3 million (with debt discount to convertible notes of $17.7 million) and with the accumulated interest in amount of $0.6 million were potentially convertible into 5,697,575 shares of common stock. Conversion of the notes depends on the lowest daily volume weighted average price of the Company's common stock ("VWAP"). If the lowest daily VWAP in the five trading days prior to September 30, 2024, was $0.10 less, the Company, upon full conversion of outstanding notes and accumulated interest, would theoretically be liable to issue approximately 150,795 shares more. If the lowest daily VWAP in the five trading days prior to September 30, 2024, was $0.10 higher, the Company, upon full conversion of outstanding notes and accumulated interest, would theoretically be liable to issue approximately 144,160 shares less. The maximum number of shares that could theoretically be issued upon conversion of these notes and accumulated interest, was 19 million (if the lowest daily VWAP in the five trading days prior to such conversion date decreased to or below $1.16).

F- 31

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 8 - WARRANTS AND OTHER DERIVATIVE LIABILITIES AND FAIR VALUE MEASUREMENTS

ASC 825-10 defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement is disclosed and is determined based on the lowest level input that is significant to the fair value measurement.

**Financial Instruments at Carrying Value That Approximated Fair Value**

Certain financial instruments that are not carried at fair value on the consolidated balance sheets are carried at amounts that approximate fair value, due to their short-term nature and credit risk. These instruments include cash and cash equivalents and accounts payable. Accounts payable are short-term in nature and generally are due upon receipt or within 30 to 90 days.

**Non-Financial Assets Measured at Fair Value on a Non-Recurring Basis**

Non-financial assets are only required to be measured at fair value when acquired as a part of business combination or when an impairment loss is recognized. See *Note 6 - Goodwill and intangible assets and Note 14 - Property, plant, and equipment, net* for further information. All these valuations are based on Level 3 - Unobservable inputs to the valuation methodology that are significant to the measurement of fair value of these assets or liabilities.

**Financial Liabilities Other than Measured at Fair Value on a Recurring Basis**

As of September 30, 2024, the Company had the matured loans and advances due with a principal and carrying amount of $2.7 million and accumulated interest in amount of $2.1 million. Their fair value as of September 30, 2024 (having significant unobservable inputs - level 3) approximated $3 million. Also, the company had Senior convertible notes (see Note 7 - Debt) in cross-default as of September 30, 2024, with a principal of $20.3 million and carrying amount (after unamortized original issue discount) of $2.7 million with accumulated interest in amount of $0.3 million. Their fair value (having significant unobservable inputs - level 3) was approximately $17.7 million.

**Financial Liabilities Measured at Fair Value on a Recurring Basis**

During the year ended September 30, 2024, the Company had the following financial liabilities measured at fair value on a recurring basis:

F- 32

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Warrants issued with the $50 Million Senior Secured Convertible Notes (and Additional Investment Right)*

As described in the *Note 7*, in connection with the issuance of the Convertible Notes, the holders also received 5-year warrants exercisable for 200% of the shares of common stock underlying such Convertible Notes at an exercise price equal to 105% of the closing sale price of the common stock on the execution date (i.e., $6.07, after the reverse stock split - $607), subject to further adjustment. The Warrants also provide for cashless exercise pursuant to which the holder will receive upon exercise a "net number" of shares of common stock determined according to the following formula:

Net Number = (A x B) / C
For purposes of the foregoing formula:
A= The total number of shares with respect to which the Warrant is then being exercised.
B= The Black Scholes Value (as described below).
C= The lower of the two Closing Bid Prices of the common stock in the two days prior the time of such exercise (as such Closing Bid Price is defined therein), but in any event not less than $1 (after reverse stock split, see *Note 1 - Description of business and basis of presentation*).

For purposes of the cashless exercise, "Black Scholes Value" means the Black Scholes value of an option for one share of common stock at the date of the applicable cashless exercise. As such, the Black Scholes value is determined and calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Exercise Price, as adjusted (i.e., $6.07, after the reverse stock split - $607), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable cashless exercise (i.e., $6.07, after the reverse stock split - $607), (iv) expected volatility equal to 135%, and (v) a deemed remaining term of the Warrant of five years (regardless of the actual remaining term of the Warrant).

The warrants provide that if the Company issues or sells, enters into a definitive, binding agreement pursuant to which he Company is required to issue or sell or is deemed, pursuant to the provisions of the warrants, to have issued or sold, any shares of common stock for a price per share lower than the exercise price then in effect, subject to certain limited exceptions, then the exercise price of the warrants shall be reduced to such lower price per share. In addition, the exercise price and the number of shares of common stock issuable upon exercise of the warrants are subject to adjustment in connection with stock splits, dividends or distributions or other similar transactions.

The Company will have the option to require the holders to exercise the Warrants for cash if, at any time, the following conditions are met: (i) the registration statement covering the securities has been declared effective is effective and available for the resale of the securities and no stop-order has been issued nor has the SEC suspended or withdrawn the effectiveness of the registration statement; (ii) the Company is not in violation of any of the rules, regulations or requirements of, and has no knowledge of any facts or circumstances that could reasonably lead to suspension in the foreseeable future on, the principal market; and (iii) the VWAP for each trading day during the 10 trading day period immediately preceding the date on which the Company elects to exercise this option is 250% above the exercise price.

F- 33

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As described in *Note 7*, the Company issued 237,400 warrants (giving effect to the reverse stock splits) as part of consideration for the funds provided under the $50 million senior secured Convertible Notes contract and $11.9 million out of the $50 million additional investment right.

These warrants were recognized as liabilities due to requirements of ASC 480 as the variable number of shares to be issued upon cashless exercise (deemed the predominant exercise option) is based predominantly on a fixed monetary value. The warrant liabilities were classified as derivative liabilities when requirements of ASC 815 were met. The warrant liabilities for the remaining unexercised warrants are carried forward subsequently at fair value and the gain or loss from revaluation is recorded within the line item "Gain/(loss) on other warrants revaluation" and "Gain/(loss) on derivative liability revaluation" at each warrant exercise date and each accounting period end. The fair value of the warrants is based on the fair value of the shares they are exercisable into under cashless basis. Upon initial recognition, the fair value of warrants and other derivative liabilities was $126.7 million and exceeded the amount of proceeds. The resulting discount to the carrying amount of the Convertible Notes ($65.2 million) is amortized over the life of the note and recognized as interest expense under the effective interest method during the 4 months after the date of the relevant tranche. Excess of initial fair value of warrant liabilities over the cash proceeds ($61.9 million) is presented in the consolidated statement of operations as "Other financing costs - initial recognition of warrants" (for warrant liabilities meeting, on initial recognition, requirements of ASC 450 only) and "Other financing costs - initial recognition of derivative liabilities" (for warrant liabilities meeting, on initial recognition, requirements of ASC 450 and ASC 815).

The additional investment right has also been exercised in July 2024 by certain investor who has exchanged 76,923 shares of Series E Preferred Stock for an initial aggregate principal amount of $3.2 million, or $3.0 million including the 5% original issue discount, of Convertible Notes and 11,504 Warrants (giving effect to reverse stock split). Upon initial recognition, the fair value of derivative liabilities was $6.3 million, and fair value of the convertible notes was $3.2 million. Excess of initial fair value of liabilities and over carrying amount of Series E Preferred stock ($0.9 million) is presented in the consolidated statement of operations as "Other financing costs - initial recognition of warrants".

During the remaining period until September 30, 2024, a part of the warrants in amount 77,361 (giving effect to the reverse stock split) was exercised on a cashless basis and 2,041,630 shares of common stock were issued by the Company.

Outstanding warrants in amount of 171,547 with carrying value of $79.7 million as of September 30, 2024 were potentially exercisable for 25,314,996 (under cashless basis) shares of common stock and their exercise (on a cash or cashless basis) is available to investors for a period of approximately 5 years. Exercise of the warrants depends on closing bid price in the last 2 days. If the lowest closing bid price in the last 2 days prior to September 30, 2024 was $0.10 less, the Company, upon full exercise of outstanding warrants, would potentially be liable to issue approximately 719,175 shares more. If the lowest closing bid price in the last 2 days prior to September 30, 2024 was $0.10 higher, the Company, upon full exercise of outstanding warrants, would potentially be liable to issue approximately 680,511 shares less. The maximum number of shares that could theoretically be issued upon exercise of these warrants was 91.6 million (if the lowest closing bid price in the last 2 days prior to such date decreased to or below $1 which is the conversion floor adjusted after the reverse stock split made effective in September 2024).

The fair value of warrant obligations is calculated based on the number and market value of shares that can be issued upon exercise of the warrants. Accordingly, the fair value of warrants on recognition date and on subsequent dates was estimated as a maximum of (i) Black Scholes value for cash exercise of relevant warrants and (ii) current market value of the number of shares the Company would be required to issue upon cashless warrant exercise on a relevant date in accordance with warrant contract requirements. The latter valuation, based on observable inputs (level 2), has been higher and reflects the pattern of the warrants exercise since the inception of the contract.

F- 34

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

At each warrant exercise date and each accounting period end the warrant liability for the remaining unexercised warrants was marked-to-market value and the resulting gain or loss was recorded in consolidated statement of operations as a "Gain / (loss) on derivative liability revaluation" (and "Gain/(loss) on other warrants revaluation" for revaluation of warrants when they did not qualify as derivatives under ASC 815).

*Preferred D Warrants*

During the financial years ended September 30, 2023 and September 30, 2022, the Company financed its activities mainly with proceeds from the June 7, 2022 Securities Purchase Agreement (Series D SPA). In accordance with Series D SPA, for every share of Series D Preferred Stock purchased, the investors received 185% (for the final $100 million voluntary investment right expiring June 30, 2023 - 110%) warrants (the "Preferred D Warrants") exercisable for shares of common stock at an exercise price equal to the lower of the price at the execution date or the market price of common stock on the trading day immediately preceding the purchase notice date. The Preferred D Warrants were exercisable during a five-year period commencing upon issuance.

Over the course of the Series D SPA, from September 2022 to June 2023, the Company received approximately $382 million investment and issued to investors 10,837 Preferred D Warrants, approximately 353 million shares of Series D Preferred Stock, as well as 5,631 prefunded warrants and 2,673 common shares in lieu of Series D Preferred stock (hereinafter, the warrants and shares of common stock are presented giving effect to the reverse stock splits, see *Note 1 - Description of business and basis of presentation*).

During the year ended September 30, 2023, all prefunded warrants and 7,013 Preferred D Warrants were exercised for 24,459 shares of common stock. As of September 30, 2023, 3,824 Preferred D Warrants (recognized as liabilities in the consolidated balance sheets) exercisable into 14,380 shares of common stock with fair value of $64.7 million remained outstanding.
During the year ended September 30, 2024, all remaining Preferred D Warrants were exercised on a cashless basis for 55,530 shares of common stock (post reverse stock splits), and there are no more Preferred D Warrants outstanding as of September 30, 2024.
The contracts for the Preferred D Warrants contained cashless exercise provisions similar to the Warrants issued with the $50 Million Senior Secured Convertible Notes (see above), and management applied similar accounting treatment to the recognition, measurement, and presentation of these warrant liabilities, including approach to estimation of the fair value of Preferred D warrant obligations.

*Qiantu Warrants*

Warrants, issued to Qiantu Motor (Suzhou) Ltd. and their affiliates (herein "Qiantu") in March 2023 were presented as other derivative liabilities as of September 30, 2023 in amount of $0.1 million. These liabilities were classified as having significant unobservable inputs (level 3) in the table below. The Qiantu warrants to purchase up to
36,149 shares of common stock at the price of $3.15 per share (number and price of shares is presented after application of down round provisions and giving effect to the reverse stock splits) expired on September 30, 2024.

F- 35

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The tables below represent a summary of issuances, exercises and forfeiture of warrants described earlier. Information for the previous periods may not be directly comparable due to a series of reverse stock splits executed by the Company over the past two financial years (see *Note 1*). In accordance with US GAAP, these reverse stock splits have been applied retroactively, reducing the number of warrant shares presented. Qiantu warrants represent the right to purchase 1 share of common stock. Preferred C, Preferred D and May 2024 Warrants can be exercised on a cashless basis into variable number of shares of common stock, see above.

| | Preferred D Warrants | May 2024 SPA Warrants | Qiantu Warrants | Total |
|---|---|---|---|---|
| Number of outstanding warrants as of October 1, 2023 | 3,824 | - | 34 | 3,858 |
| Number of warrants issued as part of financing transactions | - | 248,908 | - | 248,908 |
| Number of warrants exercised on a cashless basis | (3,824) | (77,361) | - | (81,185) |
| Downround adjustment | - | - | 36,115 | 36,115 |
| Number of warrants forfeited | - | - | (36,149) | (36,149) |
| Number of outstanding warrants as of September, 2024 | - | 171,547 | - | 171,547 |

| | Preferred D Warrants | Preferred C Warrants | Qiantu Warrants | Total |
|---|---|---|---|---|
| Number of outstanding warrants as of October 1, 2022 | 66 | 2 | - | 68 |
| Number of warrants issued as part of financing transactions | 10,771 | - | - | 10,771 |
| Number of warrants issued to vendors | - | - | 34 | 34 |
| Number of warrants exercised on a cashless basis | (7,013) | (2) | - | (7,015) |
| Number of warrants forfeited | - | - | - | - |
| Number of outstanding warrants as of September, 2023 | 3,824 | - | 34 | 3,858 |

*Liabilities settlement agreement (SCC)*
On May 13, 2024, the Company entered into a Settlement Agreement and Stipulation (the "SAA") with Silverback Capital Corporation ("SCC"), pursuant to which the Company agreed to issue common stock to SCC in exchange for the settlement of an aggregate of $4.6 million (the "Settlement Amount") to resolve outstanding overdue liabilities with different vendors.

F- 36

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On May 29, 2024, the Circuit Court of the Twelfth Judicial Circuit in and for Manatee County, Florida, entered an order approving, among other things, the fairness of the terms and conditions of an exchange pursuant to Section 3(a)(10) of the Securities Act in accordance with a stipulation of settlement, pursuant to the SSA between the Company and SCC.

Pursuant to the terms of the SSA approved by the Order, the Company agreed to issue to SCC shares (the "Settlement Shares") of common stock. The price of the Settlement Shares was calculated as 75% of the average of the 3 lowest prices traded during the valuation period. The Settlement Agreement provided that the Settlement Shares will be issued in one or more tranches, as necessary, sufficient to satisfy the Settlement Amount through the issuance of securities issued pursuant to Section 3(a)( 10) of the Securities Act. The shares of common stock issuable under SSA did not require shareholder's approval and registration.

Upon initial recognition of the transaction, the Company derecognized the liability to vendors in the amount of $4.6 million and recognized derivative liabilities to SCC in the amount of $7.0 million, calculated based on the fair value of the shares of common stock that can be issued to SCC to satisfy the claims. The financial result in the amount of $2.3 million was recognized as "Other financing costs-initial recognition of derivative liabilities" in the consolidated statement of operations.

In connection with the SAA, from May 2024 to August 2024, the Company issued 63,812 Settlement Shares (giving effect to the reverse stock split) at fair value of $6.5 million to fully settle this liability.

Breakdown of items recorded at fair value on a recurring basis in consolidated balance sheets by levels of observable and unobservable inputs as of September 30, 2024 and on September 30, 2023 is presented below:

| | September 30, 2024 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Liabilities recorded at fair value on a recurring basis | $ 79,742,180 | $ - | $ 79,742,180 | $ - |

| | September 30, 2023 | Quoted Prices in Active Markets for Identical Assets (Level 1 ) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Liabilities recorded at fair value on a recurring basis | $ 64,863,309 | $ - | $ 64,739,175 | $ 124,134 |

F- 37

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

A summary of all changes in warrants and other derivative liabilities is presented below:

| | |
|---|---:|
| **Balance, September 30, 2023** | $ **64,863,309** |
| Derivative liabilities recognized upon issuance of convertible instruments | 107,163,981 |
| Other warrants recognized upon issuance of convertible instruments | 25,861,900 |
| Loss / (gain) on revaluation | (4,503,099) |
| Conversions of derivatives into common shares | (120,629,651) |
| Derivatives issued upon extinguishment of accounts payable | 6,985,740 |
| **Balance, September 30, 2024** | $ **79,742,180** |
| | |
| **Balance, September 30, 2022** | $ **84,799,179** |
| Derivative liabilities recognized upon issuance of convertible instruments | 501,073,872 |
| Derivative liability recognized upon authorized shares shortfall | 11,978,166 |
| Loss / (gain) on derivative liability revaluation | 116,256,211 |
| Reclassification of derivative liabilities to equity | (47,818,882) |
| Financing loss upon over-issuance of shares from warrants | 8,934,892 |
| Receivables upon over-issuance of shares from warrants | 17,721,868 |
| Conversions of warrants into shares of common stock | (628,081,997) |
| **Balance, September 30, 2023** | $ **64,863,309** |

**NOTE 9 - STOCKHOLDERS' EQUITY (DEFICIT)**

**Common Stock**

At a special meeting on January 25, 2023, stockholders approved the proposal to increase the Company's authorized common stock capital from 1.75 billion to 5 billion shares. As of September 30, 2024, the Company had
5 billion shares of common stock authorized with $0.001 par value per share.

As described in detail in *Note 1 - Description of Business and Basis of Presentation* above, the Company has effectuated several reverse stock splits. All stock splits resulted in the reduction of shares of common stock issued and outstanding and did not affect authorized common stock or preferred stock. The Company had 4,577,306 and 28,718 shares of common stock (post reverse stock splits) issued and outstanding on September 30, 2024 and September 30, 2023, respectively.

The holders of common stock are entitled to one vote for each share of common stock held at all meetings of stockholders. In the event of a liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, the common stockholders are entitled to receive the remaining assets following the distribution of liquidation preferences, if any, to the holders of our preferred stock. The holders of common stock are not entitled to receive dividends unless declared by our Board. To date, no dividends have been declared or paid to the holders of common stock.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Change in Control Agreements**

On August 11, 2023, the Board of Directors approved, and the Company entered, Change in Control Agreements with each non-employee director and Chief Executive Officer. Pursuant to the Change in Control Agreements with each non-employee director, upon a change in control of the Company, any unvested equity compensation will immediately vest in full and such non-employee director will receive $5 million. Pursuant to the Agreement with CEO, upon a change in control of the Company, any unvested equity compensation will immediately vest in full and CEO will receive an aggregate percentage of the transaction proceeds as follows: 10% of the transaction proceeds that are up to and including $1 billion; plus, an additional 5% of transaction proceeds that are more than $1 billion and up to $1.5 billion; and an additional 5% of transaction proceeds that are more than $1.5 billion.

A change in control, as defined in the agreements occurs upon (i) any person becoming the beneficial owner of 50% or more of the total voting power of the Company's then outstanding voting securities, (ii) a change in the composition of the Board, as a result of which fewer than a majority of the directors are Incumbent Directors (as defined in the Change in Control Agreements), or (iii) the consummation of a merger or consolidation of the Company (except when the total voting power of the Company continues to represent at least 50% of the surviving entity), any liquidation, or the sale or disposition by the Company of all or substantially all of its assets.

**Stockholder Rights Agreement and Series A-1 Junior Participating Preferred Stock**

On May 1, 2024, the Company entered into a Rights Agreement with Continental Stock Transfer & Trust Company as the rights agent. The Board of Directors declared a dividend of one preferred share purchase right (a "Right") for each share of common stock and each outstanding share of preferred stock company payable to holders of record as of the close of business on May 13, 2024. Each Right entitles the registered holder to purchase one ten-thousandth of a share of Series A-1 Junior Participating Preferred Stock ("A-1 Preferred Stock") of the Company at a price of $30.00 per one ten-thousandth of a share of A-1 Preferred Stock, subject to adjustment (the "Exercise Price"). The Rights are not exercisable until the Distribution Date (as defined below). The description and terms of the Rights are set forth in the Rights Agreement.

The Rights will not be exercisable until the earlier of ten days after a public announcement by us that a person or group has acquired 10% or more of the shares of common stock (an "Acquiring Person") and ten business days (or a later date determined by our board of directors) after a person or group begins a tender or an exchange offer that, if completed, would result in that person or group becoming an Acquiring Person (the earlier of such dates being herein referred to as the "Distribution Date"). At any time after a person becomes an Acquiring Person, the Board of Directors may, at its option, exchange all or any part of the then outstanding and exercisable Rights for shares of common stock at an exchange ratio of one share of common stock for each Right, subject to adjustment as specified in the Rights Agreement. Notwithstanding the foregoing, the Board of Directors generally will not be empowered to effect such exchange at any time after any person becomes the beneficial owner of 50% or more of the common stock of the Company. The Rights will expire on May 1, 2025, unless previously redeemed or exchanged by the Company. The Rights Agreement is designed to enable all Company stockholders to realize the long-term value of their investment and is intended to protect Mullen and its stockholders from efforts by a single stockholder or group to obtain control of the Company without paying a control premium, see below for further details. The Rights have certain anti-takeover effects, including potentially discouraging a takeover that stockholders may consider favorable. Certain exemptions may apply to an Acquiring person. The Rights will cause substantial dilution to a person or group that attempts to acquire us on terms not approved by the Board of Directors.

F- 39

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Preferred Stock**

Under the terms of our Certificate of Incorporation, the Board may determine the rights, preferences, and terms of our authorized but unissued shares of Preferred Stock. Pursuant to the terms of its Second Amended and Restated Certificate of Incorporation, as amended, upon conversion of shares of Preferred Stock, such shares so converted are cancelled and not issuable. As of July 26, 2022, as a result of an amendment to its Certificate of Incorporation increasing its authorized Preferred Stock, the Company had 500,000,000 shares of Preferred Stock authorized with $0.001 par value per share, and as of September 30, 2024, pursuant to its terms of Preferred Stock conversion, the Company had remaining 126,263,159 shares of Preferred Stock authorized. The reverse stock splits (see *Note 1 - Description of business and basis of presentation* above) did not affect the number of shares of Preferred Stock authorized and outstanding, but the conversion ratios were proportionately adjusted to decrease the number of shares of common stock to be issued as a result.

| | Authorized (available) initially, before conversions and other transactions | Remaining authorized (both outstanding and available) as of September 30, 2023 | Remaining authorized (both outstanding and available) as of September 30, 2024 |
|---|---|---|---|
| Preferred stock, total | 500,000,000 | 127,474,458 | 126,263,159 |
| Designated: | | | |
| Preferred Series A | 200,000 | 83,859 | 83,859 |
| Preferred Series B | 12,000,000 | 6,432,681 | 6,432,681 |
| Preferred Series C | 40,000,000 | 26,085,378 | 24,874,079 |
| Preferred Series D | 437,500,001 | 84,572,538 | 84,572,538 |
| Preferred Series E | 76,950 | x | 0 |
| Series A-1 Junior Participating Preferred Stock | 50,000 | x | 50,000 |
| Remaining Blank Check (Undesignated) Preferred Authorized | x | 10,300,002 | 10,250,002 |

The Company has designated Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock (see description below), Series E Preferred Stock (see a separate section below), Series AA Preferred Stock (cancelled, see below), and Series A-1 Junior Participating Preferred Stock (see *Stockholder Rights Agreement* above).

Transactions with Preferred Stock (other than Series E Preferred Stock which was not accounted for in permanent equity due to redemption provisions) during the years ended September 30, 2024 and September 30, 2023 are presented in the table below. For more information on extinguishment of Series C Preferred Stock and issuance of Series E Preferred Stock, please see section *Series E Preferred Stock* below.

F- 40

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | Preferred Stock Series A | | Preferred Stock Series C | | Preferred Stock Series D | | Preferred Stock Series AA | | Preferred Stock Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Balance, October 1, 2022** | 1,924 | $ 2 | 1,360,321 | $ 1,360 | 4,359,652 | $ 4,359 | - | $ - | 5,721,897 | $ 5,721 |
| Issuance of preferred stock, common stock and prefunded warrants in lieu of preferred stock | - | - | - | - | 273,363,635 | 273,364 | - | - | 273,363,635 | 273,364 |
| Issuance of common stock for conversion of preferred stock and dividends | (1,276) | (1) | (148,564) | (148) | (277,360,190) | (277,360) | - | - | (277,510,030) | (277,509) |
| Preferred shares series AA issued to officers | - | - | - | - | - | - | 1 | - | 1 | - |
| Preferred shares series AA refund | - | - | - | - | - | - | (1) | - | (1) | - |
| **Balance, September 30, 2023** | 648 | $ 1 | 1,211,757 | $ 1,212 | 363,097 | $ 363 | - | $ - | 1,575,502 | $ 1,576 |
| **Balance, October 1, 2023** | 648 | $ 1 | 1,211,757 | $ 1,212 | 363,097 | $ 363 | - | $ - | 1,575,502 | $ 1,576 |
| Extinguishment of Series C P/S by issuance of Series E P/S | - | - | (1,211,299) | (1,212) | - | - | - | - | (1,211,299) | (1,212) |
| **Balance, September 30, 2024** | 648 | $ 1 | 458 | $ - | 363,097 | $ 363 | - | $ - | 364,203 | $ 364 |

**Series E Preferred Stock**

On May 31, 2024, the Company entered into the Settlement Agreement and Release with certain investor, pursuant to which the Company issued $3.0 million of, or 76,923, shares of the Company's Series E Preferred Stock in exchange for the cancellation of 1,211,299 shares of the Company's Series C Preferred Stock held by Ault Lending. Pursuant to the terms of the Certificate of Designation, such shares of Series C Preferred Stock, including undeclared dividends, had a redemption value of approximately $14.9 million.

Series E Preferred Stock generally has the following terms:

*Conversion and Exchange.* The Series E Preferred Stock is convertible at the option of each holder at any time into the number of shares of Common Stock, determined by dividing the Series E Original Issue Price by the Series E Conversion Price in effect on the date of conversion. "Series E Original Issue Price" means $39.00 per share for each share of the Series E Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalization, or the like with respect to the Series E Preferred Stock). The initial "Series E Conversion Price" was $3.90 per share, subject to adjustment. Based on this formula, each share of Series E Preferred Stock was convertible into 10 shares of Common Stock before reverse stock split. If any shares of Series E Preferred Stock are converted, redeemed, or reacquired by the Company, such shares may not be reissued and will automatically be retired and canceled. The Series E Preferred Stock will not be convertible by a holder to the extent that such holder or any of its affiliates would beneficially own in excess of 9.99% of the Common Stock.

F- 41

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Voting Rights*

Holders of the Series E Preferred Stock are entitled to vote on an as-converted-to-Common-Stock basis, have full voting rights and powers equal to the voting rights and powers of the holders of the Common Stock, and are entitled to vote together with the Common Stock with respect to any question upon which holders of Common Stock have the right to vote. In addition, approval of holders of a majority of the shares of Series E Preferred Stock, voting as a separate class, is required to (i) alter or change the powers, preferences, or rights of the Series E Preferred Stock to affect them adversely, (ii) amend the Certificate of Incorporation or other charter documents in a manner adverse to the holders of Series E Preferred Stock, (iii) increase the number of authorized shares of Series E Preferred Stock, or (iv) enter into any agreement with respect to any of the foregoing.

*Dividends.* Holders of the Series E Preferred Stock are entitled to receive dividends on shares of Series E Preferred Stock equal (on an as-if-converted-to-Common-Stock basis, disregarding for such purpose any conversion limitations hereunder) to and in the same form as dividends actually paid on shares of the Common Stock when, as and if such dividends are paid on shares of the Common Stock. No other dividends will be paid on shares of Series E Preferred Stock.

*Liquidation, Dissolution, and Winding Up.* In the event of any Liquidation Event (as defined in the Certificate of Designation), the holders of the Series E Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Common Stock, but subject to and after the distribution of proceeds to the Series A preferred stock, Series C preferred stock and Series D preferred stock, by reason of their ownership thereof, an amount per share equal to the Series E Original Price (as described above), plus declared but unpaid dividends on such share.

In accordance with the Settlement Agreement, Series E holders, at their discretion, were also permitted to exchange, pursuant to Section 3(a)(9) of the Securities Act, or any other applicable securities exemption, some or all of the shares of Series E Preferred Stock for an equal dollar amount of Notes and Warrants pursuant to additional investment rights of the Securities Purchase Agreement. For more information on these Notes and Warrants, see *Note 7 - Debt, $50 Million Senior Secured Convertible Notes and Warrants,* and *Note 8 - Warrants and other derivative liabilities and fair value measurements*.

The Series E Preferred Stock were initially recognized at fair value of $8.6 million (classified as Level 3 of the fair value hierarchy). As the Notes and Warrants conversion (exchange) option fair value significantly exceeded the fair value of the conventional conversion option, and the value of other rights available to Series E Preferred Stockholders was not likely to exceed this difference, the fair value of Series E Preferred Stock on initial recognition was determined based on fair value of the Notes and Warrants conversion (exchange) option, similarly to calculating fair value of warrants issued under the Securities Purchase Agreement (see *Note 8 - Warrants and other derivative liabilities and fair value measurements*).

The difference between the carrying amount of extinguished Series C Preferred Stock and the fair value of issued Series E Preferred Stock was recognized as reduction of additional paid-in capital and decreased losses per share (see *Note 10 - Loss per share*).

In July 2024, all 76,923 shares of Series E Preferred Stock were exchanged for Senior Secured Convertible Notes with an initial aggregate principal amount of $3.2 million, or $3.0 million including the 5% original issue discount, and 11,504 Warrants (giving effect to reverse stock splits) with fair value of $6.2 million (see *Note 8 - Warrants and other derivative liabilities and fair value measurements*). There are no Series E Preferred Stock shares outstanding as of September 30, 2024.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Redemption Rights**

The shares of Preferred Stock (hereinafter - other than Series E Preferred Stock) are not subject to mandatory redemption.

The Series C Preferred Stock and Series D Preferred Stock are voluntarily redeemable by the Company in accordance with the following schedule, provided that the issuance of shares of common stock issuable upon conversion has been registered and the registration statement remains effective:

Year 1: No Redemption
Year 2: Redemption at 120% of the Redemption Price
Year 3: Redemption at 115% of the Redemption Price
Year 4: Redemption at 110% of the Redemption Price
Year 5: Redemption at 105% of the Redemption Price
Year 6 and thereafter: Redemption at 100% of the Redemption Price

The Series C Preferred Stock and Series D Preferred Stock are redeemable by the Company for a Redemption price per share equal to the Issue Price ($8.84 for Series C Preferred Stock and $0.4379 for the remaining Series D Preferred Stock), plus all unpaid accrued and accumulated dividends on such share (whether or not declared), provided: (A) the Preferred Stock has been issued and outstanding for a period of at least one year, (B) the issuance of the shares of common stock underlying the Preferred Stock has been registered pursuant to the Securities Act and such registration remains effective, and (C) the trading price for the common stock is less than the Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market.

**Dividends**

The holders of Series A and Series B Preferred Stock are entitled to non-cumulative dividends if declared by the Board of Directors. The holders of the Series A Preferred Stock and Series B Preferred Stock participate on a pro rata basis (on an "as converted" basis to common stock) in any cash dividend paid on common stock. No dividends have been declared or paid since issuance of these shares.

The Series C Preferred Stock originally provided for a cumulative 15.0% per annum fixed dividend on the Series C Original Issue Price plus unpaid accrued and accumulated dividends. On January 13, 2023, the Company and most holders of Series C Preferred Stock entered into a waiver agreement pursuant to which such holders irrevocably waived their right to receive any and all cumulative 15.0% per annum fixed dividends on such Preferred Stock, including all unpaid accrued and accumulated dividends.

The Series D Preferred Stock bears a 15.0% per annum fixed dividend accumulated and compounded monthly, payable no later than the 5th day after the end of each month on the Series D Original Issue Price plus unpaid accrued and accumulated dividends. Dividends on the Series D Preferred Stock are payable prior to any dividends on any other series of Preferred Stock or the common stock. The amount of Series D Preferred Stock dividends accumulated as of September 30, 2024 was approximately $0.5 million.

F- 43

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

he Company may elect to pay dividends for any month with a payment-in-kind ("PIK") election if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of NASDAQ and (iii) the average daily trading dollar volume of the Company's common stock for 10 trading days in any period of 20 consecutive trading days on the NASDAQ is equal to or greater than $27.5 million.

**Liquidation, Dissolution, and Winding Up**

In the event of any Liquidation Event, the holders of the Series D Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series D Original Issue Price ($0.4379 per share in respect of the outstanding Series D Preferred Stock) plus declared but unpaid dividends (none declared but unpaid dividends on September 30, 2024 and 2023).

In the event of any Liquidation Event, the holders of the Series B Preferred Stock will be entitled to receive, after full execution of rights of the Series D Preferred Stockholders, and prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series B Original Issue Price plus declared but unpaid dividends (none declared but unpaid dividends on September 30, 2024 and 2023).

Upon the completion of a distribution pursuant to a Liquidation Event to the Series D Preferred Stock and Series B Preferred Stock, the holders of the Series C Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Series A Preferred Stock or the common stock by reason of their ownership thereof, an amount per share equal to the Series C Original Issue Price ($8.84 per share) plus declared but unpaid dividends (none declared but unpaid dividends on September 30, 2024 and 2023).

Upon the completion of a distribution pursuant to a Liquidation Event to the Series D Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock, the holders of Series A Preferred Stock are entitled to receive, prior and in preference to any distribution of any proceeds to the holders of the common stock, by reason of their ownership thereof, $1.29 per share of each share of the Series A Preferred Stock, plus declared but unpaid dividends on such share ( none declared but unpaid dividends on September 30, 2024 and 2023). "Liquidation Event" is as defined in the Certificate of Incorporation and, subject to certain exceptions, includes a sale or other disposition of all or substantially all of the Company's assets, certain mergers, consolidations, and transfers of securities, and any liquidation, dissolution or winding up of the Company.

**Conversion**

The details on conversion rights of Preferred Stock are presented in the following table:

| Class | Number of Shares | As converted to common stock | Votes/Share | Number of Votes |
|---|---|---|---|---|
| Series A Preferred Stock | 648 | 4 | One/share on an as-converted to common basis | 4 |
| Series B Preferred Stock | - | - | One/share on an as-converted to common basis | - |
| Series C Preferred Stock | 458 | 1 | One/share on an as-converted to common basis | 1 |
| Series D Preferred Stock | 363,097 | 1 | One/share, only protective voting | 363,097 |
| Series E Preferred Stock | - | - | One/share on an as-converted to common basis | - |

F- 44

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Each share of Series C Preferred Stock will automatically be converted into shares of common stock at the applicable conversion rate at the time in effect immediately upon (A) the issuance of shares of common stock underlying the Series C Preferred Stock being registered pursuant to the Securities Act of 1933 and such registration remaining effective, (B) the trading price for the Company's common stock being more than two times the Series C Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's common stock during such 20 trading days is equal to or greater than $4.0 million.

Each share of Series D Preferred Stock will automatically be converted into shares of common stock at the applicable Conversion Rate at the time in effect immediately upon (A) the issuance of shares of common stock underlying the Series D Preferred Stock being registered pursuant to the Securities Act and such registration remaining effective, (B) the trading price for the Company's common stock being more than two times the Series D Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of the Company's common stock during such 20 trading days is equal to or greater than $27.5 million.

**Voting Rights**

The holders of shares of common stock and Series A, Series B, Series C and Series E Preferred Stock at all times vote together as a single class on all matters (including the election of directors) submitted to a vote of the stockholders; provided, however, that, any proposal which adversely affects the rights, preferences and privileges of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock or Series E Preferred stock, as applicable, must be approved by a majority in interest of the affected series of Preferred Stock, as the case may be.

Each holder of common stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series E Preferred stock has the right to one vote for each share of common stock into which such Preferred Stock, as applicable, could be converted. Each holder of Series A Preferred had the right to 1,000 votes per share held of record by such holder which terminated on November 5, 2024.

The holders of Series D Preferred Stock have no voting rights except for protective voting rights (one vote for each share) in cases such as approval of a liquidation event, authorization of the issue of securities having a preference over or parity with the Series D Preferred Stock with respect to dividends, liquidation, redemption or voting, entering a merger or consolidation, etc.

**Equity Line of Credit and ELOC Commitment Fees**

On May 21, 2024, the Company entered into the Equity Line of Credit (ELOC) Purchase Agreement with Esousa LLC (the "Investor"), pursuant to which the Investor agreed to purchase from the Company, at the Company's direction from time to time, in its sole discretion, from and after July 5, 2024, and until the earlier of (i) the 36-month anniversary of the Commencement Date of July 16, 2024, or (ii) the termination of the ELOC Purchase Agreement in accordance with the terms thereof, shares of Common Stock, having a total maximum aggregate purchase price of $150 million, upon the terms and subject to the conditions and limitations set forth below. In connection with the ELOC Purchase Agreement, the Company also entered into a registration rights agreement, pursuant to which the Company agreed to file a registration statement and any additional registration statements, with the SEC covering the resale of the shares of the Company's Common Stock issued to Investor pursuant to the ELOC Purchase Agreement.

After the Commencement Date (as defined above), on any business day selected by the Company, the Company may, from time to time and at its sole discretion, direct the Investor to purchase a number of shares of Common Stock that does not exceed 20% of the trading volume on the Nasdaq Stock Market on the applicable purchase date at a purchase price per share equal to 94% of the lower of (i) the lowest daily VWAP of any trading day during the 15 trading days before, and including, the purchase date; and (ii) the closing price of the Common Stock on the applicable purchase date.

F- 45

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company will control the timing and amount of any sales of its Common Stock to the Investor, and the Investor has no right to require the Company to sell any shares to it under the Purchase Agreement. Actual sales of shares of Common Stock to the Investor under the Purchase Agreement will depend on a variety of factors to be determined by the Company from time to time, including (among others) market conditions, the trading price of its Common Stock, and determinations by the Company as to available and appropriate sources of funding for the Company and its operations. The Investor may not assign or transfer its rights and obligations under the Purchase Agreement. The Company's right to direct the Investor to purchase shares is subject to certain conditions precedent, including continued listing on Nasdaq or another major stock exchange.

The Purchase Agreement prohibits the Company from directing the Investor to purchase any shares of Common Stock if those shares, when aggregated with all other shares of Common Stock, then beneficially owned by the Investor and its affiliates, would result in the Investor and its affiliates beneficially owning more than 9.99% of the then total outstanding shares of the Company's Common Stock.

The Purchase Agreement may be terminated by the Company at any time, at its sole discretion, without any cost or penalty. From and after the date of the Purchase Agreement until its termination, the Company agreed not to effect or enter into an agreement to effect any issuance by the Company or any of its subsidiaries of Common Stock or Common Stock equivalents (or a combination of units thereof), involving a Variable Rate Transaction (as defined in the Purchase Agreement), other than in connection with an exempt issuance as described in the Purchase Agreement. The Investor has agreed not to cause or engage in any manner whatsoever any direct or indirect short selling or hedging of the Company's Common Stock.

On July 5, 2024, the SEC declared effective a registration statement on Form S-1 registering 750,000 shares (giving effect to reverse stock splits) that can be issued in connection with the ELOC Purchase Agreement. On July 9, 2024, shareholders of the Company ratified the issuance of shares in excess of the 20% Exchange Cap.

As consideration for its commitment to purchase the Company's common stock under the ELOC Purchase Agreement, the Company agreed to issue shares of common stock equivalent to $6.0 million (presented as "Other financing costs - ELOC commitment fee" in the consolidated statement of operations for the year ended September 30, 2024). In August and September 2024, the Company fully settled the commitment fee by issuing 247,934 shares of common stock (giving effect to reverse stock splits).

In October 2024, after the balance sheet date, the Company issued 502,066 shares in accordance with the ELOC Purchase Agreement and received $1 million proceeds. The Company can continue to access the ELOC if it files another registration statement with the SEC.

**Noncontrolling interest**

See details in the *Note 16 - Noncontrolling interest*.

**NOTE 10 - LOSS PER SHARE**

Earnings per common share ("EPS") is computed by dividing net income allocated to common stockholders by the weighted-average shares of common stock outstanding. Diluted EPS is computed by dividing income allocated to common stockholders plus dividends on dilutive convertible preferred stock by the weighted-average shares of common stock outstanding plus amounts representing the dilutive effect of outstanding warrants and the dilution resulting from the conversion of convertible preferred stock, if applicable. For the fiscal years ended September 30, 2024 and 2023, outstanding warrants, convertible debt and shares of Preferred Stock were excluded from the diluted share count because the result would have been antidilutive under the "if-converted method."

The following table presents the reconciliation of net loss attributable to common stockholders to net loss used in computing basic and diluted net income per share of common stock (giving effect to the reverse stock splits - see *Note 1 - Description of business and basis of presentation*):

| | | Year Ended September 30, | | |
|---|---|---|---|---|
| | | **2024** | | **2023** |
| Net loss attributable to common stockholders | $ | (457,058,901) | $ | (972,254,582) |
| Less: preferred stock dividends waived/(accrued) | | (90,431) | | 7,360,397 |
| Less: fair value of common stock issued to avoid fractional shares on reverse stock split (see *Note 1 - Description of business and basis of presentation*) | | (5,208,383) | | - |
| Less: financial result from exchange of Series C P/S for Series E P/S (see *Note 9, Series E Preferred Stock section*) | | (8,604,029) | | - |
| **Net loss used in computing basic net loss per share of common stock** | $ | **(470,961,744)** | $ | **(964,894,185)** |
| Net loss per share | $ | (1,425.61) | $ | (157,405.25) |
| Weighted average shares outstanding, basic and diluted | | 330,358 | | 6,130 |
| Net loss per share, reported previously, before adjusting to reverse stock split effectuated in September 2024, see *Note 1 - Description of business and basis of presentation* | | N/A | $ | (1,574.14) |

Weighted average shares outstanding, basic and diluted, reported previously, before adjusting to reverse stock split effectuated in September 2024, see Note 1 - Description of business and basis of presentation

|  | N/A | 612,964 |

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 11 - SHARE-BASED COMPENSATION**

The Company has an equity incentive plan that is a part of annual discretionary share-based compensation program for consultants, employees, directors, and officers. The Company has been issuing new shares of common stock under the share-based compensation programs, and cash has not been used to settle equity instruments granted under share-based payment arrangements. The remaining number of shares reserved for awards equity instruments under the Equity Incentives Plan to both employees and consultants on September 30, 2024 was 20,449,704 shares of common stock. The remaining number of shares reserved for awards to CEO under the Performance Stock Award Agreements on September 30, 2024 was 460,479 shares of common stock.

| | For the year ended September 30, | |
|---|---|---|
| **Composition of Share-Based Compensation Expense** | **2024** | **2023** |
| CEO share based performance awards, including liability revaluation | $ (7,568,874) | $ 54,065,770 |
| Share-based compensation to employees and directors | 11,847,127 | 11,689,742 |
| Share-based compensation to consultants (equity-classified) | 3,676,737 | 7,367,107 |
| Share-based compensation to consultants (liability-classified) | 32,477,698 | 12,319,250 |
| **Total share-based compensation expense** | $ 40,432,688 | $ 85,441,869 |

*CEO Award Incentive Plans*

The Company entered into a CEO Performance Stock Award Agreement, approved by the Board and by stockholders in 2022 ("2022 PSA Agreement") and a CEO Performance Stock Award Agreement, approved by the Board and by stockholders in 2023 ("2023 PSA Agreement"). Under these plans, the Chief Executive Officer is entitled to share-based awards generally calculated as 1-3% of the outstanding number of shares of common stock, issuable upon achievement of specific financial and operational targets (milestones).

The costs (income) recognized within the line item "CEO share based performance award liability revaluation" in the table above represent both actual issuances of common stock under PSA Agreements and revaluation of these provisions for future probable awards. This share-based compensation is accrued over the service term when it is probable that the milestone will be achieved. The liability to issue stock (presented within non-current liabilities if the achievement is expected later than 12 months after the balance sheet date) is revalued on every balance sheet date based on the length of the service period, the current market price of the common stock, and on the number of shares of common stock outstanding - until the shares have been issued or until the fulfillment of the milestone requirements is no longer probable. The CEO share based performance award liability revaluation for the year ended September 30, 2024 led to income recognition ($(7.6) million versus costs of $54.1 million during the year ended September 30, 2023) primarily due to reassessment of probability of milestones and market capitalization decline of the Company, and relevant decrease of the provision as of September 30, 2024 versus provision as of September 30, 2023.

*The milestones per 2022 PSA Agreement (all milestones have either been achieved or expired by September 30, 2024):*

- *Vehicle Delivery Milestones*: For each of the following five vehicle delivery milestone that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of the Company's then-current total issued and outstanding shares of common stock: (i) Delivery of the Company's Class One Van to customers for a pilot program under the captured fleet exemption by the end of December 2022 (achieved, see below); (ii) Procuring full USA certification and homologation (or vehicle approval process) for the sale and delivery of its Class One Van by end of August 2023 (expired); (iii) Full USA certification and homologation of the Dragonfly RS sports car by August 2024 (expired); (iv) Producing a drivable prototype of its Mullen 5 vehicle for consumers to test by end of October 2023 (achieved, see below); and (v) Producing a drivable prototype of its Mullen 5 RS High Performance vehicle for consumers to test by end of January 2023 (expired).

F- 47

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On October 3, 2022, the Company delivered its Class One Van to Hotwire Communications, a South Florida-based telecommunications company and Internet Service Provider for a pilot program under the captured fleet exemption.

On August 20, 2023, a drivable porotype of the Mullen 5 vehicle was part of the Mullen road tour and available for consumers to test drive.

- *Capital Benchmark Milestones*: For each $100 million raised (a "Capital Tranche"), and subject to an aggregate maximum of raised of $1.0 billion in equity or debt financing between the date of the award agreement and the end of July 2024, the Company will issue a number of shares of common stock equal to 1%, of the Company's then-current total issued and outstanding shares of common stock; as of the date a Capital Tranche is achieved. Additionally, if the Company is included in the Russell Index, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares as of the date the Company is approved to be included on the Russell Index.

On June 27, 2022, the Company joined the Russell 2000 and 3000 Indexes.

By September 30, 2023, the Company raised more than $400 million through the issuance of preferred stock, prefunded warrants and common stock in lieu of preferred stock and other warrants. By July 31, 2024 (expiration date of the milestone), the Company raised additional funds so that accumulated raised capital exceeded $100 million (mainly through the issuance of convertible notes and warrants), and relevant milestone shares are due as of September 30, 2024.

- *Feature Milestone*: If Mullen enters into an agreement with a manufacturer or provider of equipment, accessory, feature or other product (collectively, "Feature") by the end of 2023 that sets the Company or its vehicle apart from its competitors or that provides the Company a first mover or first disclosure advantage over its competitors for the Feature, the Company will issue to Mr. Michery a number of shares of common stock equal to 5% of the Company's then-current total issued and outstanding shares of common stock as of the date the Feature milestone is achieved.

On September 1, 2022, the Company announced that it a signed partnership with Watergen Inc. to develop and equip Mullen's portfolio of electric vehicles with technology that will produce fresh drinking water from the air for in-vehicle consumer and commercial application. On October 12, 2022, the Company entered into the Distributorship Agreement whereby Watergen will be integrating its unique atmospheric water generating and dehumidifying technology into the Company's vehicles and granting exclusivity to the Company for the integration design developed specifically for its vehicles.

- *Distribution Milestone*: For each vehicle distribution milestone set forth below that is satisfied by entering into a joint venture or other distribution agreement by December 31, 2024, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares of common stock for each distribution milestone achieved: (i) agreement with an established local, US dealer or franchise network; and (ii) agreement with an established Latin American or other non-US based dealer or franchise network.

On November 8, 2022, the Company entered into an agreement into an agreement to appoint Newgate Motor Group as the marketing, sales, distribution and servicing agent for the Mullen I-GO in Ireland and the United Kingdom.

On December 12, 2022, the Company entered into a Dealer Agreement with Randy Marion Isuzu, a large USA dealer, to purchase and distribute the Company's vehicles.

F- 48

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*The milestones per 2023 PSA Agreement:*

- *Vehicle Completion Milestones*: For each vehicle completion Milestone set forth below that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of common stock equal to 3% of Mullen's then-current total issued and outstanding shares of common stock: (i) Procuring full USA certification and homologation of its Class Three Van by end of December 2023 (expired); (ii) Full USA certification and homologation of the Bollinger B1 sports car by end of June 2025; and (iii) Full USA certification and homologation of the Bollinger B2 sports car by end of June 2025.

- *Revenue Benchmark Milestones*: For each $25 Million of revenue recognized by the Company (each a "Revenue Tranche"), and subject to an aggregate maximum of recognized revenue of $250 Million between the date of grant and the end of December 2025, the Company will issue to Mr. Michery a number of shares of common stock equal to 1% of Mullen's then-current total issued and outstanding shares of common stock as of the date a Revenue Tranche is achieved.

- *Battery Development Milestones*: For each Battery Development Milestone set forth below that is satisfied within the performance period specified, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares of common stock: (i) the Company either directly or in collaboration with a joint venture partner develops or produces new and more advanced battery cells by the end of December 2024; (ii) the Company either directly or in collaboration with a joint venture partner scales its battery cells in the USA to the vehicle pack level for the Mullen Class 1 vehicle by the end of December 2024; (iii) the Company either directly or in collaboration with a joint venture partner scales its battery cells in the USA to the vehicle pack level for the Mullen Class 3 vehicle by the end of December 2024.

On February 26, 2024, the Company began Class One EV cargo van road testing with the integrated solid-state polymer battery pack.

On November 21, 2024, the Company announced to the public that utilizing equipment, inventory, and intellectual property for high-volume battery pack and module production acquired as part of its Romeo assets acquisition (see below), it had integrated these assets into the Company's Monrovia, California facility, enhancing production capabilities and reducing supplier dependency. Battery lines include High-volume standard battery chemistry line, High-precision, low-volume standard chemistry R&D line, High-precision, low-volume solid-state polymer R&D line and in progress, High-volume standard chemistry battery line.

Shares to be issued pursuant to the Company meeting these two milestones are recognized as a liability in the consolidated balance sheets as of September 30, 2024.

- *JV-Acquisition Milestones*: If Mullen enters into a partnership, joint venture, purchase and sale agreement or similar transaction by the end of 2025 where the Company acquires a majority interest in an enterprise that manufacturers or provides vehicles, vehicle equipment, battery cells, accessories or other products beneficial to the Company, the Company will issue to Mr. Michery a number of shares of common stock equal to 3% of Mullen's then-current total issued and outstanding shares of common stock as of date the JV-Acquisition Milestone is achieved.

- *Accelerated Development Milestone*: If Mullen acquires a facility with existing equipment that allows the Company to expedite scaling of battery pack production in the USA, the Company will issue to Mr. Michery a number of shares of common stock equal to 2% of Mullen's then-current total issued and outstanding shares of common stock as of date the Accelerated Development Milestone is achieved.

On September 6, 2023, the Company acquired the battery production assets of Romeo Power including intellectual property, machinery and equipment that allows the Company to expedite scaling of battery pack production in the USA.

In accordance with management's estimate, all other milestones per 2023 PSA Agreement as of September 30, 2023 are considered probable (and relevant provision as of September 30, 2024 has been recognized), except for the Vehicle Completion Milestones.

F- 49

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**CEO Performance Award Table (from inception of the PSA Agreements)**

| Date approved by BOD | Milestone | % of O/S Shares | Shares O/S (*) | Shares Issued / due (*) | Stock Price (*) | Stock Compensation ($) (**) |
|---|---|---|---|---|---|---|
| 9/21/2022 | PSA2022. Russell Index Tranche | 2% | 214 | 5 | $ 789,160 | $ 3,945,799 |
| **Total shares issued during the fiscal year ended 9/30/2022** | | | | **5** | | **$ 3,945,799** |
| 10/12/2022 | PSA2022. Features Milestone | 5% | 399 | 20 | 561,054 | 11,221,088 |
| 11/9/2022 | PSA2022. Non-USA Distribution | 2% | 548 | 11 | 604,383 | 6,648,217 |
| 11/30/2022 | PSA2022. Capital Benchmark (>$200 mln) | 2% | 640 | 13 | 442,545 | 5,753,090 |
| 12/16/2022 | PSA2022. USA Distribution | 2% | 753 | 16 | 635,124 | 10,161,979 |
| 2/16/2023 | PSA2022. Vehicle Delivery - Pilot | 2% | 371 | 8 | 709,128 | 5,673,024 |
| 6/13/2023 | PSA2022. Capital Benchmark (>$300 mln) | 1% | 2,926 | 30 | 20,185 | 605,542 |
| 7/5/2023 | PSA2022. Capital Benchmark (>$400 mln) | 1% | 7,149 | 72 | 5,262 | 378,877 |
| **Total shares issued during the fiscal year ended 9/30/2023** | | | | **170** | | **$ 40,441,817** |
| 10/10/2023 | PSA2022. Vehicle Delivery - Mullen 5 | 2% | 18,441 | 369 | 2,671 | 985,468 |
| 10/10/2023 | PSA2023. Accelerated development milestone | 2% | 24,848 | 497 | 2,672 | 1,327,840 |
| **Total shares issued during the fiscal year ended 9/30/2024** | | | | **866** | | **$ 2,313,308** |
| 12/23/2024 | PSA2022. Capital Benchmark (>$500 mln) | 1% | 228,648 | 2,286 | 1.20 | 2,744 |
| 12/23/2024 | PSA2023. Battery development #2 (Class 1) | 2% | 70,576 | 1,411 | 1.20 | 1,693 |
| 12/23/2024 | PSA2023. Battery development #1 (Advanced) | 2% | 9,958,323 | 199,166 | 1.20 | 238,999 |
| **Total shares issued or to be issued after 9/30/2024** | | | | **202,863** | | **$ 243,436** |
| **Total shares issued or to be issued** | | | | **203,904** | | **$ 46,944,360** |

(*) The number of outstanding shares, shares issued and the stock price have been retroactively adjusted giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. The number of shares issued for each milestone as presented in the table may not equal the product of the percentage of outstanding shares for such milestone, due to the rounding up of fractional shares as a result of each reverse stock split.

(**) Compensation amounts do not reflect cash amounts actually received by the CEO. Amounts reported only represent fair value of common stock awarded computed in accordance with FASB ASC Topic 718 (i.e., market price of the shares on the date immediately preceding the date when the shares were issued). The weighted-average grant-date fair value of awards actually issued during the year, was $1.1 million and $3.7 million during the years ended September 30, 2024 and 2023, respectively. As of September 30, 2024, the provision for future awards under both PSA Agreements amounted to approximately $1.6 million representing the earned part of all awards considered probable. A part of this provision in the amount of $0.4 million is presented within non-current liabilities as the achievement is expected later than 12 months after the balance sheet date.

Total remaining compensation cost related to nonvested share-based compensation milestones granted under the Plans will depend on probability of the milestones' achievement, market price of the shares, and the number of shares of common stock outstanding on the day a milestone is achieved. If the market price ($3.15) and the number of shares of common stock outstanding on September 30, 2024 (4,577,306) remained constant and all milestones considered probable were actually achieved, these remaining compensation cost would amount to $0.9 million; the weighted-average period over which these costs are expected to be recognized after the balance sheet date is 11 months.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Employees of the Company*

Employees of the Company, including officers, are entitled to a number of shares of common stock specified in relevant offer letters and employment contracts and subject to the approval of our Board of Directors Compensation Committee. The total expense of share awards to employees represents the grant date fair value of the relevant number of shares to be issued. It is recognized, in correspondence with additional paid-in capital, over the service period. Awards to the majority of employees vest on the first or the second employment anniversary of the employee - the weighted average vesting period is 14 months. The weighted-average grant-date fair value of awards granted to employees per employment contracts, was $6 thousand and $2 thousand during the years ended September 30, 2024 and 2023, respectively. The weighted-average grant-date fair value of additional awards granted to employees, was $0.2 million and $0.1 million during the years ended September 30, 2024 and 2023, respectively. The majority of awards to employees are equity-classified. The liability related to liability classified stock-based compensation contracts with employees amounts to $0.1 million on September 30, 2024. Total remaining unrecognized compensation costs related to nonvested awards to these employees amount to $0.2 million. The weighted-average period over which these costs are expected to be recognized is 6 months.

| Awards granted to employees: one time issuance on employment anniversary (*) | Number of shares | | Weighted average grant date fair value of shares |
|---|---|---|---|
| Nonvested at the beginning of the year | 965 | $ | 456.17 |
| Vested at the beginning of the year | 95 | | 46,728 |
| Granted during the year | 4,300 | | 104.65 |
| Vested during the year | 874 | | 948.13 |
| Forfeited during the year | (551) | | 261.33 |
| Issued during the year | (15) | | 101,406 |
| **Nonvested at the end of the year** | **3,840** | **$** | **84.01** |
| **Vested at the end of the year** | **954** | **$** | **3,927** |

(*) The number of shares, and the stock price have been retroactively restated giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. Stock based compensation costs, recognized by the Company during the year, may not equal product of the shares and fair value in in this table, due to rounding up after adjusting to reverse stock splits. Information for the previous period(s) may not be directly comparable due to a series of reverse stock splits executed by the Company over the past two financial years, with a total combined ratio of 1:2,250,000. In accordance with US GAAP, these reverse stock splits have been applied retroactively, reducing the number of shares while proportionally increasing the share price.

Several members of management and officers are entitled to the same number of common stock specified in their employment contracts on every anniversary as long as they continue to serve. The grant fair value in this case is also based on the employment date. Therefore, these annual stock-based compensation costs are fixed throughout the employment period of each employee, unless modified subsequently. Total stock-based compensation costs of this type amounted to $5.8 million in the year ended September 30, 2024, and will amount to $5.8 million in each subsequent year unless entitled employees change or their contracts are modified.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| Awards granted to management: issuances on every employment anniversary (*,**) | Number of shares | Weighted average grant date fair value of shares |
|---|---|---|
| Nonvested at the beginning of the year | 9 | $ 11,447,960 |
| Vested at the beginning of the year | 7 | 12,019,189 |
| Granted during the year | 9 | 11,447,960 |
| Vested during the year | 9 | 11,447,960 |
| Forfeited during the year | - | - |
| Issued during the year | (13) | 11,569,473 |
| **Nonvested at the end of the year** | **9** | **$ 11,447,960** |
| **Vested at the end of the year** | **3** | **$ 10,793,259** |

(*) The number of shares, and the stock price have been retroactively restated giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. Stock based compensation costs, recognized by the Company during the year, may not equal product of the shares and fair value in in this table, due to rounding up after adjusting to reverse stock splits. Information for the previous period(s) may not be directly comparable due to a series of reverse stock splits executed by the Company over the past two financial years, with a total combined ratio of 1:2,250,000. In accordance with US GAAP, these reverse stock splits have been applied retroactively, reducing the number of shares while proportionally increasing the share price.

(**) Information is presented for a 12-month period, see comments above.

During the year ended September 30, 2024, in lieu of the shares as per employment contract, Chief Financial Officer of the Company received an option, vested immediately, to purchase 3,000 shares of common stock of the Company at the exercise price of $486 (there is also a cashless exercise provision). The option has not been exercised by September 30, 2024, and, unless exercised later, will expire on 5/16/2029. In accordance with the Black Scholes formula, the Company estimated fair value of this grant to be $1.6 million (level 3 fair value measurement based on Black Scholes formula) on the grant date. The option has not been exercised yet.

Furthermore, during the year ended September 30, 2024, the Board of Directors of the Company awarded additional shares to certain employees and managers:

| Additional shares awarded to management and employees during the year (*) | Number of shares | Weighted average grant date fair value of shares |
|---|---|---|
| Granted during the year | 3,562 | $ 617 |
| Vested during the year | 3,562 | 617 |
| Issued during the year | (3,286) | (622) |
| **Vested at the end of the year** | **276** | **$ 560** |

(*) The number of shares, and the stock price have been retroactively restated giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. Stock based compensation costs, recognized by the Company during the year, may not equal product of the shares and fair value in in this table, due to rounding up after adjusting to reverse stock splits. Information for the previous period(s) may not be directly comparable due to a series of reverse stock splits executed by the Company over the past two financial years, with a total combined ratio of 1:2,250,000. In accordance with US GAAP, these reverse stock splits have been applied retroactively, reducing the number of shares while proportionally increasing the share price.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company has also accrued a liability (presented within "Accrued expenses and other current liabilities" in the consolidated balance sheets) in an amount of $0.2 million (or 67,268 shares of common stock at market price on September 30, 2024) to compensate employees for delay with the issuance of common stock per relevant offer letters and employment contracts.

***Consultants***

From time to time the Company also issues share-based compensation to external consultants providing consulting, marketing, R&D, legal and other services. The weighted average term of such contracts is 6 months. The number of shares specified within the individual agreements, or a monetary value of those shares, if applicable, is usually negotiated by our Chief Executive Officer and approved by the Board.

These costs are generally presented as professional fees within general and administrative, and certain qualifying costs may be presented as part of research and development expenses ($0.4 million in the year ended September 30, 2024, and $5.0 million in the year ended September 30, 2023). A part of these share-based awards is classified as equity and accounted for, similar to stock-based compensation to employees. Another part of the Company's share-based awards to consultants is classified as liabilities, mainly if the number of shares a consultant is entitled to is predominantly based on monetary value fixed in the contract. An accrued part of liability, in this case, is revalued each period based on the part of the services performed and the market price of the shares of common stock of the Company until a sufficient number of shares is issued. The liability to consultants as of September 30, 2024 amounted to $0.1 million (none as of September 30, 2023). Total value of share-based liabilities settled in stock during the years ended September 30, 2024 and 2023, was $32.4 million and $13 million, respectively. The Company generally practices prepayment for future services of the consultants by unrestricted shares of common stock. In this case, a prepaid asset is recognized on the balance sheet and is amortized over the period the consultant is delivering their services to the Company. These prepaid costs were $3.3 million as of September 30, 2024 ($5.1 million as of September 30, 2023) and this amount represents the total unrecognized compensation cost related to nonvested share-based compensation arrangements granted under the Plan to non-employees. The weighted-average period over which these costs are expected to be recognized after the balance sheet date is 4 months.

The weighted-average grant-date fair value of awards granted to consultants during the year and classified as equity, was $1.2 million and $0.3 million during the years ended September 30, 2024 and 2023, respectively. The weighted-average grant-date fair value of awards granted to consultants during the year and classified as liability, was $0.8 million and $0.7 million during the years ended September 30, 2024 and 2023, respectively.

| Awards granted to consultants: classified as equity (*) | Number of shares | | Weighted average grant date fair value of shares |
|---|---|---|---|
| Nonvested at the beginning of the year | 10 | $ | 5,600 |
| Granted during the year | 353,740 | | 12 |
| Vested during the year | (53,750) | | 13 |
| Forfeited during the year | - | | - |
| Nonvested at the end of the year | 300,000 | $ | 12 |
| Prepaid in vested stock but not amortized by the end of the year | - | $ | - |
| Granted during the previous year | 70 | $ | 86,174 |
| Vested during the previous year | (80) | $ | 76,127 |

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(*) The number of shares, and the stock price have been retroactively restated giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. Stock based compensation costs, recognized by the Company during the year, may not equal product of the shares and fair value in in this table, due to rounding up after adjusting to reverse stock splits. Information for the previous period(s) may not be directly comparable due to a series of reverse stock splits executed by the Company over the past two financial years, with a total combined ratio of 1:2,250,000. In accordance with US GAAP, these reverse stock splits have been applied retroactively, reducing the number of shares while proportionally increasing the share price.

| Awards granted to consultants: classified as liability (*) | Number of shares | | Weighted average grant date fair value of shares |
|---|---|---|---|
| Nonvested at the beginning of the year | - | $ | - |
| Granted during the year | 3,279,583 | | 29 |
| Vested during the year | (944,877) | | (34) |
| Forfeited during the year | - | | - |
| Nonvested at the end of the year | 2,334,706 | $ | 3 |
| Prepaid in vested stock but not amortized by the end of the year | 157,860 | $ | 21 |
| Granted during the previous year | 1,029 | $ | 20,778 |
| Vested during the previous year | (1,029) | $ | 20,778 |

(*) The number of shares, and the stock price have been retroactively restated giving effect to reverse stock splits, see *Note 1 - Description of business and basis of presentation*. Stock based compensation costs, recognized by the Company during the year, may not equal product of the shares and fair value in in this table, due to rounding up after adjusting to reverse stock splits. Information for the previous period(s) may not be directly comparable due to a series of reverse stock splits executed by the Company over the past two financial years, with a total combined ratio of 1:2,250,000. In accordance with US GAAP, these reverse stock splits have been applied retroactively, reducing the number of shares while proportionally increasing the share price.

**NOTE 12 - ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

| | September 30, 2024 | | September 30, 2023 | |
|---|---|---|---|---|
| Provision for settlement expenses and legal fees | $ | 37,913,255 | $ | 29,763,627 |
| Tax payables | | 5,493,558 | | 2,849,346 |
| Accrued payroll | | 2,447,372 | | 2,406,650 |
| Accrued interest | | 2,395,190 | | 1,548,724 |
| Refund liability | | 763,160 | | 652,200 |
| Dividend payable | | 492,290 | | 401,859 |
| Accrued expense - other | | 2,107,341 | | 3,988,382 |
| **Total** | $ | **51,612,166** | $ | **41,610,788** |

F- 54

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 13 - LIABILITY TO ISSUE STOCK

The liability to issue stock on September 30, 2024 (current liability in the amount of $ 1.8 million and non-current liability in the amount of $0.4 million) represents CEO incentive award provision to be settled in shares of common stock upon the achievement of specific targets (current liability in the amount of $1.3 million and non-current liability in the amount of $0.4 million), liability to Directors of the Company ($0.1 million), employees ($0.2 million), as well as certain liability-classified contracts with consultants (current liability in the amount of $0.1 million) and other parties (current liability in amount of $0.1 million). The liability on September 30, 2023 (current liability in amount of $9.9 million and non-current liability in amount of $1.8 million) mainly represents CEO incentive award provision to be settled in shares of common stock upon achievement of specific targets, see *Note 11 - Share-based compensation* for more details.

## NOTE 14 - PROPERTY, PLANT, AND EQUIPMENT, NET

Property, plant, and equipment, net consists of the following:

|  | September 30, 2024 | September 30, 2023 |
|---|---|---|
| Buildings | $ 50,007,998 | $ 48,081,466 |
| Machinery and equipment | 41,968,053 | 27,861,452 |
| Construction-in-progress | 3,183,451 | 5,180,642 |
| Land | 3,065,757 | 3,040,303 |
| Other fixed assets | 6,380,587 | 2,824,165 |
| **Total cost of assets excluding accumulated impairment** | **104,605,846** | **86,988,028** |
| Less: accumulated depreciation | (22,425,580) | (4,955,243) |
| **Property, Plant, and Equipment, net** | **$ 82,180,266** | **$ 82,032,785** |

Due to unfavorable market conditions, decline of the market prices of the Company's common stock, and budgeted performance misses compared to the budgets prepared previously, we have tested long-lived asset for recoverability both for the year ended September 30, 2024, and the year ended September 30, 2023. The tests were performed with assistance of independent professional appraisers using both discounted cash flow method and guideline public company method. Additionally, fair value of real property (classified in Level 3 of the fair value hierarchy) was estimated under market approach.

Impairment tests performed as of September 30, 2024 did not result in recognition of impairment, except for $4.2 million impairment of assets (presented as construction-in-progress in the table above and related to Mullen Commercial segment - see *Note 21 - Segment information*) recorded due to insufficient financing available to finish relevant projects.

Impairment tests performed for the year ended September 30, 2023 did not result in recognition of impairment in respect of the property, plant, and equipment of the Bollinger's segment, but impairment loss in amount of $13.5 million has been recognized in respect of the property, plant, and equipment of the Mullen Commercial segment: primarily construction-in-progress, and machinery and equipment, and show room assets. Their accumulated depreciation in amount of $6.0 million was derecognized in correspondence with initial cost to present the new cost basis of these assets in accordance with ASC 360.

Depreciation expense related to property, plant, and equipment for the years ended September 30, 2024 and 2023 was $17.6 million and $8.0 million, respectively.

F- 55

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 15 - OTHER NON-CURRENT ASSETS

| | September 30, 2024 | September 30, 2023 |
|---|---|---|
| **Other Noncurrent Assets** | | |
| Lease security deposits | 3,178,870 | 960,502 |
| **Total Other Assets** | $ 3,178,870 | $ 960,502 |

## NOTE 16 - NONCONTROLLING INTEREST

On September 7, 2022, the Company acquired approximately 60% of the outstanding shares of Bollinger Motors, Inc. Noncontrolling interest recognized as of the acquisition date amounted to $99 million through a series of purchase agreements. Up to September 30, 2023, the noncontrolling interest decreased to $63.9 million due to allocation of losses of the subsidiary.

Per the Stock purchase agreement signed on July 26, 2024 (Effective date), the Company, as part of activities to launch production in the Bollinger segment, invested an additional $12.7 million in newly issued shares of the subsidiary, increasing controlling interest of the owners of the Company to 66% on a fully diluted basis. This investment has been eliminated in the consolidated statement of cash flows but decreased noncontrolling interest in the consolidated balance sheets by $3 million, see table below.

Over the next 18 months following the Effective Date, the Company has the right to purchase additional shares of Bollinger for $23.4 million, further increasing the share of the Company to 73.4% on a fully diluted basis. Also, during the next 36 months following the Effective Date, the Company shall have the right to purchase up to 100% of the total number of shares of Common Stock subject to any Committed Third Party Financing (as defined in the agreement) at a purchase price that is 75% of the purchase price offered in such Committed Third Party Financing and otherwise on the same terms and conditions provided for in the Committed Third Party Financing.

Changes of the noncontrolling interest during the years ended September 30, 2024 and 2023 are disclosed in the tables below:

| | |
|---|---|
| Noncontrolling interest as of October 1, 2023 | $ 63,855,573 |
| Changes due to net losses of the subsidiary | (48,767,650) |
| Changes due to additional investments of the Company | (3,077,774) |
| **Noncontrolling interest as of September 30, 2024** | $ 12,010,149 |

| | |
|---|---|
| Noncontrolling interest as of October 1, 2022 | $ 98,259,819 |
| Changes due to net losses of the subsidiary | (34,404,246) |
| **Noncontrolling interest as of September 30, 2023** | $ 63,855,573 |

F- 56

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 17 - LEASES**

We have entered into various operating lease agreements for certain offices, manufacturing and warehouse facilities, and land. Operating leases led to recognition of right-of-use assets, and current and noncurrent portion of lease liabilities. These right-of-use assets also include any lease payments made and initial direct costs incurred at lease commencement and exclude lease incentives. The lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Lease expense for lease payments is recognized on a straight-line basis over the lease term. We have lease agreements that require payments for both lease and non-lease components and have elected to account for these as a single lease component. Certain leases provide for annual increases to lease payments based on an index or rate.

On November 1, 2023, the Company entered a 5-year lease agreement for premises of approximately 122,000 sq. ft. in Fullerton, California, designated for light manufacturing and distribution of electric vehicle batteries. Base rent is $2.992 million for the first year (and increases approximately 4% yearly), and additional operating expenses are approximately $715 thousand in the first year with subsequent annual recalculation. Security deposit paid to the landlord is approximately $1 million.

The table below presents information regarding our lease assets and liabilities.

| | September 30, 2024 | | September 30, 2023 | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Operating lease right-of-use assets | $ | 3,041,485 | $ | 5,249,417 |
| **Liabilities:** | | | | |
| Operating lease liabilities, current | | (2,893,967) | | (2,134,494) |
| Operating lease liabilities, noncurrent | | (11,648,662) | | (3,566,922) |
| **Total lease liabilities** | $ | (14,542,629) | $ | (5,701,416) |
| | | | | |
| **Weighted average remaining lease terms:** | | | | |
| Operating leases (in years) | | 5.1 | | 4.0 |
| Cash paid for amounts included in the measurement of lease liabilities for the fiscal years then ended | $ | 3,310,845 | $ | 3,168,567 |

| Operating lease costs: | For the fiscal year ended September 30, | | | |
|---|---|---|---|---|
| | | 2024 | | 2023 |
| Fixed lease cost | $ | 5,646,859 | $ | 3,318,326 |
| Variable and short-term lease cost | | 462,339 | | 250,499 |
| Sublease income | | (573,673) | | (362,126) |
| **Total operating lease costs** | $ | 5,535,525 | $ | 3,206,699 |

During the year ended September 30, 2024, we recognized impairment of right-of-use assets in the amount of $11.5 million (none during the year ended September 30, 2023) mainly due to insufficient future cash flows to cover carrying amount of the relevant assets.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Operating Lease Commitments*

Our leases primarily consist of land, land and building, or equipment leases. Our lease obligations are based upon contractual minimum rates. Most leases provide that we pay taxes, maintenance, insurance and operating expenses applicable to the premises. Weighted average discount rate used in discounting operating lease liabilities is 28%. The following table reflects maturities of operating lease liabilities as of September 30, 2024, as well as reconciliation of undiscounted cash flows per lease contracts to carrying amount of the lease liabilities:

**Years ending September 30,**

| | |
|---|---:|
| 2025 | $ 6,421,692 |
| 2026 | 5,022,623 |
| 2027 | 5,000,409 |
| 2028 | 4,828,305 |
| 2029 | 1,358,041 |
| Thereafter | 5,994,883 |
| **Total lease payments** | $ 28,625,953 |
| Less: imputed interest | (14,083,324) |
| **Carrying amount of lease liabilities** | $ 14,542,629 |

**NOTE 18 - INCOME TAXES**

The Company and its less than 100% owned subsidiaries are filing separate tax returns, and we calculate the provision for income taxes by using a "separate" return method. Section 174 capitalization and R&D credits are calculated using consolidated tax return rules and allocated among its members. We record deferred income taxes using enacted tax laws and rates for the years in which the taxes are expected to be paid. Deferred income tax assets and liabilities are recorded based on the differences between the financial reporting and income tax bases of assets and liabilities.

The Company's total provision (benefit) for income taxes for the years ended September 30, 2024 and 2023 consists of the following elements:

| | September 30, 2024 | September 30, 2023 |
|---|---:|---:|
| **Current** | | |
| Federal | $ - | $ - |
| State | 3,200 | 2,400 |
| Foreign | - | - |
| Total Current | $ 3,200 | $ 2,400 |
| **Deferred** | | |
| Federal | $ (3,891,900) | $ (10,990,882) |
| State | - | - |
| Total Deferred | $ (3,891,900) | $ (10,990,882) |
| **Total provision (benefit) for income taxes** | $ (3,888,700) | $ (10,988,482) |

F- 58

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table represents accumulated income tax NOL (net operating loss) carryforwards for the years ended September 30, 2024 and 2023, respectively:

| | September 30, 2024 | September 30, 2023 |
|---|---|---|
| **Federal** | | |
| 2035-2038 | $ 29,838,716 | $ 29,838,716 |
| Indefinite | 650,503,744 | 451,052,564 |
| **Total Federal** | $ 680,342,460 | $ 480,891,280 |
| | | |
| **California** | | |
| 2035-2041 | $ 677,131,683 | $ 473,427,974 |
| **Total California** | $ 677,131,683 | $ 473,427,974 |

The reconciliation of our effective tax rate to the statutory federal rate of 21% for the years ended September 30, 2024 and 2023 is as follows:

| | September 30, 2024 | September 30, 2024 - % | September 30, 2023 - % | September 30, % |
|---|---|---|---|---|
| Income tax benefit at statutory rate | $ (107,040,203) | 21% | $ (213,705,935) | 21% |
| State income taxes | 3,200 | 0% | 2,400 | 0% |
| Permanent differences | 28,208,650 | -6% | 155,268,652 | -15% |
| Valuation allowance | 73,950,010 | -15% | 49,635,916 | -5% |
| Federal return to provision true up | 989,643 | 0% | (2,269,617) | 0% |
| Other | - | 0% | 80,102 | 0% |
| **Total (benefit) provision for income taxes** | $ (3,888,700) | 1% | $ (10,988,482) | 1% |

We record deferred income taxes using enacted tax laws and rates for the years in which the taxes are expected to be paid. Deferred income tax assets and liabilities are recorded based on the differences between the financial reporting and income tax bases of assets and liabilities.

F- 59

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Significant components of the Company's net deferred tax assets as of September 30, 2024 and 2023, respectively, are as follows:

| | September 30, 2024 | September 30, 2023 |
|---|---|---|
| **Deferred tax assets:** | | |
| Stock compensation | $ 10,399,209 | $ 10,327,117 |
| Net operating loss carryforwards | 174,997,328 | 118,886,728 |
| Charitable contributions | 4,062 | 2,680 |
| Accrued expenses | 579,115 | 414,745 |
| Impairment other | 2,233,957 | - |
| Other assets | 4,008,812 | 413,579 |
| 163(j) limitation | 15,971,671 | 15,971,671 |
| Research expenditures | 25,113,720 | 16,077,633 |
| Fixed assets | 373,815 | - |
| Total gross deferred tax assets | 233,681,689 | 162,094,153 |
| R&D tax credits | 12,144,679 | 7,353,043 |
| Less valuation allowance | (245,682,230) | (155,435,630) |
| Total net deferred tax assets | 144,138 | 14,011,566 |
| **Deferred tax liabilities:** | | |
| Intangibles | (144,138) | (16,358,329) |
| Fixed assets | - | (1,545,473) |
| Other | - | 336 |
| Total deferred tax liabilities | (144,138) | (17,903,466) |
| **Net deferred tax assets** | $ - | $ (3,891,900) |

For the year ended September 30, 2024, a full valuation allowance is recorded against the deferred tax assets because the Company is in a three-year cumulative pre-tax book loss, which is significant negative evidence. We do not believe that the deferred tax assets recorded as of September 30, 2024 are more likely than not realizable.

We follow the guidance for accounting for uncertainty in income taxes in accordance with ASC 740, which clarifies uncertainty in income taxes recognized in an enterprise's financial statements. The standard also prescribes a recognition threshold and measurement standard for the financial statement recognition and measurement of an income tax position taken, or expected to be taken, in an income tax return. Only tax positions that meet the more likely than not recognition threshold may be recognized. In addition, the standard provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure. As of September 30, 2024, the Company has recorded $15.2 million related to unrecognized tax benefits as a reduction to the associated deferred tax assets. The Company's tax years for 2015 through 2024 are still subject to examination by the tax authorities.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19 - CONTINGENCIES AND CLAIMS**

Occasionally, we are subject to asserted and actual claims and lawsuits arising in the ordinary course of business. Company management reviews any such legal proceedings and claims on an ongoing basis and follows appropriate accounting guidance when making accrual and disclosure decisions. As required by ASC 450, we recognize accruals for contingencies when incurrence of a loss is probable (likely to occur) and can be reasonably estimated, and disclose the amount accrued and the amount of a reasonably possible loss over the amount accrued if such disclosure is necessary for our consolidated financial statements. When the likelihood is not probable or when the likelihood is probable but the amount cannot be reasonably estimated, liabilities are not recognized. To estimate whether a loss contingency should be accrued, management evaluates, among other factors, the degree of probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of the loss.

The outcomes of our legal proceedings and other contingencies are inherently unpredictable, subject to significant uncertainties. They could be material to our operating results and cash flows for a particular period. At least quarterly, we evaluate developments in our legal proceedings and other contingencies that could affect the amount of liability, including amounts over any previous accruals and reasonably possible losses disclosed, and make adjustments and changes to our accruals and disclosures as appropriate. For the matters disclosed below without an estimate of the amount of loss or range of losses, such an estimate is not possible or is immaterial, and we may be unable to estimate the possible loss or range of losses that could potentially result from the application of non-monetary remedies. Until the final resolution of such matters, if any of our estimates and assumptions change or prove to have been incorrect, we may experience losses over the amounts recorded, which could have a material effect on our business, consolidated financial position, results of operations, or cash flows.

*Qiantu Motor (Suzhou) Ltd.*

This matter arises out of a contract dispute between Mullen and Qiantu Motor (Suzhou) Ltd. ("Qiantu") related to the engineering, design, support, and homologation of Qiantu's K50 vehicle by Mullen. On March 14, 2023, the parties entered into a Settlement Agreement providing for full settlement of all pending litigation between Mullen and Qiantu. The parties also released all claims against each other arising from or in connection with the matters and claims that were subject to the legal proceedings. Pursuant to the Settlement Agreement, (1) the parties agreed to enter into an IP Agreement (as defined and described below) and (2) in connection with the settlement of the legal proceedings and for the privilege of entering into the IP Agreement, Mullen paid $6 million to Qiantu. In connection with the execution of the Settlement Agreement, on March 14, 2023, Mullen entered into an Intellectual Property and Distribution Agreement ("IP Agreement") with Qiantu, and two of Qiantu's affiliates (collectively "Qiantu"). Pursuant to the IP Agreement, Qiantu granted Mullen the exclusive license to use certain of Qiantu's trademarks and the exclusive right to assemble, manufacture, and sell the homologated vehicles based on the Qiantu K-50 model throughout North America (including Canada, Mexico, and the United States of America) and South America for a period of five years, which period does not start until Mullen has successfully homologated vehicles based on terms of the IP Agreement ("Five Year Period"). During the Five-Year Period, Mullen is also obligated to purchase a certain number of vehicle kits every year from Qiantu. These rights shall be obtained and the commitment shall only be effective upon Mullen's assessment of feasibility and profitability of the project within 150 days as provided for by the IP Agreement. As consideration for Mullen's entry into the IP Agreement, Mullen issued to Qiantu USA warrants to purchase up to 34 shares of Mullen's common stock (giving effect to reverse stock splits); paid Qiantu $2.0 million for deliverable items under the IP Agreement; and in exchange, Mullen will pay Qiantu a royalty fee of $1,200 for each homologated vehicle sold in North America and South America during the term of the IP Agreement.

No loss contingencies have been accrued in respect of this matter as of September 30, 2024, other than those paid (see above) as the Company cannot reasonably estimate either probability of additional losses, or their magnitude (if any), based on all available information presently known to management.

F- 61

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*International Business Machines ("IBM")*

This claim was filed in the Supreme Court of the State of New York on May 7, 2019. This matter arises out of a contract dispute between Mullen and IBM related to a joint development and technology license agreement, patent license agreement, and a logo trademark agreement. On November 9, 2021, the court, pursuant to an inquest order, awarded damages in favor of IBM and on December 1, 2021, the court entered a judgment in favor of IBM in the amount of $5.6 million. On February 2, 2022, IBM filed a Motion to Amend the Judgment it had obtained to add Mullen Automotive and Ottava as Judgment Debtors. Mullen filed an Appeal on April 8, 2022. A settlement was reached in which Mullen paid the full amount of the Judgment with interest, for a total of approximately $5.9 million, but maintained its Appeal rights. IBM then filed a Motion to Dismiss the Appeal based on Mullen's payment of the Judgment. Mullen filed an Opposition to the same on July 18, 2022, and the hearing of the matter was set for July 25, 2022. The Court took the same under submission, and a decision has still not been issued. The Appeal remains pending.

The Company has recognized the amounts paid ($5.9 million) as losses on settlement in the year ended September 30, 2022 and does not expect any additional losses to be reasonably possible.

*The GEM Group*

On September 21, 2021, the GEM Group filed an arbitration demand and statement of claim against Mullen seeking declaratory relief and damages. This matter arises out of an alleged breach of a securities purchase agreement dated November 13, 2020. On November 17, 2023, the arbitrator issued the Partial Final Award on Liability finding that Mullen and Mullen Technologies, Inc. ("MTI") had repudiated and breached the securities purchase agreement and a related agreement (the "GEM Agreements"). On January 29, 2024, the parties completed the briefing on the issues of damages and allocation. On May 10, 2024, the arbitrator issued his final award, awarding the GEM Group $26.8 million in damages for breach of the relevant agreements, and $3.8 million in attorney fees and certain administrative costs.

On August 3, 2023, the Arbitrator ordered Mullen to deposit $7.0 million into an interest-bearing escrow account with a commercial bank or brokerage firm. That amount has been released to the GEM Group. On January 24, 2024, the arbitrator ordered Mullen to deposit an additional $24.1 million into escrow on or before March 9, 2024. The GEM Group has moved in the United States District Court to confirm that second interim order. On June 11, 2024, the United States District Court confirmed that order.

On or about On December 28, 2023, Mullen and MTI filed a complaint against the GEM Group and Christopher F. Brown in the United States District Court for the Southern District of New York alleging, among other things, that the GEM Group and Mr. Brown engaged in an unlawful securities transaction under the federal securities laws by entering into the GEM Agreements while the GEM Group was operating as an unregistered dealer. The complaint seeks an order declaring, among other things, that the GEM Agreements are void ab initio. On April 8, 2024, the District Court stayed that action.

On or about July 10, 2024, Mullen moved in the United States District Court for the Southern District of New York for an order vacating the arbitration awards and denying GEM's anticipated motion to confirm those awards. On or about August 7, 2024, GEM filed an opposition to Mullen's motion to vacate and cross-moved to confirm the arbitration awards. On or about August 21, 2024, Mullen filed a reply to GEM's opposition. These motions are now fully briefed.

The Company has accrued $30 million as a probable settlement expense as of September 30, 2024 (in addition to $7 million that has been paid earlier).

F- 62

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Mullen Stockholder Litigation*

In re Mullen Automotive Inc. Securities Litigation.

On May 5, 2022, Plaintiff Margaret Schaub, a purported stockholder, filed a putative class action complaint in the United States District Court for the Central District of California against the Company, as well as its Chief Executive Officer, David Michery, and the Chief Executive Officer of a predecessor entity, Oleg Firer (the "Schaub Lawsuit"). The Schaub Lawsuit was brought by Schaub both individually and on behalf of a putative class of purchasers of the Company's securities, claiming false or misleading statements regarding the Company's business partnerships, technology, and manufacturing capabilities, and alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

On September 23, 2022, a court-appointed lead plaintiff filed a Consolidated Amended Class Action Complaint against the Company, Mr. Michery, and the Company's predecessor, Mullen Technologies, Inc., premised on the same purported violations of the Exchange Act and Rule 10b-5, seeking to certify a putative class of shareholders, and seeking an award of monetary damages, as well as reasonable fees and expenses. On August 14, 2024, the parties entered a Stipulation and Agreement of Settlement to settle the securities class action matter subject to payment of $5.4 million by the Company and $1.8 million by the Company's D&O insurers. The settlement is subject to the court's final approval.

The Company has accrued $5.4 million as a probable settlement expense as of September 30, 2024.

In re Mullen Automotive Inc. Derivative Litigation.

On August 1, 2022, Jeff Witt and Joseph Birbigalia, purported stockholders, filed a derivative action in the United States District Court for the Central District of California against the Company as a nominal defendant, Mr. Michery, Mr. Firer, and current or former Company directors Ignacio Novoa, Mary Winter, Kent Puckett, Mark Betor, William Miltner and Jonathan New (the "Witt Lawsuit"). The Witt lawsuit asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violation of Section 14 of the Exchange Act primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Witt Lawsuit seeks monetary damages, as well as an award of reasonable fees and expenses. The case currently is stayed.

On August 21, 2024, the parties entered a Stipulation and Agreement of Settlement to settle the derivative matter subject to certain governance enhancements and payment of $500,000 in attorney's fees to be paid by the Company's D&O insurers. Notice of this settlement can be found on the Investor Relations page of the Company's website. The settlement is subject to the court's final approval.

No provision has been accrued in respect of this matter as of September 30, 2024, as the Company expects no losses to be incurred.

Chosten Caris v. David Michery.

On April 27, 2023, Chosten Caris, a purported stockholder, filed a complaint against Mr. Michery in the Eighth Judicial Circuit in and for Alachua County, Florida (the "Caris Lawsuit"). On May 17, 2023, Mr. Michery removed the Caris Lawsuit to the United States District Court for the Northern District of Florida. This lawsuit purports to seek damages for claims arising under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

No loss contingencies have been accrued in respect of this matter as of September 30, 2024, as the Company cannot reasonably estimate either probability of the loss, or their magnitude (if any), based on all available information presently known to management.

F- 63

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Trinon Coleman v. David Michery et al.

On December 8, 2023, Trinon Coleman, a purported stockholder, filed a derivative action in the Court of Chancery for the State of Delaware against the Company as a nominal defendant, Mr. Michery, and Company directors Mr. Puckett, Ms. Winter, Mr. Betor, Mr. Miltner, and Mr. New (the "Coleman Lawsuit"). This lawsuit asserts claims for breach of fiduciary duty, insider trading, and unjust enrichment primarily in connection with the issues and claims asserted in the Schaub Lawsuit. The Coleman Lawsuit seeks to direct the Company to improve its corporate governance and internal procedures, and seeks monetary damages and an award of reasonable fees and expenses. The case currently is stayed.

No loss contingencies have been accrued in respect of this matter as of September 30, 2024, as the Company cannot reasonably estimate either probability of the loss, or their magnitude (if any), based on all available information presently known to management.

Martis v. Michery et al.

On March 14, 2024, Marius Martis, a purported stockholder, filed a shareholder derivative action in the United States District Court for the District of New Jersey, purportedly in the right and for the benefit of the Company as a nominal defendant, against others. This lawsuit purported to seek damages for claims relating to the Net Element, Inc. ("Net Element") merger and Net Element's divestiture of a payment processing business, arising under Sections 10(b), 14(a), 20, 21D and 29(b) of the Exchange Act, as well as claims for breach of fiduciary duty. On June 13, 2024, the plaintiffs filed a notice of voluntary dismissal.

**NOTE 20 - RELATED PARTY TRANSACTIONS**

***Transition Services Agreement with MTI***

Prior to its spinoff as a separate entity and the closing of the Merger on November 5, 2021, the Company operated as a division of Mullen Technology, Inc. (MTI), an entity in which the Company's CEO and Chairman of the Board of directors David Michery has a controlling financial interest and of which he was CEO and Chairman during the fiscal years ended September 30, 2023 and 2022.

Subsequent to the spinoff transaction and Merger on November 5, 2021, the Company, in accordance with Transition Services Agreement dated May 12, 2021 between the Company and MTI (the "TSA"), processed and disbursed payroll and related compensation benefits for 11 employees that provided services only to MTI and rent costs for facilities utilized by MTI pursuant to the TSA. The terms of the TSA require MTI to repay monthly the amounts advanced by the Company, with the lower of the prime rate plus 1% or the maximum rate under applicable law charged on the unpaid amounts. The terms of the TSA do not provide for any other payment processing service fee from MTI to the Company except the interest fee on overdue advance balances.

The Company incurred approximately $1.2 million and $0.9 million of disbursements on behalf of MTI during the years ended September 30, 2022 and 2023, respectively. No amounts have been collected for the funds advanced through September 30, 2023. On March 31, 2023, the Company converted approximately $1.4 million of these advances to MTI to a note receivable from MTI. The note bears interest at 10% per year and matures on March 31, 2025 with a default rate of 15% per annum. By the end of the 2023 fiscal year, the note principal has been increased by additional $0.4 million. Remaining advances, note and interest receivable as at September 30 2023 and 2022 are presented within non-current assets of the consolidated balance sheets. On January 16, 2024, the Company terminated the Transition Services Agreement between the Company and Mullen Technologies, Inc., and received payment in full settlement of all amounts outstanding (including outstanding notes receivable, advances and related interest) of approximately $2.7 million.

Similarly, during the fiscal year ended September 30, 2024, the Company paid $55 thousand for certain expenses of other companies under control of the Company's CEO and $25 thousand was reimbursed by September 30, 2024.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**MTI Business Acquisition**

On July 18, 2024, the Company entered into an Asset Purchase Agreement with Mullen Technologies, Inc. ("MTI"), pursuant to which the Company assumed a lease for premises located in Oceanside, California and all equipment and inventory in the premises, as well as staffing and other infrastructure for vehicle sales and repairs for consideration of $1.4 million. The Company's CEO has a controlling financial interest and is Chairman of MTI. See further details in the *Note 4 - Business combinations*.

**Transactions with Directors**

For the fiscal year ended September 30, 2024, our non-employee directors have earned compensation for service on our Board of Directors and Committees of our Board of Directors in amount of $
0.4 million in cash and $0.7 million in shares of common stock ($0.3 million in cash and $0.5 million in shares of common stock for the year ended September 30, 2023). In addition, the following non-employee directors were engaged in certain other consulting contracts with the Company:

William Miltner is a litigation attorney who provides legal services to Mullen Automotive and its subsidiaries. Mr. Miltner is also an elected Director for the Company, beginning his term in August 2021. For the fiscal year ending September 30, 2024, Mr. Miltner received $1,180,733 for services rendered. Mr. Miltner has been providing legal services to us since 2020.

On October 26, 2021, the Company entered into a consulting agreement with Mary Winter, Corporate Secretary and Director, to compensate for corporate secretary services and director responsibilities for the period from October 1, 2021, to September 30, 2024, in the amount of $60,000 annually or $5,000 per month. For the fiscal year ending September 30, 2024, Ms. Winter has received $60,000 in consulting payments.

**NOTE 21 - SEGMENT INFORMATION**

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. Our CEO and Chairman of the Board, as the CODM, makes decisions about resources to be acquired, allocated and utilized to each operating segment. The Company is currently comprised of 2 major operating segments:

- Bollinger. The Company acquired the controlling interest of Bollinger Motors Inc. in September 2022. This acquisition positions Mullen into the medium duty truck classes 4-6, along with the Sport Utility and Pick Up Trucks EV segments.

- Mullen Commercial. In November 2022, Mullen acquired from ELMS a manufacturing plant in Mishawaka Indiana and all the intellectual property needed to engineer and build Class 1 and Class 3 electric vehicles.

All long-lived assets of the Company are located in the United States of America. All revenue presented in these consolidated financial statements relates to contracts with customers located in the United States of America.

F- 65

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Segment reporting for the year ended September 30, 2024**

| | Bollinger | Mullen Commercial | Total |
|---|---|---|---|
| Revenue (including $234 thousand from one dealer in the Mullen commercial segment, and $702 thousand in Bollinger segment) | $ 702,515 | $ 391,807 | $ 1,094,322 |
| Interest gains | 949,913 | 149,021 | 1,098,934 |
| Interest expense | (103,186) | (49,273,939) | (49,377,125) |
| Depreciation and amortization expense | (5,547,896) | (16,436,416) | (21,984,312) |
| Impairment of goodwill | (28,846,832) | (1,215,895) | (30,062,727) |
| Impairment of intangible assets | (58,304,612) | (15,142,455) | (73,447,067) |
| Impairment of right-of-use assets | (1,354,413) | (10,150,588) | (11,505,001) |
| Impairment of property, plant, and equipment, and other noncurrent assets | - | (4,174,935) | (4,174,935) |
| Income tax benefit/(expense) | 3,891,100 | (2,400) | 3,888,700 |
| | | | |
| Other significant noncash items: | | | |
| Stock-based compensation | - | (40,432,688) | (40,432,688) |
| Revaluation of derivative liabilities | - | 4,503,099 | 4,503,099 |
| Other financing costs - ELOC commitment fee | - | (6,000,000) | (6,000,000) |
| Other financing costs - Initial recognition of derivative liabilities | - | (54,653,033) | (54,653,033) |
| Other financing costs - initial recognition of warrants | - | (13,652,762) | (13,652,762) |
| Amortization of debt discount and other non-cash interest expense | - | (48,790,729) | (48,790,729) |
| | | | |
| Segment's net loss before impairment and income taxes | (49,316,208) | (345,384,248) | (394,700,456) |
| Segment's net loss before income taxes | (137,822,065) | (371,893,186) | (509,715,251) |
| Segment's net loss | (133,930,965) | (371,895,586) | (505,826,551) |
| | | | |
| Total segment assets | 63,307,777 | 115,323,512 | 178,631,289 |
| Expenditures for segment's long-lived assets | $ (8,642,348) | $ (7,505,707) | $ (16,148,055) |

**Segment reporting for the year ended September 30, 2023**

| | Bollinger | Mullen Commercial | Total |
|---|---|---|---|
| Revenues (including $308,000 from one dealer) | $ - | $ 366,000 | $ 366,000 |
| Interest gains | 1,585,376 | 684,367 | 2,269,743 |
| Interest expenses | (88,580) | (4,904,560) | (4,993,140) |
| Depreciation and amortization expense | (3,808,877) | (12,579,422) | (16,388,299) |
| Impairment of goodwill | (63,988,000) | - | (63,988,000) |
| Impairment of property, plant, and equipment | - | (14,770,000) | (14,770,000) |
| Impairment of intangible assets | - | (5,873,000) | (5,873,000) |
| Income tax benefit/(expense) | 10,990,882 | (2,400) | 10,988,482 |

Other significant noncash items:

| | | | |
|---|---:|---:|---:|
| Stock-based compensation | - | (85,441,869) | (85,441,869) |
| Revaluation of derivative liabilities | - | (116,256,212) | (116,256,212) |
| Initial recognition of derivative liabilities | - | (513,052,038) | (513,052,038) |
| Non-cash financing loss on over-exercise of warrants | - | (8,934,892) | (8,934,892) |
| Loss on extinguishment of debt | - | (6,246,089) | (6,246,089) |
| | | | |
| Segment's net loss before impairment and income taxes | (30,285,599) | (902,730,711) | (933,016,310) |
| Segment's net loss before income taxes | (94,273,599) | (923,373,711) | (1,017,647,310) |
| Segment's net loss | (83,285,117) | (923,373,711) | (1,006,658,828) |
| | | | |
| Total segment assets | 169,410,298 | 252,295,432 | 421,705,730 |
| Expenditures for segment's long-lived assets | $ (4,677,421) | $ (103,245,888) | $ (107,923,309) |

F- 66

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 22 - SUBSEQUENT EVENTS

Company management has evaluated subsequent events through January 24, 2025, which is the date these financial statements were available to be issued. Except as discussed below, management has determined that there were no material subsequent events which required recognition, adjustment to or disclosure in the financial statements:

*Significant stock issuances after the balance sheet date*

After the balance sheet date, the Company issued 57,018,437 shares of common stock, mainly upon exercise of Warrants (see *Note 8 - Warrants and other derivative liabilities and fair value measurements*), conversion of Senior convertible notes (see *Note 7 - Debt*) and issuance of shares to consultants under stock-based compensation plans.

*Settlement Agreement for Matured Notes*

In October 2024, the Company reached an agreement with holders of matured notes and loan advances in amount of $2.7 million, as well as accumulated interest in amount of approximately $1.8 million, that the liabilities would be settled pursuant to Section 3(a)(9) of the Securities Act of 1933 by issuance of shares of common stock of the Company worth of $3 million. The liability was fully settled by December 2024 by issuing shares of common stock in several installments.

*Settlement Agreement for Senior Convertible Notes*

In November 2024, the Company entered into a settlement agreement related to outstanding Senior convertible notes totaling approximately $20.5 million, including accrued interest, under a Securities Purchase Agreement dated May 14, 2024. The settlement involves the issuance of shares of Mullen's common stock, which will satisfy the claims in full. In December 2024, the Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida approved a settlement agreement between the Company and holders of the Senior convertible notes. Settlement terms under this agreement were identical to the conversion terms of the original Senior convertible notes as described in the *Note 7 - Debt*, including the conversion price floor of $1.16 not subject to adjustments. By the date these financial statements are available to be issued, almost full amount of the Senior convertible notes and accumulated interest, that were outstanding on September 30, 2024, has been converted to shares of common stock under Section 3(a)(10) of the Securities Act of 1933.

*Issuance of Secured Promissory Note by Subsidiary*

In October 2024, Bollinger Motors, Inc., a majority-owned subsidiary of Mullen Automotive Inc., issued an Amended and Restated Secured Promissory Note for $10.0 million to Robert Bollinger, providing additional capital to support the production and sale of Bollinger's Class 4 EV truck, the B4. The note bears interest at 15% per annum, with interest-only payments starting November 29, 2024, and principal repayment due by October 30, 2026. It is secured by part of the assets of Bollinger Motors, excluding inventory and certain intellectual property.

*Additional investments in Bollinger*

In accordance with the stock purchase agreement signed on July 26, 2024, the Company, as part of activities to launch production in the Bollinger segment, invested after the balance sheet date an additional $6 million in newly issued shares of the subsidiary, increasing controlling interest of the Company to approximately 68%.

F- 67

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

***Additional Notes and Warrants and Investment Rights***

On December 12, 2024, the Company issued an additional aggregate principal amount of approximately $4.6 million (or $4.4 million including the 5% original issue discount) of senior secured convertible notes under investment rights pursuant to the existing Securities Purchase Agreement dated May 14, 2024. In conjunction with the Notes, the Company issued five-year warrants exercisable for 16,862 shares of common stock on a cash basis. The Notes and Warrants have identical terms and conditions to those previously issued, including a four-month maturity date from issuance (see *Note 8 - Warrants and other derivative liabilities and fair value measurements* and *Note 7 - Debt*). In conjunction with this transaction, the Company entered into an Additional Investment Rights Agreement, granting investors the right, through December 12, 2025, to purchase up to $4.6 million in additional Notes and related Warrants on similar terms.

On or around December 26, 2024, the Company issued an additional aggregate principal amount of approximately $4.2 million (or $4.0 million including the 5% original issue discount) of senior secured convertible notes under investment rights pursuant to the existing Securities Purchase Agreement dated May 14, 2024, and issued five-year warrants exercisable on a cash basis for an aggregate of 8,255,933 shares of common stock. Except as set forth below, these notes and warrants have the same terms and conditions as those previously issued (see *Note 8 - Warrants and other derivative liabilities and fair value measurements* and *Note 7 - Debt*). These notes may be converted into shares of common stock at the lower of (i) $1.02, (ii) 95% of the closing sale price of the common stock on the date that the Initial Registration Statement is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five trading days prior to such conversion date, provided that the conversion price will not be less than $0.21 per share (not subject to adjustment to reverse stock splits and similar transactions). The warrants have an exercise price of $1.12 per share and may also be exercised by a cashless exercise with a closing bid price having a floor of $0.01 (subject to adjustment to reverse stock splits and similar transactions).

On December 31, 2024, the Company, pursuant to the existing investment rights under Securities Purchase Agreement dated May 14, 2024, issued senior secured convertible notes for an aggregate principal amount of approximately $5.3 million (or $5.0 million including the 5% original issue discount) and five-year warrants exercisable on a cash basis for an aggregate of 19,171 shares of Common Stock. These notes and warrants have terms and conditions identical to those previously issued (see *Note 8 - Warrants and other derivative liabilities and fair value measurements* and *Note 7 - Debt*). In connection with the purchase of the additional Notes and Warrants, on December 31, 2024, the Company and the Investor entered into an Additional Investment Rights Agreement whereby for a one-year period ending on December 31, 2025, the Investor has the right, but not the obligation, to purchase from the Company additional 5% Original Issue Discount Senior secured convertible notes in an aggregate principal amount of approximately $5.3 million (or $5.0 million including the 5% original issue discount), and related Warrants, on the same terms and conditions as provided in the Securities Purchase Agreement, except for resetting of conversion and exercise prices (and floors) of notes and warrants to subsequent market prices.

The new Additional Investment Rights granted in December as well as the notes and warrants issued on December 26, 2024 are subject to approval under Nasdaq Listing Rule 5635(d), as the aggregate potential issuances could exceed 19.99% of the Company's outstanding common stock. Accordingly, this matter will be presented for shareholder approval at the Company's Annual Meeting currently scheduled for February 27, 2025. If approval is not obtained, the issuance of additional shares under the Notes and Warrants will be limited as per the Nasdaq requirements.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Proxy statements filed to seek stockholder approval*

The Company filed preliminary Proxy statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 with regards to the Company's 2025 Annual Meeting of Stockholders, which is scheduled to be held on February 27, 2025. Among other matters, the Company seeks stockholder approval of:

- issuance of shares of common stock pursuant to senior secured convertible notes and related warrants, and any future adjustments of the conversion price of the notes and exercise price of the warrants, purchased pursuant to the Additional Investment Rights, in excess of the 19.99% exchange cap (see above);

- issuance of shares of common stock to CEO pursuant to amendments to Performance Stock Award Agreements (mainly extension of terms for certain milestones described in the *Note 11 - Share-based compensation*);

- increase the number of shares of common stock authorized for issuance under the 2022 Equity Incentives Plan by 20,000,000 shares, and adopt of an automatic annual increase in the shares of common stock available for issuance;

- increase of the authorized number of shares of preferred stock to 1,000,000,000.

In addition, the Company filed Proxy statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 seeking stockholder approval at a Special Meeting of Stockholders to be held on January 31, 2025 of a reverse stock split at an exchange ratio between 1-for-2 to 1-for-100 as a precaution if, in the future, the Board of Directors determines the need to implement a reverse stock split in order to maintain compliance with the Bid Price Rule (Nasdaq Listing Rule 5550(a)(2) requires listed companies to maintain a minimum bid price of at least $1.00 per share and failure to meet the continued listing requirement for the Bid Price Rule is determined to exist if the deficiency continues for a period of 30 consecutive business days).

*$6M Securities Purchase Agreement*

On January 23, 2025, the Company entered into a securities purchase agreement (the "January SPA") with certain investors for the sale of an aggregate principal amount of approximately $6.3 million of Senior Secured Convertible Notes ( "January Notes") and five-year warrants exercisable on a cash basis for 32,116,906 shares of common stock (the "January Warrants"). The January Notes accrue interest at 15%, including a 5% Original Issue Discount, and mature in four months from the date of issuance. Upon any event of default, the interest rate automatically increases to 20% per annum. The holder may convert the outstanding principal and accrued but unpaid interest on the January Notes into shares of common stock at the lower of (i) $0.39, (ii) 95% of the closing sale price of the common stock on the date that the Company's registration statement on Form S-1 is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five trading days prior to such conversion date, provided that the conversion price will not be less than $0.08 per share (not subject to reverse stock split). The January Warrants will have a cash exercise price equal to $0.43 and may also be exercised on a cashless basis.

As security for payment of the amounts due and payable under the January Notes, the Company collaterally assigned and granted to the holders a continuing security interest in all of the Company's right, title, and interest in, to, and under the property of the Company, whether then or hereafter owned, existing, acquired or arising and wherever then or hereafter located (subject to certain exceptions). The January Notes are senior in right of payment to all other current and future notes to which the Company is a party. The January Notes also impose restrictions on the Company, limiting additional debt, asset liens, stock repurchases, outstanding debt repayment, dividends distribution, and affiliate transactions, except for specified exceptions. The January Notes and January Warrants are not convertible by a holder to the extent that the holder or any of its affiliates would beneficially own in excess of 9.9% of the common stock.

Table of Contents

**MULLEN AUTOMOTIVE INC.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Mullen Automotive Inc.

January 24, 2025                                    By:    /s/ David Michery
                                                           _____
                                                           David Michery

                                                           Chief Executive Officer, President and Chairman of the Board

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each of Mullen Automotive Inc., a Delaware corporation (the "*Company*"), and the undersigned Directors and Officers of Mullen Automotive Inc. hereby constitute and appoint David Michery and Jonathan New as the Company's or such Director's or Officer's true and lawful attorneys-in-fact and agents, for the Company or such Director or Officer and in the Company's or such Director's or Officer's name, place and stead, in any and all capacities, with full power to act alone, to sign any and all amendments to this report, and to file each such amendment to this report, with all exhibits thereto, and any and all documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in connection therewith, as fully to all intents and purposes as the Company or such Director or Officer might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ David Michery<br>_____<br>David Michery | Chief Executive Officer, President and<br>Chairman of the Board (Principal Executive Officer) | January 24, 2025 |
| /s/ Jonathan New<br>_____<br>Jonathan New | Chief Financial Officer<br>(Principal Financial Officer) | January 24, 2025 |
| /s/ Chester Bragado<br>_____<br>Chester Bragado | Chief Accounting Officer<br>(Principal Accounting Officer) | January 24, 2025 |
| /s/ Mary Winter<br>_____<br>Mary Winter | Secretary and Director | January 24, 2025 |
| /s/ John Andersen<br>_____<br>John Andersen | Director | January 24, 2025 |
| /s/ Ignacio Novoa<br>_____<br>Ignacio Novoa | Director | January 24, 2025 |
| /s/ Kent Puckett<br>_____<br>Kent Puckett | Director | January 24, 2025 |
| /s/ Mark Betor<br>_____<br>Mark Betor | Director | January 24, 2025 |
| /s/ William Miltner<br>_____ | Director | January 24, 2025 |

William Miltner

84

**Exhibit 4.1**

DESCRIPTION OF THE REGISTRANT'S SECURITIES
REGISTERED PURSUANT TO SECTION 12 OF THE
SECURITIES EXCHANGE ACT OF 1934

The following is a brief description of shares of capital stock of Mullen Automotive Inc. (the "Company," "we," "us," or "our"). The Company's common stock, par value $0.001 per share ("Common Stock"), is registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). This brief description is based upon our second amended and restated certificate of incorporation (as amended, the "Certificate of Incorporation"), and our amended and restated Bylaws (our "Bylaws"). This description also summarizes relevant provisions of the Delaware General Copromotion Law ("DGCL"). The following summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the applicable provisions of the DGCL, our Certificate of Incorporation and Bylaws, copies of which are incorporated by reference as an exhibit to the Annual Report on Form 10-K of which this Exhibit 4.1 is a part. We encourage you to read our Certificate of Incorporation, our Bylaws and the applicable provisions of DGCL for additional information.

**General**

We are authorized to issue up to 5,000,000,000 shares of Common Stock and 500,000,000 shares of preferred stock, par value $0.001 per share (the "Preferred Stock"), of which 200,000 shares are designated as Series A Preferred Stock, 12,000,000 shares are designated as Series B Preferred Stock, 40,000,000 shares are designated as Series C Preferred Stock, 437,500,001 shares are designated as Series D Preferred Stock, 76,950 shares are designated as Series E Preferred Stock, and 50,000 shares are designated as Series A-1 Junior Participating Preferred Stock ("Series A-1 Preferred Stock") . Pursuant to the terms of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock, converted shares of preferred stock are cancelled and no longer issuable by the Company. As of January 7, 2024, there were 44,527,314 shares of Common Stock issued and outstanding, and 648 shares of Series A Preferred Stock, 458 shares of Series C Preferred Stock and 363,097 shares of Series D Preferred Stock issued and outstanding and no outstanding shares of Series B Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock

**Common Stock**

Holders of our Common Stock are each entitled to cast one vote for each share held of record on all matters presented to stockholders, and will be entitled to notice of any shareholders' meeting, in accordance with the bylaws. Cumulative voting is not allowed; the holders of a majority of our outstanding shares of capital stock may elect all directors. Holders of our Common Stock are entitled to receive such dividends as may be declared by our board out of funds legally available and, in the event of liquidation, to share pro rata in any distribution of our assets after payment of liabilities. Our directors are not obligated to declare a dividend. It is not anticipated that we will pay dividends in the foreseeable future. Holders of our Common Stock do not have preemptive rights to subscribe to any additional shares we may issue in the future. There are no conversion, redemption, sinking fund or similar provisions regarding the Common Stock. All outstanding shares of Common Stock are fully paid and nonassessable.

The rights, preferences and privileges of holders of Common Stock are subject to the rights of the holders of any outstanding shares of preferred stock.

**Preferred Stock**

Our board of directors is authorized to provide, out of the unissued shares of preferred stock, for one or more series of preferred stock and, with respect to each such series, to fix the number of shares constituting such series and the designation of such series, the voting powers of the shares of such series, and the preferences and relative, participating, optional or other special rights and any qualifications, limitations or restrictions thereof, of the shares of such series. The powers, preferences and relative, participating, optional and other special rights of each series of preferred stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding.

1

The issuance of Preferred Stock could decrease the amount of earnings and assets available for distribution to the holders of Common Stock or adversely affect the rights and powers, including voting rights, of the holders of Common Stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring or preventing a change in control of the Company, which could depress the market price of our Common Stock.

**Voting Rights**

Except as otherwise expressly provided by the Certificate of Incorporation or as provided by law, the holders of shares of Common Stock and Preferred Stock shall at all times vote together as a single class on all matters (including the election of directors) submitted to a vote of the stockholders; provided, however, that, any proposal which adversely affects the rights, preferences and privileges of the Series A, B, C, D or E Preferred Stock must be approved by a majority in interest of the affected Series of Preferred Stock, as the case may be. Each holder of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series E Preferred Stock will have the right to one vote per share (on a fully converted basis) held of record by such holder, and each holder of Series D Preferred Stock will have the right to one vote per share held of record by such holder.

**Series A Preferred Stock**

Series A Preferred Stock generally have the following terms:

- **Conversion**. The Series A Preferred Stock is convertible at the option of each holder at any time on a 100-for-1 basis (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Common Stock). The Series A Preferred Stock will automatically convert into shares of Common Stock on a 100-for-1 basis (as so adjusted) upon the earlier of (i) a Qualified Public Offering (as such term is defined in the Certificate of Incorporation) or (ii) the date specified by written consent or agreement of the holders of the then outstanding shares of Series A Preferred Stock.

- **Redemption Rights**. The Series A Preferred Stock is not redeemable.

- **Liquidation, Dissolution, and Winding Up**. Upon the completion of a distribution pursuant to a Liquidation Event to the Series B Preferred Stock and Series C Preferred Stock, the holders of Series A Preferred Stock are entitled to receive, prior and in preference to any distribution of any proceeds to the holders of the Common Stock, by reason of their ownership thereof, $1.29 per share for each share of the Series A Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series A Preferred Stock), plus declared but unpaid dividends on such share. "Liquidation Event" is as defined in the Certificate of Incorporation and, subject to certain exceptions, includes a sale or other disposition of all or substantially all of the company's assets, certain mergers, consolidations and transfers of securities, and any liquidation, dissolution or winding up of the Company.

**Series B Preferred Stock**

Series B Preferred Stock generally have the following terms:

- **Conversion**. The Series B Preferred Stock is convertible at the option of each holder at any time into the number of shares of Common Stock determined by dividing the Series B Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series B Conversion Price, as applicable, in effect on the date the certificate is surrendered for conversion. "Series B Original Issue Price" means $8.84 per share for each share of the Series B Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series B Preferred Stock). The initial "Series B Conversion Price" is the Series B Original Issue Price, subject to adjustment as set forth in the Certificate of Incorporation. Based on this formula, the Series B Preferred Stock is currently convertible into Common Stock on a 1-for-1 basis. The Series B Preferred Stock will automatically convert into shares of Common Stock upon the earlier of (i) a Qualified Public Offering (as such term is defined in the Certificate of Incorporation) or (ii) the date specified by written consent or agreement of the holders of the then outstanding shares of Series B Preferred Stock. The Series B Preferred Stock will not be convertible by a holder to the extent that the holder or any of its affiliates would beneficially own in excess of 9.99% of the Common Stock, subject to certain protections as provided in the Certificate of Incorporation.

2

- **Redemption Rights**. The Series B Preferred Stock is not redeemable.

- **Liquidation, Dissolution, and Winding Up**. In the event of any Liquidation Event, the holders of the Series B Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series B Original Issue Price plus declared but unpaid dividends.

**Series C Preferred Stock**

Series C Preferred Stock generally have the following terms:

- **Conversion**. The Series C Preferred Stock is convertible at the option of each holder at any time into the number of shares of Common Stock determined by dividing the Series C Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series C Conversion Price, as applicable, in effect on the date the certificate is surrendered for conversion. The initial "Series C Conversion Price" is the Series C Original Issue Price, subject to adjustment as set forth in the Certificate of Incorporation. All of the Series C Preferred Stock shall automatically convert into Common Stock at any such time as (i) the shares underlying the Series C Preferred Stock are subject to an effective registration statement, (ii) the trading price for the Common Stock is more than two times the Series C Conversion Price for 20 trading days in any period of 30 consecutive trading days on Nasdaq CM and (iii) the average daily trading dollar volume of the Common Stock during such twenty trading days is equal to or greater than $4.0 million. The Series C Preferred Stock will not be convertible by a holder to the extent that the holder or any of its affiliates would beneficially own in excess of 9.99% of the Common Stock, subject to certain protections as provided in the Certificate of Incorporation.

- **Dividends**. The Series C Preferred Stock bears a cumulative 15.0% per annum fixed dividend payable no later than the 5th day after the end of each month on the Series C Original Issue Price plus unpaid accrued and accumulated dividends. "Series C Original Issue Price" means $8.84 per share for each share of the Series C Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series C Preferred Stock). Dividends on the Series C Preferred Stock are prior to any dividends on any other series of Preferred Stock or the Common Stock. The Company may elect to pay dividends for any month with a paid-in-kind election ("PIK") if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of Nasdaq and (iii) the average daily trading dollar volume of the Company's Common Stock for ten trading days in any period of twenty consecutive trading days on the NASDAQ is equal to or greater than $2 million.

- **Redemption Rights**. There is no mandatory redemption date, but, subject to the conditions set forth below, all, but not less than all, of the shares are redeemable by the Company at any time, provided that if the Company issues notice to redeem, investor shall have 15 days to convert such shares to Common Stock prior to the date of redemption. The redemption price is equal to the Series C Original Issue Price, plus accrued and accumulated dividends, (whether or not declared (the "Series C Redemption Price"). The conditions to the redemption are as follows: (i) the shares have been issued and outstanding for at least one year, (ii) the issuance of the shares of Common Stock underlying the shares has been registered pursuant to the Securities Act and the registration statement is effective, and (iii) the trading price for the Common Stock is less than the Series C Conversion Price (as such term is defined in the Certificate of Incorporation) for 20 trading days in any period of 30 consecutive trading days on the Nasdaq CM. In addition to the above, the shares are also redeemable in accordance with the following schedule provided the issuance of shares of Common Stock underlying the shares has been registered and the registration statement remains effective:

  - Year 1: No Redemption

3

- Year 2: Redemption at 120% of the Series C Redemption Price

- Year 3: Redemption at 115% of the Series C Redemption Price

- Year 4: Redemption at 110% of the Series C Redemption Price

- Year 5: Redemption at 105% of the Series C Redemption Price

- Year 6 and thereafter: Redemption at 100% of the Series C Redemption Price

- **Liquidation, Dissolution, and Winding Up**. Upon the completion of a distribution pursuant to a Liquidation Event of the Series B Preferred Stock, the holders of the Series C Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Series A Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series C Original Issue Price plus declared but unpaid dividends.

**Series D Preferred Stock**

Series D Preferred Stock generally have the following terms:

- **Voting Rights**. Except as provided by law, the Series D Preferred Stock will have no voting rights except that approval from a majority in interest of the Series D Preferred Stock, voting as a separate class, is required in the case of (i) a voluntary dissolution, liquidation or winding up of the Company or voluntary petition for bankruptcy or assignment for the benefit of creditors, (ii) a merger or consolidation of the Company with or into another entity, (iii) a Liquidation Event (as defined in the Company's Certificate of Incorporation), (iv) any amendment to the Certificate of Incorporation or the Company's bylaws which adversely affects the rights, preferences and privileges of the Series D Preferred, or (v) any authorization or issuance of any equity security (including any other security convertible into or exercisable for any such equity security) having a preference over or parity with the Series D Preferred Stock.

- **Conversion**. The Series D Preferred Stock is automatically converted into shares of Common Stock at the applicable Conversion Rate at the time in effect immediately upon (A) the issuance of shares of Common Stock underlying the Series D Preferred Stock being registered pursuant to the Securities Act and such registration remaining effective, (B) the trading price for the Company's Common Stock being more than two times the Series D Conversion Price for 20 trading days in any period of 30 consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of Common Stock during such 20 trading days is equal to or greater than $27.5 million. The Series D Preferred Stock is convertible at the option of each holder at any time into the number of shares of Common Stock determined by dividing the Series D Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series D Conversion Price (the "Conversion Rate"), in effect on the date the certificate is surrendered for conversion. The initial "Series D Conversion Price" is the Series D Original Issue Price, subject to adjustment as set forth in the Certificate of Incorporation. The Series D Preferred Stock will not be convertible by a holder to the extent that the holder or any of its affiliates would beneficially own in excess of 9.99% of the Common Stock, subject to certain protections as provided in the Certificate of Incorporation.

4

- **Dividends**. The Series D Preferred Stock bears a cumulative 15.0% per annum fixed dividend payable no later than the 5th day after the end of each month on the Series D Original Issue Price plus unpaid accrued and accumulated dividends. "Series D Original Issue Price" means for each share of the Series D Preferred Stock the lower of (i) $1.27 or (ii) the closing price of the Common Stock on the trading day immediately preceding the Purchase Date (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series D Preferred Stock). Dividends on the Series D Preferred Stock will be prior to any dividends on any other series of Preferred Stock or the Common Stock. The Company may elect to pay dividends for any month with a PIK if (i) the shares issuable further to the PIK are subject to an effective registration statement, (ii) the Company is then in compliance with all listing requirements of Nasdaq and (iii) the average daily trading dollar volume of the Company's Common Stock for ten trading days in any period of twenty consecutive trading days on the NASDAQ is equal to or greater than $27.5 million.

- **Redemption Rights**. There is no mandatory redemption date, but, subject to the conditions set forth below, all, but not less than all, of the shares will be redeemable by the Company at any time, provided that if the Company issues notice to redeem, investors shall have 15 days to convert such shares to Common Stock prior to the date of redemption. The redemption price will be equal to the Series D Original Issue Price, plus accrued and accumulated dividends, (whether or not declared (the "Series D Redemption Price"). The conditions to the redemption will be follows: (i) the shares have been issued and outstanding for at least one year, (ii) the issuance of the shares of Common Stock underlying the shares has been registered pursuant to the Securities Act and the registration statement is effective, and (iii) the trading price for the Common Stock is less than the Series D Conversion Price (as such term is defined in the Certificate of Incorporation) for 20 trading days in any period of 30 consecutive trading days on the Nasdaq CM. In addition to the above, the shares will also be redeemable in accordance with the following schedule provided the issuance of shares of Common Stock underlying the shares has been registered and the registration statement remains effective:

  - Year 1: No Redemption

  - Year 2: Redemption at 120% of the Series D Redemption Price

  - Year 3: Redemption at 115% of the Series D Redemption Price

  - Year 4: Redemption at 110% of the Series D Redemption Price

  - Year 5: Redemption at 105% of the Series D Redemption Price

  - Year 6 and thereafter: Redemption at 100% of the Series D Redemption Price

- **Liquidation, Dissolution, and Winding Up**. In the event of any Liquidation Event, the holders of the Series D Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the other series of Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series D Original Issue Price plus declared but unpaid dividends.

**Series E Preferred Stock**

Series E Preferred Stock generally have the following terms:

- **Conversion and Exchange**. The Series E Preferred Stock is convertible at the option of each holder at any time into the number of shares of Common Stock, determined by dividing the Series E Original Issue Price by the Series E Conversion Price in effect on the date of conversion. "Series E Original Issue Price" means $39.00 per share for each share of the Series E Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series E Preferred Stock). The initial "Series E Conversion Price" means $3.90 per share, subject to adjustment. Based on this formula, each share of Series E Preferred Stock is currently convertible into 10 shares of Common Stock. Shares of Series E Preferred Stock may be exchanged pursuant to the terms of the Settlement Agreement. If any shares of Series E Preferred Stock are converted, redeemed or reacquired by the Company, such shares may not be reissued and will automatically be retired and cancelled and resume the status of authorized but unissued shares of preferred stock. The Series E Preferred Stock will not be convertible by a holder to the extent that such holder or any of its affiliates would beneficially own in excess of 9.99% of the Common Stock, as further described in the Certificate of Designation.

5

- **Voting Rights**. Holders of the Series E Preferred Stock are entitled to vote on an as-converted-to-Common-Stock basis, have full voting rights and powers equal to the voting rights and powers of the holders of the Common Stock, and are entitled to vote together with the Common Stock with respect to any question upon which holders of Common Stock have the right to vote. In addition, approval of holders of a majority of the shares of Series E Preferred Stock, voting as a separate class, is required to (i) alter or change the powers, preferences or rights of the Series E Preferred Stock so as to affect them adversely, (ii) amend the Certificate of Incorporation or other charter documents in a manner adverse to the holders of Series E Preferred Stock, (iii) increase the number of authorized shares of Series E Preferred Stock, or (iv) enter into any agreement with respect to any of the foregoing.

- **Dividends**. Holders of the Series E Preferred Stock are entitled to receive dividends on shares of Series E Preferred Stock equal (on an as-if-converted-to-Common-Stock basis, disregarding for such purpose any conversion limitations hereunder) to and in the same form as dividends actually paid on shares of the Common Stock when, as and if such dividends are paid on shares of the Common Stock. No other dividends will be paid on shares of Series E Preferred Stock.

- **Liquidation, Dissolution, and Winding Up**. In the event of any Liquidation Event (as defined in the Certificate of Designation), the holders of the Series E Preferred Stock will be entitled to receive, prior and in preference to any distribution of the proceeds to the holders of the Common Stock, but subject to and after the distribution of proceeds to the Series A preferred stock, Series C preferred stock and Series D preferred stock, by reason of their ownership thereof, an amount per share equal to the Series E Original Price (as described above), plus declared but unpaid dividends on such share.

**Rights Agreement**; **Series A-1 Junior Participating Preferred Stock**

On May 1, 2024, the Board of Directors of the Company declared a dividend distribution of one right (a "Right"), for each outstanding share of Common Stock and Preferred Stock. The dividend was payable to holders of record as of the close of business on May 13, 2024 (the "Record Date"). In connection with the distribution of the Rights, the Company entered into a Rights Agreement (the "Rights Agreement"), dated as of May 1, 2024, between the Company and Continental Stock Transfer & Trust Company, as rights agent.

*Issuance of Rights*

Each holder of Common Stock and Preferred Stock (i.e., Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock) as of the Record Date received a dividend of one Right per share of Common Stock and Preferred Stock, as applicable. One Right will also be issued together with each share of Common Stock and each share of a series of Preferred Stock the terms of which provide for the holders thereof to be issued Rights issued by the Company after the Record Date and prior to the Distribution Date (as defined in below), and in certain circumstances, after the Distribution Date. New certificates for Common Stock and Preferred Stock issued after the Record Date will contain a notation incorporating the Rights Agreement by reference.

Until the Distribution Date:

- the Rights will not be exercisable;

- the Rights will be evidenced by the certificates for Common Stock or Preferred Stock, as applicable (or, in the case of book entry shares, by notation in book entry) and not by separate rights certificates; and

- the Rights will be transferable by, and only in connection with, the transfer of Common Stock or Preferred Stock.

6

*Distribution Date*; *Beneficial Ownership*

The Rights are not exercisable until the Distribution Date. As of and after the Distribution Date, the Rights will separate from the Common Stock and Preferred Stock and each Right will become exercisable to purchase one ten-thousandth of a share of Series A-1 Junior Participating Preferred Stock, par value $0.001 per share, of the Company (each whole share, a share of "A-1 Preferred Stock") at a purchase price of $30.00 (such purchase price, as may be adjusted, the "Purchase Price"). This portion of a share of A-1 Preferred Stock would give the holder thereof approximately the same dividend, voting, and liquidation rights as would one share of Common Stock. Prior to exercise, the Right does not give its holder any dividend, voting or liquidation rights.

The "Distribution Date" is the earlier of:

- ten days following a public announcement that a person has become an "Acquiring Person" by acquiring beneficial ownership of 10% or more of the Common Stock then outstanding (or, in the case of a person that had beneficial ownership of 10% or more of the outstanding Common Stock on the date the Rights Agreement was executed, by obtaining beneficial ownership of additional shares of Common Stock) other than as a result of repurchases of Common Stock by the Company or certain inadvertent acquisitions; and

- ten business days (or such later date as the Board shall determine prior to the time a person becomes an Acquiring Person) after the commencement of a tender offer or exchange offer by or on behalf of any person (other than the Company and certain related entities) that, if completed, would result in such person becoming an Acquiring Person.

A person will be deemed to "beneficially own" any Common Stock if such person or any affiliated or associated person of such person:

- is considered a "beneficial owner" of the Common Stock under Rule 13d-3 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended and as in effect on the date of the Rights Agreement;

- has the right to acquire the Common Stock, either immediately or in the future, pursuant to any agreement, arrangement, or understanding (other than a customary underwriting agreement relating to a bona fide public offering of the Common Stock) or upon the exercise of conversion rights, exchange rights, rights, warrants or options, or otherwise, except that a person will not be deemed to be a beneficial owner of (a) securities tendered pursuant to a tender offer or exchange offer by or on behalf of such person or any affiliated or associated persons of such person until the tendered securities are accepted for purchase or exchange, (b) securities issuable upon exercise of a Right before the occurrence of a Triggering Event (as defined below), or (c) securities issuable upon exercise of a Right after the occurrence of a Triggering Event if the Rights are originally issued Rights or were issued in connection with an adjustment to originally issued Rights;

- has the right to vote or dispose of the Common Stock pursuant to any agreement, arrangement, or understanding (other than a right to vote arising from the granting of a revocable proxy or consent that is not also then reportable on a Schedule 13D); or

- has an agreement, arrangement, or understanding with another person who beneficially owns Common Stock and the agreement, arrangement, or understanding is for the purpose of acquiring, holding, voting, or disposing of any securities of the Company (other than customary underwriting agreements relating to a bona fide public offering of Common Stock or a right to vote arising from the granting of a revocable proxy or consent that is not also then reportable on a Schedule 13D).

Certain synthetic interests in securities created by derivative positions-whether or not such interests are considered to be ownership of the underlying Common Stock or are reportable on a Schedule 13D-are treated as beneficial ownership of the number of shares of Common Stock equivalent to the economic exposure created by the derivative position, to the extent actual shares of Common Stock are directly or indirectly held by counterparties to the derivatives contracts. Swaps dealers unassociated with any control intent or intent to evade the purposes of the rights plan are excepted from such imputed beneficial ownership.

7

*Exempt Persons and Transactions*

The Board of Directors may, in its sole and absolute discretion, determine that a Person is exempt from the Rights Agreement (an "Exempt Person"), so long as such determination is made prior to such time as such Person becomes an Acquiring Person. Any Person will cease to be an Exempt Person if the Board of Directors makes a contrary determination with respect to such Person regardless of the reason therefor. In addition, the Board of Directors may, in its sole and absolute discretion, exempt any transaction from triggering the Rights Agreement, so long as the determination in respect of such exemption is made prior to such time as any Person becomes an Acquiring Person.

*Issuance of Rights Certificates*

As soon as practicable after the Distribution Date, the Rights Agent will mail rights certificates to holders of record of Common Stock and Preferred Stock as of the close of business on the Distribution Date and, thereafter, the separate rights certificates alone will evidence the Rights.

*Expiration of Rights*

The Rights will expire on the earliest of (a) 5:00 p.m., New York time, on May 1, 2025, (b) the time at which the Rights are redeemed (as described below), and (c) the time at which the Rights are exchanged in full (as described below) (the earliest of (a), (b) and (c) being herein referred to as the "Expiration Date").

*Change of Exercise of Rights Following Certain Events*

The following described events are referred to as "Triggering Events."

(a) Flip-In Event. In the event that a person becomes an Acquiring Person, each holder of a Right will thereafter have the right to receive, upon exercise, Common Stock (or, in certain circumstances, other securities, cash, or other assets of the Company) having a value equal to two times the Purchase Price. Notwithstanding any of the foregoing, following the occurrence of a person becoming an Acquiring Person, all Rights that are, or (under certain circumstances specified in the Rights Agreement) were, beneficially owned by any Acquiring Person (or by certain related parties) will be null and void.

(b) Flip-Over Events. In the event that, at any time after a person has become an Acquiring Person, (i) the Company engages in a merger or other business combination transaction in which the Company is not the continuing or surviving corporation or other entity, (ii) the Company engages in a merger or other business combination transaction in which the Company is the continuing or surviving corporation and the Common Stock of the Company are changed or exchanged, or (iii) 50% or more of the Company's assets or earning power is sold or transferred, each holder of a Right (except Rights that have previously been voided as set forth above) shall thereafter have the right to receive, upon exercise, common shares of the acquiring company having a value equal to two times the Purchase Price.

*Redemption*

At any time prior to the earlier of (a) a person becoming an Acquiring Person and (b) the Expiration Date (as defined in the Rights Agreement), the Board may direct the Company to redeem the Rights in whole, but not in part, at a price of $0.001 per Right (payable in cash, Common Stock, or other consideration deemed appropriate by the Board). Immediately upon the action of the Board directing the Company to redeem the Rights, the Rights will terminate and the only right of the holders of Rights will be to receive the $0.001 redemption price.

8

*Exchange of Rights*

At any time after a person becomes an Acquiring Person but before any person acquires beneficial ownership of 50% or more of the outstanding Common Stock, the Board may direct the Company to exchange the Rights (other than Rights owned by such person or certain related parties, which will have become null and void), in whole or in part, at an exchange ratio of one share of Common Stock per Right (subject to adjustment). The Company may substitute shares of A-1 Preferred Stock (or shares of a class or series of the Company's preferred stock having equivalent rights, preferences, and privileges) for Common Stock at an initial rate of one one-thousandth of a share of A-1 Preferred Stock (or of a share of a class or series of the Company's preferred stock having equivalent rights, preferences, and privileges) per share of Common Stock. Immediately upon the action of the Board directing the Company to exchange the Rights, the Rights will terminate and the only right of the holders of Rights will be to receive the number of shares of Common Stock (or one ten-thousandth of a share of A-1 Preferred Stock or of a share of a class or series of the Company's preferred stock having equivalent rights, preferences, and privileges) equal to the number of Rights held by such holder multiplied by the exchange ratio.

*Adjustments to Prevent Dilution*; *Fractional Shares*

The Board may adjust the Purchase Price, the number of shares of A-1 Preferred Stock or other securities or assets issuable upon exercise of a Right, and the number of Rights outstanding to prevent dilution that may occur (a) in the event of a stock dividend on, or a subdivision, combination, or reclassification of, the A-1 Preferred Stock, (b) in the event of a stock dividend on, or a subdivision or combination of, the Common Stock, (c) if holders of the A-1 Preferred Stock are granted certain rights, options, or warrants to subscribe for A-1 Preferred Stock or convertible securities at less than the current market price of the A-1 Preferred Stock, or (d) upon the distribution to holders of the A-1 Preferred Stock of evidences of indebtedness or assets (excluding regular periodic cash dividends) or of subscription rights or warrants (other than those referred to above).

With certain exceptions, no adjustment in the Purchase Price will be required until cumulative adjustments amount to at least 1% of the Purchase Price. No fractional shares of A-1 Preferred Stock will be issued (other than fractions that are integral multiples of one one-thousandth of a share of A-1 Preferred Stock), and in lieu thereof, an adjustment in cash may be made based on the market price of the A-1 Preferred Stock on the last trading date prior to the date of exercise.

*No Stockholder Rights Prior to Exercise*; *Tax Considerations*

Until a Right is exercised, the holder thereof, as such, will have no rights as a stockholder of the Company, including, without limitation, the right to vote or to receive dividends. While the distribution of the Rights will not be taxable to stockholders or to the Company, stockholders may, depending upon the circumstances, recognize taxable income in the event that the Rights become exercisable for Common Stock (or other consideration) of the Company or for common shares of the acquiring company or in the event of the redemption of the Rights as set forth above.

*Amendment of Rights Agreement*

The Company, by action of the Board, may supplement or amend any provision of the Rights Agreement in any respect without the approval of any registered holder of Rights, including, without limitation, in order to (a) cure any ambiguity, (b) correct or supplement any provision contained in the Rights Agreement that may be defective or inconsistent with other provisions of the Rights Agreement, (c) shorten or lengthen any time period under the Rights Agreement, or (d) otherwise change, amend, or supplement any provisions of the Rights Agreement in any manner that the Company deems necessary or desirable; provided, however, that no supplement or amendment made after a person becomes an Acquiring Person shall adversely affect the interests of the registered holders of rights certificates (other than an Acquiring Person or any affiliated or associated person of an Acquiring Person or certain of their transferees) or shall cause the Rights Agreement to become amendable other than in accordance with the amendment provision contained therein. Without limiting the foregoing, the Company may at any time before any person becomes an Acquiring Person amend the Rights Agreements to make provisions of the Rights Agreement inapplicable to a particular transaction by which a person might otherwise become an Acquiring Person or to otherwise alter the terms and conditions of the Rights Agreement as they may apply with respect to any such transaction.

9

**2024 Note and Warrant Financing**

On May 14, 2024, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement"), with certain investors, pursuant to which upon the terms and subject to the conditions contained therein, the investors agreed to purchase an aggregate principal amount of $52.6 million of 5% Original Issue Discount Senior Secured Notes convertible into shares of Common Stock (the "Notes") and five-year warrants exercisable for shares of Common Stock (the "Warrants"). For a period beginning on May 14, 2024 and ending on the one year anniversary from the later of (i) the date registration statements registering the shares issuable upon conversion of all of the Notes and exercise of all the Warrants is declared effective or (ii) the date the Company has obtained stockholder approval for the transaction, the investors have the right, but not the obligation, to purchase an additional $52.6 million of 5% Original Issue Discount Senior Secured Convertible Notes and related Warrants on the same terms and conditions as provided in the Securities Purchase Agreement (the "Additional Investment Rights").

On July 8, 2024, as part of the Additional Investment Right, one investor exchanged 76,923 shares of Series E Preferred Stock for an initial aggregate principal amount of $3.2 million, or $3.0 million including the 5% original issue discount, of Notes and Warrants to purchase 11,542 shares of Common Stock (subject to adjustment) (the "July 8, 2024 Exchange"). On September 25 and 27 and October 2, 2024, pursuant to the Additional Investment Rights, the investors purchased an additional initial aggregate principal amount of approximately $13.2 million (or $12.5 million excluding the 5% original issue discount) of Notes and also received Warrants exercisable, based on a cash exercise, for an aggregate of 48,928 shares of Common Stock.

On December 12, 2024, pursuant to the Additional Investment Rights, certain investors purchased an additional aggregate principal amount of approximately $4.4 million (or $4.6 million including a 5% original issue discount) of Notes and received Warrants exercisable on a cash basis for an aggregate of 16,862 shares of Common Stock. On December 12, 2024, the Company and such investors also entered into an Additional Investment Rights Agreement whereby for a one-year period ending on December 12, 2025, the investors have the right, but not the obligation, to purchase from the Company additional 5% Original Issue Discount Senior Secured Convertible Notes in an aggregate principal amount of approximately $4.6 million, and related Warrants, on the same terms and conditions as provided in the Securities Purchase Agreement.

On December 26, and December 30, 2024, pursuant to the Additional Investment Rights, the Company issued an additional aggregate principal amount of approximately $4.2 million (or $4.0 million including the 5% original issue discount) of 5% Notes and Warrants exercisable on a cash basis for an aggregate of 8,255,933 shares of Common Stock. Such Notes mature four months from the date of issuance and the outstanding principal and accrued but unpaid interest on the Notes may be converted into shares of Common Stock at the lower of (i) $1.02, (ii) 95% of the closing sale price of the Common Stock on the date that the Initial Registration Statement is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five trading days prior to such conversion date, provided that the conversion price will not be less than $0.86 per share (not subject to adjustment). The Warrants have an exercise price of $1.12 per share and may also be exercised via a cashless exercise with a floor of $1.00.

On December 31, 2024, pursuant to the Additional Investment Rights, an investor purchased an additional aggregate principal amount of approximately $5.3 million (or $5.0 million including 5% original issue discount) of Notes and also received Warrants exercisable on a cash basis for an aggregate of 19,171 shares of Common Stock. On December 31, 2024, the Company and such investor also entered into an Additional Investment Rights Agreement whereby for a one-year period ending on December 31, 2025, the investor has the right, but not the obligation, to purchase from the Company additional 5% Original Issue Discount Senior Secured Convertible Notes in an aggregate principal amount of approximately $5.3 million (or $5.03 million including the 5% original issue discount), and related Warrants, on the same terms and conditions as provided in the Securities Purchase Agreement, except for the following:

- The Conversion Price of the Notes will be equal to a 5% discount to the lower of (a) the Closing Sale Price of the Common Stock on the Trading Day immediately prior to the date of issuance of such Notes, (b) the Closing Sale Price of the Common Stock on the date on which the Initial Registration Statement (as defined in the Registration Rights Agreement) registering at least the number of shares of Common Stock equal to the Initial Required Registration Amount (as defined in the Registration Rights Agreement) is declared effective by the SEC and (c) the lowest daily VWAP in the five trading days prior to such Conversion Date, subject to adjustment as provided therein; provided, that, notwithstanding anything to the contrary contained in the Note, the Conversion Price shall not be less than a 20% discount of the price determined pursuant to prong (a); and

10

- Each Warrant will have an exercise price equal to 105% of the Closing Sale Price of the Common Stock on the Trading Day immediately prior to the date of issuance of such Warrant.

The Notes and Warrants are not convertible by a holder to the extent that the holder or any of its affiliates would beneficially own in excess of 9.9% of the Common Stock.

### Description of the Notes

The Notes accrue interest at a rate of 15% per annum, have an original issue discount of 5% and mature four months from the date of issuance. As security for payment of the amounts due and payable under the Notes, the Company granted a continuing security interest in all of its right, title and interest in, its assets, whether owned, existing, acquired or arising and wherever located.

The outstanding principal and accrued but unpaid interest on the Notes may be converted by the holder into shares of Common Stock (the "Note Shares") at the lower of (i) $549.00, (ii) 95% of the closing sale price of the Common Stock on the date that the Initial Registration Statement is declared effective, or (iii) 95% of the lowest daily volume weighted average price in the five (5) trading days prior to such conversion date, provided, that the conversion price will not be less than $1.16 per share, not subject to adjustment.

Upon any event of default, the interest rate automatically increases to 20% per annum. An event of default includes the following:

- failure to obtain stockholder approval by within 45 calendar days after the closing date for the initial closing;

- failure to maintain sufficient reserves of authorized and unissued Common Stock to redeem 250% of the maximum number of shares issuable upon conversion of all the Notes then outstanding;

- failure to maintain a transfer agent that participates in the DTC Fast Automated Securities Transfer Program;

- failure to timely deliver the shares upon conversion of the Note for a period of five business days

- failure to pay to the holder any amount due under the Note or any other related transaction document;

- failure to remove within five business days any restrictive legend from issued upon conversion or exercise of any securities acquired by the holder under the Securities Purchase Agreement;

- the occurrence of any default under or acceleration prior to maturity of any indebtedness (with certain exclusions) in an aggregate amount in excess of $300,000, subject to any cure or grace period provided, or a payment default under any such indebtedness, if such default remains uncured for a period of 10 consecutive trading days;

- bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings instituted by or against the Company, which have not been dismissed within 30 days;

- the commencement by the Company of a voluntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by it to the entry of a decree, order, judgment or other similar document in respect of the Company in an involuntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable federal, state or foreign law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the execution of a composition of debts, or the occurrence of any other similar federal, state or foreign proceeding, or the admission by it in writing of its inability to pay its debts generally as they become due, the taking of corporate action by the Company or any Subsidiary in furtherance of any such action or the taking of any action by any person to commence a UCC foreclosure sale or any other similar action under federal, state or foreign law;

11

- the entry by a court of (A) a decree, order, judgment or other similar document in respect of the Company of a voluntary or involuntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law or (B) a decree, order, judgment or other similar document adjudging the Company or any Subsidiary as bankrupt or insolvent, or approving as properly filed a petition seeking liquidation, reorganization, arrangement, adjustment or composition of or in respect of the Company under any applicable federal, state or foreign law or (C) a decree, order, judgment or other similar document appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or any Subsidiary or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree, order, judgment or other similar document or any such other decree, order, judgment or other similar document unstayed and in effect for a period of 30 consecutive days;

- a final judgment, judgments, any arbitration or mediation award or any settlement of any litigation or any other satisfaction of any claim made by any person pursuant to any litigation, with respect to the payment of cash, securities and/or other assets with an aggregate fair value in excess of $300,000 are rendered against, agreed to or otherwise accepted by, the Company and which judgments are not, within 30 days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 30 days after the expiration of such stay; provided, that any judgment which is covered by insurance or an indemnity from a credit worthy party will not be included in calculating the $300,000 amount;

- the Company breaches any representation or warranty when made, or any covenant or other term or condition of the Note or any other related transaction document, and, only, in the case of a breach of a covenant or other term or condition that is curable, if such breach remains uncured for a period of 10 consecutive trading days after the delivery by holder of written notice thereof;

- any provision of the Note or any other related transaction document cease to be valid and binding on or enforceable against the parties thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company denies in writing that it has any liability or obligation purported to be created under any transaction document; and

- failure to file annual or quarterly reports within the required periods.

### Description of the Warrants

In connection with the issuance of the Notes, the holder also received 5-year warrants exercisable for 200% of the shares of Common Stock underlying such Notes at an exercise price equal to $607.00 (105% of closing sale price of the Common Stock on execution date), subject to further adjustment (the "Warrant Shares").

The Warrants provide for cashless exercise pursuant to which the holder will receive upon exercise a "net number" of shares of Common Stock determined according to the following formula:

Net Number = (A x B) / C

For purposes of the foregoing formula:
A= The total number of shares with respect to which the Warrant is then being exercised.
B= The Black Scholes Value (as described below).
C= The lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (as such Closing Bid Price is defined therein), but in any event not less than $0.10 (as may be adjusted).

12

For purposes of the cashless exercise, "Black Scholes Value" means the Black Scholes value of an option for one share of Common Stock at the date of the applicable cashless exercise, as such Black Scholes value is determined, calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Exercise Price, as adjusted, (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable Cashless Exercise, (iv) an expected volatility equal to 135%, and (v) a deemed remaining term of the Warrant of five years (regardless of the actual remaining term of the Warrant).

The Company will have the option to require the holders to exercise the Warrants for cash, if, at any time, the following conditions are met: (i) the registration statement covering the securities has been declared effective is effective and available for the resale of the securities and no stop-order has been issued nor has the SEC suspended or withdrawn the effectiveness of the registration statement; (ii) the Company is not in violation of any of the rules, regulations or requirements of, and has no knowledge of any facts or circumstances that could reasonably lead to suspension in the foreseeable future on, the principal market; and (iii) the VWAP for each trading day during the 10 trading day period immediately preceding the date on which the Company elects to exercise this option is 250% above the exercise price.

### *Conversion of the Notes; Exercise of the Warrants*

The Company must reserve out of authorized and unissued shares a number of shares of Common Stock equal to 250% of the maximum number of shares of Common Stock that are issuable upon conversion of the Notes and exercise of the Warrants. If the Company fails to timely deliver shares upon conversion of the Notes or exercise of the Warrants, the Company will be required to either (A) pay the holder in cash for each trading day on which shares are not delivered 5% of the product of the number of shares not so issued multiplied by the closing sale price of the Common Stock on the trading day immediately preceding the required delivery date, or (B) if the holder purchases shares of Common Stock in anticipation of delivery of shares upon conversion of the Note or exercise of the Warrant, as applicable, cash in an amount equal to holder's total purchase price of such shares.

The exercise price and number of shares issuable upon conversion of the Notes or exercise of the Warrants, as applicable, will further be adjusted upon the occurrence of certain events and holders will be allowed to participate in certain issuances and distributions (subject to certain limitations and restrictions), including certain stock dividends and splits, dilutive issuances of additional Common Stock, and dilutive issuances of, or changes in option price or rate of conversion of, options or convertible securities, as well as the issuance of purchase rights or distributions of assets.

If, during restricted period, the Company effects a subsequent financing, including the issuance of options and convertible securities, any Common Stock, issued or sold or deemed to have been issued or sold for a consideration per share less than a price equal to the current conversion price of the Notes or exercise price of the Warrants (a "Dilutive Issuance"), then immediately after such issuance, the conversion price or exercise price, as applicable, will be reduced (and in no event increased) to the price per share as determined in accordance with the following formula:

$$EP2 = EP1 \times (A + B) / (A + C)$$

For purposes of the foregoing formula:

A= The total number of Note/Warrant Shares with respect to which the Note may be converted or the Warrant may be exercised.

B= The total number of shares of Common Stock that would be issued or issuable under the Dilutive Issuance if issued at a per share equal to EP1.

C= The total number of shares of Common Stock actually issued or issuable under the Dilutive Issuance.

EP1= The Conversion Price or Exercise Price, as applicable, in effect immediately prior to a Dilutive Issuance.

EP2= The Conversion Price or Exercise Price, as applicable, immediately after such Dilutive Issuance; provided, however, that such price shall in no event be less than $0.40 per share of Common Stock (as may be adjusted) with respect to the Note or $0.10 per share of Common Stock (as may be adjusted) with respect to the Warrant.

13

"Restricted period" means the period commencing on the purchase date and ending on the earlier of (i) the date immediately following the 90th day after a registration statement registering for the securities has been declared effective by the SEC and (ii) the 90th day after the securities purchased are saleable under Rule 144 without the requirement for current public information and without volume or manner of sale limitations.

The Notes and Warrants provide for certain purchase rights whereby if the Company grants, issues or sells any options, convertible securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock, then the holder will be entitled to acquire such purchase rights which the holder could have acquired if the holder had held the number of shares of Common Stock acquirable upon complete exercise of the Warrant.

**Anti-Takeover Effects of Certain Provisions of Delaware Law and Our Certificate of Incorporation and Bylaws**

Our Certificate of Incorporation, as amended, and Bylaws, as amended contain provisions that could have the effect of discouraging potential acquisition proposals or tender offers or delaying or preventing a change of control. These provisions, summarized below, are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and are designed to encourage persons seeking to acquire control of us to negotiate with our board of directors. We believe that the benefits of increased protection against an unfriendly or unsolicited proposal to acquire or restructure us outweigh the disadvantages of discouraging such proposals. Among other things, negotiation of such proposals could result in an improvement of their terms. These provisions are as follows:

- Stockholder Meetings. Under our bylaws, only the Board of Directors, the chairman of the Board, the chief executive officer, or the president (in the absence of a chief executive officer) may call special meetings of stockholders.

- No Cumulative Voting. Our Certificate of Incorporation and bylaws do not provide for cumulative voting in the election of directors.

- Amendment of Provisions in the Certificate of Incorporation. The Certificate of Incorporation will generally require the affirmative vote of the holders of at least a majority of the outstanding voting stock in order to amend any provisions of the Certificate of Incorporation concerning, among other things:

  - the required vote to amend certain provisions of the Certificate of Incorporation; and

  - the reservation of the Board of Director's right to amend the amended and restated bylaws.

- Amendment of the bylaws. An amendment of the bylaws by stockholders requires the affirmative vote of the holders of at least a majority of the outstanding voting stock.

We are subject to the provisions of Section 203 of the Delaware General Corporation Law, an anti-takeover law. Subject to certain exceptions, the statute prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder unless:

- prior to such date, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least eighty-five percent 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned (1) by persons who are directors and also officers and (2) by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

14

- on or after such date, the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least sixty-six and two-thirds percent 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

Generally, for purposes of Section 203, a "business combination" includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns or, within three (3) years prior to the determination of interested stockholder status, owned fifteen percent (15%) or more of a corporation's outstanding voting securities.

**Potential Effects of Authorized but Unissued Stock**

We have shares of Common Stock and preferred stock available for future issuance without stockholder approval. We may utilize these additional shares for a variety of corporate purposes, including future public offerings to raise additional capital, to facilitate corporate acquisitions or payment as a dividend on the capital stock.

The existence of unissued and unreserved Common Stock and preferred stock may enable our board of directors to issue shares to persons friendly to current management or to issue preferred stock with terms that could render more difficult or discourage a third-party attempt to obtain control of us by means of a merger, tender offer, proxy contest or otherwise, thereby protecting the continuity of our management. In addition, the board of directors has the discretion to determine designations, rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences of each series of preferred stock, all to the fullest extent permissible under the DGCL and subject to any limitations set forth in our Certificate of Incorporation. The purpose of authorizing the board of directors to issue preferred stock and to determine the rights and preferences applicable to such preferred stock is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing desirable flexibility in connection with possible financings, acquisitions and other corporate purposes, could have the effect of making it more difficult for a third-party to acquire, or could discourage a third-party from acquiring, a majority of our outstanding voting stock.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Continental Stock Transfer & Trust Company.

15

Exhibit 10.25(d)

**ADDITIONAL INVESTMENT RIGHT AGREEMENT**

This Additional Investment Right Agreement (the "**Additional Investment Right Agreement**"), dated as of December 12, 2024, is between Mullen Automotive Inc., a Delaware corporation (the "**Company**"), and the investors listed on the signature page attached hereto (each, an "**Investor**" and, collectively, the "**Investors**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement, dated as of May 14, 2024, between the Company and the Buyers named therein (the "**Purchase Agreement**").

A. Pursuant to Section 4(k) of the Purchase Agreement, each Buyer has the right, until July 9, 2025, at any time from time to time, in its sole and absolute discretion to purchase from the Company Additional Notes in an amount equal to such Buyer's pro rata portion of up to an aggregate principal amount of $50,000,000 (approximately $52.6 million including the 5% original discount) on the same terms and conditions as applicable to the purchase and Sale of the Convertible Notes.

B. The Investors have agreed to effectuate as of the date hereof Additional Purchases pursuant to Section 4(k) of the Purchase Agreement in the amounts set forth on the signature page hereto (the "**December Additional Purchase**").

C. In connection with such Additional Purchase, the Company has agreed each Investor an additional right to purchase from the Company Additional Notes in an amount equal to such Investor's December Additional Purchase on the same terms and conditions as set forth in Section 4(k) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each Investor hereby agree as follows:

1. Additional Investment Right. Beginning on the date hereof and ending on December 12, 2025, each Investor shall have the right, but not the obligation, at any time from time to time, in its sole and absolute discretion to purchase from the Company Additional Notes in an amount equal to such Investor's December Additional Purchase on the same terms and conditions as set forth in Section 4(k) of the Purchase Agreement (the "**Additional Investment Right**").

2. Stockholder Approval. The Company shall take all action necessary in accordance with applicable Law, its organizational documents and the rules of the Principal Exchange to establish a record date for, duly call, give notice of, convene and hold a meeting of its stockholders (the "**Stockholder Meeting**") as promptly as reasonably practicable for the purpose of obtaining the approval of its stockholders for the issuance of Common Stock pursuant to this Additional Investment Right Agreement in accordance with the applicable rules of the Principal Market ("**Stockholder Approval**"). The Company shall, in consultation with the Investors, prepare and file with the SEC as promptly as practicable, and in any event by December 27, 2024, a preliminary version of the Proxy Statement to be sent to Company's stockholders in connection with the Stockholder Meeting. If, prior to the expiration of the ten (10) day waiting period provided in Rule 14a-6 under the 1934 Act, the Company does not receive either (i) comments from the SEC on the preliminary Proxy Statement or (ii) notice from the SEC that it will review the preliminary Proxy Statement, then the Company shall file definitive proxy materials (including the definitive Proxy Statement) with the SEC and cause the definitive Proxy Statement to be mailed to the Company's stockholders as soon as reasonably practicable, and in any event not later than two (2) Business Days after the expiration of such waiting period, the Company shall use commercially reasonable efforts to resolve all SEC comments, if any, with respect to the Proxy Statement as promptly as practicable after receipt thereof. Promptly following confirmation by the SEC that the SEC has no further comments, the Company shall cause the definitive Proxy Statement to be filed with the SEC and mailed to the Company's stockholders. The Company shall be responsible for 100% of the fees, costs and expenses associated with the preparation, filing and mailing of the Proxy Statement. The Company shall use its reasonable best efforts to solicit proxies to obtain the Stockholder Approval.

3. <u>Miscellaneous</u>. Section 10 of the Purchase Agreement is hereby incorporated by reference herein.

[*signature pages follow*]

**IN WITNESS WHEREOF,** each Investor and the Company has caused its signature page to this Agreement to be duly executed as of the date first written above.

COMPANY:

**MULLEN AUTOMOTIVE INC.**

By: /s/ David Michery

Name: David Michery
Title: Chairman and CEO

[Signature page to Additional Investment Right Agreement]

IN WITNESS WHEREOF, each Investor and the Company has caused its signature page to this Agreement to be duly executed as of the date first written above.

INVESTOR:

Esousa Group Holdings, LLC                                  Additional Purchase Amount: $2,376,973.68

By:   /s/ Michael Wachs
Name: Michael Wachs
Title: Managing Member

JADR Capital 2 Pty Ltd.                                     Additional Purchase Amount: $742,736.84

By:   /s/ Justin Davis-Rice
Name: Justin Davis-Rice
Title: Sole Director

Jim Fallon                                                 Additional Purchase Amount: $1,162,105.27

/s/ Jim Fallon

Jess Mogul                                                 Additional Purchase Amount: $290,526.31

/s/ Jess Mogul

Phil Bannister                                             Additional Purchase Amount: $21,052.64

/s/ Phil Bannister

Mario Silva                                                Additional Purchase Amount: $36,315.79

/s/ Mario Silva

*Additional Purchase Amounts include 5% original issue discount of aggregate principal amount.*

[Signature page to Additional Investment Right Agreement]

**Exhibit 10.25(e)**

### ADDITIONAL INVESTMENT RIGHTS AGREEMENT

This Additional Investment Right Agreement (the "**Additional Investment Rights Agreement**"), dated as of December 31, 2024, is between Mullen Automotive Inc., a Delaware corporation (the "**Company**"), and the investor listed on the signature page attached hereto (the "**Investor**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement, dated as of May 14, 2024, between the Company and the Buyers named therein (the "**Purchase Agreement**").

A. Pursuant to Section 4(k) of the Purchase Agreement, each Buyer has the right, until July 9, 2025, at any time from time to time, in its sole and absolute discretion to purchase from the Company Additional Notes in an amount equal to such Buyer's pro rata portion of up to an aggregate principal amount of $50,000,000 (approximately $52.6 million including the 5% original discount) on the same terms and conditions as applicable to the purchase and Sale of the Convertible Notes.

B. The Investor has agreed to effectuate as of the date hereof an Additional Purchase pursuant to Section 4(k) of the Purchase Agreement in the amount set forth on the signature page attached hereto (the "**December Additional Purchase**").

C. In connection with such Additional Purchase, the Company has agreed to grant the Investor an additional right to purchase from the Company Additional Notes in an amount equal to the Investor's December Additional Purchase on the same terms and conditions as set forth in Section 4(k) of the Purchase Agreement, except as provided for herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each Investor hereby agree as follows:

1. <u>Additional Investment Right</u>. Beginning on the date hereof and ending on December 31, 2025, the Investor shall have the right, but not the obligation, at any time from time to time, in its sole and absolute discretion to purchase from the Company Additional Notes in an amount equal to such Investor's December Additional Purchase on the same terms and conditions as set forth in Section 4(k) of the Purchase Agreement; *provided*; *however*, that the following terms shall apply to any Notes and Warrants issued pursuant to this Additional Investment Rights Agreement:

- The Conversion Price of Notes shall be equal to a 5% discount to the lower of (a) the Closing Sale Price of the Common Stock on the Trading Day immediately prior to the date of issuance of such Notes, (b) the Closing Sale Price of the Common Stock on the date on which the Initial Registration Statement (as defined in the Registration Rights Agreement) registering at least the number of shares of Common Stock equal to the Initial Required Registration Amount (as defined in the Registration Rights Agreement) is declared effective by the SEC and (c) the lowest daily VWAP in the five trading days prior to such Conversion Date, subject to adjustment as provided herein; *provided*, that, notwithstanding anything to the contrary contained in the Note, the Conversion Price shall not be less than a 20% discount of the price determined pursuant to prong (a) (the "**Conversion Price Floor**"). For the avoidance of doubt, the Conversion Price Floor shall not be subject to adjustment provided for in this Note that is otherwise applicable to the Conversion Price.

1

- Each Warrant shall have an exercise price equal to 105% of the Closing Sale Price of the Common Stock on the Trading Day immediately prior to the date of issuance of such Warrant (the "**Exercise Price**").

- Item "C" of the Cashless Exercise formula set forth in Section 1(d) of teach Warrant shall be as follows:

"C = The lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (as such Closing Bid Price is defined in Section 16 herein), but in any event not less than $0.01 (as may be adjusted for stock dividends, subdivisions, or combinations in the manner described in Section 2(a) herein)."

2. <u>Stockholder Approval</u>. The Company shall take all action necessary in accordance with applicable Law, its organizational documents and the rules of the Principal Exchange to establish a record date for, duly call, give notice of, convene and hold a meeting of its stockholders as promptly as reasonably practicable for the purpose of obtaining the approval of its stockholders for the issuance of Common Stock pursuant to this Additional Investment Rights Agreement in accordance with the applicable rules of the Principal Market ("**Stockholder Approval**"). The Company shall, in consultation with the Investor, prepare and file with the SEC as promptly as practicable, an amendment to its Preliminary Proxy Statement filed with the SEC on December 30, 2024 in connection with its annual meeting of stockholders scheduled to be held on February 27, 2025. If, prior to the expiration of the ten (10) day waiting period provided in Rule 14a-6 under the 1934 Act, the Company does not receive either (i) comments from the SEC on the preliminary Proxy Statement or (ii) notice from the SEC that it will review the preliminary Proxy Statement, then the Company shall file definitive proxy materials (including the definitive Proxy Statement) with the SEC and cause the definitive Proxy Statement to be mailed to the Company's stockholders as soon as reasonably practicable, and in any event not later than two (2) Business Days after the expiration of such waiting period, the Company shall use commercially reasonable efforts to resolve all SEC comments, if any, with respect to the Proxy Statement as promptly as practicable after receipt thereof. Promptly following confirmation by the SEC that the SEC has no further comments, the Company shall cause the definitive Proxy Statement to be filed with the SEC and mailed to the Company's stockholders. The Company shall be responsible for 100% of the fees, costs and expenses associated with the preparation, filing and mailing of the Proxy Statement. The Company shall use its reasonable best efforts to solicit proxies to obtain the Stockholder Approval.

3. <u>Miscellaneous</u>. Section 10 of the Purchase Agreement is hereby incorporated by reference herein.

[*signature pages follow*]

2

**IN WITNESS WHEREOF,** each Investor and the Company has caused its signature page to this Agreement to be duly executed as of the date first written above.

COMPANY:

**MULLEN AUTOMOTIVE INC.**

By: /s/ David Michery
Name: David Michery
Title: Chairman and CEO

[Signature page to Additional Investment Right Agreement]

**IN WITNESS WHEREOF,** each Investor and the Company has caused its signature page to this Agreement to be duly executed as of the date first written above.

**INVESTOR:**

**Esousa Group Holdings, LLC**                    Additional Purchase Amount: $5,263,157.89

By:/s/ Michael Wachs
Name: Michael Wachs
Title: Managing Member


*Additional Purchase Amount includes 5% original issue discount of aggregate principal amount.*

[Signature page to Additional Investment Right Agreement]

Exhibit 10.29(a)

**AMENDMENT TO PURCHASE AGREEMENT**

**THIS AMENDMENT TO THE PURCHASE AGEEMENT** ("Amendment") dated this 4rd day of November 2024 is by and between Mullen Automotive, Inc. ("Mullen") and Volt Mobility Holding Ltd ("VMHL"), VoltiE Group ("VoltiE"), and The Lessor Car Rental LLC trading as Volt Mobility ("Lessor Car Rental").

**BACKGROUND**

A.   On August 23, 2024, Mullen and VMHL and VoltiE entered into a Purchase Agreement ("Agreement") wherein Volt agreed to purchase 3,000 Class 3 commercial electrical vehicles commencing with 3 00 units in the remainder of 2024 with the balance of 2,700 units to be purchased in 2025. The purchase, being initial or in whole, is contingent to Mullen team USA supporting The Lessor team Dubai to complete a successful homologation and testing thereof.

B.   Shortly after entering into the Agreement, the engaged parties realized that VMHL was erroneously stated and defined in the agreement for what it was licensed for in the United Arab Emirates ("UAE"). Accordingly, VMHL wishes to assign its rights and obligations to Lessor Car Rental.

C.   Lessor Car Rental LLC, established in 2020, is engaged as an operational leasing business trading as "Volt Mobility". It operates from Dubai office located at DIC Building 2, UAE and is wholly owned and operated by the same individual that own and operate VMHL.

D.   The Parties now desire to amend the Agreement on the terms and conditions set forth in this Amendment.

E.   This Amendment is the first amendment to the Agreement.

F.   References in this Amendment to the Agreement are to the Agreement as previously amended or varied.

**IN CONSIDERATION OF** the Parties agreeing to amend their obligations under the existing Agreement and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to keep, perform, and fulfill the promises, conditions, and agreements below:

**AMENDMENTS**

1.   The Agreement is amended as follows:

a.   VMHL hereby assigns all of its rights and obligations under the Agreement with Mullen and VoltiE in whole to The Lessor Car Rental and The Lessor Car Rental along with VoltiE and Mullen consent to the transfer of all of the rights and obligations under the Agreement as the assignee.

**NO OTHER CHANGE**

2.   Except as otherwise expressly provided in this Amendment, all of the terms and conditions of the Agreement remain unchanged and in full force and effect.

**MISCELANEOUS TERMS**

3.   Capitalized terms not otherwise defined in this Amendment will have the meanings ascribed to them in the Agreement. Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Amendment. Words in the singular mean and include the plural and vice versa. Words in the masculine include the feminine and vice versa. No regard for gender is intended in the language of this Agreement.

**GOVERNING LAW**

4.   This Amendment shall be construed in accordance with and its performance shall be governed by the laws of the State of California. The courts of California shall have exclusive jurisdiction to hear and determine all claims, disputes, actions or suits which may arise hereunder.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Amendment to be executed by their duly authorized representatives on the date first above written.

VoltiE Group

By:   /s/ Abraham Bencomo
Name:  Abraham Bencomo
Title:   Executive Coordinator


The Lessor Car Rental LLC

By:   /s/ Sophia Nau
Name:  Sophia Nau
Title:   Managing Director

Volt Mobility

By:   /s/ Sophia Nau
Name:  Sophia Nau
Title:   Managing Director


Mullen Automotive, Inc.

By:   /s/ Marianne McInerney
Name:  Marianne McInerney
Title:   Chief Strategy Officer

2

**Exhibit 10.3(a)**

**Amendments
to
2022 Performance Stock Award Agreement
and
2023 Performance Stock Award Agreement**

This Amendments to 2022 Performance Stock Award Agreement and 2023 Performance Stock Award Agreement (the "Amendments") is entered into as of December __, 2024 between Mullen Automotive Inc. (the "Company") and David Michery ("Participant").

WHEREAS, the Company and Participant entered into that certain Performance Stock Award Agreement, dated May 5, 2022 (the "2022 PSA Agreement"), and that certain Performance Stock Award Agreement, dated June 8, 2023(the "2022 PSA Agreement" and together with the 2022 PSA Agreement, the "PSA Agreements"). Capitalized terms used in this Amendment and not defined herein shall have the meaning assigned to such term in the PSA Agreements, as applicable.

WHEREAS, certain milestones in the PSA Agreements expire during 2024 and 2025;

WHEREAS, the Company wishes to incentivize Participant in his continued leadership of the Company on a long-term basis while aligning his interests with those of the Company's other stockholders and providing significant stockholder value;

WHEREAS, the parties hereto mutually desire to amend the PSA Agreements as herein set forth and are executing and delivering the Amendments for such purpose.

NOW, THEREFORE, in consideration of the premises, the terms and conditions set forth in this Amendments, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Amendment to 2022 PSA Agreement**. The first sentence of the CAPITAL BENCHMARK MILESTONES set forth in Table 1.B. of Section I. is hereby deleted in its entirety and replaced with the following:

"For each $100 Million raised (a "Capital Tranche"), and subject to an aggregate maximum of raised of $1.0 Billion in equity or debt financing between the Date of Grant and the end of July 2026, the Company will issue to Participant a number of shares of Common Stock equal to 1% of Mullen's then-current total issued and outstanding shares of Common Stock as of the date a Capital Tranche is achieved."

2. **Amendments to 2022 PSA Agreement**

   (a) Subsections (ii) and (iii) of the VEHICLE COMPLETION MILESTONES set forth in Section II(a) are hereby deleted in their entirety and replaced with the following:

   "(ii) Full USA certification and homologation of the Bollinger B1 sports car by end of June 2026; and

(iii) Full USA certification and homologation of the Bollinger B2 sports car by end of June 2026."

(b)   REVENUE BENCHMARK MILESTONES set forth in Section II(b) is hereby deleted in its entirety and replaced with the following:

"For each $25 Million of revenue recognized by the Company (each a "Revenue Tranche"), and subject to an aggregate maximum of recognized revenue of $250 Million between the Date of Grant and the end of December 2027, the Company will issue to Participant a number of shares of Common Stock equal to 1% of Mullen's then-current total issued and outstanding shares of Common Stock as of the date a Revenue Tranche is achieved."

(c)   Subsection (iii) of the BATTERY DEVELOPMENT MILESTONES set forth in Section II(c) is hereby deleted in its entirety and replaced with the following:

"(iii) The Company either directly or in collaboration with a joint venture partner scaling its battery cells in the USA to the vehicle pack level for the Mullen Class 3 vehicle by the end of December 2025;"

(d)   JV-ACQUISITION MILESTONES set forth in Section II(d) is hereby deleted in its entirety and replaced with the following

"If Mullen enters into a partnership, joint venture, purchase and sale or similar transaction by the end of 2026 where the Company acquires a majority interest in a enterprise that manufacturers or provides vehicles, vehicle equipment, battery cells, accessories or other products beneficial to the Company, the Company will issue to Participant a number of shares of Common Stock equal to 3% of Mullen's then-current total issued and outstanding shares of Common Stock as of date the JV-Acquisition milestone is achieved."

3. **<u>Stockholder Approval</u>**. In the event that the Company's stockholders do not approve the Amendments within twelve (12) months following the date hereof, the Award automatically will be forfeited as of such date and Participant shall have no further rights to the Award or any Shares underlying the Award. In no event may the Award or any portion thereof be exercised before the Company's stockholders approve the Award, notwithstanding any vesting of all or a portion of the Award prior to such stockholder approval.

4. **<u>Amendment</u>**. The parties agree that notwithstanding anything contained in the PSA Agreements to the contrary, the provisions set forth in the Amendments shall be deemed to be part of the 2022 PSA Agreement and 2023 PSA Agreement, as applicable, and shall supersede any contrary provisions in such PSA Agreements and prevail and control for all purposes. The Amendments embody the entire agreement and understanding among the parties hereto in respect of the matters contemplated hereby and supersedes all prior or contemporaneous agreements and understandings of the parties, verbal or written, relating to the subject matter hereof. Except as modified herein, all of the other terms, covenants and conditions of the PSA Agreements are hereby ratified and affirmed and the same shall remain in full force and effect.

5. **<u>Counterparts</u>**. This agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. The signatures of the parties to this agreement may be delivered by facsimile or as an attachment to an email (e.g., as a PDF file) and such delivery is effective delivery of such facsimile or email attachment.

6. **Reference to Agreement**. On and after the date hereof, each reference in the 2022 PSA Agreement and 2023 PSA Agreement to "this Agreement," "hereof," "herein," "herewith," "hereunder" and words of similar import shall, unless otherwise stated, be construed to refer to such PSA Agreement as amended by the Amendments. No reference to the Amendments need be made in any instrument or document at any time referring to the 2022 PSA Agreement or 2023 PSA Agreement and a reference to the 2022 PSA Agreement and 2023 PSA Agreement in any such instrument or document shall be deemed to be a reference to the such PSA Agreement as amended by the Amendments.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have caused the Amendments to be executed as of the date first written above.

MULLEN AUTOMOTIVE INC.

By:_____
Name:
Title:

PARTICIPANT

David Michery

_____
(signature)

**Exhibit 10.31**

<u>**SETTLEMENT AGREEMENT AND STIPULATION**</u>

THIS SETTLEMENT AGREEMENT and STIPULATION (this "Agreement") is dated as of November 19, 2024 (the "Settlement Date") by and between Mullen Automotive, Inc. ("MULN" or the "Company"), a corporation formed under the laws of the State of Delaware, and the other parties whose names appear on the signature page hereto, (the "Creditors").

BACKGROUND:

WHEREAS, the Creditors hold bona fide outstanding liabilities of the Company in an aggregate amount of not less than $20,459,826 in the form of the convertible notes attached and annexed hereto and incorporated herein (hereinafter collectively referred to as the "Convertible Notes") purchased from MULN pursuant to that certain Securities Purchase Agreement, dated as of May 14, 2024, by and among MULN and Creditors (the "Securities Purchase Agreement");

WHEREAS, due to a cross-default under the terms of the Convertible Notes, the Company is in default under the Convertible Notes and the aggregate outstanding principal and accrued but unpaid interest is past due;

WHEREAS, MULN and the Creditors desire to resolve, settle, and compromise among other things the liabilities as more particularly set forth on Schedule A and the Convertible Notes (hereinafter collectively referred to as the "Claims").

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings specified or indicated (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"AGREEMENT" shall have the meaning specified in the preamble hereof.

"CLAIM AMOUNT" shall mean $20,459,826.

1

"COMMON STOCK" shall mean the Company's common stock, $0.001 par value per share, and any shares of any other class of common stock whether now or hereafter authorized, having the right to participate in the distribution of dividends (as and when declared) and assets (upon liquidation of the Company).

"COURT" shall mean Circuit Courts within the Eleventh Judicial Circuit of Florida.

"DRS" shall have the meaning specified in Section 4.

"DTC" shall have the meaning specified in Section 4.

"DWAC" shall have the meaning specified in Section 4.

"FAST" shall have the meaning specified in Section 4.

"SALE PRICE" shall mean the Sale Price of the Common Stock on the Principal Market.

"PRINCIPAL MARKET" shall mean the Nasdaq National Market, the Nasdaq SmallCap Market, CBOE, OTC Markets, OTC Pink, the Over the Counter Bulletin Board, QB marketplace, the American Stock Exchange or the New York Stock Exchange, whichever is at the time the principal trading exchange or market for the Common Stock.

"TRADING DAY" shall mean any day during which the Principal Market shall be open for business.

"TRANSFER AGENT" shall mean the transfer agent for the Common Stock (and to any substitute or replacement transfer agent for the Common Stock upon the Company's appointment of any such substitute or replacement transfer agent).

2. Fairness Hearing. Upon the execution hereof, Company and the Creditors agree, pursuant to Section 3(a)(10) of the Securities Act of 1933 (the "Act"), to expeditiously submit the terms and conditions of this Agreement to the Court for a hearing on the fairness of such terms and conditions, and the issuance exempt from registration of the Settlement Shares. This Agreement shall become binding upon the parties only upon entry of an order by the Court substantially in the form annexed hereto as Exhibit A (the "Order").

2

3. <u>Settlement Shares</u>. Following entry of an Order by the Court in accordance with Paragraph 2 herein and the execution by the Creditors and Company of the Stipulation and Order of Dismissal (as defined below) subject to paragraph 8 herein, Company shall issue and deliver to the Creditors shares of its Common Stock in accordance with the terms of the Convertible Notes or, in lieu thereof but only to the extent that the issuance of Common Stock would cause a violation of Section 2(e) of the Convertible Note, prefunded warrants exercisable for Common Stock in the form attached hereto as Exhibit B (the "Prefunded Warrants"). Such Common Stock issued pursuant to the terms hereof, including Common Stock issued pursuant to the exercise of Prefunded Warrants, is referred to herein as the "Settlement Shares."

4. No later than the first business day following the date that the Court enters the Order, time being of the essence, Company shall: (i) transmit via email, facsimile and overnight delivery an irrevocable and unconditional instruction to Company's stock transfer agent in the form annexed hereto as Exhibit C; and (ii) issue and deliver to the Creditors the Settlement Shares and/or Prefunded Warrants in one or more tranches as necessary, with any Settlement Shares being issued and delivered as Direct Registration Systems (DRS) shares to the Creditors' accounts with the Depository Transfer Company (DTC) or through the Fast Automated Securities Transfer (FAST) program of DTC's Deposit/Withdrawal Agent Commission (DWAC) system, without any legends or restrictions on transfer, sufficient to satisfy the compromised amount, through the issuance of freely trading securities issued pursuant to Section 3(a)10 of the Securities Act. Pursuant to this Agreement, any Creditor may deliver a request to MULN either directly or through Company's Transfer Agent pursuant to Exhibit "I" of the Convertible Note which states the applicable conversion price (designated in U.S. dollars) and the number of shares of Common Stock to be issued to such Creditor. The Company shall be fully responsible for all of the Transfer Agent's costs for each and every conversion of the Claims into Settlement Shares pursuant to this section which shall be promptly paid upon request by said Transfer Agent of MULN. The Company further irrevocably and unconditionally authorizes the Company's Transfer Agent to provide any Creditor with the Company's current capital structure, including, but not limited to the Company's current Issued and Outstanding shares at any time upon the request of such Creditor to the Company's Transfer Agent.

<div align="center">3</div>

5. <u>Necessary Action</u>. At all times after the execution of this Agreement and entry of the Order by the Court, each party hereto agrees to take or cause to be taken all such necessary action including, without limitation, the execution and delivery of such further instruments and documents, as may be reasonably requested by any party for such purposes or otherwise necessary to effect and complete the transactions contemplated hereby.

6. <u>Releases</u>. Upon receipt of all of the Settlement Shares for and in consideration of the terms and conditions of this Agreement, and except for the obligations, representations, indemnifications pursuant to paragraph 16 herein and covenants arising or made hereunder or a breach hereof, the parties hereby release, acquit and forever discharge the other and each, every and all of their current and past officers, directors, stockholders, affiliated corporations, subsidiaries, agents, employees, representatives, attorneys, predecessors, successors and assigns (the "Released Parties"), of and from any and all claims, damages, cause of action, suits and costs, of whatever nature, character or description, whether known or unknown, anticipated or unanticipated, which the parties may now have or may hereafter have or claim to have against each other with respect to the Claims. Nothing contained herein shall be deemed to negate or affect the Creditors' rights and title to any securities heretofore issued to it by Company or any subsidiary of Company.

<div align="center">4</div>

7. <u>Representations</u>. Company hereby represents, warrants and covenants to the Creditors as follows:

a.  There are Five Billion (5,000,000,000) shares of Common Stock of the Company authorized as of November 13, 2024, of which approximately Nine Million Five Hundred Nineteen Thousand and Nine (9,519,009) Shares of Common Stock are issued and outstanding as of November 13, 2024; and Four Billion Nine Hundred Ninety Million Four Hundred Eighty Thousand Nine Hundred Ninety-One (4,990,480,991) Shares of Common Stock are available for issuance pursuant hereto;

b. The shares of Common Stock to be issued pursuant to the Order are duly authorized, and when issued will be duly and validly issued, fully paid and non-assessable, free and clear of all liens, encumbrances and preemptive and similar rights to subscribe for or purchase securities;

c. The shares will be exempt from registration under the Securities Act and issuable without any restrictive legend;

d. The Company has complied with and shall continue to comply with all covenants and obligations provided for in the Convertible Notes and the Securities Purchase Agreement, except those that may be deemed to be superseded by this Agreement; provided, however, that the Company agrees that no covenant or obligation in the Convertible Notes or Securities Purchase Agreement relating to the rights of the Creditors thereunder, the obligations of the Company to pay expenses or indemnify the Creditors or the procedures for conversion of the principal and accrued but unpaid interest under the Convertible Note into Common Stock shall be deemed to have been superseded by this Agreement;

5

e. As of the date of this Agreement, the execution of this Agreement and performance of the Order by Company and the Creditors will not (1) conflict with, violate or cause a breach or default under any agreements between Company and any creditor of the Company (or any affiliate thereof), or (2) require any waiver, consent, or other action of the Company or any creditor, or their respective affiliates, that has not already been obtained;

f. Without limitation, the Company hereby waives any provision in any agreement related to the Claims requiring payments to be applied in a certain order, manner, or fashion, or providing for exclusive jurisdiction in any court other than this Court;

g. The Company has all necessary power and authority to execute, deliver and perform all of its obligations under this Agreement;

h. The Company has obtained stockholder approval in compliance with Nasdaq Listing Rule 5635(d) to authorize the issuance of shares of Common Stock in connection with the conversion or exchange of all Convertible Notes;

i. The corporate issuance shall be made without preferred sufficient subscription rights of the existing Shareholder's or holders of Securities granting access to the Company's capital;

j. The execution, delivery and performance of this Agreement by Company has been duly authorized by all requisite action on the part of Company and its Board of Directors (including a majority of its independent directors), and this Agreement has been duly executed and delivered by Company;

6

k. Other than actions contemplated by this Agreement, there is no action based on the Claims that is currently pending in any court or other legal venue, and no judgments based upon the Claims have been previously entered in any legal proceeding;

l. No Creditor is nor within the past ninety (90) days has any Creditor been, directly or indirectly, through one or more intermediaries in control, controlled by, or under common control with, the Company and is not an affiliate of the Company as defined in Rule 144 promulgated under the Act;

m. Company is operational and is a non-shell company within the meaning of Rule 405 and all applicable Securities Rules and Registration pertaining thereto;

n. Company has not received any notice (oral or written) from the SEC or Principal Market regarding a halt, limitation or suspension of trading in the Common Stock; and

o. Company represents that each Claim being purchased pursuant hereto is a bona-fide Claim against the Company and that Schedule A and the Convertible Notes underlying each Claim are accurate representations of the nature of the debt and the amounts and securities owed by the Company to the Creditors and that the borrowed funds which gave rise to the Claims were received by the Company;

7

p. Company acknowledges that, pursuant to the terms of the Convertible Notes, the Creditors or their affiliates may from time to time, hold outstanding securities of the Company which may be convertible in shares of the Company's common stock at a floating conversion rate tied to the current market price for the stock. The number of shares of Common Stock issuable pursuant to this Agreement may increase substantially in certain circumstances, including, but not necessarily limited to the circumstance wherein the trading price of the Common Stock declines. The Company's executive officers and directors have studied and fully understand the nature of the transaction contemplated by this Agreement and recognize that they have a potential dilutive effect. The board of directors of the Company has concluded in its good faith business judgment that such transaction is in the best interests of the Company. The Company specifically acknowledges that its obligation to issue the Settlement Shares is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other stockholders of the Company. The Board of Directors of the Company has further given its consent for each conversion of the Claims for shares of stock pursuant to this Agreement.

q. None of the transactions agreements or proceedings described above is part of a plan or scheme to evade the registration requirements of the Securities Act and MULN and the Creditors are acting and has acted in an arms length capacity.

8. <u>Continuing Jurisdiction</u>. Simultaneously with the execution of this Agreement, the attorneys representing the parties hereto will execute a stipulation of dismissal substantially in the form annexed hereto as Exhibit D (the "Stipulation of Dismissal"). The parties hereto expressly agree that said Stipulation of Dismissal shall not be filed, but shall be held in escrow by counsel for the Creditors, until such time that Company has fully complied with all of its obligations pursuant to this Agreement. In order to enable the Court to grant specific enforcement or other equitable relief in connection with this Agreement, (a) the parties consent to the jurisdiction of the Court for purposes of enforcing this Agreement, and (b) each party to this Agreement expressly waives any contention that there is an adequate remedy at law or any like doctrine that might otherwise preclude injunctive relief to enforce this Agreement.

<div align="center">8</div>

9. <u>Conditions Precedent/ Default</u>.

a. If Company shall default in promptly delivering the Settlement Shares to any Creditor in the form and mode of delivery as required by Paragraphs 2, 3, 4 and 6 herein or otherwise fail in any way to fully comply with the provisions thereof;

b. If the Order shall not have been entered by the Court on or prior to ninety (90) days after execution of this Agreement;

c. If the Company shall fail to comply with the Covenants set forth in Paragraph 15 hereof;

d. If Bankruptcy, dissolution, receivership, reorganization, insolvency or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors or other legal proceedings for any reason shall be instituted by or against the Company; or if the trading of the Common Stock shall have been halted, limited, or suspended by the SEC or on the Principal Market; or trading in securities generally on the Principal Market shall have been suspended or limited; or, minimum prices shall have been established for securities traded on the Principal Market, or Creditors' selling brokers, or eligible for delivery via DTC or DWAC; or any portion of the Common Stock is for any reason not eligible or unable to be deposited and/or cleared through any Creditor's broker, brokerage account and/or clearing agent for trade without restriction on the Principal Market pursuant to the requirements of this Agreement; or the Common Stock is no longer eligible for book transfer delivery via DWAC; or the Company is delinquent or has not made its required Securities and Exchange Commission filings or disclosures in whole or in part; or if any time; or there shall have been any material adverse change (i) in the Company's finances or operations, or (ii) in the financial markets such that, in the reasonable judgment of the Creditors, makes it impracticable or inadvisable to trade the Settlement Shares; and such suspension, limitation or other action is not cured within three (3) trading days; then the Company shall be deemed in default of this Agreement and Order and this Agreement and/or any remaining obligations, in whole or in part, of any Creditor pursuant to this Agreement shall be voidable in the sole discretion of such Creditor, unless otherwise agreed by written agreement of the parties;

9

e. In the event that the Company fails to fully comply with the conditions precedent as specified in paragraph 9a. through 9d. herein (the "Conditions Precedent"), or the Conditions Precedent are not fully met or satisfied, then the Company shall be deemed in default of the agreement and each Creditor, at its option and in its sole discretion, may declare Company to be in default of the Agreement and Order in whole or in part, and this Agreement and/or any remaining obligations of such Creditor, in whole or in part pursuant to this Agreement shall be voidable in the sole discretion of such Creditor, unless otherwise agreed by written agreement of such Creditor and the Company. In said event, such Creditor shall have no further obligation to comply with the terms of this Agreement. In the event Company is declared to be in default in whole or in part, Company shall remain fully obligated to comply with the terms of this Agreement for issuance of shares of stock to all Creditors pursuant to the terms of this Agreement, Schedule A, as well as the Order approving same. In any Creditor's sole discretion, such Creditor may declare a partial default pursuant to the terms of this Agreement, including, but not limited to Company's full compliance and satisfaction of its obligations and the Conditions Precedent herein as it relates to the Claims. In the event that a partial default is declared, then the remaining obligations of such Creditor and Company pursuant to this Agreement, shall remain in full force and effect unless otherwise defaulted. In the event that Company is declared to be in default of this Agreement prior to successful deposit and clearance of all of the Settlement Shares, Company shall further remain fully obligated for issuance of all Settlement Shares pursuant to paragraph 3 herein.

<div align="center">10</div>

10. Information. Company and each Creditor each represent that prior to the execution of this Agreement, they have fully informed themselves of its terms, contents, conditions and effects, and that no promise or representation of any kind has been made to them except as expressly stated in this Agreement.

11. Ownership and Authority. Company and each Creditor represent and warrant that they have not sold, assigned, transferred, conveyed or otherwise disposed of any or all of any claim, demand, right, or cause of action, relating to any matter which is covered by this Agreement, that each is the sole owner of such claim, demand, right or cause of action, and each has the power and authority and has been duly authorized to enter into and perform this Agreement and that this Agreement is the binding obligation of each, enforceable in accordance with its terms.

12. No Admission. This Agreement is contractual and it has been entered into in order to compromise disputed claims and to avoid the uncertainty and expense of the litigation. This Agreement and each of its provisions in any orders of the Court relating to it shall not be offered or received in evidence in any action, proceeding or otherwise used as an admission or concession as to the merits of the Action or the liability of any nature on the part of any of the parties hereto except to enforce its terms.

13. Binding Nature. This Agreement shall be binding on all parties executing this Agreement and their respective successors, assigns and heirs.

11

14. <u>Authority to Bind</u>. Each party to this Agreement represents and warrants that the execution, delivery and performance of this Agreement and the consummation of the transactions provided in this Agreement have been duly authorized by all necessary action of the respective entity and that the person executing this Agreement on its behalf has the full capacity to bind that entity. Each party further represents and warrants that it has been represented by independent counsel of its choice in connection with the negotiation and execution of this Agreement, and that counsel has reviewed this Agreement. Company further represents and warrants that they have had corporate legal counsel review and agree to the terms of this Agreement independent of counsel of their choosing to represent Company at any fairness hearing or hearings to approve this Agreement.

15. <u>Covenants</u>.

a. Immediately upon the signing of the Settlement Order by the Court, the Company shall cause to be filed a Form 8-K with the Securities and Exchange Commission disclosing the settlement or Press Release as applicable. The Company shall further immediately file such additional SEC filings as may be or are required in respect of the transactions.

b. Each Creditor hereby covenants that they have not provided any funds or other consideration to the Company for purposes of entering into this Agreement and have no intent to do so.

12

16. <u>Indemnification</u>. Company covenants and agrees to indemnify, defend and hold each Creditor and its agents, employees, representatives, officers, directors, stockholders, controlling persons and affiliates (each, an "Indemnified Party") harmless arising from or incident or related to this Agreement, including, without limitation, any claim or action brought derivatively or by the stockholders of the Company and further, harmless against any charges, claims, suits, losses, expenses, damages, obligations, fines, judgments, liabilities, costs and expenses (including actual costs of investigation and reasonable attorney's fees) whether brought by an individual or entity or imposed by a court of law or by administrative action of any Federal, State or Local governmental body or agency, administrative agency or regulatory authority related to arising in any manner out of, based upon or in connection with (a) any untrue statement or alleged untrue statement of a material fact made by the Company or any omission or alleged omission of the Company to state a material fact required to be stated herein or in any seller document or necessary to make the statements therein not misleading or (b) the inaccuracy or breach of any covenant, representation or warranty made by the Company contained herein or in any seller document or (c) any transaction, proposal or any other matter contemplated herein. The Company will promptly reimburse the Indemnified Parties for all expenses (including reasonable fees and expenses of legal counsel) as incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim related to or arising in any manner out of any matter contemplated by this Agreement, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a formal party to any such proceeding. This Agreement specifically includes, but is not limited to the foregoing concerning any claim that any Creditor is in violation of or has violated Section 5 of the Securities Act of 1933, as amended, for unlawful or unauthorized sale of securities based upon such Creditor's reliance on representations of Company or misrepresentations of Company pursuant to (a), (b) or (c) herein. Notwithstanding the foregoing, the Company shall not be liable in respect of any claims that a court of competent jurisdiction has judicially determined by final judgment (and the time to appeal has expired or the last right of appeal of has been denied) which resulted solely or in part from the willful misconduct of an Indemnified Party or the willful violation of any securities law or regulations by the Indemnified Party. The Company further agrees that it will not, without the prior written consent of any impacted Creditor, settle, compromise or consent to the entry of any judgment in any pending or threatened proceeding in respect of which indemnification may be sought hereunder (whether or not such Creditor or any Indemnified Party is an actual or potential party to such proceeding), unless such settlement, compromise or consent includes an unconditional release of al impacted Creditors and each other Indemnified Party hereunder from all liability arising out of such proceeding. In order to provide for just and equitable contribution in any case in which (i) an Indemnified Party is entitled to indemnification pursuant to this Agreement but it is judicially determined by the entry of a final judgment decree by a court of competent jurisdiction and (the time to appeal has expired or the last right of appeal has been denied) that such indemnification may not be enforced in such case, or (ii) contribution may be required by the Company in circumstances for which an Indemnified Party is otherwise entitled to indemnification under the Agreement, then, and in each such case, the Company shall contribute to the aggregate losses, claims and damages and/or liabilities in an amount equal to the amount for which indemnification was held unavailable.

The Company further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the Creditors' agreement hereunder except for claims that a court of competent jurisdiction shall have determined by final judgment (and the time to appeal has expired or the last right of appeal has been denied) resulted solely or in part from the willful misconduct of such Indemnified Party or the willful violation of any securities laws or regulations by an Indemnified Party. The indemnity, reimbursement and contribution obligations of the Company set forth herein shall be in addition to any liability which the Company may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party.

13

17. <u>Legal Effect</u>. The parties to this Agreement represent that each of them has been advised as to the terms and legal effect of this Agreement and the Order provided for herein, and that the settlement and compromise stated herein is final and conclusive forthwith, shall supersede all prior written or oral between the parties, subject to the conditions stated herein.

18. <u>Mutual Drafting</u>. Each party has participated jointly in the drafting of this Agreement which each party acknowledges is the result of negotiation between the parties and the language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent. If ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party to this Agreement by virtue of the authorship of any of the provisions of this Agreement.

19. <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of any Creditor in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

20. <u>Waiver of Defense</u>. Each party hereto waives a statement of decision, and the right to appeal from the Order after its entry. Company further waives any defense based on the rule against splitting causes of action. The prevailing party in any motion to enforce the Order shall be awarded its reasonable attorney fees and expenses in connection with such motion. Except as expressly set forth herein, each party shall bear its own attorneys' fees, expenses and costs.

21. <u>Signatures</u>. This Agreement may be signed in counterparts and the Agreement, together with its counterpart signature pages, shall be deemed valid and binding on each party when duly executed by all parties. Facsimile and electronically scanned signatures shall be deemed valid and binding for all purposes. This Agreement may be amended only by an instrument in writing signed by the party to be charged with enforcement thereof. This Agreement supersedes all prior agreements and understandings among the parties hereto with respect to the subject matter hereof.

<div align="center">14</div>

22. <u>Choice of Law, Etc</u>. Notwithstanding the place where this Agreement may be executed by either of the parties, or any other factor, all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Florida, applicable to agreements made and to be fully performed in that State and without regard to the principles of conflicts of laws thereof (whether of the State of Florida or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of Florida. Any action brought to enforce, or otherwise arising out of this Agreement shall be brought only in State Court sitting in the Eleventh Judicial Circuit, State of Florida. The parties hereby irrevocably submit to the jurisdiction of the State Court sitting in the Eleventh Judicial Circuit, State of Florida, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waive, and agree not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the Eleventh Judicial Circuit, State of Florida, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

23. <u>Inconsistency</u>. In the event of any inconsistency between the terms of this Agreement and any other document executed in connection herewith, the terms of this Agreement shall control to the extent necessary to resolve such inconsistency.

<div align="center">15</div>

24. NOTICES. Any notice required or permitted hereunder shall be given in writing (unless otherwise specified herein) and shall be deemed effectively given on the earliest of

(a) the date delivered, if delivered by personal delivery as against written receipt therefore or by confirmed facsimile transmission,

(b) the fifth business day after deposit, postage prepaid, in the United States Postal Service by registered or certified mail, or

(c) the second business day after mailing by domestic or international express courier, with delivery costs and fees prepaid,

(d) the date delivered, if delivered by email,

in each case, addressed to each of the other parties thereunto entitled at the following addresses (or at such other addresses as such party may designate by ten (10) days' advance written notice similarly given to each of the other parties hereto):

Company:

Mullen Automotive Inc.
1405 Pioneer Street
Brea, California 92821
Attn:
Telephone No.:
E-mail:

with a copy to:

Jones Day
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Attn: Katherine J. Blair
Telephone No.:
E-mail: kblair@jonesday.com

16

IN WITNESS WHEREOF, the parties have duly executed this Settlement Agreement and Stipulation as of the date first indicated above.

_____

**MULLEN AUTOMOTIVE INC.**

By: /s/ David Michery
Name: David Michery
Title: Chairman and CEO

17

IN WITNESS WHEREOF, the parties have duly executed this Settlement Agreement and Stipulation as of the date first indicated above.

**Esousa Group Holdings, LLC**

By: /s/ Michael Wachs
Name: Michael Wachs
Title: Managing Member

**JADR Capital 2 Pty Ltd**.

By: /s/ Justin Davis-Rice
Name: Justin Davis-Rice
Title: Sole Director

**Jim Fallon**

/s/ Jim Fallon

**Jess Mogul**

/s/ Jess Mogul

**Michael Friedlander**

/s/ Michael Friedlander

**Phil Bannister**

/s/ Phil Bannister

**Matthew Krieger**

/s/ Matthew Krieger

**Mario Silva**

/s/ Mario Silva

18

**EXHIBIT A**

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR ‗ COUNTY, FLORIDA

[],
a [],

     Plaintiff,

v. Case No.

‗,
a ‗ Corporation,
Defendant.
‗/

**ORDER GRANTING APPROVAL OF SETTLEMENT AGREEMENT AND STIPULATION**

This matter having come on for a hearing on the ‗ day of ‗, 2023, to approve the Settlement Agreement entered into as of ‗, 202‗ between Plaintiff, ‗ ("Plaintiff") and Defendant, ‗("Defendant" and collectively with Plaintiff, the "Parties"), and the Court having held a hearing as to the fairness of the terms and conditions of the Settlement Agreement and Stipulation and being otherwise fully advised in the premises, the Court hereby finds as follows:

1. The Court has been advised that the Parties intend that the sale of the Shares (as defined by the Settlement Agreement and, hereinafter, the "Shares") to and the resale of the Shares by Plaintiff in the United States, assuming satisfaction of all other applicable securities laws and regulations, will be exempt from registration under the Securities Act of 1933 (the "Securities Act") in reliance upon Section 3(a)(10) of the Securities Act based upon this Court's finding herein that the terms and conditions of the issuance of the Shares by Defendant to Plaintiff are fair to Plaintiff;

19

2. The hearing having been scheduled upon the consent of Plaintiff and Defendant, Plaintiff has had adequate notice of the hearing and Plaintiff is the only party to whom Shares will be issued pursuant to the Settlement Agreement;

3. The terms and conditions of the issuance of the Shares in exchange for the release of certain claims as set forth in the Settlement Agreement are fair to Plaintiff, the only party to whom the Shares will be issued;

4. The fairness hearing was open to Plaintiff. Plaintiff was represented by counsel at the hearing who acknowledged that adequate notice of the hearing was given and consented to the entry of this Order.

It is hereby ORDERED AND ADJUDGED that the Settlement Agreement and Stipulation is hereby approved as fair to the party to whom the Shares will be issued, within the meaning of Section 3(a)(10) of the Securities Act and that the sale of the Shares to Plaintiff and the resale of the Shares in the United States by Plaintiff, assuming satisfaction of all other applicable securities laws and regulations, will be exempt from registration under the Securities Act of 1933. The Settlement Agreement and Stipulation entered into between the parties is hereby approved and the parties are ordered to comply with same. The Circuit Court of the Eleventh Judicial Circuit in and for _ County, Florida reserves jurisdiction over the parties to this action as well as the subject matter herein for purposes of contempt and enforcement of the Settlement Agreement and Stipulation as well as for such other purposes as allowed by law.

20

SO ORDERED, this _ day of _, 202_.

_____
The Honorable_

Conformed copies to:
, Esq.
, Esq.

21

**EXHIBIT B**

FORM OF PREFUNDED WARRANT

(see attached)

22

**PRE-FUNDED WARRANT**

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE CORPORATION REQUESTS, AN OPINION SATISFACTORY TO THE CORPORATION TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

Original Issue Date: [●]

FOR VALUE RECEIVED, Mullen Automotive Inc., a Delaware corporation (the "**Company**"), hereby certifies that [●], or its registered assigns (the "**Holder**") is entitled to purchase from the Company [●] duly authorized, validly issued, fully paid, and nonassessable shares of Common Stock at a purchase price per share of $0.001 (the "**Exercise Price**"), all subject to the terms, conditions, and adjustments set forth below in this Warrant. Certain capitalized terms used herein are defined in Section 1 hereof.

This Warrant has been issued pursuant to the terms of the Settlement Agreement and Stipulation, dated as of November 19, 2024, among the Company, the Holder and the other investors named therein (the "**Settlement Agreement**").

1. Definitions. As used in this Warrant, the following terms have the respective meanings set forth below:

"**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to Section 3 hereof, multiplied by (b) the Exercise Price.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day, except a Saturday, Sunday, or legal holiday, on which banking institutions in the city of New York, New York are authorized or obligated by law or executive order to close.

"**Closing Bid Price**" means, for any security as of any date, the last closing bid price for such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the average of the bid prices, or the ask prices, respectively, of all of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Bid Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price (as the case may be) of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

"**Common Stock**" means the common stock, par value $0.001 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**Company**" has the meaning set forth in the preamble.

"**Convertible Securities**" means any securities (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

"**Exercise Date**" means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in Section 3 shall have been satisfied at or prior to 5:00 p.m., New York, New York time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Notice, the Warrant and the Aggregate Exercise Price.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exercise Notice**" has the meaning set forth in Section 3(a)(i).

"**Exercise Period**" has the meaning set forth in Section 2.

"**Exercise Price**" has the meaning set forth in the preamble.

"**Holder**" has the meaning set forth in the preamble.

"**Options**" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"**Original Issue Date**" means [●].

"**OTC Bulletin Board**" means the Financial Industry Regulatory Authority OTC Bulletin Board electronic inter-dealer quotation system.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

"**Pink OTC Markets**" means the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB and OTC Pink.

"**Securities Purchase Agreement**" means the Securities Purchase Agreement, dated as of May 14, 2024, among the Company, the Holder and the other investors named therein.

2

"**Settlement Agreement**" has the meaning set forth in the preamble.

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Common Stock or other capital stock of the Company then purchasable upon exercise of this Warrant in accordance with the terms of this Warrant.

2. Term of Warrant. Subject to the terms and conditions hereof, at any time or from time to time after the date hereof and prior to 5:00 p.m., New York, New York time, on the fifth (5th) anniversary of the date hereof or, if such day is not a Business Day, on the next preceding Business Day (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares purchasable hereunder (subject to adjustment as provided herein).

3. Exercise of Warrant.

(a) Exercise Procedure. This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

(i) surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft, or destruction), together with an Exercise Notice in the form attached hereto as **Exhibit A** (each, an "**Exercise Notice**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii) payment to the Company of the Aggregate Exercise Price in accordance with Section 3(b).

(b) Payment of the Aggregate Exercise Price. Payment of the Aggregate Exercise Price shall be made, at the option of the Holder as expressed in the Exercise Notice, by the following methods:

(i) by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price;

(ii) by instructing the Company to withhold a number of Warrant Shares then issuable upon exercise of this Warrant with an aggregate value based on the Closing Bid Price as of the Exercise Date equal to such Aggregate Exercise Price

(iii) by surrendering to the Company (x) Warrant Shares previously acquired by the Holder with an aggregate value based on the Closing Bid Price as of the Exercise Date equal to such Aggregate Exercise Price and/or (y) other securities of the Company having a value as of the Exercise Date equal to the Aggregate Exercise Price (which value in the case of debt securities shall be the principal amount thereof plus accrued and unpaid interest, in the case of preferred stock shall be the liquidation value thereof plus accumulated and unpaid dividends and in the case of shares of Common Stock shall be the aggregate value based on the Closing Bid Price); or

3

(iv) any combination of the foregoing.

In the event of any withholding of Warrant Shares or surrender of other equity securities pursuant to Section 3(b)(ii), 3(b)(iii), or 3(b)(iv) above where the number of shares whose value is equal to the Aggregate Exercise Price is not a whole number, the number of shares withheld by or surrendered to the Company shall be rounded down to the nearest whole share.

(c) Delivery of Stock. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by e-mail an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as **Exhibit B**, to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (the "**Required Delivery Date**"), the Company shall (i) provided that the Transfer Agent is participating in The Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program (which the Company shall cause the Transfer Agent to do at Holder's request) and provided the legends would be eligible to be removed from such shares of Common Stock pursuant to Section 5(d) of the Securities Purchase Agreement, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/ Withdrawal at Custodian system, or (ii) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or the legends would not be eligible to be removed from such shares of Common Stock pursuant to Section 5(d) of the Securities Purchase Agreement, issue and deliver to the Holder or, at the Holder's instruction pursuant to the Exercise Notice, the Holder's agent or designee, in each case, in uncertificated form by means of a bookentry kept by the Company's Transfer Agent, registered in the Company's share register in the name of the Holder or its designee (as indicated in the applicable Exercise Notice), for the number of shares of Common Stock to which the Holder is entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of the book entry evidencing such Warrant Shares (as the case may be).

(d) Fractional Shares. The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant.

4

(e) Delivery of New Warrant. Unless the purchase rights represented by this Warrant shall have expired or shall have been fully exercised, the Company shall, at the time of delivery of the certificate or certificates representing the Warrant Shares being issued in accordance with Section 3(c) hereof, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unexpired and unexercised Warrant Shares called for by this Warrant. Such new Warrant shall in all other respects be identical to this Warrant.

(f) Valid Issuance of Warrant and Warrant Shares; Payment of Taxes. With respect to the exercise of this warrant, the Company hereby represents, covenants, and agrees:

(i) This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(ii) All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid, and non-assessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens, and charges.

(iii) The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares are issued without violation by the Company of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares may be listed at the time of such exercise (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).

(iv) The Company shall use its best efforts to cause the Warrant Shares, immediately upon such exercise, to be listed on any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares are listed at the time of such exercise.

(v) The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; *provided*, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

5

(g) Reservation of Shares. During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant.

(h) Limitations on Exercises and Exchanges. Notwithstanding anything to the contrary contained in this Warrant, this Warrant shall not be exercisable or exchangeable by the Holder hereof to the extent (but only to the extent) that the Holder or any of its affiliates would beneficially own in excess of 9.99% of the number of shares of Common Stock outstanding after giving effect to the issuance of Common Stock issuable upon exercise of the Warrants calculated in accordance with Section 13(d) of the Exchange Act (the "**Maximum Percentage**"). To the extent the above limitation applies, the determination of whether this Warrant shall be exercisable or exchangeable (vis-à-vis other convertible, exercisable or exchangeable securities owned by the Holder or any of its affiliates) and of which such securities shall be exercisable or exchangeable (as among all such securities owned by the Holder) shall, subject to such Maximum Percentage limitation, be determined on the basis of the first submission to the Company for conversion, exercise or exchange (as the case may be). No prior inability to exercise or exchange this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability or exchangeability. For the purposes of this paragraph, beneficial ownership and all determinations and calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Maximum Percentage beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such Maximum Percentage limitation. The limitations contained in this paragraph shall apply to a successor Holder of this Warrant. The holders of Common Stock shall be third party beneficiaries of this paragraph and the Company may not waive this paragraph without the consent of holders of a majority of its Common Stock. For any reason at any time, upon the written or oral request of the Holder, the Company shall within two (2) Business Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise or exchange of convertible or exercisable or exchangeable securities into shares of Common Stock, including, without limitation, pursuant to this Warrant or securities issued pursuant to the Securities Purchase Agreement.

6

4. <u>Adjustment to Number of Warrant Shares</u>. The number of Warrant Shares issuable upon exercise of this Warrant shall be subject to adjustment from time to time as provided in this Section 4 (in each case, after taking into consideration any prior adjustments pursuant to this Section 4).

(a) Adjustment to Number of Warrant Shares Upon Dividend, Subdivision or Combination of Common Stock. If the Company shall, at any time or from time to time after the Original Issue Date, (i) pay a dividend or make any other distribution upon the Common Stock or any other capital stock of the Company payable in shares of Common Stock or in Options or Convertible Securities, or (ii) subdivide (by any stock split, recapitalization, or otherwise) its outstanding shares of Common Stock into a greater number of shares, the number of Warrant Shares issuable upon exercise of this Warrant immediately prior to any such dividend, distribution, or subdivision shall be proportionately increased. If the Company at any time combines (by combination, reverse stock split, or otherwise) its outstanding shares of Common Stock into a smaller number of shares, the number of Warrant Shares issuable upon exercise of this Warrant immediately prior to such combination shall be proportionately decreased. Any adjustment under this Section 4(a) shall become effective at the close of business on the date the dividend, subdivision, or combination becomes effective.

(b) Adjustment to Number of Warrant Shares Upon Reorganization, Reclassification, Consolidation, or Merger. In the event of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up, or combination of shares), (iii) consolidation or merger of the Company with or into another Person, (iv) sale of all or substantially all of the Company's assets to another Person or (v) other similar transaction (other than any such transaction covered by Section 4(a), in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) stock, securities, or assets with respect to or in exchange for Common Stock, each Warrant shall, immediately after such reorganization, reclassification, consolidation, merger, sale, or similar transaction, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then exercisable under this Warrant, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Holder would have been entitled upon such reorganization, reclassification, consolidation, merger, sale, or similar transaction if the Holder had exercised this Warrant in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale, or similar transaction and acquired the applicable number of Warrant Shares then issuable hereunder as a result of such exercise (without taking into account any limitations or restrictions on the exercisability of this Warrant); and, in such case, appropriate adjustment (in form and substance satisfactory to the Holder) shall be made with respect to the Holder's rights under this Warrant to insure that the provisions of this Section 4 hereof shall thereafter be applicable, as nearly as possible, to this Warrant in relation to any shares of stock, securities, or assets thereafter acquirable upon exercise of this Warrant. The provisions of this Section 4(b) shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales, or similar transactions. The Company shall not effect any such reorganization, reclassification, consolidation, merger, sale, or similar transaction unless, prior to the consummation thereof, the successor Person (if other than the Company) resulting from such reorganization, reclassification, consolidation, merger, sale, or similar transaction, shall assume, by written instrument substantially similar in form and substance to this Warrant and satisfactory to the Holder, the obligation to deliver to the Holder such shares of stock, securities, or assets which, in accordance with the foregoing provisions, such Holder shall be entitled to receive upon exercise of this Warrant. Notwithstanding anything to the contrary contained herein, with respect to any corporate event or other transaction contemplated by the provisions of this Section 4(b), the Holder shall have the right to elect prior to the consummation of such event or transaction, to give effect to the exercise rights contained in Section 2 instead of giving effect to the provisions contained in this Section 4(b) with respect to this Warrant.

7

(c) Certain Events. If any event of the type contemplated by the provisions of this Section 4 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights, or other rights with equity features) occurs, then the Board shall make an appropriate adjustment in the number of Warrant Shares issuable upon exercise of this Warrant so as to protect the rights of the Holder in a manner consistent with the provisions of this Section 4; *provided*, that no such adjustment pursuant to this Section 4(c) shall decrease the number of Warrant Shares issuable as otherwise determined pursuant to this Section 4.

(d) Certificate as to Adjustment.

(i) As promptly as reasonably practicable following any adjustment of the number of Warrant Shares pursuant to the provisions of this Section 4, but in any event not later than five (5) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii) As promptly as reasonably practicable following the receipt by the Company of a written request by the Holder, but in any event not later than five (5) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer certifying the number of Warrant Shares or the amount, if any, of other shares of stock, securities, or assets then issuable upon exercise of the Warrant.

(e) Notices. In the event:

(i) that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon exercise of the Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, to vote at a meeting (or by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

8

(ii) of any capital reorganization of the Company, any reclassification of the Common Stock of the Company, any consolidation or merger of the Company with or into another Person, or sale of all or substantially all of the Company's assets to another Person; or

(iii) of the voluntary or involuntary dissolution, liquidation, or winding- up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Holder at least fifteen (15) days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting or consent, or other right or action, and a description of such dividend, distribution, or other right or action to be taken at such meeting or by written consent, or (B) the effective date on which such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation, or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon exercise of the Warrant) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation, or winding-up, and the amount per share and character of such exchange applicable to the Warrant and the Warrant Shares.

5. <u>Purchase Rights</u>. In addition to any adjustments pursuant to Section 4 above, if at any time the Company grants, issues, or sells any shares of Common Stock, Options, Convertible Securities, or rights to purchase stock, warrants, securities, or other property pro rata to the record holders of Common Stock (the "**Purchase Rights**"), then the Holder shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder would have acquired if the Holder had held the number of Warrant Shares acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance, or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue, or sale of such Purchase Rights.

6. [Reserved].

7. <u>Transfer of Warrant</u>. Subject to the transfer conditions referred to in the legend endorsed hereon, this Warrant and all rights hereunder are transferable, in whole or in part, by the Holder without charge to the Holder, upon surrender of this Warrant to the Company at its then principal executive offices with a properly completed and duly executed Assignment in the form attached hereto as **Exhibit C**, together with funds sufficient to pay any transfer taxes described in Section 3(f)(v) in connection with the making of such transfer. Upon such compliance, surrender, and delivery and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant, if any, not so assigned and this Warrant shall promptly be cancelled.

9

8. <u>Holder Not Deemed a Stockholder; Limitations on Liability</u>. Except as otherwise specifically provided herein, prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give, or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance, or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

9. <u>Replacement on Loss; Division and Combination</u>.

(a) Replacement of Warrant on Loss. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be a sufficient indemnity) and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company at its own expense shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for an equivalent number of Warrant Shares as the Warrant so lost, stolen, mutilated, or destroyed; *provided*, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b) Division and Combination of Warrant. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for an equivalent number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

10. <u>No Impairment</u>. The Company shall not, by amendment of its Certificate of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed by it hereunder, but shall at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may reasonably be requested by the Holder in order to protect the exercise rights of the Holder against dilution or other impairment, consistent with the tenor and purpose of this Warrant.

10

11. <u>Compliance with the Securities Act.</u>

(a) Agreement to Comply with the Securities Act; Legend. The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this Section 11 and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell, or otherwise dispose of this Warrant or any Warrant Shares to be issued upon exercise hereof except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"). This Warrant and all Warrant Shares issued upon exercise of this Warrant (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

"THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE CORPORATION REQUESTS, AN OPINION SATISFACTORY TO THE CORPORATION TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL."

(b) Representations of the Holder. In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows:

(i) The Holder is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act. The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act.

(ii) The Holder understands and acknowledges that this Warrant and the Warrant Shares to be issued upon exercise hereof are "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, such securities may be resold without registration under the Securities Act only in certain limited circumstances. In addition, the Holder represents that it is familiar with Rule 144 under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

11

(iii) The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Warrant and the Warrant Shares. The Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Warrant and the business, properties, prospects, and financial condition of the Company.

12. Warrant Register. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination, or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

13. Notices. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 10(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant, including in reasonable detail a description of such action and the reason therefor.

14. Cumulative Remedies. Except to the extent expressly provided in Section 8 to the contrary, the rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity or otherwise.

15. Equitable Relief. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction.

16. Entire Agreement. This Warrant, together with the Settlement Agreement, constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the Settlement Agreement, the statements in the body of this Warrant shall control.

12

17. <u>Successor and Assigns</u>. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

18. <u>No Third-Party Beneficiaries</u>. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Warrant.

19. <u>Headings</u>. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

20. <u>Amendment and Modification; Waiver</u>. Except as otherwise provided herein, this Warrant may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

21. <u>Severability</u>. If any term or provision of this Warrant is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

22. <u>Governing Law</u>. This Warrant shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York.

23. <u>Submission to Jurisdiction</u>. Any legal suit, action, or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the City of New York, Borough of Manhattan, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by certified or registered mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

13

24. <u>Waiver of Jury Trial</u>. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

25. <u>Counterparts</u>. This Warrant may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Warrant delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant.

26. <u>No Strict Construction</u>. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

[SIGNATURE PAGE FOLLOWS]

14

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

**MULLEN AUTOMOTIVE INC.**

By: _____
David Michery
Chief Executive Officer

Accepted and agreed,

[●]

By: _
[●]
[●]

15

**EXHIBIT A**

**NOTICE OF EXERCISE**

TO: MULLEN AUTOMOTIVE INC.

The undersigned hereby elects to purchase ___ Warrant Shares of the Company pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

(1) Payment shall take the form of (check applicable box):

[ ] in lawful money of the United States; or

[ ] if permitted the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 3(b)(ii), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 3(b)(ii).

(2) Please issue said Warrant Shares in the name of the undersigned or in such other name as is specified below:

_____

The Warrant Shares shall be delivered to the following DWAC Account Number:

_____

_____

_____

(4) <u>Accredited Investor</u>. The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

[SIGNATURE OF HOLDER]

Name of Investing Entity: ___

*Signature of Authorized Signatory of Investing Entity*: ___

Name of Authorized Signatory: ___

Title of Authorized Signatory: ___

Date: ___

**EXHIBIT B**

ACKNOWLEDGMENT

The Company hereby acknowledges this Exercise Notice and hereby directs to issue the above indicated number of shares of Common Stock to _.

MULLEN AUTOMOTIVE INC.

By:
Name:
        Title:

**EXHIBIT C**

**ASSIGNMENT FORM**

*(To assign the foregoing Warrant, execute this form and supply required information. Do not use this form to purchase shares.)*

FOR VALUE RECEIVED, the foregoing Warrant and all rights evidenced thereby are hereby assigned to

Name: _____

(Please Print)

Address: _____

(Please Print)

Phone Number: _____

Email Address: _____

Dated: __, _

Holder's Signature: _

Holder's Address: _

**EXHIBIT C**

[To be reprinted on Company letterhead]

Date

Continental Stock Transfer & Trust Company
1 State Street, Floor 30
New York, NY 10004

Ladies and Gentlemen:

Mullen Automotive, Inc, a Delaware corporation (the "Company"), and [●] (the "Investor") have entered into a 3(a)(10) Settlement Agreement dated as of _ (the "Agreement") providing for the issuance of the Settlement in the principal amount of $[●] (the "Settlement").

You are hereby irrevocably authorized and instructed to reserve a sufficient number of shares of common stock ("shares") of the Company (initially, [●] shares) for issuance upon full conversion of the Settlement in accordance with the terms thereof. The amount of shares so reserved may be increased, from time to time, only upon the written instructions of the Company.

The ability to convert the Settlement in a timely manner is a material obligation of the Company pursuant to the Settlement. **Provided you are acting as Transfer Agent at the time** and provided no single issuance is greater than 9.9% of the issued and outstanding shares of the Company, your firm is hereby irrevocably authorized and instructed to within one (1) Trading day issue shares of Common Stock of the Company to the Investor **without any further action or confirmation by the Company** upon your receipt from the Investor of: (i) a notice of conversion ("Conversion Notice") executed by the Investor, (ii) an opinion of counsel of the issuer or of the Investor hereby designated by the Company as counsel to the Company for transactions hereunder, confirming that the shares may be issued upon conversion of the Settlement without any transfer restrictions pursuant to the exemption provided by Rule 144 (or any other available exemption) under the Federal Securities Act of 1933, as amended (the "Securities Act"), and (iii) if applicable, copies of all supporting Rule 144 documentation (a seller's representation letter and a broker's representation letter if the shares have been held less than twelve months). **A copy of the Conversion Notice must be sent via email to the Company at the same time it is sent to Continental**. Such shares should be issued, at the option of the Investor as specified in the Notice of Conversion either (i) electronically by crediting the account of a Prime Broker with the Depository Trust Company through its Deposit Withdrawal at Custodian ("DWAC") system provided the Investor causes its broker or bank to initiate a DWAC deposit or (ii) in certificated form without any restrictive legend which would restrict the transfer of the shares, provided however that if such shares are not able to be sold under Rule 144 or any other exemption under the Securities Act and you have received an opinion from the Investor's counsel that the issuance of the shares is exempt from registration under the Securities Act and when issued the shares will be fully paid and non-assessable, then the issued certificates for such shares shall bear the following restrictive legend:

24

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER SAID ACT, OR AN OPINION OF COUNSEL IN FORM, SUBSTANCE AND SCOPE CUSTOMARY FOR OPINIONS OF COUNSEL IN COMPARABLE TRANSACTIONS, THAT REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT.

The shares shall remain in the created reserve with the Transfer Agent until counsel to the Investor **and** an authorized officer of the Company provides joint written instructions to the Transfer Agent that the shares or any part of them shall be taken out of the reserve and shall no longer be subject to the terms of these instructions.

The Company shall indemnify you and your officers, directors, principals, partners, agents and representatives, and hold each of them harmless from and against any and all loss, liability, damage, claim or expense (including the reasonable fees and disbursements of its attorneys) incurred by or asserted against you or any of them arising out of or in connection with the instructions set forth herein, the performance of your duties hereunder and otherwise in respect hereof, including the costs and expenses of defending yourself or themselves against any claim or liability including any claim which may be made or asserted by the Company, except that the Company shall not be liable hereunder as to matters in respect of which it is determined that you have acted with gross negligence or in bad faith. You shall have no liability to the Company and the Investor in respect of this if such action was taken or omitted to be taken in good faith, and you shall be entitled to rely in this regard and without liability on the advice of counsel, including counsel selected by you.

The Board of Directors of the Company has approved these irrevocable instructions and does hereby extend the Company's irrevocable agreement to indemnify your firm for all loss, liability or expense in carrying out the authority and direction herein contained on the terms herein set forth.

The Company agrees that in the event that you resign as the Company's transfer agent, the Company shall engage a suitable replacement transfer agent that will agree to serve as transfer agent for the Company within five (5) business days. The Company acknowledges that you will have the right to complete any issuance or conversion request received in good order prior to your resignation. It is also understood that you are permitted to resign without any stipulated conditions.

The Investor is intended to be and is a third party beneficiary hereof, and no amendment or modification to the instructions set forth herein may be made without the consent of the Investor.

25

Notwithstanding any other provision hereof, the Company and the Investor understand that you shall not be required to perform any issuance of the Shares if (a) such an issuance or transfer of Shares is in violation of any state or federal securities laws or regulations or (b) the issuance of the Shares is prohibited or stopped as required or directed by a court order from a court of competent jurisdiction. Additionally, Company and Investor understand that you shall not be required to perform any issuance of the Shares if Company is in default of its payment obligations under its agreement with you.

<div style="margin-left:45%;">

Very truly yours,

Mullen Automotive, Inc.

By: _____
Name:
Title:
Date:

</div>

Acknowledged and Agreed:

[●]

By :_
Name:
Title:
Date:

Acknowledged and Agreed:
[Transfer Agent]

By: _
Name:
Title:
Date:

<div style="text-align:center;">26</div>

**EXHIBIT D**

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR _ COUNTY, FLORIDA

[●],
a [●],
      Plaintiff,

v. Case No.

_,
a _ Corporation,
    Defendant.
_/

**STIPULATION AND ORDER OF DISMISSAL**

    **IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned, the attorneys of record for all the parties to the above-entitled action, pursuant to the Florida Rules of Civil Procedure, that whereas no party hereto is an infant or incompetent person for whom a committee has been appointed or conservatee and no person not a party has an interest in the subject matter of the action, the above-entitled action be, and the same hereby is, dismissed, each party to bear its own costs.

Dated: _, 202_.

_____          _____

SO ORDERED:          _____
                   The Honorable_

27

SCHEDULE A
CLAIMS

Convertible Notes

| Plaintiff | Date of Issuance | Outstanding Principal and Accrued but Unpaid Interest |
|---|---|---|
| Esousa Group Holdings, LLC | September 27, 2024 | $9,717,861 |
| JADR Capital 2 Pty Ltd. | July 15, 2024 | $5,635,114 |
| JADR Capital 2 Pty Ltd. | September 25, 2024 | $3,014,912 |
| Jess Mogul | July 9, 2024 | $12,357 |
| Jess Mogul | July 15, 2024 | $237,067 |
| Jess Mogul | October 2, 2024 | $107,368 |
| Jim Fallon | May 14, 2024 | $160,315 |
| Jim Fallon | July 9,2024 | $336,842 |
| Jim Fallon | July 15, 2024 | $499,620 |
| Jim Fallon | October 2, 2024 | $430,351 |
| Mario Silva | May 14, 2024 | $3,466 |
| Mario Silva | July 9, 2024 | $10,547 |
| Mario Silva | July 15, 2024 | $10,893 |
| Mario Silva | September 27, 2024 | $13,448 |
| Matthew Krieger | July 15, 2024 | $25,470 |
| Matthew Krieger | September 27, 2024 | $26,897 |
| Michael Friedlander | July 15, 2024 | $30,195 |
| Michael Friedlander | October 1, 2024 | $96,671 |
| Philip Bannister | July 9, 2024 | $34,175 |
| Philip Bannister | July 15, 2024 | $13,220 |
| Philip Bannister | September 27, 2024 | $43,035 |

28

**Exhibit 10.32**

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (the "Agreement") is entered into as of July 18, 2024, by and between MULLEN TECHNOLOGIES, INC. a California corporation ("Seller"), and MULLEN AUTOMOTIVE INC., a Delaware corporation ("Buyer").

RECITALS

A. WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, upon the terms and conditions set forth herein, certain assets of Seller.

B. WHEREAS, Exhibit A attached hereto sets forth a list of the Purchased Assets.

C. WHEREAS, Seller and Buyer have a prior affiliation and the CEO of Seller is a Board member and has a financial interest in Buyer, and while the Parties are entering into this Agreement in good faith, the Parties have agreed to the appointment of an independent valuation expert as more fully detailed below.

NOW, THEREFORE, in consideration of the above recitals and the mutual covenants, agreements, representations and warranties hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

**AGREEMENT**

1. **Purchase and Sale of the Purchased Assets**.

1.1 Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties and covenants set forth in this Agreement, Seller hereby agrees to sell, assign, transfer and convey to Buyer or its designees at the Closing Date (as defined below), and Buyer hereby agrees to purchase and acquire from Seller, or cause to be purchased and acquired from Seller, at the Closing Date, all of Seller's right, title and interest in and to the Purchased Assets.

1.2 The Purchased Assets will be sold, assigned, transferred and conveyed to Buyer on the Closing Date on an "AS IS" and "WHERE IS" basis, with no representations or warranties other than those specifically set forth below, and subject to any and all existing pledges, liens, licenses, rights of possession, security interests, restrictions, encumbrances, charges, title retention, conditional sale or other security arrangements.

2. **Assumed/Excluded Liabilities**.

2.1 Assumed Liabilities. Buyer agrees, upon consummation of, and effective as of the Closing Date, to assume the lease payment obligations from the Oceanside Lease.

2.2 Liabilities and Obligations Not Assumed. Except as expressly set forth in this Agreement, Buyer shall neither assume nor become obligated in any way to pay or perform any liabilities, debts or obligations of Seller. All liabilities, debts and obligations of Seller not expressly assumed by Buyer hereunder are hereinafter referred to as the "Excluded Liabilities."

3. **Consideration**. In consideration of the sale, conveyance, assignment, and transfer of the Purchased Assets and in full payment therefor, and after satisfaction of the conditions and deliveries listed below, Buyer agrees to assume only the Assumed Liabilities and pay to Seller cash in the aggregate amount of **$1,355,000.00 - One Million Three Hundred Fifty Five Thousand Dollars -** (collectively, the "Purchase Price"), which shall be paid to Seller at the Closing and delivered to Seller by wire transfer of immediately available funds or such other method as mutually agreed upon by the parties hereto.

4. **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by exchange of documents and signatures (or their electronic counterparts), within 3 business days of receiving approval from each of Buyer and Seller's Board of Directors to the transaction contemplated hereby, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "Closing Date."

4.1 Seller Closing Deliverables. At the Closing, Seller shall deliver to Buyer the following:

(a) a bill of sale, in the form attached hereto as Exhibit B (the "Bill of Sale"), duly executed by Seller, to transfer the Purchased Assets to Buyer;

(b) with respect to Seller, a copy of the resolutions duly adopted by the Board of Directors of Seller on behalf of Seller authorizing the execution, delivery and performance of this Agreement, any ancillary agreements and the consummation of the transactions contemplated hereby;

(c) such other customary instruments of transfer or assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement.

4.2 Buyer Closing Deliverables. At the Closing, Buyer shall deliver to Seller the following:

(a) the Purchase Price, by wire transfer of immediately available funds to the account(s) designated by Seller;

(b) the Bill of Sale, duly executed by Buyer;

(c) with respect to Buyer, a copy of the resolutions duly adopted by the board of directors of Buyer on behalf of Buyer authorizing the execution, delivery and performance of this Agreement, any ancillary agreements and the consummation of the transactions contemplated hereby and thereby, signed by the secretary (or equivalent officer) of Buyer; and

2

(d) Valuation report from a duly appointed independent third party valuation expert supporting the Consideration payable by Buyer.

(e) such other customary instruments of transfer or assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to the transactions contemplated by this Agreement.

5. **Representations and Warranties.**

5.1 <u>Seller's Representations and Warranties</u>. Except as to Seller's representations and warranties provided below, the Purchased Assets are being sold "as is" and "where is" with no express or implied representation and warranties of any kind, nature, or type whatsoever from, or on behalf of, Seller except that:

(a) Seller is a California corporation validly existing, and in good standing under the laws of the State of California;

(b) Seller has all requisite power and authority to enter into and deliver this Agreement and all other documents that Seller is required to execute and deliver hereunder and to perform its obligations hereunder. The execution, delivery and performance by Seller of this Agreement, and the consummation of all of the transactions contemplated hereby, have been duly and validly authorized by Seller. This Agreement, when signed and delivered by Seller, will be duly and validly executed and delivered and will be the valid and binding obligation of Seller, enforceable against Seller, as assignee, in accordance with its terms as governed by applicable law, regulations and rules. Neither the signing and delivery of this Agreement by Seller, nor the performance by Seller of its obligations under this Agreement, will (i) violate Seller's By-Laws (or such equivalent organizational or governing document), (ii) to the best of Seller's knowledge, violate any law, statute, rule or regulation, or order, judgment, injunction or decree of any court, administrative agency, or government body applicable to Seller, (iii) to the best of Seller's knowledge, violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under, or permit the termination of any provision of, or result in the termination of, the acceleration of the maturity of, or the acceleration of the performance of any obligation of Seller with respect to the Purchased Assets under, any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which Seller is a party or by which Seller is bound or to which Seller's properties or assets including the Purchased Assets are subject, (iv) to the best of Seller's knowledge, result in the creation or imposition of any Encumbrances upon the Purchased Assets, or (v) to the best of Seller's knowledge, result in the cancellation, modification, revocation or suspension of any licenses, permits, franchises, authorizations and approvals issued or granted to Seller by any governmental body with respect to the Purchased Assets;

(c) To the best of Seller's knowledge, there is no claim, action, arbitration, inquiry, investigation, suit or proceeding pending or threatened against Seller or Assignor that might affect in any way any of the Purchased Assets or the transactions contemplated by this Agreement, nor is Seller aware or have grounds to know of any reasonable basis therefor. To the best of Seller's knowledge, there are no judgments, decrees, injunctions or orders of any court, governmental body, department, commission, agency, instrumentality or arbitrator against Seller affecting the Purchased Assets or that is reasonably likely to interfere with the consummation of the transactions contemplated in this Agreement and the ancillary agreements; and

3

(d) No broker, finder or similar intermediary has acted for or on behalf of, or is entitled to any broker's, finder's or similar fee or other commission from, Seller in connection with this Agreement.

5.2 <u>Buyer's Representations and Warranties</u>. Buyer represents and warrants to Seller, as follows:

(a) Buyer (i) is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, and (ii) has all requisite corporate power and authority to execute, deliver, and perform the transactions contemplated hereby;

(b) Buyer has all requisite power and authority to enter into and deliver this Agreement and to perform its obligations hereunder. The execution, delivery and performance by Buyer of this Agreement, and the consummation of all the transactions contemplated hereby, have been duly and validly authorized by Buyer. This Agreement, when signed and delivered by Buyer, will be duly and validly executed and delivered and will be the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the laws relating to bankruptcy, insolvency and relief of debtors, and rules and laws governing specific performance, injunctions, relief and other equitable remedies;

(c) No authorization, approval, consent of, or filing with any governmental body, department, bureau, agency, public board, authority or other third party is required for the consummation by Buyer of the transactions contemplated by this Agreement;

(d) No person or entity acting on behalf of Buyer or any of its affiliates or under the authority of any of them is or will be entitled to any "brokers" or "finders" fee or any other commission or similar fee, directly or indirectly, from Buyer or any of its affiliates in connection with any of the transactions contemplated by this Agreement;

(e) To the best of Buyer's knowledge, there is no claim, action, arbitration, inquiry, investigation, suit or proceeding pending or threatened against Buyer that might affect in any way the transactions contemplated by this Agreement nor is Buyer aware or have grounds to know of any reasonable basis therefor. To the best of Buyer's knowledge, there are no judgments, decrees, injunctions or orders of any court, governmental body, department, commission, agency, instrumentality or arbitrator against Buyer that is reasonably likely to interfere with the consummation of the transactions contemplated in this Agreement and the ancillary agreements; and

6. **As-Is Sale; Warranty Disclaimer; Release.**

6.1 EXCEPT AS SET FORTH HEREIN, THE PURCHASED ASSETS ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT.

4

6.2 BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY ALL OF ITS RIGHT, TITLE AND INTEREST IN AND TO THE PURCHASED ASSETS TO BUYER AND BUYER SHALL ACCEPT THE PURCHASED ASSETS "AS IS, WHERE IS, WITH ALL FAULTS," EXCEPT THAT ANY RECORDED ENCUMBRANCES ATTACHED TO OR EXISTING WITH RESPECT TO THE PURCHASED ASSETS SHALL BE RELEASED AS OF THE CLOSING DATE, AND [SELLER'S] RIGHT, TI TLE AND INTERESTS IN THE PURCHASED ASSETS SHALL BE TRANSFERRED AND ASSIGNED TO BUYER AS OF THE CLOSING DATE. BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PURCHASED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PURCHASED ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS,"

7. **Notices.**

7.1 Any notice, report, approval or consent required or permitted hereunder shall be in writing and will be deemed to have been duly given if delivered personally, or mailed by first- class U.S. mail, postage prepaid to the respective addresses of the parties as set below (or such other address as a party may designate by ten (10) days written notice) on the parties as set forth below.

|  |  |
|---|---|
| To Buyer: | MULLEN AUTOMOTIVE INC.<br>Attn:<br>Address: 1405 Pioneer Street<br>　　　　Brea, CA 92821<br>E-Mail: |
| To Seller: | MULLEN TECHNOLOGIES, INC<br>Attn:<br>Address: 1405 Pioneer Street<br>　　　　Brea, CA 92821<br>E-Mail: |

8. **Non-Waiver.**

No failure to exercise, and no delay in exercising, on the part of any party, any privilege, any power or any rights hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right or power hereunder preclude further exercise of any other right hereunder.

5

9. **Severability**.

If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

10. **Choice of Law**.

This Agreement shall be deemed to have been made in, and shall be construed pursuant to the laws of the State of California and the United States without regard to conflicts of laws provisions thereof.

11. **Modifications in Writing**.

Any waivers or amendments of this Agreement or any provision hereof shall be effective only if made in writing and signed by a representative of the respective parties hereto authorized to bind the parties.

12. **Complete Agreement**.

All parties hereto agree that this Agreement and the ancillary agreements executed in connection with this Agreement are the complete and exclusive statement of the mutual understanding of the parties hereto with regard to their subject matter, and supersede and cancel all previous written and oral agreements and communications relating to the subject matter of this Agreement and the ancillary agreements executed in connection with this Agreement.

13. **Counterparts/Facsimile Signature**.

This Agreement may be executed in any number of counterparts, each of which when executed by the parties hereto and delivered shall be deemed to be an original, and all such counterparts taken together shall be deemed to be but one and the same instrument. This Agreement may be executed by .PDF or facsimile signature, and any such .PDF or facsimile signature shall be deemed to be an original signature.

*(signature page follows)*

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first indicated above.

**BUYER:**

**MULLEN AUTOMOTIVE, INC.**

By:   /s/ David Michery
Name: David Michery
Title:  CEO

**SELLER:**

**MULLEN TECHNOLOGIES, INC.**

By:   /s/ Shawn Hughes
Name: Shawn Hughes
Title:  CEO

7

**EXHIBIT A**

Purchased Assets

Assignment of the lease for the +_ 8,000 square foot premises on +_ 16,000 square feet of land located in Oceanside CA, including all equipment and inventory located in the said premises, staffing and other infrastructure for vehicle sales and repairs and all goodwill associated therewith.

**EXHIBIT B**

Bill of Sale

THIS ASSIGNMENT AND BILL OF SALE AGREEMENT (the "Agreement") is made as of [●], 2024, by and between MULLEN TECHNOLOGIES, INC, a California corporation ("Seller"), and MULLEN AUTOMOTIVE, INC., a Delaware corporation ("Buyer"). Seller and Buyer are parties to a certain Asset Purchase Agreement dated as of [●], 2024 (the "Asset Purchase Agreement"). Capitalized terms used without definitions herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

1. Sale and Assignment of Purchased Assets. Pursuant to the Asset Purchase Agreement, Buyer has on the date hereof purchased the Purchased Assets from Seller. In accordance with and subject to the terms and conditions set forth in the Asset Purchase Agreement, for good and valuable consideration, the receipt of which is hereby acknowledged, Seller does hereby sell, assign, bargain, transfer, convey and deliver unto Buyer all of its right, title and interest in and to the Purchased Assets.

2. Cooperation. Buyer and Seller agree to cooperate with each other to execute and deliver such other documents and instruments and to do such further acts and things as may be reasonably requested by the other to evidence, document, or carry out the sale of the Purchased Assets and the assumption of the Assumed Liabilities.

3. Effect of Agreement. Nothing in this Agreement shall, or shall be deemed to, modify or otherwise affect any provisions of the Asset Purchase Agreement or affect the rights of the parties under the Asset Purchase Agreement. In the event of any conflict between the provisions hereof and the provisions of the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

[REMAINDER OF PAGE LEFT BLANK]

IN WITNESS WHEREOF, Seller and Buyer have caused this Assignment and Bill of Sale Agreement to be executed on the date first written above.

**SELLER:**

**MULLEN TECHNOLOGIES, INC.**

By: _____
Name: Shawn Hughes
Title:  CEO

**BUYER:**

**MULLEN AUTOMOTIVE, INC.**

By: _____
Name: David Michery
Title:  CEO

**Exhibit 10.33**



**MULLEN AUTOMOTIVE, INC.**
**EMPLOYMENT AGREEMENT**

This Employment Agreement ("Agreement") is made as of this 5th day of August 2024, by and between John Taylor, an individual ("Employee") and Mullen Automotive, Inc., a Delaware corporation (the "Company"). Employee shall commence his duties as President and Senior Vice President of Global Manufacturing Operations ("SVP-GMO") of the Company's commercial division effective 6 August 2024.

**PREAMBLE**

The Company desires to employ Employee as the President and SVP-GMO of the Company's commercial division and to compensate Employee therefore. Employee desires to be employed by the Company and to commit to serve the Company on the terms herein provided.

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements of the parties, the parties agree as follows:

**1. Definitions**.

"Benefits" shall mean all the fringe benefits approved by the Board from time to time and established by the Company for the benefit of Employees generally, including, but not limited to, regular holidays, vacations, absences resulting from illness or accident, health insurance, disability and medical plans (including dental and prescription drug), group life insurance, and pension, profit-sharing and stock bonus plans or their equivalent.

"Board" shall mean the Board of Directors of the Company, together with an executive committee thereof (if any), as the same shall be constituted from time to time.

"Cause" shall mean any of the following: (A) conviction of, or the entry of a plea of guilty or no contest to, a felony, a crime of moral turpitude, or any other crime that causes the Company public disgrace or disrepute, or which materially and adversely affects the Company's operations or financial performance or the relationship the Company has with its customers; (B) gross negligence or willful misconduct with respect to the Company, including, without limitation fraud, embezzlement, theft or proven dishonesty in the course of Executive's employment or other service; (C) alcohol abuse or use of either illegal drugs or controlled drugs (other than in accordance with a physician's prescription); (D) refusal to perform any lawful, material obligation or fulfill any duty (other than any duty or obligation of the type described in clause (F) below) to the Company (other than due to a disability), which refusal, if curable, is not cured within 15 days after delivery of written notice thereof (and for the avoidance of doubt, the relevant refused obligation or duty will be specifically identified in such written notice); (E) material breach of any agreement with or duty owed to the Company, which breach, if curable, is not cured within 15 days after the delivery of written notice thereof (and for the avoidance of doubt, if applicable, the relevant breached duty will be specifically identified in such written notice); (F) any breach of any obligation or duty to the Company (whether arising by statute, common law or agreement) relating to confidentiality, non-competition, non-solicitation, trade secrets, and/or proprietary rights; or (G) violation of the Company's written policies or codes of conduct, including those related to discrimination, harassment, performance of illegal or unethical practices, and ethical misconduct.

1



"Change of Control" shall mean the occurrence of one or more of the following events:

- A Reorganization; or

- A sale of all or substantially all of the assets of the Company, time as its chairman.

"Chairman" shall mean the individual designated by the Board from time to time as its chairman.

"Chief Executive Officer" shall mean the individual having responsibility to the Board for direction and management of all operational affairs of the Company and who reports and is accountable only to the Board.

"Company" shall mean Mullen Automotive, Inc., a Delaware corporation and any of its subsidiaries.

"Competitive Business Activity" shall mean the development, production, marketing and sale of vehicles.

"Director" shall mean the individual designated by the Board from time to time as a director of the Company.

"Disability" shall mean a written determination by an independent physician mutually agreeable to the Company and Employee (or, in the event of Employee's total physical or mental disability, Employee's legal representative) that Employee is physically or mentally unable to perform his duties of President and SVP-GMO of the Company's commercial division under this Agreement and that such disability can reasonably be expected to continue for a period of six (6) consecutive months or for shorter periods aggregating one hundred and eighty (180) days in any twelve-(12)-month period.

"Exchange Act" shall mean the Securities Exchange Act of 1934.

"Employee" shall mean John Taylor and, if the context requires, his heirs, personal representatives, and permitted successors and assigns.

"Performance Year" shall mean each twelve-month period of employment under this Agreement commencing upon the date of this Agreement.

"Person" shall mean any natural person, incorporated entity, limited or general partnership, limited liability company, business trust, association, agency (governmental or private), division, political sovereign, or subdivision or instrumentality, including those groups identified as "persons" in §§ 13(d)(3) and 14(d)(2) of the Exchange Act.

<div style="text-align:center">2</div>



"President" shall mean the individual having responsibility to the Chief Executive Officer and Board for the day-to-day direction and management of the operational affairs of the Company's commercial division and who reports and is accountable only to the Chief Executive Officer and Board.

"Senior Vice President of Global Manufacturing Operations" shall mean the individual on the senior leadership team that is in charge of directing and managing all manufacturing activities of the Company's commercial division by developing and implementing manufacturing strategies that are in line with corporate objectives as a strategic leader to achieve operational excellence, increase productivity, and foster business expansion.

"Reorganization" shall mean any transaction, or any series of transactions consummated in a 12-month period, pursuant to which any Person acquires (by merger, acquisition, or otherwise) all or substantially all of the assets of the Company or the then outstanding equity securities of the Company and the Company is not the surviving entity, the Company being deemed surviving if and only if the majority of the Board of Directors of the ultimate parent of the surviving entity were directors of the Company prior to its organization.

"Territory" shall mean any state of the United States and any equivalent section or area of any country in which the Company has revenue-producing customers or activities.

**2. Position and Responsibilities**.

**2.01 Position**. Employee shall serve as the President and SVP-GMO of the Company's commercial division. In this capacity, Employee shall, subject to the bylaws of the Company, and to the direction of the Chief Executive Officer and the Board, serve the Company by performing such duties and carrying out such responsibilities as are normally related to the position in accordance with the standards of the industry in which the Company carries on its business.

**2.02 Reporting**. Employee, in his capacity as President and SVP-GMO of the Company's commercial division, will report directly to the Chief Executive Officer and the Board.

**2.03 Time and Efforts Covenant**. Employee will, to the best of his ability, devote such time and efforts as are necessary to the performance of his duties for the Company and its subsidiaries.

**2.04 Employee's Commitment**. During Employee's employment with the Company, Employee will not undertake or engage in any other employment, occupation or business enterprise inconsistent with his obligations under this Agreement. Subject to the foregoing, Employee agrees not to acquire, assume, or participate in, directly or indirectly, any position, investment, or interest in the Territory adverse or antagonistic to the Company, its business or prospects, financial or otherwise, or take any action towards any of the foregoing. The provisions of this Section shall not prevent Employee from owning shares of any entity engaging in Competitive Business Activity, so long as such shares (i) do not constitute more than 5% of the outstanding equity of such competitor, and (ii) are regularly traded on a national securities exchange or quoted for trading by the NASDAQ Stock Market.

3



**2.05  Relocation and Relocation Expenses**. Employee's place of employment will not be located outside the United States. In connection with Employee's employment with the Company, Employee will be expected to work out of the Company's Troy, Michigan office. To assist with the relocation, Employee will be entitled to reimbursement of all reasonable and pre-approved relocation expenses, subject to, and as outlined in the Company's Moving and Relocation Policy, which is attached hereto as Exhibit A.

Additionally, Employee shall receive a one-time payment of $100,000.00, less all applicable taxes and withholdings, for certain real estate expenses incurred as a result of said relocation. The first half of this one-time payment ($50,000.00) was made to Employee on October 4, 2024. The second half of this one-time payment was made to Employee on November 1, 2024.

**2.06 Confidential Information**. Employee recognizes and acknowledges that the Company's trade secrets and proprietary information and know how, as they may exist from time to time and to the extent, they are unique to and internally developed by the Company ("Confidential Information"), are valuable assets of the Company's business, access to and knowledge of which are essential to the performance of Employee's duties hereunder Employee will not, during or after the term of his employment by the Company, in whole or in part, disclose such secrets, information or know-how to any Person for any reason or purpose whatsoever, nor shall Employee make use of any such property for his own purposes or for the benefit of any Person (except the Company) under any circumstances during or after the term of his employment, *provided*, *however*, that after the term of his employment these restrictions shall not apply to such secrets, information and know-how which are then in the public domain (provided that Employee was not responsible, directly or indirectly, for such secrets, information or processes entering the public domain without the Company's consent). Employee shall have no obligation hereunder to keep confidential any Confidential Information if and to the extent disclosure of any thereof is specifically required by law; *provided*, *however*, that in the event disclosure is required by applicable law, the Employee shall provide the Company with prompt notice of such requirement, prior to making any disclosure, so that the Company may seek an appropriate protective order. Employee agrees to hold as the Company's property all memoranda, books, papers, letters, customer and supplier lists, processes, computer software, records, financial information, policy and procedure manuals, training and recruiting procedures and other data, and all copies thereof and therefrom, in any way relating to the Company's business and affairs, whether made by his or otherwise coming into his possession, and on termination of his employment, or on demand of the Company at any time, to deliver the same to the Company.

Employee shall use his best efforts to prevent the removal of any Confidential Information from the premises of the Company, except as required in his normal course of employment by the Company. Employee shall use his best efforts to cause all persons or entities to whom any Confidential Information shall be disclosed by him hereunder to observe the terms and conditions set forth herein as though each such person or entity was bound hereby.

4



**2.07 Records, Files**. All records, files, drawings, documents, equipment and the like relating to the business of the Company which are prepared or used by Employee during the term of his employment under this Agreement shall be and shall remain the sole property of the Company.

**2.08 Equitable Relief**. Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company. Employee further recognizes that material and intentional violations by Employee of any one or more of the provisions of this Section 2 may give rise to losses or damages for which the Company cannot be reasonably or adequately compensated in an action at law and that such material and intentional violations may result in irreparable and continuing harm to the Company. Employee agrees that, in addition to any other remedy which the Company may have at law and equity, including the right to withhold any payment of compensation under Section 3 of this Agreement, the Company shall be entitled to injunctive relief to restrain any material and intentional violation, actual or threatened, by Employee of the provisions of Section 2 of this Agreement.

**2.09 Work Products**.

(a) Employee agrees promptly to disclose and deliver to the Company any and all, and hereby assigns, transfers, and sets over to the Company, Employee's entire and exclusive right, title, and interest, including rights in the nature of patent rights, trademark rights, copyrights, trade secrets, or design rights, in and to any and all, improvements, inventions, developments, discoveries, works of authorship, innovations, systems, techniques, ideas, processes, programs, listings, and other things that may be of assistance to the Company, whether patentable or unpatentable, relating to or arising out of any development, service, or product of, or pertaining in any manner to the business of, the Company whether conceived, developed, or learned by Employee, alone or with others, during or after normal business hours, while employed by the Company (collectively, "Work Products"). These include only items that would be construed as part of the Company's business plan. Any other unrelated activities that do not relate to the business plan of the Company will be the property of any third party and/or the Employee, whichever is applicable. Any developments for any third party shall be made solely on the Employee's personal time and not during business hours. The foregoing assignment includes, without limitation, all such rights in the United States of America and throughout the world, and to any letters patent, applications for letters patent, any division, reissue, extension, continuation, or continuation in part thereof, or any copyright or trademark registrations that may be granted and issued for such Work Products. Employee hereby authorizes and requests the Commissioner of Patents and Trademarks or other appropriate government official to issue any such Letters Patent or registrations to the Company, its successors, and assigns.

(b) The parties intend that the Company have the sole and exclusive right, title, and interest in such Work Products. Employee acknowledges and agrees that all Work Products will be and remain the exclusive property of the Company and that Employee will, upon the request of the Company, and without further compensation, do all lawful things requested by the Company to ensure the Company's ownership of the Work Products, including, without limitation, the execution of all documents requested by the Company to assign and transfer to the Company and its assigns all of Employee's right, title, and interest in the Work Products, if any, and to enable the Company to file and obtain patents, copyrights, and other proprietary rights in the United States and foreign countries relating to the Work Products. Employee hereby appoints the Company as Employee's attorney-in-fact to execute all documents relating to such registrations, applications, and assignments. The provisions of this Section 2.09 will survive the expiration or termination of this Agreement for any reason.

5



**3. Compensation**.

      **3.01 Annual Compensation**. The Company shall pay to Employee for the services to be rendered hereunder an annual base salary of $360,000.00 and 75,000 restricted shares (as adjusted for any reverse stock split the Company may initiate) of common stock of the Company, post-merger, per year (the "Annual Compensation"). Employee's salary shall be payable in periodic installments in accordance with the Company's usual practice for similarly situated Employees of the Company.

      **3.02 Car Allowance**. For each month of his employment, Employee shall receive an automotive allowance of $1,000, less any applicable withholdings.

      **3.03 Incentive Compensation**. In addition to his Annual Compensation, Employee shall be entitled to receive annual incentive compensation in such further amounts, if any, as determined by the Board from time to time (the "Incentive Compensation"). The Board may designate additional Incentive Compensation, based on production and/or performance, as it desires and said additions shall be attached as an addendum to this Agreement. Any Incentive Compensation which is not deductible in the opinion of the Company's counsel under § 162(m) of the Internal Revenue Code of 1986 as amended, shall be deferred and paid, without interest, in the first year or years when and to the extent such payment may be deducted, Employee's right to such payment being absolute so long as Employee remains employed by the Company, subject only to the provisions of Section 2.09.

      **3.04 Participating in Benefits**. Employee shall be entitled to all Benefits for as long as such Benefits may remain in effect and/or any substitute or additional Benefits made available in the future to similarly situated Employees of the Company, subject to and on a basis consistent with the terms, conditions and overall administration of such Benefits adopted by the Company. Benefits paid to Employee shall not be deemed to be in lieu of other compensation to Employee hereunder as described in this Section 3.

**4. Term/Termination**.

      **4.01 Limited Duration Employment**. The Employee's employment with the Company is for one (1) year.

      **4.02 Termination by the Company for Reasons Other Than Cause**. If the Company terminates the employment of Employee and such termination is not for Cause (a "Termination by the Company for Reasons Other Than Cause"), then, the Company shall pay to Employee (i) an amount equal to Employee's Annual Compensation at the time of such termination (the "Salary Termination Payment"). The Salary Termination Payment shall be paid to Employee no later than 90 days after the date of such termination. To the extent that Employee is not fully vested in Benefits from any pension or any other retirement plan or program (whether tax qualified or not) maintained by the Company, the Company shall obtain and pay the premium upon an annuity policy to provide Employee with Benefits as though he had been fully vested on the date that his employment terminated.



**4.03 Constructive Discharge**. If the Company (a) subjects Employee to a diminution in his title(s), responsibilities, or in his then-current Annual Compensation, (b) fails to comply with the provisions of Section 3, (c) locates Employee's place of employment outside the United States, or (d) engages in any material and intentional breach of the Company's principal obligations under this Agreement which is not remedied within fifteen (15) business days after receipt of written notice from the Employee (a "Constructive Discharge"), Employee may at his option terminate his employment, and such termination shall be considered to be a Termination by the Company for Reasons Other Than Cause.

**4.04 Termination by the Company for Cause**. The Company shall have the right to terminate the employment of Employee for Cause (a "Termination by the Company for Cause"). Effective as of the date of Termination by the Company for Cause, this Agreement, except for Sections 2.06 through 2.9, shall terminate, and no further payments of the Compensation described in Section 3 (except for such remaining payments of Annual Compensation under Section 3.01 relating to periods during which Employee was employed by the Company, Benefits which are required by applicable law to be continued, and reimbursement of expenses incurred prior to such termination under Section 3.04) shall be made.

**4.05 Termination on Account of Employee's Death**. In the event of Employee's death during his employment at the Company, the Company shall pay to Employee's beneficiary or beneficiaries (or to his estate if he fails to make such a designation) an amount equal to his Annual Compensation earned through the date of Employee's death. Employee may designate one or more beneficiaries for the purposes of this Section 4.05 by making a written designation and delivering such designation to the Board of Directors. If Employee makes more than one such written designation, the designation last received before Employee's death shall control.

**4.06 Disability**. If Employee shall sustain a Disability, the Company shall continue to pay to Employee while such Disability continues the full amount of his then-current Annual Compensation for the three-month period next succeeding the date upon which such Disability shall have been so certified, as well as a prorated amount of any Incentive Compensation which would have been paid to Employee at the end of the year. Thereafter, if Employee's Disability shall continue, the employment of Employee under this Agreement shall terminate and all obligations of Employee shall cease and Employee shall be entitled to receive the Benefits, if any, as may be provided by any insurance to which he may have become entitled pursuant to Section 3.04 as well as the acceleration of the exercise date of any incentive stock options granted prior to Employee's Disability.



**5. Stock Options**. Employee will be eligible to participate in any Company stock option plan and will participate at the level of other similarly situated Employees in such plan or any future stock incentive plans established by the Company.

**6. Indemnification**. The Company shall indemnify Employee and hold Employee harmless from and against any claim, loss or cause of action arising from or out of Employee's performance as an officer, director or employee of the Company or in any other capacity, including any fiduciary capacity, in which the Employee serves at the request of the Company to the maximum extent permitted by applicable law. The Company shall advance to Employee the reasonable costs and expenses of investigating and/or defending any such claim, subject to receiving a written undertaking from Employee to repay any such amounts advanced to Employee in the event and to the extent of any subsequent determination by an agency of competent jurisdiction that Employee was not entitled to indemnification hereunder. In the event that Employee is or becomes a party to any action or proceeding in respect of which indemnification may be sought hereunder, Employee shall promptly notify the Company thereof. Following such notice, the Company shall be entitled to participate therein and, to the extent that it may wish, to assume the defense thereof with counsel satisfactory to Employee in its reasonable judgment. After notice from the Company to Employee of the Company's election to assume the defense of such Employee, the Company will not be liable to Employee hereunder for any legal or other expenses subsequently incurred by Employee in connection with the defense thereof other than reasonable costs of investigation. Employee shall not settle any action or claim against Employee without the prior written consent of the Company except at such Employee's sole cost and expense.

**7. Miscellaneous**.

**7.01 Assignment**. This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of each of the parties hereto and shall also bind and inure to the benefit of any successor or successors of the Company in a Reorganization, merger or consolidation and any assignee of all or substantially all of the Company's business and properties, but, except as to any such successor of the Company, neither this Agreement nor any rights or benefits hereunder may be assigned by the Company or Employee.

**7.02 Governing Law**. This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of California.

**7.03 Interpretation**. In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.



**7.04 Notice**. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, effective when delivered, or if delivered by express delivery service, effective when delivered, or if mailed by registered or certified mail (return receipt requested), effective three business days after mailing to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

    If to the Company to:

    Mullen Automotive, Inc.
    1405 Pioneer Street
    Brea, CA 92821

    If to Employee to:

    John Taylor

**7.05 Amendment and Waiver**. This Agreement may not be amended, supplemented or waived except by a writing signed by the party against which such amendment or waiver is to be enforced. The waiver by any party of a breach of any provision of this Agreement shall not operate to, or be construed as a waiver of, any other breach of that provision or as a waiver of any breach of another provision.

**7.06 Binding Effect**. Subject to the provisions of Sections 4 & 7 hereof, this Agreement shall be binding on the successors and assigns of the parties hereto. All obligations of Employee with respect to any shares covered by this Agreement shall, as the context requires, bind Employee's spouse and the divorce or death of such spouse shall not vitiate the binding nature of such obligation.

**7.07 Survival of Rights and Obligations**. All rights and obligations of Employee or the Company arising during the term of this Agreement shall continue to have full force and effect after the termination of this Agreement unless otherwise provided herein.

**7.08 Section Headings**. The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

**7.09 Entire Agreement**. This Agreement contains the entire understanding, and cancels and supersedes all prior agreements, including any agreement in principle or oral statement, letter of intent, statement of understanding or guidelines of the parties hereto with respect to the subject matter hereof with the exception of the January *5,* 2024 Additional Conditions of Employment agreement, attached hereto as Exhibit B.

<div align="center">9</div>



In witness whereof, on the date first written above, the undersigned do hereby agree to the terms contained herein.

**COMPANY**:

Mullen Automotive, Inc.

By: /s/ *David Michery*
Name: DAVID MICHERY
Title: CEO

**EMPLOYEE**:

By: /s/ *John Taylor*
Name: JOHN TAYLOR

10



# EXHIBIT B



**MULLEN AUTOMOTIVE, INC.**
**ADDITIONAL CONDITIONS OF EMPLOYMENT**

In addition to the compensation and benefits outlined in the Employment Agreement entered into by and between John Taylor, an individual ("Employee") and Mullen Automotive, Inc., a Delaware corporation (the "Company") on the 5th day of August 2024, the Employee and Company have agreed to following:

- A 2023 Production Bonus not to exceed $300,000;

- A 2024 Performance Award payable and predicated on the achievement of established milestones; and

- Reorganization the Company's Tunica, Mississippi facility so that Employee is responsible for overall management and direction of the facility.

**Exhibit 21.1**

<u>List of Subsidiaries</u>

| Subsidiary | Place of Organization |
|---|---|
| Ottava Automotive, Inc. | California |
| Mullen Investment Properties, LLC | Mississippi |
| Mullen Indiana Real Estate, LLC | Delaware |
| Bollinger Motors, Inc. | Delaware |
| Mullen Automotive UK Limited | United Kingdom |
| Mullen Advanced Energy Operations, LLC | California |
| Mullen Credit Corporation | Delaware |

**Exhibit 23.1**



CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements of Mullen Automotive, Inc. on Form S-8 (File Nos. 333-276539, 333-28274, 333-274113, 333-267417 and 333-266787) of our report dated January 24 2025, with respect to our audits of the consolidated financial statements of Mullen Automotive, Inc., as of September 30, 2024 and 2023 and for the years then ended, included in this Annual Report on Form 10-K of Mullen Automotive, Inc., for the fiscal year ended September 30, 2024. Our report includes an explanatory paragraph as to the Company's ability to continue as a going concern.

/s/ *RBSM LLP*

**RBSM LLP**
Larkspur, CA
January 24, 2025
PCAOB ID No. 587

**Exhibit 31.1**

**CEO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, David Michery, certify that:

1.      I have reviewed this report on Form 10-K of Mullen Automotive Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    January 24, 2025                          By:    /s/ David Michery
                                                          David Michery
                                                          Chief Executive Officer

**Exhibit 31.2**

**CFO Certification**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jonathan New, certify that:

1.      I have reviewed this report on Form 10-K of Mullen Automotive Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    January 24, 2025                         By:    /s/ Jonathan New
                                                        Jonathan New
                                                        Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K for the period ended September 30, 2024 of Mullen Automotive Inc. (the "Company") as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned, in the capacities and on the dates indicated below, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1.  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods presented in the Report.

By:    /s/ David Michery
       David Michery
       Chief Executive Officer
       January 24, 2025

By:    /s/ Jonathan New
       Jonathan New
       Chief Financial Officer
       January 24, 2025