UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 25-1187-DMG (CTSx)** | Date | September 30, 2026 |
| Title | ***In re Mullen Automotive, Inc. Securities Litigation II*** | Page | **1** of **29** |

| | |
|---|---|
| Present: The Honorable | DOLLY M. GEE, CHIEF UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| DEREK DAVIS | NOT REPORTED |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT [77]**

On July 30, 2025, co-lead Plaintiffs Muhammad Jafri and Teeluck Persad, individually and on behalf of a putative class, filed a First Amended Complaint ("FAC") against Defendants Mullen Automotive, Inc., David Michery, and Jonathan New. [Doc. # 63.] Plaintiffs bring suit against Defendants under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and the Securities and Exchange Commission's ("SEC") Rule 10b-5. Plaintiffs allege that Defendants engaged in a scheme where they made a series of misleading or false statements to inflate Mullen's stock prices, only to engage in acts—e.g., enacting reverse stock splits and selling warrants and convertibles notes to preferred investors—that benefited Defendants and harmed retail investors.

Defendants move to dismiss the entire FAC. [Doc. # 77 ("MTD").] The motion is fully briefed. [Doc. ## 80 ("Opp."), 82 ("Reply").] The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' MTD, for the reasons discussed below.

## I.
## BACKGROUND

### A. Factual Background[1]

Mullen Automotive, Inc. ("Mullen") is a small startup electric vehicle ("EV") manufacturer that has struggled to generate revenue and a gross profit.[2] FAC at ¶¶ 2, 30–31. David Michery is

[1] The Court assumes the truth of Plaintiffs' factual allegations as pleaded in the FAC, solely for the purpose of deciding Defendants' MTD.

[2] On July 15, 2025, Mullen announced that it was changing its company name to Bollinger Innovation. *Id.* at ¶ 19 n.1. Since Defendant's name was Mullen during the time period relevant to the allegations in the FAC, the Court refers to Defendant as Mullen.

Mullen's Chief Executive Officer ("CEO"), President, and Chairman of the Board, and Jonathan New serves as Mullen's Chief Financial Officer ("CFO"). *Id.* at ¶¶ 20–21. Plaintiffs bring suit on behalf of investors who acquired Mullen common stock between November 14, 2022 and June 2, 2025 ("the Class Period"). *Id.* at ¶ 1.

During the Class Period, Mullen traded common stock on the NASDAQ under the ticker symbol "MULN."[3] *Id.* at ¶¶ 19, 29. Companies seeking to maintain a NASDAQ listing must, *inter alia*, uphold a minimum bid price of at least one dollar per share ("Bid Price Requirement"). *Id.* at ¶ 36. If a company has a closing bid price of less than one dollar for 30 consecutive business days, NASDAQ notifies the company of this deficiency and provides an automatic 180-calendar-day compliance period.[4] *Id.* at ¶¶ 38–39. Generally, the deficiency can be corrected by meeting the Bid Price Requirement for at least 10 consecutive business days. *Id.* at ¶ 39. If the company fails to correct the deficiency during the compliance period, NASDAQ ordinarily issues a "delisting determination" which could be "catastrophic" because it "drastically limit[s] [a company's] ability to raise capital from outside investors." *Id.* at ¶¶ 40–41.

Plaintiffs allege that Defendants were desperate to meet the Bid Price Requirement to stay on the NASDAQ. *Id.* at ¶ 45. Accordingly, Defendants effected "reverse stock splits"[5] to increase the trading price of Mullen's shares, to attract investors and regain compliance with the Bid Price Requirement. *Id.* at ¶¶ 45, 48. Repeatedly using reverse stock splits "can obscure a company's serious financial or operational distress, potentially leading to investor confusion and making these securities susceptible to manipulation." *Id.* at ¶¶ 50–52. During the Class Period, Defendants effected seven reverse stock splits on the following dates: May 4, 2023, August 11, 2023, December 21, 2023, September 17, 2024, February 18, 2025, April 11, 2025, and June 2, 2025. *Id.* at ¶¶ 96–97.

Plaintiffs claim Mullen's "true purpose, instead of manufacturing and selling EVs, is to serve as Michery's personal slush fund." *Id.* at ¶ 53. While Mullen largely failed to generate

---

[3] On July 28, 2025, Mullen became Bollinger Innovations and its NASDAQ ticker symbol was updated to "BINI." *Id.* at ¶ 19 n.1.

[4] The FAC specifies that this was the NASDAQ rule during the Class Period, but that rule changed after the Class Period. *See id.* at ¶ 49.

[5] "A reverse stock split is a corporate action where a company reduces the total number of its outstanding shares while proportionally increasing the price per share. In other words, a reverse split merges multiple existing shares into a single share based on a predetermined ratio, such as 1-for-10, 1-for-100, etc." *Id.* at ¶ 46. "While the number of shares decreases, the price per share increases proportionally to maintain the same total value (market capitalization) of the company and investment." *Id.* at ¶ 47.

revenue and incurred substantial losses during the Class Period, Michery was compensated millions of dollars. *Id.* at ¶¶ 54–56. In addition, Michery used Mullen's funds to obtain perks for himself, family, and close associates. *Id.* at ¶¶ 59–68, 70–72. Plaintiffs also claim New was "paid handsomely" with compensation of $633,300 in 2023 and $2,098,405 in 2024, despite Mullen's poor performance. *Id.* at ¶ 69.

Plaintiffs allege a scheme whereby Defendants would repeat the following cycle: (1) issue misleading press releases and announcements about Mullen's deals and technology advancements to generate investor interest and drive up Mullen's stock prices; (2) sell warrants[6] and convertible notes[7] to "preferred investors" who would then sell common stock to retail investors for a profit; (3) reveal that the previously announced deals were terminated, thereby causing stock prices to fall; and (4) effect a reverse stock split to meet the Bid Price Requirement and avoid being de-listed from the NASDAQ. *Id.* at ¶¶ 73–99. Plaintiffs allege that as a result of Defendants' acts and omissions, Plaintiffs suffered significant losses and damages based on the decline in market value of Mullen's securities. *Id.* at ¶ 200.

**1. Press Releases and Announcements**

At issue here are three categories of alleged misrepresentations: (1) statements relating to Mullen's use of reverse stock splits; (2) statements relating to Mullen's partnership with Global EV Technology, Inc., EV Technologies LLC, and Lawrence Hardge, to create a battery technology; and; (3) statements relating to a deal with Volt Mobility to sell Mullen's EVs in the United Arab Emirates ("UAE").

**a. Reverse Stock Splits**

In September 2022, NASDAQ notified Mullen that it had 180 days, i.e., until March 6, 2023, to come into compliance with the Bid Price Requirement. *Id.* at ¶ 115. On January 25, 2023,

---

[6] "A warrant is a financial instrument that gives the holder the right to purchase a company's stock at a predetermined price (the 'strike price') within a specific timeframe. When a warrant is exercised, it results in the issuance of new shares, increasing the total number of shares outstanding. Further, once a warrant is exercised, the issuing company is then paid for the then-issued shares at the previously agreed-upon strike price. Investors who buy warrants generally want the price of the stock to go above the strike price, so that they can make money by exercising the warrant and selling the newly issued stock for a profit." *Id.* at ¶ 80.

[7] "A convertible note is a financing tool that allows investors to provide a loan to a company with the option to convert that loan into equity/stock at a later time, often at a discount. . . . The investor could then re-sell those shares for a significant profit, especially if the company's stock price continued to rise." *Id.* at ¶ 81.

Mullen issued a press release announcing that it "has no plans at the current time to effect a reverse split." *Id.* at ¶ 108. Mullen stated that it had until March 6, 2023 to come into compliance with the Bid Price Requirement and, if it did not, it would request an extension for another 180 days to reach compliance (i.e., until around September 6, 2023). *Id.* If Mullen still fell short of the minimum requirement "at that time," it would effect a reverse stock split. *Id.* Plaintiffs assert that, in reality, Defendants anticipated that reverse stock splits would be needed and that Defendants had already internally decided to implement a reverse split before September 6, 2023. *Id.* at ¶¶ 108–09.

On February 14, 2023, Mullen issued its Q1 FY2023 10-Q and a press release, disclosing that shareholders approved a proposal to implement a reverse stock split. *Id.* at ¶¶ 110, 112. Mullen reiterated, however, that it did not plan to enact a reverse stock split before September 6, 2023. *Id.* Defendants effected the first reverse stock split of the Class Period on May 4, 2023. *Id.* at ¶ 131.

**b. Mullen Advanced Energy Operations ("MAEO")**

Plaintiffs allege that Defendants issued misleading announcements about a partnership with Global EV Technology, Inc. and EV Technologies LLC (collectively, "EVT"), and their founder, Lawrence Hardge, to boost Mullen's stock. *Id.* at ¶¶ 118–19. On April 18, 2023, Mullen announced the partnership to create Mullen Advanced Energy Operations, LLC ("MAEO"), which was focused on creating an improved battery technology for Mullen's EVs. *Id.* at ¶¶ 119–20. On April 18, 2023, Mullen issued a press release that announced MAEO would work "on known verified technology for improving existing vehicle performance and extending battery range." *Id.* at ¶ 120. The press release also claimed that Hardge was "a successful life-long inventor" and was "convicted of a state crime" in the late 1990s that was ultimately expunged. *Id.* Plaintiffs allege that the battery technology referenced in the press release did not actually exist, Hardge was convicted of a felony for selling unregistered securities, and that Harge's conviction was never actually expunged. *Id.* at ¶ 121.

In a second press release issued on April 20, 2023, Mullen continued to tout the battery technology and announced that "exciting and groundbreaking test results" showed the technology substantially increased the driving range and efficiency of the current EV battery. *Id.* at ¶ 122. The press release stated that the Energy Management Module ("EMM") technology was tested by Mullen engineers on one of its EV cargo vans, and "showed more than a 75% increase in range[.]" *Id.* Testing by Element Materials Technology of another type of EV "resulted in a calculated increase in range from 269 to 431 miles, which is a 60% increase in efficiency." *Id.* Plaintiffs assert that Mullen's own engineers never independently tested the technology. *Id.* at ¶ 124.

On April 20, 2023, Hardge announced a $10 billion contract with Saudi Arabia on Facebook Live. *Id.* at ¶ 126. Hardge stated, "Mullen and Lawrence Hardge are here to assist [Saudi Arabia], they have countries like Yemen, Israel, all of them have joined in to take this technology, and they're going to produce it in Saudi Arabia and they're also paying for a manufacturing plant to come to Michigan." *Id.* Mullen's share price increased by 25.6% (from $0.084 to $0.102) in response to the announcements. *Id.* at ¶ 128.

On May 15, 2023, Mullen issued several statements about the purported battery technology. In a press release, Mullen stated that Hardge and Mullen engineers tested the EMM technology on EV cargo vans and the results showed "an increased battery capacity of 44%." *Id.* at ¶ 132. In Mullen's Q2 FY 2023 10-Q, filed on May 15, 2023, and signed by Michery and New, Defendants discussed the details of the deal to form MAEO. *Id.* at ¶ 134. MAEO would develop, manufacture, market, sell, distribute, and service a "Battery Life Enhancing Technology." *Id.* Mullen would hold a 51% equity interest in MAEO, while EVT would hold 49% equity interest. *Id.* In a second press release issued the same day, Mullen announced a $680,000 deal it struck with the city of Washington, D.C., to install EMMs on the city's government vehicle fleet. *Id.* at ¶ 136. The announcement indicated Hardge was named the Senior Vice President of Technology for MAEO. *Id.*

On June 6, 2023, Michery stated that Hardge's announcement regarding a deal with Saudi Arabia had nothing to do with Mullen. *Id.* at ¶ 141. Michery also claimed that the data "showing that these units performed at whatever level that we had advertised" was provided by Lawrence. *Id.* Mullen's stock prices dropped by 22.7% based on this news and closed at $0.517 on June 7, 2023. *Id.* at ¶ 142. By June 15, 2023, the stock price had fallen to $0.261. *Id.* at ¶ 144.

On July 10, 2023, Mullen announced that it issued a termination notice to Hardge and EVT. *Id.* at ¶ 145. At the end of the day, Mullen's stock dropped to $0.176. *Id.* at ¶ 146. On July 17, 2023, WUSA9 in Washington, D.C. published a news report stating that the battery technology announced by Defendants and Hardge did not exist and was "practically impossible" based on testing conducted at the University of Maryland. *Id.* at ¶ 147. The news report also indicated that Hardge had previously been sentenced to 26 years in prison for a 2001 felony conviction for selling unregistered securities. *Id.* at ¶ 148. Plaintiffs allege that as of April 2023, Hardge was still a convicted felon. *Id.* By July 19, 2023, Mullen's stock closed at $0.147. *Id.* at ¶ 150. On July 22, 2023, an article released by Carscoops.com reported that the city of Washington, D.C. cancelled the $680,000 contract Mullen announced on May 15, 2023. *Id.* at ¶ 151. Mullen's stock price declined to a closing price of $0.13 on July 26, 2023. *Id.* at ¶ 152.

**c. Volt Mobility**

On August 26, 2024, Mullen announced that it entered into a purchase agreement with Volt Mobility ("Volt"), a company based in the UAE. *Id.* at ¶ 165. The agreement involved "$210 million to acquire 3,000 Class 1 and Class 3 EV cargo vans and trucks over a 16-month period." *Id.* The August 26, 2024 press release indicated Mullen "will begin shipping the first vehicles immediately" and that Volt "intends to lease these vehicles to corporate customers based in the Middle East and Gulf States." *Id.* On the same day, Michery issued four posts on "X," formerly known as Twitter, announcing the $210 million agreement. *Id.* at ¶¶ 167, 169, 171, 173. Michery's posts reiterated that the initial vehicle shipment would "begin immediately." *Id.* at ¶¶ 167, 169. Mullen's share price increased 69%, from $0.34 to $0.575 in response to this news. *Id.* at ¶ 175.

On September 20, 2024, Mullen issued a press release announcing that it delivered one EV cargo van and three cab chassis trucks to the UAE on September 18, 2024. *Id.* at ¶ 179. Mullen indicated that it "plans an additional 3,000 vehicles scheduled for delivery in 2025." *Id.* On November 8, 2024, Mullen issued a prospectus discussing the details of its deal with Volt. *Id.* at ¶ 183. "Volt Mobility committed to purchase 3,000 Class 3 commercial EVs with an initial deposit of $3.0 million for initial orders of 300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025. As of the date of this prospectus, Volt Mobility has not yet made the deposit nor placed the initial orders. The Company also agreed that it will coordinate with Volt Mobility to set up a fully operational service center in the UAE." *Id.*

On January 24, 2025, Mullen filed its FY2024 10-K which was signed by Michery. *Id.* at ¶ 186. Mullen reported that it "has fulfilled its initial commitment by providing vehicles to support homologation. However, Volt Mobility has not made the deposit nor placed the initial orders. At this time, it is not known if the Company will continue the relationship and is currently investigating alternative distributors for the region." *Id.*

Plaintiffs allege that as of July 2024, it was known throughout Mullen that its vehicles did not meet the UAE's homologation standards.[8] *Id.* at ¶ 163. According to a confidential witness, Mullen's head of homologation stated Mullen's vehicles were a year and $25 million worth of upgrades away from being able to meet the UAE's standards. *Id.* Plaintiffs allege Defendants knew that Mullen's vehicles did not meet the standards and thus would not be in a position to begin shipping vehicles immediately or to expect the $210 million in revenue from the purchase agreement. *Id.* at ¶¶ 164, 166, 168, 170, 172, 174. The confidential witness stated that the four

[8] "Homologation is the process of certifying that a vehicle meets regulatory and safety standards for a particular market." *Id.* at ¶ 163.

EVs sent to the UAE on September 18, 2024 were only for marketing purposes because the cars did not meet the UAE's homologation standards. *Id.* at ¶ 180.

On March 20, 2025, Mullen announced that it sent a termination notice to Volt regarding the August 23, 2024 purchase agreement. *Id.* at ¶ 192. In response to this news, Mullen's stock price dropped 30.6% in two days, from $0.40 to $0.289 on March 21, 2025. *Id.* at ¶ 193.

**B. Request for Judicial Notice**

Defendants filed a Request for Judicial Notice of 27 SEC filings and one press release copy pursuant to Federal Rule of Evidence 201. [Doc. # 75 ("RJN")]; *see* Declaration of Jenny Pelaez ISO RJN ("Pelaez Decl.") [Doc. # 76]. Plaintiff filed a response to Defendants' RJN. [Doc. # 81 ("RJN Opp.").] Defendants filed a reply in support of the RJN. [Doc. # 83 ("RJN Reply").]

Generally, courts may consider only the pleadings and properly attached documents when reviewing a motion to dismiss for failure to state a claim. *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Courts may not "on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed." *Corinthian Colleges*, 655 F.3d at 999.

Plaintiffs do not object to the Court taking judicial notice of documents that the FAC relies upon as part of the allegations, including Exhibits 1–3, 5–14, 16, 18, 22–25, 27–28. *See* RJN Opp. at 2.[9] Accordingly, the Court **GRANTS** Defendants' RJN as to Exhibits 1–3, 5–14, 16, 18, 22–25, 27–28. The Court takes judicial notice of these exhibits only to prove the "existence and content" of the filings, and not the truth of the information contained therein. *See In re Am. Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 2d 1043, 1062 n.143 (C.D. Cal. 2012); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022) (taking judicial notice of SEC filings "for the purpose of determining what information was available to the market" but not for the truth of the matters asserted therein).

Plaintiffs object to the Court taking judicial notice of Exhibits 4, 15, 17, 19–21, and 26 because the documents are extraneous to the FAC. RJN Opp. at 2. Defendants contend these seven exhibits contain cautionary language accompanying forward-looking statements that are

[9] All page references herein are to page numbers inserted by the CM/ECF system.

alleged to be misleading and false. RJN Reply at 4. Since the Court does not rely on these exhibits in reaching its decision, the Court **DENIES as MOOT** Defendants' RJN as to Exhibits 4, 15, 17, 19–21, and 26.

## II.
## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may seek to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating the sufficiency of a complaint, courts must accept all factual allegations as true—this presumption does not apply, however, to legal conclusions. *Id.* (citing *Twombly*, 550 U.S. at 555).

When a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. A plaintiff is required to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To properly plead fraud with particularity under Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged." *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018)). Critically, the complaint must explain "what is false or misleading about the purportedly fraudulent statement, and why it is false," without relying on hindsight. *Id.* (citation omitted). Instead, the complaint must explain "why the statements were false or misleading at the time they were made." *Id.* (quoting *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012)).

In addition, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes "[e]xacting pleading requirements" when claims are based on the Exchange Act. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "Importantly, the PSLRA 'did not impose an insurmountable standard.'" *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, -- F.4th --, No. 24-4909, 2026 WL 2601128, at *9 (9th Cir. Sept. 2, 2026) (citation omitted). The factual allegations in the complaint "remain entitled to a presumption of truth" and an Exchange Act claim will survive dismissal "if the factual allegations in the complaint allow the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted).

If the court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (citation omitted); *see* Fed. R. Civ. P. 15(a)(2).

## III.
## DISCUSSION

### A. Exchange Act Section 10(b) and Rule 10b-5 Claims

Under Section 10(b) of the Exchange Act, it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC promulgated Rule 10b-5 to implement Section 10(b). *See* 17 C.F.R. § 240.10b-5(b). Under Rule 10b-5, it is unlawful to: (a) "employ any device, scheme, or artifice to defraud"; (b) to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *See* 17 C.F.R. § 240.10b-5(a)–(c). Plaintiffs bring Count One of the FAC under subsections (a) and (c) and Count Two of the FAC under subsection (b).

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must adequately plead six elements: "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants move to dismiss the Section 10(b) and Rule 10b-5(b) claims because the FAC contains insufficient allegations to support falsity, scienter, and loss causation. Additionally, Defendants contend Plaintiffs have not sufficiently alleged a scheme under subsections (a) and (c) of Rule 10b-5. The Court addresses each argument in turn.

**1. Falsity**

To establish falsity, Plaintiffs "may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)). An affirmative misrepresentation is an "untrue statement of a material fact" while a fraudulent omission is a failure to "state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). Courts apply an objective "reasonable investor" standard in determining whether a statement is misleading. *Glazer Cap. Mgmt., L.P. v. Forescout Tech., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (citation omitted). "Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility." *Id.* at 766.

**a. Statements Regarding Reverse Stock Splits**

Defendants assert that (1) Plaintiffs fail to adequately allege that Defendants knew further stock splits would be needed at the time the statements were made and (2) the statements specifically warned that reverse stock splits may be needed in the future. Reply at 12.

The January 25, 2023 press release stated that Mullen "has no plans at the current time to effect a reverse split." FAC at ¶ 108. After explaining that Mullen would continue to seek extensions with NASDAQ to meet the minimum bid price until approximately September 6, 2023, Mullen stated, "[i]f the company still falls short of the minimum bid requirement, it will effect a reverse stock split *at that time*[.]" *Id.* (emphasis added). In the February 14, 2023 Q1 FY 2023 10-Q and corresponding press release, Mullen stated it "does not plan to enact [a reverse stock split] in the event the stock eclipses the $1 mark *between now and September 6th*. Should the price of the Mullen common stock not reach $1 per share, management plans to implement the reverse split at a magnitude determined *at that time.*" *Id.* at ¶¶ 110, 112 (emphasis added). Each statement disclosed Mullen's plan to enact a reverse stock split if it fell short of the minimum bid requirement, but claimed it would not do so before September 6, 2023.

Plaintiffs argue that these statements are materially false because at the time the statements were made, Defendants "always anticipated reverse stock splits to meet NASDAQ listing requirements." Opp. at 19. The statements above do not contradict, however, the notion that Defendants anticipated reverse stock splits would be needed at some point. Indeed, Mullen announced in its February 14, 2023 Q1 FY 2023 10-Q SEC filing and press release, that shareholders approved a proposal to implement a reverse stock split, to be implemented at a later

time. *See* FAC at ¶¶ 110, 112. Thus, Plaintiffs must sufficiently allege that Defendants knew that they would need to implement reverse stock splits *before* September 6, 2023. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time."). The FAC includes a conclusory allegation that Defendants "already internally decided" to effect a reverse split when it issued the January 25, 2023 press release, FAC at ¶ 108, but provides no supporting factual allegations to meet the PSLRA's "exacting requirements for pleading 'falsity.'" *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Plaintiffs' conclusory allegations that Defendants knew reverse stock splits would be effected because "Mullen lacked any legitimate business prospects for manufacturing and selling EVs" does not cure the defect. *See* FAC at ¶¶ 109, 111, 113. The cursory allegation does not give color to the precise timing of when Defendants planned to enact the reverse stock splits, such that the Court can reasonably infer that the above statements are materially false or misleading.

Accordingly, claims pertaining to statements made in the January 25, 2023 press release, February 14, 2023 Q1 FY 2023 10-Q, and February 14, 2023 press release will be dismissed, with leave to amend.

### b. Statements Regarding MAEO Battery Technology

Next, Defendants argue that Plaintiffs have not sufficiently alleged that the challenged statements regarding Mullen's joint venture with EVT and Hardge were false or misleading at the time they were made. MTD at 20–21; Reply at 13–15. Specifically, Defendants contend that there are no allegations in the FAC to support that "Defendants knew the technology did not work or knew that the testing data provided by Hardge to Mullen and its engineers was not accurate at the time of the statements." Reply at 13.

Plaintiffs rely on three overlapping theories of falsity for statements relating to the MAEO battery technology: (1) the statements are materially false because the battery technology did not exist and instead was a "fiction" purportedly created by Hardge; (2) Defendants mispresented that Mullen independently verified the technology; and (3) Defendants omitted material information when they announced deals and therefore misled investors because the technology did not exist. *See* Opp. 20–21. The Court addresses the relevant theories as to each statement.

//
//
//

**1) April 20, 2023 Press Release**

In the April 20, 2023 press release, Mullen announced "exciting and groundbreaking test results of its recently acquired joint venture technology, greatly improving current EV performance by increasing EV vehicle range." *Id.* at ¶ 122. Specifically, Mullen claimed "Element Materials Technology test results indicate that the Energy Management Module (EMM) technology substantially increases the driving range and efficiency of any current EV battery." *Id.* In addition, [s]pecific vehicle testing" completed by Element "resulted in a calculated increase in range from 269 to 431 miles, which is a 60% increase in efficiency." *Id.* Defendants argue that nothing in the FAC supports the assertion that Defendants knew the technology did not work or "knew that the testing data provided by Hardge to Mullen and its engineers was not accurate at the time of the statements." Reply at 13.

Contrary to Defendants' argument, the April 20, 2023 press release specifically noted that the EMM battery technology "*was tested by Mullen Automotive engineers* on the Company's Class 1 EV Cargo Van at its Troy, Michigan facility." FAC at ¶ 122 (emphasis added). Mullen went on to announce that those "[r]esults showed more than a 75% increase in range for the 42-kWh lithium-ion battery pack, which would be a calculated EPA estimated range of 186 miles at a very low added cost and mass." *Id.* Additionally, Michery made the following statement in the April 20, 2023 press release: "[s]eeing the previous EMM test results conducted by Element and *correlating that with our own engineers testing*, we believe this technology is a perfect fit for Mullen's EV product lineup[.]" *Id.* (emphasis added). Thus, the April 20, 2023 announcement touted improvements of "current EV performance" based on a combination of testing overseen by Hardge and Mullen's own testing. *Id.* Defendants' arguments that Mullen's statements were purely reliant on representations by Hardge are therefore unpersuasive.

Plaintiffs allege that testing conducted by the University of Maryland showed that the battery technology capabilities announced by Defendants were "untested and practically impossible." FAC at ¶ 147. A news article quoted an associate director of the Maryland Energy Innovation Institute" as saying, "[t]here's not technologies that I'm aware of that can really boost that same battery pack to significantly more than 200 mile range[.] . . . There's a variety of limitations just from basic chemical theory. There's only so much energy you can store for the materials that you put into a battery." *Id.*; *see In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (courts may credit newspaper articles "if they are sufficiently particular and detailed to indicate their reliability."). Plaintiffs further allege that Element Materials Technology stated that, contrary to Defendants claims, it came to no conclusion about EMM's ability to increase driving range and efficiency of any current EV battery. FAC at ¶ 153. Based on these allegations and Defendants' assertions regarding Mullen's own engineers having

tested the technology, the Court can reasonably infer that Defendants knew that the EMM battery technology's purported capabilities were false at the time the April 20, 2023 press release was issued.

**2) May 15, 2023 Statements**

Plaintiffs sufficiently allege falsity as to Mullen's May 15, 2023 press release for the same reasons discussed above. On May 15, 2023, Mullen claimed that the EMM technology was tested on January 20, 2023 by *both* "Hardge and Mullen engineers on the Company's EV Cargo Van at its Troy, Michigan, facility, with testing results showing an increased battery capacity of 44%." *Id.* at ¶ 132. Plaintiffs sufficiently allege that Defendants' statement was materially false and misleading because the technology with these purported capabilities did not and could not have existed. *Id.* at ¶¶ 133, 143, 153. Mullen issued a second press release on May 15, 2023, announcing a $680,000 contract between EVT and the city of Washington D.C. "for the purchase and installation of EMM units" on the D.C. city government's vehicle fleet. *Id.* at ¶ 136. Plaintiffs adequately allege that the press release was at a minimum misleading, given that the EMM technology as advertised, did not exist, and therefore it would not be possible to carry out the contract.

Plaintiffs also challenge Mullen's Q2 FY 2023 10-Q statement, issued on May 15, 2023, because it discussed Mullen's partnership with Hardge and EVT "on a device known as a Battery Life Enhancing Technology." FAC at ¶ 134. The portion of the statement included in the FAC simply names the device as a "Battery Life Enhancing Technology" and describes the formation of MAEO. *Id.* The use of the name "Battery Life Enhancing Technology" falls into the category of statements of "mere corporate puffery" that is inactionable for a securities fraud claim. *See City of Roseville Emp.s' Ret. Sys. v. Sterling Fin. Corp.*, 47 F. Supp. 3d 1205, 1219–20 ("Statements that lack a standard against which a reasonable investor could expect them to be pegged are puffery."). The name is too vague and general, such that a reasonable investor would not rely on it, unlike the data touted in statements above. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim."). Therefore, claims relying on the May 15, 2023 Q2 FY 2023 10-Q statement are dismissed, with leave to amend.

**3) April 18, 2023 Press Release**

In the April 18, 2023 press release, Mullen claimed it would work with EVT on "known verified technology for improving existing vehicle performance and extending battery range."

FAC at ¶ 120. The press release further stated that the battery technology "has immediate and key implications for electric vehicles." *Id.* Plaintiffs adequately allege this statement is materially false and misleading because the technology was not actually verified and the purported capabilities did not exist.

Plaintiffs also contend the April 18, 2023 press release falsely claimed that Hardge "was convicted of a state crime and ultimately it was expunged." FAC at ¶ 121. Although Plaintiffs sufficiently allege that at the time the press release was issued, Hardge's felony conviction was not expunged, the FAC alleges no facts from which the Court can reasonably infer that Defendants knew that this was the case. *Id.* at ¶¶ 148–49. Therefore, the Court dismisses claims relating to the April 18, 2023 press release insofar as it relies on the statement about Harge's conviction and expungement, with leave to amend.

**4) April 20, 2023 Facebook Live Statement**

Hardge's April 20, 2023 statement on Facebook Live about a $10 billion contract with Saudi Arabia is also not actionable here. *See* FAC at ¶ 126. Plaintiffs have not sufficiently alleged that any Defendant was "the maker of a statement," in that they had "authority over the content of the statement and whether and how to communicate it." *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011).

Moreover, Plaintiffs fail to sufficiently allege that Hardge had apparent authority to speak on behalf of Mullen. Hardge is alleged to have been a Senior Vice President of the subsidiary MAEO, rather than an employee, officer, or director of Mullen. *See* FAC at ¶ 119. Plaintiff's citation to *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 473 (9th Cir. 2015) is unavailing. In *ChinaCast*, the Ninth Circuit held that the scienter of the founder and CEO of a company can be imputed to his corporate employer in a securities fraud action. *Id.* at 472–73. *ChinaCast* did not involve an officer of a subsidiary speaking on behalf of a parent company. While the FAC draws a cursory legal conclusion that Hardge was "acting as the actual or apparent agent of Mullen," FAC at ¶ 126, it offers insufficient facts to plausibly support that conclusion. Plaintiffs cite to *SEC v. OwnZones Media Network, Inc.*, No. CV 20-03108-CJC (JPRx), 2020 WL 13311398, at *4–5 (C.D. Cal. Sept. 17, 2020), where a court found the SEC offered sufficient allegations that an employee of a company acted with apparent authority to speak on behalf of the corporation. Unlike here, the complaint in *OwnZones* included allegations that the company provided the employee with a company email address, business card, office space to present to prospective investors, and that the employee was introduced to investors as someone who would raise funds on behalf of the company. *Id.* at *5. The FAC here lacks any such details from which

to infer apparent authority. Accordingly, the Court dismisses claims about the April 20, 2023 Facebook Live statement, with leave to amend.

**c. Statements Regarding Volt Mobility Deal**

Plaintiffs allege Defendants misled investors about their deal with Volt Mobility because they omitted the following material information: (1) Mullen's EVs were not equipped to meet homologation standards in the UAE; (2) the batteries in Mullen's EVs were not equipped to withstand the heat in the UAE; and (3) it would take a year and $25 million in order for Mullen's EVs to be homologated to UAE standards. Opp. at 21. To support these allegations, Plaintiffs rely on the statements of a confidential witness ("CW1").[10] According to CW1, around mid-July 2024, it was "well known" throughout Mullen that none of Mullen's vehicles met the UAE's homologation standards. FAC at ¶ 163. Mullen's head of homologation, Corry Davis, stated that Mullen's vehicles were $25 million worth of upgrades and a year away from being able to meet the UAE's standards. *Id.*

Defendants assert that the statements pertaining to Volt are not false or misleading because Mullen disclosed the "homologation issue" in the operative Volt Purchase Agreement, dated August 23, 2024. Reply at 15; MTD at 21. Notably, Defendants do not pinpoint specific statements in the Volt Purchase Agreement that disclose any "issues" with homologation. *See id.* The Volt Purchase Agreement merely stated that Mullen and Volt "will ensure all vehicles and chargers will meet UAE certification requirements[,] and safety standards required for market entry in the UAE and across the GCC." *See* Pelaez Decl., Exhibit 22 ("Volt Purchase Agreement") [Doc. # 76-22 at 6]. Mullen would be responsible for sharing "relevant technical documentation to confirm the homologation process and marketing for vehicles and provide on-site personnel as needed." *Id.* Meanwhile, Volt Mobility would "[c]onfirm all homologation and testing procedures have been met." *Id.* at 7. Although Mullen did not outright represent that homologation was *already* satisfied, a reasonable investor reading the Volt Purchase Agreement would infer that homologation simply needed to be confirmed. In other words, the Volt Purchase Agreement and Defendants' subsequent statements did not mention any hurdles Mullen faced to achieve homologation. Therefore, Defendants' cursory argument that Mullen disclosed the "homologation issue" is unconvincing.

When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the

[10] The Court discusses the reliability of CW1's statements in more detail in the section on scienter, below. *See* Section III.A.2.a.

positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (internal quotation marks and citation omitted). That homologation would take one year and cost $25 million is the type of adverse information necessary to disclose to avoid "creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The Court now turns to the challenged statements.

**1) August 26, 2024 Press Release and Michery's Posts on "X"**

On August 26, 2024, Mullen issued a press release announcing the purchase agreement it executed with Volt. FAC at ¶ 165. Mullen announced it "will begin shipping the first vehicles *immediately*." *Id.* (emphasis added). It further announced it expected to "recognize approximately $210 million in revenue over the next 16 months of the agreement." *Id.* Following the press release, Michery posted four statements on X, announcing the Volt deal and claiming that the "[f]irst round of deliveries to begin immediately!" FAC at ¶¶ 167, 169, 171, 173. As alleged, however, Mullen's EVs were nowhere near equipped to be used in the UAE. *Id.* at ¶¶ 163–66. Therefore, Plaintiffs have plausibly alleged that the press release and Michery's subsequent posts on X were materially false and misleading.

**2) September 20, 2024 Press Release**

The September 20, 2024 Press Release is materially misleading for the same reasons. Mullen announced: "Mullen's technical and sales team members arrived on site in Dubai this week to meet with Volt's leadership and to support initial market launch activities, including delivery of the first Mullen ONE EV cargo vans and Mullen THREE cab chassis trucks on Sept. 18, 2024." *Id.* at ¶ 179. Michery stated, "[W]e made sure to have technical and sales team members in Dubai this week to meet Volt leadership to ensure and kick off a successful launch." *Id.* These statements create a misleading impression that Mullen's EVs were ready to be sold and used in the UAE.

**3) November 8, 2024 Company Prospectus**

On November 8, 2024, Mullen issued a prospectus continuing to represent that it would "provide Volt Mobility with commercial electric vehicles ("EVs"), specifically, Class 1 and Class 3 Mullen vehicles . . . and chargers at preferred wholesale pricing for the [UAE] region as its exclusive representative." *Id.* at ¶ 183. While the prospectus disclosed that "Volt Mobility has not yet made the deposit nor placed the initial orders," Mullen continued to tout Volt Mobility's commitment to purchase 3,000 of its vehicle, with the first 300 within 60 days. *Id.* The Court

finds that Plaintiffs adequately allege that the prospectus is materially misleading for the same reasons discussed above.

**4) January 24, 2025 FY 2024 10-K Statement**

Lastly, Plaintiffs challenge statements in Mullen's January 24, 2025 FY 2024 10-K filing, wherein Mullen claimed to have "fulfilled its initial commitment by providing vehicles to support homologation." *Id.* at ¶ 186. Mullen went on to state: "However, Volt Mobility has not made the deposit nor placed the initial orders. At this time, it is not known if the Company will continue the relationship and is *currently* investigating *alternative distributors for the region*." *Id.* (emphasis added). Crediting Plaintiffs' allegations as true, even six months after it was well-known throughout Mullen that its vehicles were not homologated to the UAE's standards, Mullen continued to assert that it had fulfilled its "initial commitment" to provide vehicles "to support homologation." Not only does this statement misleadingly suggest that Volt Mobility was the reason why the $210 million deal was lagging, it also misleadingly suggests that Mullen would still be able to sell its vehicles through another distributor in the UAE.

In sum, the Court finds that Plaintiffs' adequately alleged falsity for the statements pertaining to the Volt Mobility deal.

**2. Scienter**

To properly plead scienter under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Glazer*, 549 F.3d at 766 (quoting 15 U.S.C. § 78u-4(b)(2)). "To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citation omitted). To plead "deliberate recklessness" a Plaintiff must allege "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation omitted). Courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322–23. Moreover, in assessing scienter, courts "must take into account plausible opposing inferences." *Id.* at 323.

First, the Court determines "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter." *Zucco*, 552 F.3d at 992. Second, "if no

individual allegations are sufficient," the Court conducts a "'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* Since the Court has determined that the FAC fails to plead falsity of the reverse stock split statements, the Court will examine Defendants' scienter only as to the statements about the MAEO battery technology and Volt Mobility deal.

**a. Confidential Witnesses**

The FAC relies on the statements of two confidential witnesses to plead scienter. Plaintiffs must "pass two hurdles" to rely on them. *Id.* at 995. First, a confidential witness "must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* Second, "statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

According to the FAC, CW1 worked for Mullen as a "high-level finance executive" from June 2022 to March 2025. FAC at ¶ 60. CW1 reported to New and the Chief Accounting Officer, Chester Bragado. *Id.* CW1's job responsibilities involved "overseeing all Mullen manufacturing and commercial finance." *Id.* CW1 was based out of Mullen's plant in Tunica, Mississippi. *Id.* at ¶ 180. CW1 had "intimate knowledge of Mullen's payments" and had insight into the perks in which Michery allegedly indulged. *Id.* at ¶¶ 60, 62–68. CW1 allegedly "spoke with Mullen's head of homologation, Corry Davis, who told CW1 that Mullen's vehicles were a year and $25 million worth of upgrades away from being able to address the United Arab Emirates' homologation standards." *Id.* at ¶ 163. CW1 also spoke to New "multiple times on the telephone in mid-July 2024 about Mullen's inability to sell vehicles in the Middle East because Mullen's vehicles did not meet homologation standards." *Id.* at ¶ 164. According to CW1, New acknowledged this issue "but said that Michery wanted to move forward with a deal with Volt Mobility . . . so the Company would start shipping over vehicles immediately and figure out how to resolve the homologation problems later." *Id.*

Since the FAC relies on CW1 without "other factual information, such as documentary evidence," to support CW1's statements, CW1's statements can only be relied upon to support scienter if the FAC "provide[s] an adequate basis for determining that the witness[] in question [has] personal knowledge of the events they report." *Zucco*, 552 F.3d at 995. At this stage, the FAC includes sufficient detail about CW1 to reliably establish his/her position and personal knowledge of the reported events. As a "high-level finance executive" who oversaw all of Mullen's commercial and manufacturing finances during the Class Period, it is reasonable to infer that CW1 would have personal knowledge about whether Mullen could actually sell its EVs in the UAE. This inference is even more plausible given CW1's numerous conversations with New—

the highest finance officer in the company and the person to whom he directly reported—who acknowledged on multiple occasions that the EVs did not meet homologation standards. CW1's personal knowledge of the homologation issue is supported by the fact that he spoke with the *head of homologation*, about the major barriers Mullen had ahead of it. *See Zucco*, 552 F.3d at 997 n.4 ("[T]he fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.").

CW1's statements support a strong inference of scienter as to New for the Volt Mobility statements. CW1 states that he spoke to New multiple times in July 2024 about Mullen's inability to sell its cars in the UAE given the homologation issue—this was only about a month before the first press release announcing the deal. The Court can reasonably infer that CW1 shared with New, the information he received from Davis regarding the $25 million in upgrades needed to homologate the EVs. CW1's statements also support an inference of scienter as to Michery. If New knew about the homologation problems, it is plausible that there would be no reason for him to keep that information from Michery, the head executive of the company and the person with whom he had weekly telephone meetings. *See* FAC at ¶ 175. In addition, according to CW1's statements, New indicated that *Michery* wanted to move forward with the deal "and figure out how to resolve the homologation problems later." New's statement to CW1 would make no sense unless Michery knew about the homologation problem.

Turning to Confidential Witness 2 ("CW2"), CW2 is alleged to be "a director in Mullen's sales and marketing department" whose job responsibilities included "sales and marketing, price labels, distribution, engineering, and serving as a technical liaison between Mullen and other companies." FAC at ¶ 61. CW 2 "oversaw dealer sales and service agreements." *Id.* According to CW2, Michery signed all checks on behalf of Mullen. *Id.* at ¶ 63. Even if the Court assumes that CW2 is described with sufficient particularity to establish reliability, the statement—that Michery signed all checks on behalf of Mullen—is not indicative of scienter for the allegedly false statements pertaining to the MAEO battery technology and Volt Mobility deal.

**b. Contemporaneous Allegations of Scienter**

Defendants argue that Plaintiffs fail to allege any specific contemporaneous statements or conditions that demonstrate scienter. MTD at 24. Plaintiffs contend that the FAC alleges sufficient facts of contemporaneous knowledge based on Defendants' access to information, Defendants' claimed knowledge about certain topics, and Defendants' key positions within Mullen. Opp. at 25–28.

The core operations doctrine refers to the theory that "facts critical to a business's 'core operations' or an important transaction are known to a company's key officers" and can therefore "be one relevant part of a complaint that raises a strong inference of scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783–84 (9th Cir. 2008). The Ninth Circuit has recognized two situations where such allegations may independently satisfy the PSLRA's scienter requirement: (1) "where [the allegations] are particular and suggest that defendants had actual access to the disputed information" and (2) "in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 785–86; *see also Zucco*, 552 F.3d at 1000 (same).

The Court finds that Plaintiffs have pleaded a strong inference of scienter as to Michery regarding the MAEO battery technology statements. The reporting of false information can be "indicative of scienter where the falsity is *patently obvious*." *Zucco*, 552 F.3d at 1001 (emphasis added). Here, multiple press releases claimed that Mullen acquired technology that "greatly improv[ed] current EV performance" and was tested by Mullen's own engineers. FAC at ¶¶ 120, 122–23. Importantly, Michery himself, was quoted in a press release saying that Mullen was "correlating" external testing with testing by its own engineers. *Id.* at ¶ 123. The April 20, 2023 press release provided specifications about Mullen's testing, indicating that some results showed "more than a 75% increase in range." *Id.* at ¶ 122. "Inventing statements about the technical specifications of the Mullen battery without an underlying factual basis would, if true, clearly be an example of Michery intending to deceive investors." *See In re Mullen Auto. Sec. Litig.*, No. CV 22-3206-DMG (AGRx), 2023 WL 8125447, at *9 (C.D. Cal. Sept. 28, 2023). Plaintiffs have alleged exactly that: Mullen never actually independently verified any test results, yet Michery touted that they did. Moreover, as this Court has previously concluded, where a core feature of Michery's business is "groundbreaking battery technology, it would be absurd to suggest that Michery, Defendants' founder and CEO, simply restated false claims about Defendants' battery technology without scienter." *Id.* (citing *Zucco*, 552 F.3d at 1001).

The Court also finds that the core operations allegations, along with other allegations, support an inference of Michery's scienter regarding the Volt Mobility statements. *Funko*, 2026 WL 2601128, at *18 (core operations allegations may support strong inference of scienter as part of holistic review of plaintiff's allegations). As discussed above, there are particular allegations that suggest Michery had actual access to information regarding the homologation issue. Additionally, the fact that Mullen's EVs were not homologated to operate in the UAE is such a significant roadblock to the deal that it would be absurd to suggest that Michery would not know about it, particularly given Michery's repeated statements that the vehicles were going to be shipped *immediately*.

**c. Plaintiffs' Remaining Allegations of Scienter**

**1) SOX Certifications**

Plaintiffs contend that Sarbanes-Oakley Act ("SOX") certifications signed by Michery and New support scienter. Opp. at 29. Michery and New signed the May 15, 2023 Q2 FY 2023 10-Q which discussed the MAEO deal, FAC at ¶ 134, and Michery signed the January 24, 2025 FY 2024 10-K which discussed the Volt deal, FAC at ¶ 186. Since the Court dismissed claims pertaining to the May 15, 2023 Q2 FY 2023 10-Q based on insufficient allegations of falsity in Section III.A.1.b.2 above, the Court declines to credit the fact that Michery and New signed that specific SOX certification as indicative of scienter. As for the January 24, 2025 FY 2024 10-K discussing the Volt deal, the fact that Michery signed it does not alone support a strong inference of scienter, though it may have a role in the holistic analysis that the Court undertakes below. *See Zucco*, 552 F.3d at 1004 (holding that SOX certifications will not make otherwise insufficient allegations more compelling, and generally "adds nothing substantial to the scienter calculus.").

**2) Insider Sales**

The FAC alleges that Michery and New made "unusual common stock sales and transfers that took advantage of Mullen's artificially inflated stock price." FAC at ¶ 218. Suspicious or unusual stock sales may be circumstantial evidence of scienter "only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 (internal quotation marks and citation omitted). In determining whether such sales are suspicious, courts consider: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citation omitted).

The FAC alleges that New sold 159,066 shares on March 6, 2023, for a total of $36,505.65, reducing his total shares by approximately 95%. FAC at ¶¶ 218, 221. New's sale was made pursuant to a 10b5-1 trading plan that he entered into on February 17, 2023.[11] *Id.* at ¶ 221. The Ninth Circuit has held that trades made pursuant to preexisting trading plans "do not by themselves support an inference of scienter." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 n.2 (9th Cir. 2012). Although the sale seems dramatic in scale, the Court cannot infer scienter from this single stock sale, given that the FAC does not contain any allegations about New's prior trading history. *Zucco*, 552 F.3d at 1005 ("For individual defendants' stock sales to raise an

[11] Although New entered the 10b5-1 trading plan during the Class Period, this was prior to Defendants' statements about the MAEO battery technology and Volt deal.

inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." (citation omitted)).

The FAC suffers from the same dearth of allegations relating to Michery's prior trading history. *See* FAC at ¶¶ 218–26. The FAC alleges a single sale where Michery sold 14,937,660 shares on February 16, 2023, for $4,726,275.62. *Id.* at ¶ 218. Plaintiffs fail to convincingly explain how the timing of this sale was suspicious or unusual, or whether this sale was inconsistent with Michery's prior trading history. Therefore, Plaintiffs' stock sale allegations do not, standing alone, raise a strong inference of scienter.

**3) Personal Profit**

Lastly, Plaintiffs allege Defendants misled investors because they were motivated by personal profit to "fund their lavish lifestyles." Opp. at 30. "A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." *Zucco*, 552 F.3d at 1004. Critically, allegations of financial gain must be tied to the company's financial performance. *Id.* (concluding scienter could not be established where there was "no allegation indicating how intimately the bonuses were tied to the company's financials."). General allegations that a defendant was motivated to increase his or her compensation are insufficient to establish a strong inference of scienter. *See In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1087 (N.D. Cal. 2003) (reasoning that "doing so would imply that a securities fraud plaintiff can automatically establish a strong inference of scienter whenever an executive's compensation is tied to the performance or stock price of the company for which he or she works. Such a result would appear inconsistent with the intent of the PSLRA"). Plaintiffs argue that Defendants' motive to mislead investors based on a desire for personal profit is particularly apparent because "Defendants' compensation far outweighed the Company's revenue." Opp. at 30. Plaintiffs cite no authority, however, to support the proposition that an exorbitant salary in comparison to a company's revenue is sufficient to establish scienter. *See id.* Accordingly, the FAC's allegations that Defendants were motivated by personal profit are insufficient to establish scienter.

**d. Holistic Review**

The FAC sufficiently pleaded allegations that independently suffice to raise a strong inference of scienter as to (1) Michery and the misleading statements regarding the MAEO battery technology, and (2) New and the misleading statements regarding the Volt deal. Now, the Court looks at the FAC's allegations holistically. The Court may properly consider "[v]ague or ambiguous allegations" as part of this holistic review. *S. Ferry LP*, 542 F.3d at 784.

The sum of allegations of scienter for Defendant New are as follows: (1) CW1's statements that New, the CFO, acknowledged that Mullen's vehicles did not meet the UAE's homologation standards but that Michery wanted to move forward with sales anyway and figure out how to deal with the homologation problem later; (2) CW1's statements that New attended weekly telephone meetings where Mullen's executives discussed business prospects; (3) New sold 95% of his shares through a single stock sale on March 6, 2023, pursuant to a Rule 10b5-1 trading plan; and (4) New's compensation far outweighed Mullen's revenue. While the Court finds that these allegations in combination support a strong inference of scienter as to the falsity of the Volt statements, they do not create a strong inference that New acted with the requisite mental state to mislead investors regarding the MAEO battery technology statements. Unlike Michery, who made public statements about data and testing the battery technology, the FAC does not include any such allegations tying New to the misleading statements about MAEO.

As for Michery, the following allegations support a strong inference of scienter regarding the falsity of the Volt deal: (1) New's statements to CW1 that Michery wanted to move forward with the Volt deal and figure out how to deal with the homologation problem later; (2) Michery's weekly telephonic meetings with New, who is alleged to have acknowledged the inability to sell Mullen's EVs in the UAE; (3) core-operations doctrine inference and Michery's high level position within the company; (4) Michery's signature on the January 24, 2025 FY2024 10-K discussing the Volt deal. The Court further concludes that Defendants have not set forth a cogent and compelling opposing inference to draw from the alleged facts. *See Tellabs*, 551 U.S. at 324.

In light of the foregoing, the Court **DISMISSES** any claim under Count Two against New based on alleged misrepresentations about the MAEO battery technology, for failure to adequately allege scienter, with leave to amend.

### 3. Loss Causation

Loss causation refers to the "causal connection between the material misrepresentation and the [plaintiff's] loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Ninth Circuit applies the heightened Rule 9(b) particularity standard to the loss causation element. *In re Bolf Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (noting that Rule 9(b)'s particularity requirement "usually adds little to the plaintiff's burden" because "plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" (citation omitted)). For fraud-on-the-market cases, such as this one, to establish loss causation, Plaintiffs "must show that after purchasing her shares and before selling, the following occurred: (1) 'the

truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Id.* at 786 (quoting *Dura Pharmaceuticals*, 544 U.S. at 769). Plaintiffs commonly use "corrective disclosures" to prove that "the truth became known."[12] *Id.* at 790.

Defendants contend that the FAC fails to adequately plead loss causation because it is unclear whether share prices declined as a result of alleged corrective disclosures or due to the impact of the reverse stock splits and Mullen's financing dynamics. *See* MTD at 28; Reply at 27. The Court disagrees.

With respect to the alleged misstatements regarding the MAEO battery technology, Plaintiffs rely on numerous corrective disclosures: (1) a June 6, 2023 interview between Michery and a "Youtube page, Financial Journey" where Michery specified that Hardge provided the data "showing that these units performed at whatever level we had advertised," essentially retracting prior representations that Mullen's engineers independently confirmed the testing, FAC at ¶ 141; (2) a June 8, 2023 article published by Jalopnick.com that debunked EVT's testing of the battery technology, *id.* at ¶ 143; (3) a July 17, 2023 news article issued by WUSA9 reporting that the purported EV technology was "untested and practically impossible," *id.* at ¶ 147; (4) a July 22, 2023 article published by Carscoops.com reporting the cancellation of the $680,000 contract Mullen had with the city of Washington, D.C., *id.* at ¶ 151; and (5) an August 7, 2023 article published by WUSA9 reiterating that the purported battery technology did not exist, *id.* at ¶ 153. Plaintiffs adequately allege that Mullen's stock prices dropped in response to the disclosures. *See id.* at ¶¶ 142, 144, 150, 152. For the Volt Mobility statements, Plaintiffs rely on a March 20, 2025 notice that Mullen sent to Volt Mobility terminating the August 23, 2024 Volt Purchase Agreement. *Id.* at ¶ 192. Plaintiffs argue this was "a tacit admission to investors, of the fact that Mullen could not fulfill its obligations to Volt Mobility and could not deliver legally-drivable vehicles to the [UAE] because it could not meet homologation standards." *Id.* Plaintiffs allege Mullen's stock price dropped 30.6% based on this news. *Id.* at ¶ 193.

At the pleading stage, the FAC sufficiently alleges loss causation for the statements regarding the MAEO battery technology and Volt Mobility deal.

//
//
//

---

[12] "A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* at 790 (quoting 15 U.S.C. § 78u-4(e)(1)).

**4. PSLRA Safe Harbor**

Under the PSLRA's "safe harbor" provision, even where a plaintiff properly pleads all six elements of a Section 10(b) violation, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys.*, 865 F.3d at 1141; 15 U.S.C. § 78u-5(c)(1). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003). Defendants contend a number of the challenged statements are forward-looking. MTD at 21. The Court assesses only the surviving statements.

The Court begins with the statements about the MAEO battery technology, which include the April 18, 2023 press release (FAC at ¶¶ 119–20), April 20, 2023 press release (FAC at ¶ 122) and the two May 15, 2023 press releases (FAC at ¶¶ 132, 136). All four statements contain specific assertions of past or present fact, which means they are not protected under the safe harbor provision. *In re Quality Sys.*, 865 F.3d at 1142 ("[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts."). The April 18, 2023 press release describes the battery technology as "known" and "verified" and claims it has "immediate and key implications for electric vehicles." FAC at ¶ 120. The April 20, 2023 press release and May 15, 2023 press release discuss specific test results and improvements to "current EV performance." *Id.* at ¶¶ 122, 132. The May 15, 2023 press release announced the "previously awarded" contract with the city of Washington D.C. for the installation of EMM units. *Id.* at ¶ 136. In the press release, Michery stated that "testing and installations continue" in D.C. *Id.* The safe harbor provision does not protect statements containing misleading or false statements about current or past facts, even if they are combined with forward-looking statements. *In re Quality Sys.*, 865 F.3d at 1142.

As for the August 26, 2024 press release (FAC ¶ 165) and two "X" posts (FAC at ¶¶ 167, 169), Defendants attempt to argue that statements to the effect of "deliveries to begin immediately" and "initial vehicle shipment to begin immediately" are forward-looking. MTD at 21. In support, Defendants cite to *In re ECOtality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 WL 4634280, at *5 (N.D. Cal. Sept. 16, 2014). The statement discussed in *ECOtality*, however, was "[w]e'll begin deliveries of the [product] by Q3 of this year." *Id.* There is a difference between beginning a delivery in a *future* quarter, and deliveries beginning *immediately*. The September 20, 2024 press release (FAC at ¶ 179) and January 24, 2025 FY 2024 10-K statement (FAC at ¶ 186) each contain concrete assertions of current or past fact. The September 20, 2024 press release announced that

"Mullen's technical and sales team members arrived" in Dubai to "support initial market launch activities." FAC at ¶ 179. The FY 2024 10-K statement asserts the past fact that "Mullen has fulfilled its initial commitment by providing vehicles to support homologation" and its current investigation into alternative distributors in the UAE. FAC at ¶ 186. In addition, to the extent Plaintiffs challenge these statements, along with the November 8, 2024 prospectus, based on Defendants' omission of present facts (i.e., that Mullen's vehicles were nowhere near equipped to be homologated to the UAE's standards), the safe harbor provision does not apply. *See Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (noting PSLRA's safe harbor provision does not apply to statements that misleadingly omit past or present facts).

Accordingly, Plaintiffs' claims based on the remaining statements are not barred by the PSLRA.

**5. Scheme Liability Allegations**

Subsections (a) and (c) of Rule 10b-5 make it unlawful to "employ any device, scheme, or artifice to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a), (c). To state a claim for securities fraud based on scheme liability, a plaintiff must allege the same elements of a securities fraud claim, but instead of relying solely on material misrepresentations or omissions, a plaintiff must allege that "the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015); *see also ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). The plaintiff must allege that *each* defendant committed their own deceptive or manipulative act in furtherance of the scheme. *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997).

"Manipulation" is a "term of art" that "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). "[N]ondisclosure is usually essential to the success of a manipulative scheme." *Id.* at 477. "The deception arises from the fact that investors are misled to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'" *ATSI Comms.*, 493 F.3d at 100 (citation omitted).

Plaintiffs allege a scheme where Defendants would engage in the following cycle: (1) issue misleading press releases and announcements to generate investor interest and drive up Mullen's stock prices; (2) sell warrants and convertible notes to "preferred investors" who would then sell common stock to retail investors for a profit; (3) reveal that the previously announced deals were

terminated, thereby causing stock prices to fall; and (4) effect a reverse stock split to meet the Bid Price Requirement. FAC at ¶¶ 73–99.

Plaintiffs allege that the following acts go beyond the misrepresentation and omission allegations: First, Defendants created a Series AA Preferred Stock which allowed the holder of such stock to have 1,300,000,000 votes per share. Michery purchased one Serries AA share for $25,000, giving him immense voting power at the January 19, 2023 Special Meeting of Stockholders, where there was a vote on the reverse stock split proposal. *Id.* at ¶¶ 100–106. After Michery redeemed a share of Series AA Preferred Stock, Mullen eliminated the Series AA Preferred Stock. *Id.* at ¶ 106. Second, Defendants sold over $300 million of warrants and convertible notes to certain preferred investors. The investors allegedly made a profit by converting the warrants into common stock to sell to retail investors just before Mullen's stock prices fell. *Id.* at ¶¶ 82–90.

Defendants argue that Plaintiffs' claim fails because a scheme to manipulate cannot be based on information disclosed to the market. *See* Reply 7–8. The Court agrees. Mullen's shareholders approved the proposal to authorize reverse stock splits on January 19, 2023, which was disclosed to investors in a Form 10-Q that was filed on May 15, 2023. FAC at ¶ 105; *see* Pelaez Decl., Exhibit 11 [Doc. # 76-11 at 11]. Plaintiffs do not dispute that this information was disclosed, and that each reverse stock split was disclosed prior to being effected. *See* Opp. at 33. Instead, Plaintiffs contend that Defendants hid additional information for "months ahead of time" and cite to Paragraphs 100 to 107 of the FAC. *Id.* at 33–34. Plaintiffs do not specify, however, which information, if any, in Paragraphs 100 to 107 was concealed. The fact that Michery "controlled a sufficient portion of voting shares to approve each of the reverse stock splits on his own" is not itself manipulative where "Plaintiffs do not allege that this fact was not disclosed to the investing public." *Onel v. Top Ships, Inc.*, 806 Fed. App'x 64, 67 n.2 (2d Cir. 2020) (market manipulation claims need specific allegations of nondisclosure). Plaintiffs have not sufficiently alleged that Defendants were sending a false signal to the market. *Silverberg v. DryShips, Inc.*, No. 17-cv-4547 (BMC), 2024 WL 4450793, at *5 (E.D.N.Y. Oct. 9, 2024) ("[S]o long as the reason for the split is disclosed and investors have the option of voting against or selling before (or probably right after) the split, no one is being fooled. There is no false signal."). What remains to support the scheme claim are the misleading statements about the MAEO battery technology and Volt deal, which are insufficient alone to support a claim under Subsections (a) and (c) of Rule 10b-5.

Accordingly, the Court **DISMISSES** Count One of the FAC against all Defendants, with leave to amend.

**B. Exchange Act Section 20(a) Claim**

Under Section 20(a) of the Exchange Act, certain "controlling" individuals can be held jointly and severally liable for violations of Section 10(b). *See* 15 U.S.C. § 78t(a). The two elements of a Section 20(a) claim are: (1) "a primary violation of federal securities law"; and (2) "the defendant exercised actual power or control over the primary violator." *Glazer*, 63 F.4th at 765 (internal quotation marks and citation omitted). "Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of Section 10(b)." *Zucco*, 552 F.3d at 990; *see also In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) ("Controlling persons liability under Section 20(a) of the Exchange Act is derivative, such that there is no individual liability where there is no primary violation of securities law.").

The FAC adequately pleads a primary violation of Section 10(b) against Defendants Michery and New. To state a Section 20(a) claim against them, the FAC must adequately allege that each is a controlling person. Defendants argue that the individual defendants' status as an executive is insufficient to show control. MTD at 31 (citing *Katz v. China Century Dragon Media, Inc.*, No. CV 11-2769-JAK (SSx), 2011 WL 6047093, at *2 (C.D. Cal. Nov. 30, 2011)). Defendants overlook the additional facts that Plaintiffs plead, including that Michery oversaw Mullen's day-to-day business, spoke on behalf of the company, had sole authority over the treasury, and was designated as the "Chief Operating Decision Maker" in SEC filings. FAC at ¶ 20. As for New, Plaintiffs allege that he had authority and oversight over Mullen's business and was privy to Mullen's business deals with potential partners and buyers, including the purchase agreement with Volt Mobility. *Id.* at ¶ 21. Such allegations are sufficient to adequately plead that New and Michery were each a "control person." *See SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).

**IV.**
**CONCLUSION**

In light of the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendants' MTD. The following claims are **DISMISSED with leave to amend**:

- Count One for violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against all Defendants;
- Count Two for violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) against all Defendants insofar as the claim is based on statements alleged in the following paragraphs of the FAC: ¶¶ 108, 110, 112, 120 (dismissed only as to the statement about Hardge's conviction/expungement), 126, 134; and

- Count Two for violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) against New insofar as the claim is based on statements pertaining to the MAEO battery technology.

Plaintiffs shall file a Second Amended Complaint or a notice of intent not to amend by **October 23, 2026**. Defendants' response shall be filed within 21 days after the filing of the Second Amended Complaint or notice of intent to proceed on the FAC.

**IT IS SO ORDERED.**